Jenkens & Gilchrist
A PROFESSIONAL CORPORATION
225 WEST WASHINGTON STREET
SUITE 2600
CHICAGO, ILLINOIS 60606-3418
(312) 425-3900
FACSIMILE (312) 425-3909
www.jenkens.com

AUSTIN, TEXAS
(512) 499-3800
DALLAS, TEXAS
(214) 855-4500
HOUSTON, TEXAS
(713) 951-3300
LOS ANGELES, CALIFORNIA
(310) 820-8800
SAN ANTONIO, TEXAS
(210) 246-5000
WASHINGTON, D.C.
(202) 326-1500

January 2, 2001

**CONFIDENTIAL**
**ATTORNEY-CLIENT PRIVILEGED**

Mr. Jeffrey F. Welles
780 Third Avenue
Suite 3400
New York, NY 10017

Dear Mr. Welles:

You have requested us to review the United States federal income tax consequences of a number of transactions in which you have been involved and to provide our opinion regarding certain material United States federal income tax issues. Such transactions are described below under the heading "Facts."

In connection with this opinion, we have examined such matters of law, and such limited liability company, corporate, and partnership records and such other agreements, certificates, instruments and documents, and we have made such other inquiries of officers, owners and representatives of the entities involved, as we have deemed necessary to render the opinions set forth herein. We have without any investigation or independent confirmation relied upon and assumed the accuracy of the responses to such inquiries and such certificates, limited liability company and partnership records and other documents with respect to factual matters.



PENGAD-Bayonne, N. J.
Exhibit 9

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION



**FACTS**

In particular, our opinion is based upon the following facts:

1. On March 24, 2000, you contributed shares of Therma-Tru Corporation (the "Shares") to Stobie Creek Investments LLC, a Delaware limited liability company which is treated as a partnership for Federal income tax purposes[1] (the "Partnership").

2. On March 31, 2000, you, through a Delaware limited liability company wholly owned by you, JFW Investments, L.L.C. ("JFWLLC"), entered into certain over-the-counter, non-publicly traded European style foreign currency option positions on the Euro and the Swiss Franc (the "Options") with Deutsche Bank AG New York Branch ("Bank"), an unrelated substantive counter party. Specifically, you bought digital options on (1) the Euro/U.S. Dollar exchange rate at a strike price of 0.9912 U.S. Dollars per 1.00 Euro with an expiration date of April 17, 2000, a settlement date of April 19, 2000 and a payoff amount of $19,325,000, and paid a premium of $9,662,500 and (2) the Swiss Franc/U.S. Dollar exchange rate at a strike price of 1.7027 Swiss Francs per 1.00 U.S. Dollar with an expiration date of April 17, 2000, a settlement date of April 19, 2000 and a payoff amount of $19,325,000, and paid a premium of $9,662,500 (collectively referred to herein as the "Long Option"). Additionally, you sold (1) a digital option on the Euro/U.S. Dollar exchange rate at a strike price of 0.9914 U.S. Dollars per 1.00 Euro and received a premium of

---

[1] Under federal income tax law, a limited liability company is a business entity that is eligible to elect its classification for federal tax purposes. As an eligible entity, a limited liability company with at least two members can elect to be classified as either an association (and thus a corporation) or a partnership. See Treas. Reg. §301.7701-3(a). Unless the entity elects otherwise, a domestic eligible entity is a partnership if it has two or more members. Treas. Reg. §301.7701-3(b)(i). Hence, for purposes of this opinion letter, Stobie Creek Investments LLC will be referred to as the "Partnership" and its members as "Partners."

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION



$9,565,875, with an expiration date of April 17, 2000, a settlement date of April 19, 2000, and a payoff amount of $19,131,750 and (2) a digital option on the Swiss Franc/U.S. Dollar exchange rate at a strike price of 1.7029 Swiss Francs per 1.00 U.S. Dollar and received a premium of $9,565,875, with an expiration date of April 17, 2000, a settlement date of April 19, 2000, and a payoff amount of $19,131,750 (collectively referred to herein as the "Short Option").

3. On April 3, 2000, you contributed the Options to the Partnership as a contribution to capital.

4. On April 17, 2000, the Partnership's Option positions terminated.

5. On April 30, 2000, you contributed your interest in JFWLLC to JFW Enterprises, Inc. ("JFW INC."), a Delaware corporation in which you are the 100% shareholder, as a contribution to its capital. The Partnership made, or intends to make, with respect to its taxable year ending April 30, 2000, an election pursuant to section 754 of the Internal Revenue Code of 1986, as amended (the "Code").

**OPINION**

Based on the following discussion and analysis and subject to the qualifications, limitations and assumptions set forth herein, we are of the opinion that under current U.S. federal income tax law it is more likely than not that:

A. JFWLLC, as a single member limited liability company, should be disregarded as an entity for federal income tax purposes.

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION



B. Investing in the Options should not be taxable and the Options should be treated as separate instruments for federal income tax purposes.

C. The Partnership should be classified as a partnership for federal income tax purposes.

D. Your contributions of the Options to the Partnership should not result in a taxable gain or loss.

E. The Short Option should not be a liability within the meaning of Code section 752.

F. Your basis in your interest in the Partnership after the contribution of the Options should include the cost of the Long Option contributed, without adjustment for the Short Option.

G. An adjustment to your adjusted basis in your Partnership interest should be required as a result of the expiration of the Options, due to the recognition of loss on such expiration under Code section 1234.

H. Your contribution of your interest in JFWLLC to JFW INC. should be treated as a transfer of JFWLLC's interest in the Partnership and should not be a taxable transaction and JFW INC.'s basis in the Partnership interest contributed by you as a result of your contribution of your interest in JFWLLC should be equal to your basis as of the date of such contribution.

I. Your basis in your interest in JFW INC. should be increased by an amount equal to the adjusted basis of your interest in the Partnership as of the date of contribution.

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION



J. The effect of the Code section 754 election should be that the Partnership's basis in its property should be increased with respect to JFW INC.

K. The step transaction and sham transaction doctrines should not apply to the transactions described herein.

L. Treasury Regulation section ("Treas. Reg. sec.") 1.701-2 should not apply to the transactions described herein.

The opinions set forth above are subject to the following qualifications, limitations and exceptions:

No opinion is expressed about the tax treatment of the described transaction for purposes of any state or local income tax, or any tax other than the United States federal income tax.

Any misstatement of a material fact or omission of any fact that may be material or any change in any of the facts referred to may require a modification of all or a part of our opinions.

Our opinions are limited to the matters expressly set forth herein and no opinion may be implied or inferred beyond the matters so stated. The opinions expressed herein are based upon our interpretation of current law. The opinions expressed herein are not binding on the Internal Revenue Service (the "IRS" or the "Service") or the courts, and there can be no assurance that the IRS and the courts will not take a position contrary to the opinions expressed herein. In fact, on August 11, 2000, the IRS issued Notice 2000-44, which describes two transactions with respect to which the

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION



IRS concluded that tax losses generated were "artificial" and not allowable to the taxpayer.[2] One of the described transactions in Notice 2000-44 bears similarities to the transactions described in our enclosed opinion. While Notice 2000-44 sets forth the IRS position on such loss generation transactions, the Notice does not change the existing law which we rely upon herein.[3]

We do not undertake to advise you of any changes in law which may occur after the date hereof. The Code, the regulations promulgated thereunder, and the administrative position of the IRS are subject to change either prospectively or retroactively. Such changes could render certain or all of the opinions expressed herein inapplicable.

For purposes of all of the above opinions, we are relying on the truth of the representations of you and/or partners or representatives of the Partnership or partners or representatives of JFW INC.

The opinions expressed herein are furnished by us solely for your benefit and for the benefit of the Partnership and JFW INC. and they may not be relied upon or delivered to any person other than you, JFWLLC, the Partnership and JFW INC. and your successors or assigns without our express, prior written approval.

---

[2] 2000-35 I.R.B. 6700. The IRS views Notices as "the equivalent of Revenue Rulings and Revenue Procedures." Rev. Rul. 87-138, 1987-2 C.B. 287. Revenue Rulings and other IRS administrative authority such as Notices do not have the force and effect of law. True Oil Co. v. C.I.R., 170 F.3d 1294 (10th Cir. 1999), *citing*, Storm Plastics, Inc. v. United States, 770 F.2d 148, 154 (10th Cir. 1985). Courts have held that they merely represent the IRS's litigating position. *See e.g.*, Stubbs Overbeck & Associates v. U.S., 445 F.2d 1142, 1146-47 (5th Cir. 1971); Neuhoff v. Commissioner, 75 T.C. 36, 46 (1980). "[A]lthough they are entitled to some consideration, they do not control when contrary to statute or the expressed intention of Congress." True Oil Co. v. C.I.R., 170 F.3d 1294 (10th Cir. 1999), *citing*, Storm Plastics, Inc. v. United States, 770 F.2d 148, 154 (10th Cir. 1985).

[3] For a more thorough discussion of Notice 2000-44, see Section M, below.

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION



**REPRESENTATIONS**

You and/or partners of the Partnership and/or officers of JFW INC. have represented the following: all

a. You entered into the purchase and sale of the Options for substantial nontax business reasons, including (i) to produce overall economic profits because of your belief that the Euro/U.S. Dollar exchange rate and the Swiss Franc/U.S. Dollar exchange rate would change; and (ii) your belief that the most direct way, with the most leverage, to realize gain from expected changes in currency prices was the purchase and sale of the Options.

b. You contributed the Options to the Partnership for substantial nontax business reasons, including, but not limited to, potential diversification of the risks of certain investments, the desire to co-invest as partners with the other members and for your convenience.

c. Your contribution of your interest in JFWLLC to JFW INC. was made for substantial nontax business reasons, including, but not limited to, the ability to engage in estate planning, shared investment management, ownership with other anticipated shareholders, and asset protection planning.

d. Neither you, JFWLLC, the Partnership, nor JFW INC. were obligated to engage in any transaction to which our opinions herein relate upon the completion of any other of such transactions.

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION



e. To the best of your knowledge, you have provided to us all the facts and circumstances necessary for us to form our opinion.

**APPLICABLE LAW**

Our analysis of the applicable United States federal income tax law with respect to the above-stated facts and in support of each of the lettered opinions as set forth on pages 3 through 5 hereof is attached, with each attachment lettered to correspond to each such opinion.

Based on the foregoing and subject to the qualifications, limitations and assumptions set forth herein, we are of the opinion that the described tax consequences have substantial authority and that it is more likely than not that you will prevail if challenged by the IRS.

Very truly yours,

Jenkens & Gilchrist

JENKENS & GILCHRIST

## A. SINGLE MEMBER LIMITED LIABILITY COMPANY DISREGARDED FOR FEDERAL INCOME TAX PURPOSES

***General***

The IRS issued revised regulations promulgated under Code section 7701 on December 17, 1996 (the "Classification Regulations"). T.D. 8697. In general, these regulations provide that, effective January 1, 1997, any domestic business entity which is not a corporation and which has a single owner will be disregarded as an entity separate from its owner unless the entity elects otherwise. Treas. Reg. sec. 301.7701-3(b)(1)(ii).

***JFW Investments, L.L.C.***

JFWLLC was formed under a Certificate of Formation filed with the State of Delaware on March 17, 2000. JFWLLC is a domestic entity which is not a corporation and you own 100% of the membership interest in JFWLLC. Under the rules provided in the Treasury Regulations, JFWLLC should be disregarded as a separate entity. Neither you nor JFWLLC elected nor intend to elect to be classified as a partnership or as an association taxable as a corporation. Accordingly, it is more likely than not that the IRS should regard you as the owner of the assets held in the name of JFWLLC. As a result, your transfer of your interest in JFWLLC to JFW INC. will more likely than not be treated as a transfer to JFW INC. of JFWLLC's interest in the Partnership.

## B. INVESTING IN THE OPTIONS IS NOT TAXABLE AND THE OPTIONS SHOULD CONSTITUTE SEPARATE TRANSACTIONS

You sold the Short Option on March 31, 2000. Receiving an option premium is more likely than not, not a taxable transaction, as the option writer cannot determine whether the option will be exercised or will lapse. In Rev. Rul. 58-234,1958-1 C.B. 279, the Service held that no income, gain, profits, or earnings are derived from the receipt of either a "put" or "call" option premium unless and until the option expires without being exercised, or is terminated upon payment by the optionor of an amount less than the premium.

Also, on March 31, 2000 you bought the Long Option. This is a mere investment transaction, the taxation of which will more likely than not also be determined upon its exercise or lapse.

Once the Options are exchanged or lapse, their taxation will more likely than not be governed by Code section 1234.

In determining the tax consequences of the transactions involving the Options, a threshold issue concerns whether each of the Long Option and the Short Option would be regarded as separate transactions or instead would be somehow integrated into a single transaction.

First, the timing of income, gains, deduction and losses from a hedging transaction must match those of the hedged transaction. Treas. Reg. sec. 1.446-4. A hedge is a transaction entered into in the normal course of a taxpayer's trade or business. It does not appear that an entity involved in the Option transactions will hedge the economic risk with any other entity involved in the transaction. Specifically, both the Partnership and Bank retain real net economic risk which neither will hedge with the other. Also, since you entered into the Long Option and the Short Option as an investment activity, and not as a trade or business, it is more likely than not that the hedging regulations will not be applicable. See Treas. Reg. sec. 1.445-4(a) and Treas. Reg. sec. 1.1221-2(b).

Second, even where one transaction may significantly offset the risk of the other, this factor alone is generally not sufficient to integrate otherwise separate transactions that would be given separate effect. See, e.g., Code section 1092 (deferring the loss on one "leg" of a straddle until gain is recognized on the other, but not netting the offsetting positions); Code section 1258 (recharacterizing as ordinary income certain gain attributable to the time value of a taxpayer's investment transaction, but not recharacterizing it as a borrowing) and Code section 1259 (describing treatment of a constructive sale).

Third, Code section 988 transactions, which involve foreign currency transactions, may not be integrated. Specifically, Treas. Reg. sec. 1.988-1(e) provides in relevant part:

> [T]he amount of exchange gain or loss from a section 988 transaction shall be separately computed for each section 988 transaction, and such amount shall not be integrated with gain or loss recognized on another transaction (whether or not such transaction is economically related to the section 988 transaction).

As discussed below in Section G, the acquisition and disposition of each of the Long Option and the Short Option are Code section 988 transactions.

Fourth, a critical factor in determining if two instruments should be treated as one is whether they can be transferred or assigned independently of one another. For example, Code section 269B provides for the special treatment of a stapled entity, which occurs where the stock of one entity cannot be traded without trading the stock of the other entity. Here, however, each Option is not a stapled entity as described under Code section 269B because it can be transferred, assigned, or liquidated independently of the other. It does not appear that Congress has attempted to treat non-stapled entities as a single entity.

Finally, courts have long recognized that a taxpayer can hold long and short positions in property at the same time, and that each position is a separate property. See Smith v. Commissioner, 78 T.C. 350 (1983), aff'd, 820 F.2d 1220 (4th Cir. 1987) (holding that each leg of a straddle should be treated as separate property, regardless of whether the legs were acquired at different times or at the same time); see also, Stoller v. Commissioner, 994 F.2d 855 (DC Cir. 1993), aff'g in part and rev'g in part, 60 TCM 1554 (1990) (respecting separate contracts as stand-alone transactions); Richardson v. Commissioner, 121 F.2d 1 (2d Cir. 1941) (finding that long and short positions can be held simultaneously); Rev. Proc. 65-29, 1965-2 CB 1023; Rev. Rul. 78-182, 1978-1 CB 265.

Based on the foregoing, the Options will be more likely than not treated as separate instruments for federal income tax purposes.

## C. CLASSIFICATION OF THE PARTNERSHIP AS A PARTNERSHIP FOR FEDERAL INCOME TAX PURPOSES

In determining the tax consequences of the transactions involving the Partnership, a threshold issue is its classification for federal tax purposes. Code section 7701(a)(2) defines the term "partnership" to include a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of the Code, a trust, estate or corporation. See also Code section 761(a). The term "partner" includes a member in such a syndicate, group, pool joint venture or organization. Code section 7701(a)(2). The classification of an entity as a partnership under state law is not determinative of its classification for federal tax purposes.

Under the Classification Regulations, effective January 1, 1997, any business entity which is not classified as a corporation for federal tax purposes, and which has two or more owners can choose to be classified as either a partnership or an association taxable as a corporation, and if no such election is made, will by default be classified as a partnership. Treas. Reg. sec. 301.7701-2, -3. Entities which are classified as corporations for federal tax purposes include (1) a business entity organized under a Federal or State statute, or under a statute of a federally recognized Indian tribe, if the statute describes or refers to the entity as incorporated or as a corporation, body corporate or body politic; (2) an entity which elects to be classified as an association; (3) a business entity organized under a State statute, if the statute describes or refers to the entity as a joint stock company or joint-stock association; (4) an insurance company; (5) a State-chartered business entity conducting banking activities; (6) a business entity wholly owned by a state or political subdivision thereof; (7) a business entity that is taxable as a corporation under a provision of the Code other than section

7701(a)(3); and (8) certain foreign entities, as more fully provided in the Treasury Regulations. Treas. Reg. sec. 301.7701-2(b).

***The Partnership***

Stobie Creek Investments LLC, a Delaware limited liability company, was formed under a Certificate of Formation dated March 3, 2000, and governed by an Operating Agreement dated March 3, 2000 (the "Partnership Agreement"). More than one person owned an equity interest in the Partnership. Neither the Partnership nor any partner has filed an election to treat the Partnership as an association taxable as a corporation. The Partnership did not constitute a corporation under any other provision of the Treasury Regulations. Accordingly, the IRS should regard the Partnership as a partnership rather than a corporation for tax purposes.

***Potential IRS Arguments***

There are three grounds on which the IRS conceivably could argue that the Partnership should not be treated as a partnership for federal tax purposes. First, the IRS might allege that the Partnership lacked a profit motive. To this end, the IRS perhaps would claim that the partners used the Partnership to serve tax purposes. Second, the IRS could allege that no true partnership existed. For reasons set forth below, you should prevail if the IRS challenges the classification of the Partnership on either of these grounds. Finally, the IRS might argue that the Partnership should be disregarded pursuant to the Subchapter K anti-abuse regulation. That regulation is analyzed separately in this opinion.

It is generally understood that to qualify as a partnership for tax purposes, the organization must have a profit objective. Hence, a venture formed to pursue a hobby or artistic interest, instead of economic profits, has been held not to constitute a partnership for income tax purposes. Ewing

v. Commissioner, 20 T.C. 216 (1953), affd., 213 F.2d 438 (2d Cir. 1954). However, the Tax Court has treated a tax shelter limited partnership as a partnership for tax purposes despite its determination that the entity lacked a profit motive. Brannen v. Commissioner, 78 T.C. 471, 512 n. 16 (1982), affd. 722 F.2d 695 (11th Cir. 1984). See also National Commodity & Barter Association v. United States, 843 F.Supp. 655 (D. Colo 1993) (membership organization that carried on financial operations and tax protester activities lacked profit motive but was classified as a partnership). In addition, the IRS has on at least one occasion indicated that the absence of a joint profit motive does not prevent an arrangement from being a partnership for tax purposes. In PLR 7903084, the IRS classified an arrangement between co-owners of environmental protection equipment as a partnership, even though the arrangement lacked a joint profit motive. In reaching this conclusion, the IRS stated that the classification principles set forth in Treas. Reg. sec. 301.7701-2 "were developed without reference to, and do not definitely cover, unincorporated organizations (other than trusts) that are engaged in not-for-profit activities." The IRS has also ruled that an unincorporated organization with no profit objective may be classified as a partnership. PLR 9108025 (November 26, 1990).

Assuming that a profit objective is required of entities classified as partnerships for tax purposes, it has been represented that the Partnership possessed that objective. Moreover, as noted below, objectively the Partnership has a realistic ability to profit through changes in values of the various options it holds. In any event, the presence of a tax motive in the formation or use of a partnership historically has never prevented a partnership from classification as such for tax purposes. See, e.g., Commissioner v. Culbertson, 337 U.S. 733 (1949); Slifka v. Commissioner, 182 F.2d 345 (2d Cir. 1950).

The question of whether a partnership actually exists was recently addressed in the case of ASA Investerings Partnership v. Commissioner, T.C. Memo. 1998-305. There, the Tax Court held that no partnership existed for federal income tax purposes between Allied Signal Inc. and a foreign commercial bank. In that case, the partnership, which was primarily capitalized with contributions from such foreign partner, invested in high-grade, floating-rate private placement notes ("PPNs"). The PPNs were subsequently sold in an installment sale in which the consideration was cash and LIBOR-indexed installment notes. Due to the structure of the sale, a large portion of the PPNs' tax basis was allocated to the LIBOR notes. Additional financial instruments were purchased by the partnership, and later Allied Signal purchased most of the foreign partner's interest in the partnership. The LIBOR notes were distributed to Allied Signal, which subsequently sold such notes, generating a large capital loss. While a partnership agreement had been entered into by the parties, other agreements regarding the economics of the series of transactions were also in place. The result of such other agreements was that the foreign partner was to get a certain specified return on its contribution to the partnership. The Court held that to form a valid partnership the parties must have intended to join together in the present conduct of an enterprise, and found, as a factual matter, that the purported partners of ASA had divergent business goals. The Court found that, considering all of the facts and circumstances, the foreign partner was, in reality, a creditor to Allied Signal, rather than its partner.

In the case of the Partnership, each of the partners intended to join together in the common purpose of profiting from the investment in foreign currency option positions and other financial instruments and investments and sharing the losses and profits therefrom. No partner's share was guaranteed or limited. Also, each partner shared proportionality in the income, gain, loss and

deductions of the Partnership. Accordingly, the analysis employed by the court in ASA should be inapplicable and the partnership should be respected.

## D. YOUR CONTRIBUTIONS OF THE OPTIONS TO THE PARTNERSHIP SHOULD NOT RESULT IN A TAXABLE GAIN OR LOSS

***General Rule - Nonrecognition***

Code §721(a) provides that:

> No gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership.

As a result of this general rule, it is more likely than not that your contribution of the Options to the Partnership should not result in taxable gain or loss. Further, it is more likely than not that the exceptions to the general rule listed below, the investment company exception of Code §721(b), the Code §1234(b) exception for closing transactions and the Code §1256(c) exception for mid-year mark to markets, should not apply to your contribution of the Options to the Partnership.

***Investment Company Exception***

It is possible that gain may be recognized on a transfer to a partnership if such transfer qualifies under Code §351 as a transfer to an investment company.[4] Under Code §351(e) and Treas. Reg. §1.351-1(c), a transfer of property qualifies as a transfer to an investment company if:

> (i) the transfer results, directly or indirectly, in diversification of the transferors' interests, and
> (ii) the transferee is
>> (a) a regulated investment company (RIC),
>> (b) a real estate investment trust (REIT), or
>> (c) a company more than 80 percent of the value of whose assets are held for investment and are stocks or securities.[5]

JFW-1325

[4] Code §721(b).

[5] The Taxpayer Relief Act of 1997 amended Code §351(e) to provide that the determination of whether an entity constitutes an investment company is made by including in the definition of stocks and securities: (i) any money; (ii) stocks and other equity interests in a corporation, evidences of indebtedness, options, forward or futures contracts, notional principal contracts and derivatives; (iii) any foreign currency; (iv) any interest in a real estate investment trust, a common trust fund, a regulated investment company, a publicly-traded partnership or any other equity interest which

Because the Options transferred to the Partnership by you were transferred *pro rata* in accordance with your interests in the Partnership, there was no diversification of interests. Therefore, the transfer does not meet the requirement of Treas. Reg. §1.351-1(c)(1)(i), and the Partnership more likely than not should not be classified as an investment company.

***Code §1234(b) Exception for Closing Transactions***

Code §1234(b) provides that gain or loss from any "closing transaction" with respect to an option in property shall be treated as short-term capital gain or loss. Code §1234(b)(2)(A) broadly defines a "closing transaction" as any termination of the taxpayer's obligation under an option, other than through the exercise or lapse of the option.

According to the legislative history, the purpose of enacting this provision was to eliminate taxpayers' ability to enter into arrangements that would allow them to obtain ordinary and capital gain through the acquisition of offsetting options, treated as "closing transactions," thereby triggering the recognition of income.[6] Such arrangements were described in a series of Private Letter Rulings issued to the Chicago Board Options Exchange ("CBOE"), wherein the IRS concluded, among other things, that certain set-off transactions that the taxpayer elected to be treated as "closing transactions"

---

pursuant to its terms or any other arrangement is readily convertible into, or exchangeable for, any asset described in any preceding clause, this clause or clause (v) or (viii); (v) except to the extent provided in regulations prescribed by the Secretary, any interest in a precious metal, unless such metal is used or held in the active conduct of a trade or business after the contribution; (vi) except as otherwise provided in regulations prescribed by the Secretary, interest in any entity if substantially all of the assets of such entity consist (directly or indirectly) of any assets described in any preceding clause or clause (viii); (vii) to the extent provided in regulations prescribed by the Secretary, any interest in any entity not described in clause (vi), but only to the extent of the value of such interest that is attributable to assets listed in clauses (i) through (v) or clause (viii); or (viii) or any other assets specified in the regulations prescribed by the Secretary. Code §351(e)(1)(A) and (B)(i) through (viii).

[6] *See* H. Rpt. No. 94-1192, 94th Cong., 2d Sess., 5 (May 26, 1976).

were recognition events. Consequently, it appears that Code §1234(b) does not create the recognition event itself, but merely determines the character of recognized gain or loss.

In any event, it is more likely than not that Code §1234(b) would not independently cause gain or loss to be recognized by you on the transfer. The Short Option lapsed subsequent to its transfer into the Partnership, thereby disqualifying it from tax treatment under Code §1234(b). As discussed above, the transfer of the Options to the Partnership was more likely than not a nonrecognition event under Code §721; your obligation under the Short Option was not terminated as a result of the assignment. The original option contract was not novated to remove you as a potential obligor.

***Code §1256 Exception***

Code §1256(a) provides that any Code §1256 contract held by the taxpayer at the close of the taxable year shall be marked to market (basis shall be increased to fair market value). Code §1256(c) provides that, with respect to a Code §1256 contract, this rule should also apply to a termination *during the taxable year* that occurs as a result of offsetting, by taking or making delivery, by exercise or being exercised, by assignment or being assigned, by lapse or otherwise. Thus, there is a risk that the mark to market rules could apply to the tax-free contribution to the Partnership.

However, this is unlikely because the mark to market rules only apply to "Code §1256 contracts." Code §1256(b) defines such contracts as any regulated futures contracts, foreign currency contracts, nonequity options, and dealer equity options. Code §1256(g) further provides that both the futures contracts and the options contracts need to be traded or listed on a board of trade or exchange, thus excluding the Options at issue from this definition.

With respect to foreign currency contracts, Code §1256(g)(2)(A) provides that the foreign currency contract must be a contract --

i. which requires delivery of, or the settlement of which depends on the value of, foreign currency which is a currency in which positions are also traded through regulated futures contracts,

ii. which is traded in the interbank market, and

iii. which is entered into at arm's length at a price determined by reference to the price in the interbank market.

Based upon these requirements, the Options should not be marked to market upon contribution to the Partnership. While the Options at issue are contracts for a currency in which positions are also traded through regulated futures contracts, such digital option contracts are not traded in the interbank market. Furthermore, as the legislative history makes clear, a contract between two persons neither of whom is a futures commission merchant or other similar participant in the interbank market is not a foreign currency contract under the provision.[7]

***Conclusion***

Other instances in which income or gain might be required to be recognized upon the transfer to a partnership include when debt relief exceeds the basis of property transferred under the principles of Code §752,[8] or if the contribution were a disguised sale of property to the entity under the principles of Code §707. In your case, such exceptions are more likely than not inapplicable,

---

[7] *See* House Ways and Means Committee Report on P.L. 97-448.

[8] As discussed in Section E below, the Short Option transferred to the Partnership should not constitute a "liability" for purposes of Code §752; additionally, such contingent obligations are generally not taken into account for federal income tax purposes in tax-free transactions, such as partnership formations under Code §721, in accordance with a "step into the shoes" approach. *See, e.g.*, Keyes and Mandarino, "Dealing With Contingent Stock and Contingent Liabilities in Tax-Free Transactions," 52 N.Y.U. 24 (1994).

and the general rule of nonrecognition of gain should more likely than not apply to the contribution by you of the Long Option and the Short Option to the Partnership.

## E. TREATMENT UNDER CODE SECTION 752 OF ASSUMING A SHORT OPTION POSITION

Code §752(b) treats a partnership's assumption of a partner's "liabilities" as a deemed distribution of money by the partnership to such partner, thus decreasing the partner's basis in the partnership. Code §752, however, does not define the term "liabilities." Additionally, no other section of the Code or the Treasury Regulations defines the term "liabilities." Given the lack of a statutory or regulatory definition, the courts have literally interpreted the term "liabilities" for purposes of Code §752 to mean its plain and ordinary meaning,[9] even where a literal interpretation may be inconsistent with the purported policy of Code §752 to equate partnership outside and inside basis.[10]

Courts look to dictionary definitions to determine the plain and ordinary meaning of undefined terms used in the Code. In the recent Salina case, the Tax Court relied on the Black's Law Dictionary definition of "liabilities" to mean "being legally obligated." Another standard dictionary defines a "liability" as "a debt; an amount which is owed," and a "contingent liability" as "an amount resulting from past transactions which may become a liability in the future under certain defined circumstances."[11] Clearly, under these and other dictionary definitions, for there to be a "liability," there must be an "amount," and for the liability to be other than "contingent," this amount must be "owed" or "legally obligated" to be paid.

---

[9] *See, e.g.*, Salina Partnership LP, FPL Group, Inc. v. Commissioner, T.C. Memo 2000-352 (November 14, 2000).

[10] *See, e.g.*, Helmer v. Commissioner, 34 T.C.M. 727 (1975).

JFW-1330

[11] Merriam-Webster International Dictionary of the English Language, Second Edition.

There is currently nothing owed and no current legal obligation to make payment with respect to the Short Option. Instead, the legal obligation with respect to the Short Option comes into being if, and only if, a payment is due with respect to the Short Option pursuant to its terms as a result of the exchange rates on the date the Short Option expires. This potential contractual duty under the Short Option fails to meet the plain and ordinary meaning of a "liability," especially taking into account that the Short Option is a European-style, out-of-the-money option when assumed by the Partnership. Thus, it is more likely than not that the Short Option should not be treated as an assumption of a liability by the Partnership for purposes of Code §752(b). This conclusion is consistent with the tax treatment of options in general and is supported by the authorities interpreting the term "liability" under Code §752.

***<u>Tax Treatment of Options In General</u>***

Based upon case law, the rulings, and the statutes, when issuing a put or call option, the premium should be held in suspense under an open transaction theory until the option expires, lapses, or the writer's potential contractual duty under the option terminates. Additionally, upon the termination of an option on stock, securities or commodities (including foreign currency), the writer recognizes "gain or loss," not "income" (and not cancellation of indebtedness income).

***The Tax Consequences of <u>Issuing</u> an Option***

In Rev. Rul. 58-234,[12] the IRS held that the premium received by the writer (issuer or optionor) of a "put" or "call" option which is not exercised constituted ordinary income under §61 of the 1954 Code, which should be included in his gross income *only for the taxable year in which*

---

[12] 1958-1 C.B. 279.

JFW-1331

*the failure to exercise the option became final.* The IRS based its holding on an "open transaction" approach:

> An optionor, by the mere granting of an option to sell ("put") or buy ("call"), certain property, may not have parted with any physical or tangible assets; but, just as the optionee thereby acquires a right to sell, or buy, certain property at a fixed price during a specified future period or on or before a specified future date, so does the optionor become obligated to accept, or deliver, such property at that price, if the option is exercised. Since the optionor assumes such obligation, which may be burdensome and is continuing until the option is terminated, without exercise, or otherwise, there is no closed transaction nor ascertainable income or gain realized by an optionor upon mere receipt of a premium for granting such an option. The open, rather than closed, status of an unexercised and otherwise unterminated option to buy (in effect a "call") was recognized, for Federal income tax purposes, in A.E. Hollingsworth v. Commissioner, 27 B. T. A. 621, acquiescence, C.B. XII-1, 6 (1933). It is manifest, from the nature and consequences of "put" or "call" option premiums and obligations, that there is no Federal income tax incidence on account of either the receipt or the payment of such option premiums, i e., from the standpoint of either the optionor or the optionee, unless and until the options have been terminated, by failure to exercise, or otherwise, with resultant gain or loss. The optionor seeking to minimize or conclude the eventual burden of his option obligation, might pay the optionee, as consideration for cancellation of the option, an amount equal to or greater than the premium. Hence, no income, gain, profits, or earnings are derived from the receipt of either a "put" or "call" option premium unless and until the option expires without being exercised, or is terminated upon payment by the optionor of an amount less than the premium. Therefore, it is considered that the principle of the decision in North American Oil Consolidated v. Burnet, 286 U.S. 417, Ct. D. 499, C.B. XI-1, 293 (1932), which involved the receipt of "earnings," is not applicable to receipts of premiums on outstanding options.

In Rev. Rul. 78-182,[13] dealing with options listed on the Chicago Board Options Exchange, the Service followed Rev. Rul. 58-234 in holding, *inter alia*, that as to the writer of a put or call, "there is no Federal income tax incident on account of either the receipt or the payment of such option premium, that is, from the standpoint of either the optionor or the optionee, unless and until the options have been terminated, by failure to exercise, or otherwise, with resultant gain or loss."

---

[13] 1978-1 C.B. 265, *citing*, 1958-1 C.B. 279. Because of a 1976 amendment to Code §1234, as noted below, the ruling adds that this gain or loss is now short-term capital gain or loss.

In I.T. 3835,[14] the IRS ruled that the premium received by a writer of a "put" or "call" option which is not exercised constitutes a short-term capital gain, to be taken into account in computing his gross income for Federal income tax purposes, *only for the taxable year in which the failure to exercise the option becomes final.*

In the case of Virginia Iron Coal & Coke Co. v. Commissioner, the taxpayer granted a counter party a four-year option to buy the stock of a subsidiary in exchange for a payment of $300,000 in 1930 and annual payments of $125,000, applied to the purchase price if the counter party exercised the option.[15] After paying $300,000 in 1930 and $125,000 in 1931, the counter party notified the taxpayer in 1933 that it was abandoning the option. The taxpayer, who had not initially reported the receipt of the option premiums, thereupon filed amended returns for 1930 and 1931 and reported the premiums as income for the appropriate year. The Commissioner asserted that the premiums were income in the year the option was abandoned, and the court agreed, adopting an "open transaction" approach:[16]

> It was impossible to tell in 1930 and 1931, when the payments were received, whether they would ultimately represent income to the petitioner or a return of capital. They were to be applied against the purchase price in case of the exercise of the option. Had the option been exercised, they would have represented a return of capital, that is, a recovery of a part of the basis for gain or loss which the property had in the hands of the seller. In that event they would not have been income and

[14] 1947-1 C.B. 53.

[15] 37 B.T.A. 195 (1938).

[16] 37 B.T.A. 197-199. A dissent argued that the taxpayer recognized income in the year of receipt because it had unfettered control of the premium at that time. The dissent added that the income could be included in the year the option was abandoned under only one of two theories, both of which the dissent felt were untenable. The first theory is that the counter party "forfeited" the premiums only in 193 3. That theory was untenable because the taxpayer had absolute control of the funds since 1930, so there was nothing to "forfeit." The second theory was that the value of the abandonment was income. However, if that were the case, the only income would be the difference between the value of the optioned property at the time of the abandonment and the price at which the taxpayer was obligated to convey it.

their return as income when received would have been improper... But in case of termination of the option and abandonment by the Texas Co. of its right to have the payments applied as a part of the purchase price, it would be apparent for the first time that the payments represented clear gain to the petitioner. In that case, since no property would be sold, there would be no reason to reduce the basis of that retained.

Thus it was impossible for either the taxpayer or the Commissioner to determine in 1930 and 1931 whether or not the payments would eventually represent income and how they should be reported. Obviously those years could not be held open for income tax purposes to await the final outcome of such contracts. The taxpayer in this case, after the option to purchase had been surrendered, filed amended returns reporting the payments as income for the years in which received. But returns must be filed in the light of facts known at the time the returns are due. Some other taxpayer might not choose to file amended returns. Then the statute of limitations would foreclose the Commissioner and prevent the collection of taxes lawfully due. If the Commissioner is to make an orderly and uniform collection of taxes in such cases, the tax liability for those earlier years must be determined and closed by collection, without waiting to see whether or not the option is exercised.

Thus it is necessary to exclude such payments from the income of the year in which received and to include them for the later year when, for the first time, a satisfactory determination of their character for income tax purposes can be made. The other party to the contract in the taxable year for the first time released and abandoned its right under the agreements to have the payments applied against the purchase price, and charged off its loss. The recipient then knew for the first time that it could retain the payments without any obligation to apply them against the purchase price. Its property was then free of the option. It had lost nothing, but had retained everything with which it started and had acquired $425,000 in addition. The $425,000 was then income.

The taxpayer argues that, since the funds were received in 1930 and 1931 with the right to retain them forever and to use them without restriction, they should have been accrued as income for those years. Although they were received without any obligation to return them, there was one condition attached to their receipt. That is, they had to be applied against the purchase price in case the option was exercised. That one condition is the determining factor in this case. Until it was removed in 1933, the question of the liability of the recipient for income tax upon the payments had to be held in abeyance.

Based upon this case law, more likely than not, the Short Option position should be treated as an open transaction until the option expires, lapses, or the writer's potential contractual duty under the option terminates.

***The Tax Consequences Upon Termination of the Option***

Code §1234(a)(1) currently provides the following rule: "Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, an option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him)." Rev. Rul 78-182 provides that if a holder sells a put or call option on a capital asset before maturity, any gain or loss recognized at that time is capital gain.[17] As provided in Section D, Code §1234(b) provides that "gain or loss" from any "closing transaction" with respect to an option in property shall be treated as a gain or loss from the sale or exchange of a capital asset held not more than 1 year.[18] Code §1234(b)(2)(A) defines a "closing transaction" as "any termination of the taxpayer's obligation under an option in property other than through the exercise or lapse of the option." As described in Section D, the contribution of the Options to the Partnership was more likely than not, not a closing transaction which triggered Code §1234(b). The Options lapsed on April 17, 2000, subsequent to their transfer into the Partnership. Because of the lapse, the Options are disqualified from Code §1234(b) tax treatment, and thus fall under the general rule of Code §1234(a).

---

[17] 1978-1 C.B. 265.

[18] Rev. Rul. 58-234, 1958-1 C.B. 279.

JFW-1335