***Code §752 Authorities***

The relevant authorities interpreting Code §752 support the conclusion that the Short Option more likely than not is not a "liability" for purposes of Code §752. In Helmer v. Commissioner, the Tax Court held that a transfer of money pursuant to an option agreement and the partnership's obligation to deliver property upon exercise of the Option did not create a partnership liability for purposes of Code §752.[19] Furthermore, analogy can be made to other financial instruments that may or may not be treated as liabilities for purposes of Code §752, such as contingent or speculative items. Although the Tax Court recently held in Salina that a short sale does create a liability for purposes of Code §752,[20] the Tax Court recognized the continuing authority of Helmer and the differences between a short sale and an option. Moreover, the Salina court's adoption of the plain and ordinary meaning of the term "liability" supports not treating a short option as a liability. Although recently enacted legislation provides that a "liability" includes any fixed or contingent obligation to make payment, without regard to whether such obligation or potential obligation is otherwise taken into account, the legislation more likely than not does not apply to the Transactions for the reasons described below.[21]

***The Helmer Case***

In the case of Helmer v. Commissioner, the Tax Court held that a partnership's receipt of money pursuant to an option agreement and the partnership's obligation to deliver property upon

[19] 34 T.C.M. 727 (1975).

[20] *See* Salina Partnership LP, FPL Group, Inc. v. Commissioner, T. C. Memo 2000-352 (November 14, 2000).

[21] *See* H.R. 4577, which became Public Law No: 106-554.

exercise of the option did not create a partnership liability under Code §752.[22] In that case, a partnership owned certain real property on which it granted a corporation a purchase option. In consideration for the option, the corporation paid cash to the partnership. The partnership distributed the cash to its partners. The IRS argued that the option agreement did not create a partnership liability under Code §752 and, thus, the distribution of the option money caused the partners to recognize gain under Code §731 (i.e., the distribution of the option money exceeded the partners' tax bases in their partnership interests).[23] The partners argued that the partnership's obligations under the option agreement (i.e., to transfer the property upon exercise of the option) created a partnership liability under Code §752 which increased the adjusted bases of their partnership interests.

The Tax Court held for the IRS, even though a disparity between partnership inside and outside basis resulted. The Tax Court stated:

> We are faced with a unique situation. Helmer Brothers received payments pursuant to the option agreement when there was no forfeiture of any of the option payments, the options had not been terminated, nor had any portion of the option been exercised by the optionee. Respondent, in his brief, conceded that the income from the option payments was deferrable by the partnership until characterized as ordinary income (because the default by the optionee) or capital gains (because of an exercise of the option by the optionee).
>
> * * * * * * *
>
> The moneys received under the option agreement were free of restrictions except that upon exercise of the option such amounts would be applied against the purchase price. Thus, the restriction only affected the character of the gain in the partnership's hands. It is this lack of ability to determine character of income (not any liability to

---

[22] 34 T.C.M. 727 (1975).

JFW-1337

[23] The Service appears to have asserted in other contexts that a contractual duty under an option constitutes a liability. *Cf.* Rev. Rul. 68-637, 1968-2 C.B. 158, *amplifying*, Rev. Rul. 98-10, 1998-1 I.R.B. 11; Priv. Ltr. Rul. 79--51-128 (September 24, 1979); Priv. Ltr. Rul. 83-03-028 (October 15, 1982).

repay or to perform) that causes the deferral of the recognition of the income by the partnership until the option is either exercised or lapsed.

The Helmer case is a Memorandum Opinion, and while the Tax Court has stated that "we consider neither revenue rulings nor Memorandum Opinions of this court to be controlling precedent," numerous Tax Court decisions nevertheless routinely cite memorandum opinions as precedent.[24] The leading treatise on partnership taxation, without mentioning Helmer's status as a Memorandum Opinion, appears to view it as controlling authority.[25]

***Revenue Ruling 73-301***

In addition, the Helmer decision is consistent with Revenue Ruling 73-301,[26] which held that an unrestricted progress payment received by a partnership did not create a "liability" for purposes of Code §752. In Revenue Ruling 73-301, a partnership received cash progress payments on a construction contract reported under the completed contract method and distributed the cash to its partners.[27] At issue was whether the partnership's duty under the contract caused the advance payments to constitute Code §752 liabilities. If so, the cash distributions to the partners would not

---

[24] Nico v. Commissioner, 67 T.C. 647 (1977), *aff'd in part and rev'd in part on other grounds*, 565 F.2d 1234 (2d Cir. 1977). *See* generally Sommers and Waters, "Tax Court Memorandum Decisions--What are They Worth?," 98 TNT (LEXIS) 138-96 (July 20, 1998). *See also* Anastoff v. United States, 86 AFTR 2d 2000-5724 (August 22, 2000), where the 8th Circuit recently declared unconstitutional a court rule that "unpublished opinion are not precedent." The court's rationale in Anastasoff is that, as far back as 1642, it has been the function of a judge "not to make, but to declare the law, according to the golden mete-wand of the law and not by the crooked cord of discretion." I. E. Coke, Institutes of the Laws of England 51 (1642). Further, the Anastasoff court claims that the ability of a judge to deny ongoing precedential treatment of a case exceeds the "judicial" nature of a judge's authority, as the terms of Article III of the Constitution were meant by the Framers.

[25] McKee, Nelson and Whitmire, *Federal Taxation of Partnerships and Partners* ¶7.01[1] (3rd Ed. 1997).

[26] 1973-2 CB 215.

[27] 1973-2 C.B. 216.

have exceeded the bases of the partners' interests. The IRS refused to accord Code §752 liability treatment to the construction contract, stating:

> The progress payments ... received by the partnership and reflected as 'deferred income' on the books of the partnership ... represent amounts received on account of services performed on the contract not yet reported as gross income. This amount together with the right of the partnership to an additional payment ... for work performed constitute 'unrealized receivables' within the meaning of Section 751(c) of the Code, and the progress payments are not a 'liability' as referred to in Section 752 which increases the adjusted basis of the partnership interests of the partners. The income or loss from performance of the contract will affect the basis of the partnership interest in the partners, as provided in Section 705(a), when such income or loss is recognized for Federal income tax purposes.
>
> Accordingly, no increase in the adjusted basis of the partnership interests... is made as a result of the receipt by the partnership of the advance payments within the meaning of Section 752(a) of the Code.

The IRS disallowed a Code §752 basis step-up, despite the resulting disparity between the inside basis of the partnership's assets and the outside basis of the partnership interests.

A partnership which enters into a short option position is similar to the partnership that received advance payments in Rev. Rul. 73-301. Both contractual duties are uncertain in amount in that the partnerships cannot precisely calculate the cost of fulfilling such potential duties. Both partnerships are reporting their taxable income under specialized methods of accounting which permit deferral of taxable income until completion of performance under an executory contract. Accordingly, like the partners in Rev. Rul. 73-301, the Partners here more likely than not should receive no Code §752 basis adjustment as a result of the potential contractual duty associated with the Short Option position, and the assumption of the Short Option position by the Partnership more likely than not should not be treated as the assumption of a liability.

***Revenue Ruling 95-26***

On March 9, 1995, the IRS held in Revenue Ruling 95-26[28] that a short sale created a partnership liability within the meaning of Code §752. In that ruling, a partnership entered into a short sale of securities on a national securities exchange. The partnership's broker/dealer took securities on hand and sold them on behalf of the partnership. The partnership left the proceeds of the sale with the broker as collateral and deposited additional cash with the broker as further collateral. The partnership was obligated to deliver identical securities to the broker to close out the short sale.

In concluding that the short sale created a partnership liability within the meaning of Code §752, the IRS cited Revenue Ruling 88-77,[29] where the IRS concluded that accrued but unpaid partnership expenses and accounts payable are not liabilities within the meaning of Code §752 for purposes of computing the adjusted basis of a partner's interest in a partnership, except when such liabilities result in the creation of, or an increase in, the basis of property. The IRS concluded in Revenue Ruling 95-26 that a short sale creates just such a liability for two reasons:[30]

---

[28] 1995-1 C.B. 798. *See also* Rev. Rul. 95-45, 1995-1 C.B. 53, regarding contributions of short positions to corporate entities.

[29] 1988-2 C.B. 128.

JFW-1340

[30] 1995-1 C.B. 131, 132. Curiously, the IRS also cited Deputy v. duPont to support its conclusion that a short sale is a liability for purposes of Code § 752. In Deputy v. duPont, the taxpayer entered into a short sale of securities and agreed to pay to the lender of the securities the dividends paid on the securities during the period that the short sale remained open.308 U.S. 488 (1940). The taxpayer claimed the amount that he paid to the lender as a deduction for interest paid or accrued on indebtedness under section 23(b) of the Internal Revenue Code of 1928. The Supreme Court held that the taxpayer's obligation to transfer the dividend to the lender *did not* constitute an indebtedness within the meaning of the statute, stating in pertinent part that "although an indebtedness is an obligation, an obligation is not necessarily an indebtedness." It is illogical to cite a case holding that a short sale is not an "indebtedness" to support the conclusion that a short sale is a "liability."

It should also be noted that the IRS took the opposite approach in Rev. Rul. 95-8 in which it cited Deputy v. duPont to support the conclusion that income attributed to a short sale transaction did not constitute unrelated debt-financed income to a tax-exempt organization because the short sale was merely an obligation. If the standards for determining whether something is a "liability" and an "indebtedness" are the same, it should follow that if a short

(1) a short sale creates an obligation to return the borrowed securities; and
(2) the partnership's basis in its assets is increased by the amount of cash received on the sale of the borrowed securities.

Thus, the Commissioner concluded that the partners' bases in their interests in the partnership should be increased to reflect their shares of the partnership's liability.

The Service's conclusion in Revenue Ruling 95-26 that the inclusion of proceeds in basis automatically causes an obligation to be a "liability" has been criticized by commentators,[31] as the argument has several weaknesses:

1. It is inconsistent with Helmer and Rev. Rul. 73-301. In both the case and the ruling, the cash received increased the basis of a partnership's assets, yet that did not cause a "liability" to come into existence for purposes of Code §752.

2. It is not supported by Rev. Rul. 88-77,[32] the only authority cited explicitly in Rev. Rul. 95-26. This ruling holds that accrued but unpaid expenses and accounts payable are not liabilities of a cash basis partnership for purposes of Code §752. The Service's stated rationale was that an obligation which does not give rise to basis is not a liability. The two subsequent rulings infer from this holding that Rev. Rul. 88-77 stands for the proposition that an obligation which does give rise to basis is a liability. However, Rev. Rul. 88-77 makes no such holding, nor is it authority for such a holding.

---

sale obligation is not an "indebtedness," it is not a "liability" either. The Tax Court, however, recently held in Salina that the meaning of "indebtedness" adopted in Deputy v. duPont is not necessarily the same as "liability" under Code § 752. The Tax Court stated:

> ... the Supreme Court's statement in Deputy v. duPont, *supra* at 497, that "an obligation is not necessarily an 'indebtedness'", which was directed at the taxpayer's obligation to transfer an amount equivalent to the dividends paid on the borrowed securities to the lender, does not constitute a blanket holding that a borrower's obligation to close a short sale by returning the borrowed securities to the lender will never be considered an indebtedness. Moreover, petitioner attempts to equate the term "indebtedness", as contemplated under section 23(b) of the Internal Revenue Code of 1928, with the term "liabilities" as used in section 752, without any meaningful analysis or citation to precedent. We, of course, are in no way constrained (nor prepared) to assume that a liability within the meaning of section 752 must satisfy the definition of an indebtedness as that term is used elsewhere in the Code.

[31] *See, generally*, Cunningham, "Short-Sale Obligations and Basis in Partnership Interests," Tax Notes, Sept. 23, 1996 at 1663; McKee, et al, *supra*.

[32] 1988-2 C.B. 128.

3. It results in a clearly wrong answer in other contexts. For example, assume that a taxpayer borrows $100x, buys an asset, pays down a portion of the liability with other funds, and then contributes the asset to a corporation subject to the liability. Under Code §358(d),[33] the taxpayer's basis in the corporation's stock is his original $100x basis, reduced by the liability. Using the Service's argument, the basis would be reduced by the original full amount of the liability, resulting in a zero basis in the corporation's stock.[34]

Furthermore, the legislative history of Code §357(c)(3), also relied on by the Service in Rev. Rul. 95-26, does not support the Service's argument that a short sale obligation is a liability. As added by the 1978 Tax Act, Code §357(c)(3)(A)(i) excludes from the definition of a "liability" any obligation the payment of which would give rise to a deduction.[35] Code §357(c)(3)(B) then provides that this exclusion shall not apply to any liability to the extent that "*the incurrence of the liability* resulted in the creation of, or an increase in, the basis of any property".[36] The legislative history of this provision provides as an example a cash-basis taxpayer that purchases tools on credit and, before

[33] While in theory the term "liability" could mean different things under different Code sections, in practice both Congress and the IRS have indicated that the terms as used in Code §§357, 358 and 752 are synonymous. In the 1984 Tax Act, Congress amended §704(c) to, *inter alia,* require that accounts payable contributed to a partnership be allocated to the contributing partner and not be treated as a liability of the partnership under Code §752. The conference committee report states that this treatment was intended to be "parallel to the [1978] amendment to §357(c), which also excludes deductible liabilities from the definition of "liability." H.R. Conf. Rep. No. 861, 98th Cong. 2d Sess., 1984-3 (vol 2) C.B. 110-11. In Rev. Rul. 88-77, *supra,* the IRS noted that: "The legislative history accompanying the amendment to §704(c) made by the Tax Reform Act of 1984 explicitly rejected the conclusion reached in Revenue Ruling 60-345 in favor of an interpretation of §752 that is consistent with §357(c)." And in Rev. Rul. 95-74, 1995-2 C.B. 36, in support of its ruling that contingent environmental liabilities were not "liabilities" for purposes of Code §§357 and 358, the Service cited Rev. Rul. 88-77, which addresses the treatment of liabilities under Code §752.

Also, since Code §§357 and 358 work in tandem, it is generally assumed that the terms "liability" in both sections are synonymous. *See* Rev. Rul. 95-74, 1995-2 C.B. 36, "Due to the parallel constructions and interrelated function and mechanics of §§357 and 358, liabilities that are not included in the determination under §357(c)(1) also are not included in §358 determination of transferor's basis in the stock received in the §351 exchange[,]" *citing,* 68 T.C. 223 (1977), *acq.,* 1980-2 C.B. 1; S. Rep. No. 1263, 95th Cong., 2d Sess. 183-85 (1978), 1978-3 C.B. 481-83.

[34] *Cf.* Treas. Reg. §1.356-3(b) (right to acquire stock that is treated as security for purposes of Code §§354 and 355 has no principal amount).

[35] This exclusion from the definition of a liability for purposes of Code §357(c)(3)(A)(i) also applies to Code §358, since it is construed in *pari materia* with Code §357(c)(3).

[36] Emphasis added.

paying for the tools, transfers them along with the related obligation in a Code §351 transfer.[37] In the example, the incurrence of the liability (not the receipt of the tools) created basis in the tools pending actual payment.

By contrast, in the case of a short option, basis is created only because the seller receives cash, not because he incurred a liability. The mere incurrence of the liability could not create basis in either case because of the longstanding principle that contingent and indefinite liabilities assumed by the purchaser of an asset are not part of the cost basis of the asset. As noted above, a short option position, particularly a European-style, out-of-the-money option, is less than contingent. It is speculative.

Moreover, since the potential contractual duty under the short option is contingent, if instead the option had been issued in consideration for property (e.g., machine tools or nonfunctional foreign currency), the basis of the partnership's property would be zero. Thus, the IRS position in Rev. Rul. 95-26 leads to the untenable conclusion that whether a short option is a "liability" depends on the consideration received.[38]

***Salina Partnership: Short Options Compared to Short Sales***

---

[37] S. Rep. No. 1263, 95th Cong. 2d Sess. 183-185 (1978), 1978-3 C.B. 481-483.

[38] In addition to its technical deficiencies, Rev. Rul. 95-26 has questionable pragmatic ramifications. To protect the fisc and perhaps for other policy reasons, the courts and the IRS regularly have avoided broad interpretations of partnership liabilities under Code §752. The uncharacteristically broad interpretation in Rev. Rul. 95-26 has perhaps opened a flood gate for circumventing Code §731(a) and deferring tax on cash distributions that otherwise would exceed the basis of a partner's interest.

A further example of the Service's aversion to determining that a liability exists for federal income tax purposes is found in Rev. Rul. 95-74, in which the Service ruled that contingent environmental liabilities and post-retirement medical liabilities assumed from its parent by a newly created subsidiary of a corporation were not "liabilities" for purposes of Code §§357(c)(1) and 358. In that ruling, the IRS noted that such contingent liabilities had not yet been taken into account by the parent corporation and therefore had neither given rise to deductions nor resulted in the creation of, or increase in, basis in any property of the parent. The same reasoning is readily applied to the potential contractual duty which arises upon entering into a short option position, and for the same reasons a short option position should not be found to be a liability.

On November 14, 2000, the Tax Court issued another Memorandum Opinion, Salina Partnership LP, FPL Group, Inc. v. Commissioner,[39] holding that a limited partnership's short position in Treasury bills generated a partnership liability under Code §752. In Salina, the limited partnership took a substantial short position in U.S. Treasury bills and realized a $344 million short-term capital gain, $337 million of which was allocated to one partner, FPL Group. In 1992, FPL Group claimed a capital loss carryover to offset nearly all of the distributive share of the limited partnership's gain. Two years later the limited partnership was liquidated. FPL Group had increased its outside basis in its interest in the limited partnership by the $337 million gain it had reported in 1992 and claimed large ordinary losses attributable to its interest in the limited partnership for taxable years 1994 through 1997. The Tax Court determined that the Treasury bills generated a liability under Code §752 that was not taken into account in 1992, and the limited partnership therefore did not realize a $344 million short-term capital gain for the 1992 taxable year.

The Service argued that the short sale obligation was a "liability" under the broad definition of "liabilities" adopted in Revenue Rulings 88-77 and 95-26, and that the inclusion of proceeds in basis automatically causes an obligation to be a "liability." Significantly, the Tax Court did not adopt the Service's broad definition of "liabilities" contained in these rulings.[40] Instead, the Tax Court held that "[i]n the absence of any indication that Congress intended otherwise, we apply the term [liabilities] taking into account its plain and ordinary meaning." The Tax Court then looked solely to the Black's Law Dictionary definition of liability to conclude that a short sale did constitute

---

[39] T.C. Memo 2000-352 (November 14, 2000).

[40] Although the Tax Court discusses Revenue Rulings 95-26 and 88-77, nowhere in its opinion did it adopt the Service's reasoning in these rulings. Instead, the Tax Court merely summarized these rulings as the authority relied upon by the Service and held that these rulings do not conflict with Helmer or Revenue Ruling 73-301.

a liability. Under the plain and ordinary meaning of liability, the Tax Court concluded that a short sale was a "liability" because "Salina has a legally enforceable financial obligation to return the borrowed Treasury bills to Goldman Sachs and ABN." The Tax Court also found it significant that Salina has treated the short sale as a liability on its balance sheet.[41]

By contrast, unlike the short sale where there is a fixed current obligation to deliver the same replacement securities, the grantor of an option incurs a legal obligation with respect to a Short Option if, and only if, a payment is due with respect to the Short Option pursuant to its terms as a result of the exchange rates on the date the Short Option expires. Because there is no current obligation under a short option position, there is more likely than not no liability under the plain and ordinary meaning of the term "liability" adopted by the Tax Court in Salina.

The Tax Court also recognized in Salina the continuing authority of Helmer. The taxpayer in Salina argued that the short sale was not a liability under the open transaction principles of Revenue Ruling 73-301 and Helmer. The Tax Court acknowledged that both Rev. Rul. 73-301 and Helmer stand for the general proposition that amounts owed or paid to a partnership or its partners in a transaction that qualifies as an open transaction for tax purposes do not generate adjustments to the partners' outside bases in their partnership interests until the transaction is closed and the tax characteristics of the transaction can be determined. However, the Tax Court went on to state that "the transaction must nevertheless be examined to determine whether the partnership incurred related liabilities that may require partner-level basis adjustments pursuant to section 752." Upon such an

---

[41] Although the Tax Court also noted that its conclusion was "consistent with the policy underlining section 752," it should be emphasized that its decision was "[b]ased upon" the plain and ordinary meaning of the term liability and not on the underlying policy of Code.

examination, the Tax Court concluded that a Treasury short sale did result in creation of a liability, while acknowledging the Helmer court's holding that an option did not:

> Although the two transactions are both considered open transactions for purposes of application of the income tax, the transactions are materially different for purposes of analysis under section 752. The option payments that the partnership received in Helmer v. Commissioner, *supra*, represented fixed payments on the sale of a partnership asset that were free and clear of any claim for repayment or demand for further services. In contrast, Salina's gain or loss on the sale of borrowed Treasury bills was dependent upon the cost to Salina of fulfilling its obligation to replace the borrowed Treasury bills. Consequently, we hold that Helmer v. Commissioner, *supra*, does not support petitioner's position in this case.

By recognizing the continuing authority of Helmer, the Tax Court made clear in Salina that a short sale may be treated differently than a short option for purposes of Code §752. To summarize, the rationale applied in the case of a short sale, as in Rev. Rul. 95-26 and Salina, more likely than not does not apply to a potential contractual duty under a short option, for at least three reasons:

1. As previously discussed, Helmer stands squarely for the proposition that an option position is not a liability.[42]

2. A potential contractual duty under a short option position does not meet the plain and ordinary meaning of a liability adopted by the Tax Court in Salina. Unlike the short sale, where there is a fixed current obligation to deliver the same replacement securities (even if the dollar value of that obligation will change with the price of the item sold short), the grantor of an option incurs no contractual duty until and unless the option is exercised. Since there is no current obligation, there is no liability.[43]

3. The amount of the liability in Rev. Rul. 95-26 is equal to the amount of cash received for the short sale. The rationale in the ruling was that such amount is the amount included in the inside basis of the partnership's assets (i.e., the cash received). As explained herein, this rationale is suspect. Moreover, this rationale was not given by

---

[42] Although the courts in Helmer and Salina focus on the lack of any repayment obligation in Helmer if the option was not exercised, it is significant that the courts did not find a liability with respect to the taxpayer's potential obligation to deliver the property upon exercise of the option. This potential obligation to deliver property upon exercise of the option is similar to the potential contractual obligation upon expiration of the Short Option.

[43] Treating the Short Option as a liability if there is, upon its termination, an amount due should yield the same basis result. See Section G.

the Tax Court in Salina, which did not address how the amount of the liability should have been determined. Nevertheless, in the case of a short sale, the same result is also consistent with a different rationale: the amount of the liability is the cash received because that is the original amount of the obligation, i.e., the amount that the obligee could demand from the obligor were the "obligation" to mature on its date of issuance. It is not necessarily the amount that the obligor might have to pay the obligee to free himself of the obligation.[44] In the case of a short sale, this amount is the original cost of purchasing replacement securities. By contrast, in the case of an out-of-the-money short option, the amount that the obligee could demand were the option to expire on that date is zero. Thus, even assuming that both the short sale and the short option create "liabilities," the amount of the option liability, unlike the short sale liability, is zero.

***Contingent or Speculative Commitments***

The courts have consistently held that commitments which are contingent or speculative are not liabilities for purposes of Code §752, a principle which the IRS has consistently followed.[45] The IRS and the courts reason that contingent or speculative commitments cannot give rise to basis.[46]

---

[44] *Accord*, Rev. Rul. 95-45, where the short seller received $1,000x in sale proceeds and contributed them in a Code §351 transfer when replacement securities would cost $800x. The transferee assumed the transferor's obligations to deliver identical securities. The IRS ruled that the assumed obligation was a "liability" in the amount of $1,000x. Similarly, disregarding the OID rules (which are an overlay on the common tax law of debt obligations and in any event apply only after a *de minimis* threshold), the amount of a debt obligation is set when the obligation is issued. It does not change with fluctuations in interest rates or the issuer's credit rating, even though these changes would affect the value of the debt obligation and therefore the amount that an economically rational issuer would pay the holder to discharge the debt. Also, while discharge of indebtedness income is measured by the original issue price and not by the face amount, for numerous other tax purposes the amount of a debt obligation is its face amount, i.e., the amount that the holder would receive at maturity. *See, e.g.*, Code §§146(a), 453A(c)(4), 691(a)(5)(B).

[45] *See* Long v. Commissioner, 660 F.2d 416 (10th Cir. 1981), *affg.*, 71 T.C. 1 (1979); Brountas v. Commissioner, 692 F.2d. 152 (1st Cir. 1982).

[46] *See* Denver & Rio Grande Western Railroad Co. v. United States, 505 F.2d 1266 (Ct. Cl. 1974); Lemery v. Commissioner, 52 T.C. 367 (1969), *aff'd.*, 451 F.2d 173 (9th Cir. 1971).

In Long v. Commissioner, the Tenth Circuit addressed whether certain contested claimsagainst a partnership were liabilities under Code §752.[47] Holding the claims were not, the court stated:[48]

> The Tax Court held that because the lawsuit claims against the partnership were indefinite and contingent liabilities, they should not be recognized for basis adjustment purposes *until the exact amounts of the liabilities were established.* After the parties settled those suits, the Tax Court treated the settlement totals plus attorneys' fees incurred as partnership liabilities and permitted adjustment of the estate's basis in the partnership interest to the extent of its 25% interest. *See* W. McKee, W. Nelson & R. Whitmire, *Federal Taxation of Partnerships and Partners* ¶7.01[2] (1977). We agree with this approach and holding.

Brountas v. Commissioner involved an oil and gas drilling partnership investment partially paid with nonrecourse obligations that were to be satisfied only out of oil production payments.[49] The First Circuit characterized the obligation as highly contingent and speculative and seeming "less like the repayment obligation that typically accompanies a recourse loan than like a device for sharing business risks--the risks that accompany oil explorations."[50] Hence, the court held, *inter alia*, that the obligations were not partnership liabilities for purposes of Code §752.

In Lemery v. Commissioner, the court held that a contractual duty to pay part of the purchase price of a business out of "net profit" was too contingent to be included in the purchaser's basis.[51] The petitioners were unsuccessful in arguing that, although the amount was contingent, the liability itself was absolute.

---

[47] 600 F.2d 416 (10 Cir. 1981), *aff'g*, 71 T.C. 1 (1979).

[48] Emphasis added.

[49] 692 F.2d 152 (1st Cir. 1982).

[50] 692 F.2d at 158.

[51] 52 T.C. 367, 377-78.

JFW-1348

In determining whether a commitment is contingent, the analysis generally stops abruptly at the terms of the contract if those terms objectively impose a contingency.[52] In Denver & Rio Grande Western Railroad Co. v. United States, the court refused to allow the railroad taxpayer to include in its cost basis of property advances by a customer (used to build a "spur line") which were repayable only out of proceeds from shipping above a certain annual tonnage for 10 years.[53] The taxpayer argued that the commitment was not contingent because in light of the underlying facts and circumstances it could be predicted with "reasonable certainty" that the advances would be repaid in full. The court rejected the argument, stating that the subjective intent of the parties did not matter. Absent a binding obligation to repay all of the advances at the time the subject deductions were taken, the court considered it "impossible" to value the duty assumed.

By its terms, entering into a short put option position--particularly one issued European style: exercisable only at expiration--is both contingent and speculative. There is no certainty as to the amount of the potential contractual duty until settlement. If at expiration, the underlying property has a value greater than the strike price, the option is worthless. In fact, the granting of an out-of-the-money option presents a more compelling instance of a contingent contractual duty than those in the cases discussed above, because the option writer's *desired, if not expected, result* is for the value of the option to decline.

[52] *See* Denver & Rio Grande Western Railroad Co. v. United States, *supra*; Lemery v. Commissioner, *supra*; Priv. Ltr. Rul. 7704269550A (April 26, 1977). ("When the documents, by their terms, create only contingent obligations, Courts ordinarily will not look beyond the documents to determine the intent of the parties.").

[53] 505 F.2d 1266 at 1269-70 (Ct. Cl. 1974).

***The All-Events Test for Determining a Liability***

In a case involving short securities obligations, LaRue v. Commissioner, the Tax Court held that liabilities must meet the "all events" test of Code §461 (described below) in order to qualify as "liabilities" for purposes of inclusion in a partner's basis in his partnership interest.[54] With respect to any item, the "all events" test is met if all events have occurred which determine the fact of the liability, and the amount of the liability can be determined with reasonable accuracy.[55]

LaRue was a general partner of Goodbody and Co. ("Goodbody"), a large stock brokerage firm. Due to the inability of record keeping technology at the time to keep up with trading volume, Goodbody incurred large, unanticipated "back office" liabilities. These back office liabilities were created by the following types of transactions:

> (1) Fails to Receive-- Securities which the broker should have purchased at a stated price were not purchased. Gain or loss would be incurred on these transactions measured by the difference between the customer's contract price and what the broker had to pay to obtain the securities. These transactions were the functional equivalent of short sale transactions.
>
> (2) Fails to Deliver-- Securities which the broker thought were sold to another broker but for which no "comparison" for proof could be provided. These securities then had to be sold and the gain or loss incurred was measured by the difference between the original sales price and the actual proceeds received.
>
> (3) Securities Differences--These represented differences between the securities the broker's records stated it should be holding for its own or other's accounts and the securities actually "in the box." These resulted mainly from incorrect deliveries, receipts, or thefts. Gain or loss was measured by the value of excess securities or their replacement cost.
>
> (4) Dividend Errors--The broker was responsible to its customers for dividends and interest on securities which it held as nominee for its customers, i.e., securities held

[54] 90 T.C. 465 (1988).

[55] Treas. Reg. §1.461-1(a).

in "street name." If the broker failed to receive a dividend or interest payment when due it was still liable to its customer for such amount.

Due to the large losses generated by these back office problems and the withdrawal of capital by subordinated lenders, Goodbody was in violation of the New York Stock Exchange minimum capital requirements. At the same time, another brokerage firm, Merrill Lynch, agreed to acquire Goodbody. The acquisition transaction raised the issue as to whether LaRue, and the other Goodbody partners, could include the back office liabilities in the bases of their partnership interests.

The LaRue court held that the Goodbody partners could not include these back office liabilities in their bases because the "all events" test had not been met. The court said:

> Because an accrual basis partnership uses the 'all-events' test to determine when an expense is deductible, we think that test may be properly used to determine when the corresponding liability is includable in basis.

The court stated that while Goodbody had a liability to its customers for their back office failures, the amount of these liabilities was not determinable with reasonable accuracy until any missing securities were purchased or excess securities sold at the market price.

***Recently Enacted Legislation***

On December 21, 2000, President Clinton signed into law the Consolidated Appropriations Act 2000 (the "Act"). Section 309 of the Act amends Code §§357 and 358 to prevent duplication or acceleration of loss through assumption of liabilities in certain situations. New Code §358(h)(1) provides: (1) the taxpayer must determine whether the basis of stock received as part of a tax-free exchange exceeds its fair market value; and (2) if so, the shareholder must reduce the basis of such stock by the amount of any "liability" that is assumed in exchange for stock and does not otherwise reduce the transferor's basis due to the assumption. For this purpose, new Code §358(h)(3) provides

that the term "liability" includes any fixed or contingent obligation to make payment, without regard to whether such obligation or potential obligation is otherwise taken into account under the Code. Significantly, new Code §358(h)(2) contains an exception from such treatment where the trade or business or substantially all of the assets with which the liability is "associated" are also transferred to the controlled corporation. This new legislation is substantially similar to legislation proposed by the Joint Committee on Taxation ("Joint Committee") on October 19, 1999 and the President's Fiscal Year 2001 Revenue Proposals on February 1, 2000. The effective date of new Code §358(h) is October 19, 1999, the same date as the initial Joint Committee Proposal.

Although the Act only amends the provisions related to assumptions of liabilities by controlled corporations, Section 309(c) of the Act authorizes and instructs the Secretary of the Treasury or his delegate to prescribe rules which provide appropriate adjustments in the case of assumptions of liabilities by partnerships to prevent acceleration or duplication of losses. The effective date of the application of any such rules to partnerships would be October 19, 1999 or such later date as may be prescribed in such rules. It is highly likely that any later adoption of rules by the Treasury Department or the Service comparable to Code §358(h) applicable to partnerships would have an effective date of October 19, 1999. Thus, we address below the potential application of this new legislation to the Partnership's assumption of the Short Option.

From the text of the new legislation, the prior proposals, the scant legislative history and summaries of the prior proposals, it appears that the new legislation was meant to eliminate those tax strategies that use Code §357(c)(3) under which taxpayers accelerate or duplicate losses by separating a contingent liability from the underlying asset with which such liability is associated. For example, taxpayer owns real estate with contingent environmental liabilities associated with such

real estate. The taxpayer causes a controlled corporation to assume the contingent environmental liabilities but does not transfer the real estate to the corporation. Instead, the taxpayer transfers cash to the corporation in an amount equal to the expected environmental liabilities. The taxpayer takes the position that its basis in the corporation's stock under Code §358 is the amount of cash contributed to the corporation without reduction for the contingent environmental liabilities. The taxpayer then sells the stock for a nominal amount and reports a loss equal to the cash contributed to the corporation. The corporation later obtains a deduction for the environmental liabilities pursuant to Rev. Rul. 95-74.[56] Thus, the tax strategy produces an accelerated loss for the taxpayer and a duplicate deduction for the corporation, while the taxpayer keeps the underlying real estate that generated the liabilities. By excluding from the new Code §358(h) treatment situations where the trade or business or substantially all of the assets with which the liability is "associated" are also transferred to the controlled corporation, Congress is targeting only those situations where the taxpayer *retains* a business or asset and transfers contingent liabilities related to such business or asset to a controlled corporation.

The abuse that Code §358(h) is intended to curb is not present in the Transactions described herein. Presumably, the only asset that initially could be considered "associated"[57] with the Short Option is the option premium received on the sale of the Short Option. You used the Short Option premium and other funds to purchase the Long Option. Upon your purchase of the Long Option, the Bank required you to secure your potential contractual obligations under the Short Option with the

[56] 1995-2 C.B. 36.

[57] A standard dictionary definition of associate is "closely connected" or "closely related." Merrian-Webster International Dictionary of the English Language, Second Edition.

Long Option. You then transferred the Long Option with the Short Option to the Partnership. Indeed, the Bank has informed us that unless valuable collateral were substituted for the Long Option, in order to assure that sufficient assets were available in the event the potential contractual obligation under the Short option became due, it would require that any transfer of the Short Option be accompanied by a transfer of the Long Option. Thus, the only asset that could be considered "associated" with the Short Option at the time the Partnership assumed the Short Option is the Long Option. Because you transferred the Long Option with the Short Option, there has been no separation of your potential contractual obligation under the Short Option with any associated assets. Indeed, you retained no assets. Thus, it is more likely than not that the Short Option should not be treated as a "liability" for purposes of new Code § 358(h).

***Conclusion***

The plain and ordinary meaning of the term "liabilities" under Code §752 more likely than not does not include a short option position such as the Short Option. This conclusion is supported by the relevant authorities discussed above interpreting the meaning of "liabilities" for purposes of Code §752. The Helmer case, a Tax Court memorandum decision which is the closest authority, unequivocally held that a short option position is not a liability for purposes of Code §752. The recent Salina case, a Tax Court memorandum decision holding that a short sale is a liability, acknowledges the continuing authority of the holding in Helmer and distinguishes the option position in Helmer from a short sale. Thus, based on these and other authorities discussed above, you should more likely than not prevail on this issue if challenged by the IRS.

**F. YOUR TAX BASIS IN YOUR PARTNERSHIP INTEREST WILL BE INCREASED BY THE COST OF THE LONG OPTION POSITION CONTRIBUTED, WITHOUT ADJUSTMENT FOR THE SHORT OPTION**

In general, the basis of an interest in a partnership is adjusted for contributions and distributions made by a partner. A partner's tax basis is increased by the amount of money and the adjusted basis of property contributed to the partnership determined as of the date of contribution, and by the amount (if any) of gain recognized to the contributing partner at such time. Code section 722. The basis of a purchased interest is cost. Code section 742; Treas. Reg. sec. 1.742-1. A partner's tax basis is decreased by the amount of money or the adjusted basis of property (other than money) distributed to the partner other than in liquidation of the partnership. Code section 733. If the partnership assumes liabilities of a partner in connection with his contribution of property to the partnership, such decrease in a partner's individual liabilities is deemed to be a distribution of money to the partner by the partnership. Code section 752(b). On the other hand, any increase in a partner's share of liabilities of a partnership or in a partner's individual liabilities by reason of his assumption of partnership liabilities is deemed to be a contribution of money by such partner to the partnership. Code section 752(a). As discussed in Section E, these liabilities should, more likely than not, not include the Short Option.

The adjusted basis of the Long Option is its cost. Code section 1012. Accordingly, pursuant to Code section 722, your tax basis in your Partnership interest should be your cost basis increased by the cost of the Long Option contributed, and you should more likely than not prevail on this issue if challenged by the IRS.

## G. TAX CONSEQUENCES DUE TO EXPIRATION OF THE OPTIONS

On April 17, 2000, the Long Option and the Short Option expired. Code section 1234 provides that options generally have the same character in a taxpayer's hands as the underlying property would have in that taxpayer's hands. Because of the special rules of Code section 988, neither Euros nor Swiss Francs would have the tax consequences of a capital asset to you or to the Partnership.

Code section 988 provides special rules for the characterization of gains or losses from certain transactions in foreign currency. In general, any disposition of any nonfunctional currency is treated as a "section 988 transaction" and any resulting gain or loss from such transaction is treated as foreign currency gain or loss (as the case may be). Code section 988(c)(1)(C). Any foreign currency gain or loss is treated as ordinary income or loss (as the case may be). Code section 988(a)(1)(A). A nonfunctional currency is a currency other than the dollar or the currency of the economic environment in which a significant part of the activities of a trade or business of the taxpayer are conducted. (See Code section 985(b), which defines "functional currency.") Thus, for you or for an entity such as the Partnership, any currency other than U.S. Dollars would constitute nonfunctional currency, income or loss on which would be ordinary in nature, rather than capital.

Code section 1234A provides for capital treatment of income and losses from the expiration of options in only one additional case: when the option is a Code section 1256 contract. As discussed in Section D, the Options are not Code section 1256 contracts. Therefore, the loss realized from the expiration of the Options is more likely than not ordinary loss. Consistent with the normal rules of partnership accounting, Code section 705(a)(2)(A) provides that your basis in the Partnership will be adjusted by your share of that loss.

## H. THE CONTRIBUTION OF YOUR INTEREST IN JFWLLC TO JFW INC. SHOULD NOT BE TAXABLE; BASIS IS A CARRYOVER BASIS

In general, no gain or loss is recognized upon a transfer of property to a corporation by one or more persons in exchange for stock in such corporation if, immediately after such exchange, such person or persons are in "control" of the corporation.[58] For these purposes, "control" is defined as ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.[59] Here, JFW Inc. has one class of stock, and you own 100 percent of all such stock. Although no stock was actually issued by JFW Inc. in exchange for your contribution of the Partnership interest, an actual issuance of stock is not required for Code §351 to apply when all the shareholders of a corporation contribute property to such corporation in the same proportion as their interests in the corporation.[60]

Code §362(a) provides for JFW Inc. to take the contributor's basis in property contributed in a tax-free Code §351 exchange. Therefore, JFW Inc.'s tax basis in its interest in the Partnership should more likely than not be increased by the contributor's basis in the contributed interest as of such contribution.

[58] Code §351(a); Treas. Reg. §1.351-1(a)(1).

JFW-1357

[59] Code §368(c).

[60] *See* Lessinger v. Commissioner, 872 F.2d 519 (2d Cir. 1989) (Code §351 applied to a property transfer even though no stock was issued; the actual issuance of shares would have been a "meaningless gesture"); Jackson v. Commissioner, 708 F.2d 1402 (9th Cir. 1983).