## I. INCREASE TO BASIS IN JFW INC. INTEREST DUE TO CONTRIBUTION

Code §358(a)(1) provides that in a nontaxable Code §351 exchange, the transferor's basis in his stock received is determined by reference to his basis in the transferred property. Therefore, more likely than not, your basis in your corporate stock was increased by your adjusted basis in your Partnership interest contributed to JFW Inc.[61]

[61] Code §358(a)(1).

**J. THE TRANSFER OF AN INTEREST IN THE PARTNERSHIP SHOULD RESULT IN AN ADJUSTMENT TO THE PARTNERSHIP'S BASIS IN ITS ASSETS BECAUSE OF THE ELECTION MADE UNDER CODE SECTION 754**

You transferred your interest in JFWLLC, which will be treated for federal income tax purposes as a transfer of JFWLLC's interest in the Partnership, to JFW INC. on April 30, 2000. This transfer constituted an "exchange" under the provisions of Code section 721. (See Section H. above.) Because of such transfer, the Partnership intends to make, or already has made and has in effect, with respect to the taxable period in which such transfer occurred and thereafter, an election under section 754 of the Code. Pursuant to such election, in the case of a transfer of a partnership interest by sale or exchange, Code section 743 requires the increase in the adjusted basis of partnership property by the excess of the basis to the transferee partner of its interest in the partnership over its proportionate share of the adjusted basis of the partnership property. Code section 743(b)(1); Treas. Reg. sec. 1.743-l(b)(1)(i). An adjustment of this type is made to partnership property with respect to the transferee partner only. Code section 743(b); Treas. Reg. sec. 1.743-1(b).

Your transfer of your interest in the Partnership to JFW INC. will therefore result in an adjustment to the basis of the Partnership's property under Code section 743. Code section 743(c) provides that the allocation of the basis adjustment is made in accordance with the rules set forth in Code section 755. In general, Code section 755 requires that the allocation be made in a manner which has the effect of reducing the difference between the fair market value and the adjusted basis of partnership property, subject to certain characterization rules. Since the cash in the Partnership has a tax basis equal to its fair market value, while the fair market value of the Shares held by the Partnership significantly exceeds the adjusted basis of such stock, the basis adjustment should be

entirely allocated to such stock. Such adjusted basis should more likely than not be used to determine the Partnership's share of any gain or loss realized upon any subsequent sale or other disposition of such stock.

The transfer of a greater than 50% interest in the Partnership also caused a termination of the Partnership for federal income tax purposes under the provisions of Code section 708(b)(1)(B). Under the applicable regulations, the effect of such termination is that "the following is deemed to occur: The partnership contributes all of its assets and liabilities to a new partnership in exchange for an interest in the new partnership; and, immediately thereafter, the terminated partnership distributes interests in the new partnership to the purchasing partner and the other remaining partners in proportion to their respective interest in the terminated partnership in liquidation of the terminated partnership, either for the continuation of the business by the new partnership or for its dissolution and winding up." Treas. Reg. sec. 1.708-1(b)(1)(iv). Such deemed contributions and distributions do not themselves effect the adjusted tax basis of properties, or the capital accounts of partners, nor is a new taxpayer identification number required for the "new" partnership. Id. Additionally, a Code section 754 election (including a Code section 754 election made by the terminated partnership on its final return) that is in effect for the taxable year of the partnership in which the sale or exchange occurs, applies with respect to the incoming partner. Treas. Reg. sec. 1.708-1(b)(1)(v).

## K. NON-APPLICABILITY OF CERTAIN DOCTRINES

In reaching our conclusions herein, we have determined that it is more likely than not that neither the sham transaction doctrine nor the step transaction doctrine should apply.

***Non-Applicability of the Sham Transaction Doctrine***

It is axiomatic that taxpayers may structure their business transactions as they please, even though motivated by tax-beneficial considerations. Gregory v. Helvering, 293 U.S. 465 (1935); Frank Lyon Co. v. United States, 435 U.S. 561, 581 (1978); Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985) affg. and revg. 81 T.C. 184 (1983); Baker v. Commissioner, T.C. Memo 1991-331. However, a transaction must have economic substance to be respected for federal tax purposes. Frank Lyon Co., 435 U.S. at 583-584. A transaction which, though it may be proper in form, lacks economic substance beyond the creation of tax benefits and is not imbued with tax-independent considerations is an economic sham without effect for federal income tax purposes.[62] Karr v. Commissioner, 924 F.2d 1018 (11th Cir. 1991), aff'g. Smith v. Commissioner, 91 T.C. 733 (1988); Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985), affg. and revg. 81 T.C. 184 (1983).

Generally, courts focus on two factors to determine whether a transaction would be deemed an economic sham for federal tax purposes:

---

[62] The courts have distinguished "shams in fact," in which the alleged transactions never actually took place, from "shams in substance," in which transactions actually took place and are genuine for general private law purposes, but for federal tax purposes nonetheless lack the substance their form represents. See Lerman v. Commissioner, 939 F.2d 44, 48 at n.6 (3d Cir. 1991); Kirchman v. Commissioner, 862 F.2d 1486, 1492 (11th Cir. 1989); Horn v. Commissioner, 968 F.2d 1229, n.8 (D.C. Cir. 1992); Brown v. Commissioner, T.C. Memo 1992-379, n.8 (court noted that the investment in a horse breeding tax shelter were not factual shams, since they [did] not deal with phantom horses or other indices of fictitiousness;" however, the court found the transactions to be economic shams). The "sham in fact" analysis is not addressed in this opinion because the transactions entered into by you, JFWLLC, the Partnership, and JFW INC. were indisputably real and genuine.

1) whether the transaction has no economic substance, which involves the objective analysis of whether there is any realistic potential for profit or practicable economic effect, exclusive of tax benefits, and

2) whether the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering into the transaction, which involves a subjective analysis of the taxpayer's intent.

See, e.g., Karr v. Commissioner, 924 F.2d 1018 (11th Cir. 1991); Bryant v. Commissioner, 928 F.2d 745 (6th Cir. 1990); Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 91 (4th Cir. 1985), Levy v. Commissioner, 91 T.C. 838, 853-54 (1988). The two factors must be examined in light of the facts and circumstances existing as of the time of the subject transaction, not in hindsight.

The courts have not been uniform as to the weight they assign to these factors. In Rice's Toyota World, Inc., the Fourth Circuit established that a transaction is not a sham for tax purposes if the taxpayer satisfies *either* factor of this inquiry. Other courts, such as the Eleventh Circuit, apply a more flexible analysis, assigning neither factor special consideration. Karr v. Commissioner, 924 F.2d 1018 (11th Cir. 1991). The Tax Court considers the economic substance factor virtually determinative in the analysis and business purpose merely relevant. Cherin v. Commissioner, 89 T.C. 986 (1987). According to the Tax Court, "A transaction imbued with economic substance will be recognized for tax purposes even in the absence of a business purpose. On the other hand, the existence of a subjective business purpose does not mandate the recognition of a transaction lacking economic substance." Dixon v. Commissioner, T.C. Memo 1991-614. In other cases, particularly older ones, the taxpayer's intent has been disregarded entirely. See Knetsch v. United States, 364 U.S. 361 (1960).

Finally, there is a narrow line of sham cases involving interest deductions which continue to articulate the test as it was stated in 1960 in Knetsch--whether the arrangements "have purpose, substance, or utility apart from their anticipated tax consequences." Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), affg. 44 T.C. 284 (1965); Sheldon v. Commissioner, 94 T.C. 738 (1990) (noting that profit potential and profit objective were of little significance in determining the substance of the subject debt instruments, since those factors were not relevant for purposes of Code section 163).

The genesis of the distinct doctrine of economic shams is Knetsch v. United States, 364 U.S. 361 (1960).[63] In Knetsch, the taxpayer purchased from an insurance company in 1953 30-year maturity 22% deferred annuity savings bonds with a total face value of $4 million. The taxpayer paid for the bonds with $4,000 in cash and $4,000,000 of 32% nonrecourse annuity loan notes, secured by the bonds. Interest on the notes of $140,000 was due and paid in advance. The cash or loan value of the bonds at the end of the first contract year was to be $4,100,000, and the contract terms permitted the taxpayer to borrow the excess of this value above his indebtedness without waiting until the end of the first year. The taxpayer took advantage of this provision within days after the purchase, whereby he received from the company $99,000 of the $100,000 excess over his $4,000,000 indebtedness, for which he signed 32% notes and prepaid the first year's interest of $3,465. On their joint return for 1953, the taxpayer and his spouse claimed interest deductions for the sum of the two interest payments--$143,465. These "borrowings" and "interest" payments were repeated during the following two tax years. In 1956, the bonds were surrendered and the

[63] Knetsch was predicated on Gregory v. Helvering, 293 U.S. 465 (1935), which was the first landmark case under federal tax law applying the substance over form doctrine.

indebtedness was canceled. The IRS disallowed the interest deductions on the ground that the purported debts were shams.

The trial court in Knetsch found that there was no "commercial economic substance" to the transaction, that the parties did not intend the taxpayer to become indebted to the company, that no indebtedness of the taxpayer was created by any of the transactions, and that no economic gain could be achieved from the purchase of these bonds without regard to the tax consequences. The court concluded that the transactions were shams and upheld the IRS determination. 58-2 U.S.T.C. ¶9935 (S.D. Cal. 1958). The Ninth Circuit affirmed the decision.

The Supreme Court majority articulated the issue in Knetsch in terms of whether "what was done," apart from tax motive, comported with the intent of the relevant statute. Accordingly, the Court first "put aside" a finding by the trial court that the taxpayer's sole motive in purchasing the bonds was to secure an interest deduction. The majority answered the issue in the negative.

> "This [form], as we have seen, was a fiction, because each year Knetsch's annual borrowing kept the net cash value, on which any annuity or insurance payments would depend, at the relative pittance of $1,000. Plainly, therefore, Knetsch's transaction with the insurance company did "not appreciably affect his beneficial interest except to reduce his tax . . . For it is patent that *there was nothing of substance to be realized by Knetsch from this transaction beyond a tax deduction.* What he was ostensibly "lent" back was in reality only the rebate of a substantial part of the so-called "interest" payments. The $91,570 difference retained by the company was its fee for providing the facade of "loans" whereby the petitioners sought to reduce their 1953 and 1954 taxes in the total sum of $233,297.68. There may well be single-premium annuity arrangements with nontax substance which create an "indebtedness" for the purposes of [Code section 163(a)]. But this one is a sham." [Emphasis provided.]

364 U.S. at 365-366.

In Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), the Second Circuit reinforced that a transaction need not be fictitious to be an economic sham. That case involved a winner of the

Irish Sweepstakes who adopted a plan to generate interest deductions to reduce the tax burden on the winnings. The plan was to purchase relatively large amounts of Treasury notes bearing 12% interest by means of funds borrowed at 4%. The 4% interest on the borrowed funds was to be prepaid and deducted in the taxable year of the sweepstakes winnings. The loans were secured by the Treasury notes and it was contemplated that the overall transactions would result in economic losses, but that the net result would be tax benefits.

The Second Circuit in Goldstein disagreed with the Tax Court that both loan transactions created "no genuine indebtedness," and instead remarked that those transactions were "regular and ...indistinguishable from any other legitimate loan transaction contracted for the purchase of Government securities." 364 F.2d at 737. The court went on to hold that Code section 163 "does not permit a deduction for interest paid or accrued in loan arrangements ... that can not with reason be said to have purpose, substance or utility apart from their anticipated tax consequences." 364 F.2d at 740. The court added that Congress intended through the broad language of Code section 163 to permit an interest deduction to encourage--

> "purposive activity to be financed through borrowing ....In other words, *the interest deduction should be permitted whenever it can be said that the taxpayer's desire to secure an interest deduction is only one of mixed motives that prompts the taxpayer to borrow funds*; or, put a third way, the deduction is proper if there is some substance to the loan arrangement beyond the taxpayer's desire to secure the deduction." [Emphasis provided.]

364 F.2d at 741.

The Supreme Court revisited the sham transaction doctrine in United States v. Consumer Life Insurance Co., 430 U.S. 725 (1977). Specifically, the Court addressed whether by virtue of two sets of reinsurance agreements, or "treaties," the taxpayers maintained a sufficient proportion of life

insurance reserves vis-à-vis nonlife reserves to qualify for the favorable federal income tax treatment afforded "life insurance companies" under Code section 801. The government argued, among other theories, that the treaties, which allocated unearned premium reserves between the taxpayers and other unrelated insurance companies, were sham transactions without substance.

The Court rejected this argument on the ground that the treaties, which were negotiated at arm's length, served valid business purposes for the respective parties in addition to tax benefits. Under the first set of treaties, the taxpayers were the reinsurers, and the ceding companies were required to hold the premiums until earned. The terms of those treaties permitted the ceding companies to invest the funds and keep all resulting investment income. The second set of treaties, under which the taxpayers were the ceding companies, "served most of the basic business purposes commonly claimed for reinsurance treaties," and in effect enabled each taxpayer to expand its business. Moreover, each taxpayer associated itself through the second treaty with a reinsurance company more experienced in the field and, under the terms, were shielded against certain catastrophic losses. According to the Court, "tax considerations well may have had a good deal to do with the specific terms of the treaties, but even a *'major motive' to reduce taxes will not vitiate an otherwise substantial transaction.*" 430 U.S. at 738. [Emphasis provided.]

In 1978, the Supreme Court decided Frank Lyon Co. v. United States, 435 U.S. 561 (1978) which is the most recent landmark decision on the sham transaction doctrine.[64] In Frank Lyon Co., Worthen Bank & Trust ("Worthen") planned the construction of a multistory bank and office

[64] Frank Lyon Co. is distinguishable from numerous sham cases in that the IRS conceded the subject transactions had substance beyond the creation of tax benefits, but, in the IRS's view, their form did not comport with their substance. Nevertheless, courts have consistently relied on Frank Lyon Co. in the analysis of shams in cases where the only substance of the subject transaction was the generation of tax benefits.

building to replace its existing facility. Worthen's banking competitor also planned to construct a new building in which to relocate its operations, which placed pressure on Worthen to follow through with its construction plans. Worthen initially hoped to finance, build and own the proposed facility by selling debentures and contributing the proceeds to a wholly-owned real estate subsidiary. As planned, the subsidiary would hold formal title and would raise the remaining $5 million by a conventional mortgage loan on the new premises. Worthen abandoned the plan for two reasons. First, Worthen legally could not pay more interest on any debentures it might issue than that specified under Arkansas banking law, which would render the proposed obligation unmarketable. Second, the Federal Reserve refused to grant Worthen the necessary permission to invest in banking premises in the planned amount. Worthen was thus forced to seek an alternative solution that would provide it with the use of the building, satisfy the state and federal regulators, and attract the necessary capital.

Consequently, after negotiations with various prospective investors, Worthen negotiated and consummated a sale-leaseback arrangement with the taxpayer, whereby the taxpayer took title to the Worthen building under construction, financed the acquisition through unrelated third parties, and leased the building back to Worthen. The lease was a net lease; the rental payments were identical to the taxpayer's mortgage payments; and the lease granted Worthen a option to purchase the building after the primary lease and on other future dates at predetermined amounts that would represent a 6% compound return on the taxpayer's equity. The IRS maintained that the taxpayer's transactions in their entirety were shams for tax purposes and that all deductions, such as interest expenses and depreciation, should be disallowed. According to the IRS, the taxpayer was in substance merely a conduit between Worthen and the lenders in an elaborate financing arrangement.

The Supreme Court rejected the government's position. The Court found a host of business and regulatory purposes, rather than mere tax benefits, underlying the structure of the transaction. The Court regarded the taxpayer's exposure to the "real and substantial" risk of the notes and the presence of a third party--a finance agency--in the transaction as evidence that the transaction as structured had substance. The Court concluded--

> "In short, we hold that where, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties."

435 U.S. at 583-584.

Smith v. Commissioner, 78 T.C. 350 (1982), involved the analysis of the sham transaction doctrine in the context of "commodity tax straddles." The taxpayers acquired on August 7, 1973, long positions in March and December 1974 silver futures contracts and short positions in July 1974 silver futures contracts pursuant to simultaneously placed "straddle"[65] trades complying with the rules of the Commodity Exchange, Inc. ("COMEX"). Two days later, the taxpayers acquired additional long and short positions in silver futures contracts and applied the short positions to close out the long positions acquired on August 7. The goal of these straddles was to "move" short-term capital gain into a future year and possibly convert it into a long-term capital gain. 78 T.C. at 364. The taxpayers liquidated their straddles in February 1974 by acquiring additional positions. The taxpayers claimed deductible losses for 1973 of over $95,000 on the August 9 close of the long

[65] A "straddle" was defined as the simultaneous holding in a long position in one delivery month and a short position in another delivery month. Under the COMEX rules in effect in 1973, straddles could be bought and sold as a unit. 78 T.C. at 355. "Butterfly straddles," which involve two separate straddles having one common intermediate delivery month, are designed to create less economic risk. 78 T.C. at 365. Smith involved butterfly straddles.

positions.[66] The IRS challenged the losses under various theories, including the sham transaction doctrine, the step transaction doctrine and the profit objective requirement for losses of individuals under Code section 165(c)(2).

The court first addressed what units of property were initially acquired. According to the court,

> "[the taxpayers] did not merely acquire a long *or* short position on August 7; rather, petitioners claim to have acquired equal long *and* short positions that day. Did these positions cancel each other out such that no property was acquired for tax purposes on August 7? We think not."

78 T.C. at 372.

After making adjustments to the basis of the acquired positions and the amounts realized in closing them out to reflect fair market value rather than the artificial prices asserted by the taxpayers, the court concluded the "losses were real, not shams."

> "They were the product of commodity trading actually engaged in pursuant to COMEX rules during the straddle trading sessions on August 7 and 9. The contracts traded were legally binding on the parties under the rules of the COMEX; if petitioners had not, through later independent trades, closed out their August 7 positions, delivery rights and obligations respecting the underlying commodity, silver, would have ensued. Such losses may not be disallowed on the grounds of sham."

78 T.C. at 385.

The court then addressed whether the first-year losses in a commodity tax straddle should be integrated with second-year gains and recognized, if at all, only in the second year. The court indicated that it might have been more sympathetic with the IRS's argument to integrate the losses

---

[66] Subsequent to the tax year in question, Congress enacted tax legislation governing such straddles. See 78 T.C. at 362-363.

and gains if the taxpayers were "guaranteed" to have an exact offsetting unrealized gain; however, in that case the taxpayers were not so assured. As explained by the Tax Court,

> "Contracts in different delivery months could, and in fact, did, show varying relative prices during the course of petitioners" straddles trades. While the actual pricing differences may have been small considering the size of petitioners" investments, we are not prepared to say such differences were de minimis. For us to draw a line, here, by saying that investments in these different assets must be integrated for tax purposes because their prices travel too much in tandem, simply begs the question: How nearly parallel is too nearly parallel? If platinum and gold futures prices travel roughly in tandem, are we to integrate a straddle in opposing platinum and gold futures?"

After rejecting the IRS's step transaction argument, the Tax Court in Smith held for the IRS on the ground that the taxpayer had no profit objective in entering into the transactions in violation of Code section 165(c)(2) governing losses of individuals.

Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985), affg. and revg. 81 T.C. 184 (1983) was the first major case to construe Frank Lyon Co. as requiring the two factor analysis under the sham transaction doctrine. In Rice's Toyota, the taxpayer entered into a computer sale and leaseback transaction, which the seller/lessee ("Finalco") had marketed as a tax shelter, and financed the investment with a 3-year recourse and two 8-year nonrecourse notes. The taxpayer's purchase price was over 10 percent more than the price Finalco had recently paid for the used computer, which was subleased to an end-user at the time of the taxpayer's transaction. Under the lease, rental payments exceeded the taxpayer's obligations on the nonrecourse debt by $10,000 annually. Finalco, which was responsible for remarketing the computer following the expiration of the sublease, was entitled to 30 percent of the re-lease or sale proceeds. The taxpayer paid off the

recourse note with interest as scheduled. The IRS determined the entire arrangement to be a sham and disallowed the depreciation and interest deductions associated with the transaction.

The Tax Court noted that the presence of a genuine indebtedness supported by an actual investment is strong evidence of economic substance. 81 T.C. at 202. However, the Tax Court found that the taxpayer lacked any business purpose for entering into the sale-leaseback transaction, that the transaction was devoid of economic substance, and thus that the entire arrangement, including the recourse note, was a sham for tax purposes.

The Fourth Circuit agreed that the taxpayer satisfied neither factor of the sham transaction analysis with respect to the computer sale-leaseback and thus affirmed the disallowance of the depreciation deductions and nonrecourse interest deductions. In determining the business purpose inquiry -- specifically, whether the taxpayer entered into the transaction with a profit objective -- the Fourth Circuit looked to three facts. First, the taxpayer did not seriously evaluate whether the computer would have sufficient residual value at the end of the existing lease to enable it to earn a profit on its purchase and leaseback. According to the court,

> "Residual value of the computer (either in selling or releasing) should therefore have been the crucial point of inquiry for a person with a business purpose of making a profit on this transaction. However, Rice's principal officer knew virtually nothing about computers, and relied almost exclusively on the representations of a Finalco salesperson regarding expected residual value. Despite the Finalco representative's frank concession that he was not an expert in predicting residual values, Rice did not pursue the representative's offer to provide an expert appraisal of likely residual value. Rice's accountant advised that the transaction appeared to be profitable, but the record does not reveal that the accountant's opinion reflects anything more than the fact that the transaction, if successful, would generate large tax deductions. Although Rice had in its possession a report containing a chart that showed a possibility that the computer would have sufficient residual value to earn Rice a

> profit, the report warned of great risk in predicting residual values, and also showed a large possibility of losses on the transaction."[67]

Second, the sales literature of the transaction emphasized the large tax deductions associated with the transaction, rather than the profit potential. Third, and most critically according to the court, the taxpayer willingly paid an inflated purchase price for the computer. According to the court,

> "Considering that Finalco had a right to 30 percent of re-leasing or sale proceeds after five years, Rice can more accurately be said to have purchased only 70 percent of a computer, then worth less than $1,000,000. Because Rice paid so obviously inflated a purchase price for the computer and financed the purchase mainly with nonrecourse debt, it was properly inferable by the tax court that Rice intended to abandon the transaction down the road by walking away from the nonrecourse note balance before the transaction ran its stated course."[68]

The economic substance inquiry, according to the Fourth Circuit, requires an objective determination of whether a reasonable possibility of profit from the transaction existed apart from tax benefits. The court accepted the Tax Court's finding that the sale-leaseback carried no hope of earning a profit because the computer's residual value was not sufficient to recoup the interest and principal paid to the seller on the recourse note less the $10,000 annual return under the lease. In substance, the taxpayer did not purchase or lease a computer, but rather, paid a fee to Finalco in exchange for claims for tax benefits. The court found the nonrecourse note associated with the sham investment similarly without economic substance.

The Fourth Circuit reversed, however, the Tax Court on the disallowance of the interest deductions based on the *recourse* note, which it held was genuine and had independent economic

---

[67] 752 F.2d at 92-93.

[68] 752 F.2d at 93.

substance. Citing Frank Lyon Co., the court reasoned that a transaction that has economic substance must be respected for tax purposes even if the motive for the transaction is to avoid taxes.

The case of Sheldon v. Commissioner, 94 T.C. 738 (1990), seems to be the only case in which deductions under a Code provision that does not require a profit motive were denied for a transaction that produced some profit. Sheldon was a pre-1984 leveraged Treasury Bill transaction in which the taxpayer deducted interest in one year and reported income on the Treasury Bill in the subsequent year. The 9-judge majority denied the interest deduction under Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), cert. denied, 385 U.S. 1005 (1967) stating that the potential for gain was not the sole standard by which the substance of a transaction is judged, "and in any event, [the potential for gain in the case *sub judice*] is infinitesimally nominal and vastly insignificant when considered in comparison with the claimed deductions." The majority also stated,

> "In summary, the timing of the transactions here was critical and of overriding importance. The transactions were intentionally and cleverly structured to be and are real, but are without substance within the meaning of established case precedent. The transactions occurred at year-end to create deferral for tax purposes irrespective of whether they resulted in gain or loss, which, as structured, were destined to be de minimis in amount."[69]

Seven judges dissented in the case, writing:

> "To date the only instances I can find in which we have compared potential profit with expected tax benefit are those in which we have evaluated a transaction for profit objective ...
>
> The majority . . . sets forth a new "de minimis" test for economic substance. ... Such a new test could require us to substitute our business judgment for that of taxpayers and disregard, for Federal income tax purposes, those transactions lacking sufficient potential profit in light of expected tax benefits. For example, applying such a test to sale and leaseback transactions, will we have to determine ... whether the potential profit from residual values is de minimis when compared to expected tax benefits?

---

[69] 94 T.C. at 769.

> Assuming an inquiry into whether a transaction offers enough profit is appropriate (and ... I believe it is not), then the proper analysis should be to compare the potential profit with the investment, rather than to compare the potential profit with the expected tax benefits, heretofore a section 183 inquiry."

It is possible that the Sheldon case can be read to stand for the proposition that more than a de minimis business purpose/profit motive must exist, but that once the threshold has been met, no further weighing of tax versus non-tax factors is necessary.[70]

In Peat Oil & Gas Associates v. Commissioner, 100 T.C. 271 (1993), the Tax Court, in Judge Swift's concurring opinion, discussed the judicial authorities surrounding the notion of a weighing of tax versus non-tax motives in the context of the sham transaction doctrine. Judge Swift declined to weigh tax versus non-tax benefits in a compelling legal analysis, a portion of which follows:

> "I believe a 'primary' profit-objective test, as suggested by Judge Ruwe in his concurring opinion--that is not found in the relevant statutory or regulatory scheme, that is in my opinion contrary to commercial and financial reality, and that has been utilized by the Supreme Court only in the context of evaluating whether an activity is in the nature of a hobby activity as distinguished from a trade or business activity--is too strict.
>
> Over the years, in the context of analyzing passive, tax-sheltered investments, the courts have not been consistent in the language used to describe the quantity or level of profit objective that must be established: (1) under section 183; (2) under the profit-objective aspect of the sham-transaction doctrine; and (3) under the profit-objective aspect of the economic-substance doctrine. The inconsistent profit-objective language that has been used has included, among other language, the following: 'Basic', 'dominant', 'primary', 'predominant', 'substantial', 'reasonable', 'bona fide', and 'actual and honest.' As one court commented, we have been glutted with tests. Many such tests proliferate because they give the comforting illusion of consistency and precision. They often obscure rather than clarify. Collins v.

---

[70] Generally, the finding of a profit motive has been sufficient for the courts to hold in favor of the taxpayer without further analysis. It is interesting to note that none of the cases where the courts have arguably employed a test that weighs tax and non-tax motivations have involved a question involving the interpretation and application of Subchapter K. The provisions of Subchapter K are mostly mechanical in nature, and do not contain the "for profit" restriction that has provided some courts in some cases the basis to assert that business purpose must exceed tax purpose.

Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo 1987-217.

Some courts have used different, inconsistent language in the same opinion. For example, one recent opinion suggested that investors have to establish that they had a 'dominant' profit objective, but also that 'the determination crucial to the instant case [was] whether the taxpayers had an actual and honest profit objective.' Nickson v. Commissioner, 962 F.2d 973, 976 (10th Cir. 1992), affg. Brock v. Commissioner, T.C. Memo 1989-641. Another opinion suggested that investors must show a 'primary' profit objective, but then suggested that the test for sham-transaction purposes was whether 'the transaction has any practicable economic effects other than' tax benefits. Bryant v. Commissioner, 928 F.2d 745, 758 (6th Cir. 1991), affg. in part, revg., in part, and remanding T.C. Memo 1989-527.

The Tax Court, however, in the last 5 years and with few exceptions--in evaluating passive, tax-sheltered investments and in an attempt to bring some uniformity to the language and the analysis associated with the determination of profit objective--has consistently stated the test relating to profit objective to be whether the investors had an actual and honest profit objective (or whether the investors had a 'bona fide', 'good faith', or 'any' profit objective--language, in my opinion, synonymous with 'actual and honest'). Generally, no particular attempt has been made by the Tax Court to quantify the amount of profit objective required (i.e., to disallow claimed tax benefits where the investors' profit objective was actual and honest but not primary).

According to my research, in over 123 of the 131 Tax Court division and memorandum opinions issued since 1987 in which profit objective as at issue in the context of passive, tax-sheltered investments, we applied the 'actual and honest' profit-objective test, or a synonymous test, in evaluating whether passive investors had the requisite profit objective. See, e.g., Krause v. Commissioner, 99 T.C. 132 (1992); Marine v. Commissioner, 92 T.C. 958 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991; McCrary v. Commissioner, 92 T.C. 827 (1989); Levy v. Commissioner, 91 T.C. 838 (1988); Antonides v. Commissioner, 91 T.C. 686 (1988), affd 893 F.2d 656 (4th Cir. 1990); Soriano v. Commissioner, 90 T.C. 44 (1988); Fielding v. Commissioner, T.C. Memo 1992-553; Universal Research and Development Partnership No. I v. Commissioner, T.C. Memo 1991-437; Schwartz v. Commissioner, T.C. Memo 1991-380; Berry v. Commissioner, T.C. Memo 199-145; Charlton v. Commissioner, T.C. Memo 1990-402; Bukove v. Commissioner, T.C. Memo, 1989-588; Golden v. Commissioner, T.C. Memo 1989-514; Keenan v. Commissioner, T.C. Memo 1989-300; Brown v. Commissioner, T.C. Memo 1988-527.

I submit that the "primary" profit objective test suggested by Judge Ruwe ignores the commercial and business reality that the tax laws affect the shape of most business

transactions. Frank Lyon v. United States, 435 U.S. 561, 580 (1978). The underlying activity on which a passive, tax-sheltered investment is typically structured generally constitutes an activity that carries with it (assuming it is not a sham) significant tax benefits. The availability of the tax benefits, or tax shelter, is often the reason the particular activity (e.g., equipment leasing) is selected in preference to an activity that does not carry with it significant tax benefits (e.g., undeveloped land). The presence, therefore, of significant tax benefits (that may even represent the investors' primary objective for entering into the transaction) should not result in the loss of the associated tax benefits if the investor, in fact, has an actual and honest profit objective apart from the tax benefits (and assuming the transaction is not a sham).

Judge Ruwe's concurring opinion cites the Supreme Court's opinion in Commissioner v. Groetzinger, 480 U.S. 23 (1987), as support for his suggestion that we should require taxpayers to prove a "primary" profit objective in analyzing the allowableness of tax benefits associated with passive, tax-sheltered investments. In Commissioner v. Groetzinger, supra at 35, the Supreme Court utilized a primary profit-objective test to ascertain whether a taxpayer was engaged in the active conduct of a gambling trade or business activity or whether the taxpayer's gambling activity was merely a hobby. As stated by the Supreme Court, "the taxpayer's primary purpose for engaging in the activity must be for income or for profit. A sporadic activity, a hobby, or an amusement diversion does not qualify." [Footnote omitted].

The hobby-loss issue in Groetzinger is distinguishable from issues arising in the context of tax-sheltered investments, and as suggested in Snyder v. United States, 674 F.2d 1359, 1363 (10th Cir. 1982), the primary profit-objective test should only apply when distinguishing between a hobby and a trade or business activity. See also Carkhuff v. Commissioner, 425 F.2d 1400, 1404 (6th Cir. 1970), affg. T.C. Memo 1969-66; Schley v. Commissioner, supra at 750. As noted in Johnson v. United States, 11 Cl. Ct. 17, 27, 58 AFTR 2d 86-5893, at 86-5901, 86-2 U.S.T.C. par. 9705 at 85,705 (1986), "the predominant profit motive cases under section 162 have importance only in the 'hobby loss' context, and do not control in a business situation and a primary profit-objective test is not supported by relevant statutory language or legislative history."

Recently, in ACM Partnership v. Commissioner, 73 TCM 2189 (1997), affd. in part and rev'd in part, 157 F.3d 231 (3rd Cir., 1998), cert. denied, 119 S. Ct. 1251 (1999), the Tax Court was faced with assessing whether a series of complex financial transactions had the requisite economic substance to be respected for U.S. federal income tax purposes. ACM Partnership involved a foreign partnership that engaged in contingent installment sales transactions of certain notes that shifted

income to a foreign partner and generated a capital loss to its U.S. partner, Colgate-Palmolive, which incurred all the costs. The Tax Court found, in a memorandum decision, that at the time Colgate-Palmolive entered into the partnership, its only opportunity to earn a profit was through either an increase in the credit quality of the issuers of the notes or a 400-500 basis point increase in the 3-month LIBOR interest rate.

The Tax Court found it was impossible for the issuers' credit quality to increase by the necessary amount because it was so highly rated at the time of the transaction. Moreover, a 6-year review of the 3-month LIBOR rate by the Tax Court failed to find an increase of even 300 basis points within that time frame. Thus, the Tax Court concluded that there was no reasonable expectation of profit from the investment strategy undertaken by the taxpayer, without regard to tax benefits, and that engaging in such strategy was not "consistent with rational profit-motivated behavior in the absence of expected tax benefits." In explaining its rationale, the Tax Court held "in this case...the taxpayer desired to take advantage of a loss that was not economically inherent in the object of the sale, but which the taxpayer created artificially through the manipulation and abuse of the tax laws. A taxpayer is not entitled to recognize a phantom loss from a transaction that lacks economic substance."

The Tax Court also determined that, on the basis of the evidence presented, the investment strategy did not achieve the stated hedging effects and other non-tax commercial goals as the taxpayer had contended. Thus, the Tax Court concluded that the strategy served no useful non-tax business purpose and held for the Service.

On ACM's appeal to the Third Circuit Court of Appeals, the appellate court applied an economic substance analysis in its partial affirmation of the Tax Court's holding, finding that ACM's

transactions had no effect on ACM's net economic position or non-tax business interests and thus did not constitute an economically substantive transaction that may be respected for tax purposes. The Third Circuit did acknowledge that it is "well established that where a transaction objectively affects that taxpayer's net economic position, legal relations, or non-tax business interests, it will not be disregarded merely because it was motivated by tax considerations." The Third Circuit did allow ACM to deduct the economic losses it incurred in the transaction.

The ACM case appears to be an affirmation of the well developed case law regarding sham transactions by virtue of the fact that the Tax Court cited and applied the two-part "sham" test of Rice's Toyota World. While the Tax Court analyzed other business alternatives the taxpayer could have pursued, it does not appear the court meant to imply that a taxpayer must always pursue the most efficient and profitable means of accomplishing the taxpayer's goals in order to avoid having the transaction labeled a "sham." Rather, the court appears to have been assessing alternative business transactions as a means of gauging the validity of the taxpayer's assertions regarding business purpose.

These principles have been recently reaffirmed in a number of cases. See Winn-Dixie Stores, Inc. v. Commissioner, 113 T.C. No. 21 (1999) (finding the taxpayer's leveraged corporate-owned life insurance ("COLI") program lacked economic substance and constituted a "sham" for tax purposes since "[t]he only 'expense' that was reduced by the COLI plan was petitioner's income tax liability"); Compaq Computer Corp. v. Commissioner, 113 T.C. No. 13 (1999) (disallowing as lacking economic substance the capture of foreign tax credits through an American depository receipts ("ADR") arrangement where petitioner's treasurer failed to separately analyze the transactions or consult outside advisors, shredded the spreadsheet the ADR advisor provided, and

failed to discuss with the ADR advisor such basic information as the price of the ADRs); Saba Partnership v. Commissioner, T.C. Memo. 1999-359 (disallowing similar ACM-type transaction); United Parcel Service of America, Inc. v. Commissioner; T.C. Memo. 1999-268 (disallowing distribution of newly formed reinsurance subsidiary as a taxable dividend because such restructuring was a "sham" that had "neither business purpose nor economic substance, other than tax avoidance"). Further, the IRS, in Notice 99-59 (December 27, 1999),[71] used similar arguments concerning the lack of economic substance in voicing its disapproval of an arrangement commonly referred to as a bond and option sales strategy ("BOSS") (involving a borrowing and encumbrance and the corporate distribution of assets subject to the encumbrance). As explained below, the analysis used in the above-described matters is inapplicable to the transactions at issue here.

***Economic Substance***

The critical issue in determining whether the investments made by you in the foreign currency options positions had economic substance is whether the investments had "realistic potential for profit" or some other practicable economic effect without regard to tax consequences. According to the Tax Court,

> "The phrase "realistic potential for profit" does not mean that the transaction must make a profit or even that similar transactions generally are profitable. As we found in Abramson v. Commissioner, only an average of 1 film in 10 is successful; in wildcat oil drilling, the success rate based upon the number of wells drilled may be low. Realistic potential for profit is found, however, when the transaction is carefully conceived and planned in accordance with standards applicable to the particular industry, so that judged by those standards the hypothetical reasonable businessman would make the investment."

[71] Although notices do not have the force of law, they are indicative of the position of the IRS, and "[t]axpayers are entitled to rely on and the [IRS] states that it will be bound by substantive and procedural guidance provided by notices or announcements." Hall v. Commissioner, T.C. Memo. 1998-336 (citing Rev. Rul. 90-91, 1990-2 C.B. 262).

Cherin v. Commissioner, 89 T.C. 986, 993-994 (1987).

In Salina Partnership LP, FPL Group, Inc. v. Commissioner,[72] the Tax Court ruled that a short sale transaction providing a 4 to 7 percent return on investment over the yield on Treasury bills and potentially $119 million in additional tax benefits was not a sham in substance. Salina Partnership was formed on December 16, 1992 and entered into a short sale of U.S. Treasury bills with a face value of $350 million on December 17. On December 28, 1992, FPL acquired a 98 percent partnership interest in Salina. On December 30, 1992, Salina closed its short position in the Treasury bills and the proceeds were reinvested pursuant to an alternative tax strategy. The Salina Partnership continued its existence until November of 1994. For the short 1992 taxable year, Salina Partnership reported a capital gain of $344 million; FPL offset its distributive share ($337 million) with its significant capital loss carryover resulting from an unrelated sale. FPL increased its outside basis in its interest in the limited partnership by the $337 million gain it had reported in 1992, and claimed large ordinary losses attributable to its interest in the limited partnership for the taxable years 1994 through 1997.

The IRS in Salina argued that FPL's investment in Salina during the period December 28 through 31, should be disregarded for tax purposes as a sham in substance. The IRS contended that Goldman Sachs, fully aware that FPL had incurred a large capital loss in 1992, orchestrated Salina's $350 million short position in Treasury bills so that, following FPL's investment in the partnership and the immediate liquidation of the partnership's investments, Salina would realize a substantial capital gain and a subsequent built-in loss in its Salina partnership interest -- a loss that FPL would be able to realize at will through its control of Salina.

---

[72] T.C. Memo 2000-352 (November 14, 2000).

However, the Tax Court held that FPL's investment in Salina was not a sham in substance because FPL invested in Salina in order to achieve legitimate business objectives independent of the purported tax benefits and FPL's investment produced objective economic consequences.

> Although we agree with respondent that Goldman Sachs structured FPL's purchase of the Salina partnership interest to provide FPL with a perceived tax benefit, this factor, standing alone, is insufficient to render the transaction a sham in substance.
>
> Considering all the facts and circumstances, we conclude that FPL entered into the Salina transaction to achieve a valid business purpose independent of tax benefits. The record demonstrates that FPL entered into the Salina partnership for the primary purpose of enhancing the return on its short-term investments. . .
>
> We are convinced that FPL's investment in Salina provided a reasonable opportunity for FPL to earn profits independent of tax benefits. As previously discussed, FPL carefully evaluated the potential risks and rewards of the . . . strategy. . . we are satisfied that the potential profits associated with the investment were not de minimis relative to the perceived tax benefit.

As shown below, there is ample evidence that the investments made had profit potential.

***Business Purpose***

You have indicated that you, JFWLLC, the Partnership and JFW INC. each had the business purpose of a profit objective with respect to your respective investments and activities. Although a reasonable expectation of profit is not required, the activity must be entered into in good faith with the objective of making a profit. Taube v. Commissioner, 88 T.C. 464, 478-479 (1987).

There are several aspects of the transaction, however, which may be perceived to demonstrate a substantial tax motive in connection with the transactions. Those facts, however, should not render the transactions shams. The general standard under the sham transaction doctrine is whether the transaction was entered into for the sole motive of obtaining tax benefits. As long as a bona fide non-tax business purpose exists, the courts do not weigh the motives. See, e.g., Knetsch v. United

States, 364 U.S. 361 (1960); United States v. Consumer Life Insurance Co., 430 U.S. 725 (1977); Frank Lyon v. United States, 435 U.S. 561 (1978); Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985), affg. and revg. 81 T.C. 184 (1983); Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966); Peat Oil & Gas Associates v. Commissioner, 100 T.C. 271 (1993).

The recognition and magnitude of any tax benefits from the investment to you may be relevant to the subjective intent analysis but must be viewed in light of all of the facts surrounding the transactions. The business purpose and substance of the Long and Short Options positions are addressed subsequently in this Section.

***The Options Investments of JFWLLC***

You engaged in the following Options transactions: you, through JFWLLC, bought (1) a digital option on the Euro/U.S. Dollar exchange rate at a strike price of 0.9912 U.S. Dollars per 1.00 Euro with an expiration date of April 17, 2000, a settlement date of April 19, 2000, and a payoff amount of $19,325,000, and paid a premium of $9,662,500 and (2) a digital option on the Swiss Franc/U.S. Dollar exchange rate at a strike price of 1.7027 Swiss Francs per 1.00 U.S. Dollar with an expiration date of April 17, 2000, a settlement date of April 19, 2000, and a payoff amount of $19,325,000 and paid a premium of $9,662,500. Additionally, you sold (1) a digital option on the Euro/U.S. Dollar exchange rate at a strike price of 0.9914 U.S. Dollars per 1.00 Euro and received a premium of $9,565,875, with an expiration date of April 17, 2000, a settlement date of April 19, 2000, and a payoff amount of $19,131,750 and (2) a digital option on the Swiss Franc/U.S. Dollar exchange rate at a strike price of 1.7029 Swiss Francs per 1.00 U.S. Dollar and received a premium of $9,565,875, with an expiration date of April 17, 2000, a settlement date of April 19, 2000, and