a payoff amount of $19,131,750. On April 3, 2000, you contributed the above referenced positions to the Partnership. On April 17, 2000, the Partnership's Option positions terminated.

For purposes of analyzing whether the above described options transactions were shams, it is possible that either the two-factor test or the Knetsch/Goldstein test could be applied. Under either test, those transactions should be respected as structured for tax purposes.

The foreign currency options transactions must be respected for tax purposes because they were economically substantive transactions. Unlike the investments in Knetsch, Goldstein, and Sheldon, the foreign currency options positions did not lock in economic losses; rather, they created substantial risk and potential profit.

We have been informed that an objective investment analysis of the instant option positions at the time of your investment in such option positions, using generally accepted models employing standard option pricing theories and methodologies, indicated a substantial probability that the long option strike price level would be reached and that profitability would be achieved. With a payoff amount as a multiple of the investment amount of 2.0 with respect to the Swiss Franc options, and 2.0 with respect to the Euro options, it is objectively demonstrable that a realistic possibility of economic profit existed.

Given that the foreign currency options positions were imbued with economic substance and were not entered into and held solely for tax purposes, you were free to structure such an option investment however you desired. Frank Lyon Co. v. United States, 435 U.S. 561 (1978). This principle was generally reflected in a relatively recent Tax Court case Richard Hansen Land, Inc. v. Commissioner, T.C. Memo 1993-249. In that case the IRS urged the court to recast for tax purposes

a closely-held taxpayer's acquisition of an amortizable estate for years in farm land on substance-over-form grounds. The Tax Court rejected the IRS's argument and stated,

> "We are not impressed with respondent's search for a business purpose to justify the form of the transaction. It is obvious that respondent's attack is not directed at the fact that petitioners ended up with an estate for years. Rather, respondent is saying that however valid the reasons for acquiring an estate for years may be, one must have a reason other than a tax reason for the form used. The effect of such a position is to suggest that if tax advantages are the motivating force, one must choose a structure for the transaction which will minimize and even eliminate those advantages, at least where related parties are involved. Under this thesis, the fact that the transaction has substance would be irrelevant. We were not prepared to go this far in Gordon v. Commissioner, supra, and we are not prepared to extend our holding in that case to a situation such as it involved herein. The question in this case is not one of purpose but whether the acquisitions of the estates for years and the remainders "were in fact what they appear to be in form." Cf. Hobby v. Commissioner, 2 T.C. 980, 985 (1943). We think that the circumstances herein satisfy that test. The fact that the transactions might have been structured another way, more advantageous to the revenue, does not, in and of itself, justify recasting their form.

In summary, there is substantial evidence and authority for concluding that the Options transactions at issue had economic substance and were entered into for business purposes.

***Non-Applicability of the Step Transaction Doctrine***

The "step transaction" doctrine represents a judicially imposed requirement to amalgamate formally separate transactions as a single integrated transaction "if such steps are in substance integrated, interdependent, and focused toward a particular result." Penrod v. Commissioner, 88 T.C. 1416 at 1428 (1987).

Application of the step transaction doctrine may cause certain intermediate steps in a transaction to be ignored for federal income tax purposes. As stated by the Tax Court in Smith v. Commissioner, 78 T.C. 350, 389 (1982):

> "The step transaction doctrine generally applies in cases where a taxpayer seeks to get from point A to point D and does so stopping in between at points B and C. The whole purpose of the unnecessary stops is to achieve tax consequences differing from those which a direct path from A to D would have produced. In such a situation, courts are not bound by the twisted path taken by the taxpayer, and the intervening stops may be disregarded or rearranged."[73]

Typically, the Courts have invoked the step transaction doctrine as the result of several alternative tests.

Under the "binding commitment" test, steps will be collapsed if, at the time of the first step, there was binding commitment to undertake the later steps. Under the "mutual interdependence" test, steps will be collapsed if they are so interdependent that the legal relations created by one step would have been economically meaningless without a completion of all of the steps. Under the "end result" test, the Courts will collapse a series of formally separate steps if they are really prearranged parts of a single transaction intended from the outset to reach a particular result. While this test has potentially broad application, it has been somewhat limited by interpretations which would require, (regardless of the test employed), that the step transaction doctrine only be invoked where meaningless or unnecessary steps are undertaken without independent legal significance.

---

[73] The court in Smith rejected the IRS's argument under the step transaction doctrine on the following basis:

> "Respondent has not pointed us to any court decision which to this date has held that the step transaction doctrine requires that gains and losses in a tax sheltering investment spanning the course of more than 1 taxable year must be integrated and recognized only at the termination of such an investment 2, 5, or 20 years down the road. Indeed, such an argument would go far toward undermining the very system of annual tax accounting.
>
> Respondent's argument also fails to recognize that there is some risk that the future offsetting gains might never occur (a conceivable, though not probable, result in the instant case). Accordingly, we view petitioners' straddle transactions as being distinguishable from the situations where courts have previously applied the step transaction doctrine, most notably in the taxation of transactions between corporations and stockholders."

78 T.C. at 389-390.

More recently, in True v. United States, 190 F.3d 1165 (10th Cir. 1999), the court affirmed summary judgment in favor of the IRS regarding the integration of one series of transactions under the "end result" formulation of the step transaction. There, the court found the evidence clearly showed that, from the beginning, the end result was the sole outcome intended to be achieved by entering into the transactions. The court also concluded that integration of the transactions would be appropriate under the "mutual interdependence" formulation, because each of the steps would have been fruitless without the others. The court did, however, reverse the district court's summary judgment integrating another series of transactions. The court concluded that with respect to those transactions, there was a factual issue under the "end result" formulation whether the evidence created a genuine factual issue that the end result achieved was the sole intended result from the outset. Similarly, the court found a factual issue under the "mutual interdependence" formulation, because it appeared that each of the steps might have economic significance on its own. The True decision appears to stand for the proposition that if the facts demonstrate that at the time of entering into a series of transactions an investor has in mind only one final outcome, and no other plausible outcome exists, a court can apply the "end-result" formulation of the step transaction doctrine to disregard intermediate steps. This is particularly true if those intermediate steps had so little economic significance on their own as to also be covered by the "mutual interdependence" formulation.

It should be noted that under any of these specific tests, you should be viewed as the transferor of the Options positions, not cash, to the Partnership, i.e., you never had a "binding commitment" to transfer the Options positions to the Partnership, or to subsequently transfer in the Partnership to JFW INC. The "steps" were not "mutually interdependent" because each phase of the

transaction was economically viable regardless of whether the next "step" was undertaken; and you were willing from an economic viewpoint to enter into the options transaction and the contribution transaction regardless of whether there was any subsequent transfer to the third party which occurred as the "end result" of the transaction. In the case of Weikel v. Commissioner, 51 TCM 432 (1986), the court indicated that the end result test will not apply where the taxpayer completes a first step expecting to undertake a later step but knowing that the later step may not occur.

The step transaction doctrine cannot be used to ignore tax-motivated transactions unless they are shams; nor can it be invoked to create steps that did not occur. See Grove v. Commissioner, 490 F.2d 241 (2d Cir. 1973) in which the court refused to recast a tax-motivated transaction as a redemption followed by a gift rather than a gift followed by a redemption because there is no basis for "generat[ing] events which never took place just so an additional tax liability might be asserted"; see also Esmark, Inc. v. Commissioner, 90 T.C. 171 (1988), aff'd per curiam, 886 F.2d 1318 (7th Cir. 1989), Technical Advice Memoranda 8735006 and 8735007 (May 18, 1987), Technical Advice Memorandum 8815003 (December 11, 1987) and Technical Advice Memorandum 8948001 (November 27, 1989). For example, in one case the Tax Court found that for purposes of determining the year in which investment tax credit recapture is realized, the step transaction doctrine is ineffective to treat the second step of a tax-free "spin-off" (the distribution of stock) as occurring in the year the first step of the transaction (the drop down of assets into the spun-off companies) was undertaken, stating:

> "None of the steps in this transaction were meaningless or unnecessary . . . just as the step transaction doctrine is inappropriate to generate events neither may it rearrange events so as to cause a significant step . . . which actually takes place in one year to be treated for tax purposes as having taken place in a different year. Where a

> particular step has an independent tax consequence, as is the case here, that step is given its tax consequence in the particular year in which it takes place."

Tandy v. Commissioner, 92 T.C. 1165, 1172-1173 (1989).

This rationale is equally applicable to cases involving timing issues. As the court stated in Walt Disney, Inc. v. Commissioner, 97 T.C. 221, 236 (1991), "The Tandy reasoning is no less appropriate here merely because a change in taxable years did not intervene," and ". . . overall plans and integrated transactions do not, without more, justify application of the step transaction doctrine."

None of the transactions engaged in by you or the Partnership was meaningless. Rather, you, through JFWLLC, entered into the Options with a realistic hope of profit (as well as a risk of loss) regardless of whether any subsequent contribution to another entity in which you held an interest occurred. The same is true for the Partnership's investment in the Shares. In addition, the Partnership was entitled to any profit (as well as risk of loss) on the Options and other investments (including the Shares) regardless of whether any subsequent transaction occurred. Thus, none of the transactions were illusory, but rather were imbued with economic substance.

The decision of the Tax Court in Esmark precisely illustrates that the IRS cannot invent fictitious transactions merely because the transactions the taxpayer actually undertook consisted of tax-saving, but meaningful steps, aimed at a particular conclusion. In that case, Esmark Corporation ("Esmark"), for valid business reasons, wanted to dispose of its energy segment and redeem a substantial portion of its stock. To accomplish these goals, Esmark solicited third parties to undertake a public tender offer to purchase approximately 50% of its stock. Esmark intended to then distribute the stock of its wholly-owned subsidiary, Vickers (which functioned as a holding company for TransOcean, an energy subsidiary), in exchange for the recently-purchased Esmark stock held

by the acquirer. Esmark wanted to structure the disposition of its energy business and the contraction of its capital structure in this manner primarily because it believed it would not be taxed on this transaction under the literal language of Code section 311 as then in effect.

Mobil Oil Corp. ("Mobil") agreed to the tender offer-redemption format suggested by Esmark in the offer it submitted, and emerged as the highest bidder. Mobil and Esmark negotiated additional terms and entered into a binding agreement providing for the tender offer/redemption transaction. A Mobil subsidiary completed a successful tender offer for approximately 54% of Esmark's stock and on the same day exchanged its newly acquired Esmark stock for the Vickers stock. The IRS rejected Esmark's characterization of the exchange as a tax-free distribution of Vickers stock in redemption of Esmark stock held by Mobil, and attempted to recast the transaction as if Esmark had sold Vickers stock to Mobil for cash and then distributed the cash to its shareholders in redemption of their Esmark stock.

The Tax Court found no merit in any of the theories that the IRS advanced to require recharacterization of the transaction as a sale of Vickers followed by a self-tender. Specifically, while the Tax Court found that the transaction could have been accomplished differently, the Tax Court also held that Mobil's ownership of Esmark's stock could not be disregarded under the step transaction doctrine, even though Esmark clearly chose to structure a transaction resulting in the least tax. The Tax Court stated:

> "[The IRS] proposes to recharacterize the tender offer/redemption as a sale of the Vickers shares to Mobil followed by a self-tender. This recharacterization does not simply combine steps; it invents new ones. Courts have refused to apply the step transaction doctrine in this manner. In Grove v. Commissioner, 490 F.2d 241 (2d Cir. 1973), affirming a Memorandum Opinion of this Court, the Commissioner relied on the step transaction doctrine to recharacterize a donor's gift of stock followed by

a redemption of that stock from the donee as a redemption of the donor's shares followed by a gift of cash to the donee. The Court of Appeals stated:

> '. . . [W]e can discover no basis for elevating the Commissioner's 'form' over that employed by the taxpayer in good faith. 'Useful as the step transaction doctrine may be in the interpretation of equivocal contracts and ambiguous events, it cannot generate events which never took place just so additional tax liability might be asserted.'"

90 T.C. at 196-197 (citations omitted).

Similarly, the step transaction doctrine should not be available to insert fictitious steps so as to maximize a taxpayer's tax liability. Hypothetically, a transaction could have been structured that would leave you in nearly the same ultimate position as the described transactions (disregarding the effect of taxes). However, you did not choose to undertake this hypothetical transaction. Just as the step transaction doctrine did not apply to treat Esmark as redeeming its stock for cash following Mobil's purported purchase of Vickers, it should also not apply to treat you or the Partnership as having engaged in a transaction which did not actually occur.

Authorities under Code section 351 further support respecting the independent transactions undertaken by you and the Partnership. Under Code section 351, transferors of property to a corporation in exchange for the corporation's stock must be in "control" of the corporation "immediately after" the exchange in order to obtain tax-free treatment. The IRS has sometimes asserted that the transferor is not in control "immediately after" the exchange when a transferor of property disposes of the corporation's stock shortly after receipt.

Thus, in <u>American Bantam Car Co. v. Commissioner</u>, 11 T.C. 397 (1948), aff'd per curiam, 177 F.2d 513 (3rd Cir. 1949), the step transaction doctrine did not defeat an otherwise qualifying Section 351 transaction despite the existence of a prearranged plan to dispose of stock representing

control. In that case, shareholders transferred assets to a corporation in exchange for common stock representing control in the corporation. Five days later, pursuant to a previous intent, the corporation and shareholders contractually agreed with underwriters that the shareholders would transfer their newly acquired common stock to the underwriters as and if the underwriters sold shares of preferred stock in the corporation. The underwriters successfully marketed the preferred stock, and the shareholders transferred stock representing "control" of the corporation to the underwriters pursuant to their agreement. Nevertheless, the Tax Court found that the subsequent loss of control was not an integral part of the initial Code section 351 transaction, and thus the shareholders' common stock ownership was respected for purposes of determining whether Code section 351 was satisfied. See also Harder v. Commissioner, 17 TCM 494 (1958) (Code section 351 was satisfied even though third parties had the option, but not the obligation, to purchase the stock received by the transferor shareholders as of the date of the Code section 351 exchange); and Rev. Rul. 78-294, 1978-2 C.B. 141 (a firm commitment underwriter who intends to sell to the public the stock he receives from a corporation is in "control" of the corporation for purposes of Code section 351 because the underwriter would be required to keep the shares of stock he could not sell and therefore assumed the risks of marketing the stock).

Several rulings issued by the IRS also illustrate that the step transaction doctrine is not available as a means to recharacterize a tax-motivated transaction consisting of economically meaningful events. Examples of such rulings focus on "debt-for-equity swaps" and "debt-for-debt swaps."

In a typical debt-for-equity swap, a corporate issuer ("Issuer") and an underwriter ("Underwriter") enter into a binding exchange agreement ("Exchange Agreement") pursuant to

which the Issuer would agree to reacquire its outstanding debentures from the Underwriter in exchange for newly issued shares of its stock. Generally, the Underwriter would purchase the corporation's outstanding debentures in various acquisition transactions prior to entering into a formal Exchange Agreement, but after discussing the terms of the transaction and preparing written proposal letters setting forth the expected rights and obligations of the parties to the transaction. A typical Exchange Agreement would then provide that the Underwriter would register its newly acquired stock for resale with the Securities and Exchange Commission ("SEC"), although the Underwriter would not be legally committed to the Issuer to sell such stock. In actual practice and in accordance with the parties' intent, however, the Underwriter would sell its newly acquired stock immediately after the swap, sometimes pursuant to binding agreements with brokers entered into at the same time as the Exchange Agreement. Under Code section 108 (as in effect during the years involved), the Issuer did not report cancellation of indebtedness income even though the value of the stock was less than the face amount of the canceled debt. Code section 108 was subsequently amended in 1984 to treat a debtor corporation that uses its stock to cancel debt as satisfying the debt with an amount of money equal to the fair market value of the stock. Thus, if the stock was issued in exchange for debt trading at a discount after the amendment to Code section 108, the debtor corporation would recognize cancellation of indebtedness income. A typical debt-for-debt swap followed essentially the same form as a debt-for-equity swap, except that the parties intended to avoid cancellation of indebtedness income on the basis of an exception for recapitalizations derived from then existing Code section 1232.

In Technical Advice Memoranda 8735006 and 8735007 (May 18, 1987) (debt-for-equity swaps) and in Technical Advice Memorandum 8815003 (December 11, 1987) (debt-for-debt swap),

the National Office of the IRS rejected the District Director's contention that the exchanges should be recast on the grounds of "substance over form" as direct retirements by the Issuer of its debt for cash (resulting in cancellation of indebtedness income). In all three rulings, the National Office also rejected the District Director's attempt to recast the swaps under the theory that the Underwriter was the Issuer's agent, which would have attributed the Underwriter's activities to the Issuer. The National Office found in these rulings that the recharacterizations proposed by the field agents would require a conclusion that in substance the Underwriter had first participated in an underwriting of new stock or debt on behalf of the Issuer, and that the Issuer had then used the proceeds of the underwriting to repurchase its existing debt.

The National Office noted that it found this recharacterization "problematic because it requires a reversal of the order of the transactions, which the Courts and IRS have generally been reluctant to do in applying the step-transaction doctrine." (Citations omitted). Moreover, the National Office stated that it found "no merit to the argument that application of the step-transaction doctrine here and the resulting recharacterization of the form of these transactions better portrays the substance of these transactions. Contrarily, its application would ignore salient economic realities."

It should be noted that in these rulings the National Office found that several meaningful factors precluded the District Director from recharacterizing the transaction. Specifically, the Underwriter acquired at least some of the existing debt for its own account prior to the execution of the Exchange Agreement, and the Issuer did not provide funds for the acquisition of such debt or act as guarantor for any financing arrangement with respect to such acquisition, so that "[t]he Underwriter ran the risk, however minimal, that the [Issuer] would not execute [the Exchange Agreement], and acquired whatever benefit" ownership of the existing debt provided. The IRS

found such risk even though, in Technical Advice Memorandum 8735007, an SEC filing was made with respect to the newly issued stock and a group of brokers agreed to buy the stock received by the Underwriter on the same day that the Exchange Agreement was executed between the Underwriter and Issuer, and, in Technical Advice Memorandum 8815003, third-party underwriters were, as of the date of the exchange, "previously committed" to acquiring the newly issued debt of Underwriter. Additionally, the Underwriter, not the Issuer, stood to profit from the sale of the stock or debt received from the Issuer and the Underwriter, not the Issuer, bore the risk of loss on the subsequent sales of the newly issued stock or debt and the Issuer generally did not provide any indemnification to the Underwriter against this loss. In Technical Advice Memorandum 8735007, however, the Issuer did agree to indemnify the Underwriter in the event that regulatory impediments prevented the Issuer from entertaining the Underwriter's offer to consummate the exchange. The National Office noted that such an indemnity is not uncommon and did not reduce the Underwriter's risk with respect to selling the newly acquired stock. In Technical Advice Memorandum 8815003, the National Office also noted that the Issuer at one point refused to renegotiate the pricing terms when the Underwriter suggested revising the exchange ratio to reflect the increased risks from an unexpected delay in closing. Further, the Issuer did not redeem any of the newly issued stock or debt, indicating that the Underwriter was not merely a facilitator of a transitory issuance of new securities.

The National Office concluded in each Technical Advice Memorandum that application of the step transaction doctrine would distort the economic substance of the transactions. In Technical Advice Memoranda 8735006 and 8753007, the National Office found:

> "Recasting the form . . . would not better reflect [the] substance than the form in which the transactions were cast. While it would result in a greater tax liability . . . there is nothing in the tax law that requires a taxpayer to structure his transactions in a form that will result in a greater tax liability, so long as there is substance to the form that is chosen."

Similarly, the National Office rejected application of the step transaction doctrine in Technical Advice Memorandum 8815003, stating:

> "The application of a step transaction approach to the facts presented would distort the economic substance of the transactions involved. Moreover, none of the alternative step transaction formulations apply. Certainly neither party was under a binding commitment prior to the execution of the Exchange Agreement, nor was the Underwriter under any binding commitment to [Issuer] to sell the New Debentures to the public. Each of the supposed steps -- acquisition of the Old Debentures for New Debentures, and sale of the New Debentures -- carried its own independent legal and economic significance. The earlier transactions were not "fruitless" without the later transactions [so] the mutual interdependence test would not result in stepping the transactions together. Finally, the end result test merely states that, when a taxpayer intends by a series of circuitous transactions to reach a particular result, the actual circuitous transaction undertaken by the taxpayer may be recharacterized for tax purposes to reach the same result in a more direct manner. Application of the end result test would not result in the separate transactions being stepped together, because to do so would not only ignore the substance of each transaction, but would also presuppose an end result which never took place -- that is, [Issuer] never received cash for its New Debentures. Thus, recasting the transaction would not result in a better reflection of the economic realities of the debt-for-debt exchange than the form chosen by the parties, and therefore the end result test does not require that the transaction be stepped together."

In a like manner, the step transaction doctrine should not be applied to treat the Partnership as the initial investor in the options positions. Such a recasting of the transaction would require a reversal of steps, which the National Office has acknowledged is problematic.

In addition, an analysis of the factors the National Office found significant in the swap rulings supports the view that the form of the described transactions has economic substance and must be respected. First, you invested in the Long Option and sold the Short Option for your own account

using your own funds as investment capital. Those positions had independent economic profit potential. You expected to profit from your options positions even if there was no subsequent transfer of the securities positions to the Partnership.

As the IRS stated in Rev. Rul. 79-250, 1979-2 C.B. 156:

> "The Internal Revenue Service has indicated on several occasions that threshold steps will not be disregarded under a step transaction analysis if such preliminary activity results in a permanent alteration of a previous bona fide business relationship. Thus, the substance of each of a series of steps will be recognized and the step transaction doctrine will not apply, if each such step demonstrates independent economic significance, is not subject to attack as a sham, and was undertaken for valid business purposes and not mere avoidance of taxes."

Each of the transactions of you, JFWLLC, the Partnership and JFW INC. was meaningful and imbued with non-tax considerations. Each created risk and left the parties involved in distinctly different legal and economic positions.

In summary, recasting any of the transactions addressed in this opinion would distort, not better reflect, the economic and legal realities. Therefore none of those transactions should be stepped together. Where there are two or more paths to the same end result, the taxpayer is not required to take the more expensive route. See, e.g., Glacier State Elec. Supply Co. v. Commissioner, 80 T.C. 1047 (1983).

## L. TREASURY REGULATION SECTION 1.701-2

Treasury Regulation section 1.701-2 (sometimes referred to herein as the "Regulation") was proposed by the Treasury on May 12, 1994, to be effective on or after May 12, 1994, and was revised and re-issued in final form with retention of the original effective date, except for certain aggregate versus entity issues, on December 29, 1994, notwithstanding substantial criticism and adverse commentary by tax practitioners, trade and professional organizations, claims of the House Ways and Means and Senate Finance committees, and at least one federal agency. As modified, the regulation was effective for any transaction "involving a partnership" occurring on or after May 12, 1994.

Under the Regulation, if a partnership is formed or availed of in connection with a transaction with a principal purpose of substantially reducing the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K of the Code (the partnership rules), the IRS can disregard the form of the transaction. In such a case, even if the taxpayer complies with the literal language of one or more of the provisions of the Code or regulations thereunder, the IRS can recast the transaction for federal tax purposes as it deems appropriate. The principal purpose for structuring a transaction involving a partnership will be determined based on all of the facts and circumstances, including a number of illustrative factors articulated in the final Regulation.

There is no clear guidance as to how this Regulation will be applied by the IRS and there can be no assurances that the IRS will not attempt to apply the Regulation to you, JFWLLC, the Partnership and/or JFW INC.

***Provisions of the Regulation***

The requirement of Treas. Reg. sec. 1.701-2 of a purpose to achieve a result inconsistent with the purpose of Subchapter K is difficult to analyze. Treas. Reg. sec. 1.701-2(a) purports to define the intent of Subchapter K:

> "Subchapter K is intended to permit taxpayers to conduct joint business (including investment) activities through a flexible economic arrangement without incurring an entity-level tax."

However, implicit in the intent of subchapter K, according to the IRS and the Treasury, are the following requirements:

(1) the partnership must be bona fide and each partnership transaction or series of related transactions (individually or collectively) must be entered into for a substantial business purpose;[74]

(2) the form of each partnership transaction must be respected under substance over form principles; and

(3) generally, the tax consequences under subchapter K to each partner of the partnership operations and of transactions between the partner and the partnership must accurately reflect the partner's economic agreement and clearly reflect the partner's income (collectively, the "proper reflection of income").

The Regulation notes that certain subchapter K provisions and the regulations thereunder were adopted to promote administrative convenience or other policy objectives, with the recognition

---

[74] The definition of "substantial" is not provided in Treas. Reg. sec. 1.701-2. Ordinarily, "substantial" means "real" or more than de minimis." See, e.g., Black's Law Dictionary 1428 (6th ed. 1990); Treas. Reg. sec. 25.2703-1(c)(1) ("Any discretionary modification . . . that results in other than a de minimis change . . . is a substantial modification."); Valmont Industries, Inc. v. Commissioner, 73 T.C. 1059, 1074 (activity was "substantial," not "de minimis"); McNemany v. Commissioner, 54 T.C. 1057, 1064 (1970) ("different is substantial, not *de minimis*"). For purposes of the regulation, both meanings are consistent with unofficial statements of Treasury and IRS officials. See Sheppard, Lee, "Final Partnership Antiabuse Rule: Grudging Acceptance," 66 Tax Notes 776, 777-778 (Feb. 6, 1995): "There was no conscious effort to incorporate the standards of section 355; we meant that business purpose has to be real, not an afterthought." (Statement of Monte Jackel, IRS Acting Associate Chief Counsel (Domestic).) [Treasury] could just say "business purpose," because people would read that to be de minimis, and assert any old purpose. . . . A tremendous tax savings requires more than a peppercorn of business purpose." (Statement of John Rooney, Attorney-Advisor, Treasury Office of Tax Legislative Counsel.) In any event, the "substantial" standard clearly represents a lower threshold than the "primary" or "principal" standards.

that application of those provisions could, in some cases, produce tax results that do not properly reflect income. For this reason, the "proper reflection of income" requirement will be treated as satisfied (for a transaction that also satisfies the other two requirements) to the extent that the application of such provision to the transaction and the ultimate tax results are "clearly contemplated" by the provision.

The IRS can determine that to achieve tax results that are consistent with the intent of subchapter K: (1) the purported partnership may be disregarded, in whole or in part, and the partnership's assets and activities considered to be owned or conducted, respectively, by one or more of the partners; (2) one or more of the purported partners should not be treated as a partner; (3) the accounting methods used by the partnership or a partner should be adjusted to clearly reflect the partnership's or partner's income; (4) the partnership's items of income, gain, loss, deduction or credit should be reallocated; or (5) the claimed tax treatment should otherwise be adjusted or modified.

Treas. Reg. sec. 1.701-2(c) establishes a facts and circumstances analysis for determining whether a partnership was formed or availed of with a principal purpose of tax avoidance in a manner inconsistent with the intent of Subchapter K, including a comparison of the purported business purpose for a transaction and the claimed tax benefits resulting from the transaction. The Regulation also describes certain illustrative factors which might indicate (without being determinative) that a partnership was used with a principal purpose to reduce substantially the partners' federal tax liability in a manner inconsistent with the intent of Subchapter K. These factors include: (1) the present value of the partners' federal tax liability is substantially less than had the partners owned the partnership's assets and conducted the partnership activities directly; (2) the

present value of the partners' federal tax liability is substantially less than would be the case if purportedly separate transactions that are designed to achieve a particular end result are integrated in a single transaction; (3) one or more partners who are necessary to achieve the claimed tax results either have a nominal interest in the partnership, are substantially protected from any risk of loss from the partnership's activities, or have little or no participation in the partnership's profits other than a preferred return in the nature of a payment for the use of capital; (4) substantially all of the partners are related (directly or indirectly) to one another; (5) partnership items are allocated in compliance with the literal language of Treas. Reg. sections 1.704-1 and 1.704-2, but with results that are inconsistent with the purpose of Code section 704(b) and those regulations; (6) the benefits and burdens of ownership of property nominally contributed to the partnership are in substantial part retained (directly or indirectly) by the contributing partner (or a related party); or (7) the benefits and burdens of ownership of partnership property are in substantial part shifted (directly or indirectly) to the distributee partner before or after the property is actually distributed to the distributee partner (or a related party). The weight to be given these factors is also dependent on the facts and circumstances of the situations.

The requirement of Treas. Reg. sec. 1.701-2 that the partnership be utilized for "a" principal purpose of tax avoidance as opposed to having tax reduction be "the" principal purpose of utilizing the partnership suggests an interpretation by the IRS that would proscribe "an important" purpose of tax avoidance. However, Webster's Ninth New Collegiate Dictionary (Merriam-Webster Inc., 1975) defines "principal" as "most important," and the Court in Mallat v. Riddell, 383 U.S. 569 (1966) defined "primarily" as meaning "of first importance" or "principally." (Emphasis added). Thus, a reasonable regulatory interpretation would require a tax avoidance motivation to rank at least

co-equally ("a" versus "the") with some other first order purpose or constitute itself the highest purpose before the Regulation could be invoked. The existence of any non-tax purpose of higher magnitude would presumably render the tax purpose of secondary, and thus non-principal, importance.

The final Regulation initially provided sixteen examples of partnership transactions which discussed the application of the anti-abuse rule. Two of these examples (Examples 5 and 6) concerned the application of the anti-abuse rule to transfers of interests in family partnerships. However, on January 3, 1995, only five days after publishing the Regulation in final form after eight months of reconsideration, hearings and commentary, the IRS announced in Announcement 95-8, 1995-7 IRB 56, that the Regulation would be amended as of its effective date to provide that it applies solely with respect to income taxes, and that because the Regulation will not apply to transfer taxes, Examples 5 and 6 would be deleted.

The Regulation specifically provides that the IRS can continue to assert and rely upon applicable nonstatutory principles and other statutory and regulatory authorities to challenge transactions, and that the Regulation is not intended to limit the applicability of such principles and authorities.

***Analysis***

***1. Do the Transactions at Issue Violate the Regulation?***

The Partnership was a bona fide partnership (see discussion in Section C relating to the tax classification of the Partnership). Taxpayers will presumably file returns in a manner consistent with applicable statutes and validly adopted regulations; in fact, they would appear to have no choice but to do so. For example, the Supreme Court in Commissioner v. Culbertson, 337 U.S. 733 (1949), a

case dealing with using partnerships to achieve income splitting to avoid high marginal tax brackets, upheld the tax classification of a family partnership. Congress followed shortly thereafter with the enactment of the predecessor of Code section 704(e), which specifically permits the use of partnership to achieve rate splitting despite being clearly tax motivated. See S. Rep. No. 781, 82d Congress, 1st Session 38 (1951) wherein it is stated: "If the ownership is real, it does not matter what motivated the transfer to him or whether the business benefited from the entrance of the new partner." In fact, the equivalent of the current preamble to the regulations subsequently promulgated under the predecessor of Code section 704(e) expressly disavows the relevance of a tax-avoidance motive to the classification issue.

The IRS frequently cites Merryman v. Commissioner, 55 T.C.M. 191 (CCH) (1988), aff'd 873 F.2d 897 (5th Cir. 1989) as a case that supports the IRS when it attempts to disregard a partnership entity (and thus disallow the tax benefits that flowed through it) when in the view of the IRS the partnership lacks economic purpose and profit motive. The facts of the Merryman case make it clear that the decision as applied to those facts was correct. In Merryman, a partnership was formed to acquire a drilling rig from a corporation controlled by the partners of the partnership. Even though the partnership executed a note for purchase of the assets, payments of principal and interest were not timely made and management of the rig was continued by the corporation. In essence, the Tax Court held that the risks and burdens of ownership were not transferred from the selling corporation to the partnership. The Tax Court opinion and the Court of Appeals opinion made it clear that had the form of the business transaction been followed -- as is the case of the transaction at issue -- the partnership would have been respected.