Furthermore, in enacting Subchapter K in 1954, Congress stated as its motivation its desire to eliminate confusion and provide certainty with respect to the tax treatment of partnerships and partners. "The presence of a tax avoidance motive, however, is of no consequence if the reality of the transfer of interest and the good faith of the parties are satisfactorily established." Mim. 6767, 1952-1 CB 111. H.R. Rep. No. 1337, 83d Congress, 2d Session 65 (1954); S. Rep. No. 1622, 83d Congress, 2d Session 89 (1954).

There are numerous areas where Subchapter K deliberately requires tax results that are inconsistent with substance or economic reality. The general rule of Subchapter K creates clear distortions by not mandating equality between "inside" and "outside" basis, precisely the situation in the instant case. Also, the character and holding period of partnership assets is determined at the partnership level. Further, recognized partnership income must be allocated among the partners even though it is unclear which partners, if any, will benefit from such income, and even though if the partnership were treated as an aggregate entity no partner would report any income. Additionally, partnership "terminations" under Code section 708(b)(1)(B) can have significant beneficial tax effects or significant adverse tax effects on partners whose economic position with respect to the partnership's assets and business is not changed. These rules, and numerous similar rules, reflect the fact that Subchapter K was codified primarily to provide certainty, not to achieve the goal of economic harmony. Thus, the resultant step-up in basis is more likely than not consistent with the intent of subchapter K.[75]

---

[75] It should be noted that, during the comment period on the proposed regulations, the New York State Bar Association made a recommendation to the Treasury that a short sale example that contained facts similar to the transaction at issue be included in the Regulation. The recommendation from the New York State Bar Association was that the example illustrated a transaction that would violate the proposed anti-abuse regulations. However, the Treasury did not adopt the recommendation and did not include the example in the Regulation.

***2. Validity of the Regulation.***

As discussed below, in light of Congress' strong statement that partnerships, if they are real, are to be respected regardless of the motive for their formation and use, and Congress's desire to provide certainty in the area of the taxation of partnerships and partners, the scope of the Regulation and its associated remedies are grossly overbroad. Hence, to the extent the Regulation were applied as broadly as its words permit, it would be invalid. If the Regulation were interpreted to override the clearly expressed intent of Congress as reflected in the provisions of Subchapter K, it would be invalid. See, e.g., Wasserman & Cuff "IRS Attempts To 'Demonize' the Partnership: The Final Section 701 Regulations--Antiabuse Regulations or Simply Abusive Regulations?" Portland Tax Forum, 1995; Gouwar, "The Proposed Partnership Anti-Abuse Regulation: Treasury Oversteps its Authority," 11 Journal of Partnership Taxation 287 (Winter 1995); McKee, Nelson & Whitmire, "Special Report - Subchapter K Anti-Abuse Rule," Federal Taxation of Partnerships and Partners, 2d Edition (Warren, Gorham & Lamont, 1994); Dell, "The Proposed Partnership Anti-Abuse Regulation: Let's Get Real (and Practical), Shall We?!" 21 Journal of Real Estate Taxation 99; Lipton, "IRS Improves Partnership Anti-Abuse Regs., but Major Problems Remain" 82 Journal of Taxation 132 (March 1995); Banoff, "Anatomy of an AntiAbuse Rule: What's Really Wrong With Reg. Section 1.701-2" Tax Notes, March 20, 1995, p. 1859; Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984); and Commissioner v. South Texas Lumber Co., 333 U.S. 496 (1948). Moreover, regulations issued under Code section 7805 generally have been treated as interpretive, and not legislative. See United States v. Vogel Fertilizer Co., 455 U.S. 16 (1982); Rowan Cos. v. United States, 452 U.S. 247 (1981); Dresser Industries, Inc. v. Commissioner, 911 F.2d 1128 (5th Cir. 1990); Gehl Co. v. Commissioner, 795 F.2d 1327 (7th Cir.

1986); CWT Farms, Inc. v. Commissioner, 755 F.2d 790 (11th Cir. 1985), cert. denied, 477 U.S. 902 (1982).

The thrust of the legal commentary is that the Regulation is unworkable because it does not include a clear and reasonable standard that can be used by taxpayers and the IRS to identify prohibited transactions, nor are the examples of partnership arrangements sufficient to provide a standard or an analytical approach which can be reasonably utilized to identify permissible or impermissible transactions. Inasmuch as the Regulation itself and the Examples it contains provide little or no guidance as to the difference between transactions which are prohibited and those which are not, it may be void for vagueness. The apparent implied standard for application by the IRS of the Regulation consists of "I know it when I see it" (Jacobellis v. Ohio, 378 U.S. 184, 197 (1964)). This type of ambiguous *ex post facto* standard for application of the Regulation permits and encourages arbitrary and discriminatory enforcement, which is one of the specific evils addressed by courts in invalidating laws for vagueness. See, e.g., Papachristou v. City of Jacksonville, 405 U.S. 156 (1972). See also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489 (1982), in which the court found that a commercial ordinance may be void for vagueness; and Diebold, Inc. v. Marshall, 585 F.2d 1327 (6th Cir. 1978), where an economic regulation was held void for vagueness.

Additionally, the Regulation should be viewed as a significant regulatory action under Executive Order (EO) 12866. The "Special Analyses" section of the preamble states that "It has been determined that this Treasury decision is not a significant regulatory action as defined in EO 12866." Additionally, in a "Special Analyses and the Secretary's Authority" section of the preamble, the IRS and Treasury acknowledge and discount adverse commentary and criticisms of this

determination and conclude, without analysis, that they "... believe that the regulation complies with all statutory and regulatory requirements related to the issuance of the notice of proposed rulemaking and that it is clearly within the Secretary's authority to issue the final regulation." However, for reasons hereinafter discussed, we believe that the issuance of the Regulation does constitute a significant regulatory action.

Section 3(f) of EO 12866 defines a "significant regulatory action" to include any regulatory action that is likely to result in a rule that "may: (1) [h]ave an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, [or] productivity ..." (emphasis added). The term "significant regulatory action" also includes any regulatory action that is likely to result in a rule that "may: (4) raise novel legal or policy issues" (emphasis added). EO 12866 §3(f)(4). "Regulatory action" includes the issuance of final regulations by Treasury decision.

There may be a significant effect on the economy from the prohibition of allegedly abusive partnership transactions targeted by the Regulation. Any one of these targeted transactions could involve $100 million or more. The impact on Brown Group transactions alone meets this requirement. (Such transactions derive their name from the case of Brown Group, Inc. v. Commissioner, 102 T.C. 616 (1994), withdrawn and reversed upon reconsideration, 104 T.C. No. 5 (1995), involving the attempted use of a partnership structure to avoid realization of "subpart F income.") According to IRS officials in their motion for reconsideration, the original decision by the Tax Court in Brown Group, which is a stated target of the Regulation, would reduce tax collections by $4 billion. (See also, "Tax Court's Decision in Brown Group May Have Major Ramifications," 63 Tax Notes 512, May 2, 1994; "Subpart F: U.S. Tax Court's Brown Group

Decision Rejects Aggregate Theory of Partnership Taxation; Threatens Operation of Subpart F," 8 Tax Notes Int'l 1175, May 2, 1994.)

Further, the Regulation could well deter many non-abusive and legitimate economic transactions and thereby have an effect on the U.S. economy that may easily be greater than $100 million annually. If the Regulation affects just ten transactions per year, and each of the transactions has an impact on the economy of $10 million, there would obviously be an annual impact on the economy of $100 million. In such case, the Treasury decision may be a "significant regulatory action" under §3(f)(1) of EO 12866. The likely effect of the Regulation on its intended targets, when combined with the effect on unintended targets, is likely well in excess of the minimum limits required to make EO 12866 apply.

Moreover, EO 12866 can apply even if the impact on the economy as a whole does not reach an annual level of $100 million if the Regulation may "adversely effect in a material way the economy, a sector of the economy [or] productivity." For example, the real estate industry, a sector of the economy that is only recently reviving from recession, may be adversely affected by the Regulation, as may the equipment leasing industry, the oil and gas industry, hedge funds, and structured finance transactions.

Moreover, by creating an "abuse of entity" standard that prohibits the use of partnerships "in circumvention of the intent of ..." other provisions of the Code, the Regulation raises novel legal and policy issues, so as to constitute a "significant regulatory action" under EO 12866 §3(f)(4). The controversy surrounding the issuance of the Regulation is unprecedented. The Regulation describes circumstances under which the IRS may ignore the literal language or requirements of the Code, and this ability alone obviously "may ... raise novel legal or policy issues."

Thus, the Treasury may have erred in determining that the Regulation is not a "significant regulatory action" under the EO 12866, and if so, at a minimum, a regulatory assessment appears to be required.

Further, the Regulation is further subject to attack because it grants to the Commissioner of Internal Revenue the discretionary power on a case-by-case basis to alter the substantive law and its application to the facts, and thereby usurps Congressional legislative authority and strips the courts of de novo adjudication authority when there is no basis in the law for this grant of power to the Commissioner in the manner asserted by the Regulation.

Subchapter K (sections 701 through 761) of chapter 1 of the Code addresses the federal income taxation of partners and partnerships. Under the Regulation, the Commissioner, who is a delegate of the Secretary of the Treasury, is given certain discretionary powers that can be exercised on a case-by-case basis with respect to transactions involving partnerships. Specifically, under certain standards which may not be ascertainable, the Commissioner, under paragraph (b) of the Regulation, can recast a transaction "as appropriate to achieve tax results that are consistent with the intent of subchapter K" and "can determine, based on the particular facts and circumstances, that to achieve tax results that are consistent with the intent of subchapter K," the particular manner in which the claimed tax treatment should be "adjusted or modified." Paragraph (d) sets forth various examples of when the Commissioner may exercise his powers to recast a transaction as something other than what it purports to be. However, in none of those examples which conclude that the Commissioner may recast the transaction (Examples 6, 9, 10 and 13) is there any statement of what the recast transaction shall be or indeed whether the transaction shall be recast at all. Instead, the matter is left to the discretion of the Commissioner. Under paragraph (e) of the Regulation, subject

to standards that may not be ascertainable, the Commissioner "can treat a partnership as an aggregate of its partners in whole or in part as appropriate to carry out the purposes of any provision of the Internal Revenue Code or the regulations promulgated thereunder."

The Treasury Department, which is the administrative agency charged by Code section 7801 with the administration and enforcement of the internal revenue laws, has by the issuance of this Regulation asserted an expansion of its powers beyond the powers it had before. Prior to this Regulation, the Secretary's delegate, i.e., the Commissioner, with respect to the matters addressed by the Regulation, had the power as a litigant (as does the taxpayer) to argue to a court his own views as to the proper interpretation of the tax laws and their application to the facts of a particular case. Under the Regulation, with respect to the matters addressed therein, the Commissioner has the discretionary power under certain standards (which may not be ascertainable) to alter the substantive law and its application to the facts and to do so on a case-by-case basis. The Commissioner's determination thus becomes part of the law itself and is no longer merely the position of a litigant. The power of a court to make a de novo interpretation of the law and a de novo application of it to the facts of a particular case, has been, to the extent the Commissioner's power is exercised, reduced to a review of whether the Commissioner has abused his discretion. This would be starkly apparent in tax-refund cases, where the Commissioner is not even a party to the case, the Justice Department representing the government in such cases. Furthermore, the Regulation sets up no procedures which must be followed or findings which must be made which would form an administrative record which would provide a basis to enable a court adequately to perform a function of judicial review of the exercise of power by an administrative agency.

Thus, the Regulation has granted to the Commissioner both a new legislative power and a new judicial power. The new legislative power is the power to alter the express provisions of subchapter K and other provisions of the Code so as to conform them to the same perceived intent of subchapter K. The new judicial power is the power to make these alterations and determinations on a case-by-case basis.

The powers of an administrative agency charged by Congress with the enforcement and administration of a body of law are only those powers expressly or impliedly granted to the administrative agency by Congress. An administrative agency cannot by regulation expand its powers unless such expansion of powers by regulation is expressly or impliedly authorized by Congress. The issue, then, is whether the Treasury Department has the authority to issue this Regulation, which grants to the Commissioner these new legislative and judicial powers.

This matter, therefore, touches upon fundamental issues relating to the nature of our government; specifically, the separation-of-powers doctrine, which distributes legislative, executive, and judicial powers among the three branches of government. Notwithstanding this doctrine, it has been held permissible under certain circumstances for Congress (being the legislative branch) to grant to an administrative agency (being in the executive branch) certain legislative and judicial powers. Without examining the scope of Congress' power to make such grants, the fact is that, with respect to the Regulation, it has not done so in the present case. That is, Congress has simply not expressly or impliedly authorized the Treasury Department to create for itself the power to alter the substantive law relating to the taxation of partnerships or, most certainly, to do so on a case-by-case basis. Treasury Decision 8588, which promulgated the Regulation, stated that the authority for the Regulation was Code section 7805 and also Code sections 701 through 761. Code section 7805 is

the general provision authorizing the Treasury Department to issue "needful rules and regulations" for the enforcement of the internal revenue laws. Code section 7805 has been held to authorize only interpretative regulations. See, e.g., United States v. Vogel Fertilizer Co., supra; Rowan Cos. v. United States, supra; Dresser Industries, Inc. v. Commissioner, supra; Gehl Co. v. Commissioner, supra; CWT Farms, Inc. v. Commissioner, supra. The power to modify or alter on a case-by-case basis is not the power to interpret. With respect to Code sections 701 through 761, relating to the taxation of partners and partnerships, there is simply nothing in those sections from which can be inferred the power to issue a regulation granting new legislative and judicial powers to the Commissioner in the manner asserted by the present Regulation.

For an interpretative regulation to be valid, it must implement in a reasonable manner a Congressional mandate set forth in the Code. See, e.g., U.S. v. Cartwright, 411 U.S. 546, 550 (1973); U.S. v. Correll, 389 U.S. 299, 307 (1967). An interpretative regulation implements the Congressional mandate in a reasonable manner if it harmonizes the statute's origin and purpose with the statutory language. See, e.g., U.S. v. Vogel Fertilizer Co., supra; National Muffler Dealers Ass'n. v. U.S., 440 U.S. 472, 477 (1979).

To be valid under the foregoing test, an interpretative regulation must satisfy the following requirements:

(a) The regulation cannot usurp Congressional authority by adding restrictions that are not contained in the statute. See, e.g., Hughes Int'l. Sales Corp. v. Commissioner, 100 T.C. 293, 304 (1993);

(b) The regulation cannot be inconsistent with statutory language. See, e.g., The Ann Jackson Family Foundation v. Commissioner, 15 F.3d 917 (9th Cir. 1994);

(c) In the absence of statutory ambiguity, the regulation must comport with the plain language of the statute it purports to interpret. See, e.g., Nalle III v. Commissioner, 997 F.2d 1134 (5th Cir. 1993);

(d) The regulation cannot broaden the scope of coverage of the statute beyond its unambiguous terms. See, e.g., Rowan Cos. v. U.S., supra; and

(e) The regulation cannot be used by the Secretary or his delegate to rewrite legislative enactments that give effect to ideas of policy and fitness or the desirability of symmetry in statutes, especially where an unclear regulatory interpretation of an otherwise clear statutory provision is the means used to accomplish these ends. See, e.g., Busse v. Commissioner, 479 F.2d 1147, 1151 (7th Cir. 1973).

Based upon the foregoing requirements for a valid interpretative regulation, a compelling argument can be made that the Regulation more likely than not exceeds Treasury's rulemaking authority. First, the Regulation does not reflect the language or the intent of Code section 701 under which it is promulgated and which it purports to interpret or Code sections 701 through 761. Code section 701 provides that: "A partnership as such shall not be subject to the income tax imposed by this chapter. Persons carrying on business as partners shall be liable for income tax only in their separate or individual capacities." The Regulation does not interpret this provision.

Second, there is no other authority under subchapter K for issuance of the Regulation. The Regulation states that a transaction may be abusive if the transaction, although complying with the literal language of the Code, violates the "purposes" of subchapter K or is in circumvention of the intention of other provisions of the Code. Thus, the Regulation cannot be an interpretative regulation; instead of "interpreting" the law, it allows the IRS to ignore subchapter K and other provisions of the Code. The Regulation, in effect, represents a legislative action by the Treasury, creating new tax law and effecting its new anti-abuse policy without Congressional approval.

Further, Congress has previously considered and rejected broad anti-tax avoidance language for the administration of subchapter K. The House version of the Tax Reform Bill of 1975 would have required, under Code section 704(b), that an allocation have a "business purpose" and that "no significant avoidance or evasion of any tax imposed by the subtitle results from such allocation." The Senate Finance Committee expressly rejected the "significant avoidance or evasion of any tax" concept presented in the House Bill because of its concern as to the uncertainty of application for such a standard. See S. Rep. No. 938, Part I 49th Cong. 2d Sess. 100 n.11 (June 10, 1976). The Finance Committee replaced that standard with the present "substantial economic effect" test which was adopted by the Conference Committee and subsequently included in Code section 704(b) by the Tax Reform Act of 1976. (Pub. L. 94-455). Accordingly, Congress has already rejected the standard of "significant avoidance or evasion of any tax" in the administration of provisions which are significant to the operation of subchapter K. Treasury cannot now issue a purported interpretative regulation that attempts to implement an even broader anti-abuse rule than Congress has considered and failed to adopt.

There are provisions of the Code which expressly give the Commissioner (as delegate of the Secretary) certain powers to alter substantive law and its application to the facts on a case-by-case basis. For example, Code section 482 authorizes the Commissioner to reallocate income among related entities. Code section 446(b) states that if a taxpayer's method of accounting does not clearly reflect income, "the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." Also, for example, Code section 385 authorizes the Secretary to prescribe regulations to determine whether an interest in a corporation is to be treated as stock or as debt, and Code section 1502 authorizes the consolidated return

regulations, which in many ways alter the substantive tax law with respect to corporations filing consolidated returns. There is simply nothing, however, authorizing the Secretary to alter or modify the provisions of subchapter K, much less to do so on a case-by-case basis.

Case-by-case basis adjudication authority is not something foreign to administrative agencies. The Regulation, however, is simply not in conformance with the present regulatory scheme set forth by Congress for enforcement of the internal revenue laws. For example, the Board of Tax Appeals, which adjudicated certain tax cases, was formerly part of the Bureau of Internal Revenue, which was part of the Treasury Department. Today, the functions of the Bureau of Internal Revenue have been taken over by the IRS, which remains part of the Treasury Department. However, the functions of the Board of Tax Appeals are today performed by the United States Tax Court, a Title I legislative court, which is not part of the Treasury Department. Thus, case-by-case adjudication of tax cases is something that Congress addressed. Clearly, Congress could not have envisioned that the Commissioner could be granted such authority by a regulation promulgated without express statutory authority therefor.

The purported grant by the Regulation of these new legislative and judicial powers to the Commissioner is startling. If the Regulation's grant of authority to the Commissioner is valid under present law, there is virtually no limit on the ability of the Treasury Department to issue regulations granting to the Commissioner the power to alter substantive law with respect to a taxpayer on a case-by-case basis in pursuance of some perceived intent of some statutory provisions. The Regulation, if valid, represents a virtual elimination of restraints on the ability of government officials to expand their own powers over the people by means of their own declarations to that effect. In other words, an interpretation of the Regulation that it is valid would create a vast shift in

the presumptions to be made about Congressional silence as to allocations, retentions, and grants of power in a regulatory scheme. Congressional silence as to whether a particular power has been granted to or instead withheld from an administrative agency would be construed more easily and more often in favor of the granting than the withholding. This is not in accordance with the structure of our government laid down by the Founders. In the U.S. Declaration of Independence, for example, it is said, as part of the list of the crimes committed by the King of Great Britain, who acted outside the restraints of representative government: "He hath created a multitude of new offices and sent hither swarms of officers to harass our people and eat out their substance."

Accordingly, the Regulation appears to be a lawless expansion by bureaucrats of their own powers over the people and is in derogation of the people's rights to have independent judicial determinations of their controversies with their government regarding the amounts of their property that their government may take or retain. In similar cases where the Treasury or other executive departments have usurped Congressional authority in the promulgation of a regulation, the courts have held the regulation invalid. See, e.g., RLC Industries Co. v. Commissioner, 58 F. 3d 413 (9th Cir. 1995); The National Life and Accident Insurance Co. v. U.S., 524 F.2d 559, 560 (6th Cir. 1975). Even assuming, arguendo, a predominant tax avoidance motive, it is arguable that such a motive is not inconsistent with the purposes of subchapter K inasmuch as that purpose has been demonstrated and determined to be the achievement of certainty, not the desire to reflect economic substance, and, to the extent that a taxpayer has followed the literal provisions of the Code, those results which obtain should be given tax effect.

Additionally, the Regulation may be held to be invalid due to 1) vagueness, as it does not articulate a clear and workable standard delineating permissible and proscribed transactions, and thus

permits and encourages arbitrary and discriminatory enforcement; 2) failure to comply with Executive Order 12866 and perform the required regulatory assessment; and 3) a lack of authority for issuance of the Regulation and the unauthorized usurpation of legislative and judicial authority.

## M. NOTICE 2000-44

In Notice 2000-44, the Service provided two examples of transactions purported to "give taxpayers artificially high basis in partnership interests and thereby give rise to deductible losses on disposition of those partnership interests." Notice 2000-44 is *prima facie* inapplicable to your situation, because the result of the transactions discussed herein was an increase in basis in the Shares which did not give rise to a loss upon the sale of the Shares. Even if Notice 2000-44 were applicable, it would not change our opinions herein.

The Service uses three cases[76] and Treas. Reg. §1.165-1(b) to attempt to substantiate its positions in Notice 2000-44. In each of the cases, the purported transactions were not respected for federal income tax purposes. However, all three cases clearly hinged on the economics surrounding the sale of the assets which produced the purported loss. In no case was the economic position of the seller of the assets after the sale significantly affected by the sale. Treasury Regulation §1.165-1(b), states in part "[t]o be allowable as a deduction under §165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events... Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss." By citing the Treasury Regulation in Notice 2000-44, the Service implies that the manner in which basis is determined affects whether loss will be recognized under Code §165. Code §165 has no such requirement. While Code §165 permits deductions for certain losses, the question of whether a disposition of assets results in a gain or loss is not determined by reference to Code §165. Such a determination is made under Code §1001.

---

[76] ACM Partnership v. Commissioner, 157 F.3d 231, 252 (3rd. Cir. 1998); Scully v. United States, 840 F.2d 478, 486 (7th Cir. 1988); Shoenberg v. Commissioner, 77 F.2d 446, 448 (8th Cir. 1935).

We believe a better reading of the legal authority discussed in Notice 2000-44 is to state only the current law: losses are deductible under Code §165 only when realized upon a disposition of property which is respected for federal income tax purposes. Here, if the Partnership were to sell the Shares for cash equal to a fair market value sale price close to the Partnership's basis, such a sale would more likely than not be respected as a sale for federal income tax purposes. In such a circumstance, no offsetting trade would be entered into; no partially related entity would purchase the Shares from the Partnership; and the Partnership would not sell the Shares for a financial instrument designed to mimic the return which could have been obtained if the Shares had been retained. The Shares would be sold for cash, which substantively, actually, and irrevocably changes your economic position and therefore, more likely than not, places such a sale outside the scope of the rulings laid down in the cases cited by Notice 2000-44.