# EXHIBIT A

**Office of Chief Counsel**
**Internal Revenue Service**
# memorandum

date: February 13, 2007

to: Richard C. Starke
Senior Attorney (CORP)
Washington, DC

from: Helen T. Repsis
Deputy Area Counsel (Small Business/Self Employed)
Area 6

Philip J. Lindenmuth
Deputy Assistant Chief Counsel (Disclosure & Privacy Law)

subject: Testimony Authorization for Richard C. Starke
In re: Stobie Creek Investments LLC v. United States, Fed. Cl. No. 05-00748

The Government has been served with a subpoena for your appearance and deposition testimony in connection with the above-captioned matter in your official capacity as a Senior Attorney, Office of Associate Chief Counsel (Corporate), Internal Revenue Service, Washington, D C. The deposition originally scheduled to take place at 1666 K Street, N.W., Suite 300, Washington, D.C. 20006, on February 1, 2007, was rescheduled for February 15, 2007.

Pursuant to Delegation Order 11-2, 26 C.F.R. § 301.9000-1, you are <u>not</u> <u>authorized</u> to give testimony in response to the subpoena. The denial of authorization is based on the fact that you had previously testified on the identical subject matter at deposition and at trial in the matter captioned as *Jade Trading, LLC v. United States*, Fed. Cl. No. 03-2164 T, that the government has proffered transcripts of that testimony to petitioner in this case, and that your testimony is not expected to change sufficiently to warrant the burden on the government to provide for your appearance.

If you are required to appear at the scheduled time for the deposition, you will be accompanied by counsel for the Government. You are advised to follow the guidance of Government's counsel.

You may provide a copy of this document to petitioner's counsel if so requested.

Inquiries concerning this matter may be directed to Deputy Assistant Chief Counsel (Disclosure & Privacy Law) Philip Lindenmuth at (202) 622-4560, or Department of Justice Senior Litigation Counsel Stuart Gibson at (202) 307-6418.

EXHIBIT
A

cc: Office of Governmental Liaison and Disclosure

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| STOBIE CREEK INVESTMENTS LLC, JFW ENTERPRISES, INC., Tax Matters and Notice Partner,<br>Plaintiff<br>v.<br>THE UNITED STATES OF AMERICA,<br>Defendant. | Case No. 05-748 T<br>Judge Block |

**AFFIDAVIT OF ROBERT E. KOLEK**

**ROBERT E. KOLEK,** being duly sworn, according to law, upon his oath, deposes and says:

1. I am an attorney at law in the State of Illinois, and I am admitted to practice and have practiced before this Court. I am a partner of the law firm of Schiff Hardin LLP, and serve as counsel of record for Plaintiffs Stobie Creek Investments LLC, JFW Enterprises, Inc. ("Plaintiffs") in the above matter. I have personal knowledge of the following facts and am prepared to testify competently to them if called as a witness.

2. I have made a good faith effort on behalf of Plaintiffs to resolve the discovery dispute that is the subject of this Motion to Compel Deposition Testimony from Richard Starke.

3. As a result of the IRS denial of authority to depose Mr. Starke in this matter, Defense counsel, Stuart Gibson, and I had a phone conference, on February 8, 2007, in an effort to stipulate to Mr. Starke's testimony here. Defense counsel suggested that Plaintiffs stipulate to the testimony as given by Mr. Starke in trial and his deposition in *Jade Trading LLC v. United States*, Fed. Cl. No. 03-2164T.

EXHIBIT
B

4. After review of the trial and deposition testimony of Mr. Starke, I determined that there are additional and follow-up questions which are necessary to understand the scope of Mr. Starke's knowledge of the proposed subjects.

5. Upon information and belief, Defense counsel could not agree, based upon the IRS determinations outlined in Exhibit B, to allow Plaintiffs' counsel to inquire of Mr. Starke new or follow-up questions to his previous testimony.

Further affiant sayeth not.

DATED: February 27, 2007

Robert E. Kolek

Subscribed and sworn to before me, this 27th day of February, 2007

Notary

OFFICIAL SEAL
PAULA KHILE
Notary Public - State of Illinois
My Commission Expires Oct 03, 2010

0001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------------X

JADE TRADING, LLC, by and through :
ROBERT W. ERVIN AND LAURA :
KAVANAUGH ERVIN on behalf of :
ERVIN CAPITAL, LLC, Partners Other :
Than the Tax Matters Partner, :
Plaintiffs, :
v. : No. 03-2164T
UNITED STATES OF AMERICA, by and :
through its agent, the INTERNAL :
REVENUE SERVICE, :
Defendant. :

-----------------------------------X

Washington, D.C.
Tuesday, July 19, 2005

Deposition of RICHARD CASSIUS LEE STARKE, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by Raymond Heer, A Notary Public in and for the District of Columbia, taken at the offices of the United States Department of Justice, 555 4th Street, N.W., Washington, D.C., at 11:10 a.m., Tuesday, July 19, 2005, and the proceedings being taken down by Raymond Heer III and transcribed under his direction.

0002

APPEARANCES:

On behalf of the Plaintiffs:

DAVID D. AUGHTRY, ESQ.
Chamberlain, Hrdlicka, White, Williams& Martin
191 Peachtree Street, N.E., Ninth Floor
Atlanta, Georgia 30303-1747
(404) 659-1410

On behalf of the Defendant:

STUART J. BASSIN, ESQ.
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
555 4th Street, N.W., Room 8812
Washington, D.C., 20044
(202) 307-6418

0003

ALSO PRESENT:

HENRY S. SCHNEIDMAN, ESQ
Internal Revenue Service
Office of Chief Counsel
1111 Constitution Avenue, N.W., Room 5501
Washington, D.C., 20224
(202) 622-3400



EXHIBIT
C

0004

CONTENTS


| Witness: | Examination By | Page |
|---|---|---|
| RICHARD STARKE | Mr. Aughtry | 5 |
| | Mr. Bassin | 198 |


INDEX OF STARKE EXHIBITS


| No. | Description | Page |
|---|---|---|
| 1 | Notice of Deposition | 9 |
| A | IRS written authorization | 10 |
| B | Defendant's objection | 10 |
| C | Starke's personal objection | 11 |
| 2 | Starke's personal notes | 24 |
| 3 | RR 95-26 | 58 |
| 4 | Document | 161 |
| 5 | "Tax Avoidance" document | 163 |
| 6 | Salina document | 164 |
| 7 | Document | 170 |


0005

P R O C E E D I N G S

Whereupon,

RICHARD CASSIUS LEE STARKE,

having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. AUGHTRY:

Q Mr. Starke, we met earlier. For the record, I'll state who I am. I'm David Aughtry. I represent the Plaintiffs in this matter. And we've asked you to come and share with us what you know about these subject matters.

You understand -- I know you've just taken an oath to tell the whole truth, but you understand this case is very important to the Ervin Brothers, who I represent, and it's important that we have an understanding that's accurate testimony. If I - if you believe that I've garbled a question, and you don't understand the question, will you tell me that, and I'll clarify -- allow me the chance to clarify the question?

A I'll try to.

Q If it -- if it -- if you think that I've misstated something that's going to lead to a confusing or misleading conclusion, or off point, will you let me know that?
A I'll try to.
Q Have you ever testified before?
A Not a deposition. I've testified in court.

0006

Q When was that?
A Ages ago. Probably -- I'd say between '81 and '84.
Q Okay. Was it a tax matter or --
A No, it was criminal.
Q You were a witness, weren't you?
A Yeah. That's, to my -- to my recollection, that's my only court testimony.
Q Criminal tax matter or --
A Yes.
Q Were you with the Internal Revenue Service at the time?
A No.
Q Well, the --
A Sorry, it was not a criminal tax matter. It was a criminal matter, not a tax matter.
Q Okay. Just to get it out of the way, can you tell us briefly what that was?
A Yes. I was fresh out of law school and had represented a juvenile accused of a crime in Juvenile Domestic Relations Court in the Commonwealth of Virginia.
Q Are you from Virginia?
A Yeah. The case was appealed, and, because of something that happened in the course of my representing the youth in Juvenile Domestic Relations Court, I testified in Circuit Court when his case was moved up to Circuit Court.

0007

Q What was the thrust of the testimony? Was it in aid of a representation defense or --
A In the course of -- in the course of representing the juvenile, I had interviewed a potential witness, and I took notes, and my notes were in the file.
Q All right. Well, in all of that, through our dealings with Mr. Bassin, as counsel for the Defendant, we had lodged a Notice of Deposition subpoena with Mr. Bassin on your behalf. Is that acceptable to you?
A Yes.
Q And there's been an objection, and which I think is a well-founded objection, as to whether or not you had adequate time to respond to the subpoena. And entirely my fault. I was in trial yesterday. But our response to that -- and I think this is with the consent of Defendant; we'll get a confirmation on this in a little bit -- is that we'll go through part of your deposition today. We won't use the entire seven hours today. We'll spend the deposition. We'll allow you adequate time to confirm whether or not any of the requested documents within your possession, access, custody or control are available. Mr. Bassin and I will talk. If they are available, we'd like to get those documents and complete the deposition. If there is no issue, then there is no issue. And so, we'll coordinate that with Mr. Bassin, I guess.
I would like to know, from both of you, if that's

0008

acceptable.
MR. BASSIN: Yeah, I think you have, in front of you, the deposition notice. Why don't we get that marked? And I have a couple of other documents to mark.

MR. AUGHTRY: Okay, great. So, we've got some documents to be produced?

MR. BASSIN: No. No. It's just testimony authorization, a formal objection to the subpoena.

BY MR. AUGHTRY:

Q I hand you what has been marked Starke 1, Plaintiff's Exhibit Starke 1.

(Whereupon, the document was marked as Starke Exhibit 1 for purposes of identification.)

BY MR. AUGHTRY:

Q If you could confirm whether or not that's the same Notice of Deposition, with subpoena attached, that you received through Mr. Bassin.

A Having flipped through it, it looks like it.

Q And do I understand there are no documents being produced today in response to the subpoena duces tecum?

MR. BASSIN: That is correct.

THE WITNESS: Do you want this back?

MR. AUGHTRY: No, no. Please hold on to it.

And there's a copy for you, Stuart.

BY MR. AUGHTRY:

0009

Q Are you aware of any documents that exist that would be covered by the scope of the subpoena duces tecum?

A They may exist.

Q You need an adequate opportunity to find out.

A That's true.

MR. BASSIN: Okay. For the record, I wanted to identify a couple of documents.

Mr. Starke is appearing pursuant to a written authorization from the Office of Chief Counsel of the United -- of the Internal Revenue Service. That is marked as Starke Exhibit A, Government Exhibit A.

(Whereupon, the document was marked as Starke Exhibit A for purposes of identification.)

MR. BASSIN: The formal objection to the Notice of Deposition and subpoena duces tecum is marked as Starke B. That is -- that is a Defendant's objection.

(Whereupon, the document was marked as Starke Exhibit B for purposes identification.)

MR. BASSIN: Then there is, coming up, as Exhibit Starke C, Mr. Starke's personal objection to the subpoena.

(Whereupon, the document was marked as Starke Exhibit C for purposes identification.)

MR. AUGHTRY: Mr. Bassin, do you have an extra copy of Starke A? I'd like to have one working copy and one clean copy.

0010

MR. BASSIN: Yes.

MR. AUGHTRY: I'll tell you -- in fact, can I get you to put a sticker on that, so we'll know it'll be true?

Is the proposal that I've outlined, of suspending the deposition and allowing the gentleman an opportunity to look at his files, and then find out if we have an issue and resolve an issue with the court, if necessary -- otherwise, completing the deposition -- acceptable to the Defendant?

MR. BASSIN: Yes, subject to the various objections that we have, but -- we're not waiving anything, but we'll let you know within the next week or so whether or not there is anything responsive to the subpoena.

MR. AUGHTRY: And, certainly, neither party is waiving any advice in behalf --

MR. BASSIN: Right.

MR. AUGHTRY: -- either by way of enforcement or objection?
MR. BASSIN: Right.
MR. AUGHTRY: Okay. Anything else you can think of on preliminary matter?
MR. BASSIN: Oh, we should -- I should note that Henry Schneiderman is also sitting next to me. He's an attorney with the Internal Revenue Service, and he's representing the agency here today.
MR. AUGHTRY: Is Mr. Schneiderman entering an

0011

appearance in the case?
MR. BASSIN: He's not -- I don't think he is technically entering an appearance as counsel.
MR. AUGHTRY: Okay. I would just say, it would be easier if you all could coordinate whatever discussion or objections through counsel of record. Avoids lots of issues. Let's see if we have an issue with that.
MR. BASSIN: Okay.
BY MR. AUGHTRY:
Q Mr. Starke, the burning question I've got to ask you, are you aware, have there been two Richard Starkes with the Chief Counsel's Office at the -- or with the IRS, in any capacity?
A I don't know.
Q It may be just confusion on our part. We had a gentleman some years ago we dealt with who went into private practice.
And you indicated you're from Virginia, originally?
A Yes.
Q Where?
A Norfolk. Born in Richmond, grew up in Norfolk.
Q I was born in Richmond.
The -- and where did you go to school?
A Which? All my schools?
Q Yes. After high school. You went to high school in

0012

Norfolk, right?
A I still went to high school in Orange County, Virginia, but also in Norfolk. I went to Hampden-Sydney College.
Q Did you?
A Went to Rutgers University. Went to University of Virginia, Georgetown -- not -- excuse me, not Georgetown -- yeah, Georgetown, the law school. I think that's it.
Q When did you start at Hampden-Sydney?
A I believe that was '73.
Q And did you obtain a degree from Hampden-Sydney, or transfer?
A Bachelor of arts, I believe.
Q In what? What major?
A I believe it was economics.
Q Are you having difficulty recalling?
A I just have to think about it for a second. And, even then, I'm not absolutely certain.
Q All right. You and I are about the same age. Reaching back's not fun.
And then you had indicated -- what was the next school you went to?
A Rutgers.
Q Rutgers?
A The state university in New Jersey.

0013

Q Right. And did you obtain a degree at Rutgers?
A Yes.
Q In what year?
A Probably '77 -- 1977.
Q And what was that degree?
A I believe that was an MBA, with an emphasis in accounting.
Q You say you "believe." You're not sure that you got an MBA?
A I believe it was called an MBA, and I believe it met the state's requirements for an MBA, in terms of the breadth of the curriculum --
Q I went to --
A -- but it was focused on accounting.
Q -- I went to Carolina. They called it a master's of accountancy. Would it be about the same thing?
A I actually think this was an MBA.
Q And after Rutgers, in '77, where did you go? Virginia?
A Then I went to law school at the University of Virginia, beginning in 19- -- that would probably have been '77, starting in '77.
Q And finished when?
A '80.
Q With a JD?

0014

A Uh-huh.
Q What did you do then?
A Clerked for a U.S. District Court judge for one year.
Q Where?
A Norfolk, Virginia.
Q Who was that?
A He's dead now. Richard B. Kellam.
Q You're saying that was for a year?
A Uh-huh.
Q What did you do after that?
A Practiced law in Norfolk for something like a year or two years.
Q What firm?
A Scanelli & Shapiro.
Q Could you spell that for us?
A I'm not sure I can get it right, but I can try.
Q All right.
A S-c-a-n-e-l-l-i, ampersand, S-h-a-p-i-r-o.
Q And the area of practice?
A I suppose just whatever I was given. No specific area of practice.
Q Trial -- any trial work or --
A The aforementioned Juvenile Domestic Relations

0015

matters.
Q What?
A Juvenile Domestic Relations matters.
Q Was this a general practice?
A Yeah, general practice.
Q And you say you did that for a year?
A A year or two years. I don't specifically remember.
Q Where, after that?
A Let's see, I believe that, after that -- now that you're dragging me -- not dragging -- taking me through it year by year --

Q No, I'm dragging you through it.
A -- I think I'm going to remember a couple of more schools I went to.
Q Okay. And what were they?
A Then I believe I went to -- if I've got this right, I went to New York University Law School.
Q When?
A This is going to be a bit of guesswork.
MR. BASSIN: If you don't remember --
THE WITNESS: Mid-'80s.
BY MR. AUGHTRY:
Q And did you obtain a degree?
A Yes.
Q In what?

0016

A It was an LLM.
Q In taxation?
A Uh-huh.
Q Okay. Have we -- have I missed any schools? I've got Hampden-Sydney, Rutgers, UVA, NYU. Any other schools?
A I think that's right, up to that point in time.
Q Okay. What about after that?
A Schools after that?
Q Well, let's just walk through schools and work, so we'll have a consistent chronology.
A Go ahead.
Q And your best guess as to when you left the practice with Scanelli & Shapiro -- is what?
A I guess mid-'80s.
Q Did you go from there to NYU?
A I believe so.
Q You're not sure if there was anything in between?
A I don't think there was.
Q Okay. And after NYU, where did you go?
A I went to Richmond, Virginia, practiced law at a law firm called Browder Russell Morris & Butcher.
Q And what type practice did they have?
A They had a general practice.
Q How long were you with them?
A Something like five or six years.

0017

Q And were you practicing in the tax area?
A Uh-huh.
Q Any school while you were with them?
A No.
Q When you -- when you -- I assume when you left Scanelli Shapiro, you left to go get an LLM. Is that correct?
A Uh-huh.
Q And your reason for leaving Browder Russell was what?
A The firm disbanded.
Q And what did you do then?
A Then I went to work for -- I've got to dredge up the name. Hmm, I don't know why I can't dredge it up. I can't think of it at the moment.
Q This firm whose name doesn't come to mind at the moment, how long were you with them?
A Something like a year.
Q And what --
A Maybe two years.
Q -- what line of practice?
A Tax.
Q And what was their area of concentration insofar as

practice?
A I think they're probably described as a general law firm.
0018
Q Okay. And any sense of how many lawyers?
A I don't know, specifically. I would believe over 50.
Q In Richmond?
A That was the office I was in.
Q There were multiple offices?
A I think they probably had one in Washington, yes. If I may jump back to your prior question.
Q Yes.
A Williams Mullin -- there may have been a few more names in there, but I think they shortened the name. I'm not sure what they shortened it --
Q But that was the firm with which you went, after Browder Russell.
A Uh-huh.
Q Okay. Thank you, sir.
A Sure.
Q Any sense of what year that would be?
A Late '80s. Maybe 1990.
Q Then where did you go?
A Then I went to the American -- I may scramble this name -- American Graduate School of International Management. American Graduate School of International Management.
Q Is that the name of the school, or is that associated with the university? Is this American University?
0019
A No.
Q All right. And where is that school located?
A Arizona, outside of Phoenix.
Q Okay. What degree were you looking for there?
A I'm not sure exactly what that degree was. It was a business degree.
Q Did you get a degree?
A Yes.
Q And why did you leave the practice of law to go into this --
A Tired of practicing law, tired of lawyers.
Q Yeah. I can take judicial notice of that.
All right. The -- so, how long did that last?
A I think it was about 15 months. Actually -- probably about 15 months.
Q All right. And you don't know -- was it a master's degree or bachelor's degree or associate's degree or --
A I don't know if it was technically called a -- an MBA or -- MBA with something international built in.
Q All right. And that would take you up until the early '90s? Is that right?
A Uh-huh.
Q Who did you go with next?
A After I graduated, I probably didn't -- probably didn't work for six months, maybe even a year.
0020
Q Was there a reason for that?
A Looking for a job I really wanted, but trying to figure out, really, what I wanted to do.
Q And what did you do at the conclusion of the six -- where did you live during the six months?
A Richmond.
Q Richmond. Family's in Richmond?

A A sister and a brother.
Q And at the end of the six months, what did you do?
A At the end of whatever period it was, I started working for the IRS here, in what I guess one would call my current job.
Q Which part of the IRS?
A I've always worked in the Office of -- the titles have changed, but right now it's called something like Associate Chief Counsel Corporate.
Q And your initial position with that office?
A Again, they -- I think they made changes to what they call it, but I think of it as attorney, dash, advisor, but they may have changed the label.
Q Well, you had a good bit of experience at that stage. What grade did you come in at?
A I believe it was a 14, but I'm not certain.
Q What positions -- well, first of all, do you recall when you started with the IRS?

0021

A I think it was April 4th, 1994.
Q All right. And what positions have you held with the IRS since starting with the IRS?
A That position, the whole time.
Q Okay. And you've not held any management position?
A No.
Q Any special advisor in any particular area?
A No. Other than being a member of corporate.
Q Okay. The -- you haven't served as associate chief counsel corporate or anything -- assistant of any description.
A No.
Q All right. I hand you --
A I -- if I may interject without a question -- I think one of these documents described me as a senior attorney. I'm not sure I actually am one. If that's any sort of formal term, I'm not sure I am that. I'd just like to make that clear.

Q Thank you.
A Other than the number of years or because of my grade --
Q And what grade are you today?
A Fourteen.
Q Fourteen? All right. I hand you what we are marking as Plaintiff's Exhibit Starke 2.
(Whereupon, the document was marked as Starke

0022

Exhibit 2 for purposes identification.)
MR. AUGHTRY: Let the record reflect that I am providing a copy to Counsel for Defendant.
There you go, Henry.
BY MR. AUGHTRY:
Q Do I understand this is a document that you prepared?
A I believe so.
Q What is it?
A I believe that these were notes I took in the course of working on something, a given assignment.
Q What was that assignment?
A I believe that these notes pertain to the ultimate issuance of a revenue ruling.
Q Do you recall what revenue ruling?
A I believe the number was 95, dash, 45.
Q What was the subject of that revenue ruling?
A As I recall, that revenue ruling dealt with -- it

was guidance to the public on the proper taxation of a certain transaction or pattern -- type of transaction.
Q What type of transaction?
A I believe it was a case where a shareholder sells, I guess, a share of stock short, as it was called, and then transfers, I believe, the cash gotten in the short sale -- in other words, proceeds of the short sale -- to a controlled

0023

corporation, and, at the same time, the controlled corporation assumes what people have referred to, I guess, as the replacement obligation.
Q And the tax consequence of that would be what, as claimed by the taxpayer?
A I'm not sure. It might depend on the facts.
Q Would it be an increase in basis upon the contribution of the cash to the controlled corporation?
A I'm sure they would claim that.
Q And what was your conclusion in the ruling?
A I believe the conclusion in the ruling was that the appropriate taxation is that the -- in the overall calculation, the shareholder would get credit towards basis for the cash put into the corporation, but then would also suffer a reduction in the basis, respecting the corporation's assumption of the replacement obligation.
Q Because it would be treated as a liability?
A Yes.
Q I want to walk through this document with you. Well, why don't you take a minute and skim through the document and -- so you'll have a sense of where we are. And then I want to focus on certain aspects of it.
A Literally a minute? I could probably spend forever.
Q Take just a few minutes, sir. And then if you need more time on specific questions, take whatever time, but I'm

0024

going to be directing you to specific sections.
A Okay.
[Pause.]
THE WITNESS: I've looked through it.
BY MR. AUGHTRY:
Q Okay. I want to, I guess, invite your attention first to page 9. We're going to be, kind of, concentrating on page 9.
A The handwritten page numbers?
Q Please.
A Okay. Page 9.
Q There are two numbers stamped. One is 010804, and the other is HE010804.
A I'm on that page.
Q I guess a question arises, do you have any idea what the HE stands for?
A No.
MR. AUGHTRY: Stuart, do you know?
MR. BASSIN: I don't think those are our numbers.
BY MR. AUGHTRY:
Q There's a reference here to Deputy versus du Pont, on handwritten page 9; Bongiovanni, on 10; and then, over on 12, questions about liabilities, and numerous references to liabilities. What did this document have to do with liabilities?

0025

A This document -- I believe, from scanning it, that this document was -- constituted my own personal notes, which I made in the course of working on what was ultimately issued as

revenue ruling 95, dash, 45.
Q And what did that have to do with liabilities?
A I suppose -- 95, dash, 45 had to do with liabilities, in the sense that perhaps there was a question as to whether the control corporation's assumption of short-sale replacement obligation was or was not a liability.
Q Okay. And how does this reference on page 9, to Deputy versus du Pont relate to that?
A Do you want me to read it?
Q Well, if you can tell me what your understanding is, we've got -- I don't want you to read it. We've got the text.
MR. BASSIN: Take your time to look through it, if you need to.
THE WITNESS: I would assume that Deputy versus du Pont had some relevance to the work on 95, dash, 45, in that I believe that Deputy versus du Pont -- this is, in a way, guesswork. It's been a long time since I've looked at --
BY MR. AUGHTRY:
Q Would it refresh your recollection if you looked at the last sentence in that paragraph?
A The last sentence in the paragraph carrying over from 9 to 10?

0026

Q Yes, sir. And it's on the top of page 10.
A Okay.
Q It's getting the -- I guess it's kind of a funny break, but just above Kahn & Oesterle.
A Okay. The last sentence, just before that?
Q Yes.
A Okay, I've looked at the sentence.
Q Okay. Does that refresh your recollection as to what Deputy versus du Pont has to do with your consideration of liabilities here?
A I think my answer would still, to a large extent, be guesswork.
Q And this quotation here, where you say, "The Court also said," open quotes, "'although indebtedness is an obligation,'" comma, "'an obligation is not necessarily an indebtedness within the meaning of,'" open brackets, "'[Section 163],'" close brackets. What's that got to do with the liability?
A Okay, I guess what the sentence is saying, if I read it correctly, is that the scope of the term "obligation" is larger than the scope of the term "indebtedness."
Q Yes. And you are dealing with liabilities again in that next cite, to the Kahn Michigan Law Review.
A Okay. Shall I read that?
Q Please.

0027

[Pause.]
A I have read it.
Q In it, you deal with liabilities there, as well?
A It appears to.
Q Okay. How about this Bongiovanni cite, particularly three lines -- maybe three sentences down, but where you see the three --
A Yes.
Q -- dots that --
A The ellipsis?
Q -- the sentence following that. Yes.
A Uh-huh. read the sentence after that?
Q Please.
A Okay.

Q And go ahead and read it in the record, if you would, so that --
A Read the sentence aloud?
Q Please.
A There is an ellipsis, followed by this sentence, "The payables of a cash basis taxpayer are liabilities for accounting purposes, but should not be considered liabilities for tax purposes under section 357(c) until they are paid."
Q Okay. And how did that relate to your undertaking here, with respect to the ruling?
A I have no recollection. Would you like me to try to

0028

figure that out from the sentence?
Q If you can within a reasonable time.
MR. BASSIN: To the extent that you can remember.
THE WITNESS: I don't remember. You're saying to restrict myself to my memory?
MR. BASSIN: Yes, we -- you shouldn't be speculating.
THE WITNESS: I don't remember. Sorry.
BY MR. AUGHTRY:
Q Now, these notes, the -- page 1 seems to refer to research.
A Handwritten page 1?
Q Yes, sir. And several of the pages appear to reference meetings. Were the -- is it your recollection there were multiple meetings that you attended on this subject?
A All I can say is -- my answer is that the process of creating revenue ruling 95, dash, 45 took a reasonably long period of time, and I'm certain there were a number of meetings during that time pertaining to the work.
Q Did you do any work on revenue ruling 95, dash, 26?
A I had no part in the promulgation of that. I -- certainly, in the process of 95, dash, 45, I looked at it, I believe.
Q Let's turn now to -- let's see -- page 12, handwritten page 12. This is also dealing with liabilities,

0029

isn't it?
A Any particular part of the page?
Q Black's Law Dictionary and the revenue ruling site that follows.
A Okay. I would think that the part that purports to be from Black's Law Dictionary -- it says nothing about liabilities. I would -- I guess one could decide for oneself whether it could cover the subject of liabilities.
Q What about the revenue ruling --
A Okay.
Q -- that follows?
A I'll look at that. [Pause.] I've looked at it.
Q Okay. How do those two relate, the executory reference and the discussion of liabilities, here and elsewhere?
A I have no personal recollection. Should I --
Q What's your -- what is your best recollection?
MR. BASSIN: Just confine yourself to your recollection, please.
THE WITNESS: All right. I have no recollection.
BY MR. AUGHTRY:
Q From your review of your notes, what's your understanding of your point here?
A Understanding that I have no personal recollection.
Q No, your understanding as to how your reference to executory relates to your consideration of liabilities on this

0030
page.
A Okay. But my answer is going to be uninformed by any recollection of --
Q What's your understanding, reviewing your notes?
MR. BASSIN: Do you know what you were thinking at the time?
THE WITNESS: I do not.
BY MR. AUGHTRY:
Q I'm asking you now, as you review your notes now, what is your understanding, from the notes?
MR. BASSIN: Objection.
BY MR. AUGHTRY:
Q You understand, in a deposition, it's the obligation of a lawyer to object, but we go forward with the answer --
THE WITNESS: Is that right?
MR. AUGHTRY: -- unless you're instructed otherwise.
MR. BASSIN: Yeah.
[Pause.]
THE WITNESS: I'm not sure there is any connection between the two, other than they both pertain in some way to the thinking that occurred in the process of ultimately issuing 95, dash, 45.
BY MR. AUGHTRY:
Q So, you don't know how "executory" relates to that, in any way.
0031
A No.
Q And you don't recall what your purpose was, at the time, in inserting this reference from Black's Law Dictionary to "executory"?
A I could guess at that.
MR. BASSIN: Don't speculate.
BY MR. AUGHTRY:
Q And on page 13, there's a reference to B&E.
A Okay.
Q That's not breaking and entering, is it?
[Laughter.]
A No, I don't think so.
Q That would be Bittker & Eustace, wouldn't it?
A It probably would be.
Q And where have a referenced definition -- Bittker & Eustace. I'm probably going to butcher this, but it's B-i-t-k-e-r --
MR. BASSIN: Two "t's."
MR. AUGHTRY: -- two "t's," for give me -- and Eustace -- I'm on a bad strike here, but E-u-s- --
THE WITNESS: I think it's U-e-s-t- -- I would have said -a-c-e, but I'm not sure.
MR. AUGHTRY: I misspelled both of them.
BY MR. AUGHTRY:
0032
Q The -- you have a reference "for reorganization purposes." That would be corporation reorganization purposes, is that right?
A I believe so.
Q Bittker & Eustace is what?
A Bittker & Eustace is a -- at least today, it is a two-volume treatise on -- the title of it is something like "Corporate Taxation" -- "Federal Corporate Taxation" or "Federal Taxation of Corporations and Shareholders."
Q I want to invite your attention, down in this text,

under "General," about halfway to where it says RR 73, dash, 301. Do you see that?
A Yes.
Q I want to ask you about how that relates to some other things. But if you'd be kind enough to read that into the record, on down to where it ends, "Rule," close paren, period, which is about five lines.
A Okay. RR 73, dash, 301, comma, 1973, dash, two, CB215, left paren, definition of "liability" in partnership context under Section 752, semicolon, contractual obligation to perform services not a section 752 liability, semicolon, RR 88, dash, 77, comma, 1988, dash, 2, CB 392, left paren, accrued liabilities for unpaid expenses of cash-basis partnership are not "liabilities" for Section 752 by analogy to the Section 357(c)(3) rule, right paren.

0033

Q How does that relate, if at all, to your earlier reference to "executory," under Black's Law Dictionary?
[Pause.]
A This statement you had me read, it summarizes, in a short form, purportedly, the contents of two revenue rulings. Both revenue rulings appear, to my rather untrained eye, to deal with contracts which have not been totally executed --
Q Is that to say they --
A -- not totally performed.
Q Is that consistent with your understanding of "executory," versus "executed"?
A I would think that that means they -- those two contracts, one in each revenue ruling, was, to some extent, still executory.
Q Okay. And what is your understanding of "executory" consistent with the Black's Law Dictionary reference in your notes?
A What page was that?
Q I believe that was back on page 12.
[Pause.]
A It looks -- seems to me as though -- using the Black's Law Dictionary definition of "executory," that there is -- the -- at the time at which the statements describing these two revenue rulings were made, an executory element existed respecting both revenue rulings.

0034

Q So, does "executory" --
A An element -- an executory element remained, at the time of each statement, describing the pertinent revenue ruling.
Q Okay. And just so we'll have it in the transcript, at this point, we're referring now to page 12, the Black's Law Dictionary notation, "executory," colon, that which is yet to be fully executed or performed, semicolon, that which remains to be carried into operation or effect, semicolon, incomplete, semicolon, depending upon future performance or event, period, the opposite of, quote, "executed," close quote, period. That would be your notes.
A That is the Black's Law Dictionary "executory" definition to which I was referring.
Q And that would be a fair statement of what is in your notes -- what I just read?
A I believe you read it.
Q So, that would be yes?
A I believe you read it.
Q Yes. Thank you.
Now, on this reference on page 13, sir, to the two circumstances in which an obligation was held not to be a

Section 752 liability -- are you with me?
A So, this was 73, dash, 301 and 88, dash, 77, again?
Q Yes, sir.
A Uh-huh.

0035

Q How does that relate, if at all, to your earlier reference to Deputy versus du Pont, on page 9 and 10?
A I don't believe I actually read what was on page 9 and 10.
Q Well, let me be more specific, then. Do you recall, a moment ago, focusing upon the last sentence on the stub paragraph at the top of page 10?
A Yes.
Q And how do these rulings relate to that concept from Deputy versus du Pont?
A I think the sentence from Deputy versus du Pont merely discusses the relative breadth of two terms, "indebtedness" and "obligation."
Q And that one was larger than the other? Was that your --
A I believe one should infer from that sentence the obligation is a more comprehensive term.
Q And is that consistent with your description of these two rulings on page 13?
A Let me look at them again.
Q Yes, sir.
[Pause.]
A If I may look at them in order?
Q Yes, sir.
A First 73, dash, 301.

0036

Q Yes.
A It says "definition of liability" -- my notes say "definition of liability in partnership context under 752, contractual obligation to perform services not a Section 752 liability."
One can't -- I don't believe one can conclude, from reading that, what the thought process behind the statement was. I'm not sure it was necessarily that an obligation was a larger, more encompassing item than liability obligation.
Q Well, would it be fair to say that -- at least in this instance -- that the contractual obligation involved there was not within the scope of the Section 752 liability?
A I believe that's what it says.
Q Okay. And to the extent that there are obligations that would fall within the concept of a Section 752 liability, there would be overlapping, but one set would be broader than the other?
A Sorry, say that again.
Q If we have two sets, one consisting of contractual obligations and one consisting of Section 752 liabilities --
A Okay.
Q -- and I think, if I understood what you said a moment ago, you would agree that there are contractual obligations here to perform services that do not constitute a Section 752 liability, and, therefore, would not fall within

0037

that set.
MR. BASSIN: Objection. Form.
MR. AUGHTRY: Please answer the --
THE WITNESS: Go ahead. Sorry. Could you ask the question again, please?
MR. AUGHTRY: It's very confusing for a witness when

people -- I mean, the objections are required, but -- you know, you think it's over, but it's not.
THE WITNESS: If you don't mind, could you ask your question again?
MR. AUGHTRY:
Q All right. You -- I'm focused now on your reference, on page 13, to "contractual obligations."
A Sure. You're referring to the parenthetical description, as I'll call it, of 73, dash, 301?
Q Yes, sir.
A Okay.
Q And I'm also referring to the concept stated on the top of page 10, "obligations."
[Pause.]
A Okay.
Q Okay. Are you with me?
A Yes.
Q Okay.
A I believe so.

0038

Q If you take the set of the universe of obligations, did I understand you to say, a moment ago, that some of those obligations don't fall within Section 752 liabilities described on page 13?
MR. BASSIN: I'm going to object to the form of the question, to the extent that it asks for anything other than his recollection of what his understanding was at the time that he generated these notes.
MR. AUGHTRY: Okay. I mean, I can refine the question.
BY MR. AUGHTRY:
Q I'm asking for -- I'm asking for your understanding today. And then if you can tell me if that differs from your understanding then, fine.
A I don't recall what my understanding was.
Q In know, but right now I'm asking -- as you look at these two concepts in your notes, sir -- I'm asking you, what is your understanding as how these two concepts relate?
MR. BASSIN: I'm going to -- I'm going to object, to the extent that you're asking him for an opinion on the law.
MR. AUGHTRY: I'm asking for his understanding. Please answer. If your counsel instructs you not to testify, which I don't understand your counsel to be --
MR. BASSIN: Not yet.
MR. AUGHTRY: -- to be instructing you not to --

0039

THE WITNESS: Okay.
MR. AUGHTRY: -- testify, then it's your obligation to go ahead and answer.
THE WITNESS: Please let me look at the description.
MR. AUGHTRY: Please.
[Pause.]
THE WITNESS: The parenthetical description of 73, dash, 301?
MR. AUGHTRY: Yes, sir.
THE WITNESS: It seems to me to say that a particular contractual obligation, which is not described here -- or, excuse me, to perform services, which is not otherwise described here -- is not a 752 liability. I don't have any idea whether it is saying that because it's not a liability or because there's something in 752 that has excluded it.
By MR. AUGHTRY:
Q From your understanding of your reference here to a

Section 752 liability, do you understand that to include certain obligations -- for example the obligation to pay money?
MR. BASSIN: I'm going to state a continuing objection here, to the extent that you're asking for opinions of law, and also to the extent that the questions are ambiguous to -- and seek information other than his recollection of what he meant at the time he wrote the document that's labeled as Starke Exhibit 2.

0040

MR. AUGHTRY: Good, that'll speed things up.
MR. BASSIN: Okay.
MR. AUGHTRY: Thank you.
BY MR. AUGHTRY:
Q All right. Here, I want -- with your references on page 13 to Section 752 liability --
A Uh-huh.
Q -- and at the time you prepared this document, it was -- you say it was in advance of issuance of the '95 revenue ruling?
A I think it would have been.
Q Okay. Any sense of whether it was years in advance or months in advance or --
A I believe -- 95, dash, 45 -- it must have been issued in '95. Perhaps the government has a different description of 95. Perhaps a fiscal year. As I started at the IRS, I believe, April 4th, 1994, it must have been within that scope. I don't think these notes would have been generated after the revenue ruling was issued.
Q Thank you. All right. And, at that time, when you used Section 752 liability, what was your understanding as to what that meant?
A All I know is, 752 is a partnership provision, and I think 752 does deal with partnership liabilities. But I have -- I don't even have any current knowledge, beyond that.

0041

Q Okay. Who was the person primarily responsible for this revenue ruling that you were working on, in terms of developing it, drafting it, that sort of thing?
A I was the docket attorney. Certainly, I had the obligation to put it in writing.
Q And in the context of your reference at the beginning of this paragraph to --
A On page 13?
Q -- yes, sir -- to liability and your references on -- if you'll -- I'm just flipping around here -- on page 12, to liability, under 80, dash, 199 --
A Sorry, where is that on page 12?
Q Just under the "Black's Law Dictionary" reference.
A Liability under -- sorry? One more time?
Q On page 12, just under the "Black's Law Dictionary," there's a reference to --
A Oh, 80, dash, 199.
Q Yes, sir.
A Thanks.
Q And in the context of your reference on page 10 to "liabilities" and "indebtedness" --
A The last sentence of the carryover paragraph --
Q Yes, sir, and on --
A -- between 9 and 109?
Q -- as well as in Bongiovanni. What was your

0042

understanding as to how the concept of "obligation" and the concept of "liability" related then, when you were preparing

these notes in 1995?
A I don't have any recollection. My only recollection is in these notes.
Q What is your understanding today?
MR. BASSIN: Continuing objection.
MR. AUGHTRY: Yes, sir.
THE WITNESS: Could you repeat the question, please?
BY MR. AUGHTRY:
Q What is your understanding today of the relationship between liability and obligation?
A Particularly based on what I've been asked to read from these notes, I believe that the term "obligation" is a broader one than the term "liability." And probably that term "liability" is within the term "obligation," but I -- I'm not sure about the latter.
Q Yes, sir. All right, thank you.
Let's move to page 14, if we could.
A Fourteen?
Q Yes, sir.
MR. AUGHTRY: It's so thrilling, we've got witnesses running for the door.
[Laughter.]
BY MR. AUGHTRY:

0043

Q At the top of page 14, there's a reference to "preparation" for a 4, slash, 4, '95 conference.
A I see it.
Q What is your understanding as what you mean by "front office"?
A Front office, I don't know what the practice is in other divisions of Chief Counsel, but, in corporate, we refer to the office where the senior -- the highest-ranking people in the Office of Associate Chief Counsel Corporate, as it is currently called, physically sat.
Q Who held that position -- was in the front office during this period, to the best of your recollection?
A That's -- I think that the -- again, I think that the label was a little different back then.
Q Yes.
A The person who, back then, was what we currently call the Associate Chief Counsel Corporate, I believe was Rick Solomon.
Q He's no longer with the service, is he? Or is he?
A I believe that's -- that's true. He's no longer with the service.
Q Do you know where he is?
A I believe he's still at the Treasury Department.
Q Anybody else in the front office?
A I think that, at that point in time, Phil Levine,

0044

L-e-v-i-n-e, was his immediate -- call it assistant or subordinate.
Q And is he still with the service?
A I don't believe so.
Q Do you know where he is?
A I believe he works in Washington, D.C., but I don't know any more.
Q Is he a lawyer?
A I believe he was a lawyer.
Q Do you think he's practicing with a law firm in Washington?
A I would say either a law firm or an accounting firm.
Q I know him. Yeah. All right.

A A nice person.
Q Yeah, he's a great guy.
What about -- is it -- I'm going to butcher this, I'm afraid -- is it Penico?
A Mr. Penico was not in the front office.
Q Okay. And who is he?
A Penico is -- was then, and is currently, an IRS employee in the Office of Associate Chief Counsel Corporate.
Q Still in corporate?
A Yes.
Q Do you still work with him?
A I ask him professional questions from time to time, but I would not say I work with him anymore.

0045

Q And --
Q I'm not in the same chain of command.
Q Is he in a different group than you?
A Within corporate.
Q Is he an attorney advisor, or does he have a position of management responsibility?
A I believe he is a senior technical reviewer, if that's the right term, and I think that's a management position.
Q And his first name, once again?
A Victor.
Q And he works at 1111 Constitution Avenue?
A Yes.
Q As do you now?
A Yes.
Q Okay. Mr. Rooney? That's not Andy Rooney.
A No. I don't know what his first name was. I believe, at the time, he was -- worked at the Treasury Department, not at the IRS.
Q Do you know if he still works for the government?
A I don't believe so. I believe he is long gone.
Q Is he a lawyer?
A I believe he was a lawyer.
Q Do you have any idea where he practices?
A No.

0046

Q All right. This conference, preparation for the April 4th conference --
A Uh-huh.
Q -- do you have any notes relating to the -- that conference, other than what's in this one document?
A I don't know.
Q Do you know if either Mr. Solomon, Mr. Levine, Mr. Penico, or Mr. Rooney has any documents?
A I don't know.
Q Do you know if the IRS has any documents relating to that conference?
A The IRS is capable of misplacing files, but I would believe that a -- an historic file exists for revenue ruling 95, dash, 45.
Q Do you know if that's been produced in this case?
A I don't know.
MR. AUGHTRY: Let's go off the record a second.
[Discussion off the record.]
MR. AUGHTRY: Let's go back on the record.
BY MR. AUGHTRY:
Q All right. Let's see, there is a reference, a third of the way down page 2, to "analysis of layout of partnership background information," and --
A A third of the way down the page, you say?

Q A third of the way down the page, on page 14.

0047

A I believe I see what you're saying.
Q You have "initial capitalization on background information note." Is that sometimes known as a "BIN file"?
A I believe so. Or, I don't know about the word "file." I've heard of "BIN."
Q Of "BIN"? In what context are you familiar with the phrase "BIN"?
A I've heard the term, but I don't remember what it means.
Q All right. What is the function of that reference? What do you understand that -- the reference, "partnership background information note," refers to?
A I don't know.
Q You've got a list of what appears to be topics here -- "holding," "background," "source," "reason for publication." Does that refresh your recollection as to what the function of the "background information note" would provide?
A No. I could only conclude from what is here what it was -- you know, its character.
Q I, maybe, asked you this, but is a BIN prepared for most rulings?
A I don't know.
Q Is a BIN prepared on most regulations?
A I don't believe so.
Q How many times have you been associated with

0048

something known as a "background information note"?
A I don't know.
Q Is this the only instance, over the course of your career with the Internal Revenue Service, that you've been associated with a background information note?
A I believe so, but I'm --
Q Or that --
A -- not --
Q -- with that concept?
A I believe so, but I'm not certain.
Q This "holding" --
A Uh-huh.
Q -- if you could focus on it, does that supply you -- or refresh your recollection in any way as to what is being referred to here?
A It supplies me with information, but does not refresh my recollection.
Q Where is this "holding" found?
A I would assume, from what's here, that it's in the background information, but I don't know for sure.
Q And what is your understanding as to what that background information note relates to? Does it relate to the ruling upon which you were working here, or does --
A I --
Q -- it relate to a different ruling?

0049

A -- I don't -- when you say -- I don't believe it related to 95, dash, 45, which is the ruling I worked on.
Q What do you believe it related to?
A It looks to me as though it relates to something in the partnership area -- I mean, given the description underneath the heading.
Q Would that be because 752 is a partnership provision?
A 752 is a partnership provision. Yes, I suppose it's

because of the reference to 752 and the word -- recurrence of the word "partnership" at least once under the heading.
Q How, if at all, to your recollection, does this relate to revenue ruling 99, dash, 26?
A Can you tell me what 99, dash, 26 was?
Q Just see if that refreshes your recollection.
MR. BASSIN: I think the record should reflect that Counsel has just provided the witness with a copy of the text of revenue ruling --
MR. AUGHTRY: I'm going to go ahead and put it in, if that --
MR. BASSIN: -- 95, dash, 26.
BY MR. AUGHTRY:
Q I hand you what has been marked as Plaintiff's Exhibit Starke 3. Could you tell us what that is, please, sir?
(Whereupon, the document was marked as Starke

0050

Exhibit 3 for purposes identification.)
MR. AUGHTRY: Let the record reflect I'm supplying a copy to counsel for Defendant.
THE WITNESS: It purports to be a revenue ruling, number 95, dash, 26, the title of which was "Short Sales of Securities by Partnerships." Shall I read --
BY MR. AUGHTRY:
Q Just -- you know, just review it, and if you see anything that suggests that it's not what it purports to be, let me know.
MR. BASSIN: I would also note for the record that this is -- we've talked about a number of revenue rulings this morning -- this is the first one which has actually been provided to the witness.
[Pause.]
THE WITNESS: I haven't read it word for word, but I've scanned it, and it's -- it seems -- the text of it seems consistent with its title.
BY MR. AUGHTRY:
Q And does that refresh your recollection at all as to whether or not your notes on page 14 are referring to 99 [sic], dash, 26?
A It does not refresh my recollection, no.
Q I note that -- I invite your attention to page 1 of Starke 3, the revenue ruling.

0051

A Page 1 of Starke 3, okay.
Q You see there's a reference at the bottom of the page to Deputy versus du Pont?
A I see the reference.
Q And you -- now I invite your attention to page 14 --
A Page 14.
Q -- of Starke 2 --
A I have it.
Q -- and the reference to Deputy versus du Pont.
A Under the heading "Contra Arguments"?
Q Yes, sir.
A Shall I read that?
Q Please.
[Pause.]
A I've read it.
Q And does that refresh your recollection as to whether or not your section here, under the heading "Analysis of Layout of Partnership Background Information Note," relates to revenue ruling 99 -- excuse me -- 95, dash, 26?
A No.

Q There's a reference down below the reference to Deputy versus du Pont, on page 14 of Starke -- Plaintiff's Starke 2, to "EBEO." Could you tell us what that stands for?
A Again, phrases change in the IRS. Names of divisions change. I believe EBEO was probably Employee Benefits

0052

--
Q And exempt organizations?
A Yeah, probably.
Q So, it would be -- so, is it -- your recollection is -- I interrupted you then -- forgive me -- Employee Benefits Exempt Organizations?
A Yeah, I believe that was -- that was what that meant back when this was written.
Q And would you read that sentence for us, please?
A Sure. The first sentence under "Coordination"?
Q Uh-huh.
A "EBEO published RR 95, dash, 8, that short sales did not create indebtedness re the UBTI rules."
Q Okay. And "UBTI" stands for what? It would be "unrelated business taxable income," wouldn't it?
A Yeah.
Q All right. Let's turn to page 15. Would you read, so we'll have an easy reference in the record, the section relating to "Questions I might be asked"?
A Read the whole -- this small section?
Q Yes, sir.
A "Questions I might be asked. That RR 88, dash, 77." I'm sorry, that appears to be a sentence fragment. "Significance of partnership case Helmer," left paren, "probably find significance below," right parent, period. "Similarity to

0053

deep-in-the-money options. P&SI says there is no relevant case under Section 357, but mentions Bongiovanni."
Q What does PS -- P ampersand SI stand for?
A I believe that is a reference to another division of the Office of Chief Counsel. It stands for Partnerships and Special Industries, I believe.
Q Would it be -- would it be -- could it be Pass-Throughs and Special Interests?
A That could be pass-throughs, yes.
Q And would the -- how does the concept of pass-throughs relate to partnerships?
A Partnership, I believe people refer to that as an example of a pass-through entity.
Q Why?
A Because I believe that generally, or perhaps as an absolute rule, partnerships themselves do not pay tax.
Q Pass through the tax consequences to the partners or members?
A Yes.
Q All right. Back to the first reference in this sequence of four items, what, if anything of significance, was the reference to RR 88, dash 77?
A It appears to be a reference to a revenue ruling, but I can't conclude any more from looking at that statement.
Q Do you recognize that revenue ruling at all?

0054

A I've seen the number before, I think, but that's my only recollection.
Q Do you have any recollection as to whether or not it relates to basis?
A No idea.

Q Okay. Or partnerships?
A NO idea.
Q All right. What about the next item, "significance of partnership case Helmer, probably find significance below"? And you may want to take a moment and review the rest of the page.
[Pause.]
A There are a number of references, lower down the page, to Helmer, but I'm not sure there's a statement of what Helmer actually held. And, sorry, your question, again?
Q I suppose my question is, what was your point here, when you say "significance of partnership case Helmer"?
A I have seen this page before, during the last week, and read, starting at the heading, "Conference with Jackal, FI&P, and P&SI" --
Q Yes.
A Jackal, FI&P, and P&SI. Having looked at that in -- taking a little bit longer, last week -- I believe that Helmer has something to do with an issue in a way similar to that which was addressed in 95, dash 45. So, this discussion was generally
0055
of -- what to conclude in -- regarding the issue of 95, dash, 45. And apparently Helmer was of some relevance.
Q What is your understanding of what the significance or relevance is of Helmer?
MR. BASSIN: I'm going to object to form again, as to the extent that we're asking for something other than his recollection at the time.
THE WITNESS: But I should -- okay. I really don't know what Helmer held. And so, the best I can say is that it bore some relevance to what conclusion we should reach regarding the issue we addressed in 95, dash, 45.
BY MR. AUGHTRY:
Q Let me make sure I understand your point. You say you don't understand what Helmer held. You would have understood at the time what Helmer held, didn't you? Or wouldn't you?
A Not necessarily.
Q All right. Let's make sure we're clear here. On the top of page -- on page 15, there's a reference to Helmer?
A Yes. More than one.
Q And then in the middle of page 15, there's a second reference to Helmer, right?
A I see a number of them. I'm not sure exactly which one you're referring to.
Q Well, I'm just going in sequence. I'm trying to
0056
make sure we have an accurate statement of the number of references to Helmer that you've made here.
A Okay.
Q And the first that I see in your document is on page 15.
A Okay. The third line?
Q Yes, sir. And then there's a second reference to Helmer about halfway down.
A I see that. Underlined. They're -- these are all underlined.
Q Yes. It sticks out more readily to see. And the third reference, on -- a little bit below that --
A "Rely on Helmer using" --
Q Yes, sir. And a fourth reference, on page 15, to Helmer, below that.
A "At odds with Helmer"?

Q Yes, sir. And a fifth reference to Helmer, in the next-to-last line, correct?
A Right.
Q And a sixth reference to Helmer in the following line.
A I see them all.
Q All right. And a seventh reference to Helmer on top of page 16 --
A I see that.

0057

Q -- right?
A Yes.
Q And an eighth reference to Helmer in the line below that.
A I see it.
Q And a ninth reference to Helmer a little bit below that.
A At the end of the paragraph?
Q Yes, sir.
A I see that.
Q And a tenth reference to Helmer down towards the bottom of the page.
A I see that, too.
Q And I guess my question is -- you've got ten references to Helmer --
A Uh-huh.
Q -- at this stage. Are you saying you wouldn't have known what Helmer stood for at the time that you made these ten references?
A I did not know -- I don't -- I believe I did not know what Helmer's authority was at the time, or what it stood for.
Q All right. And when you -- when your testimony is that you didn't know what Helmer stood for at the time that you did this memo, let's look at some of these ten references.

0058

There's the first reference, "significance of partnership case Helmer, probably find significance below," right?
A I'm sorry?
Q I'm at the top of page 15 again.
A Uh-huh. Uh-huh.
Q And your testimony is, you did not know the significance of Helmer at the time.
A Okay.
Q Is that right? Is that your testimony?
A I don't think I did.
Q Okay. And then, down below, we have a sentence -- I'm looking now at the next --
A Well --
Q -- reference --
A -- if I may back up for a second.
Q Please.
A Sorry. "Significance of partnership case Helmer, probably find significance below," that -- I mean, does imply that, at the time, I at least appreciated that Helmer had some relevance to whatever we were discussing.
Q Okay, when I -- let's go through this and see if we can refresh your recollection.
A Okay.
Q Down below, I'm looking at the sentence preceding the second reference to Helmer, "The court said no, no

0059

obligation to repay. Certainly if the option were exercised,

the partnership must transfer the land. Case apparently called Helmer, discussed in McKee. It did it without a partnership, no gain." You're focusing upon Helmer here, aren't you?
A The sentence -- the sentences you read do seem to focus on Helmer.
Q Okay. Well, let's go up a little bit higher than that. This is in the conference with Jackal, FI&P, P&SI, Treasury, and Crouch.
A Uh-huh.
Q January 9th --
A Crouch.
Q Excuse me?
A Crouch.
Q Crouch. I mispronounced it. Excuse me. And this date, January 9th, 1995, do you have any reason to believe that's not an accurate date?
A No.
Q Okay. Are you aware of any other documents, other than your notes, relating to that conference, being available within the Internal Revenue Service?
A They may exist, but I'm -- have no awareness --
Q Okay. Who --
A -- personal awareness of them.
Q Please tell me Jackal is somebody's name and not a

0060

description.
A I believe that was a reference to Monte Jackal.
Q Yes.
A I'm not sure how one -- Monte must be spelled M-o-n-t-something, but I'm not sure if it's a "y" or an "i."
Q And what was his position at the time?
A I'm not sure exactly what his title was. I believe he worked on what we commonly and often referred to as the third floor, which is where the chief counsel himself or herself, as the case may be, is located.
Q Okay. And --
A And so, it's a rather important person within the Office of Chief Counsel.
Q Is that person still with the Internal Revenue Service?
A I believe that person -- I'm pretty sure that person left, but that person may have actually returned. I don't know.
Q Okay, was -- we were referring to it as "that person," I'm sorry, and this -- is this a man or a woman?
A I believe this is a reference to a man.
Q Okay. And is he a lawyer?
A I was assuming he was a lawyer.
Q You don't know where he has gone, if he left?
A No.
Q All right. FI&P, what does that stand for?

0061

A I don't like getting it corrected, so let me think about this for a minute. I believe that's something like Financial and Insurance Products.
Q Would it be Financial and Insurance Products or Financial Instruments and Products?
A I would have said Financial and Insurance Products, but I could well be wrong.
Q Okay. On the P&SI -- I think you gave us a reference to that -- the reference to Treasury is --
A United States --
Q -- to what?
A -- Treasury Department.

Q Yes, sir. And you had -- and you had a conference here with Treasury. Do you mean representatives from the Treasury Department?
A I would assume that that's what that means. I don't --
Q You didn't have a meeting with a building, you had a meeting with a --
A Someone from --
Q -- with some people.
A -- the building was at the meeting.
Q All right.
A I would assume that's what that means.
Q Thank you, sir.

0062

A Sure.
Q And on Crouch, who is Crouch?
A Crouch was in the -- when I first started working at the IRS, in 1994, and, I'm pretty sure, through 1995, Crouch was what we referred to as a branch chief. I was in his branch.
Q And what was his -- or is his first name?
A Nelson. Or that's his -- I don't know what his full name is, but he went by Nelson.
Q And is he still with the IRS?
A No.
Q Do you know where he is?
A He's practicing tax somewhere in, I believe, Washington.
Q All right. All right. Now, at this meeting, any recollection as to how long this meeting or conference lasted with Messrs. --
A I could only infer, from the length of my notes. I have no personal recollection of the meeting.
Q Okay. Do you have any idea who was representing FI&P or P&SI or Treasury?
A I can't recall any faces of people from P&SI. I can recall -- I have no recollection of what persons from -- what -- I'll just literally read, FI&P were at that meeting.
Q What about Treasury?
A I have no personal recollection of who, from

0063

Treasury, was at that meeting.
Q Any sense how long that meeting lasted?
A I could only guess, from the length of the notes. I have no independent recollection of the meeting at all.
Q From the length of the notes, would you guess it would be a long meeting -- or would you view it would be that it was a long meeting, short meeting?
A It was not a five-minute meeting. I mean, my notes could be condensed. They could have -- I mean, I had a lot of verbiage.
Q So, what would be your best estimate as to the length of the meeting, judging --
A More --
Q -- from your notes?
A -- more than five minutes.
Q More than ten minutes?
A Probably more than ten minutes.
Q More than an hour?
A I don't know.
Q All right. You make a reference here, under RR 95, dash, 8 --
A I'm sorry, where was that?
Q -- in the context of this conference --

MR. BASSIN: David, we've been going almost an hour and a half now. What are your intentions?

0064

MR. AUGHTRY: Why don't we finish this conference? This is the primary document, obviously.

MR. BASSIN: Uh-huh.

MR. AUGHTRY: Why don't we finish this conference. And if you want to break for lunch, we can, you know, get back in --

MR. BASSIN: Okay.

MR. AUGHTRY: I don't know how long. A couple, three more hours, probably.

MR. BASSIN: Thank you.

BY MR. AUGHTRY:

Q All right, let's plow on, if that's okay.
A Oh, I'm --
Q If, at any point in time, you need a break --
A I'm fine right now.
Q -- say so.
A Thank you.
Q Uh-huh.
All right. The reference to 95, dash, 8, would you state that --
A Yes.
Q -- so we'll have it on the --
A We're talking about the second --
Q -- transcript?
A -- what looks like the second paragraph under the

0065

heading "Conference with Jackal," et cetera?
Q Yes, sir.
A "RR 95, dash, 8, says a short sale does not create indebtedness, so income from short sale is not UBTI."
Q And is that consistent with a short sale, not constituting a liability?

MR. BASSIN: Objection, ambiguous.

BY MR. AUGHTRY:

Q How does that relate, in your mind, to whether a short sale would constitute --
A I --
Q -- an liability?
A I think indebtedness and liability probably have different meanings.
Q Uh-huh.
A This sentence refers to -- doesn't talk about liability, it talks about indebtedness.
Q The next sentence refers to "Brown." Would that be Stuart Brown?
A I don't -- I have no personal recollection of talking to Stuart Brown in the course of work on 95, dash, 45, but it doesn't mean I didn't, or we didn't. I wouldn't have talked to him by myself. So, I would guess that that's probably Stuart Brown.
Q Okay. And what was his position?

0066

A I believe he was the chief counsel. That was his title.
Q And as chief counsel, he was head of the IRS Office of Chief Counsel?
A Yes.
Q And during that point in time, roughly how many lawyers did the Office of IRS Chief Counsel have?
A Over a hundred.

Q Over a thousand, wouldn't it be?
A In the national office. I'm really not equipped to guess as to many are in the field. Certainly over a hundred in the national office.
Q Yeah, when I left, it was over -- there were 1282.
All right. The -- nationwide -- how many offices does IRS Office of Chief Counsel maintain, nationwide?
MR. BASSIN: When?
BY MR. AUGHTRY:
Q At this time, in '95.
A I don't know.
Q What would be your best estimate?
A Just a total guess would be at least one per state.
Q I mean, how many lawyers would be your best estimate as to the number employees with the Office of Chief Counsel for the IRS at this time, in 1995?
A Nationwide?
0067
Q Yes, sir.
A Just a total guess? Five hundred.
Q All right. Then it says, "So Brown" -- who you understand to be Stuart Brown, chief counsel -- "is reluctant to say short sale generates a liability."
A That's what it says.
Q What's your understanding of what the -- of what that means, or the significance of that, from your notes?
A From that sentence, alone?
Q Yes.
MR. BASSIN: Let's be clear in your answer as to whether you're testifying regarding what you recall from that conference to be or whether you're talking about what you understand today or what you think that might mean.
THE WITNESS: I have no recollection whatsoever of this meeting.
BY MR. AUGHTRY:
Q So, you have no recollection inconsistent with your notes describing this conference?
A That's true. I don't have a recollection on this point.
Q Thank you, sir.
A You're welcome.
Q Now, from your notes, the next point that you make in your notes, which is your exclusive recollections, as I
0068
understand it, is "Can it be an obligation without being indebtedness?"
A I see these notes.
Q Since you have no recollection inconsistent with your notes then, what is your understanding today as to how that relates to the point we touched upon with respect to Deputy versus du Pont, on page 10?
[Pause.]
A They seem to address the same question, although the statement on 15 is just a question.
Q Yes.
A It doesn't contain the answer.
Q In the next line, "Brown" -- and that would be Stuart Brown, is that right?
A I would assume so.
Q -- "suggested writing a regulation to cover all these questions," correct?
A That's what it says, yes.
Q All right. When was that regulation written?

A I'm not sure it ever was written. Don't know.
Q You're not aware of any regulation being written to address "these questions"?
A You mean the term "these questions," as it appears in that sentence?
Q Yes.

0069

A We have written regulations under Section 357. 357 deals with liabilities. I'm not sure exactly what "these questions" means right -- that phase, as it appears in the sentence, right here, means. Perhaps it -- perhaps the gentleman was referring to something that has been covered under the regs issued under 357, but I don't know.
Q Do you see the reference, several lines ago, above, to "partnership tax law"?
A Partnership tax law? Within brackets?
Q Yes.
A The bracketed sentence?
Q Yes.
A Yes, I see that.
Q And does that refresh your recollection as to the context of these questions?
A It does, a little bit.
Q And how about the reference below -- and we'll get to this in a minute -- but to "'75('78) case: people formed a partnership"?
A I'm sorry, where is this?
Q This references --
A Sorry. Pardon me, where is this?
Q Down below the reference to "these questions."
A Ah.
Q Would you review that next paragraph?

0070

A The one that starts, "Brown mentioned"?
Q Please.
[Pause.]
A The whole paragraph -- whole paragraph? Sorry.
Q Actually, let me just walk you through the thing, if I might.
A Okay.
Q Three lines down --
A Inside that paragraph?
Q Yes. Below the reference to "these questions," there's a reference to "formed a partnership," correct?
A I see "formed a partnership." I see that phrasing.
Q And then the next sentence starts with, "The partnership got," correct?
A Yes.
Q And then the next sentence references "Option was fixed price." And the following sentences says, "We tried Section 731 gain," right?
A "We tried say 731 gain." That's what that says.
Q And you understand Section 731 is a partnership provision, don't you, sir?
A I believe that's true.
Q I think it proceeds on, "because partnership distributed cash to partners," right?
A It says that, yes.

0071

Q The next sentence starts, "Partners said no, should be a Section 752 liability there," correct?
A That's what it says, yes.
Q And you understand Section 752 to be a partnership

tax provision.
A Yes.
Q "But court said no, no obligation to repay. Certainly if the partnership were exercised" -- excuse me -- "if the option were exercised," comma, "the partnership must transfer the land." Do you see that? There were --
A Yes, I see that.
Q Partnership -- "Case apparently called Helmer, discussed in McKee."
A I see that.
Q You recognize McKee as the treatise, McKee Nelson Whitmire, dealing with partnership taxation, don't you, sir?
A Yes.
Q And then the reference is, "It did it without a partnership," and, "no gain."
A I see the reference "If did it without a partnership."
Q All right. We'll go back and get the context, at great expense in transcript cost, but does that refresh your recollection as to whether the concept of all these questions relate in any way to partnerships?

0072

A It certainly seems as if they do, but not, perhaps, exclusively to partnerships.
Q All right. And, again, just to make sure the record's clear, can you tell me when, if at all, this suggestion by the IRS chief counsel, Stuart Brown, of writing a regulation to cover all of these questions, was carried out or completed?
A I don't follow what the IRS does with respect to partnerships very closely.
Q But you're not aware of any regulation being adopted to cover all these questions.
A I'm not aware of any partnership regulation. At the current time, I'm not aware of any partnership regulations having been issued, but that doesn't mean it wasn't.
Q All right. Review, if you would -- and this may be easier in light of your earlier comment -- just -- how about just reading back through -- and I know I've garbled it and skipped over things -- but read into the record this paragraph, starting, "Brown mentioned uncovered options."
A I'm sorry, did you say --
Q From your notes, if you could read your notes into the record.
A Okay. The whole paragraph?
Q Yes, under this -- under your reference in your notes to "Brown suggested writing a regulation to cover all these questions."

0073

A "Brown mentioned uncovered options. How would one be handled? Would the problem ever arise without a deep-in-the-money option? A '75," left paren, "'78," right paren, "case: people formed a partnership. The partnership got $1,000 for writing an option to sell its land. Option was fixed price. We tried say Section 731 gain because partnership distributed the cash to partners. Partners said no, should be a Section 752 liability there. But court said no, no obligation to repay. Certainly if the option were exercised, the partnership must transfer the land." Then a sentence in brackets, "Case apparently called Helmer, discussed in McKee," end of the bracketed sentence. And then I'm not sure whether the next sentence is a new paragraph or a part of the old paragraph. It says, "If did it without a partnership, no gain."
Q The -- on this particular paragraph, if I understand

your earlier testimony, you have no recollection of this conference inconsistent with what you've said here.
A That's true.
Q And are -- I think you had indicated you're not -- that you don't know whether additional notes may exist in the possession or created by Mr. Jackal.
A No idea.
Q No idea regarding additional notes from F&IP [sic]?
A No idea.
Q Or P&SI?

0074

A No idea.
Q No additional notes from Treasury, to your knowledge.
A Not to my knowledge.
Q No additional notes from Mr. Crouch.
A I have no idea whether Treasury has additional notes, or Mr. Crouch.
Q All right. And are -- from reviewing this, are you aware of any cases existing, at the time that you wrote this, this that were inconsistent with Helmer?
A I have no idea.
Q Are you are, today, of any cases that are inconsistent with Helmer?
A No idea.
Q Okay. Let's go on. And the next section deals with comparing options and short sales. And there's an -- if you could review that, please, sir, that next section.
[Pause.]
A Including what looks like a subparagraph?
Q Yes, sir.
[Pause.]
A I've read it.
Q Okay. Would you read into the record the passage beginning, "Should we say short sale."
A "Should we say short sale creates liability when an

0075

option does not? Worried about adverse selection," colon, "if want basis and gain, rely on Helmer using short sale, if not use option."
Q And, as I understand your earlier testimony, you're not aware of -- you have no recollection that's inconsistent with what you have stated here.
A That's true.
Q Are you aware of any precedent that's inconsistent with Helmer in 1995, at the time you wrote this?
A I'm not personally aware of any such.
Q Any indication, as you look at these notes, that an option, as addressed in Helmer, would be treated inconsistently than the way it's treated in Helmer?
A I'm not sure I understand the question.
Q Okay.
A I got the drift, from this, that Helmer was about short sales.
Q All right. My question is, are you -- and this is a redundant question. I just want to make sure we have this tied down. There's a reference here, "if not use option." Do you see that?
A I see that.
Q Are you aware of any other authority that would govern how an option would be handled relative to a liability -- creating a liability -- than Helmer as the law in 1995?

0076

A We've noted some other revenue rulings. Perhaps they are relevant.
Q Anything beyond the revenue rulings that are noted?
A Not that I'm aware of.
Q Okay. In -- I'm going to take you up through today, but what about in 1999? What, if any --
A 1999?
Q 1999, yes. What, if any, authority are you aware of that -- existing in 1999 that would be inconsistent with Helmer?
MR. BASSIN: Objection, calls for a legal opinion.
MR. AUGHTRY: Objection is noted --
THE WITNESS: Oh, sorry. Sorry.
MR. AUGHTRY: -- the objection is noted. Please --
THE WITNESS: Right. It's going to take me awhile to catch onto that. I guess my answer is that I'm not aware of anything that existed in '99 that I'm not aware of having existed in '95.
BY MR. AUGHTRY:
Q And what about in 2000?
A Same answer. I'm not aware of anything that existed in 2000 that's -- regarding what we have discussed, that was any different from what existed in '95.
Q All right. And what about in 2003?
A May I say "same answer," or shall I repeat it?
Q Please.

0077

MR. BASSIN: Same objection.
MR. AUGHTRY: A recurring objection, I think, that you noted earlier.
BY MR. AUGHTRY:
Q All right. Then we move into --
MR. AUGHTRY: This is getting lengthy. Do you want to break for lunch?
MR. BASSIN: It's getting to be about --
MR. AUGHTRY: What's your purpose?
MR. BASSIN: -- that time.
MR. AUGHTRY: Would you like to do that, or -- okay, let's get through a little -- to the end of this page, and then we'll try to get -- and then we'll break, if that's okay.
MR. BASSIN: Okay.
BY MR. AUGHTRY:
Q Okay. The next reference is, "F&IP" [sic] "might say all options, obligations," open brackets, "liabilities," question mark. Do you see that?
A Yes.
Q Is it fair to say that, at this point in time, it was unclear how to treat options, as either obligations or liabilities?
A Just inferring from this sentence, standing alone, I guess it reflects uncertainty as to what is an obligation and what is a liability, vis-a-vis an option.

0078

Q Thank you, sir. And is that consistent, if you drop down to the passage, "But P&SI has problems with that F&IP" [sic] "view"?
A I'm sorry, what was your question, again?
Q Is that consistent in your -- your answer, that there appeared to be some uncertainty about how these things would be treated, consistent with your reference here to -- beginning, "But P&SI"?
A So, you're asking me if P&SI has problems with the possibility that F&IP [sic] might say all options are obligations or liabilities?

Q Yes, sir. Consistent with your answer that there was uncertainty of it, as to the treatment.
A The sentence does say, "P&SI has problems with that FI&P view."
Q What do you understand that meaning?
A I'm not --
MR. BASSIN: At the time --
THE WITNESS: -- really sure.
MR. BASSIN: -- what did you under-
THE WITNESS: I have no recollection of this.
BY MR. AUGHTRY:
Q And nothing you're going to say today is going to alter your view that you've got no recollection of what went on in this conference, beyond what's reflected in the notes?
0079
A I think that's true.
Q Okay. But on your understanding today, which is all we're left with, from reviewing your notes from 1995, and particularly focusing upon this parenthetical reference that is apparently at odds with Helmer, is it fair to say that --
A I'm sorry, I did not read that paragraph --
Q All right. Why don't you just take a moment and focus upon the paragraph under the heading, "F&IP" [sic] "might say all options obligations" and the next indentation line that says, "But P&SI has problems with that F&IP" [sic] "view."
A I should read the indented paragraph between them?
Q Yes, to yourself.
[Pause.]
A I've read it.
Q All right. And is it your understanding, today, that your notes reflect that there was a dispute between F&IP [sic] and P&SI as to the treatment of options under Helmer?
A I infer that from the notes.
Q And that F&IP [sic] was advocating a position that was, quote, "at odds with Helmer," close quote.
MR. BASSIN: That quotation left out the word "apparently."
BY MR. AUGHTRY:
Q Well, I'll tell you what, why don't you read that parenthetical into the record?
0080
A The one that starts, "That is apparently"?
Q Please.
A Left paren, "That is apparently at odds with Helmer; hence they are talking about maybe doing this as a regulation," left paren, "overruling a case," right paren, "rather than just a RR," left paren, "or something," right parent, right paren.
I'm sorry, did you have a question?
Q I do, I have several on that point. "RR," you understand to be "revenue ruling"?
A Yes.
Q Not "railroad," but "revenue ruling."
A Revenue ruling.
Q All right. And when it refers, "hence," they are talking -- that would be F&IP [sic] are talking?
A Let me reread the preceding two sentences, please.
[Pause.]
A Well, it's not entirely clear to me. The sentence in parentheticals, in parentheses, the -- after the semicolon, the subject is the word "they," the grammatical subject of that sentence. And it's not entirely clear whether the grammatical subject, "they," refers to the "others" mentioned in the immediately preceding sentence or FI&P, mentioned in the

preceding sentence.
Q So, in fairness, F&IP [sic] is advocating treating options as a liability under Section 752 --
0081
A No.
Q -- in "others" --
A No. No.
Q -- "apparently disagree"?
A Preceding sentence clearly seems to say -- it clearly says that FI&P -- it says "every option whether deep-in-money or not, has a 752 obligation." Now, the word "liability" appears in brackets. The fact that it's in brackets suggests that perhaps that word was not used in the -- in the meeting, but that, in writing my notes, I said, "Well, maybe they also mean liability, or, alternatively, mean liability." But I think the indication is that they did not use the word.
Q All right. So, your understanding, from your notes, is, "F&IP" [sic] "apparently says every option, whether deep-in-money or not, is a Section 752 obligation."
A That's what I believe the notes say.
Q All right. And --
A That's my own reading.
Q -- and your next reference is, "Others apparently disagree."
A Okay.
Q All right. And then the next reference is, "That is apparently at odds with Helmer; hence they" -- and you're not sure -- or, tell me who you think "they" --
A Well, I think it's uncertain --
0082
Q -- refers to.
A There are -- there are two subjects in the sentence inside the parens, the subject of the first half of the sentence is that word "that," and the subject of the second half of the sentence is the word "they." I'm not absolutely positive what either of those refers to. They -- "that" could refer to the statement in the second preceding sentence about FI&P's position, and "they" could refer to FI&P, or "that" could refer to the position in the immediately preceding sentence that the "others," who would apparently agree -- disagree with their position. And "they" could refer to the "others."
Q Or "they" could refer to both groups, all together, couldn't they?
A I suppose that's --
Q All right.
A -- grammatically possible.
Q And let's make sure we understand the three possibilities of subsets here. F&IP [sic] was the -- with the IRS Chief Counsel's Office?
A Yes. They were a subdivision of the office.
Q To your knowledge, are they capable -- do you have any reason not to think that they were capable, competent, reasonable people?
A I think the ones I met were -- and had any professional interaction with -- were competent.
0083
Q And reasonable?
A I'm sure that they were competent. I don't know about reasonable, but they were probably reasonable.
Q All right. And what about the "others" that -- we know, down below, that P&SI had some problems. Do you have any sense of how the "others apparently disagreed" relates to P&SI?
A I don't.