**EXHIBIT C (continued)**

Q Okay. Were there -- was there anyone in this conference who was not an employee of the Internal Revenue Service or the Treasury Department?
A All I can do is look at the heading, "Conference with Jackal, FI&P, P&SI, Treasury, Crouch," and I can merely infer that no one else was present. However, the sentence, "others apparently disagree," might be a reference to people who were not there.
Q Now, when you say that you're looking at the heading as to who was there, those people were there as a part of their job, weren't they? Nobody was floating in there because they were on vacation, were they?
A I'm guessing that that's true.
Q And any reason to believe that they weren't acting within the scope of their authority?
A I have no reason to believe that. I don't know what their authority was.
Q Okay. Insofar as you know, everybody that was there

0084

had properly authorized to be there.
A As far as I know, yes, including me.
Q And so, was there anyone from your -- to your knowledge, in the room who was not competent or reasonable?
A I would assume that they were all competent. I'm not sure about their reasonableness.
Q All right.
A I'm not sure I've had enough evidence to judge.
Q All right. And when we move down to the reference, "But P&SI has problems with that F&IP" [sic] "view" --
A I see it.
Q Yes, sir. And that would be -- both of those groups of people or divisions would be within the Chief Counsel's Office of the --
A Yes.
Q -- Internal Revenue Service?
A That's true.
Q All right. And they disagreed with each other.
A That's what that sentence seems --
Q All right.
A -- to say. Or "has problems," whatever that means. It doesn't -- it doesn't necessarily mean "disagree."
Q Well, did you understand that -- but you knew that others apparently disagreed.
A Whoever "others" is.

0085

Q And that would be, apparently disagree with F&IP [sic], is that correct?
A That would appear to be true. I mean, that's -- appears to be what this says.
Q Okay. And when they disagree with F&IP [sic], was there anybody there who you feel, if it's from reviewing your notes or any other basis, that there was -- that it was anything other than a reasonable disagreement among reasonable people?
A I have -- from reading my notes, nothing suggests to me that anybody was being unreasonable.
Q Genuinely held points of differing opinions.
A As far as I know.
Q Yes. All right. And then it goes on to -- state for the record what that next sentence, beginning, "P&SI wants."
A Beginning -- again?
Q "P&SI wants."
A "P&SI wants keep liabilities narrow, not blow Section 752 wide open."

Q And what do you understand that to mean, in the context of this discussion?
A That P&SI favors a -- relative to something, a narrow definition of "liabilities."
Q Would that --
A And that's in the context of their dealing with Section 752.
Q How would that relate to the questions or disagreements, above, as to "options"?
A The subparagraph that starts, "Mentions 446, dash, 5," the second sentence, "FI&P apparently says every option," skipping a few words, "is a 752 obligation." And, moving down, "P&SI wants to keep liabilities narrow."
Well, I'm not sure whether, in the sentence above, starting "FI&P apparently," whether FI&P used the term "liability," because it's in brackets.
Q But, certainly, you're raising the question as to whether or not they're referring to "liabilities" when they say "obligations," aren't you?
A FI&P apparently advocated a broad interpretation of the word "obligation." P&SI apparently advocates something other than a totally wide-open interpretation of the word "liability."
Q Okay. And in the context of an option, is it fair to say that FI&P advocated including options in this concept of Section 752 obligation, which you've referenced, open bracket, "liability," question mark, close brackets, and P&SI advocated a narrow view of "liabilities" in the context of options?
A First of all, I'd say that apparently their statements were in the context of options, because the word "option" appears a lot in this -- what I'll call "subsection," starting with the heading "Conference with Jackal, FI&P, PSI," et cetera. So, they're both apparently -- have options, to some extent, in mind. And -- well, the terms FI&P and P&SI -- I mean, obviously, they hold -- all the persons in FI&P and P&SI were not there. And so, these references are, necessarily, to my understanding, correct or not, of what individuals from FI&P and/or PSI said.
Q Well, there's a paragraph down below there, beginning, "They are trying to figure out what Brown's feelings was at last meeting."
A Uh-huh.
Q Do you know when that last meeting was?
A I would have to read back through the notes and see if there is any indication. Otherwise, I have no idea.
Q Are you aware of any documents still existing within the Internal Revenue Service --
A No.
Q -- or elsewhere, relating to the last meeting?
A No personal knowledge.
Q None, beyond these.
A Some others may exist on a person's computer or something.
Q And I want to -- if you would read into the record, beginning with, "Apparently Brown's worried."
A Let me find that again. Can you help me?
Q It's in the indented paragraph under "They are trying to figure out."
A I've got the The Court Reporter helping me out here.
Q Good.

A You say starting with, "Apparently Brown's worried"?
Q Yes, sir.
A Okay. Just that sentence, or the rest --
Q Yes --
A -- of the paragraph?
Q -- of that paragraph.
A "Apparently Brown's worried this proposed ruling and RR 95, dash, 8 seem run in opposite directions. Re Helmer, et cetera. If we had to choose one poison or another, he tended agree with Helmer," left paren, "a position IRS perhaps needs, lesser of two evils," right paren.
Q What do you understand is meant by the "a position of IRS perhaps needs"?
[Pause.]
MR. BASSIN: To the extent you remember.
THE WITNESS: I guess I have no specific recollection of what I was -- how I interpreted that at the time, if those were the actual words spoken. They could be my words, for all I know. My -- when I went back and typed up my notes, they could be just a reflection of mine.
BY MR. AUGHTRY:
Q What is your understanding today as you look at your

0089

notes from then?
A Of the "a position the IRS needs" --
Q Yes.
A -- "perhaps needs"? I guess I would refer to the -- the IRS has a mission statement -- I can't recite it; I'm not able to, because I don't remember it word for word -- but a mission statement of the IRS's purpose and how it's to interpret the tax laws. And part of it might be, for instance, like "good administration of the tax laws" -- "sound administration of the tax laws." And I assume that that, "a position the IRS perhaps needs," bears on the IRS's carrying out its mandate.
Q All right. In fairness, in Helmer the government was the one that argued that options were not liabilities, for partnership purposes, right?
A I don't know.
Q All right. And when you say, "he tended agree with Helmer," the "he" refers to the IRS chief counsel, Mr. Brown, is that correct?
A I would assume, from the way this paragraph is laid out, yes.
MR. BASSIN: Do you know?
THE WITNESS: I don't know, other than from reading this.
BY MR. AUGHTRY:
Q And what is your understanding as "agree with" --

0090

what "agree with Helmer" means, from your notes?
A All I can say is that, I would assume that he was agreeing the holding in Helmer, whatever that was.
MR. AUGHTRY: Why don't we break, at this stage, for lunch? We're at the end of the page. And we'll reconvene when you want to reconvene.
[Lunch recess at 1:10 p.m.]

0091

A F T E R N O O N S E S S I O N

[2:15 p.m.]

Whereupon,

RICHARD CASSIUS LEE STARKE (resumed),

having previously been duly sworn, was examined and testified as follows:

EXAMINATION (continued)

BY MR. AUGHTRY:

Q We're back on, and you're still under an oath. Not that you would not --
A Okay.
Q -- state truthful, otherwise, but --
A I understand.
Q We, I think, raced forward to -- through page 15. We're up to page 16 of this memorandum.
As we're looking at the top of page 16, there's a reference to "Jackal" again. That's the same gentleman, Monte Jackal.
A Uh-huh. I see it.
Q And his position, once again, was -- do you recall?
A I don't recall.
Q I don't think it says, on the prior page, but he was with the Internal Revenue Service Chief Counsel's Office, was he?
A He was on the third floor. Yes, he was within the

0092

whole big Office of Chief Counsel.
Q And when you say "the third floor," that would be the third floor at 1111 Constitution Avenue?
A Yes.
Q Okay.
A I'm pretty sure he was on the third floor.
Q Which is the IRS building.
A Yes.
Q Okay. And the third floor is Chief Counsel's floor?
A Yes. Well, it's where the chief counsel, himself, is, his office spans more than one floor.
Q All right. And then, down several lines, there's -- I guess, three lines -- there's a discussion about "Brown." That would be Stuart Brown again?
A I would assume so.
Q All right. And it's a reference to, "Helmer's bad if just do Section 705 only" -- "so our" -- I'm skipping a little bit here -- "so our ruling should say basis increase under Section 752." Do you see that sentence?
A I see it.
Q Do you know what that means?
A I really don't. I'm not a partnership person.
Q And then it -- in the next line, it indicates -- if you could read that into the record, please --
A Sure.

0093

Q -- at "F&IP" [sic] --
A What do you mean --
Q -- "FI&P."
A The first sentence?
Q Yes, sir.
A "FI&P willing put out short sale ruling and say nothing about options."
Q All right. And through the next sentence, please.
A "FI&P had argued against the EBEO ruling, 95, dash, eight," in brackets, "as inconsistent with the proposed ruling, same thing worrying Brown."
Q What do you understand that to mean?
[Pause.]
MR. BASSIN: To the extent you can remember.
THE WITNESS: I'm not sure.
BY MR. AUGHTRY:
Q Is it consistent with there being disagreement as to the -- among the Chief Counsel representatives as to the proper treatment of these matters?
A I don't know.
Q Down six or seven lines, there's a sentence that begins, "Whole issue."
A Right.
Q "Whole issue is mismatch between inside and outside basis." What do you understand that to mean?

0094

A In a partnership context, or just --
Q Yes.
A Okay.
Q Now, this reference is in a partnership context, isn't it, as referenced by the next sentence?
A I see the word "partnership." Well, I guess, "Whole issue is mismatch between inside and outside basis," that would be a failure of equal interest of the partners in a partnership interest compared to partnerships' aggregate interest in its assets. And equality would be where the two numbers are the same.
Q Do you see where the sentence beginning, "Treasury wants reach"?
A I see the -- part of the sentence beginning --
Q If you could --
A -- after a colon?
Q Yes, sir. If you could read that and tell us what you understand that to mean.
A Read it out loud?
Q Please.
A "Treasury wants reach right result re outside basis too: a basis kick-up there too, no matter how get to that result, and only way there is 752: using it to cram through result: understands it is not an entirely clean way of doing it."

0095

I think that sentence is just entirely about partnership matters --
Q Yes.
A -- and not corporate. And I was a member of corporate, and I was concerned with 95, dash, 45, which is a corporate promulgation. I don't think I understood, at the time, what they were saying. I just wrote it down.
Q Okay. What do you understand about the phrase "a basis kick-up there too" to mean?
MR. BASSIN: What you meant at the time.

THE WITNESS: What, now, do I think I probably meant, at the time?
MR. BASSIN: Uh-huh.
THE WITNESS: It seems to me that Treasury is interested, probably, in maintaining parity between inside and outside basis.
BY MR. AUGHTRY:
Q And what basis is being kicked-up, to your understanding?
A I would assume this is --
MR. BASSIN: Do you know, or are you --
THE WITNESS: I'm pretty sure, but I'm not 100 percent sure. It seems to me they are referring to the partners' aggregate basis in their partnership interest, because it says "outside basis."

0096

BY MR. AUGHTRY:
Q So, you understand "outside basis" to be the partners' interest in their partnership interest?
A That's what I would think that means.
Q What about the phrase, "no matter how get to that result"?
A I'm not sure. It just means they were -- I'm not sure. They wanted to -- I guess they thought that was the right result.
Q Yeah.
A If I knew partnership law, I might be able to, you know, figure out the mechanics.
Q And do -- what about "the only way to get there is Section 752"?
A I don't -- I know 752 is about liabilities, but I don't know more.
Q What about "no matter how to get the result," "only way there is 752, using it to cram through result"?
A I don't know what that means.
Q What about with the added phrase, "understands it is not an entirely clean way of doing it"?
A I would -- could only guess.
MR. BASSIN: Don't speculate. Only testify as to what you know.
THE WITNESS: Maybe -- I could only give my

0097

interpretation of those words.
BY MR. AUGHTRY:
Q Well, they're your words, so if you're could give us your interpretation.
A Well, they may not be my words. I may have written them down.
Q But they're your notes.
A Uh-huh.
Q Is that a fair statement, they're your notes?
A Yeah. I would guess that the odds are that, you know, whoever came up with those words meant that there might be some disagreement.
Q It goes on, "P&SI does not want to broaden Section 752." What do you understand that to mean, in the context of options or as it applies to the options you're talking about here?
A I really don't know what 752 says, other than it's -- I think it's about liabilities. And so, I really couldn't, you know, say much about 752, as it applies to options.
Q All right. And, two lines down, it references, "Talked about meeting again next week," open brackets, "to try

to reach a consensus," question mark, close parenthesis. Do you see that?
A Yes.
Q Was there a meeting the next week?
0098
A The only way I could tell is to look through these notes and see if anything suggested there was. I have no recollection.
Q When do you understand that this conference took place? I invite your attention back to page 15.
A Okay.
Q And the line, a third of the way down, that starts, "Conference with Jackal, F&IP" [sic]. It's the date of January 9th, 1995.
A I think we've covered this before. I would assume it's --
Q All right.
A -- 1/9/95.
Q All right. And then there is -- I guess, on this, "Conference" --
A Page 16, again?
Q Back to page 16, if you could. Are you aware, other than your notes here, are any documents relating to the proposed "meeting again next week" --
A I don't know what documents I might have on my computer, still, at this time.
Q What about the other attendees? Are you aware of the existence of the other attendees, either who they were or what documents they may have?
A I don't know. The only way I could tell who might
0099
have been in the meeting is to read the notes. I have no independent recollection. I think the only -- I have no idea what, if any, notes they might have written, and then what they might have kept. And, to my knowledge, the only thing I know of that might exist that I had any connection with might be on my computer, or maybe in the official file that was -- I think, which we referred to earlier, which would have been sent to the records room, for the 95, dash, 45.
Q Are you aware of any notes relating to the meeting --
MR. BASSIN: Let's go off the record for a minute.
[Discussion off the record.]
MR. AUGHTRY: Let's go back on the record.
BY MR. AUGHTRY:
Q All right, let's make sure we are clear on -- as we wrap up this conference that you're referring to in your notes, including on page 16, that, if I understand, your testimony is, you don't know what, if any, other documents there may be relating to the meeting that was discussed about being -- discussed as to being held the next week.
A The only thing I would add is that, as I said, some documents of mine may have ended up in the official file for 95, dash, 45, and there may still be something on my computer. But I would think that any notes I made of the occurrence of such a meeting, or at such a meeting, would be in here.
0100
Q What about from the other four participants, or five participants, if we go back to the beginning of this conference? That's referenced on page 15. It's a reference to Jackal, then a reference to FI&P, a reference to P&SI, a reference to Treasury, and a reference to Crouch.
A I see it.

Q As to -- and these are your notes, listing other people at the meeting, is that right?
A I believe that's what they are.
Q And, as you sit here today, can you tell me whether or not there were one or more than one representatives of F&IP [sic]?
A I don't know.
Q What about P&SI?
A I don't know. I would assume there was one there, but I don't know whether there were more.
Q And Treasury, one or more than one?
A Don't know.
Q Okay. Of those five folks, or groups of folks, in addition to yourself, can you tell me whether or not they met again in the weeks that followed?
A I don't know, unless it's reflected in these notes.
Q And you've answered with respect to the documents and notes that you prepared. Do you know where the notes that they may have taken from the meeting are located? And when I

0101

say "the meeting," I'm taking about the January 9th meeting.
A I don't know where they might be located, other than to look in their -- into the official file or -- I don't know where they might keep any personal notes.
Q Did you say "entity official file"?
A Look in the official file for revenue ruling 95, dash, 45.
Q You haven't looked in the --
A No, I haven't.
Q -- official file.
A I may have -- I may have compiled it and sent it to the records room, but I have -- don't -- and I may have looked at it once since, in respect of a discovery request that somebody else handled. But I don't believe I've looked at it, otherwise.
Q When you say "it," you're referring to the official file?
A Yeah, uh-huh.
Q How fat is the official file?
A I'm not sure. I don't think it's -- I don't think it's fat.
Q How many pages, to the best of your estimate?
A You know, it's just -- I'm not -- I don't recollect how big it was. And so, anything I say would be, kind of, a guess. And the best I could guess would be in inches, and I'd

0102

just say an inch or two.
Q So, you can't say whether or not the notes from these other people from the January 9th meeting are in the official file?
A I could not say for sure.
Q And you can't say whether or not the notes from these other people would be in the official file from whatever meeting was held, quote, "next week," or thereafter?
A I can't say for sure. Sorry.
Q What -- you do -- there's a bracketed phrase here, "to try to reach consensus." Was a consensus reached?
A This is page 16?
Q Yes, sir,
A To the extent -- and I'm not certain about this -- to the extent this conference was -- you know, looking at the notes of the conference here, I would assume that, because what we were working on was what ended up being 95, dash, 45, that

this conference was about what kind of answer to give in 95, dash, 45. And, because we ultimately did issue 95, dash, 45 with a clear answer, I would assume that some sort of consensus was reached. But that's a string of assumptions.
Q And you can't tell us where the notes are from whatever meeting was held to reach a consensus?
A If I don't have notes in here, and somebody's notes relevant to that are not in the official file, then I can't tell
0103
you where they might be.
Q You can't tell us what notes are in the official file, today?
A No. Without having it in front of me, I can't.
Q All right. What about -- there is a reference to "Conference with Crouch" --
A I'm sorry?
Q The next line.
A Oh, 16?
Q Yes, sir. "Conference with Crouch, on January 9th, '95."
A I see it.
Q Other than these notes, what, if any, other notes exist relating to that meeting?
A I don't know if Crouch would have taken any notes or not. And if I took notes, I'd think they would be in here. You know, I take handwritten notes. I probably transcribed those in creating this. Perhaps not word for word. I may have condensed things. I may have added subsequent thoughts, and probably destroyed my handwritten notes. This pretty much documented my handwritten notes.
Q And the reference here, "Make sure there are no cases on point under Section 351," comma, "357."
A Uh-huh.
Q Did you do that?
0104
A I think the best way to answer that question would be to go through these, as they do seem to incorporate the results of my research, and see whether such cases are in there.
Q Well, whatever effort on that score would be contained in this document?
A If it's in writing at all, I would think, in a note form. There may be copies of cases in the official file, for all I know -- you know, from cases in 351. I may have made a copy and put those in the official file.
Q But you would need to look at the official file to know if there are.
A Yeah, I would.
Q And you would need to look at the official file to know if other people's notes relating to these various meetings are in there?
A Yes.
Q Do you -- do you recall running across any cases that were on point under 351 or 357?
A I don't recall. We have seen -- have we not seen Bongiovanni?
Q Yes.
A Well, that was a 357 case.
Q Yeah, and that's an interesting point. If you look back on page 14, the top of the page --
A Sorry, they're sticking together here. I'm on page
0105
14?
Q Yeah. So, there's a reference, "preparation for

April 4, '95, conference."
A I see it.
Q And then if you look at page 15, it says "Conference with Jackal" and others, January 9th, 1995.
A Uh-huh.
Q Is the sequence of these materials an entry in reverse chronological order?
A That would certainly suggest reverse chronological order, but I don't recall.
MR. BASSIN: But then -- but then it goes on, on page 16, to talk about 3/7/95.
BY MR. AUGHTRY:
Q How do you explain --
A Well, review --
Q -- the different dates --
A Wait, can I say something?
Q Please.
A You cited 3/7/95 on 16. That doesn't mean that was the day I reviewed it and made these notes.
Q Okay.
A That's the date of the document, apparently.
Q Let's see if we can find some other references to dates that may aid in understanding the sequence. Will you flip

0106

through and see if you see --
A Oh, you want me to?
Q -- any other references to dates --
A Sure.
Q -- that may aid you in explaining the sequence of this, please?
A Sure.
[Pause.]
A I haven't seen any other dates, so far. I started on page 16 and worked my way to the back.
Q What is your understanding as to whether or not your notes are presented in the sequence of most recent to most remote, or most remote to most recent?
A I -- this was -- I'm not sure what my practice would have been in the first couple of years of my -- with the IRS. These -- this --present time, when I do my -- what I refer to my -- as my "case log" on my computer, and I do that in reverse chronological order.
Q Meaning from most --
A Most recent --
Q -- recent to --
A -- would at the top --
Q -- most remote?
A -- of the file.
Q Is that the way these notes were taken off your

0107

computer?
A It is hard to tell. What do you mean by "taken" -- "the way they were taken off my computer" -- what do you mean by that?
Q If I could ask you to explain --
A Sure.
Q -- how this document was printed out, from where, from what source --
A I would imagine it was printed from a file on my hard drive.
Q But you don't recall doing that?
A No. Sorry.
Q And you don't know when that was done, or do you?

A I can only assume that I printed this out in the course of creating the official file.
Q So, you believe this document was included in the official file?
A I would think so.
Q All right. Thank you.
A Sure.
Q And if you -- if, at the conclusion of this deposition, some point comes to mind that sheds light on either this question or some other question that you feel like you're not clear about, or you hadn't answered correctly --
A Uh-huh.

0108

Q -- would you tell us that, through Mr. Bassin?
A I may also -- sure. Sure. Along those lines, I may -- there doesn't really seem to be that much in the way of personal notes in here. It's primarily just research. Perhaps -- I think I would have also done an official log sheet, which has some entries of occurrences on it. That may be in the official file, as well. So, when I said earlier that "if I made any notes, they're most likely in here," there may also be a case history sheet.
Q Could you check that and see -- let us know if that exists?
MR. BASSIN: We have a -- we have a note to re-pool that revenue ruling file and make -- and confirm that everything has either been produced or privilege claimed for it.
MR. AUGHTRY: I mean, you'll let us know?
MR. BASSIN: Right.
MR. AUGHTRY: Okay.
BY MR. AUGHTRY:
Q All right. All right. We were -- there's a conference reference here, we mentioned a moment ago, about Crouch, January 9th, 1995.
A So, we're on page 16?
Q Yes, sir.
A Okay.
Q The second lines reference, "Then decide whether

0109

corporate wants to do -- the result to go one way or the other."

A Uh-huh.
Q And I -- can you share with us what you understand that to mean?
A I can only assume that, because these -- I believe these notes pertain to the work I did on 95, dash, 45 -- in other words, I created these in the course of working on that -- I would assume that that sentence means to decide what corporate thinks is the right outcome on the issue addressed in 95, dash, 45.
Q And that would be a -- the basis question and liability question in that revenue ruling?
A In a corporate 351, 357, 358 context.
Q Would that include the question of the relationship between options and basis?
A Well, I don't think -- 95, dash, 45 didn't have anything to do with options, I don't think.
Q It dealt with short sales, didn't it?
A Yeah, but I don't think that's an option.
Q All right. And is -- and we went through the discussion, up above, about whether or not to deal at the same time with short sales and with options.
A I don't remember specifically what the question was.

Q If you look up above, in the -- either the first or
0110
second paragraph -- "F&IP" [sic] "willing put out short sale ruling and say nothing about options," wasn't there a consideration of dealing with both the short sale and the options in the same document?

A Can you point more specifically to the provision?

Q It's six lines down.

A From the beginning of the --

Q On top of page 16. Yes, sir.

A Oh, page 16. Sorry.

Q Yes. I'm sorry.

A Okay. "FI&P willing to put out short sale ruling and say nothing about options"?

Q Yes, sir.

A Okay. I would assume that that is a reference to the corporate factual scenario, although it doesn't say so.

Q But they are considering both short sales and options?

A That's what that sentence says. And I would assume, there again, that's in the context of what -- sort of, a corporate ruling issue, but it doesn't say that.

Q And what is your understanding as to how that question of whether or not to address both short sales and options, or just short sale, relates to your reference, "then decide whether corporate wants the result to go one way or the other"?
0111

A I don't know. I don't know. The result, you know -- "then decide whether corporate wants the result to go one way or the other" -- I don't know whether that refers to what was perhaps a question of whether to cover options, as well as short sales, or was with regard to how to answer the short-sale option -- the short -- excuse me, the short-sale question in the revenue ruling. I don't know whether it was a question of scope or just a question of answer to the short-sale question.

Q What about the proposition, just up above the "Conference with Crouch," three lines above, "PSI does not want to broaden Section 752" versus "Treasury wants consistency if done inside or outside the partnership"?

A Well, it's -- that -- the notes here from that meeting are all, kind of, strange, because it's all about partnerships and -- you know, we were -- we were working on a corporate matter. And I would imagine that folks in Pass-throughs, as PSI is shorthand referred to, are a lot more concerned about insider versus outsider basis than we are, in corporate.

Q And refresh my recollection, if you would, please, sir, as to what P&SI stands for.

A I believe, since I was informed earlier in this conference, it's probably Pass-throughs and Special Industries.

Q All right. As -- reference to, "Review of Pass-Throughs and Special Industries' briefing memo for March
0112
7th" --

A I'm sorry, where is this?

Q -- "'95" -- this is the next caption, after the "Conference with Crouch," on page 16.

A I see it, thank you.

Q And you were referring -- or you're referring, in your notes, are you not, sir, to the partnership and -- did you say "Special Industries"?

A Yeah.

Q -- "briefing memo" --
A I see that.
Q -- "for the March 7, '95, meeting" --
A Uh-huh.
Q -- "with Brown." "Brown" would be Stuart Brown, the chief counsel?
A I would assume so.
Q And where is that briefing memo?
A I don't think I have it. I don't have any -- personally, have any hard documents. Anything I have would be on the computer and I don't think I would have that on the computer, because I think that would have been a physical thing. So, if it's not in the official 95, dash, 45 file, then maybe Pass-throughs has a copy.
MR. AUGHTRY: Mr. Bassin, do you know if that memo was one of the documents produced to Judge Williams, or can you

0113

say?
MR. BASSIN: I don't know.
MR. AUGHTRY: All right.
BY MR. AUGHTRY:
Q Do you know who else may have a copy of the P&SI briefing memo referred to in your notes on page 16?
A It would not amaze me if, for instance, any of Jackal or Crouch has it, because I -- because I see their names as attendees at a prior meeting.
Q All right. And did you tell me that either one of those people were still with the government?
A Jackal may have come back. I don't think Crouch is with the government anymore.
Q Where would his files from the government be?
A Sorry. Where would his file --
Q Yeah, who would have his files from --
A Who, Crouch?
Q Yeah, from his days with the government. Yes, sir.
A I don't know. I don't know what the procedure is when a branch chief leaves.
Q Who was the successing -- successor branch chief?
A Branch one. At the same time Crouch left branch one, I left branch one, and I'm not sure who took his place.
Q Did the two of you go to --
A No.

0114

Q -- a different branch together or --
A I think he left. No, wait, wait, wait, wait. No, no, sorry. He stayed. He stayed, and I left. I went to branch three.
Q How many branches are there?
A Six now. There were probably five at the time. And then I guess, at some point thereafter, he left the government.
Q And you don't know who the branch chief is of branch one today?
A I should know this, but I -- I'm not sure which branch is which, because they all have moved physical space. I'm not sure, you know, which branch. I'm sorry. I should know, but I don't.
Q Well, when you're gathering your documents for this review, we would ask that someone ask the branch chief of branch one where this memo is. And if you could let us know whether or not you're going to ask or -- because we'd like to know --
MR. BASSIN: What you're looking for is, is there a branch chief of branch one, and if that person has a, quote, "branch," unquote, file on 95, dash, 45.

MR. AUGHTRY: Yeah, either he or if -- I've been gone from the government a long time. I've got -- I would have an inferior ability to guess who might have that document. I'm just guessing, as best I can. But whoever you think may most likely have that document, we'd like to see it.

0115

MR. BASSIN: The reason that an institutional file is generated is that -- is to try to capture the significant stuff. That there is -- that there are individuals who might have a piece of paper about a particular revenue ruling, beyond what's in the institutional file, is pure happenstance, and we will check branch one to look for a revenue ruling 95, dash 45 file. But, you know, it's been ten years.

MR. AUGHTRY: Well, all we can do is try to identify who may have it, to a limited number of people.

MR. BASSIN: All right.

BY MR. AUGHTRY:

Q Okay. Now, let's go back to this section, caption, "Review of Pass-through and Special Industries' briefing memo for March 7, 1995, meeting with Brown."

A Okay.

Q Did that meeting take place with Brown?

A All I can say is -- I could make an inquiry as whether these notes indicate that it did. I have no personal recollection.

Q Okay. Now, down there, there's two indented paragraphs, with a caption of "Treatment of other arrangements," period, "Options."

A I see that.

Q You see that?

A Yes.

0116

Q For the record, would you read the first sentence in that indented paragraph?

A First sentence of the paragraph beginning "Existing authority"?

Q Please.

A This is in quotes, "Existing authority is contrary to position that options create liabilities."

Q And proceed on with the next sentence.

A "Helmer held that no partnership liability is created upon receipt of option payments by a partnership," semicolon.

Q Continue on, please.

A "Payments received were without restrictions except that upon exercise of the options the amounts would be applied against the purchase price."

Q The first sentence, in quotes, is that your quoting what was said in this meeting or in the document, the P&SI briefing memo?

A I'm sorry, I have no idea.

Q It wouldn't come from the Helmer case, would it? And that is the existing authority, isn't it?

MR. BASSIN: If you know.

THE WITNESS: I have no idea. Sorry.

BY MR. AUGHTRY:

Q Are you aware of any other existing authority on

0117

this point -- existing at --

A Not to my knowledge.

Q -- existing -- let me -- excuse me for interrupting you -- I want to tie down the time frame -- existing at the time that you wrote these materials?

A Not to my knowledge, unless the revenue rulings, mentioned earlier, constitute authority.
Q As of today, are you aware of any existing authority that's "contrary to position that options create liabilities"?
A I don't believe I'm aware of any relevant authorities.
Q All right. On this -- read this second paragraph, if you would.
A Any authorities, one way or the other. I'm sorry.
Q If you could, for the record, read the second one in --
A The entire paragraph?
Q Yes.
A Okay. "While we agree that existing authority prevents treating options as creating liabilities in the proposed RR, further consideration of the appropriateness of expanding the definition of liability is recommended. We recommend the" -- excuse me -- "we recommend in view of connection between liability definition under Section 752 and 357(c), existing project examining liabilities re 357(c) be

0118

expanded to include 752," and then, in brackets, "apparently all re options," close bracket.
Q All right. Now, what you've just read is entirely in quotes, isn't it?
A Yes.
Q What's the source of that quote?
A I don't know for sure. The source is not identified in the -- in the immediate locale.
Q You're -- can you tell us whether or not it comes from the "Pass-through and Special Industries' briefing memo for March 7th, 1995, meeting with Brown"?
A Actually, the -- there's an intermediate heading, "Attachment to Chief Counsel Meeting Request Form."
Q Oh, yes.
A And I guess the best inference as the source of those quoted paragraphs is not indicated right at those paragraphs. Perhaps it's from that document.
Q Where is the "Attachment to Chief Counsel Meeting Request Form" today? Where is that document?
A Presumably on the back side of the request form, but I don't know where that is, either. I would check -- I suppose I would look in the official file.
Q Where is the meeting request form?
A I don't know.
Q What is a meeting request form?

0119

A I don't know if we still use that. I would assume it asks time -- asks for time on the chief counsel's agenda. Seems to be what that is.
Q All right. And the -- when we say "Attachment of Chief Counsel Meeting Request Form," the chief counsel at that stage was Stuart Brown?
A I would -- I would -- based on the fact that his name has occurred earlier, for the meeting in 1/95, references to his name in that meeting, I would assume he was still the chief counsel -- was still the chief counsel as of 3/7/95. At least that's one day that appears, the day of the PSI briefing memo.
Q And, beyond the official file, you can't tell us where either the attachment to the chief counsel meeting request form is, or where the chief counsel meeting request form is?
A No. I doubt I would have that on my computer. The

only place I could look would be the official 95-45 file.
Q And will you do that?
MR. BASSIN: We are -- we are going to review the 95, dash, 45 file.
MR. AUGHTRY: And let us know, one way or the other?
MR. BASSIN: Yes.
MR. AUGHTRY: All right, thank you.
BY MR. AUGHTRY:
Q There's a reference in this quote, the second quote you read a moment ago, beginning, "While we agree that existing authority prevents treating options as creating liabilities in the proposed revenue ruling."
A Yes.
Q That -- is that the revenue ruling you were working on, 99, dash, 45?
A One moment, please. I would assume so. I don't think we were working on another revenue ruling contemporaneously that had anything to do with this, so I would assume that that's it.
Q When the -- you see the reference to "proposed revenue ruling" -- was it in a proposed format at that stage?
A I don't know. I don't -- I would not infer, from the phrase "proposed RR," that a draft actually existed.
Q Now, at the conclusion of that quote, there is a phrase, or caption, of sorts, "Deep-in-the-money puts." Do you see that?
A At the conclusion of that same quote?
Q Yes.
A The next entry, so to speak?
Q Yes.
A I see that. On page -- top of page 17.
Q All right. And could you read the following sentence for the record, please?
A "Reference deleted in RR in light of recommendation to study options under the regulation project."
Q All right. And what is your understanding of the meaning of that sentence?
A That, first of all, suggests that maybe there was a draft at that point.
Q That there was, sir?
A It suggest that perhaps there was.
Q Yes, sir.
A I guess it now appears, from that sentence, that we were both working on an RR, which I would assume was 95 -- what became 95, dash, 45, although it had not -- certainly had not been assigned a number at the time. And, separately -- ah -- writing a regulation. I don't know what ever became of the idea to write a regulation.
Q You're not aware of any regulation?
A Not personally, no.
Q And --
A At this time.
Q -- are you -- are you aware that, in 2003, the IRS issued a temporary regulation, on 752?
A I may have known at the time, but I'm not aware of that now.
Q Meaning, "at the time," in 2003?
A Yes.
Q You're not aware of -- you're not aware of any other regulation arising from this regulation project?

A I'm not aware that I know of any other regulation. I mean, I may -- You know, I may know there's a reg there, but I may not realize it --
Q As you sit here today, you can identify no other regulation?
A No, I cannot.
Q And is this reference to deleting options from the revenue ruling consistent with your understanding of the revenue ruling -- the ultimate outcome in the revenue ruling that you participated in?
A I'm going to have to ask you to repeat the question. But, first of all, "reference deleted," I'm not sure what the "reference" was. Perhaps it was to "Deep-in-the-money puts," since that's the title of this subsection. But I'm not exactly sure what was deleted, what the quote, "reference," was.
Q Let's see if we can't refresh your recollection by going back to the quote. If you would review the second quote for a moment --
A Okay.
Q -- with me, sir.
A Read the -- reread the quote?
Q Where it's suggesting that, "We recommend, in view of connection between liability," "under Section 752 and 357, existing project examining liabilities regarding 357(c) be

0123

expanded to include Section 752," open brackets, "apparently all re options." And then the caption -- next caption is, "Deep-in-the-money puts."
A Uh-huh.
Q You understand a "put" is a type of option, don't you?
A Yes.
Q And then the next comment in your notes is, "Reference deleted in revenue ruling in light of recommendation to study options under the regulation project," period.
A Uh-huh.
Q So, isn't it your understanding that what is being deleted here is the reference to options?
MR. BASSIN: If you know.
THE WITNESS: Do you mean if I recollect, or if I can divine it from these notes?
MR. AUGHTRY: Tell us both.
THE WITNESS: I don't recollect, but I will see if I can divine it from the notes.
[Pause.]
THE WITNESS: Would you care to repeat your question, please?
BY MR. AUGHTRY:
Q From your reviewing your notes, is it fair to say that the reference that's being deleted in the revenue ruling,

0124

in light of the recommendation to study options under the regulation project, is the reference to options?
A I would say that that's a fair interpretation.
Q Particularly "Deep-in-the-money puts."
A That's what the heading says, but I --
Q Is that a fair interpretation, do you believe?
A It's a possible one. Certainly -- I guess it's fair.
Q All right. Let's move down towards -- around the subject of regulations, towards the bottom of the page. Do you see a reference to "Pending regulations"?
A Yes.

Q Before we move from -- to that, where are the documents relating to this regulation project, as referenced on page 17 of the materials, up at the top, that we just covered?
MR. BASSIN: If you know.
THE WITNESS: So, you're talking about the -- what I'll call the second heading at the bottom of page 17, "Pending regulations"?
BY MR. AUGHTRY:
Q I'm sorry, I've given you mixed references. Let me -- just forget all that and let me draw you back to the top of the page, under the caption "Deep-in-the-money puts."
A Okay.
Q And there's a reference there to "under the

0125

regulation project."
A All right.
Q And we would -- we want to find and see and examine the documents relating to the regulation project. So, I'm asking you, where are those documents?
A I don't know. Sorry.
Q Where would you look if you needed to find them?
A Oh, I guess I'd look in the existing regs and see if any of them looks like -- such as this -- you know, issued after the date these notes were written, see if it looks like a relevant reg came out. And I imagine, if it didn't, you know, I'd look at -- I'm sure the IRS has a -- has a business plan which suggests, at least as an official matter, what projects it was working on. And if you can find one referring to this, back in '95 or whatever, you should be able to -- I would guess, to trace its -- you know, how that played out and whether it resulted in a reg. And then, I would suppose there is some way to request -- I don't know if, you know, the requestor would have the power to get it, but I would assume that for -- just as for a revenue ruling, there would be an official file for a reg.
Q All right.
A And it might be in there.
MR. AUGHTRY: For the record, Mr. Bassin, in our document designation for trial, we're going to want to look at those things. If we find anything, we'll identify 'em for you.

0126

MR. BASSIN: Okay. For the record, I don't even -- you know, at this point, I don't even know what -- whether there was a proposed reg project that got passed the -- should we have a reg project --
MR. AUGHTRY: Can you find out?
MR. BASSIN: That's your job. You're dealing with the public -- you're dealing with the same public information we have.
MR. AUGHTRY: We'll identify it as quickly as we can. If you will look at it, that's great; if you won't, fine. This is the first time the idea has been raised, which is a great idea, that there might be an inventory of projects at the end of each year. And if it's a matter of public record, we'll --
MR. BASSIN: It has --
MR. AUGHTRY: -- get it.
MR. BASSIN: I've been reading -- I've been reading those in the Daily Tax Report for 15 years. And you can search for them --
MR. AUGHTRY: Well, I'm just -- I'm just putting you on notice that we're going to look, and when we get it we'll identify it for you, and we want to -- and, depending upon their contents, we'll want to use them at trial.

MR. BASSIN: Okay.
MR. AUGHTRY: As well as whatever other documents
0127
that we've been trying to ferret out through today's discussion. Whatever we get, we'll get 'em to you as soon as we get 'em.
MR. BASSIN: Uh-huh.
BY MR. AUGHTRY:
Q Okay. Page -- bottom of page 17, there's a reference to "Pending regulations."
A I see it.
Q Is that consistent, in your mind, with there being a regulation project extant at this stage?
A You mean in -- when these notes were written?
Q Yes, sir. Actually, this is a different regulation, isn't it?
A So, we're talking about the heading "Pending regulations," and then, "P&SI does not believe," et cetera?
Q Yes. Actually, that would be a different set of regulations, wouldn't it? That wouldn't be option-specific, it would be part of the anti-abuse regulation, wouldn't it?
A Yeah.
MR. BASSIN: If you know.
THE WITNESS: Well, I -- I don't -- I mean, I have no independent knowledge, but I -- all I can do is give my opinion on what this sentence means.
BY MR. AUGHTRY:
Q Okay. And what is that?
A I got the feeling -- get the feeling they're
0128
referring to an existing regulation --
Q And it was --
A -- the anti-abuse -- I'm not aware of such a reg, but I get the feeling, from reading this, that, at that point in time, an anti-abuse reg existed and we were talking about whether to apply it or not.
Q For the record, would you read that sentence?
A Sure. "P&SI does not believe alternative of attacking this via the proposed partnership anti-abuse regulation is advisable."
Q What, if any, recollection do you have as to why it was not advisable?
A I don't have any.
Q There's a listing of "Contra arguments." A
I see that entry.
Q And would you read into the record the second sentence relating to Deputy versus du Pont?
A "Also, Deputy versus du Pont holds that a short sale does not create 'indebtedness.'"
Q And then the next sentence, at the top of this next page?
A "The proposed RR will make it easier for partners to generate basis."
Q And then the parenthetical following that?
A "But there are other ways to do that."
0129
Q What did you understand those sentences to mean?
A I don't -- um --
Q Let's take it one at a time. And let's take the parenthetical and work backwards.
A Okay. Oh, work backwards?
Q Yes.
A Reverse chronological order.
Q I know. Yeah, that's good.

[Laughter.]
A Well, I'm going to have to reread the second sentence in order to have the third make sense to me.
Q Well, let me just put -- rephrase the question, but would you break it up into parts that you think make sense, and take it either --
A Okay.
Q -- front to back, or back to front?
A Okay. You know, having read parts of these notes that I've been shown to, I do -- I do recall that I think the point of Deputy versus du Pont was that, sort of, short sale does not create debt. And I got a feeling that what was at stake in Deputy versus du Pont was perhaps some sort of interest deduction.
Q Yes, sir.
A But we viewed that as, you know, not meaning that "replacement obligation," as -- just loosely call it -- was not

0130

a liability just because it's a debt. Not being debt does not mean it's not a liability.
Second sentence of the three in question, "The proposed RR will make it easier for partners to generate basis."
Q What is your understanding as to what that means?
A Well, first of all, you -- it's hard to know -- maybe one could do it from reading all these notes -- but exactly what the state of the quote/unquote, "Proposed RR" was at that time, and what it said. And I don't know that, at this point.
I would assume that if the revenue ruling -- at that point, "proposed revenue ruling" said that the replacement obligation wasn't liability, then the point here is that -- and I'm not a partnership person -- that -- and this is just my interpretation of this -- I would interpret this sentence as a concern that if partners were to enter into short sales -- partners who needed basis in their partnership interests were to enter into short sales and then convey, or at least have the partnership assume the replacement obligation, they would claim that they'd get added basis in their outside partnership interest, because they -- I think partners share out the partnership liabilities into their basis, which is, of course, not the corporate regime.
Q Yes. And in that context --
A "But there are other ways to do that," I -- I'm not

0131

sure what that means. Sorry.
Q Now, back at the beginning of that discussion --
A The beginning of the first three sentences?
Q Well, actually, in the midst of -- on page 17, there's another reference to "Background information note."
A I see it.
Q Again, what is your understanding as to what a "background information note" is?
A You know, I vaguely recollect the term, and I would assume, without having specific memory, that we created a BIN for -- in the process of working on revenue ruling 95, dash, 45. And I would assume -- again, without knowing for certain -- that a BIN is kind of like a briefing tool for the third floor, when you go down there.
Q Where is that document?
A I don't know. I would -- I would look in the official file.
Q Official --
A I --

Q -- official file relating to --
A 95, dash, 45.
Q Thank you.
A I can't speak as to what might be in other files. The BIN, itself, might also be on -- if anything is left on my computer, the BIN might be there, because I would think -- at
0132
least if there were a BIN for 95, dash, 45, I would have generated it.
Q Yes, sir. When you generate a BIN, what's the normal length of a BIN?
A I don't remember. I just know the third floor wants things short. But, you know, the --
Q But, Mr. Starke, the burning question is, Does a BIN fill up a bin? But --
A It may have gotten binned.
[Laughter.]
Q Yeah, that's right. Or has been. I don't know.
All right. Okay. The -- there's a -- on the top of page 18, there's a reference to "Review of memo Crouch gave me he wrote in another case."
A I see that.
Q Where is that document?
MR. BASSIN: If you know.
THE WITNESS: I don't know.
BY MR. AUGHTRY:
Q Where would you look to find it, if asked?
A The only place I can think to look at is the official folder for 95, dash, 45. And I really have my doubts that it would have made it there. And, again, Mr. Crouch, quite a number of years ago, left the service.
Q All right. Racing to page 19 -- if anybody suffers
0133
from whiplash, let me know --
[Laughter.]
Q -- there's a -- three-quarters of the way down the page, there's a reference to "Important regarding difficult valuation." And if you could read that into the record?
A Read the --
Q That --
A -- heading, or the whole paragraph?
Q The caption and the remainder of the paragraph.
A "Important re difficult valuation," colon, "Talks about perhaps leaving incorporations involving contingent liabilities open. This may not be the" -- this is in brackets -- "This may not be the only authority cited re amount uncertain," right bracket. "RR 55, dash 119, 1955, dash, 1, C.B. 352, dealing with an annuity paid for property, allowed the payor to estimate the liability and adjust his basis or take a loss upon later payment of a different total amount. Page 3, dash, 38."
Q What do you understand is the meaning of that?
A What do I understand is the meaning of it, or --
Q Yes, sir.
A -- why do I think it's in this -- in these notes?
Q Either one.
A Okay. The heading is a -- "Important re difficult valuation" -- I assume that's the -- the contingent liabilities
0134
can be hard to value, because they are contingent. And, hence, the first lowercase sentence, "perhaps leaving the question open" -- in other words, we would not address contingent liabilities.

Then there's a citation to a revenue ruling, 1955, "dealing with an annuity paid for property," allowing "the payor to estimate the liability and adjust his basis or take a loss upon later payment of a different total amount." I assume they're talking about an annuity that's not a fixed-term, fixed-amount, stream of payments. In other words, there is some undetermined question, such as how long the annuitant may live.

So, the sentence -- the last full sentence says, "an annuity paid for property," so we're probably talking about the payor is the -- I'm sure it's -- whoever issued the annuity got back property? Do we allow "the payor to estimate the liability and adjust his basis" -- I would guess that's in the property gotten -- "or take a loss upon later payment of a different total amount." I'm assuming, just on the first reading, that this is question of -- where you've got somebody who buys property in return for some sort of contingent promise, promise of contingent consideration, what sort of basis the party who writes the annuity and buys the property gets in the property up front. It's because there's a promise of contingent consideration. There's some uncertainty as to what the appropriate basis is for the issuer of the annuity. I guess

0135

that's the point of the paragraph.

Q Okay. Just -- and we're about to draw to a close on this document, but, in reviewing the documents, fair to say there are some differences of opinion between P&SI and FI&P?

A I do recall that there was some expression of --

Q All right. And any indication, in your mind, as to their -- those differences of opinion not being genuine?

A I would imagine -- I have no reason to believe that the opinions were not heartfelt.

Q All right. And in good faith.

A I have no reason to think otherwise.

Q And reasonable.

A I don't know about reasonable. I'm not a partnerships person. I'm not an options person. I don't know if they were taking reasonable positions or not.

Q Well, if you have divisions within the Chief Counsel's Office of IRS that have differing opinions on this subject, wouldn't you agree that citizens would be --

MR. BASSIN: Objection.

MR. AUGHTRY: If I might finish my question.

BY MR. AUGHTRY:

Q Wouldn't you agree that a citizen unschooled in tax matters would be -- could genuinely draw the same conclusion as drawn by P&SI?

MR. BASSIN: Objection. You're not authorized to

0136

answer that question.

BY MR. AUGHTRY:

Q And wouldn't you agree, sir, that a citizen may well be, in good faith, drawing a conclusion consistent with FI&P?

MR. BASSIN: Objection. You're instructed not to answer that question.

BY MR. AUGHTRY:

Q Did you, at any time, as a citizen, say to any of these people during any of these meetings, "Your position is not in good faith"?

A I don't believe I said that.

Q Or did you ever tell them, "No, your position is not genuinely held"?

A I don't believe I said that.

Q Did you ever tell them, "Your position was not

reasonable"?
A I -- probably not. Don't recall it.
Q All right. All right.
A I probably don't -- didn't even have an opinion as to whether they were reasonable or not.
Q You didn't dispute the issue, one way or the other?
A I didn't dispute it. My -- somebody else might have.
Q All right.
A And it's not being noted here.
0137
Q All right. Thank you, sir.
A Sure.
MR. BASSIN: Shall we break -- take a break? We've been at this a little over an hour now.
MR. AUGHTRY: That would be great.
[Recess.]
MR. AUGHTRY: Back on the record.
BY MR. AUGHTRY:
Q I hand you what has been marked as Plaintiff Starke Exhibit 4, just to have the complete reference in the records.
A Okay.
MR. AUGHTRY: And let the record reflect that I'm also providing a copy to both counsel here for the Defendant.
(Whereupon, the document was marked as Starke Exhibit 4 for purposes identification.)
BY MR. AUGHTRY:
Q All right. If you would inspect that document and tell me if that's, to your way of understanding, the same Helmer case you were referring to in the last document.
A I'm not sure I saw a citation in the --
Q There's --
A -- notes.
Q -- not a citation in your notes.
A Or even to the court that issued the opinion, the name of the court.
0138
Q Let's see --
A I don't recall seeing it.
Q I'll tell you, how about if you read the last four lines, to yourself, of the summation?
A On the first page?
Q Yes, sir.
A The first column?
Q Yes, sir, right here, and see if that appears to address the same concepts as we've just discussed.
A Shall I read it out loud?
Q No, just read it to yourself, if you would.
[Pause.]
A Yeah, I have read it, and it's more revealing than I -- what I recall reading in my notes.
Q But does it appear to be the same case?
A I think it's the same thing --
Q Okay.
A -- same basic principle that I recall having read somewhere in the -- or having read to me somewhere on these notes today.
Q Okay. All right. The next document I want to make sure we have in as we complete the record -- well, let me just ask you. What, if any, involvement did you -- or have you had with respect to notice 2000, dash, 44?
A I'm not sure. I'm not very good with those numbers.
0139

May I see it?
Q Yes. I'm going to just --
MR. AUGHTRY: We'll just put this on -- it's being marked Starke Exhibit -- Plaintiff's Exhibit 5. And let the record reflect that I'm providing copy to counsel for Defendant.
(Whereupon, the document was marked as Starke Exhibit 5 for purposes identification.)
THE WITNESS: I'm not sure I've read this before. I probably -- as I work in the Internal Revenue Service and hear about things, I've probably heard about it, but I don't believe I've read this before.
BY MR. AUGHTRY:
Q Okay. All right.
A It's a very -- it's a very broad title, "Tax avoidance using artificially high basis." I mean, I'm --
Q Does it address, anywhere in its four corners, "Helmer"?
A Are you asking me whether Helmer is cited?
Q Yes.
MR. BASSIN: Objection. He doesn't claim any familiarity with it.
MR. AUGHTRY: I know. I'm just asking if he sees anything, on the face of it.
[Pause.]
THE WITNESS: I don't see a citation to Helmer. It

0140

should be underlined, and I don't see any such word underlined.
BY MR. AUGHTRY:
Q You do, on the second page, see several references to Section 752, don't you?
A Yeah, I see three, I believe.
Q Okay. What, if any, dealings have you had with a case by the name of Salina?
A How is it spelled?
Q S- -- I hand you what's been marked as Plaintiff's Exhibit Starke 6.
MR. AUGHTRY: And let the record reflect I'm also providing a copy --
THE WITNESS: I don't recall --
MR. AUGHTRY: -- to counsel for Defendant.
THE WITNESS: Sorry.
(Whereupon, the document was marked as Starke Exhibit 6 for purposes identification.)
THE WITNESS: I don't recall ever having seen this case, or even having heard of it, but that does not mean I have not.
BY MR. AUGHTRY:
Q I invite your attention to, let's see, page 17. Actually, page 16.
A I'm on page 16.
Q Yes, sir. Do you see a reference to "Helmer"?

0141

A Yes.
Q And does that appear to be the same Helmer decision that we looked at a moment ago, as Plaintiff's Exhibit 4 -- Starke 4?
A It seems to have the same name.
Q And the same cite, too, doesn't it? Tax court memo 1975, dash, 160?
A Yeah, the same cite is printed by -- probably by Westlaw at the top of Exhibit Starke 4, as appears in -- on this page 16 for Helmer on Exhibit -- Starke Exhibit 6.
Q Now, if you look at Starke Exhibit 4, is it your

understanding that the IRS prevailed in establishing the position in Starke Exhibit 4?
MR. BASSIN: Why don't you take -- take your time and read the opinion front to back if you don't -- if you're not familiar with it.
[Pause.]
BY MR. AUGHTRY:
Q It may aid you if you look at page 19.
A Page 19 of?
Q Starke Exhibit 4.
A Page 19 of Starke Exhibit 4?
Q Yes. I'm sorry, Starke Exhibit 6.
A I'm sorry, which document were you asking about?
Q I was asking about 4, and I'm looking at the wrong

0142

document.
A Which document is it you were asking me --
Q About -- I was about 4 --
A Oh.
Q -- about Helmer, and I was looking at the wrong document. Go ahead, keep reviewing it --
A Okay.
Q -- and I'll try to resurrect that devil.
[Pause.]
Q And, on that document, I'd invite you to page 6 --
A Page -- oh, document 6?
Q Yes, sir. Excuse me, on Starke 4, page 6. So, you've got Starke 4 in your hand --
A Okay.
Q -- and the last line in the opinion states, "Decisions will be entered for Respondent," correct?
A Yes.
Q And you understand, from the caption, that Respondent is the Commissioner of Internal Revenue.
A Yes.
Q Okay. All right. All right. Now, back to Starke 6. You were dealing -- looking, a moment ago, confirming that it's the same Helmer decision at, I believe --
A Document --
Q -- page 16.

0143

A I'm sorry.
Q You're -- I invite your attention to Starke Exhibit 6 --
A Got it.
Q -- which, in the bottom right-hand column, refers to Helmer, which is what we have marked as Starke Exhibit 4.
A All right.
Q And what I simply want to establish is, if you would scan -- or look to page 17, right-hand column --
A Seventeen, right-hand column?
Q Yes, sir. First full paragraph. As you see, there's a discussion of Helmer that follows?
A Right.
Q And that discussion follows through page 18.
A All the way through page 18?
Q Yes, sir. And then on page 19 it picks up with a discussion of Deputy versus du Pont. Is that right?
A Yes.
Q All right. The Salina opinion is handed out what date, according to Starke 6? What date is the opinion handed down?
A Is it actually going to use the words "handed down"?

Q What is the date on the caption?
A November 14, 2000.
Q All right. Between that date and the date of your
0144
earlier notes, in '95, are you aware of anything altering the landscape of tax law that would change the result in Helmer?
MR. BASSIN: I'm going to want to instruct the witness that his authorization is limited to events up to the issuance of notice 2000-44, which is September 2000, not November 2000.
MR. AUGHTRY: Well, I'm asking him about the consequences associated with Helmer, and the Helmer document, and the relative impact of that. I believe -- first of all, I believe a party does not have an ability to restrict a witness's testimony, and I believe your -- the confines on your restriction includes an ability to discuss matters flowing from the Helmer/Cram memorandum -- events leading up to and following the drafting of the Helmer/Cram memorandum.
MR. BASSIN: The restriction is on page 2 of Starke Exhibit A, the third paragraph, that says you may not testify regarding events that occurred after issuance of notice 2000, dash, 44, and Treas Reg Section 1, point, 752, dash, 16.
MR. AUGHTRY: And so, do I understand Defendant, by its own restriction -- there's nothing in the subpoena that supports this restriction, is there?
MR. BASSIN: Uh-uh.
MR. AUGHTRY: So, Defendant, by its own restriction, is instructing the witness not to answer the questions about the state of the law or changes from the Helmer/Cram memorandum
0145
flowing through 2000.
MR. BASSIN: Through the issuance of 2000, dash, 44 is fair game. After that, no.
MR. AUGHTRY: So, there's an instruction not to testify --
MR. BASSIN: Yes.
MR. AUGHTRY: -- about the tax court handing down an opinion in Salina citing and discussing Helmer with approval?
MR. BASSIN: Yes. That is our instruction, not to answer.
MR. AUGHTRY: Take that up to the judge.
BY MR. AUGHTRY:
Q All right, my next question goes to what is being marked as Starke 6 -- I'm sorry, thank you -- Starke 7, which I hand you.
(Whereupon, the document was marked as Starke Exhibit 7 for purposes identification.)
MR. AUGHTRY: And let the record reflect I'm providing a copy to counsel for Defendant.
All right. And I believe your fourth item of authorization would be -- would encompass 1, point, 752, dash, 6(t), which would be an event after August of 2000. So, I guess a question that arises is, Do you -- will you reconsider the prior instruction?
MR. SCHNEIDERMAN: What is the date of the 6(t)
0146
regs?
MR. AUGHTRY: June 23rd, 2003.
THE WITNESS: June 24?
MR. AUGHTRY: Is it 24?
THE WITNESS: I think so.
MR. AUGHTRY: Yeah, 24. Forgive me.
MR. BASSIN: Okay. Your notice of deposition goes

to discussing Helmer and issuance of these regs. The witness may answer questions regarding the --
MR. AUGHTRY: Salina.
MR. BASSIN: -- well, events regarding the drafting of 752, dash, 16.
MR. AUGHTRY: But not as to Salina?
MR. BASSIN: That's not even a topic that's addressed in your notice of deposition as one of the topics.
MR. AUGHTRY: Not as to the consideration of Helmer, in any source, including Salina.
MR. BASSIN: We are not reconsidering our instruction.
MR. AUGHTRY: All right.
BY MR. AUGHTRY:
Q All right. I ask you now about what has been marked as Plaintiff's Exhibit Starke 7. And, in particular, I invite your attention to, first, page 5.
A I'm there.

0147

Q All right. At the end of the second paragraph, there are two sentences. If you could read that into the record --
A Tell me --
Q -- beginning, "The definition of a liability."
A "The definition of a liability contained in these proposed regulations does not follow Helmer versus Commissioner TC memo 1975, dash, 160." Then a sentence in parens, "The tax court in Helmer held that a partnership's issuance of an option to require property did not create a partnership liability for purpose of Section 752."
Q Between this regulation, on June 24th, 2003, in which the IRS indicated that it was not following its victory in Helmer, and your earlier notes from 1995, what, if any, change had there been in the law?
MR. BASSIN: That you're aware of.
THE WITNESS: You're asking me whether --
BY MR. AUGHTRY:
Q Has there been anything --
A I'm not aware of any relevant intervening case law --
Q Okay.
A -- unless it's --
Q All right.
A -- something you gave me as another exhibit.

0148

Q All right. There was a change in the corporate area in the statutes, wasn't there, relating to contingent liabilities?
A Relating to contingent liabilities?
Q Yes, sir.
A Are you referring to something in 357?
Q 358(h).
A Yeah, I'd have to read it to make sure I know what it says, but I know what you're talking about. I'm not sure what year that was added, but I know what you're talking about.
Q Do you recall the effective date of 358(h)?
A Are you asking me?
Q Yes.
A I would guess --
MR. BASSIN: Well, don't guess.
THE WITNESS: -- that would be -- okay. I know it's definitely after 2000.
BY MR. AUGHTRY:

Q Are you aware of anything that would alter the application of Helmer for partnership contributions prior to October 18th, 1999?
A I'm not personally aware --
Q I invite your --
A -- of anything, one way or the other.
Q -- attention to the bottom paragraph on page 3 and

0149

the top paragraph on page 4.
A I'm there.
Q If you would read through those, please.
A Okay.
[Pause.]
A I said "after 2000." It appears to have been December 21st, 2000, 358(h) was created, I see in the paragraph above.
Q Yes.
[Pause.]
A I've read it.
Q What involvement have you had with 358(h)?
A I don't believe I had any involvement in its issuance.
Q What documents exist relating to Helmer, to your knowledge, and the issuance of this regulation?
MR. BASSIN: Objection. We're not talking about a regulation, we're talking about a statute.
BY MR. AUGHTRY:
Q Let me make myself clearer. This regulation, 1, point, 752, dash, 6(t), refers, in the preamble that we looked at a moment ago, to Helmer, doesn't it?
A What page was that?
Q Page 5.
A Yes.

0150

Q And I guess my question to you, in the context of the issuance of this regulation that refers to Helmer, what other documents relating to Helmer, in the context of this regulation, exist?
A I have no idea.
Q You would think there would be some, wouldn't you?
A I don't know.
Q You ever been involved in the drafting of a regulation or a preamble?
A Yes.
Q And what's the normal process there?
A Drafting of the regulation or preamble. Um -- what is the process?
Q Yes.
A So, do you mean from start to finish?
Q Please.
A I guess somebody comes up with an idea that the public needs guidance, and such guidance does not exist or should be changed. And I think somebody -- what I call an attorney advisor and a reviewer in the IRS Office of Chief Counsel are assigned to work on that. And they may be given an indication, before they start, of what answer is most likely appropriate in the -- in the guidance, or they may not.
Q Is there an exchange of memos or drafts or anything associated with what would be called a "BIN" or something of

0151

that sort?
A I don't know if we're still doing BINs. I'm sure there are certainly drafts.

Q Could you describe, other than the drafts of the regulation, what other documents there might be in putting together a regulation like this?
A To my knowledge, there are just drafts of the reg, and then, probably later, in the preamble. And I am certain -- sure that there would be e-mails respecting a lot of regulations, e-mails discussing issues.
Q What about in a context where the reg is taking a position inconsistent with prior case law, and prior case law that reflects a position of the IRS, as on page 5?
MR. BASSIN: If you know.
Are you -- excuse me, is your question in the abstract or in the context of this particular reg?
MR. AUGHTRY: Starting in the abstract.
THE WITNESS: I think it depends a lot on how a particular chief counsel wants to run things. Just speaking about corporate today, our associate chief counsel, I don't think he requires briefing memos. He would rather just talk about it. Perhaps he feels he doesn't need a briefing memo.
BY MR. AUGHTRY:
Q What about in 2003?
A I'm not sure when our changeover -- when we changed

0152

over to the current chief counsel -- I mean, current associate chief counsel corporate, I'm not sure when we got this one or when the last one --
Q Would it be at the time -- on or before the time Mr. Core took over as chief counsel, or after?
A I think the changeover would have been before that.
Q And you're saying you don't know if there we would be briefing memos, but, under some associate chief counsels, there would?
A I think, in the past, over my time at the IRS, some would have wanted briefing memos much more than others.
Q Is there any safeguard or protection where the government is adopting a regulation that, in essence, overrules prior case law?
A Safeguard against our doing so?
Q Yes, or any special consideration.
A I think it's just institutional knowledge, a role in the discussion.
Q In this context, looking at page 5 of this document marked as Starke Exhibit 7 --
A Uh-huh.
Q -- what documents would you expect to find, or may exist, relating to the choice not to follow Helmer anymore?
MR. BASSIN: Objection, compound.
BY MR. AUGHTRY:

0153

Q Let me rephrase. Are you focused now on page 5?
A I'm looking at page 5 of Exhibit Starke 7.
Q Yes, sir. All right. What documents would you ask for, based upon your experience with the IRS, relating to this decision not to follow Helmer?
A I don't think -- I don't think a lot of legal memos get written in the IRS. I think that -- of course, this is a function of just the division I'm in and my experience -- at least under the current associate chief counsel, I think that you'd really be looking at perhaps e-mails discussing the matter, draft regs, and draft preambles.
Q Is that to say that sometimes legal memorandum are drawn, and sometimes they are not?
A Certainly, I would guess that they get drawn up

sometime.
Q Are you saying, beyond e-mails and the draft, there's no safeguard against the IRS adopting a regulation that overrules judicial precedent.
A I think --
MR. BASSIN: To the extent that you know from your personal knowledge.
THE WITNESS: I think the safeguard is -- of course, as in any institution, I mean, people with more knowledge are higher up the totem pole -- and I think the safeguards are -- and they're -- the higher you get up the totem
0154
pole, the more a person questions wanting to know what's out there, what exists. And it's an oral explaining of the proposed idea to be incorporated into a reg or a revenue ruling to those people higher up who have this deeper longer-reaching-back institutional knowledge that turns up such problems.
Q You're telling me, in the context of the IRS departing from judicial precedent, you would expect no documents, beyond e-mails and the draft regulation?
MR. BASSIN: Objection. The question's been asked and answered.
BY MR. AUGHTRY:
Q Answer the question, please.
A I'm sorry. I think that's true. I'm not sure I, myself, have ever been in such a situation, so I'm perhaps not the one to ask.
Q Well, let's look at -- in your years with government --
A Uh-huh.
Q -- which now are going on 11 years with the IRS --
A That sounds right.
Q -- following some other earlier legal career, have you ever seen the IRS try to reverse judicial precedent with a regulation? In your experience?
A I think I've worked on two regulations, and -- did you want to say something?
0155
MR. BASSIN: No.
THE WITNESS: And I don't think it happened in either of those. The two that I worked on, one of which was very big, were just changes to our preexisting regulations. Certainly, those changes may have been significant, but we were not reversing judicial authority. I've worked on one revenue ruling, 95, dash, 45. To my knowledge, that did not try to -- you know, did not contradict existing legal -- existing judicial authority.
BY MR. AUGHTRY:
Q Well, have you ever seen a situation like this, where the IRS, in the preamble, is saying the "proposed regulations" -- I guess this is a typo -- no, "the definition of liability contained in the proposed regulations does not follow Helmer."
MR. BASSIN: In your personal experience.
THE WITNESS: I have not worked on any -- I don't believe I've worked on a project that included such a scenario. I certainly can't say that I have not read regulations or preambles that do not contain something contrary to existing legal -- judicial authorities.
BY MR. AUGHTRY:
Q Now, on the e-mails you were referring to, are you aware of any of the e-mails relating to Helmer in this regulation?

0156

A No. I have no recollection of that, and I'm not sure how e-mail-intensive we were in '94 and '95. I'm not sure how far our computer systems --
Q Would that be incorporated in an official file on the regulation?
A It's my own personal practice, these days, I believe, to put e-mails into official files, unless they're just totally -- you know, "Shall we meet now," or something like -- just totally procedural, like, you know, "Can you meet at 1:00 o'clock?"
Q All right. So, are you telling me, where you have a regulation that's reversing judicial precedent, that the administrative file, to your way of understanding, would consist solely of drafts of the proposed regulations and e-mails?
MR. BASSIN: Objection, that mischaracterizes his testimony.
THE WITNESS: Continue.
BY MR. AUGHTRY:
Q Answer. And, if -- for whatever reason you feel like I've not fairly characterized the testimony, if you'd correct it.
A I would think that, today, an official file would include, certainly, at least some of the drafts, would include the final version and relevant signature pages. It would certainly include any briefing memos that were written. And my

0157

point earlier was that I don't -- I'm not sure, unless it goes to the third floor, that briefing memos are often written. If it's complicated, a briefing, my practice would be to issue a -- to write a briefing record -- briefing memo for the associate chief counsel corporate. But he's a pretty smart guy; and so, he doesn't need them very often.
Q Okay. You said "today." What about in 2003?
A 2003. I imagine it would be about the same.
Q You said that, you know, if it's complicated there may well be a briefing memo. Is that a fair characterization?
A At least -- that's certainly a matter of the docket attorney's and his or her reviewer's personal choice.
Q All right. We spent the better part of today going through your notes relating to the treatment of liabilities and Helmer and contrary authority and that sort of thing. Do you recall that?
A Yes, generally.
Q Would that be the sort of complicated thing that would require a briefing memo?
MR. BASSIN: If you know.
THE WITNESS: Yeah, you know, whether or not you write a briefing memo depends on, one, who it's -- who you're briefing, and, two, probably -- depending on that -- who that person is, you probably will have had some oral discussions with him or her beforehand, and, you know, you get a feeling for

0158

whether that person needs a briefing memo, or that person may request one.
BY MR. AUGHTRY:
Q Now, in the context of this specific issue, where in 1995 there were the differences of opinion between different divisions within the Chief Counsel's Office --
A Uh-huh.
Q -- in that context, dealing with options in Helmer and partnerships, are you telling me you wouldn't expect a briefing memo or some other explanation, beyond the draft?

A I would -- that would have -- at least when that went down to the third floor, where the chief counsel is -- doesn't mean they were necessarily meeting with the chief counsel -- but I would expect -- back then, I certainly would expect a briefing memo to have been written. I don't know it would actually be called a "briefing memo." And I think -- didn't we see a reference in there to a "partnership briefing memo," in the notes?
Q Any kind of document explaining why the draft regulation is taking the position that the draft regulation is taking. Can you --
A That would be a briefing memo.
Q Okay. Or any other document just describing that. But you're referring to that, generally, as a briefing memo?
A Yeah. I mean, it may have a formal title, like

0159

maybe it was the BIN. I can't remember.
Q In this context, where you have two different divisions within the Chief Counsel Office of the Internal Revenue Service differing with each other, do I understand you to say you'd expect to see some kind of explanation?
A Not necessarily. I would guess that one division is going to have what might be referred to as primary responsibility for the regulation -- at least the last time I went to the third floor on a regulation, we had briefing memos. But I think there were -- I know that the primary division wrote briefing memos, but, as for a division that might be contesting or quibbling over a recommendation of the primary division, I'm not sure that division would necessarily have written a briefing memo. Instead, the procedure probably would have been for -- third floor would have wanted the two divisions to talk to each other orally before coming down to the third floor, and then both to come to the third floor for the briefing, and then both to be able to -- be ready to speak. But I'm not sure they -- the dissenting division would have, in all cases, or even routinely, written its own briefing memo.
Q You said "the last time that you handled a regulation" --
A What -- if you're referring to what I said, the -- what I meant was that the last time I went to the third floor in respect to a regulation.

0160

Q And when was that?
A That would have been probably between -- I worked on a fairly long regulation process between, I think, roughly 1999 and probably 2001, went through a proposed temporary final reg, down to the third floor on that, wrote briefing memos. I don't remember any other divisions writing a briefing memo.
Q All right.
A And I've worked on a regulation since, but I did not go down to the third floor with respect to that.
Q Do all regulations go through what you refer to as the "third floor"?
A I would assume that somebody on the third floor has to sign off on them.
Q And when you look at this regulation, can you -- is there any way of telling either which division --
A This is Exhibit 7? I'm sorry.
Q -- yes, sir --
A Starke 7? Okay.
Q -- initiated or had the primary responsibility, that you referred to a moment ago?
A I would probably -- as far as I know, the only

indication would be -- on the first page?
Q Yes, sir.
A "For further information, contact" --
Q Uh-huh.
0161
A -- and there is usually a name, or names. One could find out in what division that person worked.
Q Do you know who either Horace Howells or Sonya Cruse?
A No, sorry.
Q Would there be a directory that would indicate which divisions they were with?
A I think there would have been a directory then. Certainly there's a directory now, but, if they've gone or if they've moved, it would have changed. I'm not sure there would be any other indication in the reg of what division pumped out the draft, except to the extent you can infer such from the subject matter.
Q Back to page 5 on the Helmer, are you aware --
A Which -- sorry -- still on that same exhibit?
Q Yes, sir, please. Plaintiff's Exhibit Starke 7. Are you aware of anything, prior to this date -- this date being June 24th, 2003 -- of the government disavowing its victory in Helmer?
MR. BASSIN: To your personal knowledge.
THE WITNESS: No. I have no knowledge.
BY MR. AUGHTRY:
Q From your experience with the IRS, what is your understanding as to why the government would announce that they were no longer following Helmer?
0162
A Are we talking about page 5 again?
Q Yes, sir.
A Sorry, where is that language, specifically?
Q It's down at the bottom of that paragraph.
A Right here?
Q Yes, sir.
A Okay. Sorry, your question, again?
Q My question is, In your experience in handling matters for the Internal Revenue Service in regulations like -- why would the government announce that they're no longer following a specific case --
A I have no --
Q -- or that the proposed reg no longer follows a specific case?
A Sorry. I have no personal knowledge or -- I've never been involved in such a situation, to my knowledge, to my recollection.
Q You have been involved in the adoption of regulations.
A Yes.
Q And why does the government adopt regulations -- well, let me rephrase that.
If there's -- have you ever been involved in a situation where the government adopted regulations that weren't needed?
0163
A That weren't needed?
Q Yes, sir.
A I don't believe so.
Q All right. Let's go back to page 3 and 4, if we -- if we could. You've read through these paragraphs relating to --

MR. BASSIN: Which document?
MR. AUGHTRY: Of Starke 7.
BY MR. AUGHTRY:
Q I believe I had asked you to read through the paragraphs relating to 358(h).
A These are -- are they at the bottom of -- one at the bottom of 3 and the top of 4?
Q Yes, sir.
A Yes.
Q To your knowledge, are you aware of any reason the government did not go to Congress prior to December 21, 2000, to obtain some kind of relief in this area, which is the subject matter of this regulation?
MR. BASSIN: If you know whether or not that actually happened.
THE WITNESS: I don't know whether it happened, whether -- exactly what happened.
BY MR. AUGHTRY:
Q Okay. Are you aware of the IRS going to Congress

0164

with respect to contingent liabilities in the partnership area, beyond what you've read here on pages 3 and 4?
A I actually don't think that would have happened.
Q Okay. And on the effective date relating to --
A Sorry, sorry, just back up. I believe you asked me, "Are you aware of the IRS's going to Congress to ask for such-and-such legislation?"
Q Uh-huh.
A And my answer was, I don't think that would have happened. That's -- I want to make sure of my answer.
Q Does the Chief Counsel's Office still have an L&R division?
A I don't know.
Q Do you -- are you familiar with L&R, Legislative and Regulations?
A I've --
Q It's the old phrase. I don't know what the new phrase is.
A I've got a feeling -- and I could be wrong about this -- that they reorganized a long time ago.
Q All right. Who works on new legislation? What division within the Chief Counsel's Office in conjunction with the Assistant Secretary of Treasury for Tax Policy?
A I have no personal knowledge of who does that. I have never done it.

0165

Q Okay. Do you know what divisions do that?
A No.
Q Are you aware of instances where the commissioner has, or someone on behalf of the Internal Revenue Service, has advocated the adoption of legislation -- tax legislation?
A Sorry, who has advocated --
Q Anyone on behalf of the Internal Revenue Service, Treasury Department, advocated the adoption of tax legislation?
A I believe that's happened, although I'm not sure I could, with confidence, name specific incidence.
Q Okay. When you said, a moment ago -- and I don't recall, specifically, your response, but -- that you don't believe it would have happened, about going to Congress for a partnership provision dealing with this circumstances, what did you mean?
A Well, I believe your question was -- and please correct me if I'm wrong -- I thought you asked whether the IRS

had gone to Congress to ask for legislation. And my answer was, I don't believe that would have happened.
Q And why is that?
A Because I don't think the IRS does that. I think if anybody would do it, it would be the Treasury Department.
Q Well, are you aware of anybody in the Treasury Department going to Congress seeking legislation relating to partnerships and options?

0166

A I have no specific certain knowledge. It may have happened.
Q Do you have any --
A Sorry, regarding --
Q -- general knowledge --
A -- regarding partnerships?
Q Yes, sir, regarding the subject matter we've been discussing all day -- Helmer, the application, the non-application, this rule, this regulation that tends -- seems not to follow Helmer.
A I don't have personal knowledge of anybody's going to Congress from the Treasury Department to ask for that. Doesn't mean it didn't happen.
Q Are you -- when you say you don't have any personal knowledge, do you have any knowledge that's not personal that may point us to someone who would know?
A No. I don't -- what I meant to say was, I do not recollect, for certain, having heard that the Treasury ever asked Congress. That doesn't mean they didn't.
Q Okay. But you do now know that someone asked Congress to adopt 358(h).
A Yeah, but I'm not -- I'm not positive that's the same thing as what you just described --
Q It's not. I don't -- I don't think it is.
A And I'm not certain anybody went to Congress to ask

0167

for 358(h), although that may well have happened.
Q You don't know who initiated that action.
A Other than to repeat my earlier answer, that I think it would have been Treasury, not the IRS, that did it.
Q All right. But you believe Treasury would have initiated that action.
A If anybody did.
Q Okay. Now, on the 358(h) provision --
A What page are you on?
Q I'm looking now at the top of page 4 of Starke Exhibit 7.
A Okay.
Q What do you understand is the effective date of those provisions?
A Are you looking at the last sentence --
Q Yes, sir.
A -- I'm sorry -- of the first paragraph on page 4?
Q Yes, sir.
MR. BASSIN: Objection. This is -- to the extent that you're asking for an opinion of law, the statute says whatever it says.
BY MR. AUGHTRY:
Q What is your understanding of the last sentence in this paragraph?
A Let me read it.

0168

Q If you would be kind enough to read it into the record?

A Okay. "Under this statute, these rules are to" -- and this is in -- the rest of the sentence is in quotes, "'apply to assumptions of liability after October 18, 1999, or such later date as may be prescribed in such rules.'"
Q Close quote?
A Close quote.
Q Yes.
A Your question, again, please?
Q What is your understanding as to the application of that statute to earlier periods?
MR. BASSIN: Objection, calls for an opinion of law.
BY MR. AUGHTRY:
Q Answer, please.
A It doesn't seem to mention transactions that -- or it doesn't see to mention assumptions that occurred before -- on or before October 18, '99.
Q That would be assumptions of liability?
A Yeah.
MR. AUGHTRY: Let me just have a minute. We may be done here.
[Pause.]
MR. AUGHTRY: Plaintiffs are done. We're going to suspend the deposition, pursuant to our earlier discussions.

0169

Sir, if we could have an idea of how much time we have consumed, I would appreciate it.
COURT REPORTER: Four hours and two minutes.
MR. AUGHTRY: A two-fer.
I may have assumed too much. Stuart, do you have anything? Do you have anything?
MR. BASSIN: Let me ask just a couple of quick questions.

EXAMINATION

BY MR. BASSIN:
Q Mr. Starke, have you ever worked in the Office of Pass-throughs and Special Industries, the Office of Chief of Counsel?
A No.
Q Did you have any personal involvement with promulgation of proposed regulations relating to Section 752 of the Internal Revenue Code which are presented in Starke Exhibit 7?
A Not to my recollection, but that does not mean that I did not see them.
MR. BASSIN: That's it.
[Whereupon, at 4:30 p.m., the deposition was adjourned.]
[Signature not waived.]

0170

______________________________

Signature of the witness

SUBSCRIBED AND SWORN to before me this________________day of 200_____.

____________________________________

NOTARY PUBLIC

My commission expires:______________________