# In the United States Court of Federal Claims

No. 03-2164T

(Filed April 22, 2005)

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| JADE TRADING, LLC, ET AL., | * | RCFC 26(b); Relevance; |
| Plaintiffs, | * | Executive Privilege; |
| | * | Requirement that Head of the Agency Assert |
| v. | * | Executive Privilege; |
| | * | Delegation of Authority to |
| THE UNITED STATES, | * | Assert Executive Privilege; |
| | * | Treasury Regulation 1.701-2; |
| Defendant. | * | IRS Notice 2000-44; |
| | * | 26 U.S.C. 701; At-issue |
| | * | Waiver of Privileges. |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

David D. Aughtry, Chamberlain, Hrdlicka, White, Williams & Martin, Atlanta, Georgia, and Linda S. Paine, Houston, Texas, for Plaintiffs.

Stuart J. Bassin, U.S. Department of Justice, Tax Division, Washington, D.C. for Defendant. Eileen J. O'Connor, Mildred L. Seidman, David Gustafson, William K. Drew, and Matthew C. Hicks, U.S. Department of Justice, Tax Division, Of Counsel.

---

## ORDER AND OPINION DENYING DEFENDANT'S INVOCATION OF EXECUTIVE PRIVILEGE AND REJECTING PLAINTIFFS' CLAIM OF "AT ISSUE" WAIVER OF PRIVILEGES

---

WILLIAMS, Judge.

Plaintiffs bring this action under Section 6226 of the Internal Revenue Code challenging the Internal Revenue Service's (IRS) adjustment of their tax liability and assessment of penalties for 1999. In the Final Partnership Administrative Adjustment (FPAA) at issue, the IRS disallowed capital losses approximating $40,000,000 and assessed penalties of some $4,000,000, on the Ervin

EXHIBIT

A

brothers, the real parties in interest.[1]

Defendant contends that Jade was formed for the purpose of creating artificial tax losses intended to eliminate federal taxes on approximately $40 million in unrelated capital gains received by the Ervins in 1999. Plaintiffs counter that Jade Trading was a bona fide partnership, formed for the express purpose of making money from trading, and not with a principal purpose of reducing substantially the partners' aggregate federal tax liability. This case presents novel issues of statutory construction and a challenge to the validity and applicability of Treasury Regulation 1.701-2. Plaintiffs ask the Court to invalidate Treas. Reg. 1.701-2 on the grounds that it is inconsistent with judicial precedent, contrary to statute, and unduly vague.

This case is before the Court on Plaintiffs' Motions to Compel discovery responses, specifically, documents relating to: (1) the promulgation of Treasury Regulation 1.701-2; (2) IRS' internal interpretation of the term "liabilities" in 26 U.S.C. § 752 reflected in documents underlying the issuance of IRS Notice 2000-44; and (3) documents in Plaintiffs' Administrative Files. Several issues are presented -- whether these materials are relevant, whether they are protected by the executive privilege, whether that privilege has been properly invoked here, and whether Defendant has waived all privileges by placing privileged material at issue in this litigation. Because documents relied upon by the IRS in formulating Treas. Reg. 1.701-2 and documents interpreting the term liabilities could illuminate the agency's interpretation of the law at the time of Plaintiffs' transactions, these materials are relevant. In addition, the consistency of the IRS' application of this regulation over time is relevant to determine the degree of deference which should be accorded to the regulation and IRS' interpretation of it. Finally, Plaintiffs' Administrative Files containing the materials considered by the IRS in formulating the FPAA are relevant because they contain the underpinnings for the imposition of tax liability and penalties.

Plaintiffs contend that the Government has improperly invoked the executive privilege for these documents by submitting a declaration executed by the IRS' Assistant Chief Counsel (Disclosure and Privacy Law) and not by the head of the agency. Because precedent in the Circuit establishes that the executive privilege must be asserted by the head of the agency and cannot be delegated in the manner attempted here, Defendant's purported invocation of the privilege is ineffective.

Finally, Plaintiffs assert that the Government has implicitly waived any applicable privilege with respect to documents in dispute by placing the privileged subject matter of such documents "at issue" in this litigation by issuing the FPAA and relying upon Treas. Reg. 1.701-2 and the IRS'

---

[1] Plaintiffs in this action are Robert W. Ervin and Laura Kavanaugh Ervin on behalf of Ervin Capital LLC, which was a partner in Jade Trading. Ervin Capital LLC is an entity solely comprised of Robert Ervin and Laura Kavanaugh Ervin. Both of Robert Ervin's brothers, Gary Ervin and Tim Ervin, are also real parties in interest in this action because each has his own limited liability company which was a partner in Jade Trading, and each will be affected by any determination of tax liability rendered by this Court.

interpretation of the term "liabilities." Plaintiffs assertion is incorrect. The Government has not injected privileged material into this lawsuit and attempted to use it both as a sword and a shield. Accordingly, the Government has not deprived Plaintiffs of information necessary to their case, and there has been no "at issue" waiver of privileges.[2]

## Background[3]

### The Action

Plaintiff Robert Ervin and his two brothers, Gary and Tim, sold their cable businesses in 1999 for a substantial amount of cash and stock. Plaintiffs, seeking to invest and diversify their holdings, decided to work with a hedge fund, Sentinel Advisors, LLC (Sentinel), on a venture into the Euro currency market. To reduce personal liability, Robert Ervin created Ervin Capital, LLC, a limited-liability company in which he was the only member. Gary and Tim created their own single-member limited liability companies, Ervin Holdings, LLC and Ervin Investments, LLC, respectively. These single-member liability companies became partners in Jade Trading with Sentinel, already a member of Jade Trading, acting as the managing member and the tax matters partner.

In September 1999, Ervin Capital, LLC paid $15,000,020 to AIG International to purchase a Euro/U.S. Dollar call option (the Purchased Call Option).[4] The Purchased Call Option had a strike price of $1.084, and allowed Ervin Capital, LLC to purchase EUR 290,540,000 for US $314,945,360 before the expiration date of September 29, 2000. Also in September 1999, Ervin Capital, LLC sold a Euro/U.S. call option (the Sold Call Option) for $14,850,018 to AIG International. In October 1999, Ervin Capital, LLC transferred its Purchased Call Option, Sold Call Option, and $75,000 to Jade Trading in exchange for a 30.7% interest in Jade Trading.[5] Under the Sold Call Option, with a strike price of $1.085, AIG International could buy EUR 290,540,000 for US $315,235,900 from Ervin Capital, LLC on or before September 29, 2000.

Soon after Jade Trading was formed, it began taking long positions in the Euro, but the new currency fell below the U.S. dollar on December 3, 1999. A few days later, Ervin Capital, Ervin

---

[2] This opinion memorializes rulings issued orally on April 6, 2005. Tr. (Apr. 6, 2005) at 16-18.

[3] The background is derived from the Complaint, Attachments to Def.'s Preliminary Statement of its Contentions of Fact and Law, the FPAA, and the four declarations submitted by Defendant asserting the executive privilege.

[4] Plaintiffs represent that AIG International is a wholly owned subsidiary of the worldwide insurance conglomerate AIG and an unrelated third party.

[5] All three limited liability companies were partners in Jade Trading and contributed similar purchased and sold options to Jade Trading.

Holdings, and Ervin Investments gave notice of their intents to withdraw from Jade Trading, received a portion of the partnership's holdings in foreign currency and Xerox stock, and terminated their partnership interests. In 2000, Jade Trading continued trading for its remaining partners, but at a reduced volume.

Upon exiting Jade, the partners each claimed a loss of approximately $15 million -- the contribution of the Purchased Call Option minus the value of the Xerox stock and foreign currency. However, they did not offset the value of the Purchase Call Option with the value of the Sold Call Option, as the government asserts they should have. According to Plaintiffs, the Sold Call Option, as a contingent liability, did not become a liability because AIG International never exercised its purchase rights under the Sold Call Option.

In readjusting the partnership items, the IRS determined that Jade Trading was a sham and, in violation of Treas. Reg. 1.701-2, because it "was formed or availed of in connection with a transaction . . . a principal purpose of which was to reduce substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of Subchapter K of the Internal Revenue Code." The IRS further concluded that the Euro currency options were never contributed to or assumed by the partnership, and that the partnership should be disregarded and the contributions adjusted to reflect the partners' income.[6]

Alternatively, the IRS, invoking the "substance over form" doctrine, argues that the Ervins did not recognize the bulk of their claimed losses because they did not have the claimed high basis in their interest in Jade. In so arguing, the IRS characterizes the options as a "single derivative financial instrument -- a vertical spread option -- which they acquired for an amount equal to the difference between the stated premiums for the purchase and for the sale of each call option." Def.'s Statement of Contentions at 15. Finally, under Treas. Reg. § 1.988-2, the IRS argues that the options should be treated as a single transaction which would reduce the Ervins' basis in Jade interests to $150,002. Id. at 16.

The IRS' Assertion of Executive Privilege for Documents in Jade, and the Ervin Brothers' Examination Files[7]

---

[6] Alternatively, the IRS contends that the Ervins may not recognize a loss from their transaction under Internal Revenue Code 165. Section 165(a) allows an individual to deduct losses, but Section 165(c) limits such losses to those incurred in a trade or business, or in any transaction entered into for profit though not connected with a trade or business. Here, the IRS argues that the Ervins cannot satisfy Section 165(c) because they cannot establish that they entered into the transaction with a reasonable expectation of earning a pre-tax profit given the transaction costs and professional fees they incurred.

[7] These documents contain 110 pages and were authored during 2002-03 and prepared or considered by IRS employees during the examination of Jade, the Ervin brothers, and two other (continued...)

In a declaration dated December 23, 2004, Margo L. Stevens, Assistant Chief Counsel (Disclosure and Privacy Law) in the Office of Associate Chief Counsel (Procedure & Administration), Office of Chief Counsel, Internal Revenue Service, asserted the executive privilege for 49 documents, including e-mails, handwritten notes, and draft memoranda concerning the position of the IRS regarding the so-called "Son of Boss" transactions, on the grounds that discovery of the documents would inhibit "the frank and honest discussion of legal and policy matters and would adversely affect the quality of the Service's decisions and policies." Def. Ex. F. ¶ 10. Further, she asserted that dissemination of pre-decisional opinions of IRS personnel might result in confusion of the public. Id. Ms. Stevens claims authority to assert the executive privilege by a delegation from the Commissioner of Internal Revenue, under Delegation Order No. 220 (Rev. 3), effective April 16, 1997.[8]

Background Files Relating to the IRS' Interpretation of "Liabilities" Under 26 U.S.C. § 752[9]

In response to Plaintiffs' Second Request for Production of Documents, Defendant submitted another declaration of Ms. Stevens, which asserted executive privilege over 54 documents "prepared and/or considered by the Office of Chief Counsel prior to the publication of Notice 2000-44 on

---

[7](...continued)
investors. Stevens Decl. (Dec. 23, 2004) ¶ 9; Tr. (Mar. 15, 2005) at 62.

[8] The Delegation Order states:

> Certain federal courts recognize claims of executive privilege by the head of the agency as the sole basis for protecting internal or inter-agency records or information that reflect its recommendations, advisory opinions, deliberations, and other similar matters, comprising the process by which governmental decisions and policies are formulated.

Def.'s Exhibit F, Tab D. The Delegation Order does not delegate the authority to claim the state secrets privilege. Id.

[9] 26 U.S.C. § 752 provides in part:

§ 752. Treatment of certain liabilities.

(a) Increase in partner's liabilities. Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.

(b) Decrease in partner's liabilities. Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

August 13, 2000."[10] Third Stevens Declaration (Jan. 25, 2005) at 4.

In addition, Defendant relies upon an April 9, 2003 declaration from Margo L. Stevens filed in Marriott Int'l Resorts v. United States, Nos. 01-256T and 01-257T (Stevens Marriott Decl.), claiming the executive privilege over documents "which were prepared and/or considered by the Office of Chief Counsel to create Revenue Rulings 88-77, 95-8, 95-26 and 95-45, as well as the income tax regulations under sections 704(b) and 752, and documents relating to the application of Income Tax Regulations Section 1.701-2." Def. Ex. 3, Stevens Marriott Decl.¶ 10. Defendant has represented that documents responsive to Plaintiffs' requests relating to the interpretation of liabilities under § 752 are encompassed in these declarations. Tr. (March 15, 2005) at 102.[11]

Treas. Reg. 1.701-2 Background Materials[12]

In a declaration dated January 10, 2005, Ms. Stevens asserted the executive privilege over 289 documents, approximately 3,350 pages, which "were prepared and/or considered by the Office of Chief Counsel prior to the publication of the proposed Income Tax Regulations Section 1.701-2 on May 17, 1994, and Treasury Decision 8588 on December 29, 1994," containing internal comments of IRS personnel on proposed regulations under Section 701. Def. Ex. 1 ¶ 8, Second Stevens' Decl.; see Tr. (Mar. 5, 2005) at 56.

Eric Solomon, the Acting Deputy Assistant Secretary of Treasury, also claimed executive privilege for 14 documents, prepared or considered by the Department of Treasury's Office of Tax Policy during the preparation of proposed and final Treas. Reg. 1.701-2, containing confidential

---

[10] Notice 2000-44 alerted taxpayers that the purported losses arising from transactions characterized as "Son of Boss" are not properly allowable for federal income tax purposes and might be subject to challenge under § 752, § 1.701-2, or under other anti-abuse rules, or § 165(c)(2).

[11] Defendant argues that the scope of Plaintiffs' Second Request for Production of Documents Nos. 2 and 5 are so unclear they suffer from "fatal unspecificity." Defendant's Opposition to Plaintiffs Motion to Compel Defendant to Fully and Properly Respond to Plaintiffs' Second Request for Production of Documents 1-3 and 5 and Interrogatory Nos. 13, 14, and 15 at 12. The Court disagrees. These requests concern the IRS' interpretation of the term "liability" under § 752, are sufficiently narrow, and are capable of being answered.

[12] These documents are the subject of Plaintiffs' Motion to Compel Defendant to Fully and Properly Respond to Plaintiffs' First Request for Production of Documents No. 18.

Plaintiffs filed a motion for partial summary judgment early in this action seeking to have the Court invalidate Treas. Reg. 1.701-2. The Court denied this motion because the Government had not determined as of that time whether it would rely on the regulation in this action. 60 Fed. Cl. 558, 562 (2004). On March 22, 2005, after receiving Defendant's Contentions in which Defendant expressly relied upon this regulation, Plaintiffs refiled that motion for partial summary judgment, supplemented by an Appendix containing the public rulemaking record.

intra- and inter-agency memoranda opinions and recommendations of Treasury personnel, pre-decisional deliberations of Treasury officials responsible for formulating regulatory policy, as well as the opinions of non-decision-making personnel. Def. Ex. 2[13]

## Discussion

Because relevance must be determined as a threshold matter, the Court first addresses the Government's claims that the background documents underlying Plaintiffs' Administrative Files and Treas. Reg. 1.701-2, as well as documents interpreting the term liabilities under 26 U.S.C. § 752 and Notice 2000-44, are not relevant in this action. CACI Field Servs., Inc. v. United States, 12 Cl. Ct. 680, 684 (1987) ("[B]efore examining the executive privilege claim, the court must inquire whether the information sought is relevant . . . ."); Shipkovitz v. United States, 1 Cl. Ct. 400, 401 (1983) ("[R]elevant material may subsequently be protected from discovery by proper claims of privilege, but the initial question is that of relevance.") (citations omitted).

In determining questions of relevance, the Court looks to Rule 26(b)(1) of the Rules of the United States Court of Federal Claims (RCFC), which provides that, unless limited by court order, the parties may obtain discovery of any matter, not privileged, that is relevant to the claim or defense of a party. Relevance for the purposes of Rule 26 is broadly construed. Katz v. Batavia Marine & Sporting Supplies, 984 F.2d 422, 424 (Fed. Cir. 1993). At this juncture, the Court has not seen the documents at issue and cannot preliminarily assess relevance with precision. Rather, this court follows the approach sanctioned by the Supreme Court in Reynolds v. United States, 345 U.S. 1, 10-11 (1953), and finds that the Plaintiffs have "shown probable cause for discovery of the documents," without considering the applicability of the executive privilege, which, as explained below, has not been properly invoked.

The documents in Plaintiffs' Administrative Files are clearly relevant because they formed the underpinnings of the FPAA or contain data considered by the IRS in issuing the FPAA, challenged in this action.

The Government contends that documents underlying the promulgation of Treas. Reg. 1.701-2 are not relevant because the Court's determination of the validity of the regulation is a legal determination not in any way dependent upon the deliberative, predecisional opinions and analysis of IRS employees.[14]

---

[13] Mr. Solomon asserted the executive privilege pursuant to a delegation in Treasury Order No. 111-10 and Treasury Directive 27-10.

[14] The court recognizes the tension between relevance and privilege in this case. Defendant, in essence, argues that by virtue of their deliberative nature, the predecisional opinions of IRS employees cannot be relevant because such opinions have no bearing upon the Court's legal interpretations of statute and regulations. This approach puts the cart before the horse in that the (continued...)

In the context of evaluating or applying Treas. Reg. 1.701-2, the Court must ascertain the degree of deference to afford it, as well as the reasonableness of the IRS' interpretation of it. See generally, Cottage Sav. Ass'n v. Comm'r of Internal Revenue, 499 U.S. 554, 560-61, (1991); Marriott Int'l Resorts v. United States, 63 Fed. Cl. 144, 145-46 (2005).[15] As the Court recognized in Marriott Int'l Resorts v. United States, 61 Fed. Cl. 411, 416 (2004), "background files to the IRS' final actions, just as a statute's legislative history, might prove informative, particularly in sounding a note of caution." Accord Flamingo Fishing Corp. v. United States, 22 Cl. Ct. 625, 630 (1991) ("If defendant relies on this revenue ruling, relevance of the [entire file relating to the issuance of the revenue ruling] will be unassailable."). Further, the agency files may contain factual material relied upon by the IRS in promulgating the regulation, or materials which would indicate the agency's interpretation and intended scope of this regulation.

Similarly, background files relating to the IRS' construction of the term liabilities in 26 U.S.C. § 752 and documents underlying IRS Notice 2000-44 would potentially be relevant to the extent they embody the IRS' interpretations of this term at any point in time pertinent to this action.[16] Plaintiffs are entitled to know how the IRS interpreted this term in assessing their tax liability, in asserting penalties and whether the IRS' interpretation was consistent over time. Plaintiffs allege that Defendant's position in this case contradicts its historic construction and application of the word liability for purposes of § 752. As the court recognized in Bank of America v. United States, 42 AFTR 2d 78-5225, 78-2 USTC ¶ 9493 (N.D. Cal. 1978), "[i]nsofar as the historical files of the treasury regulations embody unpublished general policy statements or interpretations adopted by the IRS, or factual bases of the regulations, and concern the intended scope of the applicable regulations, they are analogous to the legislative histories of statutes which are routinely resorted to in order to

---

[14](...continued)
Court would be accepting Defendant's assertion of privilege and concluding that the documents at issue are deliberative in assessing relevance. At this stage, the Court cannot examine whether the 3,350 pages of documents for which this privilege has been asserted are truly deliberative because Defendant has not properly invoked the privilege.

[15] This Court ruled months ago that to the extent the IRS was relying on Treas. Reg. 1.701-2 and Plaintiffs were urging the Court to invalidate it, the underlying rulemaking file was relevant. In a telephonic conference on Aug. 30, 2004, this Court directed Defendant to produce the regulatory history file underlying Treas. Reg. 1.701-1, but this ruling did not encompass privileged documents.

[16] Plaintiffs' Second Request for Production of Documents Nos. 1, 2, 3 and 5 are directed toward understanding "liability."

Notice 2000-44 issued by the IRS on June 25, 2003, explained that Section 752 applies to the Son of Boss transaction to reduce the partners' basis in the partnership. The Notice provided that a short-sale obligation contributed after October 18, 1999 but before June 24, 2003, "is a liability that reduces the basis in the partnership of the partner who contributed the liability, to the extent of the amount of the liability but not below the adjusted value of the partner's interest." Notice at 3. Defendant contends that the Ervins invested in a Notice 2000-44 transaction.

interpret ambiguous provisions of such statutes."[17] These documents could also aid in determining the reasonableness of the position adopted by Plaintiffs in their tax returns, namely, that they did not need to book a contingent obligation as a liability to reduce their basis in the partnership. As such, these documents could be relevant to determining the validity of Plaintiffs' challenge to the asserted penalties.

In Marriott Int'l Resorts v. United States, 61 Fed. Cl. 411 (2004), Plaintiffs challenged the IRS' determination that contingent liabilities from short-sale transactions should have been subtracted from the partnership's tax basis, a determination which implicated the meaning of the term "liability" under IRC Section 752. The Marriott Court found that documents relating to IRS' ongoing consideration and interpretation of a revenue ruling were relevant to the issue of whether the IRS had abandoned a longstanding interpretation of 26 U.S.C. § 752, recognizing that "conflicting interpretations of the law might constitute an important framework for the matters at issue." 61 Fed. Cl. 416. Given that Plaintiffs in this case lodge similar challenges of inconsistent interpretation of this statutory term, identical considerations compel a conclusion that these types of documents are relevant here.[18]

Finally, Defendant has not substantiated its claims of the burdensomeness of complying with this discovery. Given how critical the interpretation of the term "liability" is to this lawsuit, the benefit of production of these documents outweighs the burden or expense.

**The Executive Privilege**

The executive privilege denotes at least three broad categories of privilege. First, the state secrets doctrine or privilege is an evidentiary privilege protecting military and state secrets, so as not to compel the dissemination of sensitive or classified information. Reynolds, 345 U.S. at 7-8; Marriott, 61 Fed. Cl. 411, 416 (2004). Second, the presidential privilege protects conversations and communications between the President and senior advisors. See Cheney v. United States Dist. Ct. for the Dist. of Columbia, 124 S. Ct. 2576, 159 (2004); United States v. Nixon, 418 U.S. 683 (1974); Marriott, 61 Fed. Cl. at 416. This case involves a third category of executive privilege -- the deliberative process privilege, covering intra-governmental pre-decisional documents reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions are formulated. NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150 (1975).

---

[17] As Bank of America suggests, the IRS' actual interpretations of the term liabilities and intended scope of Treas. Reg. 1-701.2 are not deliberative, since the IRS cannot apply "secret law" in discharging its regulatory duties. NLRB v. Sears Roebuck & Co., 421 U.S. 132, 150 (1975); Vons Cos., v. United States, 51 Fed. Cl. 1, 22 (2001) (citing Coastal States Gas Corp. v. Dep't of Energy, 67 F.2d 854, 866-67 (D.C. Cir. 1980)).

[18] Indeed, the Government produced the same privilege log in this litigation regarding documents interpreting the term "liabilities" as it had in Marriott. Declaration of Margo L. Stevens dated Apr. 9, 2003. See, Tr. (Mar. 15, 2005) at 102.

The deliberative category of the executive privilege was first articulated and adopted by the Court of Claims in Kaiser Aluminum & Chem. Corp. v. United States, 157 F. Supp. 939 (Ct. Cl. 1958).[19] The Kaiser Court characterized this privilege as an "evidentiary privilege" and recognized that "the power must lie in courts to determine executive privilege in litigation." 157 F. Supp. at 947. This privilege subsequently has been widely recognized in Federal courts. CACI, 12 Cl. Ct. at 686 (citing Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 40 F.R.D. 318 (D.D.C. 1966), aff'd, 384 F.2d 979, cert. denied, 389 U.S. 952 (1967)).

For a document to fall within the deliberative category of the executive privilege, it must be both pre-decisional and deliberative. Vons Cos. v. United States, 51 Fed. Cl. 1, 22 (2001). To qualify as pre-decisional, the information must address matters "antecedent to the adoption of agency policy." Walsky Constr. Co. v. United States, 20 Cl. Ct. 317, 320 (1990) (quoting Jordan v. Dep't of Justice, 591 F.2d 753, 774 (D.C. Cir. 1978). Additionally, to be deliberative, a document must reflect 'the give-and-take of the consultative process,' rather than constituting a 'body of secret law.' Vons, 51 Fed. Cl. at 22 (quoting Coastal States Gas Corp. v. Dep't of Energy, 67 F.2d 854, 866-67 (D.C. Cir. 1980)). The executive privilege is a qualified one, and can be overcome upon a showing of evidentiary need weighted against the harm that may result from disclosure. Kaiser, 157 F. Supp. at 946; CACI, citing Smith v. FTC, 403 F. Supp. 1000, 1015-16 (D. Del. 1975); FTC v. Bramman, 54 F.R.D. 364 (W.D. Mo. 1972).

**Must the Executive Privilege Be Asserted By the Head of the Agency?**

As the Federal Circuit recently recognized in accepting an interlocutory appeal in Marriott, there is a split among the circuits as well as within the Court of Federal Claims as to whether only the head of an agency can assert the executive privilege known as the deliberative process privilege. Marriott Int'l Resorts v. United States, Misc. No. 779 2005 U.S. App. Lexis 2745 (Fed. Cir. Jan. 26, 2005). Although the Federal Circuit has not recently considered this issue, its predecessor, the Court of Claims, addressed this matter in Cetron Elecs. Corp. v. United States, 207 Ct. Cl. 985 (1975).[20] There, the Court of Claims affirmed an order of the trial court requiring production of seven documents, internal reports of IRS officials relating to an assessment of penalties stated to contain "opinions, reasoning and conclusions of IRS officials" evaluating the assessment. The Court

---

[19] See, CACI v. Field Servs., Inc. v. U.S., 12 Cl. Ct. 680, 687 n.7 (1987) ("[A]ccording to commentators, the creation of the executive deliberation privilege can be traced to Kaiser.") (citing Development in the Law of Privileged Communications, 98 HARV. L. REV. 1405, 1620 (1985); Note, "Discovery of Government Documents and the Official Information Privilege," 76 COLUM. L. REV. 142, 156 (1976)).

[20] Decisions of the Court of Claims are precedential for this Court. As the Federal Circuit ruled in Southland v. United States, 690 F.2d 1368, 1369 (Fed. Cir. 1982), "the holdings of our predecessor courts, the United States Court of Claims and the United States Court of Customs and Patent Appeals, announced by those courts before the close of business September 30, 1982, shall be binding as precedent in this court."

of Claims rejected the Government's contention that these documents were privileged under "an alleged general privilege the Government has against disclosure of any intra-agency communications that contain opinions, conclusions, and reasoning of Government officials used in the administrative decision-making process." Cetron, 207 Ct. Cl. at 989.

The Cetron Court embraced the trial court's suggestion that there had to be a valid executive privilege properly asserted in order for these type of internal deliberative Governmental documents to be shielded from discovery. The Court quoted the trial judge:

> Unless there is a valid executive privilege, properly asserted, no public policy countenances withholding relevant information needed in the judicial process for evidentiary purposes merely because one of the contesting parties is the Government.

Id. at 989 (emphasis added). Importantly, Cetron recognized that the executive privilege had to be lodged by the head of the agency -- in expressly noting that the Government did "not assert the doctrine of executive privilege which can be personally invoked only by the head of a department or agency." Cetron, 207 Cl. Ct. at 989 (emphasis added).

The Cetron Court's pronouncement of the requirement that executive privilege be only invoked by the head of an agency is consistent with Reynolds and Kaiser. In Reynolds, the Supreme Court explicitly outlined the procedural requirements necessary to properly invoke the executive privilege:

> The privilege belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party. It is not to be lightly invoked. There must be formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer.

Reynolds, 345 U.S. at 7-8 (emphasis added) (internal citations omitted). In articulating the procedural requirement that the privilege be lodged by the "head of the department after a personal consideration by that officer" the Supreme Court quoted a British case, Duncan v. Cammell Laird & Co., [1942] A.C. 624:

> [t]he essential matter is that the decision to object should be taken by the minister who is the political head of the department, and that he should have seen and considered the contents of the documents and himself have formed the view that on grounds of public interest they ought not to be produced.

345 U.S. at 8 n.20 (emphasis added).[21] Likewise in Kaiser, the Court of Claims recognized and accepted the assertion of the deliberative category of executive privilege by the Administrator of the General Services Administration -- the head of an agency. 157 F. Supp. at 947-48.

Fundamental to the determination by this Court that only the head of an agency may invoke the privilege is the recently reaffirmed recognition that the "[e]xecutive privilege is an extraordinary assertion of power which is 'not to be lightly invoked.'" Cheney, 124 S. Ct. at 2590; Reynolds, 354 U.S. at 7. The Marriott court highlighted the rationale underlying the restrictive requirements for such assertion: "Requiring the head of the agency personally to assert executive privilege after gaining familiarity with the documents and determining that their release would significantly impede the agency's operations serves the important function of ensuring that the privilege is invoked only when absolutely necessary." 61 Fed. Cl. at 419. The Court further recognized that putting courts and agencies on a "collision course" by having courts review agency's claims of confederality should be "avoided whenever possible." Id. (quoting Cheney, 124 S. Ct. at 2592). In a similar vein, the District Court in Pierson v. United States, 428 F. Supp. 384 (D. Del. 1977), explained the reasons for insisting that the privilege must be invoked by the head of the agency:

> It is perhaps important to keep in mind the policy served by the requirement of a formal claim by the agency head. Executive privilege permits one branch of government to ban disclosure of documents ordinarily discoverable and as such it is "a phase of release from requirements common to private citizens or organizations." Kaiser Aluminum & Chemical Co. v. United States, supra,157 F. Supp. at 944. Thus, the privilege should be invoked with consistency and only after careful consideration. See United States v. Reynolds, supra, 345 U.S. at 7, 73 S. Ct. 528; see also Krattenmaker, Testimonial Privilege in Federal Courts, supra at 82. To permit any government attorney to assert the privilege would derogate both of those interests. It would be extremely difficult to develop a consistent policy of claiming the privilege. Moreover, the judgment of attorneys engaged in litigation is very likely to be affected by their interest in the outcome of the case. See Thill Securities Corp. v. New York Stock Exchange, 57 F.R.D. 133, 138 (E.D. Wisc. 1972). It is of the greatest importance that the privilege be invoked only when policies it seeks to encourage are seriously threatened. Requiring the agency head to review the documents sought and to claim the privilege where appropriate is the most effective method available to assure consistency and prudence.

---

[21] The Reynolds Court cited Firth Sterling Steel Co. v. Bethlehem Steel Co., 199 F. 353 (D.C.E.D. Pa. 1912) for the proposition that executive privilege must be lodged by the head of the department which has control over the matter. There, the Secretary of the Navy represented that documents at issue embodied "secrets of military value to the government that could not be disclosed without detriment to the public interests." 199 F. at 354.

Pierson, 428 F. Supp. at 395.

Defendant argues that the IRS Code "authorizes the Commissioner to delegate his duties to subordinates, like Ms. Stevens." Def.'s Opp. to Pl.s' Suppl. Mot. to Compel at 13. Specifically, Defendant argues that "Section 7803(a), the statute creating the office of Commissioner of Internal Revenue, authorizes the Commissioner to 'administer, manage, conduct, direct, and supervise the execution and application of the internal revenue laws and related statutes.'" Id., citing Section 7803(a)(2)(A). Section 7803 is a housekeeping statute and evinces no intent by Congress to trump the procedural requirements established by the courts regarding who may properly invoke the executive privilege.[22]

In sum, this Court agrees with the Marriott Court's conclusion that Cetron is binding precedent requiring that the executive privilege be asserted by the head of the agency or department, after personal consideration, and may not be delegated -- as recognized by a majority of decisions of this Court.[23] Compare Marriott 61 Fed. Cl. 411, Vons, 51 Fed. Cl. 1, Walsky, 20 Cl. Ct. 317, CACI, 4 Cl. Ct. 361,[24] and Abramson, 39 Fed. Cl. 290, with Yankee Atomic Elec. Co. v. United

---

[22] This highlights another aspect of the separation of powers issue -- whether an executive agency, by issuing a delegation, may abjure judicial precedent defining the parameters for applying an evidentiary privilege. Rule 501 of the Federal Rules of Evidence recognizes that privileges of a Government "shall be governed by the principles of the common law as they may be interpreted by the Courts of the United States in the light of reason and experience." This is further support for the principle that the common law surrounding privileges and the procedural mechanisms for invoking them are a matter for courts, not administrative agencies, to fashion.

[23] As this Court recognized in Abramson v. United States, 39 Fed. Cl. 290 (1997) "some decisions have read Cetron to stand for the proposition that the deliberative process privilege is not recognized by the court." 39 Fed. Cl. at 294 (citing, Alaska v. United States, 16 Cl. Ct. 5, 6 n.1 (1988), and Deuterium Corp. v. United States, 4 Cl. Ct. 361, 363 (1984)). However, the Abramson Court found that "[t]he view more consistent with binding precedent, however, is that Cetron held that any assertion of the deliberative process privilege must be made in the context of an executive privilege and must meet the formalities required for proper assertion of a common-law executive privilege." Id. (citing CACI, 12 Cl. Ct. at 686-87 & n.7).

[24] The CACI court recognized a distinction in the procedure for invoking the privilege when the Government is resisting discovery as a party to a lawsuit, as opposed to seeking to prevent disclosure under an exemption to the Freedom of Information Act. When the Government is a party to a lawsuit, the privilege has to be asserted by the head of the agency. The court explained: "Exemption 5 of the Freedom of Information Act ("FOIA") recognizes the deliberative process privilege by excluding 'inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency.' 5 U.S.C. § 552(b)(5) (1982). The only distinction between the deliberative process privilege when arising under FOIA

(continued...)

States, 54 Fed. Cl. 306 (2002).[25]

**"At Issue" Waiver of All Privileges**

Plaintiffs argue that "Defendant's primary reliance on Treas. Reg. § 1.701-2 to deny the existence of Jade Trading and impose penalties against the Ervins waives any privilege that may have existed." Pl.s' Letter dated Feb. 23, 2005 at 10-11. The Federal Circuit has recognized the implicit waiver of the attorney-client privilege when privileged information is "at issue." Under Hearn v. Rhay, 68 F.R.D. 574 (E.D. Wash. 1975), an implied waiver of the attorney-client privilege occurs when:

1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party;

2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and

3) application of the privilege would have denied the opposing party access to information vital to his defense.

Hearn, 68 F.R.D. at 581. In applying this implied waiver, courts have recognized that it would be fundamentally unfair to allow a party to inject a claim or defense and then invoke the privilege to prevent the opposing party from obtaining the relevant evidence it needs to rebut that claim or defense.

The "at issue" implied waiver applies where the privilege-holder makes factual assertions, the truth of which can only be assessed by examination of privileged communications. United States v. Bilzerian, 926 F.2d 1285 (2d Cir. 1991), cert. denied, 502 U.S. 813 (1991); accord Standard Chartered Bank v. Ayala Int'l Holdings, 111 F.R.D. 76, (S.D.N.Y. 1986). In this action, the

---

[24](...continued)
and the privilege when invoked in this court is that in the context of FOIA no affidavit from the agency head is necessary to invoke it. See Deuterium v. United States, 4 Cl. Ct. 361, 363 (1984)." 12 Cl. Ct. at 687 n.7.

[25] In Yankee Atomic Elec. Co. v. United States, 54 Fed. Cl. 306 (2002), the Court held that the Secretary of Energy could delegate the power to invoke the deliberative process privilege to the Chief Operating Officer (COO) of DOE, relying upon the statute authorizing the delegation, 42 U.S.C. § 7252, and concluding that precedent of the Temporary Emergency Court of Appeals (TECA) is binding upon this Court, citing Dep't of Energy v. Brett, 659 F.2d 154 (TECA 1981). This Court agrees with Marriott's conclusion that TECA's rulings on evidentiary privileges are not binding on this Court because the Federal Circuit adopted TECA decisions as precedent only in cases where the Federal Circuit was acting as a successor to TECA. See Marriott, 61 Fed. Cl. at 418.

Government relies on § 752 of the Code as well as Treas. Reg. 1.701-2 to support denial of Plaintiffs' capital losses. Plaintiff contends that by asserting these positions, the Government has effectively wielded a sword against Plaintiffs while attempting to hide behind the shield of asserted privileges. However, Defendant does not purport to rely on any underlying privileged opinions or communications relating to provisions of the Code or regulations to support its position asserted in the FPAA. Rather, the positions asserted by Defendant are based on the Code provision or regulation cited in the FPAA or Preliminary Statement of Contentions. Accordingly, Plaintiff's "at issue" waiver argument fails.

## Conclusion

Defendant's purported invocation of the executive privilege by individuals other than the head of an agency or department is declared to be invalid. Defendant shall have until May 6, 2005, to produce the documents identified in Ms. Stevens' and Mr. Solomon's declarations or submit declarations asserting the privilege by the Commissioner of the IRS and the Secretary of the Treasury.[26]

**MARY ELLEN COSTER WILLIAMS**
**Judge**

[26] The Court ruled orally on April 6, 2005, and granted Defendant 30 days from the date of that ruling within which to reassert the privilege.