<?xml version="1.0"?>
<TRN>
<DocType>Summation Transcript Export File</DocType>
<Version>0.9</Version>
<Source_Loc>d:\trials\jade trading\summation\jade trading\TRAN\</Source_loc>
<Transcript_Name>Sept-08-05</Transcript_Name>
<Transcript_Description>Sept-08-05</Transcript_Description>
<Notes>
</Notes>
<Transcript Info>
-1,540,6,0,0
</Transcript Info>
<Transcript>
00540

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

JADE TRADING, LLC, by and )
through ROBERT W. ERVIN AND )
LAURA KAVANAUGH ERVIN on )
behalf of ERVIN CAPITAL, LLC, )
Partners Other Than the )
Tax Matters Partner, )
Plaintiffs, )
)
v. ) Docket No.: 03-2164T
UNITED STATES, )
Defendant. )

Courtroom 2306
Russell Federal Building
75 Spring Street, N.W.
Atlanta, Georgia
Thursday,
September 8, 2005

The parties met, pursuant to adjournment, at 9:42 a.m.

BEFORE: HONORABLE MARY ELLEN COSTER WILLIAMS
Judge

APPEARANCES:

For the Plaintiffs:
DAVID D. AUGHTRY, Esquire
LINDA S. PAINE, Esquire
NICOLAS F. KORY, Esquire
Chamberlain, Hrdlicka, White, Williams & Martin
191 Peachtree Street, N.E., 9th Floor
Atlanta, Georgia 30303-1747
(404) 659-1401

EXHIBIT
B

33

00541

APPEARANCES: (Continued)
For the Defendant:
STUART J. BASSIN, Esquire
MATTHEW C. HICKS, Esquire
MICHAEL S. RAUM, Esquire
JENNIFER P. WILSON, Esquire
U.S. Department of Justice
Tax Division
P.O. Box 55
Washington, D.C. 20044
(202) 307-6542

CONTENTS


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Plaintiff: | | | | | |
| Gary Ervin | 549 | 608 | 711 | 745 | -- |
| (Resumes) | | 651 | 744 | | |
| Richard Starke | 748 | 783 | -- | -- | -- |

00748

give you a copy for your binder as well.

THE COURT: Okay. Thank you.

THE CLERK: Raise your right hand.

Whereupon,

RICHARD STARKE

having been duly sworn, was called as a witness and was examined and testified as follows:

THE COURT: You may proceed.

MR. AUGHTRY: Thank you.

DIRECT EXAMINATION

BY MR. AUGHTRY:

Q Mr. Starke, you worked with the IRS Office of Chief Counsel in 1995?

A Yes.

Q In the IRS National Office?

A Yes.

Q At that point in time you participated in a series of meetings, did you not, dealing with Section 752 obligations, liabilities and the sort?

A I don't personally recall that, but I have seen notes that indicate that.

Q And whose notes are those?

A Mine. The ones I was looking at.

MR. AUGHTRY: All right. I invite your attention to Plaintiffs' Exhibit 201, and I have a

00749

copy for the Court and Mr. Klein.

(The document referred to was marked for identification as Plaintiffs' Exhibit No. 201.)

MR. RAUM: Your Honor, at this point the government would like to reiterate its objection to this document based on relevancy.

THE COURT: What is it?

MR. AUGHTRY: It's the Helmer/Cram memo.

THE COURT: Overruled. I already ruled on that I think. I ruled on it in the discovery context, but this is the trial. I see. Fine.

Proceed.

MR. AUGHTRY: Thank you, Your Honor.

BY MR. AUGHTRY:

Q You say you prepared certain notes. Are these your notes, sir?

A They certainly look like them.

Q Okay. I specifically invite your attention to let's just sort of flip through here. Page 5 references the Crane case, right?

A Is this the handwritten 5?

Q I'm talking to the typed section. It's a handwritten note. Yes, it is.

A Okay.

00750

Q Handwritten numbers at the bottom.
A Okay. I'm there.
Q And you reference Crane on page 5?
A Yes.
Q And on page 7 Tufts?
A Yes.
Q And on page 9, Deputy v. du Pont?
A Yes.
Q And on page 9 you quote Deputy v. du Pont, the Supreme Court's language, and I'm looking at the last paragraph at the top of page 10. Excuse me. The first paragraph, the partial paragraph, at the top of page 10, the last sentence, where it says, "Although an indebtedness is an obligation, an obligation is not necessarily an 'indebtedness' within the meaning of Section 163," right?
A I see those words.
Q All right. You also deal with other questions about whether payables are liabilities and that sort of thing further down that page, for example, under the discussion of Bongiovanni?
A Ask the question again.
Q Seven lines down, six lines down, do you see the ellipses, the three ellipses?
A Yes.

00751

Q And discussing whether or not payables are liabilities?

A I see it.

Q All right. And then on page 12 you're dealing with what is an executory contract and that sort of thing?

A The Black's Law Dictionary definition?

Q Yes.

A I see that.

Q And then on page 13 you start dealing with B&E on definition of liability?

A I see that.

Q B&E is not breaking and entering. It's a different use, isn't it?

A Yes.

Q All right. On page 14 you start getting into preparations for a meeting April 4, 1995, with the front office. Do you see that?

A Yes.

Q And who is the front office?

A That should be a reference to the person who heads Corporate, the Corporate Division of the Office of Chief Counsel.

Q Okay.

A That would be the Corporate Division of the

00752

Office of Chief Counsel. The people highest up in the Division of Chief Counsel -- excuse me. The people highest up in the Corporate Division of Chief Counsel would be the ones that sit in the front office referred to there.

Q Okay. And Mr. or Ms. Rooney here, the reference? Who is Mr. or Ms. Rooney with?

A I believe Rooney was from the Department of Treasury itself, what we would refer to as Main Treasury probably.

Q All right. About a third of the way down you do an analysis of laying out a partnership background information note --

A I see that.

Q -- discussing whether short sales create a Section 752 basis.

A I see that first sentence.

Q Okay. And you make the comment below there that, "We did not put it in partnership regulations recently issued to keep them brief," right?

A I see that.

Q And that's referring to the creating basis rule? Is that right?

A 752, which is right above it, is a section on whether liabilities produce basis. I'm not

00753

intimately acquainted with that section, but --
Q And down below you say, and I'm looking at Pending Regulations. No proposed regulations, correct?
A I see that.
Q It says, "Why the issue should not instead be addressed in the partnership anti-abuse regulation."
A I see that.
Q All right. And then down below you note under Contra Arguments, "Third, we are giving partners a way to create basis.." --
A I see that.
Q -- "...but there are already other ways."
A I see that, but I'm not sure what it means.
Q All right. Let's move to page 15 if we could. You list on page 15 Questions I Might Be Asked for the first --
A I see that.
Q -- third of the page, and then you talk about a conference on January 9, 1995.
A I see that.
Q And on this page you make a reference to Helmer at the top of the page?
A At the top? Okay. I see that.

00754

Q And then about halfway down the page you make another reference to Helmer?
A Yes, sir.
Q And you make a third reference to Helmer about six lines below that?
A I see that.
Q A fourth reference to Helmer four or five lines below that?
A Yes, sir.
Q A fifth reference to Helmer on the next to the last line?
A I see that.
Q A sixth reference to Helmer on the following line?
A I see that.
Q A seventh and eighth reference to Helmer at the top of the next page?
A I see those.
Q A ninth reference to Helmer eight lines or nine lines below that?
A I see that.
Q All right. And then a tenth reference to Helmer down in the bottom third of the page?
A I see that.
Q Now, this meeting that transpired that you

00755

referred to, the conference with Jackal. That would be Monte Jackal?
A I'm sorry. Where is that?
Q Back on page 15, sir.
A I'm sure that's Monte Jackal. I know no other Jackal. I see it. It must be Monte Jackal.
Q All right. And what was his position at the time?
A I don't know. I believe he was on the third floor of the National Office of the Internal Revenue Service, which --
Q He was an employee or agent of the Internal Revenue Service?
A I think that's correct.
Q All right. When you say the third floor, is that a position of responsibility or --
A Yes. That's where the Chief Counsel and his immediate I'll call them inferiors work, as well as the Commissioner.
Q And at this stage were there about 1,000 lawyers in the Chief Counsel's Office?
A I really don't know. That could well be the number.
Q And the presiding Chief Counsel at that stage was Stuart Brown, wasn't it?

A I believe that's so. I think that name appears in here somewhere.

Q I want to make sure I didn't foul the record up on this when I said presiding. The Chief Counsel of the Internal Revenue Service was a gentleman named Stuart Brown?

A I believe he was Chief Counsel at the time.

Q All right. There's a reference to FI&P. Can you tell me what that --

A Are we still on -- I see. We're still on the same place?

Q Yes, sir. FI&P stands for Financial Instruments & Products, doesn't it?

A I believe it's either that or Financial & Insurance Products.

Q All right. And that is a division of the Internal Revenue Services?

A That's I guess more properly a division of the Office of Chief Counsel.

Q All right. Of the Internal Revenue Service?

A Yes.

Q All right. Thank you. P&SI?

A I think that's Passthroughs & Special Industries.

Q All right. And that is a division of the

Office of Chief Counsel?
A Yes.
Q Of the Internal Revenue Service?
A Yes.
Q And the reference here to Treasury? That would be the United States Treasury Department? Is that right?
A Yes.
Q And Crouch refers to Branch Chief Nelson Crouch?
A Yes.
Q All right. And so you describe this meeting, this conference, in your notes, don't you?
A Yes.
Q To your knowledge, are there in the entire Internal Revenue Service any other notes from this meeting?
A All I know is that I was asked to turn over everything that I had in hard copy or on my computer pertaining to the creation of Revenue Ruling 95-45, and I did so. I don't really recall whether there were other notes in there pertaining to this meeting.
Q In your preparation for your testimony today or in preparation for your deposition, did anyone show any documents that had been produced to Plaintiffs in

00758

this case from the IRS Chief Counsel, Division of FI&P?
A I'm sorry. Say that one more time.
Q In your preparation for your testimony today here in Court and your testimony at the time of your deposition, did you see any documents that had been produced by the Plaintiffs dealing with this conference or related subjects from IRS Chief Counsel, Division of FI&P?
A Produced by the Plaintiffs?
Q Produced to the Plaintiffs. Made available to the Plaintiffs.
A I don't know what was made available to the Plaintiffs.
Q You've seen no documents made available to the Plaintiffs from this conference other than your notes?
A I saw the documents shortly after my deposition pursuant to instruction. I went and looked on my computer and got everything I could find that pertained to the generation of Revenue Ruling 95-45.
I turned those over to the appropriate office in the IRS to then be released to you to the extent I guess they thought they were properly releasable. I saw the documents I turned over, but

00759

nobody showed me any other documents.

Q You're telling me that when you went back to check your computer there was more than one document on your computer beyond this?

A Yes.

Q And there was something more than just a draft of the revenue ruling?

A I don't remember what the documents were.

MR. AUGHTRY: Your Honor, those documents have been withheld, but perhaps we can take that up after conclusion of this witness.

BY MR. AUGHTRY:

Q Let's find out what documents are and are not out there. Could you describe for the record the documents, the additional documents that you had on your computer that you produced to someone?

A I didn't look at them in any detail. On my computer for one thing I had -- when I work on a job I'm given to work on, and 95-45 was such a job, on my computer in the file manager I'll create an entry, like it would be called Revenue Ruling 95-45. In the course of working on the project any document I originated that pertained to 95-45 I would probably originate in that folder.

Shortly after my deposition with you when I

was asked --
Q Yes.
A -- to turn over to the appropriate person or office within the IRS everything I had pertaining to 95-45, I just took what was in that folder.
Q Yes.
A I think I put it on a diskette and took it over there. I didn't look at each document. You know, they were in the folder headed 95-45, and I didn't look at each of them to see what they were. I didn't think that was required.
Q How many documents?
A I would say about five or six. That maybe a couple too many or one too few. I don't remember the specific number.
Q Were you aware that Plaintiffs were advised there was only one document, and it was a partial draft of a ruling?
A I don't know that.
Q That would be untrue based upon your understanding of the facts?
A I'm sorry. That would be?
Q That would be untrue to say there's only one document, and it's a partial draft of a ruling?
A I know that I forwarded to the office in the

00761

IRS more than one document.
Q And your estimation is five?
A A guess, yes.
Q All right. Let's go back. You have this meeting, and there's a reference also I think earlier to a preparation on the prior page, 14.
THE COURT: Are you talking about the conference with Jackal?
MR. AUGHTRY: I'm covering two. On page 15, Your Honor, there's a reference to a conference with Jackal. On page 14 there's a preparation for an April 4, 1995, conference with front office. That's the one that deals with the layout of partnership dealing with 752 basis.
THE WITNESS: I'm sorry. What was your question?
BY MR. AUGHTRY:
Q I'm inviting your attention back to page 14.
A I have it.
Q Are these notes in reverse chronological order? Is that why we have April before January?
A I believe that when I recorded notes on my computer, once the computer age fully started, I did it in reverse chronological order as a matter of habit.

00762

Q You kind of layered on the top?
A Yes.
Q Is that the way?
A Uh-huh.
Q All right. Now, this meeting, the conference of April 4, 1995. To your knowledge, have any documents at all been produced to Plaintiffs relating to that conference?

MR. RAUM: Objection, Your Honor. We're not taking discovery. This is outside the scope of his authorization to testify. He's allowed to testify about the substance of the Helmer/Cram document. That's the authorization he has from the IRS.

If Mr. Aughtry has a question about what's been turned over that's something that we can address afterwards. Obviously it's something that I'm going to have to talk to my senior counsel about because we don't have the answer right now, but it's not something that Mr. Starke is authorized to testify about.

MR. AUGHTRY: Documents have been withheld from the Plaintiffs. We maybe asking for an adverse inference in this case if it's relevant to this case. I think we have a witness here who at least has some knowledge.

The only papers I know of out of the 1,000 lawyers at the IRS with one exception is one piece of paper that we were supplied from Ms. Berman which we've got to work out, but beyond that from who knows when this started, but from at least 1995 through today there are no documents among the 100,000 employees of the IRS or the 1,000 lawyers of the IRS other than this document.

This is the gentleman who gives us the only shot we have at trying to find out what's out there on this point.

MR. RAUM: Your Honor, that's not the problem. This is at base a discovery dispute. His way of finding out about this discovery dispute is to talk to opposing counsel as you do in all discovery disputes.

This witness was not called to the stand nor subpoenaed to talk about this discovery dispute. He was subpoenaed to talk about the Helmer/Cram memo, and that's what his authorization allows him to speak about.

MR. AUGHTRY: And the specific response on the suggestion that we talk with opposing counsel was this gentleman has no other documents save one on his computer. That one document is a partial excerpt of a

ruling.

We now learn for the first time that there may be four or more or less additional documents in a case which goes to our reasonable cause defense that we'd like to find out about. Now, he may well tell us that he's not aware of any other documents, but we're entitled to establish that to his knowledge there are no other documents.

THE COURT: I'm reviewing the authorization. Give me a moment, please.

MR. RAUM: Yes, Your Honor. Thank you.

(Pause.)

THE COURT: The objection is overruled. The solicited testimony is within the scope of the authorization in that he is authorized to testify as to facts that you have personal knowledge of in your official capacity as Senior Attorney, Office of the Associate Chief Counsel, Corporate, related to the so-called Helmer memorandum.

You may proceed.

MR. AUGHTRY: Thank you, Your Honor.

BY MR. AUGHTRY:

Q We're back on page 14. I guess my last question to you, and let's just go through this.

On this preparation for the April 4, 1995,

00765

meeting with the front office are you aware of any documents being produced to Plaintiffs in this case from the IRS Chief Counsel's front office with respect to that conference?

A I don't know.

Q What about from --

A I have no knowledge.

Q Are you aware of the existence? Did you attend that conference?

A I have no recollection of these meetings. My recollection is in these notes. That's all there is.

Q All right. So the sole author of the sole document tells us that there was a meeting with the front office, and you don't know if there were any additional papers drawn by anybody else but the front office?

A No. Don't know.

Q And you can't tell us whether or not Mr. Penico --

A Penico.

Q Excuse me. Have you gotten any documents or seen any documents from Mr. Penico?

A I have not seen any. I do not recall seeing any. Certainly I haven't seen any, you know, this

year.

Q All right. Then we move actually outside the Internal Revenue Service to the Treasury Department, Mr. Rooney.

Are you aware of any documents that Mr. Rooney generated that would be in the possession of either the Internal Revenue Service or the Treasury Department relating to these matters?

A I'm not personally aware of any such documents.

Q All right. Let's flip to page 15 on the documents, and then we'll get into the content a little bit.

On the conference with Mr. Jackal, that is the Financial Instruments & Products and the Passthroughs & Special Industries and the Treasury Department and Branch Chief Crouch on January 19, 1995, what documents are you aware of that have been produced to Plaintiffs from Mr. Jackal that Mr. Jackal may have made and have been produced by the government in this case?

A I don't know what's been produced.

Q All right. Would the same be true with respect to the Division of Financial Instruments & Products, their papers, that division of the Internal

Revenue Service, Chief Counsel's Office, their papers from this meeting and whether or not they've been produced to Plaintiffs in this case?
A I don't know if they had any or if they've been produced.
Q Okay. Would the same also be true with respect to the documents and notes and materials prepared or maintained by the IRS Chief Counsel, Division of Passthroughs & Special Industries Office, with respect to these discussions?
A I don't know what documents there might have been or whether they've been produced.
Q Okay. How about as to the Treasury Department?
A I don't know what documents they might have or whether they've been produced.
Q Are you telling me you have no recollection of this meeting on January 9, 1995?
A I don't know about the phrase I have no personal recollection. I see from these notes that there was a meeting.
Q Have you been criticized in any way for keeping notes?
A No.
Q Okay. And Mr. Crouch? Are you aware of any

documents being produced to Plaintiffs in this case that were created or collected by Mr. Crouch and kept by the Internal Revenue Service?

A I don't know whether he kept any documents.

Q All right. At the conclusion of this meeting there's a series of notes spilling over to page 16. Would you turn with me to that point?

A I'm there.

Q All right. It says, "Talked about a meeting again next week (to try to reach a consensus)."

A I'm sorry. Where are the words "next week"?

Q Just above Conference With Crouch, 1-9-95.

A I see the sentence you're referring to.

Q Okay. On the conference next week, do you have any documents that have been produced to Plaintiffs in this case from the conference that was scheduled to transpire next week?

A I don't really remember the meeting.

Q All right. There's an indication here that you had a conference with Crouch. He was one of the gentlemen listed back on page 15 as being in the conference with Jackal, FI&P, P&SI and Treasury. Is that right?

A I see the words Conference With Crouch, 1-9-95.

Q And from your notes, that would indicate there was a separate meeting with Mr. Crouch?
A It would indicate so.
Q Are you aware of any documents from the separate meeting with Mr. Crouch being produced to Plaintiffs in this case?
A I'm not aware of what was produced.
Q All right. Down below it says Review of P&SI's Briefing Memo For 3-7-95 Meeting With Brown.
A I see that.
Q And Brown would be Stuart Brown?
A I can't think of anybody -- any other Brown that would be related to this.
Q In Atlanta with UPS you have to ask. With Stuart Brown, Chief Counsel of the Internal Revenue Service, there's this briefing memo. Has that briefing memo been produced, to your knowledge, to the Plaintiffs in this case?
A I don't know whether it has or not.
Q Now, under that section if we look down towards the bottom it's got a section Treatment of Other Arrangements, Options. Do you see that?
A I see that.
Q From your notes relating to the review of the briefing memo you say, "Existing authority is

00770

contrary to a position that options create liabilities."
A I see that.
Q Then it cites Helmer.
A I see that.
Q "Helmer held that no partnership liability is created upon receipt of option payments by a partnership; payments received were without restrictions except that upon exercise of the option the amounts would be applied against the purchase price."
A I see that.
Q And then the next quote is, "While we agree that existing authority prevents treating options as creating liabilities in the proposed revenue Ruling..." and you continue on.
A I see that.
Q Are you aware that Mr. Bricker in this case rendered an opinion to Mr. Ervin relying upon these same authorities and drawing the same conclusion that existing authority is contrary to the position that options create liabilities?
A I don't know Mr. Bricker or Mr. Ervin.
Q This handsome young man over here is Mr. Ervin. Mr. Bricker is excluded from the courtroom.

00771

Are you aware that the Internal Revenue Service is asserting $4 million of penalties against Mr. Ervin for relying upon the same position that is stated here on page 16 of your memo?

A No, I'm not aware of that.

Q That would be unreasonable in your view, wouldn't it?

A Sorry?

Q That would be unreasonable in your view?

MR. RAUM: Objection, Your Honor.

MR. AUGHTRY: I'll rephrase.

BY MR. AUGHTRY:

Q Do you believe it was reasonable for you to say when you said at the bottom of page 16, "Existing authority is contrary to the position that options create liabilities," and then cite Helmer? Is that a reasonable thing for you to do?

MR. RAUM: Objection, Your Honor. He's asking the witness to testify as to a matter of law.

MR. AUGHTRY: The reasonableness of his conduct.

THE COURT: He wrote it. Overruled.

THE WITNESS: I'm sorry. I'm sorry. Where are you again?

BY MR. AUGHTRY:

Q There are two sections down at the bottom of page 16.
A Uh-huh.
Q My point is you'll see the first section is where you write, "Existing authority is contrary to a position that options create liabilities."
A I see that.
Q Looking at your notes, is there any reason that you can think of that you would have deliberately written a falsehood here?
A I think what I did was just probably lift language out of the briefing memo.
Q All right. Out of the briefing memo that has not been produced to us?
A I don't know whether it has or not.
Q All right. And so you're lifting language out of a briefing memo for a March 7, 1995, meeting with IRS Chief Counsel Stuart Brown, correct?
A Wait a minute. If I understood what you said, I think that's probably a little mixed up. I suspect that P&SI gave Stuart Brown a briefing memo.
Q I see. The Passthroughs & Special Industries Division of the IRS Chief Counsel gave a memo to their boss. Stuart Brown would be their boss, right?

A P&SI would have answered to Mr. Brown.
Q In the IRS Chief Counsel's Office there's no one higher than Mr. Brown at this stage?
A I guess that's true.
Q Okay. So they're preparing a briefing memo for Mr. Brown for a March 7, 1995, meeting?
A I think that's what this is saying.
Q And you believe that these quotes are taken from the briefing memo prepared for IRS Chief Counsel, Mr. Brown?
A I think so.
Q And when you lift this from the briefing memorandum and say, "Existing authority is contrary to a position that options create liabilities," do you see anywhere in here were you say that's not true or there was any suggestion in the briefing memo saying that that principle, that proposition, is not true?
A I'll have to read it.
Q Please.
A Tell me how much I should read, would you?
Q Just down to the bottom. Well, as much as you want, but certainly I would go through those two sections under Options.
A Okay. So I'll answer your question with respect to the two paragraphs under Options.

Q Yes, sir. I'm trying to direct my questions to that.
A Okay.
(Pause.)
A Repeat your question, please.
Q All right. It's been some time. Let me ask you again, please.
My point was do you see anything in this discussion that indicates that this quote, "Existing authority is contrary to a position that options create liabilities," was set forth as a falsehood or inaccuracy, or was it set forth as an accurate statement?
(Pause.)
A Sorry. One more time.
Q This statement, "Existing authority is contrary to a position that options create liabilities. Helmer held that no partnership liability is created upon receipt of option payments by a partnership." That statement.
A Uh-huh.
Q From your presentation in your notes, do you glean that that statement is presented as something that you believed to be an accurate description, or was it presented as setting this up and it's clearly

00775

wrong, here's how stupid it is, and no reasonable person could believe it?
A I think I would agree with the former.
Q All right. That it's an accurate statement?
A I don't see anything in here that disputes what is said in the two sentences.
Q In fact, the following subparagraph is consistent. It says, "While we agree that existing authority prevents treating options as creating liabilities..."
A That seems consistent.
Q And that's consistent with the statements made on the prior page in your notes, isn't it, going back to the January 9, 1995, conference with Mr. Jackal, the IRS Chief Counsel, Division of Financial Instruments & Products, the IRS Passthroughs & Special Industries, the Treasury Department through whatever representative was there and Mr. Crouch?
A Can you point to something specific in that?
Q Well, I'll tell you. Let's just start at the top of the page. You note Questions I Might Be Asked. "Significance of partnership case Helmer (probably find significance below)." Do you see that?
A Uh-huh.
Q All right. So you're talking about Helmer,

00776

and you work down through here. Let's see. You cite Conference With Crouch on 1-9-95 at the top of that page. Is that a different conference with Crouch than we talked about on page 16?
A I don't know.
Q All right. RR is revenue ruling, isn't it?
A Yes.
Q "Revenue Ruling 95-8 just issued by EBEO." That's the Employee Benefits & Exempt Organizations Division of the Internal Revenue Service?
A I believe so.
Q "Income from a short sale is not UBTI. (I reviewed it.)" I would be you, right?
A Yes, I think so.
Q "It cites a Supreme Court case under Section 163 that the obligation to replace stock borrowed in a short sale is not an 'indebtedness'."
A I see that.
Q That's the Deputy v. du Pont case, isn't it?
A I believe so.
Q "The UBTI rules require indebtedness, so there is not UBTI."
Then you refer to, "Mr. Brown has asked Corporate how short sales would be treated under the liability rules under 351 and 357," right?

A I see that.
Q Now we come into the conference with Mr. Jackal, right?
A Yes.
Q Let's see. Here we go. "Brown mentioned uncovered options." Do you see that section?
A Not underlined, just the first sentence of a paragraph?
Q Yes. It's about eight lines down.
A I see that.
Q "Brown mentioned uncovered options. How would one be handled? Would the problem ever arise without a deep-in-the-money option? A '75 ('78?) case. People formed a partnership. The partnership got $1t..." You're going down through here, and it goes, "Case apparently called Helmer," right?
A I see that.
Q You were citing Helmer, and then there's a debate over whether or not to treat short sales and options as a liability, right? "Rely on Helmer using short sale, if not use option."
A Just let me read that, please.
(Pause.)
Q Let me see if I can help you out and speed this along. We're going beyond the hour.

00778

A All right.
Q "FI&P might say all options are obligations (liabilities)." Do you see that statement in your notes?
A Yes.
Q It mentions a regulation. "Get feeling quite important here. FI&P apparently says every option, whether deep-in-money or not, is a Section 752 obligation (liability?). Others apparently disagree."
A I see that.
Q "That is apparently at odds with Helmer." It goes on down and discusses a series of other circumstances dealing with Helmer there and on the next page, right?
A I see Helmer mentioned again down near the bottom twice.
Q All right. Let's move back up about six lines down from Conference With Jackal where it says, "Brown suggested writing a regulation to cover all these questions."
A I see that.
Q And down below under that, "FI&P might say all options obligations," and then there's the note we just hit. "Others apparently disagree. (That is apparently at odds with Helmer.)"

00779

It continues on. "Hence they are talking about maybe doing this as a regulation (overruling a case) rather than just a revenue ruling (or something)."

A Sir, you're getting ahead of me.
Q I'm sorry. Let's do that again.
A Okay
Q "FI&P might say all options obligations." Then we jump down halfway into that paragraph where it says, "Others apparently disagree. (That is apparently at odds with Helmer.)" Are you with me?
A Yes, but let me read the first part of the paragraph.
Q All right.
(Pause.)
A Okay. Go ahead.
Q Then it says, "Hence they are talking about maybe doing this as a regulation (overruling a case) rather than just a revenue ruling..."
A I see that.
Q These are your notes from this meeting?
A My writing down what other people said. Yes.
Q Okay. Consistent with the earlier reference that, "Brown suggested writing a regulation..."?

00780

A I would say so.
Q And then back on the following page, page 16, do you see where that first paragraph starts, "FI&P willing put out short sale ruling and say nothing about options."
A I see that.
Q And then down towards the end of that paragraph there's a discussion, "Treasury (apparently) opposes leaving it open with possibly one rule for short sales, but latitude for taxpayers regarding options."
A I see that.
Q "(Does not think can do same for options in a revenue ruling. Need regulation to overrule Helmer.)"
A I see that.
Q In 1995, was there a regulation adopted overruling Helmer, to your knowledge?
A I don't have any idea.
Q In 1996? Are you aware of any regulation overruling Helmer in 1996 adopted by the Internal Revenue Service?
A I have no idea.
Q 1997? Any regulation adopted in 1997 overruling Helmer?

00781

A I have no idea.
Q 1998?
A Same.
Q And 1999 when this gentlemen went out and relied upon advice that Helmer was right? Any regulation in 1999 overruling Helmer?
A I have no idea.
Q 2000?
A No idea.
Q 2001?
A I have no idea.
Q 2002?
A No idea.
Q At any point prior to June 23, 2003, are you aware of the IRS adopting a regulation overruling Helmer?
A I have no idea.
Q And do you know why -- well, if you're not aware I guess it would be difficult for you to know why the IRS did not adopt a regulation overruling Helmer. Is that right?
A Sorry. Say that again.
Q If you don't know if there is a regulation overruling Helmer in either 1995, 1996, 1997, 1998, 1999, all the way to 2003, it would be hard for you to

00782
say why the IRS chose not to adopt a regulation,
wouldn't it?
A I think that's true.
Q All right. Let's look down at the bottom of
page 15.
A Fifteen?
Q Yes, sir. It's not stated in very
flattering terms, but the IRS says, and you're talking
about Brown's feeling. That would be Stuart Brown,
the IRS Chief Counsel.
A Are you at the very bottom?
Q Yes, sir, regarding do you see where it
says, "Re Helmer, et cetera."?
A Yes.
Q "If we had to choose one poison or another,
he tended...", he being Brown." Check to make sure
that we're talking about he being Brown, please, sir.
A I'm sorry. Your question again?
Q When we say, "Re Helmer, et cetera. If we
had to choose one poison or another, he...", meaning
IRS Chief Counsel Stuart Brown, head of 1,000 lawyers
at the Internal Revenue Service, "...tended agree with
Helmer," correct?
A His is the only name that appears.
Q "(A position IRS perhaps needs.)"

A I see that.

MR. AUGHTRY: No further questions of this witness at this time, Your Honor.

THE COURT: Cross-examination?

MR. HICKS: I'll try to keep it really brief, Your Honor.

CROSS-EXAMINATION

BY MR. HICKS:

Q Mr. Starke?

A Hi.

Q You wrote these notes about how long ago?

A It must have been in either 1994 or 1995?

A About 10 years?

A Yes.

Q If I could have you look at page 15? The entry says Conference With Jackal, FI&P, P&SI.

A I see it.

Q You wrote, "(These are very loose notes. I was not sure who represented who and heard a lot of vaguely reminiscent partnership tax law.)"

A I see that.

Q Did you write that?

A I must have. These are my notes.

Q But you don't remember because it was 10 years ago?

00784

A That certainly sounds like an accurate characterization of my knowledge of partnership law.
Q You didn't have a good knowledge of partnership law at the time?
A No. That would have been 1994-1995. I got a degree in Tax Law in the early 1980s. I worked in private practice and did a little partnership stuff in Richmond, but it did not deal with any questions, for instance, of whether an option is a liability, and at the IRS all I've done is corporate taxation so I did not have much knowledge of partnership tax law.
Q Okay. Your knowledge is of the corporate field of tax? Isn't that right?
A Yes.
Q I guess I only have one more question, Mr. Starke. Is it true that you really only know one Jackal?
A As far as I know.
MR. HICKS: Thank you, Your Honor. That's all.
THE WITNESS: Thanks.
MR. AUGHTRY: Plaintiffs offer Plaintiffs' Exhibit 201 into evidence.
We have no further questions of this gentleman, and as far as we're concerned he may be

released.

At an appropriate time I'd like to talk to the Court about the missing documents.

THE COURT: 201? Any objection?

MR. HICKS: None other than the one we've already given, Your Honor. Thank you.

THE COURT: Overruled. 201 is admitted.

(The document referred to, previously identified as Plaintiffs' Exhibit No. 201, was received in evidence.)

THE COURT: Thank you, Mr. Starke. You may step down.

(Witness excused.)

THE COURT: Mr. Aughtry, if you have a witness that has to go we'll go. That's fine. I mean, we'll hear it. Is somebody leaving town?

MR. AUGHTRY: May I consult with my partner for a moment?

THE COURT: Certainly. We're off the record.

(Discussion held off the record.)

THE COURT: Back on the record.

Defendant has offered the authorization for Mr. Starke's testimony as Exhibit 761. There being no

objection, 761 is admitted.

(The document referred to was marked for identification as Defendant's Exhibit No. 761 and was received in evidence.)

THE COURT: Back off the record.

(Whereupon, a short recess was taken.)

THE COURT: On the record.

MR. AUGHTRY: Thank you, Your Honor.

As you know, we obtained the Helmer/Cram memo not through discovery in this case, but because it was produced in another case. There were 10,000 pages withheld from us. We've had great difficulty in getting documents.

We've just had a witness who has informed us that the exact opposite of what we were told -- what we were told was after a conference call with you, we took a partial deposition of Mr. Starke, and we had basically cut it, with the remainder to be deferred based upon whatever other documents he was going to go find and produce.

Then we received a call from Mr. Bassin who said, look, there is only one document. It's a partial draft of a revenue ruling. And I said, well,

you know, I don't need a partial draft of a revenue ruling.

I hear for the first time now there are five other documents in a context that is -- forgive me -- from our perspective suspect.

We've got 10 years of work by the IRS -- well, eight years, between 2003 and 1995. I've got the one document that we obtained through the graces of your office from, I believe, Mary Berman, a one-page document I'm trying to get a stipulation to so I don't have to bring Ms. Berman down here.

Between those two, that one page and the Helmer/Cram document, no other documents in the world from any of these meetings from all these divisions of the Internal Revenue Service and the Treasury Department.

We are entitled to them, and I think we may be entitled to an adverse inference. We will argue that at the appropriate time, but I would like to get the documents.

MR. RAUM: Your Honor, we're obviously reluctant to reach a final conclusion on this without Mr. Bassin here.

We did, however, look at the transcript from the pretrial conference, in which Mr. Bassin explained

to the Court that after Mr. Starke got the document we reviewed them pursuant to the Court and the stipulation of the parties and the stipulation looking for the word Helmer.

That cull produced the document which is the one Mr. Aughtry referred to. That's the way I understand of the representation Mr. Bassin made at the pretrial.

MR. AUGHTRY: The Helmer was an over- mistakenly gracious narrowing of the 10,000 pages. The Helmer restriction was not a narrowing of the document in the hand of the sole author of any document relating to Helmer, the Helmer/Cram memo. We wanted -- we asked for all of his documents, and all we get back is a response that there is nothing there of utility to you. It's a partial draft. I think we are entitled to all of them.

THE COURT: As I recall, your stipulation dealt with only the universe of documents I was given to look at in camera.

MR. AUGHTRY: That's correct.

THE COURT: These five documents would not have been part of that universe so the stipulation does not apply to them.

MR. RAUM: We will go back. We will look at

the documents again. Certainly, I imagine we're going to want to assert -- we may well want to assert privilege about them. We may well want to give them to the Court again for another -- if we can get a stipulation to have the Court review them for executive privilege.

But this is coming up for the first time that I know about at 6:25 without senior counsel here and I'm reluctant to reach any final conclusions now.

THE COURT: All right. Subject to some really persuasive arguments by Mr. Bassin, I want those documents in this courtroom on Monday morning.

MR. RAUM: Yes, Your Honor.

THE COURT: I will allow him to raise additional arguments tomorrow when he is here, in fairness. But that's my initial instinct. So you can get the balls rolling, and if you have to stop them later, fine.

MR. RAUM: We will certainly do so.

THE COURT: Okay.

MR. AUGHTRY: One other point. We would like rather than trying to hunt down Ms. Berman, the document that you reviewed was given to us like --

THE COURT: I know.

MR. AUGHTRY: There was a delay. And I

don't want to go put Mr. Ervin to the expense of flying Ms. Berman down here to say yes, and it looks to me like a partial document. But there is one page and it basically says the same thing we have heard here about Helmer and options.

I just would like to stipulate to that document, and I would like to work something out, and I don't know whether or not the Defendant is prepared to agree to stipulate to that document and allow it to go into evidence, or if we need to call this witness.

THE COURT: You have a description of the document in the declaration of Margo Stevens submitted in the merit litigation.

MR. AUGHTRY: Certainly.

THE COURT: Doesn't that cover it?

MR. AUGHTRY: To authenticate it?

THE COURT: Well, to describe it. I know it was a detailed description because I quoted it in one of my opinions, didn't I?

MR. AUGHTRY: It's a detailed description, and I now have the document. I would like to put the document into evidence.

THE COURT: Right.

MR. AUGHTRY: And I may be missing something here. I either need the witness or a stipulation as

to its authenticity. Maybe the affidavit is sufficient. We could put Ms. Stevens' affidavit in or stipulate that it's authentic, and in that fashion --

THE COURT: She testified under oath as to what it was. I mean, I don't know if that's going to be considered an admission.

MR. RAUM: I don't think we're going to have a problem working this out. We need to talk about it, and I imagine we can work this out.

Obviously, we're going to have, as we have all along, objections to relevance, but I don't think we will have an authenticity objection.

MR. AUGHTRY: We will cure that. We will speak afterwards.

THE COURT: Okay. For ease of reference, I notice there was some confusion about what this document is. It was referenced in a footnote in, I believe, my most recent decision.

MR. AUGHTRY: Sure.

THE COURT: On the 1006 issue.

MR. AUGHTRY: That's right.

THE COURT: Fair enough.

MR. RAUM: And that's when we produced, and we have --

MR. AUGHTRY: I just got it a week or two

00792

ago, a one page. We just want it in.

THE COURT: Okay. Anything further that we can do tonight?

MR. AUGHTRY: That's it. That's a brave offer.

No, Your Honor, not a thing.

THE COURT: We stand adjourned for the evening.

(Whereupon, at 6:30 p.m., the hearing in the above-entitled matter was recessed, to resume at 8:00 a.m. on Friday, September 9, 2005.)

//
//
//
//
//
//
//
//
//
//
//
//
//
//

00793

REPORTER'S CERTIFICATE

DOCKET NO.: 03-2164T

CASE TITLE: Jade Trading v. United States

HEARING DATE: September 8, 2005

LOCATION: Atlanta, Georgia

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: September 8, 2005

Raymond M. Vetter
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018

</Transcript>
</TRN>