IN THE UNITED STATES COURT OF FEDERAL CLAIMS

JADE TRADING, LLC, by and through ROBERT W. ERVIN AND LAURA KAVANAUGH ERVIN on behalf of ERVIN CAPITAL, LLC, Partners Other Than the Tax Matters Partner,

Plaintiffs,

v. — Docket No.: 03-2164T

UNITED STATES,

Defendant.

Courtroom 2306
Russell Federal Building
75 Spring Street, N.W.
Atlanta, Georgia
Friday,
September 9, 2005

The parties met, pursuant to adjournment, at 8:14 a.m.

BEFORE: HONORABLE MARY ELLEN COSTER WILLIAMS

Judge

APPEARANCES:

For the Plaintiffs:

DAVID D. AUGHTRY, Esquire

LINDA S. PAINE, Esquire

NICOLAS F. KORY, Esquire

Chamberlain, Hrdlicka, White, Williams & Martin

191 Peachtree Street, N.E., 9th Floor

Atlanta, Georgia 30303-1747

(404) 659-1401

APPEARANCES: (Continued)
For the Defendant:
STUART J. BASSIN, Esquire
MATTHEW C. HICKS, Esquire
MICHAEL S. RAUM, Esquire
JENNIFER P. WILSON, Esquire
U.S. Department of Justice
Tax Division
P.O. Box 55
Washington, D.C. 20044
(202) 307-6542



CONTENTS


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Plaintiff: | | | | | |
| Abraham Pfeiffer | 805 | 847 | 859 | 879 | -- |
| | 874 | | | | |
| | 881 | | | | |
| Jeffrey Frankel | 884 | 905 | -- | -- | -- |
| William L. Bricker, Jr. | 909 | 950 | 1020 | 1034 | -- |




EXHIBITS

PLAINTIFF'S


| EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| 280 | 904 | 904 | Expert Report of Jeffrey Frankel |




EXHIBITS

DEFENDANT'S


| EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| 525 | 965 | -- | 9-8-00 letter from Bricker to Dudzinsky |
| 526 | 990 | 992 | 7-26-99 bill by Curtis Mallet |
| 528 | 993 | 994 | 1-8-02 memo from Bricker to Lynch |
| 529 | 973 | -- | Stipulation and Curtis Mallet cash receipt info |
| 551 | 983 | -- | 4-15-99 memo from Bee to Bricker |
| 556 | 983 | -- | Draft consulting agreement with New Vista |
| 559 | 983 | 990 | E-mail from Conjeevaram to Bee |
| 563 | 983 | -- | Draft Master Trading Agreement, 7-99 |
| 700 | 997 | 1001 | Assignment and Assumption Agreement |
| 701 | 1000 | 1001 | Aventuri Trading, AIG |

PROCEEDINGS

(8:14 a.m.)

THE COURT: Let's go on the record.

Mr. Bassin.

MR. BASSIN: Your Honor, thank you for your consideration yesterday.

THE COURT: You're welcome. I hope you're feeling better.

MR. BASSIN: It's getting better.

I understand that there were two procedural things that came up yesterday in my absence; one relating to documents from Mr. Starke's computer. And I have here a copy of a letter that we sent to Mr. Aughtry on August 2nd, and I would like to provide a copy to the Court.

THE COURT: Very well.

MR. BASSIN: It's paragraph 1 that matters. This is our response to Mr. Aughtry's inquiry regarding documents on Mr. Starke's computer, and we've said, "With one exception, we have determined that all files on Mr. Starke's computer were included in the Rev. Ruling 95-45 file and either produced or subject to a privilege claim in Mariott."

There was one exception. It's a one-page document. Mr. Aughtry and I have discussed it. It's



about eight lines of a draft of the proposed revenue ruling.

I asked him if he wanted us to go all the way and get the privilege declaration for that. That hasn't been pursued.

We have people back in Washington today confirming the accuracy of that letter, but we were pretty careful back then.

THE COURT: The question I would have was were the document requests made during the deposition the same as those requests that were made in Court yesterday?

MR. BASSIN: That is --

MR. AUGHTRY: We asked for all of the documents this gentleman had relating to this matter, relating to our inquiry here, and relating to his work associated with what we have referred to as the Helmer/Cram memo. We now understand there are five documents rather than the one that we were told.

MR. BASSIN: That isn't what we were -- excuse me. His only involvement in anything related to the Helmer issue was in the context of working on Revenue Ruling 95-45, and what we had -- what he did was he went back to his computer and dug up his computer files on the Revenue Ruling 95-45 subject.



He found a half a dozen documents. Those were copied. They were checked. Only one of them was something different than what had already been either produced or a privilege claim had been asserted.

MR. AUGHTRY: I'm confused.

MR. BASSIN: That's what our letter said.

MR. AUGHTRY: We meet with the witness. We depose the witness. He says he has not checked his computer yet for whatever files and documents he may have. We suspend the deposition, ask him to go back and check and see what he has got on his computer.

We are told that there is only one document relating to a draft of a ruling, about which we don't have a great deal of interest, and a telephone conversation with counsel for Defendant.

We learn yesterday that there are five, maybe a half dozen documents, and somehow they were found long before the deposition and included in the file and produced as part of the executive privilege claim. I don't see how that's possible.

MR. BASSIN: But that's not correct.

THE COURT: I don't think that's what the witness said. I think the witness said he just put them on a disk and turned them over.

MR. BASSIN: Right.



MR. AUGHTRY: But he did it after the deposition.

THE COURT: Correct.

MR. AUGHTRY: Right.

MR. BASSIN: And there were a significant number of them which were duplicates. My understanding, and we will confirm that today, is that there were a significant number of them were duplicates of what was in the hard paper file which had already been reviewed, produced, and privilege had been asserted on, with the one exception. That's what the letter says.

THE COURT: We need a list of the document.

MR. BASSIN: Okay. And if need be, we can bring someone --

THE COURT: Title, date author.

MR. BASSIN: -- down early next week.

MR. AUGHTRY: That would be fine.

THE COURT: Does that satisfy you?

MR. AUGHTRY: That would be fine, Your Honor.

MR. BASSIN: Okay. Your Honor, there was a second matter that came up, I understand, regarding a Mary Berman.

THE COURT: Right.

MR. BASSIN: Okay. I have discussed this with Mr. Aughtry on several occasions. There is a document that she apparently authored. It's authentic. It's as irrelevant as everything else, but it's authentic, and that --

THE COURT: Very well.

MR. BASSIN: -- had not been an -- I didn't know that was an issue.

MR. AUGHTRY: Here, if it's authentic, and I assume it can then go into evidence. It appears to be a one-page excerpt. There is no indication as to the date, and there is a reference to TL something 93. If we could ask Defendant to confirm this '93 document, we will stipulate it, put it in. Ms. Berman, who is an employee of the Internal Revenue Service at the time, that will be done.

MR. BASSIN: She was an employee of the Internal Revenue Service at the time.

MR. AUGHTRY: We'll stipulate to her position and to the extent the Defendant can tell us the date, the document will go in, and we will be done with that.

MR. BASSIN: Okay, thank you.

THE COURT: That disposes of that, and you'll mark it as appropriate at the time.



MR. AUGHTRY: Yes, Your Honor.

THE COURT: Any other preliminary matters?

MR. BASSIN: Your Honor, of course, we are reserving the right to argue on brief that it's irrelevant and it's meaningless.

THE COURT: Right. Well, it hasn't been admitted yet.

MR. BASSIN: Okay.

THE COURT: He's going to offer it.

MR. AUGHTRY: Right. Nothing preliminary for the Plaintiffs. If the Defendant has nothing else, we would like to proceed with our next witness.

THE COURT: You may.

MR. AUGHTRY: Thank you, Your Honor.

Plaintiffs take pleasure in calling Mr. Abraham Pfeiffer to the stand.

Whereupon,

ABRAHAM PFEIFFER

having been duly sworn, was called as a witness, and was examined and testified as follows:

THE COURT: Be seated. Make yourself comfortable.

THE WITNESS: Thank you.

//

//



DIRECT EXAMINATION

BY MR. AUGHTRY:

Q Mr. Pfeiffer, what do you do for a living today?

A I run the back office at an investment manager funds.

Q How long have you been associated with investment management?

A Since 1997.

Q And before that, how were you employed?

A I was employed at Goldman Sachs as a -- actually as a computer programmer for a number of systems, but it started with the portfolio management system.

Q And then what else did you do at Goldman Sachs?

A Eventually that involved into --

Q Share those to Judge Williams, please.

A Oh, I'm sorry. I'm sorry.

THE COURT: That's okay.

THE WITNESS: The microphone is on this side.

After the portfolio management system, it eventually evolved into performance management system, which measures the performance of clients' portfolios



using various methodologies.

Eventually after that the final project or system that I was responsible for was the prime brokerage system, which is a method of settling -- a system which settles trades for clients. Typically, clients have multiple brokerage accounts. They trade with multiple brokers.

And there is a concept called the prime broker, which provides for all trades that a person or a fund or an entity does to settle in one place, so it has all the reporting in one place, all the cash in one place. They settle all the trades for the client, and that was my final project.

BY MR. AUGHTRY:

Q And when you -- you left Goldman, you said, in 1997?

A Yes.

Q And where did you go at that stage?

A I left to found, to open up Sentinel Advisors in March of 1997.

Q With whom?

A With Ari Bergmann.

Q And how did you know Mr. Bergmann?

A We're neighbors.

Q All right.