**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STOBIE CREEK INVESTMENTS, LLC, JFW ENTERPRISES, INC., Tax Matters and Notice Partner,** | ) | |
| **Plaintiff,** | ) | **No. 05-748 T** |
| | ) | **(Judge Block)** |
| **v.** | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**THE UNITED STATES' MOTION FOR LEAVE TO ENLARGE THE NUMBER OF ALLOWABLE FACT DISCOVERY DEPOSITIONS AND EXTEND THE DISCOVERY SCHEDULE**

EILEEN J. O'CONNOR
Assistant Attorney General

DAVID GUSTAFSON
Chief, Court of Federal Claims Section

STUART D. GIBSON
Senior Litigation Counsel
U.S. Department of Justice
Tax Division, Office of Civil Litigation
Post Office Box 403
Ben Franklin Station
Washington D.C. 20044
(202) 307-6586 (Phone)
(202) 307-2504 (Fax)

CORY A. JOHNSON
Trial Attorney, Court of Federal
Claims Section

# TABLE OF CONTENTS

Page(s):

Introduction. . . . . . . . . . 1

Background. . . . . . . . . . 2

I. The Son of Boss Transaction and Plaintiff's Claimed Tax Benefits. . . . . . . . . . 2

II. The Discovery Completed to Date.. . . . . . . . . . 4

Argument. . . . . . . . . . 6

I. The Presumptive Limit of Ten Depositions in RCFC 30. . . . . . . . . . 6

II. The Requirements of RCFC 26(b)(2) Are Satisfied Here. . . . . . . . . . 8

A. The Testimony the United States Seeks Is Not Unreasonably Cumulative or Duplicative, or Obtainable from Another Source. . . . . . . . . . 8

B. The United States Has Not Yet Had an Opportunity to Discover the Information Sought.. . . . . . . . . . 11

C. The Importance of the Issues, Needs of this Case, the Amount in Controversy and the Importance of the Discovery Outweigh Any Possible Burden. . . . . . . . . . 13

III. The Discovery Schedule Should Be Extended.. . . . . . . . . . 14

Conclusion. . . . . . . . . . 15

# TABLE OF AUTHORITIES

Page(s):

## CASES

American Electric Power Co. v. United States, 191 F.R.D. 132 (S.D. Oh. 1999). . . . . . . . . . . . 10

Brannen v. Commissioner, 78 T.C. 471 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Brown v. Commissioner, 85 T.C. 968 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Commissioner v. Clark, 489 U.S. 726 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Coltec Industries Inc. v. United States, 454 F.3d 1340 (Fed. Cir. 2006). . . . . . . . . . . . . . . . . . . . 8

Douglas v. United States, 410 F. Supp. 2d 292 (S.D. N.Y 2006)... . . . . . . . . . . . . . . . . . . . . . . 10

Gregory v. Helvering, 293 U.S. 465 (1935).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Hansen v. United States, 229 Ct.Cl. 660 (Ct.Cl. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Jade Trading LLC v. United States, 65 Fed. Cl. 188 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Karme v. Commissioner, 673 F.2d 1062 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

King Enterprises, Inc. v. United States, 418 F.2d 511 (Ct. Cl. 1969). . . . . . . . . . . . . . . . . . . . . . 9

Klamath Strategic Investment Fund, LLC v. United States,
__ F. Supp. 2d __, 2007 WL 283790 (E.D. Tex., 1/31/07). . . . . . . . . . . . . . . . . . . . . . . . . . 10

Sochin v. Commissioner, 843 F.2d 351 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

TIFD III-E v. United States, 459 F.3d 220 (2nd Cir. 1006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

The Falconwood Corporation v. United States, 422 F.3d 1339 (Fed. Cir. 2005). . . . . . . . . . . . . 9

United States v. Jenkens & Gilchrist, 2005 WL 1300768 (N.D. Ill. 2005). . . . . . . . . . . . . . . . . . 2

Page(s):

STATUTES & REGULATIONS

IRS Notice 2000-44, 2000-2 C.B. 255.. . . . . . . . . 3, 13
IRS Notice 2000-46, 2002-2 C.B. 265.. . . . . . . . . 13

Tres. Reg. (26 C.F.R.)

§ 1.6011-4T(b)(2). . . . . . . . . . 13
§ 301.6111-2T(b)(2). . . . . . . . . . 13

LEGISLATIVE MATERIAL

S.Rep. No. 109-54 (2005). . . . . . . . . . 7

MISCELLANEOUS

Rules of the Court of Federal Claims

R. 16.. . . . . . . . . . 11, 15
R. 26.. . . . . . . . . . 4, 6, 8, 11
R. 30(a)(2)(A) . . . . . . . . . . 2, 4, 6

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STOBIE CREEK INVESTMENTS, LLC, JFW ENTERPRISES, INC., Tax Matters and Notice Partner,** | ) | |
| **Plaintiff,** | ) | **No. 05-748 T** |
| | ) | **(Judge Christine O. C. Miller)** |
| **v.** | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**THE UNITED STATES' MOTION FOR LEAVE TO ENLARGE THE NUMBER OF ALLOWABLE FACT DISCOVERY DEPOSITIONS AND EXTEND THE DISCOVERY SCHEDULE**

**Introduction**

This case concerns a tax shelter – i.e., a "Son of Boss" shelter – developed, designed and promoted by Deutsche Bank A.G. and the law firm Jenkens & Gilchrist in 1999 and 2000. Plaintiff and members of the Welles family purchased and implemented this shelter, at a cost of over $8 million, and are now claiming in this case that the shelter allows them to avoid paying tax on $200 million of capital gains that they earned in the year 2000.

In order to defend plaintiff's claims, and develop a record of admissible evidence to prove that plaintiff is not entitled to the enormous artificial tax benefits it seeks, the United States needs to obtain discovery from the various firms and numerous individuals who developed the shelter and designed, developed, promoted, and participated in the transactions upon which plaintiff relies. For example, the United States must be given the opportunity to discover evidence to show

that the transactions plaintiff engaged in were not, as plaintiff alleges, a"unique" investment strategy, with economic substance and a business purpose, but were, instead, undertaken pursuant to a prepackaged, integrated tax shelter strategy, wholly lacking in economic substance. Because of the number of individuals who were *directly* involved in designing and developing the tax shelter and who *directly* participated in the transactions at issue here, the United States cannot obtain this necessary discovery within the presumptive ten deposition limit of RCFC 30(a)(2)(A). Accordingly, the United States requests that the Court issue an order allowing it to take an additional 30 depositions.

## Background

### I. THE SON OF BOSS TRANSACTION AND PLAINTIFF'S CLAIMED TAX BENEFITS

______In late 1999, the Welles knew that fully half the stock they owned in the family business, Therma-Tru Corporation, was going to be redeemed by the company. They faced, therefore, the prospect of paying tax on over $200 million dollars of capital gains that they would realize upon redemption. Instead of paying the applicable tax on their profits, however, the Welleses purchased and implemented a "proprietary" tax shelter designed and promoted by Jenkens & Gilchrist and Deutsche Bank. (See Exhibit A, ¶¶ 7 - 8, Affidavit of David Waterman; and Exhibit B, the confidentiality agreement signed by Jeff Welles before the shelter was disclosed to him.)[1]

[1] In the confidentiality agreement, Jenkens disclaims any fiduciary relationship with the Welleses. See Exhibit B. In 2002, the IRS issued summonses to Jenkens to discover information about the tax shelters it was promoting and to learn the identities of the taxpayers who purchased them. The Welleses intervened in the summons case. The court relied, in part, on the confidentiality agreement and found that the Welleses did not have an attorney-client relationship with Jenkens. *See United States v. Jenkens & Gilchrist*, 2005 WL 1300768 (N.D. Ill. 2005).

The shelter purchased by the Welleses involved a number of preplanned paper transactions that seem designed to unnecessarily complicate and obfuscate the underlying facts, including (i) the simultaneous creation of individual limited liability companies and subchapter S corporations for each Welles family member; (ii) the acquisition of interests in Stobie Creek Investments LLC by each of the limited liability companies, and almost immediate transfer of the interests to the subchapter S corporations; (iii) the contribution of the Therma-Tru stock to Stobie Creek in anticipation of its redemption; (iv) the purported purchase and sale of paired, offsetting "digital options" by each Welles limited liability company, with Deutsche Bank as the counter-party, at an out-of-pocket cost of $2 million; and (v) the contribution of those "options" to Stobie Creek. As a result of these alleged transactions – mostly between the Welleses own, wholly owned entities – they claim that the tax law allows them to *increase the tax basis of the Therma-Tru stock by $200 million,* and, thereby, almost completely eliminate the capital gains they would have realized, and paid tax on, in 2000. Of course, there was no expenditure of $200 million by the Welleses that would justify this basis increase.[2]

To support the artificial $200 million basis increase, plaintiff and the Welleses have made several factual claims, both in the Complaint and during discovery in this case, including the following:

---

[2] The IRS designated this Son of BOSS tax shelter an abusive tax shelter and a "listed transaction" in Notice 2000-44. "BOSS" is an acronym for "Basis Option Shifting Strategy," and encompasses a variety of techniques designed to either create artificially high basis or artificially high losses.

- the transactions they engaged in were not part of a plan, and cannot therefore be integrated under the step transaction doctrine;
- every one of the transactions they engaged in had a business purpose and economic substance;
- they entered into the transactions in order to earn a profit, and not for tax reasons;
- there was a reasonable probability of earning a profit on the transactions;
- they purchased separate "long" and "short" Deutsche Bank foreign currency "options."

For purposes of testing these factual allegations, plaintiff would evidently like to limit the United States' scope of discovery to only deposing witnesses it has identified as having information helpful to it, and to reviewing the documents plaintiff created to "paper" the shelter.[3] The United States' discovery is not so limited under RCFC 26. To the contrary, the United States is entitled to seek information and evidence from plaintiff and the third-parties that *directly* participated in developing and executing the transactions, and who have *personal knowledge* of the facts at issue.

## II. <u>THE DISCOVERY COMPLETED TO DATE</u>

The substantial document discovery completed to date has disclosed numerous individuals, including many employed, or formerly employed, by Jenkens, Deutsche Bank, and

---

[3] Plaintiff has refused to agree that the United States can take more than the ten depositions provided for in the presumptive rule of RCFC 30(a)(2)(A). In its RCFC 26(a) disclosures alone, plaintiff identified ten individuals that have information that *it* may use to support its claims.

Shumaker, Loop & Kendrick, who possess relevant, discoverable information about the transactions at issue in this case . They gained that information because they were involved in designing, developing, promoting, implementing, and/or participating in the generic tax shelter that the Welleses bought, or in the specific transactions that the Welleses engaged in, and that are at issue in this case.

In fact, documents obtained over the past few months from these third parties suggest that plaintiff's claims – including those noted above – are not true, and that the plaintiff is not entitled to shelter from tax the $200 million of capital gain realized in 2000. For example, attached as Exhibit C is a copy of an email that Craig Brubaker of Deutsche Bank sent to others at Deutsche Bank in 1999. It seems to describe Deutsche Bank's participation with Jenkens in designing and developing the Son of Boss tax shelter for use by "100+" clients, and indicates that the purpose of the transactions was to create artificial tax benefits. Attached as Exhibit D is a copy of the Jenkens' summary of the Son of Boss shelter titled "Basis Enhancing Derivative Structure" that the Welleses received from David Waterman, of Shumaker, Loop & Kendrick, in January 2000. Attached as Exhibit E are Deutsche Bank records that show how it "booked" just one of the purported "options" transactions entered into by the Welleses as part of the tax shelter. These documents appear to contradict the Welleses' claim that they could have made the profit they claim from the tax shelter transactions, and that the transactions were as represented in the option confirmations.

These are just a few examples of the subjects and documents about which the United States now seeks, and should be allowed to obtain, testimony. The United States' current list of potential witnesses, with a summary of the subjects about which it believes they have information,

is attached as Exhibit F. Only by having the opportunity to depose these witnesses can the United States develop the testimony necessary to explain the documents, fill the gaps left by the documents, and obtain testimony about other matters, and then efficiently and effectively present its defenses at trial.[4]

## Argument

### I. THE PRESUMPTIVE LIMIT OF TEN DEPOSITIONS IN RCFC 30

Rule 30(a)(2)(A) of the Rules of the Court of Federal Claims, like its counterpart in the Federal Rules of Civil Procedure, presumptively limits the number of depositions any party can take to ten. The Court is given discretion, however, to adjust this general rule, and enlarge the number of depositions to accommodate the needs of any particular case. *See*, RCFC 30(a)(2). The principles of RCFC 26(b)(2) are applicable to the exercise of this discretion. *Id.* The relevant factors are (i) whether the discovery is unreasonably cumulative or duplicative, or is obtainable frm some other source that is more convenient, less burdensome, or less expensive; (ii) whether the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; and (iii) whether the burden or expense of the proposed discovery outweighs the likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues. *See* RCFC 26(b)(2).

At the outset, it should be noted that plaintiff itself has represented to this Court that this is a "complex" case. *See,* Joint Motion to Revise the Scheduling Order, filed January 4, 2007. Indeed, the "complexity" of the shelter seems to have been intentional, and plaintiff's claims rest

[4] All of these potential witnesses have been previously disclosed to plaintiff.

on its interpretation of the tax results of dozens of transactions, involving three large law firms, two accounting firms, and Deutsche Bank, one of the largest banks in the world.[5] Additionally, the transactions at issue include the use of purported "exotic foreign currency digital options" designed and sold by Deutsche Bank. Just discovering how Deutsche Bank structured, executed, booked and approved these transactions may require the testimony of many individuals, some of whom may no longer work at the bank. For example, attached as Exhibit G is a chart describing some of the different units of the bank that would normally be involved in its foreign currency activities. The United States' review of other documents produced by Deutsche Bank confirm that this was a complicated process, and that many different people had separate and distinct roles in developing, designing, approving, booking and implementing the shelter transactions at issue in this case. Here, the problem is compounded because it appears that the normal process – which is complicated enough – was followed in part for the "options" used for the Son of Boss tax shelter, but that other steps, outside of the normal business practice, were also taken. Because there were so many different people, in so many different departments and units, with responsibility for many discrete aspects of the development or implementation of the shelter transactions, we have identified – and seek to take discovery from – the Deutsche Bank witnesses listed in Exhibit F. Although each person may only be able to offer testimony about a small aspect of the transactions, the testimony of each person is crucial to enable the United States and

[5] The role of some of these entities in the design and promotion of tax shelters is reflected in a report of the United States Senate Permanent Subcommitee on Investigations, titled "The Role of Professional Firms in the U.S. Tax Shelter Industry," dated February 8, 2005. *See*, S.Rep. No. 109-54 (2005).

the Court to obtain and understand a complete picture of the shelter and its transactions.[6] In sum, this is clearly not a case to which the general rule of only ten depositions applies.

## II. THE REQUIREMENTS OF RCFC 26(b)(2) ARE SATISFIED HERE

### A. The Testimony the United States Seeks Is Not Unreasonably Cumulative or Duplicative, or Obtainable from Another Source

The testimony that the United States seeks from the witnesses identified on Exhibit F is clearly relevant to the fundamental issues in this case, including whether the shelter and its transactions were economic shams, and did not have any economic substance and business purpose. The economic substance doctrine is an objective test, under which the actual substance of the transaction – not its mere form – controls for tax purposes. *See, e.g., Coltec Industries Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006); *Gregory v. Helvering* 293 U.S. 465 (1935) and *TIFD III-E v. United States,* 459 F.3d 220 (2nd Cir. 1006). Discovery from the firms and individuals who actually designed, developed and participated in the Welleses' transactions (as well as the similar transactions sold to other taxpayers), will allow the United States, and this Court, to see what happened behind the paper form of the transactions, and understand their true substance. Several of the individuals listed in Exhibit F – including Craig Brubaker, Dan Brooks, Paul Daugerdas, Jason Shih and others – may be able to provide information, for example, as to why the transactions here were structured as they were, including whether this "cookie-cutter" tax shelter was even designed to provide a reasonable prospect of profit, or ever

---

[6] Of course, if just a few individuals can provide enough testimony to complete the record, other witnesses will not need to be deposed. The United States will not know this, however, until it deposes the witnesses. Also, as discussed below, some of the Deutsche Bank and Jenkens witnesses may assert their 5th Amendment privilege, and thus require the United States to seek the information from another source.

actually resulted in a taxpayer earning a profit. Other individuals should be able to offer information as to how the transactions were actually executed, hedged, booked and settled by Deutsche Bank.

The testimony of these participants is also relevant to whether the transactions went beyond being economic shams and were also factual shams. That is, the other participants in these transactions with the Welleses may be able to testify as to whether the transactions actually took place as represented in the documents, or not. As noted above, some records produced by Deutsche Bank appear to indicate that the Welleses' transactions did not occur as represented on paper.

Testimony from the witnesses listed on Exhibit F may also provide information that bears on the applicability of the step transactions doctrine. *See, e.g., The Falconwood Corporation v. United States,* 422 F.3d 1339 (Fed. Cir. 2005) and *King Enterprises, Inc. v. United States*, 418 F.2d 511 (Ct. Cl. 1969). Under this doctrine, the Court must link together "all interdependent steps with legal or business significance, rather than [view] them in isolation," so that "federal tax liability may be based on a realistic view of the entire transaction." *Commissioner v. Clark*, 489 U.S. 726, 738 (1989). Clearly, information from all the participants in the transactions, rather than from just one side (*i.e.*, the Welleses) is necessary for a "realistic view of the entire transaction." For example, the Welleses have alleged, and testified in depositions, that the series of transactions they engaged in were not part of a prepackaged plan. The documents produced by Jenkens, Deutsche Bank, and Shumaker – including the checklists of steps and summaries of the "basis enhancing strategy" – suggest that the witnesses listed in Exhibit F may be able to provide information that contradicts or calls into question these crucial aspects of the plaintiff's case.

They may also be able to corroborate that the transactions were a prepackaged shelter by demonstrating that every other taxpayer to whom they sold the shelter also completed the same series of transactions.[7] Some of these witnesses will also be able to shed light on the enormous fees that the Welleses paid to participate in these transactions, as well as whether the fees were calculated on the basis of the profit potential from the "digital option" transactions or instead on the capital gains they were designed to shelter.[8]

Finally, plaintiff has alleged in this case that it reasonably relied on the advice of Jenkens & Gilchrist in reporting the tax benefits of the Son of Boss shelter transactions. This purported advice – from the promoter of the shelter – was based on several factual representations, purportedly made by the Welleses, regarding the transactions. The witnesses from Jenkens, Deutsche Bank and Shumaker, among others, will be able to provide information that contradicts these representations.

In sum, the discovery the United States seeks from the witnesses listed in Exhibit F is not duplicative or cumulative, or obtainable from another source. Rather, it is necessary to provide full record of the transactions at issue, and provide the "other side of the story." The United

---

[7] Courts that have addressed the issue, have repeatedly recognized that evidence of other similar transactions involving a similar tax shelter is relevant to application of the step transaction doctrine, as well as application of the economic substance doctrine. *See, e.g., Sochin v. Commissioner*, 843 F.2d 351; *Karme v. Commissioner*, 673 F.2d 1062, *Jade Trading LLC v. United States*, 65 Fed. Cl. 188; *American Electric Power Co. v. United States* 191 F.R.D. 132; *Brannen v. Commissioner* 78 T.C. 471; *Douglas v. United States*, 410 F.Supp.2d 292; and *Brown v. Commissioner* 85 T.C. 968.

[8]In determining that the BLIPS transactions were economic shams, the district court in Texas relied in part on the fact that the fees paid by the taxpayers were based not on the potential profit to be earned from the foreign currency transactions, but on the amount of artificial losses generated from the BLIPS tax shelter. *Klamath Strategic Investment Fund, LLC v. United States*, __ F.Supp.2d __, 2007 WL 283790 (E.D. Tex., 1/31/07).

States is entitled to this discovery not only to rebut the claims of plaintiff and the Welleses, but also to obtain relevant information to complete the record that these *direct* participants in the design and execution of the transactions at issue can provide.

**B. The United States Has Not Yet Had an Opportunity to Discover the Information Sought**

To date, the United States has deposed five members of the Welles family and one of the lawyers (David Herpe) who helped them create Stobie Creek. In its initial disclosures under RCFC 26(a), the plaintiff identified each of these individuals as having information that it would use to support its claims in this case.[9] The United States has not yet had the opportunity to obtain the testimony it seeks from the Jenkens, Deutsche Bank and Shumaker employees, and other witnesses, listed in Exhibit F. And certainly the plaintiff does not suggest that the depositions of the Welles family members and advisors has provided the information the United States seeks to discover from the witnesses listed in Exhibit F.

For the past several months the United States has been gathering the relevant documents from plaintiff and the parties listed in Exhibit F. As explained more fully in its motion to convene a RCFC 16 discovery conference (filed February 28, 2007), this process has been time consuming. Deutsche Bank, for instance, produced an enormous amount of documents in several installments, but just recently produced the records that show how it "booked" the Welleses' transactions. Jenkens and Shumaker have also produced a substantial amount of documents

[9] The United States has also deposed Stephen Bores, a former employee of the Welleses, who purchased a Son of Boss shelter from Jenkens and Deutsche Bank at the same time as the Welleses, and whose transactions were handled along with those of the Welleses by the same promoters.

concerning the development of the shelter, and the Welleses' transactions. The United States is still waiting for a further possible production from Shumaker.

Plaintiff and the Welleses have just recently produced additional documents, and intend to produce more documents in the near future. Resolution of plaintiff's and the Welleses' privilege claims have also delayed document production. Just a few weeks ago, the Welleses and plaintiff agreed to waive certain privilege claims and, just last week, produced documents they had previously withheld.[10]

While the United States has obtained substantial amounts of discovery in the way of document production, it is also necessary to take testimony of the witnesses listed on Exhibit F – after all, contrary to the popular legal maxim, documents do not exactly "speak for themselves." These witnesses should be able to explain the most important documents produced, as well as testify about matters not contained in the documents, including communications with the Welleses or their advisors. They may also contradict the representations in some of the documents created for purposes of the shelter.

The United States has no intention of taking unnecessary or duplicative depositions. Because of the number of individuals directly involved, however, and the fact that each witness played a separate and distinct role in developing and implementing the transactions at issue, the United States will not have an opportunity to discover the complete, true story of these shelter transactions within the presumptive ten deposition limit.

---

[10] The deposition of Larry Goldstein was previously noticed for January 4, 2007. It was postponed at plaintiff's suggestion to allow for resolution of plaintiff's privilege claims, which have now been withdrawn.

It should also be noted that the United States anticipates that some of the witnesses may assert their privilege under the 5th Amendment, and refuse to testify. Indeed, some individuals listed on Exhibit F have asserted the 5th Amendment privilege in other tax shelter cases in district court and tax court. But that should not limit the United States' right to take this important discovery. Because the privilege must be asserted on a question-by-question basis, the United States must still take the deposition of any witness who might possibly refuse to testify. *See, e.g., Hansen v. United States,* 229 Ct.Cl. 660 (Ct.Cl. 1981). If this occurs, the United States may then have to seek the testimony of other witnesses to obtain the relevant information.[11]

### C. The Importance of the Issues, Needs of this Case, the Amount in Controversy and the Importance of the Discovery Outweigh Any Possible Burden

As noted above, through the Son of Boss shelter, the Welleses claim to have eliminated over $200 million in taxable income. The United States is committed to fully examining this shelter and ensuring the proper, and fair, application of the tax laws to the enormous capital gains they earned in 2000.[12]

Hundreds of other taxpayers also used the same, or similar, Son of Boss tax shelter. In Notice 2000-44, the IRS designated this shelter as abusive and a "listed transaction" for purposes of Treasury Regulations §§ 1.6011-4T(b)(2) and 301.6111-2T(b)(2). Later, the IRS made a global settlement offer to participants in the shelter. See Notice 2004-46. This settlement

[11] The United States Attorney's Office for the Southern District of New York is conducting an ongoing criminal investigation into tax shelters. See Joint Preliminary Status Report, filed February 2, 2006, p. 2.

[12] The Welleses sold the remainder of their Therma-Tru stock in 2003 for an even larger sum.

initiative generated in excess of $3.2 billion in tax revenue that had previously been avoided through the shelter. Many taxpayers, like the Welleses, did not accept the settlement offer. The importance of the issues presented in this case, both for this case and the proper application of the tax law, therefore, cannot be underestimated. And, in order to fully and fairly present its case here, the United States must take discovery that bears on the issues of economic substance, and the other tax law doctrines that overlay the application of the Code to any set of facts. This includes the discovery described above, and in Exhibit F.

## III. THE DISCOVERY SCHEDULE SHOULD BE EXTENDED

Because of the delayed document production by plaintiff, the time expended resolving plaintiff's (now withdrawn) privilege claims, the time it has taken for third-parties to produce the large number of relevant documents, and the number of depositions that still need to be taken, the discovery schedule in this case should be extended. The depositions yet to be taken include not only the witnesses from Deutsche Bank, Jenkens, Shumaker and the others listed on Exhibit F, but also the continuation of the Welleses' depositions. Because of their recent document productions, after their depositions in mid-December, and the withdrawal of privilege claims asserted at the depositions, the United States must now resume the depositions of five Welles family members. Plaintiff has agreed to this reconvening of the depositions.

To accommodate the significant discovery which needs to be completed, the United States requests that the schedule be extended by three months. This will allow time for plaintiff to complete its document production and the parties to take the depositions in an orderly and logical progression.

**Conclusion**

For all the above reasons, and those set forth in its motion to convene a RCFC 16 discovery conference, the United States requests that the Court enlarge the presumptive deposition limit and allow it to take an additional thirty depositions, for a total of forty. The United States also requests that the Court enlarge the discovery schedule by three months.

Respectfully submitted,
*/s/ Stuart D. Gibson*
Stuart D. Gibson
Attorney of Record
U.S. Department of Justice
Tax Division
Office of Civil Litigation
Post Office Box 403
Ben Franklin Station
Washington D.C. 20044
(202) 307-6586

Eileen J. O'Connor
Assistant Attorney General
David Gustafson
Chief, Court of Federal Claims Section
Cory A. Johnson
Trial Attorney, Court of Federal
Claims Section

/s/ *Cory A. Johnson*
Of Counsel

Dated: March 16, 2007