**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STOBIE CREEK INVESTMENTS, LLC, JFW ENTERPRISES, INC., Tax Matters and Notice Partner,** | ) | |
| **Plaintiff,** | ) | **No. 05-748 T** |
| | ) | **(Judge Christine O. C. Miller)** |
| **v.** | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**REPLY BRIEF IN SUPPORT OF THE UNITED STATES' MOTION FOR LEAVE TO ENLARGE THE NUMBER OF ALLOWABLE FACT DISCOVERY DEPOSITIONS AND EXTEND THE DISCOVERY SCHEDULE**

**Breaking News**

The plaintiff has argued from the start that it entered into these supposedly unique digital currency option transactions with the intent to earn a profit, and with a reasonable belief that there was a reasonable opportunity to earn substantial profit. It claims that these transactions were completely unlike the hundreds of other digital option transactions developed and marketed by Jenkens & Gilchrist (J&G) and Deutsche Bank, and listed by the IRS as abusive tax shelters. It claims to have relied upon a tax opinion issued by J&G to support its tax treatment of these currency options.

On March 29, 2007, one day after the plaintiff filed its response to the motion, the United States Attorney for the Southern District of New York announced that he had entered into an agreement with J&G concerning its role in developing and marketing abusive tax shelters, and in providing false and misleading opinion letters to support the bogus tax benefits claimed by taxpayers – like the Welles family members – who participated in those shelters. Under the

agreement, a copy of which is attached as Exhibit H, J&G admitted that "certain J&G attorneys developed and marketed fraudulent tax shelters, with fraudulent tax shelter opinions, that wrongly deprived the U.S. Treasury of significant tax revenues."[1] Because J&G has gone out of business – in large respect because of the fallout from its promotion of illegal tax shelters – the United States Attorney decided not to file criminal charges against J&G. On that same day, the IRS announced that it had reached a settlement with J&G, in which the law firm agreed it is subject to a penalty of $76 million stemming, "from the firm's promotion of abusive and fraudulent tax shelters," among other things.[2] Much of the discovery the United States has taken thus far, and seeks to take in the future, relates to the conduct that led to J&G's admission of criminal conduct and liability for civil penalties – conduct that we fully believe extends to the matters at issue in this case.

## Introduction

The plaintiff now agrees that the United States should be able to take more than 10 depositions. The plaintiff agrees the United States should be able to re-depose the members of the Welles family whom it deposed last fall.[3] The plaintiff agrees the United States should be allowed to take the depositions of two current or former attorneys at Shumaker, Loop & Kendrick (SLK), four individuals identified by plaintiff, two depositions of attorneys at J&G –

[1] Ex. H, p. 19 (Ex. B to the Non-Prosecution Agreement).

[2] A copy of the IRS Press Release announcing this settlement, is attached as Ex. I.

[3] Those witnesses must be re-deposed because the plaintiff and third party witnesses had not produced all the documents sought from them by request and subpoena, beforehand. It was not until late February 2007 that most of the documents had been produced to the United States, and the United States is still waiting to receive all the books and records of Stobie Creek that it first requested last summer.

attorneys whom, we believe, are among the former J&G attorneys who developed and marketed fraudulent tax shelters – and "a few depositions of *key, relevant* individuals at Deutsche Bank."[4] Thus, the plaintiff has now agreed to more depositions than they had before we filed the motion.

With this level of agreement, it appears that the plaintiff's opposition can be broken down into in two arguments. We will address each one separately, below.[5]

1. Plaintiff argues that the United States should not be allowed to take discovery into how J&G and Deutsche Bank developed, structured and marketed the original template for the tax shelter that the Welles family members bought and implemented, and how the tax shelter they actually bought was based on this template. This is because, the plaintiff claims, its

---

[4]Response to Motion, p. 1 (emphasis in original).

[5]The rest of the opposition is devoted to attacking the timing and extent of the discovery, as well as the motives of defendant's counsel. This includes the rather strident claim that it constitutes "harassment" to seek to depose this many current and former Deutsche Bank employees – even if they **do** have discoverable information – and to seek these depositions so late in the process. These arguments do not merit a separate section in this brief. Suffice to say that we do not seek cumulative discovery – until we know which witnesses possess what information, we cannot narrow down the list of potential deponents. Should it turn out, for example, that we can obtain a particular piece of pertinent evidence from one witness instead of five, we would only depose one. By the same token, we could not very well seek depositions of key Deutsche Bank personnel until we had obtained all the relevant subpoenaed documents from Deutsche Bank. In this respect it is important to note that Deutsche Bank was still producing documents as late as yesterday, and did not produce many key documents – including for example the entries into its Risk Management System (RMS) for the Stobie Creek deals (*see, e.g.*, Exh. E to Motion for Leave to Enlarge the Number of Allowable Fact Depositions) – until late January 2007. We had already by then experienced, and did not want to repeat, taking depositions without all the pertinent documents – this is why we now must re-depose the members of the Welles family. And it was not until mid-February 2007 – two months before the close of discovery – that the plaintiff first indicated that it would not consent to allow more than 10 depositions (except on terms unacceptable to the defendant). In all respects, the United States has acted responsibly, first waiting to obtain all the documents before identifying and seeking to depose witnesses about the documents, and then by moving for leave to take more than 10 depositions when it became apparent that the plaintiff would not consent to allow more depositions in this **$210 million case.**

transactions were "unique" and not part of any "cookie cutter" tax shelter product, and the discovery the United States seeks has nothing to do with its unique transaction.

2. The United States should be required to take a Rule 30(b)(6) deposition of Deutsche Bank, before it takes individual depositions of current and former Deutsche Bank personnel, even if no one currently working at Deutsche Bank has knowledge about the transactions at issue, or the matters on which the United States seeks discovery.

## Argument

### I. The plaintiff's claims to the contrary notwithstanding, these were "cookie cutter" tax shelter transactions, and the United States may take discovery to prove it.

It should go without saying that the United States is entitled to take discovery to develop evidence which would establish facts that support its theory of the case. Part of its theory of the case is that the transactions at issue were developed and designed to give the appearance of profitability and profit motive, but lacked any economic substance whatsoever. Part of its theory is that these transactions were designed, marketed and executed by the same individuals at Deutsche Bank, SLK, and J&G who designed, marketed, and executed hundreds of identically-structured transactions, all of which had the same features as these, and produced the same desired tax results – and offered no real opportunity to earn a profit on the underlying currency options. Part of its theory is that the ways in which the other party to the transactions, Deutsche Bank, treated and accounted for these transactions on its own books is consistent with the notion that there was no real chance that Stobie Creek could earn a profit on the currency transactions it entered into with Deutsche Bank. And of course, it should go without saying that RCFC 26(b)(1)

clearly permits the United States to take discovery designed to develop evidence to support these theories.[6]

There is ample evidence in the record to refute the plaintiff's argument that these were unique transactions, motivated by business reasons, and not as tax shelters. The affidavit from the plaintiff's own attorney, David Waterman, that the Welles family members filed in United States District Court in Chicago, is one such piece of evidence. In that affidavit, Ex. A to the defendant's motion, Waterman said that in late 1999 and early 2000, the SLK law firm provided the Welles family members with legal advice and assistance in connection with the sale of approximately one-half of their interests in Therma-Tru Corp. Waterman added, "in the course of this representation, several of the [Welles family members] asked SLK whether it was aware of any tax strategies that might reduce [their] taxes resulting from the anticipated sale of their interests." Waterman concluded, "In response to this inquiry, SLK had advised the [Welles family members] that Jenkens & Gilchrist, P.C. had developed certain tax strategies and might be in a position to provide [them] with legal advice regarding such strategies."[7]

Exhibit B to the motion is a fax to Waterman from Jeffrey Welles, attaching a December 9, 1999 confidentiality agreement from Paul M. Daugerdas at J&G.[8] The agreement refers to,

---

[6]To this end, the discussion of Fed.R.Evid. 401 is completely irrelevant (excuse the pun) to this motion. Rule 26(b)(1) allows a defendant to discover matters "relevant to the defense." Certainly if the witnesses listed in the motion support the defense that these transactions lacked economic substance, and were designed expressly to produce the desired tax results, with no real chance for profit, deposing those witnesses would be relevant to the defense and, therefore, allowable. The Court should reject the plaintiff's circular argument to the contrary.

[7]Ex. A, ¶¶ 6-8.

[8]Daugerdas is not just one of the J&G attorneys whom the plaintiff admits to having discoverable information, he is one of the Chicago attorneys whose conduct led to J&G's admission of criminal and civil penalty liability.

"confidential proprietary information . . . [that] involves certain financing structures . . . developed by J&G and/or its clients, consultants or co-counsel, that provide economic, financial, business and tax advantages for individuals and companies through the use of the Structures." Exhibit D to the motion, obtained from Jeffrey Welles, is a J&G document titled "Basis Enhancing Derivatives Structure." Not coincidentally, the steps described in that document are precisely the same steps that the Welles family took to form Stobie Creek and engage in the currency option transactions at issue here.

Thus, the evidence that the plaintiff and the Welles family members have already provided refutes conclusively their assertion that the transactions they entered into were unique, and not part of any organized structured tax shelter. They were a tax shelter, developed and marketed as a proprietary product by J&G. The Basis Enhancing Derivatives Structure (BEDS) – the very same transaction that the Welles family members engaged in – is one of the tax shelter products that the IRS identified in its press release announcing J&G's admission of liability for tax penalties, and that the United States Attorney agreed not to prosecute J&G for promoting.[9]

If nothing else, the United States is entitled to take discovery into whether the BEDS deals that the Welles family members bought and executed in March and April 2000 reflected a legitimate opportunity to earn a real profit, or was simply structured to give the appearance of profitability. Certainly, the United States is entitled to develop evidence which would refute the plaintiff's claim that the BEDS deals "possessed the real opportunity for substantial profit."[10]

---

[9]Ex. I. *See also*, Ex. H, p. 2, where the United States agrees not to prosecute J&G "for crimes arising from J&G's tax shelter activities from 1998 through 2004, including but not limited to: the design, development, marketing, sale, and implementation of certain tax shelters commonly referred to as BOSS, BART, HOMER and variants of the so-called "Son of BOSS" shelter that went by names including . . . BEDS, . . .".

[10]Response, p. 2.

This includes discovering whether the counterparty to the BEDS transactions, Deutsche Bank, treated the currency option transactions as involving real risk to it, or whether Deutsche Bank helped structure the transactions at issue here to give the false appearance that they entailed a real chance for the Welles family to earn a substantial profit – and conversely, create a real loss for Deutsche Bank as the counter party to the transactions. That is all we seek.

**II. Efficient discovery does not require an exercise in futility.**

Not only does the plaintiff seek to limit the areas into which the United States may take discovery, the plaintiff also seeks to limit the number of people with discoverable information from whom the United States may obtain information that bears on – and will likely support – its defense that these BEDS transactions lack economic substance. For instance, the plaintiff questions what information might be obtained by deposing the individuals at Deutsche Bank who sold, priced, booked, accounted for, and were responsible for managing any potential trading and reputational risks to the bank for, the digital currency options transactions that the Welles family members engaged in with Deutsche Bank. Yet these are precisely the individuals who can testify about the following issues that are critical to presenting the case:

1. How did Deutsche Bank (or someone else) decide what price to charge the Welles family members for these transactions? That is, were the prices determined by applying a formula that calculated the trading risk to the bank on the underlying transactions, or were the prices determined based upon the amount of income that the Welles family members wanted to

shelter from taxation?[11] To this end, we seek to depose the individuals at Deutsche Bank who were involved in determining the fees for these transactions and the other BEDS deals.

2. Did Deutsche Bank treat these pairs of digital options as separate individual options or as one integrated transaction? The plaintiff has alleged that the foreign currency options at issue here were separate individual options. The documents produced by the bank suggest that the bank treated them as parts of a single integrated transaction. To determine whether the evidence supports the plaintiff's claim, we seek to depose the individuals at Deutsche Bank who decided how to record these options in the bank's records.

3. Did Deutsche Bank – a large "money center" bank that served as counterparty to each of these transactions (as well as to hundreds of other BEDS deals) – view these transactions as involving any chance that the currency options bought by the Welles family members "possessed the real opportunity for substantial profit," as the plaintiff has alleged?[12] Or did Deutsche Bank – the party that stood to lose whatever amount that the Welles family members earned in profit on the transactions – view these transactions as having no real risk to the bank, because of the way they were structured? The United States asserts that these transactions were designed to give the **appearance** of profitability for the Welles family, but were in fact, utterly incapable of enabling the Welles family to earn a profit that exceeded the fees they paid. The documents produced thus far, including documents recently obtained from the bank's own risk

---

[11]Calculating the price/fee/commission based on the income to be sheltered from taxation is one of the factors that the U.S. District Court for the Eastern District of Texas cited in determining that a so-called "premium loan" tax shelter marketed as BLIPS lacked economic substance. Klamath Strategic Investment Fund LLC v. United States, __ F.Supp. 2d __, 2007 WL 283790, slip op. at 11 (E.D. Tex., 1/31/07).

[12]Response, p. 2.

management system, reflect that the bank did not believe it had any trading risk that remotely approaches the potential gain the plaintiff claims it had from these transactions.[13] To establish whether that was in fact, the case, the United States seeks to depose employees of Deutsche Bank who were involved with booking the transactions and managing any trading risks that these transactions may have posed to the bank – this would tend to establish the United States' defense, and disprove the plaintiff's claim that it had a "real opportunity for substantial profit" from these transactions.

The documents that the United States has obtained in discovery identify the individuals at Deutsche Bank who possess knowledge of these discoverable matters. Those are the people we seek to depose in this case. Unfortunately, in discussing these documents with counsel for Deutsche Bank, the United States has learned that most, if not all, of these key people involved in the plaintiff's deals 7 years ago no longer work at the bank. And the lawyers for Deutsche Bank have also advised that it is likely that many of the questions that we would pose to these witnesses cannot be answered by employees and officials who are currently employed by Deutsche Bank. Thus, while the United States could require Deutsche Bank to designate one or more witnesses under RCFC 30(b)(6), proceeding in that way would not necessarily enable the United States to obtain all the discoverable information it now seeks.

Instead of beginning with a less informative deposition of Deutsche Bank, the United States believes it would promote the efficient conclusion of discovery to first depose those former Deutsche Bank employees who have first-hand knowledge of these matters. It is well settled that an entity sought to be deposed under Rule 30(b)(6) has a duty to designate and

---

[13] *See, e.g.*, Ex. E to the Motion.

produce witnesses with knowledge of the matters listed in the notice and subpoena. And if the information lies within the knowledge of the entity, the entity must make any designated witness knowledgeable about those subjects. But if the entity does not possess knowledge of the matters listed in the notice and subpoena, its obligation ceases, and it need not produce a witness to testify.[14] The alternative in such a case, is for the party to depose the witnesses who possess firsthand knowledge of the matters, who no longer work for the entity.

That is precisely what the United States seeks here. If in fact Deutsche Bank as an institution lacks knowledge of many, if not all, of the matters on which the United States would seek discovery under Rule 30(b)(6), it will advance the "just, speedy, and inexpensive" determination of this case to first take the depositions of the individuals whom the documents show have firsthand knowledge of these matters.[15] Certainly, the plaintiff has cited no rule or authority that a party must first take a RCFC 30(b)(6) entity deposition before it can depose individuals with knowledge who no longer work for the entity. This Court should not create one.

**Conclusion**

The plaintiff agrees the United States should be able to take more than 10 depositions, and even more than the 15 depositions it had previously agreed to. In a case of this complexity, where the Court has been asked to rule on the *bona fides* of a **$210 million transaction**, the

---

[14]7 Moore's Federal Practice, 3d ed., ¶30.25[3]. "If [the corporation] does not possess such knowledge as to so prepare Hartsock or another designate, then its obligations under Rule 30(b)(6) obviously cease, since the rule requires testimony only as to 'matters known or reasonably available to the organization.'" Dravo Corp. v. Liberty Mut. Ins. Co., 164 FRD 70, 76 (D. Neb. 1995). *See also*, Barron v. Caterpillar, Inc., 168 FRD 175, 177-178 (E.D. Pa. 1996). In Barron the court acknowledged the problem that Caterpillar would have in locating information about events that had occurred a long time ago.

[15]RCFC 1.

United States seeks to take discovery from knowledgeable individuals who can offer admissible evidence about its defense that these currency option transactions lacked economic substance, and the plaintiff's claim that they were not part of the abusive BEDS tax shelters identified as among the illegal tax shelters that J&G promoted. The Court should grant the motion.

Respectfully submitted,

*/s/ Stuart D. Gibson*

Stuart D. Gibson
Attorney of Record
U.S. Department of Justice
Tax Division
Office of Civil Litigation
Post Office Box 403
Ben Franklin Station
Washington D.C. 20044
(202) 307-6586

Eileen J. O'Connor
Assistant Attorney General
David Gustafson
Chief, Court of Federal Claims Section
Cory A. Johnson
Trial Attorney, Court of Federal
Claims Section

/s/ *Cory A. Johnson*
Of Counsel

Dated: April 4, 2007