**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| STOBIE CREEK INVESTMENTS LLC, JFW ENTERPRISES, INC., Tax Matters and Notice Partner,<br><br>Plaintiff<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 05-748T |
| STOBIE CREEK INVESTMENTS LLC, by and through JFW INVESTMENTS LLC, Tax Matters and Notice Partner,<br><br>Plaintiff<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 07-520 T<br>Consolidated with 05-748T<br><br>Judge Christine O.C. Miller |

**PLAINTIFFS' CONTENTIONS OF FACT AND LAW**

Robert E. Kolek
Thomas R. Wechter
Matthew C. Crowl
Colleen M. Feeney
Ayad P. Jacob
SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, IL 60606
Phone: 312-258-5500
Fax: 312-258-5600
*ATTORNEYS FOR PLAINTIFFS*

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 1

A. The Welles Family ........ 1

B. Therma-Tru Sale ........ 2

C. The Welles Family Decided to Pool Their Investments and Centralize Investment Management ........ 3

D. The Digital Option Investment Strategy is Proposed by David Waterman ........ 4

E. Creation of Stobie Creek, a Pooled Investment Entity ........ 5

F. Creation of North Channel—Family Office Management Entity ........ 5

G. Due Diligence Performed by Jeffrey Welles ........ 6

H. The Digital Options Investment Strategy ........ 7

III. ISSUES OF FACT AND LAW ........ 10

IV. CONTENTIONS OF LAW ........ 11

A. Taxpayers Are Entitled to Structure Their Transactions in the Most Tax-Advantageous Method ........ 11

B. The DOIS Transaction Complied With The Code ........ 12

1. The Long and Short Option Positions Are Separate Transactions ........ 14

2. The Short Option Positions Do Not Reduce Basis ........ 15

a. Helmer and its progeny unequivocally hold that a short option position is not a liability for purposes of Code Section 752 ........ 15

b. Amended Treasury Regulation § 1.752 Cannot Be Applied Retroactively ........ 17

3. The Code Section 465 "At-Risk" Provisions Are Inapplicable to the Stobie Creek Partnership ........ 19

4. The General Anti-Abuse Rule Does Not Apply ........ 20

C. The Sham Transaction Doctrine Does Not Apply ........ 22

1. The DOIS Transactions Were Entered Into With A Valid Business Purpose ........ 24

2. The DOIS Transaction Meets the Objective Test For Economic Substance Set Forth in Coltec ........ 25

Table of Contents
(continued)

**Page**


D. Code Section 165(c) is Inapplicable to the DOIS transactions ............................ 26

E. No Penalty Is Applicable ........................................................................ 27

1. Plaintiffs Are Not Subject to the 40% "Valuation Overstatement" or Any Other Code Section 6662(a) Penalty Because the Welles Family Members Reasonably Relied and Acted in Good Faith Upon the Advice of Tax Professionals .................................................... 29

2. Plaintiffs Are Not Subject to Negligence Related Penalties Because they Exercised Ordinary Care ................................................................ 32

3. Plaintiffs Are Not Subject to the Substantial-Understatement Penalty Because Their Tax Position Was Supported by Substantial Authority. ........................................................................................ 33

4. Imposing Penalties Would Be Unjust, Given the State of the Law ......... 33

V. CONCLUSION ........................................................................................................ 34

# TABLE OF AUTHORITIES

**Cases**

*Abramson v. Comm'r*, 86 T.C. 360, 369 (1986) ........ 26

*ACM P'ship v. Comm'r*, 157 F.3d 231 (3d Cir. 1998)........ 26

*ACM Partnership v. Comm'r*, 157 F.3d 231 (3d Cir.1998)........ 23

*Am. Home Prods. Corp. v. United States*, 601 F.2d 540 (Ct. Cl. 1979) ........ 11

*Atlantic Coast Line R. Co. v. Phillips*, 332 U.S. 168 (1947) ........ 12

*Avon Prods., Inc. v. United States*, 97 F.3d 1435 (Fed. Cir. 1996) ........ 12

*Betson v. I.R.S.*, 802 F.2d 365 (9th Cir.1986) ........ 32

*Black & Decker Corp. v. United States*, 436 F.3d 431 (4th Cir. 2006) ........ 22, 24, 26

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ........ 19

*Chamberlain v. Comm'r*, 66 F.3d 729 (5th Cir. 1995) ........ 30

*Cherin (Ralph) v. Comm'r*, 89 T.C. 986 (1987) ........ 26

*Coltec Indus., Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006)........ 23, 24, 25, 26

*Dow Chemical Co. v. United States*, 435 F.3d 594 (6th Cir.2006)........ 24

*Drobny v. United States*, 86 F.3d 1174 (Table)
1996 WL 170445 (Fed. Cir. 1996)........ 23

*Durrett v. Comm'r*, 71 F.3d 515 (5th Cir. 1996) ........ 31, 32

*Estate of Monroe v. Comm'r*, 124 F.3d 699 (1997)........ 30

*Frank Lyon Co. v. United States*, 435 U.S. 561 (1978) ........ 12

*Helmer v. Comm'r*, 34 T.C.M 727 (1975) ........ 15, 16, 17, 34

*IES Industries, Inc. v. United States*, 253 F.3d 350 (8th Cir. 2001) ........ 23, 26

*Jacobsen v. Comm'r*, 915 F.2d 832 (2d Cir. 1990) ........ 25, 26

*Jade Trading, LLC et al. v. United States*, 2007 WL 4553043
(Fed. Cl. 2007) ........ 28, 29

*James v. Comm'r*, 899 F.2d 905 (10th Cir. 1990) ........ 23

Table of Authorities
(continued)

**Page**

*Knetsch v. United States*, 364 U.S. 361 (1960) ............ 25

*La Rue v. Comm'r*, 90 T.C. 465 (1988) ............ 16

*Laureys v. Comm'r*, 92 T.C. 101 (1989) ............ 20

*Long v. Comm'r*, 71 T.C. 1 (1978) ............ 16

*Resser v. Comm'r*, T.C. Memo 1991-423 ............ 20

*Rice's Toyota World Inc. v. Comm'r*, 752 F.2d 89 (4th Cir.1985) ............ 22, 26

*See Estate of Monroe v. Comm'r*, 124 F.3d 699 (1997) ............ 32

*Smith v. Comm'r*, 78 T.C. 350 (1983) ............ 15

*Starr v. Comm'r*, T.C. Memo 1991-610 ............ 20

*Stoller v. Comm'r*, 994 F.2d 855 (DC Cir. 1993) ............ 15

*Thurner v. Comm'r*, T.C. Memo 1990-529 ............ 20

*United Parcel Serv. of Am., Inc. v. Comm'r*, 254 F.3d 1014 (11th Cir. 2001) ............ 23

*United States v. Boyle*, 469 U.S. 241 (1985) ............ 30

**Internal Revenue Code of 1986**

Section 269(a) ............ 27

Section 6662 ............ 29

Section 6662(d) ............ 11, 33

Section 6662(e) ............ 11

Section 6662(h) ............ 11, 27

Section 6664(c) ............ 11, 29

Section 708(b) ............ 14

Section 721 ............ 12

Section 721(a) ............ 13

Section 722 ............ 13, 14

Table of Authorities
(continued)

**Page**

Section 723 ........ 11, 13

Section 752(a) ........ 15

Section 752(b) ........ 15

Section 754 ........ 13, 14

Section 988 ........ 14, 15

Sections 6653(a) ........ 32

**Other Authorities**

I.R.S. G.C.M. 37860 (Feb. 16, 1979) ........ 16

I.R.S. G.C.M. 37971 ........ 16

Notice 2000-44 ........ 17, 18

Rev. Rul. 301, 1973-2 C.B. 215 ........ 16

Rev. Rul. 57-29, 1957-1 C.B. 519 ........ 16

Rev. Rul. 79-294, 1979-2 C.B. 305 ........ 16

S. Rep. No. 938, 94th Cong., 2d Sess. at 48 (June 10, 1976) ........ 19

Treas. Reg. §1.752-7(b) ........ 17

**Regulations**

K. Treas. Reg. §1.701-2(b) ........ 21

Proposed Treas. Reg. §1.465-1(e) ........ 19

Treas. Reg. § 1.6662-4(d) ........ 33

Treas. Reg. § 1.988-1(e) ........ 15

Treas. Reg. §1.6664-4(b) ........ 29

Treas. Reg. §1.701-2(a) ........ 22

Treas. Reg. §1.708-1(b) ........ 14

Treas. Reg. §1.752-6 ........ 10, 17, 18

# I. INTRODUCTION

The Welles family is a unique family comprised of both leaders and philanthropists. When they act, they strive to do things right: morally, socially and legally. They are close knit, and with respect to investments and philanthropy, generally act in concert.

This case is about a family that did things right, but still wound up in the cross hairs of the IRS. The IRS has attempted to retroactively change the law to aid its litigating position. This case is also about whether the Welles family justifiably relied not only on their individual corporate counsel of decades, but also the advice of a nationally-recognized law firm with a sound reputation in the field of taxation. Most importantly, this case is about whether a taxpayer has the right to rely on the law as set forth in the Code, interpreted by the courts and confirmed by the IRS, in shaping his or her investment decisions.

# II. STATEMENT OF FACTS

## A. The Welles Family

The late David Welles Sr. ("David") and his wife Georgia E. Welles ("Georgia"), have five adult children: David K. Welles, Jr. ("David Jr." or "Deke"), Virginia Welles Jordan ("Virginia"), Jeffrey F. Welles ("Jeffrey"), Peter C. Welles ("Peter") and Christopher S. Welles ("Christopher"). David Jr. graduated from Yale College and shortly thereafter began working in the family business, Therma-Tru Corporation ("Therma-Tru"). By 1999, David Jr. was Therma-Tru's Chairman and CEO. David Jr. and his wife, Hope, reside in Perrysburg, Ohio. Virginia, resides in Boulder, Colorado. She obtained a Masters in Fine Arts and Writing degree from Antioch College and became a self-employed psychotherapist. She also runs a non-for-profit organization called "Beads for Life." Jeffrey is an MBA graduate of Columbia University.

Upon graduation, Jeffrey began his career as an investment banker at Goldman, Sachs & Co. where he worked until 1995. In 1995, he began working at Lazard Freres, an investment advisory firm. At one point in his career, he held several NASD licenses. Jeffrey runs the Welles family investment office, North Channel LLC ("North Channel") and is responsible for the investments of the family foundation, Cricket Island Foundation ("Cricket Island"), a not-for-profit corporation operated for the benefit of inner city youth. Peter is a non-profit volunteer and philanthropist. Finally, Christopher, the youngest of the children, is the owner of an executive search firm.

**B. Therma-Tru Sale**

For many years, the members of the Welles family held, directly and indirectly, stock in Therma-Tru. David Sr. and his father founded Therma-Tru in 1962. The immediate Welles family members with interests in Therma-Tru included: David Sr., Georgia, David Jr., Virginia, Jeffrey, Peter and Christopher. A grantor trust for the benefit of David Sr. was also a Therma-Tru shareholder ("The Welles Family Trust" or "1994 Qualified Annuity Trust").

Therma-Tru was a manufacturer of fiberglass entry doors. It pioneered the development of fiberglass technology, which it introduced to the market in the mid-1980s. By the late 1990s, Therma-Tru had become the preferred brand of entry door systems, with annual sales in excess of $370 million and sales in five continents.

In the late 1990s, other building products companies began to show an interest in acquiring Therma-Tru. Eventually, the family became interested in the possibility of selling the business. In 1999, the family held discussions with Masco Corporation, one of the world's largest manufacturers of brand-name consumer products for the home improvement and new construction markets. These negotiations ultimately failed. Later that same year, the family began discussions with respect to the sale of a portion of the family's interest in Therma-Tru to

Kenner & Company ("Kenner"), a private investment firm that concentrated in the home building products industry.

### C. The Welles Family Decided to Pool Their Investments and Centralize Investment Management

Although the Welles family generally maintained their own investment accounts through independent advisors, from time to time they considered pooling their separate investment assets under a family investment entity. Since the family was considering a sale of some or all of their interests in Therma-Tru, they began investigating ways to consolidate their investment activities to take advantage of economies of scale. In the fall of 1999, David Sr., David Jr., and Jeffrey Welles met with one of the family's attorneys, David Herpe, to discuss ways to accomplish their wealth management goals. Mr. Herpe was a partner in the Private Client Department of McDermott Will & Emery LLP, a preeminent Chicago-based international law firm. Mr. Herpe advised the Welles family that they could achieve their goals of managing their money as a family unit by creating multiple entities: North Channel, Stobie Creek Investments LLC ("Stobie Creek"), and Cricket Island Foundation. North Channel was created to be the family office and to be the manager of Stobie Creek. Stobie Creek was created to be the entity directly holding the family's investments. Cricket Island was established as the vehicle through which family members could channel their large individual and family charitable contributions. Mr. Herpe explained that the creation of these entities would result in economies of scale and access to higher levels of asset management and administration than the separate Welles family members would be able to obtain individually.

In January of 2000, the family held a meeting at Vero Beach, Florida (the "Vero Beach Meeting") to discuss the planning and timing of a possible Therma-Tru sale, the formation and function of North Channel, Stobie Creek, and Cricket Island, and associated tax planning.

Jeffrey Welles and Mr. Herpe described to the family the structure and benefits of establishing a family office. Jeffrey Welles and Mr. Herpe also explained to the family members the concept and function of the creation of an entity holding all of their investments in a pooled investment vehicle which ultimately came to be called Stobie Creek.

It was agreed that the start-up expenses for establishing North Channel and Stobie Creek would be funded by a revolving loan of $750,000 from the Welles Family Trust. It was also agreed that the family office budget would be funded based on the proportion of assets under management, and accordingly allocated among the individual family members and the Welles Family Trust. To facilitate the possible sale of Therma-Tru stock, each family member agreed to contribute 50% of their individual shares in Therma-Tru to Stobie Creek. At the Vero Beach Meeting, Jeffrey Welles and Mr. Herpe also explained to the family members the concept and function of the creation of an entity holding all of their investments in a pooled investment vehicle, which ultimately came to be called Stobie Creek.

**D. The Digital Option Investment Strategy is Proposed by David Waterman**

After lunch, David Waterman spoke at the Vero Beach Meeting. Mr. Waterman was a partner at Shumaker, Loop & Kendrick, LLP ("SLK"), a large, multi-state firm established in 1925. Mr. Waterman had been the corporate attorney for Therma-Tru and his firm had advised the Welles family for almost forty years. Mr. Waterman explained how the family could create additional wealth, leverage their portfolio, and save taxes using a digital option investment strategy ("DOIS Transaction") developed by Jenkins & Gilchrist ("J&G"). At the time, J&G was a large, highly-respected national law firm with a recognized expertise in the area of taxation. The DOIS Transaction called for the creation of a leveraged position in foreign exchange derivatives that would be contributed to Stobie Creek at about the same time as the Therma-Tru stock. Mr. Waterman explained that the tax lawyers in his office had thoroughly

researched the DOIS Transaction and believed that the opinion J&G provided to other taxpayers as to the tax consequences of the transaction was accurate tax law.

Based upon the advice of Mr. Herpe, North Channel, Stobie Creek and Cricket Island were all established and commenced operations in 2000. The family postponed any decision regarding the DOIS Transaction proposed by Mr. Waterman, however, until Jeffrey Welles had satisfied himself about the economic aspects on the proposed investment.

**E. Creation of Stobie Creek, a Pooled Investment Entity**

Stobie Creek was established on March 3, 2000, as the entity that would directly hold the family's investments. On March 17, 2000, six single member limited liability companies were formed under Delaware law: DKW Senior Investments, LLC; DKW Junior Investments, LLC; JFW Investments, LLC; CSW Investments, LLC; PCW Investments, LLC; and VJ Investments, LLC (collectively the "Stobie Creek Member LLCs"). The Stobie Creek Member LLCs and the Welles Family Trust became the initial members of Stobie Creek.

Each year since its formation, Stobie Creek has made hundreds of highly sophisticated investment decisions with varying degrees of risk, ranging from conservative to highly speculative. To this day, Stobie Creek maintains a complex portfolio of assets worth hundreds of millions of dollars, generating tens of millions of dollars of annual income.

**F. Creation of North Channel—Family Office Management Entity**

At or about the same time the Welles family created Stobie Creek, they also established North Channel, to serve as a family office management entity to oversee and coordinate the management of the family's investments and coordinate its tax and estate planning. North Channel is the manager of Stobie Creek. Jeffrey Welles' wife, Maud, oversees North Channel's bond trading desk. Jeffrey directs the trading activities of North Channel's outside money

managers. North Channel also acts as a liaison between the family members and their various tax and estate planning counsel and tax return preparers.

Mr. Herpe had recommended that the family office be organized as an entity separate from Stobie Creek, the entity that held the family's combined investments. This particular structure served to isolate any liabilities that might be associated with North Channel's activities from Stobie Creek's significant investment assets. North Channel, a New York limited liability company, was the designated manager of Stobie Creek. The members of North Channel were David K. Welles, Sr. and his wife, Georgia E. Welles. Jeffrey Welles is the manager of North Channel.

**G. Due Diligence Performed by Jeffrey Welles**

Over the months of February and early March, 2000, Jeffrey Welles conducted due diligence regarding the particular digital options in which the Stobie Creek Member LLCs could invest to produce a profit. Jeffrey spoke several times with David Parse, then a Managing Director in the Chicago office of Deutsche Banc Alex Brown ("DB"), about the merits of different currency crosses. Jeffrey Welles also sought the advice of other investment advisors on option premiums and compared DB's different option pricing sources, generally, to make sure they were on their market. Jeffrey analyzed the volatility of various over-the-counter options using his Bloomberg service. He also consulted research reports from Wall Street firms.

Based upon this due diligence and drawing upon his education, training, and experience as an investment advisor and portfolio manager, Jeffrey Welles formed a number of opinions that led him to conclude that the proposed DOIS Transaction involving euro and Swiss franc options had the opportunity to produce a reasonable profit. For example, he believed that the stock market, particularly the tech-heavy NASDAQ, was overpriced and that the "dotcom" bubble would end. Jeffrey believed that the resulting market downturn would lead to a rise in the value

of the euro. Additionally, Jeffrey expected that the European Central Bank would raise interest rates in early April 2000 and issue a favorable employment report, leading to a surge in the euro and increased volatility in the currency market. Jeffrey Welles further anticipated an uncoupling of the historic relationship between the euro and Swiss franc relative to the dollar. Jeffrey learned from DB that the digital option transaction that he was considering had a 30% chance of doubling his money. Based on Jeffrey's feedback, the Welles family decided to invest in the DOIS transaction proposed by David Waterman of SLK, and developed by the law firm of J&G.

**H. The Digital Options Investment Strategy**

On March 31, 2000, the Welles family members, through their respective LLCs and the Welles Family Trust, entered into over-the-counter, non-publicly traded European style foreign currency options on the euro and the Swiss franc. They did so in hopes of doubling their investment and if the options hit the "sweet spot" price, making a 200x return on their investment, furthering their economic and charitable ambitions. For example, JFW Investments, LLC purchased digital options on the euro/U.S. dollar exchange rate. The digital options bore a strike price of 0.9912 U.S. dollars per 1.00 euro, with an expiration date of April 17, 2000, a final exchange date of April 19, 2000, a payoff amount of $19,325,000 and a paid premium of $9,662,500. In addition, JFW Investments, LLC purchased digital options on the Swiss franc/U.S. dollar exchange rate. These digital options bore a strike price of 1.7027 Swiss francs per 1.00 U.S. dollar with an expiration date of April 17, 2000, a final exchange date of April 19, 2000, a payoff amount of $19,325,000, and a paid premium of $9,662,500. Both of these digital option purchases are considered "long" options.

JFW Investments, LLC also sold a digital option on the euro/U.S. dollar exchange rate at a strike price of 0.9914 U.S. dollars per 1.00 euro and received a premium of $9,565,875, with an expiration date of April 17, 2000, a final exchange date of April 19, 2000, and a payoff amount

of $19,131,750. The limited liability company also sold a digital option on the Swiss franc/U.S. dollar exchange rate at a strike price of 1.7029 Swiss franc per 1.00 U.S. dollar and received a premium of $9,565,875, with an expiration date of April 17, 2000, a final exchange date of April 19, 2000, and a payoff amount of $19,131,750. Both of these digital option sales are considered "short" options.

Other Welles family members, through their respective LLCs and the Welles Family Trust, purchased similar long and short options. The Welles family members, through their respective LLCs, purchased the digital options with $2,045,750 loaned to their respective LLCs by the Welles Family Trust. The LLCs repaid the loans on or about April 2, 2001, with interest.

On April 3, 2000, the LLCs and the Welles Family Trust contributed the digital options to Stobie Creek. The long and short options had an aggregate cost basis of $204,575,000. On or around April 14, 2000, the Welles family members and the Welles Family Trust each transferred 50% of their shares in Therma-Tru to Stobie Creek. On April 17, 2000, Stobie Creek's long options and short options expired out of the money, without being exercised.

On April 30, 2000, Welles family members contributed their separate LLC interests holding their membership interests in Stobie Creek to individually-owned S-corporations. Over 50% of the ownership interests of Stobie Creek were transferred at that time.

After additional rounds of negotiations, the sale of Therma-Tru was finalized on May 9, 2000 in a simultaneous sign and close transaction. Therma-Tru redeemed all of the shares of Therma-Tru owned by Stobie Creek pursuant to a recapitalization in which Kenner participated by contributing cash to Therma-Tru in exchange for 50% of the outstanding shares of Therma-Tru. In exchange for its shares in Therma-Tru, Stobie Creek received $211,151,677. The proceeds were offset by the cost basis of $205,709,374, resulting in a gain of $5,442,303.

In the months following the sale of Therma-Tru, Lawrence Goldstein, the Chief Financial Officer of North Channel and an attorney and certified public accountant, investigated the proper reporting of the transaction. Mr. Goldstein reviewed multiple draft tax opinions issued by J&G, met with attorneys from SLK, and worked with the Welles family accountant, Robert Floyd, to properly report the transaction.

In August of 2000, J&G provided a lengthy draft tax opinion to Jeffrey Welles regarding the tax consequences of the DOIS Transaction. Also in August of 2000, the IRS issued Notice 2000-44. Mr. Goldstein, David Sr., David Jr. and Jeffrey Welles had a phone conference with the attorneys from J&G and SLK to discuss the applicability of Notice 2000-44 to the DOIS Transaction. Both J&G and SLK had already researched the issue and advised Mr. Goldstein and the Welles family members that Notice 2000-44 did not apply to their transaction. In February of 2001, the members of Stobie Creek signed an engagement letter with J&G regarding the tax consequences of the several transactions in which the Welles family members were involved.

In January 2001, J&G issued a 123 page final tax opinion for each of the Welles family members and the Welles Family Trust. One section of the opinion explained why Notice 2000-44 did not apply to the DOIS Transaction. In reliance on these tax opinions and discussions with SLK attorneys, the family filed their individual tax returns, reporting a total $5,442,303 gain in the sale of their Therma-Tru stock.

The IRS audited the Stobie Creek return. The Welles family members responded to numerous IRS Information Document Requests. As a result of the audit, the IRS issued Final Partnership Administrative Adjustments ("FPAAs") in May of 2005, for the period ending on December 31, 2000, and in February 2007, for the period ending on April 30, 2000. The Welles

family made deposits with the IRS on July 11, 2005 and July 10, 2007 for the amount of tax claimed due based on the adjustments alleged in the FPAAs. Plaintiffs filed suit in this Court on July 11, 2005 and July 11, 2007, respectively.

**III. ISSUES OF FACT AND LAW**

The Court will need to resolve the following issues of fact and law in order to decide Plaintiffs' refund claims:

1. Whether Stobie Creek, a partnership created for the purpose of pooling investments for the Welles family members, exists as a valid partnership created for business purposes.

2. Whether DKW Senior Investments, LLC; DKW Junior Investments, LLC; JFW Investments, LLC; CSW Investments, LLC; PCW Investments, LLC; and VJ Investments, LLC were formed for liability protection reasons and remain in good standing under Delaware law.

3. Whether the purchase of dual pairs of currency options by the Welles Family Trust and each of the members of the Welles family through their respective single-member LLCs possessed a non-tax business purpose and a reasonable possibility of profit.

4. Whether separate and distinct financial instruments, such as long and short options positions purchased in the DOIS Transaction,can be integrated into a single transaction.

5. Whether "liabilities" under Code Section 752 would include the short option position purchased and contributed as part of the DOIS Transaction and whether Treas. Reg. §1.752-6 can be retroactively applied to the short positions transferred to Stobie Creek, when the regulation was promulgated years after the transactions

at issue occurred, without express or implied authority to do so, and changed established law.

6. Whether the adjusted bases of the long call positions and other contributions and contributions made by the partners to Stobie Creek for the period ending April 30, 2000,were established under Code Section 723.

7. Whether the 40% penalty attributable to a gross valuation misstatement applies at either the partnership or partner level under Code Sections 6662(a), 6662(b) (3), 6662(e), and 6662(h).

8. Whether a 20% penalty attributable to negligence or disregard of rules and regulations applies at either the partnership or partner level under Code Sections 6662(a), 6662(b)(1), and 6662(c).

9. Whether a 20% penalty attributable to a substantial understatement of income tax applies at either the partnership or partner level under Code Sections 6662(a), 6662(b)(2), and 6662(d).

10. Whether the 20% penalty attributable to a the substantial valuation misstatement applies at either the partnership or partner level under Code Sections 6662(a), 6662(b)(3), and 6662(e).

## IV. CONTENTIONS OF LAW

### A. Taxpayers Are Entitled to Structure Their Transactions in the Most Tax-Advantageous Method

It is well settled that taxpayers may structure transactions in a manner which decreases the amount of their taxes. Given a choice between two methods of achieving the same result, a taxpayer is free to choose the most tax-advantageous method. *See Am. Home Prods. Corp. v. United States*, 601 F.2d 540, 548 (Ct. Cl. 1979) ("It is fundamental that once a taxpayer properly

enters a bona fide transaction the mere fact that the transaction legally reduces taxes is irrelevant. A taxpayer has the option to select a transaction which will legally minimize taxes."); *Avon Prods., Inc. v. United States*, 97 F.3d 1435, 1443 (Fed. Cir. 1996) (that a transaction may have been structured for tax purposes does not render it impermissible). Indeed, that a taxpayer may take advantage of any possible benefits under the Code to engage in a transaction designed, in part, to produce tax benefits, is an accepted tenet of tax law. The Supreme Court has long acknowledged:

> As to the astuteness of taxpayers in ordering their affairs so as to minimize taxes we have said that 'the very meaning of a line in the law is that you intentionally may go as close to it as you can if you do not pass it.' This is so because nobody owes any 'public duty to pay more than the law demands: taxes are enforced extractions, not voluntary contributions.'

*Atlantic Coast Line R. Co. v. Phillips*, 332 U.S. 168, 172-73 (1947). Accordingly, it is of no consequence that a taxpayer takes advantage of the Code to engage in a transaction designed, in part, to produce tax benefits, provided that the transaction is not a sham. Where a transaction "is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped *solely* by tax-avoidance features . . . , the Government should honor the allocation of rights and duties effectuated by the parties." *Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84 (1978) (emphasis added).

**B. The DOIS Transaction Complied With The Code**

In March 2000, the Stobie Creek Member LLCs were formed under Delaware law and entered into over-the-counter, non-publicly traded European style foreign currency options on the euro and the Swiss franc. In April 2000, each of the Welles family members and the Welles Family Trust transferred 50% of their shares in Therma-Tru to Stobie Creek in a tax-deferred transaction. The Stobie Creek Member LLCs also contributed their digital option positions to Stobie Creek in exchange for partnership interests. Under Code Section 721, contributions to a

partnership in exchange for a partnership interest are not taxable transactions. Code Section 721(a) ("No gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership.") Accordingly, these contributions to Stobie Creek did not result in a taxable gain or loss.

Under Sections 722 and 723 of the Code, the Stobie Creek Member LLCs' initial basis in Stobie Creek, which equaled $3,180,214 and represented their basis in contributed Therma-Tru stock, was increased by $204,575,000 - the cost of their long option positions. *See* Code Section 722 ("basis of an interest in a partnership acquired by a contribution of property, including money, to the partnership shall be the amount of such money and the adjusted basis of such property to the contributing partner at the time of the contribution . . . ."); Code Section 723 ("basis of property contributed to a partnership by a partner shall be the adjusted basis of such property to the contributing partner at the time of the contribution . . . ."). Though the basis included the cost of the long options position, no adjustment to the basis for the short option positions was required under Code Section 752 because the short option positions were contingent liabilities.

Stobie Creek then made an election under Code Section 754 to adjust the basis of its Therma-Tru Stock, so that in the event of a sale or exchange of any membership interest, the basis of the Therma-tru stock would increase to that of the selling or exchanging members' basis in their Stobie Creek membership interests.

On April 30, 2000, the Welles family members contributed the separate LLC interests holding their membership interests in Stobie Creek to individually-owned S-corporations. Because in excess of 50% of the ownership interests of Stobie Creek were transferred at that time, Stobie Creek was constructively liquidated for federal income tax purposes under Code

Section 708(b)(1)(B). Because there was continuity of operations, a new Stobie Creek LLC was deemed created for federal income tax purposes under Treas. Reg. §1.708-1(b)(iv).

Because an election had been made under Code Section 754, and the transfers were equivalent to a sale or exchange, the basis of the Therma-Tru stock was stepped up under Code Section 743(b) to equal the basis of the Stobie Creek Member LLCs' interests. *See* Code Section 743(b) ("In the case of a transfer of an interest in a partnership by sale or exchange . . . , a partnership with respect to which the election provided in Section 754 is in effect . . . shall (1) increase the adjusted basis of the partnership property by the excess of the basis to the transferee partner of his interest in the partnership over his proportionate share of the adjusted basis of the partnership property . . .") This "stepped-up basis" carried over to the new Stobie Creek LLC such that the "inside basis" of the Therma-Tru stock in the new LLC was now equal to the "outside basis" of the Stobie Creek Member LLC's membership interests in the liquidated entity.

**1. The Long and Short Option Positions Are Separate Transactions.**

The IRS asserts that the long and short option positions purchased by the Stobie Creek Member LLCs were part of a single transaction and should be integrated. Under the IRS' theory, any amount treated as contributed to Stobie Creek for the long option under Code Section 722 should be offset by the short option position. The IRS' position is without basis.

First, as the testimony of economic expert Robert Kolb will establish, the long and short options purchased by the Stobie Creek Member LLCs are separate and distinct financial instruments. The offsetting options are priced separately, can be traded separately, and have different strike and sale prices. Second, the acquisition and disposition of the long and short options are Code Section 988 transactions, which may not be integrated. Code Section 988(a)(1)(A) expressly notes that "any foreign currency gain or loss attributable to a Code Section 988 transaction shall be computed separately." Thus, by definition, the separate

computation of gain or loss on any Code Section 988 transaction necessarily requires the separate computation of basis. The Treasury Regulations provide further confirmation that each of the two foreign currency options must be treated separately. Treas. Reg. § 1.988-1(e) provides in relevant part:

> the amount of exchange gain or loss from a section 988 transaction shall be separately computed for each section 988 transaction, and such amount shall not be integrated with gain or loss recognized on another transaction (whether or not such transaction is economically related to the Section 988 Transaction).

Third, it is well established that a taxpayer can hold both a long and short position in property at the same time, and each position nonetheless will be treated as separate property. *See e.g. Smith v. Comm'r*, 78 T.C. 350 (1983) (refusing to combine long and short positions in silver under the step transaction doctrine); *Stoller v. Comm'r*, 994 F.2d 855 (DC Cir. 1993) (respecting separate contracts as independent transactions).

**2. The Short Option Positions Do Not Reduce Basis**

**a. *Helmer* and its progeny unequivocally hold that a short option position is not a liability for purposes of Code Section 752.**

Under Code Section 752(b), a partner must immediately decrease his basis in the partnership to the extent that the partnership assumes the partner's individual "liabilities." In turn, under Code Section 752(a), all partners are then to increase their bases in their partnership interests for their share of the new "partnership" liability. While Code Section 752 does not define "liabilities", since 1975 the courts have consistently held and the IRS has consistently advocated the position that commitments which are contingent or speculative are not liabilities for purposes of Code Section 752.

In 1975 the IRS won a case in the U.S. Tax Court that governs this issue and is directly on point. In *Helmer v. Comm'r*, 34 T.C.M 727 (1975), the Tax Court held that a partnership's receipt of money pursuant to an option and the partnership's obligation to deliver property upon

exercise of that option did not create a partnership liability under Code Section 752. Adopting the position advocated by the IRS, the court determined that the option proceeds were not a liability for purposes of Code Section 752 since the obligation of the partnership to credit the payments was contingent upon the option being exercised.

Following *Helmer*, in *Long v. Comm'r*, 71 T.C. 1 (1978), the IRS again successfully argued that contingent obligations were not "liabilities" within the meaning of Code Section 752. In *Long*, the court held that contingent or contested obligations are not "liabilities" for purposes of increasing partnership basis until the obligations become fixed or liquidated.

Similarly, in *La Rue v. Comm'r*, 90 T.C. 465, (1988), the Tax Court again held, consistent with the position of the IRS, that obligations that are fixed in the sense that it is known that some amount will be paid, but that remain contingent in amount, do not constitute "liabilities" for purposes of Code Section 752. The *La Rue* court held that even though a contractual obligation is fixed, that obligation does not represent a liability under Code Section 752 until the cost of that obligation becomes fixed in amount. *Id.* at 479.

The IRS also consistently applied the reasoning of the aforementioned cases in its revenue rulings. *See, e.g.*, Rev. Rul. 79-294, 1979-2 C.B. 305 (in computing costs basis, obligations reflected in executory contracts prior to performance of the contract is not included in the basis); *see also* 73-301, 1973-2 C.B. 215 (holding that interim payments in connection with a long-term contract were not liabilities under Code Section 752); 57-29, 1957-1 C.B. 519 (in computing costs basis, the IRS does not recognize obligations reflected in executory contracts prior to performance); I.R.S. G.C.M. 37971 (June 1, 1979) (same); I.R.S. G.C.M. 37860 (Feb. 16, 1979) (same).

The short options purchased by the Stobie Creek Members were digital options. The digital options at issue were exercisable at 10 a.m. on their expiration date, and then only if they were in-the-money. Therefore, there was no way to tell, prior to 10 a.m. on April 17, 2000, whether Deutsche Bank would exercise these short options. Thus, the liabilities imposed by these short options were contingent until 10 a.m. on April 17, 2000. Based on *Helmer* and its progeny, the meaning of the term "liabilities" under Code Section 752 would not include such short option positions. Accordingly, the taxpayers would not be subject to a reduction in basis for the short options under the Code.

**b. Amended Treasury Regulation § 1.752 Cannot Be Applied Retroactively**

On August 11, 2000, the IRS issued Notice 2000-44, which took the position that offsetting options positions contributed to a partnership did not create substantial positive basis because the contingent obligation under the short option position was now deemed a liability for purposes of Code Section 752. On June 24, 2003 (nearly three years later), the Treasury Department revised the regulations that govern the definition of a "liability" for purposes of Code Section 752.

The new regulations under Code Section 752 expanded the definition of liability to include "any fixed or contingent obligation to make payment without regard to whether the obligation is otherwise taken into account for purposes of the Internal Revenue Code." Treas. Reg. §1.752-1(a)(4)(ii); *see also* Treas. Reg. §1.752-6(a); Treas. Reg. §1.752-7(b)(3). The Treasury Department attempted to have this new regulation apply retroactively. *See* Treas. Reg. §1.752-6 (the "Regulation").

If valid, the purported retroactive regulation would require a partner to reduce his basis in his partnership interest by the amount of any contingent obligation assumed by the partnership,

but would not allow the partner to increase his basis for the share of the new partnership liability. Treas. Reg. §1.752-6. Regulation §1.752 thus reversed the longstanding interpretation and application of Code Section 752 and its underlying regulations. Because this regulation purports to be retroactively applicable to an assumption of liabilities accruing after October 18, 1999, and before June 24, 2003, the IRS maintains that it is applicable to the Stobie Creek DOIS transactions.

The regulation, retroactively applied, is simply not valid. The issue of Notice 2000-44 and the purported retroactive Regulation were addressed in the recent case of *Klamath Strategic Inv. Fund, LLC ex rel St. Croix Ventures, LLC v. United States*, 440 F.Supp.2d 608 (E.D. Tex. 2006). In *Klamath*, the court held that the regulation could not be applied retroactively to taxpayers who structured partnership loans in reliance on prior law which provided that contingent obligations were not partnership liabilities for tax purposes.

In support of its decision, the *Klamath* court noted the IRS' long-standing view that contingent obligations are not liabilities under Code Section 752, commenting:

> It is clear from the record that the government has often and consistently relied on the principle that a "liability" under Code Section 752 does not include an obligation that is contingent. The government has applied this principle when it works to its benefit (to increase taxes owed). This Court will consistently apply these same principles even if they sometimes work to the benefit of taxpayers (to decrease taxes owed). This Court's analysis of "liability" under Section 752 will not vary in meaning simply based on whose ox is being gored.

440 F. Supp. 2d at 619. Further, in refusing to apply the regulation retroactively, the *Klamath* court, in part, characterized the regulation as an improper attempt by the IRS to "buttress the government's litigation position in this and similar cases." *Id.* at 625. The Supreme Court has made clear that deference to such a rule that "appears to be nothing more than agency's

convenient litigating position would be entirely inappropriate." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. at 213.

**3. The Code Section 465 "At-Risk" Provisions Are Inapplicable to the Stobie Creek Partnership.**

The IRS includes the Code Section 465 loss limitation rules in its attack against the Welles family's adjusted basis in their partnership interest. *See*, FPAA dated 2/23/07 at Exhibit A. Code Section 465 is an individual loss limitation provision that has no bearing in this partnership proceeding. Moreover, Congress explicitly chose not to apply Code Section 465 to the determination of a partner's basis:

> The at risk limitation is only intended to limit the extent to which certain losses in connection with the covered activities may be deducted in the year claimed by the taxpayer. The rules of this provision *do not apply for other purposes, such as the determination of basis.* Thus, a partner's basis in his interest in the partnership will generally be unaffected by this provision of the committee amendment.

S. Rep. No. 938, 94th Cong., 2d Sess. at 48 (June 10, 1976) (footnote omitted) (emphasis added).

The Treasury admitted in Proposed Treas. Reg. §1.465-1(e) that Code Section 465 does not affect basis:

> The provisions of section 465 and the regulations thereunder are only intended to limit the extent to which certain losses in connection with covered activities may be deducted in a given year by a taxpayer. *Section 465 does not apply for other purposes, such as determining adjusted basis. Thus, for example, the adjusted basis of a partner in a partnership is not affected by section 465.* (Emphasis added).

In all events, the limited list of exceptions in Code Section 465(a)(4) (" . . . protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangement") relied upon by the IRS does not apply to pairs of options or the most common form of liability protection through the choice of entity—especially a single member LLC that is

disregarded for tax purposes. Case law is clear that Code Section 465 was not intend to apply Code Section 465 for basis purposes. *See Laureys v. Comm'r*, 92 T.C. 101, 129-32 (1989) (Congress did not intend Code Section 465 to limit losses in options straddles or spreads despite their awareness of their use as a tax planning device); *Starr v. Comm'r*, T.C. Memo 1991-610 (futures straddles not subject to Code Section 465); *Resser v. Comm'r*, T.C. Memo 1991-423 (stock spread options technique); *Thurner v. Comm'r*, T.C. Memo 1990-529 (commodity futures contracts spreads).

*Laureys* is directly on point and well reasoned. The Court analyzed the plain meaning of the specific language of Code Section 465(b)(4), recognizing that "*similar* arrangements" did not mean "*any* arrangement." Based on a study of the simultaneous legislative enactment of the straddle rules in Code Section 1092 and the at-risk rules and based on the well-known use of straddles as a tax planning device, the Court properly concluded that Congress could have and would have specified spreads or straddles in the enumerated list had it intended to do so. Further, Congress has failed to amended Code Section 465, despite the *Laureys* decision, which bolsters the *Laureys* holding that spread options are not covered by Code Section 465.

**4. The General Anti-Abuse Rule Does Not Apply**

Under the general anti-abuse rule, the IRS claims authority[1] to recast a transaction for federal income tax purposes if (i) a partnership is formed or availed of in connection with a

---

[1] The so-called "anti-abuse rule" has been routinely criticized and apparently never applied by a court. Hoffman Fuller, a well-respected professor of tax law at Tulane Law School, also commented on the criticism of this regulation shortly after it was published:

> "Criticism of the new regulation has been prolonged and sharp. Ever since it appeared, the anti-abuse rule has been attacked by tax practitioners, former tax administrators, commissioners, and Tax Court judges. The dominant theme throughout these criticisms is that the rule creates too much uncertainty – that its content is so

transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability, in a manner that is (ii) inconsistent with the intent of Subchapter K. Treas. Reg. §1.701-2(b). Both elements must exist simultaneously for the Commissioner to recast the transaction. Neither prong is met under the facts of this case.

Stobie Creek was not formed or availed of in connection with a transaction a "principal" purpose of which was to reduce tax. Stobie Creek was established on March 3, 2000, as the entity that would directly hold the family's investments. Since its formation, Stobie Creek has made hundreds of highly sophisticated investments with varying degrees of risk, ranging from conservative to speculative. Stobie Creek continues to maintain a complex portfolio of assets worth hundreds of millions of dollars.

Nor was the result of the DOIS transactions at issue inconsistent with the "intent" of subchapter K. The regulations suggest that the following requirements must be met for a transaction to be within the intent of Subchapter K:

- the partnership must be bona fide, and each partnership transaction or series of transactions must have a substantial business purpose (the "purpose" requirement);
- the form of the relevant partnership transaction must be respected under substance-over-form principles (the "substance-over-form" requirement); and
- subject to certain exceptions, the tax consequences of the transaction under Subchapter K must accurately reflect the partners' economic arrangement and

---

> unspecific as to invite unpredictable and standardless challenges by revenue agents against partnership transactions. A former Chief Judge of the Tax Court has written that while nobody doubts there are abusive transactions, "it does not follow to delegate to agents the sweeping power to interpret the intent of the statute." Moreover, critics have asserted that the uncertainty produced by the new rule increases the cost of tax planning and has a chilling effect on contemplated transactions."

*Fuller, Hoffman, "The Intent to Avoid Tax,* 70 Tul. L. Rev. 2103 (1995-1996) at 2115.

clearly reflect the partner's income (the "proper reflection of income" requirement).

*See* Treas. Reg. §1.701-2(a)(1)-(3).

The evidence at trial will demonstrate that Stobie Creek was a valid partnership and the investments it made were in the ordinary course of its business, were intended to be profitable, and were clearly bona fide. Moreover, the substance of the transactions at issue in this case reflects their form -- they are legitimate economic transactions, entered into in the ordinary course of business. While such transactions resulted in tax benefits, the consequences of the transactions accurately reflected the economic arrangement among the partners. There were no allocations among the partners that were inconsistent with Subchapter K or otherwise did not have substantial economic effect within the meaning of Code Section 704(b).

**C. The Sham Transaction Doctrine Does Not Apply**

No universally accepted standard exists among the courts for testing whether a transaction is a sham. For example, the Fourth Circuit has adopted a two-prong standard for disregarding a transaction under the so-called "sham transaction doctrine," stating that "[t]o treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits ... and that the transaction has no economic substance because no reasonable possibility of a profit exists." *Rice's Toyota World Inc. v. Comm'r*, 752 F.2d 89, 91 (4th Cir.1985); *see also Black & Decker Corp. v. United States*, 436 F.3d 431, 441 (4th Cir. 2006). Under this conjunctive test, an entity or transaction cannot be ignored for want of economic substance, unless the transaction (i) possesses no non-tax purpose and (ii) objectively has no prospect of reasonably reaping profits. *Id.*

Other circuits have applied this test in a disjunctive fashion, requiring both a subjective non-tax business purpose as well as objective economic substance. *See e.g., United Parcel Serv.*

*of Am., Inc. v. Comm'r*, 254 F.3d 1014, 1018 (11th Cir. 2001) (noting that a transaction with economic effects must nonetheless be disregarded if it has no business purpose and its motive is tax avoidance); *IES Industries, Inc. v. United States*, 253 F.3d 350 (8th Cir. 2001) (same). Under this approach, a transaction must be both purposeful and substantive. If proof in either regard is lacking, the transaction is deemed a sham.

Still other circuits view business purpose and the reasonable expectation of profit as merely factors to be considered in determining whether a transaction is a sham. *See, e.g., ACM Partnership v. Comm'r*, 157 F.3d 231, 247 (3d Cir.1998) ("[T]hese distinct aspects of the economic sham inquiry do not constitute discrete prongs of a 'rigid two-step analysis,' but rather represent related factors both of which inform the analysis of whether the transaction had sufficient substance, apart from its tax consequences, to be respected for tax purposes.") (citation omitted); *see also James v. Comm'r*, 899 F.2d 905, 908-09 (10th Cir. 1990).

In *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1355 n. 14 (Fed. Cir. 2006), *cert. denied*, --- U.S. ----, 127 S. Ct. 1261, 167 L.Ed.2d 76 (2007), the Federal Circuit appears to have adopted a disjunctive test, under which the lack of either a subjective non-tax business purpose or subjective economic substance would be grounds to disregard a transaction.[2] The Federal

[2] In *Drobny v. United States*, 86 F.3d 1174 (Table) 1996 WL 170445 (Fed. Cir. 1996), the Federal Circuit previously adopted the Fourth Circuit conjunctive test, a decision that though not directly addressed by the court in *Coltec*, appears to now have been abandoned by the Federal Circuit. Nonetheless, a clear conflict exists among the circuits that has resulted in uncertainty regarding application of the doctrine. It is Plaintiffs' contention that the standards advocated in *Coltec* offer an overly expansive view of the economic substance doctrine and that the more appropriate standard is the Fourth Circuit test previously applied by this Circuit in *Drobny*. Ultimately, this split of authority among the circuits and the uncertainty that has resulted will need to be resolved by the Supreme Court. Plaintiffs argue to this Court and, if necessary, will argue to the Federal Circuit that the Fourth Circuit test should govern this case.

Circuit commented that "[w]hile the doctrine may well also apply if the taxpayer's sole subjective motivation is tax avoidance even if the transaction has economic substance, a lack of economic substance is sufficient to disqualify the transaction without proof that the taxpayer's sole motive is tax avoidance." 454 F.3d at 1355, *citing Dow Chemical Co. v. United States*, 435 F.3d 594, 599 (6th Cir.2006). The Federal Circuit further emphasized that "[w]hile the taxpayer's subjective motivation may be pertinent to the existence of a tax avoidance purpose, . . . the economic substance of a transaction must be viewed objectively, rather than subjectively." *Id*. at 1356; *see also Black & Decker*, 436 F.3d at 441-42 (noting that economic substance inquiry requires an "objective determination of whether a reasonable possibility of profit from the transaction existed"). Moreover, the transaction to be analyzed is the one "that gave rise to the alleged tax benefit." *Coltec*, 454 F.3d at 1356-57.

Regardless of the test applied, however, the evidence of investment motive and the existence of a reasonable possibility of profit, exclusive of tax benefits, demonstrates that the DOIS Transactions executed by the Welles family had both a subjective business purpose and objective economic substance that would satisfy any formulation of the "economic substance" doctrine and the principles set forth in *Coltec*.

**1. The DOIS Transactions Were Entered Into With A Valid Business Purpose**

The IRS maintains that neither Stobie Creek nor its partners entered into the foreign currency options with a profit motive. The position adopted by the IRS is simply incorrect. Plaintiffs' investment motivations stemmed from their desire and understanding that large speculative profits could be made by investing in foreign currencies. While Plaintiffs certainly understood that such investments could be risky, such an approach was and is not inconsistent with Plaintiffs' investment profiles and the existence of a valid business purpose. *See Jacobsen v.*

*Comm'r*, 915 F.2d 832, 838 (2d Cir. 1990) (for purposes of testing profit motive under the sham transaction doctrine, "it may be sufficient that there is a small chance of making a large profit.")

Moreover, the fact that Plaintiffs chose to make their investments in foreign currencies through a tax-advantaged structure that minimized losses is not relevant to the tax consequences and in no way diminishes their expectation of a profit. Indeed, relevant evidence of investment motive will establish that Plaintiffs were drawn to this transaction by their desire and the possibility to make a large profit, albeit a speculative one, from the DOIS Transaction. This fact will be confirmed by the testimony of, among others, Jeffrey Welles and David Waterman, as well as actions by Jeffrey and others in evaluating the proposed investment strategy and due diligence conducted both prior too and during the course of the DOIS transactions.

For example. Jeffrey Welles' due diligence led him to conclude that there was a reasonable expectation of a profit. He was told by Deutsche Bank employees that there was a 30% chance of doubling his money. Moreover, given the fact that the sale of Therma-Tru was not finalized and did not close until after the options expired, Plaintiffs had every incentive to make a profit on these options. The standard for business purpose under the sham transaction doctrine is whether the transaction was entered into solely for tax benefits. So long as a bona fide non-tax business purpose exists, as it does here, the transaction must be respected. *See Knetsch v. United States*, 364 U.S. 361 (1960).

### 2. The DOIS Transaction Meets the Objective Test For Economic Substance Set Forth in *Coltec*

The objective economic substance test requires that a taxpayer prove that a transaction had a "realistic financial benefit" beyond tax avoidance. *Coltec*, 454 F.3d at 1356 n. 16 (*quoting Rothschild*, 407 F.2d at 411); *see also ACM P'ship v. Comm'r*, 157 F.3d 231, 251 (3d Cir. 1998). More precisely, the economic substance inquiry requires an objective determination of whether a

*reasonable possibility of profit* from the transaction existed, exclusive of tax benefits. *Coltec*, 454 F.3d at 1356 (*citing Black & Decker Corp. v. United States*, 436 F.3d 431, 441-442 (4th Cir. 2006); *see also Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d at 91; *IES Indus. v. United States*, 253 F.3d 350, 353 (8th Cir. 2001). Moreover, a reasonable or realistic potential for profit "does not mean that the transaction must make a profit or even that similar transactions generally are profitable." *Cherin (Ralph) v. Comm'r*, 89 T.C. 986, 993-994 (1987); *see also Abramson v. Comm'r*, 86 T.C. 360, 369 (1986) (noting that only an average of 1 film in 10 is successful); *Jacobsen*, 915 F.2d at 838 (noting that it may be found that an investor in a wildcat oil well who incurs very substantial expenditures is in the venture for profit even though the expectation of a profit might be considered unreasonable).

The DOIS transaction had a reasonable opportunity of earning profit independent of tax considerations, as economic experts Richard Levich and Robert Kolb will explain. Professor Levich will testify that the probability for a 200% return was in the range of 9-21% for the euro digital options and in the range of 15-27% for the Swiss franc digital options. In addition, Professor Levich will testify that the probability for the 200 times return was in the range of 0.13-0.15% for the euro digital options and in the range of 0.09-.11% for the Swiss franc digital options.

**D. Code Section 165(c) is Inapplicable to the DOIS transactions.**

In the FPAAs, the IRS also maintains neither Stobie Creek nor its partners entered into the option positions or purchased the foreign currency options with a profit motive for purposes of Code Section 165(c)(2). Code Section 165(c)(2) allows *individual* taxpayers to deduct "*losses* incurred in any transaction entered into for profit." Code Section 165(c)(2)(emphasis supplied). Code Section 165 items are not partnership items. Further, Code Section 165(c)(2) only operates to disallow losses claimed. No such losses were claimed in connection with the DOIS

Transactions. Finally, on its face, the loss limitation provisions of Code Section 165(c) do not require that profit constitute the "primary" motive. Unlike other statutes where Congress imposed such a standard (*see, e.g.*, Code Section 269(a), Code Section 165(c) permits losses to the extent incurred in "*A* trade or business, . . . in *any* transaction entered into for profit, [or] from fire, storm, shipwreck or other casualty, or from theft." Code Section 165(c)(emphasis added). So long as *a* business or *any* transaction is entered for profit the statute is satisfied. The profit motive need only be genuine. *Dreicer v. Comm'r*, 78 T.C. 642, 646 (1982), *aff'd without published opinion*, 702 F.2d 1205 (D.C. Cir. 1983). Thus, even should Code Section 165(c)(2) apply, Plaintiffs are permitted to deduct the losses stemming from the DOIS Transactions because, as discussed in section *supra*, Plaintiffs had the requisite profit motive when they invested. It is of no moment that Plaintiffs also considered the tax advantages that were attendant to these investments.

**E. No Penalty Is Applicable**

The IRS seeks two levels of penalties from Plaintiffs. First, the IRS seeks a penalty of 40% under Code Section 6662(h), to be imposed on purported underpayments of tax that are attributable to a "gross valuation misstatement." Second, the IRS seeks a penalty of 20% under Code Section 6662(a), to be imposed upon alleged "underpayments of tax" attributable to negligence within the meaning of Code Section 6662(b)(1) and (c), a substantial understatement of income tax as defined in Code Section 6662(b)(2) and (d), and a substantial valuation misstatement under Code Section 6662(b)(3) and (e).

As set forth in Plaintiff's' Motion to Confirm Jurisdiction With Respect to the Application of Penalties, consistent with the provisions of Code Sections 6221 *et seq*, this Court has jurisdiction to consider the application of penalties with respect to both Stobie Creek and its members (as well as any applicable defenses) in this partner level proceeding. Indeed, the recent

decision in *Klamath*, *supra*, clearly provides that the entity *and* partner/member defenses are appropriately considered in the single unified proceeding. This was confirmed by the Court in *Jade Trading, LLC et al. v. United States*, --- Fed.Cl. ----, 2007 WL 4553043 (Fed. Cl. 2007). There the Court stated:

> The Klamath Court held that the partner-level reasonable cause defense could be raised in a partnership-level action because it involved actions by the managing member and the IRS had delved into the potential defenses of the partners during the administrative process. (Citation omitted.)

2007 WL 4553043 at *49.

The facts in Stobie Creek are four square with the above statement from *Jade*. The managing member of Stobie was North Channel. Jeffrey Welles is the manager of North Channel. In docket 05-748T, JFW Enterprises, Inc. is the designated Tax Matters Partner of Stobie Creek. Jeffrey Welles is the sole shareholder of all the stock of JFW Enterprises, Inc. And, in docket 07-520T, JFW Investments LLC is the designated Tax Matters Partner of Stobie. In this case, JFW Investments LLC is solely owned by JFW Enterprises, Inc. which, in-turn is owned by Jeffrey Welles. Moreover, JFW Investments LLC is considered a disregarded entity for federal income tax purposes positing effective tax ownership in Stobie For this period in JFW Enterprises, Inc. Thus, consistent with the *Jade* interpretation of *Klamath*, the Stobie Creek cases involve actions by the managing member of Stobie Creek. Additionally, as in *Klamath*, the IRS in Stobie Creek has fully delved into the potential defenses of the partners during the administrative process. In this case, Stobie Creek and it several members through their ultimate taxpayer owners have responded fully to numerous Information Document Requests relating, in substantial part, to the transactions in which they engaged and probed for information relating to their reliance on the advice they received from their tax professionals as well as their own level

of experience in investment matters. That this has been an area in which "the IRS [has] delved" is beyond question.

Finally, the court in *Jade*, in contrasting the facts of *Jade* to those in *Klamath*, noted: "However, none of the Ervin LLCs was the managing member, and they did not prepare Jade's tax returns--Sentinel's accounting firm did." *Id.* Stobie is unlike *Jade* in this connection and identical to *Klamath*. Specifically, as described above, Jeffrey Welles' LLC is the effective manager of Stobie Creek through North Channel. Moreover, Stobie Creek's accountant, Robert Floyd, has prepared the tax returns of Stobie Creek for each tax year of its existence. Accordingly, Stobie Creek and its members are appropriately before the court and all issues of penalties should be for Stobie Creek and its members should be considered in this partnership/partner level proceeding.

### 1. Plaintiffs Are Not Subject to the 40% "Valuation Overstatement" or Any Other Code Section 6662(a) Penalty Because the Welles Family Members Reasonably Relied and Acted in Good Faith Upon the Advice of Tax Professionals

No penalty can be imposed under Code Section 6662 where the taxpayer reasonably relied upon the advice of tax professionals and acted in good faith with respect to a questioned item. Code Section 6664(c)(1). In determining whether there is a "reasonable basis" for the position taken, taxpayers are entitled to rely on the advice of professional tax advisors - precisely what occurred here.

It is well established that "[r]eliance on ... professional advice ... constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Treas. Reg. §1.6664-4(b)(1). The Supreme Court has squarely held that, "[w]hen an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice." *United States v.*

*Boyle*, 469 U.S. 241, 251 (1985) (emphasis omitted). A taxpayer who receives competent professional advice as to the permissible tax treatment of an item is not negligent in following that advice to reduce his tax liability. *See Estate of Monroe v. Comm'r*, 124 F.3d 699, 714-715 (1997) (holding that no negligence penalties could be imposed on a taxpayer who, on the advice of the Touche Ross accounting firm and with the purpose of minimizing tax on his estate, asked his heirs to disclaim their bequests and then transferred like amounts to the disclaiming heirs as inter vivos gifts); *Chamberlain v. Comm'r*, 66 F.3d 729, 733 (5th Cir. 1995) ("Because the taxpayers reasonably relied on the advice of a tax expert in claiming the loss, the negligence penalty should not have been sustained.").

Consulting one professional tax advisor is generally sufficient. *Boyle*, 469 U.S. at 251 (holding that taxpayers are not required to seek a "second opinion" in order to rely reasonably upon professional tax advice); *see also Stanford v. Comm'r*, 152 F.3d 450, 461 (finding reasonable cause, and reversing the Tax Court's contrary finding, where taxpayers relied upon the advice of "an experienced CPA"). And, having commissioned expert advice, taxpayers are generally entitled to rely upon it. As the Supreme Court held in Boyle:

> Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. 'Ordinary business care and prudence' do not demand such actions.

469 U.S. at 251 (citation omitted).

Moreover, the reasonableness of a taxpayer's reliance on expert advice regarding the tax laws does not depend upon the ultimate correctness of the advice given. *See Boyle*, 469 U.S. at 250 ("'[R]easonable cause' is established when a taxpayer shows that he reasonably relied on the advice of an accountant or attorney . . . even when such advice turned out to have been

mistaken."); *Stanford,* 152 F.3d at 461 ("Although [the CPA's] legal interpretation . . . turned out ultimately to be incorrect -- and indeed gave rise to a substantial understatement of tax on the Stanfords' 1990 joint return -- we find that the Stanfords' reliance on that interpretation constitutes 'reasonable cause' for purposes of precluding the penalty imposed against them for that understatement."). Even a conclusion that a transaction lacks economic substance does not foreclose a reasonable-cause defense for the taxpayer who has entered into it in reliance upon professional tax advice. *See Durrett v. Comm'r,* 71 F.3d 515, 517-18 (5th Cir. 1996) (affirming Tax Court's finding that the taxpayer had no profit motive, but reversing negligence penalties on the ground that the taxpayer had relied in good faith on professional advice concerning the tax laws).

Applying these standards, it is clear that the Welles family exercised ordinary care in determining their tax liability. It was reasonable for the Welles family to rely on the tax opinion of J&G, at the time a large, established law firm, with an excellent reputation and a specialization in tax matters. J&G provided the Welles family with a 123-page tax opinion establishing that it was "more likely than not" that the tax treatment of the transactions engaged in were proper under the Code.

Additionally, the firm of SLK also advised the Welles family that the tax treatment of the DOIS transactions was proper. SLK is a highly reputable firm that had advised and provided the Welles family with guidance on their business and personal affairs for over forty years. The firm thoroughly researched the legal issues presented in the J&G opinion and provided the Welles family with the comfort that not one, but two well-respected law firms had counseled them on how to structure their investments. Moreover, Mr. Waterman advised the Welles family that if he were in their shoes he would have participated in the transaction himself.

The DOIS transaction was very complex. Accordingly, it was reasonable for the Welles family to rely on their counsel, SLK to provide due diligence with respect to the tax aspects of the strategy. In addition, their newly hired CFO, Mr. Goldstein, a lawyer and CPA, reviewed multiple drafts of the opinion and did not relay any concerns to the family regarding the transaction. Plaintiffs' reliance was at all times reasonable and conducted in good faith.

**2. Plaintiffs Are Not Subject to Negligence Related Penalties Because they Exercised Ordinary Care.**

Defendant has also asserted 20% penalties under Code Section 6662(b)(1) -- for "negligence or disregard of rules or regulations." "Negligence" is defined to include any failure to reasonably attempt to comply with the tax code, including the lack of due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances. *See* Code Sections 6653(a) (3) and 6653(a). Plaintiffs were clearly not negligent.

As set forth above, taxpayers are entitled to rely on the expertise of tax professionals and financial advisors as Plaintiffs did in this case. Moreover, such reliance precludes a finding of negligence. For example, in *Betson v. I.R.S.*, 802 F.2d 365, 372 (9th Cir.1986), the Ninth Circuit refused to uphold a negligence penalty because the taxpayer relied in good faith on an accountant's advice. *See also See Estate of Monroe v. Comm'r,* 124 F.3d 699, 714-715 (1997) (holding that no negligence penalties could be imposed on a taxpayer who relied on the advice of an accounting firm regarding transaction intended to minimize tax carried out on his estate); *Durrett v. Comm'r*, 71 F.3d 515, 517-18 (5th Cir. 1996) (affirming Tax Court's finding that the taxpayer had no profit motive, but reversing negligence penalties on the ground that the taxpayer had relied in good faith on professional advice concerning the tax laws). Plaintiffs here exercised ordinary care in determining their tax liability by consulting tax experts both at the time of the transaction and at the time they filed their return.

**3. Plaintiffs Are Not Subject to the Substantial-Understatement Penalty Because Their Tax Position Was Supported by Substantial Authority.**

Under Code Section 6662(d)(2)(b)(i), a "substantial understatement" of tax under Code Section 6662(b)(2) must be reduced by the portion attributable to a tax position for which there was "substantial authority." Code Section 6662(d)(2)(B)(i). According to the Treasury Regulations, the "substantial authority standard is an objective standard involving an analysis of the law and application of the law to relevant facts. The "substantial authority" standard is less stringent than the "more likely than not" standard (the standard that is met when there is a greater than 50-percent likelihood of the position being upheld), but more stringent than the "reasonable basis standard." Treas. Reg. § 1.6662-4(d)(2). "Authority" is defined to include several sources of law, such as statutes, court cases, legislative history, and regulations. Treas. Reg. § 1.6662-4(d)(3)(ii). While opinions rendered by tax professionals are not authority, the authorities underlying such opinions, if applicable to the facts of a particular case, may give rise to substantial authority for the tax treatment of an item. Treas. Reg. § 1.6662-4(d)(3)(iii).

As the expert testimony of Stuart Smith (who represented the United States on tax issues in the Supreme Court over a period of several decades, and whose qualifications for this purpose are extremely high) and Ira Sheppard (a preeminent legal scholar if the field of federal taxation) will demonstrate, Plaintiffs relied on established rules of tax law for which substantial authority existed at the time of the transaction. The opinions offered by J&G comported with the likely or expected result required by the Code and were amply supported by applicable statutes, regulations and judicial precedent.

**4. Imposing Penalties Would Be Unjust, Given the State of the Law.**

It would be unjust for the IRS to assert millions of dollars in penalties against Plaintiffs when the tax reporting at issue was principally dependent on the IRS long standing treatment of

the term "liability" for purposes of Code Section 752, which it had often used to its advantage. As the most recent case on the subject, *Klamath*, confirms - not only are taxpayers justified in relying upon the *Helmer* line of cases - they were right. A taxpayer's decision to litigate legal uncertainties about the application of a statutory scheme as complex as the Internal Revenue Code is simply not a proper basis for imposing penalties.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court remove all adjustments to income, losses, distributions, basis, and penalties, as well as all amounts deposited, and for such other relief as to which Plaintiffs may be justly entitled.

Dated: February 7, 2008

Respectfully Submitted
SCHIFF HARDIN LLP

/s/ Robert E. Kolek
Attorneys for Plaintiffs

Robert E. Kolek
Thomas R. Wechter
Matthew C. Crowl
Colleen M. Feeney
Ayad P. Jacob
SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, IL 60606
Phone: 312-258-5500
Fax: 312-258-5600

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th of February, 2008, the undersigned counsel caused to be electronically filed *Plaintiffs' Contentions of Fact and Law* using the CM/ECF system, which will send notification of such filing to the following named counsel of record:

Stuart D. Gibson, Esq.
Cory A. Johnson, Esq.
Trial Attorney
Tax Division
U. S. Department of Justice
P.O. Box 26
Ben Franklin Station
Washington, D.C. 20044

/s/ Colleen M. Feeney