# STOBIE CREEK INVESTMENTS LLC
# JFW ENTERPRISES, INC., Tax Matters and Notice Partner
# JFW INVESTMENTS, LLC, Tax Matters and Notice Partner

**vs.**

# THE UNITED STATES OF AMERICA

**Case No. 1:05-cv-00748-CCM**
**Case No. 1:07-cv-00520-CCM**
**In the United States Court of Federal Claims**

# EXPERT REPORT OF IRA B. SHEPARD, LL.B.
**PURSUANT TO F.R.C.P. 26(a)(2)(B)**

## PURPOSE OF ENGAGEMENT

I was retained by the law firm of Schiff Hardin LLP on behalf of the family of David K. Welles, Sr., more specifically for JFW Enterprises, Inc. ("JFW Inc."), JFW Investments, LLC ("JFW LLC"), and Stobie Creek Investments LLC ("Stobie Creek") (collectively, along with other Welles family members and related entities not named parties in these lawsuits, "the Stobie Creek Plaintiffs") to review certain documents in connection with the above matters. Schiff Hardin LLP requested that I prepare a report stating my opinions regarding the allegations of the United States of America ("the IRS")[1] in connection with its examination of certain of their federal income tax returns following their participation in a series of transactions known as the Digital Options Investment Strategy ("DOIS" or "the DOIS strategy").

My findings are summarized below. The opinions expressed in this report are based upon the data and other information available at this time. I reserve the right to supplement this report based on further discovery in this lawsuit.

## QUALIFICATIONS OF IRA B. SHEPARD, LL.B.

I received an A.B. degree (cum laude) from Harvard University in 1958 and an LL.B. degree (cum laude) from Harvard Law School in 1964, where I was one of the editors of the Harvard Law Review. From 1958 to 1961 I served as an officer on active duty in the United States Naval Reserve. I am licensed to practice law in the State of New York and a member of the bars of the United States Supreme Court, the Court of Appeals for the Second Circuit, the District Court for the Southern District of New York, and the United States Tax Court.

---

1 In this report, I use the term "IRS" to refer not only to the Internal Revenue Service, but also to the United States Treasury, which makes tax policy and issues regulations that interpret the tax laws legislated by Congress and to the U.S. Department of Justice, which provides the attorneys who try lawsuits on behalf of the government in tax controversy matters not situated in the United States Tax Court, as is the case here. All section references, unless otherwise indicated, are to the Internal Revenue Code of 1986, as amended from time-to-time, and the Treasury Regulations thereunder, and which are sometimes referred to herein as "the Code" and/or "the Regs."

From 1964 to 1971 I practiced law with the firm of Paul, Weiss, Rifkind, Wharton & Garrison in New York City, NY. From 1971 to 1975 I was an Assistant Professor at the University of Georgia School of Law where I taught federal income tax and professional responsibility courses to JD candidates. In 1975, I joined the faculty of the University of Houston Law Center where I remain today as a Professor of Law. Over the course of my more than 30 years at the University of Houston Law Center, I have regularly taught numerous federal income tax and professional responsibility courses to JD and LLM (taxation) candidates, including, since 1999, a course in tax ethics.

I have been the Special Advisor to the Southern Federal Tax Institute since 1974. Moreover, I have chaired the Continuing Legal Education and Research Committee of the American Bar Association Tax Section and the planning committee for the University of Texas Tax Conference, and have been president of the Houston, Texas-based Wednesday Tax Forum. I currently sit on the board of the Houston, Texas-based International Tax Forum and the council of the Houston Bar Association Tax Section. Further, I am a fellow of the American College of Tax Counsel.

I regularly speak on recent tax developments at numerous tax institutes, including the University of Denver Tax Institute, the University of Texas Tax Conference, the University of North Carolina Tax Institute, the American Institute on Federal Taxation, the Southern Federal Tax Institute, the Tennessee Federal Tax Institute, and the William and Mary Tax Conference. I also regularly speak on recent tax developments at programs sponsored by the Tax Executives Institute, the American Petroleum Institute, the Houston Bar Association Tax Section, the Austin Tax Forum, the Austin Chapter of the Texas Society of CPAs, the University of Houston Law Foundation, and the Wednesday Tax Forum. I have also lectured at the Virginia Tax Conference, the New Mexico Tax Conference, the New Mexico Tax Institute, the New Mexico Tax Symposium, the Alabama Tax Conference, the Kentucky Tax Institute, the Lewis & Clark Tax Institute, the Great Lakes Federal Tax Institute, the State Bar of Michigan Tax Section, the Ohio [AICPA] Tax Institute, the Columbus [Ohio] Tax Institute, the Tulane Tax Institute, the NYU Tax Institute, the Maryland Tax Institute, and the Hawaii Tax Institute, as well as at programs sponsored by ALI-ABA, the Practising Law Institute, the Internal Revenue Service, and the Federal Bar Association.

I have spoken on various professional and tax ethics topics to the Houston Bar Association and its Tax Section, the American Petroleum Institute Tax Forum, the Houston, Texas-based Women Attorneys in Tax and Probate, the American Corporate Counsel Association [Houston Chapter], the Brazoria County [Texas] Bar Association, the Tax Executives Institute [Houston Chapter], South Texas College of Law, the Houston Estate and Financial Forum, and the Council on International Tax Education.

A complete copy of my professional qualifications, which includes a list of all publications I have authored within the preceding 10 years, is attached to this report as Exhibit A. I have not rendered expert testimony by deposition or at trial within the preceding four years.

## COMPENSATION RATE

The compensation to be paid me for my time spent on this matter is based on my current standard rate of $450 per hour, plus reimbursement of out-of-pocket costs.

## MATERIALS REVIEWED AND CONSIDERED IN FORMING OPINIONS

A listing of materials reviewed and considered in forming opinions is attached to this report as Exhibit B. Moreover, I reviewed the expert reports of the Stobie Creek Plaintiffs' other experts, Jeffrey A. Frankel, Ph.D. ("Frankel"), Robert W. Kolb, Ph.D. ("Kolb"), and Richard M. Levich, Ph.D. ("Levich"), as well as the expert report of the IRS's expert, David F. DeRosa, Ph.D. ("DeRosa").

## FACTS & CIRCUMSTANCES / HISTORICAL BACKGROUND

In the late 1990s, the family of David K. Welles, Sr. ("David Sr.") was the owner of Therma-Tru Corp. ("Therma-Tru"), a Maumee, OH-based manufacturer of fiberglass entry doors that David Sr. and his father founded in 1962. Initially a manufacturer of steel doors, Therma-Tru found an alternative by pioneering the development of fiberglass technology which it introduced in the mid-1980s. By the late 1990s, Therma-Tru had become the preferred brand of entry door systems with sales in excess of $370 million and distribution across five continents of the world. A survey among construction firms on brand awareness conducted by the staff of Professional Builder magazine in 1998 concluded that Therma-Tru's entry door systems ranked first in a category composed of more than 24 competitors, a ranking achieved for the second year in a row.[2] During 1999, other building products companies and investors began to show an interest in acquiring Therma-Tru. At first, the family held discussions with Masco Corporation of Taylor, MI, one of the world's largest manufacturers of brand-name consumer products for the home improvement and new construction markets.[3] Then, in the fall of that year, it began to discuss a sale or redemption of the family's interest in Therma-Tru with Kenner & Company ("Kenner"), a New York City, NY-based private investment firm with a concentration in the home building products industry.[4] As is discussed more fully below, the family struck a deal with Kenner that resulted in a recapitalization of Therma-Tru in May of 2000.[5]

---

[2] History section of the Therma-Tru website at http://www.therma-tru.com; Exhibit 52 to the deposition of Virginia, December 11, 2006 [VSJ-1025-1075 at 1042]; History section of the Therma-Tru UK website at http://www.therma-tru.co.uk; Overview of Therma-Tru Doors from the Monster website at http://www.monster.com; "Quality & Integrity Drive Brand Use (1998 Brand Leader)," Professional Builder, September 1, 1998.

[3] Deposition of David Jr., Vol. 1, December 12, 2006, p. 42 (7-13); Masco Corporation website at http://www.masco.com.

[4] Deposition of David Jr., Vol. 1, December 12, 2006, p. 42 (15-24); UBS Capital Americas website at http://www.ubscapitalamericas.com.

[5] Deposition of David Jr., Vol. 1, December 12, 2006, p. 43 (13-20).

At or about the same time, the members of the Welles family decided to consolidate the wealth generated from the possible sale or recapitalization of Therma-Tru into a jointly-owned entity that would be managed by a family office-entity to obtain the benefit of centralized management of their investment activities, i.e. to create economies of scale and access to asset management and administration that the involved three generations of family members might not have been able to obtain on their own. In that regard, they sought the counsel of David A. Herpe, Esq. ("Herpe"), an estate planning specialist and partner in the Chicago, IL office of the preeminent international law firm McDermott Will & Emory, who has helped 10 to 15 clients establish such entities.[6]

In 1999, the immediate family with ownership interests in Therma-Tru included David Sr. and his wife, Georgia E. Welles ("Georgia"), who at that time resided in Bowling Green, OH,[7] and their five adult children, only one of whom was employed by Therma-Tru:

1. David K. Welles, Jr. ("David Jr." or "Deke"), a 1974 graduate of Yale College, began working at Therma-Tru in 1977 and was its Chairman and CEO in 1999. David Jr. and his wife, Hope, reside in Perrysburg, OH, a suburb of Toledo.[8]

2. Virginia Welles Jordan ("Virginia"), a 1975 graduate of the University of Redlands, obtained a Masters in Fine Art and Writing from Antioch College in 1979. In 1999, Virginia was a self-employed psychotherapist. She and her husband, Roger, reside in Boulder, CO.[9]

3. Jeffrey F. Welles ("Jeffrey"), a 1977 graduate of Dartmouth College, worked for Emerson Electric Co. until 1984, when he returned to business school at Columbia University from which he obtained an MBA degree in 1985. Thereafter, he spent approximately 10 years in the private client group at Goldman Sachs, the large New York investment banking firm, and approximately four years as a senior portfolio manager at Lazard, a preeminent international financial advisory and asset management firm. In 1999, Jeffrey left Lazard to establish the Welles family investment office, North Channel LLC ("North Channel"), Stobie Creek, and a family foundation, Cricket Island Foundation ("Cricket Island"), discussed more fully below. Jeffrey and his wife, Maud L. Welles ("Maud"), who is also a 1977 graduate of Dartmouth

---

6 Plaintiffs' Complaint dated July 12, 2005, ¶14.c. and d., p. 13; deposition of Herpe, December 8, 2006, pp. 28 (7) – 29 (5) and 32 (18) – 34 (21); and, profile of Herpe from the McDermott, Will & Emory website at http://www.mwe.com.

7 See [FLOYD 001178-001179 at 001178]. At some point during calendar year 2000, David Sr. and Georgia may have changed their principal residence to Vero Beach, FL [deposition of Goldstein, August 7, 2007, pp. 51 (10) – 52 (13)].

8 Deposition of David Jr., Vol. 1, December 12, 2006, pp. 4 (11-12), 17 (12-15), 18 (20-21), and 19 (18-24) and Exhibit 70 thereto [DGWJR-1069-1370 at 1077].

9 Deposition of Virginia, December 11, 2006, pp. 4 (11-12) and 17 (12-17), and Exhibit 52 thereto [VSJ-1025-1075 at 1034-1036].

College and who obtained an MBA degree from New York University in 1991, reside in New York City, NY. Maud is a portfolio manager for Stobie Creek.[10]

4. Peter C. Welles ("Peter}, a 1982 graduate of the University of Minnesota, worked as a real estate leasing agent for approximately 15 years, however, by 1999 he was a self-described non-profit volunteer and philanthropist. Peter is apparently divorced and resides in Orono, MN, a suburb of Minneapolis.[11]

5. Christopher S. Welles ("Christopher"), a 1984 graduate of Hobart College, was a self-employed owner of an executive search firm, Twin Oaks Partners, in 1999. Christopher and his wife, Catherine, reside in Beverly Farms, MA.[12]

A grantor-type family trust for the benefit of David Sr. was also a Therma-Tru shareholder. Prior to the May 2000 recapitalization transaction, Herpe helped the Welles family establish the three entities mentioned above to accomplish their wealth management goals:

★ North Channel, managed by Jeffrey and based in New York City, NY, was established as a separate family office management entity to oversee and coordinate the management of the family's investments and its tax and estate planning issues. Specifically, North Channel had an in-house money management function, i.e. a bond trading desk overseen by Maud, and a "manager of managers" function through which Jeffrey directed the trading activities of the outside money managers North Channel had selected. North Channel also acted as a liaison between the family members and its various tax and estate planning counsel and tax return preparers.[13] Because of potential liability issues related to North Channel's employment of several non-family members, such as Larry Goldstein ("Goldstein"), its CFO, and Bill Chung, an investment person, and because there were ownership structure issues due to differing ownership interests of the family members among the various investments it made, Herpe recommended that the family office be organized in an entity separate and apart from the entity that held the investments. According to Herpe, in his experience this type of structure was the exclusive practice among family offices in that he had never seen a family office directly hold investments.[14]

★ Stobie Creek, also managed by Jeffrey and based in New York City, NY, was established to be the entity directly holding the family's investments. It was created in anticipation of the Therma-Tru recapitalization "to pool the resulting cash holdings of the family so that North

---

10 Deposition of Jeffrey, Vol. 1, December 15, 2006, pp. 4 (12-13), 10 (1) – 11 (2), and 29 (20) – 30 (6) and Exhibit 123 thereto [JFW-0951-0987 at 0959-0960].

11 Deposition of Peter, Vol. 1, December 13, 2006, pp. 4 (10-11), 16 (12-17), 17 (10) – 18 (5), and 18 (23-24), and Exhibit 77 thereto [PCW-1030-1063 at 1038].

12 Deposition of Christopher, Vol. 1, December 14, 2006, pp. 4 (12-19) and 22 (9-10) and Exhibit 89 thereto [CSW-1010-1079 at 1019].

13 Deposition of Herpe, December 8, 2006, pp. 21 (5-20) and 23 (11) – 25 (5); deposition of Georgia, July 31, 2007, p. 77 (10-16).

14 Deposition of Herpe, December 8, 2006, pp. 34 (22) – 36 (5).

Channel could perform asset allocation functions and find managers to carry out the asset allocations."[15] During the years 2000 through 2005 (the last year for which financial results were made available to me), Stobie Creek made many highly sophisticated investments with varying degrees of risk from the mundane to the highly speculative, conducted hundreds of trades each year, and maintained a dense and complex portfolio of assets worth hundreds of millions of dollars that generated annual income in the tens of millions of dollars.[16] A schedule that presents Stobie Creek's annual financial statements based on accrual method of accounting book income as reported on its federal income tax returns for the 2000 short periods (consolidated) and for the 2001 through 2005 calendar years is attached to this report as Exhibit C.

★ Cricket Island, a family foundation managed by Jeffrey and based in New York City, NY, was established as the vehicle through which family members could channel their large charitable contributions. There is not much information on Cricket Island in the documents provided to me and its activities are not directly relevant to the issues involved in these lawsuits, thus, I mention it only in passing because it was part of the planning done by Herpe for the Welles family in 1999-2000.

In or about December 1999, Jeffrey or David Jr. turned to David F. Waterman ("Waterman"), the managing partner of Shumaker Loop & Kendrick, LLP ("SLK"), a large multi-state law firm that had been the Welles family's primary legal advisor since the founding of Therma-Tru in 1962, to inquire about whether there were any strategies to reduce the family's taxes on the then-being-discussed sale of part of Therma-Tru. Waterman informed them he was aware of a tax strategy that had been developed by the Chicago, IL office of the Dallas, TX-based law firm, Jenkens & Gilchrist, P.C. ("J&G").[17] The strategy to which Waterman was referring is the DOIS strategy which is the subject of these lawsuits.

On January 23-24, 2000, the Welles family gathered in Vero Beach, FL to discuss, among other things, the proposed Kenner transaction and the entities Herpe recommended the family form to manage the wealth to be generated by it, and the proposed J&G DOIS strategy transaction in which Waterman recommended they participate. Both Herpe and Waterman attended, although not at the same time. David Sr., Georgia, and their five adult children met with Herpe in the morning. In the afternoon, they met with Waterman. About the DOIS strategy, Waterman told them:

> Q. Tell me what you did at the meeting with regard to talking about the Jenkens & Gilchrist strategy.
>
> A. I described the basic transaction that I described before for you. I said that tax lawyers in our office had researched the Jenkens strategy and

---

15 Deposition of Herpe, December 8, 2006, pp. 32 (24) – 33 (5).

16 See Stobie Creek U.S. Returns of Partnership Income (IRS Forms 1065) for the two 2000 short periods at issue in these lawsuits and the 2001 through 2005 calendar years.

17 Deposition of Waterman, August 1, 2007, pp. 48 (7) – 50 (3).

the opinion that had been given in other instances thoroughly, felt that the opinion was accurate as to the tax consequences of the transaction and that the transaction ought to hold up provided in general terms – provided Jeff felt comfortable with the investment, thought it would be a reasonable investment with a reasonable profit potential, and provided there were independent reasons for the partnership vehicle in which the investment was structured....

Q. Did you provide any advice as to whether the transactions or the investment transactions that were part of the Jenkens & Gilchrist strategy did provide a reasonable possibility of profit?

A. Yes, I said that was my understanding.

Q. And what transactions were you thinking of when you gave that advice?

A. I was thinking about this transaction specifically.

Q. And what is this transaction?

A. The Welles transaction....

Q. Do you recall generally what their reaction was or what they said in response to your presentation?

A. The only thing I recall is they did ask if I were they would I enter into this, and I said I would.

Q. I'm sorry, you said what?

A. That I would.[18]

Based on the advice of Herpe and Waterman, the Welles family agreed to adopt the entity structure recommended by Herpe, however, it postponed a decision about the DOIS strategy pending Jeffrey's due diligence investigation. According to his testimony, Jeffrey performed the following due diligence procedures regarding the proposed DOIS strategy:

---

[18] Deposition of Waterman, August 1, 2007, pp. 54 (1-15), 63 (11-21), and 106 (16-21); biography of Waterman from the SLK website at http://www.slk-law.com; and, Exhibit 37 to the deposition of Herpe, December 8, 2006. In reality, the Welles family utilized Stobie Creek, which was a limited liability company ("LLC"), not a partnership, as described by Waterman, but for federal income tax purposes LLCs are treated the same as partnerships. The only meaningful distinction for federal income tax purposes is the owners of LLCs are called "members," rather than "partners."

- ★ Spoke several times with David Parse ("Parse"), then a Managing Director in the Chicago, IL office of Deutsche Banc Alex Brown ("DB"), about the merits of different currency crosses.[19]
- ★ Sought investment advice on option premiums from Goldman Sachs and Morgan Stanley as well as DB.[20]
- ★ Compared DB's different option pricing sources, generally, to make sure they were on their market and spoke to a trader there about the options.[21]
- ★ Analyzed the volatility of various over-the-counter options using his Bloomberg service.[22]
- ★ Investigated the possibility of either Goldman Sachs or Morgan Stanley being the counter-party.[23]
- ★ Analyzed the probability that the substantial payout would be reached.[24]
- ★ Consulted a number of research reports from various Wall Street firms.[25]
- ★ Asked traders at various firms where he did business to run the proposed options through an option pricing model, such as the Black-Scholes model.[26]
- ★ Consulted with Goldman Sachs about the fairness of the premium DB was asking to be the counter-party in the DOIS strategy.[27]

Based on the above due diligence and drawing upon his education, training, and experience as an investment advisor and portfolio manager, Jeffrey formed a number of opinions that led him to conclude the proposed DOIS strategy would produce a reasonable profit:

- ★ He anticipated a spike in volatility in the currency markets, i.e. he expected the volatility in the currency markets over the family's expected investment horizon to be greater than it had been in the period leading up to the time it made the investment.
- ★ He concluded that the stock market, particularly the tech-heavy NASDAQ, was overpriced and that the dot.com bubble would end resulting in a market downturn, thus leading to a rise in the value of the euro.
- ★ He expected the European Central Bank to raise interest rates in early April 2000, leading to a surge in the euro and increased volatility in the currency market.
- ★ He expected an employment report from the European Central Bank that might well create substantial market volatility.
- ★ He believed there would be an uncoupling of the historic relationship between the euro and Swiss franc relative to the dollar.[28]

---

19 Deposition of Jeffrey, Vol. 1, December 15, 2006, pp. 98 (8-14) and 99 (21-24) and Exhibit 536 to the deposition of Parse, August 6, 2007.

20 Deposition of Jeffrey, Vol. 1, December 15, 2006, pp. 111 (4-20), 147 (14) – 148 (5), and 151 (9-18).

21 Deposition of Jeffrey, Vol. 1, December 15, 2006, pp. 124 (23) – 125 (5) and 126 (11-15).

22 Deposition of Jeffrey, Vol. 1, December 15, 2006, p. 127 (1-10).

23 Deposition of Jeffrey, Vol. 1, December 15, 2006, pp. 132 (3-21) and 133 (17) – 134 (14).

24 Deposition of Jeffrey, Vol. 1, December 15, 2006, pp. 145 (1) – 147 (13).

25 Deposition of Jeffrey, Vol. 1, December 15, 2006, pp. 185 (20) – 186 (8).

26 Deposition of Jeffrey, Vol. 1, December 15, 2006, pp. 216 (7) – 218 (4).

27 Deposition of Jeffrey, Vol. 2, August 8, 2007, pp. 161 (21) – 162 (5).

Based on Jeffrey's feedback, the Welles family decided to participate in the DOIS strategy.

**FEDERAL INCOME TAX ASPECTS OF THE DOIS INVESTMENT STRATEGY**

Prior to the creation of the DOIS options, each of the six family members and the grantor trust for David Sr. (collectively, for purposes of this section of my report, "the taxpayers") contributed 50% of his, her, or its Therma-Tru stock to Stobie Creek in a tax-deferred transaction.[29] The taxpayers other than the grantor trust then created wholly-owned Delaware LLCs which, along with the grantor trust, entered into offsetting option positions in the euro and Swiss franc to initiate their participation in the DOIS strategy.[30] According to Kolb, the trading in each of the seven accounts was virtually identical and differed only by scale and economically insignificant variations in pricing.[31] Each of the LLCs and the grantor trust, then, contributed their offsetting option positions to Stobie Creek in exchange for Stobie Creek membership interests. Under §722, their initial tax basis in their Stobie Creek membership interests of $3,180,124, which was their cost basis in the contributed Therma-Tru stock, was increased by $204,575,000, which was the total cost of their long or purchased options. Nonetheless, as is discussed more fully below, under §752 their basis in their Stobie Creek membership interests was not decreased by $202,529,250, which was their overall potential liability for the short or sold options. Later, all of the option positions expired worthless, which caused the taxpayers to lose their net investment of $2,045,750 ($204,575,000 - $202,529,250).[32] Stobie Creek, then, made an election under §754 to adjust the basis of its Therma-Tru stock, so that in the event of a sale or exchange of any membership interest the basis of the Therma-Tru stock would increase to equal the selling or exchanging members' basis in their Stobie Creek membership interests.

Shortly thereafter, for reasons discussed more fully below, each of the taxpayers other than the grantor trust contributed his or her wholly-owned Delaware LLC interest to a wholly-owned corporation that then made an election under Subchapter S of the Code. The grantor trust contributed its interest in Stobie Creek to a wholly-owned S corporation as well.[33] Because these transfers represented more than a 50% interest in Stobie Creek, the original LLC,

---

28 Report of Kolb, September 11, 2007, §V, pp. 13-14, drawing upon an interview he conducted with Jeffrey in August 2007.

29 §721 provides that the transfer of property to a partnership in exchange for a partnership interest will not be a currently taxable transaction. §722 provides that the basis of the partnership interest to the contributor is the same as his basis in the property transferred. §723 provides that the basis of property transferred in the hands of the partnership will be the same as the basis of the property was in the hands of the contributing partner.

30 JFW LLC, a party to one of the lawsuits the subject matter of this report, was Jeffrey's Delaware LLC participant. The other LLCs are similarly named using the individual owner's initials.

31 Report of Kolb, September 11, 2007, §IV, p. 4.

32 Explanation of Items – Tax Year Ended April 30, 2000 – attached as Exhibit A to Notice of Final Partnership Administrative Adjustment, dated February 23, 2007, p. 2 and [FLOYD 002198-002199].

33 JFW Inc., a party to the other lawsuit the subject matter of this report, was Jeffrey's S corporation LLC participant. The other corporations are similarly named using the individual owner's initials (except for the grantor trust's S corporation, which is named Welles Asset Management Inc.).

hereinafter referred to as "Stobie 1," was constructively liquidated for federal income tax purposes under §708(b)(1)(B). However, because there was a continuity of operations, i.e. except for the form of ownership, it was business as usual at Stobie Creek, a new LLC, hereinafter referred to as "Stobie 2," was technically created for federal income tax purposes under Reg. §1.708-1(b)(iv). Because Stobie 1 had made an election under §754, discussed above, and the transfers were the equivalent of a sale or exchange, the basis of Stobie 1's Therma-Tru stock was stepped-up under §743(b) to equal the basis of the Stobie 1's members interests in Stobie Creek. This stepped-up basis, then, carried over to Stobie 2 so that the "inside basis" of the Therma-Tru stock in Stobie 2 became equal to the "outside basis" of the members' interests in Stobie 1.

As a result of the constructive liquidation of Stobie 1, Stobie 2's basis in its Therma-Tru stock became $205,709,374. The elements that make up the stepped-up basis amount are spelled out in Table 1 below:

**Table 1**

| | |
|---|---|
| Cost Basis of 50% of Therma-Tru | 3,180,124 |
| Cost of Long Option Positions | 204,575,000 |
| Stobie 1 Loss on Option Expirations | (2,045,750) |
| Members' Outside Basis in Stobie 1 | 205,709,374 |

All of the above transactions occurred between March 31, 2000 and April 30, 2000. On May 9, 2000, the Kenner transaction closed. As a result, Kenner became a 50% owner of Therma-Tru. Stobie 2 received $211,151,677 for its, roughly, two-thirds interest in 50% of the company and reported a long-term capital gain from the sale of $5,442,303 ($211,151,677 - $205,709,374) on its 2000 federal income tax return.[34] In June 2000, trusts for the benefit of 12 grandchildren of David Sr. and Georgia became members of Stobie Creek. Because of their late entry, they were not allocated any of the gain from the sale of the Therma-Tru stock. In November 2003, the home improvements and construction products conglomerate, Fortune Brands, Inc., acquired Therma-Tru from Kenner and the Welles family for about $925 million.[35] There are no issues regarding the sale to Fortune Brands that are the subject matter of these lawsuits.

Despite the fact that these transactions were structured to comply with the plain language of the Code, the IRS objected on numerous grounds, discussed more fully below. Throughout the remainder of this report, I assess the IRS's arguments and my more reasonable interpretation of the tax laws as they apply to the matters at issue in these lawsuits.

---

[34] "Door Co. Loan Opens," IAC (SM) Newsletter Database, May 15, 2000; Stobie 2 2000 federal income tax return [00000241-00000553 at 00000256], and Exhibit 4 to the deposition of Goldstein, August 7, 2007 [PLAINTIFF'S 003764-003767 at 003764]. The remaining, roughly, one-third interest in 50% of Therma-Tru was owned by an aunt, several cousins, and 15 employees.

[35] "Company News; Fortune Brands to Buy Door Maker Therma-Tru," New York Times, November 4, 2003.

**PRIMARY ISSUES**

The IRS takes the following primary positions with regards to Stobie Creek, the DOIS strategy, and the Stobie 1 and 2 federal income tax returns (in summary and to paraphrase):[36]

1. The basis in the Therma-Tru stock claimed on the Stobie 2 return is disallowed because the Stobie 1 purported LLC, with which the basis was referenced, is a sham and should not be recognized for federal income tax purposes. The transactions giving rise to the "inflated" basis in question (discussed more fully above) had no business purpose other than tax avoidance, lacked economic substance, and, in fact and substance constitute an economic sham for federal income tax purposes.

2. The obligations under the short-positions DOIS transactions that were transferred to Stobie 1 are liabilities for purposes of Reg. §1.752-6T and, accordingly, reduce the members' basis in their Stobie 1 membership interests in the amount of $204,575,000, but not below the fair market value of the members' interests.

3. Even if Stobie 1 is not a sham, existed as an LLC, and filed a §754 election to adjust the basis of assets under §743(b), there is no excess outside basis over inside basis, thus the §743(b) adjustment to basis is $0 (zero). Stobie 2's basis in its Therma-Tru stock is $3,180,124 under §723. As a result, long-term capital gain income in the Stobie 2 return is increased by $202,529,250 ($211,151,677 sales price - $3,180,124 basis - $5,442,303 gain previously reported). In addition, the economic loss of $2,045,750 on the DOIS option transactions is disallowed. Thus, the total addition to income is $204,575,000 ($202,529,250 addition to long-term capital gain + $2,045,750 addition to ordinary income).

4. Because the manner in which Stobie 1 and Stobie 2 accounted for the DOIS transactions violated the intent of Subchapter K of the Code, the "inflated" basis in the Therma-Tru stock and the "inflated" members' basis in Stobie 1 and Stobie 2 is disallowed under Reg. §1.701-2.

5. Under §988, the DOIS option transactions were part of a single transaction structure and not separate offsetting options, thus the amount treated as contributed to Stobie 1 by its members under §722 is reduced by the amount received from the contemporaneous sale of the offsetting option position to the same counter-party. As a result, the claimed increase in outside basis in Stobie 1 is disallowed.

6. Under §165(c)(2), the DOIS option transactions were not entered into with a profit motive.

7. Stobie 1 and its members did not establish they had amounts at risk under §465 that would allow them to deduct losses arising from or in connection with the DOIS option transactions.

---

36 Explanation of Items – Tax Years Ended December 31, 2000 and April 30, 2000 – attached as Exhibits A to Notices of Final Partnership Administrative Adjustment, dated March 9, 2005 and February 23, 2007, respectively, which are Exhibits A to the Plaintiffs' Complaints in these lawsuits.

8. Because the adjustments of LLC items of Stobie 1 and Stobie 2 are attributable to a tax shelter for which no substantial authority has been established for the position taken, and for which there has been no showing of reasonable belief by Stobie LLC or by its members that the position taken was more likely than not the correct treatment, the accuracy-related penalties of 20% and 40% of the underpayments of tax of §6662 is imposed.

## ANALYSIS AND OPINIONS

### Introduction

The IRS complains that the DOIS transaction was an abusive tax shelter designed for the sole purpose of avoiding taxes and lacked a business purpose, thus it was an economic sham in fact and in substance. Moreover, the IRS asserts the Stobie Creek Plaintiffs entered into DOIS without the requisite profit motive. In my opinion, the IRS overly limited its investigation into the facts and circumstances of the matters at issue in these lawsuits by asserting boilerplate objections without giving due consideration to the Stobie Creek Plaintiffs' factual circumstances, as discussed more fully above.

### Aggressive Tax Planning is a Legitimate Approach to Minimizing Taxes

#### *Aggressive Tax Planning is an Evolutionary Process*

Planning strategies to minimize federal income taxes have long been accepted as legitimate endeavors of taxpayers and their professional advisors. There are longstanding precedents emanating from our courts that support the legitimacy of aggressive tax planning by holding that every person has the civic responsibility of paying legally required tax, but no more. Thus, citizens have the right to manage this seemingly large part of their annual cost of living the same as they would manage any other large, but necessary obligation - carefully and with the intent of maximizing the benefit for the minimum outlay.

This precedent was reiterated not long ago by United States Court of Federal Claims Judge Susan G. Braden when she began her opinion in Coltec Industries, Inc. v. U.S. as follows:

> Many years ago, the *United States Supreme Court in Atlantic Coast Line v. Phillips, 332 U.S. 168 (1947)*, quoting from prior decisions of Justice Holmes and Judge Learned Hand, observed:
>
> > As to the astuteness of taxpayers in ordering their affairs so as to minimize taxes we have said that 'the very meaning of a line in the law is that you intentionally may go as close to it as you can if you do not pass it.' This is so because [there is no] 'public duty to pay more than the law demands: taxes are enforced exactions, not voluntary contributions.'

*Id. at 172-73* (internal citations omitted).[37]

Over the years, taxpayers and their professional advisors have devised strategies to minimize tax, from the most staid and conservative, such as investing in municipal bonds or contributing to qualified retirement plans, to the very aggressive when first utilized, such as the deferred like-kind exchange or the extension of full qualified retirement plan benefits to professional practices. These strategies were frequently labeled "tax shelters," a term often used to describe both mundane and aggressive tax plans by the community of tax planning professionals. Some resulted from designs by planners for particular clients; others were designed by planners to address an issue of a particular industry; in some cases, planners also marketed the "tax shelters" to non-clients in similar circumstances who were made aware of their existence. Indeed, the term "tax shelter" has often been used to describe any transaction that produces a tax benefit that can be used to "shelter" income from taxation. Today, many of the aggressive tax planning schemes of the past, vigorously opposed by the IRS initially, are now common tax minimization strategies used by the most timid of tax planners.

How does this come about? Understanding the process begins with the realization the IRS is not the final arbiter of the legality of any tax strategy, aggressive or otherwise. Although it has the right to challenge a tax strategy, in the final analysis, the IRS is often unsuccessful no matter how strongly it disagrees or how hard it fights the battle. With any new aggressive tax planning strategy, there are those who venture out first, the "pioneers" who are willing to accept a significant amount of tax risk in return for a disproportionately large return if successful. While some of these pioneers lose, many win, more than a layperson with a reasonable understanding of the facts would expect. When this occurs, assuming Congress chooses not to act by changing the law to forbid such activities, the larger body of tax planning professionals who are unwilling to subject their clients to such significant tax risk head down the trail blazed by the pioneers, dutifully following the steps laid out by the pioneer whose strategy survived challenge. When enough have done so, and the IRS acquiesces in the result, the strategy becomes a plan and the more conservative planners accept it.

***Examples of Aggressive Tax Planning Strategies Analogous to DOIS Upheld by Courts***

**Frank Lyon Co. v. U.S.**[38]

In Frank Lyon Co. ("Lyon"), a distributor of household electric products located in Little Rock, AR, entered into a sale-and-leaseback transaction by taking title to a building under construction and leasing it back to the Worthen Bank & Trust Company ("Bank") that was constructing it. Bank had the option to purchase Lyon's interest in the building for far less than fair market value. Lyon would not realize a return on its investment unless Bank exercised the purchase option. The IRS claimed the transaction was <u>motivated purely by a desire to avoid taxation</u> and

37 Coltec Industries, Inc., 62 Fed. Cl. 716 (2004) at 718, rev'd on other grounds, 454 F.3d 1340 (Fed. Cir. 2006).
38 435 U.S. 561 (1978).

was best characterized as a mortgage agreement, with Bank the real owner and Lyon a lender. It sought to disallow Lyon's depreciation deductions, interest expense on the construction loan and mortgage, and other expenses, alleging the real benefits and burdens, taken as a group, were too insubstantial to allow Lyon to enjoy the tax attributes associated with ownership. Even though the transaction gave little more than bare legal title to Lyon, the Supreme Court nevertheless reversed the Court of Appeals for the Eighth Circuit and found Lyon to be the actual owner of the building and entitled to the deductions.

This decision in this case was not to the liking of many commentators, including Professor Bernard Wolfman of Harvard Law School, who wrote an article, "The Supreme Court in the *Lyon's* Den: A Failure of Judicial Process," in which he expressed his dissatisfaction with the Supreme Court's decision thusly:

> *Frank Lyon* did not have to happen. The elucidation of principle in tax cases should not depend on irrelevant or legalistic distinctions. A Supreme Court opinion ought not become the basis for tax lawyers to make a laughingstock of the Court as they now do when quite routinely they add unnecessary third parties to financing transactions in order to qualify for the shelter of *Frank Lyon*. Until the time comes when the Court can undo the mischief of *Frank Lyon*, one hopes that the Service and the lower courts will see it as a case whose precedential significance is impaired substantially by the flawed process from which it emerged.
>
> It is too much, if not wrong, to expect the Court to develop an enduring and sophisticated tax jurisprudence. In an environment of infinitely diverse and complex transactions governed by an arcane Code, the Court cannot devote the time necessary to become expert.[39]

Moreover, Professor David Weisbach of the University of Chicago Law School wrote an article, "Business Purpose, Economic Substance, and Corporate Tax Shelters: The Failure of Disclosure as an Approach to Shelters," in which he also found fault with this pro-taxpayer decision:

> There are dozens of leveraged lease cases where the courts accepted completely fictional arrangements as real. The leading case is Frank Lyon. The facts of this sale-leaseback case are complex, but the bottom line was that in virtually no event would the purported owner of the property recover anything more than its original investment plus six percent interest, and in virtually no event would the purported owner lose money. The purported owner of the property had no involvement in the transaction other than as a lender, but through fictions believed by the court, was able to cast itself as an owner. Maybe sale-leasebacks should be allowed, but the court did not make that policy

---

39 66 Cornell L. Rev. 1075 (1981) at 1099-1100.

> judgment. Instead, the court was completely fooled by the arrangement. It took a statutory change to limit the shelters allowed by Frank Lyon and similar cases and abusive leasing transactions are still common where they fall outside the statutory rules.[40]

**Compaq Computer Corp. v. Commissioner[41] and IES Industries, Inc. v. U.S.[42]**

Both of these cases address the question of whether taxpayer's purchase and resale of American Depository Receipts ("ADRs") lacked economic substance. In 1992, Compaq realized a $232 million capital gain from the sale of stock in a publicly traded nonaffiliated computer company, Conner Peripherals, Inc., that it wished to offset. Likewise, IES sought to create capital losses in 1991 and 1992 it could carry back to offset capital gains it realized when it sold stock in 1989 and 1990. Both companies were approached by representatives of Twenty-First Securities Corporation ("Twenty-First"), a New York securities broker specializing in arbitrage transactions, that offered them the opportunity to participate in a pre-determined tax planning strategy, aggressive in nature, involving dividend stripping of foreign securities with an income side of a foreign company dividend and a capital loss side based on the sale of the security from which the dividend was stripped. Because the dividend, net of foreign withholding tax, was less than the capital loss on the sale of the ADRs, the transaction resulted in a loss if U.S. tax consequences were not considered. However, if the U.S. foreign tax credit was taken into account, the transaction became profitable. Thus, the transaction lacked any potential for profit but for the U.S. tax consequences.

Moreover, the Compaq executives who made the decision to enter into the ADR transaction did so based on only a superficial investigation which consisted of a single meeting that lasted about one hour, one telephone reference check, and the review of a spreadsheet prepared by Twenty-First. Although cash flow was normally important to Compaq's investment decisions, no cash-flow analysis was prepared. On the other hand, IES performed more extensive due diligence before entering into the transaction, including meeting twice with the Twenty-First representatives, studying the materials provided, and consulting with both its outside accountants and securities counsel. Strangely, the extent of the due diligence efforts of the two companies in their pre-purchase investigations played little or no role in the eventual outcomes.

In the Compaq case, the U.S. Tax Court found that Compaq was not entitled to the foreign tax credit and imposed the accuracy-related penalty[43] because:

> <u>Every aspect of petitioner's ADR transaction was</u> deliberately predetermined and <u>designed by petitioner</u> and Twenty-First to yield a specific result and <u>to eliminate all economic risks</u> and influences from outside market forces on the purchases and sales in the ADR transaction.

---

40 54 SMU L. Rev. 73 (Winter, 2001) at 75 (footnotes omitted).
41 277 F.3d 778 (CA-5 2001) rev'g. 113 T.C. 214 (1999).
42 253 F.3d 350 (CA-8, 2001) rev'g on this issue 2001-2 USTC ¶50470 (N.D. Iowa, 1999).
43 §6662(a).

> Petitioner had no reasonable possibility of a profit from the ADR transaction without the anticipated Federal income tax consequences.
>
> Petitioner had no business purpose for the purchase and sale of Royal Dutch ADR's apart from obtaining a Federal income tax benefit in the form of a foreign tax credit while offsetting the previously recognized capital gain (*emphasis supplied*).[44]

Similarly, the U.S. District Court in the IES case found the ADR transactions lacked economic substance because they were, "shaped solely by tax avoidance considerations, had no other practical economic effect, and are properly disregarded for tax purposes."[45]

Both Compaq and IES appealed, Compaq to the Court of Appeals for the Fifth Circuit[46] and IES to the Court of Appeals for the Eight Circuit.[47] Both Courts of Appeals reversed and found in favor of the taxpayers. The Fifth Circuit's opinion in Compaq is a good illustration of how arcane the courts can be in their interpretations of the theory of federal taxation. If the primary question is, "Is there a reasonable possibility this transaction can achieve a profit but for the tax consequences?," then the primary question in Compaq is, "What are the tax consequences?," as there was a Netherlands tax on the ADR dividend that was withheld at the source in addition to the U.S. tax consequences. The Tax Court treated the Netherlands tax as a transaction cost and determined only the U.S. tax was a "tax consequence." Since there was a loss on the transaction under this theory, as is discussed more fully above, the Tax Court held the transaction had no potential for profit before the U.S. tax consequences were considered. On the other hand, the Fifth Circuit considered both the Netherlands tax and the U.S. tax to be "tax consequences," and looked at the economic effect before either tax was considered. On this basis, the transaction was profitable before "tax consequences," thus it reversed the Tax Court and ruled in favor of Compaq. Which theory is correct? The question has been the subject of considerable uncertainty and debate amongst tax practitioners for the past few years. Although the particular form of these transactions was barred when Congress added §901(k) in 1997, the question of whether a foreign tax is a "tax" or a "pre-U.S. tax expense" remains. Given the favorable results in the Tax Court, it is a distinct possibility the IRS will continue to press the issue in other appellate courts in an attempt to obtain a favorable opinion and create a conflict among the circuit courts of appeal. As is discussed more fully below, such battles can rage on for many years before being finally settled by the U.S. Supreme Court.

The Eighth Circuit decided IES similarly, determining that the economic benefit to IES was the gross dividend, before the foreign taxes were paid. Moreover, the IES Court also considered and rejected the IRS's allegations the transactions lacked a business purpose and were arranged so that there was little or no risk of economic loss:

---

44 113 T.C. 214 (1999) at 219-220.
45 2001-2 USTC ¶50,470 at 4-5 (N.D. Iowa, 1999).
46 277 F.3d 778 (CA-5, 2001).
47 253 F.3d 350 (CA-8, 2001).

> To the extent the taxpayer's subjective intent is material, we too will consider factors that are arguably relevant to the inquiry. We do so, however, mindful of the fact that "the legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." *Gregory v. Helvering, 293 U.S. 465, 469 (1935).* A taxpayer's subjective intent to avoid taxes thus will not by itself determine whether there was a business purpose to a transaction.
>
> In their briefs, both parties discuss the risk of loss inherent in the trades, evidently presuming that the degree of risk goes to IES's subjective intent in engaging in the transactions. The government argues that the transactions must be characterized as shams because there was no risk of loss. We disagree.....We are not prepared to say that a transaction should be tagged a sham for tax purposes merely because it does not involve excessive risk. IES's disinclination to accept any more risk than necessary in these circumstances strikes us as an exercise in good business judgment consistent with a subjective intent to treat the ADR trades as money-making transactions (*emphasis supplied*).[48]

**David A. Gitlitz v. Commissioner[49] and James H. Pugh, Jr. v. Commissioner[50]**

The Gitlitz case addresses S corporation basis-in-stock issues that arose out of the interrelationship among several Code sections. Prior to the Supreme Court decision in Gitlitz in early January 2001, the Tax Court had addressed the issue on 13 occasions and, relying on a "reviewed" decision, disallowed taxpayer claims in every one of them. Two federal district courts and four circuit courts of appeals had also addressed the issue. None of the circuit courts of appeals agreed with the IRS/Tax Court position. Taxpayers in three of the four circuits petitioned for certiorari and the Supreme Court accepted the Gitlitz case, which emanated from the Tenth Circuit. The Supreme Court decided that, despite the unintended relationship among several Code sections creating a wrongful "double windfall" for the S corporation shareholders, the Code's plain text permitted them to receive these benefits. Thus, it was up to Congress, not the courts to correct the error. In fact, Congress did just that by amending §108(d)(7)(A), effective October 11, 2001, when it passed the Job Creation and Worker Assistance Act of 2002.[51]

---

48 253 F.3d 350 (CA-8, 2001) at 355.

49 531 U.S. 206 (2001).

50 213 F.3d 1324 (CA-11, 2000).

51 P.L. 107-147, signed by President Bush on March 9, 2002. The "reviewed" Tax Court decision is Mel T. Nelson v. Comr., 110 T.C. 114 (2/19/98), affirmed, in result, 182 F.3d 1152 (CA-10, 7/6/99). The other Tax Court decisions are Philip D. Winn, et ux, et al v. Comr., T.C. Memo 1998-71 (2/19/98), affirmed, in result, as Gitlitz v. Comr., 182 F.3d 1143 (CA-10, 7/6/99); Chesapeake Outdoor Enterprises, Inc., et al v. Comr., T.C. Memo 1998-175 (5/12/98); Michael Friedman, et ux v. Comr., T.C. Memo 1998-196 (5/27/98); Salvador A. Gaudiano, et ux, et al v. Comr., T.C. Memo 1998-408 (11/13/98); Jerome B.

The issues in Gitlitz arose when an insolvent S corporation negotiated a discharge of its liabilities causing it to recognize cancellation of debt ("COD") income. Because the corporation was insolvent, the income was nontaxable.[52] Gitlitz and his fellow shareholder, Winn, increased the basis of their stock by their pro rata shares of the excluded COD income. Moreover, they utilized the basis increase to deduct losses from prior years suspended due to lack of basis in stock. Thus, a "double windfall" was created because tax-exempt income was used to create the basis necessary to support the deduction of a loss.

The various bodies with the authority to opine viewed this tax planning strategy very differently:

- ★ The IRS and the Tax Court took the position COD income excluded from gross income by an S Corporation under §108(a) does not pass through to a shareholder. As a result, shareholder basis is not increased under any circumstances.

- ★ The Tenth Circuit took the position COD income excluded from gross income by an S Corporation under §108(a) does pass through to a shareholder, resulting in an increase in shareholder basis, but only to the extent it is not first absorbed by the tax attribute reductions required by §108(b), which must precede the pass-through.

- ★ The Seventh Circuit took the position COD income excluded from gross income by an S Corporation under §108(a) does pass through to a shareholder, resulting in an increase in shareholder basis, but the shareholder cannot deduct existing suspended losses because they were offset at the corporate level by the excluded COD income.

- ★ The Third Circuit took the position COD income excluded from gross income by an S Corporation under §108(a) does pass through to a shareholder, resulting in an increase in shareholder basis, and losses previously suspended due to lack of adequate basis may be deducted against this increased basis immediately.

- ★ The Eleventh Circuit took the position COD income excluded from gross income by an S Corporation under §108(a) does pass through to a shareholder, resulting in an immediate increase in shareholder basis, even when the corporation has no suspended losses/NOLs,

---

Cronin, et ux v. Comr., T.C. Memo 1999-22 (1/29/99); James H. Pugh, Jr., et ux v. Comr., T.C. Memo 1999-38 (2/8/99), reversed 213 F.3d 1324 (CA-11, 2000); Michael A. Conviser, et ux v. Comr., T.C. Memo 1999-47 (2/17/99); William C. Witzel, et ux v. Comr., T.C. Memo 1999-64 (3/4/99), affirmed, in result, 200 F.3d 496 (CA-7, 1/18/00); Robert W. Eberle, et ux v. Comr., T.C. Memo 1999-287 (8/30/99); Richard T. Mullen v. Comr., T.C. Memo 2000-21 (1/19/00); Stephen L. Goodman, et ux, et al v. Comr., T.C. Memo 2000-23 (1/19/00); and, Robert H. Bettisworth, et ux v. Comr., T.C. Memo 2000-30 (1/21/00). The federal district court decisions are U.S. v. Harold D. Farley, et ux, 99-1 USTC ¶50,370 (D.C. W.Dist. PA, 1999), reversed 202 F.3d 198 (CA-3, 1/27/00); and James D. Hogue, et al v. U.S., 85 AFTR 2d 426 (D.C. Ore., 1/3/00).

[52] §108(a)(1)(B). "Insolvent" means the excess of liabilities over the fair market value of assets. See §108(d)(3).

because the shareholder has no suspended losses and the corporation has no property whose basis can be reduced under §108(b).

The position taken by the Eleventh Circuit in the Pugh case is particularly noteworthy. In its opinion in Pugh, the Eleventh Circuit stated:

> We recognize that this statutory scheme can lead to the result that shareholders actually benefit from their S corporations' insolvency. Not only do they avoid taxation on the corporation's COD income, but also they may receive capital loss deductions based on their share of the COD income. This jars with the general rule that basis should increase only to the extent of a taxpayer's actual "economic outlay."….The Commissioner argues that §§ 108, 1366 and 1367 should be read together to prevent Pugh from enjoying twice the tax-exempt status of COD income. We must acknowledge the justice of the Commissioner's position, for unlike other sources of tax-exempt income, COD income becomes tax-exempt merely from the infelicitous combination of corporate insolvency and a lack of tax attributes to offset the COD income. But, we cannot ignore the language of the statute, which clearly requires that all items of income included in §1366 must be used to increase the shareholder's basis under §1367. "The relevant question is not whether, as an abstract matter, the rule advocated by petitioners accords with good policy….Courts are not authorized to rewrite a statute because they deem its effects susceptible of improvement." *Badaracco v. Commissioner, 464 U.S. 386, 398 (Sup. Ct., 1984) (emphasis supplied).*[53]

The principle that the courts are not authorized to rewrite a statute because they deem it susceptible of improvement was confirmed in the 8-1 opinion by the U. S. Supreme Court in Gitlitz thusly:

> Second, courts have the policy concern that, if shareholders were permitted to pass through the discharge of indebtedness before reducing any tax attributes, the shareholders would wrongly experience a "double windfall": They would be exempted from paying taxes on the full amount of the discharge of indebtedness, and they would be able to increase basis and deduct their previously suspended losses. *See, e.g., 182 F.3d at 1147-1148*. Because the Code's plain text permits the taxpayers here to receive these benefits, we need not address this policy concern (*emphasis supplied*).[54]

There are striking similarities in the relevant tax concepts of the S corporation basis cases and the DOIS transaction: (1) both involve income that was not taxed under the Code as it was then written - in the S corporation basis cases, this was cancellation of debt income not taxed because the corporation was insolvent; in the DOIS transaction, this was a long-term capital

---

53 213 F.3d 1324 (CA 11, 2000) at 1330-1332.
54 531 U.S. 206 (2001) at 219-220.

gain that was offset by the stepped up basis of an LLC asset that was not reduced by a contingent obligation not treated as a liability under the Code; (2) both use "basis" that was created without an economic outlay to manufacture a loss – in the S corporation basis cases, this was basis emanating from the tax-exempt cancellation of debt income; in the DOIS transaction, this was basis emanating from the increase in basis from the long option position not offset by the potential liability for the short option position; and, (3) both arose out of the infelicitous use of several Code sections in a manner possibly not intended by Congress – in the S corporation basis cases, this was §§ 108, 1366, and 1367; in the DOIS transaction, this was §§ 708, 721, 722, 723, 743, 752, and 754.

As discussed more fully above, the U.S. Supreme Court ruled for Gitlitz because it chose not to ignore the plain language of the Code, despite the bogus nature of the losses it wound up supporting. It noted that Congress was the arbiter of how the tax laws should accord with good policy, not the court, so it permitted this bogus tax shelter to carry the day. Yet, on another day, the court ruled in favor of the government on a similar conceptual issue. In the Badaracco case, mentioned above, taxpayers who had amended admittedly false or fraudulent returns, were not permitted to escape liability for the then 50% civil fraud penalty based on statute of limitations grounds because the "...the plain and unambiguous language of §6501(c)(1) would permit the Commissioner to assess 'at any time' the tax for a year in which the taxpayer has filed 'a false or fraudulent return,' despite any subsequent disclosure the taxpayer might make."[55] Thus, as I discuss more fully below, the tax laws are appropriately blind to whether such anomalies favor the taxpayer or the government. Sometimes the result is too good to be true; other times it is too bad to be true.

**United Parcel Service of America, Inc. v. Commissioner**[56]

In the early 1980s, United Parcel Service of America, Inc. ("UPS") reimbursed customers for lost or damaged parcels with a value up to $100, and for lost or damaged parcels with a declared value in excess of $100 if the customer paid a fee of 25¢ per additional $100 as an excess value charge ("EVC"). Thus, to this point in time UPS was collecting the EVCs and paying claims itself. Over the years, UPS earned a substantial profit from this activity as claims paid were typically about one-fourth of the EVCs collected and UPS paid U.S. income taxes on these profits.

In 1983, an insurance broker suggested that UPS insure its excess value risks with an unrelated U.S. insurance company, National Union Fire Insurance Company ("NUF"), which would, in turn, reinsure the risks with a Bermuda-based captive insurance company owned by UPS shareholders, Overseas Partners, Ltd. ("OPL").[57] The purpose of rearranging the EVC modus operandi was to transfer the substantial profits to a foreign entity located in a tax-haven country that was not subject to U.S. income taxes. Despite its arrangement with NUF and OPL, UPS

---

55 Badaracco, et al v. Comr., 464 U.S. 386 (1984) at 396. The taxpayers in Badaracco argued unsuccessfully the three-year statute of limitations began to run when they filed the amended returns.

56 254 F.3d 1014 (CA-11, 2001), rev'g. T.C. Memo 1999-268 (1999).

57 At the time, UPS stock was not publicly traded as it was mostly owned by its employees.

continued to administer the EVC claims process itself and it merely transmitted the net profits to OPL via NUF. In 1984, the year at issue, NUF received fees and commissions of about $1.2 million, which the dissenting Eleventh Circuit opinion said was "in exchange for nothing."[58]

Judge Ruwe's Tax Court opinion concluded:

> Petitioner has failed to prove that the restructuring of its EVC activity was motivated by nontax business reasons or that the restructuring had economic substance. Rather, we find that the restructuring was done for the purpose of avoiding taxes and that the arrangement between petitioner, NUF, and OPL had no economic substance or business purpose. Petitioner controlled and performed all activities and functions that resulted in EVC revenue. The EVC profits that were transferred to OPL for the benefit of petitioner's and OPL's shareholders were the fruition of petitioner's EVC activity. OPL provided nothing of value to petitioner. The purpose of the arrangement with NUF and OPL was to confer tax-free benefits on petitioner's and OPL's shareholders. Obviously, petitioner is not entitled to any deductions for profits transferred to OPL. As a result, petitioner must include EVC revenue in income for 1984 and is liable for tax on the resulting profits (*emphasis supplied*) (*footnotes omitted*).[59]

Judge Ruwe also imposed the then 5% negligence penalty, the 50% of interest payable penalty, the 25% substantial understatement penalty, and the 120% tax-motivated interest rate penalty.[60]

UPS appealed to the Court of Appeals for the Eleventh Circuit. The appeals court reversed and found in UPS's favor, stating:

> It may be true that there was little change over time in how the excess-value program appeared to customers. But the tax court's narrow notion of "business purpose" -- which is admittedly implied by the phrase's plain language -- stretches the economic-substance doctrine farther than it has been stretched. A "business purpose" does not mean a reason for a transaction that is free of tax considerations. Rather, a transaction has a "business purpose," when we are talking about a going concern like UPS, as long as it figures in a bona fide, profit-seeking business. *See* ACM P'ship v. Comm'r, 157 F.3d 231, 251 (3d Cir. 1998). This concept of "business purpose" is a necessary corollary to the venerable axiom that tax-planning is permissible. See Gregory v. Helvering, 293 U.S. 465, 469, 55 S. Ct. 266, 267, 79 L. Ed. 596 (1935) ("The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted."). The Code treats lots of categories of economically similar behavior differently. For instance, two

58 254 F.3d 1014 (CA-11, 2001) at 1021.
59 T.C. Memo 1999-268 at 126-127.
60 T.C. Memo 1999-268 at 135-138. See former §§ 6653(a)(1), 6653(a)(2), 6661(a), & 6621(c), respectively.

> ways to infuse capital into a corporation, borrowing and sale of equity, have different tax consequences; interest is usually deductible and distributions to equityholders are not. <u>There may be no tax-independent reason for a taxpayer to choose between these different ways of financing the business, but it does not mean that the taxpayer lacks a "business purpose." To conclude otherwise would prohibit tax-planning</u> (*emphasis supplied*).[61]

**Vivendi-Universal Holdings II Corp. v. Commissioner (Seagram - DuPont Transaction)**[62]

Beginning in the early 1980's, Joseph E. Seagram & Sons, Inc. ("Seagram"), a U.S. subsidiary of Seagram Co., Ltd., the Canadian producer of distilled spirits and wine, began to acquire shares of Conoco, Inc. ("Conoco") on the open market in pursuit of a tender offer that eventually failed. Seagram's rival, E.I. DuPont de Nemours & Co. ("DuPont") prevailed, leaving Seagram with an interest in excess of 20% of DuPont after it converted its Conoco shares into DuPont shares. However, rather than winding up with a pig in a poke, Seagram profited handsomely from its investment in DuPont and by 1995 its approximately $3 billion outlay had a market value of about $10 billion.

In early 1995, Seagram decided to significantly reduce its interest in DuPont in order to raise about $8 billion to make a major investment in the entertainment giant MCA, Inc. On April 6, 1995, DuPont redeemed 156 million of Seagram's 164.2 million DuPont shares in a negotiated pre-planned arrangement for $8.3 billion in cash and short-term (90-day) notes, and warrants worth about $500 million that were exercisable for 156 million DuPont shares. Seagram received one warrant for each share it redeemed, but DuPont had a right of first refusal should Seagram choose to sell the warrants. The redemption reduced Seagram's direct ownership interest in DuPont from 24.2% to 1.2%.[63]

The primary purpose of the negotiated pre-planned arrangement was to reduce Seagram's tax liability on the transaction. First, Seagram was able to significantly reduce its effective tax rate because it structured DuPont's repurchase of its shares as a dividend instead of a sale or exchange. Thus, the entire purchase price of about $8.8 billion was taxable to Seagram at an effective tax rate of 7%.[64] This produced an overall tax liability of about $616 million. Had the transaction been classified as a sale or exchange, Seagram would have paid tax on a capital gain of about $6 billion, after reducing the proceeds by its approximately $2.8 billion basis of the

---

61 254 F.3d 1014 CA-11, 2001) at 1019.

62 Docket No. 18655-03, U.S. Tax Court, Stipulated Decision Entered June 22, 2006.

63 Zelenak, Lawrence, "The Story of *Seagram*: The Step Transaction Doctrine on the Rocks," <u>Business Tax Stories</u>, Bank, Steven A. and Stark, Kirk J., Eds., Ch. 9, p. 24. Foundation Press, New York, New York (2005).

64 At that time, §243 provided for a dividends received deduction of 80% for dividends received from a 21%-79%-owned corporation. The 7% effective tax rate is, therefore, calculated as follows: 35% - (35% X 80% or 28%) = 7%.

shares sold. This alternative would have meant a tax liability of about $2.1 billion, which is nearly $1.5 billion more.[65]

Unlike a sale to an outside party, which always results in sale or exchange treatment, a sale of stock back to the issuing corporation, i.e., a redemption, can result in either dividend treatment or sale or exchange treatment. §302(a) says that sale or exchange treatment is available only if a redemption qualifies under one of the four tests specified in §302(b). Otherwise, §302(d) says that the entire amount received from the redemption is a dividend. Only two of the four tests are potentially applicable to the Seagram-DuPont transaction:

1. The "substantially disproportionate" test of §302(b)(2) allows for sale or exchange treatment if a redemption reduces the redeemed shareholder's interest in the redeeming corporation to less than 80% of his pre-redemption percentage interest. Absent any other provision of the Code affecting the tax treatment of the transaction, the 24.2% to 1.2% reduction in Seagram's direct ownership of DuPont would easily qualify for sale or exchange treatment under this test.

2. The "not essentially equivalent to a dividend" test of §302(b)(1), as interpreted by the Supreme Court in U.S. vs. Davis,[66] provides that dividend treatment can be avoided only when the redemption results in a "meaningful reduction" in a shareholder's proportionate interest in the redeeming corporation. Absent any other provision of the Code affecting the tax treatment of the transaction, the 24.2% to 1.2% reduction in Seagram's direct ownership of DuPont would easily qualify as a "meaningful reduction," thus resulting in sale or exchange treatment under this test.

However, direct ownership alone is insufficient to satisfy these tests. §302(c)(1) says that in determining whether a redemption meets either of these tests, stock other than that which is directly owned may need to be counted. §302(c)(1) requires that certain stock owned by a related party or options to purchase stock which are owned by the redeemed party or a related party must be counted, based on a definitive set of rules set forth in §318. It was these rules that were used by the planners of the Seagram-DuPont transaction to achieve the intended tax result.

One commentator explained how §318 was used to Seagram's advantage in dealing with the "substantially disproportionate" test of §302(b)(2):

> Section 318 contains a number of attribution rules which apply in testing redemptions under §302(b)(2) [and under other parts of §302(b)]. The important part of §318, as far as Seagram was concerned, was §318(a)(4), under which a person who has an option to acquire stock is treated as owning the stock on which he has the option. According to IRS revenue rulings, warrants generally

---

65 Net capital gains are taxed to corporations at the same rate as ordinary income, a maximum of 35%. There is no reduced maximum rate as exists for individuals.

66 397 U.S. 301 (1970).

> qualify as options within the meaning of §318(a)(4).[107] Assuming Seagram's DuPont warrants qualified as options, the redemption would be analyzed under §§ 302(b)(2) and 318(a)(4) as resulting in *no* reduction in Seagram's percentage interest in DuPont; the 156 million redeemed shares would be exactly replaced by warrants treated as 156 million shares, so that Seagram's interest in DuPont would be 24.2 percent both before and after the redemption.[67]
>
> [107] Rev. Rul. 68-601, 1968-2 C.B. 124; Rev. Rul. 89-64, 1989-1 C.B. 91.

Another commentator explained how the Seagram-DuPont transaction planners avoided the more subjective "not essentially equivalent to a dividend" test of §302(b)(1):

> Accordingly, after dutifully applying the attribution rules of section 318(a)(4), Seagram sustained no reduction in its proportionate interest in DuPont. In such a case, Davis instructs that the redemption is not eligible for exchange treatment. The IRS, perhaps to its chagrin, scrupulously follows Davis. In Rev. Rul. 81-289[19] it stated that courts have established a pattern of applying the meaningful reduction standard and where, as here, a redemption results in no reduction in proportionate interest, the redemption cannot attain exchange treatment within section 302(b)(1). Thus, because (1) the Seagram warrants are options, (2) the attribution rules must be applied in testing a redemption, and (3) this redemption did not create any reduction in proportionate interest, it follows that Seagram reaped dividend income eligible for the 80-percent dividend received deduction.[68]
>
> [19] 1981-2 C.B. 82. Cf. Rev. Rul. 76-385, 1976-2 C.B. 92; any reduction in interest of a small, minority shareholder who exercises no control over corporate affairs is meaningful.

Second, because the $8.8 billion redemption amount was treated as a dividend, Seagram was not able to recover its basis of about $2.8 billion in the shares redeemed. But regardless, that basis is not irrevocably lost. Under Reg. §1.302-2(c), Seagram's basis in the 156 million redeemed DuPont shares shifts to the 8.2 million DuPont shares it retained.[69]

---

[67] Zelenak, Lawrence, "The Story of *Seagram*: The Step Transaction Doctrine on the Rocks," Business Tax Stories, Bank, Steven A. and Stark, Kirk J., Eds., Ch. 9, p. 25. Foundation Press, New York, New York (2005) (italics in the original).

[68] Willens, Robert, "Every Action Has an Equal and Opposite Overreaction," 95 TNT 110-111, Tax Notes Today, Tax Analysts, June 7, 1995.

[69] The basis shift in the Seagram-DuPont transaction was acknowledged at the time by one commentator who had a negative view of the transaction. See Sheppard, Lee, "Can Seagram Bail Out of DuPont Without Capital Gain Tax?" 95 TNT 75-4, Tax Notes Today, Tax Analysts, April 18, 1995. But see letter in response from Willens, Robert, "You Can't Fight the Facts," 95 TNT 87-70, Tax Notes Today, Tax Analysts, May 1, 1995, stating that regardless of Sheppard's opinion, the Seagram-DuPont redemption was a dividend.

However, under then §1059(a)(2), added to the Code in 1984, the basis of the retained 8.2 million shares was reduced by the untaxed 80% of the dividend received, roughly $7 billion. Because this amount exceeded the basis of the retained shares, even after the basis shift, a suspended negative basis account of approximately $4 billion was created. This suspended negative basis will be taxed only when the retained shares are eventually sold, in practical effect allowing taxation to be postponed forever.

Congress amended §1059(a)(2) in 1997 retroactive to May 3, 1995, to trigger immediate taxation of the suspended negative basis in the year the dividend is received, however, the effective date of the amendment was after the date of the Seagram-DuPont transaction. Congress specifically stated it enacted the amendment in response to the Seagram-DuPont transaction.[70]

In late August 2003, Vivendi Universal ("Vivendi"), a French-American media group that acquired Seagram in 1999, thus succeeding to the tax consequences of Seagram's prior acts, announced it received formal notification the IRS was challenging the transaction and seeking an additional $1.5 billion in tax, plus interest.[71] Vivendi decided to contest the IRS claim in the U.S. Tax Court, having filed its Petition on October 31, 2003.[72] However, rather than litigate this highly controversial tax issue in court, the IRS gave up the ghost and reached a settlement with Vivendi for less than 20¢ on the dollar. On June 1, 2006, Vivendi announced that the IRS had agreed to accept $284 million (plus interest of $402 million, for a total of $686 million) in full settlement of the dispute. Moreover, while this aspect of the settlement is not entirely clear, it appears that the suspended negative basis account of $4 billion was forgiven by the IRS.[73]

Thus, this aggressive, pro-taxpayer plan permitted Seagram to pioneer a tax-motivated strategy that prompted Congress to pass legislation to deny the tax strategy to others who might attempt to follow Seagram's exact trail.

**Chamberlin v. Commissioner**[74]

Chamberlain is a classic example of a tax shelter transaction - admittedly entered into for the purpose of tax avoidance - that was adjudicated by a court of tax jurisdiction in favor of the taxpayer, thus necessitating a legislative change by Congress the following year. In a nutshell, Chamberlin involved a preferred stock bailout. A closely-held corporation had a large accumulated earned surplus that was available for distribution to its shareholders. Eventually, the shareholders became fearful the IRS would assert a tax on overaccumulations known as the

70 P.L. 105-34, signed by President Clinton on August 5, 1997. Staff of the Joint Committee on Taxation, General Explanation of Tax Legislation Enacted in 1997 at 195, n. 217 (1997), a/k/a the "Blue Book."

71 "Vivendi's $1.5 Billion Tax Hangover," CFO.com at http://www.cfo.com, August 26, 2003.

72 "Vivendi to Contest I.R.S. Claim of Taxes Owed," New York Times, August 26, 2003.

73 "Vivendi Resolves Tax Dispute Over DuPont Shares," Press Release, Vivendi, June 1, 2006. See also, Ruitenberg, Rudy, "Vivendi Settles U.S. Tax Dispute, International Herald Tribune, June 4, 2006.

74 207 F.2d 462 (CA-6, 1953), rev'g 18 T.C. 164 (1952).

accumulated earnings tax, a tool Congress provided to the Treasury to force corporations to pay dividends that were then subjected to extremely high individual income tax rates.[75] Based on the advice of an investment banking firm, in December 1946 the corporation issued preferred shares as a stock dividend on the common shares held by its shareholders. The shareholders immediately sold the preferred shares to two insurance companies that certified their willingness to purchase the preferred shares before the dividend was declared, their having participated in the structuring of the terms under which the preferred shares were issued. Relying on the 1939 Code version of the substituted basis and holding period rules, the shareholders claimed long-term capital gain treatment on the sale of the preferred stock, thus distributing $800,000 of accumulated earnings at the then 25% tax rate on long-term capital gains instead of the then 86.5% tax rate on ordinary income. The IRS challenged the claimed tax treatment and sought to treat the transaction as a dividend taxable at ordinary income tax rates.

The Tax Court agreed with the IRS and, in a reviewed decision, held the transaction was not entered into in good faith:

> If we turn to what we consider to be the real substance of the transaction, the facts show conclusively that the stock dividends were *not* in good faith for any bona fide corporate business purpose. The company was concerned only with the immediate necessity of greatly reducing its accumulated earned surplus not needed in its business, which accumulated surplus otherwise would make it subject to the possible imposition of a surtax provided for by *section 102, Internal Revenue Code*. At the same time, the company's stockholders were concerned only with immediately realizing for themselves at least $800,000 cash in hand because of the existence of the company's accumulated earnings, but because of the individual tax consequences they wanted the distribution in some form other than as ordinary cash dividends....
>
> Further, the new preferred was to be redeemed out of the corporation's assets in a comparatively short period of time. With such a predetermined purpose, the dividend was not a true stock dividend made in good faith within the meaning of the cited Supreme Court decisions. A further real and, in fact, the most important, purpose of the issuance of the preferred was to enable the common stockholders to derive cash in hand almost simultaneously, in an agreed amount, solely because of and from their preexisting capital investment in the company. The entire plan was designed primarily for the benefit of the common stockholders whose will was the will of the corporation (*emphasis supplied*).[76]

The Court of Appeals for the Sixth Circuit reversed the Tax Court and upheld the validity of the tax treatment claimed by the taxpayers. The court's opinion is a classic restatement of the legal right of taxpayers to avoid taxes through the use of aggressive tax planning:

---

75 1939 §102, now 1986 §531.

76 18 T.C. 164 at 177-178 (italics in the original).

The general principle is well settled that a taxpayer has the legal right to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits; *United States v. Isham, 17 Wall. 496, 506, 21 L.Ed. 728; Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596; Commissioner v. Tower, 327 U.S. 280, 288, 66 S.Ct. 532, 90 L.Ed. 670,* and that the taxpayer's motive to avoid taxation will not establish liability if the transaction does not do so without it. *United States v. Cummins Distilleries Corp., 6 Cir., 166 F.2d 17, 20; Chisholm v. Commissioner, 2 Cir., 79 F.2d 14, 15, 101 A.L.R. 200, certiorari denied Helvering v. Chisholm, 296 U.S. 641, 56 S.Ct. 174, 80 L.Ed. 456; United States v. Cumberland Public Service Co., 338 U.S. 451, 455, 70 S.Ct. 280, 94 L.Ed. 251.*

It is equally well settled that this principle does not prevent the Government from going behind the form which the transaction takes and ascertaining the reality and genuineness of the component parts of the transaction in order to determine whether the transaction is really what it purports to be or is merely a formality without substance which for tax purposes can and should be disregarded. *Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; Minnesota Tea Co. v. Helvering, 302 U.S. 609, 58 S.Ct. 393, 82 L.Ed. 474; Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406; Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; Bazley v. Commissioner, 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782; Tennessee, Alabama & G. Ry. Co. v. Commissioner, 6 Cir., 187 F.2d 826.*

The question accordingly presented is not whether the overall transaction, admittedly carried out for the purpose of avoiding taxes, actually avoided taxes which would have been incurred if the transaction had taken a different form, but whether the stock dividend was a stock dividend in substance as well as in form.

No question is raised about the legality of the declaration of the dividend. Respondent does not contend that proper corporate procedure was not used in creating the preferred stock and in distributing it to the stockholders in the form of a dividend. If the transaction had stopped there we think it is clear that the dividend would not have been taxable in the hands of the stockholders. *Strassburger v. Commissioner, supra.* Whether the declaration of the dividend was in furtherance of any corporate business purpose or was the result of correct judgment and proper business policy on the part of the management, we believe is immaterial on this phase of the case. The Supreme Court cases in no way suggest that the taxability of a stock dividend depends on the purpose of its issuance or the good or bad judgment of the directors in capitalizing earnings instead of distributing them. The decisions are based squarely upon the proportional interest doctrine. See also *Tourtelot v. Commissioner of Internal Revenue, 7 Cir., 189 F.2d 167; Wiegand v. Commissioner of Internal Revenue, 3 Cir., 194 F.2d 479. In Dreyfuss v. Manning, D.C.N.J., 44 F.Supp. 383,* a stock

dividend of preferred stock, declared solely for the purpose of avoiding taxes on undistributed net income, was held non-taxable, which ruling apparently was not appealed by the Commissioner. The presence or absence of a corporate business purpose may play a part in determining whether a stock dividend is a bona fide one, one in substance as well as in form, but it does not by itself change an otherwise valid dividend into an invalid one. A stock dividend, legally created and distributed, which is a dividend in substance as well as in form, does not change from a non-taxable dividend into a taxable one because of the purpose of its issuance or on account of the good or bad judgment of the directors in declaring it. *Eisner v. Macomber, supra,* 252 U.S. at page 211, 40 S.Ct. at page 194....

We come then to what in our opinion is the dominant and decisive issue in the case, namely, whether the stock dividend, which, by reason of its redemption feature, enabled the Corporation to ultimately distribute its earnings to its stockholders on a taxable basis materially lower than would have been the case by declaring and paying the usual cash dividend, was a bona fide one, one in substance as well as in form. As pointed out in *Chisholm v. Commissioner, supra, 2 Cir., 79 F.2d 14, 15, certiorari denied Helvering v. Chisholm, 296 U.S. 641, 56 S.Ct. 174, 80 L.Ed. 456,* the Court cannot ignore the legal effect of a bona fide transaction on the ground that it avoids taxes, and that 'The question always is whether the transaction under scrutiny is in fact what it appears to be in form; a marriage may be a joke; a contract may be intended only to deceive others; an agreement may have a collateral defeasance. In such cases the transaction as a whole is different from its appearance.' But if the transaction is actually what it purports to be it must be accepted for its legal results....

Each case necessarily depends upon its own facts. The facts in this case show tax avoidance, and it is so conceded by petitioner. But they also show a series of legal transactions, no one of which is fictitious or so lacking in substance as to be anything different from what it purports to be. Unless we are to adopt the broad policy of holding taxable any series of transactions, the purpose and result of which is the avoidance of taxes which would otherwise accrue if handled in a different way, regardless of the legality and realities of the component parts, the tax assessed by the Commissioner was successfully avoided in the present case. We do not construe the controlling decisions as having adopted that view. *United States v. Isham, supra, 17 Wall. at page 506; Gregory v. Helvering, supra, 293 U.S. at page 469, 55 S.Ct. at page 267; Commissioner v. Tower, supra, 327 U.S .at page 288, 66 S.Ct. at page 536; United States v. Cumberland Public Service Co., supra, 338 U.S. at page 455, 70 S.Ct. at page 282; United States v. Cummins Distilleries Corp., supra, 6 Cir., 166 F.2d at page 20. See Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210,*

> *93 L.Ed. 1659; Lawton v. Commissioner, 6 Cir., 164 F.2d 380, 385; Miller v. Commissioner, 6 Cir., 183 F.2d 246* (*emphasis supplied*).[77]

In August 1954, approximately 10 months after the Chamberlin decision was handed down by the Court of Appeals for the Sixth Circuit, Congress added §306 the Code. §306 had the effect of taxing amounts realized on the sale of preferred stock received in a non-taxable stock dividend at ordinary income rates, thus overturning Chamberlin prospectively.

This more than 50-year old decision illustrates the long-standing traditional manner in which aggressive tax advantaged transactions have been adjudicated by courts of tax jurisdiction. There are many other examples, some of which I refer to elsewhere in this report. Although on different aspect of income taxation, Chamberlin and DOIS have striking similarities:

- ★ Both had a tax avoidance purpose.
- ★ Both involved several integrated steps.
- ★ Both were executed according to a pre-arranged plan.
- ★ Both were completed in a comparatively short period of time.
- ★ Chamberlin lacked a corporate business purpose; the IRS asserts the same is true regarding the Welles family DOIS transaction, although they dispute the allegation.
- ★ Both utilized an outside financial institution that was somewhat protected against risk of loss.
- ★ Both involved bona fide financial transactions.
- ★ Both involved aggressive tax planning strategies that created results possibly not intended by Congress.
- ★ Both involved assertions by the government of lack of good faith.
- ★ Both took advantage of loopholes that were subsequently closed either by Congress or the IRS.

***The IRS Aggressively Asserts Improper and Inequitable Tax Positions Routinely***

**Too Good To Be True and Too Bad To Be True**

N. Jerold Cohen ("Cohen") former Chief Counsel of the IRS, now a tax partner with Sutherland Asbill & Brennan LLP, wrote an article about the "too good to be true" phenomenon in 2005 in

---

[77] 207 F.2d 462 at 468-472.

which he cites numerous examples of appellate cases, such as those discussed above, in which the taxpayer prevailed when it was "too good to be true." Conversely, he also cites numerous examples of appellate cases in which the IRS prevailed when it was "too bad to be true." In other words, for every situation in which a taxpayer prevails when he shouldn't, there is another situation in which the IRS prevails when it shouldn't, i.e., it's too bad to be true.[78]

Having reflected upon this "too good to be true, too bad to be true" anomaly often during my long career teaching taxation to law students, I have come to the realization that we live with an imperfect, often unpredictable tax system, one that produces unfair results for both sides from time-to-time. It is not surprise to me, therefore, that both sides attempt to take advantage of the situation with surprising success. It is my experience that the IRS often fights to keep the taxes it gains unfairly by taking advantage of anomalous rulings in its favor, so it should be no surprise that taxpayers attempt to do the same. In his article, Cohen concludes on this subject:

> One can see that there is a clear conflict between the too good to be true argument of the IRS and the plain meaning of the statute holdings of the Supreme Court and other courts....[W]e need to think carefully through how the code is presented to taxpayers through the media and case law. With well-publicized example after example of situations in which the code reaches results that are not only unexpected, but also too good or too bad to be true, it seems inappropriate to impose penalties on taxpayers who not only follow advice from tax professionals, but also can see that the advice is based on the literal language of the code.[79]

This is the give-and-take of our system of federal taxation – most matters are adjudicated in accord with what is good policy and the intent of Congress. But, in many situations that just does not happen. And, when it does not happen, the IRS benefits as often as the taxpayers. In numerous cases, the IRS is able to impose what is patently unfair treatment on taxpayers because of unintended anomalies in the tax law. And, it goes without saying that when the shoe is on its foot, the IRS pays little heed to whether its positions reflect the intent of Congress. Given the time and the inclination, I could write a 1,000+ page book recounting examples of the IRS manifesting abusive behavior of this ilk, but in the interest of time and the reader's schedule I present just a few examples.

---

[78] Cohen, N. Jerold, "Too Good to be True and Too Bad to be True," Tax Notes, December 12, 2005, p. 1437. Cases cited as "too good to be true," in addition to the cases discussed above, are Coggin Automotive Corp. v. Comr., 292 F.3d 1326 (11th Cir. 2002); The Limited, Inc. v. Comr., 286 F.3d 324 (6th Cir. 2002); Brown Group, Inc. v. Comr., 77 F.3d 217 (8th Cir. 1995); Textron, Inc. v. U.S., 561 F.2d 1023 (1st Cir. 1977); The Falconwood Corp. v. United States, 422 F.3d 1339 (Fed. Cir. 2005); Woods Investment v. Comr., 85 T.C. 274 (1985); and, Rite Aid v. United States, 255 F.3d 1357 (Fed. Cir. 2001). Cases cited as "too bad to be true," in addition to cases discussed below, are Speltz v. Comr., 124 T.C. 165 (2005); and, Combrink v. Comr., 117 T.C. 82 (2001).

[79] Cohen, N. Jerold, "Too Good to be True and Too Bad to be True," Tax Notes, December 12, 2005, p. 1437, 1442.

**David H. Hillman v. Internal Revenue Service**[80]

An S corporation owned by Mr. Hillman performed management services for real estate partnerships in which he was a partner. The issue raised by the IRS was whether Mr. Hillman could deduct his passive management fee expense against his nonpassive management fee income. This is akin to the self-charged interest rule of §469(l)(2) and the Regs. thereunder, which provides that a taxpayer who receives interest income in similar circumstances may deduct the offsetting interest expense. When Congress added the passive activity loss rules to the Code in 1986, it anticipated that Regs. would be issued for self-charged interest plus "other situations in which netting of the kind described above is appropriate."[81] It left it to the IRS to issue Regs. defining these "other situations"; however, it failed to do so. Thus, when Mr. Hillman's case was decided, the IRS opposed his deduction because it insisted the plain language of §469 prohibited it. The Court of Appeals for the Fourth Circuit agreed with the IRS, stating:

> The threshold problem with the Hillmans' position is that nothing in the plain language of IRC §469 suggests that an exception to IRC §469(a)'s general prohibition against a taxpayer's deducting passive activity losses from nonpassive activity gains exists where, as in the present case, the taxpayer essentially paid a management fee to himself. The general rule is that unless there is some ambiguity in the language of a statute, a court's analysis must end with the statute's plain language (the Plain Meaning Rule)....
>
> We do note, however, that we see no reason why the factual situation before [us] is not deserving of exemption from the operation of §469(a) as proposed by the [IRS] with regard to an interest payment in a self-charged transaction. But, this is an inequity in the United States Tax Code that only Congress or the [IRS] (as holder of the delegated authority from Congress) has the authority to ameliorate.[82]

I am particularly offended by the IRS's cavalier attitude in these lawsuits regarding the Stobie Creek Plaintiffs' activities it believes contravene the intent of Congress. As the following from the opinion of the U.S. Tax Court on remand states, the IRS has no compunction with contravening the intent of Congress itself with its failure to act as Congress intended it to act and its overly literal interpretation of congressional language:

> Unfortunately, petitioners have been snared by the reach of section 469 in, what appears to be, most inequitable circumstances. As we discussed in our prior opinion, section 469 was designed to limit the use of losses generated by passive activities to offset unrelated income generated by nonpassive activities. Although section 469 was designed to stop the practices, Congress recognized that it would be inappropriate to treat certain transactions between related taxpayers as giving rise to passive expense and nonpassive income.

---

80 250 F.3d 228 (4th Cir. 2001), rev'g 114 T.C. 103 (2000), on remand 118 T.C. 323 (2002).

81 House Conference Report for the Tax Reform Act of 1986, as quoted at 250 F.3d 228 (4th Cir. 2001) at 232.

82 250 F.3d 228 (4th Cir. 2001) at 232-234.

> The [IRS] was charged with issuing regulations to implement section 469. Commentary contained in the legislative history suggests that self-charged items should be provided for in the regulations. In 1991, regulations were proposed that provided for self-charged interest. Although more than 15 years have passed since the enactment of section 469 and 10 years have passed since the self-charged interest regulation for interest was proposed, no action has been taken to relieve inequity that may be suffered with respect to self-charged items other than interest.
>
> Although we find petitioners' plight lamentable, the Court of Appeals for the Fourth Circuit has held the courts are incapable of providing relief in this situation.[83]

**Chief Counsel Advice (CCA) 2006-13030[84]**

In the Katrina Emergency Tax Relief Act of 2005,[85] Congress added employment taxes to the list of postponements and interest suspensions for "individuals" serving in the armed forces in a combat zone to §7508. Even before President Bush signed the bill into law, the IRS issued a Chief Counsel Advice holding that a partnership whose principal partner is serving in a combat zone is not eligible for the relief provided because it was unwilling to look through the pass-through entity to the "individual" principal partner whose absence had a deleterious effect on the business. This hyper-technical application of the new law is not in keeping with the obvious intent of Congress to provide relief to those in the military putting their lives at risk in combat.

**James L. Redlark v. Commissioner[86]**

The Redlark case is about the IRS's successful attempt to hinder Congress's intent to eliminate "choice of entity" as a qualifying factor for obtaining tax benefits. As part of the Tax Reform Act of 1986, Congress eliminated the deduction for personal interest expense. This included the deduction for interest paid to the IRS on personal tax deficiencies. Undisturbed, however, was the deduction for business interest expense, including interest paid to the IRS on business tax deficiencies. In December 1987, the IRS issued a temporary regulation that included interest that was "paid on underpayments of individual Federal, State or local income taxes and on indebtedness used to pay such taxes ...regardless of the source of the income generating the tax liability" in the definition of personal interest expense.[87] The IRS, then, used this temporary regulation to assert that interest paid to the IRS on tax deficiencies arising out of the business of a self-employed, unincorporated individual who reported his business income on Schedule C attached to his personal income tax return was personal interest and, therefore, not deductible. In doing so, it did not dispute the fact that had the business been organized in some other entity, such as a corporation, the interest expense would be business interest and, thus, deductible.

---

83 118 T.C. 323 (2002).
84 CCA 2006-13030 (December 15, 2005), 2006 TNT 64-7.
85 P.L. 109-135, signed by President Bush on December 21, 2005.
86 141 F. 3d 936 (9th Cir. 1998), rev'g 106 T.C. 31 (1996).
87 Temp. Reg. §1.163-9T(b)(2)(i)(A), T.D. 8168, 52 F.R. 48409 (December 22, 1987).

Consequently, choice of entity was the determining factor in whether or not interest paid to the IRS on a business tax deficiency was deductible.

This is the predicament in which Redlark found himself. During the late 1970s and early 1980s, Redlark operated an unincorporated business, Carrier Communications, that installed telephone equipment. Although he kept his books and records on the accrual method of accounting, he reported Carrier's income and expenses on the cash method of accounting on his personal income tax returns. After the IRS audited Redlark's returns for 1982-1984, it determined that extensive adjustments were necessary due to various accounting errors and tax shelter issues that ended up with his owing additional tax, penalties, and interest. Later, Redlark claimed a business expense deduction for the interest paid to the IRS with respect to the portion of the deficiencies that were due to the accounting errors and, thus, allocable to Carrier. The IRS challenged this deduction, contending that "interest on income tax deficiencies is not attributable to a taxpayer's conduct of [a] trade or business, regardless of the source of the income, but is rather 'personal interest' within the meaning of I.R.C. §163(h),"[88] citing the temporary regulation discussed above.

The Tax Court sided with Redlark and declared the temporary regulation invalid by stating:

> Suppose that the only income reported on the return of petitioners had been Schedule C income from Carrier Communications and that the entire deficiency related to the type of errors that the courts have previously concluded were expected to occur in the ordinary course of business. It would constitute an unrealistic application of our tax laws to conclude that the interest on such deficiency is not attributable to an indebtedness properly allocable to a trade or business under §163(h)(2)(A), in the absence of clear legislative intent that such a result is required. Yet, such is the inescapable consequence of adopting [the IRS's] position.
>
> In light of the foregoing....we hold that, as applied to the circumstances involved herein, section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., constitutes an impermissible reading of the statute and is therefore unreasonable. Accordingly, we further hold that the interest involved herein is interest "on indebtedness properly allocable to a trade or business" and therefore excluded from personal interest under §163(h)(2).[89]

In reversing the Tax Court, the Court of Appeals for the Ninth Circuit restated the IRS's authority to make such improper and inequitable interpretations of the tax laws when it stated:

> When Congress uses such broad, generalized language in defining an important term in a statute, a claimant must make a compelling argument, based on the

---

88 141 F. 3d 936 (9th Cir. 1998) at 938.
89 106 T.C. 31 (1996) at 35-36.

> language and history of the statute itself, that Congress can only have intended one meaning to attach to that language before we will find that the administering agency has no authority to employ a different construction. The Redlarks have offered no such compelling arguments....
>
> All that the Redlarks have done to support their argument that the [IRS's] interpretation of the Code is unreasonable is point once again to the consistent practice, prior to 1986, of allowing deductions on income tax deficiency interest of the kind that they seek here. But, as we have explained, the fact that the reasonable construction that an agency adopts in interpreting an ambiguous statute is inconsistent with past interpretations or the past practice of the agency does not, without more, call into question the propriety or the reasonableness of the new construction.[90]

The IRS won victories on the same narrow hyper-technical grounds in five more courts of appeals.[91] Eventually, the Tax Court had no choice but to abandon its position in Redlark.[92] It is my opinion the IRS's position of treating the business deficiency interest of unincorporated entities different from the way it treats the business deficiency interest of incorporated entities flies in the face of Congress's intent of making tax considerations a lesser factor in the choice of entity decision.

A good example of Congress's implementation of this policy is found in the history of the rules governing employee benefit plans. When I first began practicing law in the mid-1960s, the only type of retirement plan available to self-employed individuals was the H.R. 10 plan, also known as the Keogh plan, after Eugene James Keogh (1907-1989), then a congressman from New York. H.R. 10 plans were established in 1962 by the Self-Employed Individuals Tax Retirement Act and were subject to tighter limits on contributions and benefits and stricter rules governing plan operation than corporate retirement plans. At that time, although there was no limit to the annual contribution that could be made to a corporate plan, self-employed individuals were limited to a contribution of $2,500 per year. This disparity drove many taxpayers, particularly professionals who at the time were not allowed to practice in corporate form, to find inventive ways to organize into entities that qualified for corporate retirement plan status. In turn, during the late 1960s to early 1970s, all 50 states passed enabling legislation to allow professionals to form corporations, known generally as professional corporations or professional associations. The primary driving force behind this movement was to qualify for the higher contribution limits for corporate retirement plans.

To achieve somewhat greater equity with corporate plans, the Employment Retirement Security Act of 1974 ("ERISA") increased the annual contribution limit for self-employed individuals to the

---

90 141 F. 3d 936 (9th Cir. 1998) at 940-941.

91 Allen v. U.S., 173 F.3d 533 (4th Cir. 1999), McDonnell v. U.S., 180 F.3d 721 (6th Cir. 1999), Kikalos v. Commissioner, 190 F.3d 791 (7th Cir. 1999), Miller v. U.S., 65 F.3d 687 (8th Cir. 1995), and Alfaro v. Commissioner, 349 F.3d 225 (5th Cir. 2003).

92 Edward A. Robinson III v. Commissioner, 119 T.C. 44 (2002).

lower of 15% of earned income or $7,500, while setting a ceiling of $30,000 (which was CPI adjusted) for contributions to corporate retirement plans. The Economic Recovery Tax Act of 1981 ("ERTA") increased the dollar maximum to $15,000, effective January 1, 1982. By this time, CPI adjustments resulting from the significant inflation of the Carter era had lifted the dollar limit for corporate plans to $45,475. In the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Congress established parity between corporate and noncorporate retirement plans. To this end, most of the special rules applicable to H.R. 10 plans were eliminated and maximum limits for H.R. 10 plans were changed to be the same as those for corporate plans. And, Congress reduced the annual contributions limit to $30,000 for everyone in 1983 and effectively froze it at that level for 17 years when it CPI adjusted it again.

Another example of Congress's acts intended to eliminate tax considerations from the choice of business entity is the deduction for self-employed health insurance costs. Although corporate health insurance costs have always been fully deductible by the corporation and not includible in the employee's income, up until 1986 self-employed individuals were not accorded this special treatment and were permitted to deduct their health insurance costs only as medical expenses, subject to the floor in effect from time-to-time. The Tax Reform Act of 1986 introduced the first above-the-line deduction for self-employed health insurance costs, but it was limited to 25% of such costs. The percentage limitation yo-yoed up and down over the intervening years, finally reaching 100% in 2003 where it has remained.

In light of what seems to me to be a clear intention of Congress to eliminate circumstances such as the one Redlark faced, I find it inexplicable that the IRS would pursue a policy of treating an obviously allowable deduction such as interest on a business tax deficiency as nondeductible.

**Clinton Webb v. U.S.**[93]

Another example of abuse by the IRS taken to the extreme can be found in its refusal to sanction equitable tolling of the statute of limitations for the filing of refund claims in special situations where it would have been proper and equitable for it to do so. Take the case of Mary Morton Parsons, a wealthy childless widow who in 1972 retained the services of a physician and a lawyer to oversee her personal and financial affairs. Through systematic physical and emotional abuse over the next 14 years, the two advisors persuaded Parsons to relinquish to them total control over her affairs, which resulted in their keeping her a virtual hostage in her home confined to bed under heavy sedation. Using powers-of-attorney they induced her to grant, the two advisors fraudulently diverted a substantial portion of Parson's wealth to themselves and their families. To cover up their malfeasance, the two advisors filed a gift tax return on Parsons' behalf in 1980, paying the IRS out of Parsons' funds in excess of $4.3 million, and in 1986-1987, after an audit by the IRS, in excess of $7 million more, for a total of more than $11.3 million in taxes, penalties, and interest for these illicit gifts to themselves. When Parsons eventually escaped their domination and discovered the fraudulent transfers, she sued the two advisors in state court and recovered virtually all her lost assets. She, then,

---

93 Clinton Webb, et al v. United States, 850 F. Supp. 489 (D.C. ED Va., 1994).

filed a claim with the IRS seeking a refund of the gift taxes, penalties, and interest paid in connection with the bogus gifts. The IRS acknowledged that the taxes were wrongfully paid and refunded about $9.8 million, representing the roughly $7 million paid in 1986-1987 plus interest, but it refused to refund the $4.3 million paid in 1980 on statute of limitations grounds. After Parson's death, her executors brought suit on her claim. The parties agreed the claim, filed eight years after the gift tax return was filed, was untimely under §6511(a), which requires claims to be filed within three years of the filing of the return. The executors argued that the principles of equitable tolling of the statute of limitations should apply because Parsons had been heavily sedated while being defrauded. Not surprisingly, the IRS took the opposite position. Although it concluded that if §6511 could be equitably tolled, the facts here were sufficiently egregious for it to have applied the doctrine of equitable tolling, the District Court granted the government's motion to dismiss, ruling that equitable tolling did not apply in tax refund suits. The executors appealed the trial court's decision to the Court of Appeals for the Fourth Circuit, but it affirmed, agreeing that equitable tolling of the statute of limitations did not apply to tax refund cases.[94]

**Marian Brockamp, Administrator of the Estate of Stanley B. Gill, Deceased v. U.S.[95]**

In another case, a similar situation had developed around the same time. Three years after the death of Marian Brockamp's 98-year-old father, she discovered that at age 93 he had paid the IRS $7,000 rather than the $700 he owed due to a mental disability (senility). Accordingly, she filed a request for refund which, predictably, the IRS denied on statute of limitations grounds. Mrs. Brockamp, then, also sued in district court, which also granted summary judgment for the government. Mrs. Brockamp also appealed, although in her case the United States Court of Appeals for the Ninth Circuit reversed, stating:

> We think that the facts as alleged by Mrs. Brockamp demonstrate why equitable tolling should apply in some tax cases. In this instance, it would be unconscionable to allow the government to retain money that it concedes it was not owed, and may have only received due to a 93 year-old man's senility.[96]

The government appealed this decision to the U.S. Supreme Court, which granted certiorari, and then ruled the Code was to be interpreted literally, which meant that equitable tolling was not permitted in this situation.[97] Thus, it refused to make the government refund the excess payment to Mrs. Brockamp. The following year, Congress changed the law to permit equitable tolling of the statute of limitations during any period of time that an individual is unable to

---

94 Clinton Webb, et al v. United States, 66 F.3d 691 (CA-4, 1995).

95 Marian Brockamp, Administrator of the Estate of Stanley B. Gill, Deceased v. United States, 859 F. Supp. 1283 (D.C. CD Calif., 1994)

96 Marian Brockamp, Administrator of the Estate of Stanley B. Gill, Deceased v. United States, 67 F.3d 260 (CA-9, 1995) at 263.

97 United States v. Marian Brockamp, Administrator of the Estate of Stanley B. Gill, Deceased, 519 U.S. 347 (1997).

manage his or her financial affairs by reason of medically-determinable physical or mental impairment.[98]

**The Alternative Minimum Tax ("AMT") Trap**

A further example of abuse by the IRS taken to the extreme can be found in the positions it took with respect to the taxation of damages awarded to plaintiffs in non-physical injury or sickness cases for which their attorneys received a contingent fee. These awards – for such actions as age, race, or sex discrimination, *inter alia* - are taxable under §104(a)(2), which excludes only damages received (other than punitive damages) on account of physical personal injuries or physical sickness. In a typical settle-up arrangement, the attorney for a winning plaintiff collects the entire damages award and places it into a trust account he maintains. From there, he then distributes the award to himself and his client based on the financial terms to which they agreed. So, the client usually receives only the net amount because, literally, the attorney pays the client rather than vice-versa.

The controversy arose out of the IRS's insistence the client/recipient report the entire award in gross income, with the attorney's fee potentially deductible in one of two ways, depending on the circumstances – (1) if the client is a business or an independent business owner, say a minority-owned business that was cheated out of a contract due to race discrimination, the attorney's fee would be deductible as an ordinary and necessary trade or business expense under §162(a) for Adjusted Gross Income ("AGI") (in the trade often called "above the line"); however, (2) if the client is an employee, say a man in his early 50s who was terminated due to age discrimination, the attorney's fee would be deductible under §§ 62(a)(1) and 67(b) from AGI (in the trade often called "below the line"), i.e., only as a miscellaneous itemized deduction, subject to both the 2-percent floor on miscellaneous itemized deductions [§67(a)] and the 3-percent limitation on overall itemized deductions [§68(a)]. What is much worse, because miscellaneous itemized deductions are not deductible for AMT purposes under §56(b)(1)(A)(i), the attorney's fee would not be deductible at all under that method of computing tax.

In scenario (2), described above, the taxpayer is left with phantom income, i.e., taxable income without a corresponding economic inflow, because he will have included the entire award in his income, but will not be able to deduct the entirety of the attorney's fee subtracted from it due to the 2-percent and 3-percent limitations or, in the alternative, will not be able to deduct any of the attorney's fee subtracted from it due to the AMT, an unenviable situation that came to be known in the community of tax planning professionals as "the AMT Trap." Why the IRS would insist so vigorously in case-after-case that taxpayers in this situation should be forced to report and pay tax on phantom and/or phony income is baffling.

To avoid this result, taxpayers in a number of cases in recent years have argued the portion of a taxable damage award retained by the attorney as a contingent fee should be excluded from the recipient's gross income and treated as income earned directly by the attorney. For the most

---

[98] Code §6511(h) as amended by the IRS Restructuring and Reform Act of 1998, P.L. 105-206, signed by President Clinton on July 22, 1998.

part, the Tax Court and most circuit courts of appeals held the attorneys fee awards paid directly to a plaintiff's attorney (or the portion of a damage award that is the attorney's contingent fee that is so paid) are nevertheless includable in the plaintiff's gross income, and that he may claim a deduction, subject to the applicable limits described above, including disallowance of the deduction for AMT purposes if a miscellaneous itemized deduction.[99]

The Court of Appeals for the Ninth Circuit, applying California law in Benci-Woodward v. Comr., dismissed the notion of "equity in the tax laws" so often argued by the IRS, albeit with the shoe on the other foot:

> Petitioners also argue that the AMT results in inequities to certain taxpayers; such considerations, however, are more appropriately left for congressional resolution. *See Alexander v. IRS*, 72 F.3d 938, 946-47 (1st Cir. 1995) (recognizing that, although application of AMT to legal fees may result in a seemingly unfair outcome, "there is [no] inequality of treatment as compared to similarly situated taxpayers . . . and it is well established that equitable arguments cannot overcome the plain meaning of the statute"); *Weiser v. United States*, 959 F.2d 146, 148-49 (9th Cir. 1992) (rejecting taxpayer challenge to disallowance of deductions under AMT on inequity grounds); *see generally Okin v. Commissioner*, 808 F.2d 1338, 1342 (9th Cir. 1986) (upholding constitutionality of AMT) (*emphasis supplied*).[100]

The Court of Appeals for the Seventh Circuit, applying Wisconsin law in Kenseth v. Comr., made the same point:

> He argues that his position would eliminate an inequity created by the much-criticized alternative minimum tax. As an original matter, in taxation's Garden of Eden, it would indeed be difficult to think of a reason why Kenseth should have been denied the normal privilege of deducting from his gross income 100 percent of an expense reasonably incurred for the production of taxable income. And nothing in the background of the alternative minimum tax law indicates why attorneys' fees were, along with other "miscellaneous expenses," lumped in with tax-preference items and denied the normal privilege. See generally Laura Sager & Stephen Cohen, "How the Income Tax Undermines Civil Rights Law," 73 *So.*

---

99 See, for example, Bagley v. Comr., 105 T.C. 396 (1995), aff'd 121 F.3d 393 (CA-8, 1997); Accord Baylin v. United States, 30 Fed. Cl. 248 (1993), aff'd 43 F.3d 1451 (Fed. Cir., 1995); Coady v. Comr.. T.C. Memo 1998-291, aff'd 213 F.3d 1187 (CA-9, 2000); Alexander v. IRS, T.C. Memo 1995-51, aff'd 72 F.3d 938 (CA-1, 1995); Benci-Woodward v. Comr., T.C. Memo 1998-395, aff'd 219 F.3d 941 (CA9-2000), cert. denied, 531 U.S. 1112 (2001); Kenseth v. Comr., 114 T.C. 399 (2000), aff'd 259 F.3d 881 (CA-7, 2001); Young v. Comr., 113 T.C. 152 (1999), aff'd 240 F.3d 369 (CA-4, 2001); Hukkanen-Campbell v. Comr., T.C. Memo 2000-180, aff'd 274 F.3d 1312 (CA-10, 2001), cert. denied, 535 U.S. 1056 (2002); and, Raymond v. United States, 247 F. Supp. 2d 548 (D.C. Vt., 2002), rev'd 355 F.3d 107 (CA-2, 2004), cert. denied, 2005 U.S. LEXIS 1456 (2005).

100 Benci-Woodward v. Comr., 219 F.3d 941 (CA9-2000) at 944.

> *Calif. L. Rev.* 1075, 1090-93 (2000). But the idea behind the tax is of course to limit otherwise allowable deductions, so that, to put it crudely, everybody who has income pays *some* federal income tax. So rather than ask why attorneys' fees are not deductible for purposes of the alternative minimum tax, we should ask why those fees should be distinguished from other miscellaneous deductions that the tax disallows; no answer comes to mind.
>
> Enough; for in any event it is not a feasible judicial undertaking to achieve global equity in taxation, see *Benci-Woodward v. Commissioner, supra,* 219 F.3d at 944, and cases cited there, especially when the means suggested for eliminating one inequity (that which Kenseth argues is created by the alternative minimum income tax) consists of creating another inequity (differential treatment for purposes of that tax of fixed and contingent legal fees). And if it were a feasible judicial undertaking, it still would not be a proper one, equity in taxation being a political rather than a jural concept. Indeed the cases that reject the Tax Court's position seem based on little more than sympathy for taxpayers (*emphasis supplied*).[101]

The enormity of the inequity the IRS has so actively pursued can best be illustrated with the example of a taxpayer who actually lost money as the result of successfully prosecuting a sexual harassment claim, i.e., her taxes actually exceeded what she received as a result of winning her lawsuit:

> Eight years after [Cynthia] Spina became a police officer, a jury awarded her $3 million in damages for sexual harassment, but the award was later reduced to $300,000 plus attorney's fees and costs of $949,761.26. As a successful plaintiff in a civil rights suit, Spina was entitled to reasonable attorney's fees from the defendant pursuant to federal statutes called feeshifting provisions. But Spina's troubles did not end there. Civil rights plaintiffs are taxed on their entire award or settlement, including attorney's fees, so Spina was taxed on both the compensation award and attorney's fees, or nearly $1.3 million. Spina could deduct the attorney's fees, but as a miscellaneous itemized deduction (and therefore only deductible to the extent that the aggregate amount of the deduction exceeded two percent of Spina's adjusted gross income). Furthermore, Spina's recovery triggered the alternative minimum tax, under which attorney's fees, as miscellaneous itemized deductions, are not deductible. As a result, Spina's successful discrimination suit left her with a $99,000 after-tax loss (owing the government $ 99,000 more than she received from her award).
>
> Cynthia Spina is not the only civil rights plaintiff who has concluded a successful suit with an after-tax loss, and many more have successfully completed civil rights suits with only a small fraction of their total award, the majority of it

---

[101] Kenseth v. Comr., 259 F.3d 881 (CA-7, 2001) at 884-885.

> devoured by taxes. This phenomenon occurs for several reasons. First, due to various provisions in the United States Internal Revenue Code (the "Code"), plaintiffs who win civil rights suits (usually against their employer) either in court or through settlement are taxed on both their compensatory award and court-awarded, statutorily determined attorney's fees. The attorney's fees are included in the plaintiff's gross income even when the plaintiff never had possession of or an interest in the fee. Second, while plaintiffs may take a deduction to offset the inclusion of attorney's fees in gross income, the attorney's fees are only deductible as a miscellaneous itemized deduction (and thus only allowable to the extent that total miscellaneous itemized deductions exceed two percent of the plaintiff's gross income). Third, and importantly for plaintiffs with substantial gross income, the attorney's fees are not deductible for purposes of the alternative minimum tax.
>
> These Code provisions and their collective result of imposing an after-tax loss or a severely reduced compensation award on prevailing civil rights plaintiffs undermines the congressional intent behind the fee-shifting statutes, which is to encourage attorneys to take civil rights suits and thus reduce instances of discrimination. The current position of the courts and the Code discourages civil rights plaintiffs from bringing their discrimination suits. This unjust and unintended result should be rectified (*internal citations omitted*) (*emphasis supplied*).[102]

The article cited just above provides an illustrative example of how a taxpayer can actually lose money because of the IRS-supported improper and inequitable position on the taxation of damages awards (tax calculation based on the 2002 tax tables):

> The following example will illustrate the effects of the AMT on two taxpayers, one of whom earns her income and one of whom is a civil rights plaintiff who received attorney's fees from the defendant under a fee-shifting statute. Susan is a single taxpayer whose adjusted gross income is $300,000 a year. She also takes $10,000 in itemized deductions. Before accounting for the AMT, she will owe approximately $90,461 in regular taxes. Because Susan's tentative minimum tax under the AMT is $80,500, which is less than her regular tax, Susan will have to pay $90,461 in taxes, leaving her with $ 209,539 of disposable income.
>
> Suppose, instead, that Susan receives the $300,000 from a judgment for having won a discrimination suit against her employer. The judgment was allocated between $50,000 in compensation and $250,000 in attorney's fees awarded

[102] Neumann, Jennifer S., COMMENT: The Discrimination Created by the Tax Treatment of Attorney's Fees in Federal Civil Rights Cases, Kansas Law Review, May 2003, 51 Kan. L. Rev. 595 at 595-597. The underlying lawsuit is Cynthia C. Spina v. Forest Preserve District of Cook County, et al; Case No. 98-C-1391 in the United States District Court for the Northern District of Illinois, Eastern Division, 2002 U.S. Dist. LEXIS 16005 (2002).

> under a fee-shifting statute. Susan was unable to work during the year, and thus did not have any earned income. According to I.R.C. §61, Susan's gross income is still $300,000. Assuming that Susan has no above-the-line deductions, her adjusted gross income is $300,000. Since $250,000 of the judgment was paid to Susan's attorneys, Susan would like to deduct the attorney's fees as a miscellaneous deduction.
>
> Because taxpayers may only deduct those miscellaneous itemized deductions that exceed two percent of their AGI, Susan's miscellaneous itemized deduction for the attorney's fee is reduced by $6,000, leaving her with a $244,000 deduction. In addition, I.R.C. §68 will further reduce Susan's deductions by $4,881 because of her high adjusted gross income amount, leaving her with total deductions of $239,119. Her regular tax liability is approximately $12,784.
>
> Susan's high-income amount, however, triggers the AMT. The most significant impact of this is that I.R.C. §56(b)(1) does not allow miscellaneous itemized deductions when calculating the AMT. Therefore, Susan will have to pay taxes on the $300,000 as if she received the full award, the consequence of which requires her to pay $80,500 in taxes. <u>Because Susan cannot deduct the attorney's fees from her AMTI, Susan's entire compensation award ($50,000) plus an additional $30,500 will be eaten up in taxes. In other words, Susan will suffer a $30,500 after-tax loss for the year, meaning that Susan must pay the government $ 30,500 more than she received in the year</u> (*internal citations omitted*) (*emphasis supplied*).[103]

It appears the same fate befell Paula Corbin Jones, a former Arkansas state employee who sued President Bill Clinton for sexual harassment based on events that occurred while he was Governor of Arkansas. Although her suit was dismissed because she was unable to prove any work-related damages, President Clinton settled with her for $850,000 to preclude the possibility of reversal on appeal. The AMT tax consequence of her settlement was discussed in an article about the oral argument in the Hukkanen-Campbell case [274 F.3d 1312 (CA-10, 2001)]:

> Taxpayers can be severely whipsawed by the computational repercussions of the AMT in this context. For example, in the widely publicized Paula Jones case, Jones reportedly obtained a settlement of $850,000 from President Bill Clinton but incurred attorney fees of almost $650,000. If she is considered taxable only on her net recovery of roughly $200,000, her regular tax liability would be approximately $72,000 and she would net $128,000 after taxes. However, if she must report the entire $850,000 award and deduct her attorneys' fees below the line, her AMT liability would be approximately $238,000, with the result that she would be $38,000 out of pocket for bringing the action. While this result seems

[103] Neumann, Jennifer S., COMMENT: The Discrimination Created by the Tax Treatment of Attorney's Fees in Federal Civil Rights Cases, Kansas Law Review, May 2003, 51 Kan. L. Rev. 595 at 609-611.

> harsh, it is simply the direct result of applying the unambiguous statute as written, a result that has been recognized by some courts as inequitable.[104]

Juxtaposed to the above-mentioned line of cases is a series of cases decided based on the application of state law on attorney liens. These cases held that where the attorney has the power to enforce his contractual contingent fee rights against the defendant independent of his client, the plaintiff, the attorney fees portion of any damages award is not includible in the client's gross income.[105] Lastly, a few cases were decided on the equitable ground that the client was not required to include the contingent attorney fee portion of the damages award received in income regardless of state law because the client had no tax avoidance purpose and double taxation would otherwise result by including the contingency fee in income.[106]

The hue and cry from disgruntled taxpayers and their professional representatives on this issue finally caught the ear of Congress which by and large closed the AMT Trap when it added §§ 62(a)(19) and 62(e) to the Code in 2004 which permit above-the-line deductibility of contingent attorney fees in lawsuits for unlawful discrimination in 18 separate categories of civil rights-type offenses effective for judgments and settlements occurring after the date of enactment.[107] Unfortunately, the new law left open the fate of a myriad of cases with judgments or settlements preceding its effective date. The Supreme Court had granted certiorari in the Banaitis and Banks cases, previously cited, which had been decided in favor of the taxpayer, Banaitis on state law grounds and Banks on equitable grounds. To the chagrin of the community of tax planning professionals, the Supreme Court decided the plain language of the Code controlled, thus the client/recipients were required to include their contingent attorney fee awards in income despite the obvious inequity of the AMT Trap and regardless of the intent of Congress that the law should be changed, but only prospectively.

**Conclusion About Too Bad To Be True Results**

The point of the foregoing explanation of the tax issues surrounding (1) the self-charged passive activity loss rules; (2) the combat zone taxpayer rules; (3) the business tax deficiency interest expense rules; (4) the equitable tolling rules; and, (5) the contingent attorney fee awards rules is to inform the reader that experienced tax professionals are undeniably aware of the fact that

---

104 Serven, James, "Oral Argument in Hukkanen-Campbell: Taxpayers' Last Stand?" 93 Tax Notes 854 (Nov. 5, 2001). See also, entry re Paula Jones in Wikipedia, the free online encyclopedia, September 2007 at http://en.wikipedia.org/wiki/Paula_Jones.

105 See, for example, Davis v. Comr., T.C. Memo 1998-248, aff'd 210 F.3d 1346 (CA-11, 2000) (Alabama law); Cotnam v. Comr., 28 T.C. 947 (1957), aff'd on this issue, 263 F. 2d 119 (CA-5, 1959) (Alabama law); Estate of Clarks v. United States, 1998 U.S. Dist. LEXIS 17891 (D.C. ED Mich., 1998), rev'd 202 F.3d 854 (CA-6, 2000) (Michigan law); and, Banaitis v. Comr., T.C. Memo 2002-5, rev'd 340 F.3d 1074 (CA-9, 2003), rev'd 125 S. Ct. 826 (2005).

106 See, for example, Srivastava v. Comr., T.C. Memo 1998-362, rev'd 220 F.3d 353 (CA-5, 2000) and Banks v. Comr., T.C. Memo 2001-48, rev'd on this issue, 345 F.3d 373 (CA-6, 2003), rev'd 125 S. Ct. 826 (2005) (Oregon law).

107 §§ 62(a)(19) and 62(e) added by the American Jobs Creation Act of 2004, P. L. 108-357, signed by President Bush on October 22, 2004.

in the name of protecting the public fisc the IRS doesn't hesitate to take advantage of every ambiguity, uncertainty, and loophole in the tax laws in its favor that it can muster, even if improper, inequitable, unfair, bad policy, or not in accord with the intent of Congress. The community of tax planning professionals does likewise on behalf of its clients. The courts and Congress are available to sort out the resulting disputes, but sometimes don't or don't do it properly. In other words, our tax system leaks, sometimes in favor of the taxpayer, other times in favor of the IRS. Like it or not, this is the way the system works and it has served our country well for over 90 years.

***DOIS Investment Strategy Technical Tax Issues***

Critics of the DOIS investment strategy typically make several technical tax assertions purporting to explain why a pass-through entity's outside basis in the long leg of its digital option positions should not shift upon constructive liquidation to the inside basis of its assets without being reduced by the amount its potential liability on the short leg of its digital option positions – (1) that the potential liability on the short leg of the positions should reduce each of the partners' or members' basis in their partnership or limited liability company interests; (2) that the long leg and short leg of the digital option positions were, in fact, part of a single option transaction structure, rather than separate offsetting option transactions, thus the financial effect of the transactions should be netted for determining basis; (3) that the losses resulting from the digital option positions should not be allowed under §165(c)(2) because they were not entered into with a profit motive; and, (4) that the losses resulting from the digital option positions should not be allowed under §465 because the partners or members did not have amounts at risk.

The J&G tax opinion letters, dated January 2, 2001, that were prepared for the owners of the pass-through entities that were the members of Stobie Creek thoroughly analyze each of these technical issues. I may summarize, but will not dwell upon these analyses, although I will update them as necessary.

**The Potential Liability on the DOIS Short Position Did Not Reduce Basis in Early 2000**

As is explained in the J&G tax opinion letter, Stobie Creek's assumption of the short option position in early 2000 was not a liability which reduced its members' basis in their LLC interests. Although under §752(b) the assumption by a partnership of a partner's liability is considered to result in a reduction in the partner's basis in his partnership interest, the governing case law and IRS rulings at the time did not treat a short option position as a liability. Thus, based on the law as it existed in early 2000, the assumption of a short option position was not an event that gave rise to a reduction in a partner's basis.[108]

On August 11, 2000, the IRS issued Notice 2000-44, which took the position that offsetting option positions contributed to a partnership by a taxpayer did not create substantial positive basis in his partnership interest presumably because the contingent obligation under the short

---

[108] J&G tax opinion letter, January 2, 2001, pp. E-1 – E-25, citing Helmer v. Commissioner, T.C. Memo 1975-160 and Rev. Rul. 73-301, 1973-2 C.B. 215, among others [00000934-00000958].

option position was a liability for purposes of §752(b).[109] Here, the IRS argues that although the Stobie Creek option transactions were entered into and completed approximately four months prior to the issuance of Notice 2000-44, the Stobie Creek Plaintiffs were aware of it before they filed their federal income tax returns for calendar year 2000, and, thus, it retroactively applied to them.

On June 24, 2003, the IRS issued Temp. Reg. §1.752-6T which provided that in circumstances such as the one described above, a contingent obligation to make a payment was to be treated as a liability for basis reduction purposes.[110] Thus, had this temporary regulation been in effect at the time the events that are the subject of this lawsuit were occurring, the Stobie members' basis in their interests in Stobie Creek would have been reduced by the contingent obligation associated with their short option position. Because the temporary regulation purports to be retroactively applicable to assumptions of liabilities occurring after October 18, 1999 and before June 24, 2003, the IRS argues it is applicable to the Stobie Creek DOIS investment strategy.

Both of these subsequent events were dealt with in a recent case, Klamath Strategic Investment Fund, LLC vs. U.S, which is discussed here and further below.[111] Citing numerous instances in which the IRS had successfully argued that contingent obligations were not liabilities for the purposes of §752(b), the Klamath court noted that the IRS had adopted a "consistent view that contingent or non-executory obligations are not liabilities under Section 752."[112] In support of its refusal to allow the IRS to speak out of both sides of its mouth, the Klamath court stated:

> It is clear from the record that the government has often and consistently relied on the principle that a "liability" under Section 752 does not include an obligation that is contingent. The government has applied this principle when it works to its benefit (to increase taxes owed). This Court will consistently apply these same principles even if they sometimes work to the benefit of taxpayers (to decrease taxes owed). This Court's analysis of "liability" under Section 752 will not vary in meaning simply based on whose ox is being gored.[113]

The Klamath court also refused to apply Temp. Reg. §1.752-6T retroactively or give effect to the IRS's argument regarding Notice 2000-44:

---

109 2000-2 C.B. 255 (September 5, 2000).

110 T.D. 9062, Assumption of Partner Liabilities, 68 F.R. 37414 (June 24, 2003).

111 440 F. Supp. 2d 608 (E.D. Tex., 2006); subsequent opinions in this case are at 472 F. Supp. 2d 885 (E.D. Tex. 2007) and 2007-1 USTC ¶50,410 (E.D. Tex., April 3, 2007), cross-appeals to the 5th Cir. pending.

112 440 F. Supp. 2d 608 (E.D. Tex., 2006) at 614-617 citing Helmer v. Commissioner, T.C. Memo 1975-160; Long v. Commissioner, 71 T.C. 1 (1978); La Rue v. Commissioner, 90 T.C. 465 (1988); Gibson Products Co. v. U.S., 637 F.2d 1041 (5th Cir., 1981); Rev. Rul. 73-301, 1973-2 C.B. 215; Rev. Rul. 79-294, 1979-2 C.B. 305; Rev. Rul. 57-29, 1957-1 C.B. 519; G.C.M. 37971 (July 1, 1979); and, G.C.M. 37860 (February 16, 1979).

113 440 F. Supp. 2d 608 (E.D. Tex., 2006) at 619.

> As stated above, the Plaintiffs in this case did not have the benefit of that notice.[14] All of the conduct complained of in this litigation occurred ***before*** Notice 2000-44 was published or issued. Taxpayers, including the Plaintiffs, were entitled to rely on the well-established position of the Service for the past 25 years in 752 cases. The decision to retroactively apply a regulatory change that is in conflict with this long line of cases without any prior notice is therefore an abuse of discretion.
>
> > [14] The government asserts that the Plaintiffs were aware of Notice 2000-44 before they filed their taxes. However, the relevant inquiry is whether the taxpayers had "notice" before engaging in the prohibited conduct. In this case, the taxpayers did not have such notice.
>
> Finally, the Court cannot help but note that the Regulation applies only to conduct that occurred before June 24, 2003, and after October 18, 1999. The Service then issued a different regulation to govern liabilities for conduct that occurred after June 24, 2003. A narrow time frame, coupled with conduct that the Service specifically calls out in the preamble of the Regulation, is a strong indication that the promulgation of the Regulation was to buttress the government litigation position in this and similar cases.....This issue is supportive of Plaintiffs' position that the Regulation is owed no deference and this its retroactivity is ineffective (*emphasis in the original*) (*internal citations omitted*).[114]

In my opinion, the relevant facts of this case on this issue are squarely on all fours with the facts of the Klamath case. The Stobie Creek DOIS investment strategy was a classic example of the §752(b) scenarios dealt with in the myriad of cases and rulings cited in the J&G tax opinion and by the Klamath court. The Stobie Creek fact pattern was exactly the same as the Klamath fact pattern with respect to the retroactivity of Temp. Reg. §1.752-6T and the timing of Notice 2000-44. For these reasons, it is my opinion that the potential liability of Stobie Creek for the short leg of the DOIS option positions did not reduce the tax basis of the Stobie Creek Plaintiffs in their individual Stobie Creek interests.

Accordingly, the IRS's position that there is no excess outside basis over inside basis, thus negating the effect of the §743(b) adjustment, is incorrect because in view of the fact that the potential liability on the short option position does not reduce basis, there is excess outside basis over inside basis and the §743(b) basis adjustment is proper.[115]

**The Stobie Creek Partnership DOIS Transactions Were Separate Offsetting Options**

The IRS asserts that the DOIS option transactions were parts of a single transaction structure and not separate offsetting options. Evidently, its purpose in so asserting is its attempt to merge

---

[114] 440 F. Supp. 2d 608 (E.D. Tex., 2006) at 625.

[115] J&G tax opinion letter, January 2, 2001, pp. J-1 – J-2, citing §§ 743(b), 754, and 708 and the Regs. thereunder [00000968-00000969].

the offsetting options structure that must be recognized as separate for DOIS to comply with the provisions of the Code at the time the transactions were entered into. The J&G tax opinion deals with this IRS position from several different points of view:

★ The timing of income, gains, deductions, and losses from a hedging transaction must match those of the hedged transaction, but this is not a hedging transaction. Hedged transactions occur only in the course of a taxpayer's trade or business and this is an investment activity not a business activity. Moreover, an entity involved in the DOIS strategy will not hedge the economic risk with any other entity involved in the transaction. Thus, the hedging Regs. are unlikely to apply.[116]

★ Even where one transaction may significantly offset the risk of the other, this factor alone is generally not sufficient to integrate otherwise separate transactions that would be given separate effect.[117]

★ There is a specific exception in the Regs. under §988 – apparently, the section of the Code on which the IRS relies for this aspect of its position – that provides (to paraphrase) the amount of gain or loss from a §988 transaction, i.e. a foreign currency transaction, is to be separately computed for each such transaction and is not to be integrated with gain or loss on another transaction, whether or not such transaction is economically related to the §988 transaction.[118]

★ The courts have long recognized that a taxpayer can hold both long and short positions in property at the same time with each position being treated as a separate property.[119]

The IRS advanced a similar argument to its position here in the Klamath case, cited above.[120] In Klamath, the taxpayers borrowed $41.7 million at an interest rate of 17.97% over a seven-year term. However, they actually received $66.7 million of loan proceeds from the lender, or a $25 million premium, because of the above-market interest rate. The taxpayers transferred the loan proceeds subject to their obligation to repay to a partnership. The IRS contended that the taxpayers' $66.7 million basis in their partnership interests had to be reduced by not only the $41.7 million loan, but also by the $25 million premium because it viewed the taxpayers' obligation to repay from an "aggregate perspective" and asserted the partnership always had the obligation to repay the entire $66.7 million. The taxpayers contended that they did have to reduce their basis in their partnership interests by the $41.7 million loan, but not by the $25

---

116 J&G tax opinion letter, January 2, 2001, p. B-1, citing Reg. §§ 1.446-4(a) and 1.1221-2(b) [00000918].

117 J&G tax opinion letter, January 2, 2001, p. B-2, citing §§ 1092, 1258, and 1259 [00000919].

118 J&G tax opinion letter, January 2, 2001, p. B-2, citing §988 and Reg. §1.988-1(e) [00000919].

119 J&G tax opinion letter, January 2, 2001, p. B-3 citing Smith v. Commissioner, 78 T.C. 350, aff'd, 820 F.2d 1220 (4th Cir. 1987); Stoller v. Commissioner, 60 TCM 1554 (1990), aff'd in part and rev'd in part, 994 F.2d 855 (DC Cir. 1993); Richardson v. Commissioner, 121 F.2d 1 (2nd Cir. 1941); Rev. Proc. 65-29, 1965-2 C.B. 1023); and, Rev. Rul 78-182, 1978-1 C.B. 265 [00000920].

120 440 F. Supp. 2d 608 (E.D. Tex. 2006) at 618.

million premium because then §752 and the Regs. thereunder did not consider the obligation to repay the $25 million premium to be an unconditional liability. The operative tax planning rules for the DOIS strategy rely on the same then existing tax law to prevent a basis reduction for the contingent obligation under the short option position.

As is discussed more fully above, the Klamath court dismissed the IRS's attempt to retroactively rewrite the Regs. under §752 by refusing to aggregate the $41.7 million loan and the $25 million loan premium into a single liability:

> The government's attempt to lump all the money together in one pot ignores the plain terms of the Credit Agreement and the Court rejects that argument. Further, as will be seen *infra,* the promulgation of Notice 2000-44 and the Regulation provide further evidence that the government was well aware that the loan premium and Prepayment Amounts would not be liabilities under Section 752 and the 752 cases.[121]

What is more, in his expert report, Kolb, a professor of finance at Loyola University Chicago, in describing the long and short position option pairs, opines:

> These two options are separate and distinct financial instruments. They are priced separately; they can be traded separately. They have different strike prices; they have different sales prices. There can be no serious argument on the question of whether these are two options or one option – they are two separate options.[122]

Based on the above analysis, it is my opinion that the IRS is wrong in contending that the DOIS long and short option positions are part of a single transaction structure. In fact, although about options rather than loans and loan premiums, the facts of the Stobie Creek situation are again squarely on all fours with the facts of the Klamath case with regard to this issue. Thus, it is my opinion that the Stobie Creek DOIS long and short option positions are separate transactions for federal income tax purposes.

**The Stobie Creek Partnership DOIS Transactions Were Entered Into With a Profit Motive**

The IRS has alleged that "neither Stobie Creek Investments LLC nor its purported partners (*sic*) entered into the option(s) or purchased the foreign currency with a profit-motive for purposes of §165(c)(2)."[123] Again, the IRS has reached this conclusion without appropriately considering the facts and circumstances of these taxpayers. Jeffrey Welles, the member of the family on whom the others relied because of his expertise in investment management, clearly believed the DOIS

---

121 440 F. Supp. 2d 608 (E.D. Tex. 2006) at 618.

122 Report of Kolb, September 11, 2007, p. 8.

123 Explanation of Items – Tax Year Ended April 30, 2000 – attached as Exhibit A to Notice of Final Partnership Administrative Adjustment, dated February 23, 2007, p. 2.

strategy would be meaningfully profitable for Stobie Creek.[124] What is more, Waterman advised the entire family it was his understanding the DOIS strategy provided a reasonable opportunity to earn a profit.[125] Moreover, Waterman testified that he discussed the subject with Jeffrey and Jeffery had told him he thought it was a bona fide investment with good potential and Jeffrey testified he recalled these conversations with Waterman.[126] Thus, it is my opinion that the IRS is incorrect in its belief that Stobie Creek and its members lacked a profit motive when for the DOIS strategy.

Further, even if the IRS were correct in its assertion that the profit motive test of §165(c)(2) was not met by the Stobie Creek Plaintiffs, it would only be applicable to disallow the economic loss of $2,045,750 resulting from the expiration of the option positions and would not be applicable to disallow the step up in basis of the Therma-Tru stock under §§ 743(b) and 752 because §165(c)(2) operates only to disallow losses claimed and there were no losses claimed in connection with the sale of the Therma-Tru stock.

**The §465 At-Risk Provisions are Inapplicable to the Stobie Creek Partnership**

The IRS asserts that "the economically offsetting option positions constitute an arrangement under [Code] §465(b)(4) to limit the exposure to risk of loss and that neither Stobie Creek Investments, LLC nor its [members] established any other amounts considered to be at risk for purposes of [Code] §465 that would allow the partners to deduct losses arising from or in connection with Stobie Creek Investments, LLC."[127] This IRS position does not make sense to me. Only one of the FPAAs issued by the IRS – the FPAA for the Stobie 1 return – contains this assertion. The only amounts disallowed on that FPAA are the $2,045,750 of actual economic losses realized from closing out the two DOIS offsetting option positions.[128] In my opinion, §465 simply does not apply because there is no "arrangement" to limit loss. Stobie Creek incurred an actual dollars-out-of-pocket economic loss and correctly deducted it.

***DOIS Investment Strategy Non-Technical Tax Issues***

Critics of the DOIS investment strategy also typically make several non-technical tax assertions purporting to explain why a pass-through entity's outside basis in the long leg of its digital option positions should not shift upon constructive liquidation to the inside basis of its assets without being reduced by the amount its potential liability on the short leg of its digital option positions – (1) that such a shift upon constructive liquidation is inconsistent with the intent of the provisions

---

124 Deposition of Jeffrey, Vol. 1, December 15, 2006, pp. 71 (24) – 72 (11).

125 Deposition of Waterman, August 1, 2007, p. 63 (11-19).

126 Deposition of Waterman, August 1, 2007, pp. 107 (16) – 108 (8); deposition of Jeffrey, Vol. 2, pp. 38 (22) – 39 (17) and 48 (14-25).

127 Explanation of Items – Tax Year Ended April 30, 2000 – attached as Exhibit A to Notice of Final Partnership Administrative Adjustment, dated February 23, 2007, pp. 2-3.

128 The details of these losses were presented on a schedule to Form 4797 that was attached to the Stobie 1 return [00000703-00000735 at 00000711].

of subchapter K of the Code; and (2) that the transaction lacked a business purpose, or, in the alternative, lacked economic substance and was a sham in fact and in substance.

The J&G tax opinion letters, dated January 2, 2001, that were prepared for the owners of the pass-through entities that were the members of Stobie Creek thoroughly analyze each of these non-technical issues. Again, I may summarize, but will not dwell upon these analyses, although I will update them as necessary.

**Reg. §1.701-2 is Inapplicable to the Stobie Creek DOIS Transactions in March-April 2000**

Reg. §1.701-2, a so-called "anti-abuse rule," was adopted by the IRS in December 1994.[129] It contains very broadly worded provisions purporting to give the IRS the power to disallow certain transactions entered into via partnerships (and other pass-through entities such as LLCs that are taxed as if they were partnerships) if the IRS decides they violate the intent of subchapter K of the Code, such as:

> ....Accordingly, if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Commissioner can recast the transaction for federal tax purposes, as appropriate to achieve tax results that are consistent with the intent of subchapter K, in light of the applicable statutory and regulatory provisions and the pertinent facts and circumstances....[130]

Most interesting regarding the issuance of this Reg. was the overwhelming criticism of it the IRS received, particularly from former IRS Commissioners, IRS Chief Counsel, Chiefs of the Joint Committee Staff, and judges:

> We do not believe that the best interests of either the Government or the taxpayers will be served by this regulation or similar broad anti-abuse rules not grounded in or authorized by statutory provisions of the Code. In our experience ....certain fundamental principles are required for a workable tax system ....This new regulation fails to meet these principles.[131]

---

[129] T.D. 8588, 59 F.R. 23-33, January 3, 1995.

[130] Reg. §1.701-2(b) [in pertinent part].

[131] Letter dated August 18, 1995 to Hon. Leslie B. Samuels, Assistant Secretary of the Treasury for Tax Policy, from Donald C. Alexander (former Commissioner of Internal Revenue); William A. Goffe (former judge of the U.S. Tax Court); Harry L. Gutman (former Chief of the Joint Committee Staff); Mark L. McConaghy (former Chief of the Joint Committee Staff); Bernard M. Shapiro (former Chief of the Joint Committee Staff); Abraham N. M. Shashy, Jr. (former Chief Counsel of the IRS); Samuel B. Sterrett (former judge of the U.S. Tax Court); and, B. John Williams (former judge of the U.S. Tax Court and, later, Chief Counsel of the IRS), 95 TNT 175-28, September 7, 1995. There were additional letters to the same end published in Tax Notes Today on September 7, 1995 from Kenneth W. Gideon (former Chief Counsel of the IRS and Assistant Secretary of Treasury for Tax Policy), 95 TNT 175-26, and Lawrence B. Gibbs

Sheldon I. Banoff, a tax partner with the international law firm Katten Muchin Rosenman LLP, and a prolific and well-respected author on tax subjects expressed this point-of-view thusly:

> The antiabuse rule appears to extend existing law and go beyond congressional principles. Because there was no grant of authority in section 701 or Subchapter K in general to issue an antiabuse rule, the government has tried to walk the tightrope as to whether or not the rule is merely consistent with existing case law or attempts to create new law. Those who believe it is founded in current law point to the principles of substance over form and valid business purpose as existing judicial glosses on any technical interpretations of tax provisions. Others content that the regulation attempts to create new law by requiring a "substantial business purpose" – a phrase purposely undefined in the regulation – and the wholly new test of "proper reflection of income."
>
> One government official recently acknowledged the final regulation "is more than a restatement of existing law." Another government official implied it is not, and stated that if a transaction appeared appropriate before proposed reg. section 1.701-2 was issued, it should be appropriate now. The preamble to the final regulations brashly observes the tension between the regulation and established legal doctrines.
>
> To the extent reg. section 1.701-2 goes beyond current law, its validity is in grave doubt (*internal citations omitted*).[132]

Hoffman Fuller, a well-respected professor of tax law at Tulane Law School, also commented on the criticism of this regulation shortly after it was published:

> Criticism of the new regulation has been prolonged and sharp. Ever since it appeared, the anti-abuse rule has been attacked by tax practitioners, former tax administrators, commissioners, and Tax Court judges. The dominant theme throughout these criticisms is that the rule creates too much uncertainty – that its content is so unspecific as to invite unpredictable and standardless challenges by revenue agents against partnership transactions. A former Chief Judge of the Tax Court has written that while nobody doubts there are abusive transactions, "it does not follow to delegate to agents the sweeping power to interpret the intent of the statute."[35] Moreover, critics have asserted that the uncertainty produced by the new rule increases the cost of tax planning and has a chilling effect on contemplated transactions.

---

(former Commissioner of Internal Revenue) and John S. Nolan (former Deputy Assistant Secretary of the Treasury for Tax Policy), 95 TNT 175-27.

132 Banoff, Sheldon I., "Anatomy of an Antiabuse Rule: What's Really Wrong with Reg. Section 1.701-2," 95 TNT 56-84, March 22, 1995.

> [35] Stratton, Sheryl, "They're Back....Washington Lawyers Attack Anti-Abuse Rules," 68 Tax Notes 1263 (Sept. 11, 1995) (quoting Samuel Sterrett, former Chief Judge of the Tax Court).[133]

What is more, Professor David A. Weisbach, quoted above on another subject, wrote:

> ....anti-abuse rules are designed to allow simpler rules. Where complex rules have been enacted, it is not appropriate to add an anti-abuse rule on top of the complex rules. This is, I believe, the underlying cause of the complaints about the partnership anti-abuse rule, a cause celebre in the tax world for a number of years. The partnership anti-abuse rule came after repeated amendments to the partnership statute intended to prevent transactions such as the mixing bowl transaction. It applied in addition to all of the complex rules and overrode the rules. In this case we might have the worst of both worlds – unbelievably complex rules and uncertainty. A better approach would have been to propose the partnership anti-abuse rule in exchange for repeal of many of the complex rules (*internal citations omitted*).[134]

I researched the published tax decisions in which the Reg. §1.701-2 was mentioned and found 14 instances between January 1995 and August 2007.[135] I did not find any case where a court even considered applying the Reg. to a taxpayer, much less did so. In fact, it is my observation that courts, while willing to discuss Reg. §1.701-2, tend to ignore it in applying the tax law to the facts at issue. Thus, given that the Reg. has been on the books for more than a dozen years, it is more of dead letter than a provision worthy of further consideration.

**The Stobie Creek LLC and the DOIS Strategy Were Not Shams in Early 2000**

The IRS disallowed the capital losses claimed by the Stobie Creek Plaintiffs primarily because it believes that Stobie Creek is a sham entity that had no business purpose that entered into a sham transaction that lacked economic substance for federal income tax purposes.[136] The

---

133 Fuller, Hoffman, "The Intent to Avoid Tax," 70 Tul. L. Rev. 2103 (1995-1996) at 2115.

134 Weisbach, David A., "Costs of Departures from Formalism: Formalism in the Tax Law," 66 U. Chi. L. Rev 860 (Summer 1999).

135 The 14 cases are Brown Group v. Commissioner, 104 T.C. 105 (1995); Brown Group v. Commissioner, 77 F.3d 217 (8th Cir. 1995); ACM Partnership v. Commissioner, 157 F.3d 231 (3rd Cir. 1998); Coggin Automotive Corp. v. Commissioner, 292 F.3d 1326 (11th Cir. 2002); Jade Trading, LLC v. U.S., 60 Fed. Cl. 558 (2004); Jade Trading, LLC v. U.S., 65 Fed. Cl. 487 (2005); Jade Trading, LLC v. U.S., 65 Fed. Cl. 443 (2005); Santa Monica Pictures, L.L.C. v. Commissioner, T.C. Memo 2005-104; Belford Strategic Inv. Fund, LLC v. U.S., 2005 U.S. Dist. LEXIS 45219 (N.D. Calif. 2005); Klamath Strategic Inv. Fund v. U.S., 440 F. Supp. 2d 608 (E.D. Tex. 2006); Cemco Investors, LLC v. U.S., 99 A.F.T.R.2d 2007-1882 (N.D. Ill. 2007); Goldberg v. Commissioner, T.C. Memo 2007-81; Domulewicz v. Commissioner, 129 T.C. No. 3 (2007); and, Nussdorf v. Commissioner, 129 T.C. No. 5 (2007).

136 See Explanation of Items – Tax Years Ended December 31, 2000 and April 30, 2000 – attached as Exhibits A to Notices of Final Partnership Administrative Adjustment, dated March 9, 2005 and February 23, 2007, respectively.

sham transaction doctrine, also known as the economic substance doctrine, is not part of the Code, but instead emanated from tax case law beginning in the 1930s. There have been varying interpretations and several attempts by Congress to codify it, yet today it remains an unsettled area of the law and controversial. It is my experience that the IRS tends to assert lack of economic substance more as a "smell test," than as the result of having first made an appropriate factual analysis or considering whether the tax laws passed by Congress trump doctrines created by courts based on their own views of what should be good tax policy. In fact, it is my opinion that is what they have done here. In my opinion, it is important to understand what is and what is not a part of Stobie Creek's "economic substance," for it goes beyond just working through the arithmetic.

***The Stobie Creek LLC and DOIS Strategy Had Business Purposes Other Than Tax Avoidance***

The IRS has asserted that Stobie Creek is a "sham," i.e. that "neither Stobie Creek Investments LLC nor its purported partners (*sic*) have established the existence of Stobie Creek Investments LLC as a partnership (*sic*) as a matter of fact."[137] I disagree. In making this assertion, surely the IRS is not implying the entity Stobie Creek Investments LLC was not properly organized under the Delaware Limited Liability Company Act on March 3, 2000, for clearly it was and has existed as a legal entity ever since. Documents establishing Stobie Creek's legal status had already been turned over to the IRS prior to the time it made this allegation in Exhibit A to the FPAA for the Stobie 1 return, which is dated February 23, 2007. Moreover, the IRS could have easily checked Stobie Creek's status as a legal entity online.[138] And, surely, the IRS is not implying that Stobie Creek needs to be a "partnership" with "partners" in the legal sense and not an LLC, which is a different type of legal entity with "members" that is taxed like a partnership, to "exist" for federal income tax purposes, as it surely recalls that under the "check-the-box" regulations it issued in December 1996 a new LLC formed on or after January 1, 1997 that does not make an election regarding its classification for federal income tax purposes is taxed as a partnership under the default rules if it has two or more members, as does Stobie Creek.[139] Thus, I can only surmise that the IRS is implying that Stobie Creek should be ignored as a distinct entity because it has no meaningful assets, income, or transactions other than the DOIS strategy and, thus, has no reason to exist otherwise. Again, I disagree.

Rather than being a special purpose vehicle established solely to participate in DOIS, as were other partnerships and LLCs established by other taxpayers to participate in tax-advantaged strategies, Stobie Creek was created to be the primary investment-holding vehicle for the wealth of the Welles family and owned a diversified portfolio of assets valued at more than $266 million

---

137 Explanation of Items – Tax Year Ended April 30, 2000 – attached as Exhibit A to Notice of Final Partnership Administrative Adjustment, dated February 23, 2007, item 1, p. 1.

138 Stobie Creek Investments LLC Limited Liability Company Agreement, Exhibit 42 to the deposition of Herpe, December 8, 2006; State of Delaware, Division of Corporations Status Report for Stobie Creek Investments LLC from http://www.corp.delaware.gov.

139 Reg. §301.7701-3(b)(1), T.D. 8697, 61 F.R. 66584 (12/18/96); Starczewski, Lisa M., "Limited Liability Companies," Tax Practice Series Analysis, ¶4100, Tax Management, Inc. (09/2007).

at December 31, 2000.[140] The Realized Gain/Loss Detail report provided to Stobie Creek by The Northern Trust Company that reports the securities trades it entered into between May 1, 2000 and December 31, 2000 and that is attached to the Stobie 2 return is 95 pages long, with 40 of those 95 pages detailing foreign exchange transactions in Australian dollars, the British pound, Canadian dollars, euros, Hong Kong dollars, Japanese yen, Mexican pesos, Norwegian krona, Singapore dollars, Swedish krona, Swiss francs, and U.S. dollars.[141] At December 31, 2005, Stobie Creek's portfolio of assets was valued at more than $390 million.[142] Its federal income tax return for 2005 is four inches thick. The 2005 Northern Trust Company Realized Gain/Loss Detail report attached to the return is 370 pages long, of which 112 pages are devoted to reporting foreign exchange transactions. Over the six years between 2000 and 2005, annual realized net gains and losses on investment transactions ranged from a net loss of $15.1 million in 2001 to a net gain of $24 million in 2004.[143] By comparison, the roughly $2 million loss Stobie Creek realized on the DOIS transactions in 2000 was not unusual or out of the ordinary for the Welles family in carrying out its investment philosophy over the years. Thus, it is my opinion that the IRS is wrong in its implied assertion that Stobie Creek lacked a business purpose as it was created to hold a significant and highly diversified investment portfolio the value of which and operations of which were far more noteworthy than the one series of transactions that are issue in these lawsuits..

Moreover, the IRS has also asserted there was no business purpose for the transfers of the Stobie Creek membership interests from the single member LLCs to S corporations on April 30, 2000.[144] According to Waterman, there were several reasons for doing so – (1) a corporation is a more flexible vehicle to use for gifting interests in Stobie Creek to younger generations; (2) the LLC is a relatively new entity for which the law is less settled than the law for corporations; and, (3) at that time, it was possible to achieve a state tax savings using Electing Small Business Trusts ("ESBTs") as shareholders of S corporations for the two family members who were residents of Ohio (David Sr. and David Jr.), a savings that could not be achieved through LLCs.[145] In my opinions, these are legitimate nontax reasons for transferring the Stobie Creek membership interests to S corporations and, consequently, it is also my opinion that the IRS is wrong in concluding otherwise.

What is more, the IRS further asserts that the DOIS strategy itself is a sham, implying that it was not a real transaction in which both parties assumed market risk of gain or loss. Again, I disagree. The LLCs of each of the six family members and the grantor trust entered into four option positions on March 30, 2000 – a long position and a short position in the euro and a long position and a short

---

140 U.S. Partnership Return of Income for Stobie Creek Investments LLC for the period May 1, 2000 through December 1, 2000, "the Stobie 2 return" [00000241-00000553 at 00000246].

141 U.S. Partnership Return of Income for Stobie Creek Investments LLC for the period May 1, 2000 through December 1, 2000, "the Stobie 2 return" [00000241-00000553 at 00000257-000351].

142 2005 U.S. Partnership Return of Income for Stobie Creek Investments LLC, Schedule L, p. 4.

143 See Exhibit C attached hereto for details.

144 Explanation of Items – Tax Year Ended December 31, 2000 – attached as Exhibits A to Notice of Final Partnership Administrative Adjustment, dated March 9, 2005, item 1, p. 1.

145 Deposition of Waterman, August 1, 2007, pp. 83 (23) – 84 (11).

position in the Swiss franc – for a total of 28 option positions. Kolb analyzed the results of the 28 option positions in his report in these matters based on DB New York Branch confirmation reports.[146] I found nothing in the record to indicate there is any doubt about the validity of the trades reported on the DB confirmation reports, so any assertion to the contrary by the IRS would be rank speculation.

This result is in contrast to the result in the Klamath case, discussed above, wherein the court found that although Reg. §1.752-6T could not be applied retroactively, thus approving the step up in basis in a somewhat similar transaction, it also found the transaction lacked economic substance because it was not what it purported to be financially. The Klamath tax strategy purported to be a transaction that would take place over seven years, when in fact the counter-parties had agreed the transaction was to last for only 60 days. Moreover, the Klamath tax strategy purported to be a transaction in which a $25 million loan premium was to have been invested in foreign currencies, but was in fact held as a time deposit by the lender with only the transaction fees paid by the Klamath taxpayers invested in the foreign currencies. On the other hand, the DOIS option transactions were exactly what they purported to be – 17 day European digital options purchased for a market premium that was vetted by Jeffrey Welles as part of his due diligence investigation. Thus, they are not a sham and the IRS is again wrong because it failed to apply the tax laws to the facts of these taxpayers.

***The Federal Circuit's Test for Economic Substance and the Stobie Creek Plaintiffs***

Investment transactions are myriad and complex, and the Code has literally thousands of provisions governing them. These provisions set forth sundry, complex, and sometimes inconsistent rules for the "recovery" of basis – meaning the timing of when a taxpayer may "claim" the basis, either to shield a receipt from taxation, or to take a deduction when there is no corresponding cash outlay. The point is that when you claim the basis is often determined by the Code, and may be determined in ways that look arbitrary – that is, they are not related to any "real" or current "loss," or any cash outlay, or the like. Two circumstances aggravate this situation further. The first is that the rules of the Code can give a taxpayer basis without any loss or cash outlay. The most typical case is where a taxpayer is charged with income when the taxpayer has no cash receipt. This may give him "basis" for which he can claim an offsetting tax benefit later. The second is that sometimes "basis" and the "noncash income" that creates it can be separated between taxpayers. Another basic principle of our tax system is that we respect the separateness of legally separate taxpayers (especially corporations even if they are wholly owned by another person, be it an individual or a corporation).[147]

A common case is between a partner (or LLC member) and a partnership (or LLC) – taxpayers may have basis in their partnership (or LLC) interests, but the basis is somehow imputed to the partnership (or LLC) assets, with the result that the partnership (or LLC) may then claim a tax benefit, when it has not borne the burden of creating the basis. When this happens, the transaction may be called a "basis shifting" transaction, and the partnership's (or LLC's) received basis may be called a "basis step up."

---

146 Report of Kolb, September 11, 2007, ¶II, p. 2.

147 Moline Properties v. Commissioner, 319 U.S. 436 (1943).

Opportunities of this nature may arise from the "technical" rules-- and by "technical," one usually means "statutory." At times the results thus produced may not be especially appealing ones from the standpoint of theory or policy about tax "fairness" or tax "rationality." In these circumstances, historically, what ordinarily happens is that the tax administration – the IRS – works with the Congress to find a statutory "solution" which prohibits the form of the transaction in the future, that is, after the effective date of the statutory change. But statutory changes are rarely made retroactive; and there are constitutional limitations on the power of Congress to do so.

The difficulties arise concerning the transactions which the IRS deems "offensive" in the period intervening between the occurance of the transaction and the enactment of the statutory change. In these circumstances, the courts, usually though not always at the instance of the IRS, have developed what are called "nonstatutory" doctrines which purport to negate tax results generated by a technical application of the statute. As detailed more fully below, these nonstatutory doctrines are controversial and unstable, and are almost always invoked with respect to transactions which are headed for a statutory resolution. The question is how far the courts should go in accepting amorphous "nonstatutory" attacks on transactions.

In late October 2004, Judge Braden of the Court of Federal Claims issued her opinion in Coltec Industries, Inc. v. U.S. ("Coltec").[148] Coltec is one of the cases dealing with the transaction described in Notice 2001-17 involving the transfer of contingent liabilities to a newly-formed subsidiary in a §351 tax-free incorporation.[149] In her opinion, Judge Braden quotes the IRS description of the Coltec dispute as follows:

> Hoping to avoid tax on its substantial capital gains, Coltec [Industries, Inc.] adopted an off-the-shelf corporate tax shelter scheme developed by Arthur Andersen LLP . . ., which was designed to create an offsetting, artificial tax "loss" - - without any corresponding economic loss - - through a complex series of prearranged steps . . . that were intended to have no other material impact upon Coltec.[150]

In 1996, Coltec sold a subsidiary, Holley Automotive, for $283 million incurring a potential capital gains tax liability of approximately $100 million. Shortly thereafter, Coltec transferred cash, promissory notes receivable, and other property with a basis of approximately $379.2 million, together with approximately $371.2 million of contingent liabilities for asbestos claims, to a non-operating subsidiary, Pennsylvania Coal and Coke, Inc., which was renamed Garrison Litigation Management Group, Ltd. ("GLMG"). The contingent liabilities transferred to GLMG did not reduce Coltec's basis in its GLMG stock because the plain language of §§ 357(c)(3) and 358(d) provide that liabilities that would have resulted in a tax deduction when accrued, and that are transferred in a §351 tax-free incorporation, do not reduce the basis of the stock received by the party transferring them. Thus, this unintended interaction of three Code sections could

---

148 62 Fed. Cl. 716 (10/29/2004) at 718.
149 2001-9 IRB 730 (02/26/2001).
150 62 Fed. Cl. 716 (10/29/2004) at 718.

result in what the IRS calls the practical equivalent of a "double deduction," i.e., in this circumstance, the deduction related to the liabilities when accrued by GLMG and the capital loss Coltec realized on the sale of its GLMG stock. In December 1996, Coltec sold a portion of its GLMG stock to two banks for a total of $500,000, incurring a substantial capital loss. Coltec made later sales to various defense attorneys to the same effect. The IRS audited Coltec and assessed a deficiency in excess of $82.7 million.

In addition to the technical arguments surrounding the interpretation of the three interrelated Code sections, a dispute arose over the applicability of the economic substance doctrine to the transaction. Coltec argued, "...the [GLMG] transactions were not a sham. They had non-tax business purposes and advantages. And they had economic substance...because they permanently changed the parties' economic positions, legal relations, and non-tax business interests, and created genuine enforceable obligations to the third-party Banks."[151]

The IRS asked the court to apply the economic substance doctrine to the transactions, arguing there are two prongs of the test, i.e., "(1) a subjective inquiry into whether the transaction was carried out for a valid business purpose; and (2) an objective inquiry into the objective economic effect of the transaction," and that Coltec failed the subjective prong because the "[t]ransactions were the product of a tax avoidance strategy conceived by [Arthur] Andersen and Coltec's Tax Department to shelter the capital gain from the sale of Holley Automotive." The IRS also argued the transfer of the GLMG stock to the Banks failed the objective prong and was "illusory because Coltec had transferred only bare legal title --- not the incidents of ownership."[152]

Having indicated her agreement with Coltec's position on both the technical arguments and economic substance doctrine issues, Judge Braden finished her opinion by stating:

> The public must be able to rely on clear and understandable rules established by Congress to ascertain their federal tax obligations. If federal tax laws are applied in an unpredictable and arbitrary manner, albeit by federal judges for the "right" reasons in the "right case," public confidence in the Code and tax enforcement system surely will be further eroded. *See* John F. Coverdale, *Text As Limit: A Plea For A Decent Respect For The Tax Code*, 71 TUL. L. REV. 1501, 1507 (May 1997) ("A decision rule that prohibits courts from adopting antitextual interpretations reflects the proper role of the legislature and the courts under our democratic constitutional system, it respects the distinctive characteristics of the Code, and it promotes the values of certainty and predictability that are very important when dealing with tax statutes."). Moreover, as a legal scholar cited by the Government, observed:
>
>> The economic substance test is dizzyingly complex. . . . This complexity arises from a number of interrelated factors. First, the

151 62 Fed. Cl. 716 (10/29/2004) at 735.
152 62 Fed. Cl. 716 (10/29/2004) at 736.

> test is best seen as a technique of statutory interpretation, which poses open-ended and unanswerable questions. Second, the test must be applied to a near-infinite variety of economic activities and transactions. Third, the present treatment of capital is inconsistent and to some extent incoherent. Taxpayers can exploit this incoherence by structuring transactions that produce tax benefits out of thin air. And conflicting rules make it difficult, sometimes, to determine the "correct" treatment of a particular transaction. Finally, only a few cases have been decided under the economic substance test, leaving open multiple interpretations of the doctrine.

Joseph Bankman, *The Economic Substance Doctrine*, 74 S. CAL. L. REV. 5, 29 (2000-01). This candid assessment of the deficiencies of "economic substance" doctrine certainly does not suggest a compelling case for the court to jump into to "fill in some of the lacunae and resolve some of the [doctrine's] ambiguities." Bankman, 74 S. CAL. L. REV. at 29. Instead, as Professor Bankman advises, "Congress may have no choice but to engage in substantive law reform. Some shelter activity will take place under even the most utopian tax structure. However, the current tax treatment of capital needlessly multiplies shelter opportunities and provides a fertile breeding ground for shelter development." *Id.* at 29-30. The court agrees....

Under our time-tested system of separation of powers, it is Congress, not the court, that should determine how the federal tax laws should be used to promote economic welfare. *See, e.g., Gitlitz* v. *Commissioner*, 531 U.S. 206, 220, 148 L. Ed. 2d 613, 121 S. Ct. 701 (2000) ("Because the Code's plain text permits the taxpayers here to receive these benefits, we need not address . . . policy concerns."); *United States* v. *Byrum*, 408 U.S. 125, 135, 33 L. Ed. 2d 238, 92 S. Ct. 2382 (1972) ("When a principle of taxation requires reexamination, Congress is better equipped than a court to define precisely the type of conduct which results in tax consequences. When courts readily undertake such tasks, taxpayers may not rely with assurance on what appear to be established rules[.]"); *see also American Trucking Ass'ns v. Smith*, 496 U.S. 167, 201, 110 L. Ed. 2d 148, 110 S. Ct. 2323 (1989) (Scalia, J., concurring) (reminding the judiciary that their role "is to say what the law is, not to prescribe what it shall be."). Accordingly, the court has determined that where a taxpayer has satisfied all statutory requirements established by Congress, as Coltec did in this case, the use of the "economic substance" doctrine to trump "mere compliance with the Code" would violate the separation of powers (*emphasis supplied*).[153]

153 62 Fed. Cl. 716 (10/29/2004) at 755-757.

The IRS appealed Judge Braden's decision to the Court of Appeals for the Federal Circuit.[154] The court found that Judge Braden had correctly decided the technical tax aspects of Coltec's §351 transfer of assets in exchange for GLMG stock and the step up in basis that was used to offset the capital gain it earned from the sale of Holley Automotive. In reaching this conclusion, the court stated:

> We therefore conclude that the liabilities fall within §357(c)(3); that §357(b)(1) is not relevant here; and that §358(d)(2) excludes the liabilities from "money received" treatment. The consequence is that under the literal terms of the statute the basis of Garlock's [GLMG] stock is increased by the Stemco note and is not reduced by the assumed contingent asbestos liabilities. Ultimately, the taxpayer would not be disqualified from claiming the capital loss (*emphasis supplied*).[155]

The Court of Appeals found that even though Coltec's capital loss on the sale of stock in its subsidiary was technically correct under the Code, it should be disallowed because the transaction lacked economic substance; however, in doing so, by implication it reversed its previous decision in Drobny v. U.S.[156] and, further, ignored the circuit split on whether the economic substance test is a conjunctive or disjunctive test. In an article analyzing the Federal Circuit's decision in Coltec, three prominent tax lawyers in Washington, D.C. described the split among the circuits on this issue thusly:

> The U.S. Courts of Appeals for the Second, Fourth, and D.C. Circuits have applied the test in a *disjunctive* fashion, requiring a transaction at issue to have objective economic substance *or* the taxpayer to have a subjective non-tax business purpose to prevent the transaction from being characterized as a sham. In contrast, the First, Seventh, Eighth, and Eleventh Circuits have applied the test in a *conjunctive* fashion, requiring a transaction at issue to have objective economic substance *and* the taxpayer to have a subjective non-tax business purpose. The remaining circuits (Third, Fifth, Sixth, Ninth, and Tenth) have declined to apply a rigid two-part inquiry, but have instead collapsed the test and treated a transaction's objective economic substance and the taxpayer's subjective business purpose as relevant factors in determining whether the transaction was a sham (*emphasis in the original*) (*internal citations omitted*).[157]

---

[154] 454 F.3d 1340 (Fed. Cir. 2006), rehearing den., 2006 U.S. App. LEXIS 24771 (September 19, 2006), cert. den., 127 S. Ct. 1261 (2007).

[155] 454 F.3d 1340 (Fed. Cir. 2006), rehearing den., 2006 U.S. App. LEXIS 24771 (September 19, 2006), cert. den., 127 S. Ct. 1261 (2007) at 1351.

[156] Sheldon and Anita Drobny v. U.S., 86 F.3d 1174 (Fed. Cir. 1996), reported in full at 96-1 USTC ¶50,255.

[157] Silverman, Mark J., Lerner, Matthew D., and Kidder, Gregory N., 'The Economic Substance Doctrine: Sorting Through the Federal Circuit's 'We Know It When We See It' Ruling in *Coltec*," The Tax Executive, November-December 2006, pp. 423-441 at 426.

In Drobny, the Federal Circuit adopted the Fourth Circuit's disjunctive application of this "Two-Prong Test" first adopted in Rice's Toyota World, Inc. v. Commissioner,[158] by stating "If the only expectation of profit is one based on tax deductions and credits, the transaction is not necessarily a sham. Profit is profit...."[159] Adding to the confusion about the application of the economic substance test, the Federal Circuit in Coltec added a fourth appellate level standard, the so-called "Five Principles Test," to the interpretation of the tax laws:

1. The law does not permit the taxpayer to reap tax benefits from a transaction that lacks economic reality;
2. It is the taxpayer that has the burden of proving economic substance;
3. The economic substance of a transaction must be viewed objectively rather than subjectively;
4. The transaction to be analyzed is the one that gave rise to the alleged tax benefit; and
5. Arrangements with subsidiaries that do not affect the economic interest of interdependent third parties deserve particularly close attention.[160]

What is more, the Federal Circuit in Coltec added an additional "Three-Prong Test" on top of the "Two-Prong Test" and the "Five Principles Test":

> We therefore see nothing indicating that [1] [the transaction in question] effected any real change in the "flow of economic benefits," [2] provided any real "opportunity to make a profit," or [3] "appreciably affected" [taxpayer's] beneficial interests aside from creating a tax advantage.[161]

The Federal Circuit's decision in Coltec has been the subject of significant criticism within the community of tax planning professionals, for example:

> The Federal Circuit's opinion offers an ambiguous and potentially expansive view of the economic substance doctrine. The opinion is difficult to decipher, and it is impossible to determine exactly what standard the Federal Circuit adopted and applied. In addition, the Federal Circuit applied its ambiguous standard of the economic substance doctrine to a single step of the transaction. The combination of the Federal Circuit's narrow focus on a single step of a transaction and its expansive view of the economic substance doctrine has the potential to distend the authority of the IRS to void the tax consequences that would otherwise flow from legitimate transactions. Although the court clearly found the transaction at

---

158 752 F.2d 89 (4th Cir. 1985).

159 Sheldon and Anita Drobny v. U.S., 96-1 USTC ¶50,255 at 4.

160 Silverman, Mark J., Lerner, Matthew D., and Kidder, Gregory N., 'The Economic Substance Doctrine: Sorting Through the Federal Circuit's 'We Know It When We See It' Ruling in *Coltec*," The Tax Executive, November-December 2006, pp. 423-441 at 426.

161 454 F.3d 1340 (Fed. Cir. 2006), rehearing den., 2006 U.S. App. LEXIS 24771 (September 19, 2006), cert. den., 127 S. Ct. 1261 (2007) at 1360.

issue offensive, the opinion shows a striking disregard for the possible implications of the decision.[162]

Accordingly, when the court invoked the economic substance doctrine, it was really just expressing its disapproval of the technical rules in the case at hand. The problem for the rest of us is that any transaction that involves any tax planning at all has one or more aspects or elements that are tax motivated and serve no nontax purposes. It's all a matter of focus and how one breaks down a larger thing into smaller things. The Coltec approach for a court wanting to strike down a deduction that it doesn't like but can't strike down under the technical rules is simply to find and focus on those aspects that are the product of tax planning and to disregard the rest of the facts and circumstances. On the other hand, if the court likes the deduction, it doesn't have to focus its attention that way.

The Coltec court thus adds to the general confusion about what the economic substance doctrine is, when and how it should be applied, and whether it has become an all-purpose talisman to be invoked by the court at its discretion in setting tax policy.[163]

....the Federal Circuit clearly decided against previous cases in the Federal Circuit in which the courts have concluded that the disjunctive test should apply. As the author explains in another article, circuits are divided on how to apply the two-prong test, but it is generally known that the Federal Circuit usually applies the disjunctive test. The Federal Circuit's decision just adds to the already existing confusion as to the proper application of the economic substance standard (*internal citations omitted*).[164]

The Federal Circuit's application of the economic substance doctrine to only the transfer of the promissory note (as opposed to the whole transaction) has caused some controversy. That controversy is not relevant here. Rather, it is sufficient to observe that the court did not point to any statutory language that implicitly or explicitly indicated that economic substance principles should be applied. The Federal Circuit did not even deny that Coltec's transaction was exactly what it was purported to be, but instead concluded that it was empowered to go "beyond the literal language of a statute."

---

162 Silverman, Mark J., Lerner, Matthew D., and Kidder, Gregory N., 'The Economic Substance Doctrine: Sorting Through the Federal Circuit's 'We Know It When We See It' Ruling in *Coltec*," The Tax Executive, November-December 2006, pp. 423-441 at 423.

163 Prusiecki, John, "Coltec: A Case of Misdirected Analysis of Economic Substance," 112 Tax Notes 524 (August 7, 2006).

164 Keinan, Yoram, "It is Time for the Supreme Court to Voice its Opinion on Economic Substance," 7 Hous. Bus. & Tax L.J. 93 (2006) at 121-122.

> Although the Federal Circuit performed a detailed analysis of the statutory scheme before applying the economic substance doctrine, much of its analysis was ultimately irrelevant. While the court did conclude that Coltec had complied with the applicable statutes, that conclusion did not bear on the ultimate disposition of the case.[165]

> [The] focus on merely one step in the transaction ...seems to violate two well-accepted tax principles. First, the entire transaction should be considered, not merely one piece of that transaction. Second, a taxpayer having a legitimate business purpose can accomplish that in whatever structure gives the best tax result.[166]

Having reviewed the record in these lawsuits and the applicable statutes, regulations, and case law, it is my opinion that the Stobie Creek DOIS strategy meets the requirements of the subjective prong of the disjunctive test.[167] This is because Jeffrey's due diligence led him to conclude the DOIS strategy was bona fide and offered a reasonable opportunity to earn a profit. Moreover, the record is clear that Jeffrey's due diligence was sophisticated and thorough and of the type someone with his education, training, and experience would employ. It is further my opinion that the Stobie Creek DOIS strategy can be distinguished from the Klamath transaction because, as is discussed more fully above, it was what it purported to be and not a fiction. And, it is also my opinion that the Stobie Creek DOIS strategy can be distinguished from the Coltec (and Klamath) transactions because it was not entered into to create a loss to offset previously realized gain. In fact, I have been advised by counsel that the Kenner transaction, which closed on May 9, 2000, was not the subject of a binding contract before the date it actually closed. Thus, the events that culminated with the step up in basis of Stobie Creek's Therma-Tru stock occurred before there was any realized gain to offset. As a result, since there was no guarantee that Stobie Creek's sale of its Therma-Tru stock to Kenner would actually take place, Stobie Creek was subject to the market risk that the Kenner transaction would fail to close. For the reasons discussed below, if that had occurred it might have been years, if ever, before another buyer for Therma-Tru surfaced, thus postponing indefinitely or, perhaps, eliminating the benefit it might have realized from the DOIS strategy.

It is my opinion that the timing of events that distinguish Stobie Creek from Coltec (and Klamath) is important because these transactions occurred at the peak of the dot.com bubble which was followed by a precipitous drop in the stock market that lasted for several years.

---

165 Grewal, Amandeep S., "Economic Substance and the Supreme Court," 116 Tax Notes 969 at 973 (September 10, 2007).

166 Cohen, N. Jerold, "Finding the Beef in Routine Transactions: Does the Economic Substance Doctrine Apply to Little Old Me? Coping With the Ever-Growing Tax Shelter Classification," Outline C for Presentation at the Southern Federal Tax Institute, October 1-5, 2007, p. C-6.

167 And, in my opinion, as is discussed more fully below, also meets the objective prong of the Two-Prong disjunctive test.

March 2000 was the peak of the "dot.com bubble," a period in time marked by rapidly increasing stock prices, individual speculation in stocks, and widely available venture capital. Business values were soaring, especially from growth in the new Internet sector and related fields. This was a heady environment in which many businesses dismissed standard business models, focusing on increasing market share at the expense of the bottom line. Venture capitalists saw record-setting rises in stock valuation of these and other similar companies, and therefore moved faster and with less caution than usual, choosing to hedge the risk by starting many contenders and letting the market decide which would succeed. Not surprisingly, this "growth over profits" mentality and the aura of "new economy" invincibility led some companies to engage in lavish internal spending. Many paid their executives and employees with stock options in lieu of cash and they became instant millionaires when their companies made their initial public offerings.[168] The major stock markets performed way above average in 1999, with the Dow Jones Industrial Average rising by 25.22%, the S&P 500 Index increasing by 19.53%, and the NASDAQ Stock Price Index increasing by an astounding 85.59%.[169] The catch phrase that was later created to describe these times – irrational exuberance – had been coined a few years earlier by Alan Greenspan, then the Chairman of the Federal Reserve Board, and made its way into common parlance following the market collapse that began about that time in March 2000.[170] A chart tracking the NASDAQ Stock Price Index from January 1, 1997 through December 31, 2002 is attached as Exhibit D to this report. The chart reveals the extent of the market crash that began at or about the time of the Stobie Creek Plaintiffs' DOIS option trades. After peaking at 5048.68 on March 10, 2000, the NASDAQ Stock Price Index slid all the way to 1114.11 on October 9, 2002, a loss of almost 80% of its value. Today, in relatively good times, the Index has recovered somewhat, but at only roughly 2700 it is a far cry from where it stood at the time of the Stobie Creek DOIS trades in March-April 2000.[171] There are two important factors that come into play vis-à-vis the economic substance of the DOIS strategy. The first, mentioned above, is the market risk the Stobie Creek Plaintiffs accepted when they participated in the DOIS strategy without any contractual guarantee the Kenner transaction would close. Given the stock market environment that followed immediately thereafter, they might have paid a great deal of money for nothing.

The second is that in asserting there was lack of economic substance, the IRS fails to consider how those that were very wealthy were investing at that time. David Cay Johnston, a New York Times correspondent who has written extensively on tax matters, stated it this way:

> When F. Scott Fitzgerald pronounced that the very rich "are different from you and me," Ernest Hemingway's famously dismissive response was: "Yes, they have more money." Today, he might well add: much, much, much more money.
>
> The people at the top of America's money pyramid have so prospered in recent years that they have pulled far ahead of the rest of the population, an analysis of

---

168 Adapted from Wikipedia, "Dot.com Bubble," June 28, 2007, http://www.wikipedia.org.
169 Reuters, January 1, 2000, posted at http://biz.yahoo.com.
170 Adapted from Wikipedia, "Irrational Exuberance," June 6, 2007, http://www.wikipedia.org.
171 Current data on the NASDAQ Composite Index from http://www.CNNMoney.com.

> tax records and other government data by the New York Times shows. They have even left behind people making hundreds of thousands of dollars per year.
>
> Call them the hyper-rich.[172]

Far from being rational investors, the very wealthy were beginning to demand investments different from what their more modestly wealthy counterparts desired. A recent online article in the Wall Street Journal describes a study of this phenomenon:

> The rich invest differently because, well, they're different. <u>They can take more risks because they have more money to lose</u>.
>
> ...To flesh this out, I got a recent study by Prince & Associates on the investing habits of the rich. It shows some fascinating differences in the way that the rich invest their money compared to the rest of the population, or even the affluent.
>
> According to the study, the wealthy are much more likely to put their money into hedge funds, private equity and start-up companies – investments out of reach to most everyday investors. The rich avoid the types of investments favored by the masses – exchange traded funds and mutual funds (*emphasis supplied*).[173]

Registered Rep, the online trade journal for investment professionals, calls the very rich "off-the-radar investors," whose "soaring interest in alternative investments represents a sizeable opportunity for registered reps..." It goes on to say "The obviously rich are committed to alternatives.[174]

Another publication for wealth management advisors points out:

> Statistically speaking, individuals and families with net worths over US$10 million tend to think, act and feel differently than their less wealthy counterparts. They are less impacted by economic shifts, the current political regime, performance of the equity markets, the geological climate or other short-term situations.[175]

Thus, a rational investor theory - one which postulates that the numbers of the DOIS strategy do not seem sensible to a rational investor - cannot possibly explain what very wealthy investors

---

172 Johnston, David Cay, "Richest Are Leaving Even the Rich Far Behind," The New York Times, June 5, 2005.

173 "How the Rich Invest," The Wall Street Journal Online," June 12, 2007.

174 Grove, Hannah Shaw and Prince, Russ Alan, "The Wealth Advisor: Trading Up," Registered Rep, March 1, 2002.

175 Grove, Hannah Shaw and Prince, Russ Alan, "Taxation With Remonstration: The Only Thing More Certain Than Death is the Affluents' Desire to Pay Less in Taxes," Facts & Figures, Vol. 3, April 2007.