might reasonably do in this environment and is no gauge by which to judge the decision of the Stobie Creek Plaintiffs to invest in DOIS.

***The Supreme Court's Test for Economic Substance and the Stobie Creek Plaintiffs***

The U.S. Supreme Court has been increasingly employing a textualist approach to the interpretation of statutes, including the tax laws. This means the Supreme Court interprets the words of statutes as they were enacted by Congress without the benefit of legislative history or common law doctrines such as the economic substance doctrine. The Supreme Court is unlike any other court that might be involved in a tax controversy, because the Supreme Court has limited jurisdiction and hears few cases. All other courts that have jurisdiction over tax matters have mandatory jurisdiction - they must hear a case properly brought to them. The Supreme Court, by contrast, decides cases, in general, only when it grants a writ of certiorari, which it does in only a tiny fraction of all cases and a tinier fraction of tax cases. And reaching the Supreme Court requires a long process of litigation, with attendant costs and uncertainties.

The question for a tax practitioner arises when there is or may be a discrepancy between what Supreme Court precedent - which is almost always sparse and requires a great deal of interpolation - indicates the outcome of a matter will be, and the trend of decision in the lower federal courts or in the Tax Court. I believe that in these cases, and perhaps in contemporary "tax shelter" cases generally, there is a discrepancy between what Supreme Court decisional law implies, and what at least lines of decision in some of the lower federal courts, suggest. How should a tax practitioner take into account the limited practical likelihood that a particular case would reach the Supreme Court?

I believe the answer to this question is axiomatic. It is my opinion that in every case a tax practitioner should assume the litigation process, like the audit process, is frictionless, so that in every case the practitioner should try to visualize the outcome that would be reached by the contemporaneous Supreme Court. Supreme Court decisional law is the ultimate and final arbiter of the interpretation of federal statutes. Whatever weight is given to IRS regulations and lower court decisions, it is clear that Supreme Court decisional law has finality.

To my knowledge, this question, posed as such, has received little attention from the courts, or from the professional or scholarly commentary. I believe, however, it is important to raise it explicitly in the context of these lawsuits. It is further my opinion that Supreme Court law is considerably more hostile to the use of "nonstatutory" doctrines by the IRS than is at least the decisional law of the lower federal courts. In these circumstances, it is my opinion that a tax practitioner must pay heed first and foremost to the letter and tenor of the decisions of the Supreme Court. In particular, a review of the Supreme Court decisions accomplishes three things. First, it helps to to distinguish among three different types of "nonstatutory" attacks. Second it emphasizes that while "nonstatutory" arguments are premised primarily upon decisional law, at the same time, very little, if any, of this law derives from Supreme Court decisions. Indeed, an examination of the existing Supreme Court decisions reveals that the Court has been very skeptical of "nonstatutory" attacks on taxpayer positions for at least a half

century. Finally, this review helps to frame a critique of the most far-reaching, and the most "nonstatutory," doctrine at issue in this and many other proceedings involving contemporary tax-advantaged transactions. That doctrine is the "economic substance" doctrine. That doctrine has two central infirmities, and those are visible once a review of the Supreme Court's decisions is accomplished.

In approaching the modern decisions of the Supreme Court, some regard to the Court's approach in the early years of the income tax laws is useful. Prior to the 1920s, the Court was a conservative Court which tended to take a cautious and restrictive view of Congress' power to levy an income tax, and of the income tax Congress enacted.[176] This stance of the Court changed somewhat in the 1920s and early 1930s, when the Court took a more favorable view of the income tax, and of the Government's discretionary power in administering the tax.[177] Gregory v. Helvering,[178] which involved the reorganization provisions and which is a case virtually always cited as the fount of authority on "nonstatutory" approaches, is a product of this era.

The "court packing" struggles of the mid- and late 1930s disturbed this somewhat uneasy peace. President Roosevelt appointed seven of the nine Justices of the Court between 1937 and 1941, and the Court that resulted was radically protective of the "administrative state," and, as a corollary, of the tax administrators' power to enforce the income tax laws in restrictive and discretionary ways. The pattern was evident in the sphere of corporate taxation,[179] and in other areas.[180]

---

176 The Court invalidated an income tax passed in the early 1890s in Pollock v. Farmers' Loan & Trust Co., 158 U.S 601 (1895), leading to the adoption of the sixteenth amendment. After enactment of the amendment, the Court continued to take restrictive views of the constitutional reach of the tax, the leading case being the "stock dividend" case, Eisner v. Macomber, 252 U.S. 189 (1920).

177 Some of the decisions typical of this era are regularly included in introductory casebooks, including Burnet v. Sanford & Brooks Co., 282 U.S. 359 (1931) (annual accounting rather than "transactional" accounting) (Stone, J.); North American Oil Consolidated Co. v. Burnet, 286 U.S. 417 (1932) (claim of right doctrine) (Brandeis, J.); United States v. Kirby Lumber Co., 284 U.S. 1 (1931) (Holmes, J.). All of these decisions are "liberal" victories, authored by one of the three great liberals of the Court at this time; all are "protective" of the administrators, expanding their authority in determining the liabilities of taxpayers.

178 293 U.S. 465 (1935).

179 Thus the Court restricted nonrecognition of gain in statutory reorganizations in, e.g., LeTulle v. Scofield, 308 U.S. 415 (1940); Groman v. Commissioner, 302 U.S. 82 (1937); and Helvering v. Bashford, 302 U.S. 454 (1938). It limited the nontaxation of stock dividends, inherited from the Macomber decision in Koshland v. Helvering, 298 U.S. 441 (1936) and Helvering v. Gowran, 302 U.S. 238 (1937). It limited recognition of losses in insolvency reorganizations in Helvering v. Alabama Asphaltic Co., 315 U.S. 179 (1942), and Helvering v. Southwest Consolidated Corp., 315 U.S. 194 (1942).

180 Instances involved assignment of income with respect to family gifts or trusts in Helvering v. Horst, 311 U.S. 112 (1940) and Helvering v. Clifford, 309 U.S. 331 (1940); or the question whether mangement of personal investments constituted a trade or business for purposes of the antecedent of Section 162, allowing the deduction of expenses connected with a trade or business, in Higgins v. Commissioner, 312 U.S. 212 (1941). Another decision in this mold, but one the vitality of which has

Cases from this era reflect this attitude. The acme of this stance was probably Higgins v. Smith, which permitted the Government to disallow deductions for losses on real sales by one person to a wholly owned corporation. The Court there declared that "the Government may not be required to acquiesce in the taxpayer's election of that form for doing business which is most advantageous to him," that "the Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute," and that "[t]o hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation."[181] In addition, in this era, the Court leaned to the position that the courts should be restrained in overturning the determinations of the administrators. In Dobson v. Commissioner, it limited the authority of federal appellate courts to overturn decisions of the Tax Court, as the Court had in other decisions limited the authority of federal courts to reverse the decisions of Federal agencies in other areas.[182]

What is most significant about these developments, from the standpoint of these lawsuits, is their denouement in the mid- and late 1940s. For the radicalism of the 1940s Court evaporated almost as suddenly as it had begun. First, in the sphere of the general administrative law, the enactment of the Administrative Procedure Act in 1946, and in labor law of the Taft-Hartley Act in 1947, achieved a kind of ceasefire, a charter that protected individual rights as well as agency

---

survived the period is Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943).

[181] 308 U.S. 473 (1940) at 477-478. This case was greatly limited by the enactment of the predecessor of what is now §267, restricting the deduction of losses on transactions between "related parties," and providing a definition of "related parties" that has wide usage under the Code. This reflects another pattern of the era – of restrictive judicial decisions that are in turn limited by Congress. This stood on its head the pattern of an earlier era, a pattern which forms a conventional view of United States constitutional law, of a Congress that encroaches on rights that courts must then protect; here the courts unleashed administrators to encroach on rights, which Congress had to intervene to protect. Other of many instances in the tax area include the enactment of the antecedents of the current "grantor trust" provisions (§§ 671 to 679) to mitigate the effects of the Supreme Court's decision in Clifford, or the enactment of the predecessor of present §212, allowing the deduction of "production of income" expenses, to limit the effect of its decision in Higgins v. Commissioner. In any event, the dialogue established in the era, between judicial decision and statute, is an important one in light of the manner in which "nonstatutory" doctrines develop in later years, including the contemporary period. It is recognized, especially by critics of nonstatutory approaches and the "economic substance" doctrine in particular, that the doctrine is often invoked to attack a particular form of transaction which ultimately is "fixed" by a statutory change. The doctrine is used to block the transaction in the "interim," before the statutory change is enacted. This raises certain questions concerning whether the doctrine is functioning as a form of legitimizing what closely resembles retroactive legislation.

[182] 320 U.S. 489 (1943). The most significant such area was in labor law, where the Court held the lower courts must uphold the finding of the National Labor Relations Board if supported by "'warrant in the record' and a reasonable basis in law." NLRB v. Hearst Publications, 322 U.S. 111 (1944). In Dobson, the Court said that "all that we have said of the finality of administrative determination in other fields is applicable to determinations of the Tax Court," and repeated the "warrant" and "basis" language (320 U.S 489 at 501).

discretion, and reintroduced a moderate level of judicial review. That ceasefire has held, with significant variations in judicial approaches from one era to another, ever since.

In the tax area, too, restrictions on judicial activity were lifted. The Dobson decision was legislatively overruled in 1948 by the enactment of what is now §7482(a) of the Code. At the same time, however, the Supreme Court's self-imposed restraint on active participation in developing tax law became a permanent feature of the United States tax system. Although the lower courts resumed active involvement in tax cases, freed of the restrictions of Dobson, the Supreme Court since the 1940s has exercised its certiorari jurisdiction in a manner that means very few tax cases are decided by that Court. Thus, interpreting (or hypothesizing) what the Supreme Court would do, in an individual case, requires a considerable degree of interpolation.

Third, finally, and most significant, however, the enthusiasm of the early 1940s Court for doctrines that authorize the "Government [to] look at actualities," and to "sustain or disregard the effect of the fiction as best serves the purposes of the tax statute,"[183] has, decidedly, been limited to the era from whence it derives. The Court in 1950, five years after its substance-over-form ruling in Commissioner v. Court Holding Co.,[184] decided U.S. v. Cumberland Public Service Co.,[185] explaining that the earlier decision was based largely upon Tax Court findings of fact. And, in the period since 1950, the Court has eschewed, and at times explicitly repudiated, "nonstatutory" limitations on results apparently mandated by statute, with a regularity that borders on monotony.

Six cases, trailing up to the modern era, stand out:

In Commissioner v. Brown,[186] the taxpayer, Clay Brown, together with members of his family and three others, who owned substantially all the stock of a lumber milling company, sold their stock to a tax-exempt charitable organization for $1.3 million. The Institute paid $5,000 down from the company's assets. The Institute liquidated the company and leased its assets for five years to a new corporation (Fortuna), formed and wholly owned by Brown's attorneys. Fortuna agreed to pay the Institute 80% of the operating profits before taxes and depreciation. The Institute was to apply 90% of such payments (amounting to 72% of the net profits of the business) to a $1.3 million noninterest-bearing note to the sellers, which was secured by mortgages and assignments of the assets leased to Fortuna. The entire balance of the note was payable if payments thereon failed to total $250,000 over any consecutive two years.

The result of the transaction was that the transferor would pay capital gains on the 72 percent of the value he received. At a capital gains rate set at 40 percent of the ordinary income rate, the sellers' after tax net was 64 percent of 72 percent (~46%), rather than 10 percent of 100, under a 90% ordinary income rate. By the time of the Supreme Court decision, the IRS had abandoned the argument that the entire transaction was a "sham," but instead argued that the

183 Higgins v. Smith, 308 U.S. 473 (1940) at 478.
184 324 U.S. 331 (1945).
185 338 U.S. 451 (1950).
186 380 U.S. 563 (1965).

transaction did not constitute a "sale" within the meaning of the statute. The Court disagreed.

In Davis v. U.S.,[187] the taxpayer redeemed an entire issue of preferred stock which originally had been used to increase the company's working capital to qualify for a Reconstruction Finance Corporation loan. The taxpayer owned 25% of the corporation in his own name; his wife and children owned the remaining shares, which would have been attributed to him under §318. The taxpayer contended that the redemption distribution should not be treated as a dividend, and that the attribution rules should not apply under §302(b)(1) concerning distributions "essentially equivalent to a dividend," because there was a business purpose for the redemption. The Court held that "the plain language of the statute compels rejection of the argument" that the attribution rules should not apply.[188] It rejected the argument that treating the redemption as a dividend would "elevate form over substance," by observing that "the difference between form and substance in the tax law is largely problematical, and taxpayer's complaints have little to do with whether a business purpose is relevant under §302 (b)(1)."[189]

In Frank Lyon Co. v. U.S.,[190] described more fully above, the Supreme Court upheld Lyon's claim to depreciation deductions, rejecting two arguments made by the Government – first, that the entire transaction was a sham; and second, that the transaction was in substance a financing transaction and that Lyon had no investment in and was thus not the "true owner," for tax purposes, of the property. The Court's final language is frequently quoted:

> In short, we hold that where, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties.[191]

In Bollinger v. Commissioner,[192] the taxpayers claimed losses for property held by a corporation owned by them. The corporation had been formed to hold the property in order to avoid the effects of Kentucky usury law. The taxpayers argued that the corporation held the property as their agent. The Court rejected the IRS's argument that in order for the corporation to be treated as an agent, all dealings between the shareholders and the corporation had to be "arm's length" dealings, coupled with an agency fee. The Court permitted the IRS "to demand unequivocal evidence of genuineness in the corporation-shareholder context," but found "no basis, however, for holding that unequivocal evidence can only consist of the rigid requirements (arm's-length dealing plus agency fee)" which were not "demanded by the law of agency, which

187 397 U.S. 301 (1970).
188 397 U.S. 301 (1970 at 306.
189 397 U.S. 301 (1970 at 312-313.
190 435 U.S. 561 (1978).
191 435 U.S. 561 (1978) at 583-584.
192 485 U.S. 340 (1988).

permits agents to be unpaid family members, friends, or associates."[193] The Court held that:

> [T]he genuineness of the agency relationship is adequately assured, and tax-avoiding manipulation adequately avoided, when the fact that the corporation is acting as agent for its shareholders with respect to a particular asset is set forth in a written agreement at the time the asset is acquired, the corporation functions as agent and not principal with respect to the asset for all purposes, and the corporation is held out as the agent and not principal in all dealings with third parties relating to the asset.[194]

In Cottage Savings Association v. Commissioner,[195] Cottage Savings simultaneously transferred participation interests in 252 mortgages to four savings and loan associations and received from them participation interests in 305 other mortgages. All of the loans were secured by single-family homes. The fair market value of the package of participation interests exchanged by each side was approximately $4.5 million. The face value of the participation interests relinquished by Cottage Savings was $6.9 million. For Federal Home Loan Bank Board accounting purposes, Cottage Savings' mortgages were treated as having been exchanged for "substantially identical" ones held by the other lenders. On its 1980 federal income tax return, Cottage Savings claimed a deduction for the adjusted difference between the face value of the interests it traded and the fair market value of the interests it received. The Court upheld the deduction. It relied on the early "landmark precedents on realization," holding that a taxpayer realizes gain from an exchange "only if the properties exchanged are 'materially' or 'essentially' different."[196] The Court recognized that "the distinction in Phellis and Marr that made the stock in the successor corporations materially different from the stock in the predecessors was minimal," and held that "Phellis, Marr, and Weiss stand for the principle that properties are 'different' in the sense that is 'material' to the Internal Revenue Code so long as their respective possessors enjoy legal entitlements that are different in kind or extent."[197]

Gitlitz v. Commissioner,[198] described more fully above, did not involve any sham transaction argument on the part of the IRS, but it is significant for what it says about the Court's general approach to "nonstatutory" arguments, as well as concern about "phantom" or "double" tax benefits. As was noted above, the decision involved the question whether, when an S corporation has cancellation of indebtedness income that is excluded under §108(a), the taxpayer is entitled nevertheless to include the amount of the income in the basis of its shares. The IRS, Tax Court, and Court of Appeals had held that the taxpayer could not include the amount in the basis of the shares. The Supreme Court reversed, in language which I quoted above.

---

193 485 U.S. 340 (1988) at 349.
194 485 U.S. 340 (1988) at 349-350.
195 499 U.S. 554 (1991),
196 499 U.S. 554 (1991) at 563.
197 499 U.S. 554 (1991) at 564-565.
198 531 U.S. 206 (2001).

The one Supreme Court decision of the post-1945 period that exhibits a contrary tendency, pursuing "nonstatutory" approaches, is Knetsch v. U.S.[199] That case involved a 60-year-old taxpayer who purchased a single premium annuity, borrowing the $4 million premium by pledging the annuity contract. The taxpayer borrowed at 3.5%, while the contract bore a return of 2.5%. The taxpayer "prepaid" interest on the loan ($140,000), by borrowing the pre-credited annual return (about $100,000), and paying the balance in cash. He sought to deduct the interest. The years involved were 1953 and 1954. A statutory amendment adopted in 1954 expressly disallowed a deduction for interest incurred on a borrowing to fund a single premium annuity. The Court held the transaction was a sham, because "there was nothing of substance to be realized by Knetsch from this transaction beyond a tax deduction."[200] Three dissenting Justices nevertheless held that "as long as the transaction itself is not hocus-pocus, the interest charges incident to completing it would seem to be deductible," noting that "[t]he insurance company existed; it operated under Texas law; it was authorized to issue these policies and to make these annuity loans."[201]

Two other recent Supreme Court decisions, though like Gitlitz not involving sham transaction ideas, are worth noting, because they underscore the attitude of at least some of the current Justices toward "nonstatutory" glosses on the tax laws. The first is United Dominion Industries, Inc. v. U.S.,[202] which involved provisions of the consolidated return regulations governing the special 10-year carryback of "specified liability" losses. In a concurring opinion, Justice Thomas made the extraordinary observation that even the general principle of judicial deference to agency interpretations of ambiguous statutes – a principle strictly enforced by the contemporary Court[203] – should yield in the context of the revenue laws.

Justice Thomas disagreed with Justice Stevens' dissent, which argued that "when a provision of the Code and the corresponding regulations are ambiguous, this Court should defer to the Government's interpretation," saying that "[a]t a bare minimum, in cases such as this one, in which the complex statutory and regulatory scheme lends itself to any number of interpretations, we should be inclined to rely on the traditional canon that construes revenue-raising laws against their drafter."[204] He quoted an ancient Missouri decision, Leavell v. Blades, to the effect that "[w]hen the tax gatherer puts his finger on the citizen, he must also put his finger on the law permitting it."[205]

In Boeing Co. v. U.S.,[206] involving the allocation of research and experimental deductions in the context of domestic international sales corporations, Justice Thomas began his dissent, which Justice Scalia joined, with the observation that "[b]efore placing its hand in the taxpayer's

---

199 364 U.S. 361 (1960).
200 364 U.S. 361 (1960) at 366.
201 364 U.S. at 370 (Douglas, J., dissenting).
202 532 U.S. 822 (2001).
203 Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984).
204 532 U.S. 822 (2001) at 838-839.
205 237 Mo. 695 at 700-701, 141 S.W. 893 (1911) at 894.
206 537 U.S. 437 (2003).

pocket, the Government must place its finger on the law authorizing its action," citing his opinion in United Dominion Industries, and quoting parenthetically the language from Leavell v. Blades.[207]

In summation, Supreme Court jurisprudence makes it useful to distinguish three species of "nonstatutory" doctrine. The first is what is most commonly called the "sham in fact" doctrine, which I believe to be the true "sham transaction" doctrine. This doctrine says little more than if a transaction did not *in fact* take place – if it was a fiction of documentation or book entries – it will not be given tax effect. It applies to circumstances which essentially involve fraud, of one kind or another, at one level or another.

The second is what I would call the true "substance over form" doctrine. This doctrine admits a transaction took place, but denies that the transaction is what it purports to be, and instead assimilates the transaction to *another type* of transaction. Read carefully, Gregory v. Helvering fits in this category – it holds that a purported "reorganization" is actually a "dividend." In this category are transactions that a taxpayer characterizes as a lease, but which may be better described as a "financing" transaction. Both Frank Lyon Co. and Brown represent applications of this approach – the former considers whether a sale/leaseback is a financing, the latter whether a transaction is a true "sale." Both avoid "economic substance" arguments against the whole transaction – in Brown because the Government abandoned the argument, in Frank Lyon Co. because the Court rejected it. The step transaction doctrine is a species of this approach – it generally rewinds steps to treat a transaction characterized one way as something else.

The third is the true "economic substance" or "sham in substance" doctrine. This doctrine concedes that a transaction did take place in reality, but disregards it for tax purposes because the transaction is held to be "purely" tax-motivated. It is distinct from the sham in fact doctrine because it concedes the transaction took place in fact. It is distinct from the "substance over form" approach because it does not recharacterize a transaction. Instead, it throws the transaction out.

The "economic substance" doctrine has two abiding problems. First, by throwing out entirely a transaction that concededly had real economic or financial effects, it denies tax consequence to those effects. This consequence is commonly defended by treating the cash effects as a "payment" for tax benefits, thus justifying disregarding them. But in many instances, that is not what those effects are – they are, rather, for instance, real losses on property transactions, or real depreciation or interest costs. Thus, courts, particularly those with reservations about the doctrine, try to salvage tax consequences for the real effects. The effects, in any event, present a dilemma. Giving them tax effect undermines the coherency of the doctrine, and introduces complexities and uncertainties in its application. Not giving them effect is often patently unfair.

The second problem derives from the view that the "economic substance" doctrine in some

---

[207] 537 U.S. 437 (2003) at 457 (Thomas, J., dissenting).

sense reflects the "impatience" of courts. Tax practice in the modern era is often viewed as a cat-and-mouse game, the IRS being the cat, the community of tax planning professionals and their clients being the mouse. The mouse takes the law (the Code) as it is and devises new avoidance devices. The cat tries to catch, and to keep up, but it usually lags. When the cat catches the mouse, the Regs., or, if necessary, the Code, are amended to block the latest avoidance trend. There is nothing illegal in this. It is how the system works.

Defenders of the "economic substance" idea see it as something of a necessary evil – yes, it is uncertain and vague, but it provides a response to the "worst" abuses that is not impeded by the time lags and uncertainties of the legislative or even the regulatory process. Critics see the doctrine as at best unnecessary, and at worst something of a usurpation of the powers of Congress. It is in any event remarkable the extent to which the matters to which the "economic substance" doctrine is applied in the cases are matters that ultimately come to be resolved by statute or regulation.[208]

These two difficulties might be easier to tolerate but for the fact that each appears to touch on concerns of important if not constitutional dimension. The "overbreadth" feature of the doctrine has aspects of penalty imposition, in that it denies legitimate tax benefits. But its operation as a penalty is not statutory, and thus this operation of "economic substance" offends the principle that penalties, civil or criminal, should be legislatively enacted. The "impatience" feature, by the same token, substitutes judicial or administrative action for legislative resolution of an issue. The legislation is almost always prospective in nature. Thus, the use of "economic substance" to attack transactions in advance of the enactment of a statutory or regulatory "fix" has elements not only of "judicial legislation," but of retroactive legislation at that.

Because of the divergence among the lower courts on this issue, the community of tax planning professionals is concerned about how it will eventually be resolved by the Supreme Court. For the reasons set forth above, it is my opinion that the Supreme Court will look at "the economic substance doctrine" very differently from the way the lower courts have approached it. One commentator summed up this view, with which I agree, accordingly:

> Economic substance cases raise many difficult factual and legal issues, and one can understand why the Court might not wish to get involved. However, the lower courts' creation of an economic substance doctrine contradicts Supreme Court precedent, has caused deep circuit splits, and is inconsistent with well-settled rules of statutory interpretation. Given that the "judicially created" doctrine

---

[208] Of the Supreme Court cases decided above, for instance, the Court Holding Co./Cumberland Public Service Co. issue was resolved by the enactment of the predecessor of §337 in 1950; the specific problem in Knetsch had been resolved by amendments to what is now §264 at the time of the Knetsch decision, and the more general problem of prepaid interest was ultimately resolved by the enactment of §461(g) in 1962 and the enactment of the predecessors of the "time value" rules of §§ 1271 through 1275 in 1969; the Cottage Savings issue was resolved by the adoption of the "debt modification" regulations, Reg. §1.1001-3, in 1996; and the Gitlitz issue, respecting the "policy concerns" with which Justice Thomas stated that the Court need not be concerned, by statutory amendment adopted in 2001.

> is a "prerequisite" to the application of every code provision offering tax benefits, the Court should affirm its prior holdings and instruct the lower courts that the casual disregard of statutory language in favor of judicial tests is inappropriate.
>
> While the Court itself applies economic principles from time to time, it does so only when the governing statute makes those principles relevant. The lower courts, contrarily, apply economic substance principles regardless of what the code says (that is, they apply a free-floating test). Through applying a rule of decision that has no statutory reference point, the lower courts have concluded that "mere compliance with the code" is insufficient to enjoy tax benefits (*internal citations omitted*).[209]

Another commentator doubts the "economic substance doctrine" would remain intact if the Court were to view it in the context of textual differences:

> Under the Supreme Court's recent trend of resolving tax cases using textualist interpretation methods, it is doubtful that the Court would allow the standard sham transaction doctrine, the business purpose doctrine, the economic substance doctrine, or the step-transaction doctrine to stand. Moreover, courts and the IRS have precise texts to which they can refer. The precision of these texts leave little room for the interference of vague, indeterminate judicial doctrines in an area of law where certainty and predictability are crucial. Although it would seem that the IRS should have a way to challenge a transaction it believes Congress meant to tax, the substance-over-form doctrines are not the way to do it. It appears that the IRS and the Treasury Department now recognize this fact, because they have been sprinkling their regulations with tidbits of economic and intent requirements where they deem appropriate. Congress appears to recognize it as well, as evidenced by the fact that it has enacted transparency laws that allow it to react faster with legislation when it decides it should be taxing certain transactions....[210]

***Opinion Regarding Stobie Creek LLC, the DOIS Strategy & the Economic Substance Doctrine***

In light of the background of the "economic substance" doctrine, as discussed above, it is far from clear why the full amount of transaction costs must be offset against the potential profit in determining whether there is a reasonable opportunity for a "nontax" profit.[211] The premise of

---

209 Grewal, Amandeep S., "Economic Substance and the Supreme Court," 116 Tax Notes 969 at 970 (September 10, 2007).

210 Madison, Allen D., "The Tension Between Textualism and Substance-Over-Form Doctrines in Tax Law," 43 Santa Clara L. Rev. 699 (2003) at 749.

211 See PLR 8108008 (October 31, 1980) in which the IRS took the position in remarkably similar circumstances that legal fees paid in connection with a real estate investment be allocated between the portion that was for finding and performing due diligence regarding the investment and the portion that was for tax advice regarding the investment.

the doctrine is that some, even a significant, tax avoidance potential is acceptable, so long as there is some (certainly not necessarily predominant) nontax profit potential. Accordingly, it is my opinion that it is appropriate to allocate the transaction costs in accordance with the potential of the transaction between nontax profit and tax savings and I have done so in Table 2 below:[212]

**Table 2**

| | **Nontax Profit Potential** | **Tax Savings** | **Total** |
|---|---|---|---|
| Double the Money Scenario | 2,045,750 | 41,315,967 | 43,361,717 |
| J&G and SLK Legal Fees | (317,506) | (6,412,344) | (6,729,850) |
| Allocated Pretax Profit Potential | 1,728,244 | 34,903,623 | 36,631,867 |

Based on this analysis, it is further my opinion that the Stobie Creek Plaintiffs had a reasonable opportunity to earn a reasonable profit independent of tax considerations from their investment in the DOIS strategy by way of Stobie Creek. Thus, it is my opinion that the Stobie Creek DOIS strategy also meets the objective prong of the disjunctive test.

***DOIS Investment Strategy Penalty Issues***

**The §6662 Accuracy-Related Penalties are Inapplicable to the Stobie Creek Partnership**

***The §6662 Accuracy-Related Penalties in the 2000 Time Period***

The Code contains three types of penalties related to taxpayer conduct – penalties related to the filing of tax returns, penalties related to paying taxes, and penalties related to the accuracy of information reported. In 1989, Congress overhauled what had become a burdensome and overly complex civil tax penalty system and replaced several prior accuracy related penalties with one taxpayer accuracy related penalty under §6662.[213] The penalty is applied at a 20% rate to the portion of an underpayment of tax due to negligence, a substantial understatement of income tax, or a valuation misstatement including, among other things, a 40% rate if there is a substantial valuation overstatement.[214]

---

212 In making these calculations, I assumed the Stobie Creek Plaintiffs saved federal income taxes of 20% X $202,529,250 (the capital gains income deficiency) + 39.6% X $2,045,750 (the options ordinary loss), or $41,315,967. I ignored state income taxes in making this calculation. I allocated the legal fees paid to J&G of $4,387,800 + the legal fees paid SLK of $2,342,050, a total of $6,729.850, between these two potential cash flows.

213 Revenue Reconciliation Act of 1989, P.L. 101-239, signed by President George H.W. Bush on December 19, 1989.

214 §§6662(a), (b), (e), and (h).

**Negligence**

A taxpayer is negligent when he fails to make a reasonable attempt to comply with or carelessly, recklessly, or intentionally disregards tax rules and regulations.[215] A highly-regarded treatise that I use in my Tax Ethics course states (in the edition in use in 2000) on this subject:

> In measuring taxpayer negligence, the courts have generally applied the "reasonably prudent person' standard of tort law, inquiring whether a reasonably prudent taxpayer would act as the taxpayer did under similar circumstances.[25] While a precise definition of the standard of care required of the taxpayer depends on the facts and circumstances of the particular case, certain broad themes in the definition of negligence for the purposes of Code §6662(b)(1) can be identified. Where the taxpayer's omission of an item from income is the result of the failure to maintain adequate books and records, the IRS's imposition of the negligence penalty is frequently sustained.[26] Conversely, an incorrect decision regarding an unsettled question of law does not constitute negligence, provided the taxpayer's interpretation is not clearly untenable and is held in good faith (*emphasis supplied*).[27]
>
> [25] *See, e.g.*, Sammons v. Commissioner, 838 F.2d 330, 88-1 U.S.T.C. para. 9152 (9th Cir. 1988) (negligence within the meaning of former IRC §6653(a) is measured by the "reasonable, prudent person standard"); Bowman v. Commissioner, 54 T.C.M. 975, Dec. 44.299(M) T.C. Memo. 1987-545 (former IRC §6653 penalty imposed where "no reasonable person" would have trusted tax scheme to work); Freytag v. Commissioner, 89 T.C. 849, Dec. 44,287 (1988), *aff'd*, 904 F.2d 1011 (5th Cir. 1990), *aff'd*, 501 U.S. 868 (1991) ("[n]egligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances," citing Marcello v. Commissioner, 380 F.2d 499, 506 67-2 U.S.T.C. para. 9516 (5th Cir. 1967), *cert. denied*, 389 U.S. 1004 (1968).
> [26] *See, e.g.,* Clark v. Commissioner, 55 T.C.M. 161, Dec. 44,592(M), T.C. Mem. 1988-67; Faulkner v. Commissioner, 50 T.C.M. 1314, Dec. 42,444(M), T.C. Mem. 1985-536.
> [27] *See, e.g.,* United Title Insurance Co. v. Commissioner, 55 T.C.M. 34, 53, Dec. 44,552(M), T.C. Memo 1998-38 (penalty not imposed where "case involved hotly contested and rather close factual issues," some of which were decided in the taxpayer's favor).[216]

---

[215] §§6662(b)(1) and (c).

[216] Wolfman, Holden, and Harris, Standards of Tax Practice, Fifth Edition, Tax Analysts (1999), §202.3.1.1, p. 57.

**Substantial Understatement of Income Tax**

A substantial understatement of income tax is an understatement that exceeds the greater of (1) 10% of the tax required to be shown on the return (i.e., the correct tax), and (2) $5,000 (in the case of an individual).[217] This prong of the accuracy-related penalty is a no-fault penalty that is imposed on tax deficiencies resulting from undisclosed positions lacking substantial authority. The Code provides two exceptions to this essentially mechanically-computed penalty, one of which is potentially applicable to the instant situation. A taxpayer can avoid the substantial understatement of income tax penalty by establishing that the treatment of an item on a return is supported by "substantial authority" and, possibly, by further demonstrating that the taxpayer reasonably believed the position taken satisfied the "more likely than not" standard, i.e., that it had a greater than 50% likelihood of success if challenged.[218]

The terms "substantial authority" and "more likely than not" have been the subject of debate for many years among tax professionals. Yet, they are but two of several terms used to refer to the likelihood that a position taken on a tax return would be sustained in a court of final jurisdiction if challenged by the IRS. In the same highly-regarded treatise cited above, Professors Wolfman and his co-authors provide a continuum chart which I have adapted in Table 3 below:[219]

**Table 3**




The authors go on to describe these four "likelihoods of success" for a tax position as follows:

> While precise definition of the point on the continuum where each of the above standards lies is not possible [fn5: "The threshold for satisfying the 'more likely than not' standard unmistakably requires a likelihood of success that exceeds 50%"], the following general observations may be helpful:
>
> 1. Reasonable basis, the former ABA and Code §6694(a) standard, and the current taxpayer negligence standard, requires, at a minimum, that a position is not frivolous. While the reasonable basis standard demands *less than a one-third chance of success,* how much less is not entirely clear. There

---

217 §§6662(b)(2) and (d).
218 §§6662(d)(2)(B)(i) and 6662(d)(2)(C).
219 Wolfman, Holden, and Harris, Standards of Tax Practice, Fifth Edition, Tax Analysts (1999), §207.1.1, p. 104.

is some support for the proposition that a position with a 10 to 15 percent likelihood of prevailing will satisfy the standard. Reasonable basis also operates, following the 1993 Act, as the disclosure standard for the substantial understatement penalty (and the penalty for the intentional disregard of rules and regulations) under §6662.

2. A "realistic possibility of success" the threshold for asserting a position under [ABA] Opinion 85-352, AICPA Statements of Responsibility in Tax Practice No. 1, Code §6694(a) and [U.S. Treasury] Circular 230, is intended to elevate, not merely restate, the reasonable basis standard. Although a position with a five to ten percent likelihood of prevailing will not satisfy the standard, a position apparently need not be supported by substantial authority to satisfy the standard. As a general rule, a "realistic possibility of success" requires a likelihood of success approaching 33 percent.

3. The regulations under former Code §6662, as noted above, define the substantial authority standard as stricter than a "reasonable basis" standard but less stringent than a "more likely than not" standard. The IRS Penalty Study places the required degree of success at 45 percent. While the adoption of an expanded concept of authority for purposes of the substantial understatement penalty brings the substantial authority standard closer in line with the realistic possibility of success standard, the substantial authority standard continues to require a higher degree of accuracy than under the realistic possibility of success standard. The concept of substantial authority not only defines the degree of accuracy required of the taxpayer, but also defines the circumstances under which a practitioner is required to counsel a client as to the possibility of the substantial understatement penalty and the opportunity for avoiding the penalty by disclosure.

4. The more likely than not standard requires a likelihood of success that is *greater than* 50 percent. This standard, along with the substantial authority standard, must be satisfied by a noncorporate taxpayer to avoid the substantial understatement penalty in the case of a tax shelter item.... ....the more likely than not standard also defines the practitioner's responsibilities under Circular 230 and ABA Opinion 346 with

> respect to tax shelter advice *(emphasis in the original) (internal citations omitted)*.[220]

There are two hurdles to cross in assessing whether substantial authority exists for a tax position – (1) what "authorities" can be considered, and (2) whether the weight of the authorities that favor the taxpayer's position is "substantial" in relation to the weight of the authorities that favor the government's position.

In response to considerable criticism, Congress expanded the list of authorities that may be relied on by a taxpayer to avoid the substantial understatement penalty when it enacted the Revenue Reconciliation Act of 1989. The final regulations issued by the Treasury adopted this expanded definition of authority incorporated in the legislative history of the 1989 Act. Thus, the types of authority that can be considered for the purposes of determining whether there is substantial authority for the tax treatment of an item now include the Code and other statutory provisions; proposed, temporary, and final regulations construing such statutes; revenue rulings and revenue procedures; tax treaties and regulations thereunder, and Treasury Department and other official explanations of such treaties; court cases; congressional intent as reflected in committee reports, joint explanatory statements of managers included in conference committee reports, and floor statements made prior to enactment by one of a bill's managers; General Explanations of tax legislation prepared by the Joint Committee on Taxation (the Blue Book); private letter rulings and technical advice memoranda issue after October 31, 1976; actions on decisions and general counsel memoranda issued after March 12, 1981 (as well as general counsel memoranda published in pre-1955 volumes of the Cumulative Bulletin); Internal Revenue Service information or press releases; and notices, announcements, and other administrative pronouncements published by the Service in the Internal Revenue Bulletin.[221]

While the types of authority are clearly spelled out, the percentage weight of authorities needed to obtain substantial authority has been the subject of an ongoing discussion. There are many who do not agree with the conclusion of the IRS Penalty Study, discussed above, that 45% is the bright line. There are many knowledgeable tax practitioners who would draw the line closer to 35% than 45% and there are some knowledgeable tax practitioners who believe the IRS has capriciously and injudiciously overreached the boundaries of its authority in its administration of the civil penalty system.

Sheldon I. Banoff, quoted on another subject above, stated the following on this issue:

> It is difficult enough to attempt to translate the uncertainties of aggressive tax planning into a range of percentages for businessmen, who frequently make business judgments based on a risk/reward analysis using a "likelihood of success" guesstimate. It is quite another thing for practitioners to guesstimate

---

220 Wolfman, Holden, and Harris, Standards of Tax Practice, Fifth Edition, Tax Analysts (1999), §207.1.1, pp. 104-105.
221 Reg. §1.6662-4(d)(3)(iii).

how IRS field agents will evaluate the likelihood of success in a case that either has settled on unfavorable terms at the IRS level or ultimately litigated....

To bring a dose of reality to those academicians and IRS and Treasury officials who do not have to cope with these onerous rules, one might posit the following questions: how would you like to have your livelihood, your reputation, (and possibly your malpractice insurance coverage) threatened because an IRS agent – with a pro-government bias (surprise of surprises) – acts as judge, jury, and executioner in asserting accuracy-related penalties and/or return preparer penalties in a case you lost, because he or she felt "you never had a case in the first place?" Do you think that agent (or his or her supervisor) will toss you a bouquet of horseshoes ("gosh, you had a good case that was a near-winner and close counts in horseshoes and penalties, so we would never dream of asserting penalties against you") or more likely, ride roughshod over you ("you lost just like I told you you would, so you couldn't possibly have had a realistic possibility of success!")?....

If we as tax advisors and return preparers are to live and die with percentage penalty standards, why don't we insist on even more exactitude?....I suggest that, henceforth, IRS agents, the director of practice.... Use the following standards:...

4. "Substantial authority" exists when there is exactly 37.5-percent approval....

4. Justification for my proposed "substantial authority" standard of 37.5 percent arises from the range of 35 to 40 percent, which has been used by those commentators brave enough to venture a prediction. Splitting the difference of course generates the 37.5 percent result. This is a mathematically satisfying conclusion. It can be explained to unsophisticated taxpayers who are baseball aficionados as equivalent to getting three hits out of eight at-bats (i.e., a .375 batting average)....

If you're still with me up to this point, you may conclude that the author has placed his tongue firmly in cheek with respect to the prognostication of percentages. Quite the contrary! My sole goal is to impress upon those who "count" in the world of penalties – the IRS director of practice; IRS field agents and appeals officers; congressional staff members; Tax Court clerks, and malpractice insurance adjusters – that the imposition of something as serious as punitive penalties should be done very carefully with substantial leeway to the practitioner, particularly where judgments as to percentage likelihoods of success (given that the case is a loser, i.e., not "more likely than not" a winner) are

> becoming the key – no, make that the sole – method of analyzing norms of punitive behavior.[222]

**Substantial Valuation Overstatement**

A substantial valuation overstatement is defined as a valuation of property (or adjusted basis claimed on a return) that is 200 percent or more of the correct valuation (or adjusted basis, as the case may be).[223] The substantial valuation overstatement penalty applies only where the underpayment of tax attributable to the valuation overstatement exceeds $5,000 (in the case of an individual). The penalty rate, however, varies according to the extent of the overvaluation. The 20% penalty rate is imposed where the overvaluation is 200% or more, but less than 400% of the correct value. A 40% penalty rate applies when the overvaluation is 400% or more of the correct value.[224]

In the case of the Stobie Creek Plaintiffs, the IRS asserted all of these penalties.

***The Tax Law Regarding the Application of the Accuracy-Related Penalties***

**Professional Tax Advisors and Waiver of the Taxpayer Accuracy Penalty**

Typically, sophisticated businesspersons seek the advice of many types of advisors regarding various aspects of their commercial endeavors, be they lawyers, accountants, bankers, insurance professionals, or money managers, etc. Each one of these advisors is skilled in a technical area that is beyond the expertise (and often, the interest) of the sophisticated businessperson whose primary proficiency typically involves the product or service he or she is selling. The sophisticated businessperson often comes to rely on a cadre of trusted advisors to cover the bases that are beyond the realm of his or her possibilities. This is not unusual; it is the norm throughout the United States. Thus, it is common for sophisticated businesspersons to respond to suggestions made by trusted advisors and to accept the opinions of such persons, especially if there have been existing relationships with positive results over time. Thus, it is no surprise that the Stobie Creek Plaintiffs responded favorably when Waterman, whose firm had been their primary legal advisors for decades, informed them about the DOIS strategy in January 2000.

Professor Wolfman and his co-authors discussed the issue of reliance on advice in the context of waiver of accuracy-related penalties in the 2000-in-effect edition of the treatise I use in my Tax Ethics course, referring to the leading case on this issue from the United States Supreme Court:

---

222 Banoff, Sheldon I., "Penalty Percentages Prognosticators Perplex Practitioner," 93 TNT 249-56, December 6, 1993.
223 §§6662(b)(3) and (e)(1)(A).
224 §§6662(e)(2) and (h).

> In *United States v. Boyle*, the United States Supreme Court held that reliance on a tax advisor does not constitute a defense for failure to file a return on time under Code §6651(a)(1). Although *Boyle* can be interpreted as supporting the proposition that reliance on professional advice is not an absolute bar to the imposition of taxpayer penalties, a closer reading of *Boyle* suggests that reliance on tax advice will constitute a defense to penalty (at least where the facts do not suggest to a reasonably prudent taxpayer that the advice may be faulty) (*internal citations omitted*).[225]

In U.S. v. Boyle, the U.S. Supreme Court stated:

> When an accountant or an attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. "Ordinary business care and prudence" do not demand such actions (*internal citation omitted*) (*emphasis in the original*).[226]

There is an exception to the §6662 accuracy-related penalties based on reasonable reliance on the advice of tax professionals. §6664(c) establishes the "reasonable cause exception," i.e., the accuracy-related penalties are waived when the taxpayer's reliance was reasonable and he acted in good faith with respect to the questioned return item.[227] The Regulations under §6664 adopted by the Treasury specifically provide for waiver of the accuracy-related penalties when, having taken all facts and circumstances into account, a taxpayer "has reasonably relied in good faith on advice (including the opinion of a professional advisor) as to the treatment of the taxpayer (or any entity, plan, or arrangement) under Federal tax law."[228]

Professor Wolfman and his co-authors describe this exception in the 2000-in-effect edition of the treatise I use in my Tax Ethics course thusly:

> Code §6664 effectively converts what had been largely a no-fault penalty into a penalty standard based on the reasonableness of the taxpayer's conduct. Every taxpayer against whom the penalty is asserted has the right to challenge the Commissioner's determination on the basis of the statutory standard....

---

225 Wolfman, Holden, and Harris, Standards of Tax Practice, Fifth Edition, Tax Analysts (1999), §202.3.1.4, p. 81.
226 United States v. Boyle, Executor of the Estate of Boyle, 469 U.S. 241 (1985) at 251.
227 §6664(c)(1).
228 Regs. §1.6664-4(c)(1).

> One of the more important issues which arises with respect to waiver of the taxpayer accuracy related penalties involves when a taxpayer is entitled to rely on a professional opinion to avoid penalty.
>
> In the case of taxpayers lacking sophistication in federal tax matters, the taxpayer generally should be able to rely on the advice of a professional to avoid imposition of the taxpayer-related accuracy penalties; provided that (1) the matter is not so simple as to not require any special expertise in evaluating the risks involved in advancing the position on the return or (2) based on the facts and circumstances of the particular situation it should be clear to a reasonably prudent taxpayer that the advice rendered is [not] suspect. As noted above, at its core, the reasonable cause defense requires that the taxpayer's reliance is reasonable and in good faith (as provided in existing and final regulations under Code §6664(c)). Where professional advice is not rendered by an independent person, or the advice on its face does not purport to relate the law to the taxpayer's facts, these factors tend to weigh against a finding [of] reasonable cause for purposes of avoiding the taxpayer penalty (*internal citations omitted*) (*emphasis supplied*).[229]

Throughout the remainder of this part of my report, I assess whether the Stobie Creek Plaintiffs are entitled to waiver of the accuracy-related penalties under the exception provided in §6664 or on some other grounds.

**Tax Case Law on the Application of the §6662 Accuracy-Related Penalties**

***Negligence and Substantial Understatement of Income Tax Penalties Cases***

**David E. Heasley and Kathleen Heasley v. Commissioner**[230]

The Heasleys were blue collar workers with four children. Prior to 1981, they invested small amounts in a mutual fund and stocks (through Mr. Heasley's employment plan). In 1981, they began to consult with a "self-styled economic and financial consultant and securities dealer," who introduced them to numerous investment plans. The Heasleys accepted this consultant's advice because neither of them was knowledgeable enough to invest on their own. In December 1983, the consultant showed them an energy conservation-type tax shelter and reviewed the offering memorandum with them. On his advice, they invested about $14,000. The complexity of this investment caused the Heasleys to hire a CPA for the first time to prepare their 1983 return. The CPA also reviewed the offering memorandum and the accompanying tax and legal opinions and found everything in order, so he deducted advance rentals and claimed investment tax credits which produced about $23,000 in refunds. In 1986, the IRS audited the Heasleys' 1983 return and disallowed the tax benefits they claimed, asserting a deficiency of

---

229 Wolfman, Holden, and Harris, Standards of Tax Practice, Fifth Edition, Tax Analysts (1999), §202.3.1.4, pp. 80-81.

230 902 F.2d 380 (5th Cir. 1990), rev'g T.C. Memo 1988-408.

about $23,000 plus interest. The IRS also asserted penalties of about $7,400 for negligence, substantial understatement of income tax, and valuation overstatement (discussed below). The Heasleys chose not to contest the income tax deficiency, but filed suit in Tax Court challenging the penalties. The Tax Court ruled for the IRS, so the Heasleys appealed.

The Tax Court had found the Heasleys negligent because they did not independently investigate the investment, nor did they read the entire offering memorandum or the closing documents. The Court of Appeals determined that due care does not require moderate income investors such as the Heasleys to independently investigate their investments. They may rely on their financial advisors and accountants to do this for them. The Court of Appeals also determined that investors need not review every word in an offering memorandum or closing documents. It stated that the reasonable care standard was satisfied by their reading pertinent portions and having their advisors explain the rest.

The Tax Court had found the Heasleys subject to the penalty for substantial understatement of income tax because there was neither reasonable cause nor good faith in this case. The Tax Court found that because the advance rentals deducted exceeded the fair market value of their investment. While this was true, the Court of Appeals applied the IRS's own regulation standards to determine it abused its discretion by failing to waive the penalty in this case. "We are at a loss to determine just what the IRS would find to be reasonable cause given the Heasleys' experience, knowledge, and education."[231] In support of its decision, the Court of Appeals noted that they took their taxes to a CPA for the first time; had the CPA review the investment before claiming the tax benefits; read portions of the offering memorandum and had the consultant explain the rest; and, believed they had legitimately claimed the deduction and investment tax credit. "If neither [the consultant] nor their CPA found anything wrong with the investment, how could the Heasleys?"[232] This, stated the Court of Appeals, is tantamount to reasonable cause and good faith.

Despite the Heasleys' lack of education and financial sophistication, their case has been heavily relied upon by Courts of Appeals in reversing the IRS's imposition of penalties on taxpayers who followed advice from tax professionals.

**George S. Mauerman v. Commissioner**[233]

Mauerman was an orthopedic surgeon with an undergraduate degree from Vanderbilt University and a medical degree from Columbia Medical School. At the time the events at issue took place, he had been in practice for about 20 years. Moreover, at that time he had investments in stock and through partnerships and corporations, but did not have any legal, tax, or insurance expertise. The understatements on which the penalties asserted by the IRS were based emanated from his deduction of payments made in the early 1980s with regard to a reinsurance business promoted by Pre-Paid Legal Services, Inc. ("Pre-Paid"), a company in whose stock he

---

231 902 F.2d 380 (5th Cir. 1990) at 385.
232 902 F.2d 380 (5th Cir. 1990) at 385.
233 22 F.3d 1001 (10th Cir. 1994), rev'g T.C. Memo 1993-23.

had invested more than $500,000 by the mid-1980s. When Mauerman provided his longtime CPA information about these payments so that he could prepare the first related tax return, the CPA performed cursory due diligence, but no independent research. He discussed the reinsurance program with Mauerman and an accountant from Pre-Paid's CPA firm, who sent him materials that had been put together by an attorney who was a Pre-Paid director and its legal counsel and who Mauerman knew was Pre-Paid's second largest shareholder. The CPA confirmed some of the information by looking at the Code and Regulations and by reading some of the case synopses provided, but he did not read the case opinions. Moreover, the CPA noted that the Courts of Appeals were not in agreement as to whether the questioned payments were currently deductible or whether they should be capitalized and amortized, but he decided there was "sufficient grounds" for deducting the payments currently. The CPA also knew the preparer of these materials was an officer of Pre-Paid, its legal counsel, and its second largest shareholder. He did not explain his basis for taking the deductions to Mauerman, nor did he tell him that the Courts of Appeals disagreed about their proper tax treatment. Mauerman relied on the advice of his CPA, Pre-Paid's CPA, and the Pre-Paid officer, director, and legal counsel with respect to the reinsurance payment deductions he reported on his tax returns.

The Tax Court upheld the IRS's assertion of the substantial understatement of income tax penalty because it agreed that Mauerman (1) did not have substantial authority for the position taken on his tax return; (2) did not adequately disclose his position on his tax return; and, (3) had failed to prove that the factors showing reasonable cause and good faith were so clear that the IRS's decision was arbitrary, capricious, and without sound basis in fact. The Court of Appeals reversed the Tax Court, stating that even though the Pre-Paid legal counsel and its CPA were involved, Mauerman used his own CPA with whom he had a long-standing relationship to advise him and prepare his tax returns and the CPA had satisfied himself that the deduction was proper. The Court of Appeals concluded that Mauerman had reasonable cause because he had good cause to trust the advice and expertise of his CPA. In so saying, the Court of Appeals stated:

> Mauerman was not trained in tax law. Though he had been an investor for over ten years, it is not reasonable to expect that Mauerman could monitor his independent advisors to make sure they had done sufficient research to give knowledgeable advice. It is for exactly this reason that many intelligent investors hire independent, educated experts to advise them. Moreover, Mauerman did not attempt to limit the scope of his advisors' research. Therefore, we hold that Mauerman acted in good faith under these circumstances in relying on his independent advisors.[234]

The Mauerman case broadens the holding in Heasley by applying it to a well-educated, high-income, sophisticated taxpayer. Moreover, the Mauerman court considered a cursory review of non-independently prepared offering materials by an independent advisor to be satisfactory to establish reasonable and good faith.

---

234 22 F.3d 1001 (10th Cir. 1994) at 1006.

**Joseph P. Chamberlain and D. Kathleen Chamberlain v. Commissioner**[235]

Joseph Chamberlain was a mechanical engineer who was part owner of two petroleum refining businesses in Louisiana. In the early 1980s, the Chamberlains invested in a partnership, Great Plains Partners ("Great Plains"), whose principal objective was to take part in the notorious First Western Government Securities tax shelter ("First Western"), which was subsequently found to be a sham transaction.[236] The promoter of First Western was the infamous Allen F. Campbell, who was later enjoined from promoting abusive tax shelters.[237] The offering memorandum provided to the Chamberlains included a tax opinion letter from the Dallas, TX law firm Durant, Mankoff, Davis, Wolens & Francis, who opined that it was "more likely than not" that the gains and losses of the partnership would be allowed to Chamberlain and other similarly situated. The CPA for Great Plains (and the Campbell entities) was William E. "Bill" Bailey ("Bailey") with Bailey Vaught Robertson & Co., an accounting firm in Dallas, TX. Although introduced to the transaction by one of his business partners, Chamberlain relied upon Bailey for input about the transaction. Bailey, in turn, relied upon Ronald Mankoff, the attorney who wrote the tax opinion letter discussed above.

The Tax Court disallowed the transaction, agreeing with the Freytag decision that it was sham. In addition, it upheld various penalties asserted by the IRS, including the negligence penalty. It rejected Chamberlain's argument that his motive for entering into the transaction was not to avoid taxes and that he relied on expert advice. In rejecting Chamberlain's argument on motive, the Tax Court stated "It must be noted that these transactions can hardly be described as being run-of-the-mill, and petitioner admits that he did not understand the transactions."[238] Moreover, the Tax Court quoted the Fifth Circuit's opinion in Freytag, which stated "no reasonable investor would surrender total control of his or her ability to profit and lose unless satisfied that the risk of loss had been greatly diminished or eliminated."[239] In rejecting Chamberlain's argument on reliance on experts, the Tax Court noted that it must be shown that the expert had the expertise and knowledge of the pertinent facts to render such an opinion and it must be established that the person rendering the advice is independent and does not have an economic interest in giving advice. It then went on to state that "there is nothing in this record to indicate that Bill Bailey was qualified to give advice as to the bona fides of the First Western Program." Interestingly, the Tax Court does not address the independence issue, because Bailey, who was Campbell's CPA, was surely not independent.

---

235 66 F.3d 729 (5th Cir. 1995), aff'g in part and rev'g in part, T.C. Memo 1994-228.

236 See Freytag v. Commissioner, 904 F.2d 1011 (5th Cir. 1990), aff'd on other grounds, 501 U.S. 868 (1991).

237 United States v. Campbell, 704 F. Supp. 715 (N.D. Tex. 1988), aff'd 897 F.2d 1317 (5th Cir. 1990).

238 T.C. Memo 1994-228 at 18.

239 T.C. Memo 1994-228 at 18.

In his appeal, Chamberlain chose not to contest the tax deficiencies proposed, but did contest the penalty issues. The Court of Appeals reversed the finding that he was negligent despite his reliance on the advice of a tax expert stating:

> Taxpayers sought the advice of a tax expert about claiming the loss. The expert advised that there was "a good faith, supportable position" concerning the deductibility of the loss. The Tax Court erred in finding the taxpayers negligent for claiming the loss. The record reflects no basis or conclusion that it was not reasonable for taxpayers to rely on the expert's advice.[23]
>
> > [23] The instant case demonstrates that one may enter into a transaction without a profit motive but not be negligent in claiming a tax loss if that claim is in reasonable reliance on the advice of a tax expert (*emphasis supplied*).[240]

The Chamberlain case further broadens the Heasely/Mauerman holdings by establishing that an educated, sophisticated business owner can invest in a notorious tax shelter for no purpose other than to save taxes on the advice of a tax expert who is financially involved with the promoter of that shelter and avoid the accuracy-related penalties.

**Joseph B. Durrett, Jr. and Carolyn C. Durrett v. Commissioner**[241]

The facts in the Durrett case are remarkably similar to the facts in the Chamberlain case in that Durrett concerns the same notorious tax shelter, First Western, and Durrett's background as a chemical engineer and owner of his own business that bought and sold fuel oil is similar to Chamberlain's background as a mechanical engineer and part owner of two petroleum refineries. The result in Durrett is also the same as the result in Chamberlain with the same Tax Court holding disallowing the tax benefits and upholding the negligence penalty and the Fifth Circuit, while agreeing that Durrett had no profit motive, nevertheless reversing the Tax Court's finding of negligence because Durrett relied on professional tax advice. The tale here that is worth the telling is about the particular experts upon whom Durrett relied and their relationship to one another and to the promoter of the tax shelter.

Durrett was introduced to First Western by Allen Daniels ("Daniels"), an attorney with a general business practice who was not an expert in financial markets or in tax advantaged investments. Through Daniels, Durrett met Kenneth McCoin ("McCoin"), described in the Tax Court opinion as an owner of a firm that provides investment advice, but known here in Houston as a Ph.D. economist who serves as an expert in personal injury, wrongful death, wrongful termination, anti-trust, and commercial litigation matters. McCoin was a "finder" for First Western. Although he explained the First Western program to Durrett and Daniels, neither understood how it worked. The Tax Court concluded that both Durrett and Daniels relied on McCoin. However, McCoin was paid by First Western for obtaining clients for its program, having put approximately

240 66 F.3d 729, 733 (5th Cir. 1995).
241 71 F.3d 515 (5th Cir. 1996), aff'g in part and rev'g in part, T.C. Memo 1994-179.

100 clients in the First Western program and having earned over $600,000 in commissions for doing so. He prepared various presentations for the First Western program for presentation to prospective customers in which he pointed out that even if the customer lost his entire investment, he would still profit from the tax savings. Moreover, McCoin was also an investor in First Western and claimed deductions for losses from it. Both Durrett and Daniels were aware that McCoin was being paid by First Western.

Daniels also suggested that Durrett obtain advice on the tax ramifications from Jerry Chambers, a CPA. Chambers did not give advice regarding the bona fides of the transaction, but did review the offering memorandum. Chambers relied on McCoin and Daniels as to the bona fides of the operations of First Western. Moreover, although he had limited experience with similar public transactions, Chambers had no experience with transactions of this type for which there was no public market. Chambers was also aware that McCoin was being paid by First Western and did warn Durrett that there was a possibility the tax benefits would not be sustained if challenged. The record also shows that the partnership in which Durrett participated requested a certain tax result when it invested.

About these relationships, Tax Court Judge Dawson wrote:

> Petitioner has a background in engineering and petroleum sales. Prior to 1979, he had made no investments in any transactions of this nature. He was told about the First Western program by Daniels. Daniels had no expertise in dealing with straddles in forward contracts that were the heart of the First Western program. Neither petitioner nor Daniels understood how the program worked. Rather, Daniels relied upon McCoin and Chambers, and the latter relied on Daniels and also on McCoin. According to petitioner's version of what happened, there were four blind mice, all duped by one slick cat, McCoin. We believe that the mice, rather than being blind, suffered more from tax-motivated myopia and they stand in pari delicto with the cat.[242]

In reversing the Tax Court's finding for the IRS on the question of negligence, the Court of Appeals stated flatly that "We conclude that it was reasonable for the Durretts to rely on the advice of these experts."[243] Based on this opinion, it appears to me that the Court of Appeals felt it was conclusive that the Durretts sought expert advice and, thus, it was not necessary for it to render judgment on the quality of that advice or the interrelationships, financial and otherwise, of those that offered such expert advice.

**Long Term Capital Holdings, et al v. U.S.**[244]

Long-Term Capital Holdings ("LTCH") was the tax matters partner of one of a number of pass-through entities that entered into a complex series of transactions designed to take advantage

---

242 T.C. Memo 1994-179 at 32-33.
243 71 F.3d 515 (5th Cir. 1996) at 518.
244 150 Fed. Appx. 40 (2nd Cir. 2005), aff'g 330 F. Supp. 2d 122 (2004).

of high value, low basis preferred stock transferred to them by a foreign corporation. These pass-through entities generated substantial losses from the sale of the preferred stock in late 1997, which they passed through to their partners. In the underlying case, the court poured out the taxpayers by holding that the tax shelter transaction under which the low value, high basis preferred stock was contributed to a partnership in a carryover basis transaction lacked economic substance. The court also held that, in the alternative, the step transaction doctrine required that the transaction be recast into a direct sale of preferred stock to the partners with the result that their basis was equal to its low current value. Moreover, the court upheld the IRS's imposition of (in the alternative) both the 40-percent gross valuation overstatement and the 20-percent substantial understatement of income tax penalties. This case drew a lot of attention not only because of the big numbers involved, but also because Myron Scholes and Robert Merton, who shared the 1997 Nobel Prize in Economics, were two of the twelve participants. LTCH was also one of the highest-flying hedge funds in the world until it had to be saved from collapse by 14 banks who, acting at the instigation of the Federal Reserve, rescued and liquidated the hedge fund at a cost of $3.65 billion after the Russian government defaulted on its bonds in the summer of 1998.

LTCH's in-house tax counsel, Larry Noe ("Noe"), became interested in the possible utilization of built-in losses when he was approached by Don Turlington ("Turlington"), a New York tax lawyer who suggested the arrangement discussed above. King & Spalding, a large Atlanta, GA-based law firm, agreed to furnish a tax opinion letter stating that the taxpayers could utilize the foreign entity's built-in losses, but it did not actually provide the opinion letter to Noe (on behalf of the taxpayers) until January 27, 1999, nine months after the partnership filed its tax return in April 1998. Thus, in considering whether to grant the waiver of the accuracy-related penalties based on reliance on tax counsel's opinion, the Court focused on the testimony from King & Spalding partner Mark Kuller that he orally conveyed his opinion to Noe before the partnership return was filed. Because the Court disbelieved this testimony, it refused to grant the waiver and, as a result, the partnership was not able to rely on the King & Spalding tax opinion because it was neither actually received nor orally conveyed to Noe before the partnership return was filed.

The Court of Appeals stated that LTCH was not required to "second-guess the advice of its tax experts" but instead that it did not receive relevant tax advice upon which it relied in reporting the $106 million loss. The Court of Appeals upheld the 40 percent gross valuation overstatement penalty based upon a basis misstatement, which is specifically covered by the statute. However, as is discussed more fully below, this basis misstatement is different from the typical valuation misstatement which affects basis and to which the penalty has been applied in the past. The Court of Appeals took the position that a misstatement resulting from a legal dispute, as opposed to a factual dispute over valuation, is also subject to the gross overvaluation penalty.

**Santa Monica Pictures, LLC, et al v. Commissioner**[245]

Like LTCH, Santa Monica Pictures was also a tax shelter formed to take advantage of high basis, low value assets in the form of receivables held by the parent of MGM following the sale of the bulk of its assets to Kirk Kerkorian. It was promoted by Perry Lerner, a highly-sophisticated tax lawyer based in Los Angeles, CA. He was managing member and tax matters partner of Santa Monica Pictures, LLC ("SMP"). The investor was Peter Ackerman, a successful businessman with a Ph.D. in international affairs and former associate of Michael Milken in the junk bond department at Drexel Burnham. As was the case with LTCH, the Tax Court disallowed losses of about $300 million for 1997 and 1998 because the transactions undertaken lacked economic substance and should not be respected for Federal tax purposes The court also upheld the IRS's imposition of the negligence, 20-percent substantial understatement of income tax, and 40-percent gross valuation overstatement penalties.

The court upheld the imposition of the negligence penalty on the ground that Mr. Lerner, as a sophisticated tax lawyer, should have been aware that these transactions had no economic substance.

The court upheld the imposition of the substantial understatement of income tax penalty because SMP cited no substantial authority that might provide a basis for reducing any understatement of income tax.

The court upheld the imposition of the gross valuation overstatement penalty based upon a basis misstatement, which is specifically covered by the statute. However, as is discussed more fully below, this basis misstatement is different from the typical valuation misstatement which affects basis and to which the penalty has been applied in the past.

In an attempt to show reasonable cause and good faith under §6664(c), which requires a finding of reliance on the advice of tax professionals, SMP offered a number of tax opinions to the court to justify its tax return positions for penalty avoidance purposes. The court rejected each of them on varying grounds:

1. Two August 1996 memoranda from the law firm Shearman & Sterling LLP were rejected because they were prepared before the transactions were done and, thus, was based on hypotheticals, not on the relevant facts of actual transactions.

2. A February 1997 draft memorandum from the accounting firm Ernst & Young LLP was rejected because it was limited in scope and stated that it could not be relied upon except for internal purposes.

3. A May 1997 memorandum from the law firm Shearman & Sterling LLP was rejected because it was not prepared for tax return position purposes but was instead prepared for

245 T.C. Memo 2005-104.

the purpose of obtaining an outside opinion letter from former IRS Commissioner Donald Alexander which Alexander never provided.

4. An October 1997 memorandum from the law firm Shearman & Sterling LLP was rejected because it did not address a transaction that actually occurred, but instead considered two hypothetical structures for a joint venture.

5. A February 1998 memorandum from the law firm Shearman & Sterling LLP was rejected because it was limited only to the debt vs. equity issue and did not discuss other relevant issues.

6. A May 1998 memorandum prepared by the accounting firm Grant Thornton LLP was rejected because it was simply an interoffice memorandum and contained no indication that it was prepared so that it could be relied upon.

7. A December 1998 tax opinion letter prepared by the law firm Chamberlain Hrdlicka White Williams & Martin was rejected because (a) it was not issued until after SMP's 1997 partnership return was filed; (b) it was grounded on erroneous assumptions that Mr. Lerner knew were untrue; and (c) the law firm reached conclusions without any legal analysis or citation to the Code, the Regulations, or caselaw.

**Klamath Strategic Investment Fund, LLC, et al v. U.S.**[246]

The Klamath case, also discussed above, involves a tax strategy known as Bond Linked Issue Premium Structure ("BLIPS"), a "Son of Boss" tax shelter similar to the DOIS tax strategy. The investors, Cary Patterson ("Patterson") and Harold Nix ("Nix"), are Texas law partners who handle primarily plaintiffs' contingency fee cases and who in the late 1990s expected to receive sizeable attorneys' fees after participating in the settlement of litigation brought by the State of Texas against the tobacco industry. The IRS disallowed the sizeable ordinary losses claimed by Patterson and Nix on their 2000, 2001, and 2002 income tax returns and asserted the same four accuracy-related penalties that are at issue in this case, i.e., (1) negligence and intentional disregard of rules and regulations; (2) substantial understatement of income tax; (3) substantial valuation overstatement; and, (4) gross valuation overstatement (discussed in the following section).

Prior to the tobacco settlement, Patterson and Nix became interested in foreign currency trading after talking to Ed Cox, a wealthy Dallas, TX businessman and decided to pursue investing. To that end, they asked for help from their CPAs at Pollans & Cohen, a public accounting firm in Beaumont, TX that represented itself as a competent investment advisor. Patterson and Nix had used Pollans & Cohen for several years to provide traditional accounting work for their firm

---

246 440 F. Supp. 2d 608 (E.D. Tex. 2006) (on motion for partial summary judgment); 472 F. Supp. 2d 885 (E.D. Tex. 2007) (on the merits); and, 2007-1 USTC ¶50,410 (E.D. Tex. 2007) (on rehearing), cross-appeals to the 5th Cir. pending.

and themselves and had also used the firm to provide litigation support services with regard to the tobacco litigation. Both had developed a great deal of confidence in Pollans & Cohen and relied upon its expertise in financial matters. During its investigation into foreign currency investment opportunities, Pollans & Cohen were introduced to Presidio Advisory Services ("Presidio"), an investment advisory firm with specialty experience in foreign currency trading. Patterson and Nix met with Presidio in the summer of 1999, but did not invest with the firm at that time. However, they instructed Pollans & Cohen to continue their investigation which led to their discussing and reviewing documents for Presidio's BLIPS strategy. After reviewing these documents and learning there were tax implications, Cohen met with a highly-respected Houston tax attorney, George Hrdlicka ("Hrdlicka"), who after reviewing the tax aspects of BLIPS told Cohen he thought the transaction was "above board." After meeting again with Presidio to again discuss the investment aspects, Patterson and Nix decided to pursue BLIPS. They engaged a Denver, CO law firm, Holland & Hart LLP, which also represented Presidio, to prepare a tax opinion letter to advise them as to the propriety of claiming the very large tax losses associated with BLIPS. Patterson determined there was no conflict of interest because his and Nix's interests were aligned with Presidio with respect to the tax questions.

In reply to the IRS's assertion of the substantial understatement of income tax penalty, Patterson and Nix argued that there was "substantial authority" for the treatment of their tax position, citing the input and advice they received from Cohen and Hrdlicka, as well as the tax opinion letter they received from Holland & Hart. The court held that the record supported a finding that substantial authority existed, based on these facts and the opinion reached by Holland & Hart that it was more likely than not that the tax benefits were proper, relying on the relevant authority at that time. The court also held that the record supported a finding that the two taxpayers reasonably believed that the tax treatment at issue was more likely than not the proper treatment, thus satisfying the second leg of the two prong test for waiver of the substantial understatement of income tax penalty in tax shelter situations. Significantly, the court held that because Patterson and Nix were unaware there were some internal conflicts of interest between Presidio and one of its affiliates involved in their transaction at the time they invested, it need not consider this fact detrimental to their circumstances. Thus, the court rejected the IRS's assertion of the substantial understatement of income tax penalty because the taxpayers reasonably relied on the advice of professional tax experts. It also rejected the IRS's assertion of the negligence penalty because there can be no negligence if there is a "reasonable basis" for taking a position on a return and "substantial authority" is a more stringent requirement than "reasonable basis."[247]

With respect to the intentional disregard of rules and regulations penalty, the IRS asserted that the taxpayers ignored Notice 2000-44, discussed above, which mentioned an arrangement similar to BLIPS when it was issued on August 11, 2000, well before Patterson and Nix filed their 2000 income tax returns. As discussed above, the court also rejected this argument, on the ground that Patterson and Nix had decided to invest in BLIPS before August 11, 2000 when

---

[247] The "reasonable basis" standard of Reg. §1.6662-4(d)(2) for purposes of the negligence penalty should not be confused with the "realistic possibility of success" standard of Treasury Circular 230 §10.34 (7-94) for a tax professional to take a position on a tax return.

the IRS issued Notice 2000-44, citing their compliance with all of the notices received from the IRS in connection with its challenge to their BLIPS transaction.[248]

The IRS also asserted lack of reasonable cause and good faith because it believed Patterson and Nix failed to inquire about the profit performance of prior BLIPS deals and knew about the tax benefits prior to entering into the deal. It also asserts that Holland & Hart had an inherent conflict of interest because of its representation of Presidio on tax matters involving BLIPS. The court rejected these arguments too, stating that because of the complexity of the transactions the two taxpayers had to seek advice from qualified tax professionals and had proven their good faith in relying on them.

I note for the record that in rejecting all forms of the §6662 accuracy-related penalty, the court in its opinions in this case did not mention the fact that the two Presidio principals with whom Patterson, Nix, and their advisors dealt with were under criminal indictment and awaiting trial in the Southern District of New York regarding, among other things, their activities in promoting the BLIPS tax strategy and the court must have been aware of this fact when this decision was rendered.[249]

**Cemco Investors, LLC, et al v. U.S.**[250]

Cemco Investment Trust ("CIT"), a grantor trust, entered into two foreign exchange digital option transactions with DB on December 2, 2000. Simultaneously, CIT purchased a digital foreign currency option for $3.6 million (the long position) and sold a digital foreign currency option for $3.564 million (the short position). On the following day, CIT assigned the options to Cemco Investment Partners ("CIP"), a general partnership. A few days later, CIP purchased €55,947 for $50,000. CIP then entered into a termination agreement with respect to both of the option contracts. On December 21, 2000, CIP was liquidated with a transfer of the €55,947 and $45,847 to CIT. The transfer occurred by moving assets from CIP's account at DB to CIT's account at DB. On December 26, 2000, CIT transferred the euros to Cemco Investors, LLC ("Cemco"). On December 29, 2000, Cemco sold the majority of the euros, a non-functional currency treated as property, for $51,324. Cemco and CIP consisted of two partners, Steven Kaplan ("Kaplan") and Forest Charter Holdings, Ltd ("Forest"). Forest was a shell company set up to orchestrate the transactions. Forest's sole shareholder and president, Paul Daugerdas ("Daugerdas"), a sophisticated tax attorney then a partner in the now-defunct law firm J&G, was the trustee of CIT. Kaplan and Forest were the CIT beneficiaries.

Cemco claimed a $3.53 million loss on the sale of the euros on its 2000 partnership return. The Tax Court held that Notice 2000-44 which was released on August 11, 2000, which was before the transaction commenced, and Reg. §1.752-1(a)(4)(ii), issued in June 2003, establish that the

---

248 While the court refers to Patterson and Nix's having decided to invest in BLIPS before Notice 2000-44 was released, in fact they had already invested in BLIPS by that time, as was the case with the Stobie Creek Plaintiffs regarding DOIS.

249 United States v. Jeffrey Stein, et al [S1 05 CR 888 (LAK)].

250 99 A.F.T.R.2d 2007-1882 (N.D. Ill. 2007).

contingent obligation represented by the short or sold option will be treated as a liability to prevent the creation of artificial basis in transactions designed to create artificial tax losses by overstating basis. Thus, Cemco's losses were disallowed by summary judgment, which was recently appealed by the taxpayers to the U.S. Court of Appeals for the Seventh Circuit, where it is now pending.[251]

The summary judgment also affirmed the IRS's imposition of the gross valuation overstatement penalty. On this issue, as is discussed more fully below, the taxpayer argued that a misstatement of adjusted basis should be subject to the valuation overstatement penalty only if a misstatement of value is embedded in a misstatement of adjusted basis. The court responded to this argument by stating that the plain language of the statute applies to overstatements of basis.

This Cemco transaction is essentially the same as the DOIS transaction at issue in this case. In fact, Daugerdas was likely the author of the J&G tax opinion letter provided to the Stobie Creek Plaintiffs, although he was not a participant in the Stobie Creek transactions like he was in Cemco. There is a signifcant difference, however, between the Stobie Creek transactions and Cemco, and that is that the Stobie Creek Plaintiffs entered into their DOIS transactions prior to the release of Notice 2000-44 on August 11, 2000, whereas the CIT beneficiaries entered into the Cemco transaction after that time. The court recognized the importance of the timing of entry into the transaction in this case thusly:

> Until recently, the law respecting whether an option contract should be treated as a liability under section 752 actually supported CIP's position. In Helmer v. Commissioner, T.C. Memo 1975-160, 34 T.C.M. (CCH) 727 (1975), the Tax Court held that a contingent obligation, such as a short or sold option, is not a liability under section 752 because a partnership's obligation under the option does not become fixed until the option is exercised. This principle was affirmed in multiple subsequent cases under section 752. See, e.g., Long v. Comm'r, 71 T.C. 1, 6-7 (1978), aff'd in part 660 F.2d 416 (10th Cir. 1981) (holding that contingent obligations are not liabilities for purposes of increasing partnership basis until they become fixed or liquidated); La Rue v. Comm'r, 90 T.C. 465, 478 (1988) (obligations that are fixed but remain contingent are not liabilities under section 752); Gibson Prods. Co. v. United States, 637 F.2d 1041, 1049 (5th Cir. 1981) (contingent nature of a partnership obligation precludes treatment as a liability for tax purposes). For many years the Helmer rule served as the definition of liability under section 752. See Assumption of Partnership Liabilities, 68 Fed. Reg. 37434 (June 24, 2003) ("There is no statutory or regulatory definition of liabilities for purposes of section 752."). Thus, under Helmer and its progeny, it would have been proper for CIP to ignore the short, or sold, option as a liability under section 752.

---

[251] See Petitioner's Notice of Appeal, filed May 24, 2007.

> Shortly before the transactions underlying this case occurred, however, the IRS reversed its position regarding partnership liabilities under section 752, promulgating regulations designed to disallow losses such as those claimed by CIP and Cemco. On August 13, 2000 (*sic*), the IRS released IRS Notice 2000-44, 2002-2 C.B. 255 ("the Notice"); the Notice was published on September 5, 2000. In the Notice, the IRS discussed certain types of transactions designed to generate tax losses by "using [an] artificially high basis," and explained that such losses were not allowable and could result in penalties for taxpayers.[252]

What, in effect, occurred was that on August 11, 2000 the IRS put the taxpaying public on notice that it was changing its position regarding these §752 transactions. Yet, it was almost three years later - June 24, 2003 - before it published temporary regulations setting forth its new position. The temporary regulations purported to be applicable to assumptions of liabilities by partnerships retroactive to October 18, 1999, which was before the transactions in Klamath, Stobie Creek, and, of course, Cemco took place. However, all of the activity about which the IRS complained in both Klamath and Stobie Creek (but not Cemco) took place before Notice 2000-44 was either released or published. Indeed, the Klamath petitioners sued the IRS over its position on retroactivity and prevailed in a motion for partial summary judgment. The court decided that the earliest the temporary regulations could apply was the release date of Notice 2000-44 - August 11, 2000.[253]

***Substantial Valuation Overstatement and Gross Valuation Overstatement Penalties Cases***

**Richard J. Todd and Denese W. Todd v. Commissioner**[254]

The Todds invested in a FoodSource refrigerated food container tax shelter in 1981 and 1982. They allegedly paid $780,000 for three refrigerated containers, which were used to preserve perishable agricultural products during their shipment to markets. The Todds made a 10 percent downpayment and signed a promissory note for the remainder of the purchase price, which was intended to allow them to take depreciation deductions and investment tax credit on the entire $780,000 they allegedly paid. But, because of a payment dispute, FoodSource retained control of all three containers until 1983, so the Todds' containers were not placed in service until that year. For that reason, the Tax Court denied their claimed tax benefits for the years 1981 and 1982 and the carryback of their unused tax benefits to 1979 and 1980.

With regard to other taxpayers who invested in the FoodSource program but did not run afoul of the placed-in-service issue confronted by the Todds, the Tax Court found that the obligations represented by the promissory notes were illusory, and determined that the fair market value of each container was only $60,000, roughly 23 percent of the purported total cost. Accordingly, for those taxpayers, it limited the allowable depreciation deductions and investment tax credit to purchase prices reflecting this reduced amount.

---

252 99 A.F.T.R.2d 2007-1882 (N.D. Ill. 2007) at 10-12.
253 440 F. Supp. 2d 608 (E.D. Tex. 2006) at 623-626.
254 862 F.2d 540 (5th Cir. 1988), aff'g 89 T.C. 912 (1987).

The IRS determined that the Todds overstated the value of their containers by 500 percent, and asserted the former §6659 valuation overstatement penalty on the deficiencies. However, the Tax Court found that the Todds' underpayments of tax for 1979 to 1982 were not attributable to a valuation overstatement but were instead attributable to the fact that the containers had not been placed in service in the years at issue. Thus, the Tax Court refused to impose the §6559 penalty on the Todds.

The IRS appealed to the United States Court of Appeals for the Fifth Circuit, which affirmed the Tax Court, citing the General Explanation of the Economic Recovery Tax Act of 1981 ("ERTA Blue Book"), which stated that:

> ....the underpayment resulting from a valuation overstatement will be determined by comparing the taxpayer's (1) actual tax liability (i.e., the tax liability that results from a proper valuation and which takes into account any other proper adjustments) with (2) actual tax liability as reduced by taking into account the valuation overstatement. The difference between these two amounts will be the underpayment that is attributable to the valuation overstatement....
>
> Applying this formula, the Tax Court determined that no portion of the Todds' tax underpayment was attributable to their valuation overstatement. The Todds' actual tax liability, after adjusting for the failure to place the food containers in service before 1983, did not differ from the actual tax liability adjusted for the valuation overstatements. In other words, where the deductions and credits for these refrigeration units were inappropriate altogether, the Todds' valuation of the property supposedly generating the tax benefits had no impact on the amount of tax owed.[255]

The IRS argued that the Tax Court decision leads to anomalous results because some of the other investors were found liable for the §6659 penalty since their FoodService containers had been placed in service. The Court of Appeals responded to this argument by pointing out that the only difference between these investors and the Todds was that the Todds suffered greater infirmities as a result of their circumstances given that their deductions and credits were totally disallowed whereas the other investors' deductions and credits were merely reduced.

The IRS also argued that by affirming the Tax Court, the Court of Appeals would raise the specter that taxpayers participating in other tax advantaged transactions might avoid the §6659 penalty by denying they had a profit motivation in entering the transactions in issue. The Court of Appeals responded to this argument by reaffirming the well-established rule of law that a court cannot ignore Congressional intent just because the result seems inequitable when it stated, quoting the U.S. Supreme Court in a footnote:

---

255 862 F.2d 540 (5th Cir. 1988) at 542-543.

> We admittedly hesitate to ascribe an intent to Congress which might, at first blush, seem inequitable. However, though incongruous results can be considered in construing statutes, once a court knows Congressional intent, it may not vary the rules to avoid what it considers an undesirable outcome.[16] Having set forth the reasons for believing Congress intended to impose the committee staff's formula as the method for determining the application of §6659, the results appellant complains of do not persuade us to reverse the Tax Court.
>
> > [16] *See Asphalt Products Co., 107 S. Ct. at 2278* ("Judicial perception that a particular result would be unreasonable may enter into the construction of ambiguous provisions, but cannot justify disregard of what Congress has plainly and intentionally provided.").[256]

**Joseph M. Irom v. Commissioner**[257]

Irom invested in a coal mining tax shelter for which he reported a loss of $162,500 on his 1980 tax return. The IRS disallowed the deduction because the loss did not meet the requirements for deducting advance minimum royalty payments under Reg. §1.612-3(b)(3). The IRS also noted that the promissory note that Irom executed as part of the investment was not a bona fide debt. In addition to the tax deficiency and interest asserted due to the disallowed deduction, the IRS notified Irom he was also liable for additional interest under then §6621(c), a penalty interest charge when a tax deficiency is due to a "tax-motivated transaction," which is akin to the later-added penalty for substantial valuation overstatement. The IRS said its reason for asserting the §6621(c) penalty interest was because the loss deduction was disallowed under the "at risk" rules of §465(a) and was, therefore, a tax-motivated transaction; however, the IRS did not specifically assert the "at risk" rules as an alternative ground for the deficiency itself. Irom did not contest the tax deficiency, but did object to the §6621(c) penalty interest charge. The Tax Court sided with Irom, stating that it could not order additional interest because the only ground asserted for the deficiency was the advanced royalty issue. It refused to consider whether the deficiency might also have been based on the "at risk" rules, which would have entitled the IRS to assess the penalty interest. The IRS appealed this aspect of the decision to the United States Court of Appeal for the Second Circuit.

This case is similar to the Todd case, discussed above, in that in each of these cases there were two possible grounds for disallowance of the claimed deductions, one of which would trigger the relevant penalty and the other of which would not. In Todd, the Court of Appeals held that if the non-penalty-triggering ground was a reason for the disallowance, then the IRS could not use the penalty-triggering ground as a basis for asserting the penalty because the second penalty-triggering ground would not increase the tax deficiency, in which case the penalty would be zero. In Irom, the Court of Appeals specifically refused to follow Todd stating that if the two grounds were "inseparable," the penalty should apply. In other words, the Court of Appeals questioned whether a deficiency on the royalty grounds was inseparable from a

[256] 862 F.2d 540, 545 (5th Cir. 1988).
[257] 866 F.2d 545 (2nd Cir. 1989), vacating in part T.C. Memo 1988-211.

finding that the taxpayer was not "at risk" in the transaction. The Court of Appeals remanded the case to the Tax Court to make this determination; however, there is no record of its decision. Inexplicably, there is no discussion regarding reliance on professional tax advisors in this opinion.

**John B. Gainer v. Commissioner**[258]

Gainer also invested in a FoodSource refrigerated container tax shelter in 1981. He purchased a ten percent interest in a limited partnership that bought one container unit allegedly for $260,000, or $26,000 for his share, paying $4,500 down and executing a promissory note for the balance. He also claimed depreciation deductions and the related investment tax credit. As in Todd, the IRS disallowed his deductions and credits because the container was not placed in service in 1981. And, as in Todd, the IRS asserted the then §6659 valuation overstatement penalty. What is more, as in Todd, the Tax Court refused to allow the §6659 addition to tax because Gainer's deductions and credits were disallowed because the container had not been placed in service for the 1981 tax year, and, accordingly, he was not entitled to any deductions or credits for that year regardless of any overstatement of value. The IRS appealed this decision to the United States Court of Appeals for the Ninth Circuit.

In affirming the Tax Court, the Court of Appeals in Gainer considered the adverse decision in Irom, discussed above. The IRS argued that Irom should control because there was no requirement in the statute that the understatement be solely attributable to the valuation overstatement. The Court of Appeals, however, rejected this argument because the IRS ignored the authoritative Blue Book statements to the contrary. The IRS further argued that if there are multiple grounds for a tax underpayment, the §6659 valuation overstatement penalty could never be applied. The Court of Appeals noted that Irom is consistent with Todd and with this opinion because the penalty would apply only when there are two grounds which are inseparable. Thus, the Ninth Circuit followed the leadership of the Fifth Circuit and refused to permit the IRS to collect the penalty for substantial valuation overstatement from Gainer.

**David E. Heasley and Kathleen Heasley v. Commissioner**[259]

Above, I discussed the Heasely case as regards the negligence and substantial understatement of income tax penalties. Here, I consider the valuation overstatement penalty also asserted by the IRS. Although there was a valuation overstatement in Heasely – they overvalued each unit they purchased by $95,000 – the Court of Appeals overruled the Tax Court's imposition of the penalty for valuation overstatement because the IRS disallowed the entirety of the Heasely's claimed tax benefits, rather than only reducing them by the amount of the overvaluation. Consequently, their underpayment was not attributable to the valuation overstatement. It was attributable to their entirely disallowed deductions and credits. In its opinion, the Court of Appeals stated "In this case, the Heasleys' actual tax liability does not differ one cent from their

---

258 893 F.2d 225 (9th Cir. 1990), aff'g T.C. Memo 1988-416.
259 902 F.2d 380 (5th Cir. 1990), rev'g T.C. Memo 1988-408.

tax liability with the valuation overstatement included. In other words, the Heasleys' valuation overstatement does not change the amount of tax actually owed. Therefore, the IRS erred when it assessed the valuation overstatement penalty and the tax court erred as a matter of law upholding that assessment."[260]

In the Heasley case, the Fifth Circuit also followed Todd and Gainer. This is because when the IRS totally disallows a deduction or credit the IRS may not penalize the taxpayer for a valuation overstatement because the underpayment is not attributable to a valuation overstatement.

**Howard Gilman v. Commissioner** [261]

In 1980, Gilman was the CEO and Chairman of Gilman Paper Company. At year-end, Gilman entered into a multi-stage computer equipment purchase and leaseback tax shelter in which he made a downpayment of $45,000 and executed a long-term promissory note for $2,955,000, of which, in form, almost $2 million was purported to be recourse, but it was secured by the equipment and its rental income. This was used equipment that had previously been leased to end users in Europe. The monthly rental income exceeded the monthly note payments by $700. What is more, the long-term notes provided that he could defer payment for up to 14 years if he failed to receive the corresponding lease payments. Benefits to Gilman included a delay in the start of payments on the long-term note for two years and payment of accrued interest for those two years in the form of two short-term recourse notes totaling $375,000 plus interest of $49,597. Thus, Gilman's cash invested totaled $469,597, consisting of his downpayment plus the principal and interest on the two short-term recourse notes. On his tax returns for 1980 and 1981, he reported the transaction as a $3 million purchase. He included the rental income he received and took deductions for depreciation and interest expense. The Tax Court found that Gilman lacked a business purpose and his transaction lacked economic substance because he did little investigation. Thus, it upheld the IRS's disallowance of his claimed tax benefits. It further found Gilman liable for the then §6659 valuation overstatement penalty and the then §6621(c) penalty interest due to participating in a tax-motivated transaction. Gilman appealed the decision to the United States Court of Appeals for the Second Circuit.

The Court of Appeals held that Gilman's failure to obtain an appraisal and his failure to make more than minimal efforts to determine residual value after the expiration of the lease showed that he was interested only in tax benefits. It affirmed the Tax Court finding that the transaction was a sham.

Regarding the §6659 valuation overstatement penalty, the Court of Appeals stated that imposition of the penalty "seems more justified if one considers the alternative arguments of the [IRS] in tax shelter disputes. Had the [IRS] been confined to [its] fallback position that the taxpayer's basis was fair market value, a value far below his claimed purchase price, it would have been entirely sound to say that the asset had been 'overvalued' and to impose the section 6659 penalty. If the [IRS] is more successful and persuades the Court to disregard not only the

260 902 F.2d 380, 383 (5th Cir. 1990).
261 933 F.2d 143 (2nd Cir. 1991), aff'g T.C. Memo 1989-684.

nonrecourse notes but the entirety of the purchase price, thereby lowering the 'price' down not only to fair market value but all the way to zero, should the [IRS's] success have the perverse effect of sparing the taxpayer the overvaluation penalty?"[262] The Court of Appeals chose to ignore the Supreme Court's opinion regarding "perverse affects," quoted above from Asphalt Products Co. v. United States, and follow the Tax Court in this and other cases and the Eighth Circuit opinion in Massengill, and deemed the penalty appropriate. However, in doing so the Court of Appeals cast a measure of doubt on its opinion by stating "We acknowledge that applying the penalty somewhat strains the natural reading of the statutory phrase 'valuation overstatement.'"[263] It notes that in 1989 Congress did not specifically preclude application of the penalty where (as here) an alleged purchase price is totally disregarded as a basis for depreciation deductions, but ignores the Blue Book analysis deemed an indicator of Congressional intent by other appellate courts. Apparently, Gilman did rely on certain advisors, but not for tax advice, so the issue of potential penalty waiver based on reliance on professional tax advice was not considered.

**Hyman S. Zfass v. Commissioner[264]**

Zfass was a medical doctor specializing in sports medicine. In 1982 he purchased one share of a limited partnership that acquired by lease with the intent to market continuing medical education video programs, i.e., a video disk master tax shelter. The cost of one share was $17,000, half of which was paid in 1982 and half in 1983. In return, he was promised a tax deduction of $31,902 in 1982 and $14,000 in 1983. He learned about the partnership from B. Roland Freasier, his tax advisor and attorney. The offering memorandum thoroughly discussed the tax implications, as did an attached tax opinion letter, however it contained no projections of returns on investment other than tax benefits. Zfass claims he relied on advice from his accountant regarding the propriety of the investment and that this reliance was evidence of his exercise of due care. He also claimed his medical background and experience provided him the ability to judge the quality of the investment and he had concluded it would be a good one.

In a test case applicable to Zfass,[265] the Tax Court held the partnerships lacked any profit objective, the value of the property was grossly overstated, and these were sham transactions entered into primarily for their tax benefits. The tax matters partner of the partnership in which Zfass invested accepted the Tax Court decision. Hence, the IRS asserted the negligence and then §6659 valuation overstatement penalties against Zfass and the Tax Court upheld them, holding that he did not properly rely on his accountant's advice. While the court acknowledged the significant expertise of Zfass's accountant, their professional and personal relationship, and that he was extremely involved in Zfass's business affairs, it also pointed out that Zfass did not fully apprise his accountant of all the relevant information, did not call him as a witness at trial, and provided no evidence of what advice he may have received from him. As to the valuation

262 933 F.2d 143 (2nd Cir. 1991) at 150-151.
263 933 F.2d 143 (2nd Cir. 1991) at 151.
264 118 F.3d 184 (4th Cir. 1997), aff'g T.C. Memo 1996-167.
265 Charlton v. Commissioner, T.C. Memo 1990-402, aff'd 990 F.2d 1161 (9th Cir. 1993).

overstatement penalty, the Tax Court held it applied to this case. Zfass appealed this decision to the United States Court of Appeals for the Fourth Circuit.

On appeal, Zfass principally relied on Heasley. The Court of Appeals noted that "The facts in Heasley were much different. The Heasleys did not have a college education and were blue collar workers. They completely relied on the advice of an accountant and a questionable investment adviser. In fact, the Heasleys were indeed scammed out of a considerable sum of money. They were clearly not trying to defraud the government."[266] Thus, the Court of Appeals refused to accept Zfass's reliance on professional advice argument.

In the test case applicable to Zfass (Charlton), the Tax Court upheld the IRS's determination that (1) the partnerships lacked any profit objective; (2) the sales forecast and the values of the license, leases, and tapes were grossly overstated; and, (3) these were sham transactions entered into primarily for the tax benefits. Apparently, there was no need for the court to assess whether there was a reasonable opportunity to earn a reasonable profit over and above the costs without considering the tax benefits because the court determined there was no objective to earn an economic profit at all. Thus, this aspect of the tax case law economic substance doctrine was not addressed.

Here, the IRS determined that since the deduction in Zfass was a sham and lacked economic substance, the overvaluation penalty applied. By this time, this approach had been adopted by the Second, Sixth, and Eighth Circuits and rejected by the Fifth and Ninth Circuits. The Tax Court in Zfass also followed the Second, Sixth, and Eighth Circuits and held that "when a transaction lacks economic substance, the correct basis is zero; any amount claimed is a valuation overstatement."[267] Because the Court of Appeals agreed, the Fourth Circuit joined the other three Circuits in this approach. I note for the record that these cases all involve the acquisition of a depreciable asset at an inflated value. Thus, the depreciation that would be taken from year-to-year on the inflated basis would be assessed in determining the possibility of profit. If the same asset had been purchased for its fair market value, which would be substantially less, the annual depreciation would be correspondingly less. Thus, the amount of profit necessary to earn a reasonable profit over and above costs without considering tax benefits would also be correspondingly lower.

***The Case Law on the §6662 Accuracy-Related Penalties and the Stobie Creek Plaintiffs***

Above I have discussed numerous cases that deal with various aspects of the several components of the §6662 accuracy-related penalties. Having done so, and having applied this case law to the facts of this lawsuit, it is my unequivocal opinion that the Stobie Creek Plaintiffs qualify for non-applicability of all of these penalties under §6662 and, in the alternative, waiver of all of these penalties under §6664(c). I arrived at this opinion for the following reasons:

---

266 118 F.3d 184, 190 (4th Cir. 1997) at fn8.
267 T.C. Memo 1996-167 at .

In the Boyle case, the United States Supreme Court handed the IRS a steep hill to climb if it is to prevail on the issue of whether or not a client is permitted to rely on his professional tax advisors when considering something more than the simplest of situations. It is my opinion that the IRS failed to reach the top of the hill in this case.

Here, in response to their inquiry, Waterman advised the Welles family that the law firm of Jenkens & Gilchrist had a tax strategy and might be able to give them legal advice that would help them reduce some or all of the taxable capital gain income from the sale of Therma-Tru.[268] Moreover, as set forth more fully above, Waterman, who was managing partner of the law firm that had advised the Welles family and Therma-Tru for decades and who had been the engagement partner on the account for the past ten or so years, told the Welles family that (1) tax lawyers at SLK had researched the J&G strategy thoroughly; (2) it was accurate as to the tax consequences of the transaction; (3) the firm had represented other clients who had participated in the J&G strategy; and, (4) if he were in their shoes, he would have participated in it himself.[269] What is more, it is clear from the record that the Welles family relied on the J&G tax opinion and the advice of Waterman/SLK, regarding their participation in DOIS.[270]

If this be the case, I do not see how the IRS can legitimately assert penalties that can be waived based upon a taxpayer's good faith reasonable reliance on the advice given to him by his longtime law firm when he inquired about possible planning opportunities. In my opinion, it would not be possible for a taxpayer who, although a well-educated, successful, sophisticated investment professional, was untrained in tax law, to personally assess the veracity of such advice. What is more, as is shown by the court decisions discussed in this report, the courts have no expectation that he do so, most especially when advice such as this was given by the taxpayer's longtime law firm. As a result, it is my opinion that if the Court believes it appropriate that accuracy-related penalties be upheld here, they clearly qualify for the waiver allowed under §6664(c).

In the Heasley case, the Fifth Circuit held that these relatively unsophisticated taxpayers were permitted to rely on a CPA with whom they had no former relationship to do the heavy lifting of their pre-investment investigating and tax return reporting. Clearly, the Stobie Creek Plaintiffs are far more sophisticated and experienced businesspersons than the Heasleys, but, then again, the DOIS strategy was a far more complex series of transactions than the energy conservation tax shelter in which the Heasleys participated. Accordingly, it is my opinion that to the extent the Stobie Creek Plaintiffs relied on SLK to perform pre-investment due diligence, i.e., "vet" the tax aspects of the DOIS strategy, they were reasonable and prudent in doing so. It is axiomatic that clients turn to their attorneys for such advice on all types of proposed strategies. As is discussed just above, that Waterman and SLK were their primary attorneys with whom

---

268 Deposition of Jeffrey, Vol. 1, December 15, 2006, pp. 36 (24) – 39 (12).

269 Deposition of Waterman, August 1, 2007, pp. 13 (23) – 14 (8), 54 (1-15), 63 (11-21), and 106 (16-21).

270 Deposition of Jeffrey, Vol. 1, December 15, 2006, p. 96 (13-24); Deposition of Jeffrey, Vol. 2, August 8, 2007, p. 146 (11-24); and, Deposition of Waterman, August 1, 2007, p. 133 (6-15).

they had a longstanding relationship, they are in better circumstances vis-à-vis the question of reasonable cause and good faith than were the Heasleys.

In the Mauerman case, the Tenth Circuit held that a physician, with the help of his regular CPA with whom he had a longstanding relationship, could invest in a tax shelter based on offering materials prepared by an officer, director, employee, and second most significant shareholder of the promoter company – someone clearly not independent – and avoid the then §6661 substantial understatement penalty even though the IRS prevailed on the disallowance of his deductions and his CPA made only a cursory investigation when performing pre-investment due diligence. This was so even though the CPA did not tell Mauerman the basis for his taking the deductions or that there was a disagreement among the appellate courts over the proper tax treatment of the items. The Court of Appeals held that despite all these negative attributes, Mauerman had reasonable cause to rely on his CPA and acted in good faith in doing so. Here, the Stobie Creek Plaintiffs have been called to task because the J&G tax opinion letter is alleged to be not independent. That did not seem to matter to the appellate court in Mauerman, nor in my opinion should it matter. It is my opinion that a thoroughly researched tax opinion letter that clearly provides the requisite substantial authority and the input the taxpayer needs to form a more-likely-than-not opinion for himself is not made invalid simply because the author had a hand in structuring the strategy and charged a substantial fee for his efforts. Consequently, it is my opinion that they had reasonable cause to rely on both J&G and SLK and did so in good faith.

In the Chamberlain and Durrett cases, the taxpayers invested in what later became a high profile, widely publicized notorious tax shelter that the IRS labeled a sham transaction in which the taxpayers had little risk of loss because of hedging transactions. They did this based on a tax opinion letter from a lawyer who was clearly not independent of the promoter and who was later banned from promoting abusive tax shelters. Moreover, they did so not with the help of their regular CPAs, but with the help of the promoter's CPA (in Chamberlain's case) and a "finder" who was being paid commissions by the promoter for selling his tax shelter (in Durrett's case), neither of whom could be called independent by any stretch of the imagination. Yet, the Fifth Circuit allowed both of them to avoid the negligence penalty despite its holding they lacked a profit motive, because it was reasonable for them to have relied on their experts' advice. The facts in this case are not nearly so negative. While it is true the digital options-type tax strategy has become a high-profile tax shelter in recent years, and there may be a question about the independence of the tax opinion writer, the lawyer on whom the Stobie Creek Plaintiffs relied was their primary attorney who was the managing partner of a well-established law firm. What is more, this attorney advised them they could rely on the J&G law firm that wrote the tax opinion letter as it, too, was a very large, well respected firm at that time and his firm had verified the opinion's accuracy. Based on these facts, it is my opinion that it was reasonable and prudent for the Stobie Creek Plaintiffs to have relied on SLK and J&G and they did so in good faith.

In the Long Term Capital Holdings case, the Second Circuit decided the taxpayer did not meet the requirement for reasonable reliance because its tax advisor, a very large, well respected law

firm, did not deliver its written tax opinion to its in-house tax lawyer prior to the filing of the tax return in question, nor did it provide its tax opinion orally to the in-house tax lawyer in a timely fashion. In this case, it is clear that the Stobie Creek Plaintiffs received the J&G written tax opinion letters before any tax returns containing DOIS transactions were filed. Thus, because the Stobie Creek Plaintiffs received the J&G tax opinion letters prior to the filing of their 2000 tax returns, the problem associated with the Long Term Capital Holdings case was not present.

In Klamath Strategic Investment Fund, LLC, the District Court held that two wealthy Texas attorneys who, in reliance on the advice of their longtime regular CPAs and a well known tax attorney, invested in another notorious tax shelter transaction known as BLIPS, were not liable for the §6662 accuracy-related penalties even though there were internal conflicts of interest at the promoter organization that could have adversely affected them. The court determined the transaction lacked economic substance, as the IRS has alleged in these cases. Nevertheless, in considering whether to impose the penalties, the court found irrelevant the lack of economic substance. What is more, the court paid little heed to the internal conflict issue because the two taxpayers were unaware of it at the time they invested. Likewise, the court ignored the timing issue with respect to Notice 2000-44 because, although the two taxpayers filed their 2000 income tax returns after it was issued, they had entered into BLIPS beforehand. Here, like the petitioners in Klamath, the Stobie Creek Plaintiffs entered into DOIS before the IRS issued Notice 2000-44. Again, it is my opinion that the Stobie Creek Plaintiffs had reasonable cause to rely on SLK and J&G in deciding to participate in DOIS and did so in good faith. Thus, they should not be liable for the §6662 accuracy-related penalties and, if the trier of fact deems they are, are eligible for the waiver of said penalties provided for by §6664(c).

In Cemco Investors, LLC the taxpayers entered into a foreign exchange digital option transaction very similar to DOIS. The District Court upheld the IRS's total disallowance of the losses claimed and its imposition of the §6662 accuracy-related penalties, including the 40 percent gross valuation overstatement penalty. However, its stated purpose for having done so was that Cemco did not enter into the transaction until several months after the IRS released Notice 2000-44, thus the taxpayers were on notice before they invested that the IRS considered the transaction to be an abusive tax shelter. As discussed more fully above, the Stobie Creek Plaintiffs had totally completed the DOIS strategy before Notice 2000-44 was released. It is my opinion that the decision is distinguishable on that ground.

There is a basic conflict among the Circuit Courts of Appeals on the issues related to the overvaluation penalties. On the one hand, the Fifth and Ninth Circuits hold that the penalties are inapplicable where there are two (or more) grounds for disallowing tax benefits, one of which is not related to overvaluation, and the correct tax would be the same whether or not there was an overvaluation. On the other hand, the Second, Fourth, Sixth, and Eighth Circuits hold that in the same situation, the overvaluation penalties should apply. Some of the courts have attempted to harmonize this conflict by holding that the overvaluation penalties will be imposed only when the two grounds are inseparable, but not when the grounds are separable. In the case where there is a lack of economic substance, some of the courts have ruled the two

grounds would be inseparable, thus the overvaluation penalties have been applied in a number of tax shelter cases where there was a finding of lack of economic substance.

As of the date of this report, the Federal Circuit, to which this case would be appealed, has not ruled on the overvaluation penalties issue, If the Federal Circuit eventually rules on the issue, and it follows the Fifth and Ninth Circuit holdings, the Stobie Creek Plaintiffs will not be subject to the overvaluation penalties. If, however, the Federal Circuit were to follow the Second, Fourth, Sixth, and Eighth Circuits, there is a possibility it might rule adversely in the case of the Stobie Creek Plaintiffs. I think not, though, for the following reason.

The cases that drew unfavorable rulings in the four Circuits were, generally speaking, about the acquisition of purported business fixed assets subject to the allowance for depreciation at an inflated price. As a result, the claimed "depreciation expense" was also alleged to be inflated for the years at issue because it was based on the inflated purchase price of the asset and, thus, had to be considered in determining if there was a reasonable opportunity to earn a reasonable profit. On the other hand, while the alleged inflated basis attributable to the DOIS strategy entered into the calculation of capital gain and loss for income tax purposes, it did not enter into the pure investment transaction economic results, which were based on market purchase and sale prices. Thus, even if the trier of fact determines that the Stobie Creek Plaintiffs' DOIS strategy lacks economic substance, a position with which I disagree, it would be separable from any overvaluation of basis and, thus, would not trigger the overvaluation penalties even under the rule now followed by the Second, Fourth, Sixth, and Eighth Circuits.

***The J&G Opinions Provided to the Stobie Creek Plaintiffs Meet the Standard for Reliance***

I note for the record that, based on the history of aggressive tax planning and the law as it existed at the time the events the subject matter of these lawsuits were taking place, as is discussed more fully above, the courts have upheld many aggressive tax plans, including ones with losses similar to those generated by the DOIS strategy. Moreover, as noted above, many courts have increasingly tended to uphold aggressive tax plans based on the plain language of the Code and Regs., a significant supporting tax principle in this dispute. Thus, it is reasonable and appropriate for tax planners to determine that aggressive tax plans based on thorough research and a reading of the various authorities (such as the Code, Regs, court cases, and scholarly treatises) are more likely than not to be sustained based on their merits. It goes without saying the IRS will often disagree, but that is not the standard for judging the ability of clients to rely on such opinions.

Treasury Circular 230, revised from time-to-time, contains regulations governing the practice of attorneys, CPAs, and other federally authorized tax professionals before the IRS, including the conduct of practitioners who provide tax opinions. §10.33(a) of the July 1994 Revision, in effect at the time the events the subject of these lawsuits were occurring, contains five requirements for tax shelter opinions, although the J&G opinions appear not to fall under the definition of "tax

shelter opinion" contained in that section.[271] Nevertheless, it is my opinion that the J&G tax opinions satisfy the five requirements, which are (to paraphrase) (1) the practitioner must make an inquiry into all relevant facts and be satisfied that the material facts are accurately and completely described; (2) the practitioner must relate the law to the actual facts; (3) the practitioner must ascertain that all material Federal tax issues have been considered; (4) the practitioner must provide an opinion whether it is more likely than not the investor will prevail on the merits of each material Federal tax issue; and, (5) where possible, the practitioner must provide an overall evaluation whether the material tax benefits in the aggregate more likely than not will be realized.[272]

I also note for the record that the CPA who prepared the Stobie 1 and Stobie 2 tax returns, Robert J. Floyd ("Floyd") was not required to make certain that the Stobie Creek Plaintiffs received "More Likely Than Not" tax opinions to meet the standards of care for the giving of tax advice and the inclusion of a tax position on a tax return. A finding that the DOIS strategy had a "Realistic Possibility" it would be sustained on its merits administratively or judicially, if challenged, roughly a one-in-three possibility, would have sufficed.[273]

J&G agreed to provide the Stobie Creek Plaintiffs with "More Likely Than Not" opinions to help protect them from the imposition of the §6662 accuracy-related penalties resulting from a tax shelter investment. At that time, the IRS could assert these penalties, discussed more fully above, calculated at 20% or 40% of the amount by which their tax liabilities were understated, if the understatements were in excess of certain thresholds (which they would be in this case), unless there was substantial authority in support of the position and, "the taxpayer reasonably believed that the tax treatment of such item by the taxpayer was <u>more likely than not</u> the proper treatment (*emphasis supplied*)."[274]

Professor Wolfman and his co-authors describe the "More Likely Than Not" standard in their treatise, <u>Standards of Tax Practice</u>, stating it is:

> A judgment that the tax treatment of an item is more likely than not correct requires a determination that there is a greater than 50 percent likelihood that the position will be upheld if challenged by the IRS.[275]

I reviewed and understand the J&G tax opinions, dated January 2, 2001, found them to provide thorough and convincing analyses. In my opinion, the J&G tax opinions address every issue material to the tax return positions taken by the Stobie Creek Plaintiffs in connection with the

---

271 Treasury Circular 230 (7-94 Rev.), §10.33(c)(3).
272 Treasury Circular 230 (7-94 Rev.), §10.33(a)(1) – (5).
273 Statements on Standards for Tax Practice, No. 1, "Tax Return Positions," and Interpretation No. 1-1, "Realistic Possibility Standard," AICPA (2000); Treasury Circular 230, ¶10.34, p. 23 (7-94 Revision).
274 Former §§ 6662(a), 6662(d)(1)(A), 6662(d)(2)(B)(i), 6662(d)(2)(C), 6662(e), and 6662(h).
275 Wolfman, Holden, and Harris, <u>Standards of Tax Practice</u>, 5th Edition, Tax Analysts (1999), §503.4.2.4, p. 404.

DOIS strategy. Thus, it is my opinion that the J&G tax opinions are appropriate "More Likely Than Not" opinions at the time they were issued.

**CONCLUSION**

In entering into the DOIS strategy, the Stobie Creek Plaintiffs relied on a well-settled rule of tax case law that emanated from a position that had been repeatedly and successfully advanced by the IRS, i.e. the proper §752 treatment of a contingent liability. Here, the IRS asserts that this rule applies only when it is to its advantage and it violates the intent of Congress for a taxpayer to claim otherwise. I am offended by this double standard by which the IRS is permitted to use the plain language of Code when it is in its favor - even when that use violates congressional intent - but is permitted to vigorously oppose taxpayers who do the same. Nevertheless, at the time the events that are the subject of these lawsuits were occurring, Congress had not expressed its intent regarding §752 contingent liability transactions, nor had the IRS.

Thus, it is my opinion that the Stobie Creek Plaintiffs did not violate the intent of Congress when they chose to participate in the DOIS strategy. On the other hand, as is more fully discussed above, the IRS did indeed violate the intent of Congress by failing to issue Regs. under §469 to deal with self-charged items other than interest, and then by relentlessly pursuing a taxpayer (Hillman) who fell into its clutches. This is only one example of IRS disingenuity. It is my observation that the IRS's aggressive litigation tactics essentially take the position that if a transaction included tax planning, the tax benefits of that planning should not be sustained. This position is inconsistent with more than 90 years of historical experience. In my opinion, it is time for the courts to rein in the IRS and re-establish the arena of tax planning as a level playing field.

Respectfully submitted,

October 1, 2007
Date

Ira B. Shepard
Ira B. Shepard, LL.B.

# IRA B. SHEPARD, LL.B.
# CURRICULUM VITAE

**LAW TEACHING:**

Professor, University of Houston Law Center, September 1977 to date, Associate Dean for Academic Affairs, September 1987 to May 1993, and Associate Professor, September 1975-August 1977. Subjects taught: Federal Income Taxation, Corporate Taxation, Tax Policy Seminar, International Taxation, Business Planning, Tax Ethics, and Professional Responsibility. Member, Law Center Executive, Personnel, Curriculum, Admissions (Chair), Executive (Chair), Graduate Studies, Computer, Long Range Curriculum, and Student Affairs Committees. Member, University Library Committee (Chair), Budget Advisory Council (Chair), Academic Council (Chair), University Policy and Planning Council (Chair), Grievance Committee (Chair), and Transportation and Parking Advisory Committee (Chair). Service on various University ad hoc committees including Religious Studies Committee, NEA Restrictions Committee, Child Care Center Advisory Committee, University Self-Study Committee, and Outcomes Assessment Committee. Chaired Task Force on Evaluation of Deans.

Visiting Professor, University of North Carolina School of Law, September 1980-May 1981. Subjects taught: Federal Income Taxation, Estate and Gift Taxation, Tax Policy Seminar and Professional Responsibility.

Assistant Professor, University of Georgia School of Law, September 1971-August 1975. Subjects taught: Federal Income Taxation, Corporate Taxation, Estate and Gift Taxation, Tax Procedure, Business Problems, Civil Procedure, Legal Profession and Agency and Partnership. Faculty Advisor for Client Counseling Competition, Phi Alpha Delta Law Fraternity, Women's Law Student Association. Member, Admissions, Library and Graduate Studies Committees. Member, University Affirmative Action Advisory Committee; Executive Committee, University of Georgia American Association of University Professors.

**LEGAL EMPLOYMENT:**

Paul, Weiss, Rifkind, Wharton & Garrison, New York City. Tax associate (September 1967-July 1971). Duties: Tax planning, advice and litigation, primarily corporate. Litigation associate (September 1964-September 1967). Duties: General litigation, primarily corporate. Summer Associate (Summer 1963).

Fuchsberg & Fuchsberg, New York City, Summer Associate (Summer 1962).

**EDUCATION:**

New York University, Graduate Tax Program (September 1967-June 1969) (part time).

Harvard Law School, LL.B. 1964. Cum laude. Law Review (Vol. 76). Seminar: Constitutional Litigation. Story Club (moot court).

School of Naval Justice, Newport, R.I. (Fall 1959). First in class.

Harvard College, A.B. 1958. Cum laude. Concentrated in American History and Literature. Harvard Debate Council. Dramatics. Eliot House Committee. NROTC. Pulitzer Scholarship.

Bronx High School of Science, graduated, 1954. Mathematics Team. Founder and editor of "Math Bulletin."

**EXHIBIT A**

**PROFESSIONAL ACTIVITIES:**

Special Advisor to Board of Trustees, Southern Federal Tax Institute, 1974 to date.

Editor, Program Materials for Ninth through current Annual Southern Federal Tax Institutes (1974 to date). Editorial assistant for Eighth Annual Southern Federal Tax Institute (1973).

Chairman, Committee on Continuing Legal Education and Research, ABA Section of Taxation, 1977-78; Vice Chairman, 1975-1977. Member, Corporate Taxation and Annual Report Committees.

Member, The Group, Inc. (1995 to 2000).

Fellow, American College of Tax Counsel (1995 to date).

Planning Chairman, ABA National Institutes on 1976 Tax Reform (San Francisco, New York and Houston, Oct. & Nov. 1976).

Speaker, ALI-ABA Institute on Advanced Business Tax Planning (Villanova, July 1976; Notre Dame, July 1977; Stanford, July 1978; Philadelphia, July 1982).

Speaker, PLI Institute on Professional Corporations (New York, Denver and San Francisco, April-June 1976).

Steering Committee and Editor, ABA Section of Taxation 1976 Advanced Study Institute on Tax Shelters and Tax Reform and Executive Compensation (Houston, 1976); Estate Planning (New Orleans, 1977); Income and Estate Planning for Executors and Small Business Owners (Phoenix, 1978).

Member, Planning Committee, 25th through current University of Texas Tax Conferences, 1977 to date (Chair, speaker and moderator at various conferences).

Speaker, Federal Bar Association tax meeting ("Current Developments") (San Antonio, September 1979).

Speaker, Denver Tax Institute ("Current Developments"), 1980 to date.

Regular speaker on recent tax developments at numerous tax institutes, including the University of Denver Tax Institute, the University of Texas Tax Conference, the University of North Carolina Tax Institute, the American Institute on Federal Taxation, the Southern Federal Tax Institute, the Tennessee Federal Tax Institute, and the William and Mary Tax Conference. Regular speaker on recent tax developments at programs sponsored by the Tax Executives Institute, the American Petroleum Institute, the Houston Bar Association Tax Section, the Austin Tax Forum, the Austin Chapter of the Texas Society of CPAs, the University of Houston Law Foundation, and the Wednesday Tax Forum. Lecturer at the Virginia Tax Conference, the New Mexico Tax Conference, the New Mexico Tax Institute, the New Mexico Tax Symposium, the Alabama Tax Conference, the Kentucky Tax Institute, the Lewis & Clark Tax Institute, the Great Lakes Federal Tax Institute, the State Bar of Michigan Tax Section, the Ohio [AICPA] Tax Institute, the Columbus [Ohio] Tax Institute, the Tulane Tax Institute, the NYU Tax Institute, the Maryland Tax Institute, and the

Hawaii Tax Institute, as well as at programs sponsored by ALI-ABA, the Practising Law Institute, the Internal Revenue Service, and the Federal Bar Association.

Speaker on various professional and tax ethics topics to the Houston Bar Association and its Tax Section, the American Petroleum Institute Tax Forum, the Houston, Texas-based Women Attorneys in Tax and Probate, the American Corporate Counsel Association [Houston Chapter], the Brazoria County [Texas] Bar Association, the Tax Executives Institute [Houston Chapter], South Texas College of Law, the Houston Estate and Financial Forum, and the Council on International Tax Education.

Member, Wednesday Tax Forum, 1980 - present; President, 1983.

Director, Houston International Tax Forum (1985 – present).

Council, Houston Bar Association Tax Section (1999 – present)

Member, Houston Tax Roundtable (1990 – present).

Editor and Chairman of Editorial Board, Developments in Corporate, Banking and Securities Law, 1972-1974, a quarterly published by the Georgia State Bar Section of Corporate Securities and Banking Law.

Member, Committee on Corporate Taxation, Tax Section, New York State Bar Association (1969-1971); Member, Tax Committee, Federal Bar Association (1968-1971).

Member, New York State, Tax Court, Supreme Court, Second Circuit and Southern District Bars.

**PUBLICATIONS:**

"Book Review, Bittker, The Case for Black Reparations," 7 Ga. L. Rev. 587 (1973).

"Federal Taxation and Population Control," 55 N.C.L. Rev. 385 (1977).

Co-Reporter, Study Outline, Tax Reform Act of 1976 (2 vols. ALI-ABA, 1976); Study Outline, Revenue Act of 1978 (ALI-ABA, 1979).

"Antideficiency Relief for Foreclosed Homeowners: ULSIA Section 511(b)," 27 Wake Forest L. Rev. 455 (1992) (with John Mixon).

"Recent Federal Income Tax Developments," chapter 13 of Southwestern Legal Foundation Forty-Ninth Annual Institute on Oil and Gas Law and Taxation (Matthew Bender & Co. 1998).

"Recent Developments in Business Taxation: With Emphasis on Oil and Gas Taxation," chapter 13 of Southwestern Legal Foundation Fifty-First Annual Institute on Oil and Gas Law and Taxation (Matthew Bender & Co. 2000) (with Martin J. McMahon, Jr.).

"Recent Developments in Business Taxation: With Emphasis on Oil and Gas Taxation," chapter 13 of Southwestern Legal Foundation Fifty-Second Annual Institute on Oil and Gas Law and Taxation (Matthew Bender & Co. 2001) (with Martin J. McMahon, Jr.).

**EXHIBIT A**

"Recent Developments in Federal Income Taxation: The Year 2000," 5 Florida Tax Review 109 (2001) (with Martin J. McMahon, Jr.).

"Recent Developments in Federal Income Taxation: The Year 2001," 5 Florida Tax Review 627 (2002) (with Martin J. McMahon, Jr.).

"Recent Developments in Federal Income Taxation: The Year 2002," 6 Florida Tax Review (2003) (with Martin J. McMahon, Jr.).

"Recent Developments in Federal Income Taxation: The Year 2003," 6 Florida Tax Review 445 (2004) (with Martin J. McMahon, Jr.).

"Recent Developments in Federal Income Taxation: The Year 2004," 7 Florida Tax Review 47 (2005) (with Martin J. McMahon, Jr.).

"Privilege and the Work Product Doctrine in Tax Cases," 58 Tax Lawyer 405 (2005) (with Martin J. McMahon, Jr.).

"Recent Developments in Federal Income Taxation: The Year 2005," 8 Florida Tax Review 5 (2006) (with Martin J. McMahon, Jr.).

"Recent Developments in Federal Income Taxation: The Year 2006," __ Florida Tax Review __ (2007) (with Martin J. McMahon, Jr.).

**COMMUNITY:**

Trustee (1985-1993), Secretary (1991-1992), and Vice-President (1992-1993), Congregation Emanu Houston, Texas.

Board Member, American Jewish Committee, Houston Chapter (1983-1997, 2001 - present).

Regional Advisory Board Member, Anti-Defamation League, Southwest Region (1988 - present).

Board Member and Advisory Board Member, Texas Accountants and Lawyers for the Arts (1983-1994).

**PERSONAL:**

Born: December 14, 1937 in New York City. Married with two children. Resident of Houston, Texas.

United States Naval Reserve, active duty (June 1958-June 1961), Lieutenant (Junior grade). Active reserve (1962-1964); inactive reserve (1964-1972), Lieutenant.

Business Address: University of Houston Law Center, 100 Law Center, Houston, Texas 77204-6060 - Tel. (713) 743-2246; FAX (713) 743-2131; e-mail ishepard@uh.edu.

**EXHIBIT A**

**IRA B. SHEPARD, LL.B.**
**List of Materials Review and Considered in Forming Opinions**

## PLEADINGS AND RELATED DOCUMENTS

Complaint For Readjustment of Partnership Items Under Section 6226 Of The Internal Revenue Code, 1:05-cv-00748-CCM
Civil Docket for Case # 01:05-cv-00748-CMM as of 08-31-07
Complaint For Readjustment of Partnership Items Under Section 6226 Of The Internal Revenue Code, 1:07-cv-00520-CCM
Civil Docket for Case# 1:07-cv-00520-CCM as of 08-31-07

## TREATISES, ARTICLES, & PUBLICATIONS

Johnston, David Cay, Perfectly Legal, Penguin Group, New York, NY (2003).
"*Perfectly Legal* Isn't Perfect, but It's Well Worth Reading," Tax Analysts-Book Reviews, February 9, 2004
Lurie, Alvin D., "Toward a Trusty Test to Track and Tax Shelters," Tax Analysts, 2004 TNT 101-31, May 14, 2004
Scheindlin, Shira A. "Jenkens & Gilchrist Settlement Gets Preliminary Approval," Tax Analysts, 2004 TNT 105-7, May 14, 2004
"Deutsche Bank Sold Abusive Tax Shelters, Investors Say," Tax Analysts, 2004 TNT 121-2, June 22, 2004
Pollack and Soled, "Tax Professionals Behaving Badly," Tax Analysts – Special Report, October 11, 2004
"Jenkens Settlement Info Reveals 'Wealth' of Shelters Advisers," Tax Analysts, 2004 TNT 197-3, October 8, 2004
Wolfman, Holden, and Harris, Standards of Tax Practice, Fifth Edition, Tax Analysts (1999)
Scheindlin, Shira A., "Supplemental Notice of Amended Class Settlement Issued in Jenkens Class Action Settlement," Tax Analysts, 2005 TNT 3-16, December 29, 2004
Jones, Barbara S., "Engagement Letters Contained Attachments; Arbitration Must Proceed," Tax Analysts, 2005 TNT 33-21, February 14, 2005
Willie, Lezlie B., "Partnership Files Suit for Redetermination of Adjustments," Tax Analysts, 2005 TNT 33-22, February 15, 2005
"Class Certified, Jenkens & Gilchrist Settlement Approved," Tax Analysts, 2005 TNT 34-11, February 18, 2005
Scheindlin, Shira A., "Court Enters Order Approving Jenkens and Gilchrest Settlement," Tax Analysts, 2005 TNT 34-12, February 18, 2005
"Investor Suit against BDO and Deutsche Bank Headed toward Arbitration," Tax Analysts, 2005 TNT 115-3, June 15, 2005
"Second Circuit Finds Class Properly Certified in Class-Action Shelter Suit," Tax Analysts, 2006 TNT 64-50, March 31, 2006
"Class Action Filed E&Y for Selling Abusive Tax Shelter," Tax Analysts, 2006 TNT 72-38, April 10, 2006
"Tax Shelters: Who's Buying, Who's Selling, and What's the Government Doing About It?" Hearing before the Committee on Finance, United States Senate, 180th Congress, 1st Session, October 21, 2003

**EXHIBIT B**

Stratton, Sheryl, "Identity Privilege Pits Shelter Clients against Accounting Firms," Tax Analysts, Tax Notes Today, 2003 TNT 9-4, January 13, 2003
Banoff, Sheldon I., "Penalty Percentages Prognosticators Perplex Practitioner," Tax Analysts, 93 TNT 249-56, December 6, 1993
"IRS Revises Penalties IRM", Tax Notes Today, 97 TNT 122-30, February 24, 1997
Fink, Robert S., "Tax Controversies: Audits, Investigations, Trials" February 2007
Banoff, Sheldon I., " Dealing with the "Authorities": Determining Valid Legal Authority In Advising Clients, Rendering Opinions, Preparing Tax Returns and Avoiding Penalties" December 1988
Banoff, Sheldon I., "Anatomy of an Antiabuse Rule: What's Really Wrong with Reg. Section 1.701-2," Tax Analysts, 95 TNT 56-84, March 20, 1995
"ISP Paper Summarizes Subchapter K Antiabuse Rule," Tax Analysts, 95 TNT 124-10, June 26, 1995
Gould, Frank J., "Giving Tax Advice – Some Ethical, Professional, and Legal Considerations," Tax Analysts, 2002 TNT 209-26, October 25, 2002
Seigel, Taylor, Major Tax Planning-USC Law School Annual Institute on Federal Taxation, Vol. 51: 1999 USC Major Tax Planning, Chapter 14
Beale, Linda M., "Tax Advice Before the Return: The Case for Raising Standards and Denying Evidentiary Privileges," University of Virginia, School of Law, Virginia Tax Review, 25 Va. Tax Rev. 583, Winter 2006
"IRS Task Force Releases Penalty Reform Proposals," Tax Analysts, 89 TNT 45-36, February 22, 1989
"Audit Guide on Accuracy-related Penalties for Tax Shelter Transactions is Available," Tax Analysts, 2005 TNT 64-21, April 1, 2005
"Senate PSI Report Targets Firms Involved in Tax Shelter 'Industry'," Tax Analysts, 2005 TNT 28-28
Lipton, Walton, & Dixon, "The World Changes: Broad Sweep of New Tax Shelter Rules in AJCA and Circular 230 Affect Everyone," 2005
Lipton & Walton, "Treasury Improves the Disclosure Regime by Issuing New Temporary and Proposed Regulations," 2005
"IRS Publishes Proposed Circular 230 Regs," Tax Analysts, 2001 TNT 14-120, January 12, 2001
Gibbs, Lawrence B., Partnership Antiabuse Rule is Broader than Necessary say Miller & Chevalier Attorneys," Tax Analysts, 95 TNT 175-27, August 23, 1995
Richardson, Margaret Milner, "Richardson's Speech to ABA Tax Section Annual Meeting," Tax Analysts, 94 TNT 157-67, August 6, 1994
Cuff, Terence Floyd, "Los Angeles County Bar Urges Withdrawal of Antiabuse Reg.," Tax Analysts, 94 TNT 151-40, July 22, 1994
Taylor, Rick J., "Rusty Pipes is Simply Rusty, says Tax Practitioner," Tax Analysts, 94 TNT 135-46
Posner, Richard A. "Seventh Circuit Affirms Mexican Debt-Equity Swap, Finds no gain," 2006 TNT 224-10, November 20, 2006
Jones, Darryll K., "Subchapter K as Moral Hazard," Tax Analysts, 2007 TNT 104-48, May 30, 2007
AICPA, Statements on Standards for Tax Services, Tax Return Positions (No.1); Realistic Possibility Standard (Interpretation No. 1-1) (2000)
Lipton, Richard M. "Klamath Dispatches Another Tax Shelter, But Without Penalties," Journal of Taxation, April 2007 (106 JTAX 200)

**EXHIBIT B**

Lipton, Richard M., Various Articles From RIA Checkpoint On Tax Shelter Issues
Weisbach, David, "Business Purpose, Economic Substance and Corporate Tax Shelters: The Failure of Disclosure as an Approach to Shelters," 54 SMU L. Rev. 73, 75 (Winter, 2001)
Wolfman, Bernard, "The Supreme Court in the Lyon's Den: A Failure of Judicial Process," 66 Cornell L. Rev. 1075 (1981)
Cohen, N. Jerold, "Too Good to be True and Too Bad to be True," Tax Notes, December 12, 2005
Glassman, Daniel J., "Note: 'It's not a lie if you believe it?': Tax Shelters and the Economic Substance Doctrine," Florida Law Review, 58 Fla. L. Rev. 665, July 2006
Willens, Robert, "Every Action Has an Equal and Opposite Overreaction," 95 TNT 110-111, Tax Notes Today, Tax Analysts, June 7, 1995
Sheppard, Lee, "Can Seagram Bail Out of DuPont Without Capital Gain Tax?" 95 TNT 75-4, Tax Notes Today, Tax Analysts, April 18, 1995
Willens, Robert, "You Can Fight the Facts," 95 TNT 87-70, Tax Notes Today, Tax Analysts, May 1, 1995
Neumann, Jennifer S., COMMENT: The Discrimination Created by the Tax Treatment of Attorney's Fees in Federal Civil Rights Cases, Kansas Law Review, May 2003, 51 Kan. L. Rev. 595
Serven, James, "Oral Argument in Hukkanen-Campbell: Taxpayers' Last Stand?" 93 Tax Notes 854 (Nov. 5, 2001)
Fuller, Hoffman, "The Intent to Avoid Tax," 70 Tul. L. Rev. 2103 (1995-1996)
Weisbach, David A., "Costs of Departures from Formalism: Formalism in the Tax Law," 66 U. Chi. L. Rev 860 (Summer 1999)
Starczewski, Lisa M., "Limited Liability Companies," Tax Practice Series Analysis, Tax Management, Inc. (09/2007)
Silverman, Mark J., Lerner, Matthew D., and Kidder, Gregory N., 'The Economic Substance Doctrine: Sorting Through the Federal Circuit's 'We Know It When We See It' Ruling in *Coltec*," The Tax Executive, November-December 2006
Prusiecki, John, "Coltec: A Case of Misdirect Analysis of Economic Substance," 112 Tax Notes 524 (August 7, 2006)
Keinan, Yoram, "It is Time for the Supreme Court to Voice its Opinion on Economic Substance," 7 Hous. Bus. & Tax L.J. 93 (2006)
Grewal, Amandeep S., "Economic Substance and the Supreme Court," 116 Tax Notes 969 (September 10, 2007)
Madison, Allen D., "The Tension between Textualism and Substance-Over-Form Doctrines in Tax Law," 43 Santa Clara L. Rev. 699 (2003)
Chorvat, Terrence R., "Tax Shelters, Dutch Books, and Then Fundamental Theorem of Asset Pricing," 26 Va. Tax Rev. 859 (2007)
Knoll, Michael S., " Compaq Redux: Implicit Taxes and The Questions of Pre-tax Profit," 26 Va. Tax. Rev. 821 (2007)
Shaviro, Daniel N., "In Defense of Requiring Back-FLIPS," 26 Va. Tax Rev. 815 (2007)
Stark, Kirk J., "State Tax Shelter and U.S. Fiscal Federalism," 26 Va. Tax Rev. 789 (2007)
Bankman, Joseph, "State Tax Shelters and State Taxation of Capital," 26 Va. Tax Rev. 769 (2007)
Hickman, Kristin E., "Of Lenity, Chevron, and KPMG," 26 Va. Tax Rev. 905 (2007)
Curry, Phillip A., Hill, Claire, and Parisi, Francesco, "Creating Failures in the Market for Tax Planning," 26 Va. Tax Rev. 743 (2007)
Weisbach, David A., "Disrupting the Market for Tax Planning," 26 Va. Tax Rev. 971 (2007)

**EXHIBIT B**

Fleischer, Victor, "Options Backdating, Tax Shelters, and Corporate Culture," 26 Va. Tax Rev. 1031 (2007)
Livingston, Michael, "Practical Reason, 'Purposivism,' and the Interpretation of Tax Statutes," 51 Tax L. Rev. 677 (Summer, 1996)
Katz, Leo, "In Defense of Tax Shelters," 26 Va. Tax Rev. 799 (2007)
Dean, Steven A. and Solan, Lawrence M., "Tax Shelters and The Code: Navigating between Text and Intent," 26 Va. Tax Rev. 879 (2007)
Smith, Robert Thornton, "Business Purpose: The Assault Upon the Citadel," 53 Tax Law.1 (Fall, 1999)
Schler, Michael L., "Symposium on Corporate Tax Shelters Part II: Ten More Truths about Tax Shelters: The Problem, Possible solutions, and a Reply to Professor Weisbach," 55 Tax L. Rev. 325 (Spring, 2002)
Walsh, Alexandra M., "Formally Legal, Probably Wrong: Corporate Tax Shelters,, Practical Reason and the New Textualism," 53 Stan. L. Rev. 1541, (July, 2001)
Patton, Stewart, "Treasury Regulation §301.6111-2T and the Economic Substance Doctrine: a Plea for Certainty in the Tax Law," 39 Hous. L. Rev. 499 (Summer, 2002)
Aprill, Ellen P., "Symposium: Theories of Statutory Interpretation: The Interpretive Voice," 38 Loy. L.A. L. Rev 2081 (December, 2005)
Glassman, David J., "It's Not a Lie if You Believe It - Tax Shelters and The Economic Substance Theory," 58 Fla. L/ Rev. 665 (July, 2006)
Cunningham, Noel B. and Repetti, James R., "Textualism and Tax Shelters," 24 Va. Tax Rev. 1 (Summer, 2004)
"New IRS Penalties Handbook," Tax Analysts, 92 TNT 175-39 (07-27-92)
Cohen, N. Jerold, "Finding the Beef in Routine Transactions: Does the Economic Substance Doctrine Apply to Little Ole Me? Coping with the Ever-growing Tax Shelter Classification," 42nd Annual Southern Federal Tax Institute, Atlanta, GA, October 1-5, 2007 and related PowerPoint slides.
Terry, Thomas D., "ABA Argues For Extended And Expanded Health Insurance Deduction For Self-Employed," 94 TNT 245-35 (1994)
Guenther, Gary, "CRS Examines Tax Treatment of Self-Employed Health Insurance Expenditures," 2006 TNT 51-43 (2006)
Chief Counsel Advice (CCA) 2006-13030 (December 15, 2005) 2006 TNT 64-7

**CASE LAW, RULINGS, AND PRONOUNCEMENTS**

Notice 99-59, 1999-2 C.B. 761 (12-27-99)
ACM Partnership v. Commissioner, 157 F.3d, 252 (3rd Cir. 1998), cert. denied, 119 S. Ct. 1251 (1999)
IRS Notice 2000-44, 2002-2 C.B. 255 (08-11-00)
IRS Announcement 2002-2, 2002-1 C.B. 304 (12-21-01)
IRS Announcement 2004-46, I.R.B. 2004-21
Atlantic Coast Line Railroad Co. v. Phillips, State Revenue Commissioner, 332 U.S. 168 (1947)
Frank Lyon Co. v. United States, 435 U.S. 561 (Sup. Ct., 1978)
Compaq et al. v. Commissioner, 113 T.C. 214 (1999)
Compaq et al. v. Commissioner, 277 F.3d 778 (CA-5 2001)
IES Industries, Inc. Plaintiff, vs. United States of America, 2001-2 USTC 50, 470 (N.D. Iowa, 1999)
IES Industries, Inc., et al. vs. United States, 253 F.3d 350 (CA-8, 2001)

**EXHIBIT B**

Pugh, Jr., et al. v. Commissioner, 213 F.3d 1324 (CA-11, 2000)
Gitlitz, et ux, et al. v. Commissioner, 531 U.S. 206 (Sup. Ct., 2001)
UPS v. Commissioner, 254 F.3d 1014 (CA-11, 2001)
UPS v. Commissioner, T.C. Memo 1999-268 (1999)
United States v. Boyle, Executor of the Estate of Boyle, 469 U.S. 241, 251 (1985)
Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990)
Heasley v. Commissioner, T.C. Memo 1998-408
Mauerman v. Commissioner, 22 F.3d 1001 (10th Cir. 1994)
Mauerman v. Commissioner, T.C. Memo 1993-23
Chamberlain v. Commissioner, 66 F. 3d 729 (5th Cir. 1995)
Chamberlain v. Commissioner, T.C. Memo 1994-228
Freytag v. Commissioner, 904 F.2d 1011 (5th Cir. 1990)
Freytag v. Commissioner, 501 U.S. 868 (1991)
Freytag v. Commissioner, T.C. Memo 1994-228
United States v. Campbell, 704 F. Supp. 715 (N.D. Tex. 1998)
United States v. Campbell et al., 897 F.2d 1317 (5th Cir. 1990)
Durrett v. Commissioner, 71 F.3d 515 (5th Cir. 1996)
Durrett v. Commissioner, T.C. Memo 1994-179
Klamath Strategic Investment Fund, et al. v. United States, 440 F. Supp. 2d 608 (E.D. Tex. 2006)
Klamath Strategic Investment Fund, et al. v. United States, 472 F. Supp. 2d 885 (E.D. Tex. 2007)
Klamath Strategic Investment Fund, et al. v. United States, 2007-1 U.S.T.C. (E.D. Tex., April 3, 2007)
Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184 (1983)
Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985)
Webb et al. v. United States, 66 F.3d 691, (CA-4, 1995)
Webb, et al v. United States, 850 F. Supp. 489 (D.C. ED Va., 1994)
Stanford v. Commissioner, 152 F.3d 450, (CA-5, 1998)
Horn v. Commissioner, 90 T.C. 908, (1988)
Balboa Energy Fund 1981 et al. v. Commissioner et al., 77 A.F.T.R. 2d 1159, (1996)
Illes v. Commissioner, 982 F.2d 163, (1992)
Goldman v. Commissioner, 39 F.3d 402 (CA-2, 1994)
Irom v. Commissioner, 866 F.2d 545, (CA-2, 1989)
Irom v. Commissioner, T.C. Memo 1988-211
Long Term Capital Holdings v. United States, 150 Fed. Appx. 40 (2nd cir. 2005)
Long Term Capital Holdings v. United States, 330 F. Supp. 2d 122 (2004)
Santa Monica Pictures, LLC v. Commissioner, T.C. Memo 2005-104
Cemco Investors, LLC v. United States, 99 A.F.T.R.2d 2007-1882 (N.D. Ill. 2007)
Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988)
Todd v. Commissioner, 89 T.C. 912 (1987)
Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990)
Gainer v. Commissioner, T.C. Memo 1988-416
Gillman v. Commissioner, 933 F.2d 143 (2nd Cir. 1991)
Gillman v. Commissioner, T.C. Memo 1989-684
Zfass v. Commissioner, 118 F.3d 184 (4th Cir. 1997)
Zfass v. Commissioner, T.C. Memo 1996-167
Charlton v. Commissioner, T.C. Memo 1990-402

**EXHIBIT B**

Charlton v. Commissioner, 990 F.2d 1161 (9th Cir. 1993)
Coltec Industries, Inc. v. U.S., 62 Fed. Cl. 716 (2004)
Coltec Industries, Inc. v. U.S., 454 F.3d 1340 (Fed. Cir. 2006), rehearing den., 2006 U.S. App. LEXIS 24771 (September 19, 2006), cert. den., 127 S. Ct. 1261 (2007)
Badaracco, et al v. Commissioner, 464 U.S. 386 (Sup. Ct. 1984)
United States vs. Davis, 397 U.S. 301 (Sup. Ct., 1970)
Chamberlin v. Commissioner, 207 F.2d 462 (CA-6, 1953)
Chamberlin v. Commissioner, 18 T.C. 164 (1952)
Coggin Automotive Corp. v. Commissioner, 292 F.3d 1326 (11th Cir. 2002)
Coggin Automotive Corp. v. Commissioner, 113 T.C.. 169 (1999)
The Limited, Inc. v. Commissioner, 286 F.3d 324 (6th Cir. 2002)
Brown Group, Inc. v. Commissioner, 77 F.3d 217 (8th Cir. 1995)
Brown Group, Inc. v. Commissioner, 104 T.C. 105 (1995)
Textron, Inc. v. U.S., 561 F.2d 1023 (1st Cir. 1977)
The Falconwood Corp. v. United States, 422 F.3d 1339 (Fed. Cir. 2005)
Woods Investment v. Commissioner, 85 T.C. 274 (1985)
Rite Aid v. United States, 255 F.3d 1357 (Fed. Cir. 2001)
Combrink v. Commissioner, 117 T.C. 82 (2001)
Combrink v. Commissioner, 116 T.C. 296 (2001)
Hillman v. IRS, 250 F.3d 228 (4th Cir. 2001)
Hillman v. Commissioner, 114 T.C. 103 (2000)
Hillman v. Commissioner, 118 T.C. 323 (2002)
United States v. Marian Brockamp, Administrator of the Estate of Stanley B. Gill, Deceased, 519 U.S. 347 (Sup. Ct., 1997)
Marian Brockamp, Administrator of the Estate of Stanley B. Gill, Deceased v. United States, 859 F. Supp. 1283 (D.C. CD Calif., 1994)
Marian Brockamp, Administrator of the Estate of Stanley B. Gill, Deceased v. United States, 67 F.3d 260 (CA-9, 1995)
Benci-Woodward v. Commissioner, 219 F.3d 941 (CA9-2000)
Kenseth v. Commissioner, 259 F.3d 881 (CA-7, 2001)
Srivastava v. Commissioner, T.C. Memo 1998-362
Srivastava v. Commissioner, 220 F.3d 353 (CA-5, 2000)
Banks v. Commissioner, T.C. Memo 2001-48
Banks v. Commissioner, 345 F.3d 373 (CA-6, 2003)
Banks v. Commissioner, 125 S. Ct. 826 (Sup. Ct., 2005) (Oregon law).
Notice 2000-2 C.B. 255 (September 5, 2000)
Assumption of Partner Liabilities, Notice T.D. 9062 (2003)
Assumption of Partner Liabilities, 68 F.R. 37414 (2003)
Helmer v. Commissioner, T.C. Memo 1975-160
Long v. Commissioner, 71 T.C. 1 (1978)
La Rue v. Commissioner, 90 T.C. 465 (1988)
Gibson Products Co. v. U.S., 637 F.2d 1041 (5th Cir., 1981)
Rev. Rul. 73-301, 1973-2 C.B. 215
Rev. Rul. 79-294, 1979-2 C.B. 305
Rev. Rul. 57-29, 1957-1 C.B. 519
G.C.M. 37971 (July 1, 1979)
G.C.M. 37860 (February 16, 1979)
Notice T.D. 8588, 59 F.R. 23-33, January 3, 1995

**EXHIBIT B**

ACM Partnership v. Commissioner, 157 F.3d 231 (3rd Cir. 1998)
Jade Trading, LLC v. U.S., 60 Fed. Cl. 558 (2004)
Jade Trading, LLC v. U.S., 65 Fed. Cl. 487 (2005)
Jade Trading, LLC v. U.S., 65 Fed. Cl. 443 (2005)
Belford Strategic Inv. Fund, LLC v. U.S., 2005 U.S. Dist. LEXIS 45219 (N.D. Calif. 2005)
Goldberg v. Commissioner, T.C. Memo 2007-81
Domulewicz v. Commissioner, 129 T.C. No. 3 (2007)
Nussdorf v. Commissioner, 129 T.C. No. 5 (2007)
T.D. 8697, 61 F.R. 66584 (12/18/96)
Notice 2001-17, 2001-9 IRB 730 (02/26/01)
Sheldon and Anita Drobny v. U.S., 86 F.3d 1174 (Fed. Cir. 1996), reported in full at 96-1 USTC ¶50,255
Cynthia C. Spina v. Forest Preserve District of Cook County, et al; Case No. 98-C-1391 in the United States District Court for the Northern District of Illinois, Eastern Division, 2002 U.S. Dist. LEXIS 16005 (2002)
Vivendi-Universal Holdings II Corp. v. Commissioner (Seagram - DuPont Transaction) Docket No. 18655-03, U.S. Tax Court, Stipulated Decision Entered June 22, 2006
H.J. Heinz Company and Subsidiaries v. U.S., 76 Fed. Cl. 570 (2007)
Moline Properties v. Commissioner, 319 U.S. 436 (1943)
Pollock v. Farmers' Loan & Trust Co., 158 U.S 601 (1895)
Eisner v. Macomber, 252 U.S. 189 (1920)
Burnet v. Sanford & Brooks Co., 282 U.S. 359 (1931)
North American Oil Consolidated Co. v. Burnet, 286 U.S. 417 (1932)
United States v. Kirby Lumber Co., 284 U.S. 1 (1931)
Gregory v. Helvering, 293 U.S. 465 (1935)
LeTulle v. Scofield, 308 U.S. 415 (1940)
Groman v. Commissioner, 302 U.S. 82 (1937)
Helvering v. Bashford, 302 U.S. 454 (1938)
Koshland v. Helvering, 298 U.S. 441 (1936)
Helvering v. Gowran, 302 U.S. 238 (1937)
Helvering v. Alabama Asphaltic Co., 315 U.S. 179 (1942)
Helvering v. Southwest Consolidated Corp., 315 U.S. 194 (1942).
Helvering v. Horst, 311 U.S. 112 (1940)
Helvering v. Clifford, 309 U.S. 331 (1940)
Higgins v. Commissioner, 312 U.S. 212 (1941)
Higgins v. Smith, 308 U.S. 473 (1940)
Dobson v. Commissioner, 320 U.S. 489 (1943)
NLRB v. Hearst Publications, 322 U.S. 111 (1944)
Commissioner v. Court Holding Co., 324 U.S. 331 (1945).
U.S. v. Cumberland Public Service Co., 338 U.S. 451 (1950).
Commissioner v. Brown, 380 U.S. 563 (1965)
Davis v. U.S., 397 U.S. 301 (1970)
Bollinger v. Commissioner, 485 U.S. 340 (1988)
Cottage Savings Association v. Commissioner, 499 U.S. 554 (1991)
Knetsch v. U.S., 364 U.S. 361 (1960)
United Dominion Industries, Inc. v. U.S., 532 U.S. 822 (2001).
Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984)
Leavell v. Blades, 237 Mo. 695, 141 S.W. 893 (1911)

**EXHIBIT B**

Boeing Co. v. U.S., 537 U.S. 437 (2003)
United States v. Wickersham, Docket No. 1:92-CR-98-1 in the United States District Court for the Eastern District of Texas
United States v. Wickersham, 29 F.3d 191 (CA-5, 1994)
Wickersham v. Commissioner, T. C. Memo 1999-276 (1999)
Treasury Circular 230 (7-94 Rev.)
National Office Technical Advice Memorandum, PLR 8108008; 1980 PLR Lexis 5933 (10-31-80)
"Gain from Sale of Stock Owned by 'Small Business Trust' Subject to State Income Tax," 2005-2084 Knust v. Wilkins, 2006-Ohio-579, The Supreme Court of Ohio (11-22-06)
Renacci vs. Commissioner of Ohio, Case No. 2006-Z-780, appeal filed 06-15-07
Allen et al. v. Commissioner, 118 T.C. 1, (2002)
Allen v. U.S., 173 F.3d 533 (4th Cir. 1999)
Speltz v. Commissioner, 124 T.C. 165, (2005)
Speltz v. Commissioner, 454 F.3d 782 (2006)
Powers v. Commissioner, 195 U.S. App Lexis 9605 (1995)
Powers v. Commissioner, 100 T.C. 457 (1993)
Powers v. Commissioner, T.C. Memo 1986-494 (1986)
Powers v. Commissioner, 51 F.3d 34 (1995)
Powers v. Commissioner, 43 F.3d 175 (1995)
Redlark v. Commissioner, 141 F.3d 936 (9th Cir. 1998)
Redlark v. Commissioner, 106 T.C. 31 (1996)
Redlark v. Commissioner, 98-1 U.S.T.C.¶50,322 (9th Cir. 1995)
Miller v. U.S., 65 F.3d 687, 95-2 U.S. T.C. ¶50,485 (8th Cir. 1995)
Robinson v. Commissioner, 119 T.C. 44 (2002)
McDonnell v. U.S., 180 F.3d 721 (6th Cir. 1999)
Kikalos v. Commissioner, 190 F.3d 791 (7th Cir. 1999)
Miller v. U.S., 65 F.3d 687 (8th Cir. 1995)
Alfaro v. Commissioner, 349 F.3d 225, 92 A.F.T.R.2d 2003-6914, 2003-2 U.S.T.C. ¶50,715 (5th Cir. 2003)
T.D. 8168, 52 F.R. 48409 (12-22-87)

**DEPOSITIONS AND EXPERT REPORTS**

Bores, Stephen, December 29, 2006 and Exhibits thereto
Brubaker, Craig, August 7, 2007 and Exhibits thereto
Cotter Thomas, August 2, 2007 and Exhibits thereto
Floyd, Robert, July 31, 2007 and Exhibits thereto
Goldstein, Lawrence, August 07, 2007 and Exhibits thereto
Guerin, Donna, August 03, 2007 and Exhibits thereto
Herpe, David, December 8, 2006 and Exhibits thereto
Ivsan, John August 17, 2007 and Exhibits thereto
Jordan, Virginia, December 11, 2006 and Exhibits thereto
Parker, Perry, August 8, 2007 and Exhibits thereto
Parse, David, August 6, 2007 and Exhibits thereto
Shih, Jason, August 16, 2007 and Exhibits thereto
Vogel, William, August 13, 2007 and Exhibits thereto
Waterman, David, August 1, 2007 and Exhibits thereto

**EXHIBIT B**

Welles, Christopher, Vol. 1, December 14, 2006 and Exhibits thereto
Welles, Christopher, Vol. 2, August 16, 2007 and Exhibits thereto
Welles, David, Jr. Vol. 1, December 12, 2006 and Exhibits thereto
Welles, David, Jr. Vol. 2, July 24, 2007 and Exhibits thereto
Welles, Georgia, July 31, 2007 and Exhibits thereto
Welles, Jeffrey, Vol. 1, December 15, 2006 and Exhibits thereto
Welles, Jeffrey, Vol. 2, August 8, 2007 and Exhibits thereto
Welles, Peter, Vol. 1, December 13, 2006 and Exhibits thereto
Welles, Peter, Vol. 2, July 19, 2007 and Exhibits thereto
Expert Report of Professor Jeffrey A. Frankel, dated September 14 2007
Expert Report of Robert W. Kolb, dated September 11, 2007
Expert Report of Richard M. Levich, dated September 13 ,2007
Expert Report of David F. DeRosa, Ph.D. dated September 14, 2007

**INTERNAL REVENUE CODE AND REGULATIONS THEREUNDER**

§1.6011-4T(b)(2)
§1.163-9T(b)(2)(i)(A)
§1.6664-4(c)(1)
§1.6662-4(d)(2)
§1.6662-4(d)(3)(iii)
§1.701-2
§1.702-2(b)
§1.752-1(a)(4)(ii)
§1.752-6T
§56(a)(1)(A)(I)
§62(a)(19) and 62(e)
1939 §102
1986 §531
§108
§108(a)
§108(a)(1)(B)
§108(b)
§108(d)(3)
§108(d)(7)(A)
§165(c)(2)
§301.6111-2T(b)(2)
§301.7701-3(b)(1)
§302(a)
§302(b)
§302(b)(1)
§302(b)(2)
§302(c)(1)
§318
§465
§465(b)(4)
§708
§708(b)(1)(B)

**EXHIBIT B**

§721
§722
§723
§743
§743(b)
§752
§752(b)
§754
§901(k)
§988
§1366
§1367
§6501(c)(1)
§6511(h)
§6621(c)
§6653(a)(1)
§6653(a)(2)
§6661(a)
§6662
§6662(a)
§6662(a) and (b)
§6662(a), (b), (e), and (h)
§6662(b)(1) and (c)
§6662(b)(2) and (d)
§6662(b)(3) and (e)((1)(A)
§6662(d)(2)(B)(i)
§6662(d)(2)(C)
§6662(e)
§6662(e)(2) and (h)
§6662(h)
§6664(c)
§6664(c)(1)
§6662(d)(1)(A)

**LEGISLATION AND RELATED MATERIALS**

Revenue Reconciliation Act of 1989, P.L. 101-239, signed by President George H.W. Bush on December 19, 1989

Job Creation and Worker Assistance Act of 2002, P.L. 107-147, signed by President George W. Bush on March 9, 2002

Staff of the Joint Committee on Taxation, General Explanation of Tax Legislation Enacted in 1997 P.L. 105-34, signed by President William J. Clinton on August 5, 1997

IRS Restructuring and Reform Act of 1998, P.L. 105-206, signed by President William J. Clinton on July 22, 1998

American Jobs Creation Act of 2004, P. L. 108-357, signed by President George W. Bush on October 22, 2004

Katrina Emergency Tax Relief Act of 2005, P.L. 109-135, signed by President George W. Bush on December 21, 2005

**EXHIBIT B**

**MISCELLANEOUS MATERIALS**

"Accounting Firms Face Backlash Over the Tax Shelters They Sold," The Wall Street Journal Online, February 7, 2003
"Senators hear stories of tax shelters bought, sold," naplesnews.com, October 22, 2003
"Wide Range of Tax Shelters Draws Senate Inquiry," nytimes.com, October 22, 2003
"Tax Watch: Battle against abusive tax shelters still rages," InvestmentNews, November 3, 2003
"Helter Shelter," LAW.COM, December 05, 2003
"How Jenkens Lost Its Way," The Dallas Morning News, April 1, 2007
"How Jenkens & Gilchrist lost its way," dallasnews.com, April 1, 2007
"How a Bid to Boost Profits Led to a Law Firms Demise," The Wall Street Journal Online May 17, 2007
Biography on N. Jerold Cohen from the Sutherland Asbill Brennan, LLP website
Biography on Kenneth G. McCoin, from the State Bar of Texas 4th Annual Advanced Expert Witness Course
"Ernst & Young appoints new Phoenix tax practice leader," The Business Journal of Phoenix, March 30, 2007
"Update: The Tax Man's Travails," LAW.COM, April 01, 2004
Browning, Lynnley, "Lawsuit over Tax Shelter may Derail a Settlement," nytimes.com, November 8, 2004
Browning, Lynnley, "Wider Look at Tax Shelters Offered by Deutsche Bank," nytimes.com, May 18, 2006
"Four Individuals Charged in Criminal Tax Fraud Related to Ernst & Young Tax Shelters," Press Release, United States Attorney Southern District of New York, May 30, 2007
Neumeister, Larry, "Partners of Ernst & Young Charges," biz.yahoo.com, May 30, 2007
Neumeister, Larry, "Ernst & Young Partners Charged With Tax Fraud," chron.com, May 30, 2007
Browning, Lynnley, "Ernst & Young Won't Face Criminal Charges," nytimes.com, May 31, 2007
Davis, Paul "The KPMG Case's One Degree of Judicial Separation," The Wall Street Journal Online, May 24, 2007
"Executive Order: Protecting American Taxpayers from Payment of Contingency Fees," Press Release, Office of the Press Secretary, May 16, 2007
"Ernst & Young Statement on Tax-Fraud Investigation," The Wall Street Journal Online, May 30, 2007
Reilly, David and Davies, Paul, "Tax Shelter Indictments Leave a Cloud over Ernst," The Wall Street Journal, May 31, 2007
Browning, Lynnley "Four Charged in Tax Shelter Case," nytimes.com, May 31, 2007
Biography of Sheldon I. Banoff, P.C. from the Katten Muchin Rosenman LLP website.
"Ernst, Deutsche May Face Fines in Tax Shelter Case-WSJ", Reuters, May 31, 2007
Johnson, Carrie, "Ernst & Young Partners Charged, Probe of Tax Shelters Could Subject the Accounting Firm to Sanctions," washingtonpost.com. May 31, 2007
"Corporate Tax Shelters," LawandTaxNews.com, May 17, 2007
History section, Therna-Tru website, www.therma-tru.com
History section, Therna-Tru UK website, www.therma-tru.co.uk
Overview of Therma-Tru Doors from the Monster website at www.monster.com

**EXHIBIT B**

"Quality & Integrity Drive Brand Use (1988 Brand Leader)," Professional Builder, September 1, 1998
Masco Corporation website www.masco.com
UBS Capital Americas website www.ubscapitalamericas.com
Profile of David Herpe from the McDermott, Will & Emory website www.mwe.com
Biography of David Waterman from the SLK website www.slk-law.com
"Door Co. Loan Opens," IAC (SM) Newsletter Database, May 15, 2000
"Company News; Fortune Brands to Buy Door Maker Therma-Tru," New York Times, November 4, 2003
Zelenak, Lawrence, "The Story of *Seagram*: The Step Transaction Doctrine on the Rocks," Business Tax Stories, Bank, Steven A. and Stark, Kirk J., Eds., Foundation Press, New York New York (2005)
"Vivendi's $1.5 Billion Tax Hangover," CFO.com at http://www.cfo.com, August 26, 2003
"Vivendi to Contest I.R.S. Claim of Taxes Owed," New York Times, August 26, 2003
"Vivendi Resolves Tax Dispute Over DuPont Shares," Press Release, Vivendi, June 1, 2006
Ruitenberg, Rudy, "Vivendi Settles U.S. Tax Dispute," International Herald Tribune, June 4, 2006
Profile of Paula Jones in Wikipedia, the free online encyclopedia, September 2007 at http://en.wikipedia.org/wiki/Paula_Jones
Letter dated August 18, 1995 to Hon. Leslie B. Samuels, Assistant Secretary of the Treasury for Tax Policy, from Donald C. Alexander (former Commissioner of Internal Revenue)
State of Delaware, Division of Corporations Status Report for Stobie Creek Investments LLC from http://www.corp.delaware.gov
"Dot.com Bubble," June 28, 2007, http://www.wikipedia.org
NASDAQ Stock Price Index, historical data from http://biz.yahoo.com
NASDAQ Composite Index, current data, from http://www.CNNMoney.com
"Irrational Exuberance," June 6, 2007, http://www.wikipedia.org
Johnston, David Cay, "Richest Are Leaving Even the Rich Far Behind," The New York Times, June 5, 2005
"How the Rich Invest," The Wall Street Journal Online," June 12, 2007
Grove, Hannah Shaw and Prince, Russ Alan, "The Wealth Advisor: Trading Up," Registered Rep, March 1, 2002
Grove, Hannah Shaw and Prince, Russ Alan, "Taxation With Remonstration: The Only Thing More Certain Than Death is the Affluents' Desire to Pay Less in Taxes," Facts & Figures, Vol. 3, April 2007
Closing Documents Amended and Restated Recapitalization and Stock Purchase Agreement among Therma-Tru Corp., The Stockholders of Therma-Tru Corp. and Kt Holdings, LP, May 9, 2000
Goheen, John C. and Rogge, Gretchen, "ESBT Ohio Tax Savings for S Corp," Business & Tax Letter (Spring 1999)
FitzSimons, Brian, "Change in Ohio Taxation of Electing Small Business Trusts," FindLaw, for Legal Professionals (2001)
"IT 2000-01-Grantor Trust Provisions Take Precedence Over ESBT Provisions – January 19, 2000, Ohio Department of Taxation, www.tax.ohio.gov
Ohio's State Tax report, No. 55, Spring 2000
House Bill 215 (122nd General Assembly), Pass –Through Entity Tax
Email from Patty Culler of Hahn, Loeser & Parks LLP to The Estate Planner's and Administrator's List, Re: Electing Small Business Trust in Ohio dated March 3, 1999

**EXHIBIT B**

Tax Opinion letter to Jeffrey F. Welles from Jenkens & Gilchrist, P.C., dated January 2, 2001
U.S. Returns of Partnership Income for Stobie Creek Investments LLC for
a) March 3, 2000- April 30, 2000
b) May 1, 2000 – December 31, 2000
c) Calendar Years 2001-2005
U.S. Individual Income Tax Returns for Jeffrey W. and Maud Welles, 1999-2002
Biography of Robert E. Kolek from the Schiff Hardin LLP website
Biography of Tomas R. Wechter from the Schiff Hardin LLP website
Biography of Matthew C. Crowl from the Schiff Hardin LLP website
Biography of Colleen M. Feeney from the Schiff Hardin LLP website
Biography of Mike Zhiyuan Xu from the Schiff Hardin LLP website
Biography of Thomas A. Cotter from the Shumaker Loop & Kendrick LLP website
"BDO Seidman, LLP adds New Principals in Chicago and Charlotte," BDO Seidman, LLP Press Release (02-04-02)
Profile of John v. Ivsan, J.D., L.L.M. from the MDI Offshore Advisors, LLC website
Robert J. Floyd, CPA License information from the Ohio License Center website

All documents, cases, articles, and other materials cited in the body of this report and the footnotes thereto.

**EXHIBIT B**

**STOBIE CREEK INVESTMENTS LLC et al vs. UNITED STATES**

## STOBIE CREEK INVESTMENTS LLC

## COMPARATIVE FINANCIAL STATEMENTS

**FOR THE PARTIAL YEAR 2000 AND CALENDAR YEARS 2001 THROUGH 2005**

**BASED ON ACCRUAL METHOD OF ACCOUNTING BOOK INCOME - INCOME TAX BASIS**

**(AS DERIVED FROM PARTNERSHIP INCOME TAX RETURNS)**

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|
| ***BALANCE SHEET*** | | | | | | |
| ASSETS | | | | | | |
| *Cash and Receivables* | | | | | | |
| Cash | 22,175,905 | 8,884,976 | 6,575,095 | 96,336,041 | 16,589,380 | 5,631,951 |
| Margin Deposit | 0 | 0 | 0 | 30,468 | 0 | 48,938 |
| Escrow Receivable | 20,542,916 | 20,542,916 | 20,542,916 | 0 | 0 | 0 |
| Accrued Income Receivable | 1,127,935 | 1,135,995 | 1,084,747 | 1,059,909 | 1,718,504 | 1,843,895 |
| *Total Cash and Receivables* | 43,846,756 | 30,563,887 | 28,202,758 | 97,426,418 | 18,307,884 | 7,524,784 |
| *Investments* | | | | | | |
| U.S. Government Obligations | 15,143,603 | 9,989,806 | 10,786,631 | 10,788,047 | 11,179,900 | 9,989,806 |
| Tax-Exempt Securities | 95,047,554 | 63,884,997 | 63,165,339 | 94,734,035 | 101,943,520 | 109,100,313 |
| Common Stock | 98,338,896 | 99,871,102 | 72,347,684 | 122,247,424 | 181,927,493 | 150,486,578 |
| Preferred Stock | 353,870 | 2,207,396 | 4,723,149 | 4,291,636 | 4,165,491 | 4,000,000 |
| Partnership Interests | 16,900,000 | 27,675,000 | 33,501,032 | 38,437,965 | 60,155,309 | 69,773,875 |
| Unrealized Gain (Loss ) - Investments | (2,806,060) | (5,663,866) | (10,126,541) | 17,588,220 | 37,104,774 | 39,806,577 |
| *Total Investments* | *222,977,863* | *197,964,435* | *174,397,294* | *288,087,327* | *396,476,487* | *383,157,149* |
| **TOTAL ASSETS** | **266,824,619** | **228,528,322** | **202,600,052** | **385,513,745** | **414,784,371** | **390,681,933** |
| LIABILITIES | | | | | | |
| Accounts Payable | 0 | 0 | 0 | 0 | 0 | 40,000 |
| *Total Liabilities* | *0* | *0* | *0* | *0* | *0* | *40,000* |
| MEMBERS' CAPITAL | | | | | | |
| Member Capital Accounts - Beginning | 0 | 266,824,619 | 228,528,322 | 202,600,052 | 385,513,745 | 414,784,371 |
| Capital Contributed During Year | 306,838,396 | 2,520,079 | 29,219,119 | 176,527,397 | 51,996,464 | 2,603,901 |
| Net Income (Loss) Per Books | 4,960,181 | (11,376,313) | (13,479,731) | 24,171,955 | 26,963,888 | 21,410,992 |
| Distributions to Members | (44,973,958) | (29,440,063) | (41,667,658) | (17,785,659) | (49,689,726) | (48,157,331) |
| *Total Members' Capital - Ending* | *266,824,619* | *228,528,322* | *202,600,052* | *385,513,745* | *414,784,371* | *390,641,933* |
| **TOTAL LIABILITIES AND CAPITAL** | **266,824,619** | **228,528,322** | **202,600,052** | **385,513,745** | **414,784,371** | **390,681,933** |

**EXHIBIT C**

**STOBIE CREEK INVESTMENTS LLC et al vs. UNITED STATES**

**STOBIE CREEK INVESTMENTS LLC**

**COMPARATIVE FINANCIAL STATEMENTS**

**FOR THE PARTIAL YEAR 2000 AND CALENDAR YEARS 2001 THROUGH 2005**

**BASED ON ACCRUAL METHOD OF ACCOUNTING BOOK INCOME - INCOME TAX BASIS**

**(AS DERIVED FROM PARTNERSHIP INCOME TAX RETURNS)**

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|
| ***INCOME STATEMENT*** | | | | | | |
| INCOME | | | | | | |
| *Trade or Business Income (Loss)* | | | | | | |
| Ordinary Income (Loss) - Partnerships | 386,682 | 717,453 | (10,899) | 117,962 | 423,875 | 1,569,503 |
| ST Capital Gain (Loss) - Partnerships | (142,507) | (379,209) | 295,831 | (97,428) | 103,505 | 546,466 |
| LT Capital Gain (Loss) - Partnerships | (37,583) | (854,790) | (71,893) | 475,630 | 504,958 | 1,117,555 |
| §446 Ordinary Swap Income (Loss) | 0 | 0 | (13,052) | 18,420 | 358 | 28,755 |
| §475(f) Ordinary Income (Loss) | 0 | 0 | 0 | 0 | 76,065 | 250,280 |
| §988 Ordinary Income (Loss) | 0 | 0 | (29,224) | (119,830) | (155,874) | 176,031 |
| §1256 Income (Loss) - Partnerships | (107,615) | (313,085) | (19,676) | (88,544) | (15,819) | (18,855) |
| Income (Loss) From Outside Brokers | 0 | 0 | 0 | (164,042) | (1,337,922) | 156,888 |
| *Total Trade or Business Income (Loss)* | *98,977* | *(829,631)* | *151,087* | *142,168* | *(400,854)* | *3,826,623* |
| *Rental Real Estate Income (Loss)* | *(276)* | *(684)* | *(1,497)* | *(5,383)* | *(4,363)* | *(39,111)* |
| *Investment Income* | | | | | | |
| Taxable Interest Income | 1,306,139 | 2,116,456 | 973,457 | 826,133 | 1,524,309 | 1,926,795 |
| Tax-Exempt Interest Income | 3,723,517 | 3,237,272 | 2,911,774 | 2,581,023 | 2,945,964 | 3,978,462 |
| Net Change in Accrued Interest Purchased | (403,645) | 377,993 | (9,190) | (24,882) | (33,485) | 44,311 |
| Ordinary Dividend Income | 1,009,536 | 2,064,271 | 1,895,789 | 2,361,547 | 5,390,259 | 4,689,304 |
| Royalty Income | 0 | 0 | 0 | 0 | 6,558 | 5,451 |
| §446 Ordinary Swap Gain (Loss) | 0 | 0 | 0 | 29,894 | 49,701 | 23,931 |
| §751 Ordinary Gain - Sale of Partnership Interest | 0 | 0 | 0 | 0 | 0 | 89,348 |
| §987 Ordinary Gain (Loss) | 0 | 0 | 0 | 4,913 | 14,229 | (11,108) |
| §988 Ordinary Gain (Loss) | (95,510) | (13,956) | (628) | (524) | (61,422) | 82,113 |
| §1256 Capital Gain (Loss) | 0 | 0 | (1,052,315) | (319,226) | (343,169) | 112,065 |
| Other Gains (Losses) from Partnerships | 14 | 1 | (443,985) | (50,659) | (1,789,016) | (6,636,458) |
| Net Change in Accrued Income Receivable | 1,056,348 | 52,342 | (34,025) | (26,101) | 642,436 | 129,535 |
| *Total Investment Income* | *6,596,399* | *7,834,379* | *4,240,877* | *5,382,118* | *8,346,364* | *4,433,749* |

**EXHIBIT C**

**STOBIE CREEK INVESTMENTS LLC et al vs. UNITED STATES**

## STOBIE CREEK INVESTMENTS LLC

## COMPARATIVE FINANCIAL STATEMENTS

**FOR THE PARTIAL YEAR 2000 AND CALENDAR YEARS 2001 THROUGH 2005**

**BASED ON ACCRUAL METHOD OF ACCOUNTING BOOK INCOME - INCOME TAX BASIS**

**(AS DERIVED FROM PARTNERSHIP INCOME TAX RETURNS)**

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|
| *Gain (Loss) on Assets* | | | | | | |
| Ordinary Gain (Loss) - DOIS | (2,045,750) | 0 | 0 | 0 | 0 | 0 |
| LT Capital Gain (Loss) - Therma-Tru Stock | **5,442,303** | 0 | 0 | 0 | 0 | 0 |
| Capital Gains Dividend Income | 0 | 0 | 0 | 11,815 | 1,177,135 | 1,405,559 |
| ST Capital Gain (Loss) - Securities | (906,216) | (10,566,735) | (3,651,251) | 944,375 | 1,616,186 | 877,955 |
| LT Capital Gain (Loss) - Securities | 0 | (1,249,504) | (7,702,243) | (6,413,959) | 954,840 | 10,782,759 |
| ST Capital Gain (Loss) - Partnerships | (314) | 1,121,260 | 628,150 | 195,436 | 609,848 | 706,292 |
| LT Capital Gain (Loss) - Partnerships | 1,671 | 12,316 | 1,063,985 | (1,793,030) | 642,833 | 3,040,089 |
| LT Capital Gain (Loss) - Installment Sales | 0 | 0 | 0 | 290,384 | 0 | 0 |
| §1231 Gain (Loss) | 785 | 9,768 | 2,689 | 5,979 | 4,748 | 63,288 |
| §1293 Qualified Electing Fund Income (Loss) | 0 | (422,706) | (559,238) | 476,088 | (393,699) | (237,191) |
| Net Change in Wash Sale Gain (Loss) | (161,996) | (1,149,633) | (313,605) | (91,455) | (111,300) | 39,293 |
| Net Change in Unrealized Gain (Loss) - Investments | (2,806,060) | (2,857,815) | (4,462,672) | 27,714,759 | 19,516,544 | 2,701,799 |
| *Total Gain (Loss) - on Assets* | *(475,577)* | *(15,103,049)* | *(14,994,185)* | *21,340,392* | *24,017,135* | *19,379,843* |
| **TOTAL INCOME (LOSS)** | **6,219,523** | **(8,098,985)** | **(10,603,718)** | **26,859,295** | **31,958,282** | **27,601,104** |
| EXPENSES | | | | | | |
| Expenses Allocable to Tax-Exempt Income | 650,257 | 762,337 | 445,454 | 381,421 | 650,829 | 834,078 |
| FITW/Enhanced Oil Recovery Credit | 171 | 2,039 | 598 | 2,340 | 508 | 802 |
| Foreign Taxes Paid / Foreign Taxes Recoverable | 3,450 | 54,182 | 42,000 | 44,913 | 99,224 | 87,233 |
| Investment Interest Expense-Investments | 493 | 1,441 | 7,810 | 9,578 | 18,851 | 46,227 |
| Investment Interest Expense-Trade or Business | 35,554 | 239,702 | 198,593 | 261,436 | 412,915 | 1,282,958 |
| Investment Management Fees | 470,495 | 1,914,565 | 1,793,831 | 1,578,982 | 3,140,749 | 3,114,296 |
| Organization Expense | 24,996 | 0 | 0 | 0 | 0 | 0 |
| Other Deductions | 0 | 11 | 10 | 790 | 1,093 | 6,292 |
| Portfolio Deductions from Partnerships | 73,926 | 303,051 | 387,717 | 407,880 | 670,225 | 818,226 |
| **TOTAL EXPENSES** | **1,259,342** | **3,277,328** | **2,876,013** | **2,687,340** | **4,994,394** | **6,190,112** |
| **NET INCOME (LOSS) PER BOOKS** | **4,960,181** | **(11,376,313)** | **(13,479,731)** | **24,171,955** | **26,963,888** | **21,410,992** |

**EXHIBIT C**

**STOBIE CREEK INVESTMENTS LLC v. UNITED STATES**
**THE NASDAQ STOCK PRICE INDEX**
**JANUARY 1, 1997 THROUGH DECEMBER 31, 2002**




# EXHIBIT D