IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------ X
STOBIE CREEK INVESTMENTS, LLC, :
JFW ENTERPRISES, INC., Tax :
Matters and Notice Partner, :
Plaintiff, : No.
vs. : 1:05-cv-748
UNITED STATES OF AMERICA, :
Defendant. :
------------------------------ X

Deposition of Ira B. Shepard
Friday, October 26, 2007
Washington, D.C.

Pages 1 - 139
Job No. 183641
Reported by: Kathy Savich, RPR

Friday, October 26, 2007
10:05 a.m.

Deposition of IRA B. SHEPARD held at the offices of:

Schiff Hardin, LLP
1666 K Street, N.W., Suite 300
Washington, D.C.

Pursuant to notice, before Kathy Savich, Registered Professional Reporter and Notary Public in and for the District of Columbia.



APPEARANCES:

On Behalf of the Plaintiff
Schiff Hardin, LLP
6600 Sears Tower
Chicago, Illinois 60606
(312) 258-5609
mcrowl@schiffhardin.com
ajacob@schiffhardin.com
BY: Matthew C. Crowl, Esquire
Ayad Jacob, Esquire

On Behalf of the Defendant
U.S. Department of Justice Tax Division
P.O. Box 403
Washington, D.C. 20044
(202) 307-6586
cory.a.johnson@usdoj.gov
BY: Cory A. Johnson, Esquire



INDEX


| EXAMINATION OF SHEPARD BY | PAGE |
| --- | --- |
| Mr. Johnson | 5 |

| SHEPARD DEPOSITION EXHIBITS: | PAGE |
| --- | --- |
| 1 - Shepard expert report | 7 |
| 2 - Letter and attachments from Garcia to Fiske and Rouhandeh dated 3/26/07 | 102 |
| 3 - Three pages of Westheimer handwritten notes | 113 |
| 4 - Westheimer handwritten diagram | 120 |
| 5 - Draft of Shepard expert report | 120 |
| 6 - Letter and attachments from Jenkens & Gilchrist to Welles dated 1/2/01 | 120 |




PROCEEDINGS

Thereupon,

IRA B. SHEPARD,

the Witness, called for examination by counsel for the Defendant, and, after having been sworn by the notary, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANT

BY MR. JOHNSON:

Q. Good morning.

A. Good morning.

Q. Could you state your full name and residential address for the record.

A. Ira Shepard, S-h-e-p-a-r-d, 3767 -- 3767 Elmora, E-l-m-o-r-a -- one word -- Street, Houston, Texas.

Q. Have you given a deposition before, Mr. Shepard?

A. No.

Q. Let me just go over some of the ground rules. I'm sure you've met with counsel from plaintiff, and they've told you

Q. Okay. And that's at least one of the opinions you intend to offer at trial?
A. Yes.
Q. Okay. You mentioned earlier the economic substance doctrine -- or we were talking earlier, at least, about the economic substance doctrine and the business purpose doctrine.
Are you familiar with the Coltec case?
A. Yes.
Q. Are you familiar with both the Court of Federal Claims decision and the Federal Circuit decision?
A. Yes.
Q. Do you disagree with the Federal Circuit's decision?
A. I don't think that's why I've been retained in this case to agree or disagree with decisions of the Federal Circuit.
Q. Nevertheless, do you disagree with that decision?



MR. CROWL: I'm just going to object for relevance.
THE WITNESS: I agree with much of the criticism of that decision which I have outlined in my report at pages 54 through 64 of that report.
BY MR. JOHNSON:
Q. My question was, though, not whether you agree with the criticisms, but do you, yourself, disagree with that decision, the Federal Circuit decision?
MR. CROWL: Objection.
THE WITNESS: I share the criticisms and I agree with the criticisms. It's not up to me to agree or disagree with a Federal Circuit decision in this report -- in this expert witness testimony.
BY MR. JOHNSON:
Q. Well, let me ask you about the Court of Federal Claims' decision in the Coltec case. As a professor and a tax lawyer for a number of years, did you agree with the



Court of Federal Claims decision that the economic substance doctrine violated the separation of powers?
MR. CROWL: Objection.
THE WITNESS: Again, that is not why I have been retained to criticize decisions of the Court Of Federal Claims.
BY MR. JOHNSON:
Q. I understand that. But I'm trying to find the -- explore the bases of your opinions, and I am just wondering if you have an opinion one way or the other whether the economic substance doctrine violates the separation of powers?
MR. CROWL: And I'm going object to relevance, and it's a pure legal conclusion.
MR. JOHNSON: As you know, Mr. Crowl, I'm sure, relevance objections are preserved and not appropriate at a deposition.
MR. CROWL: Then I'll stand on the second which is a pure legal conclusion.
THE WITNESS: I think case



decisions, court decisions are the tools with which I work, and I don't view myself as a judge of judges or as a critic of their decisions. They have -- they may have more or less to offer on any particular issue. They may be useful or not useful for future purposes. But I don't think I refer to them as right or wrong.
BY MR. JOHNSON:
Q. You told me at the beginning that it was your opinion that the IRS was wrong in this case regarding its application of the law to the facts, right?
A. Right.
Q. Can you detail for me the issues upon which you disagree about the application of the law to the facts in this case?
A. In order to do that, I would have to refer to my report.
Q. Okay. Well, we marked it as Exhibit 1, so please feel free to refer to it.
A. I have already referred to my

Page 18

disagreement with the IRS position on technical tax issues on pages 43 to 48. And there were four technical tax issues that I addressed.

The first technical tax issue with which I disagree is that the IRS position is that the potential liability on the digital option investment strategy short position -- the IRS took the position that that potential liability did reduce basis. I disagree with that.

Q. And that's an application of Section 752?

A. That is correct, Section 752 in combination with Section 708, 754, 743(b).

Q. What's your understanding as to -- well, is it your understanding that the plaintiffs obtained a basis boost or increase in basis of the Therma-Tru stock pursuant to the transactions that they entered into that are at issue?

A. It is my position that the law, as

Page 19

applied to these facts, resulted in the plaintiffs having the basis that they claimed on their tax return.

Q. Now, what's your -- well, how did that come about? Did that come about through Section 754 and 743 or Section 708? Or are those independent means? Or did it happen in combination of all those sections? Can you specify for me the precise statutory grounds that allowed the basis increase?

MR. CROWL: Objection. Compound.

THE WITNESS: You objected.

BY MR. JOHNSON:

Q. I'm sorry. Do you understand my question? I'm trying to find out whether you believe that it's 708 that gives the basis increase or whether it's 754 and I think 743.

A. I think that it is the operation of all of those that, as they are properly applied to the facts of this transaction, gives the result that the plaintiffs reported on their tax returns.

Page 20

Q. Okay. I interrupted you. You were going through the technical tax issues about which you disagree with the IRS, and you mentioned 752 and 753 and 708. Why don't we go on to -- why don't you continue on?

A. Continuing on to page 45, I disagree with the conclusion that the DOIS, digital option investment strategy, transactions were part of a single transaction; instead, I believe that they were separate offsetting opposite options.

The third --

Q. Could I stop you there --

A. Surely.

Q. -- and ask you a couple of follow-ups about that second issue?

What's your basis for saying that the long and the short option in the -- well, let's just make sure we're on the same page. Each one entered into a Euro/U.S. dollar digital option, right?

A. Yes.

Page 21

Q. And you're saying that it's your opinion that there was a long and a short and the long and the short were separate options; is that right?

A. That's right.

Q. What's the basis for that opinion?

A. A number of bases that are set forth more fully and more precisely at pages 45 to 47 of my report. And these -- this conclusion is based in part on the -- on the authorities cited in those pages which include decisional authority as well as Lawrence -- Professor Kolb's opinion which he takes the position that these options are separate and distinct.

My conclusion is one of law and not of economics.

Q. Okay. You're not an economist or an option trader?

A. I am not an option trader. I have always been interested in economics and -- but I do not describe myself as an economist

because I lack the mathematics.
Q. Okay. All right. Moving on, then, from that opinion, why don't we continue on to the next technical tax issue.
A. The next technical tax issue is the applicability of Section 165(c)(2) to deny the Stobie Creek plaintiffs any losses on the ground that they were not entered into with a profit motive.
Q. And that would be the denial of a -- are you speaking of the denial of a deduction for the $2 million in premium they paid for the options?
A. I think that is the only loss to which 165(c)(2) could possibly apply.
Q. And it's your opinion that that loss should be allowed under 165(c)(2)?
A. Based upon the profit motive with which the plaintiffs entered into these transactions, it is my opinion that this loss is not -- is not disallowed by 165(c)(2).
Q. Okay. Now, you say based on the



profit motive with which they entered into the transaction. What do you base your belief on that there was a profit motive?
A. I base my belief that there was a profit motive on a review of the depositions in this case, a review of the documents in this case. That is what I base my belief.
Q. Okay. You also say in that section on profit motive on page 47 that the IRS reached its conclusion "without appropriately considering the facts and circumstances of these taxpayers."
Do you see that reference there, that last paragraph on page 47?
A. Yes.
Q. Okay. What do you base that statement on?
A. I base that statement on my review of the depositions and other documents in this case, and I do not believe that the IRS would have appropriately reached this conclusion had they considered the facts and circumstances



that were existing at the time they filed -- they put together their notices, but were subsequently confirmed by the deposition testimony.
Q. Now, when you're talking about the IRS -- the IRS' position or notice, are you talking about the -- we shorthand it as an FPAA, the final notice of partnership adjustment that was issued to Stobie Creek?
A. That is my reference -- that is my particular reference, although as noted in the footnote on page 1, I use the word -- the term "IRS" in this report to apply to the government generically, whether it be Justice Department, Treasury Department, or what have you.
Q. Okay. So I guess -- maybe to back up, when you said earlier that you disagreed with the IRS' application of the law to the facts, you're also including the Treasury and Department of Justice?
A. To the extent that they have



applied the law to the facts.
Q. All right. Moving on, on the technical tax issues, what comes after 165, Section 165?
A. Section 465 on page 48.
Q. And I take it it's your opinion that Section 465 does not apply to this case?
A. Yes.
Q. All right. It looks like the next section deals with nontechnical tax issues, so have we exhausted the technical tax issues upon -- or about which you disagree with the Government's application of the law to the facts?
A. Those are the ones that are in the report, and those are the ones that I've addressed in my report. It may be possible that the IRS makes additional technical tax objections, and I haven't addressed those in my opinion, as yet.
Q. Sitting here today, do you know of any that you intend to address, technical tax

issues?
A. I cannot think of any right now offhand, but it may be entirely possible that additional technical tax issues may surface in the future.
Q. Okay. The next section, since we're going through this, is -- deals with nontechnical tax issues; is that right?
A. Yes.
Q. Okay. And does this section, then, deal with the -- your criticisms or disagreements with the Government's position about the application of the law to the facts regarding nontechnical tax issues?
A. Yes.
Q. Okay. Why don't you -- what are the nontechnical tax issues about which you have a different view?
A. The first is addressed on page 49 through 51 of my report, and that is the application of regulation Section 1.701-2.
Q. That's the anti-abuse partnership



rule?
A. Yes.
Q. And am I correct that based on your reading of that regulation and the -- your reading of the facts, it doesn't apply in this case?
A. It is my opinion that the regulation should not apply in this case.
Q. Okay. I see in that section you quote a number of things, including -- let me see -- a letter from Treasury -- Assistant Secretary of the Treasury and a tax partner at Katten Muchin and a law professor named Hoffman Fuller and another professor named David Weisbach.
Can you tell me why you don't think the anti-abuse regulation applies?
A. In your question, you stated that there was a letter from the Assistant Secretary of the Treasury for Tax Policy. If you look at footnote 131, the letter I was referring to in that footnote was a letter to



the Assistant Secretary of the Treasury for Tax Policy.
Q. You're right. I'm sorry. I misread that.
A. I have lost your question.
Q. Sure. Can you tell me why you think the anti-abuse rule does not apply?
A. I think that the conclusory -- the last sentence in this portion of my opinion sums it up, that this regulation has been on the books for more than a dozen years and it has never been applied by any court. And I view it as a dead letter.
Q. Okay. What's the next nontechnical tax issue about which you have a different view?
A. Well, the next nontechnical tax issue comes under the generic heading on page 51 that the Stobie Creek, LLC, and digital option strategy were not shams. And the IRS position is that Stobie Creek is a sham entity that had no business purpose that



entered into a sham transaction that lacked economic substance for federal income tax purposes.
And I disagree with the application of these doctrines to the Stobie Creek digital option investment strategy transaction.
Q. Is it fair to say that that disagreement is based on your reading of the law regarding that doctrine and experience as a tax lawyer?
A. It is based primarily on my reading of the record -- in this case, the depositions, other documents, and applying the law to that record.
Q. Okay.
A. Or -- excuse me. Or applying the law to the facts as they are reflected in that record.
Q. Okay. Now, is the next issue the business purpose doctrine?
A. I would say that the business -- the heading on page 52 is a subheading to the

heading on 51. And the business purpose doctrine discussion on pages 52 to 54 dealt with the nontax-avoidance purposes with which the Stobie Creek plaintiffs entered into these transactions.

Q. And then you go on to address the application of the economic substance doctrine; is that right?

A. That is -- that is correct. And I do this in two separate contexts. The first is on pages 54 through 64 in which I address this in terms of the test in the Federal Circuit, and the second context in which I address this begins on page 64 and goes through page 73 where I address it in terms of the Supreme Court's test.

Q. And why do you do it in those two different contexts?

A. Because I wanted to cover this issue in two different frames. The first frame is the frame which the Federal Circuit has taken with respect to the economic



substance doctrine. The second frame is the frame with -- which the Supreme Court has taken with respect to the economic substance doctrine.

Q. And is it your understanding that those two frames are somehow different?

A. I think a comparison of pages 54 to 64 of my opinion with pages 64 to 73 of my opinion will give full perspective to the way that I believe the law should be applied to the facts.

Q. Now, do you come to a conclusion as to whether the transaction in this case passes the economic substance test under the Federal Circuit test -- or frame, to use your word?

A. Yes.

Q. And what is your conclusion?

A. My conclusion is that it does pass the Federal Circuit test to the extent that I understand the Federal Circuit test.

Q. And do you have an opinion as to whether the transaction passes the economic



substance test under the Supreme Court's framework?

A. Yes.

Q. And what's that conclusion?

A. I think that it does pass the economic substance test under the Supreme Court's test, again, to the extent that I understand the Supreme Court's test.

Q. Now, where does the economic substance come from in this -- in these transactions?

MR. CROWL: Objection.

THE WITNESS: I don't understand the question.

BY MR. JOHNSON:

Q. Well, you've told me that the transaction passes the economic substance test under both frameworks you've set out in your report. I'm wondering what is it, what are the facts, what are the things you're relying upon when you say that the transaction meets the economic substance doctrine?



A. On pages 3 through 9 of my report, I look at the historical background of the facts and circumstances of these transactions. And based upon these facts and circumstances as well as the discussion on pages 9 and 10 of my report as to the particular transaction itself, it is based upon those that I reach the opinion that the transaction passes or complies with the economic substance test.

Q. I noticed that you -- I think you read Dr. Kolb's report and Dr. Levich's report and Dr. Frankel's report.

A. I did, in addition to reading Dr. DeRosa's report as well, all of which were available to me at the time I wrote this report.

Q. Did you rely upon anything those gentlemen said in their reports for the purposes of reaching your opinions about economic substance?

A. I relied -- when I relied on their reports, I specifically so stated, as at one

Page 34

point, I did specifically rely upon Dr. Kolb's report on page 47. I cannot state with specificity whether I relied upon any of these four reports with respect to the economic substance test. I'm not consciously aware of having relied on any of them at this point.

Q. Do you recall whether the -- Dr. DeRosa on one hand and Drs. Levich and Kolb on the other hand came to different conclusions as to whether or not there was a reasonable opportunity of making a profit from these options?

A. I don't have any specific recollection, but I do know that I relied upon conclusions in Dr. DeRosa's report as well as in the reports of the other three experts in coming to my conclusion.

Q. What conclusions of Dr. DeRosa did you rely upon?

A. I relied in part -- and this is all I can think of at the moment -- on his discussion of the percentages of possibilities

Page 35

of the digital options falling or ending up in taxpayer's favor as opposed to their ending up in the bank's favor.

And so I did look at and rely upon Dr. DeRosa's conclusions there, as I did the conclusions on that issue by the other experts.

Q. Do you recall that Dr. DeRosa concluded that the options had a negative expected rate of return?

A. Yes.

Q. How did that factor into your opinions?

A. It did not.

Q. And why didn't it play a part in your opinions?

A. Because that is not the test, to my understanding. The test is whether there was a reasonable possibility of obtaining a profit, which is very different from whether there is a negative expected return.

Q. And is it your understanding

Page 36

that -- well, did Drs. Kolb, Levich or Frankel opine as to whether or not there was a reasonable possibility of profit?

A. I do not remember. What I do remember is that they opined as to the percentage possibilities of obtaining a profit, and to me, those percentage possibilities represented a reasonable possibility.

Q. So is it correct to say that you came to the conclusion that there was a reasonable possibility of profit based on the percentages you read in the reports of Dr. Levich and Dr. Kolb?

MR. CROWL: Object to form.

THE WITNESS: In part. Yes, in part.

BY MR. JOHNSON:

Q. What other part is there?

A. I'm sorry. Could you repeat the question before the current question.

MR. JOHNSON: I'll have it read

Page 37

back.

(The reporter read the record as requested.)

BY MR. JOHNSON:

Q. Is there some other basis that you're looking to other than the probabilities you read in Dr. Levich's and Kolb's reports, for your conclusion that there was a reasonable possibility of profit?

A. Yes.

Q. And what are those other bases?

A. I am sorry. That thought has just gone out of my head. And I will try to, if you would like, to take it up after a break --

Q. Sure.

A. -- I will try to bring that thought back.

Q. Okay.

MR. CROWL: Actually, Mr. Johnson, we've been going for an hour. Do you want to take a break now and then continue? Or do you want to --

MR. JOHNSON: Let me follow up with a couple of questions --
MR. CROWL: Absolutely.
MR. JOHNSON: -- and then we'll break shortly.
BY MR. JOHNSON:
Q. What standard or metric do you apply to determine that there is a reasonable possibility of profit?
A. The standard that I do apply is how the words "reasonable possibility" have been used in the tax law cases thereunder, just in general.
Q. Are there particular cases you're thinking of or relying upon?
A. I have no particular cases in mind.
Q. Do you have some threshold of probability in mind that -- above which is reasonable and below which is unreasonable?
A. Well, I think the definition of "substantial" in the tax law is greater than reasonable. And "substantial," substantial



possibility has been defined in the tax law to exist somewhere in the 15, 16 percent range.
So "reasonable" being less than "substantial," I believe exists at a number below 15 to 16 percent and I'm not sure where I would draw that boundary, but I think that "reasonable" is a lesser test than "substantial."
Q. Where is "substantial" defined in the tax law as about 15 to 16 percent?
A. In the interpretations of former Section 341, the word "substantial" has been defined, and I am basing this on recollection of many years ago, but I recall that "substantial" there was defined in the 15 to 16 percent range.
Q. Is former Section 341 another section now or did that disappear from the code?
A. It mercifully disappeared from the code.
Q. And did you go back to -- I take it



from your comment that you're going by recollection, that in connection with this case, you didn't go back and look at the case law or the regs to refresh your recollection of the definition?
A. That is correct.
MR. JOHNSON: Why don't we take a break.
(Recess.)
BY MR. JOHNSON:
Q. We're back after a break. Professor Shepard, let me ask you just a follow-up. You mentioned the old -- the former Section 341. What did that deal with? What was the 341 about?
A. 341 was about collapsible corporations.
Q. That's in the section of the code that deals with taxation of corporations?
A. Yes.
Q. Or it was in the code in that section? When did it drop out of the code?



A. I don't remember when it formally dropped out of the code.
Q. Do you know if it was in the '86 act or before that or after that?
A. I believe it was after the '86 act.
Q. Do you think it was prior to 1989?
A. It hung on for many years after which it was of any use.
The '86 act -- elimination of the general utilities doctrine made Section 341 pretty much of a dead letter with only vestigial effect, and I'm not sure when it was formally excised from the code.
Q. Okay. As you know, a lot of your -- well, I hope all of your work papers were produced, and you produced a lot of the case law you looked at and the depositions and documents.
Do you recall producing those things?
A. Yes, sir.
Q. The underlining -- well, not

underlining, but highlighting in the expert reports, was that highlighting done by you?
A. The highlighting in the expert reports or in the -- or in the cases?
Q. The highlighting in the expert reports of Drs. Kolb, Levich, Frankel or DeRosa.
A. That was not done by me.
Q. Who was that done by?
A. That was done by Alan Westheimer.
Q. Did you actually read those reports?
A. Yes.
Q. Did you read copies that had been highlighted by Mr. Westheimer?
A. No.
Q. Did you make any annotations or highlighting on the copies you read?
A. No.
Q. Who is Mr. Westheimer?
A. Mr. Westheimer is a CPA.
Q. And did he assist you with your


work in this case?
A. He did.
Q. In what way did he assist you?
A. He assisted me in several ways. One is that he has an office and a secretary who are available full-time to us. As a professor, I have to share a secretary with nine other professors, and I am not fully free to use her on non-university work.
He also assisted me in having computerized programs, such as Summation, with which we could together examine depositions to find particular locations in depositions.
He also has forms for things like retainer letters on his computer -- or engagement letters on his computer that we used.
Q. Did he assist you in any other ways?
A. Yes.
Q. What were those?
A. I'm trying to give you all that I


can recall. We wrote these reports sitting side by side. And he would do the keying into the computer of the reports sentence by sentence following our discussion of what that next sentence was going to be.
Q. Maybe you can describe that a little bit more for me, that process. Are you saying that you and he sat down together and discussed this, and he then typed in the report to the word processing program?
A. Yes, sir. But it was done on a sentence -- it was done one sentence at a time.
Q. And were you sort of dictating and he was entering it into the computer?
A. Sometimes.
Q. Did he contribute portions of the report?
A. Oh, sometimes we would discuss a concept, and he would type a sentence with that language and ask me whether I agreed with that sentence.


Q. Are there any portions in your final report with which you disagree?
A. No.
Q. Okay.
A. But I did disagree with some of his initial formulations, in which case whatever was put down would be reformulated until I agreed with it.
Q. Why did you use that procedure, sitting down with Mr. Westheimer and doing it the way you described?
A. Because he has experience in having been an expert witness, and I enlisted his help on this matter because I have no experience in being an expert witness in the sense of writing reports. And it's correct that I enlisted his help on the Carmel Partners matter initially, and then we followed the same procedure on this Stobie Creek matter.
Q. Which report did you write first, Carmel or Stobie Creek?

A. Carmel.
Q. The report in Stobie Creek in this case, was that all completely originally composed by you or did you cut and paste from any source to an extent to add to this report?
A. Portions of the Stobie Creek report were -- I'm sorry. Portions of the Carmel reports were initially pasted into the Stobie Creek report, but then each sentence was considered, eliminated, changed or kept as appropriate for this report.
Q. Any other source other than the Carmel report from which you took material for this report in this case?
MR. CROWL: I'm going to object to form.
THE WITNESS: Some of the material was taken from the cases, law review articles, that were quoted in there.
BY MR. JOHNSON:
Q. Okay. Other than things that, you know, you've obviously indicated in the report



as being quotations, any of the text, was that taken from any other writings you have done in the past, any law review articles, any other articles?
A. Yes. Some of it comes from the articles that Professor McMahon and I wrote on recent developments in federal taxation that were publish in the Florida Law Review. And some of the language, again, was taken from some of our case write-ups or other development write-ups and initially pasted into the report and then revised.
Q. Okay. I just asked you -- as you know, you have an extensive discussion of various cases in the report, and I was curious whether some of those discussions of cases you had done previously in a law review or some other sort of publication.
And I guess what you're telling me is that some of that discussion comes from work you've done for the Florida Law Review and other publications, at least some of them



with Professor McMahon?
A. Yes.
Q. Before we move on to the next nontechnical tax issue, in the economic substance discussion we have been talking about the expert reports and Dr. Kolb's report and Levich and DeRosa and the others.
Were you ever provided with a corrected report by Dr. Kolb?
A. I don't understand your question. I was provided with a report from Dr. Kolb, and I do not recall ever receiving a second report from Dr. Kolb.
Q. Well, let me -- your report is dated October 1, 2007, right?
A. Right.
Q. We received on October 6 a copy of a -- some corrections to Dr. Kolb's report. He made some errors in terms of understanding the numbers or the amounts of the options in his initial report. Were you ever provided with that October 6 report from Dr. Kolb that



corrected the errors in his initial report?
A. Not that I am aware of.
Q. Did you ever speak or meet with Drs. Kolb, Levich or Frankel?
A. No.
Q. Were you provided with any other documents they created other than their final reports, such as their underlying work papers or drafts?
A. Not that I'm aware of.
Q. Have you -- they were all deposed last week. Have you been told anything about their testimony?
A. No.
Q. Have you seen their deposition transcripts?
A. No.
Q. Okay. We had a little diversion there, but we were talking about -- previously, we were talking about the nontechnical tax issues about which you have a different view than the Government. And we

had gotten through, I think, the anti-abuse rule, the sham doctrine and business purpose and economic substance, I think.
Any other nontechnical tax issues that you have an opinion about in this case?
A. There is an opinion on pages 73 and 74 of my report with respect to the objective test for economic substance.
Q. And what opinion is that?
A. That opinion is that the Stobie Creek plaintiffs had a reasonable opportunity to earn a reasonable profit, independent of tax considerations from their digital options strategy, and thus, that it met the objective prong of the economic substance test.
Q. Upon what do you base your conclusion that there was a reasonable possibility of profit, independent of tax considerations?
A. I base it on the material that I cite and explain on pages 73 and 74 of my report.



Q. In that section there, you talk about an allocation of the fees paid to Jenkens & Gilchrist and Shumaker, Loop & Kendrick; is that right?
A. Yes.
Q. And you have an allocation up there. What's the -- well, you have an allocation between what you call tax savings and what you call nontax profit potential. What's the basis for your allocation there?
A. The basis of my allocation is that it is a pro rata allocation.
Q. And why do you think a pro rata allocation is appropriate?
A. Because a pro rata allocation meets the test of being empirical as opposed to being arbitrary.
Q. What do you mean by it "meets the test of being empirical"?
A. If -- by that I mean one could be arbitrary and say there are two possible benefits that can be obtained, so we will



split the cost 50/50.
But one might also say, "let us be arbitrary and split the cost 90/10 or split the costs 100/0." That is an arbitrary split.
An empirical split is where one says that the Stobie Creek plaintiffs were seeking both an investment profit and tax benefits, and let us split the cost based upon the quantum of the investment profit relative to the tax benefit potential profit.
Q. Are you looking to something in tax law for support for this pro rata allocation?
A. I do cite at the bottom of page 73, in footnote 211, a private letter ruling where the IRS allocated or took the position that legal fees should be allocated between the portion that was with respect to the investment and the portion that was with respect to tax advice.
I base my opinion in part upon that private letter ruling.
Q. Do you know how the Jenkens &



Gilchrist and Shumaker, Loop & Kendrick fees were set?
MR. CROWL: I'm going to object to mischaracterization --
THE WITNESS: I do not know how they were set. There is some testimony that they were set in terms of a percentage -- a percentage of the digital option investments.
BY MR. JOHNSON:
Q. Do you know whether or not the Welles' or Stobie Creek were liable to pay the fees to Jenkens & Gilchrist and Shumaker, Loop & Kendrick whether or not they claimed the tax benefits in the Stobie Creek tax returns?
A. I do not know.
Q. Would that fact be important to your decision or your opinion as to the allocation?
A. No.
Q. Anything other than the private letter ruling upon which you're basing your

Page 54

allocation opinion?
A. Yes.
Q. What is that?
A. That is, if you enter into a transaction with the objective of achieving two things, then the fees should be allocated between those two things. The economic substance doctrine, as it is sometimes applied, is placed in terms of, would there be a reasonable probability of profit in a world which federal taxation did not exist; therefore, in my opinion, one should distinguish fees that were paid in connection with tax planning from fees that were paid in connection with planning the investment transaction.
Q. Do you know whether the Welles' would have entered into this transaction if it didn't have the potential for the 40-plus million dollars in tax benefits?
MR. CROWL: Objection. Form.
THE WITNESS: I do not know.

Page 55

BY MR. JOHNSON:
Q. Would the answer to that question be important to your allocation decision or opinion?
MR. CROWL: Same objection.
THE WITNESS: The record reflects that the Welles' entered into this transaction both for the investment profit potential and for the tax benefits. I, therefore, conclude that they entered into the transaction for both reasons. I do not know whether they would have entered into this transaction had there been no investment profit potential, nor do I know whether they would have entered into this transaction had there been no tax benefit potential.
BY MR. JOHNSON:
Q. If you assume that they would not have entered into it if the tax benefit was not there, would that affect your allocation opinion?
MR. CROWL: Objection to form.

Page 56

THE WITNESS: I have not thought about that question, and I would like time to reflect on it and come up with an opinion.
BY MR. JOHNSON:
Q. Sitting here today, you don't have an opinion one way or another, then; is that correct?
A. Well, I based my opinion on the fact that the Welles family entered into this transaction for both reasons. And I have not considered the possibility of their having entered into it for one or the other reason.
Q. Any other bases, other than the ones you've just told me about, upon which you base your opinion that the fees should be allocated as you set forth on page 74.
A. I cannot think of any right now, and I would have to see whether there were any other bases in my written opinion, but there are no other bases that I can think of at the moment.
Q. Professor Shepard, I take it it is

Page 57

also your opinion that the plaintiffs -- that a penalty should not be imposed in this case?
A. Yes, it is.
Q. And is it also your opinion that even if a penalty were to be determined applicable, the plaintiffs are eligible for the reasonable cause and good faith defense to penalties?
A. Yes.
Q. And that's based on your understanding of Section 6662 and 6664 in the accompanying regulations, is that right?
A. Yes.
Q. And also based on your understanding of the facts in the record in this case?
A. Yes.
Q. And so, again, you disagree -- to the extent that the Government thinks that the penalties are appropriate and applicable, you disagree with the Government's position?
A. Yes.

# REPORTER'S CERTIFICATE

I, Kathy Savich, the undersigned Registered Professional Reporter and Notary Public in and for the District of Columbia, do hereby certify that the above-named witness, after having been first duly sworn to testify to the truth, did testify as set forth in the foregoing pages, that the testimony was reported by me in stenotype and transcribed under my personal direction and supervision, and is a true and correct transcript.

I further certify that I am not of counsel, not related to counsel or the parties hereto, and not in any way interested in the outcome of this matter.

SUBSCRIBED AND SWORN TO under my hand.

My Commission Expires: 1/1/2012

Kathy Savich, RPR
Notary Public in and for the
District of Columbia