IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

-----------------------------------x

| | | |
|---|---|---|
| STOBIE CREEK INVESTMENTS LLC, JFW ENTERPRISES, INC., Tax Matters and Notice Partner, | : | |
| Plaintiff, | : | |
| v. | : | No. 05-748T |
| UNITED STATES OF AMERICA, | : | |
| Defendant. | : | |

-----------------------------------x

**PLAINTIFF'S EXPERT REPORT OF STUART A. SMITH**

Stuart A. Smith
460 Park Avenue
New York, New York 10022
Tel.: 212-759-8285
Fax: 212-759-4032

I have been asked by counsel for the Plaintiff in this partnership federal income tax refund suit to review a 123-page opinion letter dated January 2, 2001, of the Chicago law firm of Jenkens & Gilchrist, P.C., that was issued to Jeffrey Welles (hereinafter sometimes referred to as "Welles" or the "Taxpayer") and other members of the Welles family and various trusts for their benefit, concerning the transaction at issue in this case (the "Transaction"). This Opinion analyzes the federal income tax consequences of a number of investment transactions in which the Taxpayer, acting through his Delaware single-member limited liability company, engaged as a partner in another Delaware limited liability company, Stobie Creek Investments LLC ("Stobie Creek" or the "Partnership"), which is treated as a partnership for federal income tax purposes.

Specifically, I have been asked to address the question whether the Opinion of this law firm is of the quality and character upon which taxpayers such as Welles could reasonably rely in preparing his tax returns.[1]

This Opinion concludes that there was a greater than 50 percent likelihood that variously identified positions sought by the Taxpayer would be upheld if challenged by the Internal Revenue Service, and that, on an overall basis, there was a greater than 50 percent likelihood that the tax treatment described in the Opinion would be upheld if challenged by the Internal Revenue Service. It is my understanding that the Stobie Creek Partnership through which the Transaction was conducted, and Welles and the members of his family and other owners of interests in the Partnership, prepared and filed their

---

[1] For convenience, I refer in this Report to the Jenkens & Gilchrist Opinion issued to Jeffrey Welles. I am advised that identical Opinions were issued to the other members of the Stobie Creek partnership, viz., members of the Welles family and various trusts established for their benefit.

2000 federal income tax returns in accordance with the conclusions reached in this Opinion issued by Jenkens & Gilchrist.

For the reasons set forth in greater detail below, I am of the opinion that the Jenkens & Gilchrist Opinion is of the character and quality upon which taxpayers such as Welles and the members of his family could reasonably rely in preparing their tax returns on the basis of the conclusions reached in the letter. In addressing this question, I am aware that the Internal Revenue Service has subsequently challenged the conclusions of this Opinion and has disallowed the tax treatment claimed for the Transaction in which Welles and the members of his family engaged. But the position of the Internal Revenue Service is not the last word in resolving a question of tax law. Under our system of tax administration, it is open to a taxpayer (as here) to challenge a determination of the Internal Revenue Service in court. In analyzing the tax consequences of the Transaction, the Jenkens & Gilchrist Opinion dated January 2, 2001, found no judicial authority that was contrary to its conclusions. Moreover, it is pertinent to note that at this juncture, there is no court decision at any level that has thus far upheld the Internal Revenue Service's legal attack against the Transaction at issue in this case.

The fact that the Internal Revenue Service may challenge the Taxpayer's treatment of transactions is not inconsistent with the conclusion of the Opinion that the Service is more likely than not incorrect in its position. Nevertheless, with the exception of the comments that follow, I will not attempt to determine the "correct" substantive tax treatment of the complex Transaction in question. I will instead focus my discussion in this Report primarily upon the question whether the Opinion received by Welles is of the type, and has the character and quality, on which a taxpayer could rely.

Pursuant to the requirements of F.R.Civ.P. 26(a)(2)(B), I set forth in Appendix A to this Report my resume, which describes my professional career and qualifications, and the compensation to be paid for this Report and my testimony, and the cases in which I have testified as an expert at trial or by deposition within the preceding four years.

In reaching my conclusion, I have examined all of the statutory, judicial, and administrative authorities cited in my Report; the final Jenkens & Gilchrist Opinion dated January 2, 2001, and the authorities cited therein; the Complaint filed in this case; the deposition transcripts of the following persons: Stephen Bores (9/29/06), David Herpe (12/8/06), Virginia Welles Jordan (12/22/06), David K. Welles, Jr. (7/24/07), Peter Cluett Welles (12/13/06), Christopher Scott Welles (12/14/06), Jeffrey Welles (12/15/06, 8/8/07), Georgia E. Welles (7/31/07), Robert Floyd (7/3/07, 8/2/07), David Waterman (8/1/07), Thomas Cotter (8/2/07), Donna Guerin (8/3/07), David Parse (8/6/07), Craig Brubaker (8/7/07), Lawrence W. Goldstein (8/7/07), Perry Parker (8/8/07), Charlotte Welles (8/16/07), John Ivsan (8/17/07) and William Vogel (8/22/07); the following deposition exhibits: Steven Bores Exhibits 1-3, Craig Brubaker Exhibits 537-556, Thomas Cotter Exhibits 1-5, Robert J. Floyd Exhibits 1-19, L. Goldstein Exhibits 1-14, Donna Guerin Exhibits 1-14, David Herpe Exhibits 35-49, J. Ivsan Exhibits 1-14, Virginia Jordan Exhibits 50-67, David Parse Exhibits 500-536, Perry Parker Exhibits 557-567, J. Shih Exhibits 605-624, W. Vogel Exhibits 563-604, David Waterman Exhibits 1-16, Christopher Welles Exhibits 87-95, David K. Welles Exhibits 68-74, 135A-137, Jeffrey Wells Exhibits 96-129, Peter Welles Exhibits 75-86, 130-135; the expert witness reports of Professor Robert W. Kolb dated September 11, 2007, Professor Richard M. Levich dated September 13, 2007, Professor Jeffrey A. Frankel dated

September 14, 2007, and David F. DeRosa, Ph.D., dated September 14, 2007; the Stobie Creek Partnership tax returns (Form 1065) for the periods 3/3/00 to 4/30/00, and 5/1/00 to 12/31/00; and the pertinent provisions of Treasury Circular 230, Appendix B, infra, that were extant in 2000 and in early 2001 and which prescribed the Internal Revenue Service's administrative standards for the issuance of tax opinions. I have also examined the Taxpayer's representations set forth in the Jenkens & Gilchrist Opinion.

In addition, I have also examined the following documents: draft tax opinion of Jenkens & Gilchrist transmitted to the Taxpayer by the law firm of Shumaker, Loop & Kendrick, LLP, on August 21, 2000; draft tax opinion of Jenkens & Gilchrist transmitted to Larry Goldstein, Chief Financial Officer of the Stobie Creek Partnership by the law firm of Shumaker, Loop & Kendrick, LLP, on January 25, 2001; Government's First Request for Admission and Third Set of Interrogatories to Plaintiff, and Plaintiff's Answers to the Government's First Request for Admission and Third Set of Interrogatories, with associated documents; Minutes of Incorporator of JFW Enterprises Inc. and Operating Agreement of JFW Investments, L.L.C.

I am also aware that the members of the Welles family intervened in an IRS summons enforcement proceeding against Jenkens & Gilchrist seeking documents relating to the Transaction at issue, and that on March 10, 2005, the district court enforced the summons, holding, in an unreported decision, that the attorney-client privilege did not apply because the documents were not kept confidential.

See United States v. Jenkens & Gilchrist, P.C., 2005 WL 1300768 (N.D. Ill.).[2] I am also aware that both Jenkens & Gilchrist and Deutsche Bank concluded financial settlements with the government, and that various lawyers of that firm and employees of that bank have invoked their Fifth Amendment privilege against compulsory self-incrimination.[3]

I have also drawn upon my extensive experience as a tax lawyer for more than 40 years during which I have addressed, both in government service as Tax Assistant to the Solicitor General in the Department of Justice and in private practice, the tax consequences of comparable transactions and the reliability of written tax opinions for those transactions.

Moreover, I am fully familiar with the general type of transaction at issue in this case because I served as an expert witness for the Plaintiffs in Klamath Strategic Investment Fund v. United States, 472 F. Supp. 2d 885 (E.D. Texas 2007), which involved a comparable transaction with respect to which two law firms' tax opinions were rendered that employed analyses that were similar to the Jenkens & Gilchrist Opinion in this case. In Klamath, the Court accepted the conclusions I reached in my

[2] I am also aware of a series of decisions enforcing IRS summonses against accounting firms and law firms seeking documents containing client identity information. See, e.g., United States v. BDO Seidman, 337 F.3d 802 (7th Cir. 2003); Doe 1&2 v. KPMG, L.L.P., 325 F.Supp. 2d 746 (N.D. Tex. 2004); United States v. Sidley Austin Brown & Wood LLP, 93 AFTR 2d 2004-1849 (N.D. Ill.), decided April 15, 2004; United States v. Jenkens & Gilchrist, P. C., 93 AFTR 2d 2004-2074 (N. D. Ill.), decided April 20, 2004; United States v. Sidley Austin Brown & Wood LLP, 93 AFTR 2d 2004-2031 (N.D. Ill.), decided April 28, 2004; United States v. Jenkens & Gilchrist, P.C., 93 AFTR 2d 2004-2465 (N.D. Ill.), decided May 13, 2004; United States v. Jenkens & Gilchrist, P.C., 93 AFTR 2d 2004-2288 (N.D. Ill.), decided May 14, 2004.

[3] I am aware that both Jenkens & Gilchrist and Deutsche Bank are the subject of criminal investigations by the United States Attorney in the Southern District of New York. As a result, no adverse inference against the Plaintiff in this case should be drawn by the Fifth Amendment privilege claims of Jenkens & Gilchrist lawyers and Deutsche Bank employees.

Report and my testimony that the two law firms' tax opinions involved in that case complied with professional and Treasury standards. It therefore ruled that the taxpayers in that case were entitled to rely on the two law firms' opinions and accordingly relieved the taxpayers of civil penalties sought by the Internal Revenue Service. For the reasons set forth below, I reach the same conclusion with respect to the Jenkens & Gilchrist Opinion in this case.

I. Reliance Upon Professional Advice Is Both Reasonable and Necessary

The tax law is complex and is often difficult to understand and apply. Tax professionals therefore frequently provide written opinions to taxpayers to assist them in understanding and reporting the tax consequences of their transactions. And, it is common for taxpayers to look to the written advice and recommendations of attorneys who are versed in the tax law in planning and reporting their transactions. In light of the great complexities of the modern tax law, it is plainly reasonable for taxpayers to look to such professional advice in conducting their business affairs whenever such advice is of sufficient character and quality to warrant their reliance. Indeed, in view of the enormous complexities of the provisions of the Internal Revenue Code, there is no realistic alternative for individuals, partnerships or corporate taxpayers: reliance on properly prepared professional advice is not only reasonable, it is a fundamental necessity of modern life.

## II. The Opinion Involved in This Case Meets the Standards for Taxpayer Reliance

It is a common standard in the tax field that, in deciding whether to rely on professional advice, taxpayers are expected to choose qualified advisors and to obtain opinions from them that are both objectively and subjectively reasonable. For the reasons discussed below, those widely accepted standards are well satisfied in this case.

The Treasury Department has also applied, in its administrative practice, a different and more complicated standard that addresses the conduct of practitioners who provide tax opinions and who are enrolled to practice before the Internal Revenue Service. This standard is set forth in detail in the version of § 10.33 of Circular 230, Appendix B, infra, that was extant on January 2, 2001, the date of the opinion involved in this case. This Section of the Treasury Circular states that a practitioner who provides a "tax shelter opinion" analyzing the federal tax consequences of a tax shelter investment is to comply with five separate enumerated requirements.[4]

The five elements that Treasury Circular 230 requires a practitioner to include in a tax shelter opinion are:

- The practitioner must make inquiry as to all relevant facts.
- The practitioner must relate the law to the actual facts.

[4] The version of § 10.33 during the year 2000, the tax year addressed by the Opinion, was identical to the version extant on January 2, 2001, the date of the Opinion of Jenkens & Gilchrist. During 2000, Treasury Circular 230, § 10.33 defined a "tax shelter opinion" as "advice by a practitioner . . . directed to persons other than the client who engaged the practitioner to give the advice." Since the Jenkens & Gilchrist Opinion was prepared for that firm's clients, viz., Welles, the members of the Welles family, and the other members of the Stobie Creek Partnership, the standards of Treasury Circular 230 did not strictly apply to it. Nevertheless, the Opinion complies with the standards of Treasury Circular 230.

- The practitioner must ascertain that all material federal tax issues have been considered, and all of those issues which involve the reasonable possibility of a challenge by the Internal Revenue Service have been fully and fairly addressed.
- The practitioner must provide an opinion whether it is more likely than not that the taxpayer will prevail on the merits of each material tax issue which involve a reasonable possibility of a challenge by the Internal Revenue Service.
- Where possible, the practitioner must provide an overall evaluation whether the material tax benefits in the aggregate more likely than not will be realized.

For the reasons that follow, I believe that the Jenkens & Gilchrist Opinion meets all five of the Treasury requirements adopted for its administrative practice. While it is plainly not necessary for an opinion to satisfy the particular requirements of this Circular for a taxpayer to act reasonably in relying on it, it is nonetheless of interest that the Opinion obtained by the Taxpayer in this case meets even the government's own standards.

Because the Opinion involved in this case complies <u>both</u> with the standards common to the profession and also with the administrative standards established by Treasury Circular 230, this Opinion unquestionably constitutes an opinion of the type and character upon which the Taxpayer could reasonably rely.

(1) <u>Factual Matters</u>. One requirement contained in the Circular (that is not a component of the common professional standards of tax practitioners) is that the practitioner is to make inquiry as to all relevant facts and be satisfied that the material facts are accurately and completely described in the offering materials, and assure that any representations as to future activities are clearly identified, reasonable and complete.

The Opinion complies with this requirement. There is a detailed description in the Jenkens & Gilchrist Opinion that confirms that the opinion writer has inquired as to all relevant facts. This discussion is set forth in the Jenkens & Gilchrist Opinion under the caption "Facts."[5] Hence, the firm was fully familiar with all of the factual details pertaining to the Transaction.

Specifically, for purposes of Jenkens & Gilchrist rendering its Opinion, the Taxpayer represented, inter alia, that: (1) he entered into the purchase and sale of the Options for substantial non-tax business reasons, including (a) to produce overall economic profits because of his belief that the Euro/U.S. Dollar exchange rate and the Swiss Franc/U.S. Dollar exchange rate would change, and (b) his belief that the most direct way, with the most leverage, to realize gain from expected changes in currency prices was the purchase and sale of the Options;[6] (2) he contributed the Options to the

---

[5] See Jenkens & Gilchrist Opinion Letter (pp. 2-3).

[6] Three of the expert witness reports reinforce the reasonableness and accuracy of the Taxpayer's representations concerning his expectation of the profit potential in the Options trading. Specifically, Professor Kolb concludes that it was reasonable for the Taxpayer to anticipate a profitable investment outcome especially given his view of the market. Kolb points out that a slightly different timing for the same investment strategy would have yielded a profit with respect to the Swiss Franc/Dollar Options. Professor Levich concludes that the probability for a 200% return was in the range of 9-21% for the Euro/Dollar Options and in the range of 15-27% for the Swiss Franc/Dollar Options. He further concludes that the probability for the 200 times return was much smaller. Finally, Professor Frankel concludes that the Taxpayer's Option investment strategy was reasonable because it was in accord with the general premise of currency traders at the time that the Euro was undervalued against the Dollar while the Swiss Franc was overvalued against the Dollar. Indeed, even Dr. DeRosa, the government's expert witness, acknowledges in his Report (p. 54) that the probability of an in-the-money return for the Euro/Dollar and Swiss Franc/Dollar Options was 11.43% and 19.95%, respectively. While Dr. DeRosa further concludes that the $6 million in legal fees paid by the Welles family for legal services, including $4 million for the Jenkens & Gilchrist

(footnote continued)

Partnership for substantial non-tax business reasons, including, but not limited to, potential diversification of the risks of certain investments, the desire to co-invest as partners with the other members of the Partnership, and for his convenience; (3) his contribution of his interest in JFWLLC to JFW INC. [an S corporation] was made for substantial non-tax business reasons, including, but not limited to, the ability to engage in estate planning, shared investment management, ownership with other anticipated shareholders, and asset protection planning; (4) neither the Taxpayer, the Partnership, nor JFW INC. were obligated to engage in any transaction to which the Opinion relates upon the completion of any other of such transactions; and (5) to the best of the Taxpayer's

---

(footnote continued)

Opinion and \$2 million to Shumaker, Loop & Kendrick, should be taken into account in considering whether the Transaction had a reasonable likelihood of profit, it is my opinion that the major portion of these fees are allocable to tax advice and not to the cost of the Options. Hence, the major portion of the legal fees paid by the Welles family would not enter into the calculus of the profits from the Options trading. Rather, as Professors Kolb and Levich conclude, the only fees paid by the Welles family that would be allocable to the Options trading was the \$2 million they paid to Deutsche Bank.

It should be noted that the members of the Stobie Creek Partnership did not deduct any of the legal fees because they were, in any event, subject to the alternative minimum tax ("AMT"), pursuant to which the deduction was eliminated (Goldstein Dep. 8/7/07, p. 177). However, because the major portion of such fees was for tax advice that recommended that the Stobie Creek Partnership acquire the Therma-Tru shares, it would have been reasonable to conclude that this portion of the legal fees could have been capitalized and added to the basis of the non-cash assets acquired by the Stobie Creek Partnership, i.e., the Therma-Tru shares. See PLR 8108008, and cases cited therein.

In pursuing foreign currency Options trading, Jeffrey understood that it was a highly speculative investment. Although his net economic loss on the trading was \$2 million, he recognized that he might have achieved an overall profit had he continued to execute the overall strategy for a period going forward. However, once he incurred a substantial loss, he decided to abandon Options trading and to deploy the family's resources in less risky investments (Jeffrey Welles Dep. 12/15/06, p. 197; 8/8/07, pp. 142-144).

knowledge, he has provided to Jenkens & Gilchrist all the facts and circumstances necessary for it to form its opinion (see Opinion, pp. 7-8).[7]

Based upon the facts as stated and the Taxpayer's representations, the Opinion analyzes the tax consequences of a series of transactions, all of which were completed by the Taxpayer as of December 31, 2000. Accordingly, there are no representations as to future activities of the parties to the Transaction. In my view, Jenkens & Gilchrist was amply justified in accepting these representations as true without an independent verification insofar as there is nothing about them that would appear to be untrue or unreasonable. See Treasury Circular 230, § 10.33(a)(1)(ii).[8]

(2) Relate Law to Facts. The practitioner is also required to relate the law to the actual facts and, when addressing issues based on future activities, clearly identify what facts are assumed. The Opinion also complies with this requirement. For example, on pages 3-5 of the Jenkens & Gilchrist Opinion, the Opinion sets forth ten different positions and conclude that it is more likely than not that they will be upheld if

---

[7] Jeffrey Welles personally reviewed the representations that he made on behalf of himself and that he was authorized to make on behalf of the other members of his family (Jeffrey Welles Dep. 12/15/06, pp. 68, 209). See p. 12, n. 8, pp. 17-18, n. 11, infra.

[8] Although each of the Welles family members participated in the Transaction, they deferred to Jeffrey Welles ("Jeffrey") who was most actively involved in reviewing it and recommending it to the family. Prior to organizing the family office to oversee its investments, Jeffrey, a Columbia Business School graduate, had 14 years of experience in investment management at Goldman Sachs and Lazard Freres. During this period, he had become familiar with many different types of financial instruments, including foreign currency Options (Jeffrey Welles Dep. 12/15/06, pp. 10-31). In 2000, members of the Welles family established a foundation for their charitable giving. Jeffrey proceeded to engage in the Transaction on behalf of himself and the other members of the family because he thought it was an opportunity to earn a substantial profit in the Options and thereby generate more funds for the family foundation. He also recognized that the Transaction had tax benefits as well (Jeffrey Welles Dep. 12/15/06, p. 67).

challenged by the Internal Revenue Service. Accordingly, the Opinion concludes that the Taxpayer will be able to claim long-term capital gain on the disposition of certain shares (in Therma-Tru Corporation) held by an S corporation, equal to the amount realized less the S corporation's basis in the shares as adjusted in accordance with a Section 754 election made by the Stobie Creek Partnership. The Opinion also concludes that, on an overall basis, it is more likely than not that three different possible theories to increase the Taxpayer's capital gain will not be upheld if they are advanced by the Internal Revenue Service.

There are comprehensive discussions in the Jenkens & Gilchrist Opinion that closely and completely relate the applicable tax law to the facts of the case. With respect to the Stobie Creek Partnership, the Jenkens & Gilchrist Opinion (Appendices I and J) concludes that the disposition of the shares will result in capital gains equal to the amount realized less the Partnership's basis in the shares.

This conclusion is also objectively reasonable because it is squarely supported by the language of the applicable statutory provisions that were then extant. In particular, the central tax issue in this case concerns the treatment of "contingent" liabilities in determining the Taxpayer's "basis" in his ownership of his Partnership interest under Section 752 of the Code. The determination of the Opinion that the Taxpayer's obligations under the Short Option is only a "contingent" liability, and that under the case law such a "contingent" liability does not reduce the partner's basis in his partnership interest, represented an objectively reasonable conclusion at the time the Opinion was issued.

As the Jenkens & Gilchrist Opinion recognized (Appendix E, pp. E-1 to E-25), the Service took the position in several cases that it won prior to 1999 that a "contingent" liability is not to be taken into account in partnership basis calculations when doing so would have had the effect of decreasing the taxpayer's taxes. Because a reversal by the Service of its position would have been inconsistent with the agency's duty to apply the tax laws neutrally and evenhandedly, it was objectively reasonable for the Opinion to follow the Service's longstanding historical position.

The Opinion's conclusion that the obligation under the Short Option was not a liability within the meaning of Section 752 and its conclusion with respect to the resulting basis of the Taxpayer's Partnership interest is the heart of the Opinion insofar as they are the legal foundation for the calculation of the Taxpayer's basis in his Partnership interest and for the calculation of the amount of his claimed capital gains on the sale of the Therma-Tru shares.

Furthermore, the objective reasonableness of the Opinion's conclusion on the law extant in the year 2000 is reinforced by the actions of the Service taken long after the consummation of the Transaction at issue in this case. On June 24, 2003, the Service promulgated temporary Regulations which apply retroactively to assumptions of liabilities by partnerships occurring after October 18, 1999.[9]

Finally, the Section 752 legal analysis of the Transaction set forth in the Jenkens & Gilchrist Opinion was thereafter upheld in Klamath Strategic Investment Fund LLC v. United States, 440 F.Supp. 2d 608 (E.D. Tex. 2006), involving a similar transaction.

[9] The issuance of a retroactive Regulation in 2003 that related back to 1999 and the preamble to that Regulation represents an explicit acknowledgment by the Service that it was attempting to change the law.

There, the Court flatly rejected the Service's attempt to change its position on the definition of "liability" under Section 752 of the Internal Revenue Code. The legal analysis of the Klamath Court therefore confirms the reasonableness of the "more likely than not" conclusions of the Jenkens & Gilchrist Opinion that was issued to Welles. As the Klamath Court stated, in terms that eloquently support the analysis which formed the basis of the Opinion in this case (440 F.Supp. 2d at 619):

> It is clear from the record that the government has often and consistently relied on the principle that a "liability" under Section 752 does not include an obligation that is contingent. The government has applied this principle when it works to its benefit (to increase taxes owed). This Court will consistently apply these same principles even if they sometimes work to the benefit of taxpayers (to decrease taxes owed). The Court's analysis of "liability" under Section 752 will not vary in meaning simply based on whose ox is being gored.

Moreover, the Court in Klamath held that the Service's retroactive Temporary Regulation, which sought to change the law, was ineffective for conduct occurring before August 11, 2000, the date of the issuance of IRS Notice 2000-44 attacking the transaction. The Court therefore denied the government's motion for summary judgment.[10]

---

[10] The Jenkens & Gilchrist Opinion (Appendix M) discusses, inter alia, the authorities cited in Notice 2000-44, and concludes that they all involved situations in which the losses were not "bona fide" because the taxpayers in those cases did not change their economic position. Hence, the Opinion reasonably concludes that the authorities are distinguishable from the Transaction in this case. Accordingly, it opines that it was more likely than not that the IRS would not be able to contend successfully that the basis adjustment claimed by the Taxpayer from the Transaction was not bona fide. Jenkens & Gilchrist's conclusion with respect to Notice 2000-44 was also analyzed by the Taxpayer's other legal advisors, who agreed with it (Cotter Dep. 8/2/07, pp. 62, 139; Goldstein Dep. 8/7/07, p. 107; Waterman Dep. 8/1/07, pp. 173, 184).

At all events, the issuance of the IRS Notice in August 2000 did not foreclose Welles and his family from reporting the Transaction on their 2000 tax returns filed in

(footnote continued)

After trial, the Court in Klamath rejected civil penalties sought by the IRS on the ground that the taxpayers relied in good faith upon the advice of accountants and tax lawyers who had issued comprehensive written opinions that were comparable to the Jenkens & Gilchrist Opinion. See 472 F.Supp. 2d 885 (E.D. Texas 2007), decided January 31, 2007.

Finally, the Klamath Court has recently reaffirmed its ruling that the term "liability" under Section 752 does not include an obligation that is contingent and that the retroactivity of Treasury Reg. § 1.752-6 was ineffective to the taxpayers in that case. The Court therefore denied the government's motion to vacate its summary judgment ruling on Section 752 as moot. The Court also held that the taxpayers could deduct the operational and interest expenses that were associated with the transactions in that case on the ground that the transactions had economic substance apart from the tax benefits. See 2007 U.S. Dist. LEXIS 24806, decided April 3, 2007.

(3) Identification of Material Issues. The practitioner is to ascertain that all material federal tax issues have been considered, and that all of those issues which

---

(footnote continued)

October 2001 in accordance with the conclusions of the Jenkens & Gilchrist Opinion. The binding authority of an IRS Notice is no greater than that of a revenue ruling. See Rev. Rul. 90-91, 1990-2 C.B. 262; Constantino v. TRW, Inc., 13 F.3d 969, 980-981 (6th Cir. 1994). The Tax Court has generally treated a revenue ruling merely as the view of one of the parties to the litigation, see, e.g., Trinova Corp. and Subsidiaries v. Commissioner, 108 T.C. 68 (1997); Pasqualini v. Commissioner, 103 T.C. 1, 8, n. 8 (1994) (citing, Tandy Corp. v. Commissioner, 92 T.C. 1165, 1170 (1989)), or, at most, as "advisory only" and a mere "useful guide, outlining some of the factors to be considered" in interpreting the Code; Burck v. Commissioner, 63 T.C. 556 (1975), aff'd, 533 F.2d 768 (2d Cir. 1976). Thus, the authoritative force of an IRS Notice ranks below that of a court decision or a Treasury Regulation.

involve the reasonable possibility of a challenge by the Internal Revenue Service have been fully and fairly addressed.

The Jenkens & Gilchrist Opinion complies with this requirement. It identifies twelve different statutory and judicial theories which the Internal Revenue Service might invoke to disallow the Taxpayer's claimed tax treatment. The Opinion concludes (p. 8) that the described tax consequences have substantial authority and that it is more likely than not that the Taxpayer will prevail if challenged by the IRS. The Opinion sets forth a detailed discussion (Appendices K and L) of various theories that the Internal Revenue Service might possibly advance. These include the step transaction doctrine, sham transaction, economic substance and business purpose doctrines,[11] and the partnership

---

[11] The reasonableness of the Jenkens & Gilchrist Opinion with respect to non-tax business purpose and profit motive is reinforced by the deposition testimony of Jeffrey Welles. This testimony described the process Jeffrey Welles undertook to review the proposed Option positions. As indicated above (p. 10, n. 6, supra), Jeffrey had considerable experience in the financial industry. Employing his professional experience, Jeffrey analyzed in detail the foreign currency Options which were the subject of the Transaction. In order to determine whether the pricing was fair, Welles compared the quotations with data from Bloomberg, conducted his own research, and consulted with persons at Goldman Sachs and Morgan Stanley, as well as with Deutsche Bank, the ultimate counterparty. Thereafter, in order to maximize the profit on the Options trades, he calculated the expected rate of return by multiplying the notional amount of the premium by the various probabilities of results that would obtain as of the expiration of the Options. (Jeffrey Welles Dep. 12/15/06, pp. 97, 111, 119, 127, 145-149; Jeffrey Welles Dep. 8/8/07, pp. 79, 84, 162).

The deposition testimony of Jeffrey and various legal advisors to the Welles family also establishes that close attention was paid to insuring the accuracy of the Taxpayer's representations with respect to business purpose set forth in the Jenkens & Gilchrist Opinion. For example, one family lawyer recognized that the transfers of the Therma-Tru stock to the Stobie Creek Partnership were to achieve family unity in consolidating their investment assets in one centralized entity (Herpe Dep. 12/8/06, p. 79; Jeffrey Welles Dep. 12/15/06, pp. 75, 172-173; Dep. 8/8/07, p. 49). Other family legal advisors confirmed that the formation of the limited liability companies was for asset

(footnote continued)

anti-abuse rules. All of these possible theories are discussed in great detail in the Opinion, which concludes that the Taxpayer is more likely than not to prevail in any challenge by the Internal Revenue Service.

(4) Opinion On Each Material Issue. Where possible, the practitioner is to provide an opinion whether it is more likely than not that an investor will prevail on the merits of each material tax issue presented by the offering which involves a reasonable possibility of a challenge by the Internal Revenue Service.

The Jenkens & Gilchrist Opinion complies with this requirement. The discussion of each material tax issue is accompanied by a conclusion that it is more likely than not that the taxpayer will prevail on the merits if challenged by the Internal Revenue Service.

The issue and the citation to the more likely than not conclusions are as follows:

A. JFW Investments, LLC ("JFW"), as a single member limited liability company, should be disregarded as an entity for federal income tax purposes. Appendix A.

B. Investing in the Options by JFW should not be taxable, and the Options should be treated as separate instruments for federal income tax purposes. Appendix B.

C. Stobie Creek Investments LLC (the "Partnership") should be classified as a partnership for federal income tax purposes. Appendix C.

---

(footnote continued)

protection purposes. The purpose of forming the S corporations was to provide a vehicle for gifting, flexibility in moving interests without interfering with the Stobie Creek Partnership accounting, limitation of liability reasons, and to achieve a particular Ohio state income tax saving that was available for those family members who were resident in Ohio (Waterman Dep. 8/1/07, p. 84; Cotter Dep. 8/2/07, p. 99; Jeffrey Welles Dep. 12/15/06, pp. 165, 199, 250-251).

D. The Taxpayer's contributions of the Options to the Partnership should not result in a taxable gain or loss. Appendix D.

E. The Short Option should not be a liability within the meaning of Section 752 of the Internal Revenue Code of 1986, as amended. Appendix E.[12]

F. The Taxpayer's basis in his interest in the Partnership after the contribution of the Options should include the cost of the Long Option contributed, without adjustment for the Short Option. Appendix F.

G. An adjustment to the Taxpayer's adjusted bases in his Partnership interest should be required as a result of the expiration of the Options, due to the recognition of loss on such expiration under Section 1234 of the Internal Revenue Code. Appendix G.

H. The Taxpayer's contribution of his interest in JFW LLC to JFW INC. should be treated as a transfer of JFW LLC's interest in the Partnership and should not be a taxable transaction, and JFW INC.'s basis in the Partnership interest contributed by the

[12] The objective reasonableness of the Jenkens & Gilchrist Opinion on this position is confirmed by the notes that Richard Starke, an attorney with the IRS Office of Chief Counsel, prepared in 1995. At that time, Starke made a set of notes in connection with a briefing of then IRS Chief Counsel Stuart Brown. Starke's notes stated that "existing authority is contrary to a position that options create liabilities." The authority in question, Helmer v. Commissioner, 34 T.C.M. 727 (1975), had held, at the behest of the IRS, that an option does not create a partnership liability. A briefing memorandum prepared for the Chief Counsel is quoted in Starke's notes as stating "We agree existing authority prevents treating options as creating liabilities." The Jenkens & Gilchrist Opinion (App. E, pp. E-7 to E-25) relies upon Helmer for its conclusion that the Short Option should not be a liability within the meaning of Section 752. In his notes, Starke writes that "if we had to choose one poison or another, [Chief Counsel Brown] tended [to] agree with Helmer (a position IRS perhaps needs, lesser of two evils)." Starke's notes were produced in Jade Trading, LLC v. United States, Fed. Cl., No. 03-2164T, and were made an exhibit in that case and they have been published by Tax Analysts Document Service (See Doc. 2005-20853). I have read Starke's notes and his testimony in the Jade Trading case given on September 8, 2005, in which he confirmed the accuracy of his notes which stated that Helmer was good authority, and that regulations rather than a revenue ruling would be needed to overrule it. See Tax Analysts 2005 TNT 198-1. See p. 14, n. 9, supra.

Taxpayer should be equal to his basis in such Partnership interest as of the date of such contribution. Appendix H.

I. The Taxpayer's basis in his interest in JFW INC. should be increased by an amount equal to the adjusted basis of his interest in the Partnership as of the date of contribution. Appendix I.

J. The effect of the Section 754 election should be that the Partnership's basis in its property should be increased with respect to JFW INC. Appendix J.[13]

K. The step transaction, sham transaction, and economic substance doctrines should not apply to the Transaction. Appendix K.

L. Treasury Regulation, Section 1.701-2 should not apply to the transaction described herein. Appendix L.

(5) Overall Evaluation. Where possible, the practitioner is to provide an overall evaluation whether the material tax benefits in the aggregate more likely than not will be realized.

The Opinion complies with this requirement. The Jenkens & Gilchrist Opinion to Welles summarily states (p. 8) as follows with respect to all of its conclusions: "Based on the foregoing, and subject to the qualifications, limitations and assumptions set forth herein, we are of the opinion that the described tax consequences have substantial

[13] As a result of the Section 754 election, Sections 743 and 755 required an upward adjustment of the basis of the non-cash assets held by the Partnership, viz., the shares of Therma-Tru that the Taxpayer contributed to the Partnership. This basis carried over to JFW INC., the S Corporation.

authority and it is more likely than not that you will prevail if challenged by the IRS."[14] In reaching this conclusion, the Jenkens & Gilchrist Opinion identified no judicial authority that was to the contrary.

[14] This conclusion complies with § 10.33(a)(5)(ii) of Circular 230 which allows a practitioner to make an overall evaluation only when "it is based on a conclusion that substantially more than half the material tax benefits, in terms of their financial impact on a typical investor, more likely than not will be realized if challenged by the Internal Revenue Service." That condition has been met in this case insofar as the Jenkens & Gilchrist Opinion concluded that the described tax consequences were all supported by substantial authority.

III. Conclusion

In light of the above, it is my conclusion that the Opinion of Jenkens & Gilchrist I have reviewed that was issued to Welles is objectively reasonable and that it complies in all respects with the professional requirements common to the tax profession and also with the specific internal administrative practice requirements of Treasury Circular 230, § 10.33. In these circumstances, it constitutes an opinion upon which the Taxpayer Welles could reasonably rely in preparing and filing his tax return.

The quality and breadth of coverage of the Opinion confirm the opinion writer's wide-ranging familiarity with the relevant provisions of federal tax law. These objective indications of the reasonableness of the opinion reinforce my conclusion that the Opinion involved in this case was of sufficient quality and character that the Taxpayer in this case could reasonably rely on it. In light of the general complexity of the tax law and the specific complexity of the issues involved in this case, a taxpayer such as Welles necessarily must seek and obtain such professional advice, and be permitted to rely upon it, in planning and reporting his transactions.

Respectfully submitted,

Stuart A Smith

Stuart A. Smith

Dated: October 1, 2007

# APPENDIX A

## STUART A. SMITH

460 Park Avenue
New York, New York 10022
Tel.: 212-759-8285
Fax: 212-759-4032

| | | |
|---|---|---|
| **EDUCATION** | Harvard Law School | LL.B., 1964 |
| | Columbia College | A.B., 1961 |

**PROFESSIONAL EXPERIENCE**

**PRIVATE LAW PRACTICE** — New York, New York

1983 to present — Federal and State Taxation and Related Litigation

Represent corporations and individuals in controversies with the Internal Revenue Service and with state and local tax authorities in civil and criminal tax matters and in related trial and appellate litigation.
Extensive trial experience in Tax Court, Court of Federal Claims, District Court, and oral appellate argument.
Advise individuals with tax compliance problems both at federal and state level. Corporate and individual tax planning in both domestic and international contexts.
Transactional tax structuring, including acquisitions, mergers, liquidations, insolvency reorganizations, offshore tax matters, and foreign trusts. Expert testimony in complex tax litigation, and in arbitration involving tax consequences of offshore insurance companies.
Tax legislative representation, including appearances before the Treasury, members of Congress, and their staffs.

1973 to 1983 — **THE SOLICITOR GENERAL, UNITED STATES DEPARTMENT OF JUSTICE** — Washington, D.C.

Tax Assistant to the Solicitor General

Represented the United States in tax matters before the Supreme Court. Argued more than thirty cases before the

Supreme Court involving a broad range of issues including the constitutionality of the worldwide unitary method of state taxation, tax shelters, international and foreign taxation, inventory accounting, life insurance company taxation, bond discount, mineral extraction, pension regulation, occupational safety inspection, criminal tax and summons enforcement, and the attorney-corporate client privilege.

Coordinated all matters involving federal tax litigation with the Treasury and the Internal Revenue Service.

Established government litigation policy in tax cases by authorizing all appeals of adverse decisions to the Courts of Appeals and the Supreme Court.

1966 to 1973 — Served in the Department of Justice in the Appellate Section of the Tax Division, briefing and arguing more than sixty tax cases in the Circuit Courts of Appeals. Two years of Washington, D.C. private practice.

**LAW TEACHING**

**ADJUNCT PROFESSOR OF LAW, GEORGETOWN UNIVERSITY LAW CENTER** — Washington, D.C.

1969 to 1977 — Course in State and Local Taxation

**JUDICIAL CLERKSHIP**

**THE HONORABLE JOHN W. KERN, UNITED STATES TAX COURT** — Washington, D.C.

1964 to 1966

**PROFESSIONAL ACTIVITIES**

American Law Institute: Tax Advisory Group, Federal Income Tax Project

ABA Tax Section: Past Chairman, Subcommittee on Incorporations, Corporate Tax Committee

New York State Bar Association:
Former Member, Executive Committee, Tax Section

Association of the Bar of the City of New York:
Former Member, Tax Committee

Second Circuit Judicial Conference (1983-1996); Tax Club of the City of New York; various professional tax institutes

**PUBLICATIONS**

"Deferred Taxation of Gains Realized Upon Divestiture of Property to Avoid Conflicts of Interest: A Proposal," Federal Bar Journal (1989)

*How You Can Get the Most from the New Tax Law*, Bantam Books (1981)

"A View from the Solicitor General's Office: Procedures in Appealing Lower Court Decisions and Settlements," 35 N.Y.U. Tax Institute 35 (1977)

"Depreciation in the Year of Sale: An Analysis," 9 Tax Counselor's Quarterly (1965)

**BAR ADMISSIONS**

State of New York
District of Columbia

U.S. Supreme Court
All Federal Courts of Appeals
U.S. Tax Court
U.S. Court of Federal Claims
U.S. District Courts for the Southern and Eastern Districts of New York

**Compensation Statement of Stuart A. Smith**

| | |
|---|---|
| Fee for Expert Witness Report | $ 23,500 |
| Fee for testimony preparation and testimony | $ 500 per hour |

**Prior Expert Witness Testimony**

During the preceding four years, I have testified as an expert at deposition and at trial in Klamath Strategic Investment Fund v. United States, 472 F.Supp. 2d 885 (E.D. Texas 2007); and as an expert at deposition in Murfam Farms, LLC, et al., v. United States, Ct.Fed.Cl., Nos. 06-245T, 06-246T, and 06-247T (Consolidated); and Tesoro Drive Partners v. United States, and SA Tesoro Investment Partners v. United States, (W.D. Tex.), Case No. SA-05-CA-0217-XR (Consolidated).

**APPENDIX B**

Treasury Circular 230, 31 C.F.R. (2002)

**§ 10.33 Tax shelter opinions.—**

(a) *Tax shelter opinions and offering materials.* A practitioner who provides a tax shelter opinion analyzing the Federal tax effects of a tax shelter investment shall comply with each of the following requirements:

(1) *Factual matters.*--(i) The practitioner must make inquiry as to all relevant facts, be satisfied that the material facts are accurately and completely described in the offering materials, and assure that any representations as to future activities are clearly identified, reasonable and complete.

(ii) A practitioner may not accept as true asserted facts pertaining to the tax shelter which he/she should not, based on his/her background and knowledge, reasonably believe to be true. However, a practitioner need not conduct an audit or independent verification of the asserted facts, or assume that a client's statement of the facts cannot be relied upon, unless he/she has reason to believe that any relevant facts asserted to him/her are untrue.

(iii) If the fair market value of property or the expected financial performance of an investment is relevant to the tax shelter, a practitioner may not accept an appraisal or financial projection as support for the matters claimed therein unless:

(A) The appraisal or financial projection makes sense on its face;

(B) The practitioner reasonably believes that the person making the appraisal or financial projection is competent to do so and is not of dubious reputation; and

(C) The appraisal is based on the definition of fair market value prescribed under the relevant Federal tax provisions.

(iv) If the fair market value of purchased property is to be established by reference to its stated purchase price, the practitioner must examine the terms and conditions upon which the property was (or is to be) purchased to determine whether the stated purchase price reasonably may be considered to be its fair market value.

(2) *Relate law to facts.* The practitioner must relate the law to the actual facts and, when addressing issues based on future activities, clearly identify what facts are assumed.

(3) *Identification of material issues.* The practitioner must ascertain that all material Federal tax issues have been considered, and that all of those issues which involve the reasonable possibility of a challenge by the Internal Revenue Service have been fully and fairly addressed in the offering materials.

(4) *Opinion on each material issue.* Where possible, the practitioner must provide an opinion whether it is more likely than not that an investor will prevail on the merits of each material tax issue presented by the offering which involves a reasonable possibility of a challenge by the Internal Revenue Service.

(5) *Overall evaluation.*--(i) Where possible, the practitioner must provide an overall evaluation whether the material tax benefits in the aggregate more likely than not will be realized. Where such an overall evaluation cannot be given, the opinion should fully describe the reasons for the practitioner's inability to make an overall evaluation. Opinions concluding that an overall evaluation cannot be provided will be given special scrutiny to determine if the stated reasons are adequate.

(ii) A favorable overall evaluation may not be rendered unless it is based on a conclusion that substantially more than half of the material tax benefits, in terms of their financial impact on a typical investor, more likely than not will be realized if challenged by the Internal Revenue Service.

(iii) If it is not possible to give an overall evaluation, or if the overall evaluation is that the material tax benefits in the aggregate will not be realized, the fact that the practitioner's opinion does not constitute a favorable overall evaluation, or that it is an unfavorable overall evaluation, must be clearly and prominently disclosed in the offering materials.

* * *

(2) A "tax shelter," as the term is used in this section, is an investment which has as a significant and intended feature for Federal income tax or excise tax purposes either of the following attributes: (i) deductions in excess of income from the investment being available in any year to reduce income from other sources in that year, or (ii) credits in excess of the tax attributable to the income from the investment being available in any year to offset taxes on income from other sources in that year. Excluded from the term are municipal bonds; annuities; family trusts (but not including schemes or arrangements that are marketed to the public other than in a direct practitioner-client relationship); qualified retirement plans; individual retirement accounts; stock option plans; securities issued in a corporate reorganization; mineral development ventures, if the only tax benefit would be percentage depletion; and real estate where it is anticipated that in no year is it likely that deductions will exceed gross income from the investment in that year, or that tax credits will exceed the tax attributable to gross income from the investment in that year. Whether an investment is intended to have tax shelter features

depends of the objective facts and circumstances of each case. Significant weight will be given to the features described in the offering materials to determine whether the investment is a tax shelter.

(3) A "tax shelter opinion," as the term is used in this section, is advice by a practitioner concerning the Federal tax aspects of a tax shelter either appearing or referred to in the offering materials, or used or referred to in connection with sales promotion efforts, and directed to persons other than the client who engaged the practitioner to give the advice. The term includes the tax aspects or tax risks portion of the offering materials prepared by or at the direction of a practitioner, whether or not a separate opinion letter is issued or whether or not the practitioner's name is referred to in the offering materials or in connection with the sales promotion efforts. In addition, a financial forecast or projection prepared by a practitioner is a tax shelter opinion if it is predicated on assumptions regarding Federal tax aspects of the investment, and it meets the other requirements of the first sentence of this subparagraph. The term does not, however, include rendering advice solely to the offeror or reviewing parts of the offering materials, so long as neither the name of the practitioner, nor the fact that a practitioner has rendered advice concerning the tax aspects, is referred to in the offering materials or in connection with the sales promotion efforts.

(4) A "material" tax issue as the term is used in this section is (i) any Federal income or excise tax issue relating to a tax shelter that would make a significant contribution toward sheltering from Federal taxes income from other sources by providing deductions in excess of the income from the tax shelter investment in any year, or tax credits available to offset tax liabilities in excess of the tax attributable to the tax shelter investment in any year; (ii) any other Federal income or excise tax issue relating to a tax shelter that could have a significant impact (either beneficial or adverse) on a tax shelter investor under any reasonably foreseeable circumstances (e.g., depreciation or investment tax credit recapture, availability of long-term capital gain treatment, or realization of taxable income in excess of cash flow, upon sale or other disposition of the tax shelter investment); and (iii) the potential applicability of penalties, additions to tax, or interest charges that reasonably could be asserted against a tax shelter investor by the Internal Revenue Service with respect to the tax shelter. The determination of what is material is to be made in good faith by the practitioner, based on information available at the time the offering materials are circulated.

(d) For purposes of advising the Director of Practice whether an individual may have violated section 10.33, the Director of Practice is authorized to establish an Advisory Committee, composed of at least five individuals authorized to practice before the Internal Revenue Service. Under procedures established by the Director of Practice, such Advisory Committee shall, at the request of the Director of Practice, review and make recommendations with regard to alleged violations of section 10.33 [Reg. § 10.33; Circular 230.]