UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STOBIE CREEK INVESTMENTS LLC, JFW ENTERPRISES, INC., Tax Matters and Notice Partner | ) | |
| Plaintiffs, | ) | Case Nos. 05-748T 07-520T |
| vs. | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DEPOSITION OF STUART A. SMITH
New York, New York
Thursday, October 18, 2007

Reported by:
TAMI H. TAKAHASHI, RPR, CSR
JOB NO. 183638

October 18, 2007
10:07 a.m.

Deposition of STUART A. SMITH, held at the offices of Schiff Hardin LLP, 900 Third Avenue, New York, New York, pursuant to Subpoena, before TAMI H. TAKAHASHI, RPR and a Notary Public of the State of New York.



A P P E A R A N C E S:

SCHIFF HARDIN LLP
Attorneys for Plaintiffs
6600 Sears Tower
Chicago, Illinois 60606
BY: ROBERT E. KOLEK, ESQ.
COLLEEN M. FEENEY, ESQ.

U.S. DEPARTMENT OF JUSTICE
Attorneys for Defendant
PO Box 403
Washington, D.C. 20044
BY: CORY A. JOHNSON, ESQ.



IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

-O-



S T U A R T A. S M I T H, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. JOHNSON:
Q. Good morning.
A. Good morning.
Q. Could you state your full name and residence for the record, please.
A. Stuart A. Smith, New York, New York.
Do you want an address?
Q. Sure.
A. 585 West End Avenue, New York, New York.
Q. As you know, Mr. Smith, my name is Cory Johnson. I'm from the Department of Justice. I represent the United States in this case.
We're here for your deposition because you've submitted an expert report in the case; so, I'm going to be asking you a series of questions.

report that I read in connection with, you know, preparing to render this opinion. I read all of the depositions that had been given in the case by the parties. And I looked at all the deposition exhibits. So, I had a good sense as to, you know, the taxpayers' point of view and their motivation.

Q. Did -- you listed a number of depositions in your report.

Did you actually read every one of those depositions?

A. I did.

Q. And you listed some deposition exhibits.

Did you actually read each one of the exhibits?

A. Yes, I did.

Q. Did you look at the transactional documents and the organizational documents involved in the transaction you've described to determine whether the Jenkens & Gilchrist opinion letter accurately described the transaction?



A. Did I look at the transaction documents? I may have looked at some of them. I don't want to guess. So -- so, I think it would be better to say I don't remember.

Q. Okay. Would it be fair to say, then, that you were not asked to, and you did not, investigate and research the underlying organizational transactional documents for the purpose of determining whether the Jenkens & Gilchrist opinion letter accurately described the transaction?

A. Rather than agree with what you said, it was fair to say, let me simply say that I read the factual discussion of the -- in the Jenkens & Gilchrist opinion, regarded all of those elements as reasonable, and assumed, for purposes of my own analysis, that each one of those things happened.

Q. Okay. So, you didn't -- you didn't go beyond that to look at the underlying transactional documents to determine if what J&G said occurred with regard to the transaction actually occurred?



A. No, I did not.

Q. Okay. What's your understanding of what the purpose of this -- the transaction that you've described and its steps was?

A. Well, I think the purpose, you know, is set forth -- was articulated in detail in the deposition of Jeffrey Welles, who took the lead in organizing this transaction.

I think that the family -- that he -- he had been presented with this opportunity to invest in foreign currency options, and did an enormous amount of research.

First, he had a financial background, as well, consulted with a lot of the people, and concluded that there was an opportunity to earn some profits that would -- that would redound to the family's benefit.

The family was very philanthropic. I read some depositions that they had set up a philanthropical foundation. And they had given a lot of money to various charities and



cultural institutions that they admired and favored. And he thought that this was an opportunity to do that.

Q. Do you understand whether the transaction had any other purposes?

A. Well, I think -- I think he also testified at his deposition that the transaction had some tax benefits, as well.

Q. What's your understanding as to how he learned of these tax benefits?

A. Well, my recollection from the depositions was that this transaction -- you know, this opportunity was brought to the attention of a long-standing family advisor whose name was Waterman -- or is Waterman -- who was a lawyer, I think, in Toledo at the firm of Shumaker or something or another.

And Waterman had become familiar with this transaction in connection with work with other clients, so that he had brought it to Jeffrey Welles' attention. And that the subject of it was discussed as part of an agenda at a family meeting that was held in Florida sometime before Jeffrey Welles

Page 42

what the issues are in the case?
A. I do.
Q. Okay. Can you tell me what issue, if any, in the case your opinions bear upon?
A. Well, there are basically two issues in the case. One, the entitlement to a refund -- tax refund by -- to the Plaintiffs. And, also, the imposition of penalties.
The -- as I say in my report, I'm not -- I did not render a report to provide a conclusion as to the correct answer to -- to what the tax consequences should be. I regarded that as the job of Plaintiffs' counsel.
But my report addresses the objective quality and reasonableness of the opinion, and the taxpayer's ability to rely in good faith on that opinion.
And, in that sense, if the conclusion I reached is correct with respect to the quality of the opinion and the ability of the taxpayers to rely upon it, it would bear upon the propriety of the imposition of

Page 43

penalties.
Q. And, specifically, with regard to the issue of penalties, are you saying it would bear upon reasonable cause defense to penalties, or whether the penalties are applicable in the first place?
A. Well --
MR. KOLEK: Objection as to form.
A. I don't have the regulations, you know, at my fingertips with respect to -- I know there was a reasonable cause -- I know there was a body of case --
Let me start again.
I know there was a body of case law that makes it clear that reliance upon a tax expert can absolve a taxpayer of penalties. The Supreme Court has said it, and all the courts of appeals, in one way or another, have said that.
And I know that the -- the regulations adopt that rationale in terms of a reasonable cause defense to penalties.
But it may well be -- and I'm not -- I don't want to state with certainty,

Page 44

but it may well be that, if a -- if a taxpayer has received a more likely than not opinion, that it may actually -- and that the opinion is objectively reasonable, it may actually insulate the taxpayer from the application of penalties in the first instance.
I don't want to say, for sure, Yes or No until -- without looking at some materials.
Q. And the materials you would look at would be the regulations?
A. Right. I would look at the regulations. And bearing in mind, of course, that the current regulations deal with current law, and this is, I think -- is this -- I forget, is this the tax year 2000?
Q. Tax year 2000.
A. 2000. So, I would have to look at the regulations that would stand for that year.
Q. Any other issues in the case that you understand your opinion to bear upon, other than what you've just described?

Page 45

A. I'm not aware of any other issues, but I would have to look at the complaint to -- you know, to -- which I haven't read in a while.
Q. Now, the opinion that you've reviewed, and upon which you're providing an opinion, is that the Jenkens & Gilchrist opinion?
A. It is.
Q. Any other opinion upon which you've been asked to provide your own opinion?
A. In this case?
Q. Yes.
A. No.
Q. Okay. And I think you said in your report that you looked at the opinion given to Jeff Welles and didn't look at the ones -- the opinions given to the others, because you were told that they were similar or identical?
A. Correct.
Q. Do you -- you mentioned Mr. Waterman earlier. And do you understand that he worked at the firm of Shumaker, Loop



ESQUIRE DEPOSITION SERVICES
DC 1-800-441-3376 MD 1-800-539-6398 VA 1-800-752-8979

Page 46

& Kendrick?
A. I do understand that, yes.
Q. Did you -- were you asked to provide an opinion about any written opinions or statements provided or made by the Shumaker, Loop & Kendrick firm regarding the transaction at issue?
A. No.
Q. So, is it fair to say that you do not anticipate rendering any opinion at trial about any opinions, or correspondence, or statements by the Shumaker, Loop & Kendrick firm regarding this transaction?
MR. KOLEK: Objection as to form. Objection as to speculation.
A. I didn't say that. I have, thus far, not been asked to do that.
Q. Okay.
A. I have enough experience to know the tax litigation is an evolving process. So, I don't want to say, with certainty, that I won't be asked to do that and that, if asked, I won't do it.
Q. Okay.

Page 47

A. But, as of now, the answer is No, I have not been asked to do.
Q. Okay. So, as of now, you have not been asked to render an opinion upon any advice that may have been given by the Shumaker, Loop & Kendrick firm to the Welles regarding the transaction?
A. Correct
MR. KOLEK: Objection. Assumes facts not in evidence.
BY MR. JOHNSON:
Q. Is that correct?
A. That is correct.
Q. Okay. Have you been asked to provide any sort of rebuttal report?
A. As of -- as of today, no.
Q. Did you review the tax returns filed by Stobie Creek for the tax year 2000? They had an inner period for which they filed a return, which ended end of April, I think?
A. April 30th.
Q. April 30. And then, they filed for the period ending December 31st, 2000.
Did you review those two tax

Page 48

returns?
A. I looked at them, yes. I believe they were deposition exhibits.
Q. Okay. Were you asked to provide an opinion as to whether those tax returns were complete and correct?
A. No.
Q. Did you do any investigation or review to determine whether they were complete and correct?
A. No. I just read them as part of the general preparation I did for this assignment.
Q. Okay.
(Defendant's Exhibit 1, Plaintiffs' Expert Report of Stuart A. Smith, marked for identification as of this date.)
BY MR. JOHNSON:
Q. A while ago, I asked you about whether you went back and looked at all the transactional and organizational documents for the transaction.
Do you remember that discussion?
A. Yes.

Page 49

Q. Okay. And you told me you didn't do that to determine whether the J&G opinion correctly set forth those transactions?
A. I think that's what I said, yes.
Q. Okay. Is it also correct that you didn't go back and look at the transactional and organizational documents for the purpose of determining what tax issues are raised by those transactions?
MS. FEENEY: Objection to form.
A. Well, let me answer the question this way: If the transactional documents were included in the loose-leaf books I got about -- which set forth -- which included the deposition exhibits, I looked at them.
I was not asked to discuss other tax issues that might arise in connection with those transactional documents.
I was simply asked to render an opinion as to the character and quality of the Jenkens & Gilchrist opinion letter.
BY MR. JOHNSON:
Q. Okay. So, what I'm trying to find out is whether you went back and looked at

Page 50

the transactional documents and came to a determination of what the transaction was, and independently decided or determined, in your opinion, what the tax issues are that arise from this transaction.
A. Well, that's not the way I went about, you know, my assignment. I went about my assignment by looking at the controversy in this case, which involved the transaction that was described in the Jenkens & Gilchrist tax opinion, and I addressed the adequacy of the discussion of the issues that were discussed in the Jenkens & Gilchrist opinion. Okay.
Q. Let me show you what we've marked as Smith Exhibit No. 1.
A. By the way, Mr. Johnson, do you want this back?
Q. Sure.
A. Okay.
Q. Now, is Smith Exhibit 1 a copy of your report in this case?
A. It appears to be.
Q. Could you take look at the second

Page 51

page of the exhibit, the first page of the -- of the text of the report.
A. Um-hum.
Q. In the middle paragraph, you state, specifically: "I have been asked to address the question of whether the Opinion of this law firm is of the quality and character upon which taxpayers such as the Welles could reasonably rely in preparing his tax returns."
Do you see that?
A. I do.
Q. What do you mean by "quality and character"?
A. Well, what I mean by "quality and character" is whether the opinion addressed, completely and professionally, the body of tax law that was germane for purposes of the -- and provided legal support for the conclusions that it reached.
The -- based upon my experience in reading legal analyses, I brought to bear my own sense and, you know, professional experience as to whether this opinion is

Page 52

technically sound and covered the spectrum of issues that were involved in the transaction.
Q. How did you decide what the spectrum of issues involved in the transaction was?
A. Well, the first thing I did was to look at what the facts were, and then I looked at what the positions that the opinion was addressing, which were, I think, listed at the front of the opinion.
And then I read all of the sections of the opinion, which were conveniently tabbed with letters to the positions -- I'm just going to call them tax positions.
And then I read all of the authorities that were cited in the report -- I mean, in the opinion, to see whether they were fairly cited. Sometimes -- you can learn a lot from reading citations of opinions that lawyers cite, because sometimes people don't cite them quite accurately.
And so -- and then, upon a further examination, I sort of concluded that this was -- that this opinion, you know, had --

Page 53

was technically sound and that the conclusions it reached under the more likely than not standard were -- were sound.
Q. At the beginning of your answer you said you looked to see what the facts were.
Do you mean, you looked at the fact section of the opinion?
A. Correct.
Q. Okay. Then you said you read all the authorities cited.
A. Well, then I looked at the -- I looked at what the opinion was trying to do. The opinion had a number of points that it said.
And then I -- I thought about those, and thought about how they related to the conclusion that the opinion was trying to reach or did reach. And then I delved in in greater detail to the -- to the lengthy discussions -- some of them were less lengthy than others -- to get a sense of what -- what the technical support was for these conclusions.
And then I read the authorities and

Page 54

the discussions to see whether they supported the statements in the more elaborate discussions.
And then came to a conclusion -- came to my conclusion about what -- I think you asked me, at the beginning, about the quality and character of the opinion.
I've had enough experience that I've read opinions that don't meet what I consider to be the cogency standard, and I concluded that this opinion did.
Q. In those instances when they didn't meet the cogency standard, what -- was the problem that they didn't cite the authorities correctly or --
A. No.
Q. -- the reasoning was faulty?
A. No. I've read a lot of opinions which speak at great length about things that are totally unremarkable. And then kind of the critical issue is just glossed over in a -- in two sentences.
So that, you know, that's kind of an important signal to me that the opinion is

Page 55

not of the character and quality that taxpayers could rely on. I've done that for clients. They've given me something and asked me what I think of it. So --
Q. And did you come to a conclusion whether or not the Jenkens & Gilchrist opinion cited the authorities that it did cite correctly?
A. I did.
Q. And what was your conclusion?
A. That it did.
Q. Did you read all the authorities cited?
A. I did.
Q. So, you read each case that was cited?
A. I did.
Q. And each statute or regulation?
A. I did.
Q. And were there any cases that they cited that you had read before?
A. I did -- yes, there were cases that I read before. But it's my practice when I'm, you know, judging something, not to rely

Page 56

on my memory -- which, no matter how confident I am that I can remember what the X case said, I find, sometimes, that it said something that I didn't remember it said.
So, the answer is Yes, I did read them again.
Q. Well, so, even -- for a case that you had read sometime in the past, you went back and reread it?
A. Correct.
Q. And the same for any regulation or statute?
A. Correct.
Q. Now, you said, earlier, that you -- part of your analysis was determining whether the opinion completely and professionally addressed the body of tax law that was -- that was germane.
A. Um-hum.
Q. How did you decide what body of tax law was germane?
A. Well, I looked at the opinion to see what the conclusion was and what the opinion was trying to do. You know, what the

Page 57

nub of the -- what the goal of the transaction was.
And then proceeded to think about whether, under the -- whether the discussion that -- that was set forth supported, you know, that kind -- I'm just going to kind -- and then I concluded that -- after, you know, careful review of the discussion and the authorities, that the opinion, you know, supported the pivotal point of the -- of the conclusion on a more -- on a more likely than not standard.
Q. And what expertise, or knowledge, or experience were you relying upon to reach your conclusions and opinions?
A. Well, my -- my experience is, like, 40 some years of doing nothing but this work, and seeing, you know, the tax law evolve. Keeping up with professional publications, handling a bunch of cases on my own and giving advice. And having daily contact with the Internal Revenue Code, which has probably increased fourfold in girth during my professional career.

Page 58

Q. So, it's your 40-plus years as -- as a practicing tax lawyer?
A. Right, right.
Q. Okay. Later in that paragraph that we were talking about, on page 2 of the exhibit, you say that you've been asked to address whether the opinion was of the type that the Welles can reasonably rely.
Do you see that?
A. Um-hum.
Q. What -- was there a standard you were using to examine whether the opinion was the type upon which the Welles could reasonably rely?
A. Well, what I did was, I measured the opinion, as I set forth later on in my report, against the requirements of the -- of section 10.33 of the -- of circular 230, which, although is not technically applicable here, nevertheless offers a useful litmus test, because it's absolutely a more elaborate standard than the -- the common professional standard.
So, my feeling was, that, if it met

Page 59

that standard, then -- which I would just say is like a -- I don't mean to use a stupid term, but it's like the gold standard, if you will -- the standard that the Treasury regards as, you know, the acme of quality. If it met that standard, then it -- it was yarned at any lesser American Bar Association standard, et cetera, et cetera.
So, I looked at the opinion in connection -- you know, against that circular 230, which has got those five standards that I -- or five elements that I discuss.
And that's what I meant by quality and character.
Q. Okay. I was asking about the standard you applied, if any, for reasonable reliance that you're -- you're mentioning there.
A. Well, I suppose the standard has got to be, you know, that standard. If it's -- if it's something that -- if it's something that the profession and the Treasury would regard as -- as having a high degree of quality, then it's something --

Page 60

I'm -- let me back up a bit
Taxpayers of all sorts don't have this kind of training are really not equipped to look at an opinion and say, is this -- is this opinion correct or not? Does it reach a proper conclusion? Is it something that I can, you know, rely on?
So, but there are standards that -- that are applicable that the opinion can be measured against. So, that's -- now, Jenkens & Gilchrist, in my view, you know, met those standards. Having met those standards, it was something that the taxpayers could reasonably rely upon.
Q. You said circular 230 was not technically applicable. What did you mean by that?
A. Well, I meant essentially, I think that -- you know, I think things have changed. But back then, section 10.33, I think, really was talking about opinions that were given to, you know, like a general partner of a syndicate -- syndicated deal. Oftentimes those opinions were attached to an

Page 61

offering memorandum.
So, the -- the -- they weren't -- I think I discuss this in the footnote in the opinion -- in my report. On page 8, footnote 4, I say that this section defined a tax shelter opinion as "advised by a practitioner, directed to persons other than the client who engaged a practitioner to give the advice."
So, you know, it goes -- those -- this standard is for people who put together a transaction for a general partner, or whatever, who then appends his opinion.
Now, the opinion has to meet those standards for -- for the -- as issue to this "non-client." In other words, not the taxpayer.
So, in point of fact -- but here, the Jenkens & Gilchrist opinion was prepared for Welles himself. So, while that -- while section 10.33 is not technically applicable, it's a good standard to measure the quality and character of the opinion.
Q. The section 10.33 deals

Page 70

those exceptions for which you are attempting to determine the correct substantive tax treatment of the transaction?
A. Well, I think what I meant by this sentence was, in focusing on a discussion on the question of whether the opinion was -- had the requisite character and quality, you necessarily have to discuss the substantive tax issues.
So -- and in saying that something is more likely than not correct, you are saying something -- I mean, it's not like you're talking about ice cream.
So, to the -- to that extent, the opinion -- or the report trenches on, you know, what I believe to be the -- you know, the sound, more likely than not, you know, tilt on these issues.
So, that's what I meant by "with the exception of the comments that follow." I mean, I didn't -- as I said earlier, I didn't regard -- I didn't regard my mission as to provide a full-blown advocacy of the taxpayers' position. They have lawyers to do

Page 71

that. My job was simply to comment on the adequacy of the opinion, and to the extent that it required talking about the issues, I did.
Q. So, did you investigate the issues to determine whether the opinion was correct on the tax issues?
A. I investigated the issues in sufficient detail in order to conclude that the more likely than not conclusions in the opinion were sound.
Q. And do you have an opinion as to whether those conclusions were or were not sound?
A. I do. I think at the end of my report I say that -- on page 22, I say that the opinion was objectively reasonable and complies with professional requirements, and also the specific internal administrative practice requirements of the Treasury circular.
Q. When you say they were "objectively reasonable," what do you mean by that modifier "objectively"?

Page 72

A. Well, what I meant was that, viewed as a -- kind of from my third-party perspective, and having reviewed the authorities, I concluded that -- that the -- that the more likely than not conclusions satisfied an objective test, insofar as it wasn't simply that I liked them and thought, gee whiz, this is really neat; but, rather, that it met, you know, a standard of rigorous analysis and cogency. That's what I meant.
Q. When you say they objectively met that standard, do you mean that you're testing them against the authorities?
A. Yeah.
Q. Okay. And then, on page -- well, on page 3 you list materials you've reviewed. And I don't see a listing for the deposition of Paul Daugardas. Did you review his deposition?
A. No, I don't remember -- I know that several people claimed the Fifth Amendment. And those are listed here, as well. I don't recall -- you know, I -- I don't recall reading Paul Daugardas's deposition.

Page 73

Q. Okay. He was deposed and there were exhibits used in his deposition, as well, and I don't see the exhibits from his deposition listed either.
So, is it correct, also, that you did not review the exhibits to Mr. Daugardas's deposition?
A. If they're not here, I think it's -- it's fair to say I didn't -- I didn't look at them.
Q. Okay.
A. Or maybe I wasn't given them.
MS. FEENEY: Cory, can I interject for a minute here? Is this the corrected page 3 that we forwarded to you?
MR. JOHNSON: We never received a corrected page 3 from anybody.
BY MR. JOHNSON:
Q. You said a number of witnesses took The Fifth?
A. Um-hum.
Q. Do you recall those were Jenkens & Gilchrist -- or former Jenkens & Gilchrist

Page 106

in any way, on the Welles and Stobie Creek
reporting the tax results of the transaction,
as set forth in the Jenkens opinion?
A. I'm not aware that it was. I
don't -- I don't have any recollection of it
being contingent upon -- I think it was a fee
for the opinion.
Q. If the fee were dependent upon the
Stobie Creek and the Welles actually going on
and reporting the transaction, as set forth
in the Jenkens opinion letter, would it
change your mind about whether that advice
was independent?
A. No, I don't think so. At least it
wouldn't change my mind under the standards
that I understood to exist back in 2001 --
2000-2001.
Q. Okay. The -- the -- we're still
talking about -- well, I want to go back to
paragraph 1 there on page 8.
We were talking about the standards
you're citing that are widely accepted in the
profession.
A. Um-hum.

Page 107

Q. It -- are you saying that there is
an independence or conflict of interest
aspect to those standards for the tax
advisors that taxpayers are expected to seek?
A. I'm not sure I understand your
question at all.
Q. Okay.
A. I'm sorry.
Q. It may have been unintelligible.
A. Okay.
Q. The standards you're talking about
there in paragraph 1 --
A. Right.
Q. -- are you saying that they
include, at least to some extent, a component
related to the independence of the advisor
and the lack of a conflict of interest of the
advisor?
A. I think I am, in the sense that I'm
aware of the fact that there are cases that
cast aside opinions by what I described as
salesmen -- you know, non-technically adept
salesmen.
However, that having been said, I

Page 108

think that the facts in this case are far
from such -- such a situation.
Q. Now, the standards you're referring
to there in paragraph 1, are those set forth
anywhere in any authorities or writing
anywhere?
A. There may be some -- I'm not aware
that, back in 2000-2001, that Treasury
circular 230 had anything very detailed about
fees.
Q. Okay. I'm not talking about
circular 230. I'm talking about these
standards you're addressing in -- are you
addressing in paragraph 1 circular 230, or is
this a different set of standards?
A. No. This is, basically, the
standards as I -- as I understand them to
exist, just in the case law about reliance.
In other words, there are -- you know, people
who rely on incompetent advisors, you know,
can't really rely on them.
I mean, they're -- the -- there's
a -- there's a bunch of cases that come out
of the United States versus Boyle, which was

Page 109

a Supreme Court case, I think, back in the
late '80s. And from that, there are some
Fifth Circuit cases -- Chamberlain, Durrett,
cases like that -- in which taxpayers
rely on competent people, you know, and the
penalties are set aside. The courts comment
upon -- about the acumen of the advisor.
And so, even if the transaction
is -- the tax consequences are set aside, the
penalty is abated. That's what I'm -- that's
what I tried to say. I didn't want to
encumber my report with a bunch of, you know,
citations, because I didn't really think that
it was necessary.
Q. So, and -- in the first paragraph
you're talking about the standards that are
applied or can be derived from the case law?
A. Right.
Q. Okay. And then, in the second
paragraph on that page 8, you then go on and
talk about circular 230.
A. Correct.
Q. Okay.
MR. JOHNSON: Well, I guess we're

Page 110

at a breaking point. Why don't we break for lunch.
MR. KOLEK: Okay.
THE WITNESS: Okay.
(Luncheon recess: 12:47 p.m.)

Page 111

AFTERNOON SESSION
(Time noted: 2:13 p.m.)
(Defendant's Exhibit 2, Copy of diary and work record, marked for identification as of this date.)
MR. KOLEK: I'd just like to make a statement.
At the lunch break, we had asked Mr. Smith to contact his office and to obtain a copy of his time records during the month of -- or his time records that were relevant for -- that dealt with the preparation -- the review and preparation of the report that he prepared in this case.
And we did that, and I've given a copy to Mr. Johnson. I believe there's an additional copy for the court reporter. Thank you.
STUART A. SMITH, resumed and testified as follows:
EXAMINATION BY (Cont'd.)
MR. JOHNSON:
Q. Why don't we start with the time

Page 112

records, then, Mr. Smith --
A. Okay.
Q. -- that you've just produced to us. We've marked that as Exhibit 2 --
A. Um-hum.
Q. -- which, I believe, you have a copy of.
Do these -- does this constitute all your time records for this case?
A. No. It encompasses my time records, you know, that -- through the filing of my report --
Q. Okay.
A. -- which was on October 1st.
Q. Okay. You had mentioned that you were contacted in August, and I just noticed that these records are for September. Do you have -- you do not have any records for August?
A. No, I do. And I looked at them. I didn't record any time, although I suspect that I began to read the stuff, you know, sandwiched it in with other work that I was doing. But I didn't have any time recorded

Page 113

for that.
But I can recall getting back to Mr. Kolek after reading this before September 9th. But since -- since the -- since the diary pages didn't have anything, I didn't really think that it was necessary to give you some things that were just, you know, redacted -- with total redaction.
Q. Okay. Also, during the break, I looked back at your report, which is Exhibit 1. And you said we could figure out how much time you put in by dividing your bill by your hourly rate.
A. Right.
Q. And I --
A. Well, it's not a bill. It's just a compensation statement.
Q. Right.
A. I haven't done a bill yet. But the -- I think it comes to, like --
Q. Well, I did the math.
A. It's, like, to -- is it 47 hours or something?
Q. That's what I came up with, I

think --
A. Okay.
Q. -- 47 hours.
A. Right.
Q. Does that sound right to you, as the amount of time you put in before you submitted the report?
A. Right.
Q. Okay.
A. It does.
Q. Before we broke, we were talking about page 8 of your report, and that first paragraph we were -- where you had told me that the standards you're referencing in the first paragraph on page 8 are the standards that you had, I guess, gleaned from the case law; is that right?
A. Um-hum, yes. Sorry.
Q. Okay. You listed a couple of cases, the Boyle case, the Durrett case?
A. It's the Fifth Circuit case.
Q. Are there any other cases you were thinking of?
A. Well, I also mentioned the



Chamberlain case.
Q. Okay.
A. I think there's a case called Stanford versus Commissioner. Actually, since I haven't memorized, you know, the citation, if you look in some of my other reports, I actually have a fuller discussion of -- of the legal standard and the citations.
Q. Okay. So, you think you may, in those other reports that you've produced, have citations for the Chamberlain, Stanford, and maybe some other cases?
A. I think so. Maybe in the Klamath report, and maybe some of the others.
Q. Okay. Did you pull or read any cases that dealt with the issue of the tax advisor's independence, or possible conflict of interest, and how that related to the reliance issue?
A. Yeah. I think there are -- there's a Second Circuit case called Goldman. And a Second Circuit -- I want to say Shapiro, but I'm not sure. But there's another Second



Circuit case that deals with, you know, what I would call salesmen-type characters.
Q. Did you review those cases in connection with this -- your work in your report here?
A. Yes, yes.
Q. Okay. And did you take the standards from those cases and apply them here?
A. Yes, I did. I didn't think it was necessary to advert to them in this report, because I felt that the Jenkens & Gilchrist law firm was far from the facts of those cases.
Q. Okay. Now, does that -- and then, in the next paragraph, you go on and talk about circular 230. And the rest of this section, too, is on circular 230; is that right?
A. That's correct.
Q. Okay. Does circular 230 have any provisions that deal with what happens if you don't meet the standards in it, in particular the standards under section 10.33?



A. Not that I'm -- not that I can recall. Although, I think we discussed the -- you know, the -- the potential of some disciplinary proceeding that the directive practice might institute against someone. But that's something you would have to glean from the entire circular.
Q. On page 9 is where you begin talking about some of the -- some of the elements of circular 230. And you talk about the -- what you list as the first requirement, and that being that the practitioner is to make inquiry as to all relevant facts.
A. Um-hum -- yes. I'm sorry.
Q. And you say there, in that parenthetical, that that requirement is "not a component of the common professional standards."
Why do you say that?
A. Well, I think -- I'm -- I think I was referring to the ABA opinion, which I think is 346, which I don't think, you know, requires a practitioner to do that. Although

Page 150

experience, that the representations that were made were not unreasonable?
A. Well, yes, insofar as what I'm saying is that Jenkens & Gilchrist was -- were -- was justified in accepting the representations.
For example, one of the representations says that neither the taxpayer, nor the partnership, nor JFW, Inc. were obligated to engage in any transaction to which the opinion relates upon the completion of any other transaction.
So, that's something you can read in the documents and make a determination about whether there's an obligation. If you're going to do one, you have to do two, you have to do three, you have to do four. You know, there was no -- there was no legal commitment to do that.
And the same with all the other representations. I think that the -- that Jenkens & Gilchrist, being sophisticated, had a good sense of what was -- what -- what kinds of representations would be reasonable

Page 151

and that could be accepted on the taxpayers' say-so.
Q. Now, in subsection 2, which is titled "Relate law to facts," you talk about the practitioner being required to relate the law to the actual facts in the opinion.
A. Yes.
Q. Okay. Did you analyze the Jenkens & Gilchrist opinion and determine whether they, correctly or incorrectly, related the law to the facts in this case?
A. I did.
Q. Okay. What did you determine?
A. I did determine that they -- that they did relate the law correctly to the facts, as set forth in the beginning of the opinion.
Q. And what did you to come up -- to reach that conclusion?
A. Well, I -- I -- as I said, I read their discussion, and I read the authorities that they cited in their discussion. And I think what I -- you know, I set forth in capsule form what I did further on in my

Page 152

report on pages 13 and 14 and 15 and 16.
And one of the things that I was struck by was, you know, their conclusion about section 752 and the contingent obligation. And it struck me that it was consistent with my understanding of what the law was.
In fact, it was consistent with what I thought the Service's view of the law was when this transaction was done. Because, in 2003, the Service promulgated temporary retroactive regulations which, in the preamble, stated explicitly that they were changing the law.
So, that to me was a -- kind of a bellwether of reasonable -- objective reasonableness of the technical soundness of Jenkens & Gilchrist's analysis.
Q. The opinion was written in -- or given in 2001 before the --
A. Correct.
Q. -- reg was promulgated?
A. Correct
Q. Okay.

Page 153

A. But they read -- you know, they read the case law and made a determination that -- that a contingent obligation was not a liability under section 752. Something that other courts had -- had come to the same conclusion.
Q. I'm sorry. I missed the beginning of your answer. Did you say you read the cases, or --
A. Well, they read the cases, and then they cited them, and I read the cases.
Q. Okay. So, you read the cases on the authorities, and you then applied those to the facts that are set out in the beginning --
A. Right.
Q. -- of the J&G opinion?
A. Right.
Q. And came to your conclusions as to what the right result was?
A. Right.
Q. And then you compared that to what J&G --
A. Did.

C E R T I F I C A T E

STATE OF NEW YORK )
: ss.
COUNTY OF NEW YORK )

I, TAMI H. TAKAHASHI, a Notary Public within and for the State of New York, do hereby certify:

That STUART A. SMITH, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 30th day of October 2007.

Tami H. Takahashi

TAMI H. TAKAHASHI