# EXHIBIT B

# PART I

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STOBIE CREEK INVESTMENTS, L.L.C., | ) | |
| JFW ENTERPRISES, INC., Tax | ) | |
| matters and Notice Partner, | ) | |
| Plaintiffs, | ) | No. 05-748 T |
| vs. | ) | (Judge Block) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

The videotaped deposition of VIRGINIA WELLES JORDAN, called for examination, taken pursuant to the provisions of the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions for the purpose of discovery, taken before Barbara J. Cramer, CSR No. 84-1700, a Certified Shorthand Reporter of the State of Illinois, at Suite 7200, 233 South Wacker Drive, Chicago, Illinois, on the 11th day of December, A.D. 2006, at 10:01 a.m.

A. Yes.
Q. Okay. Other than that meeting, have you ever spoken with him?
A. I don't recall.
10:38:09 Q. Okay. Were there any -- was there anybody else at the meeting or there in Florida, other than your family members and Mr. Waterman?
A. It says Dave Herpe's on here. But I don't remember.
10:38:38 Q. Okay. So you -- you don't remember him being there --
A. Um-hmm.
Q. -- but the agenda seems to indicate he was there.
10:38:46 A. Yes.
Q. Okay. So you -- is it fair to say, then, you don't recall anything --
A. I don't --
Q. -- he said?
10:38:51 A. I don't recall anything, no.
Q. You don't recall anything Mr. Herpe might have said at the meeting?
A. No.
Q. Okay. You did say that you remembered

Mr. Waterman coming down and being at the meeting and talking to him.

Why was he there, in your understanding?

A. He was there to speak to us about a

10:39:13 particular investment strategy he wanted to have us have the information about.

Q. And do you know who asked him to come down?

A. No.

10:39:27 Q. Mrs. Jordan, I'd like to show you what's also been previously marked as Exhibit 37.

A. Um-hmm.

Q. And this is a document Bates stamped Welles Privileged 1. It's numerous pages. And

10:40:00 you're welcome to page through that.

MS. FEENEY: Excuse me, Cory. Do you have extra copies of these?

MR. JOHNSON: No, I brought just the two. I gave one to Bob Friday, so I was assuming it would

10:40:22 be available to you --

THE WITNESS: Do you want to look over my shoulder?

MR. JOHNSON: -- all from that source.

MS. FEENEY: It may have been available, but I



00461374-1cdb-4ff8-a3d1-7f02fc828bc6

aware of any tax strategies that might reduce the intervenors' -- intervenors' taxes resulting from the anticipated sale of their interests," period.

Do you see that?

10:56:27 A. Yes.

Q. Okay. And he refers to "intervenors," and that's the people listed on the first page and those --

MS. FEENEY: Objection.

10:56:38 BY MR. JOHNSON:

Q. -- are your brothers and parents, and you're listed as one.

Do you recall whether you're one of the people who asked Shumaker, Loop & Kendrick or

10:56:52 Mr. Waterman whether they were aware of any tax strategies that might reduce taxes resulting from the anticipated sale of the Therma-Tru interest?

A. No.

Q. Do you -- do you -- you don't recall

10:57:05 whether you were one or you're sure that you were not one?

A. I was not one.

Q. Okay. Do you know who was?

A. No.

Q. Okay. The -- the tax -- Mr. Waterman's referring to a tax strategy here. Do you see? In Paragraph 7.

MS. FEENEY: Objection; the document speaks for itself.

10:57:32

BY MR. JOHNSON:

Q. Do you see that in Paragraph 7?

A. Yes.

Q. Okay. Do you know if this is what he was coming to talk to you about in Florida in January 2000?

10:57:41

A. I don't recall.

Q. Okay. You -- you said he was coming down to talk to you all about a strategy.

10:58:00

A. Yes.

Q. Okay. And here in his affidavit, he says that somebody from your family asked him about strategies, and then he told somebody in your family about the strategies.

10:58:17

And I'm wondering if -- if this is -- if this is the strategy that was discussed in Florida?

MS. FEENEY: Objection; foundation and form, and it -- to the extent it calls for attorney-client privileged discussions.

I'm going to instruct the witness not to answer anything relative to attorney-client privilege.

BY THE WITNESS:

10:58:47 A. I don't recall the particulars. I remember David being there, because I was anxious to meet this man that I'd heard about.

BY MR. JOHNSON:

Q. Um-hmm.

10:58:55 A. And I don't -- I don't recall the content. He -- he -- I mean, that's the best I can offer.

Q. Okay. Well, you told me earlier that you -- you understood his purpose being there to

10:59:05 tell you about some strategy that he -- he was offering as something you -- you all might pursue. Is that -- is that correct?

A. I -- I perceived it as an investment opportunity.

10:59:21 Q. Okay. Do you recall anything that he said down there?

A. No.

Q. Okay. Do you recall anything anybody else said about this investment opportunity?



00461374-1cdb-4ff8-a3d1-7f02fc828bc6

A. No.
Q. Okay. So you don't recall what Jeff might have said?
A. No.
10:59:40 Q. Okay. Do you recall anything about that meeting?
A. Not much. I -- I recall being real excited about our foundation --
Q. Okay.
10:59:55 A. -- happening, something we'd been wanting to do for a long time.
Q. And that's the Cricket Island Foundation?
A. Correct.
Q. Okay.
11:00:03 A. I remember that.
Q. Okay. What -- what else do you -- I know -- I know it's six years ago, and you say you don't recall much about it. But I'd -- I'd like you to tell me everything that you remember about that
11:00:16 meeting.
A. We were happy to be together. I don't -- I -- we were enjoying each other's company and just happy for the opportunity to be able to -- to make this particular vision come true.

11:05:54

Do you recognize this? Have you seen it before?

A. I don't recognize it.

Q. Okay.

MS. FEENEY: For the record, although it says on this Virginia Jordan at the top, there's no address.

MR. JOHNSON: Right.

BY MR. JOHNSON:

11:06:16

Q. Have you heard of Jenkens & Gilchrist?

A. Yes.

Q. Okay. When did you first hear of them?

A. I don't recall.

Q. How did you first hear of them?

11:06:29

A. I don't -- don't remember.

Q. Have you had any dealings with them?

A. Through my brother, Jeff.

Q. You understand it's a law firm.

A. Yes.

11:06:59

Q. Okay. And what dealings have you had with them through your brother, Jeff?

A. Jeff engaged in a relationship with them, and that's what I know. I mean, I don't -- I didn't have direct -- you know, didn't talk to them on the

phone or ...

Q. Have you ever talked with anybody from Jenkens & Gilchrist?

A. I don't remember.

11:07:40 Q. Okay. Have you ever spoken with or met with Donna Guerin or Paul Daugerdas?

A. I don't remember.

Q. Okay. Getting back to the IDR Response 3, in which it's indicated that you did

11:08:15 sign a confidentiality agreement with regard to the Notice 2000-44 transaction --

A. Um-hmm.

Q. -- after seeing Exhibit 54, do I -- do you believe you did sign a confidentiality agreement

11:08:28 of some sort?

A. Yes.

Q. Okay. And do you know if your brothers did as well?

A. I don't know.

11:08:35 Q. Okay. And do you believe that you did that prior to the meeting in Florida in January of 2000?

A. I have no idea.

Q. You don't know one way or the other?



00461374-1cdb-4ff8-a3d1-7f02fc828bc6

A. Um-hmm.
Q. -- you all about, you know, involved these transactions or steps that are -- that are in this --
11:16:25 A. Yeah.
Q. -- document?
A. I don't -- I don't remember. I don't remember.
Q. Um-hmm. Do you remember any of the
11:16:36 transactions or steps in the strategy that Mr. Waterman told you about in Florida?
A. No.
Q. Do you recall whether it had anything to do with purchasing or selling foreign currency
11:16:55 options?
A. You're talking to such a non-financial person. Usually, I go south when these conversations happen. I don't really recall.
Q. Okay. You told me earlier -- I'm sorry.
11:17:09 Were you --
A. By foreign, you mean, non-local?
Q. Non-U.S. dollars.
A. Non-U.S. dollars.
Q. For instance, on the Euro.

were purportedly done and are the subject of the lawsuit, in your understanding?

A. Can you clarify "those transactions"?

Q. Well -- well, you told me that your

11:18:35 understanding of the lawsuit was that it dealt with certain option transactions.

A. Yes.

Q. Is -- is that right?

A. Yes.

11:18:42 Q. Okay. Did Mr. Waterman have any involvement in advising or urging any of you to engage in those transactions?

A. Yes.

Q. Okay. Could you describe for me his

11:19:00 involvement?

A. I don't know it.

Q. Okay. Well, why do you say that he was involved in advising or urging you to --

A. Because he came to the meeting as the

11:19:12 family lawyer.

Q. Okay.

A. So to that degree, he was involved --

Q. Okay.

A. -- making some recommendations.

Q. But you don't recall the substance of anything he said.

A. No.

Q. Okay.

11:19:39 A. I'm feeling I'm not -- not being very helpful.

Q. No. I understand it's been six years.

I just want to ask you some specific questions about the Florida meeting, see if I can

11:20:31 spur -- you know, spur your memory at all.

A. Okay.

Q. Do you recall any discussions as to what the strategy would cost?

A. Yes.

11:20:41 Q. Okay. What do you recall?

A. I -- I recall that it would cost something. The exact amount, I don't recall, but this was something to be purchased.

Q. Okay. And what -- what was your -- when

11:21:04 you say "it was something to be purchased," what would you be purchasing?

A. I don't know exactly.

Q. Okay. Do you recall from whom it would be purchased?

A. No.

Q. Do you recall whether it was from Jenkens & Gilchrist or Shumaker, Loop & Kendrick, or somebody else from whom it would be purchased?

11:21:31 MS. FEENEY: Objection to form. I'm -- I don't know what we're purchasing.

If -- if you understand the question ...

BY MR. JOHNSON:

Q. Do you understand the question,

11:21:43 Mrs. Jordan?

A. Can you ask it again --

Q. Sure.

A. -- so I can remember it?

Q. You told -- I asked you about the cost.

11:21:49 A. Yeah.

Q. Any discussions about cost at the meeting.

A. Yes.

Q. You said you recalled that there were

11:21:55 discussions about it.

A. Yes.

Q. And you told me that it was your understanding that this was something that was to be purchased. Right?

A. Yes.
Q. Okay. And the something that you were referring to as being purchased was this strategy that Mr. Waterman was talking about?
11:22:09 A. I believe so.
Q. Okay. And I'm just asking if you could flesh that out a bit and tell me, if you recall, you know, who the strategy was to be purchased from. I mean, who -- who would be paid?
11:22:26 A. I don't know; lawyers. I don't know.
Q. Okay. So you don't -- you don't know whether Shumaker or whether Jenkens & Gilchrist or whether it was somebody else.
A. No.
11:22:39 Q. Okay. All you recall is that this strategy was something that was going to be purchased?
A. Yes.
Q. If you all wanted to pursue it.
11:22:48 A. Yes.
Q. Okay. And do you recall how the purchase price would be set or how it was going to be set?
A. I recall that it didn't seem to be a negotiable thing.

Q. Okay.
A. But I don't -- I don't know.
Q. Why do you -- why do you remember that it was not negotiable? Why you do you use that term?
11:23:18 A. I just -- I don't -- all -- I remember thinking at the time that it's just -- not understanding this universe, that it was just a -- a -- a fee.
Q. Okay.
11:23:29 A. A given fee.
Q. Sort of a flat fee?
A. Yes.
Q. Okay. So I guess it was a flat fee, as opposed to an hourly fee, depending on how many
11:23:38 hours the lawyers put in.
A. Yes.
Q. Okay. Do you recall that the flat fee was determined as a percentage of some other number?
A. No.
11:23:52 Q. Okay. You -- you don't recall one way or the other?
A. No.
Q. Okay. Do you recall anything about the amount of the fee or how it was set?


00461374-1cdb-4ff8-a3d1-7f02fc828bc6

Q. Okay. Was there any discussion as to whether the strategy would have any effect on the sale or redemption of the Therma-Tru shares or the taxes that might be due on the sale or redemption of those shares?
11:27:10
A. Can you ask it one more time?
Q. Sure. You told me that Mr. Waterman came down to talk about a strategy. I'm wondering if you recall whether there was any discussion or consideration of whether this strategy --
11:27:27
A. Um-hmm.
Q. And I understand you don't remember the details of it, but I was wondering if you recall any discussion about any effects or consequences or impact the strategy might have on the sale of the Therma-Tru stock and the taxes that might be due on that -- the sale of that stock.
11:27:40
A. I don't recall.
Q. Okay. What was your reaction to Mr. Waterman's presentation of the strategy?
11:28:04
A. I didn't have a way to evaluate it. In this department, I -- I tend to sort of go with the financial people in my family.
Q. Okay. So is it fair to say that you

(WHEREUPON, a recess was had from 11:31 a.m. until 11:38 a.m.)

THE VIDEOGRAPHER: We are back on the record at 11:38 a.m.

11:38:19 BY MR. JOHNSON:

Q. Just to follow up, Mrs. Jordan, on something you said earlier, when you said it was your understanding that this was something to be purchased, what was your understanding as to what

11:38:30 you would get in return for the purchase price?

A. Some investment strategy of some kind.

Q. Okay. And -- and how would -- how would you get this strategy? In what form would it come to you?

11:38:50 A. That was my brother's department.

Q. Okay.

A. I don't --

Q. Had you made a decision on whether to pursue the strategy when you left the meeting?

11:39:08 A. I don't recall it being that definitive --

Q. Okay.

A. -- at that time.

Q. Did you do anything at any later point to

help you decide whether or not you wanted to pursue that strategy?
A. I talked to my financial advisor.
Q. Okay.
11:39:31 A. And asked his opinion.
Q. And who is that?
A. Drew Simon.
Q. Okay. Did you give him any documents?
A. No.
11:39:54 Q. Okay. Did you personally talk with him?
A. Yes, on the --
Q. Okay.
A. Excuse me. On the phone.
Q. Okay. Was it one phone call or more?
11:40:05 A. I don't recall.
Q. Is it fair to say that you did not have a personal meeting with him?
A. Yes.
Q. Okay. What did you and he talk about
11:40:32 in -- in this phone call that you recall?
A. I remember asking his advice on this investment strategy, what he thought of it, whether he, you know, knew about it. And he said he wasn't familiar with this particular -- the Gilkens --

Jenk -- Jenker -- that one.

Q. The Jenkens & Gilchrist?

A. The Jenkens & Gilchrist, yeah, that he wasn't familiar with that particular one.

11:41:03 Q. Okay.

A. That he was familiar with some other investments.

Q. So -- so you told him this was a Jenkens & Gilchrist --

11:41:10 A. Yes.

Q. -- strategy?

A. Yes. At that time, it -- I don't recall the timing on this, but at that time, it was evident that was the recommendation coming from my family.

11:41:19 Q. The recommendation coming was that -- regarded this Jenkens & Gilchrist strategy.

A. Correct.

Q. Okay. So at that point, you knew that's where it came from, and so that's how you were able

11:41:32 to tell Mr. Simon that this is what --

A. Yes.

Q. -- you were thinking about?

A. Yes.

Q. Okay. But you didn't send him any papers


00461374-1cdb-4ff8-a3d1-7f02fc828bc6

or documents.

A. No.

Q. Okay. So he said he wasn't familiar with it?

11:41:44 A. With this particular one.

Q. Okay.

A. But he was familiar with some other --

Q. Did he --

A. -- perhaps ones like this.

11:41:53 Q. Did he tell you what other things he was familiar with?

A. He did, but I don't recall names.

Q. How -- how did you describe the Jenkens & Gilchrist strategy to him, do you recall?

11:42:05 A. I don't. It's a very -- pretty brief conversation.

Q. Had --

A. I don't recall.

Q. Had you done anything to familiarize

11:42:28 yourself with the strategy enough to be able to, you know, give him the details about it?

A. No.

Q. Okay. Is it fair to say that the only information you had that you could have conveyed to

him is what you learned at the Florida meeting?
MS. FEENEY: Objection; form.
BY THE WITNESS:
A. Can you ask that again?
11:42:48 BY MR. JOHNSON:
Q. Sure. Did you do anything -- let me ask a different question.
Did you do anything between the Florida meeting and your call with Mr. Simon to learn more
11:43:00 about the strategy?
A. No.
Q. Okay. So when you talked with Mr. Simon, all you could really relate is what you learned at the Florida meeting. Is that fair?
11:43:11 A. No.
MS. FEENEY: Objection; form.
BY MR. JOHNSON:
Q. Okay. What other information did you have when you talked with Mr. Simon that you could
11:43:25 have related to him?
A. I don't remember.
Q. Well, when I asked -- when I asked you if -- what you were able to relate to Mr. Simon was based only on your -- the Florida meeting, you told

me that was incorrect.
A. Say that again?
Q. I thought you told me earlier that you had other sources of information, other than the Florida meeting, from which to draw when you related the strategy to Mr. Simon.
A. What other sources?
Q. That's what I'm trying to find out.
A. I -- well, I feel -- no, I did not have other sources.
Q. Okay. So is it fair to say that the only source of information you had about the strategy was the Florida meeting at the -- at the time you called Mr. Simon?
A. Um-hmm. Maybe there were a few conversations with Jeff --
Q. Okay.
A. -- to have him help explain it a little bit.
Q. But you're not sure whether there were or not?
A. I don't recall.
Q. Okay. You told me that Mr. Simon said he was unfamiliar with this Jenkens & Gilchrist

strategy. What else did he tell you?
A. That he was familiar with some -- one, perhaps, similar, from what I was describing.
Q. Okay. What else did he say?
11:45:13 A. He couldn't really pass an opinion on this particular one, because he wasn't familiar with it.
Q. Okay. So as -- as -- is it fair to say that he didn't -- he told you that he could not give
11:45:39 you an opinion on this strategy?
A. Yes.
Q. Okay. Did he ever send anything to -- to you in writing or put anything in writing about it?
A. No.
11:45:49 Q. So there was just this one phone call. And at the end of it, he basically said, "I can't tell you one way or the other."
A. Correct.
MS. FEENEY: Objection.
11:45:59 MR. JOHNSON: Okay.
MS. FEENEY: Mischaracterizes the testimony; she wasn't sure how many phone calls there were.
BY MR. JOHNSON:
Q. I -- I think you told me that you didn't

recall any other phone calls. Is that right?
A. I -- I recall the one.
Q. Okay. What -- what business is Mr. Simon in? What -- is he a financial advisor, an
11:46:24 accountant or -- or what?
A. A financial advisor.
Q. Okay. Does he give you or your family tax advice? Or is it financial advice?
A. Financial advice.
11:46:33 Q. Okay. Other than Mr. Simon and any of your family members and Mr. Waterman, did you talk to anybody else about the strategy?
A. No.
Q. Okay. Did there come a point where you
11:47:11 decided to pursue the strategy, the Jenkens & Gilchrist strategy?
A. You're -- you're asking like a definitive decision, "Oh, yes, I'm doing this"? Is that what you're saying when you say "make a decision"?
11:47:46 Q. Yeah. Well, you've told me that this strategy was presented at the Florida meeting.
A. Right.
Q. You told me that you then called Mr. Simon to run it by him.



00461374-1cdb-4ff8-a3d1-7f02fc828bc6

A. Yes.
Q. Did there come a point in time where you decided, "Yes, I am going to do this. I am going to pursue this strategy."
11:48:08 A. Again, I'd have to answer that I defer, really, to Jeff.
Q. When you -- when you say you defer to him, what --
A. It was his recommendation. So, yes, from
11:48:30 that, I would say, then I decided, yes.
Q. Okay. So you deferred to him as to whether it was a good idea or not?
A. Yes.
Q. Is that what you're saying?
11:48:39 A. Yes.
Q. Okay.
A. And from there, I then -- it was his recommendation, and then I --
Q. Okay.
11:48:44 A. And then I could say yes.
Q. Okay. So there did come a point in time where you did say yes.
A. Yes.
Q. Okay. I'll show you what's been marked

as Exhibit 45. And this is a -- this was previously marked, and this is a March 6, 2000, letter from Mr. Waterman to you and your parents and brothers. And you're welcome to take a look at that if you'd like.

11:49:32

Have you had a chance to take a look at it --

A. Scan it.

Q. -- or do you want to --

11:50:54 A. Yeah.

Q. Okay. Do you recall receiving this back in March of 2000?

A. No.

Q. Okay. Do you have any reason to believe that you did not?

11:50:59

A. No.

MS. FEENEY: This copy is unsigned.

MR. JOHNSON: Correct.

BY MR. JOHNSON:

11:51:33 Q. Do you recall receiving a letter from Mr. Waterman back in 2000 regarding the strategy that he had presented to you?

A. No.

Q. No?


00461374-1cdb-4ff8-a3d1-7f02fc828bc6

A. (Indicating.)

Q. Other than the meeting in Florida, do you recall having any -- any other communication from him, whether orally or in writing --

11:51:50 A. No.

Q. -- regarding the strategy?

A. No.

Q. Do you ever recall that he advised you and your family not to pursue the strategy?

11:51:58 A. No.

Q. Okay. Do you recall that he or his firm ever told you or your family that they couldn't recommend that you do it or not do it? They were just being agnostic about it and ...

11:52:17 A. Ask the question again?

Q. Sure. Do you recall whether Mr. Waterman and his firm ever told you or any member of your family that they couldn't express an opinion as to whether or not you should pursue the strategy?

11:52:32 MS. FEENEY: Objection on attorney-client privilege, and I'll instruct the witness not to answer at this time.

BY THE WITNESS:

A. I don't remember.

privilege.

BY MR. JOHNSON:

Q. Your answer was no?

THE WITNESS: So I shouldn't answer?

12:07:36 MS. FEENEY: Please do not answer the question.

THE WITNESS: Okay. Sorry.

MR. JOHNSON: You're not letting her answer that yes-or-no question?

BY THE WITNESS:

12:07:44 A. No, I'm not answering.

BY MR. JOHNSON:

Q. Are you going to follow that advice --

A. Yes.

Q. -- Mrs. Jordan?

12:07:48 A. Yes.

Q. You said at some point you decided to pursue the strategy, based on the recommendation of Jeff. Right?

A. Yes.

12:07:59 Q. Okay. Who, if anyone, helped implement the strategy?

A. I don't know.

Q. Were there any advisors or lawyers or other people who assisted you and your family?


00461374-1cdb-4ff8-a3d1-7f02fc828bc6

A. I'm assuming, yes.
Q. Do you -- do you know if it was Mr. Waterman and his firm?
A. The question is whether he assisted
12:08:28 in ...
Q. In -- in implementing the strategy.
A. I don't know.
Q. You -- you don't know if his -- he and his firm assisted you?
12:08:37 A. No.
Q. Okay. Do you know who might have?
A. Poor Jeff. I don't know. You -- you mean in terms of particular lawyers and ...
Q. Or -- or firms.
12:08:59 A. I don't know.
Q. Okay. If you could turn to page 2 of this letter, the first full paragraph, the first sentence says -- oh, I'm sorry -- the last sentence of that -- in that first full paragraph says, "An
12:09:27 information brochure regarding the firm was provided to you."
Do you see that sentence?
A. No.
Q. This -- this paragraph, the first full



00461374-1cdb-4ff8-a3d1-7f02fc828bc6

one on the page.

A. "The investment program and strategy"?

Q. Yeah.

A. Okay.

Q. And the last sentence there --

A. Okay.

Q. -- says, "A brochure regarding the firm," and the firm being Jenkens & Gilchrist --

A. Was provided.

Q. -- "was provided to you."

A. Okay.

Q. Do you recall getting a brochure about the firm Jenkens & Gilchrist?

A. No.

Q. And the next sentence says, the next paragraph, and I'll paraphrase it -- that Mr. Waterman has enclosed for your review a redacted version of a draft opinion issued by Jenkens & Gilchrist in connection with a similar transaction.

Do you see that?

A. Um-hmm.

Q. Okay. Do you recall ever receiving a draft opinion from Jenkens & Gilchrist?

A. No.

Q. Further along in that paragraph, he says he's also enclosing a copy of a research memorandum prepared by Jenkens & Gilchrist.
Do you recall ever seeing something like that?
12:10:31
A. No.
Q. I'm going to show you what was previously marked as Exhibit 46, and that's a November 1999 memo on Jenkens & Gilchrist letterhead. And you're welcome to page through it if you'd like, but I wanted to ask if you've ever seen this before.
12:10:52
MS. FEENEY: My copy is not complete. Is your copy?
MR. JOHNSON: What's missing?
12:11:05
MS. FEENEY: It's missing page 21.
THE WITNESS: Yeah, mine is, too.
MR. JOHNSON: Mine is as well.
THE WITNESS: Well, we're all missing it.
BY MR. JOHNSON:
12:11:15
Q. Does missing page 21 impact your answer, Mrs. Jordan?
A. No.
Q. Okay. Have you ever seen this before?
A. No.



00461374-1cdb-4ff8-a3d1-7f02fc828bc6

Q. That's the other exhibit, the letter.
A. Oh. Do you know this is my brother's initials at the bottom, not me?
Q. Yes.
12:15:38 A. Is that okay? Okay.
Q. Yes.
A. All right. What number?
Q. SLK 50. The last full paragraph, this one (indicating).
12:15:53 A. Um-hmm, okay.
Q. There's a sentence in there in the middle that says, "I believe we have been clear that we are not recommending that you pursue their proposal."
And you'll see that he's referring to the
12:16:12 Jenkens & Gilchrist proposal.
A. Um-hmm.
Q. Do you see that?
A. Yes.
Q. Okay. Was it your understanding that
12:16:19 Shumaker, and Mr. Waterman in particular, were not recommending that you pursue the Jenkens & Gilchrist proposal?
MS. FEENEY: Objection. This witness said that she doesn't recall ever receiving this document.

The document speaks for itself.
BY THE WITNESS:
A. Ask the question again?
MR. JOHNSON: Sure. Could you read back the question?
12:16:43
(WHEREUPON, the record was read by the reporter.)
BY THE WITNESS:
A. So my understanding -- no.
12:17:12
BY MR. JOHNSON:
Q. What was your understanding on that issue?
A. That it was a recommendation, not much more than that, really.
12:17:28
Q. Okay. A recommendation by whom?
A. Well, actually, can I change my answer?
Q. Sure.
A. I don't -- I don't think the word "recommendation" is right.
12:17:42
Q. Okay.
A. That they were just presenting this as --
Q. Okay.
A. -- as an opportunity or an option.
Q. Okay. So -- I'm sorry.

BY MR. JOHNSON:
Q. Okay. You can answer the question. She's objecting for the record.
A. I understand that. But I get involved in
14:23:52 her objection, and I'm trying to remember what you asked. So you're asking -- can you ask -- repeat the question?
Q. Did he describe the financial or economic effects or consequences that could or might result
14:24:04 from the strategy?
A. It -- it seemed pretty vague to me, so some -- you know, as in any investment, you don't really know what the outcome is going to be.
Q. Okay. Do you remember anything at all
14:24:23 about what he described they might be?
A. No.
Q. Well, in -- in light of your -- your previous answers then, Mrs. Jordan, I'm going to ask you again.
14:24:43 When Mr. Waterman presented the strategy, is it correct that he was not taking a position as to whether or not he would recommend it, but he was simply presenting it as an option?
A. Yes.

Q. Okay. And did he ever take a different position, in that did there ever come a time where he took a position where he was recommending it or not recommending it, to your knowledge?

14:25:20 A. Not that I know of.

Q. Okay. So it's your recollection that Mr. Waterman and his firm never took a position as to whether you and your family should pursue this strategy?

14:25:33 A. Correct.

Q. Okay. You -- you don't recall him taking the position that you should not pursue it?

MS. FEENEY: Objection; asked and answered.

BY THE WITNESS:

14:25:41 A. No.

BY MR. JOHNSON:

Q. Okay. Did you ever consult a lawyer, other than Mr. Waterman or anybody from his firm or anybody from Jenkens & Gilchrist, about the

14:26:04 strategy?

A. No.

Q. And then other than Mr. Simon and your brother, Jeff, is it correct that you didn't consult anybody else about the financial effects or possible

consequences?
A. Yes.
Q. Okay. You told me earlier that -- I think when you left the Florida meeting, you -- you
14:26:46 really hadn't decided whether you were going to pursue the strategy or not. But at some point, Jeff recommended it, so on the bas- -- on that basis, you decided to do it.
A. Yes.
14:26:58 Q. Okay. What did he tell you or do to convince you to pursue the strategy?
A. I don't think there was any convincing. It was just more state of fact, this is what we've decided is what we're doing, and this is a -- a
14:27:20 family decision, and there wasn't any particular content about that that I remember.
Q. Do you remember anything else he might have said to cause you to agree to go along with the strategy?
14:27:38 A. No.
Q. So he didn't tell you anything about the financial or economic returns or profits that might be earned?
A. No, just that he felt that it was going

to be a worthy investment, and -- from his assessment and his background, he felt it was a good thing to be doing.

Q. Worthy in what sense?

14:28:01 A. You know, the investment world is not my world. So I -- you know, that can be interpreted lots of ways, but just that it was going to be, you know, likely we would make some profit and that would be a good thing, and my motivation is always

14:28:22 if we can fund this foundation more, that's great.

Q. Did he quantify that for you?

A. No.

Q. Okay. Did he at all quantify the costs that would be involved in order to pursue the

14:28:33 strategy, that -- that you would --

A. Not that I --

Q. -- bear?

A. Not that I remember.

Q. Did you do any analysis to determine

14:28:42 whether the possible profits outweighed the costs?

A. No.

Q. Did he do any such analysis and present the -- provide the results to you?

A. I don't -- I don't know.

A. No.
Q. You don't recall at some point deciding not to pursue the strategy?
A. No.
14:30:37 Q. Other than talking to your brother, Jeff, and hearing what he had to say, was there anything else upon which you relied in deciding to pursue the strategy?
A. Anyone else?
14:31:14 Q. Anyone or anything else upon which you relied in deciding to pursue the strategy?
A. No.
Q. So it was based solely on what Jeff told you?
14:31:26 A. Yes.
Q. Okay. Did he tell you that -- well, you told me that he may have told you he thought it was a worthy investment, to use your term. Did he say what he may have been relying upon or who he may
14:31:48 have been relying upon to --
A. "He" being --
Q. Jeff -- to -- to form that conclusion?
A. Not that I recall.
Q. Okay. Did you have an understanding as

MR. JOHNSON: There are some states that don't.
BY THE WITNESS:
A. Well, then I don't know.
BY MR. JOHNSON:
15:31:51 Q. Okay. I'm not aware of Colorado being one of those that doesn't, but it's your assumption that if they do have a tax, you filed it --
A. Correct.
Q. -- timely and properly.
15:32:04 A. Yes.
Q. Okay. Regarding the strategy and considering whether to pursue it back in 2000 and the implementation of it, what was your father's involvement?
15:32:15 A. I don't really know.
Q. Other than the meeting -- did he attend the meeting in Florida?
A. Yes.
Q. Okay. It was at his place in Florida.
15:32:29 Is that right?
A. Yes.
Q. Okay. Other than attending that meeting, are you aware of any other communications he had with Mr. Waterman or Mr. Waterman's firm about the

strategy?
A. No.
Q. Okay. Any communications he might have had with Jenkens?
15:32:45 A. I don't know.
Q. Okay. Do you know if he talked with Jeff about it?
A. No.
Q. Okay. Other than the foreign currency
15:33:21 options, do you recall any other steps or transactions that were involved in the Jenkens strategy?
A. Any other steps?
Q. Any other aspects or steps or
15:33:31 transactions that were part of it.
A. No.
Q. Okay. So the only -- the only piece you remember about it involved -- that it involved was foreign currency options.
15:33:43 A. Yes.
Q. Okay. After the Florida meeting, did you have any further or additional communication with Mr. Waterman about the strategy?
A. No.

Q. How about with -- with John Ivsan? Did you have any communications with him, whether written or oral?

A. I don't know who he is.

15:34:57 Q. You never heard that name before?

A. No.

Q. Okay. Would you recognize Jeff's handwriting if you saw it, do you think?

A. I think so.

15:35:33 Q. Okay. Why don't I show you --

A. It's not as bad as mine.

Q. Let me just show you some things and -- before I decide whether to mark it. And it's a document Bates stamped IRSJG 837.

15:35:53 Do you recognize -- and that's a handwritten one-page document. Do you recognize that handwriting?

MS. FEENEY: May I see that?

BY THE WITNESS:

15:36:01 A. No.

BY MR. JOHNSON:

Q. Okay. How about this? And this is a document Bates stamped JFW 1301 through 1305. Do you recognize that handwriting?

meeting in Florida, you told me it was your impression -- impression that this was a strategy that could be purchased for a price, to use your term.

15:40:15 Do you remember the -- do you recall that?

A. Yes.

Q. Okay. And in return --

MS. FEENEY: Objection to that to the extent

15:40:24 that that mischaracterizes her previous testimony. I don't recall that that was necessarily her term, but ...

BY MR. JOHNSON:

Q. And in return for the price, do you

15:40:34 recall that you all would receive an opinion letter from Jenkens giving their opinion about the tax consequences of pursuing the strategy?

A. No.

Q. Okay. Do you ever -- do you recall ever

15:40:53 learning that Jenkens was going to provide a -- an opinion letter about the taxes?

A. No.

Q. Okay. So are you -- sitting here today, are you surprised that they did so?

A. An opinion letter? I'm not even clear on that.

Q. Okay. Was it your understanding that, at some point, Jenkens & Gilchrist provided their

15:41:24 advice about how to report for tax purposes the results of the Jenkens strategy?

A. And the question is did I know that or --

Q. Yeah. Did you ever learn --

A. No.

15:41:35 Q. -- that?

A. No.

Q. Okay. So if I told you that they did provide an opinion letter about how to report or what the -- the tax -- tax consequences of the

15:41:45 strategy, would that be a surprise to you?

MS. FEENEY: Objection; form, speculation.

BY THE WITNESS:

A. I -- I can't even answer that like that. I mean, a surprise? I don't know. I mean, I

15:42:03 don't ...

BY MR. JOHNSON:

Q. Okay. And I think you -- you told me earlier that you never communicated with Jenkens & Gilchrist. Is that right?