# EXHIBIT B

# PART II

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STOBIE CREEK INVESTMENTS, L.L.C., )
JFW ENTERPRISES, INC., Tax )
Matters and Notice Partner, )
Plaintiff, )
vs. ) NO. 05-748 T
UNITED STATES OF AMERICA, ) (Judge Block)
Defendant. )

The videotaped deposition of CHRISTOPHER SCOTT WELLES, called as a witness for examination, taken before PAULINE M. VARGO, a Notary Public within and for the County of DuPage, State of Illinois, and a Certified Shorthand Reporter of said state, C.S.R. No. 84-1573, at Suite 7200, 233 South Wacker Drive, Chicago, Illinois, on the 14th day of December, A.D. 2006, at 9:20 a.m.

60:1 other amount, such as a purported loss or increase in tax basis or some other tax attribute or benefit, and your response is, "Yes, they were set in such a fashion." So are you referring to one of those methods?

A. No. I was referring to as a flat fee, so I guess the answer should be I don't know, because it is more a previous answer, "F," I don't know.

Q. Now, did there come a time when Jeff, your brother, recommended that you and the other members of your family engage in some purported foreign currency options or invest in some foreign currency options?

A. Yes.

Q. And was this in the year 2000?

A. I believe so.

Q. And was this one of the results of Jeff's discussions with Jenkens & Gilchrist?

A. I don't know.

Q. Do you know if it was a result of his discussions with Shumaker, Loop & Kendrick?

A. I do not know.

Q. Do you know why he recommended that you

61:1 and your family members engage in investments in foreign currency options?

A. As an investment strategy.

Q. Do you know if it also might have some tax advantages or benefits?

MS. FEENEY: Objection, form.

BY THE WITNESS:

A. I recall that there could be tax benefits in this type of investment.

BY MR. JOHNSON:

Q. And what is that belief based upon?

A. Conversations.

Q. With whom?

A. Jeff.

Q. Is it based on any conversations with anybody else?

A. No.

Q. Was it based on any analysis or investigation you did?

A. No.

Q. What did Jeff tell you about the tax benefits?

A. As I recall, it was an investment strategy that if it worked, you could gain a lot of

62:1 income off of it, and if the options didn't work, there could be some tax benefits.

Q. And can you tell me what those tax benefits were in your understanding?

A. I can't. I can't tell you the mechanics of those tax benefits. I don't understand.

Q. You said that this investment strategy could possibly lead to a profit or you all making some money?

A. Um-hmm.

Q. What is that based on? What is that statement based on?

A. If when the options -- the date expired, if they were in the positive, then there is a financial benefit from that.

Q. And is that based on some investigation or analysis that you did regarding the foreign currency options and the strategy, or is that based on something somebody told you?

A. Neither.

Q. What is it based upon?

A. My understanding of how options work.

Q. I think you said Jeff recommended that you all pursue this strategy?

63:1 A. I don't think I did say that.
Q. Did he recommend it?
A. Yes.
Q. Did anybody else recommend that it be done?
A. Not that I recall, no.
Q. What did he recommend that you do?
MS. FEENEY: Objection, form.
BY THE WITNESS:
A. I don't think he recommended I do anything. It was more -- he didn't recommend I do anything.
BY MR. JOHNSON:
Q. Well, what did he recommend be done whether by you or somebody else with regard to this investment strategy?
A. The option strategy was an investment vehicle the same as any of other our investment vehicles.
Q. Well, I am just trying to get you to describe what was this strategy. What was to be done?
A. You buy an option. It's got an expiration date. If it is in the money, you make

72:1 BY THE WITNESS:
A. Do I know what entity is a party? Yes.
BY MR. JOHNSON:
Q. Why?
A. It is my share of the investment.
Q. And when you say your share of the investment, what do you mean? What are you referring to?
A. Stobie Creek invests pooled assets of all family members, and then we all have it broken into individual accounts. CSW is my individual account within the pooled assets.
Q. Do you know when CSW Investments was formed?
A. Sometime in the year 2000.
Q. Did anybody advise you to form it or that it be formed?
A. Yes.
Q. Do you know who that was?
A. Jeff Welles.
Q. And did he tell you why it should be formed, why he thought it should be formed?
A. Yes.
Q. What did he tell you?

73:1 A. We all were contributing our individual assets. In this case it was just Therma-Tru. So I owned Therma-Tru, my brothers owned Therma-Tru, my sister. We were all pooling them together to start our family office which then became named Stobie Creek.

Q. So you contributed Therma-Tru stock to Stobie Creek?

A. I did.

Q. And was that at the advice of Jeff?

A. Advice of Jeff, and I think also in terms of the planning part through David Herpe as well.

Q. And why did Jeff or did Jeff tell you why he thought that the Therma-Tru stock should be contributed to Stobie?

A. Yes. There was a sale of Therma-Tru, and so it was what do we do now with the combined assets based on the sale.

Q. And did he advise that it be contributed prior to the sale?

A. I don't remember the exact timing of when it needed to be contributed. Well, obviously, it had to be contributed beforehand. I am not sure

82:1

A. Not that I am aware of.
Q. Getting back to Exhibit 45, you told me you had seen that yesterday?
A. Yes. That's the previous one?
Q. Yes.
A. Yep.
Q. Do you recall seeing that before yesterday?
A. I do not.
Q. On Page 3 of this document, Mr. Waterman has a paragraph talking about possible penalties.
A. Paragraph 3?
Q. Yes. Do you recall any discussions with anybody about possible income tax penalties?
A. No.
Q. In the fourth paragraph Mr. Waterman states that he has previously informed you that "Jenkens & Gilchrist has offered to Shumaker, Loop & Kendrick a portion of its fee for our assistance in creating and implementing the investment vehicles and documenting the transfers of assets and that this could bias our opinion as to the merits of the proposal."
My question is, was it your

83:1 understanding that Shumaker Loop & Kendrick was to be paid a fee in connection with your family's pursuit of the foreign currency option exchange or option strategy?

A. Yes.

Q. And was it also your understanding that Jenkens & Gilchrist was going to be paid a fee in connection with that strategy as well?

A. Yes.

Q. And you understood that back in 2000?

A. Yes.

Q. And was it your understanding that the Jenkens fee was about $4 million?

A. I am not sure what my understanding about the amount of the fee was in 2000. I am aware of it subsequently through the IDR process.

Q. So sitting here today, you understand that their fee was about 4 million?

A. That's correct.

Q. And similarly, it's your understanding at least sitting here today that the Shumaker fee was about 2 million?

A. That's correct.

Q. And Mr. Waterman states that also there

84:1 the fee that they are receiving is for the assistance in creating and implementing the investment vehicles and documenting the transfer of assets in that fourth paragraph, I guess. Was it your understanding that the $4 million to be paid to Jenkens was in exchange for their telling you all how to implement the strategy?

A. I did not have any understanding of what their fee was for.

Q. So you didn't back in 2000, 2001 know what they were doing in return for the $4 million?

A. That's not a correct characterization.

Q. Well, you understood that Jenkens was going to be paid a fee?

A. Um-hmm.

Q. And I think we talked earlier that you understood it was a flat fee?

A. That's correct.

Q. What was your understanding as to why you were paying them a fee?

A. For legal advice.

Q. And what legal advice was that?

A. Tax planning and estate planning.

Q. And what was the planning?

A. Putting together a plan on how to pay your taxes.
Q. Well, did this plan involve the foreign currency option transactions?
A. I don't know if it did or did not include the foreign currency option.
Q. Where did the idea to pursue the foreign currency option strategy come from?
A. It came through my conversations -- my understanding of it is through my brother Jeff.
Q. Do you know where -- did he come up with the idea on his own, or did somebody propose it to him?
A. You will have to ask him that.
Q. You don't know whether it was his or somebody gave it to him?
A. I don't know.
Q. The fee to Shumaker which we talked about earlier you understood as being a flat fee as well, and in this letter Mr. Shumaker -- I am sorry -- Mr. Waterman is saying that he and his firm would be unable to issue an opinion like the one being offered by Jenkens?
A. Where do you see that?

VOLUME I PAGES 1 - 54
EXHIBITS: None
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
C.A. NO. 05-748T
(Judge Miller)
STOBIE CREEK INVESTMENTS, ) L.L.C., JFW ENTERPRISES, )
INC., Tax Matters and Notice ) Partner, )
Plaintiff, ) )
vs. ) )
UNITED STATES OF AMERICA, ) Defendant. )

DEPOSITION OF CHRISTOPHER WELLES, taken on behalf of the Defendant, pursuant to the Massachusetts Rules of Civil Procedure before Tina M. Sarcia, Registered Professional Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Attorney Generals Office, One Courthouse Way, Boston, Massachusetts, on Thursday, August 16, 2007, commencing at 9:10 a.m.

Concordance key word in context printing for depositions
Welles, Christopher - August 16, 2007 09:10:00 a.m.

10:1
A. I personally did not -- was not involved in the transaction, so I can't describe what they were.
Q. You personally did not purchase the foreign currency options; is that correct?
A. That's correct.
Q. Do you know what entity did or who did on your behalf?
A. The entity would have been Stobie Creek on my behalf.
Q. Do you know why those options were purchased?
A. They were an investment vehicle just like any other investment vehicles that Stobie Creek purchases on my behalf.
Q. Could you describe what you mean by investment vehicle?
A. It's the exchange of money for an investment in the hopes that will be worth more money than what you bought it for, just like buying a stock or a bond or I guess a house.
Q. I guess that could be an investment, correct?
A. Sure.
Q. Did you personally conduct an analysis on this particular investment?

11:1 A. I did not.
Q. Do you know if anybody else did?
A. I do not know -- I did not see somebody else do an analysis of the transaction.
Q. Do you know if anyone else did perform such an analysis?
A. Prior to any investments, Stobie Creek and my brother Jeff do an analysis of any investment that they're going to purchase, and I believe that like buying any other investment the analysis was done by Stobie Creek and by Jeff.
Q. When you say Stobie Creek, does that include anyone other than Jeff who would have participated in that analysis?
A. There is staff at Stobie Creek besides Jeff.
Q. I think I know who they are, but for my benefit, could you name the staff who you believe -- please name the staff who you believe would have participated with Jeff in forming this analysis.
A. Larry Goldstein, Bill Chung, and possibly Mod Welles.
Q. Did you say Mod Welles?

12:1 A. I did.
Q. What is Mod Welles relationship to you?
A. My sister-in-law.
Q. Who is her husband?
A. Jeff Welles.
Q. Why did you decide to allow Jeff or Stobie Creek make this investment on your behalf?
A. Stobie Creek has a discretionary account for all my investments, so whether it's currency options or, again, any other investments. Jeff has discretion to make those investments.
Q. Did you ever see any analysis that Jeff did or that Stobie Creek and the staff of Stobie Creek did with regard to this particular investment of digital options?
A. I did not.
Q. So it's your understanding that Jeff in his discretion purchased these investments without receiving or without consulting you beforehand?
A. Can you ask the question again, please.
MR. CHRISTENSEN: Yes. I'll just ask you, Tina, if you could reread that

13:1 question for me.

(Question read)

A. I did not have a specific long discussion with him about buying digital options if that's -- I couldn't tell you what currencies they were in.

Q. Did he inform you that he would be purchasing these options on your behalf prior to the time he actually purchased them?

A. I believe so, yes.

Q. At that time, did he convey to you the potential for profit that these investments might have?

A. Yes.

Q. What was conveyed to you in that regard?

A. The potential was for a good -- I can't tell you he did not put a number on it, but a good investment return if the options expired in the money.

Q. Aside from Jeff and the staff at Stobie Creek which would include Goldstein, Bill Chung and possibly Mod Welles, did anyone else advise you to purchase these options?

A. No.

14:1
Q. Did anyone from Shumaker, Loop and Kendrick provide an analysis to you regarding the reasonable likelihood of -- excuse me, regarding the potential for profit of the options?
A. No.
Q. Did anyone from Jenkens and Gilchrist give you an opinion regarding the potential for profit of these options?
A. No.
Q. Do you know whether anyone from Shumaker, Loop and Kendrick advised Jeff as to the potential for profit of these options?
A. I do not know.
Q. Do you know if anyone from Jenkens and Gilchrist advised Jeff or anyone else at Stobie Creek regarding the potential for profit of those options?
A. I do not know.
Q. Have you had any formal education regarding foreign currency options?
A. No.
Q. How about any seminars or informal education regarding foreign currency options?

15:1 A. No.
Q. Was it your understanding there would be any tax consequences in connection with the purchase of the foreign currency options back in 2000?
A. I believe, yes, that there would be some -- like any investment, there would be tax consequences at the time of a sale.
Q. What was your understanding in 2000 as to what those tax consequences might be?
A. At the sale of the options, at the exercise date, if they were in the money, there would be a capital gains; and if they were not in the money, then they would be a loss.
Q. At the time that the digital options were purchased on your behalf, were you anticipating a sale of Therma-Tru stock held by you or by an entity on your behalf?
MS. FEENEY: Objection to form.
A. Can you ask the question again?
(Question read)
A. Yes.
Q. Was it your understanding that the purchase of foreign currency options could affect the

16:1 tax consequences of the sale of Therma-Tru stock?
A. I didn't understand mechanics of a foreign currency option and how it related to Therma-Tru, but I believe there was a connection between the two.
Q. Based on your understanding, what was the connection?
MS. FEENEY: Objection to form.
A. I don't really understand what the connection was to be perfectly honest with you.
Q. Did you engage in the purchase of the foreign currency options for the purpose of reducing any capital gain that would have resulted in the sale of Therma-Tru stock?
A. No.
Q. Let's discuss quickly the Florida meeting that occurred in 2000, and let me first ask you, did your family have a family meeting in Florida in the year 2000?
A. Yes.
Q. Do you recall what the subject of that meeting was, what was discussed at the meeting?

17:1 A. I do, yes. Some parts of it. I certainly don't remember all the details.
Q. In particular, do you recall whether David Waterman from Shumaker was present?
A. I do recall David being there for the very last part of the meeting.
Q. Did he make a presentation at the meeting?
A. I believe he did, yes.
Q. What was the substance of his presentation?
A. I don't remember.
Q. Do you remember anything he said during that presentation?
A. The only conversations I remember with Dave had nothing to do with the presentation. We discussed if we were going to have time to play golf at the end of the meeting. That's what I recall about Dave being there. I recall it was a very brief time he was with the family.
Q. Have you spoken with David Waterman since that time?
A. Since the year 2000.
Q. Let me narrow the question a little bit. Since the Florida meeting in 2000, up until

23:1
Q. Did Stobie Creek also hold your Therma-Tru shares on your behalf?
A. I personally held my Therma-Tru shares.
Q. Were those shares ever transferred to Stobie Creek?
A. I don't recall if those were transferred to Stobie Creek. I personally had stock certificates that I forwarded, I believe, to David Waterman. I'm not positive.
Q. So you don't know whether those were transferred to Stobie Creek or not?
A. I do not.
Q. The next paragraph of the letter, second page of the letter states that the investment program and strategy has been proposed by the Chicago office of Jenkens and Gilchrist.
Are you aware of any investment program or strategy that was proposed to your family by the -- that was proposed by the Jenkens and Gilchrist law firm?
A. Yes.
Q. What is your understanding of that program and strategy that was proposed by Jenkens and Gilchrist?

24:1 A. Not much to be honest with you. It was a very complicated strategy involving the sale of Therma-Tru. I didn't really get into the details of it at all, and I never met anyone from Jenkens and Gilchrist.
Q. Have you ever talked with anyone from Jenkens and Gilchrist?
A. No.
Q. Do you recall what any of the specific details of the strategy were involving the sale of Therma-Tru stock?
A. I do not.
Q. Other than it was complicated, I guess?
A. Yes.
Q. Did David Waterman advise you to pursue that investment program or strategy?
A. I did not talk to David specifically about it.
Q. Do you know whether he advised anyone else in your family to pursue that strategy?
A. I know that he had various conversations with Jeff and my brother Deek and my father about the strategy.
Q. Do you know whether he advised them to pursue

25:1 the strategy?
A. You'll have to ask them that question. I don't know.
Q. Did you ever speak with anyone else at Shumaker, Loop and Kendrick?
A. I did not.
Q. Did you --
A. Let me take it back. I think I had some phone calls or -- other people from Shumaker but I don't recall what those were about. Those were more procedural type of things.
Q. Do you recall who those phone calls, phone conversations were with?
A. I do not.
Q. Have you ever received any written communication from anyone else besides David Waterman at Shumaker, Loop and Kendrick?
A. Not that I'm aware of, no.
Q. So it would be your understanding then that nobody else at Shumaker, Loop and Kendrick advised you to pursue the investment program and strategy that was proposed by Jenkens and Gilchrist?
A. That's correct.

Concordance key word in context printing for depositions
Welles, Christopher - August 16, 2007 09:10:00 a.m.

26:1 Q. Did your brother Jeff advise you to pursue that investment program and strategy?
A. Yes.
Q. What is that answer based on? Is it based on conversations that you had with Jeff regarding the investment program and strategy?
A. Yes, it was based on conversations.
Q. What did Jeff tell you about the investment program and strategy?
A. Jeff told me that he believed this was a good investment opportunity, and based on the advice he had got from counsel, a sound strategy.
Q. Did you discuss any tax benefits that the strategy would have with Jeff?
A. Yes.
Q. What did you discuss in that regard with him?
A. As I recall, we discussed that he had talked to both Jenkens and Gilchrist and Shumaker and -- he was advised by them this was a sound tax strategy as well as a sound investment strategy.
Q. So it's your understanding that Shumaker

27:1 advised Jeff it was a sound tax strategy?
A. Yes.
Q. Who from Shumaker advised Jeff it was a sound tax strategy?
A. I don't know.
Q. Have you seen any documents from anyone at Shumaker that advised Jeff it was a sound tax strategy?
A. I have not, no.
Q. It's your understanding that Shumaker advised Jeff it was a sound tax strategy based on your conversations you had with Jeff?
A. Yes.
Q. Is it based on anything else other than conversations you had with Jeff?
A. If you're asking if I saw any documents, the answer would be no. It was just conversations.
Q. Was it your understanding that the tax benefits were dependent upon there being a substantial nontax business purpose for engaging in the investment program and strategy?
A. I didn't have an understanding one way or

28:1 another on the nontax business interest.
Q. Did you actually decide to pursue the investment program and strategy that was proposed by Jenkens and Gilchrist?
A. I decided to invest in the option, the foreign currency option. I don't know if that was part of the -- I don't know what was advised by Jenkens and Gilchrist. It was pretty obvious I invested in Stobie Creek and the currency exchange.
Q. Why did you decide to do that or whose -- did someone advise you to do that?
A. Jeff did.
Q. Did anyone else advise you to do that?
A. No.
Q. So your decision to pursue the investment program was based on advice given you from Jeff?
A. Just like any other investments I've done with Jeff are countless.
Q. So the answer is yes?
A. The answer is yes.
Q. But you didn't do any independent analysis of the profitability of the investment?

29:1 A. I think the same answer I had the last time, no, I didn't.
Q. You never received advice from Shumaker, Loop and Kendrick personally to pursue the strategy?
A. No.
Q. Did you ever receive advice personally from Jenkens and Gilchrist to pursue the strategy?
A. I never had any conversations with anyone from Jenkens and Gilchrist.
Q. You didn't receive advice from them in any form other than conversations to pursue the strategy?
A. That's correct.
Q. Do you recall receiving a draft opinion from Jenkens and Gilchrist in 2000 regarding an investment program and strategy?
A. I do not recall receiving that.
Q. Okay. Will you turn to the third page of that letter. The last full paragraph, the second sentence, it says, "I believe we have been clear that we're not recommending that you pursue their proposal. In fact, we have advised you that our knowledge of J and G's

1:1 UNITED STATES COURT OF FEDERAL CLAIMS

STOBIE CREEK INVESTMENTS, : LLC, JFW ENTERPRISES, INC.,:
tax matters and notice : partner, :
: Plaintiff, :
: v. : Case Number 05-748
: UNITED STATES OF AMERICA, :
: Defendant. :

\- - -

Telephonic Continued Deposition of DAVID K. WELLES, JR., a Witness herein, called by the Defendants as upon Cross Examination pursuant to the Federal Rules of Civil Procedure, taken before Nicole D. Blaker, Registered Professional Reporter, Notary Public in and for the State of Ohio, at the offices of the United States Attorney, Four SeaGate, Suite 300, Toledo, Ohio, on Tuesday, July 24, 2007, commencing at 9:20 a.m.

Concordance key word in context printing for depositions
Welles, David K. - July 24, 2007 09:20:00 a.m.

8:1 would think in the course of conversations he probably would have referenced it, but I have no specific recollection as to, you know, any direct talk about it.
Q Have you ever had any conversations with Mr. Waterman about the taxation or tax strategies related to the redemption or sale of the Therma-Tru stock back in 2000?
MR. JACOB: Before he responds, Cory, I just want to make sure, lodge an objection to the extent that you're asking for the content of any discussion that occurred after the filing of the tax return, so I just want to be clear that with respect to any questions as to conversations with attorneys that the response is limited to conversations that occurred prior to the filing of the tax return. Go ahead. You can answer, Mr. Welles.
A I'm sorry, would you repeat the question?
Q Did you ever have any conversations with Mr. Waterman about the taxation related to the redemption or sale of the Therma-Tru stock?
A I don't recall.

9:1 Q Did he ever provide you any advice as to the taxation of the redemption or sale of that stock?
A The letter we were referencing does contain advice in that.
Q What letter are you talking about?
A What we were discussing earlier, that July of whatever it was.
Q The letter of which you saw various iterations?
A Correct.
Q And do you recall receiving that letter back in 2000?
A I do not.
Q Do you recall it was sent to you though back in 2000?
A Yes, I do.
Q Why do you believe it was sent to you?
A Well, my name is on it, and I would assume that the mail came through.
(Discussion held off the record.)
(Exhibits 45 and 130 provided to the witness.)
Q Mr. Welles, could you take a look at these two letters, and take your time to look through them, and I want to ask you which one you were referring to when you said just a minute ago that you assumed

10:1 you got this back in 2000.
A I was referring to Exhibit 45 dated March 6, 2000.
Q So Exhibit 45 is the one that you presume you received in 2000?
A Yes.
Q Have you talked about this letter with any of your brothers or your sister or your parents?
A I have not.
Q Do you know if they received it?
A I don't recall.
Q The address there lists you on Rockledge Drive in Perrysburg. Was that your residence in 2000?
A Yes.
Q Do you still live there?
A I do.
Q Did you ever talk with Mr. Waterman about Exhibit 45 which is the March 6th letter?
A I don't recall.
Q How about with anybody else, did you talk with anybody else about the contents or anything raised in Mr. Waterman's March 6th letter?
A Not to my knowledge. I should say not to my recollection.
Q The last page of the letter, which is Bates stamped SLK-51, states -- or Mr. Waterman states

15:1 understanding at the time or understanding now?
Q Mr. Welles, why do you say that it was your understanding that it was a strategy by Jenkins?
A Because that's what it says in this letter.
Q Well, I asked you if that was your understanding as well and you said yes. Now, what is that understanding based upon?
A It's my recollection that Jenkins & Gilchrist suggested the strategy.
Q And when you say that, what are you recalling, what are you basing that recollection on?
A It's just a general recollection. Some of that is from reading in the newspapers that they had provided strategies for a number of entities, but I don't have a specific recollection of any documents or any meeting where it was coming directly from them.
Q Did Mr. Waterman tell you sometime back in 2000 that this was a strategy developed by Jenkins?
A I don't recall.
Q Your belief at the time that this was a strategy developed by Jenkins, would that have come from anybody other than Mr. Waterman or your brother, Jeff?

18:1 A I would assume so.
Q Why do you assume that?
A For reasons I just stated a few minutes ago.
Q Well, just so the record's clear, what reasons are you referring to?
A This letter references a reliance on Jenkins & Gilchrist's opinion, and my assumption in that respect is that the idea came from Jenkins & Gilchrist. I do not specifically recall that, so I interpret that from what's written here.
Q You don't have any reason to doubt Mr. Waterman?
A I have no doubt -- no reason to doubt him, that's correct.
Q Further on in that paragraph Mr. Waterman references the fee that's to be paid to SLK in the amount of $2,045,000. Do you see that?
A I see that.
Q Do you recall if that was a fee paid to SLK?
A I do not.
Q Do you recall if SLK was paid a fee for its work in connection with this strategy?
A I don't.
Q Do you recall whether Jenkins & Gilchrist was paid a fee?
A I do not.

1:1 IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STOBIE CREEK INVESTMENTS: LLC, JFW ENTERPRISES, :
INC., : :
Plaintiff, : :
v. : Case No.: 05-748T :
THE UNITED STATES OF : AMERICA, :
: Defendant. :
\- - -

Deposition of GEORGIA E. WELLES, a Witness herein, called by the Defendant as upon Cross Examination pursuant to the Ohio Rules of Civil Procedure, taken before Mary K. Valentine,

Registered Professional Reporter and Notary Public

in and for the State of Ohio, at the offices of

The U.S. Attorney's Office, Four SeaGate, Third

Floor, Toledo, Ohio, on Tuesday, July 31, 2007,

commencing at 9:10 a.m.

\- - -

24:1 Q The one that you had mentioned earlier that you reviewed minutes for to prepare for this deposition.
A Yes.
Q You believe it was in January of what year?
A 2000.
Q Do you recall what took place at that meeting and what was discussed? First, let me back up.
Who was there at the meeting?
A All five of our children, my husband, I believe there were two or three spouses of the children there. David Herpe was there for part of the meeting, and David Waterman was there for part of the meeting, but separately. I recall quite clearly they were not there at the same time.
Q Anybody else?
A Not that I can recall, no.
Q Now, do you recall what was discussed at that meeting?
A In terms of David Waterman or in terms of David Herpe or in general?
Q Just generally then I'd like a specific answer to each of those as well.
A David Herpe was there to advise us on the structure of our family foundation that we were

25:1 forming, and I can't remember if there was anything else. I mean we had worked with him previously in estate planning.
Q I see. Anything else discussed in general at that meeting?
A By David Herpe?
Q No, I think you just said --
A By David Waterman, at a separate meeting?
Q Let's go to David Waterman.
A What?
Q Let's go to David Waterman. What do you recall being discussed by David Waterman?
A A proposal for a -- how am I going to put this? An opportunity to make an investment to increase our financial returns. At the time we were forming this family foundation and wishing to be able to put as much money as possible into the start of and formation of this foundation.
Q Were there any tax benefits along with the strategy?
A What do you mean? I don't know what you mean by tax benefits exactly.
Q Did he discuss any relation that his proposal would have on taxes, anything to that effect?
A Yes, I believe so. He talked about a legal

26:1 opportunity to create income. I don't know exactly how -- it's hard for me to describe it and to remember specifically because it was a while ago.

And I have to say that I relied upon David Waterman as our attorney and our son Jeff as the president and investor in our family company.

Q Do you recall what was said about the tax effects on the proposal by David Waterman?

A No.

Q Do you recall how the proposal would have affected your taxes for the year 2000?

A Not specifically, no.

Q Did his proposal have anything to do with the sale of Therma-Tru stock?

A Well, I believe that was a separate occasion.

Q At that point at the Florida meeting were you or you on behalf of the qualified annuity trust anticipating a sale of Therma-Tru stock?

A Yes.

Q Did his proposal, the proposal by David Waterman, did that have any connection whatsoever with the Therma-Tru stock, the anticipated sale of the Therma-Tru stock?

A I don't understand how they were connected.

Q Were they connected, as far as you understand?

27:1 A I don't know.
Q Do you recall whether David Waterman made a connection between the sale of Therma-Tru stock and his proposal?
A I don't recall. I -- I was -- I just can't remember much about that. I remember him being there and discussing with us, but I can't remember any of the details of it.
(Defendant's Exhibit 39 identified.)
Q I'm going to hand you what's been marked as Exhibit 39.
(Discussion held off the record.)
Q Do you recognize that document?
A Yes.
Q What is it?
A It's an agenda for a family meeting, our family meeting in January.
Q That's the meeting we have been discussing?
A Yes.
Q If you look at the last entry, Number 4 under topic, it says capital gain strategies, the presenter was David Waterman. What does that mean? It says the topic was capital gain strategies. What is your understanding of what that means?
A Well, if you look over to the right-hand side, it

says 4:15. Usually by that time I'm pretty well flagged out.

Capital gain strategies to me means that we were discussing the subject of taxes.

Q Does that jog your memory on anything that was discussed by David Waterman at that meeting?

A No more than I've been able to respond to you.

(Defendant's Exhibit 37 identified.)

Q I'll hand you what's been marked as Exhibit 37. Do you recognize what that is?

A Yes.

Q Can you explain what that is?

A It's a document for the meeting of the family that took place on January 23rd and 24th, 2000.

Q Do you recall having received one of these at the meeting?

A I'm sure I did.

Q If you'll turn to a page near the end, sorry, it's more than halfway through, and --

A What's the heading on it?

Q The heading is Jenkens & Gilchrist.

A I think I have it. I don't know whether it's the same one.

Q That's it. Do you know what Jenkens & Gilchrist is?

29:1 A A law firm, I believe. Is or was?
Q Yes, was. You're right, I don't think it's a law firm any longer.
Do you recall seeing this page during the Florida meeting? It's just the one page there.
A Just that page?
Q Yes.
A I don't recall.
Q Jenkens & Gilchrist, the law firm, were they mentioned in David Waterman's proposal?
A I'm working on it. It must be now 4:30.
Q You can take your time. Take your time.
A I'm trying to remember specifically. I know the document is here, but I don't -- I just don't remember the discussion at all.
Q Do you remember whether there was a connection between the law firm of Jenkens & Gilchrist and the proposal by David Waterman? Were the -- I will just leave it at that.
A Well --
Q Or what involvement, if any, Jenkens & Gilchrist would have with the proposal?
A I know that to be true, but I don't know it to be true on the basis of this document because I can't remember what happened at that specific meeting.

30:1 Q We can just go off of what you understand then.
Could you clarify what you mean what you know to be true, as you just said?
A That there was a connection between David Waterman and Jenkens & Gilchrist.
Q Do you recall what the connection was or do you understand what the connection was now?
A Yes.
Q At the time did you understand what the connection was?
A I don't remember.
Q Just that there was some connection with that law firm?
A Yes, but not -- I didn't -- I don't remember at the time. I know that to be a fact now.
MR. CHRISTENSEN: Yes, we can make a pile here with those.
A A pile?
Q Yes.
MR. CHRISTENSEN: Yes, put them face down here like that.
MR. KOLEK: We'll just go like that.
MR. CHRISTENSEN: That will be great. Thanks.
(Defendant's Exhibit 45 identified.)

31:1 Q I'm handing you what's been marked as Exhibit 45.
Could you tell me what that exhibit is?
A What was the question again, please?
Q Can you tell me what that Exhibit 45 is, please?
A It's a letter from David Waterman to the members
of the family, myself, my husband, our children
regarding --
MR. KOLEK: If I may clarify. This
is an undated -- unsigned letter.
THE WITNESS: Yes.
Q Do you see the date there, it's dated March 6,
2000?
A Yes.
Q Do you recall receiving this letter around that
time?
A I do not recall receiving it, no.
Q Do you recall whether your husband received it?
A No, I don't know.
Q Do you recall discussing -- I think you've had a
moment to read through it a little bit?
A Yes.
Q Do you recall discussing any of its content with
David Waterman personally?
A No.
Q Do you know whether your husband did?

32:1 A I don't know.
Q Go ahead and set that here. If you wouldn't mind just making a pile here for us.
MR. CHRISTENSEN: Let's not mess those up.
MR. KOLEK: Oh, that's mine?
MR. CHRISTENSEN: Yes, you can keep your copy.
THE WITNESS: You get to keep one and I don't?
MR. KOLEK: Oh, but I've got copies of these.
MR. CHRISTENSEN: Could you mark that Exhibit Number 400?
(Discussion held off the record; Defendant's Exhibit 400 marked and identified.)
Q Showing you what's been marked Exhibit 400, the addressee reflected in this letter, does that appear to be your husband?
A It is.
Q Do you recall whether your husband ever received this letter?
A I don't recall that he did.
Q The first sentence of the letter states that the purpose of this letter is to set fourth in writing

33:1 the agreement between our firm, Jenkens & Gilchrist, and the undersigned and its affiliates regarding the confidentiality and disclosure of certain proprietary information that J&G has provided and may continue to provide to undersigned for use by undersigned.

So it appears to be some sort of confidentiality agreement sent by the law firm Jenkens & Gilchrist to your husband. Do you have any idea why the law firm would have sent this to your husband?

A Am I suppose to surmise or what?

Q Do you know?

A I don't know.

Q Yes, your answers should be based on your personal knowledge.

Just so that it's clear, did you ever receive a letter such as this from Jenkens & Gilchrist?

A I do not recall receiving it, no.

Q Okay.

A I don't -- I don't recall or know the name of the signor of this document.

Q We're through with that one.

MR. CHRISTENSEN: This is 401.

(Discussion held off the record;

34:1 Defendant's Exhibit 401 marked and identified.)
Q Can you tell me who the addressee is --
A My husband.
Q -- for this letter? It says that it's from Jenkens & Gilchrist and it's been sent to your husband apparently in his capacity as the grantor of the David K. Welles 1994 qualified annuity trust?
A Now we have a date.
Q Is that the date that the trust was created, 19 -- or the year? Is that why it's in the name? I'm just wondering if based on your knowledge if you know the answer?
A 1994 is written here. That's as much as I could --
Q Okay.
A It must be.
Q Have you ever seen this document before?
A No. This is dated January 2nd, 2001. I definitely do not recall seeing this document.
Q The first sentence says you have requested us to review the United States federal income tax consequences of a number of transactions in which you have been involved in your capacity as grantor

38:1 A On the second page? All right.
Q Were you going to say something else?
A I was going to say these affairs I left up to my children, in particular Jeff. I didn't involve myself in them. It was more a question of my decision, not that anybody was keeping anything from me.
Q Did Jeff recommend anything regarding the creation of this entity, the Welles Asset Management, Inc.?
A To me?
Q Yes.
A No.
Q Were you advised to have such an entity created?
A I don't know.
Q On the second page, which is Bates Stamp FLOYD 001142, do you know whose signature that is at the bottom?
A I assume that's the signature of the man whose name is written underneath it.
Q John Ivsan. Do you know who that is?
A No. I can see from this page that he is an attorney, I'm assuming from Shumaker Loop, because I know their address, but I have had no connection with him.
Q If you will, turn to a page closer to the end, but

42:1 the third page?
A I think so.
Q Have you seen his signature before aside from this document?
A Yes, I'm sure I have.
Q Is it something that you would be able to recognize?
A Most probably, but then I have five children's signatures.
Q Does that appear to be Jeff's signature?
A That appears to be, yes.
Q This document at the top purports to -- well, I'll read the heading, full trading authorization with privilege to withdraw money and/or securities.
Do you recall giving any such authority to Jeff Welles with regards to a Deutsche Banc account held by the trust?
A I don't recall, but I obviously did. I was obviously aware because I signed this. I don't remember signing it. I don't remember any of this.
Q Do you know what the purpose would have been?
A No, I -- I don't remember any of that unfortunately --
Q Okay.
A -- but --

43:1 Q Okay.
A -- again, I trusted my son Jeffrey.
Q Can you look at the third to last page? It's DB-DOJ-COBRA 00148296. It's the third to last page of that exhibit.
A Yep.
Q Is that your signature down at the bottom?
A Yes, it is.
Q Two pages later, is that your signature as well?
A I have one page later, 97 is the last page.
Q Oh, yes, yes.
A Yes.
Q That is your signature down on the bottom?
A Yes.
Q Okay.
A I must have been doing a lot of signing.
Q On some of these, I think I'm just going to ask you to identify your signature. It will speed up this process somewhat.
(Defendant's Exhibit 404 marked and identified.)
Q Can you look on the last page and tell me whether that is your signature?
A Yes, it is.
Q Okay.

61:1 they provided you with legal advice, Jenkens & Gilchrist provided you with legal advice regarding those strategies as is stated here?
A Through SLK.
Q Okay.
A I do not recall having any contact with Jenkens & Gilchrist directly.
Q Was it the purpose of the tax strategies that we're referring to to reduce the taxes that you would owe on the sale of your Therma-Tru stock?
A I believe so.
Q Was it --
A My understanding was to legally reduce the taxes.
Q Was that the primary purpose of this tax strategy that was recommended by Jenkens & Gilchrist?
A I believe it was considered an investment that would produce greater returns for Stobie Creek and the family with the intention of establishing and funding the family foundation. Again, our motivations were mainly to be able to have the funds to establish a family foundation, which we did.
Q Was it an investment strategy or tax strategy that was recommended by Jenkens & Gilchrist?
A I -- I can't -- I think it was an investment

62:1 strategy.
Q But it says here that they have developed certain tax strategies, and you agreed that that was true?
MR. KOLEK: Objection, it's argumentive.
Q So my question is was it the purpose of the strategy to save taxes?
A I don't know how to answer that because I'm not clear on -- you seem to be separating tax strategies from investment strategies, and I'm not sure I understand that they are a separate --
Q Okay. I understand.
A -- situations.
Q I understand. Did you do any research yourself to learn what the benefits would have been in financial terms without regard to taxes of the strategy that was recommended?
A No, I relied upon son Jeff --
Q Okay.
A -- and David Waterman, of course.
Q Did David Waterman recommend that you implement that strategy?
A That was my feeling that's what he was doing bringing Jenkens & Gilchrist to us, bringing their strategy. I don't know why he would have done that

63:1 if he didn't support it.
Q Have you ever invested to your knowledge in foreign exchange options on behalf of the qualified annuity trust?
A Have I?
Q Or has the trust ever invested in foreign exchange options, to your knowledge?
A Well, you're presenting me with information here that indicates the answer is yes.
Q I'm talking about based on your knowledge.
A Are you talking about other times or other events?
Q I think I recall you saying that you didn't remember that they had purchased any foreign exchange options, and I'm just asking you whether you recall if the trust has ever invested in foreign exchange options, period?
A Period?
Q Yes, at any time.
A At -- no, to my knowledge.
Q Okay.
A I mean we're looking at papers here that tell me that we did this, but --
Q Since this time --
A Since then?
Q -- are you aware of any?

75:1 to implement the tax strategy or the strategy?
A I don't recall. You know, I talk to all of my children all of the time and that whole thing has faded away.
Q All right. One last round of --
A I'm sorry.
Q -- one last round of questions. Do you recall any advice, do you recall seeking advice from Jeff regarding your decision to implement the strategy?
A Within the context of the family discussions, yes.
Q Do you recall what his advice was?
A We all were in agreement to go ahead.
Q Did you discuss the likelihood of making -- realizing a profit with Jeff by implementing the strategy?
A Yes, we thought it was a business investment, is my understanding.
Q Do you recall --
A Which naturally we wanted to realize a profit from.
Q Do you recall receiving any data, financial data on foreign exchange options upon which you based that decision to implement the strategy?
A There must have been some, but I don't recall any of it. I don't have any information on it.