# EXHIBIT B

# PART III

IN THE UNITED STATES COURT OF CLAIMS

| | | |
|---|---|---|
| STOBIE CREEK INVESTMENTS, | ) | |
| L.L.C., JFW ENTERPRISES, | ) | |
| INC., Tax matters and Notice | ) | |
| Partner, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 05-748 T |
| UNITED STATES OF AMERICA, | ) | (Judge Block) |
| Defendant. | ) | |

The deposition of JEFFREY WELLES, called as a witness for examination, taken before KRISTIN C. BRAJKOVICH, a Certified Shorthand Reporter, CSR. No. 84-3810, of said state, at Suite 6600, 233 South Wacker Drive, Chicago, Illinois, on the 15th day of December, A.D. 2006, at 9:29 a.m.

10:12:03 that.

10:12:03 MR. KOLEK: Could you please rephrase that.
10:12:06 I'm a little bit confused as to what the term
10:12:08 "circumstances" means.

10:12:16 MR. JOHNSON: I don't know if I can define
10:12:18 "circumstances."

10:12:21 BY MR. JOHNSON:

10:12:22 Q. Mr. Welles, let me ask you, you have
10:12:24 told me you don't remember exactly when
10:12:29 Mr. Waterman told you that Jenkens had developed
10:12:33 certain strategies, right?

10:12:35 A. That's true.

10:12:36 Q. Okay. Do you remember the context,
10:12:37 where he told you that, in what setting? What were
10:12:40 the circumstances surrounding him telling you that?

10:12:43 A. There were a number of conversations
10:12:46 culminating in his appearing at a family meeting.

10:12:49 Q. Okay. So you recall having
10:12:55 conversations about the Jenkens tax strategy prior
10:12:59 to the family meeting?

10:13:01 A. I remember that he was going to present
10:13:05 at the family meeting.

10:13:06 Q. Okay. He was going to present about the
10:13:09 Jenkens tax strategy?

10:13:12 A. Yes.
10:13:12 Q. And you had talked to him about this
10:13:15 beforehand, right?
10:13:16 A. I was responsible for the agenda at the
10:13:20 family meeting.
10:13:21 Q. So are you the one who asked him to come
10:13:23 down to the family meeting and present on the
10:13:25 Jenkens strategy?
10:13:27 A. Yes.
10:13:27 Q. Now, in Mr. Waterman's affidavit he
10:13:43 referred to Shumaker Loop & Kendrick advising you
10:13:47 that Jenkens had developed this tax strategy.
10:13:52 Did you ever talk with Mr. John Ivsan
10:13:57 about this Jenkens tax strategy?
10:14:00 A. Yes, I met John Ivsan and talked about
10:14:03 it.
10:14:03 Q. Okay. Did you talk with him and meet
10:14:04 with him and discuss this Jenkens strategy before
10:14:08 the family meeting in Florida?
10:14:11 A. To the best of my recollection, it was
10:14:13 after the family meeting.
10:14:17 Q. So to the best of your recollection, you
10:14:19 did not talk with Mr. Ivsan until after the family
10:14:23 meeting in Florida?

10:14:23 A. That's correct.
10:14:24 Q. And this is the family meeting in
10:14:27 January of 2000?
10:14:28 A. Yes.
10:14:28 Q. I want to just focus now on the time
10:14:39 period prior to the family meeting. Okay?
10:14:41 A. Okay.
10:14:42 Q. What did Mr. Waterman tell you about the
10:14:45 Jenkens tax strategy?
10:14:47 MR. KOLEK: I would object to that question to
10:14:52 the extent that it requires a communication with
10:14:57 respect to the advice that was actually given and
10:15:01 any legal advice that may have been rendered by
10:15:05 Mr. Waterman to my client. As you know, we
10:15:09 maintain that the attorney-client privilege still
10:15:12 exists with respect to the conversations between
10:15:17 Shumaker Loop & Kendrick and its attorneys and the
10:15:20 Welles Family.
10:15:22 MR. JOHNSON: Well, I don't agree with your
10:15:33 assertion of privilege. There has already been
10:15:37 testimony that there was no attorney-client
10:15:39 relationship, and Mr. Waterman conveying
10:15:42 information about the tax strategy is not
10:15:45 privileged, particularly when it is the tax

10:26:17 isn't it?
10:26:17 A. It is a New York area code, typically
10:26:20 for cell phone service.
10:26:23 Q. Okay. Do you recall who gave you this
10:26:32 document?
10:26:33 A. No.
10:26:35 Q. Do you know if it was somebody from
10:26:40 Jenkens & Gilchrist?
10:26:43 A. I don't know.
10:26:59 Q. Did you get a copy of this prior to the
10:27:01 family meeting down in Florida in January of 2000?
10:27:06 A. I believe so because it was attached to
10:27:10 the book that was presented.
10:27:12 Q. Okay. After getting this document,
10:27:22 Exhibit 97, did you talk about its contents with
10:27:26 anybody -- well, let me ask a better question.
10:27:32 After getting Exhibit 97, did you talk
10:27:35 about its contents with Mr. Waterman prior to the
10:27:39 family meeting?
10:27:40 A. I may have, but I don't recall the
10:27:43 conversation.
10:27:44 Q. Okay. How about with anybody from
10:27:48 Jenkens & Gilchrist, did you talk about the
10:27:49 contents or the structure set forth in this



51caffaf-c5f5-4caa-b233-f2fb06c5c93b

10:27:54 document?
10:27:55 A. There were a number of conversations
10:28:00 with Jenkens & Gilchrist. I don't recall the
10:28:02 dates.
10:28:03 Q. Okay. Why don't I show you, Mr. Welles,
10:28:23 what has been marked previously as Exhibit 37. You
10:28:29 referenced earlier a booklet or book put together
10:28:32 for the January 2000 family meeting. Is this a
10:28:35 copy of that?
10:28:37 A. It appears to be, yes.
10:28:39 Q. Okay. Do you still have a copy of this
10:28:43 anywhere?
10:28:44 A. No.
10:28:45 Q. Did you put this together back in 2000?
10:28:55 A. I remember putting this together in
10:28:58 conjunction with David Herpe.
10:29:00 Q. Okay. And did Mr. Herpe contribute some
10:29:03 of the pages in here?
10:29:04 A. Yes, I believe so.
10:29:07 Q. Okay. You will notice I have tabbed the
10:29:13 basis enhancing derivative structure memo that we
10:29:17 looked at earlier, and this is another copy of it
10:29:23 here in this exhibit?
10:29:24 A. It appears to be the same.


51caffaf-c5f5-4caa-b233-f2fb06c5c93b

10:29:25 Q. Okay. And did you -- I think you told
10:29:28 me earlier that you put this copy of this document
10:29:31 in this booklet?
10:29:32 A. I don't remember putting it in there,
10:29:35 but I was responsible -- I presented the --
10:29:37 prepared this book for presentation at the family
10:29:40 meeting.
10:29:41 Q. Okay.
10:29:49 MR. JOHNSON: Why don't we take a short break.
10:29:52 THE VIDEOGRAPHER: We are off the record at
10:29:54 10:32 a.m.
10:29:59 (WHEREUPON, a recess was had.)
10:42:43 THE VIDEOGRAPHER: We are back on the record
10:42:47 at 10:46 a.m.
10:43:34 BY MR. JOHNSON:
10:43:39 Q. Just to go back to where we left off,
10:43:42 Mr. Welles, the document that is included in
10:43:46 Exhibit 37 titled Basis Enhancing Derivative
10:43:52 Structure, this is a document you obtained pursuant
10:43:57 to the confidentiality agreement you signed with
10:44:01 Jenkens?
10:44:02 A. Is that a question?
10:44:04 Q. Yes.
10:44:05 A. The question is, is it the document



51caffaf-c5f5-4caa-b233-f2fb06c5c93b

10:47:03 BY MR. JOHNSON:
10:47:07 Q. Is that correct?
10:47:07 MR. KOLEK: We would object to that question
10:47:09 on the form.
10:47:09 BY MR. JOHNSON:
10:47:11 Q. Okay. Can you answer the question,
10:47:13 Mr. Welles?
10:47:14 A. Could you repeat the question, please.
10:47:49 Q. You told me that Mr. Waterman came down
10:47:53 to the Florida meeting?
10:47:55 A. I did.
10:47:56 Q. And he came down to talk about the
10:47:58 Jenkens & Gilchrist strategy, right?
10:48:02 MR. KOLEK: I object to that. I would object
10:48:03 to that. I think you should ask why he came down
10:48:06 to the Florida meeting as opposed to telling
10:48:12 Mr. Welles why he came down to the meeting.
10:48:16 MR. JOHNSON: It is your understanding that I
10:48:18 can't ask plaintiff leading questions?
10:48:20 MR. KOLEK: I think you can ask leading
10:48:23 questions, but I don't think that you can ask
10:48:25 Mr. Welles misleading questions.
10:48:27 BY MR. JOHNSON:
10:48:28 Q. Mr. Waterman came down to talk about the



51caffaf-c5f5-4caa-b233-f2fb06c5c93b

10:48:32 Jenkens & Gilchrist tax strategy, correct?
10:48:34 A. He came to the meeting to present and
10:48:36 give us some advice, as he typically did as our
10:48:40 attorney.
10:48:40 Q. And that was advice about the Jenkens &
10:48:45 Gilchrist tax strategy?
10:48:46 A. I don't recall the -- completely his
10:48:50 presentation, but he was invited to offer advice to
10:48:54 the family.
10:48:55 Q. Advice about what?
10:48:58 A. I believe it was advice around taxes.
10:49:01 Q. Taxes related to what?
10:49:05 A. Well, he had been involved, as you know,
10:49:11 in representing the family for years, but,
10:49:14 additionally, he had been involved in the potential
10:49:17 transaction for Therma-Tru whereby we were selling
10:49:22 half of the business in a leveraged recap and he
10:49:25 was generally giving us advice about structures
10:49:29 around -- and as I noted earlier, I had asked him
10:49:34 for tax advice earlier, which you pointed out in
10:49:40 one of the documents.
10:49:42 Q. Right. And, in fact, we looked at his
10:49:45 affidavit where he said that he told you that
10:49:49 Jenkens & Gilchrist might have a tax strategy that



51caffaf-c5f5-4caa-b233-f2fb06c5c93b

11:03:26 A. I remember talking about the merits
11:03:32 and -- the, perhaps, pluses and minuses of it, but,
11:03:37 again, this is a very general recollection.
11:03:39 Q. Do you recall what you may have said
11:03:42 about the merits and pluses or minuses?
11:03:45 MR. KOLEK: I would again raise the same
11:03:47 objection that I have. Could we get some certainty
11:03:51 with respect to who was at the discussions, when
11:03:52 the discussions took place.
11:03:52 BY MR. JOHNSON:
11:03:55 Q. We are talking about the discussions at
11:03:57 the family meeting in January of 2000, right,
11:03:59 Mr. Welles?
11:04:00 A. I believe that's the question.
11:04:03 Q. Okay.
11:04:03 A. It relates --
11:04:05 Q. That is a meeting where you were there
11:04:07 and your brothers and sister and parents?
11:04:09 A. Yes.
11:04:10 Q. And you told me you talked with them
11:04:13 about the basis enhancing structure?
11:04:15 A. Yes.
11:04:16 Q. Okay. And you told me that you
11:04:17 generally recall talking about the merits and



51caffaf-c5f5-4caa-b233-f2fb06c5c93b

11:04:19 pluses and minuses?
11:04:21 A. Yes.
11:04:21 Q. What were -- do you recall any of the
11:04:23 pluses and minuses you talked about?
11:04:26 A. Not specifically.
11:04:27 Q. Generally?
11:04:27 A. Hard to recall.
11:04:29 Q. Did you recommend that this basis
11:04:35 enhancing structure be pursued at that meeting?
11:04:39 A. Did I recommend it to the other family
11:04:47 members?
11:04:47 Q. Yes.
11:04:47 A. I remember a discussion. I don't
11:04:49 specifically remember coming out in favor of doing
11:04:52 it, if that's what you mean by "recommendation."
11:04:55 Q. Okay. Did there come a time when you
11:05:06 did come out in favor of doing this or pursuing
11:05:09 this basis enhancing structure?
11:05:11 A. Yes.
11:05:12 Q. Okay. When was that?
11:05:13 A. I don't recall.
11:05:14 Q. It's your recollection that it was
11:05:18 sometime after the Florida meeting?
11:05:19 A. I'm not sure.



51caffaf-c5f5-4caa-b233-f2fb06c5c93b

11:05:20 Q. Okay. Why did you at some point come out in favor of pursuing the Jenkens & Gilchrist basis enhancing structure?
11:05:33 A. Well, I ultimately, as you know, entered into the transaction, so I clearly made a decision in favor of doing that.
11:05:47 And the question then is why?
11:05:51 Q. Yes.
11:05:52 A. I thought it was a strategy whereby we could make a substantial profit in the options, at the same time fund our family investment partnership with a substantial amount of money to do further investments and to fund our foundation.
11:06:15 Q. Did you also decide to pursue it because it would have tax benefits or tax advantages?
11:06:27 A. Was that a consideration? Was that --
11:06:32 Q. Did you also decide to pursue the strategy, the Jenkens & Gilchrist strategy because it would have tax benefits or tax advantages?
11:06:42 A. It was a consideration.
11:06:45 Q. What tax benefits or advantages did you find to be a consideration? What were they in particular?
11:07:00 A. Well, we are always interested in paying

fewer taxes rather than more, and there are structures that allow us to do that. And every investment consideration I make is on an after-tax net kind of basis. So when I buy a security or enter into a trade, I take into account taxes every step of the way.

Q. Okay. When you decided to pursue the Jenkens strategy, did you then tell your brothers and sister and parents that you thought they should pursue it, as well?

A. Well, we made a collective choice to do the strategy.

Q. Would it be fair to say that that collective choice was substantially based on your recommendation?

A. Would it be fair to say that? The family relies on me for my investment expertise, so perhaps it would be fair to say that.

Q. In fact, you were the one who had been talking with Mr. Waterman about the tax benefits, as well, right?

A. Yes, I had had conversations with David Waterman.

Q. And in recommending it to your family,



51caffaf-c5f5-4caa-b233-f2fb06c5c93b

11:08:32 it is correct that you were also basing that
11:08:36 recommendation on the potential tax benefits?
11:08:38 A. The tax benefits were a consideration.
11:08:41 I said that.
11:08:42 Q. And did you tell your family members
11:08:44 about the consideration of the tax benefits?
11:08:48 A. I don't remember specifically how it was
11:08:51 presented, but as I told you earlier, the
11:08:54 presentation was made at that Florida meeting.
11:08:59 Q. When you made the decision to pursue the
11:09:06 strategy, is it the structure that is set forth in
11:09:16 this basis enhancing memo that you had in mind as
11:09:21 to what the strategy would involve?
11:09:23 A. I don't know what I had in mind, if
11:09:29 that's your question.
11:09:30 Q. Well, that's probably a bad question.
11:09:33 You said at some point you made the
11:09:36 decision that the strategy should be pursued,
11:09:40 right?
11:09:40 A. Yes.
11:09:40 Q. Okay. Does this basis enhancing
11:09:51 derivative structure memo set forth the strategy
11:09:56 that you understood that you were agreeing to
11:10:00 pursue?



51caffaf-c5f5-4caa-b233-f2fb06c5c93b

11:22:05 A. I don't remember.
11:22:05 Q. What was on the term sheet?
11:22:10 A. I don't remember the specifics, but it showed -- typically when you enter into a transaction there is a term sheet that shows pricing and details. As I said, it is a vague recollection, but I believe there was a term sheet.
11:22:30 Q. What transaction or transactions did the term sheet relate to?
11:22:34 A. I don't remember.
11:22:35 Q. You don't remember whether it related to the foreign currency options or to something else?
11:22:50 A. It was a term sheet of a similar type of transaction, so I believe it was related to foreign currency options.
11:22:58 Q. Did it relate to any other transactions?
11:23:01 A. I don't remember.
11:23:05 Q. I think you told me earlier that you had conversations with people from Jenkens; is that right?
11:23:29 A. Yes.
11:23:30 Q. And were these conversations about the Jenkens tax strategy?
11:23:39 A. Yes.

11:23:39 Q. And who were they with? Who were the
11:23:43 conversations with?
11:23:43 A. I remember a conversation with Donna
11:23:47 Guerin, and I don't remember who else I spoke to.
11:23:51 Q. You do recall, though, speaking to
11:23:56 somebody other than Donna Guerin, as well?
11:23:59 A. I'm not certain.
11:24:01 Q. Did you ever speak with Paul Daugerdas?
11:24:05 A. I don't remember.
11:24:06 Q. How many times do you think you spoke
11:24:16 with Donna Guerin?
11:24:18 A. I don't know.
11:24:19 Q. Do you think it was more than once?
11:24:21 A. Yes.
11:24:22 Q. Did you ever meet her in person?
11:24:25 A. No.
11:24:26 Q. So your conversations were over the
11:24:29 phone?
11:24:29 A. Yes.
11:24:30 Q. In the first conversation you recall,
11:24:42 what did you and she talk about?
11:24:45 A. I don't remember.
11:24:46 Q. Do you remember the substance of any
11:24:54 conversations with her?



51caffaf-c5f5-4caa-b233-f2fb06c5c93b

11:24:55 A. Not details of any conversation.
11:25:01 Q. Were you talking with her about the --
11:25:09 her firm's tax strategy?
11:25:11 A. Yes.
11:25:11 Q. And were you talking generally about the
11:25:17 strategy or the transactions that are set forth in
11:25:21 this executive summary memo?
11:25:22 A. Yes.
11:25:23 Q. Okay. Did you want to talk to her? Did
11:25:37 you call her up or ask that she call you, or how
11:25:40 did it come about that you talked to her?
11:25:43 A. I'm not certain. I believe the
11:25:45 introduction was made by David Waterman.
11:25:47 Q. Was he on the phone with you --
11:25:47 A. I don't --
11:25:50 Q. -- you two so there were three of you?
11:25:52 A. I don't remember.
11:25:53 Q. Okay. Do you recall generally when
11:26:10 these conversations with Ms. Guerin were?
11:26:13 A. I believe they were in 2000 -- late '99,
11:26:19 2000, but I'm not certain.
11:26:22 Q. Were they before you made the decision
11:26:24 to pursue the strategy?
11:26:26 A. I don't remember.



51caffaf-c5f5-4caa-b233-f2fb06c5c93b

11:26:26 Q. Were you talking with her about the
11:26:39 potential for any profit or what -- how much money
11:26:50 you could make on the options?
11:26:53 A. I don't remember that specific
11:26:56 conversation, if that's what you are referring to.
11:26:58 Q. I'm sorry. Were you talking with her
11:27:00 about tax issues related to the strategy?
11:27:03 A. Generally, yes.
11:27:05 Q. What do you recall about the tax issues
11:27:08 that you have talked about?
11:27:09 A. Not much.
11:27:11 Q. Okay. Do you recall anything?
11:27:19 A. I remember the conversations, but I'm
11:27:22 just not good at the specifics of it because it was
11:27:25 over six years ago, is when I think the
11:27:28 conversation took place.
11:27:29 Q. Okay. Did you talk with her about fees?
11:27:38 A. No, not that I remember.
11:27:40 Q. Did you ask her for a draft opinion as
11:27:51 to the tax results of the strategy, if you and your
11:27:55 family members pursued it?
11:27:57 A. I don't remember asking her for the
11:28:00 draft. Was that your question?
11:28:03 Q. Yes.



51caffaf-c5f5-4caa-b233-f2fb06c5c93b

11:28:03 A. I don't remember asking her for it.
11:28:05 Q. Do you remember receiving a draft opinion at some point?
11:28:08 A. Yes.
11:28:09 Q. Okay. And did you get that draft opinion before you decided to pursue the strategy?
11:28:15 A. I don't remember what the timing was.
11:28:17 Q. Well, you said the tax benefits or advantages were a consideration in deciding to pursue the strategy.
11:28:31 Did you do anything to get any specifics on those benefits or advantages?
11:28:39 A. I relied very much on the advice of our attorneys.
11:28:42 Q. Okay. And did you ask them for any specifics on the benefits or tax advantages?
11:28:52 A. It's likely that I did.
11:28:57 Q. Who did you ask?
11:28:59 A. I remember asking David Waterman.
11:29:05 Q. And what did he tell you?
11:29:08 MR. KOLEK: I would object to the -- to that particular question because it infringes on the attorney-client privilege.
11:29:18 BY MR. JOHNSON:



51caffaf-c5f5-4caa-b233-f2fb06c5c93b

11:29:19 Q. Do you know when you asked Mr. Waterman
11:29:21 about the tax benefits?
11:29:22 A. No.
11:29:26 Q. Did you ever retain Mr. Waterman to
11:29:36 provide legal advice regarding the tax benefits or
11:29:40 advantages or tax positions to take as a result of
11:29:42 the Jenkens & Gilchrist strategy on the option
11:29:45 transactions?
11:29:46 A. Could we take those one at a -- it
11:29:51 seemed like there were a lot of questions in that
11:29:54 one.
11:29:55 Q. Okay. Did you ever retain Mr. Waterman
11:29:57 to provide legal advice regarding the tax
11:30:03 consequences of the foreign currency option
11:30:06 transactions?
11:30:07 A. I don't recall a specific retainer with
11:30:11 David. As I think you know, he has served our
11:30:15 family for many, many years on any number of
11:30:20 issues, including aircraft leasing, a myriad of
11:30:26 things.
11:30:26 Q. Okay. Well, I'm not asking about
11:30:29 aircraft leasing. I'm asking whether you retained
11:30:32 Mr. Waterman to provide legal advice about the tax
11:30:36 consequences of the foreign currency option



51caffaf-c5f5-4caa-b233-f2fb06c5c93b

11:30:39 transactions?

11:30:40 A. Do I remember specifically retaining him? No, I don't remember specifically retaining him for that.

11:30:46 Q. So you weren't asked -- you don't recall asking him for legal advice about the tax consequences of those transactions?

11:30:54 A. You asked me earlier if we had retained him for -- so this is a different question? Could you repeat the question?

11:31:06 Q. Sure. Did you ever ask Mr. Waterman for legal advice about the tax consequences of the foreign currency option transactions?

11:31:15 A. Yes.

11:31:16 Q. Okay. Did he provide any advice?

11:31:19 A. Yes.

11:31:22 Q. Was it in written form?

11:31:24 A. I don't remember.

11:31:30 Q. Was it orally?

11:31:31 A. Yes.

11:31:32 Q. When did he provide it?

11:31:36 A. I don't remember the dates.

11:31:38 Q. What did he tell you about the tax consequences?

13:48:51 investment and financial activity.

13:48:53 A. No.

13:48:53 Q. Did you investigate any other possible counterparties? Did you talk to any other firms that might be willing to enter into option transactions like these?

13:49:15 A. Yes.

13:49:15 Q. Okay. Who else?

13:49:17 A. Goldman Sachs and Morgan Stanley.

13:49:21 Q. Were you talking with Goldman Sachs about the possibility of Goldman being the counterparty?

13:49:28 A. Yes.

13:49:28 Q. And, similarly, were you talking with -- what was the other firm you mentioned -- oh, Morgan Stanley, were you talking with them about the possibility of being a counterparty?

13:49:45 A. Yes.

13:49:45 Q. What was Goldman's reaction?

13:49:47 A. I think Goldman was interested in the business.

13:49:52 Q. Who did you talk to at Goldman Sachs about this?

13:50:00 A. A number of people, including Neal



51caffaf-c5f5-4caa-b233-f2fb06c5c93b

13:50:05 Bresolin.
13:50:05 Q. Do you remember anybody else?
13:50:08 A. Yes. I talked to traders, options
13:50:14 traders, but I don't remember the names.
13:50:16 Q. I take it you didn't enter into the
13:50:22 option transaction with Goldman as the
13:50:24 counterparty?
13:50:25 A. No. With Deutsche Bank as the
13:50:27 counterparty.
13:50:27 Q. Why didn't you do it with Goldman?
13:50:30 A. I don't remember the exact reason.
13:50:33 Q. Do you remember generally?
13:50:37 A. Well, I relied on them for advice and
13:50:42 got quotes on option premiums from the different
13:50:49 firms, but the ultimate decision, I don't remember
13:50:51 why we used Deutsche.
13:50:54 Q. How about Morgan Stanley, who did you
13:50:59 talk to there about the possibility of it being the
13:51:02 counterparty?
13:51:03 A. Similarly to Goldman, I talked to
13:51:06 several people. Frank Edwards was the person that
13:51:10 covered me from Morgan Stanley, but I talked to
13:51:14 people on his options trading desk, also.
13:51:16 Q. Do you recall why you didn't enter into

13:51:23 the transactions with Morgan Stanley as the
13:51:32 counterparty?
13:51:32 A. No.
13:51:33 Q. Did -- were there any proposals back and
13:51:36 forth as to terms of the options transactions with
13:51:39 either Goldman Sachs or Morgan Stanley?
13:51:41 A. Not term sheets. I have some notes that
13:51:44 I prepared of the discussions.
13:51:45 Q. Were the notes about possible
13:51:51 transactions with Goldman or Morgan Stanley?
13:51:55 A. Yes.
13:51:55 Q. Did you produce those notes in this
13:52:01 case?
13:52:01 A. Yes.
13:52:02 Q. Okay. Let's look at Exhibit 98 again as
13:52:18 an example. We have looked at the payout or the
13:52:26 final exchange amounts and the terms under which
13:52:31 those would be made, if the range levels are
13:52:36 reached.
13:52:36 Is it your understanding that once the
13:52:40 net -- or the premium, as you call it, was paid
13:52:46 under Exhibit 98, for instance, you didn't have any
13:52:51 further possible liability to Deutsche Bank?
13:52:56 By that I mean, regardless of what



51caffaf-c5f5-4caa-b233-f2fb06c5c93b

I think you told me earlier that you do recall seeing draft opinions. Do you recall if you had seen draft opinions by this point in time, that being February 9, 2001?

A. I don't remember.

(WHEREUPON, certain documents were marked Welles Deposition Exhibit Nos. 115 through 117, for identification.)

BY MR. JOHNSON:

Q. Mr. Welles, do you have Exhibit 115?

A. Yes.

Q. Okay. That consists of a cover letter from Mr. Ivsan addressed to you dated August 21, 2000, in which he states he is enclosing a draft tax opinion, and then there is a multipage document attached with each page stamped "draft."

Do you recognize this as a draft opinion letter you saw back in August of 2000?

A. I don't remember.

Q. Okay. How about Exhibit 116, that one consists of another draft opinion letter. Again, the opinion letter is addressed to you and then the cover letter dated January 25, 2001, is addressed



51caffaf-c5f5-4caa-b233-f2fb06c5c93b

16:05:09 to Mr. Goldstein at Stobie Creek, again from John Ivsan.
16:05:12
16:05:13 Do you recognize that as one of the -- as the draft opinion letter you may have seen?
16:05:16
16:05:19 A. I may have seen it at that time.
16:05:23 Q. And how about Exhibit 117, could you take a look at that, as well. That consists of what appears to be a note on Jenkens & Gilchrist stationery to John from Donna and then an attached red lined version of a draft opinion.
16:05:30
16:05:40
16:05:43
16:05:48
16:05:52 Do you know if you ever saw this?
16:05:53 A. I don't know.
16:05:54 Q. Okay. Regarding the draft opinions, you do recall seeing a draft opinion at one point though?
16:06:00
16:06:02
16:06:02 A. Yes, I did.
16:06:03 Q. Okay. Did you offer any comments to anybody about it?
16:06:05
16:06:08 A. I don't remember.
16:06:09 Q. Do you remember discussing it with anybody?
16:06:14
16:06:15 A. Yes, I remember discussions.
16:06:18 Q. Who with?
16:06:20 A. I believe with David Waterman.



51caffaf-c5f5-4caa-b233-f2fb06c5c93b

16:06:23 Q. Okay. And the draft opinion letter you saw, was it done by Jenkens?

16:06:28 A. Repeat the question.

16:06:31 Q. The draft opinion letter you say you recall seeing at some point, was it an opinion letter by Jenkens & Gilchrist?

16:06:39 A. Yes.

16:06:39 Q. And you were talking about the Jenkens letter with Mr. Waterman?

16:06:53 A. Yes.

16:06:53 Q. Did you talk about it with Mr. Ivsan at any time?

16:06:57 A. I don't remember.

16:06:57 Q. Regarding the draft opinion, what did you and Mr. Waterman talk about?

16:07:06 MR. KOLEK: Objection, privileged communication.

16:07:19 MR. JOHNSON: You are asserting the privilege with regard to communications about the Jenkens & Gilchrist opinion letter that has been produced with Mr. Waterman?

16:07:29 MR. KOLEK: Yes.

16:07:30 MR. JOHNSON: Okay.

16:07:40 BY MR. JOHNSON:



51caffaf-c5f5-4caa-b233-f2fb06c5c93b

16:07:40 Q. Did you discuss it with anybody other than Mr. Waterman?
16:07:44 A. I don't remember.
16:07:45 Q. Have you ever heard of something called Notice 2000-44?
16:08:09 A. Yes.
16:08:10 Q. When did you first learn of that?
16:08:11 A. I don't know.
16:08:13 Q. What is your understanding of what it is?
16:08:15 A. My understanding -- and I may be wrong about this -- was that it was categorizing a tax strategy as a registrable entity. I'm not sure that's describing it well.
16:08:41 Q. Okay. Did you learn about the notice back in 2000?
16:08:43 A. I believe so, but I'm not certain of the timing.
16:08:46 Q. Okay. Did you learn about it before the tax return for Stobie Creek was filed for the year 2000?
16:08:57 A. I don't know.
16:09:00 Q. Do you think you learned about it in connection with discussions or consultations



51caffaf-c5f5-4caa-b233-f2fb06c5c93b

16:09:05 regarding the preparation of Stobie Creek's tax
16:09:08 return?
16:09:08 A. I'm not certain.
16:09:09 Q. What was the context of your learning
16:09:12 about that notice?
16:09:14 A. What was the context of it?
16:09:19 Q. Yeah. What were the circumstances?
16:09:22 A. I don't remember the exact
16:09:23 circumstances.
16:09:24 Q. You don't recall who brought it to your
16:09:26 attention?
16:09:27 A. I'm not certain.
16:09:28 Q. Do you recall discussing it with
16:09:31 anybody?
16:09:31 A. Yes.
16:09:31 Q. Who?
16:09:32 A. With David Waterman.
16:09:34 Q. And was that in connection with deciding
16:09:38 how to report the Jenkens & Gilchrist strategy for
16:09:43 tax purposes?
16:09:45 A. Can you repeat the question?
16:09:46 Q. Sure. Was your learning of the Notice
16:09:52 2000-44 from Mr. Waterman in connection with
16:09:57 discussions about how to report the foreign



51caffaf-c5f5-4caa-b233-f2fb06c5c93b

currency option transactions for tax purposes?
MR. KOLEK: I object on the basis of foundation.
BY THE WITNESS:
A. I don't remember the context.
BY MR. JOHNSON:
Q. You said you had sort of a vague understanding that the notice listed or described certain transactions as -- what was it, did you say requiring registration or something?
A. Something to that effect.
Q. Did you understand that it applied to the Jenkens & Gilchrist strategy that you-all had pursued?
A. That wasn't clear to me.
Q. Did you ask Mr. Waterman whether it applied?
MR. KOLEK: Objection, attorney-client privilege.
BY MR. JOHNSON:
Q. Were you involved at all in determining how that transaction was reported for tax purposes?
A. Was I involved?
Q. Yeah.

16:11:41 A. At all?

16:11:43 Q. Yeah. Were you involved at all in
16:11:47 determining how the foreign currency option
16:11:52 transactions and any related transactions were
16:11:54 reported for tax purposes?

16:11:55 A. I was involved from the standpoint that
16:11:59 my office prepares the returns, but I'm not an
16:12:04 accountant or a lawyer, so my involvement is
16:12:14 peripheral.

16:12:14 (WHEREUPON, a certain document
16:12:14 was marked Welles Deposition
16:12:14 Exhibit No. 118, for
16:12:14 identification.)

16:12:57 BY MR. JOHNSON:

16:12:57 Q. We have marked as Exhibit 118,
16:13:00 Mr. Welles, a document addressed to you from
16:13:03 Jenkens & Gilchrist dated January 2, 2001.

16:13:10 Do you recall seeing this back in 2001
16:13:13 at any point?

16:13:14 A. Yes.

16:13:14 Q. And what's your understanding of what
16:13:16 this document is?

16:13:17 A. I haven't had a chance to review it, but
16:13:23 I believe this is the letter that was provided by

16:13:26 Jenkens & Gilchrist.
16:13:26 Q. Okay.
16:13:33 A. Let me correct that. The opinion that
16:13:35 was provided by Jenkens & Gilchrist.
16:13:37 Q. Okay. Could you take a look at the page
16:14:10 that is numbered 7. The page numbers are in the
16:14:15 upper left-hand corner. You could just read it to
16:14:35 yourself, but could you read that section that is
16:14:37 called Representations. It is on this page and
16:14:40 then there is a subparagraph E on the next page.
16:15:52 Have you had a chance to look at that?
16:15:53 A. Yes.
16:15:54 Q. Okay. The introductory sentence says
16:16:00 that you and/or your partners of the partnership
16:16:03 and/or officers of JFW, Inc., have represented the
16:16:07 following, and then there are those four sub- -- or
16:16:09 five subparagraphs listed.
16:16:12 Did you personally make any of the
16:16:13 representations indicated there to Jenkens &
16:16:17 Gilchrist?
16:16:17 A. Yes.
16:16:20 Q. Who did you make them to?
16:16:22 A. I don't remember.
16:16:23 Q. Do you know in what form you made them?