# EXHIBIT B

# PART IV

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x STOBIE CREEK INVESTMENTS, LLC.; :
JFW ENTERPRISES, INC.; ; TAX MATTERS and NOTICE PARTNER, :
: Plaintiffs, :
: :
-against- : No. : 05-748T
UNITED STATES OF AMERICA, : :
Defendant. : :
- - - - - - - - - - - - - - - - - - - - -x

DEPOSITION of JEFFREY F. WELLES, taken by Defendant at the offices of the U.S. Attorney, One St. Andrews Plaza, New York, New York, on Wednesday, August 8, 2007, commencing at 9:40 o'clock a.m., before Debra DiBenedetto, a Shorthand (Stenotype) Reporter and Notary Public within and for the State of New York.

7:1 J. Welles

A I remember seeing a memo that was prepared that I saw for the first time that described the 2000-44. What else. I'm sorry I'm coming up empty, but I saw other documents.

Q The checklist that Mr. Ivsan prepared, had you seen that prior to just the other day when it was included in the box of documents?

A No.

Q I want to go back and talk about the Florida meeting in January of 2000. Do you remember that meeting, the family meeting?

A Yes.

Q We talked about that briefly at your first deposition. Do you recall that?

A Yes.

Q Okay. And I want to talk about the portion of the meeting where Mr. Waterman was there. Can you tell me now what you recall Mr. Waterman telling you and your family members at that meeting?

A He was invited to the meeting by me to describe various planning techniques to minimize our, or maximize our after tax gain on

8:1 J. Welles

the Therma Tru transaction.

Q I'm sorry, to maximize your gain?

A To, no, excuse me, to maximize our after tax proceeds.

Q And what were the techniques he told you about?

A I don't have a strong recollection of all of them, but there were various planning techniques including charitable remainder trusts, and there was the basis enhancing description.

Q And that basis enhancing technique, was that the one described in the Jenkens & Gilchrist executive summary memo?

A Yes.

Q Okay. What did he tell you about that technique, the basis enhancing structure?

A I don't have a strong recollection but I believe it was basically as the executive summary described, I think he walked through that.

Q And did he tell you that that was a technique or strategy developed by Jenkens & Gilchrist?

A Yes.

Q Did he tell you whether Shumaker,

9:1 J. Welles

Loop & Kendrick had any involvement in the
development of that technique?
A I don't remember.
Q Did you ever gain an understanding
as to whether Shumaker, Loop & Kendrick had any
involvement in the development of that technique?
A No.
Q Is it fair to say as far as you know
that was a technique developed by Jenkens?
A As far as I know, yes.
Q Okay. What did Mr. Waterman tell
you was the purpose of the basis enhancing
structure?
A I don't remember.
Q What was your understanding of the
purpose of that structure?
A My understanding was that the
purpose was to, to enhance the basis in an
underlying security and to ultimately minimize the
capital gain.
Q Do you recall anything else
Mr. Waterman said at the meeting in Florida?
A No.
Q Do you recall anything you said at

10:1 J. Welles

the meeting regarding this Jenkens basis enhancing structure?

A I remember telling the assembled group that I had looked at the executive summary and that I thought it, that it merited our consideration.

Q Had you received the executive summary prior to the meeting?

A Yes.

Q And you'd reviewed it prior to the meeting?

A Yes.

Q After receiving it did you talk with Mr. Ivsan or Mr. Waterman about it prior to the meeting?

A Yes.

Q Who did you speak to, which one of those two?

A Certainly Dave Waterman, perhaps John Ivsan, I don't have a specific recollection.

Q Do you recall what you talked about with Mr. Waterman?

A We talked about the merits of the structure.

11:1 J. Welles

Q Did Mr. Waterman, in that conversation prior to the Florida meeting, recommend that you and your family pursue the basis enhancing strategy?

A He recommended that we consider it.

Q Did he recommend that you actually implement it?

A I think the -- he said that they had used it for other clients and I don't know that he recommended it, as I said. He suggested that we consider it.

Q Did he tell you who these other clients were?

A No.

Q Did he tell you how many other clients had used that strategy?

A No.

Q Did you ever speak with anybody who had used that strategy other than you and your family?

A No.

Q The other clients who implemented the strategy, did Mr. Waterman tell you whether those transactions also involved foreign currency

12:1 J. Welles

options?
A No.
Q Do you know whether these other transactions that he mentioned involved foreign currency options?
A I don't know.
Q In a meeting did Mr. Waterman recommend that you and your family implement the basis enhancing strategy?
A I don't remember a specific recommendation.
Q Do you recall anything other members of your family said at that Florida meeting in any discussion about the basis enhancing strategy?
A No.
Q Prior to you and your family actually implementing the strategy and purchasing and selling the options, did you ever ask Mr. Waterman about these other clients and whether their transactions involved foreign currency options?
A No, I considered that to be proprietary information.
Q Did you know whether or not other

13:1 J. Welles

clients, whether or not clients of -- well, let me rephrase that.

Do you know whether other individuals had pursued a similar strategy prior to the time you implemented the strategy?

A Yes. In conversations with David Parse, he discussed the fact that other individuals had used the strategy.

Q Okay. And did he tell you that these other individuals also entered into foreign currency digital options?

A Yes.

Q And was it your understanding that they were similar in structure to the ones you and your family were going to enter into?

A Yes.

Q Did you ask him for any information on the results of those other option transactions? And by results I mean what the payouts were, whether they hit the sweet spot or anything like that?

A Yes.

Q And what did he tell you?

A I don't remember the specifics, but

17:1 J. Welles

pay out?
A Yes.
Q Did he tell you how many clients had received that payout in terms of number or percentage?
A No.
Q Did you ask him?
A I don't remember.
Q Did you ask him what the probability was for reaching that two times payout?
A I don't remember asking him the probability.
Q This conversation that we've just been talking about that you had with Mr. Parse, when did that occur?
A Early in 2000.
Q How did it come about that you spoke with Mr. Parse?
A I was referred to him. I don't remember by whom.
Q Do you know if you were referred to him by somebody at Shumaker?
A I don't remember.
Q You told me that Mr. Parse told you

18:1 J. Welles

that other clients had entered into similar options. Was it your understanding that these other clients were doing so pursuant to the Jenkens strategy as well?

A I'm not sure he specifically said that, but I made that assumption.

Q Okay, and why did you assume that?

A I don't know.

Q Was it your understanding that Mr. Parse knew that the strategy that involved the purchase and sale of options had tax benefits?

A Can you repeat the question?

Q Sure. Was it your understanding that Mr. Parse understood that this strategy that involved the purchase and sale of foreign currency options with Deutsche Bank would have tax benefits to the parties who entered into the options?

A Yes.

Q Did you and Mr. Parse talk about the tax benefits?

A I don't remember.

Q Why do you say that you believe he understood that the transactions had tax benefits?

A I assumed that he'd done a number of

19:1 J. Welles

similar transactions for clients of Jenkens & Gilchrist and that he knew that that was one of the areas that Jenkens & Gilchrist was giving advice on.

Q Did he say that Deutsche Bank and Jenkens had worked together to develop the strategy?

A I don't remember that.

Q You said this conversation took place with Mr. Parse in early 2000. Do you know if it was before or after you and your family entered into the options?

A Before.

Q Now, after the Florida meeting, what's the next conversation you had or communication you had with Mr. Waterman or Mr. Ivsan about the Jenkens strategy?

A I don't remember.

Q Do you think you talked with them about -- well, I want to concentrate on the time period from the Florida meeting to let's say March 31, okay?

A Um-hum.

Q During that time period, did you

20:1 J. Welles

talk with Mr. Waterman or Mr. Ivsan about the strategy?

A I believe so.

Q Can you tell me what you recall about conversations with Mr. Waterman during that time period about the strategy?

A No, I don't remember.

Q Can you tell me anything about what you talked about with Mr. Ivsan during that time period about the strategy?

A I don't remember.

Q So you don't -- is it fair to say then you don't recall the substance or contents of any advice or communications from Mr. Ivsan or Mr. Waterman after the Florida meeting but prior to March 31?

A Yes, that would be fair to say.

Q When did you decide to implement the strategy?

A Sometime after the Florida meeting when it was discussed and when we developed consensus amongst the family.

Q Do you recall when that was?

A No.

21:1 J. Welles

Q Was it prior to March 31?

A Yes. My notes might indicate the dates.

Q What notes are you referring to?

A The notes that -- my handwritten notes that we went through at the prior deposition.

Q Okay. Now, did you have any communication with Mr. Waterman or Mr. Ivsan after March 31 about the strategy?

A Yes.

Q What's the first communication you recall with Mr. Waterman?

A I don't remember.

Q Do you recall the substance or contents of any communications with Mr. Waterman after March 31 regarding the strategy?

A Yes.

Q Tell me what you recall.

A I recall at least one conversation when we were looking at where the currencies were trading.

Q Do you recall when this occurred?

A During the period that the, of the

22:1 J. Welles

options. In other words, between the 31st and April 17th.

Q Any other topics or subjects you recall discussing with Mr. Waterman at that point?

A I don't remember.

Q How about with Mr. Ive -- well, how about any other conversations with Mr. Waterman after March 31 regarding the strategy? Do you recall any others?

A Yes.

Q When did this other one that you're recalling occur?

A Well, there are more than one and they occurred periodically over the course of the spring and summer.

Q This is the spring and summer of 2000?

A Yes.

Q Did you also have discussions with him about the strategy in 2001?

A Yes.

Q During any of the conversations or communications with Mr. Waterman after March 31, 2000, did he ever tell you that he or Shumaker,

23:1 J. Welles

Loop & Kendrick would be prepared to issue an opinion similar to the one that was to be provided by Jenkens & Gilchrist?

A Can you repeat the question.

Q Sure. Is it correct that you got an opinion letter from Jenkens & Gilchrist?

A Yes.

Q Regarding this strategy?

A Yes.

Q At any time after -- at any time did Mr. Waterman tell you that Shumaker, Loop & Kendrick would be willing to issue a similar letter regarding the tax consequences from the strategy?

A I don't remember him -- I don't recall him offering, or telling me that.

Q Do you recall Mr. Ivsan ever telling you that Shumaker, Loop & Kendrick would be willing to offer an opinion regarding the tax results from the strategy?

A No.

Q Other than Jenkens & Gilchrist, do you recall anybody else ever telling you they were willing to provide you an opinion letter regarding

24:1 J. Welles

the tax results from the strategy?

A I remember learning that some investors had gotten multiple opinions, but I don't remember anybody telling me that they would provide a second opinion.

Q Did you ever ask anybody at Shumaker, Loop & Kendrick whether they would provide an opinion?

A No.

Q You mentioned that you had heard that other investors had gotten multiple opinions. Can you tell me some more about that?

A I don't remember who I heard that from, but yes, I had heard that other investors had gotten multiple opinions and the advice I received was that our opinion was good and sufficient and that a second opinion wasn't necessary.

Q And who gave you the advice that your opinion was good and sufficient?

MR. KOLEK: Object. Could you repeat that question?

Q Sure. Who gave you the advice that your one opinion from Jenkens was good and

25:1 J. Welles

sufficient and that you didn't need another, second opinion?

A I'm not sure anybody used the language good and sufficient. That was my language.

Q That's why I used your language because that's what you just told me.

A Well, I'm not repeating verbatim what anybody else said.

Q Who told you this, that you didn't need to get a second opinion?

A That was my own judgment based on the conversations I had with Shumaker.

Q Well, you told me a couple answers ago that somebody told you that, to your use your words, the opinion you were getting was good and sufficient and you didn't need to get a second one. So my question is, who told you that?

A Perhaps I misspoke when I said good and sufficient. Those are my own words. My judgment was, after discussing the opinion with Shumaker, that that was sufficient and we didn't need a second opinion.

Q Did anybody ever tell you that you

26:1 J. Welles

and your family members did not need to get a second opinion?

A Not that I recall.

Q After learning that other investors had gotten multiple opinions, did you ask anybody about whether you and your family should get a second opinion?

A I don't remember asking the question.

Q Okay. So you didn't ask Shumaker whether you and your family should get another opinion in addition to the one being provided by Jenkens?

A I don't remember asking that.

Q Do you recall ever asking Mr. Waterman whether he had implemented the strategy himself?

A Implemented the strategy himself on behalf of clients?

Q No, for his personal benefit. Did you ever ask Mr. Waterman whether he had, you know, implemented the strategy himself for his own benefit?

A No. I don't remember.

J. Welles

Q Did you ever ask him whether he would do it or whether he had ever considered doing it?

A No, I don't remember asking him that.

Q Do you remember him telling you whether or not he would pursue the strategy if he were in your shoes or your other family members' shoes?

A I believe he said that he would, but I'm not certain of that.

Q Why do you believe he may have said that?

A Well, this was seven years ago and I just -- it's a vague recollection.

Q Do you have a recollection as to where this might have been said?

A No.

Q Now, did you have a meeting with Mr. Ivsan in New York in the summer of 2000?

A I met with John Ivsan in New York, I believe it was the summer.

Q Okay. And was it just the two of you or was there somebody else there?

31:1 J. Welles

Jenkens was on the call?

A I don't remember.

Q What was -- was there a purpose for the conference call?

A Was there a purpose, sure.

Q Okay, what was it?

A I believe the call was to discuss the 2000-44.

Q How did it come about that y'all got on the phone to talk about 2000-44? Was it something that Mr. Waterman or Mr. Ivsan suggested?

A I believe so, yeah.

Q And what did they tell you about Notice 2000-44?

A I remember their describing Notice 2000-44 and talking about how it may or may not apply to our transaction.

Q What did they tell you about how it might apply to the transaction?

A I remember more specifically how it may not apply.

Q Do you remember anything about what they told you about how it might apply?

32:1 J. Welles

A No, I remember hearing some specifics about how it did not apply.

Q What do you recall about what they said as to whether it would not apply?

A I remember that the transaction addressed in the notice was not a basis enhancing transaction and that it dealt with corporate taxpayers.

Q Have you looked at any documents recently that refresh your recollection of the contents of that call?

A Yes.

Q What? What have you looked at?

A I saw a document for the first time that summarized several of the points that were made in the call.

Q What document was that?

A It was a memo from Shumaker, Loop & Kendrick.

Q And who was it addressed to?

A I don't recall.

Q Was it a memo from Mr. Ivsan and Mr. Cotter to Mr. Waterman?

A I'm not certain.

33:1 J. Welles

Q You had never seen the memo until a few days ago?

A I hadn't seen it till yesterday.

Q Okay. And did that memo that you saw yesterday address the points of whether Notice 2000-44 dealt with basis enhancing transactions?

A Yes. The memo -- the description I may have -- I gave you earlier is what I remember of it. I believe it was subpoenaed from Bob Floyd.

Q Prior to looking at that memo yesterday, did you have any recollection as to what Mr. Waterman said about how the notice might not apply to your transaction?

A I remember the conference call. I didn't remember a lot of the specifics of David Waterman's opinions.

Q Okay. So prior to yesterday and looking at the document you didn't recall that he talked about a distinction between basis enhancing transactions and other types of transactions in that conference call?

A I remember vaguely that, some of that conversation, yes.

34:1 J. Welles

Q And I think you also said that one of the other issues discussed was whether or not the notice dealt with corporate taxpayers?

A I believe that was one of the distinctions.

Q Do you recall if Mr. Waterman -- well, did Mr. Waterman tell you in that conference call or did Mr. Ivsan tell you in that conference call that Notice 2000-44 only applied to corporate taxpayers?

A I don't remember that specific statement.

Q What do you recall about this issue of whether the notice applied to corporate taxpayers or others as well?

A Can you repeat the question.

Q From that conference call, what do you remember about what Mr. Waterman or Mr. Ivsan might have said about the issue of whether the notice applied to corporate taxpayers or other taxpayers or both?

A The conclusion that I drew from the call was that there were some distinctions, but I don't remember the specifics of what Mr. Waterman

35:1 J. Welles

or Ivsan said regarding corporate taxpayers.

Q During that call did Mr. Waterman or Mr. Ivsan come to a conclusion as to whether notice 2000-44 applied to the transaction you and your family engaged in?

A I don't remember a conclusion.

Q Do you remember subsequently if Shumaker, Loop & Kendrick ever conveyed to you or your family members a conclusion as to whether or not 2000-44 applied?

A No.

Q Subsequent to the call did you ever ask for advice from Shumaker about whether Notice 2000-44 applied?

A Subsequent to the call?

Q Um-hum.

A I don't remember.

Q Do you recall discussing with anybody from Jenkens & Gilchrist this topic of whether Notice 2000-44 applied or how it affected the transactions you and your family engaged in pursuant to the Jenkens strategy?

A I don't remember asking, although I believe someone from Jenkens was on the call.

36:1 J. Welles

Q Do you recall who that was?
A No.
Q Do you recall anything they said?
A No.
Q Putting aside the conference call, did you ever have any communications with anybody from Jenkens about this issue of whether Notice 2000-44 applied to your transactions?
A I don't remember.
Q Now, I think we talked about last time that you got some draft opinion letters from Jenkens & Gilchrist?
A Yes.
Q Did you ever discuss those drafts or the contents of those drafts with anybody from Shumaker, Loop & Kendrick?
A Yes.
Q Who did you discuss the drafts with?
A David Waterman, perhaps John Ivsan.
Q The discussions you had with Mr. Waterman, was it more than one, and I'm talking about discussions about the draft opinion letter, was it one conversation or more than one?
A I believe it was more than one.

37:1 J. Welles

Q Do you know when the first occurred?
A No.
Q Was it prior to your entering into the option transactions?
A I don't remember.
Q You don't remember one way or the other whether it was before or after?
A No, I don't.
Q Okay. Tell me what you remember about the discussions with Mr. Waterman about the draft opinion letters.
A I remember his saying that he had read the opinion and that he thought it was a good opinion.
Q Do you remember anything else he said?
A No.
Q When you say he said it was a good opinion, are those your words or do you recall --
A Those are my words.
Q Do you recall Mr. Waterman telling you that there were certain conditions that needed to be met for the tax results that Jenkens opined about to be valid?

38:1 J. Welles

A You're talking about representations?

Q Well, any conditions. Did you discuss any conditions with him that needed to be met before the opinion would be valid?

A I don't remember.

Q Do you remember talking with him about the necessity for a business purpose?

A I don't remember.

Q Do you remember talking with him about the representations?

A I believe, yeah, I have a vague recollection.

Q What do you recall about your discussions with him about the representations?

A I don't remember specifics.

Q Do you recall whether he inquired whether you believed the representations to be true and accurate?

A I don't remember.

Q Did you ever have any communications or discussions with Mr. Waterman about the profit potential of the digital options?

A Yes.

39:1 J. Welles

Q And when were those?

A I'm not certain.

Q Were they before or after you entered into the options?

A I believe both. As I said earlier, I also remember having conversations with him during the period that the options were running.

Q Do you recall the substance of any of those conversations with Mr. Waterman about any profit potential from the options?

A Can you repeat the question.

Q Sure. Do you recall any substance, well, do you recall the substance of any conversations you had with Mr. Waterman about the profit potential from the options?

A I don't remember the substance, no.

Q Did you ever speak with Mr. Cotter about the strategy and the options?

A I believe so.

Q Did you speak with him back in 2000, 2001?

A I don't remember the dates of the conversations.

Q Well, I'm trying to determine if you

40:1 J. Welles

spoke with him back then or you think it was more recent in connection with this case, in connection with the audits, do you recall?

A I don't remember the specifics of a conversation in 2000 and 2001.

(Brief recess.)

Q Mr. Welles, in the conference call you had about Notice 2000-44 or any subsequent conversations with Shumaker, Loop & Kendrick, did anybody from Shumaker ever tell you that the risks of this transaction had changed or increased in terms of being challenged by the IRS?

A I don't remember anybody saying that the risks had changed. They had, Dave Waterman had been largely enthusiastic about the transaction, said that many clients had done it, but I don't remember his addressing additional risks.

Q The other clients that he told you about who had pursued it, was it your understanding that they had also retained Jenkens for those transactions?

A I don't know.

Q Let me show you what we previously

46:1 J. Welles

A I've read it.

Q Okay. In that last full paragraph on that page Mr. Waterman, there's a statement, quote, "I believe we have been clear that we are not recommending that you pursue their proposal." Period, end quote.

Do you see that sentence?

A Yes.

Q Did Mr. Waterman ever say anything like that to you?

A I don't remember him saying that they would not recommend the transaction.

Q Okay. Do you recall him telling you that Shumaker had learned of the Jenkens & Gilchrist strategy pursuant to a confidentiality agreement that it had with Jenkens?

A I don't remember that.

Q Further on in that paragraph he states, quote, "We have not determined that we would be prepared to issue such an opinion even if permitted under our confidentiality restrictions," period, end quote.

Do you recall Mr. Waterman or anybody from Shumaker telling you anything like

47:1 J. Welles

that?

A I don't remember that.

Q Do you remember one way or the other?

A No.

Q Okay. This is a letter addressed to you at North Channel, 445 Park Avenue. Do you see the address on the first page?

A Yes.

Q Was that the North Channel's offices in March 2000?

A Yes.

Q Okay. Do you have any reason to believe you didn't receive this letter in March of 2000?

A I don't remember the letter but. There's no reason to believe that I didn't receive it.

Q Do you recall Mr. Waterman ever saying anything to you or anybody else at Shumaker saying anything to you that the effect of retracting what he said in his March 6 letter, this March 6 letter, or qualifying anything in this March 6 letter?

48:1 J. Welles

A No.

Q On the last page of the letter, page 4, Mr. Waterman's talking about the representations. Do you see that?

A Yes.

Q Okay. And he says, quote, "Of particular importance are the representations that you have a substantial non-tax business purpose to convey the options and the Therma Tru stock to the partnership."

Do you see that reference?

A Yes.

Q Do you remember discussing that topic with Mr. Waterman?

A Yes.

Q What do you recall about that discussion?

A I don't remember the specifics of the conversation.

Q Do you recall generally the substance of the conversation?

A Generally that, that we indeed had a profit modus in the transaction and a non-tax business reason to enter into it.

J. Welles

Q Did you understand that Mr. Parse was providing you advice as to how to structure the options or what terms would be beneficial for you and your family?

A Yes.

Q And did you rely upon him for that?

A Relied on he and others.

Q Okay. Did he give you a percentage figure for the probability of hitting the two times pay out?

A I don't remember him giving a percentage number.

Q Did he give you a range or a feel for that?

A Yes.

Q Would you recall what that was?

A No, I don't.

Q Was this also before the actual terms of the options you and your family entered into that had been agreed upon?

A Yes.

Q You also, you and your family entered into options concerning the euro, U.S. dollar exchange rate?

146:1 J. Welles

Q And do you know who made that decision, that the returns should be filed reporting the transactions as set forth in the Jenkens opinions?

A No.

Q Did you make that decision?

A Ultimately as the manager of Stobie Creek investments, LLC, it was me who signed the returns.

Q And did you rely on the Jenkens opinions?

A In part and from our counsel from Shumaker, Loop & Kendrick.

Q Am I correct that Shumaker, Loop & Kendrick did not provide a written opinion?

A That's correct.

Q What from Shumaker, Loop & Kendrick did you rely upon with regard to the tax return positions?

A We had the regular dialogue with Dave Waterman and others who were quite enthusiastic about the transaction and provided counsel throughout.

Q Did you ever speak with Mr. Waterman

147:1 J. Welles

after receiving the final opinion letter from Jenkens & Gilchrist?

A I believe so.

Q Do you know if he had seen that final opinion when you talked with him?

A I know that he'd seen the opinion. I don't know the timing.

Q Did he ever tell you whether or not he agreed with Jenkens' opinion?

A Yes. He felt that it was a good opinion. Did he agree? I'm not certain he said that in those words.

Q Did he ever provide any warnings or at least cautions to you that the opinion was only a "more likely than not" opinion?

A Well, I think he defined what more likely than not means.

Q And how did he define it?

A I think exactly as the wording suggests, that it's more likely than not to stand the scrutiny.

Q Mr. Welles, let me show you what was previously marked as Exhibit 137. Do you recognize that?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STOBIE CREEK INVESTMENTS, L.L.C., JFW ENTERPRISES, INC., TAX MATTERS AND NOTICE PARTNER,

Plaintiff,

vs. Index No. 05-748 T

UNITED STATES OF AMERICA,

Defendant. ________________________________/

Continued Videoconference Deposition of PETER CLUETT WELLES, held on July 19, 2007, at the U.S. Attorney's Office, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, Minnesota, commencing at 9:05 a.m., before Elizabeth J. Gangl, Court Reporter and Notary Public in and for the State of Minnesota.

13:1

night that Mr. Waterman had sought counsel
from a third-party firm on our behalf.
Q. And who was the third-party firm?
A. That was the Jenkins firm.
Q. And what kind of help did he seek
from Jenkins & Gilchrist?
A. My interpretation is it's a
third-party opinion.
Q. Opinion about what?
A. About tax matters as it related to
an option investment that my brother made for
Stobie Creek.
Q. You consistently describe the
investment as something your brother made.
Did you invest any money in that transaction,
the options transactions with Deutsche Bank?
A. Money was invested on my behalf.
Q. And who invested the money on your
behalf?
A. My brother Jeff.
Q. And how much money was invested on
your behalf?
A. I don't specifically know.
Q. When you say it was invested on your

39:1

to it because we had some privilege objections the first time around which have now been resolved or withdrawn, so I want to go back and cover that ground completely this time. Mr. Waterman came down to talk about the Jenkins & Gilchrist strategy, is that correct?

MS. FEENEY: Objection to the extent it mischaracterizes his prior testimony.

A. I don't -- he came to talk about tax strategies for us related to an investment my brother was going to make. I don't know whose strategy it was that he was talking about.

Q. And can you tell me everything you recall about what Mr. Waterman told you about this tax strategy?

A. I don't remember anything really about what he discussed. Seven years ago.

Q. I understand that.

A. In the course of looking at this stuff, I reviewed stuff last night, I don't recall specifics of anything from that time.

Q. Well, I would like to try to exhaust

40:1

your memory, so you've told me that you recall that he came down to talk about a tax strategy related to an investment that Jeff was proposing. What do you recall generally about what he said?

A. I remember that my brother introduced an investment that he wanted to make on behalf of Stobie Creek, and I remember Mr. Waterman saying that we could potentially stem some of our losses if we didn't have the windfall that my brother was hoping for with the investment through a tax strategy.

Q. And what do you recall him -- well, is it fair to say that Mr. Waterman wasn't there to talk about the financial aspects of the investment?

A. My brother was. Jeff discussed the financial aspects of the investment.

Q. Okay. So Mr. Waterman wasn't there, and he didn't in fact talk to you about whether there was a potential for profit or what that potential might be?

A. He did not discuss the nuances of that.

41:1

Q. Okay. So that was Jeff's area?
A. Jeff's the financial guy; Mr. Waterman was the legal guy.
Q. Okay. So you said he was there to talk about the tax strategy part of it. What do you recall generally about what he said?
A. That we could potentially mitigate losses if we didn't see a huge windfall in the currency option investment.
Q. And did he tell you how that would occur?
A. I don't recall if he did.
Q. Do you recall whether he talked about any of the things that would need to be done in connection with that strategy?
A. I don't remember.
Q. Do you recall whether he said that there was any other law firm involved or that this strategy came to him from another law firm?
A. I can't remember.
Q. Do you recall one way or the other whether he talked about Jenkins & Gilchrist

42:1

at that meeting?
A. I can't remember.
Q. Do you recall if Mr. Waterman had
any documents that he showed to any of you
at the meeting?
A. I can't remember.
Q. Did you make a decision one way or
the other whether to pursue this strategy at
the Florida meeting?
A. I don't understand your question.
Q. You said that Jeff was talking about
a proposed transaction.
A. Correct.
Q. And that Mr. Waterman was there to
talk about the tax aspects of that
transaction.
A. Correct.
Q. And is it fair to say that at this
point it was a proposal?
A. I don't honestly know if my brother
had initiated the investment at that point or
not.
Q. And was the investment that Jeff was
talking about the option transactions?

54:1

were they?
A. As I said a moment ago, there was a, I believe there was a loss on the option investment and therefore there was a taxable loss.
Q. And did that then decrease the amount of taxes that would otherwise have been due on the Therma-Tru stock redemption?
A. I don't specifically know the corollary between this, the option loss and the Therma-Tru redemption tax issue.
Q. When did you first learn that Jenkins & Gilchrist was involved in some way in developing or implementing this strategy?
A. I don't remember when I first learned of their involvement.
Q. Was it in 2001?
A. I can't recall.
Q. But at some point you did learn that Jenkins was involved?
A. Yes.
Q. Is there anybody you relied upon with regard to the tax benefits related to this strategy in terms of tax advice?

55:1

A. Larry and Jeff, investing on my behalf.

Q. Anybody else you relied upon, other than Larry and Jeff, regarding the tax benefits that resulted from the strategy?

A. No.

Q. Do you know who Jeff resulted, if anyone, with regard to this strategy and whether it should be pursued?

A. I don't know who he spoke with.

Q. You don't recall Jeff telling you about any individuals he talked with or consulted?

A. No.

(Whereupon, Welles Exhibit Number-134 marked.)

BY-MR.JOHNSON:

Q. Mr. Welles, this is a single page of handwritten notes, which in my original has two other pages, but the writing appears to be the same on all three pages, so why don't I just start by asking if -- do you recognize this handwriting?

A. No.