# EXHIBIT B

# PART V

1:1 UNITED STATES COURT OF FEDERAL CLAIMS

STOBIE CREEK INVESTMENTS, : LLC, JFW ENTERPRISES, INC.,:
tax matters and notice : partner, :
: Plaintiff, :
: v. : Case Number 05-748
: UNITED STATES OF AMERICA, :
: Defendant. :

\- - -

Videotape Deposition of DAVID F. WATERMAN, a Witness herein, called by the Defendant as upon Cross Examination pursuant to the Federal Rules of Civil Procedure, Superintendence Rule 13, taken before Nicole D. Blaker, Registered Professional Reporter, Notary Public in and for the State of Ohio, at the offices of the United States Attorney, Four SeaGate, Suite 300, Toledo, Ohio, on Wednesday, August 1, 2007, commencing at 9:05 a.m.

49:1 A No.
Q What was the second interaction you had with any member of the Welles family regarding their interest in a tax strategy?
A I really can't be that precise. I think we had a couple of brief conversations, but I just -- the details escape me.
Q The first inquiry that you do recall, do you know when that occurred?
A Probably in December of '99.
Q And at that point in December of '99 the sale of Therma-Tru -- the sale of the Therma-Tru stock was under negotiation with Kenner and company, wasn't it?
A It was under consideration at least.
Q A letter of intent had been signed by that point?
A I don't remember when the letter of intent was signed.
Q But the discussions were far enough along at least for Jeff and David to come to you about tax strategies on the eventual sale?
A I don't know the status of the discussions, but there were some discussions occurring.
Q Now, when Jeff and/or Deke came to you to ask about tax strategies, what did you tell them?

50:1 A I said we were aware of a strategy that had been developed by Jenkens & Gilchrist that they might be interested in.
Q And what did you tell them about this Jenkens & Gilchrist strategy?
A I don't know that I told them anything about it initially.
Q There came a point obviously where you did tell them some more about it?
A Uh-huh.
Q When was the first time that you remember that you did describe in a little more detail or substance the strategy to them?
A I really think it was in January of 2000.
Q And what was that occasion?
A That was a family meeting in David and Georgia's home in Florida at Vero Beach.
Q And did you go down and meet them in Florida?
A I did.
Q And what was your purpose in going down to Florida for that meeting?
A Well, I think it was to describe at that point the status of the Kenner transaction from my perspective and the transaction developed by Jenkens & Gilchrist.

53:1 Q And this is an affidavit you submitted in
connection with the case United States versus
Jenkens & Gilchrist?
A Yes.
Q Paragraph 7 of the affidavit says in part that
several of the intervenors asked SLK whether it was
aware of any tax strategies that might reduce the
intervenors' taxes resulting from the anticipated
sale of their interests. The intervenors you're
referring to there, was that Jeff and David,
Junior?
A Uh-huh, yes.
Q But you don't recall anybody else?
A No.
Q Is there anything -- sitting here today, is there
anything in this declaration that you think is
inaccurate?
A No.
Q Now, you were telling me that you went to a family
meeting in Florida the end of January to talk about
the Jenkens & Gilchrist strategy, right?
A And the Kenner transaction.
Q Okay. You were going to talk about the status of
the Kenner transaction?
A Uh-huh, yes.

54:1 Q Tell me what you did at the meeting with regard to talking about the Jenkens & Gilchrist strategy.
A I described the basic transaction that I described before for you. I said that tax lawyers in our office had researched the Jenkens strategy and the opinion that had been given in other instances thoroughly, felt that the opinion was accurate as to the tax consequences of the transaction and that the transaction ought to hold up provided in general terms -- provided Jeff felt comfortable with the investment, thought it would be a reasonable investment with a reasonable profit potential, and provided there were independent reasons for the partnership vehicle in which the investment was structured.
Q Now, I think you told me that you had at least one conversation and maybe a couple with Jeff and/or David prior to the meeting in Florida.
A Yes.
Q Okay. The one where they inquired about a tax strategy, right?
A Yes.
Q Okay. And you're not sure whether -- you think you may have had another conversation with them prior to going to Florida?

55:1 A I really don't recall. I might have had a couple.
Q In that first conversation where they inquired about the strategy, did Jeff or David ask you about foreign currency options?
A No.
Q Did they tell you that they wanted to invest in foreign currency options?
A No.
Q Had you had any conversations with them about foreign currency options, investments prior to going to Florida?
A Had I?
Q Yes.
A No.
Q Do you know if anybody else had had conversations with Jeff and/or David about foreign currency options prior to the Florida meeting?
A No.
Q Now, foreign currency options were part of the strategy you presented in Florida, right?
A That's correct.
Q So as far as you know, that's the first interaction or discussion of that topic between the Welles family and anybody from Shumaker?
A As far as I know it is.

56:1

Q Okay. Now, a minute ago you told me that Shumaker lawyers had looked at the strategy and looked at I guess some J&G opinions from other cases?
A Yes.
Q Who were those Shumaker lawyers?
A Principally John Ivsan and Tom Cotter.
Q Anybody else?
A I think there was some involvement from Bruce Gordon in our Tampa office, but I don't know the extent of involvement.
Q Did they prepare any written documents concerning their review of the strategy and review of other Jenkens opinion letters?
A Not that I've seen.
Q Are you aware of documents that they've prepared that you haven't seen?
A No.
Q How are you aware of their review of the strategy and other opinions?
A Because we had lengthy discussions about it.
Q That you participated in?
A Yes.

(Page 57 confidential pursuant to the protective order.)

58:1 Q And you participated in these discussions?
A Yes.
Q Okay. Who else participated in the discussions in which you were involved?
A Well, other members of our tax group and members of our management group.
Q Well, could you tell me the names of the people who were involved in discussions in which you were involved?
A Bruce Gordon, Mike McGowan, Bill Fischer, Greg Yadley, Mary Ellen Pisanelli. I can't recall the other names or if there were other names specifically.
Q Of the people you've mentioned, including Mr. Ivsan, Cotter, and Gordon, who to your knowledge actually did a review of the strategy to determine whether or not it worked and reviewed other Jenkens opinions?
A Ivsan and Cotter.
Q So the other people you know --
A And possibly Gordon, as I said. I don't know the extent of his involvement really.
Q So Mr. Ivsan, Mr. Cotter, Mr. Gordon possibly are the ones who did the review?
A Uh-huh.

59:1
Q The other people you mentioned did not do a review of the strategy?
A Not an independent review.
Q They were simply -- is it fair to say they were simply involved in discussions where these issues were discussed?
A Yes.
Q And I think you said that these discussions occurred in 1999 at the time of another transaction that occurred?
A Yes.
Q You told me about the first transaction you were aware of for which Shumaker was compensated on an hourly basis.
A Uh-huh.
Q The first transaction I'm talking about is the first J&G transaction.
A Yes.
Q And then the second one you remember that you remember now Shumaker was compensated on a flat fee basis?
A Yes.
Q Did there come a time where there was a arrangement made with Jenkens or an understanding as to how Shumaker would be compensated with regard

60:1 to these transactions?
A Not to my knowledge.
Q Do you have any personal knowledge as to how much time Mr. Ivsan, Mr. Cotter, and Mr. Gordon possibly spent reviewing the strategy?
A I can only say a lot of time.
Q Why do you say that?
A Because I understood that they researched every case and cite in the opinion. That would take a lot of time.
Q Did one of them tell you that they did that?
A Yes.
Q Who?
A Tom Cotter.
Q Anybody else?
A I don't have a specific recollection of other specific comments.
Q Do you know if there would be any time records or billing records for this review that you're talking about?
A Well, I don't know if they would exist any more, no, I don't know.
Q Do you know if that was work that was billed to a particular client?
(Page 62 confidential pursuant to the

78:1 A No.
Q Have you ever met Mr. Herpe?
A Yes.
Q In what context?
A David Herpe has done some of the estate planning for David and Georgia, and we have interacted in that context.
Q Did you have any interaction with him in connection with the implementation of the Jenkens & Gilchrist strategy for the Welleses?
A No.
Q Do you know if he knew whether it was being implemented?
A No.
Q You don't know one way --
A I mean I don't know.
Q Okay. Did you know that he also went to meet with the Welleses in Florida?
A Not then, no.
Q And he wasn't there when you gave your presentation?
A No.
Q When you were at the Florida meeting, did you have any discussions with the Welleses about an establishment of a family office?

79:1 A No.
Q Did you know that they were thinking about that?
A No.
Q Did you ever provide them any advice on the establishment of a family office?
A No.
Q When I use that term, do you know what I'm referring to?
A Yes, I do.
Q Just so we're clear, what's your understanding of what a family office is?
A That is an effort to centralize investment and tax planning and tax services for the family.
Q And when you were at the Florida meeting, did you have any discussion with the Welleses about any charitable foundations they were thinking about establishing?
A No.
Q After the Florida meeting did you have any interaction with Mr. Herpe or anybody from McDermott about establishment of a family office for the Welleses or the running of it?
A Not that I can recall.
Q Do you know whether the Welleses have established a family office?

80:1 A Oh, yes.
Q And what is it or where is it?
A It's in New York City.
Q Does it have any connection with Stobie, do you know, Stobie Creek?
A Yes.
Q What's the connection?
A I think there were two entities. An entity called North Channel is the -- I would say is the operating family management group, if you will, and part of what they do is operate the investments or make the investments for Stobie Creek.
Q And do you know if Shumaker, Loop & Kendrick had any involvement in providing legal services to establish that family office?
A Did not.
Q Is it your understanding that that's what McDermott did or do you know?
A Yes, that's my understanding.
Q Now, did -- you told me about some other entities that were created in connection with the Jenkens & Gilchrist strategy, and one was the creation of single member LLCs, right?
A Yes.
Q And that was done for each of the Welleses?

126:1
A No.
Q Do you know whether or not that 2,000,000 net investment figure was subject to any negotiation between the Welleses and Deutsche Bank?
A I don't know that.
Q You said you searched for the original of Exhibit 45. What would the original look like?
A Just like this, I assume.
Q Okay.
A But probably on letterhead.
Q Okay.
A I don't see the letterhead here.
Q Back in 2000 did Shumaker use letterhead?
A Yes.
Q And so --
A Still do.
Q And so in Exhibit 45 at the top it looks -- says Shumaker and some other things, I presume?
A It would, yes.
Q Okay. This one's unsigned, as you know.
A Uh-huh.
Q But you believe -- it's your belief that you signed an original letter and sent it out to the Welleses in March, 2000?
A That is my belief.

127:1 Q And Shumaker kept this copy in its files?
A Uh-huh.
Q And I assume that was your normal practice at the time when you were sending correspondence to clients?
A Yes.
Q Now, you told me the reason you sent this or one of the reasons was to confirm some advice, and, in fact, the first sentence in the letter says that you want to confirm and correct certain information provided earlier. When was this earlier advice given?
A In Florida.
Q Any other occasion you're thinking of?
A No.
Q The first paragraph, as I said, you mentioned that you're confirming and correcting information, then you go on to describe the proposed transaction and you list a number of steps there. Do you see those?
A Yes.
Q Each of those steps, were those all contemplated as being undertaken as part of the strategy at this point?
MR. RIZEK: I'm sorry, I'm confused.

128:1 I don't see what steps you're referring to.
MR. JOHNSON: In the first paragraph.
MR. RIZEK: Okay. Thank you.
A Repeat the question, please.
MR. JOHNSON: Sure. Could you read that back?
(Said question read.)
A Yes.
Q Moving on, the second paragraph on the -- well, first full paragraph on the second page --
A Uh-huh.
Q -- talks about a brochure being sent to the Welleses. Did you send a brochure about Jenkens?
A I think what I sent -- we have no record in our file, but I think it was a Martindale-Hubbell listing.
Q Okay. The next paragraph says that you've enclosed a redacted version of a draft opinion issued by J&G in connection with a similar transaction together with the supporting legal memoranda. Do you see that reference?
A Yes.
Q Do you recall that you did send on a draft -- a redacted draft opinion letter?

129:1

A Yes.

Q Do you know if that was for one of the transactions that Shumaker --

A Yes.

Q -- had previously been involved in?

A Yes.

(Page 130 confidential pursuant to the protective order.)

131:1
Q You further say in that paragraph that you also are enclosing a copy of a research memorandum prepared by Jenkens in connection with the option form of the transaction. Do you recall that you did send on such a research memorandum?
A Yes.
Q And do you know what the subject of that memorandum was?
A Yes, that was the discussion of the attributes of the digital option strategy as opposed to other investments that had been used previously.
Q Do you recall discussing with any of the Welleses that draft opinion letter or research memorandum you had sent on to them?
A No, not specifically, no.
Q At the bottom of the Page 2 you talk about President Clinton's budget proposals increasing funding for the IRS and focus on uncovering tax shelters. Why did you include that in this letter?
A I think as the letter says it indicates a heightened sensitivity of the government to tax favored investments.
Q And you felt the Welleses should be aware of that?
A Yes.
Q Why did you think they should be aware of it?

132:1
A Because this investment that was proposed had considerable tax benefits associated with it.
Q You used the word tax shelter in that paragraph. Did you consider this transaction to be a tax shelter?
MR. BANNON: Objection to form.
A Yes, loosely speaking.
Q On the third page in the second full paragraph you talk about possible penalties if the transaction's discovered on audit. Do you see that?
A Uh-huh.
Q And you're saying you've previously informed them about these possible penalties. When did you talk with the Welleses about penalties?
A In Florida.
Q What did you tell them about penalties at that point?
A Same thing I said here, that if you -- if the tax benefits are disallowed, you have a penalty -- a 20 percent penalty, that's automatic, unless you have some reliance theory, which the Jenkens opinion was intended to provide, that would abate those penalties. They actually asked for sort of a worst case scenario, so I tried to find the highest penalty anyone could propose.

133:1 Q Did they ask for the worst case scenario at the Florida meeting?
A Yes.
Q And did you give them a response at that point?
A I did, I did.
Q And did you give them an opinion at the Florida meeting as to the likelihood of the imposition of any penalty if the transaction is found on an audit?
A I did, I thought that was unlikely.
Q And why do you -- why did you say you thought it would be unlikely?
A Because they were entitled to rely on the Jenkens opinion, which we thought was a good opinion, subject to satisfying some of those preconditions.
Q And I think you told me earlier that at the Florida meeting at least it wasn't determined whether those preconditions would be met or not?
A They didn't discuss it with me, no.
Q In the third full paragraph on that page you talk about the sharing of the fee between Jenkens and Shumaker.
A Uh-huh.
Q And then you state, quote, I believe we have been clear that we are not recommending that you pursue

134:1 their proposal, period, end quote. Why did you
state that in this letter?
A Because I didn't view our introduction of this
proposal as carrying with it a recommendation that
they, in fact, do it. That was up to them to
decide, and it was based on these other factors of
which we had no knowledge at this point, and there
was a down side.
Q The other factors that it was dependent upon that
you didn't have knowledge of, what are those?
A Jeff's investigation of the options.
Q Okay.
A And the partnership.
Q Rather than --
A For an independent purpose.
Q Okay. So as of March 6, 2000, you didn't know
whether those conditions were or would be met?
A That's correct, I did not.
Q Do you know if anybody within Shumaker knew
whether those conditions had or would be met?
A I don't know.
Q Okay.
A I don't know if they talked to Jeff, and I don't
know when -- I did not find out about Stobie Creek
and that plan until later. That was the family

135:1 office, the pool investment.
Q Okay. You said you included that statement in there in part to convey to the Welleses that your introduction of the strategy to them shouldn't be interpreted to carry a recommendation that they do it?
A Correct.
Q Okay. And in that sentence you say, you know, I believe we have been clear, which I take to mean that you on previous occasions conveyed to them that you were not recommending that the proposal be pursued; is that correct?
A Yes.
Q Okay. What are the previous occasions on which you conveyed to the Welleses --
A The Florida meeting.
Q Any other occasions?
A Not to my knowledge.
Q So it's your recollection that at the Florida meeting you told the Welleses that you and Shumaker were not recommending that the Welles family pursue the Jenkens strategy?
A I said at that meeting that our tax lawyers were very confident of this structure, at least on a more likely than not basis, but I stressed that

136:1 more likely than not is 51 percent, so there's a 49 percent chance that this would not work, in which case they would have significant dollars invested and they might be upset. That's why I didn't want to be in a position of recommending that they pursue that. I wanted them to know the opportunity and our feelings, but the decision was theirs.

Q So it's your recollection that you stressed to the Welleses at that meeting that at Shumaker you were not recommending that they pursue the strategy?

MR. BANNON: Objection, asked and answered.

A I think I just told you specifically what I said. I'll stand with that.

Q Well, I'm just a little confused about what -- what your position was at the meeting, so is it your recollection that at the meeting you stressed to them that Shumaker was not recommending that they pursue the meeting -- or pursue the strategy?

MR. BANNON: Objection, asked and answered. Don't answer the question.

MR. JOHNSON: Mr. Bannon, you cannot instruct the witness not to answer the question.

MR. RIZEK: I sure can. If you're

137:1

going to ask the same question over and over again, he's not going to change his answer.

MR. JOHNSON: I'm just trying to clarify, John.

MR. BANNON: I know what you're trying to do.

Q Mr. Waterman, can you answer my question?

A I told them at that meeting that our tax lawyers who had spent countless hours reviewing the Jenkens work product and countless hours with Jenkens representatives, KPMG representatives, and others involved in this type of strategy believed that this was a good, solid, more likely than not opinion. I personally said remember, this is not a legal opinion that says it's a guarantee. There's a 49 percent chance that it would not hold up, and they needed to be aware of that. That's why I didn't want to be in a position of telling them what to do. They needed to make up their own mind with full understanding of the merits and the risks.

Q Well, I'm trying to find out if Shumaker, Loop as a firm had a position, because you've told me about other lawyers at the firm who looked at it and

138:1
you've told me about what you stressed at the meeting, but your sentence in this -- in this letter says, you know, I believe we have been clear, and by saying we, are you referring to Shumaker?
A I'm referring to me as a representative of Shumaker.
Q So --
A I was the contact with the family.
Q So I'm just trying to be clear. Was it Shumaker's position as a firm that it was not recommending the proposal?
MR. BANNON: Objection, asked and answered.
A I as a representative of Shumaker was cautioning them about the risks as well as the merits.
Q Okay. Was there another representative of Shumaker who was recommending that the Welleses pursue the proposal?
MR. BANNON: Object to the form.
A There were tax lawyers who were recommending to other people that they pursue it.
Q Okay. I'm concerned about the Welleses, so my question is were there other Shumaker attorneys other than yourself who were recommending to the

139:1 Welleses that they should pursue the proposal?
A At this point in time?
Q Yeah, as of March 6th.
A Not that I know of, no.
Q How about subsequent to March 6th?
A I think subsequent to March 6th our comfort level and my particular comfort level increased because the two preconditions that I was worried about seemed to be clearly established.
Q Did you ever send the Welleses another letter retracting the statement in that paragraph in which you say that you are not recommending that they pursue the proposal?
A No, not to my knowledge.
Q Did you ever tell them orally that you were retracting that statement in this letter?
A I think I phrased it exactly the way I did before, that we and I felt much more confident when I understood the development of Stobie Creek and when Jeff blessed the options, if you will, and the potential for profit.
Q Did you ever tell them that you are now recommending that they pursue the proposal?
MR. BANNON: Objection to form, asked and answered.

140:1
A I don't recall if I was that specific.
Q Did you say anything generally along the lines of saying you are now recommending that they pursue it?
MR. BANNON: Same objection.
A I think I expressed it in terms of an increased level of support and comfort with the strategy in their case.
Q Okay. I understand that, Mr. Waterman, but I also understand that in this letter you tell them that you are not recommending that they pursue it, right?
A Uh-huh.
Q Okay. And you've told me that your comfort level increased subsequent to that?
A Yes.
Q So I'm wondering if you then went one step further and said I know what I said earlier on March 6th, I'm now telling you that I now recommend that you pursue this proposal.
A I don't know that I was ever that specific, I just don't recall.
Q Further in that paragraph you say that your knowledge of the proposal was obtained under a confidentiality agreement and therefore you're

141:1 unable to issue the opinion being offered by J&G.
Did that ever change? Did you ever offer to provide an opinion letter on the tax results?
A No.
Q Did the Welleses ever ask you -- ask Shumaker whether they would consider doing that?
A No.
Q You then go on to say that we have not determined that we would be prepared to issue such an opinion even if permitted. Do you see that?
A I do.
Q Okay. What did you mean by that?
A I meant that issuing a formal opinion involved in a strategy of this sort was not something that we, the firm, generally thought we had the expertise and depth to do to constantly monitor changes in the law that Jenkens was doing daily.
Q Did you tell the Welleses that you felt that Shumaker didn't have the depth of experience or expertise to offer the type of opinion that J&G was offering?
A I don't know if I was ever that specific.
Q Did there come a time subsequent to March 6th when you felt that Shumaker had acquired the depth of experience and expertise on these matters to

142:1 determine whether or not it could issue such an
opinion?
A No.
Q I take it that you felt you didn't have the
expertise to offer the opinion?
A Me personally?
Q Yeah.
A No.
Q Okay. Do you know if you told the Welleses that,
that you felt you didn't personally have the
expertise to offer an opinion on the tax
consequences?
A I don't know if I said anything like that.
MR. BANNON: If you're done with that
exhibit, maybe this is a good time to
break for lunch.
MR. JOHNSON: I actually want to
continue with the exhibit as a different
exhibit, if that makes sense.
MR. BANNON: Then I'm going to need
to take a short break just for --
MR. JOHNSON: Well, it's the same
document so I want to get to --
MR. BANNON: No, no, it's fine if you
go on, but I need to take a break.

143:1

MR. JOHNSON: Oh, okay.
MR. BANNON: Can we go off the record for about five minutes?
MR. JOHNSON: Yes.
(Recess taken.)
Q Mr. Waterman, I'd like to go back to Exhibit 45, Herpe 45 which we had just been talking about, and again on Page 3 of the letter, that final full paragraph, at the beginning of that paragraph you're talking about the split of the fees, and you also say that you've previously informed the Welleses that the split of the fees, quote, could bias our opinion as to the merits of the proposal, period, end quote. What did you mean by that?
A We felt it was our ethical obligation to let them know at the beginning that we were a potential participant in the fee and that it could affect our judgment, that was our ethical obligation.
Q So at this --
A Not that it did, but it was our obligation.
Q Okay. So at this point had the $6,000,000 fee been agreed to and the split of 2,000,000 to Shumaker and 4,000,000 to Jenkens been determined?
A I don't know. I don't know when that actually was finalized.

144:1
Q Did you think that your getting a portion of the fee for the implementation of the transaction was a conflict that would prevent Shumaker from providing an opinion on the tax results?
A No.
Q Is there a reason you say that? Why do you say it was not a conflict?
A I didn't think it was.
Q But you thought it might -- you had the obligation to tell them it might bias your opinion?
A Uh-huh.
Q I'm going to show you what was previously marked as Floyd 4.
MR. JOHNSON: And, John, that should be in the stack that you brought with you that was marked yesterday.
Q Mr. Waterman, this is an exhibit that was produced by Mr. Floyd pursuant to subpoena. Do you know Mr. Floyd, Bob Floyd?
A I do.
Q Do you recognize this as a fax that you sent to Mr. Floyd back in March of 2000?
A Not that I recall, but that's what it purports to be.
Q Okay. Well, there's a fax cover sheet and then

145:1 there's a copy of the March 6 letter we were just working -- looking at?
A Yes.
Q Do you recall that you sent -- in addition to sending it to the Welleses you also sent it on to Mr. Floyd?
A I don't recall that.
Q Do you recall discussing any of the topics in the letter with Mr. Floyd?
A Not really, no.
Q What was Mr. Floyd's role in implementing the Jenkens strategy, if any?
A I don't think he had an involvement in implementation. He was a tax return preparer.
Q What's your understanding of what role he did or what role he had with regard to the preparation of tax returns?
A That's what he does, he prepared them, well, with the assistance of Jenkens & Gilchrist and SLK.
Q Are you aware of any advice he provided to the Welleses regarding whether or not they should engage in the strategy?
A No.
Q Any advice he gave regarding the possibility of profit from the options?

146:1
A No.
Q You mentioned that his role was in preparation of the tax returns in connection -- or in conjunction with Jenkens. Do you know whether Mr. Floyd himself determined what the proper tax consequences were from the transactions and how they should be reported or was his role to prepare the tax returns based on the instructions from Jenkens?
A I don't know what he did.
Q So you don't know whether or not he had independently determined what the correct results were?
A No.
Q At the time you sent the March 6th letter do you know if a decision had been reached by the Welleses whether to engage in the strategy?
A I do not.
Q Do you know when such a decision was made?
A No, not precisely.
Q When did you first learn that they were going to pursue the strategy?
A Sometime in March, I think.
Q And how did you learn that they were going to pursue the strategy?
A I don't think I knew what they were going to do

149:1 A Yes.
Q And when did you first have an interaction with Miss Guerin?
A I think in October of 2000 was the first time I recall talking to her directly.
Q Okay. So you don't have a recollection of talking or dealing with her during the implementation in March?
A No.
Q And what was the occasion of your talking with her in October?
A We arranged a conference call to discuss Notice 2000-44 with her.
Q And did this have something to do with the Welles transactions?
A Yes.
Q Were you trying to determine if Notice 2000-44 covered the Welles transaction?
A Had an impact, yes.
MR. JOHNSON: All right. Why don't we -- if nobody objects, we'll break for lunch.
(Recess taken.)
(Defendant's Exhibits Waterman 2 through 9 marked.)

150:1

Q Mr. Waterman, before we broke for lunch we were talking about the March 6 letter that you sent. Do you recall talking with Virginia Welles at all about that letter?

A No.

Q Do you recall whether she at one point decided she was not going to pursue the strategy?

A No.

Q Did you ever talk with her at all about the strategy?

A Only in Florida.

Q You also mentioned before we broke KPMG. What was their involvement?

(Page 151 confidential pursuant to the protective order.)

172:1 Q So the balance was kept by Shumaker?
A Yes.
Q You say in the letter that if you waived -- if Shumaker waived a portion of the fee Jenkens would then -- would then take it for itself.
A That was my understanding.
Q Do you recall that that was the -- Jenkens' attitude at the time?
A That's my understanding.
Q You also say, if you could look at the last paragraph of Page 2, and I'll paraphrase, you say if for any reason the Welleses decide not to pursue reporting the transaction as set forth in the Jenkens opinion Shumaker wouldn't charge its fee.
A Uh-huh.
Q And was that an offer you made?
A Yes, I made it right here.
Q Okay. Was there consideration in 2000 in August or subsequently not to report the transaction as set forth in the Jenkens opinion?
A Not to my knowledge. We had the concern about Notice 2000-44.
Q Okay.
A I don't know that that ever generated an actual reconsideration on their part.

173:1 Q Did you reconsider your position about the transaction and the proper tax results as it resulted from Notice 2000-44?
A I think I said before I was concerned about it. That's why I arranged a conference call with Donna Guerin.
Q Well, did it change your opinion?
A She did, yes.
Q What did she say?
A She said that their opinion review committee had been studying this, and for two or three reasons I think she said they felt that it was not applicable to our transaction and not reflective of the law anyway and that she and they would opine through it.
Q And was this one conversation? You said it was a conference call. I guess was this one call?
A I think -- I think we might have had an earlier call but just arranging for the conference call. I think there was one substantive call.
Q Okay. And besides you and Miss Guerin, was there anybody else involved?
A Yes.
Q Who was that?
A John Ivsan.

174:1 Q Okay.
A David Welles, Senior, Deke, Jeff, and Larry Goldstein.
Q And were you and Mr. Ivsan and the Welleses and Mr. Goldstein all in one location or were you patched in?
A Just on a conference call.
Q Okay. You said Miss Guerin had two or three reasons why she felt that it didn't --
A That's my recollection.
Q What were the reasons?
A I don't recall what she was discussing then.
Q And when I asked you whether Notice 2000-44 changed your opinion on the transaction, you said that Miss Guerin did.
A Notice 2000-44 raised some concerns in my mind, and she dispelled those concerns.
Q Okay. Did you do anything in addition to talking to Miss Guerin to address your concerns?
A No.
Q So is it fair to say that you were looking to her on what impact this notice might have?
A Yes.
Q Do you recall anything Mr. Goldstein said during the conference call?

175:1 A No.
Q How about Mr. Ivsan?
A No.
Q How about any of the Welleses who were on the call?
A The only thing I recall with any precision was David, Senior saying at the end that he was satisfied with her comments.
Q Was anything ever provided in writing by Miss Guerin or Jenkens & Gilchrist on this issue of 2000-44?
A Her opinions.
Q Other than the opinions?
A Not to my knowledge.
Q Did you ever have any conversations or communications with anybody from Deutsche Bank about the Welles transactions?
A Did I, no.
Q Do you know if anybody from Shumaker did?
A John Ivsan probably did.
Q Did he ever relate to you any of the substance of those dealings?
A Only to the extent he discussed the profitability analysis that I mentioned before, how the options worked, what they were likely to produce.

176:1

Q Was he relating advice he had received from Deutsche Bank?
A I believe so, Deutsche Bank and Jenkens.
Q Is it your understanding that Deutsche Bank was to be the counter party on the option transactions?
A To the extent I understand what a counter party is, yes.
Q Okay. Well, you said you understood that long and short options were to be entered into as part of the strategy.
A Uh-huh.
Q Was there going to be another party on the opposite side of those transactions, on the opposite side of the Welleses?
A Well, there has to be. I think that's Deutsche Bank.
Q Okay. So that's your understanding of a counter party?
A Yes.
Q Okay. And do you know who Mr. Ivsan was dealing with at Deutsche Bank?
A I think David Parse, but I don't know if it was exclusively David Parse.
Q You don't know of anybody else by name?
A I know of no other names, no.

177:1 Q Do you know if Mr. Ivsan was ever provided anything in writing from Deutsche Bank about the possibility of profits on those options?
A I don't know.
Q Did you ever see anything in writing?
A No.
Q Mr. Waterman, I'm showing you what's been marked as Welles Exhibit 118, Bates stamped JFW-1308 to 1418. Have you ever seen a copy of this before?
A I think so.
Q Let me ask you about something on Page 7 of the letter starting with Bates stamp JFW-1314, the section called representations.
A Uh-huh.
Q You're welcome to read through that. My question is did you on behalf of the Welleses or Stobie Creek make any of these representations here listed to Jenkens & Gilchrist?
A Did I?
Q Yes.
A No.
Q Do you know if anybody at Shumaker did?
A I believe John Ivsan did.
Q And why do you think Mr. Ivsan did?
A Because he was the one who was interfacing between

178:1 Welleses and Jenkens & Gilchrist.
Q Well, are you assuming that he did or do you have knowledge, in fact, that he did make the representations listed here?
A I don't know specifically about A.
Q Okay. So you --
A That's just more specific than I -- than my understanding of the options extends.
Q Well, I'm just trying to find out what you know. We are going to depose Mr. Ivsan in a couple weeks.
A Uh-huh.
Q So do you know for a fact that Mr. Ivsan represented what is set forth in Subparagraph A there to Jenkens & Gilchrist?
A I don't know for a fact if he represented precisely A.
Q Do you know for a fact that he represented something else similar to A?
A Yes.
Q Okay. Tell me what that is.
A Well, he expressed it to me in the same way that Jeff did, that they thought the options could be structured to produce a reasonable expectation of profit. This is just more specific than my understanding permits.