**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **STOBIE CREEK INVESTMENTS, LLC, JFW ENTERPRISES, INC., Tax Matters and Notice Partner,** | |
| **Plaintiff,** | **No. 05-748 T &** **No. 07-520-T** |
| **v.** | **Judge Christine O.C. Miller** |
| **UNITED STATES OF AMERICA,** | |
| **Defendant.** | |

---

**THE UNITED STATES' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

---


JOHN A. DICICCO
Deputy Assistant Attorney General

DAVID GUSTAFSON
Chief, Court of Federal Claims Section

STUART D. GIBSON
Senior Litigation Counsel
U.S. Department of Justice
Tax Division, Office of Civil Litigation
Post Office Box 403
Ben Franklin Station
Washington D.C. 20044
(202) 307-6586 (Phone)
(202) 307-2504 (Fax)

CORY A. JOHNSON
JACOB E. CHRISTENSEN
Trial Attorneys, Court of Federal Claims Section

# TABLE OF CONTENTS

Page(s):

INTRODUCTION. . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . 2

I. Anticipating a $200 Million Capital Gain, The Welleses Sought A Tax Shelter.. . . . . . . . . . 2

II. The *"Basis Enhancing Derivative Structure"* Shelter.. . . . . . . . . . 3

A. Mr. Waterman Presented Jenkens' BEDS Shelter to the Welleses As a Way to Avoid Paying Taxes on the Gain from the Sale of Their Therma Tru Stock, Not As an Investment. . . . . . . . . . 4

B. Mr. Waterman's Warnings About the BEDS Shelter. . . . . . . . . . 6

III. The Welleses Implement The "BEDS" Tax Shelter. . . . . . . . . . 7

A. The Transactional Steps.. . . . . . . . . . 7

B. What Really Happened. . . . . . . . . . 8

1. The Partners of Stobie Creek. . . . . . . . . . 8

2. The Purchase of the Options. . . . . . . . . . 9

3. The Capital Gain That the Welleses Sought to Shelter from Taxation Determined the Notional Amounts and the Stated Premiums for the Options, as Well As the Naming of the Welleses' LLCs as Parties to the Options.. . . . . . . . . . 10

4. Jeff Welles' Alleged Evaluation of the Options. . . . . . . . . . 11

C. The Cost of the BEDS Shelter. . . . . . . . . . 13

IV. The Options Were Part and Parcel of a Pre-Planned, Integrated Set of Artificial Transactions Designed to Reduce Taxes, and That Did Not Provide a Reasonable Possibility of Earning a Profit. . . . . . . . . . 13

Page(s):


A. The Structure of the Foreign Exchange Digital Option Transactions On Paper. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1. The Stated Premiums Offset Each Other, and the Total Cost of All the Options Was $2,045,750, Not $204,575,000. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

2. The Two Possible Pay-Offs on Any Individual FXDOT Were a Loss of the Net Premium or a Doubling of the Net Premium. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

B. The FXDOTs are Each One Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

C. The Self-Cancelling Bets on the Dollar. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

D. There Was No Reasonable Possibility of Earning a Profit from the Options. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

1. The Options Were Vastly Overpriced. . . . . . . . . . . . . . . . . . . . . . . . 21

2. The FXDOTs Had a Negative Expected Return. . . . . . . . . . . . . . . . 22

V. Stobie Creek Claimed a $204 Million Increase in the Cost Basis For the Therma-Tru Stock Based on the BEDS Shelter.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

A. Stobie Creek Was Aware of Notice 2000-44 Before it Filed its Tax Returns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

B. Stobie Creek's Return for the Tax Year Ended April 30, 2000.. . . . . . . . . . . 24

C. Stobie Creek's Return for the Tax Year Ended December 31, 2000. . . . . . . 28

ISSUES OF FACT AND LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

DISCUSSION OF LEGAL PRINCIPLES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

I. This Court Has Jurisdiction to Determine the Partnership Items of Stobie Creek and the Applicability of Penalties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

II. The Code's Basis Rules for Partnerships.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

III. The "BEDS" Shelter Lacked Economic Substance. . . . . . . . . . . . . . . . . . . . . . . . . . 31

Page(s):

IV. Under the Step Transaction Doctrine Stobie Creek Cannot Claim the Inflated Stock Basis.. . . . . . . . . . . 33

V. The Option Pairs Should Be Treated as Single Transactions, and Not Parsed Into Separate Long and Short Components. . . . . . . . . . . 34

VI. The $204 Million Basis Increase is Precluded by Treas. Reg. §1.752-6. . . . . . . . . . 36

VII. Penalties Are Applicable Under § 6662.. . . . . . . . . . 37

A. The Gross Valuation Misstatement Penalty Is Applicable. . . . . . . . . . 37

B. The Substantial Understatement of Income Tax Penalty Is Applicable. . . . . . . . . . 37

C. The Negligence and Disregard of Rules Penalty Is Applicable. . . . . . . . . . 38

D. The Reasonable Case and Good Faith Defense Is Not Applicable. . . . . . . . . . 39

CONCLUSION. . . . . . . . . . 41

# TABLE OF AUTHORITIES

Page(s):

CASES

*ACM Partnership v. Commissioner*, 157 F.3d 231 (3rd Cir. 1998). . . . . . . . . . . . . . . . . . . . 31

*CEMCO Investors v. United States*, 2008 WL 321270 (7th Cir. 2007). . . . . . . . 32, 35, 37, 38

*Coltec Industries, Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006). . . . . . . . . . . . . . . 31

*Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945). . . . . . . . . . . . . . . . . . . . . . . . . 33

*Conway v. United States*, 50 Fed. Cl. 273 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Frank Lyon Company v. United States*, 435 U.S. 573- (1978). . . . . . . . . . . . . . . . . . . . 31, 34

*Goldstein v. Commissioner*, 364 F.2d 734 (2nd Cir. 1966). . . . . . . . . . . . . . . . . . . . . . . . . 31

*H. J. Heinz and Co. v. United States*, 76 Fed. Cl. 570 (2007). . . . . . . . . . . . . . . . . . . . . . . 33

*Illes v. Commissioner*, 982 F.2d 163 (6th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Jade Trading LLC v. United States*, 80 Fed. Cl. 11 (2007). . . . . . . . . . . . . . . . . . . . 32, 35, 37

*Keeler v. Commissioner*, 243 F.3d 1212 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*King Enterprises, Inc. v. United States*, 418 F.2d 511 (Cl. Ct. 1969). . . . . . . . . . . . . . . . . . 33

*Knetsch v. United States*, 364 U.S. 361 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Long Term Capital v. United States*, 330 F. Supp. 2d 122 (D.Conn. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32-33, 38-40

*Minn. Tea Co. v. Helvering*, 302 U.S. 609 (1938). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Neonatology Associates, P.A. v. Commissioner*, 299 F.3d 221 (2002). . . . . . . . . . . 38, 39, 40

*Novinger v. Comm'r*, T.C. Memo 1991-289. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Pasternack v. Commissioner*, 990 F.2d 893 (6th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . 40

*Santa Monica Pictures LLC v. Comm'r*, T.C. Memo 2005-104. . . . . . . . . . . . . . . . . . 33, 40

Page(s):

*TIFD III-E, Inc. v. United States*, 342 F. Supp. 2d 94 (D.Conn. 2004), *rev'd on other grounds*, 459 F.3d 220 (2nd Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . 30, 34

*United States v. Jenkens & Gilchrist, P.C*, 2005 WL 1300768 (N.D. Ill. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 40

STATUTES & REGULATIONS

Internal Revenue Code of 1986 (26 U.S.C.)

§ 165. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 36, 38
§ 358. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37
§ 704. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 30
§ 721. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
§ 722. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 30
§ 723. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 30
§ 733. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
§ 743. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 34
§ 752. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
§ 754. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 29, 34, 36
§ 988. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 35, 38
§ 989. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
§ 6011. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
§ 6626. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
§ 6662. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 37, 38
§ 6664. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
§ 7701. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
§ 7805. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

IRS Notice 2000-44. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 39

H.R. Rep. No. 795, 100th Cong., 2nd Sess. 296 (1988). . . . . . . . . . . . . . . . . . . . . . . . . 35

Pub. L. 106-554, 114 Stat. 2763A-587, 638 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . 36

S. Rep. No. 313, 99th Cong. 2d Sess. 45 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

S. Rep. No. 445,100th Cong., 2nd Sess. 311 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Treas. Reg. (26 C.F.R.)

§ 1.6662. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
§ 1.6664. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
§ 1.701. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 38
§ 1.752-6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 36
§ 1.988 .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35
§ 301.6231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STOBIE CREEK INVESTMENTS, LLC, JFW ENTERPRISES, INC., Tax Matters and Notice Partner,** | ) | |
| **Plaintiff,** | ) | **No. 05-748 T &** <br> **No. 07-520-T** |
| **v.** | ) | **Judge Christine O.C. Miller** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | **<u>DRAFT</u>** |

---

**THE UNITED STATES' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

---

## Introduction

"Quintuple your money in 17 days. No risk!" Most people who saw such a sales pitch would put it in the trash. But when the Welles family anticipated having to pay capital gains taxes on over $200 million they would receive from selling the family business in 2000, they bit on such an offer. After all, the tax deal was designed by lawyers, and accompanied by a 100-page letter, full of legalese, explaining to them why what seemed too good to be true was true – they could save $40 million in taxes by paying $2 million for short-term foreign currency options, shuffling some paper, and paying the lawyers exactly 3% of the income they wanted to shelter from taxation. At trial, the United States will prove not only that the deal was too good to be true, but also that Jeff Welles knew it.

## STATEMENT OF FACTS

### I. ANTICIPATING A $200 MILLION CAPITAL GAIN, THE WELLESES SOUGHT A TAX SHELTER

In late 1999, the Welles family decided to sell their substantial and controlling stock holdings in Therma-Tru Corporation, an Ohio-based company that manufactured exterior doors.[1] Because the stock had a very low cost basis compared to its market value, the Welles expected to realize an enormous profit of hundreds of millions of dollars upon the sale of the stock. Sometime in late 1999, Jeff Welles asked David Waterman, an attorney with Shumaker, Loop & Kendrick who represented Therma-Tru, about tax strategies that could help his family avoid paying taxes on these profits. In response, Mr. Waterman referred the Welleses to Paul Daugerdas and Donna Guerin at Jenkens & Gilchrist, a Chicago law firm.[2] On December 19, 1999, David Welles, Jr., as Chairman and Chief Executive Officer of Therma-Tru signed a letter of intent with Kenner & Co., agreeing to Kenner's proposal to acquire 50% of the stock of Therma-Tru for $425 to $440 million. That very same day, John Ivsan, another attorney with Shumaker, sent an e-mail to Donna Guerin and told her that he had a "$450 million transaction." He added that he had told the Welleses something about the tax shelter, but needed her to send him confidentiality

---

[1] The "Welles family" or the "Welleses" will refer to David Welles, Sr., Georgia Welles, David Welles, Jr., Jeffrey Welles, Christopher Welles, Peter Welles, and Virginia Welles Jordan. "Plaintiffs" will refer to JFW Investments LLC and JFW Enterprises, Inc.

[2] Mr. Waterman relates the facts about the Welleses'interest in tax strategies, and his referral to Jenkens, in an affidavit he filed in *United States v. Jenkens & Gilchrist, P.C,* 2005 WL 1300768 (N.D. Ill. 2005). In that case, the court enforced an IRS summons issued to Jenkens for information about its promotion of tax shelters. The Welleses intervened. The court rejected their claim that the attorney-client privilege barred production of Jenkens' files about their implementation of the tax shelter at issue here, and found no attorney-client privilege.

agreements for Jeff Welles, David Welles, Sr. and David Welles, Jr. to sign before he could disclose any more information to them.[3]

In December 1999, David Welles Sr., David Welles, Jr. and Jeff Welles signed confidentiality agreements with Jenkens (signed by Paul Daugerdas on behalf of Jenkens). Pursuant to these agreements, Jenkens agreed to disclose information about a tax shelter to the Welleses. The Welleses agreed that they would not disclose information about the shelter to any third party without Jenkens' approval, that Jenkens had no liability to the Welleses relating to the use of the shelter and that they and Jenkens did not have a fiduciary relationship. The other Welles family members signed similar confidentiality agreements.

## II. THE "*BASIS ENHANCING DERIVATIVE STRUCTURE*" SHELTER

In late 1999, a few lawyers at Jenkens, with the assistance of a several employees of Deutsche Bank, designed a tax shelter that was intended to create (i) artificial losses that could be used to off-set other taxable gains or (ii) artificial increases in the cost basis of assets that would decrease the taxable gain to the holders of those assets when those assets were sold. The combination of transactions in the shelter was expressly designed for tax avoidance purposes, not for any business or investment purpose. Indeed, the "target basis" needed for tax purposes governed the structure of the shelter. Knowing that the tax benefits would be disallowed by the IRS, if the IRS discovered the transactions, the designers

---

[3] Throughout this litigation, the plaintiffs have identified both Mr. Ivsan and Ms. Guerin as having information bearing on their claims in this case. The United States deposed both of them during discovery in this case. Both refused to answer any questions based on their rights under the 5th Amendment. They no longer are employed by Shumaker and Jenkens, respectively. Jenkens went out of business in 2007, and entered into a non-prosecution agreement with the United States Attorney for the Southern District of New York. In its response to plaintiffs' motion *in limine* to exclude the testimony of Mr. Ivsan, Ms. Guerin and the other witnesses who refused to testify based on their 5th Amendment rights, the United States will discuss the law that allows the Court to draw negative inferences from these witnesses' refusals to testify.

planned one final step in which the taxpayers placed the tax savings in a reserve fund for three years while they waited for the statute of limitations to run.

To provide the appearance of a business purpose for the shelter, a template foreign currency option transaction was also designed specifically for use in the shelters. The designers created the option transaction to have the appearance of separate long and short option components with large stated premiums and pay-offs. In fact, this structure was completely artificial, and the large stated premiums and pay-offs were illusory. Attorneys at Jenkens dubbed one of these shelters the "Basis Enhancing Derivative Structure."[4]

### A. Mr. Waterman Presented Jenkens' BEDS Shelter to the Welleses As a Way to Avoid Paying Taxes on the Gain from the Sale of their Therma-Tru Stock, Not As an Investment

After he signed the confidentiality agreement, Jeff Welles was given a one-page summary of Jenkens' Basis Enhancing Derivatives Structure (BEDS) shelter.[5] The summary set forth the steps and transactions that would purportedly lead to the desired goal of increasing the cost basis of an asset, and thus decreasing the amount of tax due. Some of the steps of the shelter described in the summary include the following:

- the taxpayer forms a LLC and through it enters into off-setting options by buying a "long option" and selling a "short option" on foreign currency (a "spread position");

---

[4] The United States deposed Craig Brubaker, Perry Parker, Jason Shih, and David Parse, all former employees of Deutsche Bank involved in designing, marketing or implementing the shelter and option transactions. All four refused to answer questions based on their rights under the 5th Amendment. The United States also deposed Paul Daugerdas, the former Jenkens lawyer who was principally involved in designing and marketing the tax shelter. He also refused to testify based on his rights under the 5th Amendment.

[5] "Basis Enhancing Derivative Structure" was Jenkens' name for its tax shelter using foreign currency options – it was the title of the one-page summary. In this litigation, plaintiff has tried to rename the shelter a "Digital Option Investment Strategy," and uses the acronym DOIS in its pretrial brief.

- the taxpayer forms a partnership with a third party;
- the taxpayer contributes the spread to the partnership and claims that the basis of his partnership interest is increased by the amount of the long option premium paid, but not decreased by the amount of the short option premium received as part of the spread;
- the taxpayer forms a subchapter S corporation and contributes his partnership interest to his subchapter S corporation;
- the partnership claims a "step-up' in the tax basis of assets in the partnership in the amount of the long option premium paid (and ignores the off-setting short option part of the spread); and
- the assets are sold reporting the stepped-up tax basis, and reduced capital gain.

As the title of the shelter itself indicates, this set of transactions was not marketed by Jenkens as a way to make money. In fact, Jeff Welles admittedly understood that the purpose of the BEDS shelter, including the use of foreign currency options, was to increase the purported tax basis of the Therma-Tru stock that he and his family were expecting to sell.

Jeff Welles provided copies of the BEDS summary to each member of the Welles family, and the family then discussed the shelter at a meeting in Florida on January 24, 2000. Mr. Waterman was also at the meeting to discuss the BEDS shelter. Although Mr. Waterman told the Welleses about the Jenkens shelter at the meeting, he also made it clear to them that he and his firm were *not* recommending that the Welleses pursue it.[6]

---

[6] At that January 2000 meeting, the Welles family members also discussed creating a family office and a family charitable foundation. But the creation of a family office and foundation was completely separate from the Welleses' consideration of the BEDS shelter – the two subjects were not even discussed with the same advisors or at the same time. The Welles discussed the family office and foundation only with David Herpe, a lawyer with McDermott, Will & Emery, from Chicago, and not at all with Mr. Waterman. Mr. Herpe had no knowledge of the BEDS shelter under consideration. According to Mr. Herpe, the family office and foundation did not use or need any of the transactions, entities or steps used in the BEDS shelter. The family office and BEDS shelter had different purposes.

### B. Mr. Waterman's Warnings About the BEDS Shelter

About one month after the family meeting in Florida, on March 6, 2000, Mr. Waterman wrote a letter to the Welleses. The letter was so important that Mr. Waterman circulated a draft to twelve of his partners at Shumaker for their comments. Mr. Waterman wrote the letter to "confirm and correct" – and to put in writing – "information" he had previously given the Welleses orally at the Florida meeting, as well as advise them of "recent developments in the 'tax shelter' area." For example, he advised them that if the strategy were "discovered on audit," they may be required to pay the avoided tax plus interest. He also confirmed that his firm would receive a portion of the $6 million fee payable to Jenkens for his firm's help in implementing the shelter, and that this could "bias our opinion as to the merits of the proposal." (Shumaker received one-third of the fee, about $2 million.) He then stated that,

> *I believe we have been clear that we are not recommending that you pursue their [Jenkens'] proposal....* Also, please note that the enclosed [example Jenkens' tax] opinion states, and the opinion to you will state, that it is based on certain representation made by you.... Of particular importance are the representations that you have substantial non-tax business purposes to convey the options and Therma-Tru stock to the partnership.... Because of these representations, if your tax position is successfully challenged on these grounds, you would likely have no recourse against J&G for any tax, interest and penalties that could be sought or obtained by the government. [Exhibit DX 45, emphasis added.]

On March 17, 2000, Mr. Waterman also sent a copy of this letter to Robert Floyd, the CPA who prepared the tax returns for Stobie Creek and some of the Welleses.[7]

---

[7] Mr. Floyd did not have any role in the Welleses' decision to engage in the BEDS shelter or their implementation of it. Nor did he advise them about the tax consequences.

## III. THE WELLESES IMPLEMENT THE "BEDS" TAX SHELTER

### A. The Transactional Steps

According to plaintiffs, the Welleses and Stobie Creek completed all the steps necessary to implement the BEDS shelter in a matter of a few weeks during March and April 2000, in anticipation of the redemption of the Therma-Tru stock on May 9, 2000:

- On March 3, Stobie Creek was formed;
- On March 17, David Welles Sr., David Welles Jr., Jeffrey Welles, Peter Welles, Christopher Welles, and Virginia Welles Jordan each formed a single member limited liability company (six in total);
- On March 17, David Welles Sr., David Welles Jr., Jeffrey Welles, Peter Welles, Christopher Welles, Virginia Welles Jordan and David Welles, Sr.'s 1994 trust ("trust") also each formed individually owned subchapter S corporations (seven in total);
- On or about April 3, Jeff Welles signed, on behalf of the Welleses' LLCs and the trust, fourteen option agreements with Deutsche Bank, *described* as consisting of offsetting long and short options, at a net cost of about $2 million, with a trade date of March 31 (two option agreements for each of the six LLCs and the trust);
- On or about April 3, the options were also allegedly immediately assigned by the LLCs and the trust to Stobie Creek;
- On April 14, the Welleses and the trust each allegedly contributed Therma-Tru stock to Stobie Creek;
- On April 17, all of the options expired worthless;
- On April 30, each of the Welleses purportedly transferred their respective interests in their LLCs to their respective subchapter S corporations and the trust transferred its interest in Stobie Creek to its subchapter S corporation;
- On May 9, the Therma-Tru stock was redeemed by the company, and Stobie Creek received $211 million; and
- In 2001, Stobie Creek filed its tax return for the period March 3 through April 30, 2000, and claimed that the cost basis in the Therma-Tru stock was increased by $204 million (from an initial cost basis of $3.1 million).

Each of these transactions reflected a step in Jenkens' BEDS shelter. In anticipation of these transactions, Jenkens and Deutsche Bank had already prepared the requisite template transactional documents for the Welleses to use – as they had prepared for hundreds of other taxpayers who implemented the BEDS tax shelter. The Shumaker firm

assisted the Welleses with the tasks of preparing the documentation and quickly completing the transactional steps.[8]

**B. What Really Happened**

Although it is clear that the Welleses and Stobie implemented the BEDS shelter, they did not actually carry it out in quite the way that the plaintiffs have represented. Nevertheless, the facts reinforce what is plain from the BEDS summary – the transactions at issue here were part of a prepackaged scheme wholly lacking in economic substance that the Welleses bought and implemented in order to avoid paying taxes on the $200+ million in gain they expected to realize on the sale of their Therma-Tru stock.

**1. The Partners of Stobie Creek**

Plaintiffs claim that the six Welles LLCs and the trust were the partners of Stobie from March 3 through April 30, 2000, and that the seven Welles subchapter S corporations were the partners after April 30. The factual record regarding the partners of Stobie, however, is contradictory and incomplete. David Herpe – the lawyer who drafted the Stobie operating agreement, advised the Welleses about forming Stobie as a family office, and still represents Stobie – testified that David and Georgia Welles became the first two partners of Stobie in May 2000, in their individual capacity, when they signed subscription agreements. He was not aware of, and did not assist in, the LLCs or S corporations becoming members.

Shumaker and Jenkens created the LLCs and subchapter S corporations on March 17 as part of the BEDS shelter design. In early April, they sent the Welleses "joinder

---

[8] Deutsche Bank referred to the option transactions that were used as part of the shelters as "tax trades." The United States intends to present at trial an exhibit under Federal Rule of Evidence 1006 summarizing the nearly-identically structured cookie-cutter transactions and shelters that Deutsche Bank and Jenkens sold to hundreds of other taxpayers.

agreements" for the LLCs and the trust to become partners of Stobie. John Ivsan told Donna Guerin in an email in early April that he would obtain undated joinder agreements from the Welleses, and let her fill in the dates. *At the same time*, Shumaker also had the Welleses sign assignment agreements that would allegedly effect a transfer of those very same partnership interests of the LLCs and the trust in Stobie to the Welleses' respective subchapter S corporations. These assignments were also undated so that Ms. Guerin could fill in the dates; apparently, the Welleses and Ms. Guerin kept these transactions secret from Mr. Herpe. Clearly, the LLCs' and trust's purported membership in Stobie, and the change in membership, were merely steps in the BEDS shelter, and wholly lacked substance.[9]

**2. The Purchase of the Options**

Plaintiffs allege in their complaints that each of the Welles LLCs and the trust "purchased and sold" both long and short options with stated premiums in the tens of millions of dollars, and an alleged total cost basis of $204 million. (*See* 2005 Complaint, ¶ 14(p) and (q)) In fact, discovery has revealed that the trust, owned by David Welles Sr., paid for *all* of the options, at a total cost of only $2,045,750, and the other Welleses and their LLCs did *not* contribute any money towards the purchase price of the options in 2000,

---

[9] The assignments signed by the Welleses LLCs actually purport to transfer each of their individual interests in their respective LLCs to their subchapter S corporations, not to transfer the LLCs' interests in Stobie to the subchapter S corporations. Thus, according to the assignments, the stacking of ownership interests changed from the Welleses – LLCs – Stobie, to the Welleses – S corporations – LLCs – Stobie. Stobie Creek claimed the LLCs were partners for the period March 3 to April 30, 2000, but ignored them for the period May 1 to December 31, 2000. It also claims, as discussed below, that the addition of the S corporations provided the opportunity for the basis adjustment to the Therma-Tru stock held by Stobie Creek by purportedly changing the membership of Stobie. What is abundantly clear is that the plaintiffs – aided by Shumaker and Jenkens – did not even bother to honor the essential formalities that supposedly made the BEDS shelter "work," if only on paper.

although they were named as counter-parties in the Deutsche Bank option confirmation agreements.

Plaintiffs now claim that the trust loaned money to each of the Welles's LLCs in 2000 for the purchase of the options, and that the Welleses then purportedly "repaid" the trust sometime in 2001 using proceeds received from the Therma-Tru stock redemption.[10] The plaintiffs have offered no evidence that any such loans were made – no promissory notes, no contemporaneous accounting entries, and no explicit or even tacit contemporaneous acknowledgment of indebtedness to the trust.

**3. The Capital Gain That the Welleses Sought to Shelter from Taxation Determined the Notional Amounts and the Stated Premiums for the Options, as Well As the Naming of the Welleses' LLCs as Parties to the Options**

The entire structure of these transactions was driven by the Welleses' desire to eliminate capital gains taxes on their Therma-Tru stock. Accordingly, the transactions were structured in a way to achieve the desired tax result – *not* to achieve any particular return from investing in foreign currency options. Thus, the trade confirmation agreements were issued in the name of the Welleses' LLCs and the trust because the BEDS shelter was designed so that anyone who wanted to report an increased cost basis for Therma-Tru stock had to appear to enter into currency option transactions, and contribute the options to a partnership. (*See* BEDS summary above.) It was for this reason – and this reason alone – that the option confirmation agreements were issued in the names of the LLCs, even though the LLCs did not invest any money in options.

[10] The Welleses who did not contribute any funds towards the options, therefore, boot-strapped the claimed cost basis increase in their stock pursuant to the BEDS shelter by using part of the proceeds from the sale of that stock to support a claimed previous increase in the stock's cost basis.

The large stated premiums for the options were also not determined by any investment criteria such as the amount each member of the Welles family wanted to "invest," the amount each had available to invest, or even by some rational (or arbitrary, for that matter) determination of the possible risks and rewards from investing in foreign currency options. Instead, the premium amounts were all expressly chosen to correspond to the amount of capital gain that each member of Welles family expected to realize on his or her Therma-Tru stock holdings. That is, each one of the Welleses, with the help of Shumaker and Jenkens, calculated the capital gain he or she was expecting to realize on Therma-Tru stock, and then had Deutsche Bank issue foreign currency options to each of their LLCs and the trust with *stated* premiums for a long component option in an amount that corresponded to that expected gain. Under the BEDS shelter, the Welleses intended to claim that the cost basis of their Therma-Tru stock was increased by the stated premiums of the long component options. For example, because Jeff Welles expected to realize a gain of about $20 million on his Therma-Tru stock, he structured his LLCs' two options to have long component options with stated premiums totaling just over $19 million. As indicated above and explained more fully below, none of the Welles family members actually paid those stated premiums.[11]

#### 4. Jeff Welles's Alleged Evaluation of the Options

Jeff Welles is a sophisticated investor with extensive training and experience in financial markets and products. As recounted in the complaints, he is a graduate of Dartmouth College, and has a M.B.A. from Columbia University. He was employed by Goldman Sachs & Co., one of the largest investment banks on Wall Street, from 1985 to

[11] Thus, large stated premiums corresponding to the expected capital gain could be chosen without any practical limitation such as the ability to pay the premium. It was a premium on paper only. For example, the trust paid a premium of only $193,250 for the options issued in the name of Jeff Welles' LLC.

1995, and by Lazard Freres from 1995 to 1999. He has also held several licenses issued by the National Association of Securities Dealers (NASD), including a Series 15 license for foreign currency options.

Plaintiffs claim that Jeff Welles evaluated the options himself and discussed them with others before the Welleses' LLCs and the trust entered into them. For example, Jeff Welles stated in an interrogatory answer that "David Parse [of Deutsche Bank], Neil Bresolin at Goldman Sachs and Frank Edwards at Morgan Stanley performed analysis, estimate or calculation of, or gave advice regarding the potential return from or risks of the Foreign Exchange Digital Option Transaction." David Parse, however, has refused to testify based on his rights under the 5th Amendment. And both Neil Bresolin and Frank Edwards flatly deny giving Jeff Welles advice regarding the returns or risks of these particular options in 2000. In fact, Messrs. Bresolin and Edwards admit that they didn't have the knowledge to do so, especially in light of the fact that Jeff Welles never shared with them the actual terms of the options.

Additionally, Jeff Welles admits that, despite his knowledge and experience, he did not conduct any analysis to determine the profit potential of the options, and did not determine whether they were reasonably priced, or even priced in accordance with standard option pricing methods commonly used in the industry.[12] Indeed, Jeff Welles did not perform the type of financial analysis that would have been applicable, and that he was fully capable of doing, to determine whether anyone had a reasonable opportunity to earn a profit on these particular options. This is not surprising because, as noted above, Jeff Welles knew that the premiums were determined by the amount of capital gains that he wanted to shelter,

[12] All the expert witnesses in this case (including plaintiffs') agree that the options were vastly overpriced. But the plaintiffs' experts did not include their analysis of the option pricing in their reports.

not market or investment criteria, and that the options were just a fig leaf for the real purpose of the tax shelter – artificially boosting the cost basis of the Therma-Tru stock.

Indeed, one of plaintiffs' own financial expert witnesses in this case, after talking with Jeff Welles about the transactions as preparation for submitting his report in this case, concluded that Mr. Welles did not have a good or coherent financial explanation for entering into the option transactions.

### C. The Cost of the BEDS Shelter

The costs and fees charged for implementing the BEDS strategy were expressly determined as a percentage of the amount of capital gains to be sheltered from taxation. Thus, Deutsche Bank charged $2,045,750 for the options, which was calculated as precisely 1% of the $204,575,000 of capital gains to be sheltered from taxation (because of the basis increase reported pursuant to the BEDS shelter). The fees paid to Jenkens and Shumaker were determined in the same manner. As Mr. Waterman stated in another letter to the Welleses – sent *before* they filed their tax returns – the fee is "3% of the gain to be sheltered, or in this case $204,575,000." This 3% fee of $6,137,250 was shared between Jenkens and Shumaker, with Jenkens receiving two-thirds ($4,091,500) and Shumaker receiving one-third ($2,045,750). In total, therefore, the BEDS shelter cost $8,182,825, or 4% of the capital gain that Stobie Creek claimed was sheltered from tax.

## IV. THE OPTIONS WERE PART AND PARCEL OF A PRE-PLANNED, INTEGRATED SET OF ARTIFICIAL TRANSACTIONS DESIGNED TO REDUCE TAXES, AND THAT DID NOT PROVIDE A REASONABLE POSSIBILITY OF EARNING A PROFIT

Besides the alleged transfer of ownership interests in the partnership, the illusion upon which the BEDS shelter rests is the claim that the partners purchased and sold separate long and short options, with enormous stated premiums, and that these 17-day options were investments with an objectively reasonable possibility of earning a profit. In fact, the options

were artifices created for tax purposes, and carried no reasonable possibility of profit. And, as explained in greater detail below, because the seven Euro and seven Swiss franc options in this case were intentionally structured in equal amounts, each predicated on sizeable opposing movements against the dollar, the Welleses were virtually assured that they could not earn a profit. In fact, putting aside the $6 million Jenkens and Shumaker fees, the best outcome they could realistically hope to achieve was to break even on the currency trades. When the total costs of the shelter are considered, there was no possibility of profit at all. Of course, saving $40 million in capital gains taxes may be well worth the $2 million price tag for the options and $6 million payable to the lawyers, if the shelter is not discovered by the IRS.

### A. The Structure of the Foreign Exchange Digital Option Transactions On Paper

Each of the Welleses' LLCs and the trust purportedly entered into one Foreign Exchange Digital Option Transaction ("FXDOT") based on the Euro - U.S. dollar exchange rate and one FXDOT based on the Swiss franc - U.S. dollar exchange rate. Accordingly, there were fourteen FXDOTs.[13]

All the FXDOTs had a similar structure. Each one – whether for the Euro or Swiss franc – is reflected in one confirmation agreement, but is *described* in that agreement as consisting of two components, a First Digital Option Transaction and a Second Digital Option Transaction. The First Digital Option component, viewed in isolation, is similar to a long option, and provides, on paper, that the LLC will pay a premium (the "long premium") to Deutsche Bank on the trade date in exchange for the right to receive double that premium

[13] Foreign Exchange Digital Option Transaction is the title of the transaction set forth on the Deutsche Bank confirmation agreements. Each FXDOT was assigned one reference number.

from Deutsche Bank on the expiration date, if the specified exchange rate is reached or exceeded. The Second Digital Option component, also viewed in isolation, is similar to a short option, and provides, on paper, that the LLC will receive a premium (the "short premium") from Deutsche Bank on the trade date in exchange for the obligation to pay to Deutsche Bank double that premium, if the specified exchange rate is reached or exceeded. The exchange rate on the short option is always just two "pips" away from the exchange rate in the long option.[14] Other than the premium amounts, which vary, the terms of all the Euro FXDOTs are identical and the terms of all the Swiss franc FXDOTs are identical. That is, the trade date of March 31, the expiration date of April 17, and the trigger exchange rates ("strike prices") are identical. The chart below summarizes the FXDOTs:

**<u>Chart 1</u>**

| FXDOT# | Participant | CCY Pair | Long Strike | Short Strike | Long Premium | Short Premium | Net Premium | Net Potential Payoff |
|---|---|---|---|---|---|---|---|---|
| 23996 | JFW Inv., LLC | EUR/USD | 0.9912 | 0.9914 | (9,662,500) | 9,565,875 | (96,625) | $193,250 |
| 23999 | JFW Inv., LLC | USD/CHF | 1.7027 | 1.7029 | (9,662,500) | 9,565,875 | (96,625) | $193,250 |
| 23995 | PCW Inv., LLC | EUR/USD | 0.9912 | 0.9914 | (9,902,500) | 9,803,475 | (99,025) | $198,050 |
| 24000 | PCW Inv., LLC | USD/CHF | 1.7027 | 1.7029 | (9,902,500) | 9,803,475 | (99,025) | $198,050 |
| 23994 | CSW Inv., LLC | EUR/USD | 0.9912 | 0.9914 | (9,662,500) | 9,565,875 | (96,625) | $193,250 |
| 24001 | CSW Inv., LLC | USD/CHF | 1.7027 | 1.7029 | (9,662,500) | 9,565,875 | (96,625) | $193,250 |
| 23990 | DKW Sr Inv., LLC | EUR/USD | 0.9912 | 0.9914 | (2,707,500) | 2,680,425 | (27,075) | $54,150 |
| 24004 | DKW Sr Inv., LLC | USD/CHF | 1.7027 | 1.7029 | (2,707,500) | 2,680,425 | (27,075) | $54,150 |
| 23992 | DKW Sr. 1994 Trust | EUR/USD | 0.9912 | 0.9914 | ($44,820,000) | 44,371,800 | (448,200) | $896,400 |
| 24003 | DKW Sr. 1994 Trust | USD/CHF | 1.7027 | 1.7029 | ($44,820,000) | 44,371,800 | (448,200) | $896,400 |
| 23993 | DKW Jr. Inv., LLC | EUR/USD | 0.9912 | 0.9914 | (15,870,000) | 15,711,300 | (158,700) | $317,400 |
| 24002 | DKW Jr. Inv., LLC | USD/CHF | 1.7027 | 1.7029 | (15,870,000) | 15,711,300 | (158,700) | $317,400 |
| 23997 | VJ Inv., LLC | EUR/USD | 0.9912 | 0.9914 | (9,662,500) | 9,565,875 | (96,625) | $193,250 |
| 23998 | VJ Inv., LLC | USD/CHF | 1.7027 | 1.7029 | (9,662,500) | 9,565,875 | (96,625) | $193,250 |

[14] For the Euro trading against the dollar, two pips is equal to 2/100th of one U.S. cent. For the dollar trading against the Swiss Franc, two pips is equal to 2/10,000th of a franc.

### 1. The Stated Premiums Offset Each Other, and the Total Cost of All the Options Was $2,045,750, Not $204,575,000

As the chart above shows, for each FXDOT, the stated long premium described in the agreement as owed by each LLC for the long component is always just slightly higher than the stated short premium described as owed by Deutsche Bank to the LLC for the short component. Specifically, the difference is always equal to 1% of the long premium paid by the LLCs. For example, the Euro FXDOT in the name of JFW Investments LLC states that the LLC will pay to Deutsche Bank $9,662,500 and that Deutsche Bank will simultaneously pay $9,565,875 to the LLC on March 31, the trade date. The actual net payment is only $96,625 by the LLC to Deutsche Bank – 1% of the $9,662,500 long option amount. Similarly, the total stated premiums described in the agreements as owed by the LLCs for all fourteen FXDOTs are $204,575,000, and the total stated premiums described as owed by Deutsche Bank to the LLCs are $202,529,250 . The LLCs and the trust actually owed, and the trust (not the LLCs or the individual Welles family members) paid, a total net premium of only $2,045,750.

### 2. The Two Possible Pay-Offs on Any Individual FXDOT Were a Loss of the Net Premium or a Doubling of the Net Premium

The stated pay-offs for the components of each individual FXDOTs also largely offset each other. For simplicity, we use the Euro FXDOT for JFW Investments LLC as an example to explain the pay-off structure, as described in the confirmation agreements. The same pay-off structure applies to the other FXDOTs.

In this Euro FXDOT, the stated pay-off to the LLC under the long component was triggered if the spot rate was greater than or equal to .9912 USD per Euro (the long strike) at 10:00 a.m. on April 17, 2000. However, the stated pay-off to Deutsche Bank by the LLC

under the short component was also triggered if the spot rate was greater than .9914 USD per Euro at 10:00 a.m. on April 17. Accordingly, if the spot rate was below .9912 USD per Euro on April 17, neither component option would pay off, and the LLC would lose the net premium of $96,625 that the trust paid for this FXDOT. If the exchange rate was .9914 per Euro or above, both components would pay off. As described in the FXDOT, this means that the LLC would simultaneously pay $19,325,000 to Deutsche Bank and Deutsche Bank would pay the LLC $19,131,750. In reality, Deutsche Bank would simply pay the LLC $193,250, or double the premium paid for the FXDOT. The same structure of pay-offs – a loss of the *net* premium or receipt of double the *net* premium by the LLCs – applies to each of the other Euro and Swiss franc FXDOTs, even though much larger stated pay-offs are described in each. (See Chart 2, above.)[15]

Plaintiffs claim that there is, on paper, also a third possible pay-off under each FXDOT. For example, with regard to JFW Investment LLC's Euro FXDOT, if the spot rate is exactly .9912 or .9913 USD per Euro at 10:00 a.m. on April 17, the LLC would receive $19,325,000 under the long component but would not have to pay anything under the short component. This is the alleged "200x" pay-off possibility that plaintiff references in its pre-trial brief.

All the experts in this case agree, however, that the likelihood of the spot rate being within this two pip spread at precisely 10:00 a.m. on April 17 was essentially non-existent, and did not provide a reasonable possibility of earning a profit. More importantly, Deutsche Bank reserved the sole right to chose the spot rate on April 17, and the right to disregard any spot rate that it determined was not commercially reasonable. And, the trade confirmation

---

[15] On a net basis, regardless of the spot rate on expiration, the LLCs and trust would never owe anything to Deutsche Bank when the options expired.

agreements gave no objective basis for the taxpayers to determine any spot rate other than the one chosen by Deutsche Bank. Given the decentralized nature of the foreign currency markets and the multiple bid and ask prices available at any one time, Deutsche Bank could use its discretion to choose a spot rate that did not fall within this two pip range and trigger this lottery-type pay-off.[16] Of the hundreds of taxpayers who used options in a Jenkens' tax shelter structured like these, not one achieved this lottery-type pay-off.

In fact, for purposes of its trading and risk-management system, Deutsche Bank eliminated this lottery pay-off as a possible outcome. For example, with regard to the Euro FXDOTs, Deutsche Bank actually recorded the short option component as having a strike price of .9912, not the .9914 rate described in the confirmation. With a .9912 trigger rate for both components, there was no spot rate that triggered only the long option – either both components expired out-of-the-money or both payed-off. Deutsche Bank eliminated the lottery pay-off for all the Euro and Swiss franc FXDOTs in the same manner. Thus, Deutsche Bank actually treated the FXDOTs as if they had only two possible pay-offs: the LLCs lose their net premiums or they double their net premiums.

### B. The FXDOTs are Each One Transaction

While it is true that investors can purchase and sell separate long and short options on foreign currencies, the FXDOTs that the Welleses and hundreds of other taxpayers used to carry out the BEDS shelter were, in substance, one linked transaction. The FXDOTs were designed and marketed as one transaction, and treated by everyone as one transaction. Jeff Welles also viewed each of them as one transaction. Additionally, as a practical matter they could not have been separated. To divide them into separate long and short options would

[16] At least one internal Deutsche Bank e-mail makes it quite clear that the bank will be able to choose a spot price that enables it to avoid making the lottery-type pay-off.

have required the Welleses LLCs to post hundreds of millions of dollars of margin, in addition to having to pay more than $200 million for the long component options. Only if the purported long and short components were inextricably bound in a single transaction, could the Welleses afford to enter into these options by paying the relatively small net premiums.

### C. The Self-Cancelling Bets on the Dollar

As noted above, each of the LLCs and the trust entered into two FXDOTs – one on the Euro and one on the Swiss franc. The net premiums and potential net pay-offs on the two FXDOTs entered into by each were identical. For example, the net premium for JFW Investments LLC's Euro FXDOT was $96,625 and the net premium for JFW Investements LLC's Swiss franc FXDOT also was $96,625. The net possible payoff for each was $193,250. (See Chart 2, above.) The same is true for the two sets of FXDOTs: the total premiums for the seven Euro FXDOTs ($1,022,875) equaled the total premiums for the seven Swiss franc FXDOTs ($1,022,875), and that the total possible pay-off for seven Euro FXDOTs ($2,045,750) equaled the total possible pay-off for the seven Swiss franc FXDOTs ($2,045,750) .

This equality of premiums and possible pay-offs is important because the Welleses made opposing bets on the dollar in their FXDOTs. That is, the seven Euro FXDOTs could finish in-the-money only if the dollar *depreciated* against the Euro by enough to meet those FXDOTs' strike price, and the seven Swiss franc FXDOTs could finish in-the-money only if the dollar *appreciated* against the Swiss franc by enough to meet those FXDOTs' strike price. Thus, the LLCs actually had a chance to double the total premium they paid of $2,045,575 *only* if the dollar *simultaneously de*preciated by a significant amount against the Euro and *ap*preciated by a significant amount against the Swiss franc.

If the dollar did not simultaneously move in opposite directions against these two major currencies, only one set of the options would pay off. And if only the Euro or Swiss franc options finished in-the-money, the LLCs simply would simply break even on the options. For example, if there was a pay-off only under the seven Euro FXDOTs, the LLCs would receive $2,045,750, or double the premium of $1,022,875 for those FXDOTs. Viewed alone, this would be profitable. But the LLCs also paid $1,022,875 for the seven Swiss franc FXDOTs. Overall, therefore, they would have paid $2,045,750 to earn $2,045,750. Similarly, if there was a pay-off under only the Swiss franc FXDOTs, the LLCs would only break even on the options because of the loss on the Euro FXDOTs.

It is undisputed that the Euro and Swiss franc are highly correlated against the dollar. That is, if one appreciates (or depreciates) against the dollar, the other will as well. In fact, the correlation was about .97 in 2000. (1 is perfect correlation.) Plaintiffs' own expert witness, Dr. Jeffrey Frankel, agrees that it would be unreasonable to expect the Euro and Swiss franc to suddenly move in opposite directions against the dollar simultaneously, each by the large amount required under the FXDOTs to reach the strike prices. Viewed by any objective measure, the Welleses' LLCs entered a set of options for which the best possible outcome was only breaking even (without even considering the other $6 million in costs, which ensure an overall non-tax loss from the shelter).

### D. There Was No Reasonable Possibility of Earning a Profit from the Options

The opposing bets on the dollar merely compounded the lack of a reasonable possibility of profit from the FXDOTs. The Swiss franc and Euro FXDOTs also separately each had negative expected rates of return.

### 1. The Options Were Vastly Overpriced

As explained above, the desired tax benefits dictated the structure and stated premiums for the FXDOTs. This caused them to be substantially overpriced in relation to the foreign currency option market at the time. In fact, plaintiffs' and the United States' experts all agree that the FXDOTs did not remotely reflect normal market transactions.

Dr. David DeRosa, an expert in foreign currency options, and former options trader, retained by the United States, analyzed the FXDOTs and determined that both the stated premiums and the actual net premiums paid far exceed the prices that should have been expected, and would have been available in the market. He calculated that, if viewed separately, the stated component premiums described within the Euro FXDOTs were over three times the market price, and that the stated component premiums described within the Swiss franc FXDOTs were about twice the market price. Determined on a "net" basis, the actual premiums paid for each FXDOT were about double the price an arms-length buyer would expect to pay in the market. Significantly, Deutsche Bank's internal records confirm Dr. DeRosa's calculations, and demonstrate that it knew the options were vastly overpriced. By overpaying for these options, the Welleses severely limited any return on the options. Of course, their goal was not to earn a profit, but to *appear* to seek a profit, while trying to avoid $40 million in capital gains taxes.

Plaintiffs' experts Dr. Richard Levich and Dr. Robert Kolb also analyzed the pricing of the options, and came to the same basic conclusion as Dr. DeRosa. They did not include their conclusions in their reports, however. Their calculations and conclusions were discovered in their work-papers.[17]

---

[17] This overpricing was Deutsche Bank's compensation for helping provide these "tax trades" for Jenkens' tax shelters. The overpricing also reinforces the conclusion that each FXDOT was one transaction. As one transaction, only the Welleses LLCs are paying

**2. The FXDOTs Had a Negative Expected Return**

Dr. DeRosa also calculated the possibility of earning a profit from the FXDOTs, across the entire range of possible pay-offs. Taking into account the prices paid for the options and the probability of each possible outcome being achieved, Dr. DeRosa determined that the Euro FXDOTs had an expected rate of return of about negative 77% (- 77%) and, separately, that the Swiss franc FXDOTs had an expected rate of return of about negative 60% (- 60%). That is, an investor would expect his return to be negative if he invested in either the Euro or Swiss franc options – he could not expect to earn a profit. In Dr. DeRosa's words, "no investor would have had a reasonable expectation of earning a profit on these options, and no reasonable investor seeking to earn a profit would have entered into these transactions."

These substantial negative returns do not even take into account the fees that the Welleses paid to Jenkens and Shumaker for the tax opinion letters. If the additional costs for the shelter (the Jenkens and Shumaker fees totaling about $6 million) are included, the expected returns from the options are even more negative. In sum, neither set of options individually provided a reasonable possibility of profit. And, because the separate expected returns for the Swiss franc and Euro FXDOTs are negative, there is no need to also take into account the correlation of the two currencies for a calculation of an expected return on all the options as a group. It would still be negative, only more so.

Plaintiffs' experts Dr. Levich and Dr. Kolb intend to provide opinions at trial only about their calculations of the probability of the Euro FXDOT strike price being reached or,

the inflated prices for each FXDOT – the net premium they paid to Deutsche Bank. If the components within each FXDOT are treated as separate options, however, that implies that the Welleses overpaid for long options *and* that Deutsche Bank paid the Welleses double or triple the market price for the short option components.

separately, the Swiss franc FXDOT strike price being reached. They do not take the next step of using these probabilities in a calculation that takes into account the costs of the options and the amount of the pay-offs to which the probabilities apply. In short, they did not incorporate into their reports any calculation of expected rates of return[18]

Perhaps most important, in determining their probabilities, neither of the plaintiffs' experts takes into account the high degree of correlation of the Swiss franc and Euro against the dollar. Neither has offered an opinion – nor can they now – about the probability of both strike prices being reached simultaneously. In light of the off-setting bets on the dollar, therefore, plaintiffs cannot and will not offer any evidence about even the extremely unlikely chance that, taken in total, these option transactions will finish in-the-money.

## V. STOBIE CREEK CLAIMED A $204 MILLION INCREASE IN THE COST BASIS FOR THE THERMA-TRU STOCK BASED ON THE BEDS SHELTER

### A. Stobie Creek Was Aware of Notice 2000-44 Before it Filed its Tax Returns

In August 2000 the IRS issued Notice 2000-44, which was designed to alert the public about a particular kind of abusive tax shelter. In that notice the IRS described, among other things, the type of transactions underlying the BEDS shelter, including the purported purchase and sale of offsetting long and short component options and their immediate contribution to a partnership. The IRS notified taxpayers that the tax benefits claimed from these transactions – and transactions substantially similar to them – were not permitted under existing law, and would not be allowed. Jeff Welles admits knowing of this notice before he filed Stobie Creek's tax return in February 2001. Nevertheless, Stobie Creek claimed the tax benefits of the BEDS shelter on its 2000 returns.

---

[18] Dr. DeRosa also used plaintiffs' experts probabilities for an alternative expected return calculation – and the expected returns were all still substantially negative.

### B. Stobie Creek's Return for the Tax Year Ended April 30, 2000

Plaintiffs allege that 100% of the ownership interests in Stobie Creek were transferred on April 30, 2000, when the each of the Welleses transferred interests in their respective LLCs to their respective subchapter S corporations and the trust transferred its interest in Stobie to its subchapter S corporation, and that Stobie's first tax year therefore ended on that date. Stobie Creek filed its first tax return for the period March 3 through April 30, 2000.

For that period, the only items of income, loss, or deduction reported on the return relate to the foreign currency options that the Welleses LLCs and the trust purportedly contributed to Stobie pursuant to the BEDS shelter. Stobie did not report any other investment or business income or activity. The return claimed a loss of $2,045,750, the cost of the options (that expired worthless). In attachments to the return, Stobie Creek also claimed a $204 million increase in the basis of the Therma-Tru stock (identified as "marketable securities"). In brief, Stobie Creek reported that it had "new" partners as a result of the transfers on April 30, 2000 – the Welleses' seven subchapter S corporations, instead of the Welleses' seven LLCs and the trust – and that the basis of each of these new partners in their respective partnership interests in Stobie ("outside basis") was in the millions of dollars, totaling about $207 million. It also claimed that, under §§ 743 and 754 of the Code, it could adjust the basis ("inside basis") of property held by Stobie with respect to each new partner, so that the inside basis of Stobie's property that was allocable to each "new" partner would equal that partner's outside basis.

The inside basis of the Therma-Tru stock held by Stobie, before the adjustment, was equal to the same total cost basis of the stock when it was held by the Welleses before the alleged contribution to Stobie, about $3.1 million. It had a "transferred" basis. Code. § 723.

For purposes of making the basis adjustment, Stobie allocated to each of the Welleses' subchapter S corporations Therma-Tru shares equal to the number of shares contributed just days before by the Welles family member who owned that S corporation. Thus, each of the Welleses continued to have an interest in the same number of shares of Therma-Tru stock (and gross proceeds from any sale) as they did before the stock's contribution to Stobie – in that respect nothing changed. *See* Code § 704(c).

Although not disclosed in the return, the new, enormous outside basis that Stobie reported that each of the subchapter S corporations had in their partnership interests was based on the purported contribution of the Deutsche Bank options to Stobie. As indicated in the BEDS summary, the outside basis of the partners' partnership interests are allegedly increased by the stated premium of long component options but not reduced by the stated off-setting premiums for the short component options, or by the stated obligation to pay Deutsche Bank on the short option component if those options finish in-the-money. The partnership parses the options in this artificial way despite the fact that the off-setting components are part of one transaction and contributed to the partnership together. The partnership also ignores the fact that neither the stated long or short component premiums were actually paid, and that only a much smaller net amount was paid. Here, that meant that the outside bases of the partners of Stobie were increased, pursuant to the BEDS shelter, by a total of $204,575,000, the *stated* cost of just the long component options contributed to Stobie.

The new, inflated outside basis of each of the partners is simply reported as a given fact in Stobie's return; the derivation is not explained at all.[19] Stobie Creek then claims that

[19] Putting aside the multi-million dollar boost claimed under the BEDS shelter, the outside basis for a partner who contributed stock to Stobie would be the real cost basis of the stock to the partner when contributed. Here, plaintiffs claim that the outside basis resulting

the inside basis of the Therma-Tru stock must be increased from its original cost basis to equal the total outside basis. Set forth below is a summary of the basis increases reported by Stobie for the Therma-Tru stock, as allocated to each of the Welleses' subchapter S corporations:

**Chart 2**

| S-corp. | Basis of Therma Tru stock before adjustment | Claimed Increase in Cost Basis | Outside Basis and New Adjusted Basis of Stock |
|---|---|---|---|
| DKW, Sr. | $164,528 | $5,415,000 | $5,579,528 |
| Welles, Inc. | $1,204,370 | $89,640,000 | $90,844,370 |
| DKW, Jr. | $596,320 | $31,740,000 | $32,336,320 |
| JFW | $306,819 | $19,325,000 | $19,631,819 |
| CSW | $302,148 | $19,325,000 | $19,627,148 |
| PCW | $303,788 | $19,805,000 | $20,108,788 |
| VJ | $302,151 | $19,325,000 | $19,627,151 |
| Totals: | $3,180,124 | $204,575,000 | $207,755,124 |

Thus, Stobie Creek claimed that the adjusted cost basis of the Therma-Tru stock to be used for any sale of the stock was now $204 million greater than it had been just days before. The taxable capital gain passed through to the partners, therefore, would be $204 million less than it was just days before. The (undisclosed) cause of this increase in cost basis and reduction in potential capital gain was the purchase of options at a cost of slightly more than $2 million.

The claimed benefit of the shelter can be further demonstrated with an individual example. According to plaintiffs, Jeff Welles had a cost basis in his Therma-Tru stock of $306,819 on April 14, 2000, when he purportedly contributed the stock to Stobie. After he contributed the stock to Stobie, those same shares (and the gross proceeds realized from any sale) remained allocated and taxable to him, and the stock had the same low cost basis.

---

from the stock contributions totaled $3.1 million. *See* Code § 722.

Plaintiffs claim, however, that because of his LLC's previous contribution to Stobie (on April 3, 2000) of options that cost $193,250 – and that contained within them a description of purported long component options with stated premiums of $19,325,000 – the cost basis of the shares allocated to Jeff (inside basis) was increased by $19,325,000, as of April 30, 2000. Any capital gains taxable to him on a sale of the stock would, therefore, also be reduced by $19,325,000. The increase purportedly occurred on April 30 because that was the day Jeff's interest in Stobie was transferred from one pocket to the other, *i.e.*, from his LLC to his subchapter S corporation.

In sum, by spending $193,325 and executing a few pre-planned transactions with himself – transactions that had no conceivable business purpose outside the BEDS tax shelter scheme – Jeff Welles was able to allegedly reduce his taxable gain on the future sale of his Therma-Tru stock by $19,325,000, or 100 times the amount actually paid for the options. This is the essence of the "Basis Enhancing" shelter.

### C. Stobie Creek's Return for the Tax Year Ended December 31, 2000

The Therma-Tru stock was redeemed on May 9, 2000, after Stobie's first tax year purportedly ended on April 30, 2000. Thus, Stobie's second 2000 tax return, for the period May 1, 2000 through December 31, 2000, reported the gain on the Therma-Tru stock. Using the alleged benefit of the BEDS shelter, Stobie reported a gain of only $5,442,303 on the stock, which then flowed thru to the Welleses. Of course, Stobie and the Welleses enjoyed a real economic gain that exceeded $200 million (less the $8 million they paid for the shelter). The BEDS shelter impacts only the taxable gain – not real economic gain.

Because the BEDS shelter was implemented – and the basis increase claimed – on the tax return for the year ended April 30, 2000, but the reduced gain was reported on the

return for the year ended December 31, 2000, the IRS issued FPAAs for both years. Plaintiffs filed petitions with regard to both FPAAs, and the cases were consolidated.

**ISSUES OF FACT AND LAW**

The following issues of law and fact are presented in these cases:

1. Whether the claimed $204 million inflation of the Therma-Tru stock's cost basis should be disallowed because the transactions upon which plaintiffs rely to increase their basis lacked economic substance;

2. Whether any one of the intermediate steps undertaken by the Welleses pursuant to the BEDS strategy – including the purported transfer of partnership interests in Stobie Creek from their LLCs and trust to their S corporations, the contribution of the Therma-Tru stock to Stobie Creek and the contribution of options to Stobie Creek – should be disregarded for tax purposes under the step-transaction doctrine, and the $204 million basis inflation therefore disallowed;

3. Whether the transactions that generated the artificial basis inflation, the purported transfer of ownership of Stobie Creek from the Welleses' single-member LLCs and the trust to their wholly-owned subchapter S corporations and the contribution of options to Stobie, should be disregarded, because they lack any valid non-tax business purpose;

4. Whether the artificial basis increase should be disallowed as to the Welleses and purported Stobie partners who claimed the benefits of that basis increase but did not, in fact, pay for the transactions that allegedly generated the basis increase;

5. Whether Treas. Reg. § 1.752-6 is valid as applied retroactively, and disallows all but $2 million of the $204 million increase in the outside basis of Stobie Creeks' partners that plaintiffs claim resulted from the contribution of the options;

6. Whether, under the substance-over-form doctrine or § 988 of the Code, the FXDOTs should be treated as one transaction rather than separate long and short options; and

7. Whether penalties are applicable under § 6662 of the Code at the partnership level.

## DISCUSSION OF LEGAL PRINCIPLES

### I. THIS COURT HAS JURISDICTION TO DETERMINE THE PARTNERSHIP ITEMS OF STOBIE CREEK AND THE APPLICABILITY OF PENALTIES

Under § 6226(f), this Court has jurisdiction to determine all the partnership items of Stobie Creek, and the applicability of penalties relating to those partnership items, for the tax years ended April 30, 2000, and December 31, 2000. An increase in the cost basis of partnership assets, pursuant to § 754, such as Stobie Creek claims with respect to the Therma-Tru stock, is specifically defined as a partnership item in Treas. Reg. § 301.6231(a)(3)-1(a)(3).[20]

### II. THE CODE'S BASIS RULES FOR PARTNERSHIPS

In the background of these cases are the Code's basis rules for partnerships. A brief summary is useful.

---

[20] Plaintiffs have the burden of proof in this case. *TIFD III-E, Inc. v. United States*, 342 F.Supp.2d 94, 108 (D.Conn. 2004), *rev'd on other grounds*, 459 F.3d 220 (2nd Cir. 2006). The United States asserts, however, that it should prevail on the facts and the law, regardless of which side bears the burden of proof.

Generally, when a partner contributes property to a partnership in exchange for a partnership interest, no gain or loss is recognized. *See* Code § 721. A partner's basis in a partnership interest ("outside basis") acquired by contribution of property is generally equal to the basis of the property to the partner at the time of contribution, plus the value of any money contributed. *See* Code § 722. The assumption by the partnership of a liability of a partner, however, decreases the partner's outside basis. See Code §§ 733 and 752(b).

The partnership's basis in the contributed property ("inside basis") is the basis that the property had when it was in the partner's hands. *See* Code §§ 723 and 7701(a)(43). If property with a built-in gain is contributed to a partnership, that gain at the time of contribution is generally taxable to the contributing partner upon sale of the asset. *See* Code § 704(c).

Underlying these, and all other, Code provisions are the fundamental doctrines that govern application of the tax law. These include the principle that the substance of transactions, not their form, determine their treatment under the tax law, and the principle that courts must look to the objective economic realities of transactions, and are not bound by the parties' written descriptions of transactions. *See Frank Lyon Company v. United States,* 435 U.S. 573- 74 (1978).

## III. <u>THE "BEDS" SHELTER LACKED ECONOMIC SUBSTANCE</u>

Under the economic substance doctrine, transactions that may literally comply with the terms of the Code, but lack economic substance, are disregarded for tax purposes. *Coltec Industries, Inc. v. United States,* 454 F.3d 1340, 1352 (Fed. Cir. 2006). In *Coltec*, the Federal Circuit set forth five principles relevant to determining whether transactions that allegedly create tax benefits, such as the BEDS shelter and the options it relies upon, lack economic substance. First, the law does not permit taxpayers to reap tax benefits from

transactions that "lack economic reality." Second, the taxpayer bears the burden of proving that the relevant transaction has economic substance. Third, the relevant transaction must be viewed objectively rather than subjectively. For example, in a purported financial transaction, there must be an objectively reasonable possibility of profit. Fourth, the specific transaction that allegedly gives rise the tax benefit is the one analyzed for economic substance. The fact that the tax-benefit transaction may be connected to other legitimate activities and transactions is irrelevant. Fifth, arrangements that do not affect the economic interests of third parties should receive particularly close scrutiny. *Id* at 1355 - 57. The $204 million basis increase claimed by Stobie Creek must be disallowed when these principles are applied here. *See also Knetsch v. United States*, 364 U.S. 361 (1960), *ACM Partnership v. Comm'r*, 157 F.3d 231 (3rd Cir. 1998), and *Goldstein v. Comm'r*, 364 F.2d 734 (2nd Cir. 1966).

The Welleses' implementation of the BEDS shelter consisted of an artificial and prepackaged set of transactions designed for the specific purpose of generating a tax benefit. In particular, the claimed inflation of the stock's cost basis by $204 million based on purchasing options that cost only $2 million lacks any economic reality. *See, e.g., Jade Trading LLC v. United States*, 80 Fed. Cl. 11 (2007), and *CEMCO Investors v. United States*, 2008 WL 321270 (7th Cir. 2007) (*CEMCO* concerned Paul Daugerdas's use of the BEDS shelter to reduce his own income tax liabilities). The purported purchase of options by the LLCs and trust and their simultaneous contribution to Stobie, as well as the purported simultaneous change in ownership of Stobie, also each lacked any economic (*i.e.*, non-tax business) purpose. This is especially true here where the LLCs did not actually pay for the options, and the amounts of the options were determined solely to increase the outside bases of the "new" partners in the amount needed to purportedly eliminate their capital gains.

The options themselves also lacked economic substance, or an objective reasonable possibility of profit. Because of the artificial, non-market pricing and terms, they each individually had a negative expected return. Moreover, taken together as a whole, the only realistically possible outcomes were losing the entire net premium or breaking even. Furthermore, when the total costs of the shelter are considered, the return is negative even if the near-impossible occurred, and all the options finished in-the-money: Stobie would have paid $8 million to receive only $4 million. *See, e.g., Long Term Capital v. United States,* 330 F.Supp.2d 122, 172-85 (D.Conn. 2004) (transaction lacked economic substance because it did not have reasonable expectation of non-tax profit considering costs, including legal fees). When any one of these transactions – the options themselves, the contribution of the options to Stobie, the purported change in Stobie's membership or the entire scheme – is disregarded under the economic substance doctrine, the claimed tax benefits disappear.

Finally, because the economic substance inquiry is objective, Jeff Welles, and the other Welleses subjective beliefs, about the options are irrelevant. The fact that Stobie Creek now functions as a family office, engaging in other legitimate activities, is also irrelevant.[21]

## IV. UNDER THE STEP TRANSACTION DOCTRINE STOBIE CREEK CANNOT CLAIM THE INFLATED STOCK BASIS

The purpose of the step transaction doctrine is to ensure that "tax consequences turn on the substance of a transaction rather than on its form." *King Enterprises, Inc. v. United States*, 418 F.2d 511 (Cl. Ct. 1969). As the Supreme Court has noted, to permit the nature of transactions to be "disguised by mere formalisms," that exist solely to alter tax liabilities,

[21] Because the transactions lacked economic substance, Stobie Creek, and ultimately the Welleses, cannot deduct the net option fee or other losses. *See, e.g., Keeler v. Comm'r*, 243 F.3d 1212, 1217 (2001) and Code § 165(c)(2).

"would seriously impair the administration of the tax policies of Congress." *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945). Although the doctrine has been articulated through different tests – *e.g.*, the "interdependence test" and "end-result test" – the essence of the doctrine is that seemingly separate steps must be "taken together in attaching tax consequences." *King Enterprises, 418 F.2d at 516. See also H. J. Heinz and Co. v. United States,* 76 Fed. Cl. 570 (2007); *Long Term Capital*, 330 F.Supp.2d at 191 (contribution of stock to partnership disregarded); and *Santa Monica Pictures LLC v. Comm'r*, T.C Memo 2005-104 (contributions of property to partnership disregarded).

Here, it cannot be disputed that the individual S corporations' immediate substitution as partners of Stobie Creek, the appearance of the LLCs and trust purchasing options, and immediately contributing them to Stobie Creek, and the funneling of the redemption of the Therma-Tru stock through Stobie Creek were merely component parts of an interconnected, pre-planned series of artificial steps, undertaken pursuant to the BEDS shelter for tax purposes. The end result was always understood as the redemption of the Welleses' Therma-Tru stock by the company. *See, e.g.*, *Minn. Tea Co. v. Helvering*, 302 U.S. 609, 613 (1938) ("A given result at the end of a straight path is not made a different result because reached by following a devious path."). When any of one these steps is disregarded, Stobie Creek cannot claim a basis increase pursuant to §§ 743 and 754.[22]

[22] Treas. Reg. § 1.701-2, the anti-abuse regulation applies here, and also results in a recharacterization of the BEDS shelter transactional steps. For the tax year ended April 30 (when the BEDS shelter was implemented) Stobie Creek was used for the purpose of reducing the partners aggregate tax liabilities. *See* Treas. Reg. § 1.701-2(b). Thus, the artificial steps, as well as the use of the partnership entity, should be disregarded, and the basis inflation disallowed.

## V. THE OPTION PAIRS SHOULD BE TREATED AS SINGLE TRANSACTIONS, AND NOT PARSED INTO SEPARATE LONG AND SHORT COMPONENTS

The claimed $204 million basis increase of the Therma-Tru stock rests on plaintiffs' claim that the options contributed to Stobie Creek consisted of separate long and short options, and that the short options, as separate, allegedly "contingent" liabilities (in the amount of $202 million), can be disregarded in determining the partners' outside basis. This argument relies merely on the shelter promoters' description of the transaction, however, and ignores the actual substance and economic realities. *See, e.g., Frank Lyon, supra*, and *TIFD III-E, Inc. v United States*, 459 F.3d 220 (district court erred "by accepting at face value the appearances and labels created by partnership, rather than assessing the underlying economic realities"). Under both the substance-over-form doctrine and Treas. Reg. § 1.988-2(f), each FXDOT must be treated as single transaction.

As explained above, the FXDOTs were each reflected in one agreement, and were treated economically and practically as single spread transactions. They were purchased and sold as single transactions, for a total net premium of $2 million. Under no circumstances would Stobie Creek have any liability to Deutsche Bank upon the options' expiration. There is no evidence that these FXDOTS – or the hundreds of similarly-structured spread transactions employed by other shelter participants – would have or could have been separated into components. As this Court stated in *Jade* with regard to similar transactions, the purportedly separate components were "totally dependent on one another from an economic and pragmatic standpoint." *Jade,* 80 Fed. Cl. at 51. When the options are treated according to this economic reality, the increase in the partners' outside basis (and increase in the Therma-Tru stock basis) can be at most $2 million, the actual premium paid. *See also CEMCO, supra*.

Treas. Reg. 1.988-2(f) also requires that the purported long and short components of each FXDOT be treated as one transaction. Plaintiffs claim that the options are governed by § 988. *See* Code § 988(c)(1)(B)(iii). Section 988(a)(1)(A) provides that gain and loss on § 988 transactions are computed separately. However, Treas. Reg. § 1.988-2(f) expressly provides that "if the substance of a transaction described in § 1.988-1(a)(1) differs from its form, the timing, source, and character of the gains or losses with respect to such transaction may be recharacterized by the Commissioner in accordance with their substance.... In applying the substance over form principle, separate transactions may be integrated where appropriate." *See also* Code §§ 989(c) and 988(d)(1). The options here should be treated according to their substance, and integrated under this authority, as well as under the judicial substance-over-form doctrine.[23]

## VI. THE $204 MILLION BASIS INCREASE IS PRECLUDED BY TREAS. REG. § 1.752-6

Plaintiffs do not dispute that if Treas. Reg. § 1.752-6 is applicable to the contribution of the options to Stobie Creek, it precludes the claimed $204 million increase of the Therma-Tru stock's cost basis. Under this regulation, the outside basis of a partner is decreased in the amount of any contingent or fixed liability contributed to the partnership. *See* Treas. Reg. § 1.752-6(a) and Code § 358(h)(3). Thus, *if* the option components are treated separately, a $204,575,000 increase in outside basis based on the stated premium of the long

[23] Plaintiffs' citation (at p. 15) of Treas. Reg. § 1.988-1(e) is incomplete and misleading. The introductory clause of the passage they cite clearly states that it applies "Except as otherwise provided in these regulations." Thus, Treas. Reg. § 1.988-1(f) remains applicable. The case law plaintiff cites is also inapposite. *See, e.g.*, *Jade*, 80 Fed. Cl. at 51. It should also be noted that the legislative history of section 985 through 989 reflects a consistent concern about tax-motivated transactions. S. Rep. No. 313, 99th Cong. 2d. Sess. 45 (1986). *See also* H.R. Rep. No. 795, 100th Cong., 2nd Sess. 296 (1988), and S. Rep. No. 445,100th Cong., 2nd Sess. 311 (1988).

option components is simultaneously off-set by a $202,529,250 million decrease based on the stated amount of the obligation under the short option components contributed to Stobie Creek. The outside basis increase (and inside basis increase under §754) would be only a net $2,045,750. Plaintiffs' concede this result under the regulation, but claim that the regulation cannot be retroactively applied to the option contributions in 2000.[24]

The regulation was issued in a temporary form in 2003, and later made permanent. It was expressly authorized – indeed mandated – by the Community Renewal Tax Relief Act of 2000, however. *See* Pub. L. 106-554, 114 Stat. 2763A-587, 638 (2000). In § 309(c) and (d) of the Act, Congress instructed the Treasury Department to issue such a regulation, and also expressly stated that the regulation "shall apply to assumptions of liability after October 19, 1999, or such later date as may be prescribed in such rules." Treas. Reg. § 1.752-6 follows this statutory authorization, and applies to a partnership's assumption of liabilities after October 19, 1999, but before June 24, 2003. *See also* Code § 7805(b)(6). As the Seventh Circuit recently held in *CEMCO*, *supra,* the regulation is valid, applicable to a purported contribution of a short option obligation in 2000, and precludes the tax benefits plaintiffs claim.[25]

---

[24] This regulation does not render moot the economic substance doctrine, step transaction doctrine, §165(c) of the Code and other relevant law. These other rules preclude any tax benefits at all from the shelter, and these other doctrines may be relevant to the application of penalties.

[25] In addition to being irrelevant, plaintiffs complaint that the regulation changed the law, rings hollow. As applied here, the regulation is simply a backstop to the result that otherwise obtains under the existing law of economic substance and substance-over-form. *Id*. Additionally, taxpayers were on notice in 2000 when the Act was passed that regulations were forthcoming, effective as of October 1999, that would explicitly require a decrease in a partner's outside basis in the amount of any contingent liability contributed to a partnership, just as the new § 358(h)(3) did in the corporate context.

## VII. PENALTIES ARE APPLICABLE UNDER § 6662[26]

### A. The Gross Valuation Misstatement Penalty Is Applicable

A 40% gross valuation misstatement penalty applies if the value or adjusted basis of any property claimed on any return is 400% or more of the correct amount. Code § 6662(e)(1) and (h). According to plaintiff, the original cost basis of the Therma-Tru stock, without the benefit of the BEDS shelter, was about $3.1 million.[27] By claiming in its returns that the stock had a basis of $207 million, the 400% threshold is easily surpassed. Thus, the 40% penalty automatically applies, unless plaintiffs can prove a partnership-level defense. *See Jade,* 80 Fed. Cl. at 54, and *Conway v. United States,* 50 Fed. Cl. 273 (2001).

### B. The Substantial Understatement of Income Tax Penalty Is Applicable

The 20% substantial understatement of income tax penalty is applicable if the understatement exceeds 10% of the correct tax or $5,000. Code § 6662(d). This understatement calculation must be done later with regard to the taxpayers ultimately behind Stobie Creek. Treas. Reg. § 301.6221-1(d). Here, in this partnership-level proceeding, however, the Court can determine whether a reduction of the understatement is warranted because it was based on "substantial authority." Code § 6662(d)(2)(B). Whether the substantial authority standard is met is an objective test, based on the relevant statutes, regulations and case law. A taxpayer's subjective beliefs are irrelevant. *See* Treas. Reg. § 1.6662-4(d)(2) and (3) and *Long Term Capital*, 330 F.Supp.2d at 200 n. 100.

---

[26] The United States recently briefed the issue of this Court's jurisdiction to determine penalties and partnership-level defenses to penalties. (See docket entry 73.) It will not repeat that discussion here.

[27] Stobie Creek's December 31, 2000 return indicates that the cost basis may have actually been lower than $3.1 million when the stock was redeemed.

A special rule applies for tax shelters. In addition to showing substantial authority, there must also have been a reasonable belief that the tax treatment claimed was more likely than not the correct treatment, and the adequate disclosure defense does not apply. Code § 6662(d)(2)(C) (2000). This rule applies to the BEDS shelter. *See, e.g., Long Term Capital*, 330 F.Supp.2d at 201.

For the reasons discussed above, substantial authority for inflation of the Therma-Tru stock's basis by $204 million did not exist.[28] And, for all the reasons discussed below with regard to plaintiffs' reasonable cause defense, there also could be no reasonable belief that this basis increase was correct. *See* Treas. Reg. § 1.6662-4(g)(4)(ii)

**C. The Negligence and Disregard of Rules Penalty Is Applicable**

A 20% penalty is also applicable if a taxpayer was negligent or carelessly or recklessly disregarded relevant rules and regulations. Code § 6662(c) and Treas. Reg. § 1.6662-3. The standard is objective. *Neonatology Associates, P.A. v. Comm'r*, 299 F.3d 221, 233 (2002).

Under this standard, a reasonably prudent person must investigate purported tax benefits when they appear "too good to be true." *Id*. Here, Stobie Creek was allegedly told by the promoters of the shelter, who were charging an $6 million fee for the shelter – calculated as 3% of the income to be sheltered from taxation – that the purchase of options costing $2 million would result in avoiding tax on a $204 million gain. Stobie Creek did not

---

[28] Plaintiffs' reliance on *Helmer*, and the other cases they cite, is misplaced. Those cases concerned facts very different from the BEDS shelter and FXDOTs at issue here. For example, there was no separate and independent "contingent liability" in the FXDOTs. *See, e.g., Cemco*, *supra*. Moreover, *Helmer* does not negate the substance-over-form doctrine, § 988 of the Code, the economic substance doctrine, Treas. Reg. §1.701-2, § 165(c) of the Code, and the step transaction doctrine, all fundamental parts of the tax law that clearly precluded the tax treatment claimed for the BEDS shelter transactions. *Helmer,* by itself*,* does not define the relevant tax law. *See CEMCO, supra*.

obtain any independent, objective advice about these alleged tax benefits, or the substance of the transactions underlying the shelter. Moreover, it intentionally disregarded Notice 2000-44, which made the BEDS shelter a listed transaction under § 6011, and did not report the transaction as required by the Code and regulations. For these reasons, and based on the facts expected to be proven at trial, this penalty is applicable. *Id* at 233 - 34.

**D. The Reasonable Cause and Good Faith Defense is Not Applicable**

Under § 6664(d), no penalties are imposed if plaintiffs can show that Stobie Creek acted with reasonable cause and good faith. Here, this is based on partnership-level determinations.

Plaintiffs argue that Stobie Creek relied upon Jenkens' advice regarding the tax benefits, and that this was reasonable. Purported reliance on professional advisors does not necessarily satisfy the reasonable cause and good faith standard, however. The advice must be based on all the pertinent facts and circumstance, and cannot be based on unreasonable factual or legal assumptions (including assumptions about future events). The advice also must take into account the purpose of the taxpayer for entering into a transaction, and structuring it in a particular manner. The advice is not adequate if the taxpayer fails to disclose facts that it knows, or should know, are relevant, or if the advice relies upon representations of the taxpayer or any other person that the taxpayer knows, or has reason to know, are unlikely to be true. *See* Treas. Reg. § 1.6664-4(c); *Long Term Capital*, 330 F.Supp.2d at 206, and *Santa Monica Pictures,* 2005 WL 1111792, at 91 -2. It is also unreasonable to rely on a professional that has a conflict of interest, such as a tax shelter promoter. *Neonatology,* 299 F3d at 234; *Pasternack v. Comm'r*, 990 F.2d 893, 903 (6th Cir. 1993); *Illes v. Comm'r*, 982 F.2d 163 (6th Cir. 1992); *Novinger v. Comm'r*, T.C. Memo.

1991-289. Any attempt to conceal the tax benefits also negates good faith. *Long Term Treas*. 330 F.Supp.2d at 211.

The advice plaintiffs now point to as support for their reasonable cause defense do not meet these standards.[29] Jenkens and Shumaker were promoters that sold the BEDS shelter to the Welleses, not independent professionals. Indeed, a sample Jenkens' opinion was provided to the Welleses as part of the firm's marketing efforts. Moreover, the Jenkens opinions are based on unreasonable and erroneous representations and assumptions of fact, as well as incomplete and erroneous discussions of the applicable law.[30] For these reasons, and others to be presented at trial, plaintiffs did not have reasonable cause for claiming an artificial $204 million basis boost, and did not rely in good faith on an opinion letter written by the developer of the BEDS shelter, for which they paid 3% of the gain they attempted to shelter from taxation.

**Conclusion**

For all the above reasons, this Court should dismiss plaintiffs petition, and uphold all the determinations in the FPAAs issued to Stobie Creek.

---

[29] Although plaintiffs claim that Stobie Creek relied upon the Jenkens' opinion, the Welleses, when they intervened in the Jenkens IRS summons enforcement case, represented by the same counsel as plaintiffs are here, told the court in that case that "There is no evidence that Document K [the Jenkens' opinion letter] was actually used by any tax preparer to prepare a tax return after the document was received in February 2001. Under these circumstances, the tax opinion should remain privileged." Intervenors' Memorandum in Opposition to Motion to Compel, p. 10, filed December 16, 2004, *United States v. Jenkens & Gilchrist*, 2005 WL 1300768 (N.D. Ill. 2005) (No.03-5693).

[30] For example, Jeff Welles cannot rely on a Jenkins opinion which relied upon the accuracy of his representation that he purchased options that he did not pay for. Nor can he rely upon his representation that these grossly-overpriced options presented a reasonable opportunity for profit, especially when he structured the options in such a way as to virtually guarantee that the best possible outcome on the options was breaking even. And when all costs are considered, a loss was inevitable.

Respectfully submitted,

*s/ Stuart D. Gibson*

Stuart D. Gibson
Attorney of Record
U.S. Department of Justice
Tax Division
Office of Civil Litigation
Post Office Box 403
Ben Franklin Station
Washington D.C. 20044
(202) 307-6586

John A. DiCicco
Deputy Assistant Attorney General
David Gustafson
Chief, Court of Federal Claims Section
Cory A. Johnson
Trial Attorney, Court of Federal
Jacob E. Christensen
Trial Attorney Court of Federal
Claims Section

*s/ David Gustafson*
Of Counsel

Dated: March 12, 2008