**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STOBIE CREEK INVESTMENTS, LLC, JFW ENTERPRISES, INC., Tax Matters and Notice Partner,** | ) | |
| **Plaintiff,** | ) | **No. 05-748 T &** |
| | ) | **No. 07-520-T** |
| **v.** | ) | |
| | ) | **Judge Christine O.C. Miller** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

# THE UNITED STATES' RESPONSE TO PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE DEPOSITION TESTIMONY


JOHN A. DiCICCO
Deputy Assistant Attorney General

DAVID GUSTAFSON
Chief, Court of Federal Claims Section

STUART D. GIBSON
Senior Litigation Counsel
U.S. Department of Justice
Tax Division, Office of Civil Litigation
Post Office Box 403
Ben Franklin Station
Washington D.C. 20044
(202) 307-6586 (Phone)
(202) 307-2504 (Fax)

CORY A. JOHNSON
Trial Attorney, Court of Federal Claims Section

**TABLE OF CONTENTS**

Page(s):

Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Arguments

I. The Court May Properly Draw Adverse Inferences From Assertions of the Fifth Amendment, Whether or Not the Witness is a Party. . . . . . . . . . . . . . 7

II. This Court Should Draw Adverse Inferences Against the Plaintiffs Based on the Refusal of each of These Seven Witnesses to Testify in Reliance on the Fifth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**TABLE OF AUTHORITIES**

CASES

*CEMCO v. United States*, 517 F.3d 749 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Cerro Gordo Charity v. Fireman's Fund America Life Insurance Co.*, 819 F.2d 1471 (8th Cir.1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 13

*Federal Deposit Insurance Corp. v. Fidelity & Deposit Co. of Maryland*, 45 F.3d 969 (5th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10

*LiButti v. United States*, 107 F.3d 110 (2nd Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*RAD Services, Inc. v. Aetna Casualty & Surety Co.*, 808 F.2d 271 (3rd Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509 (8th Cir.1984). . . . . . . . . . . . . . . . . . . . . . 9

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STOBIE CREEK INVESTMENTS, LLC, JFW ENTERPRISES, INC., Tax Matters and Notice Partner,** | ) | |
| **Plaintiff,** | ) | **No. 05-748 T** |
| | ) | **No. 07-520 T** |
| **v.** | ) | **(Judge Christine O.C. Miller)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**THE UNITED STATES' RESPONSE TO PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE DEPOSITION TESTIMONY**

For the reasons set forth below, the Court should deny the plaintiffs' motion in limine which seeks to exclude testimony of witnesses who have refused to answer questions in reliance on their Fifth Amendment privilege against self-incrimination.[1]

At the outset, it is important to understand that the motion is, in fact, misnamed in two important respects. First, the plaintiffs are **not** seeking to prevent the United States from offering substantive testimony from these seven witnesses. Indeed, the plaintiffs themselves identified four of these witnesses – Donna Guerin, Paul Daugerdas, John Ivsan and David Parse – as persons upon whom they allegedly relied to purchase and implement a tax shelter that, they claim, enabled them to legitimately reap $40 million in tax benefits, all for placing only $2

[1]The witnesses who refused to answer specific questions posed by counsel for the United States during depositions taken in this case are David Parse, Craig Brubaker, Perry Parker, Jason Shih, Paul Daugerdas, Donna Guerin, and John Ivsan. The United States has filed a separate motion, seeking to offer the testimony of these witnesses through their depositions, instead of requiring them to appear at trial and invoke their Fifth Amendment privileges in response to each question (as they had already done in their depositions). The United States is also issuing subpoenas to the witnesses in case the Court prefers live testimony or the United States determines that their presence at trial is required.

million at risk. It is reasonable to assume that if any of these witnesses were prepared to offer testimony favorable to the plaintiffs' case, and which would not tend to incriminate them, the plaintiffs would have listed them as witnesses, and sought to compel them to appear for trial.

What the plaintiffs **are** seeking to do is prevent the Court from drawing adverse inferences from these witnesses' refusal to answer specific questions posed at their depositions about their involvement in designing, marketing and implementing these Son of BOSS tax shelters. Thus, what the plaintiffs have filed is **not** a motion in limine seeking to exclude their testimony at trial. Instead, they have asked the Court to decline to draw adverse inferences against the plaintiffs because these witnesses each invoked their Fifth Amendment privilege.

Second, the plaintiffs mistakenly allege that these witnesses made "blanket assertions of the Fifth Amendment privilege." In fact, defendant's counsel posed specific questions to each of these seven witnesses, designed to elicit testimony about their role in designing, marketing and implementing these tax shelters. Each witness whom the plaintiffs identified as having relied upon to engage in these transactions was asked about their dealings with the plaintiffs, and their involvement in the transactions that the plaintiffs engaged in. Each witness could have chosen which questions to answer, and which not to answer, depending upon whether the witness reasonably believed that the answer to any particular question might tend to incriminate him- or herself.[2]

---

[2]If either the plaintiffs or the defendant believed that the witness did not have a valid reason under the Fifth Amendment to refuse to answer any specific question, that party could have filed a motion to compel the witness to answer. And the Court would then have had to decide the merits of each particular claim of privilege. Neither party filed such a motion.

At their depositions, each of these seven witnesses who refused to answer questions in reliance upon their privilege against self-incrimination did so in response to a lengthy series of specific questions posed by counsel for the United States. Each deposition lasted for hours and in each, counsel for the United States asked the witness a series of specific questions designed to discover information within the scope of RCFC 26(a).[3] Ironically, it was counsel for the plaintiffs who asked each witness one "blanket question," to which the witness responded by either asserting the Fifth Amendment, or by affirming that he or should would assert the Fifth Amendment if asked any questions by plaintiffs' counsel.[4]

## Background

As the Court is aware, this case concerns a tax shelter known as BEDS – an acronym for "Basis Enhancing Derivatives Shelter" (a type of "Son of Boss" tax shelter) – developed, promoted, and implemented by the law firm Jenkens & Gilchrist and the international banking concern Deutsche Bank A.G. in 1999 and 2000. Plaintiffs and members of the Welles family purchased and implemented this shelter in 2000, and plaintiffs now claim in this case that the

---

[3]Rather than burden the record with the transcript of each of the 7 depositions, the United States files with this response as Exhibits 1 and 2, respectively, transcripts of the depositions of two persons upon whom the plaintiffs claim to have relied to engage in transactions that allegedly generated millions of dollars in tax benefits, David Parse and Paul Daugerdas.

[4]For example, during the 2-½ hour deposition of David Parse – the Deutsche Bank representative in Chicago who set up the digital foreign currency option transactions for the Welleses – counsel for the plaintiff asked just one question: "Mr. Parse, I just have one question. You've pled the Fifth Amendment to all the questions asked by Mr. Gibson this afternoon. If I were to ask you any questions regarding your knowledge concerning the communications with any of the Welles family members or the transactions at issue in this case or digital option transactions or any of the subjects in Attachment A of Exhibit 501 entered today, would your answer be the same?" Mr. Parse responded, "I would answer just like I answered all the other questions, so yes." (Ex. 1, p. 112) Each of the other six depositions ended with plaintiffs' counsel asking a similar "blanket" question.

shelter allows the Welleses to avoid paying any income tax on approximately $204 million in capital gains that they earned in 2000.

During the initial disclosure and discovery phases of the lawsuit, the plaintiffs identified a number of persons whom they contend have evidence that supports their position, or have firsthand knowledge of events that bear on this case. They are:

Donna Guerin: Donna Guerin, a former partner at Jenkens & Gilchrist, was one of the two "engagement partners" for the tax opinion letters issued to members of the Welles family in connection with their participation in the BEDS tax shelter at issue in this case. The plaintiffs claim that they relied upon Ms. Guerin to support the tax benefits claimed from the BEDS tax shelter. When she was deposed on August 3, 2007, Ms. Guerin refused to answer any of the specific, substantive questions asked by defendant's counsel, relying upon her Fifth Amendment privilege against self-incrimination.

Paul Daugerdas: Paul Daugerdas, a former partner at Jenkens & Gilchrist, was one of the two "engagement partners" for the tax opinion letters issued to members of the Welles family in connection with their participation in the BEDS tax shelter at issue in this case. The plaintiffs claim that they relied upon Mr. Daugerdas to support the tax benefits claimed from the BEDS tax shelter. When he was deposed on August 30, 2007, Mr. Daugerdas refused to answer any of the specific, substantive questions asked by defendant's counsel, relying upon his Fifth Amendment privilege against self-incrimination.[5]

[5]At his deposition, Mr. Daugerdas would not even identify the declaration he filed in *CEMCO v. United States*, 517 F.3d 749 (7th Cir. 2008) to support his own use of the BEDS tax shelter.

John Ivsan: John Ivsan, a former partner at Shumaker, Loop & Kendrick, is one of the persons upon whom the plaintiffs claim to have relied to support the tax benefits claimed from the BEDS tax shelter. The plaintiffs claim that they relied upon Mr. Ivsan in deciding to participate in the BEDS tax shelter. Before the plaintiffs filed this case, Mr. Ivsan filed an affidavit in a IRS summons enforcement lawsuit involving Jenkens & Gilchrist, in which Mr. Ivsan represented that he was an attorney for the Welles family members, and that he was retained in 2000 because the Welleses were interested in pursuing tax savings strategies. When he was deposed on August 17, 2007, Mr. Ivsan refused to answer any of the specific, substantive questions asked by defendant's counsel, relying upon his Fifth Amendment privilege against self-incrimination.

David Parse: David Parse, a former account representative at Deutsche Bank in Chicago, is one of the persons who helped design and execute the digital foreign currency option transactions that the Welles family members engaged in as part of the BEDS tax shelter. The plaintiffs have identified Mr. Parse as someone upon whom they relied to analyze the potential economic benefits from, and to execute, their foreign currency option transactions. When he was deposed on August 6, 2007, Mr. Parse refused to answer any of the specific, substantive questions asked by defendant's counsel, relying upon his Fifth Amendment privilege against self-incrimination.

During discovery, defendant's counsel identified three former Deutsche Bank employees who also played important roles in designing, approving, and implementing the BEDS tax shelters. Each of these three witnesses also declined to answer questions. They are:

<u>Craig Brubaker</u>: Craig Brubaker, a former account representative at Deutsche Bank in Texas, is one of the two principal architects (along with Paul Daugerdas) of the BEDS tax shelter that the plaintiffs engaged in. When he was deposed on August 7, 2007, Mr. Brubaker refused to answer any of the specific, substantive questions asked by defendant's counsel, relying upon his Fifth Amendment privilege against self-incrimination.

<u>Jason Shih</u>: Jason Shih, a former executive at Deutsche Bank, was one of the Deutsche Bank officials who was responsible for approving the bank's participation in, and structure of, digital foreign currency option transactions engaged in by hundred of clients (including the Welles family members) who participated in the BEDS tax shelter. When he was deposed on August 16, 2007, Mr. Shih refused to answer any of the specific, substantive questions asked by defendant's counsel, relying upon his Fifth Amendment privilege against self-incrimination.

<u>Perry Parker</u>: Perry Parker, a former currency trader for Deutsche Bank, was responsible for executing the digital foreign currency transactions at the heart of the BEDS tax shelter, including (on information and belief) the transactions that the Welles family members engaged in. When he was deposed on August 8, 2007, Mr. Parker refused to answer any of the specific, substantive questions asked by defendant's counsel, relying upon his Fifth Amendment privilege against self-incrimination.

Each of these witnesses has evidence – some of which was identified by the plaintiffs – that bears on the merits of the tax shelter in which plaintiffs engaged, and the reasonableness of the reliance they supposedly placed upon written tax opinions which supported their decision to claim millions of dollars in tax benefits on their filed income tax returns. The plaintiffs expressly claim to have relied upon four witnesses who have refused to testify. Two of those witnesses

were the "engagement partners" for the tax opinion letters on which the plaintiffs and other members of the Welles family allegedly relied to claim a $40 million tax benefit. Those same two witnesses – Paul Daugerdas and Donna Guerin – allegedly authored the tax opinion letter that the plaintiffs' hired expert witness, Stuart Smith, plans to testify about. The Welleses paid $4 million to the law firm where those two witnesses were partners until its demise at their hands in 2007. Incongruously, the plaintiffs want the Court to allow the Welleses to testify about their alleged reliance upon Mr. Daugerdas and Ms. Guerin, while at the time plaintiffs ask the Court not to draw any adverse inference from these witnesses' refusal to answer any questions about the plaintiffs, the transactions, the tax opinion letters, or anything else dealing with the BEDS tax shelter.

For the reasons discussed below, the Court should deny the motion, allow the United States to offer the testimony of these seven witnesses – either by deposition or in person – and draw all appropriate adverse inferences from their refusal to answer specific questions posed to them during their testimony – including adverse inferences about the merits of the tax shelter itself, and about the reasonableness of the plaintiffs' alleged reliance on tax opinion letters authored by attorneys at Jenkens & Gilchrist.

## Argument

### I. THE COURT MAY PROPERLY DRAW ADVERSE INFERENCES FROM ASSERTIONS OF THE FIFTH AMENDMENT, WHETHER OR NOT THE WITNESS IS A PARTY.

The plaintiffs argue that the Court should refuse to draw adverse inferences from these witnesses' refusal to answer questions pertinent to this dispute, in reliance on their Fifth Amendment privilege against self-incrimination. They claim that the witnesses are not parties,

that the witnesses have no interest in trying to "help" the plaintiffs,[6] that the defendant's counsel had a chance to ask questions that would enable it to draw the most incriminating inferences, and that it is unfair to have required witnesses who may be under grand jury investigation to answer questions in this civil lawsuit.

A judicial consensus has emerged over the past 20 years that a non-party's refusal to testify may be relevant and admissible, and may support an adverse inference against a party, depending upon the facts and circumstances of the particular case. In *Federal Deposit Insurance Corp. v. Fidelity & Deposit Co. of Maryland*, 45 F.3d 969 (5th Cir. 1995), the court addressed an argument similar to the plaintiffs' here:

> [Defendant] argues that inferences from the invocation of the Fifth Amendment are not allowed when a non-party asserts the privilege. *We find no support for such a proposition.*

*Federal Deposit Ins. Corp.*, 45 F.3d at 977 (emphasis added). The court added that whether or not an adverse inference is appropriate is examined on a case-by-case basis, and is determined under the standard evidence rules applicable at trial, including Federal Rules of Evidence 402 and 403. 45 F.3d at 977 - 78. In that case, the court found that the adverse inference instruction given to the jury was appropriate.

---

[6]On this point, the appropriate question is **not** whether the witness has an incentive to help the party against whom an adverse inference is sought. The proper question is whether the witness who asserts the Fifth Amendment has an incentive to tell the truth, and whether a truthful answer would tend to incriminate the witness. If telling the truth would tend to incriminate the witness, and hurt the party against whom an adverse inference is sought, then the case law suggests that the court **should** draw the adverse inference. In *RAD Services, Inc. v. Aetna Cas. & Surety Co.*, 808 F.2d 271, 275, 276 (3rd Cir. 1986), the Third Circuit analyzed whether a former employee who refused to answer questions would have an incentive to falsely claim that they engaged in criminal conduct while working for the former employer. The court answered that question in the negative, and decided it **was** appropriate for the trial court to draw an adverse inference from the former employee's invocation of the Fifth Amendment.

In *LiButti v. United States*, 107 F.3d 110, 120 - 24 (2nd Cir. 1997), the court held that a non-party's refusal to testify based on an assertion of his 5th Amendment rights could support an adverse inference at trial against a party. Indeed, the court stated (170 F.3d at 124):

> As for the weight to be accorded to adverse inferences, the district court should be mindful of Justice Brandeis' classic admonition: "Silence is often evidence of the most persuasive character."

The Second Circuit in *LiButti* relied upon cases from three other circuits to support the notion that a court should engage in a deeper analysis of the relationship between the witness and the party, and the other aspects of the particular testimony, in deciding whether to draw an adverse inference against a party from a witness' invocation of the Fifth Amendment.[7]

Particularly applicable here is the analysis of the Eighth Circuit in *Cerro Gordo Charity v. Firemen's Fund Am. Life Ins. Co.*, 819 F.2d 1471 (8th Cir. 1987). Rather than focus solely on the relationship between the witness and the party against whom an adverse inference was sought, the court focused on the factors that bore on whether the trier of fact could reliably draw an adverse inference from the witness' refusal to testify. There the court focused on whether the witness had a motive to lie about potentially incriminating testimony, whether the adverse inference was the only evidence before the trier of fact, and whether the witness who invoked the privilege was a "key figure" in the transactions at issue in the case. As the court stated,

> (1) it was unlikely that the non-party witness would invoke the privilege solely for the purpose of harming the charity since he was a controlling member of the charity at the time the suits were brought; (2) the invocation of the privilege was not the exclusive

[7] *RAD Servs., Inc. v. Aetna Cas. and Surety Co.,* 808 F.2d 271 (3d Cir.1986); *FDIC v. Fidelity & Deposit Co.,* 45 F.3d 969 (5th Cir.1995); *Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co.,* 819 F.2d 1471 (8th Cir.1987); *Rosebud Sioux Tribe v. A & P Steel, Inc.,* 733 F.2d 509 (8th Cir.1984).

> factor for the jury to consider in determining whether a fraud had been committed since there was other evidence presented at trial implicating the non-party witness in defrauding the insurance companies; and (3) the non-party witness, similar to the non-party deponent in *Rosebud,* was "a key figure" since his actions formed the very basis for the affirmative defense of fraud.

*Id.* at 1482.

Applying that thoughtful and logical analysis to its appropriate end, there is not – nor should there be – any particular requirement of a formal familial or transactional relationship between the witness who invokes the privilege, and a party against whom an adverse inference is sought. The Fifth Circuit agrees, and has allowed an adverse inference to be drawn against a party based upon the refusal of a witness to testify, even where the witness was neither a party, nor someone who had a "special relationship" with a party. *FDIC v. Fidelity & Deposit Co.,* 45 F.3d 969, 978 (5th Cir. 1995).

Thus, the courts have refused to draw bright lines of the sort which the plaintiffs now ask this Court to draw. Rather, to decide whether it is appropriate to draw adverse inferences from the refusal of each of these seven witnesses to answer specific questions, the Court should analyze each witness' motivation, potential knowledge of relevant evidence, and relationship to not only the plaintiffs but also to the transactions whose bona fides are at issue here, against the common sense, case-specific situation that this case presents. As discussed below, applying the fact-specific analysis that the courts have adopted, leads not only to the conclusion that the testimony of all these witnesses is admissible, but also that the Court can and should draw adverse inferences from their refusal to answer questions that go to the very heart of this dispute.

## II. THIS COURT SHOULD DRAW ADVERSE INFERENCES AGAINST THE PLAINTIFFS BASED ON THE REFUSAL OF EACH OF THESE SEVEN WITNESSES TO TESTIFY IN RELIANCE ON THE FIFTH AMENDMENT.

For purposes of this analysis, it is useful to divide these seven witnesses into two groups. Group 1 (Guerin, Daugerdas, Ivsan, and Parse) are the witnesses who had specific contact with the plaintiffs, and were people whom the plaintiffs claim to have relied upon. Group 2 (Brubaker, Shih and Parker) are the witnesses who worked at Deutsche Bank and were involved in designing, approving, and implementing the BEDS tax shelter that the plaintiffs engaged in.

Group 1. As noted earlier, each of the witnesses in Group 1 was involved in helping explain the BEDS tax shelter to the Welles family members, design the particular digital foreign currency options that they engaged in to effectuate the tax shelter, and prepare the tax opinion letters that they allegedly relied upon to avoid paying $40 million in capital gains taxes on the sale of their stock in Therma-Tru. The plaintiffs identified each person in Group 1 as someone with knowledge of the events at issue, and as someone upon whom they relied in deciding to undertake the BEDS tax shelter.

As best as can be determined, none of these four witnesses has a motive to invoke the privilege to harm the plaintiffs. If anything, it would appear that the interests of these witnesses would coincide with the plaintiffs' interests, as both would wish to vouch for the bona fides of the transactions they designed, approved, and implemented, and the plaintiffs purchased. Because these witnesses lack any incentive to harm the plaintiffs – and, in fact, would appear to be motivated to help the plaintiffs – it is reasonable to conclude that they invoked the privilege to

avoid answering questions about these transactions, because they are genuinely concerned they might incriminate themselves.

The next part of the analysis, whether the adverse inferences are the only evidence against the plaintiffs, also weighs in favor of allowing the adverse inferences. The defendant intends to offer significant other evidence which demonstrates that the digital foreign currency options had no reasonable prospect to earn a profit, and that the particular design and structure of the BEDS transactions had no non-tax business purpose. The transactions were, in fact, designed solely to enable the taxpayers to artificially boost the basis of their Therma-Tru stock in anticipation of realizing $204 million in gain upon its sale in 2000. The defendant also intends to offer other evidence that the representations on which the Jenkens' tax opinions were based were mere boiler-plate, and not true. This element of the analysis demonstrates that other evidence corroborates the reasonableness adverse inferences and favors drawing them.

Finally, each of these four witnesses played a critical role in the decision of the Welles family members to seek, select, and implement the BEDS tax shelter – and to report its benefits on their filed income tax returns. Mr. Ivsan brought the shelter to them, in response to their inquiry into ways to avoid paying taxes on the gain from their Therma-Tru stock. Mr. Daugerdas and Ms. Guerin owned the rights to the BEDS tax shelter, having designed it, and required the Welleses to sign confidentiality agreements before they would explain the shelter to the family. In addition, Mr. Daugerdas and Ms. Guerin presumably wrote or developed the tax opinion letters that the plaintiffs have said they relied upon to report the results of the BEDS tax shelter transactions on their returns. The plaintiffs have even hired an "expert" witness, Stuart Smith, to explain why the Daugerdas/Guerin opinion letters support the plaintiffs' decision to claim the tax

benefits – all in an effort to avoid penalties. And Mr. Parse actually planned and implemented the particular digital foreign currency options that formed the underpinnings for the Welles family members' BEDS transactions.

In the parlance of *Cerro Gordo, supra*, each of the four witnesses in Group 1 was a "key figure" in the Welles family members' implementation of the BEDS tax shelter, and use of that tax shelter to avoid paying $40 million in capital gains taxes. Because all three factors identified in *Cerro Gordo* weigh in favor of drawing an adverse inference, the Court should draw adverse inferences from the refusal of Ms. Guerin, Mr. Daugerdas, Mr. Ivsan and Mr. Parse to testify about the BEDS tax shelter, the plaintiffs' use of that shelter, and the plaintiffs' decision to claim the tax benefits purportedly generated by that shelter.

<u>Group 2</u>. The 3-part analysis of the three witnesses in Group 2 – Mr. Brubaker, Mr. Shih, and Mr. Parker – follows a similar path and reaches a similar result. None of these witnesses has an incentive to lie about these transactions to harm the plaintiffs. And, as with the witnesses in Group 1, the adverse inferences which the defendant seeks to draw from their invocation of the Fifth Amendment are not the only evidence the defendant will rely upon to support its case. Thus, the first two factors support the defendant's request that the Court draw adverse inferences from these witnesses' refusal to answer questions.

The third factor – the relationship of these witnesses to the matters at issue here – also weighs in favor of drawing adverse inferences, but in a different way than the Group 1 witnesses. Mr. Brubaker worked with Mr. Daugerdas to design the BEDS tax shelter. Mr. Shih worked with Mr. Brubaker, Mr. Daugerdas, and others at Deutsche Bank to obtain institutional approval for the bank to participate in the BEDS transactions with hundreds of tax shelter clients

(including the Welleses). Mr. Parker worked with Mr. Parse to implement the shelter. Each of these three witnesses was a "key figure" in the design, approval, and implementation of the BEDS tax shelter. As such, it is appropriate to draw adverse inferences from their refusal to answer questions about the BEDS tax shelter.

## CONCLUSION

The plaintiffs have filed a motion in limine in which they seek to prevent the Court from drawing adverse inferences against them by reason of the refusal of seven key figures to answer specific questions about transactions that lie at the heart of the dispute presented in this case. The case law, rules of evidence, and facts in this case, support the Court drawing adverse inferences from these key witnesses' refusal to answer significant questions that go to the merits of the plaintiffs' position on important issues. Accordingly, the Court should deny the plaintiffs' motion in limine, allow the defendant to offer the testimony of these seven witnesses – either in person or by deposition – and draw all appropriate adverse inferences from the witnesses' invocation of the Fifth Amendment privilege against self-incrimination.

Respectfully submitted,

*/s/ Stuart D. Gibson*
Stuart D. Gibson
Attorney of Record
U.S. Department of Justice
Tax Division
Office of Civil Litigation
Post Office Box 403
Ben Franklin Station
Washington D.C. 20044
(202) 307-6586

John A. DiCicco
Deputy Assistant Attorney General

David Gustafson
Chief, Court of Federal Claims Section
Cory A. Johnson
Trial Attorney, Court of Federal
Claims Section

/s/ *Cory A. Johnson*
Of Counsel

Dated: March 19, 2008