**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STOBIE CREEK INVESTMENTS, LLC, JFW ENTERPRISES, INC., Tax Matters and Notice Partner,** | ) | |
| **Plaintiff,** | ) | **No. 05-748 T** |
| | ) | **No. 07-520 T** |
| **v.** | ) | **(Judge Christine O.C. Miller)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**THE UNITED STATES' RESPONSE TO PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE REPORTS AND TESTIMONY OF DR. DAVID F. DeROSA**

The plaintiffs' motion to exclude the reports and testimony of a consensus expert on foreign currency trading, David F. DeRosa, is a study in irony.[1] The plaintiffs seek to prevent Dr. DeRosa from offering **any opinions** because, they argue, that the defendant has not established

[1]Dr. DeRosa testified as an expert for the United States in *Jade Trading v. United States,* 80 Fed.Cl. 11 (2007) – after Judge Williams denied a motion to prevent him from testifying as an expert on the same issues that the plaintiffs raise in the instant motion. In *Jade*, the Court ultimately relied heavily on Dr. DeRosa's expertise in foreign currency trading, and cited his testimony extensively in the Court's opinion. Of particular concern to this motion, Judge Williams in *Jade* permitted Dr. DeRosa to testify at length about the very subject on which the plaintiffs seem to object so strenuously here – whether, in the real world of foreign currency option trading, the particular option pairs at issue here should be treated as two separate transactions, or as component parts of a single transaction. Relying on Dr. DeRosa, Judge Williams found that the paired foreign currency options were "inextricably linked," and that, "the economic realities of the spread transaction contributed to Jade made it impossible to delink the option pairs." 80 Fed. Cl. at 50. No wonder the plaintiffs want to prevent Dr. DeRosa from testifying here.

sufficient foundation for just one of his opinions. Tellingly, they have not submitted Dr. DeRosa's reports with their motion, with which the Court could make its own determination.[2]

The plaintiffs also claim that Dr. DeRosa has abandoned the mantle of objectivity expected of an expert. They argue this because Dr. DeRosa's expert conclusions coincide with the defendant's views on the principal issues which his expertise has informed. Plaintiffs see no inconsistency in pressing this claim, even as they fail to acknowledge that their options "expert" in this case, Robert Kolb, at the direction of plaintiffs' counsel, declined to include important information – information that matches Dr. DeRosa's analysis that these options were grossly overpriced.[3]

The plaintiffs reliance upon the *post hoc, ergo propter hoc* fallacy is obvious. The Court should reject this transparent attempt to prevent the United States from proving its case at trial.[4]

---

[2]Dr. DeRosa's initial report, rebuttal report, and post-deposition amendment are filed with this response as Exhibits 1, 2 and 3, respectively.

[3]During his deposition, Dr. Kolb testified that "fairly early on"during his work on this case, he determined the prices for these options by applying standard methods for pricing foreign currency options. He arrived at prices that were "significantly lower" than the prices that the Welles family members paid for these options, and "pretty promptly shared that conclusion with the attorneys." Dr. Kolb then made a conscious decision not to include that information in his report explaining, "I discussed that with counsel, said, you know, what I had found. They thought it wasn't a good idea to include it." (Kolb Dep., p. 198, lines 2-20)

[4]Viewed in isolation, this motion borders on frivolous. Viewed in combination with the plaintiffs' other motions in limine – in which the plaintiffs also seek to prevent the United States from offering evidence of, (1) hundreds of other identically structured, tax-driven digital option shelter transactions, each of which generated millions of dollars in tax savings that dwarfed any realistic possibility of profit from the foreign currency options; (2) the admissions of the Jenkens & Gilchrist law firm that these tax shelters were criminally fraudulent; and (3) the refusal of key individuals involved in these tax shelters and the transactions at issue here to testify – it seems that the plaintiffs' trial strategy is to prevent the defendant from offering any evidence that might contradict their scripted version of what happened here.

**FACTS CONCERNING THIS MOTION**

Dr. DeRosa is a world-acknowledged expert in foreign currency option trading, among other things. He earned his Ph.D. in finance and economics at the University of Chicago. He has traded foreign exchange and derivatives in foreign exchange for his own account and for others, evaluated and managed hedge funds, managed billion-dollar portfolios, and regularly teaches courses in finance, derivatives, and foreign exchange at Yale and Columbia Universities. He has also served on the faculties of the Graduate School of Business of the University of Chicago, the University of Southern California, and Loyola University of Chicago. His books enjoy widespread use not only in university classrooms, but in the offices of financial professionals around the globe. There can be no serious question about his credentials or his expertise.

The United States engaged Dr. DeRosa to examine the evidence developed in this case, and offer opinions on the following subjects:

1. Whether the prices that the Welles family members and Deutsche Bank paid for the foreign currency options at issue in these case reflected fair market prices determined in accordance with standard option pricing methodology;
2. Whether the offsetting long and short foreign currency options at issue in this case could be exercised separately (*i.e.*, whether it was realistically possible to hit the "sweet spot");
3. Whether the offsetting foreign currency options at issue in this case provided the Welles family members with a reasonable opportunity to earn a profit;
4. Whether, in the real world of foreign currency option trading, the offsetting long and short foreign currency options at issue in this case be effectively separated

into two parts, or whether they were inextricably linked as component parts of one integrated transaction; and

5. Whether any business purpose existed for contributing the foreign currency options to Stobie Creek Investments, LLC.

Dr. DeRosa analyzed the information developed in this case, and reached conclusions on each of these issues – as well as on a number of related issues. He summarized his findings in a 96-page report. He explained in a 14-page rebuttal report why he disagreed with a number of the opinions expressed by the plaintiffs' retained experts. And when plaintiffs' counsel raised a question during his deposition about one aspect of his original report, Dr. DeRosa prepared a 4-page supplemental report, addressing the apparent discrepancy raised by plaintiffs' counsel, and explaining why that apparent discrepancy was not a discrepancy at all, but the result of an inadvertent rounding error.

In his report, Dr. DeRosa not only described his conclusions on these subjects, he also explained the reasoning behind each conclusion, the method of analysis that he – as an expert in foreign exchange – used to reach his conclusion, and the evidence upon which he relied to support that conclusion. When the Court reads the report, and takes into account Dr. DeRosa's own explanations, it will see clearly that the plaintiffs' motion mis-describes and short-changes both Dr. DeRosa's methodology and the evidence to which he applied that methodology.

In particular, on p. 2 of their motion the plaintiffs list the factors that they claim form the basis for Dr. DeRosa's opinion that the paired foreign currency options at issue here should be treated as component parts of one integrated transaction, instead of as two transactions as the plaintiffs argue. But the plaintiffs' list omits a number of factors that Dr. DeRosa not only relied

upon, but explained at length in his report.[5] Those factors, which comprise a significant part of Dr. DeRosa's report and analysis (and which the plaintiffs neglected to mention in their motion) include:

1. If the options could have been separated, Deutsche Bank as counter-party would have required the participants to undergo credit checks. This common practice in the world of foreign currency options trading led Dr.DeRosa to conclude that Deutsche Bank believed it had no credit risk in these transactions. Accordingly, based on his experience, Dr. DeRosa concluded that Deutsche Bank treated the option pairs as component parts of a single transaction, instead of as two separate transactions.

2. If the options could have been separated, Deutsche Bank as counter-party would have required the Welles family members to post "a massive amount of margin collateral."[6] Based upon his experience in foreign currency options trading, Dr. DeRosa analyzed the amount of margin that the bank would have required the Welles family members to post, had they been able from a practical standpoint to separate the option pairs. Applying standard margin analysis, Dr. DeRosa concluded that if the options were separated, the Welles family would have had to post margin for the long option components totaling the face value of the long options, $204,575,000.[7] And applying standard margin analysis, Dr. DeRosa concluded that if the options were separated, the Welles family would have had to post margin for the short options totaling

---

[5]*See*, DeRosa Initial Report (Ex. 1), pp. 60 - 77.

[6]Ex. 1, p. 61.

[7]Ex. 1, pp. 63-64.

$405,058,500, "a staggering 199 times the value of the net premium" they paid for the offsetting option pairs.[8]

3. Documents obtained from Deutsche Bank in discovery showed that the bank treated the option pairs as component parts of a single transaction. Missing from p. 2 of the plaintiffs' motion, Dr. DeRosa analyzed the bank's internal documentation at pp. 67-72 of his report, and concluded from his experience in foreign currency option trading that the bank viewed these option pairs as component parts of one transaction, and not as two separate transactions. Also missing from plaintiffs' motion is any reference to Dr. DeRosa's analysis of the behavior of the parties to these transactions, the Welleses and Deutsche Bank, who at all times treated the options as component parts of a single transaction and at no time sought to separate them.

This detailed analysis, ignored in the plaintiffs' motion, led Dr. DeRosa to conclude that, as a practical matter, the long and short components of the option pairs were inextricably linked, and could not be separated. This is precisely the analysis that Judge Williams allowed Dr. DeRosa to testify about in *Jade*, and then concluded that the option pairs at issue in that case were "inextricably linked."[9]

---

[8]Ex. 1, pp. 64-67.

[9]The remaining issues do not merit discussion in the text. The fact that Dr. DeRosa received fees in a certain amount over the past 2 years for providing expert opinion testimony for the United States, or that he devotes – for now – a certain percentage of time to engagements for the United States, does not bear upon the admissibility of his testimony. And, the plaintiffs' allegation about supposed bias no more reflects on the admissibility of Dr. DeRosa's expert opinions than does the fact that plaintiffs' proffered expert, Dr. Kolb, does not appear to have **ever** testified on behalf of the United States in a tax case, bears on the admissibility of Dr. Kolb's views here. On the last point in plaintiffs' brief, the plaintiffs could not possibly have been "irreparably harmed" (p. 8) by not having received the electronic versions of documents

(continued...)

## ARGUMENT

## DR. DeROSA'S OPINIONS MEET THE *DAUBERT* STANDARD

There is no dispute that the Court must determine the admissibility of all expert opinions – not just those of Dr. DeRosa – on the standard articulated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). And there is no dispute that the plaintiffs brief accurately lays out that standard on the top of p. 3. But that is where the agreement ends.

Reading Dr. DeRosa's report – instead of plaintiffs' crabbed and one-sided summary – one is struck by how faithfully Dr. DeRosa satisfies the touchstone principles of *Daubert*.

1. There can be no serious question about his expertise.

2. He based his opinions upon the facts and data described in his report.

3. He clearly applied reliable principles and methods to analyze the data. In particular:

   a. Dr. DeRosa used well-established option pricing methods to determine that these options were grossly overpriced – the plaintiffs' experts used these same methods, and reached the same conclusion.

---

[9](...continued)
produced in hard copy five months ago – in fact, the plaintiffs' own experts seemed to have replicated Dr. DeRosa's work nearly identically using the well-known Black-Scholes formula for pricing currency options. Furthermore, the comparison to the subpoena issued to their proffered expert, Dr. Kolb, is inapposite. It was not until midway through the morning of Dr. Kolb's deposition that he revealed his "reading" of the subpoena was that it did not demand "spreadsheets" in any form. He went home during the lunch break to retrieve his computer, so that counsel could ask him about the subpoenaed spreadsheets during the deposition. In contrast, Dr. DeRosa had produced hard copies of his electronic documents before his deposition.

b. He applied the methods developed in the banking industry to determine margin requirements for customers who buy foreign currency options, as well as long-established criteria that banks use to determine whether to extend credit to a prospective customer.

c. He applied standard financial analysis to determine whether a hypothetical prospective objective investor considering whether to enter into these particular options could expect to achieve a positive rate of return – both he and the plaintiffs' experts agree that this is a standard method for analyzing prospective investment opportunities, and that such an investor could expect to achieve a negative rate of return on the options at issue here.

d. And he used his expertise in currency markets and how banks determine the strike price for option contracts to determine whether, in the real world, the Welles family members could have even theoretically hit the "sweet spot" on these options.

4. Considering Dr. DeRosa's report in its entirety, and not the plaintiffs' one-sided mis-portrayal of that report, the conclusion is inescapable that Dr. DeRosa has clearly applied these well-established principles to the facts of this case.

In short, Dr. DeRosa's report far exceeds the threshold set by the Supreme Court in *Daubert*.[10]

---

[10]In light of Dr. DeRosa's unquestioned expertise, and the reliance of at least two trial judges on that expertise, plaintiffs' pejorative reference to "junk science" (p. 3) is simply inappropriate.

When presented with a nearly identical motion to prevent Dr. DeRosa from offering expert opinions two years ago in *Jade*, Judge Williams agreed with the United States and denied the motion to exclude him. There – as here – the plaintiffs moved to prevent Dr. DeRosa from testifying that the paired foreign currency options should be treated as component parts of a single transaction. They raised the same arguments there that these plaintiffs raise here. And not only did Judge Williams deny their motion and allow Dr. DeRosa to testify on this point (and others), she also agreed with Dr. DeRosa that the long option and the short options were "inextricably linked" so that they constituted two component parts of a single transactions. Given this history, the motion to exclude him here borders on frivolous.[11]

[11] *See, e.g.*, *Caracci v. Commissioner*, 118 T.C. 379, 399 (2002).

## CONCLUSION

Taken in total, Dr. DeRosa's reports and opinions meet the standard for reliability set out in *Daubert.* Accordingly, the Court should deny the plaintiffs' motion to prevent him from testifying at trial.

Respectfully submitted,

*/s/ Stuart D. Gibson*

Stuart D. Gibson
Attorney of Record
U.S. Department of Justice
Tax Division
Office of Civil Litigation
Post Office Box 403
Ben Franklin Station
Washington D.C. 20044
(202) 307-6586

John A. DiCicco
Deputy Assistant Attorney General
David Gustafson
Chief, Court of Federal Claims Section
Cory A. Johnson
Trial Attorney, Court of Federal
Claims Section

/s/ *Cory A. Johnson*
Of Counsel

Dated: March 19, 2008