UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STOBIE CREEK INVESTMENTS, LLC., and JFW ENTERPRISES, INC., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Docket Nos. 05-748 07-520 |
| UNITED STATES, | ) | |
| Defendant. | ) | |

Pages: 1 through 258

Place: Chicago, Illinois

Date: April 9, 2008

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STOBIE CREEK INVESTMENTS, LLC., JFW ENTERPRISES, INC. | ) |
| Plaintiffs, | ) |
| v. | ) Docket Nos. 05-748 07-520 |
| UNITED STATES | ) |
| Defendant. | ) |

Courtroom 2266

219 S. Dearborn
Chicago, Illinois 60604

Wednesday,
April 9th, 2008

The parties met, pursuant to notice of the Court, at 10:08 a.m.

BEFORE: HONORABLE CHRISTINE O.C. MILLER
Judge

APPEARANCES:

For the Plaintiffs:

ROBERT E. KOLEK, Esq.
COLLEEN FEENEY, Esq.
MATT CROWL, Esq.
Schiff Hardin, LLP
6600 Sears Tower
Chicago, Ilinois 60606
(312) 258-5755

For the Defendant:

CORY A. JOHNSON, Esquire
STUART D. GIBSON
U.S. Department of Justice
Tax Division
P.O. Box 403
Washington, D.C. 20044
(202) 307-6586

C O N T E N T S


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| David Herpe | 78 | 133 | --- | --- | --- |
| David Waterman | 153 | --- | --- | --- | --- |

E X H I B I T S

| PLAINTIFFS EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| 57 | 131 | 133 | |
| 61 | 165 | 166 | |
| 62 | 176 | 177 | |
| 108 | 231 | 232 | |
| 111 | 108 | 110 | |
| 113 | 106 | 108 | |
| 117 | 118 | 120 | |
| 134 | 187 | 189 | |
| 151 | 214 | 216 | |
| 152 | 218 | 219 | |
| 228 | 190 | 190 | |
| 259 | 241 | 242 | |
| 314 | 169 | 169 | |

E X H I B I T S

| DEFENDANT'S EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| 40 | 143 | 144 | |
| 41 | 145 | 146 | |
| 42 | 148 | --- | |
| 424 | 136 | 137 | |
| 548 | 135 | 136 | |

P R O C E E D I N G S

(10:08 a.m.)

THE CLERK: The United States Federal Court of Claims is now in session, the Honorable Judge Christine Odell Cook Miller presiding. I'm calling the cases of Stobie Creek Investments, LLC and JFW Enterprises, Inc., Case Nos. 05748 and 07520. All rise.

THE COURT: Good morning, everybody. Please be seated and -- joining me on the bench. Thank you for taking my advice. Please plan on using smaller binders. I can guarantee that you'll find it easier. Good morning, Mr. Kolek.

MR. KOLEK: Good morning, Yours Honor.

THE COURT: Mr. Crowl.

MR. CROWL: Good morning, Judge.

THE COURT: And you are?

MS. FEENEY: I'm Colleen Feeney.

THE COURT: Ms. Feeney, how are you today?

MR. KOLEK: And this is Mr. Jeffrey Welles.

MR. WELLES: Hi, Jeff Welles. How do you do?

THE COURT: How do you do?

MR. KOLEK: And I have back here Thomas Swecter and Jacob.

THE COURT: There they are. And Mr. Gibson?

MR. GIBSON: Good morning, Your Honors.

THE COURT: And Mr. Johnson.

MR. JOHNSON: Good morning, Your Honor.

THE COURT: Who else is here?

MR. KOLEK: We have David Enrohoe, who is a paralegal with our office.

MR. ENROHOE: Good morning, Your Honor.

MR. KOLEK: And my assistant, Ken McGee in the back.

MS. MCGEE: Good morning.

THE COURT: I'm handing Mr. -- as well. Are there any preliminary matters?

MR. CROWL: None by us, thank you.

MR. GIBSON: Nothing, Your Honor.

THE COURT: The government has invoked Rule 615 of the Federal Rules of Evidence which says that all witnesses who are going to testify other than party representatives will be excluded after opening statements -- counsel to place that rule.

Tomorrow morning at 11:00 a.m. our time, I have an important matter to which I must attend to. We'll be breaking at 11:00 tomorrow. However, we'll have an extended lunch for an hour for recognizing -- So we're breaking at 11:00 tomorrow and Mr. Kedem will

let you know if -- the bench earlier and we're basically speaking of probably two hours.

We are being evicted from the building every night at 6:00. Mr. Kedem will tell you we had a trial session at 9:00 p.m. in Newark. This just really cramps our style. We can also begin earlier if run into a time issue. What I'm going to try to do is break at approximately 5:30 so I can leave at 6:00 p.m. With that in mind if you'd like to proceed.

MR. KOLEK: Good morning, Your Honor. Welcome to Chicago. I hope your trip here was pleasant and I hope your stay here is going to be enjoyable.

THE COURT: I want to apologize for the size of this courtroom. We are going to do our best, so, close all the windows if I find people gazing out. I'd like to say something, this is a Court, no computers. That means no Blackberries, no cell phones. If I see anybody use, especially a Blackberry, you're out of here. The problem with most Blackberrys and cell phones of course -- and that is strictly code. So, Mr. Kedem will keep his eyes open wide and everybody can proceed.

MR. KOLEK: Well, as soon as I finish my opening statement, I will put my Blackberry away.

THE COURT: Please proceed.

MR. KOLEK: Thank you, Your Honor. This is a case about the Welles family, a civic minded, closely knit family. They trusted and relied on their professional advisors. The professional advisors, in turn, trusted and relied on the status of the law.

The Welles family is now seeking a refund of $46 plus million dollars of taxes, interest, and penalties imposed upon them by the Internal Revenue Service. The Welles family began with David, Sr. and Georgia. David died last year. David and Georgia had five children. They had David, Junior. He's also known as Deke; Virginia, Virginia's known as Jenny; there's Jeff, Peter and Kris.

This is not the story of some overly aggressive taxpayer taking advantage of an egregious tax shelter or tax scheme. Instead this is a story of a family that sought professional advice on minimizing their taxes. They acted upon the advice of their counsel of almost 40 years.

Did they take advantage of a loophole in the law? Yes. Undeniably, they did. But did they do anything improper? I think the answer is resoundingly no. For more than a half century the law has been quite clear. There is no requirement for a taxpayer

or anyone else to pay the most taxes. They can arrange their affairs as they seek fit to pay the least amount of tax.

We believe that the evidence will show that legacy of David and Georgia is multifaceted. But above all, it is to do the right thing. I think the character of the Welles children will show that.

It is a legacy of philanthropy and of giving to the community, not only of money, that they have given a lot, but also of one self. Georgia sits on the board of a nature conservancy. Jeff is on the board of Anchor, Inc. That's an organization that works to maximize the potential of inner city youth. He's also in the board of the Buckley School. That's a college preparatory day school that takes into account children from kindergarten to Grade 9.

Jenny spends part of her year in Africa working with an organization called Deed for Life. That organization is helping to eradicate the extreme poverty in Uganda. Peter serves on the board of the Land Alliance Trust that promotes voluntary private land conservation to benefit communities and natural systems. Kris is on the board of the Brookwood School. They all sit on the board of the Cricket Island Foundation. That's the family foundation which

helps to develop the capacity and commitment of young people to improve their lives in the communities and the world around them.

The evidence will show that the family business, Therma-Tru Corporation, grew from a very, very small ordinance. Almost like the proverbial acorn to the oak tree. In 1962, David, Sr. purchased a lumberyard out of bankruptcy with the aid of an attorney by the name of Greg Alexander. He was an attorney with the law firm of Shumaker, Loop & Kendrick. That acquisition forged a 40-year trusted relationship between Shumaker, Loop & Kendrick and the Welles family that exists still today.

That lumberyard became Therma-Tru Corporation. Therma-Tru, in turn, became vastly successful beyond anyone's imagination. It became the industry leader for the manufacture of residential entry doors. It did this through hard work in the entrepreneurial spirit of David and his family.

In 1987, David developed bone cancer. As a result, he sought to sell Therma-Tru. Bids were solicited and received, including one from a company called Masco. That name will pop up again. That's why I mention it now. Masco was also in the building supplies business.

However, in one of those rare black swan events, Black Monday, October 19, 1987 occurred. The stock market dropped over 20 percent on that day. The offers that had been received were cut. David decided to hold on to Therma-Tru.

As is frequently the case, what happened to be a dark day actually provided much greater opportunity, 12 years later in 1999, Therma-Tru was firmly positioned at the top of its industry. Mike, will you show Graph 40, sir?

These are some of the doors that Therma-Tru manufactures. David Welles, still active in the business, brought his son, Deke, in to run the company. Jeff Welles, by this time, was an investment advisor and sat on the board of Therma-Tru along with David, Sr. and Deke. Greg Alexander, the attorney from Shumaker, Loop & Kendrick, had retired. And now David Waterman, the new managing partner of Shumaker, Loop & Kendrick was now the advisor to Therma-Tru and the members of the Welles family.

Then and now, the Shumaker firm was the largest in Toledo. It had over 170 lawyers and they had represented Therma-Tru for 37 consecutive years. It had also represented the Welles family on a continuous basis for that same 37 consecutive years.

Shumaker, who's the lead outside counsel for Therma-Tru as well as the principal attorneys for David and Georgia, Deke and his wife, Hopi, and other family members. By 1999, Jeff had had ten years of experience at Goldman Sachs. And he was now an investment advisor at Lazard Freres. He had gone from a salesman, a securities salesman to now an investment advisor.

Now, 1999 was a pivotal year for the Welles family. David, through effective tax buying, had transferred a significant part of his Therma-Tru holdings to his children. He had made them all wealthy. It was at this point that David and Georgia decided that they wanted to focus their efforts more on philanthropy and on giving back to the community.

In order to effect this plan, David recognized that he needed to bring liquidity to his estate. Therma-Tru was once again put on the market and put up for sale. Masco became aware that Therma-Tru was on the market and made a bid for the company. It proposed a stock for stock transaction in which the shareholders of Therma-Tru would receive approximately $825 million in Masco shares. The problem with that was that they were restricted stock. It was a tax-free transaction, however.

While bringing David closer to his objective of liquidity, this deal posed risks to David and the other shareholders of Therma-Tru, who by now included not only the family members but key nonfamily employees as well.

David went to his son Jeff and asked him to explore ways of protecting the family interest should the Masco transaction go through and the family winds up owning a chunk of restricted stock that was very difficult to transfer. Jeff contacted an acquaintance at Golden Sachs who Jeff knew from his days at Goldman. Jeff also contacted a colleague at Morgan Stanley.

In each instance, Jeff explored Wall Street mechanisms to limit the risk of holding restricted Masco shares. Through the summer and early fall of 1999, it looked as though the Masco deal would close. However, the parties meant an insurmountable stumbling block.

The management of Therma-Tru, following the acquisition, caused a problem. They couldn't reach consensus of how the company would be managed subsequently. The deal cratered and Masco walked. In the summer of 1999, while the Masco deal was still pending, Dave, Sr. and Jeff contacted David Herpe, a

partner in the estates and trust area at McDermott, Will, and Emery, where Mr. Kim is at now.

They asked him to assist the family in forming a family foundation and an investment entity through the family office. Mr. Herpe had significant experience in the establishment and operation of family offices. And Mr. Herpe was one of the few non-non-Shumaker lawyers that the family relied upon. Herpe had been the architect of the qualified annuity trust that Dave, Sr. had used and established and effectively used to transfer Therma-Tru's ownership, a significant part of Therma-Tru's ownership over to his children.

Now Dave's primary goal was that of philanthropy. A meeting was set up for Herpe to meet with Dave, Sr., Georgia, Deke, and Jeff to discuss the proposed foundation and family office. At the meeting David Herpe explained the mechanics of establishing a private foundation and a family office.

He had subsequent conversations with Jeff explaining that the structure for a family office and an investment would be to create two entities. One, Stobie Creek, to hold the family's assets, and the other, North Channel, LLC to manage those assets.

Dave Herpe explained the structure.

Insulates the family from assets from creditors. Stobie Creek was not planned to be and today is not a special purpose entity. Stobie Creek continues to invest the family's assets and currently has almost a half of billion dollars of assets that it invests for the Welles family. The family asked Mr. Herpe to start work on establishing a family foundation and to begin the process of establishing the family office.

Although, the Masco deal was off the table, they were still hopeful that they could find a buyer. A Therma-Tru board member suggested that they contact Kenner and Company, a private equity firm. The contact was arranged. David, Deke, and Jeff met with the Kenner principals. Kenner expressed an interest in doing a deal with Therma-Tru. Kenner, however, needed to do its due diligence on Therma-Tru. Additionally, because Kenner was a private equity investor, it had to line up its own equity and capital financing for this transaction. A deal with Kenner, while promising, was still anything but certain.

The initial contact with Kenner was made in the fall of 1999. Negotiations commenced, initial bids were negotiated and renegotiated. Finally a tentative deal was struck in December of 1999.

Unlike the Masco transaction, the Kenner

deal was to be structured as a simultaneous recapitalization of Therma-Tru and a redemption of part of the outstanding shares. Essentially, the deal that was proposed had Kenner infusing cash into Therma-Tru for a 50-percent piece of the equity of Therma-Tru at the same time that the current shareholders would redeem 50 percent of their stock in the company.

The first share offer increased from the Masco offer. The Kenner proposal valued 50 percent of Therma-Tru between $425 to $435 million. Now, that would equate to somewhere between $850 to $870 million. That's as compared with $825 that had come from Masco.

The deal was significant in another way. This was a taxable transaction. Now, a nonbinding letter of intent was prepared and Kenner's due diligence began.

During late '99, following a meeting at the Therma-Tru board, Deke, David, Sr. and Jeff approached David Waterman. David Waterman was then serving on the board of directors, and inquired whether there were any opportunities to reduce federal and state tax exposure from a sale of Therma-Tru to Kenner.

Waterman told them that a couple of other

Shumaker clients had obtained tax advice from a firm down in Texas called Jenkins & Gilchrist on tax savings strategies. At that time Jenkins was a large Texas-based firm with offices in several cities.

Waterman, after checking with his partners on the deals that other Shumaker clients had engaged in, told the Welles family that his firm had fully vetted the Jenkins & Gilchrist ideas and that the Shumaker lawyers felt comfortable that the Jenkins' strategies worked.

Now, responsibilities for all that was occurring were assigned to Deke and to Jeff. Deke would have primary responsibility to advance the ball on the Kenner transaction and could call on Jeff's knowledge of Wall Street financial structuring to cut the best deal possible for the family. Jeff would assist in negotiating the dollar terms of the Kenner transaction.

Jeff also took hold of establishing the infrastructure for the family office, the family investment vehicle and the family foundation. Now in the fall of 1999, David Waterman did arrange for Jeff to be introduced over the phone to Donna Guerin. Donna was a tax attorney at the Jenkins & Gilchrist firm. Jeff later arranged a personal meeting with Ms.

Guerin. It took place in Chicago while Jeff was in Chicago on other business.

That initial meeting was no more than a goodwill meeting. Ms. Guerin introduced herself and described her firm. She said they had an outstanding reputation in tax matters. That meeting led to followup telephone conversations from Donna Guerin to Mr. Welles. And as this Kenner proposal started gaining more momentum, the thought of taking advantage of the tax savings opportunity became more appealing.

At about the same time, ideas for the family office and the family foundation started to also gain interest. David and Georgia, whose primary concern was philanthropy, decided to call for a family meeting. Both Jeff and Deke saw this as an opportunity to bring their siblings the details of the proposed Kenner deal and to explore the creation of a family office with their siblings.

In anticipation of that meeting, Jeff contacted Donna Guerin. She told Jeff that before Jenkins would disclose tax planning ideas, family members would have to create, I'm sorry, would have to execute a confidentiality agreement. Confidentiality agreements were circulated among the family. No fee was associated with any of the disclosures. The

confidentiality letters provided fees for any tax opinion, would have to be the subject of further negotiation between Jenkins and the Welles family.

Your Honor, you will hear about the meeting at Dave and Georgia's Florida home. That's the Vero Beach meeting. The meeting took place over two days. Dave and Georgia addressed the children on the importance of philanthropy to them and the Welles family legacy and their desire to create a family foundation.

Deke and Jeff described the status of the terms of the Kenner transaction at the time it was still open. In fact, Deke spent a lot of time during that meeting negotiating with respect to specific terms.

Jeff and Dave Herpes spoke about the benefits of the family office, while Dave, Sr. and Georgia and David Herpe and Jeff spoke on the creation of a family foundation. And in a separate session, Dave Waterman came in and addressed the family about the mechanics of the Jenkins & Gilchrist tax savings proposal.

At the Vero Beach meeting, Waterman was asked a seminal question, David, if you were in our situation, would you take advantage of the Jenkins tax

savings structure. And he responded that he would.

The family reached a consensus on creating a family charitable foundation, like this 45. That's Cricket Island up here, Your Honor, in the corner. Now, and they also, the family investment vehicle. Now the family investment vehicle is right here in the center. That would be Stobie Creek.

(Away from microphone.)

Stobie Creek's ownership is written -- individual family members' interests. And North Channel (phonetic) is a manager and runs the family office. David, Sr. up until his death, and Georgia are the only North Channel and Jeffrey Welles is the manager of North Channel. That's our structure.

With respect to the tax savings structure suggested by David Waterman, the family asked Jeff to do further research. What they had been told by Waterman was that the Jenkins proposal involved trading in foreign currency options. Jeff stated that he would follow up on the economics of the foreign currency option trades suggested. If Jeff thought that there was a reasonable possibility of profit on the trades, he would recommend that the family do them.

In the case of Therma-Tru, the family

deferred on all things to Deke's knowledge of the business and with Kenner. In financial matters, the family deferred to Jeff's investment acumen. They, again, defer it at this time to Jeff's good judgment.

Following the meeting, Jeff conducted his own due diligence on the proposed foreign exchange trades. Jenkins & Gilchrist told Jeff that an individual at Deutsche Bank by the name of David Parse, was familiar with the foreign exchange option trading concept.

Now, this was significant information for Jeff for two reasons. First, when he had started looking to establish an infrastructure for Stobie Creek, he had contacted several banking organizations, including Deutsche Bank. It had been highly recommended to him as being reputable and being able to effect the type of investment opportunities that were necessary for Stobie Creek.

Second, Jeff knew David Parse. They previously had worked together at Goldman Sachs. In fact, when Parse was first hired by Goldman, Parse spent a short period of time assigned to Jeff's trading partnership. And when Parse was reassigned to Chicago, Jeff, from time to time, had conversations with David.

What happened was that Jeff contacted Parse and after exchanging pleasantries and trying to learn about what they had been doing in the interim, he asked him about the foreign exchange option trades that were suggested by Jenkins. After learning what the design was, Jeff once again reached out to his Wall Street connections at Goldman Sachs and Morgan Stanley to get information on the economics of the proposed FX trades.

Jeff was looking at doing two spread trades. He had to analyze four separate options, a long and a separate short on the euro and a long and a separate short on the Swiss franc. These were digital options. Digital options differ from U.S. style options in that digital options mature as of a specific date or only exercisable at a specific time. U.S. options are exercisable anytime within a span of time.

There were three payoff possibilities. Jeff could lose his investment. He could double his money. (A) is his options expired within a very narrow band of strike prices, he could make up 200 times his initial investment.

Jeff's concern focused on the cost of the two spread positions. Parse had told Jeff that the cost of each spread would be approximately 1 percent

of the long option premium. Mr. Parse also advised him that the odds on doubling his money were in the range of plus or minus 30 percent. Obviously, the converse is that the odds of losing his investment were in the range of plus or minus 70 percent. Again, obviously, the odds of hitting that narrow band, that narrow sweet spot on either the euro or the Swiss franc was far less certain.

Jeff knew from his trading days at Goldman Sachs that foreign exchange options were speculative investments. He knew that in order to profit, one needed to have a contrarian view from that of the market. One needed to look for a trigger event that would cause an increase in the currency's volatility. Mr. Welles started reading Goldman and Deutsche Bank analyses on currency patterns and positions. Each Goldman and Deutsche Bank viewed the euro as underpriced and the Swiss franc as overpriced in relation to other currencies.

Jeff knew that historically there was a correlation between the euro and the Swiss franc. But he believed that there was a short-term opportunity to exploit a deterioration in the relationship between the euro and the Swiss franc.

Jeff discussed with Deutsche Bank the

trading ideas suggested and conversed with Goldman and what he then wound up doing is taking a look at some Goldman and Deutsche Bank articles, specifically relating to establishing the two spreads.

The transaction that was suggested was that one position would anticipate a rise in the euro and the other would anticipate that the Swiss franc would fall. Jeff discusses his thoughts with his family. They told him that he should use his best judgment. If there was a reasonable opportunity to make a profit on the trades, then he should make the investment.

Jeff made arrangements with Deutsche Bank to represent his family in making the investment. In order to obtain the funds to engage in these transactions, each of the members of the Welles family, through their separate LLC's, borrowed from the family trust. The trades were executed through those LLC's and their purpose to protect the individuals from liability.

Jeff Welles formed a Delaware limited liability company named JFW Investments, LLC in March 3, 2000. On March 31, 2000, Jeff's LLC bought a long option on the euro with an expiration date of April 17, 2000. He paid a premium of $9,662,500 for that option. He also sold a short digital option on the

euro and received a premium of $9,565,875. Deutsche Bank was the counterparty in both of those transactions. That option also had an expiration date of April 17th, 2000.

Jeff believed that the euro would rise in relation to the dollar. That was a Euro bull spread. In addition, Jeff's LLC sold a short digital option on the Swiss franc for which he received a premium of $9,565,875. That option also had an expiration date of April 17, 2000.

Jeff also bought a Swiss franc long digital option with an expiration date of April 17. For that option he paid a premium of $9,662,500. With respect to that transaction, Jeff anticipated that the Swiss franc would decrease in value in relation to the dollar. That was a Swiss bear spread transaction.

Each member of the family through their LLC's also put on the same trade as Jeff's LLC, anticipating that the euro would rise in relation to the dollar and anticipating that over the short term the Swiss franc would decrease in relation to the dollar.

Now, the spread transactions on the euro and Swiss franc allowed Jeff, through his LLC, to leverage his investment and at the same time control the amount

of risk that he was exposed to on the options. The end game on these options was to anticipate a separation in the correlation between the Swiss franc and the euro. That is what was suggested in the readings that Jeff had done, in reviewing analysis from Goldman Sachs and Deutsche Bank.

In the case of the euro spread, if at the expiration date the euro was trading at or above a specific amount, then Jeff would double his money. If, however, it was selling at less than another amount that was slightly lower, he would lose his premium. If at the expiration date the euro was trading between those two spread numbers, so called sweet spot, Jeff would have a payoff of 200 times his premium on the euro options.

Similarly, if the Swiss franc were trading at or below a specific rate, then Jeff would double his investment on the option transaction. If the Swiss franc were valued at a rate slightly higher on April 17, Jeff would lose his investment. As in the case of the euro, if an April 17 the Swiss franc were trading between that narrow range, the so called sweet spot, then he stood to gain 200 times his net premium in the transaction.

Now all the while that Jeff was engaging in

the foreign exchange trades for himself and his family, Deke was managing the Kenner deal. Due diligence was still proceeding. Kenner still hadn't arranged for financing on its transaction. The deal was still open.

In April, each of the Welles families, each of the Welles LLC's contributed the digital options to Stobie Creek. At the same time, they individually contributed to Stobie Creek one half of their shares in the stock of Therma-Tru.

Now the contribution of the options and the shares of Therma-Tru constituted the very first step in the funding of Stobie Creek as a family investment vehicle. Also, if the transaction with Kenner did close, they would be in a position to take advantage of the Jenkins & Gilchrist proposal. If the transaction with Kenner didn't go forward, nothing happened.

Through April 17, 2000, the expiration of the options, Jeff monitored the foreign exchange markets to determine whether the appropriate volatility was occurring in the markets and whether any announcements that were projected from either the Swiss National Bank or the european Central Bank had occurred.

These were the types of events that could cause movement in both currencies. These are the types of events that would cause volatility. You will hear expert testimony that many factors can affect the currencies movement. These were just a couple of them.

In addition to Jeff's monitoring the trades, Bill Chung, who was an employee and worked in the office of North Channel at the time, was monitoring both the euro and the Swiss franc daily during that period if the options were outstanding. Both Mr. Welles and his employees actively monitored the trades to determine if there was a sufficient volatility to cause movement that would allow him to make a profit or to do some other things with the options.

As things ultimately turned out, however, both trades expired out of the money. And Mr. Welles, along with his family, lost their investment on the transaction, some $2 million. Stobie made an election under section 754 to adjust the basis of its assets so that in the event of a sale or exchange of the members' interest, the basis of the partnership assets would increase or decrease to that of the basis of the member.

THE COURT: You said that Mr. Welles, in the

matter, lost the investement --

MR. KOLEK: Well, by then it would be Stobie Creek's investment.

THE COURT: It would be Stobie Creek's. Stobie Creek lost the investment. But this $2 million, was it a loan, if I understand correctly, from the family trust?

MR. KOLEK: The family trust had loaned $2 million to the LLC interests that acquired the foreign options. Those loans were subsequently repaid with interest out of an allocation through Stobie Creek.

THE COURT: What was the recourse on those loans?

MR. KOLEK: There was no note that was signed, Your Honor. It was a family transaction. It was treated as a transaction within the family. To the best of my knowledge, there was not a nonrecourse loan.

Even in mid April, when the options expired, the Therma-Tru transaction with Kenner was still up in the air. On April 30, 2000, each of the members of the Welles family transferred their individual limited liability company interests, which were the members of Stobie Creek, to separate S corporations, which each of them had established. As a consequence, Stobie

Creek terminated as an entity for federal income tax purposes pursuant to section 708 of the Code.

Its assets had been distributed and recontributed back to Stobie Creek. Upon the deem distribution of the shares of Therma-Tru to each LLC and in turn the S corporation, the shares picked up the basis of the interest in Stobie Creek, thereby increasing the basis of the Therma-Tru shares inside Stobie Creek.

Now, it was about at this time that the transaction with Kenner was starting to come together. The financing of the acquisition was starting to take shape. However, the contract and the exhibits to the contract still had to be finalized. On May 9th, 2000, the transaction with Kenner was consummated in a simultaneous sign and close transaction.

Kenner contributed cash to Therma-Tru in exchange for a new stock position. Each of the existing shareholders of Therma-Tru received a cash distribution for Therma-Tru in redemption of their shares. Those funds went straight to Stobie. All of this was consistent with the Internal Revenue Code, the regulations and existing case law at the time.

Now, at this point no decision had been made as to whether or not Jenkins & Gilchrist would render

an opinion and no agreement had been reached with respect to how much that opinion might cost. Now, David Waterman had told the family earlier that year at the Vero Beach meeting that any opinion would be expensive. And based upon his prior experience, he was aware that the fee generally was determined by reference to a percentage of the amount of stepped-up basis that the transaction generated.

On August 14, 2000, however, the Internal Revenue Service issued Notice 2044. That notice described two transactions in which the IRS contended that the losses generated were artificial and were not to be allowed as a deduction for the taxpayer. One of the examples in Notice 2044 was similar to the transaction that the Welles family had engaged in.

It was a transaction that generated a loss as opposed to a transaction in which basis was enhanced. Although concluding that the loss was artificial, the Internal Revenue Service chose not to make a broader statement with respect to the law. The case law, Helmer in particular, allowed for a step-up in basis because the short position of the digital option that was contributed did not constitute a liability, an offsetting liability.

As a result, there was no statement on the

law. They just merely looked at the artificiality of the transaction. Additionally, Notice 2044, the transactions related to corporations. Now, as soon as David Waterman learned of Notice 2044, he asked the Shumaker tax lawyers to examine it and determine whether or not it applied to the Welles' transaction.

Waterman was told that Notice 2000-44 did not apply. Waterman wanted confirmation. He asked that a conference call be set up with a representative of Jenkins & Gilchrist. At the same time, Waterman contacted Jeff Welles, advising him of the fact that the notice had been issued and said that he had requested a conference call with the Jenkins firm, and in particular Donna Guerin.

THE COURT: Was the basis of that opinion it wouldn't apply because they were dealing with a partnership here?

MR. KOLEK: Yes, that was one of the things that they said, that this was not a corporate situation. This is a partnership situation, and corporate law had really specific provisions under sections 356 and 357 dealing with liabilities.

On that conference call, which Jeff was on, the attorneys described the facts of Notice 2000-44 and then indicated why they believed Notice 2000-44

wasn't applicable to the transactions that the Welles family had engaged in.

At the conclusion of the conversation, David Waterman asked the Jenkins firm whether or not if they issued an opinion they would include their conclusions with respect to Notice 2000-44 in that opinion.

The parties were told, yes, they would include an opined overt Notice 2000-44. When the opinion was ultimately issued, that was included.

We've spoken about the trades that were done and the legal advice that was received. But you should know about two other individuals who assisted Jeff in reporting these transactions. In April 2000, North Channel hired Larry Goldstein as its Chief Financial Officer.

Mr. Goldstein was and is a CPA and an attorney. He received his L.L.M. and Taxation from MYU. Larry's expertise was in tax compliance. Larry was on the phone with Jeff when Jenkins explained the Notice 2000-44 issues and he assisted the family's trusted accountant, Bob Floyd, in preparing the Stobie returns.

Now, Bob Floyd had been the longtime accountant for the family. Mr. Floyd had worked for many years in public accounting at Arthur Young. And

in 1985, Mr. Floyd left Arthur Young and opened up his own accounting firm. For years he had been preparing the tax returns for David and Georgia, Deke and Hopi and other family members.

Given his relationship as the family's accountant, North Channel hired Mr. Floyd to prepare the Stobie tax returns for the year 2000 as well. Mr. Floyd worked with attorneys at the Shumaker firm and cleared his draft tax returns with Larry Goldstein.

At about the same time, Jeff Welles finalized his negotiations with Jenkins & Gilchrist with respect to the cost of an opinion. Jeff, who had worked on Wall Street for almost 15 years and was accustomed to seeing large fees charged for things such as fairness opinions, innovative transactions, innovative financing techniques, large estate matters, discussed with Ms. Guerin the fees to be paid in this matter for Jenkins & Gilchrist's opinion.

Jeff, on behalf of Stobie, ultimately agreed to pay approximately $6 million to Jenkins, of which $2 million would go to the Shumaker firm.

Now, you will see as evidence a letter that was found in the files of the Shumaker firm that is addressed to each of the members of the Welles family. In that letter, David Waterman offered to forgo any

fees with respect to this matter because of the amount of the fees and the long relationship that had existed between the Shumaker firm and the Welles family.

Now, there is some question as to whether Mr. Waterman actually sent the letter. Although he believes he did, none of the Welles family members recalls having received a copy of the letter and only one unsigned copy was located in the Shumaker firm files. Jeff Welles did have a conversation with David Waterman in which Mr. Waterman offered to forgo receipt of any fees associated with the transaction.

In Jeff's view, the Shumaker firm had acted as trusted counsel for the Welles family and for Therma-Tru for over 37 years. Jeff and his family members looked at the fee as appropriate in light of all the years of faithful service the Shumaker firm had provided to the Welles family and to Therma-Tru.

Following the filing of the tax return in this case, the Internal Revenue Service began an audit examination of the Jenkins firm. That examination led to a disclosure of all of Jenkins' clients, including the Welles family.

As a result of that examination, the IRS audited the Welles family. What the IRS did was they disallowed the stepped-up basis resulting from the

digital option transactions.

So, where are we now? The Defendant claims that Stobie Creek was a sham. A special purpose entity designed solely to effectuate the Jenkins & Gilchrist tax strategy. Well, the facts will show that's just not the case. Stobie Creek was on the drawing board in advance of any hint of a transaction involving digital options or any proposals by Jenkins & Gilchrist. It has engaged, over the years, in billions of dollars of transactions. It provides a latter investment opportunity for the Welles family to participate in the best financial advice available.

It allows for the flexibility of investments, to take advantage of a full range of investments from the most secure to those with great risk and great reward associated with them.

Did the Welles family have a legitimate nonbusiness purpose, excuse me, for the creation of Stobie Creek? I'm sorry. Did the Welles family have a legitimate business purpose for the creation of Stobie Creek? I think the only rational conclusion is that they did.

Stobie Creek was formed for nontax business purposes and exists today and provides the family with opportunities that it would not otherwise have. Did

the Welles'es --

(Nearby siren sound.)

THE COURT: Did they focus -- beyond Stobie Creek.

MR. KOLEK: I think it is a combination of things. I think that there's a business-purpose function that's associated with the transaction. I also think that if one looks at the FPAA that was issued in this particular case, that there is an issue with respect to whether or not Stobie Creek was formed for the right reasons.

Now did the Welles family take advantage of a loophole in the law, as I said earlier, the answer is that they did. But there's nothing wrong with that. Taxpayers are allowed to reserve pairs to pay the least amount of taxes. There's no obligation, patriotic or otherwise to pay the most.

The government contends that Stobie was formed in connection with a transaction the principal purpose of which was to reduce substantially the present value of the taxpayer's tax liabilities. It's not the case. Stobie was formed as an investment vehicle for the Welles family.

(Away from microphone.)

Additionally, the government contents that

the short positions, the written call options and the two split positions that Jeff Welles, through a couple option transfers, constituted a liability for purposes of Treas. Reg. § 1.752.

This regulation was promulgated in 2003. It's application to the particular facts of this case is less than certain. How can the government argue for the retroactive application of this regulation. Now that's somewhat akin to Dean Wormer in Animal House and his treatment of the Deltas with double secret probation.

No one knew about it, especially at the time these transaction occurred. The Defendant had an opportunity to announce his position in 2044, it didn't do that. It's unfair for the government to be arguing the application of this retroactive regulation when the law was well settled at the time. The government should not now be allowed to claim -- rather it's the Welles family and all taxpayers, for that matter, that were misled.

(Electronic interference.)

THE COURT: Well -- Judge Easterbrook in Cemco (phonetic) just rejected the argument that you made. What's your response to Cemco?

MR. KOLEK: Well, I look at the Cemco case,

I think in many respects the Cemco case is colored by particular facts of that case. And I think that was a loss generator case, number one. Number two, the transactions that Mr. Daugerdas (phonetic) has been engaged in in the case do appear to be somewhat contrived with respect to how those transactions were ordered.

But Judge Easterbrook's opinion goes off a and takes onto it something that I learned later on to the case. His judgment was not relevant or was not important to the ultimate decision in that case. You know, obviously this is an issue that we're going to talk further about with the Court. But we believe that there are distinctions with Cemco and our facts. And I think we can make that, there's a distinction with respect to how Cemco should be applied.

Now the government in its contentions that, that the Welles family did not answer to the digital option transaction with an appropriate objective profit motive.

Defendant's experts spends pages analyzing the pricing of the option and profit potential as if it were the Zapruder film.

THE COURT: You like movies.

(Laughter.)

MR. KOLEK: It's something that people can relate to.

THE COURT: Okay.

MR. KOLEK: But that type of analysis doesn't take into account reality. Defendant proceeds from the assumption that there is but one method of analyzing a transaction's profit potential. If taxpayer does not do all the things that the Defendant claims is reasonable and appropriate, then according to the Defendant, the taxpayer did not have an appropriate profit objective.

Defendant would have all taxpayers analyze each and every investment they make on a strict probability of profit basis. According to the government, unless there is a significant probability of profit, then there can be no valid profit motive.

The Defendant would apply this test irrespective of taxpayer's financial condition or whether taxpayer had views contrary to the market. If a taxpayer's appetite for risk is greater than the average person, the taxpayer fails the Defendant's test.

If a taxpayer seeks to speculate on the market, then the taxpayer fails the Defendant's test. On the Defendant's approach, an investment in a

restaurant or an oilwell or gaswell or in a new startup, would not satisfy the Defendant's objective profit test. If you apply the government's objective profit test, as rigidly as it wants it applied, then the entrepreneurial spirit, the risk-taking that made our country so vibrant, also fails this test.

The facts are that the Welles family had considerable resources and they had the wherewithal to take an educated chance with respect to the some of that wealth, on a speculative investment.

None of them were venturing their last investment dollar. Jeff Welles had analyzed the prospective trades. There was a basis for a contrarian view that the euro would rise in value in relation to the dollar and that the Swiss franc would fall in relation to the dollar.

The Welles family took that risk. The investment failed. Didn't work. They lost. That does not make the investment unreasonable or a sham. It was a speculative risk for which the Welles family could double their money or if they hit that sweet spot, could reap enormous profits that they could use to fund their charitable endeavors.

Jeff Welles devoted appropriate attention to analyzing the trades. There was a reasonable

opportunity to profit. Additionally, the Defendant argues that the long and the short options are part of a single transaction and it should be integrated.

Expert testimony, however, will establish that the long and short positions are separate and distinct transactions. They're separate and distinct instruments.

These positions of section 988 transactions and under the Code are not to be integrated. The documents confirm that they are separate transactions and were intended to be separate.

Finally the Court acknowledges that a taxpayer can hold both long and short transactions, positions rather, at the same time and they will be treated as separate.

THE COURT: The government's position seems to be that because they were offsetting premiums, if you will, was going to be having almost a substantial exposure to Stobie Creek, that Stobie Creek avoided having to come up to satisfy margin requirements that would have been excessive and because of this structure that mitigated any real risk, the primary purpose of the transaction was not business purpose related.

MR. KOLEK: Well I think that's a false

premise on the part of the Defendant. I think that does not take into account what happens in the reality of the market on a daily basis. People enter into spread transactions on a continual basis.

There's no, nothing wrong with a spread transaction. It is two definitive transactions. One was a sale of an option, they used the premium from that particular sale to then, plus some additional dollars, to take a long position, to go out long. It's done every day. It's done by traders every day on the Chicago Merc, Chicago Board of Trade. It is a standard-type transaction.

THE COURT: Okay.

MR. KOLEK: In this case, Jeff Welles instructed the sale of the stock in Therma-Tru so he could fund the family office with proceeds of the sale. The structure used was well designed to provide maximum protection from liabilities. He also entered into foreign exchange option transactions that were designed to profit from perceived opportunities and currency values.

Those foreign options also allowed him to take advantage of a well-settled law, the Helmer case. Jeff entered into the option transactions. He structured his transactions with the advice of counsel

to give him the greatest flexibility of ownership of his shares of the family office.

All the entities that were used are still in place. His S corporation allows him the flexibility to make gifts of his interest in Stobie Creek without affecting the allocations of Stobie. It's a flexibility that all of the members of the Welles family currently enjoy. The S corporation structure also provided for some Ohio State tax benefits for each of David and Georgia and for Deke and his wife, Hope. Finally --

THE COURT: Have you had occasion to read about the Allison decision of Judge Wolski that was issued on --

MR. KOLEK: Yes, I did. I took a brief look at the Allison decision.

THE COURT: Did you like that verdict?

MR. KOLEK: I did.

THE COURT: I realize the burden has shifted but in terms of his canvassing the law and saying that the Tenth Circuit approach probably is the best one to apply in terms of the reasonableness or reliance on investment advisor's view recommended?

(Traffic noise nearby.)

MR. KOLEK: Yes. I think one of our former

witnesses, Stuart Smith, was the attorney --

THE COURT: Right.

MR. KOLEK: -- in the Allison case. I would, you know, I'd be more than happy to prepare some type of a brief on that.

THE COURT: No. I'm just querying you as we go forward.

MR. KOLEK: Okay. Finally, on the question of penalties. No penalties should be imposed where a taxpayer reasonably relied on the advice of tax professionals and acted in good faith with respect to the particular item in question. That's what Boyle teaches us.

The evidence will show that Jeff consulted multiple tax professionals prior to making any action. He wanted to do things right, not only for himself but for his family. When it came to forming a family office and establishing a family foundation, he sought the advice of David Herpe, a family office and an estates and trust expert at McDermott, Will & Emery.

When Jeff was looking for tax advice on the sale of stock in Therma-Tru, he consulted David Waterman, a trusted advisor with Shumaker, Loop & Kendrick. David sat on the board of Therma-Tru. Mr. Waterman was the managing partner and served, from

this, served Therma-Tru and Welles family for almost four decades. The evidence will show that Mr. Waterman suggested that Jeff seeks the counsel of Jenkins & Gilchrist. Jenkins was a large firm with a fine reputation for tax matters.

Jeff acted on Mr. Waterman's suggestion and met with the attorneys at Jenkins. He learned of the techniques they suggested and discussed it with Mr. Waterman. He gained greater confidence when Mr. Waterman advised him that his firm had other clients that engaged in this similar transactions, that the Shumaker's own tax lawyers had researched the techniques and that Mr. Waterman, himself, if presented with the opportunity, would engage in the transaction.

Upon learning that engaging in foreign exchange options were part of the strategy, Jeff satisfied himself that there was an appropriate opportunity for profit as well that fit well within the risk parameters of his family.

Still, he did more. He made certain that the new chief financial officer of Stobie Creek, Larry Goldstein, an attorney and CPA was brought into the loop. In short, I think Jeff Welles received and reasonably relied upon the advice of trusted

professionals. And that's where we're at today. Thank you.

THE COURT: Thank you very much. May we take a short break before you begin?

MR. GIBSON: That would be very helpful and we could get our easel set up here.

THE COURT: Okay. I have 11:05, we'll break now.

(Whereupon, a short recess was taken.)

THE COURT: Please proceed.

MR. GIBSON: Thank you, Your Honor.

THE COURT: Is everybody here from claimant's table? We have, for the record we have a very large and powerful chart that took some mastery to make. I'm very impressed. We saw critical path charts that were as large.

MR. GIBSON: We wanted to make it so I wouldn't need my glasses to read it, Your Honor. And we'll see if I need my glasses to read my own notes.

Your Honor, I need to talk about what the case is about and what the case is not about. The case is not about whether the Welles family are philanthropists. This case is not about whether the Welles family did due diligence when they sold their company. This case isn't about whether Stobie Creek

has a valid business purpose for having been formed. It's not in our pretrial memo.

What this case is about is whether the particular transactions that generated the tax benefit that they claimed, that is an artificial increase in basis of more than a fifth of a billion dollars had economic substance.

And so I need to go back and redo or at least cover a little of the glam and the timeline to put a little em-pha'sis on the right syl-lab'les. Because, obviously, our case differs a bit.

Your Honor, this is a case about a family that sold their business and made inquiries about how to pay the lowest amount of taxes they could to eliminate taxes on the income that they would get from selling the business, $204 million.

And I don't think it's ironic, although one might think it is, that this is not the first time that the Welles family has been in this courthouse arguing about this tax shelter. Three and a half years ago, the IRS issued a summons to Jenkins & Gilchrist for information about their development, marketing, promotion and implementation of Son of BOSS tax shelters.

And lo and behold, the Welles family members

intervened in that lawsuit. They filed affidavits from two of their lawyers, Mr. Waterman and Mr. Ivsan, and unfortunately we will not be hearing from Mr. Ivsan during this trial because he's declined to testify and reliance on his rights under the Fifth Amendment.

And they came in and what did they tell the Court? They told the Court, in the Northern District of Illinois, that the IRS should not be able to have access to the communications between their lawyers at Shumaker, Loop & Kendrick and the lawyers at Jenkins & Gilchrist because those were privileged.

And they came in and they said, we went and we sought out tax strategies and that's the first thing, that was their first contact with the Court system involving this transaction. And I don't think that that should be lost on the Court.

Now, in our view, all of the rest, pretty pictures of the doors, the abortive sale, what happened, the tragic death or Mr. Welles, Sr., that's all aside. That's all on the side. That's not what this case is about.

What this case is about is a series of preplanned, orchestrated steps that Jenkins & Gilchrist designed for hundreds and hundreds of

taxpayers that Jenkins & Gilchrist got compensated for.

That Deutsche Bank assisted in implementing for hundreds and hundreds of taxpayers, that Deutsche Bank got compensated for. That Shumaker, Loop & Kendrick assisted in implementing for some taxpayers, that Shumaker, Loop & Kendrick got compensated for.

And it's about, to borrow a phrase from Mr. Kolek, this is about reality. And in reality, in the cold light of reality, what they did made no economic sense whatsoever. And we will prove that. And what they did was designed, was designed from the start to produce a prearranged result using a series of steps. And I'd like to just go through the timeline that we have here, Your Honor, because I think it's best to see it laid out.

In December of 1999, Therma-Tru agreed to the buyout deal with Kenner. The details aren't particularly important except they knew that they were going to have to pay tax on about $204 million worth of gain.

The very same day that they accepted the offer, their lawyer at Shumaker, Loop & Kendrick, John Ivsan, wrote to Donna Guerin and said I have new clients, can you send me confidentiality agreements so

I can talk about this tax shelter with you.

What's interesting is, and this is ironic, that e-mail is one of the documents that the Welles family tried to prevent the IRS from finding when they intervened in the summons lawsuit here in Illinois three and a half years ago.

About three and a half weeks go by, David Sr., Deke and Jeff Welles sign confidentiality agreements so that Jenkins & Gilchrist could disclose the details of their confidential tax strategy to the Welles family.

And on January 24, you heard Mr. Kolek refer to the meeting in Vero Beach, and at that meeting, David Waterman told the Welles'es about the basis-enhancing derivative structure using foreign exchange options, or the BEDS Shelter.

Now one of the documents we obtained from Jenkins & Gilchrist in discovery in this case, what's interesting is we never got a copy of the BEDS memo from the Welles'es in discovery. We did get one from David Herpe and we did get a whole bunch of them from Jenkins & Gilchrist.

And what happened was they laid out this plan and the plan has seven steps. Now the seven steps are dependent, Your Honor, on a bunch of things

happening, the formation of particular entities, individual limited liability companies, the formation of the Stobie Creek partnership, et cetera.

And so what did they do? They formed Stobie Creek on March 3rd. Three days later David Waterman wrote and said Shumaker will get a portion of the Jenkins & Gilchrist fee and says, "I believe we had been clear that we are not recommending that you pursue their proposal."

And then he also sent them a sample tax opinion letter written by Jenkins & Gilchrist and also advised them about certain other developments that, and that's Defendant's Exhibit 45, Your Honor; 11 days later, what did they do? They did exactly what they needed to do to implement the tax shelter. They formed six single-member, limited-liability companies and seven single-owner S corporations, one LLC and one S corp for each of the Welles'es.

And just so the Court knows, there was David, Sr., there were five siblings and then David, Sr. had a qualified annuity trust and that was one of the S corporations.

Two weeks later they did the deals and this is an issue that's in dispute, Your Honor. On March 30, 2000, Jeff Welles directed the Welles family trust

to transfer $2,045,750, that is the total cost of the combined options, to the recently opened accounts at Deutsche Bank.

And Mr. Kolek referred to loans. The only evidence that there will be of loans is oral. There was no contemporaneous written note of any of the loans. And the evidence of the recording of those loans was made well after the fact, Your Honor. It's the United States' position that there were no loans, that the Welles family members never paid for these contemporaneously until after everything was consummated. Then what happened? Well --

THE COURT: How was the interest determined?

MR. GIBSON: How was the interest, I'll get to that in a second, Your Honor. If the Court will bear with me?

THE COURT: Sure.

MR. GIBSON: The first step is the taxpayer, through a single-member, limited-liability company, writes a short option position on foreign currency and a long option position is purchased using the short option premium and taxpayer cash.

THE COURT: And what exhibit are you referring to? It's one of Defendant's, correct?

MR. GIBSON: I'm sorry?

THE COURT: The Jenkins & Gilchrist letter, that --

MR. GIBSON: Yes.

THE COURT: For the record.

MR. GIBSON: Can I --

THE COURT: It's demonstrative, if you're ready?

MR. KOLEK: 244.

MR. GIBSON: That's right, it is, that's why we have it up there. So it's the idiotproof chart, Your Honor and unfortunately, I'm not idiotproof. It is Defendant's Exhibit 244, Your Honor. And the references to the exhibits are on the chart.

THE COURT: Right. And I just wanted to know if you did have a smaller copy of your timeline that is in the exhibit books?

MR. GIBSON: We did not, Your Honor because we --

THE COURT: That's fine.

MR. GIBSON: Okay. What did they do? They, they entered into FX option trades and that's step one of the BEDS memo. That is they write a short option position on foreign currency and they buy a long option position on foreign currency. And instead of paying for the long option they pay the net amount.

They pay the net amount and the net amount was the $2,045,750 combined for all the Welles family members.

Now what we'll also prove, Your Honor, is that the amount, and this gets to the Court's last question, the amount was determined by reference to the expected gain for each member of the Welles family on the sale of their particular amount of stock in Therma-Tru. And there's a chart that lays out how each amount for each option is determined for each LLC for each member of the Welles family. And they were written to correspond to the expected gain.

THE COURT: Now you've heard Mr. Kolek say they're making this due diligence assessment of the proposed investment. Mr. Jeffrey Welles, based on his own experience, was not surprised to see really high fees. Is the government going to offer proof that in the normal course they are in structure to expect a gain of this nature?

MR. GIBSON: I'm going to get to that. The short answer's yes. The longer answer is I'll explain why a little later in my opening.

THE COURT: I will now be silent.

MR. GIBSON: That's okay. Good questions. So what did they do next? They followed the second, taxpayer forms a partnership with a third party or

with this wholly owned S corporation in which the taxpayer's a 99-percent partner.

At some point, the Welles'es became members of Stobie Creek. This is, the date of that, the timing of that is a bit in issue, Your Honor, because there are documents that we will offer into evidence that reflect that the entire package of documents necessary to implement the transaction were signed undated, so that Ms. Guerin at Jenkins & Gilchrist could enter the dates so that the documents reflected the transactions occurring in the appropriate sequence to generate the tax benefit.

Because, obviously, if they didn't sign them in the appropriate sequence, they wouldn't get the tax benefit. So that's why a couple of these say date unknown. So that's step 2. And as the Court can see, we highlighted in red all of the seven steps.

On April 3rd, Deutsche Bank issued confirmation letters for the foreign exchange options. I'll get to that shortly. Then step 3, on April 3rd, the taxpayer contributes the options spread position to the partnership. And the position of law, as Mr. Kolek said, is their position is that the basis increases includes the amount of the long option but it's not offset by the amount of the short option.

Now, we will offer expert testimony, Your Honor, that the two options were inextricably intertwined. That is, as a practical matter, and I keep going back to Mr. Kolek's statement about reality, in reality it was a practical impossibility to separate the options. It would have been financially disastrous for the Welles family to attempt to separate the options. So that's what they did on April 3rd. That's step 3.

Step 4, again, we don't know what date because of the whole issue about having signed documents that were not dated. The partnership halter purchases foreign currency or the partners contribute such assets to the partnership.

Step 4, each of the Welles'es allegedly transferred their Therma-Tru stock to Stobie Creek. Now these were 17-day options, so it was pretty easy to find out you don't have to wait around very long to get the answer.

Step 5, and in appropriate time, the partnership closes the option positions or the options expire and the partnership recognizes gain or loss. As Mr. Kolek said, not in dispute, all the options finished out of the money. I'll explain a little later why that's not a surprise.

April 30, they do step 6. The partnership interest is contributed to a subchapter S corporation and a tax basis step-up election is made. This will result in a step-up in the tax basis of the capital assets held by the partnership to an amount equal to the outside basis of the contributing partners. And it's as Mr. Kolek described but it was done pursuant to this prearranged plan.

And finally, on May 9, the Therma-Tru stock was redeemed, partnership sells the stepped-up capital assets, generating reduced gain for tax purposes. And so the shelter worked the way it was designed that generated the step-up basis. And we get around to August. In August, the IRS issues notice 2044. And at that point, Mr. Waterman writes to the Welles'es and tells them a few things. First of all, he says, the fee payable.

And I want to point out for the Court's benefit, that the fee agreement wasn't actually signed until sometime later. But the understanding for the amount of the fees was clear from the get-go. The fees were a percentage of the gain to be sheltered from taxation. It's in Mr. Waterman's letter. He says that the fee payable to Jenkins & Gilchrist and Shumaker is 3 percent of the gain to be sheltered.

He also tells the Welles'es that he won't charge them if they don't report the transaction on their tax return on the basis of the Jenkins' opinion. And then of course we get into 2001 and 2002 and the Welles at Stobie Creek files his tax return, reports a step-upping basis of $204 million. And again, the allocation of the option contracts was directly related to the amount of income expected from the redemption of the Therma-Tru stock that each member of the Welles family expected to receive.

THE COURT: What relationship if any, again this opening statement is your thought for, the evidence of these will tell me if it won't as to the August 9th letter and the August 13th issuance of the notice?

MR. GIBSON: Well, we're going to put the letter in, Your Honor. And Mr. Waterman will tell --

THE COURT: I know you're going to put it in, but is it Defendant's position that there was a motivation of Mr. Waterman, as reflected in that letter, that anticipated the issuance of the notice?

MR. GIBSON: Well, I don't believe so. I agree with a couple things that Mr. Kolek said which is, that there is some concern at the firm about whether or not his 2044 covered these transactions. I

think it's fairly clear that it does. And I will add, Your Honor, that any advice that would have been given either by Jenkins & Gilchrist --

THE COURT: Well, let me put it another way. You highlighted language near the Munster exhibit. You said Mr. Waterman offers not to charge this extraordinary percentage fee and quotes Mr. Welles, "[E]lect not to pursue recording the transaction on the basis of the Jenkins opinion, which you have emphasized." Are you going to be eliciting testimony that explains the motivation for that statement?

MR. GIBSON: I expect we will, Your Honor. I'm not sure, except that they're related in time, I'm not sure that one is dependent on the other. That is, I'm not sure that the statement, I guess I should have put different colors on them. But the answer is, not necessarily.

Now in order to avoid paying the capital gains taxes, this particular strategy, the BEDS strategy, called upon the Welles'es to use a very highly structured foreign currency option as a vehicle. And the options had a number of important features. As I just said, the amount of each option was determined not by reference to how much money anybody wanted to invest in foreign currency options,

but each amount was picked to correspond almost precisely to the amount of income that each member of the Welles family sought to shelter from taxation.

Mr. Kolek talked about the pricing. And we'll present expert testimony on the pricing. These options were not priced by any reference to market conditions or currency option pricing theory. Again, I refer to Mr. Kolek's use of the word "reality." The pricing of these options didn't bear any relationship to reality. As the Court might understand, foreign currency options are fungible commodities. You can walk into a money center bank and buy a foreign currency option that's priced according to a fairly well-established set of criteria referred to, in general, as the modified Black Sholes formula. We'll have expert testimony from Dr. DeRosa about the modified Black Sholes formula. We may even have testimony --

THE COURT: I'm so delighted to learn that I will have to go into the shoals of the Black Sholes formula again.

MR. GIBSON: I once misspelled that, Your Honor. S-h-o-a-l-s.

(Laughter.)

But the options were priced at almost

exactly 1 percent of the gain from the Therma-Tru doc. that the Welles'es had sought to shelter from taxation. It's out contention, Your Honor, that that was the fee, a disguised fee, that the folks at Deutsche Bank received to do the transactions.

On an individual basis, just to put this in perspective, on an individual basis applying standard option pricing theory, the options taken separately, the long options, the short options separately, they were overpriced by about three times the market rate. About 300 to 350 percent of the price that somebody walking in off the street would pay for these options.

And I might add at this point, Your Honor, that it's also undisputed that Mr. Welles is an extremely sophisticated investor. He's managed millions and millions of dollars of other people's money, his own family's money. He has an M.B.A. He has a currency trading license. I think it's a Series 15. And certainly the expertise to have been able to analyze the pricing of these opinions and determine for himself that the options, the prices that he and his family were called upon to pay for these options, according to the tax shelter strategy --

THE COURT: Mr. Kolek's anticipated response in his opening argument is that spread transactions

are very common. And so, when you talk about your analysis, these are priced more than three times more than the market price for the options, are you saying in terms of pairing them their price is three times or more?

MR. GIBSON: Actually when you pair them they're only twice what the market would charge. And what's interesting is that Dr. Kolb and Dr. Levich both priced these options and both reached the same result as Dr. DeRosa that applying standard option pricing methodologies that are common in the financial industry, on a net basis, when you net the short against the long they were overpriced by about 2 to 1.

The options covered a very short timespan and in fact the Plaintiff will offer an expert, Dr. Frankle, who will testify that he would never hazard a guess. He's an expert in the markets of foreign currencies, not in these particular transactions. And he will testify, we expect, that the period of these options, 17 days is so short that he wouldn't even hazard a prediction as to the way in which the markets will move.

And next, the options look like about 500 other options that Deutsche Bank sold and bought and that Jenkins & Gilchrist helped facilitate for other

tax shelter clients. And finally, the options looked very little like normal currently options. Yes, it is true, you can walk in off the street to Chicago Merc or to Deutsche Bank or to any money center bank and buy a spread. These don't look like that. The option conforms make it very, very clear that the two options are inextricably linked. And we will offer the expert testimony of Dr. DeRosa to prove that, Your Honor.

At the end we will prove that the options were nothing more than a figleaf, a vehicle designed to generate an artificial bump in the basis of the Welles' Therma-Tru stock. And in fact the Welles'es had no experience whatsoever, either before or since trading foreign currently options.

Now to understand why these were figleaf, it's important to know a little bit about the details of these particular options. Each one had a similar structure. Each was described in a trade confirmation document as having two components, one long and one short. That is, an LLC formed by a member of the Welles family purportedly bought a long option from Deutsche Bank and purportedly sold a long option to Deutsche Bank. The options were on identical currencies, either euro and U.S. dollar or U.S. dollar and Swiss franc. The options were in identical

amounts. But the total of the long options is equal to the total amount of income that the Welles'es sought to shelter from taxation.

The only difference between the long option and short option was that the strike price, that is the price at which on expiration the options would either pay off or not, differed from the strike price on the other options by what we refer to as two pips.

Now in financial jargon, a pip is one hundredth of a cent. That's .0001 cents. These were two of those. Or on the Swiss franc options they were two ten-thousandths of a franc. Very, very tiny spread. We're all referring to these as the sweet spot and we will present the testimony of Dr. DeRosa why the sweet spot was illusory. That is why Deutsche Bank had the basically unfettered discretion to decide what price it would take to pay off on the expiration date.

And Deutsche Bank had a wide range of commercially acceptable numbers from which to choose, most of which were outside the sweet spot. As practical matter, none of these options and none of the options done for the hundreds of other tax shelter clients who did this tax shelter, ever came close to hitting the sweet spot.

Now each option component provided that if the currency exceeded a particular strike price on expiration, the seller of the option would pay to the buyer of the option double the amount of the premium.

The options were structured to theoretically each option pair had three possible outcomes. (1) both options finish in the money and the taxpayer gets double the amount of his premium. (2) both options finish out of the money and the taxpayer loses the total amount of his premium. And the third is the sweet spot where the taxpayer's option finishes in the money and the bank's option finishes out of the money. And the taxpayers get that lottery-type payout. That's a likelihood that ranged from extremely remote to nonexistent. But that's theory.

Here's what actually happened with the way the Welles'es structured their options. Under the way they structured the options the outcomes were not even as rosy as a 30-percent possibility of doubling your investment on an option that was twice market price.

So Jeff Welles knew and Mr. Kolek mentioned it, that the euro and the Swiss franc were closely correlated against the dollar. That means that they both traditionally move in tandem against the dollar. So when one goes up the other does too and vice versa.

And because they were so closely correlated they also tended to move by similar amounts against the dollar. Dr. DeRosa will testify that the correlation was about .97. None of the other experts calculated the amount of the correlation.

They do not move in opposite directions. To move in opposite directions would reflect a negative correlation. And Jeff Welles structured the option transactions in a way that virtually guaranteed that he couldn't make any money. He arranged the options so that the euro option paid out 2 for 1 if the dollar lost value against the euro. And the Swiss option would pay out if the dollar gained in value against the Swiss.

And not only that but he arranged the euro options and the Swiss options in identical amounts. Because they were so closely correlated, Jeff Welles virtually insured that he and his family would either break even or lose their entire premium.

I have prepared a matrix that's based upon the testimony that Dr. Kolb, who is the Plaintiff's expert, this is a revision a bit of one of the charts in his report. This illustrates the possible payouts under the option scheme that Jeff Welles entered into. And Dr. Kolb actually calculated, I'm going to run

through this. I actually had these color-coordinated, Your Honor. The Swiss is in this kind of beigey color. I'm colorblind, so --

THE COURT: Gold.

MR. GIBSON: Okay, that would help. And out of the money is in gold. In the money is in maroon.

THE COURT: Burgundy.

MR. GIBSON: Burgundy, maroon. And the euros are in the grand shade of blue or something. Anyway, there were four options, as I just said. They both finish out of the money, in which case the taxpayer loses the entire premium. This is the actual amount of the premium, the aggregate premium that the Welles family members paid.

The euro option finishes in the money and the Swiss finishes out, they break even. If it's a 2 for 1 payout on the euro and he loses his premium on the Swiss, if the Swiss is in and the euro is out, the same thing. They both have to hit for him to make 2 for 1.

Now there will be no evidence produced, at least there hasn't been any in discovery, about what the odds were of any these four things happening. But we have a clue. Dr. Kolb actually calculated this, but he didn't put it in his report. And what he

found, and I don't buy into the methodology, but I want to give the Court a flavor for what his report reflects. What Dr. Kolb did is he said, let me look at all of the 17-day periods for the year immediately preceding March 31, 2000 when Jeff Welles did the deal. How many of those did the euro, would the euro have moved in the proper direction in the proper amount to create the 2 for 1 payout. And the same thing for the Swiss.

And here's what he found. Euro option in the money, this box, 35 out of 349, about 10 percent. This box, Swiss in the money, euro out, about 6.6 percent, 23 times in 349 tries. He didn't calculate and he didn't put in his report this or this. And he didn't attempt --

THE COURT: When you say, this or this, the record won't reflect that.

MR. GIBSON: I'm sorry, thank you, the boxes where both of them finishing in the money or both of them finishing out of the money. But what he did is he produced the spreadsheet where he did his analysis. And his spreadsheet shows that the other 291 17-day periods in the year immediately preceding, he wouldn't have finished in the money. So if the Welles'es had done this transaction, these actual deals at any time

during the year immediately preceding March 31, 2000 6 percent of the time they would have broken even because the Swiss finished in the money. Ten percent of the time they would have broken even because the euro finished in the money. And 83 percent of the time they would have lost the whole investment. Not once in 349 tries would they have doubled it.

And I think the Court will have to draw its own conclusion, but we would submit, Your Honor, that Jeff Welles is a sophisticated enough investor to have known this. Whatever his subjective views on what might happen with the Swiss franc and the euro against the dollar in the very short two-plus-week period -- the options were written on a Friday and they expired on Monday, they're referred to in the trade as two-week options -- that what had to happen for him to hit the 2 for 1 payout was virtually assured not to happen.

Of course, that's not surprising because the reason that they did these transactions in the first place was as part of the seven step program called the Basis Enhancing Derivative Structured Tax Shelter.

And Mr. Kolek referred to reliance on individuals. And unfortunately, some of the people that the Welles' claim to have relied on won't be

testifying. Mr. Parse, whose deposition we took last fall in this building refused to answer questions. Even whether he knows Jeff Welles. Ms. Guerin, whose deposition we took here in Chicago also refused to answer questions. And Mr. Iverson, who wrote the e-mail on December 9, 1999 to Ms. Guerin saying, boy, do I have clients for you, he won't testify either.

Now, I mentioned the fact that we're going to hear from some experts. And there's an old expression that goes for each expert opinion there's an equal and opposite expert opinion. So sometimes what you have to do is see what's in common. Well, there are a number of things that the experts all agree on. Number one, that the premiums were all 1 percent of the long options. Number two, that the premiums don't bear any relationship to the actual market value of these fungible commodities. They all will agree that in order to achieve a positive payoff the dollar would have had to go down against the euro and up against the Swiss franc in the same period of time. And they all agree that either they didn't look at it or the likelihood of that happening was extremely remote.

You'll hear from Dr. DeRosa that he actually calculated an expected rate of return. It's a common

financial practice used when investors are evaluating possible investment alternatives to try to determine across a range of outcomes, what an expected rate of return is, knowing what the costs of the transaction are and the incidental costs.

And the expected rate of return, whether or not you include the $6 million that they paid to Jenkins & Gilchrist and Shumaker, Loop & Kendrick, was negative across the board. And what it's really telling about the experts is that none of the Plaintiff's experts even attempted to calculate the likelihood of any particular outcome and none attempted to calculate an expected rate of return.

What's also telling is that at no time before he did those options did Jeff Welles analyze the pricing, the possible outcomes or the expected rates of return. He relied upon the people who sold him the deal and every one of those people stood to make money from the deal, all as a percentage of the income to be sheltered from taxation.

At the end of the trial, Your Honor, we'll ask the Court to find that the BEDS tax shelter transactions lacked economic substance, that there was no business purpose for transferring the Therma-Tru stock, or the interest in the individual LLC's, in the

S corporations which existed in name only for a month.

There was no business purpose for any of the steps. There was no business purpose and no objective opportunity for profit from the currency transactions that the Welles'es engaged in. And all of the steps that we've outlined here in red follow the steps in the memorandum presented by Jenkins & Gilchrist. And under the STEP transaction doctrine they should be collapsed into one. And that the tax benefits, the elimination of capital gains taxes on a fifth of a billion dollars in income from the sale on Therma-Tru stock should be ignored.

We'll also ask the Court to uphold the IRS's determination to impose substantial penalties at the partnership level because the managing partner, Jeff Welles, had the requisite experience to know that these transactions had no objectively reasonable prospect to earn a profit, whether or not you take into account the fact that he was paying $6 million in fees to the lawyers to justify the transaction.

So that any gain that might theoretically have been earned from the options finishing in the money, $2 million would be more than swamped by the fees that he paid to Jenkins & Gilchrist and Shumaker, Loop & Kendrick to justify his reporting of these

outrageous transactions on their tax returns. And at the end of the day, Your Honor, we will ask the Court to uphold the adjustments made by the Internal Revenue Service in the notices of final partnership administrative adjustments and add it to the penalty adjustments as well.

THE COURT: When we're looking at the penalty issue and we're looking at reasonable cause and reasonable reliance on investment advice, in terms of the numbers of individuals who Jeffrey Welles consulted in terms of their particular background, in terms of his having obtained opinions from each of them, you're saying, put that aside because another case that has been held to be reasonable conduct in terms of vetting or doing due diligence on investments and focus instead on what Jeff Welles should have known because of his own expertise.

And because he didn't undertake to making an analysis of the investment rate of return, you're saying it should have been done. The cases today at least haven't involved in any way Mr. Welles' unique background. If you can separate the two isn't it true under the case law that he consulted enough individuals?

MR. GIBSON: We will dispute that, Your

Honor. We will offer evidence. I can't cover everything in my opening, but we will offer evidence that the individuals whom Jeff Welles consulted either lacked the requisite expertise to advise or that Jeff Welles did not share the particular details of the transactions that he was contemplating in order to get sound advice from these people. In other words, sometimes you get the answers to the questions that you ask and you don't get the answers to the questions that you don't ask.

And in this instance, and we will present the testimony of an individual upon who Mr. Welles claimed to have relied, to analyze the bonafides of these transactions; Neil Breslin (phonetic) who works at Goldman Sachs. And Mr. Breslin, we expect will testify that Mr. Welles never shared with him any of the details of these transactions and that had he even seen the indicative term sheets, the sample trade confirmations, that Jeff Welles was contemplating at the time in late March of 2000, that Mr. Breslin would have said he had never seen anything like this before.

We expect that the Plaintiffs will present testimony from Frank Edwards who was a friend of Mr. Welles who works at Morgan Stanley. Mr. Edwards has no expertise in currency trading, no expertise in

foreign currency options. And we expect that Mr. Welles testified in an interrogatory answer, and we will present that to the court at the appropriate time, that Mr. Edward performed an analysis of the economic substance of this transaction and in fact he did no such thing.

So there's two components to the answer, Your Honor. Number one, we believe that a man with Mr. Welles' level of sophistication and understanding knows the questions that he needed to ask to properly vet these transactions. That it would have taken very little to call up Deutsche Bank or Swiss Bank or any other money center bank and say, would you quote me a price on X and such option and they would do it over the phone using their Bloomberg terminal.

And also, to claim to have consulted individuals who either lacked the requisite expertise or were not asked the appropriate questions to be able to give objective advice as to whether these transactions could have made any money. Because, Your Honor, the Court will hear from the experts on both sides that the odds on both the dollar going up against the Swiss franc and down against the euro in the same period of time were virtually nonexistent. And at his level of sophistication we will show that

Jeff Welles should have known that. Thank you, Your Honor.

THE COURT: We timed that perfectly. Being high noon I think we should break for lunch before we go out first witness. Is one hour adequate for you, you tell me?

MR. CROWL: Whatever, whatever works best.

THE COURT: I usually do an hour unless we start galloping and then we have no choice to lose an hour tomorrow. So we will reconvene at 1:00 p.m.

MR. CROWL: Thank you.

MR. GIBSON: Thank you, Your Honor.

(Whereupon, the hearing in the above-entitled matter was recessed to reconvene at 1:00 p.m., this same day, Wednesday, April 9, 2008)

//

//

//

//

//

//

//

//

//

//

A F T E R N O O N  S E S S I O N

(1:00 p.m.)

THE COURT: Mr. Crowl?

MR. CROWL: Yes, Judge. We're ready to proceed, and the Welles family would call David Herpe to the stand, please.

Whereupon,

DAVID HERPE

having been duly sworn, was called as a witness and was examined and testified as follows:

THE COURT: Please sit down, sir, and state your full name for the record.

THE WITNESS: Okay. My full name is David A. Herpe, H-E-R-P-E.

THE COURT: Mr. Crowl.

MR. CROWL: Thank you, Judge.

DIRECT EXAMINATION

BY MR. CROWL:

Q Will you tell us what you do for a living, Mr. Herpe?

A Yes, I'm an attorney.

Q Where do you work?

A I work at McDermott, Will & Emery, LLP.

Q How long have you worked at McDermott?

A I've been there for almost 12 years.

Q What's your position?
A I'm a partner with the firm.
Q What area are you a partner in?
A I'm a partner in the Private Client Department.
Q And can you tell the Judge what the Private Client Department is?
A It's our fancy name for estate planning. We work with high net-worth individuals, closely held companies, charitable foundations, family offices, and similar entities relating to wealth transfer planning and other family-type issues.
Q Where did you work prior to McDermott?
A I worked at Schiff Hardin & Waite.
Q How long were you at Schiff?
A I was there about 18 years.
Q What area of law did you practice at Schiff?
A Also estate planning.
Q What did you do prior to working at Schiff?
A I was in law school.
Q Where did you graduate?
A Where did I graduate?
Q Yes.
A From the University of Chicago.
Q And what year?

A 1978.
Q Are you a member of any professional organizations, Mr. Herpe?
A Yes.
Q What?
A I'm a member of the American Bar Association, the American College of Trust and Estate Council, and the Chicago Estate Planning Council.
Q And can you tell us a little bit about McDermott, Will & Emery, please?
A Sure. McDermott is about an 1,100 attorney law firm, it's an international firm with 15 offices, both in the U.S. and overseas. We're essentially a general practice firm, similar to Schiff Hardin.
Q And what types of matters have you been involved with while at McDermott?
A Again, I represent high net-worth individuals, I work with them, their closely held businesses, their family offices. I do estate planning work, corporate succession work, reorganizational type work, charitable foundations, taxes, setting up and helping administer family offices, and things of that sort.
Q Now would you tell Judge Miller about your work in the area of family offices, please?

A Our firm represents a number of families that have family offices, some of which we've established for them, some of which were already in existence when we began we our representation. I've probably set up about five or six family offices for my clients, including for the Welles family.

Q And what is a family office?

A A family office is an entity that performs certain functions collectively for family members that can range from something fairly simple like recordkeeping, paying bills, cash management on the one end. The other end it could be investment oversight, tax compliance, coordinating estate planning work and actually serving as a fiduciary for trusts and foundations.

Q And Mr. Herpe, are you testifying today in part because you provided legal advice to the Welles family relating to creation of both a family office and also Stobie Creek?

A That's correct.

Q Tell us how you started working with the Welles family.

A I began working with the Welles family when I was at Schiff Hardin & Waite in 1993. One of the senior partners in our department had some connection

with Jeff Welles through Jeff's employment in New York at the time. And as they got to know each other, Jeff indicated that his family had a significant closely held company, and that his parents could probably benefit from our counsel on their estate planning.

Q And what was that closely held company?

A That was Therma-Tru Corporation.

Q And what do you know about Therma-Tru?

A Therma-Tru is based in the Toledo, Ohio area, they are a manufacturer of entry door systems and related products.

Q So when you had this indication that you might be able to work with the family, and in particular with regard to their Therma-Tru holdings, what happened next?

A We set up an initial meeting with Jeffrey's parents, David Welles, Sr. and Georgia, and that was held at the company offices in Toledo.

Q When was that meeting with David, Sr. and Georgia?

A That was probably in October, or thereabouts, of 1993.

Q And what was the purpose of that meeting?

A It was obviously to get to introduce ourselves, and get to know the client a little bit

better, to talk about some of their goals and concerns, and some initial thoughts that we had in terms of some estate planning ideas.

Q And did they have any concerns with regard to charitable activities?

A Yes, we did discuss various types of charitable things. Even at that point there was some interest in creating a family private foundation, or engaging in some other types of charitable planning techniques, planned giving techniques.

Q And did you know at the time whether or not they were involved in charitable giving?

A Yes, I believe they were.

Q Okay. Did you discuss with David, Sr. and Georgia Welles anything known as a Grantor-Retained Annuity Trust?

A Yes, we did.

Q And can you tell us what a Grantor-Retained Annuity Trust is, please?

A It's what's known as a leveraged gift technique, it's a trust which is used to transfer assets at a greatly reduced gift tax value, and as a means, therefore, to save transfer taxes.

Q And when you discussed this with Georgia and with David, Sr., when was that discussion?

A We would have discussed it preliminarily at this October meeting. We subsequently prepared for them a comprehensive planning memorandum, and we would have covered that in the planning memorandum with some specific examples. There was then a followup meeting with them and certain other people, which took place in Toledo, in December of 1993.

Q And did you explain what the tax advantages could be for, is there an acronym for these?

A These are called GRATS.

Q Okay.

A So a GRAT, Grantor-Retained Annuity Trust.

Q So did you discuss with them the tax advantages of having a GRAT?

A Certainly.

Q What was discussed?

A Again, we discussed how we could use this technique to transfer, in their case, a significant amount of Therma-Tru stock from their estates to the next generation, their children's generation, and in a certain respect to the grandchildren.

Q And what's the tax advantage of that?

A When you create a GRAT you are exchanging an asset for a fixed annuity, a series of fixed-annuity payments over a term. The GRAT is set up so that the

annuity payments are a more or less equal exchange for the asset put in. Based on tables that the government publishes you can value that annuity interest.

The gift that you make when you create the GRAT is the value of the asset you put in minus the value of the annuity stream. So the gift is only a fraction, and it can approach zero of the actual asset you put in. To the extent assets remain in the GRAT when the term ends, those pass on with no further transfer tax.

Q So in essence, you can avoid having to pay a gift tax?

A Correct.

Q Did you create GRATs?

A Yes, we created two GRATs.

Q What were they called?

A We created one for Georgia, which was the Georgia E. Welles 1994 Qualified Annuity Trust, and David's was the David K. Welles 1994 Qualified Annuity Trust.

Q What was the term, or how long were these GRATs in existence?

A They provided each for a four-year annuity.

Q And can you tell us what happened over that four-year period?

A Well, each of the trusts were funded with shares of stock in Therma-Tru, nonvoting stock. Therma-Tru paid a dividend on its stock periodically, the dividends were used to fund the annuity payments.

So by the time we actually got to the end of the four years we hadn't had to distribute anything other than the dividend cash back to David and Georgia. And the result was that all of the stock was still in the trust at the end of the four-year period.

Q And do you have any sense for what the tax savings was for the Welles family because you used a GRAT as opposed to just gifting it outright?

MR. JOHNSON: Your Honor, I'm going to have an objection to the relevance of this line of inquiry. This is about conversations that happened in 1993 and tax vehicles that aren't at issue in this case. So I believe it's gone on a little too long at this point.

THE COURT: Mr. Crowl?

MR. CROWL: Judge, it's very relevant because the government has already suggested in their opening statement that in essence this was all too good to be true, that somehow there should have been red flags. And I'll expect they'll argue that in closing with every witness. And here I'll expect you'll hear that they knew that there was a

substantial advantage, that it complied, and did, and still does comply with the law.

And that is a relevant timeframe and mentality for when somebody else comes and says, here's a tax strategy, complies with the law, this kind of history shows that they reasonably relied on tax advice as opposed to thinking, gosh, this is just too good to be true.

THE COURT: Well, I think the particular vehicles are different. However, to show that the family was very interested in lawful and legitimate tax-saving methodology is relevant. And therefore I'll overrule the objection.

BY MR. CROWL:

Q What was the savings from the GRAT as opposed to having just gifted this outright without using a GRAT?

A At the end of the GRAT term, the stock was valued at approximately $56 million, and that $56 million of stock, therefore, passed without any gift or estate tax to the beneficiaries. The tax rate at that time was 55 percent at the high end, so the tax savings was approximately $30 million.

Q And based upon your experience, was that appropriate under the Tax Code?

A Yes.
Q I want to talk a little bit, Mr. Herpe, about how you helped established three entities one, North Channel, two, Stobie Creek, and three, Cricket Island. And to start off with some background, did you have a conversation with David, Sr. and Deke, who is David, Jr. regarding sale of the company?
A Yes, I did.
Q When was that conversation?
A There were several conversations which took place in the summer of 1999.
Q And who was involved in those conversations?
A Initially it was David, Sr. and Deke.
Q And you, obviously?
A And myself, sure.
Q In person or over the telephone?
A It would have been over the telephone.
Q And tell the Judge what was said.
A They alerted me to the fact that they were looking to sell the company, they had a potential buyer. They talked a little bit about what a deal might look like, and they were particularly interested in taking advantage of any relevant estate planning techniques that might apply in connection with the sale, as well as the possibility of using some of the

sale proceeds to set up a family foundation.

Q And what did you say?

A I said we certainly felt that there were some things we could in that connection.

Q Did you have a conversation with Jeff Welles relating to these issues?

A I had a couple of different conversations with Jeff Welles as well.

Q When?

A During the same time period, probably late in the summer of '99.

Q In person or over the telephone?

A Over the phone.

Q Who was on those calls?

A Just Jeff and myself.

Q Tell us what was said.

A We talked both about some estate planning ideas again as a followup from my earlier discussion with Jeff's father. And Jeff raised the idea for the first time also of the possibility of creating a family office and a family investment entity.

Q Now you described for the Judge what a family office is, tell us what a family investment entity is, please.

A Jeff had a sense, and I think it was shared

by his parents, that having the family invest collectively through a single entity provided a lot of advantages to the family. So we discussed setting up what ultimately became Stobie Creek as an investment vehicle where all of the collective assets would be invested. And we talked a little bit about some alternatives for what that entity would look like and how it might operate.

Q And tell us what are the advantages of having an entity, a collective entity for investment.

A Sure. There are several advantages, one simply being if you put a lot of separate funds together you have a much bigger fund, that gets you economies of scale in that you can often reduce your investment costs. It gives you access to higher-end managers, it helps you meet high minimums, a lot of these higher-end managers have a million or even $5 million minimums for investing in their vehicles. It provides you with some centralization of management and planning in terms of your own asset allocation strategy. It can also provide you with some asset protection benefits.

In this case, we contemplated setting up a number of different funds within the LLC that would invest in different asset categories. And the idea

was that each participant could pick and choose which funds that they wanted to invest in.

Q And you said that conversation took place at the end of the summer?

A Yes.

Q Did you have a meeting in Toledo then to discuss these ideas?

A Yes, we did.

Q When was that meeting?

A That meeting was in early September of 1999.

Q And where did that meeting take place?

A That meeting took place at a country club, Dave and Georgia's country club, in a suburb of Toledo, I don't recall the name of the club.

Q Who attended?

A At the meeting was, excuse me, David Welles, Sr., Georgia, and Jeffrey, and myself.

Q And what was discussed at that meeting?

A We again talked about the proposed sale of the company, and we talked about various planning strategies with the focus on setting up a family office, and how we could use a portion of the sale proceeds to set up a family foundation, and some related gifting.

Q Now you talked about the sale of the

company, did you have a sense as to what the status of the sale of the company was at the time?

A In September, I think they anticipated that they would complete a sale to the potential buyer. I didn't have a good sense of the timeframe at that point.

Q And did that sale ever go through?

A No, that sale did not go through.

Q Now, you mentioned a foundation that they were discussing as well. Tell us about that, please.

A David and Georgia were very active in the Toledo Art Museum, they were philanthropic in the community, and they were very interested in setting up a private foundation as a means to channel future charitable giving.

Obviously their largest asset being Therma-Tru, they were interested in coming up with some ideas of how they could use a portion of the sale proceeds to fund the foundation, and whether there might be some tax advantages, which there might be in terms of deferring capital gain on the sale.

Q Did you eventually create a family foundation?

A Yes, we did.

Q What was it called?

A It was ultimately called Cricket Island Foundation.

Q And when was it created?

A It was actually created in May of 2000.

Q And what was the mission of the Cricket Island Foundation?

A The Cricket Island Foundation is a private foundation under the Internal Revenue Code, and it's a grant-making foundation, so it gives money to public charities.

Q I want to talk a little bit about creation of the family office. You talked generally about family offices. Did you create one for the Welles family?

A Yes, we did.

Q And ultimately, what was that one called?

A That was called North Channel, LLC.

Q Okay. In particular, I want to draw your attention to October of 1999. What, if anything, did you do with regard to North Channel in that timeframe?

A Well, at our September meeting we were told to go ahead and set up the family office, so we began working on the documentation. We filed, at the beginning of October, a certificate, articles of organization in the state of New York to form North

Channel. We also prepared an operating agreement, and some related documents, and sent those on to family members for review, I believe in early November.

Q And who runs the family office?

A It's a manager-managed LLC, and the manager is Jeffrey Welles.

Q Do they have other employees as well?

A Yes.

Q Who?

A Currently, they have, I think, six or seven employees. I know two of them, Jeff obviously being the third, but I know two others, Larry Goldstein, who's the chief financial officer, and Bill Chung, who was their chief investment officer.

Q And what are the functions of North Channel, or the family office?

A North Channel originally, in its sort of embryonic stage, was there to sort of follow the potential sale, and consider ways that the funds might be used for investment, and it did some recordkeeping.

Today it's involved in a whole range of services, tax compliance for family members, coordination of investments, and oversight of investment managers, cash management, I mentioned recordkeeping, coordination of some estate planning

for different family members, et cetera.
Q Okay. I want to take you back to that October of 1999 timeframe.
A Okay.
Q Did you have another conversation with Jeff Welles about the creation of a pooled-investment entity?
A Yes.
Q Approximately when was that conversation?
A That would have been in October or November. I think that was sort of phase 2, if you will, of setting up the family office and connecting it with the Therma-Tru sale.
Q Was that a conversation in person or over the telephone?
A It would have been over the telephone.
Q Who was in the conversation?
A Jeff and myself.
Q Tell us what was said.
A Jeff, following up on the earlier conversation back in the summer, was very interested in the idea of setting up a separate investment entity. We discussed some possible structural design in terms of this multifund approach. how that might work. We talked about the fact that our law firm had

a great deal of expertise in setting these up. Jeff was very interested in the proposal, wanted us to think about issues that might come up in terms of what additional information we might need and how we might structure it.

Q It sounds like you're setting up and entity for the pooled holding of investments that's separate from the family office?

A Yes, it was a separate entity.

Q Did you recommend that?

A Yes.

Q Why?

A That has a number of advantages, it doesn't blur the functions of the family office, which in large part were also in areas outside of investments. The structure was different because of this multifund approach that we were using, it had a much different tax and accounting set of provisions in the operating agreement.

We contemplated that North Channel would operate as the manager, so that North Channel could perform certain administrative functions that the entity itself didn't have to perform.

That entity potentially would have been owned by different people. North Channel, the only

members were David and Georgia. The investment pool we contemplated would include the five children and a variety of trusts. There was some concern about liability because North Channel was an operating business, which potentially could have liabilities, we didn't want those applying against the investment portfolio. So for a lot of reasons it made sense to use a separate entity.

Q And ultimately then did you create Stobie Creek, the investment entity, as separate from North Channel?

A Yes.

Q By the way, had you had experience with other clients in creating these two separate structures where you've got the family office and the Stobie Creek investment entity separate?

A Yes, we do that quite frequently.

Q And tell the Judge about that.

A We have a number of different clients who have similar vehicles with the multifund strategy, and we always set that up as a separate entity for many of the same reasons that I mentioned.

Typically the family office is the manager of that entity. There's generally differences in ownership between the entities. We have the same

concerns, liability concerns and things of that sort. Sometimes we actually set up more than one investment entity, we might have two or three, all of which are managed by the family office.

Q So after your conversation in October or November with Jeff about the creation of the pooled-investment entity, what did you with regard to gathering information?

A Well, we had to make a determination about where we were going to form the entity, Jeff's office was in New York, the family members lived in a variety of different jurisdictions. So we were trying to determine what state we should form it in, what relevant state rules might apply, whether we would have securities law issues in terms of having to register as an investment advisor, things of that sort.

We started sketching out issues that needed to be addressed in terms of how many funds might we create, who the members might be, what some of the tax issues in terms of structuring the allocations would be, and things of that sort.

Q Now, I want to talk a little bit about a family meeting that took place. Did you attend that family meeting?

A Yes.
Q Okay. How did it come about that you went to the family meeting?
A I was invited to attend the family meeting by Jeff.
Q Okay. And did he explain why?
A The family meeting was an opportunity to vet a bunch of ideas for the family connected with the Therma-Tru sale, including the family office and what it was going to evolve to be, the investment entity, and the foundation.
Q Where was the family meeting?
A The family meeting was at the Welles' home in Vero Beach, Florida.
Q When was it?
A It was on January 24th of 2000.
Q And can you tell us about your attendance at that meeting, please?
A Yes. I drove down from Orlando to attend the morning session of the meeting, which started at 8:30, and it ran until about 12:15 or 12:30.
Q And did you know at the time whether or not that was the only session or whether or not the meeting was longer?
A I don't recall when I found out that there

was an agenda. I guess I did know because I prepared the agenda for the meeting along with Jeff's assistance, so I knew before I went that there was going to be two additional sessions, if you will.

There was a family only sort of informal meeting the night before, which was a Sunday evening. And then there was the morning, where I was participating in, and then there two afternoon sessions.

Q Now, were you or your firm involved at all in the sale of Therma-Tru?

A No.

Q Were you and your firm involved at all with any income tax strategies?

A No, we weren't.

Q Were you or your firm, I guess McDermott's a nice place right?

A We feel like family.

Q Were you or your firm involved at all in any option purchases?

A No, we weren't.

Q What was your purpose for attending the meeting?

A My purpose was to explain these three entities and what we anticipated doing with them, how

they would be set up, who would participate, some of the timeframe, et cetera, and what some of the advantages were to the family. The purpose was to essentially get everybody's endorsement to proceed.

Q So tell the Judge about that morning session that you attended then, please. You should probably tell us who's there first.

A At the morning session were David Welles, Sr., and Georgia, and their five children, and myself.

Q And where was the meeting located?

A We actually sat around a big table in their dining room in the house in Vero Beach.

Q Had you known any of the other family members? You mentioned --

A Yes.

Q Who did you know at that point?

A I knew personally both Jeff and Deke, because I had met them at previous meetings. I had also done some gift-planning work for two of the other children, Virginia and Peter, but I had never met them before.

Q Tell us about the meeting, please.

A The morning session really had sort of three components to it. The night before, the family members were briefed on the new potential sale, at

that time the original sale deal had fallen apart.

The family had entered into a new proposal with a private equity firm called Kenner, which you've probably heard about. The terms of that deal were discussed, they were briefly recapped, and there was a little bit more detail presented first thing in the morning, that was done by Deke.

Then Jeff and I proceeded to spend about an hour talking about the family office and the pooled-investment structure, and about another hour and half talking about the private foundation.

Q And briefly, what was said about the family office? That had already been created I assume?

A That had already been created. We explained who was operating the family office, what the intended purpose was, and how that could serve other family members.

Q And who was going to be the operator?

A Jeff was the manager the operator, and they had, I think by that time obtained some space in an office in New York.

Q And I want to go into a little more detail as to your discussions relating to the pooled-investment entity that later becomes Stobie Creek.

A Okay.

Q Please tell us about those conversations.

A We explained what the structure was going to look like, we had some flowcharts that we used to sort of illustrate, you know, who was going to participate, what the entity was, the fact that we had these multiple pools, how the family office was going to have separate discussions with each of the individuals about some asset allocation and how they might choose to invest in these pools.

We talked a little bit about the fact this was a limited liability company. As we planned it where we would set it up, when it would begin operations, how it would really be connected to receipt of proceeds from the Therma-Tru sale.

Q And what was the final topic during your part of the meeting?

A It was the private foundation.

Q And that was the one that became Cricket Island?

A Yes.

Q Was there a decision made at that meeting?

A Yes, several.

Q Tell us about those.

A The family endorsed the idea of moving ahead with Stobie Creek. We talked a little bit about what

we were going to name it, which ultimately was something different, but we found a name that couldn't be used so it became Stobie Creek.

Q What was the name that they were going to use at first?

A They were going to use something, it was called Poured Investments.

Q And why couldn't you use Poured?

A That was a name that was not available at the time. This entity was set up in Delaware, and that was a name that was already spoken for.

Q Go ahead and tell the Judge why it's already spoken for.

A Yeah, one of my other clients took it first unbeknownst to me.

Q Okay.

A So ultimately they came up with the name Stobie Creek, it had some relationship to their summer dwelling. We also were given the go-ahead to proceed putting the private foundation together, we spent some time discussing how it would be funded, how it would be operated.

It was contemplated that the five children and the parents would all be directors. We talked a little bit about what the functioning of the directors

would be, and some ways we might encourage further philanthropy in the family.

Q Were there any discussions of any tax benefits for forming Stobie Creek?

A No.

Q Now, how long did the morning session last?

A I think we finished up about 12:15 to 12:30.

Q And did you stay for the afternoon session?

A No, I didn't.

Q Why not?

A I wasn't part of the presentations at the afternoon session and I billed by the hour.

Q You're sorry you weren't invited, right?

A Right.

Q What was on the agenda for the afternoon session?

A There were two parts to the afternoon session, one was called Family Philosophy, which I understood to be just a meeting of the family members to talk about a variety of subjects. And then there was a session that was called Capital Gain Strategies.

Q And is that your area of expertise, capital gain strategies?

A No.

//

(The document referred to was marked for identification as Plaintiff's Exhibit No. 113.)

Q Okay. Now, you mentioned an agenda, and I'd like to show you what we've marked as Plaintiff's Exhibit 113.

MR. CROWL: May I approach the witness, Judge?

THE COURT: Please.

BY MR. CROWL:

Q I'm going to put it on the screen as well, I know that Mr. Kedem has given you, and I'll give you an extra one just in case. You probably don't want to have two.

THE COURT: We'll just use our book. Just, off the record, I've already spilled water.

MR. CROWL: You already did what?

THE COURT: I already spilled water.

MR. CROWL: I thought you were going to be the first, Judge, I was concerned that we got water all over the place here.

***(Whereupon, a short recess was taken.)***

BY MR. CROWL:

Q Now, would you show us right here where it says Sunday --

A Yes.
Q -- and it might be highlighted, the Sunday section. You put this agenda together, is that right?
A That's right.
Q Okay. So tell us about that.
A Sunday, as you can see, was kind of an informal meeting over cocktails and dinner. There was a discussion of the Kenner transaction and some discussion of family philanthropy.
Q And this is a portion that you did not attend?
A I did not attend.
Q Okay. Now, if you move to Monday, okay, which portions were your presentation?
A The ones that are noted as Roman numerals I and II were my presentation.
Q And where did you talk about the discussions relating to creating Stobie Creek?
A That was part of the family office concept conversation, excuse me.
Q And so the family office concept is both North Channel and then also discussions of Stobie Creek?
A Yes.
Q And what is Roman numeral II?

A That was discussion about the Cricket Island Foundation.

Q Now, you also mentioned, Mr. Herpe, I'm not sure you mentioned, let me ask you, were there any other materials apart from an agenda prepared for this meeting?

A Yes.

Q I'd like to take a look at those as well.

MR. CROWL: And we've marked them, Judge, as Plaintiff's Exhibit 111. Judge, we would offer the Agenda, which was --

THE COURT: Any objection?

MR. JOHNSON: No objection, Your Honor.

THE COURT: Plaintiff's 113 will be admitted.

(The document referred to, previously identified as Plaintiff's Exhibit No. 113, was received in evidence.)

(The document referred to was marked for identification as Plaintiff's Exhibit No. 111.)

BY MR. CROWL:

Q I'll give you a copy as well, but we can take a look at it on the screen. I'm showing you what

I've marked as Plaintiff's Exhibit 111. What is Plaintiff's Exhibit 111?

A This is a copy of a booklet that was put together for the family members for use at the January 24th meeting.

Q And where did you maintain that?

A Where did I maintain --

Q These records.

A I put this in my file.

Q And why did you maintain it in your file?

A This was part of my presentation, and so I wanted to keep a record of what we had done for the family and what we had discussed.

Q Now, there was some suggesting in opening statements relating to this being produced only through you. I want to ask you some questions about that. When you first identified this, did you mark it as privileged or nonprivileged?

A We marked it as privileged.

Q And why did you do that?

A It involved legal advice that we were giving to the family at the meeting.

Q Was it placed on a privilege log?

A Yes.

Q And then what happened?

A Ultimately, Mr. Kolek waived the privilege on it.

Q And then what happened with regard to these documents?

A This was given to the government.

Q And this is a business record I presume?

A Yes.

MR. CROWL: We will offer Plaintiff's Exhibit 111. And I can --

MR. JOHNSON: I guess that was a presumption.

MR. CROWL: No, Judge, I'm happy to lay the formal foundation.

MR. JOHNSON: We have no objection to it, Your Honor.

MR. CROWL: I didn't think there would be.

THE COURT: It will be received.

(The document referred to, previously identified as Plaintiff's Exhibit No. 111, was received in evidence.)

BY MR. CROWL:

Q So I'd to like to now take a look at that. The first page, is obviously on the screen. If you turn to the second page, I know it's hard to hear back

there, and highlight Roman numeral I. First of all, on this first page, what are we looking at?

A As it says, this is a discussion outline that we used to run through the topics at the morning session.

Q And who prepared this discussion outline?

A I believe I did.

Q Okay. And what is Roman numeral number II?

A That was talking about the family office formation, purpose, function, and also the formation of Stobie Creek.

Q And I want to go to the next page, page 3, I guess, of this document.

MR. CROWL: And I'm not sure that yours are numbered, Judge, so --

THE COURT: I think I can follow up to number 3.

MR. CROWL: It gets harder in a minute.

BY MR. CROWL:

Q Would you look at number 5 listed there? What is number five?

A That was referring to the part of the discussion where we began talking about the creation of the pooled-investment vehicle, which was Stobie Creek.

Q Okay. And then A, what was that discussion?
A Again, we outlined what the entity would look like, what its purpose and function would be, some general terms.
Q And then at the top of the next page, page 4, just 1, 2, and 3.
A Yes, some of --
Q Does that still relate to Stobie Creek?
A Yes.
Q Okay. And tell us what the topics of discussion were as to 1, 2, and 3, please.
A These were three of the main advantages that we felt existed for the family and that they would respond to in terms of proceeding with this. So the group purchasing power was, you know, the bulking of assets together. Performance monitoring, which would be done collectively through North Channel. And the risk management being both the asset allocation strategy on the one hand, and the liability protection on the other hand.
Q And Roman numeral number III is what?
A That was the part on the private foundation discussion.
Q Now, if you would then go ahead 1, 2, 3 more pages to what's page 7, it says North Channel, LLC at

the top. Do you see that?
A Yes.
Q And this page, and then a couple pages after that, look like they're in this form. What are these pages?
A I believe Jeff prepared these, and these were sort of general concepts of what the family office was meant to be, and what some of the benefits were to the family.
Q The next page, which is page 8, what is this?
A This is an outline that ticks off some benefits of having a family office, the types of issues that come up for large high net-worth families, and how the family office can help.
Q Who prepared this?
A Jeff did, I believe.
Q I want to go two more pages in to page 10, please. And if you would explain for the Judge, well first of all, who put this together?
A I put that together.
Q Okay. And what does it show?
A That was sort of an integrated diagram showing our plan for the operational structure of the family office, and how it would serve the investment

entity, as well as the foundation, as well as family members directly.

Q And where does Stobie Creek appear?

A Stobie Creek would be on the left where it says investment management. And the idea was that North Channel would perform an investment management function for that entity.

Q And where does Cricket Island appear?

A That's on the right side where it says, foundation administration. And the idea there was that North Channel was also going to fulfill various administrative and related functions for the foundation when it was created.

Q Mr. Herpe, if you'd go ahead one more page to page 11.

A Okay.

Q Tell us, what are we looking at on page 11?

A This was a diagram that we used to explain how the investment entity would be set up and how it would operate.

Q Who prepared it?

A I did.

Q And in particular, can you walk us through what this shows?

A Sure. Poured Investments, as I mentioned,

ultimately became Stobie Creek because we couldn't use that name, it was going to be a limited liability company. North Channel over on the right, you can see there's a box under that with an arrow that says it was going to be the manager of the LLC and what it's functions were going to be.

On the left side, where it says family members and trusts, the family members were the investors, or the participants. They would put money in in exchange for what we call units, which are like shares. The fact that the entity then would have multiple asset classes, or funds if you will, and 4 was just a random number that I picked for illustration.

Q Now, I want to go ahead, have the pages here, it's a little bit harder, let's go ahead one, two, three, four, five, six, seven, eight, nine, 10, 11 pages there's another org chart, page 22. Do you see that org chart, Mr. Herpe?

A Yes.

Q What does this org chart show?

A This was a diagram, which, again, we used in our discussion to illustrate how the private foundation would be set up and operate, the foundation being the top middle box. The family members would be

the donors, so they would contribute funds to the foundation. The foundation would make grants to other charities.

Operationally this was a nonprofit corporation, and it would have members, nonprofits don't have shareholders so it has members, who would elect the board of directors, and the board of directors would discharge various functions for the foundation.

Q I want to go ahead two more pages to 24. Is this a document that was also included with the meeting materials?

A Yes.

Q Why was this included?

A This was under a separate tab, and I assumed it related to the afternoon session.

Q Okay. How did you get this particular document?

A This was part of the book that Jeff put together and gave to me.

Q Did you review this particular page, which is talking about the basis-enhancing derivative structure before you went to the meeting?

A No.

Q Is this your area of expertise?

A No, it's not.

Q I want to turn to the next page, which is page 18, and it looks like, the next page, starting, the Adams Family Office, kind of going --

THE COURT: Page 25.

MR. CROWL: Page 25, yes Judge, I apologize.

BY MR. CROWL:

Q Page 25. This page, and then it goes all the way through the end, page 41, it looks like they're very similar.

A Yes.

Q Can you tell the Judge what those pages are?

A These were very brief descriptions put together by an outside organization of various other family offices that different families had put together. I believe Jeff got this at a conference that he attended.

MR. CROWL: Judge, have I already offered, and this has been received as an exhibit?

THE COURT: Yes.

MR. CROWL: Thank you.

BY MR. CROWL:

Q Okay, Mr. Herpe, that's it for that document, at least for me. Did you create any minutes of this morning session that you attended?

A Yes, I did.

Q And why did you create those minutes?

A I had taken notes at the morning session for my own use, and at the end of the meeting I offered to have them typed up and used as minutes.

Q I want to show you what I've marked as Plaintiff's Exhibit 117.

MR. CROWL: May I approach, Judge?

THE COURT: Yes.

MR. CROWL: And Judge, may I just move freely in the Courtroom?

THE COURT: For sure.

MR. CROWL: Okay.

(The document referred to was marked for identification as Plaintiff's Exhibit No. 117.)

BY MR. CROWL:

Q I'm showing you what I've marked as Plaintiff's Exhibit 117. What is this exhibit?

A These are the typed minutes that I prepared subsequent to the meeting.

MR. CROWL: We offer Plaintiff's Exhibit 117, Your Honor.

THE COURT: Mr. Johnson?

MR. JOHNSON: Well, I think it's hearsay,

Your Honor, I object on those grounds.

MR. CROWL: I'll lay further foundation, Judge.

BY MR. CROWL:

Q Is this a business record?

A Yes.

Q Indeed is it a business record of McDermott, Will & Emery?

A Yes, it is.

Q Was it made by a person with knowledge of the events appearing on it?

A Yes, it was made by me.

Q At or near the time of the events occurring?

A Yes.

Q Is it the regular practice of you to keep such a record?

A If I prepared it I'll keep it, yes.

Q And was it kept in the ordinary course of business?

A Yes.

MR. CROWL: Judge, we offer as a business record under 803.6.

THE COURT: Any objection to the admissibility under 803 subsection 6, the Rules of Evidence?

MR. JOHNSON: No, Your Honor.

THE COURT: I'll note your objection if you want, but I would overrule it, the proper foundation having been laid. You were just asking for a foundation.

MR. JOHNSON: Yes, Your Honor.

THE COURT: No problem. That will be admitted without objection, the proper foundation having been laid. Go ahead.

(The document referred to, previously identified as Plaintiff's Exhibit No. 117, was received in evidence.)

BY MR. CROWL:

Q Let's look at the first page of these minutes, please. And the first italicized heading, it says what?

A Family Office.

Q And what does this summarize, this portion of your minutes?

A This was the first part of my presentation and discussion with the family about North Channel, and that had been set up, and what its purpose and function were.

Q And where do you discuss what later became

Stobie Creek?

A In the next section.

Q Is that the bottom of that same page?

A Yes.

Q And how is that titled?

A It says, Pooled-Investment Vehicle.

Q That discussion goes through page 2 of your minutes, is that correct?

A Yes.

Q Turn to page 2 and look at the final paragraph of that section on the pooled-investment vehicle. Do you see that? Okay, and can you read that for us, please?

A It says, it was agreed by the family that the pooled-investment LLC will be called "Poured Investments, LLC." The LLC will be established in sufficient time to be available to receive proceeds from the Therma-Tru sale.

Q And then the next heading is what?

A That's the private foundation discussion.

Q And that relates to Cricket Island?

A That relates to Cricket Island. I guess the Island came later, because it says Cricket Foundation in the minutes.

Q And does that have meaning as well, as far

as you know?

A Yes, to the family.

Q Mr. Herpe, tell the Judge whether or not Stobie Creek was created.

A Yes, it was.

Q Who created it?

A I did.

Q When?

A Or my firm did. We filed a Certificate of Formation in Delaware around the beginning of March, March 3rd I believe it was, or maybe it was the middle of March. I'm sorry, sometime in early to mid-March.

Q Was it in fact March 3rd?

A That could be, yes.

Q Okay. And what else was done with regard to Stobie Creek?

A We prepared an operating agreement which went through several drafts, we prepared some summaries, we worked out a number of the asset allocation funds that were going to be set up. We made sure that Jeff and his folks were familiar and comfortable with the tax and accounting methodologies in terms of how it would operate.

We set up a cash management agency arrangement to receive proceeds from the Therma-Tru

sale, which we ultimately intended would be used to fund Stobie Creek.

Q Now, you mentioned, at the beginning part of your testimony, Mr. Herpe, that there were reasons for you to create a two-entity structure, one for Stobie Creek and one for North Channel.

A Right.

Q Even within Stobie Creek have you ever experienced reasons to create entities, I guess, within the pooled-investment vehicle?

A Yes, sometimes we create Series LLC, which are really like multiple entities under an umbrella. Those entities will typically either hold separate assets, or they'll be for the benefit of separate, separate members or partners, if you will.

Q And what's the purpose for creating an LLC within an LLC, I guess, the Stobie Creek or the pooled-investment entity?

A They're --

MR. JOHNSON: I have an objection to foundation. Is this a hypothetical question, or is this a question about what he actually did with regard to Stobie Creek?

MR. CROWL: I can --

THE COURT: He said later on he would have

occasion to do this, but go ahead.

BY MR. CROWL:

Q Yes. Now, with regard to Stobie Creek, did you create that?

A No.

Q Have you done that for other families?

A Yes.

Q And what's the purpose of that?

THE COURT: I misunderstood, you didn't create Series LLC's within this LLC?

THE WITNESS: No.

THE COURT: Then I don't understand the purpose.

MR. CROWL: And I can explain it, Judge. I expect that the government may try to argue that with regard to the elements of this transaction having LLC's that then kind of make a contribution to Stobie Creek, that there can't be any reason for that.

And I would expect Mr. Herpe would say, there are reasons for that, it makes sense to insulate people from liability even within Stobie Creek. And it happens all the time, and he's done that for other families. If they're not going to argue that then that's one thing, but my understanding --

THE COURT: He says he didn't create the

Series LLC's within Stobie Creek, they were created by somebody else and --

MR. CROWL: What happened is, remember each family members has an LLC.

THE COURT: Correct.

MR. CROWL: And then they --

THE COURT: But that's different than your Series LLC you're saying?

MR. CROWL: Yes, but the principle is what I'm trying to elicit, which is there's liability issues on why you might want to insulate the LLC itself from actually entering in --

THE COURT: I'll direct your questioning --

MR. CROWL: That'd be great.

THE COURT: -- with respect to that to the actual creation and use of the LLC's in connection with Stobie Creek. It's understood that there is a desire to insulate entities from liability, and I'm sure that's what we'll hear, why they were created in this case, but we'll see how else they functioned.

MR. JOHNSON: And, Your Honor, I also have another objection. Mr. Herpe is here as a fact witness, I think it's improper to try to elicit testimony from him about his legal opinion as to how he could create these LLC's to obtain liability and

how these different structures worked.

Mr. Herpe was never noticed as an expert, and as you know we have objected to legal experts. So Mr. Herpe's here as a fact witness. I think his testimony should be limited to what he actually did.

THE COURT: Well, I wanted to limit him to what he actually did vis-à-vis Stobie Creek. But insofar as that would involve any testimony admissible under Fed. R. Evid. 701, I'll let him do, in terms of providing tax or investment advice as to the advisability of creating entities that were involved in this case since the privilege has been waived.

BY MR. CROWL:

Q Did you advise any members of the Welles family about the advantages of having protection from liability even within an entity?

A I don't recall.

Q Okay. Now, let me ask you about Stobie Creek. How long was Stobie Creek in existence?

A It's still in existence. It was formed in March of 2000, so it's been in existence for a little over eight years.

Q Now, Mr. Herpe, I want to ask you about your fees in this particular case. Are you being paid for your time in this particular case?

A Yes, I am.

Q And when you have charged members of the Welles family, have you charged on an hourly rate or on a percentage rate?

A We charge on an hourly rate.

Q And are you familiar with whether or not percentages rates are also appropriate in the area of estate planning?

A Sometimes, yes.

Q And how so?

MR. JOHNSON: Objection, Your Honor, he's not here as an opinion witness on fees either.

THE COURT: No, he's here to talk about McDermott, Will & Emery and his own practice, and then we'll have the relevancy objection. So he may talk about whether he has charged percentage rates in the past. Then if there's an objection.

BY MR. CROWL:

Q Let's talk about McDermott, Will & Emery's practice. Has McDermott, Will & Emery used percentages rates in the estate area?

A Yes.

Q Explain that to the Judge, please.

THE COURT: Well, were any used with respect to this representation?

THE WITNESS: They were not used with respect to this representation.

MR. JOHNSON: Relevancy objection, Your Honor.

THE COURT: Well, since we're not talking about management of the estate I think it could get confusing. So if you want to narrow the question down to whether the percentages were charge with respect to the specific transactions, you can ask that. You'll get an objection, but at least we narrowed it down.

MR. CROWL: Yes, and I've already asked that, Judge. My first question was, did you charge a percentage in this case. He did not.

THE COURT: No, we're now general.

MR. CROWL: Yes.

THE COURT: Because you're exploring with him what McDermott, Will & Emery has done with respect to other estate transactions, which suggests they haven't charged a percentage rates.

We're not talking about percentage or estate to manage for purposes of estate purposes, we're talking about specific transactions. So the question will be whether McDermott, Will & Emery has charged percentage rates in connection with specific transactions.

MR. CROWL: Relating to this particular case or just generally?

THE COURT: Well, it has to be unrelated to this case, because you're asking him his general practice.

MR. CROWL: Yes.

THE COURT: And since he didn't use anything but an hourly rate here.

MR. CROWL: Right.

THE COURT: But at least we're narrowing down the field --

MR. CROWL: Yes, I will --

THE COURT: -- which Mr. Johnson will object.

MR. CROWL: I understand, I'll narrow that field.

BY MR. CROWL:

Q Has McDermott done that percentage in a particular area?

A Yes.

Q And what area is that?

MR. JOHNSON: Your Honor, I'm don't know if you want to give me a --

THE COURT: I'll let him --

MR. JOHNSON: -- continuing objection on

this relevancy, and whether he's here as an opinion witness or a fact witness.

THE COURT: He can testify under 701 as to opinions that are legitimately within his role in the case because he provided advice, and he has opinions that are relevant to the area of his practice. The Rule 701 is applied to this case.

But I guess what I'm trying to get as are you asking the witness if a percentage was used with respect to the value of an estate or the value of a particular transaction in estate planning? I know it wasn't applied with respect to the Welles'es.

MR. CROWL: An estate.

THE COURT: So which are you asking?

MR. CROWL: An estate.

THE COURT: An estate.

MR. CROWL: Yes.

MR. JOHNSON: Your Honor, I think you've --

THE COURT: I'll sustain the objection.

MR. JOHNSON: -- this is not --

THE COURT: It's not relevant.

BY MR. CROWL:

Q And you mentioned that Stobie Creek was founded on or about March 3rd of 2000, is that right?

A That's right.

Q Okay. And tell us about the course of Stobie Creek then, your understanding of what happened with regard to Stobie Creek since then.

A We prepared and sent out, in the latter part of March, an operating agreement for Stobie Creek, it was anticipated that whoever was going to participate would sign on. Since that time I've really had very little to do with Stobie Creek.

So my understanding is that it's still an operating entity, and I'm sure other people will confirm that. And that's all I really know about it.

MR. CROWL: May I have one moment, please, Judge?

THE COURT: Certainly.

MR. CROWL: I'm going to show one more record, Judge, and it's Plaintiff's Exhibit 57, and there's a Tab 9. I'm sorry, 57.

THE COURT: 57, Tab 9.

(The document referred to was marked for identification as Plaintiff's Exhibit No. 57.)

BY MR. CROWL:

Q I want to show you what I've marked as Plaintiff's Exhibit 57, and refer you only to Tab 9. What is that?

A This is a Certificate of Good Standing for Stobie Creek Investments, LLC.
Q And does the record reflect when Stobie Creek was filed originally?
A Yes, it does.
Q And what's the date?
A It was March 3, 2000.
Q Okay. Because you had earlier indicated you weren't sure when in March it was.
A Right.
Q Okay.
MR. CROWL: Judge, we'll offer this into evidence.
THE COURT: Any objection?
MR. JOHNSON: Well, I'm not sure Mr. Herpe's laid a foundation, whether he got this agreement from the State of Delaware, or where it --
THE COURT: If you can't identify the document then we'll just use it to refresh your memory and won't admit it at this time.
MR. CROWL: I'll try, but we'll see whether or not the other --
THE COURT: Sure.
BY MR. CROWL:
Q First of all, does it refresh your

recollection as to the date that it was filed?

A Yes, it does.

Q Okay. And what date is that?

A March 3, 2000.

Q And are you familiar with whether or not this is a business record maintained by your company?

A Yes, it is.

Q Okay.

MR. CROWL: I offer it into evidence, Judge.

THE COURT: Any objection?

MR. JOHNSON: No objection, Your Honor.

THE COURT: Document received.

(The document referred to, previously identified as Plaintiff's Exhibit No. 57, was received in evidence.)

MR. CROWL: No further questions, Judge.

THE COURT: Thank you very much.

MR. CROWL: Mr. Herpe, thank you for the time, and if you'd stick around for cross-examination.

THE WITNESS: Sure.

MR. CROWL: Thank you very much.

CROSS-EXAMINATION

BY MR. JOHNSON:

Q Good afternoon, Mr. Herpe.

A Good afternoon, Mr. Johnson.

Q Let me start by picking up on a couple questions Mr. Crowl asked you, or a couple questions about a topic he asked you about. I think you said, you didn't talk about any tax benefits with regard to the family office or the pooled-investment vehicle, Stobie Creek, with the Welles'es, is that correct?

A I believe so, yes.

Q Okay. And you didn't advise them that any other structures needed to be created, or any other entities needed to be created for the purposes they wanted the family office and Stobie Creek to serve?

A I did not advise them.

Q Okay. So you didn't advise them to create any LLC's or S corporations through which they would be members of the Stobie Creek?

A That's correct.

Q Okay.

MR. JOHNSON: May I approach the witness, Your Honor?

THE COURT: Please.

MR. JOHNSON: Thank you.

BY MR. JOHNSON:

Q The shelf's a little narrow here.

A Sure.

(The document referred to was marked for identification as Defendant's Exhibit No. 548.)

Q So you may have to balance. Mr. Herpe, I've shown you what's been marked as Defendant's Exhibit 548. And do you recognize that as a draft of a letter you sent to Mr. Welles on March 3, 2000?

A Yes.

Q Okay. And that came from your files?

A Yes.

Q Okay. And you state in there that today you filed a Certificate of Formation for Stobie Creek?

A Yes.

Q Okay. You also state in the letter, in the second paragraph, that you're enclosing a Cash Handling Agency Agreement, do you see that?

A Yes.

Q Can you tell us what that is?

A We had discussed --

THE COURT: Before you publish it do you want to offer this?

MR. JOHNSON: I'm sorry, Your Honor. At this time I'd like to move for the admission of Defendant's Exhibit 548.

MR. CROWL: No objection, Judge.

THE COURT: It will be received. Go ahead.

(The document referred to, previously identified as Defendant's Exhibit No. 548, was received in evidence.)

THE WITNESS: I'm sorry, could you repeat your question?

BY MR. JOHNSON:

Q Sure. I was asking you about the Cash Handling Agency Agreement --

A Yeah.

Q -- that's referenced there in the second paragraph of your March 3, 2000 letter.

A Okay.

Q Can you tell us what that is?

A Yes. We contemplated, at the time, that all of the shareholders who were selling Therma-Tru Stock would deliver their share certificates to Jeff at North Channel. And we wanted all of the proceeds to come into one single account, so the Agency Agreement was to facilitate that.

(The document referred to was marked for identification as Defendant's Exhibit No. 424.)

Q Okay. Let me show you, Mr. Herpe, what's

been marked as Defendant's Exhibit 424.

A Okay.

Q Do you recognize Exhibit 424, Mr. Herpe?

A Yes.

Q Is that a document you created?

A Yes.

Q Okay. And is this a document that came from your files and was produced in this case as well?

A Yes, it is.

Q Okay. And it's titled Cash Handling Agency Agreement?

A Yes.

Q Okay.

MR. JOHNSON: Your Honor, at this time I'd offer into evidence Defendant's Exhibit 424.

MR. CROWL: No objection.

BY MR. JOHNSON:

Q Is this the Cash Handling Agency Agreement you just mentioned --

THE COURT: 424 will be admitted, I'm sorry.

MR. JOHNSON: That's all right.

(The document referred to, previously identified as Defendant's Exhibit No. 424, was received in evidence.)

BY MR. JOHNSON:

Q Is this the agreement you just referenced and that is also referenced in your March 3rd letter?

A Yes.

Q Okay. And it was your proposal that this be used to direct the proceeds from the Therma-Tru redemption into Stobie Creek?

A Or an account in the name of Stobie Creek, yes.

Q Okay. And where would that account be?

A It doesn't say where the account would be.

Q Okay. Now, at the third page, there are some signature lines. The first one is labeled, Agent. Do you see that?

A Yes.

Q Okay. And the second one's labeled, Principal. What was your intention as to who would be the principal in signing in this agreement?

A Each of the family members was intended to be a principal and would have signed a copy of this, so we would have a bunch of separate Agency Agreements.

Q Okay. And can you describe for us briefly what purpose this agreement would serve?

A This was to allow the proceeds of the sale

of Therma-Tru Stock to be consolidated in a single account.

Q And would the Therma-Tru Stock stay in the name of each of the Welles'es?

A I'm sorry, I don't understand the question.

Q Well, is it correct that with this agreement, upon the redemption of the Therma-Tru Stock, the redemption proceeds each of the Welles'es would receive for the stock they own, would be directed to the account held by Stobie Creek pursuant to this agreement?

A This agreement only talks about receipt of funds from the principal, or on behalf of the principal.

Q And the principal would be?

A Would be one of the Welles' shareholders.

Q Okay.

A Or each of the Welles' shareholders.

Q The shareholders in Therma-Tru?

A Correct.

Q Okay. And the proceeds that each of the Welles'es would receive would be the proceeds upon the redemption of the Therma-Tru Stock?

A Correct.

Q Okay. And then through operation of this

agreement, the proceeds received by the Welles'es could be directed to Stobie Creek?

A This agreement did not accomplish that, it simply put the proceeds in a single account, and there were going to be further discussions with each family member. The agreement says that after a 60-day period whatever was in the account would come out back to the principal. So presumably, during that 60-day period they would make a decision as to how much to invest in Stobie, and how much to take back.

Q So there would be cash in this account from the proceeds?

A Right.

Q Okay. And then each individual Welles could decide how much cash to then put into Stobie, and how much to take back for themselves?

A That's right.

Q Okay. And this is what you were proposing in terms of how to handle the redemption?

A This was an agreement that I put together, this was not something I think we proposed, this was something that was proposed to be done and we were documenting it.

Q Who proposed it, do you know?

A Somebody at North Channel, I don't recall

specifically.

Q And then you created this document at their request?

A Yes.

Q Do you know if these agreements were ever executed by Stobie Creek or the Welles family?

A I don't know.

Q If you could turn to the second page of the agreement? You see a paragraph labeled 8?

A Yes.

Q Numbered 8? The first sentence there that reads, upon the occurrence of the termination date all sums held by the Agent hereunder, excluding the disbursed amount, shall be considered contributed to the capital of the Agent by Principal, period.

A Yes.

Q Can you tell us what was meant by that?

A During the 60-day period the principal would determine how much cash they wanted to take out. That was defined here as the disbursed amount.

Whatever they chose not to take out presumably was what they chose to invest in Stobie, and that was the remaining principal. So Stobie would withdraw the money, or would move it at the end of the 60-day period, the nondisbursed amount, into some fund

as part of its capital.

Q And this amount that was moved would be considered a contribution to capital of Stobie by that particular Welles Family member?

A Yes.

Q Okay. So under this agreement, or this procedure, the Therma-Tru Stock itself would not be contributed to Stobie, but instead cash of some amount decided by each Welles family member would be contributed?

A That's correct.

Q Okay. If you could go back to Defendant's Exhibit 548, that's your March 3rd letter? In the second paragraph, that third sentence, I think it is, that begins, we have provided a 60-day period.

A Yes.

Q Sorry about that. In that sentence, Mr. Herpe, you reference that each person could determine how much cash, if any, to pull out. Do you see that reference?

A Yes.

Q Is it your recollection that at this time, March 3, 2000, it was still undetermined whether the Welles family members wanted to leave all of the proceeds of the Therma-Tru Stock in Stobie, or

contribute all of the money, all of those redemption proceeds to Stobie?

A I did not have any discussions with anybody in the Welles family about that.

Q Okay. But you were advising of the opportunity that they could put some of the proceeds in, or take some of the proceeds out?

A It was understood that that was a possibility they were contemplating.

Q Okay. Now, that understanding, what was that based on?

A I'm sure it was based on a discussion that I had either with Jeff or with Larry Goldstein.

Q So it was your understanding that they were contemplating leaving some of the proceeds, or putting some of the proceeds in Stobie, but them keeping some of the proceeds out of Stobie?

A Well, I don't know what they were contemplating. They asked me to provide the flexibility in the document.

(The document referred to was marked for identification as Defendant's Exhibit No. 40.)

Q Okay. Mr. Herpe, I've given you what's been marked as Defendant's Exhibit 40. Do you recognize

that?

A Yes.

Q Okay. Is that a letter you sent to Mr. Welles on March 6, 2000?

A Yes, it is.

Q Okay. And is this a copy of the letter from your files?

A Yes, it is.

MR. JOHNSON: Your Honor, at this point I'd move for the admission of Defendant's Exhibit 40.

THE COURT: Objection?

MR. CROWL: No objection, Judge.

THE COURT: Exhibit 40 will be received.

(The document referred to, previously identified as Defendant's Exhibit No. 40, was received in evidence.)

BY MR. JOHNSON:

Q The letter states that a draft of the Stobie Creek Company Agreement is enclosed. Do you recall when it was finalized?

A It was finalized at a later date in March.

Q You also say in the letter that it's your thought that Jeff Welles' parents, David, Sr. and Georgia, will become the initial members of Stobie.

Is that your recollection?

A It says what it says, yes.

Q Do you recall if that was your thought, that David, Sr. and Georgia Welles would become the initial members?

A Yes.

Q Okay. And then you also go on there to say that the other family members can join through the use of the Agency Agreement, do you see that?

A Yes, I do.

Q And is that the Agency Agreement we just looked at?

A Yes.

Q Okay.

MR. JOHNSON: We're sticking in the same binder, Your Honor, so this should be Defendant's Exhibit 41.

(The document referred to was marked for identification as Defendant's Exhibit No. 41.)

BY MR. JOHNSON:

Q Mr. Herpe, I've given you what's been marked as Defendant's Exhibit 41. Do you recognize this as a letter you received in May of 2000?

A Yes.

Q Okay. And did this come from your files as well?

A I believe so, yes.

Q Okay.

MR. JOHNSON: At this time, Your Honor, I'd introduce into evidence Defendant's Exhibit 41.

MR. CROWL: No objection.

THE COURT: 41 will be admitted.

(The document referred to, previously identified as Defendant's Exhibit No. 41, was received in evidence.)

BY MR. JOHNSON:

Q And this letter is from Mr. Goldstein to you?

A Yes.

Q Okay. And he's attaching two signature pages for David K. Welles, Sr. and Georgia Welles, correct?

A Correct.

Q And was it your understanding that David Welles, Sr. and Georgia Welles were becoming members in their individual capacity in Stobie Creek at this point in time?

A Yes, they signed these as individuals.

Q Okay. And was it your understand that they were becoming the initial members of Stobie Creek at this time, as Mr. Goldstein's letter states?

A I had no independent knowledge of who the members were, so this is what Mr. Goldstein said.

Q Did you assist anybody else to become members of Stobie Creek?

A No.

Q Mr. Goldstein also asks you to forward the LLC when it is available. Was it your understanding he was referring to the Stobie Creek, LLC Agreement?

A I assume that's right, because the foundation was not an LLC, that was the only other entity we were working on.

Q Was the LLC Agreement finalized by May 19, 2000?

A I thought it was finalized in March.

Q Are you uncertain of that?

A No, I believe you'll find that I provided a letter that sent it out which said, enclosed is the final agreement. So it could be that they lost it, or there was some other change that was made subsequent to that. I just don't recall.

//

//

(The document referred to was marked for identification as Defendant's Exhibit No. 42.)

Q Okay. Next, Mr. Herpe, I'd like to show you what's been marked as Defendant's Exhibit 42. Do you recognize this Defendant's Exhibit 42, Mr. Herpe?
A Yes.
Q Okay. What is it?
A It's a copy of the Operating Agreement for Stobie Creek Investment, LLC.
Q And attached to it are signature pages for Georgia Welles and David Welles, Sr., is that correct?
A Yes.
Q Okay. And was this copy of this agreement from your files?
A No.
Q Where did this come from? Do you know?
A I have no idea.
Q You reviewed the documents produced in response to the subpoena to McDermott, Will & Emery, didn't you?
A Yes.
Q Okay. And this was one of the documents that was produced, wasn't it?
A I produced several copies of this agreement.

It's possible that this was one in our files. But the one I recall did not have any signature, any signed signature pages. But I could have produced it, I don't know.

Q Well, it has the same Bates stamp as the other documents that you produced, isn't that correct?

A Sure, yeah.

Q Is there another copy of the Stobie Creek Investment, LLC that you're aware of from your files?

A My recollection was that we actually produced more than one copy. I don't have those, you have them.

Q Mr. Herpe, do you still have Plaintiff's Exhibit 111 there in front of you which Mr. Crowl showed you? It's right there, it's the family meeting packet.

A Yeah.

Q I'd like to ask you about that.

A Sure.

THE COURT: You're not moving this document in at this time?

MR. JOHNSON: I am not, Your Honor. Why don't we turn to the Jenkins & Gilchrist executive summary that you touched on briefly earlier in your direct.

THE COURT: Page 24.

BY MR. JOHNSON:

Q And if I remember correctly, Mr. Herpe, you did not talk about this document or its contents with the Welles family?

A No, I didn't.

Q And you didn't advise them of any of the tax benefits that could be claimed pursuant to this strategy?

A No, I didn't.

Q Okay. And you never saw a Jenkins & Gilchrist tax opinion letter dealing with this strategy, did you?

A No, I didn't.

Q And the summary talks about short options and long options. You never offered any advice on the possibility of earning a profit from such options, did you?

A No, I didn't.

Q And am I correct that not only did you not do that at the meeting, you have not done that any time since?

A That's correct.

Q So from the time of the meeting until today, you've never provided any advice to the Welles'es as

to the tax benefits that could or could not be claimed from this strategy?

A Not on any income tax benefits. That's correct.

Q Well, you've not advised them as to the effect of this strategy on the capital gains that could be due on the Therma-Tru redemption?

A No, I did not.

Q Okay. Let me ask you one more question about the packet, Plaintiff's Exhibit 111, Mr. Herpe. You said you and your firm produced this in this litigation?

A Correct.

Q Did each one of the Welles family have a copy of this at the meeting?

A They were given copies at the meeting, I don't know what happened to those copies.

Q Okay. Thank you, Mr. Herpe.

A You're welcome.

THE COURT: Will there be any redirect?

MR. CROWL: No redirect, Judge, thank you.

THE COURT: Subject to Mr. Crowl, you'll be excused, thank you very much.

THE WITNESS: Thank you.

MR. CROWL: Judge, we've got Mr. Waterman,

the next witness who came in now, or you want to take a break?

THE COURT: It's up to you.

MR. CROWL: We might as well take a brief break.

THE COURT: We usually take a 15-minute afternoon break, or would you like to take it later? Would you like to take a brief break, we're really in the middle of the afternoon, aren't we? Why don't we break through 2:40.

MR. CROWL: 2:40, thank you, Judge.

THE COURT: Off the record.

***(Whereupon, a short recess was taken.)***

THE COURT: Mr. Crowl?

MR. CROWL: Thank you, Judge. The Welles family calls David Waterman.

THE COURT: Good afternoon, Mr. Waterman, I hope you don't have to climb over that, must open, yes.

Whereupon,

DAVID F. WATERMAN

having been duly sworn, was called as a witness and was examined and testified as follows:

THE COURT: Please sit down, sir, and state your full name for the record.

THE WITNESS: David Waterman, David F. Waterman.

THE COURT: Mr. Crowl.

DIRECT EXAMINATION

BY MR. CROWL:

Q What do you do for a living, Mr. Waterman?

A I am a partner with Shumaker, Loop & Kendrick.

Q How long have you been with Shumaker, Loop & Kendrick?

A Since 1979.

Q Where did you work before you were at Shumaker?

A Sidley & Austin, here in Chicago.

Q What years were you at Sidley?

A '75 through '79.

Q What area of practice were you in at Sidley & Austin?

A I was in their tax group.

Q And what were your responsibilities in the tax group at Sidley?

A Well, I started in 1975, about a year after ERISA was enacted. So I spent the first two or three years pretty much doing pension work and other benefit areas. Then I broadened to other tax matters after

that.

Q And what were you doing right prior to Sidley?

A I was in law school.

Q Where?

A University of Michigan.

Q What year did you graduate from the University of Michigan?

A 1975.

Q I want to talk with you a little bit about Shumaker, Loop & Kendrick. You started what year again?

A 1979.

Q And tell us about the area or areas of law that you practice at the Shumaker firm?

A Well, Shumaker was much smaller than Sidley and not as specialized. So when I joined Shumaker I joined their corporate group, which was a blend of corporate, and tax, and related fields.

Q When you joined, how many lawyers were there?

A I think we had 28 or 30.

Q Then how did your practice develop?

A Well, I did a little tax work at the beginning, and then I gradually moved into a, what I

could call a general corporate and transactional practice.

Q And tell the Judge what your current responsibilities are.

A Well, I'm a partner in a corporate group and I chair our management committee.

Q So in essence you're the managing partner for Shumaker?

A You could say that.

Q How long have you chaired the management committee at the firm?

A 17 years.

Q Do you like it?

A I do.

Q How so?

A Well, I have an interest in business, I went to business school for a year before law school. And this enables me to, you know, do some business while I'm practicing law with my clients.

Q How has the firm done under those 17 years?

A I think it's done very well, I'm very proud of what the firm has done, we've grown considerably, moved into other markets, and we're very happy with what we've done.

Q How many lawyers do you have today?

A I think about 175.
Q And can you tell the Judge a little bit the firm, Shumaker, Loop & Kendrick?
A Well, it's what we would call a regional, or midlevel general practice firm. We do most things except very little patent work, we have one patent lawyer down in Tampa. We have one domestic relations lawyer in Toledo, we do no criminal work.
Q When was the firm founded?
A 1925.
Q And where was it founded?
A In Toledo.
Q You mentioned that you do many different areas of practice. Does the firm do tax work?
A Certainly.
Q And who is in charge of your tax practice?
A Tom Cotter.
THE COURT: Spell the last name, please.
THE WITNESS: (C-o-t-t-e-r).
THE COURT: Thank you.
BY MR. CROWL:
Q And how large is Shumaker compared to the other firms in Toledo?
A Well, well over twice as large as the other firms in Toledo and northwest Ohio.

Q And have members of the Welles family been clients of Shumaker, Loop & Kendrick?

A Yes, for about 45 years, I think.

Q Can you tell the Judge the history of that relationship?

A Well, we might have done some work for David and Georgia before this. But I think when it really started was when David left Owens Corning Fiberglass, where he had been working, and decided to buy a bankrupt lumberyard actually called Vogelsang Lumber, I think that was in 1962, perhaps early '60's at least.

And he was acquainted with one of our partners then, they had met at Yale. Our partner's name was Greg Alexander, and Greg assisted him in that purchase. That started really the bulk of the work we did for Therma-Tru really.

Q And tell us about Therma-Tru.

A Well, Therma-Tru, David obviously had a background in fiberglass, and Therma-Tru really started out, well, Therma-Tru primarily makes, even today, residential entry doors. And when they started out they made primarily steel doors, I think.

But David sort of quickly moved them into the fiberglass door category, I think essentially

created that category in the U.S. They're a dominant company in their field, certainly at the time they sold out to a fortune brands.

Q Tell us about the kind of legal work that Shumaker, Loop & Kendrick did and does for the Welles family, please.

A Well, individually we have done estate planning and real estate work, that's pretty much what individuals need. For the company we did essentially everything the company needed, which runs the gamut of real estate, and tax, and litigation. And we did not do patent work because we didn't have that capability. And we occasionally would not do litigation, we would be conflicted out.

Q What kind of tax planning work did you do for the company?

A Well, the company was an S Corp, which leads to lots of tax issues, and we handle that just on a general basis.

Q You mentioned that the firm also did work for the family members.

A Yes.

Q Who? For whom?

A Well, David and Georgia in particular, and David, Jr. and his wife, Hope.

Q What kind of work did Shumaker, Loop & Kendrick do for David and Georgia?
A As I think I said, estate planning and real estate work, for the most part.
Q And how about for Deke, or David, Jr.?
A I would say the same, plus David, Jr. has had a number of other business interests that we assisted with as well.
Q Are you the relationship partner between your firm and the Welles family?
A I think that's an accurate description, yes.
Q And when did that role start for you?
A I think it started in 1992, thereabouts.
Q How'd that come about?
A Well, I think the Welles family, probably David, Sr. and David, Jr. had decided at that point that they wanted to have someone a little closer to David, Jr.'s age, he was running the company at that point. Someone who'd have a little more rapport with him, and who would be there and practicing actively while he was running the company. And so they approached us, approached me and asked if I would take that over for Greg Alexander who had been doing that.
Q Did you go on the board?
A I did.

Q Describe the board, please.
A Well, the board included, one of the things that Therma-Tru did very well, I think, is early on they adopted the concept of getting outside board members and actually listening to them, they were very good about that. They had some excellent people in the community on that board.
I think there were seven or eight people on the board, I don't quite recall how many. And of course, David, Sr. was, David, Jr., and Jeff, as well as these outside boards.
Q And, Mr. Waterman, are you testifying today in part because you provided legal advice to the Welles family regarding the sale of Therma-Tru and also options that were being purchased?
A That's correct.
Q I want to start by asking you about the sale of Therma-Tru. When was the first time that you know of when Therma-Tru was being considered for sale?
A Let's see. The first time would have been in the mid to later 80's. I was not the relationship partner then, but Greg Alexander asked me to review an engagement letter with an investment bank, which I did. And they engaged an investment bank to help to market the company.

Q And what happened with regard to that investment bank relationship?

A Well, they consummated that. They marketed the company and they got into serious discussions with Masco Corp based in Detroit, but the deal did not go through.

Q Do you know why the deal didn't go through?

A I think it was, what do they call it, Black Monday or something. In October of 1987, the stock market dropped about 25 percent and that damaged the deal beyond repair.

Q When was the next time when the company was up for sale as far as you know?

A In the middle, I would say, of 1999. They actually had engaged, I believe, another investment bank to assist in the transfer of the company.

Q And who were they considering transferring the company to then in the summer of 1999?

A Once again, Masco.

Q And did that particular sale go through ultimately?

A No, it did not.

Q Why not?

A Well, I think there was a fundamental disagreement over management and how they would be

compensated. Therma-Tru had, they attributed some of their success or a good portion of their success to what you might call a novel or entrepreneurial compensation system for their top management. In other words, they wanted to pay people actually less than market but provide bonus incentives that could take them well above market.

That type of system, entrepreneurial system, clashed certainly with the culture of a large company like Masco. The family, I believe, still wanted to go forward with Masco. Management, I think, balked, at least that was the feeling of the family, and that is what caused the deal to abort.

Q Do you know why the family was considering selling?

A Yes.

Q Why?

A David Welles had health issues much of his life. I'm not sure there was anything wrong with him right then, but he was getting a little older and he wanted to liquidate his holdings so he could further his philanthropic goals.

Q And did he in fact further his philanthropic goals?

A He did in a very big way, yes.

Q How so?
A Well, once the Kenner, a subsequent transaction, actually occurred generating the liquidity, he and the family contributed $40 million, I believe, to a foundation, Cricket Island Foundation, which is devoted to underprivileged youth. I know he quickly made a pledge to the Toledo Museum of Art for $25 million which he honored obviously over the next few years. And I think a number of other bequests or charitable contributions. He was very, very charitable throughout his life.
Q Now, you mentioned that the Masco deal that started in the summer of 1999 ultimately didn't happen. How far along had it gotten before it failed in the end?
A It got pretty far along. I think it was pretty well documented. And they were once again working these so-called ancillary agreements setting out the management compensation program.
Q Could you tell us then about the third time that the company was for sale?
A Well, that would be the Kenner transaction, and that started, I think, really not too long after the Masco transaction aborted. I believe the connection there was to a board member, a fellow by

the name of Larry Sularry who David Sr. had known for many years. He was an Owens Corning alum, if you will, worked with David over there, was on the Therma-Tru board, and he also had a relationship with Jeff Kenner who had a private equity fund in New York. I believe or I assume that was the connection. And they started discussing an acquisition by Kenner's private equity fund.

Q Did you work on those negotiations?

A I did very much.

Q Tell the Judge about how the negotiations went.

A Well, the basic pricing negotiations probably took six or seven weeks starting, I think, in probably the very end of October of 1999, culminating in a letter of intent. We had several face-to-face meetings, culminating in a letter of intent, I think, sometime in fairly early December.

Q And what kind of a transaction was this to be?

A This was unusual actually in my experience, and this now is what I do. I do business transactions and a lot of private equity transactions. This was, really in my experience, unique. It probably isn't unique but it is in my experience in that Kenner was

willing to take a noncontrolling stake in the company, although he wanted a 50-percent interest which is a delicate balance. Again, I've never seen a private equity fund do that. But that was the basic structure that could have been put together I suppose in different ways, but the way it actually occurred from a technical standpoint was an infusion of equity by the Kenner fund and his partners. A borrowing of significant dollars from external banks and mezzanine lenders, and then a redemption or a purchase by Therma-Tru of one-half the outstanding shares. So that's what created the 50-50 split.

Q Now, you just told us that you entered into a, or a letter of intent was entered into?

A Yes.

Q I want to show you what I have marked as Plaintiff's Exhibit 61. I ask you to take a look at that please. What is government Exhibit -- I'm sorry, Plaintiff's Exhibit 61?

(The document referred to was marked for identification as Plaintiff's Exhibit No. 61.)

A Well, I only see the heading.

Q I'm sorry. Let me hand you a copy here.

A There it is. That would be a copy of the

letter of intent, December 8, 1999.

Q Is that an accurate copy of that letter?

A Yes.

MR. CROWL: We offer Plaintiff's Exhibit 61 please.

THE COURT: Mr. Johnson?

MR. JOHNSON: No objection, Your Honor.

THE COURT: Document will be received.

(The document referred to, previously identified as Plaintiff's Exhibit No. 61, was received in evidence.)

BY MR. CROWL:

Q Now, would you show us who did this letter go to?

A It went to David Jr. and Jeff.

Q Now, this particular letter of intent, what was the purpose of it?

A This is like a typical letter of intent, any transaction ordinarily starts off this way. It sets the pricing, the basic pricing, and not much else. It is nonbinding usually on its face as this one is except for a provision that we would call a "no shop" which is an exclusive negotiating term.

Q And when you say that this is nonbinding,

can you show the Judge where in the document it reflects that it's nonbinding?

A In the last sentence on the second page.

Q Can you just read that for us please?

A "Neither party shall be bound until a formal agreement is executed except for the preceding sentence." The preceding sentence is the "no shop" that I just mentioned.

THE COURT: I'm sorry, "no shot"?

THE WITNESS: "No shop."

THE COURT: "No shop."

THE WITNESS: Yes. In other words, you're not supposed to shop the company to other potential buyers.

BY MR. CROWL:

Q So, what happened after the letter of intent was entered into?

A We began work on the formal documentation for the transaction, which always involves a very extensive process.

Q And just give us a general sense of what that process is.

A Well, private transactions, that's where you have a private buyer and seller, are very different from public transactions, that is with publicly held

companies. Private transactions, in those transactions you negotiate a very detailed purchase agreement that really establishes not only the basic pricing of the transaction but also contains many, many representations by the selling shareholders really as to the status of the company.

The dynamic in that process is the buyer of course wants to negotiate the broadest possible representations. The seller is trying to carve out exceptions or dilute those representations. Throughout that process or when that process is done, there are extensive disclosure schedules to be produced by the sellers and their counsel, and they do two things.

Some of those reps will simply be disclosure reps. Tell us about your past lawsuits, your past tax audits, any of that sort. Others will be exceptions to the representations where you can't confirm a statement that they want you to make.

So, that is different than a public transaction because in a public deal, the shareholders go away and there is no retained liability on the part of the shareholders. Here, the shareholders remain liable for breach of those reps for a certain period of time which is usually secured by an escrow.

Q And so, this purchase agreement that then is negotiated, was there one that was entered into with regard to the Kenner transaction?

A Yes, actually there was a preliminary document entered into in February of 2000.

Q I'm going to show you that document which I have marked as Plaintiff's Exhibit 314.

(The document referred to was marked for identification as Plaintiff's Exhibit No. 314 and received in evidence.)

THE COURT: Off the record.

(Whereupon, a short recess was taken.)

BY MR. CROWL:

Q Sir, I'm handing you what I've marked as Plaintiff's Exhibit 314. What is Plaintiff's Exhibit 314?

A This would be the preliminary document I mentioned dated February 8, 2000.

Q And is this a binding or nonbinding document?

A This on its face is a nonbinding agreement.

Q When you say 'on its face,' can you point to provisions in this agreement that show that as of this date, February 8th ,2000, it was still nonbinding?

MR. JOHNSON: Your Honor, I'm going to object to Mr. Waterman characterizing the binding nature of these agreements. I mean, the agreements speak for themselves and his opinion on it is not going to change it.

THE COURT: He can point to language that he would consider to be nonbinding, at least any kind of provision that he would deem to that effect.

THE WITNESS: Sure. That would be 1.11 on page 6 and 1.12 on page 7.

BY MR. CROWL:

Q Let's start at 1.11. And which language are you referring to in 1.11 on page 6?

A Well, multiple sentences or almost the entire paragraph. It starts off with the comment that the parties have executed and delivered this agreement prior to the preparation review and acceptance by each of them of schedules, that's the disclosure schedules I mentioned, and exhibits. The exhibits would be so-called ancillary documents, which in this case were always important.

Here they were even more important because there was again a complicated structure ultimately arrived at for the granting of options and so-called stock appreciation rights which are option

equivalents, as well as a thoroughly negotiated shareholders agreement to provide the governance structure in a 50-50 equity ownership position. That's not easy.

Q What other --

MR. JOHNSON: Your Honor, if I could interrupt? We're trying to find if this was disclosed on Plaintiff's exhibit list.

THE COURT: Hang on. We will go off the record a minute.

(Whereupon, a short recess was taken.)

THE COURT: We'll go back on the record. The document apparently was produced after the early meeting of counsel which was held on what date?

MR. CROWL: January 22nd.

MS. FEENEY: January 22nd, Your Honor.

THE COURT: Okay. And it bears the Bates number of the production from SLK. What's your objection, Mr. Johnson?

MR. JOHNSON: Your Honor, we reserved an objection to any late-produced documents including this one. This is obviously a document that we weren't able to cross examine Mr. Waterman about. I took Mr. Waterman's deposition last summer, I think, in Toledo.

THE WITNESS: August 12th.

MR. JOHNSON: Obviously we didn't have this at that point.

THE COURT: I will overrule the objection with two caveats. The first caveat is, depends on how many documents of this nature are introduced, whether I'll allow this to continue. And then secondly, if during the course of your cross-examination you may lay any foundation which would prejudice. Go ahead.

BY MR. CROWL:

Q So, what other language in 1.11 reflects that it's nonbinding?

A I would say two sentences after that. 'Such schedules will only be deemed part of this agreement and incorporated herein upon the written acceptance by purchaser, the company and the representatives.' Representatives are the representatives of the Welles family.

Q Okay. Any other language that you rely upon in 1.11?

A I think two sentences later. 'The exhibits will be deemed finalized upon their execution at the closing.'

Q And you mentioned there was a second provision of this recapitalization and stock purchase

agreement that also reflects its nonbinding nature?

A 1.12 on the next page.

Q And what language do you refer to?

A Well, starting with the first sentence, "Because purchaser has not had an opportunity to review the schedules and the business of the company," in other words, they really hadn't done their due diligence as of the date of this agreement. They were to have a period of ten days after receipt of the full and complete disclosure schedules to complete their due diligence review, that's their evaluation of the company and its past history, before they would be bound. In other words, they had ten days to respond or not.

Q Any other language in 1.12 that you would refer to?

MR. JOHNSON: Your Honor, I want to renew my objection to Mr. Waterman providing his opinion about the legal implications of this written document.

THE COURT: He can write what he intended as a draft of, he may not have effected that result. And I understand you prepared the document from what you said?

THE WITNESS: Well, it was jointly prepared. I think this --

THE COURT: You had a role in its preparation?

THE WITNESS: Yes.

THE COURT: Okay. And you were talking about what you intended.

THE WITNESS: Yes.

THE COURT: It may not have accomplished it though, he can talk about what he intended. He intended that this language indicate that the agreement was not binding. I note your objection. But I'll sustain your objection if you're objecting to the question is there anything else you'd like to point to about the agreement because it isn't tied in to anything. So tie it into something.

MR. CROWL: Very well, Judge.

BY MR. CROWL:

Q Is there other language in paragraph 1.12 that you intended to reflect its nonbinding nature?

A Well, I just talked about the first sentence. The second sentence as well, it's rather long. But in substance, it says if the purchaser determines that information is revealed during this period, whether through disclosure pursuant to the document or otherwise, which affects their evaluation of the company and could be a material adverse

condition regarding the company. And if they don't want to proceed, they can advise the selling shareholders and try to negotiate through that, resolve it in some respect. And if they're not, they're unable to do that, then no party is bound. That's the last sentence. So, it's really, you really have to read all the sentences I think to get that.

Q Is there a provision in this agreement relating to financing?

A Yes, there was a financing contingency.

Q And do you know what number that went in?

A Section 8.7 on page 38. That would be typical, too, in a transaction of this type.

Q And can you explain to us what a financing contingency is please?

A Well, Kenner had two financing issues. Kenner is, I believe Kenner, I'm not sure they had actually cash in their fund. They have to go to their partners or normal partners and raise the equity. So, they needed to raise $150 million of equity, then they had to borrow another $300 million or so from lenders, that would be basic bank lenders and mezzanine or subordinated debt lenders. That process, that's a substantial process and it takes a long time. And that was not completed, even the equity raise I don't

believe was completed until the day of the closing.

Q And when was the day of the closing?

A May 9th of 2000.

Q As far as you know, was there any binding agreement prior to May 9th?

A No. There was not.

Q I want to show you then Plaintiff's Exhibit 62.

(The document referred to was marked for identification as Plaintiff's Exhibit No. 62.)

MR. CROWL: May I have one moment, Judge?

THE COURT: Certainly.

MR. CROWL: Thank you.

BY MR. CROWL:

Q Here is Plaintiff's Exhibit 62. If you would take a look at that please? What is Plaintiff's Exhibit 62?

A That's the final definitive agreement that was entered into on May 9.

MR. CROWL: Judge, we offer Plaintiff's Exhibit 62 into evidence.

THE COURT: And again being a lengthy document Mr. Johnson would indicate those pages actually discussed with it.

MR. CROWL: I will discuss --

THE COURT: No, wait one second.

MR. CROWL: I'm sorry.

THE COURT: I'm saying that for the record as I thumb through it.

MR. JOHNSON: I don't think I have any objection, Your Honor. Just curious, foundation, where did this copy come from, if you know?

MR. CROWL: Do you want me to lay a foundation, Judge?

THE COURT: If the witness knows where this copy came from.

BY MR. CROWL:

Q Do you know where your copy came from?

A I believe this was produced by SLK.

Q And that's your law firm?

A Yes.

MR. CROWL: We offer Plaintiff's Exhibit 62, Judge.

MR. JOHNSON: No objection, Your Honor.

THE COURT: It will be received.

(The document referred to, previously identified as Plaintiff's Exhibit No. 62, was received in evidence.)

BY MR. CROWL:

Q So what is Plaintiff Exhibit 62?

A That's the actual definitive agreement governing the transaction.

Q Are you familiar with what a "sign and close" deal is?

A Yes.

Q What is a "sign and close" deal?

A That's the deal where you don't have a binding agreement until you actually close. You sign the definitive document then and close at the same time. Not uncommon actually.

Q And what kind of deal is this?

A That would be a sign and close deal.

Q And is there a provision in this document that reflects that?

A Yes, right on its face, page 1. The recitals which are whereas clauses, specifically the third clause I think is very specific.

THE COURT: I'm sorry, what page are we on?

THE WITNESS: Page 1 actually. There is no pagination right down there.

BY MR. CROWL:

Q At the top, it says Recapitalization and Stock Purchase Agreement?

A Yes.

Q And your focusing us on?

A The third "Whereas" clause.

Q And can you tell us --

A Which really just says what we've gone over with that interim document. "Whereas the parties previously entered into the prior agreement," that's the one we looked at, February 8 is defined up there in the first paragraph, without having negotiated any of the exhibits and ancillary agreements. Those would be the governance structure and the compensation arrangements, perhaps others, escrow to provide recourse for indemnification claims, all those. So they entered into that prior agreement without having negotiated any of those documents and without the preparation and delivery of disclosure schedules, we talked about that, referenced "therein and herein," and with certain other substantive terms regarding the transactions described here and still being negotiated. So, that earlier document had all sorts of holes in it.

Anyway, continuing, "all with the understanding that the prior agreement was not binding upon the parties until all such exhibits, ancillary exhibits and schedules were negotiated, completed and

attached, and all substantive terms resolved." That really couldn't be any more clearer.

MR. CROWL: I have three copies of all the exhibits, Judge, just in case you wanted me to hand them to you.

THE COURT: No, I didn't. The binders are, I'm sorry, I can't --

MR. CROWL: No, that's all right. I just wanted to be, have a belt and suspenders, I suppose.

BY MR. CROWL:

Q So, Mr. Waterman, I want to talk with you a little bit now about discussions that you had with individuals in the Welles family about tax strategies. Did you have such discussions?

A I did.

Q When do you believe you had the first such discussion?

A I think the first discussion was right at the end of October or the first part of November of 1999.

Q Who was involved in that discussion?

A I believe it was David Sr., David Jr. and Jeff.

Q Was that in person or over the telephone?

A That was in person.

Q Where?
A At the company's offices.
Q That's in Toledo or outside of Toledo?
A It's in the suburb. Maumee, Ohio, suburb of Toledo.
Q Tell us what was discussed in that conversation please.
A One of them, I can't recall who, inquired as to whether I or we at Shumaker's office were familiar with any strategies that could reduce taxes in connection with the transaction, the Kenner transaction.
Q And when they asked if you were aware of any such strategies, what did you say?
A I said that we had, that I was not directly involved but that I knew we had assisted clients, at least two clients in our Toledo and Tampa offices in connection with a strategy that had been developed by a law firm, a Dallas-based law firm whose personnel, you know, who were involved in that strategy were located here in Chicago.
Q And what was that firm?
A That's Jenkins & Gilchrist.
(Buzzing sound.)
Q What was the response when you mentioned

that you were familiar with such a strategy from use with a couple of other clients?

A They indicated some interest in finding out more about it, that's all.

Q So what else was said in this pretty quick conversation then? If anything.

A Well, they asked how they could find out more about it. Roughly, I mean.

Q Yes, and what did you say?

A I said that I would have someone from our office contact them and put them in touch with the appropriate parties at Jenkins & Gilchrist, and our people who were familiar with the transactions.

Q And did you do that? Did you put them in touch with someone from your office?

A I did.

Q Who did you put them in touch with?

A John Ivsan.

Q And tell the Judge who John Ivsan is please.

A John Ivsan was a lawyer in our office. I think he joined us in 1995. He was a tax specialist. He was a graduate of NYU's graduate program in tax, a very talented young tax lawyer in our opinion. And he was --

THE COURT: Is he an L.L.M.?

THE WITNESS: Yes. He did a variety of tax work for us. He operated out of our Toledo office and became involved in one of these transactions, I think about a year or year and a half earlier which is how we learned about it.

(Nearby siren sound.)

BY MR. CROWL:

Q And John Ivsan at the time, was he a partner or an associate?

A He was an associate.

Q Did you have any concerns about referring the Welles family to an associate at Shumaker, Loop & Kendrick?

A No.

Q Why not?

A Well, John was a conduit, if you will, between the client and Jenkins & Gilchrist. But the thought and the judgment that was being exercised and the strategy itself was being created by Jenkins & Gilchrist. They were the ones responsible for so-called heavy lifting. Also, Tom Cotter, in our Tampa office, had been involved in a transaction, perhaps a year earlier. He was a partner in our Tampa office, very talented. We were very happy with Tom. And he and John actually collaborated on a lot of tax matters

and specifically on this strategy that we'll discuss here later, I'm sure.

THE COURT: So, he was involved a year later with Mr. Ivsan and another Jenkins --

THE WITNESS: Yes. Yes. And we were comfortable, I mean, Tom's involvement was very helpful to us certainly. If we hadn't had that, we might have questioned John a little more. But since the two guys who had looked at this extensively we had confidence in, no, I didn't have any problem with John Ivsan running interference, if you will.

BY MR. CROWL:

Q And describe for me Jenkins & Gilchrist at the time.

A Jenkins & Gilchrist was a top 100 law firm, that refers to size. They were based in Dallas but they had offices in a number of other major cities. And we had considerable confidence in them I think because of their size and the quality of the work that we had seen in these other two transactions.

Q Did you have a conversation with Tom Cotter where you involved him in this transaction in terms of providing advice?

A Yes. Early on, probably in the November-December timeframe, I asked him to confer with John on

anything substantive or any issue that John and he thought were appropriate to make sure he would concur in John's thinking and Jenkins' thinking.

Q And how did he respond?

A He was happy to do that.

MR. JOHNSON: Objection, Your Honor. Hearsay.

MR. CROWL: And, Judge, it goes --

THE COURT: I'll accept it only because he offered the fact that he sought a partner to back up Mr. Crowl.

MR. CROWL: So he may answer this?

THE COURT: I'll permit that.

MR. CROWL: Thank you. You may answer --

THE COURT: Well, the fact he's happy isn't salient to my summary.

MR. CROWL: Very well, Judge.

BY MR. CROWL:

Q So, what did he say that he would do?

A Well, he said he would be happy to assist.

Q Okay.

A As I expected him to.

Q Right. I guess you are the managing partner, right?

A He would assist anyway, I'm sure.

Q Okay. Did there come a time when you went to Vero Beach for the family meeting?

A Yes.

Q Okay. How did it come about that you were invited?

A Well, I was just invited. I'm not sure who invited me. Probably David Jr., could have been Jeff, could have been David Sr.

Q And what was your understanding of your role at the Vero Beach meeting?

A They were interested in a couple of things. First of all, the status of the Kenner transaction which was in process at that time. Documents were being exchanged. And they wanted to hear more about the strategy that I had very loosely described I think to David Sr., David Jr. and Jeff before.

Q And prior to your attending that Vero Beach meeting, did you receive a confidentiality agreement relating to Jeff and David Sr.?

A Well, yes. I know that John went to Jenkins, they required a confidentiality agreement --

THE COURT: Mr. Cotter or Mr. Ivsan?

THE WITNESS: John Ivsan.

THE COURT: Ivsan, okay.

THE WITNESS: Yes.

THE COURT: Oh, Tom Cotter, sorry. My mistake.

THE WITNESS: Yes. And he obtained the confidentiality agreement that they requested and I think saw to its execution.

BY MR. CROWL:

Q I want to show you what I've marked as Plaintiff's Exhibit 134. If you could take a look at Plaintiff Exhibit 134, what is that?

(The document referred to was marked for identification as Plaintiff's Exhibit No. 134.)

A That would be the rather standard confidentiality agreement that Jenkins required. And this bears Jeff's signature.

MR. CROWL: Judge, we offer Plaintiff's Exhibit 134 into evidence.

THE COURT: It's not listed. Should I just fill it in?

MS. FEENEY: It's listed. Your Honor, may I speak?

THE COURT: Say again?

MS. FEENEY: It's listed in Exhibit B.

THE COURT: Oh, I see.

MR. JOHNSON: I'm sorry, Exhibit B?

MS. FEENEY: To the list given to the Judge.
MR. CROWL: I think we had to separate it by --
MS. FEENEY: Right.
MR. JOHNSON: We have no objection, Your Honor.
THE COURT: Let me find Exhibit B, my exhibit sheet. Okay, separated by yellow, got it. Let me make a note of that.
MR. CROWL: And that's the exhibit that we are going to put in but I'm not going to talk about it at length right now.
THE COURT: You can identify it if you want to.
MR. CROWL: I'm sorry, Judge, I missed that.
THE COURT: You can identify it if you wanted.
MR. CROWL: Yes.
BY MR. CROWL:
Q And could you tell us what that exhibit is?
A That's the essentially standard confidentiality agreement that Jenkins required.
Q And that was executed prior to your meeting at Vero Beach, is that right?
A Yes.

Q Okay.

MR. CROWL: Judge, I believe I offered that. It's in?

(Electronic interference.)

THE COURT: 134?

MR. CROWL: Yes. If not, I'll offer it.

MR. JOHNSON: I have no objection.

THE COURT: No objection. It will be received.

(The document referred to, previously identified as Plaintiff's Exhibit No. 134, was received in evidence.)

BY MR. CROWL:

Q Now, what did you do prior to the Vero Beach meeting to prepare for that meeting?

A Well, I talked on a number of occasions with John Ivsan and Tom Cotter about their evaluation of the merits of the strategy. I wanted to confirm what I understood to be the case, that they were fully supportive, and they were. I also asked Tom to provide me, Tom Cotter, to provide me with a copy of the Jenkins opinion that was issued to the Tampa based client so that I could review it myself, which he did.

Q I want to show you what I've marked then as

Plaintiff's Exhibit 228.

And what is Plaintiff's Exhibit 228?

(The document referred to was marked for identification as Plaintiff's Exhibit No. 228.)

A That would be a copy of the opinion that I just referenced.

Q That's the opinion that you asked Tom Cotter to forward you?

A Yes.

Q And that relates to a previous client of Shumaker, Loop & Kendrick, is that right?

A Yes.

MR. CROWL: We offer Plaintiff's Exhibit 228 into evidence, Judge.

THE COURT: Is it in Exhibit B?

MR. CROWL: It's in Exhibit B, too.

MR. JOHNSON: We have no objection, Your Honor.

THE COURT: Let me find it.

MR. CROWL: It's page 4 of the, right toward the end.

THE COURT: Plaintiff's 228 will be admitted with no objections.

(The document referred to,

previously identified as
Plaintiff's Exhibit No. 228,
was received in evidence.)

BY MR. CROWL:

Q Can you tell us again, Mr. Waterman, what did you do when you received from Tom Cotter this particular Jenkins & Gilchrist opinion?

A I reviewed it.

Q Okay. And then what happened?

A Well, I'm sure I discussed it with Tom again, but then I proceeded down to Vero Beach. For that meeting.

Q Okay. Prior to going to Vero Beach, did you have any conversations with John Ivsan?

A Yes.

Q And approximately how many conversations did you have?

A A number of conversations.

Q Approximately when were they?

A Probably throughout the period from November, December, up until the time I left for Vero Beach.

Q And who was present for those conversations?

A Just John as far as I can recall.

Q And what was discussed?

A Well, as I said, I along with Tom Cotter, I wanted to get John Ivsan's views on, first of all, how the transaction really worked because I didn't understand that back when I was first asked about potential strategies by the Welles family. So I needed to find out how it worked and then I wanted to make sure that both he and Tom had thoroughly reviewed these prior opinions and felt comfortable, at least from a technical standpoint, with the transaction. And so, I had a number of conversations along those lines.

There was also a change really in the investment that was being proposed from that which Larry Morgan used. So, I needed to find out about that investment and see what both Tom and John felt about it, see if that would change their view of the strategy and the opinion.

Q And what was the change in the investment?

A Well, not that I know a lot about this stuff, but these were, they were now proposing long and short currency options, and the Larry Morgan transaction had been a Treasury bill spread, I think they call it. But don't ask me to explain it.

Q Okay.

THE COURT: You said you were discussing the

matter with Mr. Ivsan and Mr. Cotter. You wanted to make sure that they were comfortable with the opinions from Jenkins & Gilchrist. Is this the only opinion you obtained from Mr. Cotter?

THE WITNESS: This is the only opinion I obtained from Mr. Cotter, yes.

THE COURT: Is this the only opinion discussed with either him and Mr. Ivsan as to which you gauged their comfort level?

THE WITNESS: No. John Ivsan had been involved with a Toledo-based client, actually two I think, I'm just not sure of the date of the second one relative to these discussions. But he actually was involved in a transaction earlier than this.

THE COURT: Earlier than the Morgan?

THE WITNESS: Earlier than the Morgan transaction. That was our first exposure to Jenkins & Gilchrist and to this type of strategy. So, he gained his knowledge, fundamental knowledge, in connection with that transaction. Tom Cotter --

THE COURT: I'm talking specifically about the comfort level with opinions issued by Jenkins & Gilchrist in terms of specifically those discussions. Did you discuss other Jenkins & Gilchrist opinion letters than this Exhibit 228 opinion?

THE WITNESS: Well, let's see. The opinions were not that different, I think, in those two transactions as far as I know. They were --

THE COURT: Did you have an understanding from Mr. Ivsan that the opinion letters were the same? Is that what you're saying? You didn't examine those opinion letters from what I get.

THE WITNESS: I did not review the opinion myself in the earlier transaction, no.

THE COURT: But you did review this one?

THE WITNESS: I did review this one. I understood them to be saying that the opinions were similar. I'm sure not identical but similar. So, this was a format generally that they would expect in any subsequent transaction.

THE COURT: When you say they, you mean who?

THE WITNESS: Both John Ivsan and Tom Cotter.

THE COURT: So, this is representative of the Jenkins & Gilchrist opinion letter format?

THE WITNESS: Yes. That is what they believed and that is what I believed.

BY MR. CROWL:

Q In your discussions with John Ivsan again prior to your meeting at Vero Beach, did you discuss

profit potential?

A Yes. That was important because again the, it was important generally but this was, they had changed the investment aside from the T bill spread to these long and short options. And so, that created two issues. One, what did that do to the technical analysis that was set forth in the opinion? Their view on that was if anything it strengthened it considerably.

THE COURT: You mean both Mr. Cotter and Mr. Ivsan said this to you, it strengthened the --

THE WITNESS: Yes, yes. And actually they felt that it also improved the profit potential from that which existed in the so-called T bill spread. And that is what had been represented to them at least by Jenkins & Gilchrist and Deutsche Bank.

BY MR. CROWL:

Q And did you have a sense for what the types of profits would be with regard to the options that you were discussing?

A My fairly rudimentary understanding was that there was a reasonably good chance of, let's say, doubling your money. When I say reasonably good, I thought it was in the 20-, 25-, 30-percent range. And then there was a small chance of a huge return on the

investment. But that was limited, very limited.

Q And in talking with Mr. Cotter and Mr. Ivsan, did you come to any understanding as to whether or not Jenkins & Gilchrist would provide an opinion letter relating to the options transactions?

A Oh, yes, that's what they were offering to do throughout. Yes.

Q What if anything did you discuss with Mr. Ivsan and Mr. Cotter regarding the quality or nature of the Jenkins & Gilchrist opinion?

A Well, they thought it was extremely thorough and well done. I mean, it's thorough, you can see that from the length of it. They were very impressed with the quality of the work.

MR. JOHNSON: Your Honor, I have obviously a hearsay objection to that testimony about what Mr. Cotter and Mr. Ivsan related.

THE COURT: Would you speak to that?

MR. CROWL: Yes, Judge. It goes to his course of conduct. So it's not offered for the truth. He is providing legal advice to the family based in part on his partners and associates at the firm.

THE COURT: Well, those depositions are going to come in. Okay. I'll overrule the objection and -- with the corresponding portion of Mr. Ivsan's

deposition coming in.

MR. CROWL: And we understand that, Judge. But on an advice of counsel case, you know, you --

THE COURT: Quite understood.

MR. CROWL: -- you have to put in the counsel's advice. Thank you, Judge.

BY MR. CROWL:

Q So had you completed your answer? My question was --

A I think so.

Q What had they informed you with regard to their confidence level.

A Yes.

Q And at this point, prior to the Welles family meeting in January, how confident were you that the Jenkins & Gilchrist analysis was correct?

A I was rather confident that from a technical standpoint it was correct, yes.

Q Why?

A Because it was a thorough opinion and that's what two people, on whom I have relied in the past considerably, felt. They concurred in that. And actually, Tom Cotter specifically contrasted this with other proposals that he had reviewed on behalf of Larry Morgan and perhaps others which he did not think

passed muster, if you will. So, this was what he identified as a strategy that had merit. From a technical standpoint.

THE COURT: Even though it's involving different people?

THE WITNESS: Yes, yes.

BY MR. CROWL:

Q And what role if any did Jenkins & Gilchrist play in your confidence level?

A Considerable role. I mean, they and others, I mean we thought they were a good firm. It was a large firm certainly, operating in large communities. And they produced a very thorough product.

Q And what role if any did the advice of other professionals in this area play in your thinking in terms of confidence?

MR. JOHNSON: Your Honor, I'm going to object again to this line of questioning. As Mr. Crowl said, advice Mr. Waterman may or may not have given may be relevant to penalties, but his internal thoughts and his conversations with Mr. Cotter or Mr. Ivsan are not.

What's relevant is what Mr. Waterman said to the Welles'es and that's it, I believe. So it's a relevancy objection and this line of questioning is

really getting into what was the subject of the motion in limine on Mr. Stuart and Professor Shepard (phonetic), and that is providing legal testimony about the quality and character of the opinion.

THE COURT: Well, given that this is the individual providing the advice himself, I don't think that we are in the same danger zone. However, there is a difference between what Mr. Waterman considered and evaluated and exactly what he communicated to the Welles'es, and when I say the Welles'es I mean whoever Welles he was speaking to, Jeffrey, Deke or David or all three. And we have to make clear what we're talking about.

MR. CROWL: And, Judge, I vehemently would respond to that, that in the opening statement they suggested that because of the amount of the fees in this case, that there was some sort of notion that everybody was kind of looking the other way and just kind of passing on a transaction.

THE COURT: That's not what I inferred. Not at all.

MR. CROWL: Yes, well, if that's --

THE COURT: It had to do with the structuring and the financing. And that's a different issue.

MR. CROWL: Okay.

THE COURT: And I took it in that vein.

MR. CROWL: Okay. So --

THE COURT: I'm getting a nod. I didn't infer that at all.

MR. CROWL: Okay.

THE COURT: No. No, the issue is going to be what, we have here if you will, to make a bad pun, at this hour this happens, a derivative situation where the advice that was obtained wasn't directly, at least as far as what we're discussing right now, but by the investor, it was obtained by the investor's agent, his attorney, Mr. Waterman, and then passed on. And therefore, we have to make a distinction between Mr. Waterman's reactions and thoughts and those that he eventually communicated especially in response to any particular question you're about to make to the extent of this investigation.

MR. CROWL: Right.

BY MR. CROWL:

Q So, Mr. Waterman, did your understanding of how other professionals were dealing in this area inform your confidence level?

A Yes.

THE COURT: And what do you mean by other

professionals?

MR. CROWL: And he's, yes, he'll explain that, Judge.

THE COURT: Well, let's ask him if he has an understanding of what you mean by that.

BY MR. CROWL:

Q Do you understand what I mean by that?

A I think I do, yes.

THE COURT: And what is it?

BY MR. CROWL:

Q Okay. Can you tell the Judge?

A Well, the Larry Morgan transaction, starting with that, he had been introduced to this strategy actually at or about the same time we mentioned it to him by his accounting firm, KPMG, obviously a very large, well-known accounting firm. They were very supportive of this strategy, so much so that they recommended it despite the fact that Larry Morgan and his company, his S corporation, was audited virtually every year. Nonetheless, they thought this deserved merit and recommended it to him.

We also were aware, but I don't know how specifically, of similar strategies of being recommended by BDO Seidman, possibly Ernst & Young, and similar opinions. I don't know if they were

identical, really don't know the structures, I don't want to go too far with that, but similar opinions being given by other law firms around the country.

Certainly in Austin, out of their New York office which I think then was Brown & Wood, Bryan & Cave in St. Louis, and others whose names escape me. So, yes, that developed a level of comfort. All of that, yes.

Q I want to talk with you now, Mr. Waterman, about the Welles family meeting. When was that meeting?

A In January of 2000.

Q Where?

A In David and Georgia's home in Vero Beach, Florida.

Q And what part of the meeting did you attend?

A I attended the only part I was aware of. It was probably mid afternoon, I think.

Q And where did the meeting take place?

A In their dining room, I believe.

Q How long did it last?

A I would say probably an hour and a half. An hour to two, something like that.

Q Who was present?

A David Sr. and Georgia, and all of their

children. That would be David Jr., Jeff, Peter, Chris and Jenny.

Q And what was your purpose for attending that, it was the afternoon meeting? It was in the afternoon?

A Afternoon meeting, yes.

Q Yes. What was your purpose for attending?

A I think I said it before. It's (1), I just wanted to update them on the status of the Kenner transaction which was ongoing. And (2), to describe to the entire family, at least generally, our experience with these strategies and how they worked.

Q What did you say with regard to the status of the Kenner transaction?

A Just that it was ongoing, proceeding on a normal course. We were working on documents, the basic agreement at that point, and that there were no particular roadblocks that had developed as of yet.

Q And what did you describe with regard to the investment strategy?

A Well, first I described, again in fairly rudimentary terms, the particular investment, the purchase of a long and the sale of a short currency option. I described the profit potential as I understood it to be and as I described previously.

Q Yes, and you should tell us now. I mean, this is the meeting with the family so you should tell us.

A Okay. Well, I said my understanding of these options based on advice I got from John and, at least John, I'm not sure about Tom at that point, I don't know when he talked to Deutsche Bank.

And of course their advice was, their opinion was formed by Jenkins & Gilchrist and Deutsche Bank, I know John talked directly to Deutsche Bank at length, was that there was a realistic potential to roughly double their investment in a couple of different ways. The complexities get beyond me, and a narrow opportunity, limited opportunity for a huge gain because it was a highly leveraged set of investments.

THE COURT: Earlier you described that as a reasonably good chance of doubling their money.

THE WITNESS: Yes.

THE COURT: And then a small chance of a huge return.

THE WITNESS: Yes.

THE COURT: And then you said very limited possibility. Those are, you know, distinctions with a difference. What description are you most comfortable

with in terms of your recollection today of what you conveyed at that meeting?

THE WITNESS: Well, I guess I would think I said the same thing with different words. The limited return is in fact just that, it's a small possibility.

THE COURT: It was very limited --

THE WITNESS: Of a large return. I did not then have any, in my mind, any precise definition of what small was. But I knew it was small.

THE COURT: And the reasonably good chance of doubling the money, is that your recollection of what you said or did you use other words?

THE WITNESS: Well, my understanding was it was somewhere in the neighborhood of 20 to 30 percent.

THE COURT: Okay. And did you use those figures? Did you convey --

THE WITNESS: I believe so, I believe so. But I also knew and communicated that I think all of that depends on how these options were structured. So there was some art involved in that, and that assistance would be provided by Deutsche Bank or, in this case, since Jeff Welles was in the financial community, had been for many years in New York, he presumably would understand it and be able to do his own analysis.

BY MR. CROWL:

Q Did you describe how the investment strategy worked from a tax standpoint?

A I did. I did.

Q What did you say?

A Well, again, while these opinions are very thorough and go into all sorts of more subtle issues, the fundamental structure was rather simple in my view. You would purchase a long currency option, thereby paying for that, and you would sell at or about the same time a short currency option. The long position that you bought in a leveraged transaction created a lot of tax bases cost, if you will, in that long position.

If those series of options are then conveyed to a partnership, the basis, cost basis in the long option, would create basis in the transferor's interest in the partnership. But the principle that Jenkins and apparently others were using was that the contingent obligation on the short option from the transferee partnership did not offset or reduce the basis that was created on transfer of the long option. And that, I said and understood to be then and even now, was well established under common law principles.

Then, the partnership, when it was

terminated, whenever that occurred in the future and there were presumably different ways that that might occur or events that might cause that, that outside basis from the transferor in the long position would attach to assets within the partnership, thereby elevating that basis. And when that property was sold, it would reduce the gain recognized on that transaction.

Q Did you have any discussions with them about Jenkins & Gilchrist?

A I did.

Q Tell the Judge what you said.

A Well, that's really just two things. One, that they were very large, operated in multiple locations including big cities. They were in the top 100 of the law firms in the U.S., and that their work product was extremely thorough and very impressive to our people who had examined it extensively.

Q Did you have any discussions with the family as to whether or not SLK lawyers, the Shumaker lawyers, had vetted Jenkins' work?

A Absolutely. I told them that our tax lawyers, now I don't know if I mentioned who necessarily, but I said our tax lawyers, at least a number of them had reviewed this thoroughly in the

case of at least two prior transactions and concurred with the analysis set forth in the Jenkins opinion.

Q And did you have any discussions with the family members relating to business purpose?

A Yes. I said that, actually translating to my view now that is not from a technical or a technician's background, that the risk of a strategy of this sort failing was probably dependent upon application of the so-called soft doctrines of business purpose and economic substance, not on the technical side which I was convinced is an accurate discussion and conclusion as to the consequences.

Q What did you tell them about business purpose and economic substance?

A Well, I told them that those are rather vague doctrines, very difficult, sort of patchwork series of case law is the only thing that developed it, that it had been, I guess Congress had considered codifying it in the past and had backed off that. It was fairly difficult to articulate, but in this context, what they needed to be concerned about was primarily two things. One, the ability to make a representation to the issuer of the opinion that the investment itself was entered into with a reasonable expectation of profit.

Not that they were not entitled to consider and be aware of tax attributes associated with it, but they needed to conclude and be able to represent that the investment itself was a rational and reasonable thing to do, reasonable potential for profit.

And of course that, our understanding was that this investment should have met that test, but certainly wanted Jeff in particular here since he had the type of background that was necessary to evaluate that, Jeff needed to evaluate that. And secondly, that they needed to have an independent nontax purpose for the partnership that was essential to effectuate the strategy. And frankly, that in our view might have been the toughest hurdle to accomplish. So they needed to address those two items before they could take comfort in this opinion.

Q Did you discuss penalties at all with the family?

A I did. They asked what the, well, they asked what the worst case could possibly be with the strategy if it failed. And actually, before that, I reminded them of the fact that this is a more likely than not opinion, which means by definition there was a 49-percent chance that it doesn't work. That creates risk in pursuing the transaction entirely

independently of penalties because the fees for the opinion were significant and the cost of the options was significant. And if the transaction failed, they would owe taxes, nondeductible interest, and they would be out of pocket those fees and the cost of the option. That's the baseline.

As to penalties, when they asked for a worst case, I said I thought the maximum penalty that I was aware of was 50 percent, but that I didn't think that would apply. The purpose of, I especially didn't think that penalty would apply, but I didn't think any penalties would apply and neither the opinion. They ought to be able to rely upon it. But nonetheless, that's the worst case.

The penalties we're really worried about was the so-called accuracy related penalties that in fact attach, I think, automatically if you lose all the merits. And then you have to defeat that through your due diligence and reasonable reliance on opinion and other efforts.

Q And what if anything did you say as to whether or not you believed that the Jenkins & Gilchrist opinion would provide that kind of protection from penalties?

A I thought it would. I thought it would, as

long as they were comfortable making those representations. Sure.

Q You mentioned the cost of purchasing the options.

A Yes.

Q Did you know what the cost was at the time?

A No, because I didn't know, one, whether they were going to pursue this, and two, who would be interested in pursuing it and to what extent.

Q And you also had mentioned the fees relating to the tax opinion. What did you say about the fees relating to the tax opinion?

A I said they were large. There again I couldn't say exactly what because I didn't know who might pursue this and to what extent.

Q Did you discuss anything about whether or not your firm would be offered to share in the fees relating to the tax opinion?

A Yes, we felt that it was, I felt that it was my obligation to advise them of that. And so I did. In the Morgan transaction specifically, we were offered to share that fee along with others because we had made a joint referral with KPMG over to Jenkins. And that presumably, I didn't know that, but presumably we would receive the same offer here.

Q And did any member of the Welles family that you can recall ask any questions relating to your presentation?

A Well, I think we talked about it for a while and I'm sure they had questions. I can't recall anything specific until, I'll call it the conclusion if you will, when I believe it was Jenny, I could be wrong, I think it was Jenny, asked me whether, that if I were they, would I pursue this strategy. And I said that I would. I think that concluded the meeting.

Q Now, at the time of this meeting, was the Kenner transaction finalized?

A Oh, no, it was just getting started really.

Q And when you were discussing this digital option strategy with the family, were the Welles family required to pay for the Jenkins & Gilchrist tax opinion? I mean, had they committed themselves to paying for a tax opinion from Jenkins & Gilchrist?

A Well, no. That would be much later.

Q And do you have an understanding as to whether or not, if the Kenner transaction hadn't occurred, whether or not they would still be required to pay for a tax opinion from Jenkins & Gilchrist?

MR. JOHNSON: Objection, calls for speculation.

THE COURT: I'll sustain the objection.

BY MR. CROWL:

Q Did you know whether or not the family members at this point were going to invest in the digital options?

A No.

Q No, you didn't know?

A No, I didn't know.

Q Okay.

A But we're talking about the Vero Beach meeting, right?

Q At the Vero Beach meeting.

A No, I didn't know then.

MR. CROWL: Judge, normally I wouldn't suggest this, we've been going for an hour and 15 minutes with Mr. Waterman. Can we take just a brief break? I think --

THE COURT: Tell me, would you like to take five or ten minutes? You tell me.

MR. CROWL: Yes, five or ten would be great.

THE COURT: We'll recess until 4:15.

MR. CROWL: Thank you, Judge.

(Whereupon, a short recess was taken.)

MR. CROWL: May I proceed, Judge?

THE COURT: Please.

BY MR. CROWL:

Q Mr. Waterman, after your meeting at Vero Beach, did you have a conversation with Tom Cotter regarding a Jenkins & Gilchrist memorandum relating to the options?

A Yes. I guess it was after Vero Beach, yes.

Q Okay. Approximately when was that conversation?

A Probably in February.

Q And in particular, what did you ask Tom to do?

A I asked Tom, John had already reviewed this, but Jenkins produced a separate memorandum discussing the new investment that I mentioned before, the currency options as opposed to the T bill spread. They prepared a memo on that and analyzing the tax consequences of the use of that. John had looked at it before, was comfortable with it, very comfortable with it. I asked Tom to look at it as well.

Q Okay. I want to show you what I've marked as Plaintiff's Exhibit 151, and ask you to examine that. What is Plaintiff's Exhibit 151?

(The document referred to was marked for identification as Plaintiff's Exhibit No. 151.)

A That's a copy of the memo I was just describing. What they refer to here is an option spread.

MR. CROWL: Judge, we offer Plaintiff's Exhibit 151 into evidence.

MR. JOHNSON: I do have a hearsay objection and a relevancy objection, Your Honor. Again, the relevant testimony that Mr. Waterman could provide is the advice he actually gave the Welles'es if any. And his reading of memos, internal reflections on memos and discussions with Mr. Cotter don't go towards that.

MR. CROWL: And, Judge --

THE COURT: Well, is this going to be a predicate for subsequent conversations with Welles family members?

MR. CROWL: It is, Judge.

MR. JOHNSON: Well, I think we need to establish whether there are any subsequent conversations before we get into this.

THE COURT: Before you can go into it --

MR. JOHNSON: I think we need some foundation.

THE COURT: Thank you.

BY MR. CROWL:

Q Later, did you provide some additional

advice to the family, in particular relating to Notice 2000-44 and whether or not you still had confidence that they should proceed with the tax strategy? And I'm just laying, I'm not asking that as my next series of questions but one that we'll get to later into your direct examination.

THE COURT: Just indicate whether or not there is any foundation for --

THE WITNESS: That's right.

THE COURT: In terms of --

MR. JOHNSON: Object to leading as well, Your Honor.

MR. CROWL: For foundation, Judge, we're allowed to lead.

MR. JOHNSON: I was going to make a leading objection as well.

THE COURT: No, it's not. I'll allow the question and do you still want to raise an objection to be registered to the document? Do you want an objection to be registered to the document?

MR. JOHNSON: Yes, Your Honor.

THE COURT: I'll admit it over objection to its relevance, the advice.

(The document referred to, previously identified as

Plaintiff's Exhibit No. 151,
was received in evidence.)

BY MR. CROWL:

Q And is this then the --

A Did I answer that question?

Q No, the foundation has been laid so now we can proceed. It's in evidence.

MR. CROWL: I'm sorry, Mr. Johnson was laughing, I didn't understand the basis.

THE COURT: You don't understand the basis of his laughter?

MR. CROWL: Yes. I thought that he was still objecting to --

MR. GIBSON: The witness was talking, we're not supposed to ask questions.

MR. CROWL: Okay. May we proceed, Judge?

THE COURT: Please.

MR. GIBSON: Sorry about that.

BY MR. CROWL:

Q Okay. So, the memo that we're looking at, 151, is what you asked Tom to review and report back to you on, is that correct?

A Yes.

Q Okay. Did he do that?

A He did.

Q When?
A He did in February. January or February probably.
Q And what did he tell you?
A He told me the analysis was good. He said, he told me the same thing that John did, that the options actually provided a better basis for the opinion than the prior investment.
THE COURT: You mean the Morgan investment?
THE WITNESS: Yes.
BY MR. CROWL:
Q Now, draw your attention to March of 2000. In March of 2000, did you write a letter for the Welles family?
A I did.
Q I'm going to show you then what I've marked as Plaintiff's Exhibit 152.
What is Plaintiff's Exhibit 152?
(The document referred to was marked for identification as Plaintiff's Exhibit No. 152.)
A This is a copy of the letter you just referred to, March 6th, 2000, I made to the Welles family.
Q And is this copy signed or unsigned?

A It's not signed.
Q Okay. Do you believe that you sent this letter to the members of the Welles family?
A I do.
Q Okay. Did you ever check to see if it indeed was sent?
A Well, we looked for verification of that.
Q Were you ever able to find a signed copy of the letter you sent?
A No.
Q And I guess the question is are you certain that you had sent this letter?
A I can't be certain.
Q But you believe so?
A But I believe so, yes.
Q Okay. And with regard --
MR. CROWL: And, Judge, we'll offer Plaintiff's Exhibit 152.
MR. JOHNSON: No objection, Your Honor.
THE COURT: Document will be received.
(The document referred to, previously identified as Plaintiff's Exhibit No. 152, was received in evidence.)
BY MR. CROWL:

Q With regard to Plaintiff's Exhibit 152, were there attachments?

A Well, there were enclosures, yes. A redacted version of the Morgan opinion and a copy of this memorandum that we just discussed.

Q So, the --

A And I think what was, we couldn't find it in our files, but I think it was a Martindale-Hubbell listing for Jenkins & Gilchrist.

THE COURT: When you say copy of this opinion, you meant Plaintiff's Exhibit 151, the opinion letter related to the options?

THE WITNESS: There is the opinion given to Larry Morgan, we redacted that.

THE COURT: Right.

MR. CROWL: And that was Plaintiff's Exhibit 228 for the record, Judge.

THE COURT: Right.

THE WITNESS: And then there was this memo that we just talked about.

THE COURT: And that's 151, correct? So, you attached, you enclosed 151 and 228?

THE WITNESS: I enclosed them, yes. Yes.

BY MR. CROWL:

Q And what was your purpose in sending the

March 6th letter?
A Just to confirm the advice I had given them. I really hadn't heard anything from Jeff or the family about our discussions since our Vero Beach meeting, at least that I can recall now.
Q Okay. So, let's go ahead and look at this particular letter. When is it dated, Mr. Waterman?
A March 6th of 2000.
Q And referring to the first paragraph that starts in the bottom of the page, okay, what does this refer to?
A Well, I'm saying I'm confirming and correcting the advice I gave them in Vero Beach.
Q And what's the reference to correcting to?
A The only thing was the, when they asked that question about the worst case, I recited a 50 penalty and it turns out I was wrong. There was 75 percent penalty, that I didn't think applied at all but that was the worst. Worst case is always pretty bad.
Q And turning to the second page, the second full paragraph, the first sentence, is this, what does this refer to?
A That's the Larry Morgan opinion, the redacted version.
Q Okay. And then, well, I guess, 1, 2, 3,

three lines down, you talk about the research memorandum prepared by J&G in connection with the option form of transaction?

A Again, the memorandum we discussed about ten minutes ago.

Q Okay. Turning to page 3, the middle paragraph, now, five lines down, it says, "We have also stated that in reliance upon the J&G opinion, it is unlikely that the government would seek or obtain penalties. I previously informed you that in any event the maximum penalty would not exceed 50 percent of the tax ultimately found to be due. This was incorrect." What is this referring to?

A That's the worst case penalty that I had to correct, being 75 percent rather than 50.

Q And that's what you told them at the Vero Beach meeting?

A I used 50 percent.

Q And then you correct it to explain that it would be what percent?

A It could be 75, well, theoretically.

Q Okay. And then, the last paragraph on the page, the last full paragraph, it also says, 'We also previously informed you that J&G has offered to Shumaker, Loop & Kendrick a portion of its fee for our

assistance in creating and implementing the investment vehicles and documenting the transfers of assets and that this could bias our opinion as to the merits of the --

A Yes.

Q Why did you use the word "bias"?

A Because we felt that was our obligation to inform them that it could have that effect, not that it did.

Q And did it bias your opinion in any way?

A Absolutely not.

Q The next sentence says, "I believe that we have been clear, that we are not recommending that you pursue their proposal." Do you see that sentence?

A I do.

Q Okay. Why did you write that?

A Well, when I was writing this letter, and I hadn't heard back like I said, I don't think. There may have been, probably were discussions with John Ivsan, maybe Tom Cotter, but I was concentrating on that transaction. I hadn't heard back about their intentions. And the comment that I left them at the Vero Beach meeting was if I were they I would pursue this transaction, okay. This is a family that's been, they seek out the best advice they could find and they

follow it. Routinely.

And I didn't want them to sort of blithely pursue the transaction without focusing on the qualifications that I put on this advice at that meeting, namely, that they find if you will or there is a partnership with an independent tax purpose to conduct this trade, and I was not aware of that, of any efforts on that in that regard, and that Jeff or someone on his behalf independently evaluate the options and the profit potential. So I was more careful in this letter, I acknowledge that.

Q And then, the last sentence says, 'In fact, we have advised you that our knowledge of J&G's proposal was obtained in confidence under a confidentiality agreement similar to the one you executed, that we are therefore unable to issue the opinion being offered by J&G and that we have no determined that we would be prepared to issue such an opinion even if permitted under our confidentiality restrictions.'

A Yes.

Q What are you referring to there?

A I'm referring to whether Shumaker, Loop & Kendrick would independently issue an opinion on this transaction or a similar transaction to a taxpayer.

And at this point, that was being debated within the firm and we hadn't made a decision as to whether we would do that.

We felt and I felt along with others that it's one thing to review the work of another and vet it and analyze it, it is another to actually devote resources, manpower that we did not have really to stay up to speed, up to date, in a changing environment sort of on the cutting edge like this and issue opinions on our own. That was being debated at the time, and we hadn't made a decision as to whether we would do that.

In any event, here we didn't feel that we could because this, we learned of this through Jenkins. We were under our own confidentiality restriction and we didn't feel that we could pirate their idea and sell it if you will.

Q In terms of issuing out additional such opinion --

A Yes. Yes.

Q With regard to the tax treatment of the options --

A Or an opinion independently of Jenkins.

Q And you mentioned that this was something that you were discussing internally?

A Yes.
Q In fact, did you have an earlier draft of this very letter?
A I did.
Q And in that draft, had you said that you would be unable to render such an opinion?
A I did.
Q Okay. Why did you change the language?
A Because on the first version sent out for comments from among others Tom and John and Bruce Gordon and others, Bruce is another tax guy in our Tampa office, they advised me that in their opinion we could give that opinion independently. And in fact they were encouraging the firm to do so.
Q To issue a separate opinion as to this transaction?
A We were not talking about this particular transaction which was already under our confidentiality agreement with Jenkins. We're referring to whether Shumaker would independently issue to some, to any taxpayer this type of opinion. And they were of the view that we could, that it met the "more likely than not" standard and they were advocating that within the office.
Q And now, turn to the final page of this

letter, the first full sentence. It says, "Also, please note that the enclosed opinion states and the opinions you will state, that it's based on certain representations provided to you in connection with these transactions, namely, that you will enter into the option agreements with the proper notice, that your contributions of the options in the Therma-tru stock and the investment partnership will have substantial nontax business reasons, and that each transaction described in the beginning of this correspondence will be undertaken separately without any binding commitment to do so."

A Yes, yes. I was making sure that they, that's just confirming the advice I gave them in Vero Beach.

Q And then it continues, "Of particular importance are the representations that these are substantial nontax business purposes to convey the options in the Therma-Tru stock and the partnership since that is one of the more likely grounds on which the IRS could challenge the arrangement and resulting tax consequences."

A Yes.

Q And you described that in Vero Beach as well?

A Yes. Again, that is the independent significance of a partnership to effectuate a transaction.

Q Now, Mr. Waterman, did there come a time when you learned that Jeff intended to pursue the digital option investment strategy?

A Yes.

Q When was that?

A I think probably around the middle of March.

Q Did you have a conversation with Jeff about that?

A I think I had a number of conversations with Jeff about that.

Q When did they occur?

A Well, starting a few days after this letter.

Q And was that in person or was it over the telephone?

A Telephone.

Q Anyone on the line besides you and Jeff?

A John Ivsan might have been on the line.

Q And tell us what was discussed.

A Well, I think, first, shortly after this letter, I was advised, and I don't know if it was first by Jeff or by John Ivsan, but nonetheless I was advised for the first time of the development of

Stobie Creek and their independent discussions with David Herpe and his firm over the creation if you will of a family office in New York, the consolidation of assets of the family to put it under a unified investment and management structure led by Jeff who was eminently qualified to do that. That's the first I had heard that.

Secondly, and I think it was independent conversation later, I inquired of Jeff about the options and what his view was of the options. And he informed me that he had reviewed it not only with Deutsche Bank but with other investment houses in New York. Again, that was his field, he knew people to call.

He had discussed that with a number of people. And he felt comfortable with his representation, he felt that it produced, it had the potential to produce a reasonable profit, or the reasonable potential for a profit. So he was comfortable with that representation.

Q And you mentioned that you had learned about the formation of Stobie Creek. Did you talk with Jeff about that?

A I did, yes.

Q And what was said in that conversation?

A Well, I just wanted to get a further update. As I said, I think John Ivsan may have brought that to my attention first. I don't know if it was John or Jeff but I talked to Jeff about it because it was highly significant. That established conclusively in my view an independent reason for the partnership necessary to effectuate this strategy.

Q Did he describe for you how Stobie Creek could work?

A Yes, in that it would provide a consolidated pool of assets for joint management and investment on behalf of the family.

Q And how did this additional information affect your belief about the tax treatment of this transaction?

A That was what I was looking for and that gave me comfort in the opinion.

Q What was the status of the Kenner transaction at this time in March of 2000?

A Well, we were working on the ancillary agreements, as I said important agreements that I recall included the governance structure, again very important document because of the 50-50 shareholder split and a potential for deadlock, the option, the stock appreciation rates plans that were very

important for management. You recall how I said before Therma-Tru had been very good to their managers, by the way, and they had that entrepreneurial system for compensation.

They wanted to provide similar incentives under this joint ownership so we were working on that. And Kenner was working on its due diligence. We were making disclosures and gradually generating the schedules, either of items that simply were required to be disclosed or exceptions to representations. That was all in process.

Q And when was it again that the Kenner transaction finally closed?

A May 9th of that year.

Q Mr. Waterman, did there come a time when you sent a letter to the Welles family relating to legal fees?

A Yes. I think that was in August of that year.

Q Let me show you Plaintiff's Exhibit 108. What is Plaintiff's Exhibit 108?

(The document referred to was marked for identification as Plaintiff's Exhibit No. 108.)

A That's a copy of the letter that you eluded

to regarding fees.

Q And this is from you, is that right?

A Yes.

MR. CROWL: Okay. We offer Plaintiff's Exhibit 108.

MR. JOHNSON: No objection.

THE COURT: It will be received.

(The document referred to, previously identified as Plaintiff's Exhibit No. 108, was received in evidence.)

BY MR. CROWL:

Q Going to the first page of this letter, again on the first page, what's the date?

A August 9.

Q Okay. And who is the letter addressed to?

A David and Georgia and their five children.

Q Turning to the second page of the letter, first full paragraph, starting right in the middle. It says, "[A]s we have discussed, the aggregate fee payment for this option and all work in connection with implementing the strategy is 3 percent of the gain to be sheltered or, in this case, $204,575,000. This fee has been proposed to be shared by Jenkins and Shumaker in the ratio of two-thirds to one-third,

hence the aggregate to be payable to SLK would be a $2,045,750." Do you see that?

A I do.

Q Okay. When was this fee arrived at?

A Probably, I guess I'd, probably the 3 percent was probably arrived at back in the March timeframe.

Q Okay. And it starts off, as we've discussed, what are you referring to there?

A Well, I mean, this was not new news. They knew what the aggregate fee was. I'm not sure when we discussed the split. I think it was before this letter but I'm not sure when we advised them of the split.

Q And then the next paragraph starts, and I'll start with the first sentence, it says, I informed you previously and reiterate our willingness to waive, perhaps not all, but substantially all of this extraordinary fees you found it inappropriate. Do you see that?

A I do.

Q Okay. Why do you say that?

A Well, first because we had made that offer repeatedly. And as I explained later here, we were, the Welles family is a terrific family for all sorts

of reasons and they've been very good to us, that is to Shumaker, Loop & Kendrick, and to me. And the last thing that I or any of us at SL&K wanted was to jeopardize that relationship if they thought this was an inappropriate fee.

So we had repeatedly offered to waive that. In other words, their goodwill was far more important to us than a fee, even if $2 million.

Q The last sentence in this paragraph, it says, "In the alternative, we offered and now reiterate our offer to make a substantial contribution to a charity or charities of your choice from the fee payable to SL&K."

A Yes.

Q Okay. And what does that refer to?

A That refers, again, to our offer, repeated offers in the past to do just that. In other words, our understanding was that even if we waived our fee, that Jenkins would intend to capture it for their benefit. So it wasn't clear to me, although we certainly invited them to discuss that with Jenkins, whether our waiver would actually reduce their aggregate cost.

I did feel, as an alternative, we could make a substantial donation to a charity and Jenkins could

not complain about that because that was our own business.

Q Now ultimately you were paid the fee, is that right?

A Yes.

Q Did you make a contribution to charity?

A Yes.

Q What did you do?

A In, we sponsored, if you will, two capital campaigns or requests for contributions from the Toledo Museum of Art in the aggregate amount of $145,000.

Q The next paragraph starts off, "We do not mean to suggest that we're not financially motivated, however, we believe we have been very fairly compensated for our work in connection with this transaction. In fact, we appreciate the opportunity that you gave to us to assist in the transaction. We're more interested in maintaining the trust and confidence of our clients and our reputation for quality legal services. We are receiving extraordinary fee like that, which is proposed."

What does that relate to?

A Just that. Our relationship with the Welles family was far more important to us than a fee, even

of $2 million, which is a pretty big fee.

THE COURT: What do you mean we've been very fairly compensated for our work in connection with this transaction? This sounds as though you've been billing hourly and already been compensated?

THE WITNESS: We were, yes, billing hourly throughout the transaction and issuing those invoices on a monthly basis.

THE COURT: So this, you refer to this extraordinary fee is an end of deal --

THE WITNESS: Yes.

THE COURT: -- sweetener or whatever?

THE WITNESS: That is simply the Jenkins, the portion of the Jenkins fee, yes, related to the strategy.

THE COURT: Sort of, that was my term, but some kind of bonus or reward?

THE WITNESS: It's, in my view, a referral fee, actually, but any fixed fee.

BY MR. CROWL:

Q And then the next paragraph, the first sentence you say, I understand also that Jenkins has insisted upon payment of one-half of its fee upon rendering the opinion necessary to file the Stobie Creek return next week. The balance of this fee will

be payable next year when the individual returns are filed. Do you see that?

A I do.

Q What does that refer to?

A Well, I apparently was informed of just that. That Jenkins was requesting half of their portion of the fee at that time. They did not receive that at that time, I presume that either Jeff directly or we, on his behalf, objected and they did not get paid until later.

Q When did they get paid, do you know?

A I think in February or March, maybe, of the next year. But I'm not certain about that.

Q Of 2001?

A Yes.

Q A couple lines down, it says this, too, is consistent with our position. Do you see that?

A Yes.

Q That if, for any reason, you elect not to pursue reporting the transaction on the basis of the Jenkins opinion, we will not charge the extraordinary percentage fee. Do you see that?

A Yes.

Q What does that refer to?

A Well, if they, they could engage in the

investment transaction, they could do, they could implement the strategy. If they chose not to file their returns on that basis, under no circumstances were we going to invoice them for any kind of fee.

Q Now, Mr. Waterman, did there come a time when you learned about what's known as Notice 2044?

A Yes.

Q When was Notice 2044 published?

A I think it was August 11th of 2000.

Q So it was after this August 9th letter we just looked at?

A Yes.

Q How did you find out about Notice 2044?

A I think John Ivsan and Tom Cotter brought it to my attention.

Q Did you read it?

A I did.

Q Now at this point, had the options already been purchased and the investment already occurred?

A Oh, yes.

Q And when you read Notice 2044, did that raise any concerns for you?

A It did.

Q Tell the Judge how you were concerned?

A Well, that described, I think two or three

different types of investment structures, one of which at least looked similar to the transaction that had been engaged in or pursued by the Welles family, that concerned me.

Q So what did you do?

A I asked John and Tom to research this further, talk to the Jenkins people and get back to me as to what effect they collectively thought this might have on our reporting the transaction on the basis of the expected opinion from them.

Q Did Tom Cotter and John Ivsan get back to you?

A They did.

Q How?

A They wrote me a memo addressing that and other issues. A very complicated memo.

Q But tell the Judge what you thought of the memo?

A Well, they addressed three things. Notice 2044 which I understood, that's what I asked them to address. And also, other regulations that had been issued, I think on the same date, actually, August 11th, governing, I think, obligations of disclosure of tax-favored investments that we previously thought were limited to corporate taxpayers only. This seemed

to be expanding that.

There was a requirement to maintain lists of taxpayers engaging in transactions of that sort within definitions contained in these regulations.

And also, amending or affecting some regulations that had been issued years priors to that, under what I understand now are the registration provisions of the Code. That is an obligation of pretty much anyone involved in a transaction of that sort to notify the government of its existence.

Q And when you got that memo and you're reading it, did you write some comments on the memo?

A I did.

Q Including BS in a couple instances, is that right?

A Yes, I did.

Q Okay. Let's take a look at that memo. But before we do, did you also have some conversations with Tom Cotter and John Ivsan about the memo?

A Well, sure, as soon as I read it.

Q Yes. And when did those conversations take place?

A I'm sure in September. I think the memo, they only drafted, it was never finalized it but the only draft we found was dated September 1 so that's

probably the draft I got and I would have talked to them pretty shortly thereafter.

Q Okay. And how many conversations do you recall?

A Just one or two. It was pretty clear where they were coming from and they understood my concerns.

Q And did you have those, I'm just laying the conversation foundations. Do you remember those individually or collectively?

A Collectively.

Q And were they in person or over the telephone?

A Well John would have been in person. Tom Cotter, probably over the telephone.

Q And just the three of you, is that right?

A Yes.

Q Okay. I'd like to look at that memorandum and also discuss those conversations.

MR. CROWL: Plaintiff's Exhibit 259, Judge.

(The document referred to was marked for identification as Plaintiff's Exhibit No. 259.)

BY MR. CROWL:

Q Is this a fair and accurate copy of the memorandum you're referring to?

A I believe so, yes.

MR. CROWL: Judge, we offer Plaintiff's Exhibit 259 into evidence.

THE COURT: Sorry, Mr. Johnson?

MR. JOHNSON: I'm sorry. Mr. Crowl, did you move for it?

THE COURT: Yes, he did.

MR. JOHNSON: Okay. I have no objections. Sorry, Your Honor.

THE COURT: The document is received.

(The document referred to, previously identified as Plaintiff's Exhibit No. 259, was received in evidence.)

BY MR. CROWL:

Q So, Mr. Waterman, let's look at the first page. You mentioned in the upper right-hand corner, just a minute ago, that this was a draft and never finalized?

A Correct.

Q What does that in fact reflect, in the upper right-hand corner?

A A draft stamp and a 9/1 date.

Q And you never got a final version of this?

A No.

Q And who's it addressed to?
A Myself.
Q And from?
A Tom Cotter and John Ivsan.
Q And it looks like it's dated on August 18th, is that right?
A Yes. That must have been the date they started writing it, I suppose.
Q Okay. And it's entitled revisions to confidential corporate tax shelter regulations, is that right?
A Um-hum.
Q And referring to the first paragraph of that page, it says on August 11th, the Treasury Department issued temporary and proposed regulations modifying the recently proposed regulations on confidential corporate tax shelters. The original proposals were issued on February 28th.
On the same day, the IRS issued Notice 2044 in which the Service identified two particular transactions as corporate tax shelters. Okay. And what does that relate to?
A Well, the first sort of explains my confusion. These were, this is an amendment to earlier regulations that they're still describing as

applicable to confidential corporate tax shelters. And that I think were extended beyond corporate tax shelters, but it was very difficult to figure out from this memo.

Q And then the second or the last sentence in that paragraph refers to what you've been quoted about --

A Yes.

Q -- with Notice 2044, is that right?

A Yes. Um-hum.

Q Okay. And the next paragraph says, this memorandum outlines a February proposal according to three separate areas governed by the proposals, registration of the confidential corporate tax shelters, disclosure by C corporations of confidential corporate tax shelters and then three customers list to be maintained.

And then it goes on in the final couple of sentences, the memorandum then discusses the changes imposed by the August announcement. Finally, the memorandum analyzes Notice 2044 as it relates to the regulations and potential transactions.

A Yes.

Q Okay. And so what does that relate to, in particular to 2044?

A Well, the 2044 was their analysis of that notice that was issued on August 11 by the IRS.

Q And you mentioned you had conversations with John and Tom about that, right?

A I did.

Q Okay. And what did they tell you about whether or not Notice 2044 applied to the Welles family?

A Well, in their view it did not. Because they felt that 2044 describes what I would call a loss generator, a transaction that generates a section 165 loss and not a basis enhancement strategy which is what the Welles'es pursued. They thought that was different. Certainly from a technical standpoint.

Q Okay. I want to turn to, it's a little bit hard to read but it's page 13. And there's a comment box there.

A Um-hum.

Q Do you see the comment box?

A Yes.

Q And it says in comment, as discussed earlier, there are three means by which a significant purpose of the structure of transactions considered to be the avoidance for elimination of federal income tax.

A Yeah, I'm sorry. What page are you on?

Q I'm on page 13 of the memo.

A Okay.

Q And do you see a comment box there? Looks like right there?

A Oh, yeah. Okay.

Q Okay.

A Good.

Q All right. Let's look at the first thing that's listed. It talks about listed transactions, as for reasons discussed later in the memorandum, one may reasonably infer that the evaluated transaction is not described in or substantially similar to the transaction describe in Notice 2044.

A Um-hum.

Q Okay. What's that comment? I can't read your handwriting?

A Are you sure, question mark?

Q Okay. And did you talk with Tom and John about whether or not they were true?

A Yes. I think they were sure for the reason I gave.

THE COURT: It says are we sure, correct?

THE WITNESS: Pardon me?

THE COURT: Are we sure?

THE WITNESS: Or are they sure.

THE COURT: Well I'm reading your writing.

MR. CROWL: Just read the handwriting --

THE WITNESS: Oh, yes. I'm sorry, are we sure, yes.

BY MR. CROWL:

Q And did you talk with Tom and John about that?

A Yes.

Q And what was that conversation?

A They felt that a basis enhancement strategy was different from a so-called loss generator, producing a loss under section 165 of the Code.

Q After that conversation, were you satisfied that 2044 didn't apply?

A No.

Q And so what did you end up doing?

A I asked John, I think it was, to arrange a conference call with the Jenkins representative, Donna Guerin, who we had worked with at Jenkins on the strategy to see what their opinion was on it.

Q And we'll talk about that conference call in a minute. There's a, the last two lines of that same page, see where it says, the evaluated transaction consistent of the investment strategy intended to

generate a pretax profit that far exceeds any expected tax savings. Right? And you wrote BS next to that, is that right?

A Yes, I did.

Q And why were you questioning that?

A Because I think that overstated the case. Again, the large return I knew was a narrow opportunity. And this would suggest that there was no motivation to obtain the tax benefits.

And I presumed that was part of their motivation, at least, in pursuing the investment strategy. And they're entitled to consider that.

Q Now turn to page 20 and in particular --

A 20 or 14?

Q Page 20, not just the next page but page 20.

A Okay.

Q There's some handwriting there in the bottom left, do you see that?

A Um-hum.

Q Okay. Can you tell us what you've written there?

A It says, we don't qualify. And that was my opinion.

Q Okay. And what is that related to?

A I'm referring to Romanette (ii) (phonetic),

now I don't know the context of this text to tell you the truth. But Romanette (ii) describes a taxpayer participating in a transaction for which there is a longstanding and generally accepted understanding that the expected federal income tax benefits from the transaction were allowable under the Code. And I didn't think that was our transaction.

Q Why not?

A I didn't think it was longstanding and generally accepted that we would obtain this result. We were, after all, receiving or expecting to receive an opinion to the effect that it was more likely than not that these tax consequences would be realized. This would be a different form of opinion.

Q Then turning to page 26. At page 26 of the 33 page memo, what's being discussed here?

A Now they're discussing Notice 2044.

Q Which is what you had requested guidance on, is that right?

A Yes.

Q And turning to page 30, on the right-hand side of page 30, there's some handwriting. Do you see your handwriting there?

A Yes.

Q Okay. The first bit of handwriting there,

what does that say?

A It says looks like us.

Q And what are you referring to there?

A The transaction that he was summarizing there looked like the transaction that the Welles'es had engaged in.

Q Okay.

A In my opinion.

Q Right. And then the next paragraph, next to it on the right, there's other handwriting there by you and what have you said there on your notes?

A I said, I wouldn't count on this.

Q Okay.

A That was the distinction, that paragraph, they were drawing between the basis enhancement strategy and the loss generator.

Q And, again, after you had these concerns, you discussed these with Tom and with John, is that right?

A Yes.

Q And did they address your belief that these distinctions might not be satisfactory?

A Well, I understood, they explained why they said what they said. Namely, that from a technical standpoint, a 165 loss is in fact quite different in

their view from a basis enhancement. That's spoken or viewed from the eyes of a tax expert and technician.

The other item that we questioned about the longstanding and generally accepted understanding that these tax benefits would be received. What they were intending and the reason I said that there is because looking at each element of the transaction in fact there was a longstanding and well-understood tax consequence to them which is what Jenkins opined to.

I, on the other hand, was looking at it as a whole producing the tax benefits resulting from the entire strategy. So that's why they said what they did and why I questioned it.

Q And you were looking at it as in the whole isn't more likely than not?

A Yes.

Q After you received this memo and had your conversations with Tom Cotter and John Ivsan, did you have a conversation with Jeff about --

A Yes.

Q -- Notice 2044?

A Yes. I may have had one before too, but yes.

Q And what was your, I'm sorry, and when did your conversation with Jeff occur?

A It may have been before or after this memo. I just don't recall.
Q But it was after Notice 2044 had come out?
A Yes. Um-hum.
Q Is that right?
A Yes.
Q Was there anybody else on the line besides you and Jeff?
A John Ivsan might have been on the line, I don't recall.
Q Okay. And what was discussed?
A I told Jeff about the issuance of this notice and my concerns about the notice. And I told him how Tom and John had evaluated it and that I wanted to go further and I wanted a conference call with Donna Guerin to be arranged so that we could hear what Jenkins has to say about it.
Q Did you in fact set up that conference call with Donna Guerin?
A We did, yes.
Q When did that conference call occur?
A I believe it was in October of that year.
Q Who was on the conference call?
A David, Sr., David, Jr., Jeff, Larry Goldstein, John Ivsan, myself and Donna Guerin.

Q Who is Larry Goldstein?
A Larry Goldstein is the chief financial officer for Stobie Creek and North Channel, the family investment firm in New York City.
Q And tell the Judge about this conversation, this conference call relating to Notice 2044, please?
A Well, I think I more or less conducted the questions for Donna, and I simply asked her what the opinion of Jenkins was or would be regarding the applicability of 2044 to the Welles' transaction and the effect on their reporting the transaction as the opinion was expected to indicate. And actually, their willingness to continue giving that opinion.
And she responded, it was an interesting conversation. She responded that their opinion committee had reviewed the matter. We stop on that. That's a comforting thought. It may not sound like much but an opinion committee, that some big law firms operate, that takes a determination of that sort out of the hands of an individual, one or two practitioners who may be involved in this, it went to the full committee.
The committee had determined that 2044 did not affect transactions of the type that the Welles'es had engaged in and that they would opine to that

effect in their final opinion.

I asked her if she was sure about that and she said, again you may take this as you want now but she said we're not about to commit malpractice. That's a comforting comment. And that's how she responded. And she was sure, in other words, their opinion committee was sure and they were not about to commit malpractice.

Then I asked how, I asked her if other tax payers were continuing to pursue these transactions and she said they were on the basis of, at least, their advice.

And there may have been some other questions voiced by other participants on the call but I think it was concluded when David, Sr. said he'd heard enough, he was satisfied with what she had to say and he was not worried about this notice.

Q When Donna Guerin said, Mr. Waterman, that for a number of reasons they at Jenkins & Gilchrist came to the conclusion that 2044 had no effect on this transaction, did she explain what those reasons were?

A Yes. I recall three, actually. One was, in fact she concurred with Cotter and Ivsan that the 165 loss generator was different, fundamentally different from a basis enhancement strategy. And in fact that's

what their opinion ultimately read.

She also said that regardless of that, even if it were, even if it were arguably applicable to the Welles' transaction, it did not affect their opinion because it did not affect the legal principles on which they relied in issuing that opinion, in the past or in the future.

I believe she also said, at that time, that the Welles'es had already engaged in their transaction and that was the third reason why the notice would not apply to them.

Q And she had indicated that the Jenkins & Gilchrist opinion would refer to Notice 2044 and opine as to the fact that it did not apply to this transaction --

A Yes.

Q -- is that right?

A Yes.

Q The ultimate Jenkins & Gilchrist opinion, did it do that?

A It did. Yes, it did.

MR. CROWL: Judge, I apologize. I'm flagging just a bit, I think it was a little bit warmer. It's gotten better. We have a substantial next section. We have a substantial next section and

I guess I would request if we may just conclude now.
I can finish up in the morning, if Your Honor pleases?

THE COURT: Okay. Mr. Johnson?

MR. JOHNSON: That's fine.

THE COURT: Off the record.

(Whereupon, a short recess was taken.)

THE COURT: Back on the record. Today we admitted for Plaintiff, Plaintiff's 57 pt. 9, 61, 62, Plaintiff's 108, 111, 113, Plaintiff's 117, and there's 151, 152, and Plaintiff's 134, 228, 314. The government --

MR. GIBSON: I got 259 also for the Plaintiff's.

THE COURT: I don't believe that was offered. Was it? I can't remember. It should have been, we discussed it, this might have been my oversight.

MR. GIBSON: It was just received about ten minutes ago, Your Honor.

THE COURT: My mistake.

MR. CROWL: I think 259 was admitted.

THE COURT: Thank you. And 259 for Plaintiff. For the government, Defendant's 40, Defendant's 41, Defendant's 424, Defendant's 548, that's what I, all I have. The parties may leave

anything they want here. And tomorrow we will reconvene at 9:00 a.m. Any final matters?

MR. CROWL: Nothing by the Plaintiff, Judge.

MR. JOHNSON: Nothing, Your Honor.

THE COURT: Have a good evening.

MR. CROWL: You, too, Judge.

(Whereupon, at 5:15 p.m., the hearing in the above-entitled matter was recessed to reconvene at 9:00 a.m. on April 10, 2008.)

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

REPORTER'S CERTIFICATE

DOCKET NO.: 05-748

CASE TITLE: STOBIE CREEK INVESTMENTS v. U.S.

HEARING DATE: April 9, 2008

LOCATION: Chicago, Illinois

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: April 9, 2008

____________________________

Adrian Holguin
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018