UNITED STATES
COURT OF FEDERAL CLAIMS

---

STOBIE CREEK INVESTMENTS, LLC., and JFW ENTERPRISES, INC.,

Plaintiffs,

v.

UNITED STATES,

Defendant.

Docket Nos. 05-748
07-520

Pages: 259 through 513

Place: Chicago, Illinois

Date: April 10, 2008

---

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STOBIE CREEK INVESTMENTS, LLC., and JFW ENTERPRISES, INC., | ) |
| Plaintiffs, | ) |
| v. | ) Docket Nos. 05-748 07-520 |
| UNITED STATES, | ) |
| Defendant. | ) |

Courtroom 2266
Kluczynski Federal Building
230 South Dearborn Street
Chicago, Illinois 60604

Thursday,
April 10, 2008

The parties met, pursuant to notice of the Court, at 9:27 a.m.

BEFORE: HONORABLE CHRISTINE O.C. MILLER
Judge

APPEARANCES:

For the Plaintiffs:

COLLEEN FEENEY, Esquire
ROBERT E. KOLEK, Esquire
MATT CROWL, Esquire
Schiff Hardin, LLP
6600 Sears Tower
Chicago, Illinois 60606
312-258-5755

For the Defendant:

CORY A. JOHNSON, Esquire
STUART D. GIBSON, Esquire
U.S. Department of Justice
Tax Division
P.O. Box 403
Washington, D.C. 20044
202-307-6586

C O N T E N T S


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Plaintiffs: | | | | | |
| David Waterman | 265 | 291 | --- | --- | --- |
| Jeffrey F. Welles | 392 | --- | --- | --- | --- |

E X H I B I T S

| PLAINTIFFS EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| 36 | 279 | 280 | Transcript of Doc. |
| 143 | 265 | 266 | Opinion |
| 154 | 483 | 483 | Welles notes |
| 184 | 275 | 277 | Assignments of Stock |

E X H I B I T S

| DEFENDANT'S EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| 93 | 352 | 352 | Business record |
| 112 | 349 | 349 | Business record |
| 305 | 337 | 337 | Business record |
| 326 | 327 | 329 | E-mail: Ivsan/Guerin |
| 327 | 345 | 345 | Business records |
| 371 | 318 | 319 | E-mail: Ivsan/Guerin |
| 377 | 306 | 308 | E-mail |
| 453 | 374 | 374 | Document |
| 572 | 350 | 350 | Business records |
| 573 | 350 | 350 | Business records |
| 574 | 350 | 350 | Business records |
| 669 | 323 | 323 | Transaction Checklist |
| 684 | 357 | 357 | Business record |
| 715 | 370 | 370 | Notice 2044 |

P R O C E D I N G S

(9:27 a.m.)

THE CLERK: Calling the case of Stobie Creek Investments, LLC and JFW Enterprises, Incorporated for day two of trial.

THE COURT: Good morning, everybody, please be seated.

ALL: Good morning, Your Honor.

THE COURT: Are there any preliminary matters?

MR. CROWL: Nothing by the Plaintiffs, Judge.

MR. GIBSON: Nothing, Your Honor.

THE COURT: Mr. Kedem informed me that Ms. Feeney raised a matter with respect to the reporter. And I wanted to indicate that if there is a desire upon the Plaintiff's behalf to get a daily transcript then you have to enlist the services of different reporter.

The government would have to agree and we'd have to make a formal transition on the record whereby this reporter will be responsible for the record up to a certain point, filing the transcript and associated exhibits. However, those exhibits would not be sent until the conclusion of the trial.

And then the successor reporter would be responsible thereafter. So there would have to be a formal changing of the guard, and you would just divide this amount.

MR. CROWL: And Judge, it would be our request to do daily copy. We thought we'd arranged, and apparently we must have somehow miscommunicated. If this court reporting service can give us daily copy, that's terrific, but if not, we would make a formal request.

THE COURT: And you're going to deal with the reporter about this?

MR. CROWL: We certainly will, Judge. Thank you.

THE COURT: Thank you. And you may proceed.

MR. CROWL: Thank you, Judge. And we'll call Mr. Waterman back to the stand, please.

THE COURT: Good morning, Mr. Waterman.

THE WITNESS: Good morning.

THE COURT: You have what's called a durable oath, it lasted overnight.

THE WITNESS: Okay, I understand.

MR. CROWL: May I proceed, Judge?

THE COURT: Please.

MR. CROWL: Thank you.

DAVID WATERMAN,

recalled as a witness herein, having been previously duly sworn, resumed the stand and testified as follows:

DIRECT EXAMINATION (Cont'd)

BY MR. CROWL:

Q Mr. Waterman, when we finished yesterday afternoon you had told the Judge about a conference call that you, Jeff Welles, Donna Guerin, and others were all on discussing 2044. Do you remember that?

A I do.

Q And in that conference call you indicated that Donna Guerin had said that they would actually include Jenkens & Gilchrist's analysis of 2044, and why they believed it did not apply to the Welles situation in their opinion?

A That's correct.

(The document referred to was marked for identification as Plaintiff's Exhibit No. 143.)

Q I want to show you now, please, what I have marked as Plaintiff's Exhibit 143, and ask you to examine that, please. What is Exhibit 143?

A That's one of their opinions, this one issued to Jeff Welles.

Q Did you receive that opinion?
A Yes.
Q And is it a fair and accurate copy of that opinion?
A I believe so, yes.
MR. CROWL: Judge, we offer Plaintiff's Exhibit 143.
MR. JOHNSON: I have no objection, Your Honor.
THE COURT: Plaintiff's 143 will be received.
(The document referred to, previously identified as Plaintiff's Exhibit No. 143, was received in evidence.)
BY MR. CROWL:
Q Mr. Waterman, would you point out to the Judge where in this opinion Jenkens & Gilchrist has discussed the inapplicability of Notice 2004, please?
A Well, it's in two places. The first on page, starting at the bottom of page 5, and continuing on to page 6.
Q And what's the paragraph start?
A Well, when they get to their 2044 reference, it's the last sentence starting on page 5. In fact,

on August 11, 2000 the IRS issued Notice 2044.

Their conclusion is on the next page, last sentence in that paragraph, while Notice 2044 sets forth the IRS position on such loss generation and transactions, the Notice does not change the existing law, which we rely upon herein.

Q And then I guess their's a footnote there, right?

A There is. For a more thorough discussion of Notice 2044 see section M, M was the last section, two pages.

Q The last two pages of the opinion?

A The last two pages of the opinion, and it sets forth their more detailed analysis.

THE COURT: Are you going into that?

MR. CROWL: I just wanted to highlight that.

BY MR. CROWL:

Q Is there anything you'd like to discuss with regard to that, Mr. Waterman?

A No, it just confirms the advice they had given us over the phone.

THE COURT: I'm going to do a quick review, one moment, please.

(Pause.)

BY MR. CROWL:

Q Now, Mr. Waterman, I want to stay with that exhibit for a bit. Turning to page 2 of the exhibit, paragraph number 1, can you tell us what that says, please?

A It's a recitation of some facts. Item 1, on March 24, the contributions of Therma-Tru Stock were made to Stobie Creek. On March 31 ---

Q I just want to start with the first paragraph, okay?

A Okay.

Q With regard to the March 24, 2000, do you know whether that was the actual date that there was the transfer, or the contribution of shares of Therma-Tru?

A That in fact is incorrect, it took place on April 14th.

Q And why did it take place on April 14th?

A It was delayed, it was scheduled for March 24th, it was delayed because the company decided to make a so-called triple A distribution, that is a distribution, it's like a dividend of previously taxed income, it comes out tax-free to the shareholders.

They had been making distributions for years and years as an S corp, they did that frequently. And it was all set up, the wire transfers, to go to the

individuals. So it was easier to simply send those to the individuals and delay the transfer into Stobie Creek rather than adjust all the wire transfer instructions.

Q So that occurred on April 14th, is that right?

A Yes, correct.

Q Okay. And are there certain representations that are made in this opinion letter?

A Yes.

Q What page are the representations?

A It starts on page 7.

Q If you would turn to page 7, please? What is the first representation?

A That the purchase and sale of the options were entered into for a substantial nontax business reasons.

Q What is your understanding, by the way, of when the options were purchased?

A March 31.

Q Okay. And this representation that they were purchased for substantial nontax business reasons, did you believe that representation to be true?

A I did.

Q Okay.

MR. JOHNSON: I'll object to the foundation.

MR. CROWL: And that's where I'm going next, Judge.

THE COURT: Establish the foundation first.

MR. CROWL: Okay.

BY MR. CROWL:

Q Why did you believe that to be true?

MR. JOHNSON: I have an objection to foundation as well as the timing of all this, when Mr. Waterman received this and review.

THE COURT: Mr. Waterman, he's distanced himself from evaluation and the investment prospect determination as proposed and that's between Mr. Welles. So you'll have to lay a foundation.

MR. CROWL: Okay.

BY MR. CROWL:

Q Mr. Waterman, when did you receive this opinion?

A Well, this opinion is dated January 2, we received earlier drafts, I think starting in August.

Q Okay. And do you know if you got this in January or in February?

A I do not.

Q Okay. And the earlier drafts, did they also

have representations similar to this?

A I believe so.

Q Okay. And based upon your belief one way or the other with regard to these representations, would that affect whether or not you advised or didn't advise Mr. Welles or the family that they should proceed on their income tax returns?

A It did. As I explained yesterday, we knew, regardless of when this document was received, that there would be a representation to this effect, that was important.

And we discussed that with Jeff on many occasions, and that's why he did his diligence in researching the proposed investment and doing his own analysis.

Q And the income tax returns were then filed after receipt of this, is that correct?

A Yes.

Q Okay. So did you have a belief as to whether or not this was true?

MR. JOHNSON: Objection, foundation, irrelevance.

THE COURT: I'm going to sustain the objection, you haven't laid the foundation.

MR. CROWL: Okay. Judge, where I'm trying

to go and ---

THE COURT: Yes, but don't tell me.

MR. CROWL: Okay, yes, I will lay further foundation.

THE COURT: I mean, this witness has, if you're going to elicit testimony, a percipient basis or having impressions about the investment worthiness of the transaction. And that to the extent that he said, that he expected Mr. Welles to make an analysis, that's one thing.

MR. CROWL: Okay.

THE COURT: But to the extent that he has any opinions based on the nature and extent of the thoroughness, et cetera of that analysis is quite another.

MR. CROWL: Very well.

BY MR. CROWL:

Q Did you have any conversations with Mr. Welles regarding whether the options were purchased for substantial nontax business reasons?

A I did.

Q Okay. And what did you say, and what did he say?

A I asked him that on several occasions, and he responded that he had talked with representatives

of Deutsche Bank and other investment banks.

As I said, he lived in, lived still in New York, he was involved in the financial community, he knew people who could assist actually in evaluating this.

And he made several inquiries, and he reached the conclusion that this was a reasonable investment with a reasonable expectation of profit.

Q Now, the options were purchased by individuals, or by LLCs?

A They were purchased by LLCs.

Q And are there any tax consequences to purchasing them through an LLC?

A No.

Q Why not?

A Because an LLC is a disregarded entity, it kind of speaks for itself. It has no income tax, or any tax consequence to it.

Q Are there any advantages to purchasing them in an LLC?

A Probably, I mean ---

MR. JOHNSON: I'm going to have an objection to foundation as to whether this is opinion evidence or this is factual evidence of discussions with Mr. Welles.

THE COURT: I refer to the question he asked

the witness based on his knowledge of the state tax practice.

MR. CROWL: Yes, Judge.

THE COURT: And I'm taking the answer in that sense. I'm not taking the answer in the sense of the conversation that occurred with Mr. Welles, because the witnesses understand.

MR. CROWL: Okay.

BY MR. CROWL:

Q What's your understanding of advantages for purchasing an LLC?

A Some liability protection.

Q The next representation, can you tell us what that is, please?

A The options were contributed to the partnership, in this case Stobie Creek, for substantial nontax business reasons.

Q And did you have an understanding of Stobie Creek's purpose?

A I did.

Q And what was that?

A Stobie Creek's purpose was to provide a central spot for management of the family's assets, which were expected to be very large, especially on consummation of the Kenner transaction

And administration and management of those investments was to be vested essentially in Jeff through a separate entity called North Channel, as manager of Stobie Creek, on behalf of all the family members.

Q And was Therma-Tru Stock transferred actually to Stobie Creek?

A It was.

Q And in fact did your law firm do the assignment paperwork?

A We did.

(The document referred to was marked for identification as Plaintiff's Exhibit No. 184.)

Q I'm going to show you what I've marked as Plaintiff's Exhibit 184. What is Plaintiff's Exhibit 184?

A These are all the assignments separate from the certificate, it's a common way of assigning a stock certificate, executed, I believe, by all of the family members transferring stock in.

MR. CROWL: We offer Plaintiff's Exhibit 184.

THE COURT: Mr. Johnson?

MR. JOHNSON: Your Honor, I guess I have an

objection on foundation and also an issue to raise. These are dated April 14th, our other copies of these have March 24. And I don't know if Mr. Waterman has established that he ever saw these or witnessed the signatures.

THE COURT: Explained earlier the difference in the dates, but make that clear.

MR. CROWL: Yes.

BY MR. CROWL:

Q Mr. Waterman, were these prepared by Shumaker, Loop & Kendrick?

A They were.

Q And are they business records as well as legal documents relating to this particular assignment?

A Yes.

Q Okay. Did these come actually from your files?

A Yes.

MR. CROWL: Judge, we offer them and I'll be happy, once they're in, to also ask about the date change.

MR. JOHNSON: Your Honor, I have no objection to his point of clarification, these are Bates-stamped JFW, and these come from the Shumaker

files. Mr. Crowl?

MR. CROWL: I don't know the answer to that, and I think that would be appropriate for cross-examination, Judge. I think I've laid the foundation for a business record foundation, and also for the legal document.

MR. JOHNSON: We have no objection at this point, Your Honor.

THE COURT: Plaintiff's 184 will be admitted.

(The document referred to, previously identified as Plaintiff's Exhibit No. 184, was received in evidence.)

BY MR. CROWL:

Q Okay. And can you explain the question that Mr. Johnson had raised about the dating on April 14th versus there was a March 24th? I know you talked about it earlier, but if you'll follow up on that.

A We had intended to transfer the stock on March 24th. At some point, it was decided to pay a dividend out of their Triple A Account, that it called an Accumulated Adjustments Account. With an S corp, that means a dividend of income that's already been taxed to the shareholders.

They paid dividends frequently as an S corp for many, many years, and they had it all set up with wiring instructions to the individual shareholders.

And it was easier to delay the contribution of the stock to Stobie than it was to change the wiring instructions that were already in place to pay that dividend to the individuals. It's purely mechanics, that's all.

Q And, Mr. Waterman, in your experience, is there a difference in terms of how you approach transactions if you're dealing with people who are all members of the same family?

A Yeah, that would certainly be a difference.

Q How so?

A Just generally ---

THE COURT: From what? Just state what your practice is dealing with members of the family.

THE WITNESS: I'm not sure of the nature of the question. But obviously, if you're dealing with a family you're documentation is probably not going to be as formal, and you're not going to be quite as careful with it, so the matter of course.

There is a level of trust, I don't know that anything need to be necessarily set forth in writing as far as that goes. So you're documentation is

sometimes just sloppier, sometimes follows events, that sort of thing.

BY MR. CROWL:

Q The third representation on page 7 of that Jenkens & Gilchrist opinion. Could you take us to that one, please?

A Yes.

Q And tell us what that representation is.

A That the contribution of the LLC interest to a separate corporation, they had made an S selection, was made for substantial nontax business reasons.

Q And indeed, was there a contribution of the LLC interest to an S corporation?

A There was.

(The document referred to was marked for identification as Plaintiff's Exhibit No. 36.)

Q I want to show you what I have marked as Plaintiff's Exhibit 36, it's a little bit lengthy, it's got several tabs. What is Plaintiff's Exhibit 36?

A I would call this a transcript of documentation relating to the LLC and the S corp that Jeff Welles set up, and some assignments relating to this transaction.

Q And did Shumaker, Loop & Kendrick prepare these documents?
A Yes.
Q Okay. And did they come from the SLK files?
A Well, now noticing after Mr. Johnson's comment, this is marked JFW, I'm sure we have similar files.
Q Is it kept in the ordinary course of your business ---
A Yes.
Q -- as representatives?
A Yes.
Q Is it the regular practice to keep such records?
A Yes.
MR. CROWL: We offer Plaintiff's Exhibit 36, Judge.
MR. JOHNSON: No objection, Your Honor.
THE COURT: Plaintiff's 36 will be received.
(The document referred to, previously identified as Plaintiff's Exhibit No. 36, was received in evidence.)
BY MR. CROWL:
Q And if you would just take us to the index

so we have a general sense of the documents in Plaintiff's Exhibit 36. See the index?

A Yes.

Q In particular, what does Tab 1 refer to? And just from the index is fine, I just want to give you a ---

A Tab 1 refers to the Certificate of Formation issued by Delaware for JFW Investments, LLC, it's a limited liability company?

Q And then if you turn to that certificate, is it just, what, a couple pages behind the index itself?

THE COURT: No, it's a Tab.

MR. CROWL: Yes, tab.

THE WITNESS: Well, the index is part of Tab 1 as well.

BY MR. CROWL:

Q So the index comes at the beginning, and then at least in this, there should be something called the State of Delaware, Office of Secretary of State.

A It's actually part of Tab 1, a little confusing.

Q Okay.

MR. CROWL: I just want to make sure, Judge, you've got that Tab?

BY MR. CROWL:

Q Beautiful, thank you.

A Thank you.

THE COURT: I want you to know, Mr. Crowl, I really appreciate all the visual aides, and I occasionally have checked, but I just love looking at the documents.

MR. CROWL: I can tell, Judge, and that's important.

BY MR. CROWL:

Q So that is the Delaware Certificate of Formation for JFW Investments, LLC, is that correct?

A Yes, issued by the Secretary of State of the State of Delaware.

Q Okay. I want to have you talk a little bit about Tab 4. What is Tab 4?

A Tab 4 is a similar document issued by the Secretary of State of Delaware, certifying to the incorporation of JFW Enterprises, Inc.

Q And JFW Enterprises, Inc. is what?

A That is a corporation owned by Jeff, which subsequent made an S selection.

Q Then I'd like to take you next to Tabs 11 and 12. Let's start with Tab 11 in that. What is Tab 11?

A I already looked at this document before, this is another copy of the assignment, separate from an actual certificate, assignment of, in this case, the nonvoting shares of Therma-Tru held by Jeff to Stobie Creek.

Q What's the distinction between, why did you one for nonvoting separate from voting shares?

A Because they're two different blocks of shares. We could have done it the same, but they were represented by different certificates.

Q And where is the assignment of Jeff's voting Therma-Tru Stock to Stobie Creek?

A That would be Tab 12 just behind it.

Q Okay.

THE COURT: Well, is this the same as Plaintiff's 184?

MR. CROWL: It is Judge.

THE WITNESS: Yes.

MR. CROWL: Let me check and see if that's the --- Judge, Ms. Feeney correctly points out that the other assignment also includes other family members other than just Jeff. So you're correct that it's in the other one as well.

BY MR. CROWL:

Q And then what is Tab 13?

A Tab 13 looks to be a schedule to the Stobie Creek Operating Agreement, or to the Stobie Creek records.

Q Okay.

A We don't have the Operating Agreement here, so I don't know when that was finalized.

Q And then what is Tab 14?

A 14 is the assignment of the LLC interest, Jeff's LLC interest of the LLC entity, JFW Investments, to the corporation JFW Enterprises, Inc.

Q And do you know why that's not dated, Mr. Waterman?

A No, I don't know why this particular copy isn't dated.

Q Now, you talked in the representations, representation C. You talked about how C indicated there was a contribution of the LLC interest to the S corp for substantial nontax business reasons.

A Yes.

Q Do you see that as to C?

A Yes.

Q Were there reasons to contribute an LLC interest to an S corp?

MR. JOHNSON: Objection, foundation.

THE COURT: He did raise tax advice between

them.

MR. CROWL: Yes.

MR. JOHNSON: I'm sorry. My objection, Your Honor, is whether he actually gave any advice and what the relevance of his opinion about this would be.

THE COURT: Well, okay. The question is in the present tense, and if you're asking if he had occasion to give that advice, make that clear. Now if you're asking him today, make that clear.

MR. CROWL: Right.

BY MR. CROWL:

Q I'm going to ask you in a minute about those nontax business reasons, right. But did you communicate that there were nontax business reasons to members of the Welles family?

A To Jeff, yes.

Q Okay. So what were those nontax business reasons?

A Several actually. The LLCs at that point were actually thoroughly new, and people were not very comfortable with the extent of their liability protection, especially a single number LLC. Corporations thought, well, if the corporation was well established that you would have that protection.

That doubt, if you will, has continued even

to this day. And now, my understanding, because Ohio's in this process, states have been adopting legislation to clarify that, and to state specifically that the liability protection it queries to that of the corporation. But that was not clear at the time.

Stobie Creek was expected to have, a second point, vast assets and lots of activity, making the accounting and reporting for the entity very complicated. By positioning each family's interest in the investment vehicle through a separate S corp that would facilitate transfers among family members without interfering with the internal workings and accountings of Stobie Creek. That, we thought, was a desirable thing to do.

Third, our estate planners had had success then with obtaining multiple discounts, valuation discounts, for gifting of tiered entities. In other words, stacking entities on top of each other and taking discounts at each level on the value of stock that would be gifted. All of those seemed to present reasonable reasons to convert this to an S corp from that.

In addition, and this will take a little more explanation, there was something specific that we wanted to establish for the Ohio residents, which

included David, Jr., and David, and most importantly David's GRAT, which in combination held about 67 percent of the interest in Stobie.

This will take a little explanation. Well, let me take you back to the beginning. In about roughly the middle 1990s, the Internal Revenue Code was changed to permit trusts, all kinds of trusts, to hold S corporation stock. That was always problematic before then. Certain trusts could, but complex trusts, let me go back to that.

Two basic types of trusts, a complex trust is something that is fundamentally taxed at the trust level multiple beneficiary, spring powers. So it's taxed at the trust level.

A simple trust, by contrast, would be a revocable trust, or a grantor trust, that's a pure conduit, it comes right through to the creator or to the beneficiary. By making an ESBT election, any trust, they were intending, I think, to refer to complex trust, but any trust could hold S corporation stock.

One other fact, at that point, Ohio did not tax complex trusts, or trusts that were taxed while at the entity level. There simply was no tax. So Ernst & Young determined that, and was recommending widely,

and was widely used too, putting S corp stock into a revocable trust, a pure conduit, making it an ESBT election, so he could hold the S corp stock.

THE COURT: What's that term? What's the election?

THE WITNESS: ESBT is Electing Small Business Trust. Then let's say you had a transaction, like Therma-Tru sale, or any sale.

All you need is an S corp, related or unrelated to the asset being sold, held in a trust, a purely revocable trust that could be collapsed at any time, together with the asset to be sold, make an ESBT election, sell the asset, there is no Ohio tax. Then you revoke the trust, the proceeds go right back to the original owner, and you simply bypassed Ohio tax.

It may seem too good to be true. But in fact it worked until the federal, I think the way it was addressed is the federal regulations governing the election itself was changed at the end of the year 2000 retroactive to January 1 of 2000. So that one of these grantor trust, or revocable trust could not make that election.

Ohio, subsequently, amended this law to tax trusts, too. But for the time being, that was a device that proved to actually work, they seem like it

shouldn't, but it did. And we wanted the Ohio shareholders comprising 67 percent of this investment to take advantage of that in the event the strategy outlined by Jenkens was unsuccessful.

Q You mentioned that this was a strategy that Ernst & Young ---

A Yes.

Q -- was recommending?

A Yes.

Q Did you have any conversations with members of the Welles family about that strategy at the time it was being recommended?

A Yes, actually Therma-Tru was an audit and tax client of Ernst & Young for many years. And when they first developed this technique, if you will, they approached all of their clients, probably nonclients too. It's interesting too, it bears on, I think, this situation.

They approached them under a confidentiality restriction to disclose this idea, and for a very high fee. In other words, they were selling this strategy, this idea, if you will.

And they did sell for many years, eventually it became widely known if you would all, everybody did it, or anybody who knew what they were doing did it.

But they approached the family, because Therma-Tru was an S corp, could have sheltered lots of Ohio tax on the income being generated by Therma-Tru in those years, which was a terrific amount of income.

Q Did the members of the Welles family choose to pursue that strategy?

A No.

Q Why not?

A Well, in principle, because in that instance Ernst & Young was not rendering an opinion as to its viability. They gave them a memorandum, which basically outlined all the reasons why it might not work, and then were not willing to provide an opinion to that affect.

MR. CROWL: May I have one moment, Judge?

THE COURT: Please.

MR. CROWL: No further questions, Judge, thank you.

THE COURT: Mr. Johnson, did you want a quick break before cross-examination?

MR. JOHNSON: Just a couple minutes maybe to organize, Your Honor.

THE COURT: We'll just wait then.

MR. JOHNSON: Okay.

THE COURT: Take your time. We're off the

record.

(Whereupon, a short recess was taken.)

THE COURT: Back on the record.

CROSS-EXAMINATION

BY MR. JOHNSON:

Q Good morning again, Mr. Waterman.

A Good morning.

Q I wanted to talk to you briefly about something Mr. Crowl talked to you about to start. And that would be Plaintiff's Exhibit 228, that's the Morgan opinion. Remember talking about that yesterday?

A Yes.

Q And this is the opinion you sent on to Jeff Welles.

A Yes.

Q And did you talk about this opinion with him?

A In general terms, yes.

Q Okay. Do you recall when that discussion was with him about this opinion?

A Well, at the Vero Beach meeting. I think primarily at the Vero Beach meeting.

Q This is the opinion you sent with the March 6th letter, isn't it?

A Correct.
Q Okay. Do you think you talked with him about this opinion after the March 6th letter?
A I don't know that I talked with him about this opinion after the March 6th letter.
Q Okay. But this is the one you sent with the March 6th letter?
A I believe so, yeah.
Q And you talked with Mr. Welles about this opinion?
A Yes.
Q Now, this opinion deals with a gentleman named Mr. Larry Morgan?
A Yes.
Q And you became aware of his transaction when the structure and the amount of the fee Shumaker, Loop & Kendrick was going to earn was brought to your attention, isn't that right?
A That is correct.
Q Okay. And you have described that fee as a success fee.
A Yes.
Q Okay. And by success fee you mean that's a fee that would be earned only if the transaction actually goes through and is reported on the tax

return, isn't that correct?
A That's correct.
Q Okay. And in this case, Shumaker earned a success fee of $1.3 Million, isn't that correct?
A I think that's right.
Q Okay. And Jenkens & Gilchrist also got a sizable fee?
A Yes.
Q And this transaction involved Deutsche Bank as well, didn't it?
A Yes, I think so.
Q Okay. This transaction concerns a treasury short though.
A Yes.
Q Now, in addition to Mr. Morgan, Shumaker, Loop & Kendrick have referred other clients to Jenkens too, didn't they?
A Yes.
Q Okay. Mr. Kasperzak?
A Mrs. Kasperzak.
Q I'm sorry?
A Mr. Kasperzak was deceased.
Q I'm sorry.
THE COURT: Spell the name for the reporter, please, of the one that is living.

THE WITNESS: Mr. Johnson, there actually was a son Kasperzak too, so there was a male ---

BY MR. JOHNSON:

Q Okay. I'm sorry, I thought we were talking about Mr. Kasperzak at your deposition, K-a-z-p-e-r-a-k. Sound right?

A (K-a-s-p-e-r-z-a-k) maybe.

Q Yes, I'm sorry.

A Sounds right, Kasperzak, yes.

Q Mrs. Kasperzak you referred to Jenkens?

A Yes.

Q And ---

A And her family.

Q And her family. And they were all shareholders in what corporation?

A Calphalon Corp.

Q And you referred them to Jenkens ---

A Actually, I need to correct this. We did not refer them to Jenkens, I think that's an important distinction. This was the first, this is the transaction where we became acquainted with Jenkens and the strategy.

Q And that's when Mr. Daugerdas came to firm and gave a presentation?

A Yeah, yes.

Q They were referred ---
A The referral of the family to Mr. Daugerdas was from their CFO from the company.
Q And Shumaker assisted in the implementation of that transaction, correct?
A We did some, yes.
Q Okay. And the Kasperzaks were anticipating selling their stock in Calphalon?
A That's correct.
Q And so they were doing this transaction because of an anticipated capital gain on that stock? Was that your understanding?
A I assume, I don't know. I don't know, I did not work on that.
Q Okay. How about Mr. Morgan? Mr. Morgan was anticipating a large capital gain on the sale of his stock in his corporation, correct?
A That's my understanding, yes.
Q And that's why he did this transaction, correct?
MR. CROWL: Judge, I'm going to object to him speculating as to why someone did a transaction without a foundation.
THE COURT: Correct.
BY MR. JOHNSON:

Q Mr. Waterman, did you have an understanding as to why Mr. Morgan was undertaking this transaction?

MR. CROWL: Again, foundation, Judge.

THE WITNESS: Not really, I don't know Mr. Morgan, I never met him. He was a client of our Tampa office.

(Pause.)

BY MR. JOHNSON:

Q Mr. Waterman, I'd like to show you the copy of your deposition taken on Wednesday, August 1, 2007. You remember that, don't you?

A I do.

Q I took your deposition in Toledo.

A You did.

Q And your counsel, Christopher Rizik was there?

A Yes.

Q And counsel for the Plaintiff was there as well, right?

A Yes.

Q Okay. Could you turn to page 39 of your deposition?

THE COURT: Under Rule 613 of Federal Rules of Evidence it's your choice to have the witness read along, you do not need to show him the deposition.

MR. JOHNSON: I wanted to give Mr. Waterman a chance to read along if he'd like, to be fair.

THE COURT: No, if someone chooses not to, you may change your mind. Go ahead.

BY MR. JOHNSON:

Q Beginning at line 4, Mr. Waterman, on page 39. The question, Was he selling some stock or a company? The answer, Oh, yes. What was he selling? Answer, his company was called Morgan Tire.

A Yes.

Q Question, and he was a stockholder in that company? Answer, yes. Question, is it your recollection that he engaged in the transaction because he was about to sell his stock, or some of his stock at least, in Morgan Tire? Answer, yes. Do you recall giving those answers, Mr. Waterman?

A Well, I'm not surprised I said that.

MR. CROWL: Judge, I'm objecting, he's trying to impeach him based upon what he asked him.

THE COURT: I'm going to allow the question.

MR. JOHNSON: I believe it's admissible under 801 anyway.

THE COURT: He had a poor recollection. Go ahead.

THE WITNESS: Can I clarify?

BY MR. JOHNSON:

Q No. In addition to Mr. Morgan and Mr. Kasperzak ---

MR. CROWL: I'm sorry, I think the witness wanted to explain that.

THE COURT: Say that you can't answer a question yes or no, without clarification, give your counsel an option, too late after. It's the way it goes.

BY MR. JOHNSON:

Q In addition, I'm sorry ---

THE COURT: Counsel is entitled to yes or no answers. If you can't answer the question yes or no then tell him, and it's his choice whether to take the full explanation. Of course on redirect, your counsel has been fully primed to get your answers, he'll remember it. Go ahead.

BY MR. JOHNSON:

Q In addition to Mrs. Kasperzak and Mr. Morgan, did Shumaker, Loop & Kendrick also have a client named Mr. Cooley who engaged in a transaction involving Jenkens?

A Yes, same transaction, counsel and transaction.

Q And he was selling Calphalon stock as well?

A Yes.
Q And it was your understanding that he was anticipating a capital gain on that?
A Yes.
Q Was it your understanding that he undertook this transaction that involved Jenkens & Gilchrist and Deutsche Bank because he was anticipating that capital gain?
A There again, that would be my assumption.
Q Okay.
A I really don't know.
MR. CROWL: And Judge, again, I'm going to object, because that would be, again, an assumption.
THE COURT: Correct. And his deposition testimony will have it, unless you want to move on?
MR. JOHNSON: I'm going to move on, Your Honor.
BY MR. JOHNSON:
Q Now, you testified yesterday that you were asked by, I believe David Welles, Jr. and Jeff Welles about tax strategies.
A Well, I think what I said is I'm not sure who actually made the inquiry, but we were meeting with the two of them and David, Sr.
Q And this inquiry occurred during the course

of time when you were assisting with the potential sale of the Therma-Tru stock, the Therma-Tru?
A Right at the very beginning of the Kenner interest, I believe, yes.
Q Okay. And the inquiry you received was whether you knew of any tax strategies that could reduce the taxes that would be due on the sale or redemption of that stock?
A That is correct.
Q And in response, you referred them to Jenkens, and in particular Donna Guerin and Paul Daugerdas?
A My firm did, yes.
Q Okay. And in that conversation with either David or Jeff, they didn't ask you about any investment opportunities you might know of related to foreign currency options, correct?
A No.
Q That's not your specialty?
A That's not my specialty.
Q Now, you went down to Florida, correct?
A Correct.
Q And talked about the Jenkens strategy?
A I did.
Q I'd like to show you an exhibit that was

admitted yesterday, Plaintiff's Exhibit 111. Mr. Waterman, do you recall seeing this packet and this set of materials at the Florida meeting?
A No.
Q Could I ask you to turn to the page, I think it's 25, it's the one with the Jenkens & Gilchrist executive summary.
THE COURT: Page 24.
BY MR. JOHNSON:
Q 24, sorry. Did you provide a copy of this to the Welles?
A I don't believe so, no.
Q Had you seen this before you went to Florida?
A I don't believe so, no.
Q Did you see it at the Florida meeting?
A I don't believe so, no.
Q Did you see it at any time after the Florida meeting?
A I think I saw it the day before my deposition with you.
Q So prior to your deposition in August of last year you had never seen this?
A I don't believe so, no.
Q When you talked to them about the strategy,

had you reviewed any written materials about the Jenken strategy?

A Well, written materials? Not necessarily.

Q Could you take a look at the paragraph numbered one? That talks about the purchase of short and long options, do you see that?

And your firm assisted with the implementation of the Jenken strategy for the Welles, is that right?

A That's correct.

Q And do you recall that they purchased long and short options?

A Yes.

Q And Deutsche Bank was involved with that?

A Yes.

Q They were the counterparty?

A Yep.

Q And the strategy also involved the creation of LLCs and S corporations, correct?

A Yes.

Q And your firm assisted with that?

A Yes.

Q Okay. Both the LLC and the S corps were created on March 17th, right?

A That's my understanding.

Q And there was one LLC for each of the Welles?
A That's correct.
Q And one S corp for each of the Welles?
A That's correct also.
Q Now, you said earlier also that it is your understanding that the options were contributed to Stobie Creek?
A That is correct.
Q And that's the step that's listed in paragraph 3, isn't it?
A Yes.
Q Okay. And you also talked about, with Mr. Crowl this morning, the transfer of
a Stobie interest, reportedly its transfer of the Stobie interest from the LLCs to the S corps?
A Yes.
Q Do you recall that?
A The transfer of the LLC to the S corp, yes.
Q Were the LLCs the initial members of Stobie, do you know?
A I believe so, yes.
Q And did they obtain new members at some point, do you know?
A I don't really know who the members are. I

think some of the children may be members now, or grandchildren, I should say of Dave and Georgia.

Q The transfer that you talked about earlier with Mr. Crowl from the LLCs to the S corps, that's the step listed there in paragraph 5, isn't it?

A Yes, a variant of it I guess.

Q And you understood that the S corps were created on March 17th for the purpose of subsequently becoming members in Stobie, correct?

A I can't testify as to the purpose at that time, but it's a logical assumption, yes.

Q But you understood that to be one of the steps of the Jenken strategy?

A I did.

Q Okay. And you understood the creation of the LLC is to be one of the steps in the Jenken strategy?

A Well, I think I said before, I see no significance to the formation of those LLCs, but.

Q Do you know of any reason that they were formed?

A I think I said before the only thing I can think of is a separate liability shield for whatever it's worth.

Q Now, at the Florida meeting, I think you

said yesterday that you mentioned to the Welles that the fee that Jenkens would charge would be quite large, is that correct?

A Yes.

Q Did you give them any estimate?

A I don't recall if I actually defined it ---

Q Did you ---

A -- because I didn't know what it would be.

Q Did you provide any information as to how it would be set?

A I said it is relation to the basis elevation, yes.

Q You told them it would be a percentage of the basis enhancement, is that right?

A I believe so, yes.

Q Okay. And that's the basis enhancement that would be claimed pursuant to the Jenken strategy for the Therma-Tru Stock?

A That's correct.

Q Okay. It was anticipated that that basis enhancement would then be used for reporting the gain on the redemption of the Therma-Tru Stock?

A That's correct.

Q Did you give them an indication as to what the percentage might be?

A I don't recall specifically, no.
Q Now, yesterday, Mr. Waterman, you told us that after the Florida meeting you hadn't really heard anything from the Welles for a while, and then you decided to write the March 6th letter, is that right?
A I hadn't heard from them regarding this tax strategy, yes.
Q So you hadn't really heard anything from them from the time of January 24 until March 6, is that fair to say?
A That's fair to say, I think, yes.
Q Okay. So on March 6th, or thereabouts, maybe a day before, you drafted a letter to send to them?
A I don't think I started in February.
(The document referred to was marked for identification as Defendant's Exhibit No. 377.)
Q Mr. Waterman, I'd like to show you what's been marked as Defendant's Exhibit 377. And that is a copy of a fax, I'm sorry, an e-mail. Well, let me back up. At the bottom there's an e-mail, correct, from Pat Carpenter?
A Yes.
Q And she was your secretary at the time, your assistant?

A Yes.

Q Okay. And it's addressed to, I believe, 12 people. Are those colleagues of yours from Shumaker?

A Yes.

Q Okay. And with this e-mail you were sending a draft of what eventually became the March 6th letter, correct?

A Correct.

Q And you got comments from some of these people, correct?

A Yes.

Q Let's look again at the March 6th letter that was marked yesterday as Plaintiff's Exhibit 152.

MR. JOHNSON: Your Honor, I'd like to move for admission of 377, Defendant's Exhibit 377, the e-mail we just looked at.

THE COURT: Mr. Crowl?

MR. CROWL: Judge, I just want to make sure that Mr. Waterman actually saw this. I'm not sure that that foundation laid, that he saw it. I assume that he did, because it's his secretary, but just need to ---

THE WITNESS: Well, I assume that I did.

BY MR. JOHNSON:

Q You say you saw it, Mr. Waterman?

A Yes.

Q And you asked your secretary to send it to these individuals, didn't you?

MR. CROWL: No objection, Judge.

THE COURT: The document will be received. Business records work both ways too.

(The document referred to, previously identified as Defendant's Exhibit No. 377, was received in evidence.)

BY MR. JOHNSON:

Q Now, Plaintiff's Exhibit 152, that's your March 6, 2000 letter?

A Yep.

Q And this was retrieved from your correspondence file?

A The Stobie Creek file, yes.

Q Okay. And at the top, you have a banner in bold and all caps, do you see that?

A I do.

Q Okay. The last line says, retain this correspondence in a secure place, do you see that?

A I do.

Q Why did you say that?

A Well, honestly, I think this is standard

language that we put on something that we want to maintain the privilege of.

Q Okay. But you're asking the Welles to retain this letter there in that sentence?

A In a secure place, I think, yes.

Q Okay.

A So it doesn't get outside of the family, which would waive the privilege.

Q Okay. And you sent this letter to confirm the information you had given to the Welles at the Florida meeting?

A That's correct.

Q And in fact, I think you said yesterday, that the way you left it at the meeting, or one of the last things you said at the meeting was in response to a question from Virginia Jordan, right?

A Yes.

Q And you testified yesterday that you recall saying, if I were you I would do this?

A Yes.

Q And that's what motivated you to write this letter, correct?

A Well, I think I just wanted to confirm my advice in general.

Q Okay. And in this letter you don't say, do

you, if I were you I would do this?
A No, I don't say that specifically, no.
Q And in fact, on the third page, the last full paragraph, you said, I believe we have been clear that we are not recommending that you pursue their proposal, correct?
A I see that, yes.
Q Okay. And you say, I believe we have been clear. Are you referring to the Florida meeting as the prior occasion where you conveyed this information?
A Probably all along.
Q Okay. So all along, including the Florida meeting?
A Well, let me ---
Q Is that correct, Mr. Waterman?
A We were recommending that they consider it and evaluate it. Recommending that they simply do it without attending to the profit motive, the profitability of the options, and establishment of the partnership, that would not be wise.
Q My question, Mr. --
A That's --
Q My question, Mr. Waterman, is you say, I believe we have been clear. Are you referring to the

Florida meeting as an occasion upon which you convey this information, that being we are not recommending that you pursue their proposal?
A I suppose so, yes.
Q Okay. Are there other occasions subsequent to the Florida meeting you were referring to here when you say, I believe we have been clear that we are not recommending you pursue their proposal?
A I think our advice throughout was this had merit from the technical standpoint, and they should consider it, provided their comfortable with those representations.
Q My question, Mr. Waterman, was what other occasions, if any, you're referring to in that sentence when you say, I believe we have been clear?
A Probably earlier conversations about this, and we didn't have many conversations.
Q So conversations between the Florida meeting and March 6th?
A No, I think it would be before that.
Q Okay. So you think before the Florida meeting you conveyed to them that what you say here, that you are not recommending that they pursue the proposal?
A I think I conveyed to them exactly what I

said, and that is, we're recommending that they entertain it as long as they're comfortable with those representations. So that's a distinction, but an important one.

Q But you were not recommending that they do it?

A I couldn't until I had the answers to those questions.

Q Also in the letter you referenced the opinion your sending, that's the Morgan opinion, right?

A Yep.

Q Okay. And I think you said yesterday that you expected any opinion to the Welles to be about the same.

A Similar, yes.

Q Had you seen any templates for those opinions?

A Well, the Morgan opinion. Is that what you mean?

Q I'm asking you about a template for the opinion that could be adapted for the Welles?

A The only opinion I reviewed myself was the Morgan opinion.

Q Okay. Now, again on page 3, Mr. Waterman.

At the bottom, at the end of the last full paragraph, the paragraph we looked at earlier, you state in sum that Shumaker would be unable to issue an opinion, the opinion being offered by J&G, correct?

A Yes, because of our own confidentiality restrictions, yes.

Q And you also go on to state in that same sentence that we have not determined that we would be prepared to issue such an opinion even if permitted under our confidentiality restrictions, correct?

A Yeah. I explained the yesterday.

Q So putting aside the confidentiality restrictions, at this point, Shumaker had not determined that it would be prepared to issue such an opinion, correct?

A I had explained yesterday, that was being debated within the office. Our tax lawyers felt we could give an opinion.

We weren't sure that we were prepared to do that, that we had the manpower, and the expertise, and the depth of talent to do that on an ongoing basis. It was being debated.

Q Okay. You don't say in this letter that that's being debated, do you?

A I said we were not determined.

Q You don't say in this letter that it's being debated, do you?

A I didn't use that word, I said, we have not determined.

Q Okay. And you don't say in this letter that there are some tax lawyers at Shumaker, Loop & Kendrick who thought an opinion could be issued, do you?

A Well, I told Jeff that, sure.

Q Mr. Waterman, did you say in this letter that there were some lawyers at Shumaker, Loop & Kendrick who thought a letter ---

A I didn't say that in this letter, no.

Q Okay. So the documentary evidence in this letter does not include a reference to any lawyers at Shumaker, Loop & Kendrick who thought it could issue such an opinion, correct?

A That's correct.

Q Okay. This letter is as of March 6th when you say that the firm is not determined whether we would be prepared to issue such an opinion.

Isn't it true, Mr. Waterman, that even subsequent to March 6th you did not feel that Shumaker had ever acquired the depth of experience and expertise on these matters to determine whether or not

it could issue such an opinion?

A We never reached a conclusion that we had the expertise independently to reach our own opinions in a matter such as this.

Q And you yourself didn't think you had the expertise to do so, correct?

A I did not, no.

Q Okay. And you did not write a letter to the Welles indicating that Shumaker, Loop & Kendrick now had the expertise and experience to issue such a letter, correct?

A No.

Q Also in the March 6th letter you reference the fee. And that Shumaker, Loop & Kendrick would receive a portion of the fee.

A We'd be offered a portion, yes. That was our expectation.

Q What was your understanding as to what portion Shumaker would receive at this point?

A I'm not sure that I had an understanding, I think it varied. I mean, actually, it only happened once before. That would be the Morgan instance.

Q Now, I think you told us yesterday, Mr. Waterman, that subsequent to this letter, sometime in March, you learned that Jeff Welles had decided to

proceed with the transaction.
A Yes, it looked like he was going to, yes.
Q Okay. And during that time period there were negotiations about the fees, correct? The fees to be paid to Jenkens & Gilchrist and Shumaker, Loop & Kendrick?
A I think so, yes.
Q And that was negotiated between Jeff Welles and John Ivsan, is that correct?
A I'm not sure exactly how the discussions took place.
Q And Shumaker's original proposal, along with Jenkens & Gilchrist, was that they would get a fee of four percent, is that correct?
A I'm not sure I recall that, no.
Q And do you recall that the eventual agreement was that Jenkens & Gilchrist and Shumaker, Loop & Kendrick would share a fee of 3 percent of the basis enhancement?
A Yes.
Q I'm sorry?
A Yes, that is correct.
Q Okay. And do you recall if that was a reduction from the normal fee on a percentage basis that was charged?

A No.
Q You know Mr. Bores, don't you?
A I don't know what the normal fee was.
Q Okay. You know Stephen Bores?
A I know Steve Bores.
Q Okay. And he was a former employee of Therma-Tru?
A Yes.
Q And he was a stockholder at Therma-Tru?
A Yes.
Q And you called him and offered him the Jenken strategy as well, didn't you?
A No, I think he inquired of me about that. But, yes.
Q And Mr. Bores implemented the Jenken strategy as well, didn't he?
A He did.
Q He entered into digital options with Deutsche Bank?
A He did.
Q And he used that to enhance the basis of his Therma-Tru Stock, didn't he?
A He did.
Q And Shumaker, Loop & Kendrick charged Mr. Bores 2 percent of the basis boost, didn't they?

A I don't think I know what we charged him.
Q Do you recall that that, his fee was on a percentage basis as well?
A Oh, yes.
(The document referred to was marked for identification as Defendant's Exhibit No. 371.)
Q Mr. Waterman, I'd like to show you what we've marked as Defendant's Exhibit 371.
A Okay.
Q Mr. Waterman, do you have 371?
A Yes.
Q Have you had a chance to look at it?
A Yes.
Q Okay. Do you recognize this as a copy of an e-mail with attachments from Mr. Ivsan to Donna Guerin?
A Yes.
Q Okay. And the charts that are attached, you've seen these before, haven't you?
A I think so.
Q And you saw these back in 2000?
A I don't know when I saw them, but I've seen them.
Q Could you take a look at your deposition

again, Mr. Waterman, page 168? You'll see at the bottom --

MR. JOHNSON: Your Honor, I'm on page 168, line 18.

BY MR. JOHNSON:

Q Question, Mr. Waterman, we've marked as Exhibit 10 a document Bates-stamped IRSGAG 862 through 867, you're welcome to page through that, have you seen this before, any of its pages? Answer, I've seen this, or something similar to it, yes. Question, did you see this back in 2000? Answer, I believe so. Remember giving those answers, Mr. Waterman,?

A Yes. I think that evidence is some uncertainty.

Q Okay. Now, looking at the second page.

THE COURT: You're moving it in?

MR. JOHNSON: Yes, I'm sorry, yes, Your Honor. At this point, I'd like to move for admission of Defendant's 371.

MR. CROWL: No objection.

THE COURT: It may be admitted.

(The document referred to, previously identified as Defendant's Exhibit No. 371, was received in evidence.)

BY MR. JOHNSON:

Q Now, as we mentioned earlier, this is an e-mail from Mr. Ivsan to Ms. Guerin. And I think you said yesterday that Mr. Ivsan was the conduit, I think was your term, to Jenkens & Gilchrist?

A From the Toledo office at least.

Q Okay. And I think you also said he was sort of running interference on the relationship with Jenkens?

A Yeah, I think so.

Q Okay. And would it be fair to say that he had more contact with Ms. Guerin than you did?

A I had no contact with Ms. Guerin.

Q Did you ever meet Ms. Guerin?

A No.

Q Other than the October conference call that you talked about earlier, had you ever had any telephone conversations with her?

A Prior to that?

Q Other than the October one you mentioned about 2044?

A I don't recall any conversations prior to that.

Q Have you had conversations with her subsequent to that October telephone conference?

A I think so, yes.
Q Okay. The subject line on this e-mail is the updated fee schedule, do you see that?
A Yes.
Q And then the attachment there indicated is titled Contract Amounts Fee Schedule?
A Yes.
Q Okay. And this is dated March 31, 2000?
A March 31, yes.
Q If you could turn to the second page, the chart there with the names of the Welles, and then Mr. Bores at the end, do you see that?
A Yes.
Q Okay. And there's a column titled, Contract Amount?
A Yes.
Q Is it your understanding that that refers to the option contracts?
A Yes.
Q Okay. And then the next two columns over, J&G Fees and SLK Fees, do you see those?
A I do.
Q And is it your understanding if those referred to the fees that were to be payable to your firm and Jenkens & Gilchrist ---

A Yes.
Q -- in connection with this strategy?
A Yes.
Q And the Jenkens fees are 2 percent of the contract amount, is that right?
A Correct.
Q Okay. And that's true for each of the Welles there listed?
A I think so, yes.
Q Okay. And the Shumaker, Loop & Kendrick fees listed there are 1 percent of the contract amounts?
A That's correct.
Q Okay. And that's what the fee, that's the fee that was ultimately paid, correct?
A That's correct.
Q So the total fee was 3 percent to the two law firms? Okay. And that 3 percent was a percentage of the option contract amounts?
A Yes.
Q Okay. And that corresponds with the basis enhancement?
A Roughly, yes.
Q Okay. Is it your recollection that the amounts for the option contracts were determined

according to the expected capital gains on the Therma-Tru Stock?

A Certainly bore a relation to that, yes.

Q That was the benchmark for choosing the option contract amounts, wasn't it? The expected capital gain that each of the Welles was anticipating?

A I would say that probably presented a ceiling.

Q There is no purpose in boosting the basis above the amounts of the redemption, are there?

A Probably not at that time, no.

Q The purpose of the strategy is to boost the basis and then reduce the capital gain?

A That's its fundamental purposes, yes.

Q Yes. Next, Mr. Waterman, I'd like to show you what we've marked as Defendant's Exhibit 669.

MR. JOHNSON: And I guess, before we start, Your Honor, I can move for admission of 669, it's been admitted as a business record in a response to a request to admit.

MR. CROWL: I have no objection.

THE COURT: It'll be received.

(The document referred to was marked for identification as Defendant's Exhibit No. 669

and received in evidence.)
BY MR. JOHNSON:
Q Mr. Waterman, we've marked as Defendant's Exhibit 669 a group of documents titled, Transaction Checklist. , do you see that?
A I see that.
Q Okay. And do you understand that these were created by Mr. Ivsan for use in connection with implementing the Welles pursuit of the Jenken strategy?
A I believe so, yes.
Q Okay. And these are dated as of, well, typed as of March 15, but then some of them indicate March 17? The first one indicates March 17?
A Okay, yes.
Q Correct? Okay. And in the checklist there are 20 items listed, do you see those?
A I do.
Q Okay. And is it your understanding that those are the steps and elements of this strategy?
A These are the steps involving the creation of the, looks like the LLCs and the S corps.
Q At the top they label a Transaction Checklist, it says Digital Options Investment Strategy, do you see that? And that refers to the

Jenken strategy, doesn't it?
A It does.
Q Okay. And the last item on the list, Number 20. Why don't we just start with the first checklist for Christopher Welles, sorry. The last item on that checklist for Christopher Welles, Number 20, says, SCI Units assigned by LLC to S corp, do you see that?
A I do.
Q Okay. Do you understand the S corp to refer to S corporation?
A Probably, yes.
Q Okay. And SCI, do you understand that to refer to Stobie Creek?
A Probably.
THE COURT: Well, they go --
MR. JOHNSON: Yes, okay.
BY MR. JOHNSON:
Q And this is the purported substitution of the S corps as partners in Stobie for the LLCs?
THE COURT: Probably refers --
MR. JOHNSON: I'm sorry?
THE COURT: It probably refers to them. You said purported substitution. It refers to them.
BY MR. JOHNSON:
Q It refers to the purported substitution of

the S corps for the LLCs?
A Yes.
Q Okay. So that was the last step in this series of, in this checklist?
A Appears to be so, yes.
Q Okay.
A Now, in terms of your firm's role in the implementation of the strategy, would you agree with me that Shumaker's role was fairly ministerial in that you created the entities, made the transfers, documented the transfers, created the board resolutions, and such?
MR. CROWL: I'm going to object, Judge.
THE COURT: Ask him if he agrees that it's ministerial, and then if you have a question about it you can define what you mean by ministerial? Do you agree that the role was fairly ministerial?
THE WITNESS: Yes.
BY MR. JOHNSON:
Q And is it correct that the actions Shumaker undertook were at the direction of Jenkens?
A In collaboration with us, yes.
Q Well, would you agree with me, Mr. Waterman, that Shumaker determined what transactions to do, and what transfers to make was at the direction of

Jenkens?

A Yes, I think so, yes.

(The document referred to was marked for identification as Defendant's Exhibit No. 326.)

Q Okay. Mr. Waterman, I'd like to show you now what's been marked as Defendant's Exhibit 326. And, Mr. Waterman, that's an e-mail from Mr. Ivsan to Ms. Guerin?

A Well, it appears to be, yes.

Q Do you recognize that as your firm's e-mail address, SLK-law.com?

A Yes.

Q Okay. And the postscript there at the bottom, below Mr. Ivsan's name. Do you recognize that was added to the e-mails from Shumaker, Loop & Kendrick, outgoing e-mails from Shumaker, Loop & Kendrick at the time?

A You mean the SLK reference and all that?

Q The SLK reference and then the paragraph that says that this message is being sent by or on behalf of a lawyer? , do you see that paragraph?

A Yes.

Q Okay. Do you recall that being included in outgoing e-mails from Shumaker, Loop & Kendrick at the

time?

A Can't be sure as to the precise note, but we always have something like that there.

Q And do you know who Karen Waynor is? She's referenced in that paragraph?

A Karen Waynor is a secretary.

Q Okay. Was she working with Mr. Ivsan?

A I don't recall specifically.

Q Okay. In the e-mail, Mr. Ivsan references a $450 million transaction, do you see that? Okay.

MR. CROWL: Judge, I'm going to object, this one I do object as to admissibility.

THE COURT: What's the basis of your objection?

MR. CROWL: The basis is hearsay. This is a document that came only from Jenkens & Gilchrist, so I think that this witness can't authenticate it, and Jenkens & Gilchrist certainly can if they'd done the proffer. Business record foundation.

It's simply improper, I think, to ask a witness, based on the fact that, you know, this is typically how our e-mails look. Everyone who used Microsoft has e-mails that look like this. But it just needs to come in through the proper person.

MR. JOHNSON: Yes, I think Mr. Waterman had

identified some distinctive characteristics of the e-mail. The e-mail address, the e-mail postscript there at the end, and some individuals involved there. And I think the contents of the e-mail as well provide indicia of trustworthiness and its authenticity. And I think those distinctive characteristics, under 803, would allow it to be admitted.

THE COURT: I'm going to overrule the objection for the reason that's a copy to all personnel, who might see this. And in the bottom which indicates that this has a transaction relationship to this lawsuit and benefits the record as to relevance, I think that it's indicia or not. But it also helps that the author intended to have some bearing on this matter. So you may proceed.

MR. JOHNSON: Thank you, Your Honor.

THE COURT: But you have a registered objection --

MR. CROWL: Yes, Judge, thank you.

(The document referred to, previously identified as Defendant's Exhibit No. 326, was received in evidence.)

THE COURT: And I will admit it over objection. And before we get to this missive, we have

to recess. We will reconvene at 1:30 p.m..

If there's a quorum here, and I'm fortunate enough to finish earlier, perhaps we can begin as early as 1:00, but I'm not requiring you to be here. Mr. Kedem will advise you of the unlikelihood it's later than 1:30. I meant 12:30 our time, I'm sorry. I'm anticipating my meeting at lunch from 11:00 to 12:30 our time.

And we'll stick our heads back in definitely at 12:30 and let you know what's up. But my anticipation is we would continue this, before then only if we see a quorum, you don't have to be there. And thank you for the courtesy.

(Whereupon, the hearing in the above-entitled matter was recessed to reconvene at 1:30 p.m., this same day, Thursday, April 10, 2008.)

//

//

//

//

//

//

//

//

//

A F T E R N O O N S E S S I O N

(1:30 p.m.)

THE CLERK: Please be seated.

MR. GIBSON: I just have one housekeeping matter, Your Honor.

THE COURT: On the record?

MR. GIBSON: Yes, on the record.

THE COURT: We'll go back on the record.

MR. GIBSON: The Court had requested copies of the two graphics that we used during our opening.

THE COURT: Well, thank you.

MR. GIBSON: And I apologize for their not being in color, but they're legible. So if I can hand them up to Mr. Kedem.

THE COURT: If you would get them, Mr. Kedem. Thank you.

MR. GIBSON: I've given copies to the Plaintiff.

THE COURT: Thanks.

MR. GIBSON: Thank you.

THE COURT: Mr. Waterman --

THE WITNESS: Thanks.

THE COURT: Thank you, Mr. --

MR. JOHNSON: Thank you, Your Honor.

THE COURT: We were just beginning a new

document.

MR. JOHNSON: Yes, we were, Defendant's Exhibit 326. And while I'm thinking of it, I'll just mention for the record, Your Honor, that it's been admitted.

THE COURT: Correct.

MR. JOHNSON: Plaintiff's did not object to it --

THE COURT: Correct.

MR. JOHNSON: -- in their pretrial filings either, but they did here today, but you admitted it anyway. I just wanted to note for the record that they hadn't previously objected.

BY MR. JOHNSON:

Q Defendant's Exhibit 326, Mr. Waterman, do you still have a copy of that? That's the --

A Is that the DS --

Q I'm sorry, yes, down in the lower left-hand corner there should be a DS --

A Correct.

Q Oh, yes, there it is. Okay, and that's the December 9, 1999 e-mail from Mr. Ivsan to Ms. Guerin.

A Yes.

Q Okay, and the subject line on that is The Welles, do you see that?

A Yes.
Q Okay, and in the e-mail am I correct that Mr. Ivsan is asking for confidentiality agreements for the Welles to sign, specifically Jeffrey Welles, David K. Welles and David K. Welles, Jr.?
A Yes.
Q Okay. Now you mentioned earlier or I take it you testified, I think, yesterday about the confidentiality agreement. Do you remember that, Plaintiff's Exhibit 134?
A I think so, yes.
Q Okay. Well, I'd like to show you a copy. I think you looked at that yesterday, and I think it was earlier today. Do you recall that?
A Yes.
Q Okay, and that's signed by, and this was a fax to you from Mr. Welles.
A Yes.
Q Okay, and I think you referred to this as sort of a standard confidentiality agreement, is that right?
A That's my assumption at least, yes.
Q Okay. Have you ever read it?
A Yes. I read it back then I'm sure.
Q Okay. Well, let me ask you about the

numbered paragraph 6 in the letter, which is actually on the third page of the exhibit, the second page of the letter. That's the paragraph numbered 6 at the bottom.

A Uh-huh.

Q And the first sentence states, undersigned and J&G are acting solely as independent contracting parties and neither party shall be deemed to be the agent or fiduciary of the other, do you see that sentence?

A I do.

Q Okay. Did you understand that that was the relationship at the time, December 1999, that there would be no fiduciary relationship between the Welles and Jenkins & Gilchrist?

A Did I understand that? I would say probably no.

Q Okay, so when you were thinking of the standard confidentiality agreement you didn't have this part in mind.

A No.

Q Okay. Now, Shumaker signed a confidentiality agreement with Jenkins as well, didn't they?

A That's what I believe, yes.

Q Okay. Do you know if that confidentiality agreement included similar language in terms of disclaiming any fiduciary relationship?

A I don't think we were ever able to locate a copy of that. That's why I said I believe we signed one. I was told that, but I never saw a copy of it.

Q Okay. In this exhibit that we're looking at, the one that was faxed to you, that's signed by Jeff Welles and David Welles, Jr., right?

A Uh-huh.

Q Is it your understanding that the other Welles family members also signed confidentiality agreements?

A I believe so, yes.

Q Next Mr. Waterman, I'd like to show you what's been marked as Defendant's Exhibit 305.

THE COURT: Do I have Defendant's 305 listed?

MR. JOHNSON: It should be on the list, Your Honor.

THE COURT: Yes.

MR. JOHNSON: Page 10 of our list I'm told.

BY MR. JOHNSON:

Q Mr. Waterman, we've marked as Defendant's Exhibit 305 a one page e-mail from Mr. Ivsan to Ms.

Guerin, again dated April 4th, 2000.

A Uh-huh.

Q And again, do you recognize that SLK-law.com as the e-mail address of Shumaker, Loop & Kendrick at the time?

A Yes.

Q Okay, and we have the similar paragraph at the bottom describing this e-mail as a message being sent by or on behalf of a lawyer.

A Yes, I see that.

Q And Mr. Ivsan's name is listed down there, as well as Ms. Shannon Healy.

A Yes.

Q Okay, and was that an employee of Shumaker, Loop & Kendrick, Ms. Healy?

A I presume so but I really don't know. This is from our Charlotte office, I assume.

Q Okay, and again the subject line states that Welles-Update, do you see that?

A Yes, yes.

Q Okay. The first numbered paragraph --

THE COURT: Are you moving it?

MR. JOHNSON: Yes, Your Honor, I'd like to move in Defendant's Exhibit 305.

MR. CROWL: We'll object only for the record

for the same reasons we did last time, but I understand Your Honor's ruling.

THE COURT: I think it's been established as a business record, so the objection is overruled and the document will be admitted. Go ahead.

(The document referred to was marked for identification as Defendant's Exhibit No. 305 and received in evidence.)

MR. JOHNSON: Thank you, Your Honor.

BY MR. JOHNSON:

Q You see that the first numbered paragraph in Mr. Ivsan's e-mail he references LLC and S corporation minute books.

A Yes.

Q And is it your understanding that those are the LLCs and S corps created pursuant to the Jenkins' strategy?

A Probably.

Q Okay, and you looked at it earlier, Plaintiff's Exhibit 36, which was that index for Jeff Welles with the certificate of formation and those other foundational transactional documents?

A Yes.

Q Was that the minute book that's referred to

here?

A I don't think that would be a minute book, although it contains portions that would be in a minute book, namely the resolutions. You'd have your organizational documents in there too.

Q Okay. If you could look at paragraph number 3, Mr. Ivsan says he's prepared contribution/joinder agreements for each Welles individual and the Welles' trust based on the LLC operating agreement and prepared joinder forms drafted by McDermott, Will & Emery for Stobie Creek Investments. He then says that they have been filed for execution and are undated and he will provide the original executed copies to Ms. Guerin for her to fill in the dates, do you see that?

(Siren sounds nearby.)

A I do.

Q Okay. Is it your recollection that that was the procedure, that the joinder and contribution forms for Stobie Creek were sent to Ms. Guerin undated?

A I don't know that I had any recollection. That's what this purports to say, but --

Q Well, we looked at earlier in Exhibit 36 some of those documents and they weren't dated. I think you noted that it was not dated, right?

A I think I noted one that wasn't dated, yes.
Q Right, okay. And then he references the stock powers executed on, in that same paragraph number 3, I'm sorry.
A Uh-huh.
Q He references the stock powers executed March 24th assigning the Therma-Tru stock to Stobie Creek, do you see that?
A I do.
Q And this relates to the issue you talked about earlier about moving the date of that.
A Right.
Q Is that referring to a AAA distribution that --
A Yes.
Q -- Stobie conducted?
A Yes.
Q Okay, and that reduces the basis of the stockholders, doesn't it --
A It does.
Q -- in an S corp?
A Uh-huh.
Q Okay. Now in the fourth numbered paragraph he's referencing Mr. Bores. And is it your understanding that that's Stephen Bores who we talked

about earlier?
A I believe so, yes.
Q Okay. Now the contribution/joinder agreements referenced in paragraph three, those were the agreements through which the Welles LLCs would become members in Stobie.
A That's what it appears to be, yes.
Q Okay. That's your understanding of how the process worked.
A That's what it appears to be.
Q Okay, and under paragraph five he says also that he's prepared undated forms of assignment/joinder transferring all Stobie Creek LLC membership interests from the Welles individual/trust members to their respective S corporations.
A Uh-huh.
Q , do you see that?
A I do.
Q Okay. Do you remember all these transactions occurring pretty much simultaneously?
A I don't remember that, but I was not really involved much with this.
Q Mr. Ivsan was handling this?
A Yes.
Q Okay, along with Ms. Guerin?

A Yes.
Q You didn't have day-to-day involvement in the transactions?
A Not in this, no.
Q Okay. Now, you talked earlier today with Mr. Crowl about the benefits of having an S corporation, using an S corporation, right?
A Uh-huh.
Q Do you remember that?
A Yes.
Q You talked about Ohio tax law, the benefits under that.
A Yes.
Q And there were some benefits to having the S corps be the members in Stobie.
A Yes.
Q Okay, and I think you referenced the law went into effect in 1987, is that right?
A Which law are you talking about now?
Q The Ohio state law that provided this benefit.
A The ESBIT technique, that was actually a federal change and I think it was around the middle of the 90s.
Q Okay, so the benefits for having the S corps

be the members of Stobie, that was well established in 1999.

A If you're referring to the ESBIT strategy, the ESBIT strategy had been in effect, I think, since about 1995. I don't know when it became commonly used, a little bit later than that.

Q But you were aware of it.

A Yes.

Q Okay. It wasn't a surprise that somebody discovered in the midst of 2000.

A No.

Q Okay, and in part because of these benefits under Ohio law, it was your understanding that it was always the intention to have the S corporations be the members of Stobie, correct?

A I think that was the general contemplation, yes.

Q And if that was ultimately the goal, why did the Welles start with the LLCs being the members of Stobie?

A I presume it was just easier. LLC is a very convenient organization.

Q Could you pull out your deposition again, Mr. Waterman?

A Uh-huh.

Q And turn to page 168. Page 168, line 11, if that was ultimately the goal, as you say, why did they start with the LLCs being a partner? Answer, I don't know. I said I don't know why they started with the LLCs.

Did I read that correctly, Mr. Waterman?

A Yes.

Q Okay, and let me ask you another question. What purpose did the individual LLCs serve that were the initial members of Stobie?

A I already said, I don't think the individual LLCs were essential for any tax or other purpose, okay. The LLCs were presumably used as opposed to the individual simply buying the options as a little liability protection device.

Q Could you turn to page 85 of your deposition?

A Uh-huh.

Q Line 18, question, how about the single member LLCs, what purpose did they have? Answer, I have no idea. I really don't.

A I still don't. I'm saying I'm assuming that they were looking for a little liability shield.

Q Do you think Mr. Ivsan, Mr. Daugerdas, Ms. Guerin might know what purpose those LLCs served?

MR. CROWL: Object --

THE WITNESS: They might.

BY MR. JOHNSON:

Q Okay.

THE COURT: I'll sustain the objection based on speculation that the question is to whom would you refer Mr. Johnson for advice, and the answer were the same, would be an objection. The answer would be the same, too. Go ahead.

BY MR. JOHNSON:

Q Let me show you another e-mail, Mr. Waterman. This one is marked Defendant's Exhibit 327. And Mr. Waterman, this is another e-mail from Mr. Ivsan to Ms. Guerin, this one dated December 14, 1999, do you see that?

A Uh-huh.

Q Okay, and this has the same e-mail address and the same format as the others we've looked at, doesn't it?

A Yes.

MR. JOHNSON: Okay. Your Honor, I'd move for admission of Defendant's Exhibit 327.

MR. CROWL: Judge, can I plead the same objection, but I understand --

THE COURT: Certainly, but say you move for

its admission based on the business records exception, 8036 and the admission. These documents were all business records and then have a record.

(The document referred to was marked for identification as Defendant's Exhibit No. 327 and received in evidence.)

MR. JOHNSON: Sorry, Your Honor.

THE COURT: No, we've already, next up.

MR. JOHNSON: Okay.

THE COURT: We can cut through, okay. So willing to sense, but it needed to be a business record.

BY MR. JOHNSON:

Q Mr. Waterman, I wanted to ask you about the reference about halfway down the e-mail --

A Uh-huh.

Q -- the paragraph that begins with separately.

A I see that.

Q Okay, and in that paragraph there's the name redacted there, do you see that?

A Uh-huh.

Q Or there's a word redacted in front of family. But Mr. Ivsan says he going to be meeting

with this family regarding the $440 million deal, do you see that?

A I do.

Q As of December 14, 1999, that was about the consideration that was going to be paid in the Therma-Tru deal, isn't it?

A Roughly.

Q Okay. Do you read that section there to concern the Welles?

A It might.

Q He references a proposal that in this instance giving an overall fee quote inclusive of advisory fees of 5 percent, do you see that?

A I see that.

Q And that Jenkins be compensated at 2 percent.

A I see that too.

u Q And in terms of the Welles transaction, Jenkins was compensated at 2 percent of the basis enhancement.

A That's correct.

Q Okay, and is it your understanding that the options that the Welles entered into as part of the strategy cost 1 percent of the basis enhancement?

A Yes.

Q Okay, and the basis enhancement in the Welles case was about $204 million, correct?

A That's correct.

Q Okay, so the price of the options was about $2,045,000.

A That's correct.

Q Okay, so that gets us to 3 percent in terms of the cost, 2 percent to Jenkins --

A That's --

Q -- and 1 percent to Deutsche Bank, correct?

A Yes.

Q Okay, and then the other 2 percent to get to 5 percent that Mr. Ivsan is proposing here, is it your recollection that that 2 percent was proposed to be charged by Shumaker?

A No.

Q Shumaker ended up charging 1 percent, right?

A That's correct.

Q Okay. Next Mr. Waterman, I want to show you what's been marked as Defendant's Exhibit 112. I want to talk to you a bit about some of the ministerial actions you took at Jenkins directions to implement the transaction. In Defendant's Exhibit 112 is an April 3rd letter from Ms. Monroe to Mr. Jeffrey Welles, do you see that?

A I do.
Q Okay. Ms. Monroe, she was your legal assistant?
A That's correct.
Q Okay, and do you recognize her signature?
A Yes.
Q And when you were looking at Plaintiff's Exhibit 46, I think you looked at a copy of the second page of this exhibit, which is Schedule A. Let me ask you to look at the second page of this exhibit, Schedule A.
A Yes, I think so, yes. That's right.
Q And this was an unsigned version of what you looked at earlier in Plaintiff's Exhibit 36.
A I think so, yes.
Q Okay. Do you have an understanding of what the remaining documents attached to Ms. Monroe's letter are?
A That's evidencing someone becoming a member of Stobie Creek and becoming bound by their operating agreement.
Q And this was sent out by Ms. Monroe on April 3?
A That's what it purports to be, yes.
Q And did this copy of this document come from

Shumaker, Loop & Kendrick's files? It says JFW on the bottom.

A Well, I'm sure we have a copy.

Q Okay, just like the other document we looked at this morning.

MR. JOHNSON: At this time, Your Honor, I move for the admission of Defendant's Exhibit 112 as a business record.

MR. CROWL: No objection, Judge.

THE COURT: Document received.

(The document referred to was marked for identification as Defendant's Exhibit No. 112 and received in evidence.)

BY MR. JOHNSON:

Q Mr. Waterman, I'd like to show you three similar documents, Defendant's Exhibit 572, 573 and 574. And Mr. Waterman, is Defendant's Exhibit 572 another letter from Ms. Monroe dated April 3, this one to David Welles, Sr. enclosing Schedules A, B and C and amendment to Schedule A for Stobie Creek Investments?

A It is.

Q And 573, is that a similar letter again signed by Ms. Monroe dated April 3 to Georgia Welles?

A It is.

Q And 574, is that another similar letter from Ms. Monroe dated April 3, 2000 to Ms. Virginia Jordan with the same attachments?

A It is.

Q Is it your understanding that these were sent out in connection with these members of the Welles family becoming members of Stobie Creek?

A That's what it appears to be, yes.

MR. JOHNSON: At this time, Your Honor, I'd move into evidence Defendant's Exhibit 572, 573 and 574 as business records.

MR. CROWL: No objection, Judge.

THE COURT: Let's move that it's to be received.

(The documents referred to were marked for identification as Defendant's Exhibit Nos. 572, 573 and 574 and received in evidence.)

BY MR. JOHNSON:

Q Next Mr. Waterman, I'd like to show you what's been marked as Defendant's Exhibit 93. Do you recognize that as an April 13, 2000 letter from Ms. Monroe to Donna Guerin on Shumaker, Loop & Kendrick

letterhead with some attachments?
A Yes.
Q Okay, and in the body of the letter, Ms. Monroe says she's enclosing assignment of membership interest and joinder agreement for David K. Welles 1994 qualified annuity trust, do you see that?
A Yes.
Q And then she also says she's enclosing Schedules A, B and C and amendment to Schedule A for Stobie Creek Investments for each of the Welles LLCs, correct?
A Yes.
Q Okay. Schedules A, B and C, those are the schedules through which those LLCs would become members of Stobie, is that right?
A Yes.
Q Okay.
A Evidencing their membership.
Q Okay, and the assignment of membership interest and joinder agreement that's enclosed with this letter for the qualified annuity trust, that's the document that was purported to reflect the transfer of the trust's interest in Stobie to the trust's S corp?
A Yes.

Q Okay. In one of the sets of the schedules A, B and C that Ms. Monroe is sending to Ms. Guerin was for that trust, correct? Isn't that the last, I'm looking at the letter, Mr. Waterman, but the last line of the first paragraph she references she's including Schedules A, B and C for the LLCs and the family trust under the qualified annuity trust.

A Yes, I see that.

Q Okay. So she's sending out to Ms. Guerin under cover of the same letter on April 13th, the documents that are purporting to allow the trust to become a member in Stobie, and also the documents purporting to transfer the trust's interest in Stobie to the S corporation, correct?

A That's what the letter contains, yes.

Q Okay. Let me show you what's been marked as Defendant's Exhibit 684.

THE COURT: Did you admit 93?

MR. JOHNSON: If I failed to do it, Your Honor, I move for admission as a business record as well.

MR. CROWL: No objection.

THE COURT: It will be admitted.

(The document referred to was marked for identification as

Defendant's Exhibit No. 93
and received in evidence.)

BY MR. JOHNSON:

Q Which reminds me, Mr. Waterman, I left 93 too early. The attachments, the first one we have is the assignment for membership interest and joinder agreement for the trust, correct?

A I see that, yes.

Q And that's undated?

A That's correct, as of this time.

Q And then further on in the page stamped Defendant's Exhibit 93-6, I'm referring to the numbers in the lower left-hand corner.

A Uh-huh.

Q We have a joinder agreement signed by, it appears to be Jeff Welles and Peter Welles, is that right?

A Yes.

Q And that one is undated.

A That is correct.

Q And then on page -8 of that exhibit, we have an amendment to Schedule A that's signed by Peter Welles.

A Yes.

Q Okay, and that appears to be dated April 4.

A It appears to be, yes.

Q Okay, and am I correct that I think except for a document signed by Chris Welles dated April 5, the remainder of the documents are undated, correct?

THE COURT: Well, how about the next page Schedule A following the --

MR. JOHNSON: I thought I said he signed it. It appears to be dated April 5.

THE COURT: No, I'm talking about the next to the last page. It's really a document signed by Christopher Welles dated March 3rd and then the later one

THE WITNESS: Yes, that appears to be the case, Mr. Johnson.

MR. JOHNSON: I'm sorry, Your Honor, are you referring to the -9, page -9?

THE COURT: Yes. Are you saying all the documents after, I thought you were referring to all the documents after the Schedule B and I included this April 4th document. And then we get to the April 5th one. I don't know if they're all signed. If you look at all the documents after the April 5th signed document, well, we've got a Jeffrey Welles signature and then we have signatures on the two Schedule Bs. Schedule C doesn't require a signature.

MR. JOHNSON: I'm sorry, Your Honor. I wasn't referring to signatures. I was referring to the dates or blanks for dates, for the associated dates.

THE COURT: I'm sorry.

MR. JOHNSON: Not signatures, I'm sorry if I misspoke.

THE COURT: That was probably my error. I thought you said signatures.

MR. JOHNSON: I'm sorry. I meant dates, that the blanks for dates are left empty was the only point.

THE COURT: Then you're correct, and the witness can confirm it.

BY MR. JOHNSON:

Q Mr. Waterman, let me show you, moving on from that exhibit, Defendant's Exhibit 684.

A Is that the one you just gave me? Yes, 684, I have that.

THE COURT: Did you move that in? I'm sorry we just need --

BY MR. JOHNSON:

Q Do you have 684, Mr. Waterman?

A I do.

Q And that's another letter from Ms. Monroe to

Ms. Guerin.

A Yes.

Q And in this letter she's referencing sending on two things, two groups of documents. One, the assignment separate from certificate assigning voting and nonvoting stock of Therma-Tru to Stobie Creek, do you see that?

A Yes.

Q And I think you talked about that issue earlier with Mr. Crowl.

A I did.

Q And the next group of documents she's sending are the assignment of membership interest and joinder agreements for the Welles, do you see that?

A Yes.

Q Okay, and is it your understanding that those were the documents purporting to, again, assign the interests in Stobie from the LLCs to the S corporations?

A I think that's what that's referencing.

Q And she sent this on April 10.

A Yes.

Q Okay. So she sent that three days before she sent on the joinder agreements in Defendant's Exhibit 93 on April 13th.

A That's what it purports to say, yes.

Q Okay.

MR. JOHNSON: Your Honor, I want to move for admission of Defendant's Exhibit 684 as a business record at this point.

MR. CROWL: No objection, Judge.

THE COURT: The document is received.

(The document referred to was marked for identification as Defendant's Exhibit No. 684 and received in evidence.)

BY MR. JOHNSON:

Q We've looked at a number of letters, Mr. Waterman, and documents created from the transfers of interests in Stobie Creek and so on. And I think you said yesterday that your firm was billing hourly for this work.

A That's correct.

Q Do you recall with regard to the work that you did in order to implement the Jenkins' strategy, how much Shumaker billed on an hourly basis?

A Could you repeat that question?

Q Sure. With regard to the work that was done in order to implement the basis enhancing strategy, what was the amount that Shumaker billed on an hourly

basis for that work?

A I don't know.

Q Do you have a general idea of how much it was?

A I actually only discovered that recently, and no, not really.

Q During the time period of the implementation of the strategy, did you ever see the options that were entered into?

A Did I? I'm not sure that I did.

Q We looked earlier at your March 6 letter, Mr. Waterman. I'd like to look again now at your August 9 letter --

A Okay.

Q -- which I think you talked about with Mr. Crowl.

A Okay.

Q And that is Plaintiff's Exhibit 108. And I think you said this is a letter you sent on to the Welles, is that right?

A Yes.

Q And this copy came from your firm's files?

A Yes.

Q And this one is unsigned as well, isn't it?

A Yes.

Q Now we talked earlier about your comment at the Florida meeting where you recall saying to the Welles, if I were you, I'd do it. Do you recall that?
A Yes.
Q And we talked about the fact that you didn't repeat that in your March 6th letter.
A I understand that.
Q Okay, and you don't mention that or state that in this letter either, do you?
A No.
Q Now in the second page of the letter, you reference the 3 percent fee as 3 percent of the gain to be sheltered, do you see that?
A Yes.
Q At this point, is it correct that that had been agreed upon that that would be the fee?
A I think that was the understanding that it was a 3 percent fee, yes.
Q And further down you talk about the fact that even if Shumaker agreed to waive it, it was your understanding that Jenkins would recapture that, I think is the word you used.
A That was my understanding, yes.
Q Okay, and it was also your understanding that Jenkins would charge the 3 percent fee --

A That was my understanding.
Q -- whether or not the Welles actually reported the transaction on their tax returns pursuant to the opinion.
A No, that's not my understanding. I think that was confusing, frankly.
Q Well, let me point you to the last sentence on the second page, do you see the sentence that begins with I understand?
A Yes.
Q You state, I understand, however, that Jenkins may expect payment in full of its fee as long as it remains willing to stand by its opinion when the individual returns are filed.
A I say they may expect it.
Q They may further take the position that any fee waived by SLK becomes payable to it.
A I said they may expect it.
Q Okay.
A I was not sure what their intention was then.
Q But you state there that Jenkins may expect payment as long as it's willing to stand by its opinion.
A Yes.

Q Okay. Now, in this first full paragraph on that page you reference in the first line the Jenkins & Gilchrist opinion, do you see that?
A Which page now?
Q The second page of the letter.
A Okay.
Q You reference the Jenkins & Gilchrist opinion.
A Yes.
Q And then later down on the paragraph you reference the aggregate fee payable for this opinion, do you see that?
A Yes.
Q And by this opinion you're referring to the Jenkins' opinion.
A Yes.
Q And then in the last paragraph on that page, you again reference the Jenkins' opinion in the first line, correct?
A Yes.
Q Okay, and then in the middle of that paragraph you also reference the Jenkins' opinion.
A Yes.
Q And then further on in that paragraph you state this too was consistent with our position that

if for any reason you elect not to pursue reporting the transaction on the basis of the Jenkins' opinion, we will not charge the extraordinary fee, do you see that?

A Yes.

Q Okay, and you're referencing the Jenkins' opinion there.

A Yes.

Q And then the last sentence there, which we talked about a minute ago, you're referencing again the fee being charged if Jenkins is willing to stand by its opinion, right?

A Yes.

Q You don't have any reference in this letter to any opinion being issued by Shumaker, Loop & Kendrick, do you?

A No.

Q Now, we've looked at the March 6th letter and we've looked at the August 9 letter that you sent to the Welles. We haven't seen any other letters you sent to them regarding this transaction. Are these the two letters you recall sending to them about this transaction?

A Yes.

Q Now, in the August 9 letter you made an

offer to donate a portion of the fee to a charity.
A I did.
Q And I think you told us yesterday that Shumaker, Loop did donate a portion.
A Yes.
Q About $140,000, $150,000.
A Yes.
Q So is it correct then that Shumaker retained the balance being about 1.9 million?
A That's correct.
Q Now just a few days after you wrote this letter the IRS issued Notice 2044.
A That's correct.
Q And you talked about that previously with Mr. Crowl and you read that.
A Yes.
Q And that caused you concern.
A That's correct.
Q And you asked Mr. Cotter and Mr. Ivsan to write a memo.
A Not necessarily to write a memo, but I asked them to investigate, yes.
Q Okay, and you talked about with Mr. Crowl that memo, and that's Plaintiff's Exhibit 259.
A Yes.

Q Why don't I show you another copy of that. Now, when you read Notice 2044 you understood that it did not apply or it was not limited to the corporate context, correct?

A Yes.

Q You understood it dealt with individual taxpayers and their use of partnerships.

A I did.

Q Okay. So you talked a lot yesterday about the corporate tax shelter regulations that are a part of this memo. That's not what you were concerned about with regard to the Welles. You were concerned about Notice 2044 and how it applied to individuals and partnerships.

A That's correct.

(Siren sound resumes.)

Q Okay. Now, could you turn to page 31 of Plaintiff's Exhibit 259? And the box there, I wanted to ask you something about that. I think you talked about this with Mr. Crowl.

THE COURT: Not this page.

MR. JOHNSON: I'm sorry, page 31, Your Honor.

THE COURT: No.

BY MR. JOHNSON:

Q You wrote the initials BS there on the margin.
A Uh-huh.
Q What did you mean by doing that?
A The same thing I said yesterday. I was not persuaded by their argument that this was materially different. The basis enhancement, let's say, that the Welles family engaged in was materially different than the tax loss to me.
Q What lawyers call a distinction without a difference.
A Some people might call it that.
Q Would you call it that?
A I was worried about that.
Q Would you call it that?
A Not anymore.
Q Let me show you Notice 2044, Mr. Waterman.
THE COURT: What exhibit is that?
MR. JOHNSON: Your Honor, I'd like to mark this as Defendant's Exhibit 715.
BY MR. JOHNSON:
Q And if you could turn to the second page, Mr. Waterman. Do you recognize that as a copy of Notice 2044?
A That's what it purports to be, yes.

Q And what is the title there?
A Administrative Procedural and Miscellaneous.
Q And below that?
A Tax Avoidance Using Artificially High Basis.
Q Okay, and that was what the Welles did pursuant to this strategy, they increased the basis, didn't they --
A Right.
Q -- of the Therma-Tru stock?
A Yes.
Q Okay. And going on, do you recall if this notice described the use of so called long and short options?
A I don't recall that specifically, but --
Q Could you take a look at the middle column, the last paragraph in that column? It begins with, in another variation?
A It references options, yes.
Q Okay. It says in another variation, a taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those options to a partnership, right?
A Yes.
Q Okay, and that's what the Welles did,

correct?

A That's correct.

Q And it goes on to talk about slightly different strike prices (phonetic) for these options, doesn't it?

A Yes.

Q And on column three at the top it states, under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayers partnership interest is increased by the cost of the purchased call options, but is not reduced under 752 as a result of the partnership's assumption of the taxpayers obligation with respect to the written call option.

A Yes, that's what it says.

Q And that's what the Welles did, didn't they?

A I think so, yes.

Q Now, turn to the third page, the first full paragraph in the first column. It says transactions that are the same as or substantially similar to the transactions described in this notice are identified as listed transactions, do you see that?

A I do.

Q Do you recall reading that back in August 2000?

A I don't recall now reading it then, but I believe I read it then.

Q Now you said, I think yesterday, that because of your concern about this notice after reading it, you arranged a call with Ms. Guerin.

A That's correct.

Q And that was in October of 2000?

A I believe so, yes.

Q And I think you said she said something along the lines that she wasn't intending to commit malpractice.

A She said there's no way they would commit malpractice, yes.

Q Now, did you do anything else other than call Ms. Guerin to address your concerns?

A Well, I asked Tom Cotter and John Ivsan to look at it.

Q After the phone call with Ms. Guerin.

A No, not that I can recall.

Q So you called Ms. Guerin on this issue.

A Uh-huh.

Q What?

A Yes.

Q And we looked at the memo that Mr. Ivsan and Mr. Cotter wrote and you wrote BS in the margin.

THE COURT: Twice, at least.

(Laughter.)

THE WITNESS: Yes.

BY MR. JOHNSON:

Q And I think in the margin in one of your comments you said, I wouldn't count on this, right?

A That's correct.

Q It's fair to say you indicated some skepticism about the arguments they were making.

A I did at that time, yes.

Q Okay, so then you called Ms. Guerin.

A Uh-huh.

Q Okay, and after talking with Ms. Guerin on the phone, you didn't do anything else to address your concerns, correct?

A I think she satisfied the group on that phone call, yes.

Q You didn't do anything else to address your concerns though, did you?

A I think that's what addressed my concerns, yes.

Q And Ms. Guerin and her firm were standing to make $4 million from issuing the opinion, correct?

A That's correct.

Q And your firm was standing to make

$2 million.

A That's correct.

Q If the transaction went through. Let me show you, Mr. Waterman, what's been marked as Defendant's Exhibit 453.

MR. JOHNSON: I'm sorry, Your Honor, I guess I failed to move for the admission of Defendant's Exhibit 715, which is the Notice 2044.

MR. CROWL: No objection, Judge.

THE COURT: That will be received.

(The document referred to was marked for identification as Defendant's Exhibit No. 715 and received in evidence.)

MR. CROWL: Just so we know, Judge, we -- will be objecting.

THE COURT: Okay.

BY MR. JOHNSON:

Q Mr. Waterman, you mentioned yesterday that you referred the Welles to the Jenkins' firm and you talked about it being a Texas firm, right?

A Home office in Texas, yes.

Q But Ms. Guerin and Mr. Daugerdas were in the Chicago office, correct?

A That's correct.

Q And they were the ones you were dealing with, with regard to the Welles, with regard to Mr. Kasperzyk, Mr. Morgan and Mr. Cooley.

A Yes.

Q And Mr. Morris.

A Yes.

Q Now, we've marked as Defendant's Exhibit 453, Mr. Waterman, the press release issued with regard to Jenkins & Gilchrist and the statement they made upon their winding down of business. Have you seen this?

A I don't know that I've seen this before.

Q Are you aware that Jenkins has gone out of business?

A I'm aware of that, yes.

Q Okay, and are you aware that they signed a nonprosecution agreement?

A I was aware of that, yes.

Q And are you aware that they have stated in a public statement that they believe that the tax shelters and the tax opinions that you were --

THE COURT: Counsel there's going to be an objection to the document.

MR. JOHNSON: I'm sorry?

MR. CROWL: Judge, I object to the document

and I also object to him publishing it indirectly through questions.

THE COURT: I'll lodge your objection and if I sustain it I'll strike the testimony with regard to the question. Go ahead, state your objection.

BY MR. JOHNSON:

Q Mr. Waterman, are you aware that Jenkins --

THE COURT: State your objection for the record --

MR. JOHNSON: I'm sorry.

THE COURT: -- and what it is.

MR. CROWL: Judge, hearsay, relevance. It's dated March 28th, 2007. Lack of foundation through this witness.

THE COURT: And would you defend the document.

MR. JOHNSON: Sure, Your Honor. As you know, this was a subject of a motion in limine in which Your Honor ordered if Plaintiffs introduced opinion letters or evidence of conversations with Jenkins' lawyers. This document could be admitted to rebut that as long as there was evidence that it was a public statement made by Jenkins. And a copy of this document is the statement issued on March 28th, 2007 and --

THE COURT: Is there an objection as to authenticity?

MR. CROWL: Judge, not authenticity but for lack of foundation.

THE COURT: On the foundation?

MR. CROWL: Right, and my objection to foundation, Your Honor indicated that if a foundation was laid, that's fine, but to have --

THE COURT: No, the foundation would deal with the witness's familiarity with it.

MR. CROWL: Right, exactly right.

THE COURT: If there's not an objection to authenticity, I will admit the document over the objections of Plaintiffs for the reasons that I stated, in the order that I entered on a motion in limine dealing with documents before relating to settlement because of the settlement. And since Plaintiff is relying on opinion letters, Plaintiffs opinion letters, this document can come in. The witness is generally familiar with it. The witness has been instructed to the extent that he's not familiar with any parts about which he's queried he should state so and we'll stop the question as to him.

MR. CROWL: And Judge, just for the record, we had a series of objections. I assume that those

have been preserved including settlement negotiations and --

THE COURT: Right, that's what I said, largely under Rule 408 of the Federal Rules -- exist and I had already ruled on the circumstances whereby the admissible and the reason to give the Court more voice stating its ruling on the motion in limine. The only limitation would be to the extent that the witness isn't familiar with statements about which he will request. The document can be admitted.

(The document referred to was marked for identification as Defendant's Exhibit No. 453 and received in evidence.)

MR. JOHNSON: Thank you, Your Honor.

BY MR. JOHNSON:

Q Mr. Waterman, I think I asked you but let's go back to where we were. You're aware that Jenkins is no longer in business.

A I'm aware of that.

Q Okay, and you're aware that they reached a nonprosecution agreement with the government.

A I'm aware of that.

Q Okay. Are you aware that they issued a statement saying that the J&G lawyers from Chicago had

developed and marketed fraudulent tax shelters?

A I was not aware of that.

Q Okay, and are you aware that they've issued a statement saying that the attorneys in Chicago developed and marketed fraudulent tax opinions?

A I was not aware of it. That's what this purports to say.

Q Okay.

(Pause.)

THE COURT: We have a preliminary ruling in the case that documents that are not objected to can be argued by counsel. And this is a document that is objected to and the Court has admitted it over objection at trial based on the earlier ruling in motion in limine because Plaintiff opened the corresponding door. And the reason I admitted this particular document is it is a public issuance and did not relate to any settlement negotiations, among other reasons stated in the order.

However, even though it's objected to, I would like a proffer from defense counsel for benefit of the Court's education. Could you please explain, if you know Mr. Johnson, what the significance is of the fraudulent tax shelter and the fraudulent opinion letter? I know that the IRS does not assess taxes

based on fraud. They're based on the IRS's determination that the requisite economic purpose is not present.

So this seems to ratchet up the accusation one level, not with respect to anybody here, but the Jenkins & Gilchrist firm, and I'd like you to explain your understanding, if you have one, of what is meant by "fraudulent."

MR. JOHNSON: Mr. Gibson is a little more familiar this, Your Honor.

THE COURT: If you would, please.

MR. GIBSON: Thank you, Your Honor. As the Court is aware basically from both sides, there is an ongoing grand jury investigation in the Southern District of New York with respect to the development, marketing and implementation of criminally fraudulent tax shelters. My understanding is that there are individuals who were involved in the development of the basis enhancing derivative shelter that are subjects of that grand jury investigation.

And my understanding of the use of this is to not preclude or to assist the United States Attorney's Office in pursuing criminal charges against the individuals who were responsible for developing, marketing and implementing these tax shelters. And I

think the Court --

THE COURT: What particular aspect, if you know, allegedly might make them subject to criminal fraud penalties?

MR. GIBSON: I'm not talking about criminal fraud penalties. I'm talking about --

THE COURT: I'm sorry, criminal prosecution for --

MR. GIBSON: Criminal charges, yes, Your Honor.

THE COURT: -- individuals. What specific activity?

MR. GIBSON: Well, to the extent that individuals who were involved in developing, marketing and implementing fraudulent tax shelters and the --

THE COURT: What's the difference between a fraudulent tax shelter and a tax shelter that would be disallowed by the IRS for purposes of sheltering income?

MR. GIBSON: I think there's a mens rea requirement by the developers that the government would have to prove beyond a reasonable doubt. I'm not a prosecutor, but I understand that the elements of it are 26 U.S.C. § 7201, which is attempt to evade income taxes. I'm aware of the elements that are

required to prove a crime under 26 U.S.C. § 7206(2), which is aiding or assisting in the preparation or presentation of materially false tax returns.

And I'm aware, Your Honor, of the indictment that was handed up about four years ago in the United States v. Stein case, which involves KPMG's development and marketing of criminally fraudulent tax shelters and the charges that are pending, at least remaining against three individuals, actually originally four, one of whom has already pleaded guilty. I'm aware, Your Honor, that in connection with the development, marketing and implementation of fraudulent tax shelters, a number of guilty pleas have been obtained by the United States Attorney's Office in New York City.

And my assumption, and this is an assumption, Your Honor, not a statement on which I have personal knowledge, that similar theories would be pursued against the people who were involved in developing, marketing and implementing these particular tax shelters as well. My understanding, to close the loop on the Court's original question, is that the agreement that Jenkins & Gilchrist signed and the statement that Jenkins & Gilchrist made publicly might conceivably be of some assistance to the

prosecutors in New York should the grand jury ultimately charge.

THE COURT: Thank you.

MR. GIBSON: Thank you.

THE COURT: That's just for the Court's edification. It has nothing to do with any issue in this case other than to elucidate the context of the term "fraudulent" in the press release.

BY MR. JOHNSON:

Q Mr. Waterman, I'd like to talk about the document that you were asked about with Mr. Crowl, identified as Plaintiff's Exhibit 314.

MR. JOHNSON: And Your Honor, this is the document that we objected to its admission of as being produced to us on March 25, I think, just a week or two ago.

BY MR. JOHNSON:

Q Do you have Plaintiff's Exhibit 314, Mr. Waterman?

A I do.

Q Okay. Did somebody ask you to produce this recently?

A We discovered the reference to this in the May 9 document, checked our subpoena and felt that it was covered so that we ought to produce it.

Q You felt this was covered by the subpoena issued by who?
A You.
Q By the government?
A Yes, and we had not thought about that before that time.
Q Well, this is dated as of February 8th, 2000, so I assume you've had this in your files for the last three years at least.
A We've had it, yes.
THE COURT: And it's referred to in your --
THE WITNESS: It's referred to right on the first page of the May 9 agreement.
BY MR. JOHNSON:
Q And where did you find this document?
THE COURT: I'm sorry. What's this May 9 date?
THE WITNESS: The May 9 agreement is the final purchase agreement that effectuated the transaction with Kenner. That document, I think, right on the first page refers to it.
BY MR. JOHNSON:
Q Did Plaintiff's counsel ask you to find this document?
A After we saw it, well, when we saw the

reference in the May 9 document to this, they asked to see a copy of it, yes. And that's when we went back and found it.

Q Plaintiff's counsel?

A Yes.

Q When did Plaintiff's counsel ask you to find this?

A I'd say about five weeks ago.

Q And when did you produce it to Plaintiff's counsel?

A About a week after that.

Q So about four weeks ago.

A I think so.

Q Did you produce any other documents related to the Therma-Tru redemption transaction to Plaintiff's counsel about four weeks ago?

A Just those billing records that were not, we had previously provided in response to our subpoena the Stobie Creek billing information and we realized that it started later. It started June 1. So we went back to see what happened the time before that and that's when we located it on the Kenner transactional file, portions of it.

Q Did you produce any other documents regarding the Kenner redemption to Plaintiff's

counsel?

A I don't think so.

Q You said you thought this was covered by --

MR. CROWL: Judge, if I may interrupt for just one second. Just for the record, we did, when we received this on March 25th, send a copy to Mr. Johnson and indicate that this is a document we'd like to use and let us know if there's any objection. I don't know that we ever received any objection related to that, but I didn't want to give the Court the impression that once we received it we didn't tender it. We did.

THE COURT: Appreciate it, thanks.

MR. CROWL: Thank you, Judge.

BY MR. JOHNSON:

Q You said you felt this document was covered by the subpoena.

A When we went back and looked, yes.

Q Okay. If it was covered by the subpoena that we issued, why didn't you just send it to the government four weeks ago?

A Well actually, I think we sent it to our counsel, Chris Rizek, and he provided it to you on our behalf, I think.

Q Okay, and --

A And they may have too, Plaintiff's counsel may have, too.

Q And you talked about with Mr. Crowl various schedules and exhibits. Have you produced those to Plaintiff's counsel?

A They're attached to the transcript of the May 9 document.

Q Well, you were talking with Mr. Crowl about the fact that there would need to be some schedules and exhibits --

A Right.

Q -- created in connection with this.

A Right.

Q Did you produce any of those drafts of those exhibits and schedules?

A I don't know if we produced drafts. We produced the closing binder, I'm sure, months ago or years ago.

Q Did you produce any correspondence or e-mails concerning the negotiations after February 8th of 2000?

A I don't know. I don't know what we produced.

Q There would be such correspondence and e-mails regarding negotiations, wouldn't there?

A There might be. Well, I don't know about e-mails back in 2000.
Q Wouldn't those be covered by the subpoena as well?
A I didn't really respond to the subpoena myself. There may be other items of that nature. I don't know if we, we may have already have provided them.
Q Okay. This document is signed by each of the Welles, isn't it?
A Yes.
Q And were you involved in obtaining their signatures?
A I don't know if I was individually. Our firm was, obviously.
Q And in paragraph 1.2 of this document, I guess it's on the page Bates-stamped SLK 13855.
A Yes.
Q That sets forth possible closing dates, correct?
A Uh-huh.
Q And one of them being March 30, 2000.
A Yes.
Q The first one. Was it your expectation that the deal was going to close as of this time?

A As of this time?

Q February --

A That it would eventually close?

Q Yes, February of 2000.

A That was my hope, yes.

Q Was it your expectation?

A I probably would have given it a better than 50-50 chance, yes.

Q Okay. Now, we've looked at your March 6th letter, Mr. Waterman, and your August 9 letter, the two documents you did send on to the Welles. I'm correct, aren't I, that you never offered to provide an opinion letter to the Welles about the Jenkins' strategy.

A That's correct.

Q Okay, and it's also correct that the Welles never even asked you whether Shumaker would be willing to do so.

A I think that's correct.

Q Okay, and you never reviewed any of the tax returns for Stobie Creek for the year 2000, either the April 30, 2000 or the December 31, 2000 tax return, correct?

A Myself, individually?

Q Yes.

A I don't recall that I reviewed those, no.
Q And you didn't have any input into the preparation of those tax returns.
A Individually?
Q Yes.
A No.
Q Okay, and you didn't provide any advice as to how they should be prepared or what should be set forth in those tax returns, did you?
A Individually, no.
Q Okay.
MR. JOHNSON: If I could just have a minute, Your Honor.
THE COURT: Certainly.
MR. JOHNSON: Your Honor, that's all I have. Thank you, Mr. Waterman.
THE COURT: Mr. Waterman, I want to make sure I understood some of your earlier testimony this morning.
You state in reference to the Jenkins & Gilchrist opinion letter, which was Plaintiff's 143, that you had discussed with Jeffrey Welles the substantial nontax business reasons that you refer to in page 7.
THE WITNESS: Yes.

THE COURT: And then a brief reference was made to Attachment or Section M in the last two pages, which essentially is the Jenkins & Gilchrist explanation of why Jenkins & Gilchrist does not believe that, well, in fact they say Notice 2044 is prima facie and applicable to your situation, meaning the Welles situation.

THE WITNESS: Yes.

THE COURT: Now, you reviewed this opinion letter, correct?

THE WITNESS: Yes.

THE COURT: Did you review specifically Section 1?

THE WITNESS: Yes.

THE COURT: Would you look at it and tell me how that particular page-and-a-half analysis addressed your concerns?

THE WITNESS: Well, I think they had two bases for their opinion. One was that it was an expression, there was a notice from the government, a statement of the position of the government that did not change any of the judicial and statutory and regulatory authorities upon which they relied, in their opinion. So on the one hand, they were saying even if Notice 2044 described this transaction, it

would not alter their opinion.

Secondly, they said that in their view, the terminology I used was a 165 loss generator was different. That is the conclusion that I had questioned, but I was not in a position as a nontax lawyer to substitute my judgment for them if they thought that was correct. But there was only one grounds for issuing their opinion, too.

THE COURT: I'm only referring to Notice 2044. That represents my focus.

THE WITNESS: Yes. Again, those are the two bases on which they rendered the Notice 2044 opinion.

THE COURT: Now, when you achieved your level of satisfaction based on your telephone conference call with Ms. Guerin, which obviously preceded the issuance of this letter, your telephone conversation which you said there was no way that Jenkins and Gilchrist would commit malpractice.

THE WITNESS: Right.

THE COURT: Okay. This was obviously before the issuance of the letter. Am I to understand from your earlier testimony that at no time in your discussions with the Welles did you indicate that this opinion letter fortified your view that the notice would not be of a concern?

THE WITNESS: Well, no I told them I was convinced too by her, yes, for both independent reasons.

THE COURT: You told them you were convinced in this opinion letter issued sometime thereafter, and what I'm trying to determine is whether when the opinion letter issued, whether you had any subsequent discussions with the Welles?

THE WITNESS: After that, I don't know if I discussed that specifically with them. We had lots of drafts, I believe, of that and discussions with their CFO, Larry Goldstein. I participated individually in very little of that.

THE COURT: In terms of the section M, is there anything that's said in section M that differs or amplifies what Ms. Guerin told you earlier?

THE WITNESS: I don't think so, no.

THE COURT: Okay. Will there be any followup questions, any redirect?

MR. CROWL: None, thank you, Judge.

THE COURT: Mr. Waterman, you would be excused up to the direction of --

THE WITNESS: I'll just leave it right here.

THE COURT: -- Mr. Crowl. I want to say something before you leave, which is I go to a lot of

art exhibitions, all over the world. And I'm always surprised when I see the Toledo Museum has a contribution, because I go why? Well, I'm learning.

THE WITNESS: It's a wonderful art museum, actually.

THE COURT: Maybe I'll have a trial there sometime and I'll get to visit it. I think it's interesting to find out why --

THE WITNESS: These gentlemen certainly enjoyed it when they were there.

MR. JOHNSON: Four days in Toledo.

THE WITNESS: They need to get back. Well, thank you.

THE COURT: Thank you and thank you for coming. Before your next witness, do you want to take a break? Do you want to proceed?

MR. CROWL: We'd like to take a break for a minute, Judge.

THE COURT: Okay, and we'll take our afternoon break, which is 15 minutes. We'll recess until 2:15.

(Off the record.)

THE COURT: Mr. Kolek?

MR. KOLEK: Good afternoon, Your Honor. For our next witness we'd like to call Jeffrey Welles.

THE COURT: Before Mr. Welles comes forward, I'd like to go off the record about our reporter situation, Mr. Kolek.

MR. KOLEK: Yes.

(Off the record.)

THE COURT: I've been informed by the parties that tomorrow there will be a transfer to a new reporter who is with us today and we will have the company state its information on the record tomorrow when we begin. Mr. Welles?

MR. GIBSON: Just to close the loop on this, Your Honor, the Court made a statement on the record about the parties. I will say that the Plaintiffs made this arrangement without consulting us. We have no objection to changing reporters.

THE COURT: Thank you.

MR. GIBSON: But they've not discussed this with us.

MR. CROWL: I apologize, Judge. Do you have an objection?

MR. GIBSON: No, I said I don't object, but I don't want the record to reflect we agreed when we weren't even asked.

THE COURT: Just never ask him to dance.

(Laughter.)

MR. GIBSON: That's right. I'll say --

THE COURT: Mr. Welles, I feel you're the witness we know the most. We've heard about you for months and months.

MR. WELLES: Yes, it feels like my rehearsal dinner where everybody is talking about you, but there were no cocktails served.

(Laughter.)

THE COURT: Please raise your right hand.

Whereupon,

JEFFREY F. WELLES

having been duly sworn, was called as a witness and was examined and testified as follows:

DIRECT EXAMINATION

THE COURT: Please sit down, sir, and state your full name for the record.

THE WITNESS: Jeffrey F. Welles.

BY MR. KOLEK:

Q Mr. Welles, where do you live?

A In New York City.

Q And your family, your parents and your brothers and sisters, they are parties to this litigation through various entities, is that correct?

A That's true, yes.

Q Could you tell us a little bit about your

parents, start off by telling us a little bit about your parents?

A My parents, David and Georgia, were involved in the strategy as you know. They were the parents of five children, which you have also heard about. My father died last New Year's Eve.

Q Okay, and how long were they married?

A Over 50 years.

Q Okay. Your father was the founder of Therma-Tru I understand.

A He was, in 1962.

Q And was your mother involved in Therma-Tru at all?

A Never involved in Therma-Tru, though she had a very busy, busy life.

Q Okay. Can you tell us a little bit about your brothers and sister?

A Yes. David, or Deke as we refer to him, is my oldest brother, was involved in Therma-Tru for many years after having worked, after graduating from Yale he worked for Owens Corning Fiberglass, as had my father actually. And his next job was at Therma-Tru and he worked there until after the Kenner transaction, excuse me, after the Fortune Brands transaction and is now retired.

My sister, Virginia Jordan, who we call Ginny, lives in Boulder, Colorado. She's the mother of three children. She has worked as a therapist, child and family counseling, very involved in an organization called Bead for Life.

Q And what is Bead for Life?

A Bead for Life is an organization that supports women in Uganda. It turns out that they had this wonderful craft where they're able to make beads from magazine pages, very colorful beads to earn some income where they otherwise wouldn't. So Bead for Life is now sold. Go to the website, it's wonderful. And now the business does, I think, over $2 million in revenues in the United States.

Q And that all goes to support --

A It goes to the town in Uganda to support the women.

Q And what about your brother Peter? Can you tell us a little bit about Peter?

A My brother Peter is my younger brother. He is the father of two children and lives in Minneapolis. He's been involved in real estate. He's currently a partner in the Environmental News Network. He's professionally done mostly real estate, but in other things, he's on the board of the Land Trust

Alliance and the former President of the Minnesota Chapter of the Nature Conservancy.

Q And what is the Land Trust Alliance?

A The Land Trust Alliance is an organization that's involved in legislation. I think they do a lot of lobbying around land preservation issues.

Q Okay, and what about Chris?

A Chris lives in Boston, married and the father of four children. He's been involved in a number of entrepreneurial things including interests in a printing company, some skating rinks, a number of other things. He's had an executive search firm, involved in a lot of his kid's activities and also is on the board of the Brookwood School where I think all of his children attended.

Q We touched on your father and your mother and your father is involved with, somewhat with Therma-Tru. What was your father's employment background?

A He had worked directly out of college. He had worked at Owens Corning Fiberglass, was transferred from the East Coast to Toledo, which is the headquarters of Owens Corning Fiberglass. And in the early 60s he left and purchased a business called, I think it's Vogelsang Lumber was the initial company,

which subsequently became Lake Shore Industries and ultimately Therma-Tru.

Q Okay, and is your mother involved in any charitable activities?

A Yes, she is. She's been on the board of Planned Parenthood. She's currently on the national board of the Nature Conservancy and the Ohio Arts Council. I'm probably forgetting about half a dozen other things. She's very busy.

Q And what about yourself? Do you sit on any boards?

A I do. I'm on the board of Anchor, Inc., which is an urban boarding school program in New York. I'm also on the board, I'm the President of the Board of the Buckley School.

Q Are you and your siblings and your mother, I guess now, involved with Cricket Island Foundation?

A I should have mentioned Cricket Island. I'm currently the President of the Cricket Island Foundation.

Q And what is the Cricket Island Foundation?

A Cricket Island Foundation was the foundation that we established. You've heard about the charitable work that we've done. That was established in the year 2000. It currently has about 45 million

in assets and makes grants to organizations around youth development, youth civic engagement, youth activism.

Q Okay, let's go back to you a little bit now. What was your education starting with college?

A I graduated from Dartmouth College in 1977 with an A.B., double major in government and French. I returned to business school in 1984, Columbia University, where I earned an MBA.

Q Did you have any concentration in your program at Columbia?

A Yes, I had a concentration in finance.

Q You graduated from Dartmouth in 1977 and then you went for your MBA. You got your degree in 1985?

A Correct.

Q What did you do in between?

A After graduating from Dartmouth, I worked for Emerson Electric.

Q And what did you do there?

A Emerson had two divisions that I worked in, one called Browning Manufacturing, the other one called Van Gorp. And I had assignments in Chicago, in Dallas and finally in Pittsburgh in the national accounts area before returning to business school.

Q And then you went to business school beginning when?

A I started business school in the fall of '84.

Q And you graduated in 1985.

A Yes, I went directly through so it was an advanced program.

Q And what was your employment following Columbia University?

A After graduating from Columbia, I went directly to Goldman Sachs and I remained at Goldman until 1995.

Q And what did you do while at Goldman?

A I initially was an associate in the Securities Sales Division. I remained in that division, ultimately becoming a vice president. And the name of the division changed to private client services.

Q And what was your position while at Goldman?

A My title I mentioned, but my job responsibilities were, after going through a training program, my job responsibilities were covering, that's effectively selling and advising institutions, individuals and family offices on various investments. And those would be in stocks, bonds, foreign exchange,

cash instruments, some structured products, options, a number of things like that.

Q And you said that there was a training program. How long did that training program last?

A For six months.

Q And what was involved in that training program?

A The training program involved really getting to know every area of the firm. We worked on a number of projects within the firm, but we spent time on different desks learning about bonds, learning about stocks. You needed to become registered in a number of areas.

Q What do you mean by you needed to become registered?

A In order to begin to conduct business after your training program concluded, you need to be licensed, NASD licensed and things like what's called a Series 7, which is the general brokerage kind of license. Additionally, I became licensed in other things such as options, futures, foreign currency options.

Q Do all of the Goldman employees go through this training program?

A All the Goldman employees go through

training programs of various sorts. The division that I was in, everyone went through a similar six-month program and was required to be licensed in the areas that I mentioned.

Q Did you build a client base while you were at Goldman?

A Yes.

Q And did your clients engage in any foreign exchange trading?

A Yes.

Q Was the particular trading suggested by the client?

A In some cases the client had a particular view and would ask Goldman to structure a trade based on that view. Other clients relied on the firm for recommendations.

Q Let's take the ones that were Goldman recommended. Could you describe what would happen under those circumstances?

A Yeah, first off, the clients needed to be accredited investors so this wasn't something that every client did. And in the case of a recommendation from Goldman, the firm would have a point of view, speaking specifically about currencies, would have a point of view on a relationship, a currency cross, and

perhaps a change in that relationship based on research on flow of funds, on trade deficits, on current account deficits, on inflation numbers or job reports. Things like that would affect those relationships.

Q And what type of currency or foreign exchange trading did you do for your clients?

A I'd say that the trades that we did most frequently were yen/dollar trades, but there were other currencies as well.

Q And you mentioned that these would be recommended by Goldman Sachs, is that correct?

A Yes.

Q Was there any particular area of Goldman Sachs that would make these recommendations?

A Yes. At the time, Goldman had a division called J. Aron, who was --

Q And, I'm sorry, go ahead. I apologize.

A J. Aron was a business that they had acquired sometime earlier and they were in the business of commodities. They traded coffee beans. The traded various agricultural commodities. They traded oil and natural gas and options and futures on those underlying commodities.

Q And did J. Aron recommend speculative

trading positions?

A Yes.

Q And what were the types of speculative trading positions that J. Aron would recommend from time to time, if you recall?

THE COURT: Would you spell for the reporter J. Aron, please?

THE WITNESS: J., and Aron is A-r-o-n.

THE COURT: Thank you.

A In some cases, clients were looking to hedge exposure that they had. And I referred earlier to yen-related trades. One particular client of ours owned lots of Japanese equities and they would hedge their equity exposure in the currency markets. On the other side in speculation, the firm would enter into a trade as a counterparty with the client. As I described, whereby there was some point of view, it was typically a relatively short-term point of view.

If you had a very long point of view on a currency, to use that example, you'd probably structure a warrant. If you had a shorter point of view in the next couple weeks or month, you would do that through options.

BY MR. KOLEK:

Q What does the term "event trading" mean to

you?

A Event trading means to me, it is trading around certain announcements or in some cases it might be a merge-related announcement.

Q Would events trading have an effect on foreign exchange trading?

A Yes, most foreign exchange trading was based on, or the research whereby you'd develop a point of view, was highly dependent on certain events, economic announcements, some of the events I mentioned earlier.

Q Were the options that your clients structured or that they engaged in, were they in the money options or out of the money options?

A Typically out of the money options.

Q And why would somebody purchase an out-of-the-money option as opposed to an in the money option?

A To provide more leverage with more profit potential. If you simply had a view that you thought the yen was going to appreciate versus the dollar, you would buy yen. But if you wanted to do it in a way that was more leveraged whereby the returns were much larger, you would develop an option position and typically those would be out of the money.

Q When you were at Goldman Sachs, who would do the pricing on the options that were suggested by J.

Aron?

A The trader.

Q Pardon me?

A The trader at J. Aron.

Q Were you involved in that pricing?

A No.

Q And do you know how the pricing was handled?

A It was usually done based on a model, an algorithm.

Q Did you ever check the pricing yourself?

A No.

Q Did you ever do any follow-up due diligence on the recommendations that J. Aron made and that you in turn communicated to your clients?

A Yes. We were highly dependent on the firm's own research, but I would read things and look at news reports.

Q What types of things would you look at and read?

A Well, the news services that we would get at our desk I would look at. Their economic announcements are typically listed on a Bloomberg page so you can see all the upcoming announcements, things like that.

Q I think you mentioned that clients that

called Goldman Sachs would, or some of your clients would recommend certain, or have certain feelings with respect to potential trades, is that correct?

A Yes.

Q And how would you handle those?

A If they had a view, I typically wouldn't dissuade them from that view but would simply talk to a trader and see if we could structure a trade to seize that opportunity.

Q Well, let's take an example. If a client called you with respect to a foreign exchange transaction, how would you proceed?

A I would talk to the client, see what particular opportunity or currency that they were interested in. I would then talk to the trader J. Aron. He would come back to me with probably various levels. Volatilities are typically the way that things are priced, and might suggest the terms of a trade, the maturities, strike prices, that kind of thing. I would then go back to the client and reflect that.

Q While at Goldman Sachs, did you come to know an individual by the name of David Parse and another individual by the name of Rod McCay?

A I knew them both, yes.

Q And how did you come to know Mr. Parse and Mr. McKay?

A David Parse and Rod McCay had been hired by the Goldman Chicago office and they were in the training program in New York. As part of that training program, they spent time with me and others. In fact, I didn't know Rod as well, but David Parse actually sat at our trading desk.

Q And about how long was Mr. Parse at your trading desk?

A Just a couple of days.

Q Do you know what happened to Mr. Parse and Mr. McKay following their training program?

A I know that they went on to work in Goldman's Chicago office and I had infrequent, but occasional conversations with both.

Q And what would you talk to them about?

A Often a product at the firm was in underwriting, that kind of thing. And we shared information with people in other offices.

Q And when did you start investing money for your family?

A From my early days at Goldman, so I would say in the mid-80s.

Q And what type of a customer account did your

family have with you?

A It was a standard brokerage account.

Q I believe you said you were at Goldman Sachs until 1995, is that correct?

A Yes.

Q Why did you leave Goldman Sachs?

A In 1995, I may have mentioned, if I didn't, I worked in a three man partnership within the firm. One of my partners, Bob Bennett, had retired. My other partner, Bob Schafner, was intending to leave the firm to go to a competitor. So our business was coming unglued to a certain extent.

Additionally, Goldman had a transaction-based compensation arrangement. Their model was effectively brokerage. It was not a fee based and discretionary kind of arrangement. And the model for many firms was changing whereby you would be compensated for a percentage of assets under management and you had a more discretionary role. You made more investment decisions on behalf of your clients. And what I mean by that is if you were my client at Goldman, before you entered into any transaction, you had to say to me, buy 1,000 shares of GE.

A discretionary relationship is somewhat

different and I was interested in moving more into the portfolio management side of the business, which was the discretionary type of arrangement that I'm referring to.

Q And you worked at Goldman Sachs until 1995?

A Yes.

Q And where did you go from Goldman Sachs?

A I went to Lazard Asset Management, which is a division of Lazard Freres.

Q Do you want to spell Lazard Freres?

A I'll try, L-a-z-a-r-d, and then Freres is F-r-e-r-e-s.

Q And how long were you at Lazard Freres?

A I was at Lazard until 1999.

Q And while at Lazard, how many relationships did you represent?

A I had about 30 client relationships.

Q And what was the aggregate amount of the assets that were under your investment management at that time?

A It would be in total about $1 billion.

Q And what types of investments did you make on behalf of your clients?

A It was a somewhat different group of securities at Lazard. Lazard clients had equities,

bonds, cash instruments and various mutual funds that Lazard was the sponsor of, and the mutual funds would be to get exposure to different asset classes like international small cap securities or various yield related products and fixed income.

Q Did you do any foreign exchange investing on behalf of your clients while at Lazard?

A Yes, to settle trades, but not in the options market.

Q And you said you were at Lazard for how long?

A For four years.

Q And that would be what, 1999?

A Yes.

Q And why did you decide to leave Lazard in 1999?

A In 1999 I had the idea of establishing a family office.

Q And can you give us an explanation of what you mean by that?

A Yes. In my professional career, I had dealt with a number of family offices and I knew the benefits in terms of scale, the service level and reporting custody, various benefits of a family office. And at that time, I was also a director of

Therma-Tru and we were, at that point, contemplating a transaction whereby there would be greater liquidity for the family.

Q You mentioned Therma-Tru. What is Therma-Tru Corporation?

A Therma-Tru Corporation is the business that I mentioned my father founded, and it is in the business of manufacturing entry doors, entry door systems. So that would be front doors for residential construction and the ancillary things like doorsills and door lights, transoms, but all the different things associated with a front door.

Q When was Therma-Tru formed, Mr. Welles?

A Well, the predecessor firm I had mentioned earlier, Vogelsang Lumber, was formed in 1962. The name was changed to Lake Shore Industries, I think, sometime soon thereafter. And Therma-Tru was a name that referred to the product, actually. Thermal meant insulated, which, when we started making insulated steel doors, and Tru meaning not warping, which is one of the benefits of a steel door.

Q Okay, so your father acquired Vogelsang. Is it Vogelsang?

A Vogelsang Lumber, yes.

THE COURT: How do you spell that, for the

record?

THE WITNESS: V-o-g-e-l-s-a-n-g.

BY MR. KOLEK:

Q And what were the circumstances of that acquisition?

A I don't know exactly how my father identified that company. He had wanted to do something more entrepreneurial and hence, was interested in leaving Owens Corning. And he made a bid for the company out of bankruptcy using an attorney, Greg Alexander, who he knew. And Greg Alexander was with the firm Shumaker, Loop & Kendrick, which we've heard a lot about. And at that time they made paneling, wood paneling, the tacky stuff in your basement rec room on the walls. The wood paneling was their first product.

Q And was your father the sole investor in purchasing Vogelsang out of bankruptcy?

A No, he needed seed money and my grandfather provided some of that.

Q Was there anybody else that was involved in that?

A Not that I'm aware of.

Q Now, you said your father had worked at Owens Corning Fiberglass?

A Yes.
Q Does that have a connection to the building trades?
A Yes. Owens Corning Fiberglass makes the fiberglass insulation, a lot of other building products. And ultimately Therma-Tru developed a fiberglass door in the mid-80s using the same fiberglass technology that he was familiar with.
Q And the product line that you talked about earlier, you said it was entry doors.
A Yes.
Q How did the product develop from a lumberyard selling paneling to the doors that they currently sell?
A As I recall, there was one very important customer, going back to the early days, in the early 60s, called Shoals Homes and they made modular kind of homes. And they actually needed doors for their modular homes and had a relationship with Vogelsang and subsequently Lake Shore Industries, and at their request Lake Shore began to manufacture the doors.
Q Now, I think you indicated that your father used Greg Alexander to assist him in the purchase.
A Yes, he did.
Q And I think you also said he was with the

law firm of Shumaker, Loop & Kendrick, is that correct?

A Yes.

Q And what is Shumaker, Loop & Kendrick?

A It's a Toledo headquartered firm that has offices in other cities. I know of a Charlotte office. I believe there's one in Florida. And as Toledo goes, it's a big law firm. I grew up in Toledo. It was probably the only one I knew of. I've learned that it's more than 150 lawyers. I don't know at the time how many there were.

Q And was Mr. Alexander the relationship partner from Shumaker, Loop & Kendrick that was involved with Therma-Tru?

A Yes.

Q Did he also represent the Welles family?

A Yes, he did.

Q Did Mr. Alexander serve any other capacity with Therma-Tru other than legal counsel?

A Yes, he was on the board of directors.

Q And for how long was Mr. Alexander on the board of directors?

A I'm going to say for at least 25 years. He was succeeded by David Waterman, and I think that was probably in the early 90s.

Q And how long did Mr. Alexander serve as legal counsel for Therma-Tru?

A For that entire tenure, for at least 25 years.

Q Who's John Strob?

A John Strob is a former employee of Therma-Tru. He was at one time the president of Therma-Tru and he had also been an attorney at Shumaker, Loop & Kendrick.

Q Was Mr. Strob an attorney that did work for Therma-Tru?

A I believe that he worked in a backup capacity to Greg Alexander and that's how he got to know my father. My father ultimately hired him to come to work at Therma-Tru.

Q Okay. When did you first meet Mr. Waterman?

A I don't know that I had met him before my association with Therma-Tru. I joined the board in the early 90s as did Dave Waterman. I believe that was probably the first that I met him.

Q What type of legal work did Shumaker, Loop & Kendrick provide to Therma-Tru?

A Virtually everything. Therma-Tru made a couple of acquisitions, a company called Weber, a company called Benchmark. He did that merger advisory

work, so I think it was some general corporate work. When we established new manufacturing facilities, he was involved in the contracts associated with those.

There was some employment law that I knew he was involved with. There was some leasing transactions I know he was involved with. There were some employees suits I know that he was involved with. And the exception to that was the patent litigation that we were involved with.

Q Did Shumaker, Loop & Kendrick provide tax assistance to Therma-Tru?

A Yes.

Q Let me direct your attention to the year 1987. Were there any efforts to sell Therma-Tru in 1987?

A Yes.

Q Could you explain the circumstances of that?

A Sure. In 1987, the circumstances were that because of my father's health, he had been diagnosed with bone cancer, there was an interest on his part in perhaps selling the business. I was working at Goldman Sachs at the time and at my father's request, I provided an introduction to the investment banking group at Goldman Sachs.

Q And what came of that introduction to the

investment banking group?

A The investment bankers, there were two people involved, John Powers and another one, John Sheldon. They came and spent time with the company, with the board, did some financial analysis of the business, learned a little bit about the products.

Q Did Therma-Tru hire Mr. Powers and, what was the other man?

A Sheldon, John Sheldon.

Q Did Therma-Tru hire those individuals from Goldman Sachs?

A Yes.

Q And what did they do?

A Well, they engaged the firm. Those were the two people that were assigned to do the work. But they engaged Goldman Sachs to develop the marketing material and to solicit bids for the company.

Q And did they solicit bids?

A They did.

Q And how was that arranged?

A Well, after getting the requisite information that I mentioned earlier, Goldman went out to their clients, both domestically and internationally, that they knew that were in building products or might be natural acquirers of Therma-Tru

and they solicited bids.

Q Were any bids received?

A Yes.

Q From who, if you recall?

A I remember some of the companies. Three that I can think of were Tomkins PLC, which is a UK-based firm, Masco and Crane.

Q Were there any bids received?

A Yes.

Q And were they substantial?

A There were more bids than the three that I mentioned, but I think there were probably six or seven that were received. And they were substantial relative to the size of Therma-Tru at the time.

Q Though the company was not sold in 1987, is that correct?

A No.

Q Why not?

A The preliminary bids came in, I believe, in the early fall, summer or early fall of 1987. The final bids, and I think they narrowed down the number of bidders based on the level of the preliminary bids. The final bids were due in October of 1987 and on October 19th when the market went down 22 percent, the bids reflected that. The bids came back at 25 percent

and more discounts to the earlier preliminary bids.
Q And what was the family's reaction to that reduction in price?
A Well, it's really not the family's reaction. It was more my father's reaction and the board, was that despite his health issues he felt that the prospects for Therma-Tru were still pretty good. I think people were all scared by what happened in the market, but were still pretty good and that at that discounted level that he wanted to remain private.
Q Did there come another time when the sale of Therma-Tru was again considered?
A Yes, and that was in 1999.
Q And can you tell us what the circumstances of that were?
A The circumstances were different. At that point it was either late '98 or '99. Again, the company had grown enormously, so there were certainly some risk control considerations about having a very big undiversified asset. But additionally, my parents were seeking some liquidity.
Q And why is that?
A They had interest in doing charitable activities on a bigger scale.
Q Okay, I'm sorry. So what happened at that

time? What efforts did your father take to market Therma-Tru?

A Well, I think it was really more deep than my father at that point, but he was the chairman of Therma-Tru at the time. And he had a number of contacts in the building products business through trade groups, industry convenings and that kind of thing, and went to some of them to enter preliminary discussions to say that there was some interest on the part of the family to seek a sale of the business.

Q Okay, and who did Deke contact?

A It might have been more than one person, but one that I know that he contacted was a man by the name of Ham Shermer who was responsible for mergers and acquisitions at Masco.

Q Is that the same Masco that the company had been involved with in 1987?

A Yes.

Q And what is Masco?

A Masco is a building products company. It's based in Taylor, Michigan which is outside Detroit. They have a number of products like Moen faucets, and they've got a lot of cabinet companies, some window businesses. They were involved in furniture, although they've since divested their furniture lines.

Q And they're a publicly listed company you said?

A They're a publicly traded company.

Q Can you basically explain the proposal that was made by Masco with respect to an acquisition of Therma-Tru?

A After those discussions between Deke and Mr. Shermer, Masco did make a bid for all the outstanding shares of Therma-Tru.

Q When was that bid made?

A It was made in, I'm not going to know the exact time, but it was made in the end of the late spring or summer of 1999.

Q And who was representing Therma-Tru in connection with that transaction?

A UBS, Union Bank of Switzerland.

Q Any lawyers?

A Yes, and I'm forgetting if we'd used Shumaker, Loop & Kendrick. I think it was Mr. Waterman, but I'm not positive.

Q Okay. Can you explain the transaction with Masco, or that was proposed with Masco?

A Yes. The proposal from Masco was in exchange for Masco shares, and the aggregate amount of this would be a share exchange. So it was a certain

number of shares that would have had the value of about $825 million.

Q And who were the shareholders of Therma-Tru at that time?

A The shareholders at that time were my parents individually, their trusts, the GRAT trust, my siblings and me, various cousins that had received shares from my grandfather's original investment in 1962. And there were at that time, I'm guessing, 15 to 20 management shareholders.

Q The transaction was a stock for stock transaction, is that correct?

A Yes.

Q And how would a stock for stock transaction provide your father with liquidity?

A Well, the shares that, had the transaction gone through, we would have received, we, I mean Therma-Tru shareholders, would have received restricted shares in Masco. Those shares would have been subject to a holding period and there would have been various conditions upon their sale. It depended on things like daily and weekly volume and the shares couldn't exceed a certain amount, and they would have been shares with a legend on them, some technical things. But they're restricted shares.

Q Is that normally referred to as a Reg D issue?

A I'm not sure that's a Reg D, but I think they would be called Rule 144 shares.

Q Rule 144?

A Yes.

Q Okay.

A So that would not have accomplished the liquidity. There were some techniques that you could use to borrow against those shares or to assign the holding period, and I researched some of those.

Q And what did you do to research those?

A I talked to the restricted stock desks at a couple of the firms.

Q To which one did you speak?

A I spoke to Frank Edwards at Morgan Stanley.

Q And when did that conversation occur?

A It would have been, this was roughly the same timeframe, so it would have been in the late summer of, I think, late summer of '99.

Q Was this in person or by telephone?

A No, by telephone.

Q And where were you when this conversation occurred?

A I was at my desk in New York.

Q And where was Mr. Edwards?
A At Morgan Stanley in New York.
Q And can you tell us what was discussed during that conversation?
A Yeah, Frank was pretty familiar with this area. I think he'd done some of these transactions on behalf of other clients and he talked about, one strategy I can remember is a collar.
Q And how did the collar work?
A The collar was a strategy whereby you could limit your risk. You would put a collar around the share price. So if, for example, Masco shares were trading at about $30 at the time and a collar, you could limit your downside risk whereby if the stock went down to $26 and below that price, you would be effectively guaranteed $26 at the time your holding period ended in three years. In order to do that you had to give up some of the upside, so if the $30 stock went to 40, you might be only able to participate up to $34 on the upside.
Q And what is the mechanics of those types of transactions?
A Well, it's done with the restricted stock desks at the different firms. The actual mechanics are done through options.

Q Did you speak with anyone else?
A I spoke with Ollie Rezza at Goldman Sachs.
Q And who is Mr. Rezza?
A He was the man that was covering me at the time.
Q When you say covering you, what do you mean by that?
A He was responsible for our relationship.
Q And he was at Goldman Sachs.
A He was.
Q Did you have a conversation with him?
A Yes, and he in turn referred me to another man, Tom Sweeney who works, worked on Goldman's restricted stock --
Q And when did that conversation occur?
A That occurred at or around the same time. It was the late summer or early fall of '99.
Q And was that in person or by telephone?
A No, by telephone.
Q And where were you at the time?
A I was at my desk in New York.
Q And where was Mr. Rezza and Mr. Sweeney?
A At Goldman Sachs in New York.
Q And what did they tell you?
A About, one of the strategies was the same,

the costless collar. Another strategy was an exchange fund. An exchange fund was a way of diversifying a single large stock position that you were not yet able to sell. So you would contribute shares into a fund. Other investors would also contribute shares into the fund and you would be, for contributing your shares you would receive a unit and the unit included other peoples stocks as well as your own. So that was a way that you could be diversified.

Q Did the Masco deal go forward?

A No, ultimately it did not.

Q Why didn't it go forward?

A In the due diligence process, which was continued into the fall of '99, there were a number of problems associated with it. I think there were issues with our ongoing management, contractual issues. I think there were some concerns over inventories. We were in the course of making an acquisition. I think they had cold feet about that. And they tried, they amended the bid to include a lot of conditions.

Q And when did this occur?

A That would have been, I'm thinking this is in September of '99.

Q Therma-Tru was ultimately sold to a company

called Kenner & Company. How did Kenner come to learn of Therma-Tru?

A Kenner learned of Therma-Tru through a Therma-Tru director by the name of Larry Sularry. Larry had been on the board of Therma-Tru for many years. He also was a building products veteran and he had worked as a consultant and also in a management capacity for one of Kenner & Company's portfolio companies.

MR. KOLEK: Your Honor, may I approach the witness?

THE COURT: Please.

MR. KOLEK: Thank you.

BY MR. KOLEK:

Q Mr. Welles, I've just handed to you a copy of something that's admitted previously, called Plaintiff's Exhibit 61. Can you tell us what this document is?

A Yes. This is a proposal from Kenner & Company that talks to the specifics of a recapitalization that Therma-Tru would have engaged in.

Q What is the date of this proposal?

A This is dated December 8th, 1999.

Q Was this the first proposal that the family

had received from Kenner?

A No.

Q What other proposals were received from Kenner?

A There were several previous proposals at different levels, at different price points and with different conditions.

Q Were they submitted pursuant to letters of intent or was that part of just a negotiation process?

A It was part of the negotiation process.

Q And how long had the negotiation process continued?

A I'm guessing for about a month prior to the date of this letter.

Q And what was the purpose of this letter of intent?

A The purpose was to, again, show Kenner's interest in pursuing Therma-Tru. It was to elaborate on the structure of the deal and the debt versus stock component. And my understanding of it was that it was to provide for some exclusive negotiation between the two parties.

Q Was this a binding agreement between the two parties?

A No.

Q I'd like to refer you to the last paragraph on page 2. Would you please take a look at that?

A Uh-huh.

Q And let me direct your attention to the last two sentences in that paragraph. Would you read them for us, please?

A During this period, we understand that you would work exclusively with us toward an expeditious closing and not encourage or enter into any alternative transaction. Neither party shall be bound until a formal agreement is executed, except for the preceding sentence.

Q What was your understanding of that first sentence?

A This was what I had referred to earlier as an exclusivity clause.

Q And the last sentence?

A That nobody is bound until a formal agreement is executed.

Q When was Therma-Tru sold?

A The business was ultimately acquired or was recapitalized by Kenner & Company in May of 2000.

Q Was there a binding commitment between Kenner and the shareholders prior to May 9th of 2000?

MR. JOHNSON: Objection, Your Honor, to the

extent it calls for a legal conclusion.

THE COURT: You can ask him if there was a contract to which he himself was bound.

BY MR. KOLEK:

Q Did Therma-Tru have a contract to which it thought it was bound prior to May 9th --

THE COURT: Well, Therma-Tru can't think, but Jeffrey Welles can.

MR. KOLEK: Jeffrey Welles. Well, it was a recapitalization and redemption agreement and Mr. Welles was on the Board of Directors of Therma-Tru.

THE COURT: Right, it's just Therma-Tru can't think, but with the recapitalization stock purchase agreement, it's what you're referring to, correct?

MR. KOLEK: Right.

BY MR. KOLEK:

Q Did you as a shareholder of Therma-Tru believe that there was any binding agreement prior to May 9th, 2000?

A No.

Q Why not?

A There had been nothing, no contractual basis to believe that. Ultimately what happened was there was a signed and closed transaction in May of 2000,

but there had been no formal contract until that time.

Q Were you involved in the actual negotiations with respect to the Therma-Tru transaction with Kenner?

A Yes, yes, I was.

Q What was the status of financing with respect to the acquisition of Therma-Tru?

A Kenner & Company is a little bit unusual as private equity firms go in that they didn't have a big established fund, so the many big private equity funds, like a Blackstone, goes out and raises 5 billion and then they have the money all raised and they go and make acquisitions. Kenner is a pledge fund. They had a normal group of institutions that they did business with and when that happened, they would go out to that group of institutions, describe a potential transaction and ask them if they were going to invest.

So Kenner needed to put together those commitments in order to close the transaction. They also, these were the equity commitments I'm referring to. They also needed to go to the banks or insurance companies or other institutional lenders to arrange the debt.

Q Were you aware of the status of the

financing efforts by Kenner in attempting to make the acquisition of Therma-Tru?

A I got periodic updates, so yes, I was aware of it, some of those conversations.

Q When did the financing become final?

A At the 11th hour. Really not until days before or right at closing.

Q How did the Kenner deal differ from the Masco transaction?

A Well, it was a 50 percent, it was a recapitalization whereby the company, the ongoing company which was to be called KT, which stood for Kenner Therma-Tru Holdings, was the ongoing entity. But it provided for cash for 50 percent of the shares of the existing, of the old Therma-Tru shareholders.

Q Was there a difference in taxation between the Masco transaction and the Kenner transaction?

A Yes, the Masco transaction would have been taxable only upon the sale of the restricted, the 144 shares in Masco after a holding period had been satisfied.

Q During the negotiation period with respect to Kenner's acquisition of an interest in Therma-Tru, was there much discussion relating to the actual operational management of Therma-Tru following that

acquisition?

A Yes, there were a lot of conversations.

Q And what did they entail?

A Well, the, a 50 percent acquisition requires a lot of governance issues. And one of the important decisions that needed to be made was who the board would be and what would be the composition of the board, and ways whereby any significant decision around acquisitions or the sale of the business or expenditures over a certain amount of money had to be agreed to by the new board of directors. And that was ultimately decided to be a group of three of the former Therma-Tru directors, three of the new investor group and a seventh person who was the tiebreaker.

Q And who was the tiebreaker?

A The tiebreaker was Larry Sularry.

Q And he was the individual that used to sit on the board of directors, or sat on the board of directors of Therma-Tru?

A He had been on the board of Therma-Tru for probably 10 years and provided the introduction to Kenner, so it was thought that he would be the right person that would, an affiliation in a way with both groups.

Q Now, you mentioned that the Kenner

transaction differed from the Masco transaction in that the Kenner transaction was a taxable transaction, is that correct?

A Yes.

Q Did you or anyone in your family make inquiry regarding the tax consequences of the Kenner transaction?

A Yes. We knew that we would have a substantial capital gain.

Q And who did you speak with?

A With David Waterman.

Q And when did you do that?

A In the fall of '99. There was a Therma-Tru board meeting that I attended with all the directors and there was a subsequent meeting with Dave Waterman that included my brother Deke, and my father.

Q Was there anybody else present?

A No.

Q And what was said at that meeting?

A I believe it was Deke who asked the question, and asked the question of what did David know in terms of, or did he have knowledge of various strategies that would be, to help the Therma-Tru shareholders to reduce the capital gain, a substantial capital gain that would have been due on the closing

of the transaction.

Q And what did Mr. Waterman tell you?

A He said that he was familiar with, that his firm was familiar with a strategy and talked generally about it and mentioned that the firm was Jenkins & Gilchrist.

Q Okay, I'd like to come back to that topic a little bit later. Let me just switch topics slightly. I'd like to focus your attention right now on Stobie Creek. When did you become aware of the concept of a family office?

A Probably in my earliest days at Goldman Sachs, so back in 1985.

Q And what is your understanding of a family office?

A A family office is, it's an entity that provides various investments of -- we can talk about investments awhile -- but investment benefits or services for one specific group of investors, a family group. But in addition to investments, a family office can manage accounting issues, tax issues, tax compliance, various services like recordkeeping, performance reporting, custodial activities.

And some family offices do other things. They'll do real estate transactions or closing on

behalf of family members. They'll arrange for art purchases. Some do a whole valet approach, which we never had done.

Q You mentioned investment services. Individuals can go and make investments, you had individuals coming to you at Goldman Sachs, what benefit would come of having a family office with respect to investments?

A Well, for, the scale primarily. If you --

Q Could you explain that, please?

A Sure. If you, a small investor can go to a brokerage firm and they can have what's called a wrap fee arrangement or something like that whereby they pay 2- to 2-1/2-percent of, so a percentage, of assets under management for that firm to handle their investments on a discretionary basis. If you aggregate for the purposes of scale, and in the case of our family, this made a lot of sense. If you aggregate for the purposes of scale and you go back to that same firm with perhaps millions of dollars to manage, that fee arrangement gets much, much lower. We have managers today that charge 35 basis points, which is .35 percent, not 2 percent.

Q So there's a significant savings that comes from the aggregation.

A An additional benefit would be access to managers that have high minimums and access to closed managers. Some managers say they're closed. They've got as much money as they're willing to manage, but when you go to them with, and they have the expectation that you're willing to put lots of money with them, they actually will reopen.

Q Okay, money speaks.

A Yes, indeed.

Q Did you ever have conversations with your family members regarding a family office?

A Yes.

Q When did those conversations occur?

A The earliest conversations were with my parents.

Q And when was that, please?

A That was in the summer of '99.

Q And where did that conversation occur?

A In Toledo, Ohio.

Q And was it in person or by telephone?

A In person.

Q And where did that take place?

A That took place at my parent's home in Toledo, Ohio.

Q And what was discussed?

A I discussed with my parents this concept of establishing a family office for our family. I talked about some of the benefits, which I described. And I tried to elicit their feedback about whether it was something that they were interested in doing.

Q And what was their reaction?

A Their reaction was, they were receptive to the idea.

Q And what steps, if any, were taken after that to form a family office?

A To form the family office, the next step that was taken was that my father called David Herpe.

Q And who's David Herpe?

A David Herpe is an attorney with McDermott, Will & Emery.

Q Do you know when your father contacted him?

A Yes. It was in the, I think it was in the late summer of '99.

Q And you said that Mr. Herpe is an attorney. With what law firm is he with?

THE COURT: He just said McDermott.

MR. KOLEK: I'm sorry.

A McDermott, Will & Emery.

BY MR. KOLEK:

Q What happened after your father contacted

Mr. Herpe?
A We arranged, I think he arranged a meeting with David Herpe, which I attended.
Q Where did that meeting take place?
A It took place at the Belmont Country Club, which is in, near my parents home in Ohio.
Q And who was present at that meeting?
A My mother, my father, David and me.
Q And do you know when that meeting took place?
A I believe it was in early September of '99.
Q And what was discussed at that meeting?
A I discussed what I thought were, the interest that I had and that my parents seemed to share in developing a family office. I think the, David said that he was familiar with structuring family offices he'd done on behalf of other clients. And my parents talked about also the establishment of a charitable foundation.
Q Were there any decisions that were made at the Belmont Country Club meeting?
A Yes.
Q What were those?
A There was a decision to move forward with the establishment of a family office.

Q And was a family office in fact established?
A Yes.
Q And what was the name of that family office?
A It's named North Channel LLC.
Q And who's the --
MS. FEENEY: I'm sorry?
THE WITNESS: North Channel LLC.
BY MR. KOLEK:
Q And who is the manager of North Channel LLC.
A I'm the manager of North Channel.
Q Was there any decision made with respect to a private foundation at that time?
A A decision was made to, David made and said that he was going to, there was no decision made on a private foundation. He was going to look at various ways to do charitable activities and he was going to research the idea of a foundation.
Q Okay. Going back to your conversation with David Waterman after the board meeting, I believe you said that you thought Deke asked about tax planning regarding the Kenner deal, is that correct?
A That's my recollection.
Q When did that occur?
A That was in, I think in October of '99.
Q Did there come a time when you were

introduced to Jenkins & Gilchrist?

A Yes.

Q When did that occur?

A There was a introduction made, well, the idea of, the firm was introduced by David Waterman. He mentioned Jenkins & Gilchrist and some of their credentials.

Q When did he do that?

A That was soon after, I believe he mentioned Jenkins & Gilchrist in that very first meeting in October. A subsequent meeting was arranged whereby I met Donna Guerin from Jenkins & Gilchrist.

Q And how did that meeting take place?

A I was in Chicago on business.

Q And when was this?

A This was also in the fall of 1999.

Q And you said you were in Chicago. Did you meet with Ms. Guerin in person or by phone?

A I met her in person.

Q And where did this occur?

A It occurred in my hotel.

Q And what was said at that time?

A We introduced ourselves and Donna Guerin talked generally about Jenkins & Gilchrist's qualifications, how many lawyers they had, that they,

she said that they had extensive tax planning expertise, developed a number of structures on behalf of taxpayers, and generally talked about the credentials of her firm.

Q Did you have any subsequent followup conversations with Ms. Guerin?

A Over the course of, yes, I did.

Q And when did they occur?

A Several conversations over the course of the ensuing six months.

Q Was that in person or by telephone?

A By telephone.

Q And where were you at the time?

A In my New York office.

Q And where was Ms. Guerin?

A At Jenkins & Gilchrist in Chicago.

Q And would you tell the Judge what Ms. Guerin described to you?

A She described to me --

MR. JOHNSON: Objection as to foundation. If we could specify which conversation we're talking about.

BY MR. KOLEK:

Q Let's talk about the first conversation that occurred after you met with Ms. Guerin in Chicago.

Did you have a subsequent telephone conversation with Ms. Guerin?

A Yes, I did.

Q About when did that telephone conversation occur?

A I would say in, perhaps in November of, I'm not sure that's exactly right, but in November of '99.

Q And was that in person or by telephone?

A No, by telephone.

Q And where were you at the time?

A In my New York office.

Q And where was Ms. Guerin?

A In Chicago.

Q And who initiated the call?

A Donna Guerin did.

Q And could you tell us what Ms. Guerin discussed with you?

A She began to discuss what she described as a proprietary technique for basis enhancing subject to a confidentiality agreement.

Q Did there come a time when you signed a confidentiality agreement?

A Yes.

MR. KOLEK: May I please have Plaintiff's Exhibit No. 34?

BY MR. KOLEK:
Q The front page of this exhibit is a fax sheet to, it looks like to David Waterman, is that correct?
A Yes.
Q Was this sent by you from your offices at North Channel?
A Yes, it was.
Q And were your offices at 445 Park Avenue at that time?
A Yes.
Q Did Ms. Guerin indicate that there would be any fee for any disclosures that would be made to you?
A No.
Q Directing your attention to paragraph 6 on page 2 --
A I see it.
Q Was there anything discussed with you at that time regarding any fees that might be payable to Jenkins & Gilchrist with respect to any tax opinions?
A No.
Q The last sentence of that, and I know it's a little bit difficult to read. Could you read the last sentence of paragraph 6?
A I'll try to. Undersigned will be solely

responsible for the evaluation of the financial, tax and accounting consequences of the structures and J&G shall not be deemed to have made any representations with respect thereto unless separately contracted for.

Q And what did you understand that sentence to mean?

A Well, I've been hearing from a lot of attorneys. I guess I'm the first nonattorney to be here, but, so in layman's terms I read that to believe that there would be a separate contract subsequently.

MR. KOLEK: May I have a moment, Your Honor?

THE COURT: Yes.

MR. KOLEK: Thank you.

BY MR. KOLEK:

Q Mr. Welles, following your execution of the confidentiality agreement, what happened?

A I received an executive summary of what's referred to as a basis enhancing derivative structure.

Q And who sent that to you?

A Jenkins & Gilchrist.

Q And who at Jenkins & Gilchrist?

A I think it was Donna Guerin.

Q And about when did you receive that?

A That was in December, December of '99.

Q I've given you a copy of what's been marked

as Plaintiff's Exhibit 111. There is a page, I think it's like 24 pages in. Is that a copy of the document that Ms. Guerin forwarded to you?

A Yes.

Q Thank you. Did Ms. Guerin tell you anything at that time with respect to how any fees might be imposed?

A No.

Q After Ms. Guerin sent you that one page disclosure, did you have any subsequent telephone conversations with her?

A Yes.

Q And when did that conversation occur? When did the first of those conversations occur?

A The first conversation that I recall was soon after I received this, and it was a conversation where she was just checking to make sure that I received the information?

Q And did you have any other conversations with her about this document?

A Yes.

Q And when did that occur?

A Not entirely sure of the chronology. I know that I had another conversation with her after the family meeting at which I presented this.

Q During the same period, were you in touch with Mr. Herpe?

A Yes.

Q And what were your discussions with Mr. Herpe about?

A About the formation of North Channel, the Cricket Island Foundation and Stobie Creek.

Q And did your conversations take place in person or by telephone?

A By telephone.

Q And where were you at the time?

A In New York.

Q And where was Mr. Herpe?

A In Chicago.

Q And who originated that call?

A I originated at least one, the one that, where I invited him to attend the family meeting.

Q And did you ask Mr. Herpe to do anything in connection with the family meeting?

A Yes, I asked him to help prepare the book that was presented.

Q Okay. Is that book what's been marked as Plaintiff's Exhibit, I think it's 111, that's in front of you?

A Yes.

Q Okay, let's turn to that meeting. When did that meeting occur?
A The meeting occurred on January 23rd and 24th of 2000.
Q And where did that meeting occur?
A At my parent's home in Vero Beach, Florida.
Q And who was present at that meeting?
A My parents, my brothers Deke, Peter and Chris, and my sister Ginny.
Q The booklet says that the meeting took place over January 23 and January 24, is that correct?
A Yes. I should also include that for various sessions, David Herpe and Dave Waterman attended.
Q Mr. Welles, let me show you what's been previously marked as Plaintiff's Exhibit 113. Is this an agenda that was prepared in connection with the family meeting?
A Yes, it is.
Q And who prepared this agenda?
A David Herpe.
Q And did you have any involvement with the preparation of this agenda?
A Yes.
Q Directing your attention to the first day that's listed there, Sunday. There's two Roman

numerals that are set forth. The first one is I, the Therma-Tru/Kenner Transaction, and the presenters were Deke and Jeff and it took place appropriately over cocktails, is that correct?

A Yes, it did.

Q Who was present at that session?

A At this session, my parents David and Georgia, brothers Deke, Peter and Chris and my sister Ginny.

Q And you and your brother Deke were the presenters, is that correct?

A Yes, we were.

Q And what did you tell your parents and your brothers and sister about the Therma-Tru/Kenner transaction?

A Well, there are various levels of knowledge about Kenner and the transaction amongst family members. I don't think anybody knew it intimately other than my father, Deke and I, but, and Deke and I both presented this. And part of the topic was, you know, who was Kenner & Company. And Deke explained what a private equity company was, what a leverage recap is, some of the benefits to the family, talked about some of the issues going forward with management of the combined business for a transaction to close.

I had been more involved in negotiating the price of the Kenner transaction, and as I had mentioned earlier, there had been a couple different bids. That was intentional because Deke was in the management at Therma-Tru and I was not and he would need to work closely with the Kenners, the Kenner individuals if the transaction closed going forward in managing the business. So there was a general conversation about leverage recaps, who was Kenner and some of the negotiations that had begun.

Q Okay. Now, the second topic on Sunday was View on Family Philanthropy. The presenters were Dave and Georgia and that took place over dinner, correct?

A Yes.

Q And who was present for dinner?

A The same group, my parents David and Georgia, Deke, Peter, Chris, Ginny and me.

Q And what was discussed at that time?

A This conversation was not around Therma-Tru or Kenner, but was more around some of my parent's interests, not only some of the charitable things they were involved with, for example, my father was heading a campaign for the Toledo Museum. But additionally, they had the notion that it would be a wonderful thing if we could do some charitable work together,

collectively as a family. And there was a lot of conversation around that.

Q Okay, let's move on to the next day, Monday. And there were apparently four segments to the discussions on Monday, is that correct?

A Yes.

Q And let's take the first one that says Family Office Concept. The presenter is Jeff and Dave Herpe and that took place at 8:30 in the morning on the 24th, is that correct?

A Yes.

Q And who was present for that particular session?

A The same group, my parents, Deke, Ginny, Peter, Chris and me, and in this session, David Herpe as well.

Q And what was discussed at that session?

A I talked about some of what I saw as the, what the family office concept is. As I mentioned earlier, I've been, had known professionally about family offices for at least 15 years at that point, but other family members might not be as familiar, so I talked about many of the benefits as I saw them. And also said that there, we had already established that my parents were interested in this and had given

David Herpe the mandate to move forward with the development of North Channel. Dave Herpe talked about the structures and how that would take place, the different entities and the structure of developing a family office.

Q And what was discussed with respect to a family office?

A The, Dave Herpe mentioned some of the reasons that they had formed prior family offices in the fashion that they did. For example, in our case the LLC which was called North Channel, acting as a manager of a second entity which aggregates family investments, which was later called Stobie Creek Investments LLC. And he talked about the reasons why that might make sense.

For example, North Channel would hire staff and I had discussed with the family that I had actually already had discussions with Bill Chung about coming to work for us in the family office. But to the extent that there were outside people involved, nonfamily members involved in the family office, that the structure made sense to have those people work for the manageable.

Q Let me just switch exhibits slightly. Going to the booklet, Plaintiff's Exhibit 111, page 10, can

you explain what this particular diagram reflects?

A Yes. This was the recommendation that David Herpe made about that structure and it was a slide that he prepared, and it proposed North Channel LLC as the manager responsible for investment management. And that investment management would be a separate entity, a separate LLC, and foundation administration so that presumably would be the charitable foundation where North Channel provides various services for the charitable foundation. And it showed some of the functions of North Channel. For example, the custody recordkeeping, estate planning and compliance.

Q If you'll turn to the next page, page 11, it's called, I think, Pooled Investment Vehicle.

A Yes.

Q Can you explain that chart for us?

A Yes. This again was an exhibit that Dave prepared and it shows the way that he contemplated the pooled investment vehicle would work. So the family members and trusts would contribute securities into what was Welles, and then subsequently Quark and we, ultimately it was called Stobie Creek Investments LLC.

And on the other side, North Channel LLC is shown as the manager of the LLC and North Channel provides the performance reporting, the asset

allocation and monitoring. And then within the, what was at that time called Welles, subsequently Quark Investments LLC, are various asset classes and those were described as, well, those were different investment, types of investments. For example, equities, bonds, cash, et cetera, et cetera, alternative investments.

Q Were there any discussions with respect to the benefits of a family office?

A Yes, yes, there were.

Q Directing your attention to page eight, which is two in front of that, I think that reads, Benefits of Family Office, is that correct?

A Yes.

Q Were those some of the benefits that were described?

A Yeah, this was an exhibit that I prepared and included what I viewed as some of the benefits of a family office.

Q Okay, let's go back to the one page agenda, Plaintiff's Exhibit 114. We've talked about Sunday, items I and II, and Monday's topic I, Family Office Concept. II is Private Family Foundation on Monday, January 24, and the presenters are Jeff and Dave Herpe and that took place at 10:45 a.m, is that correct?

A Yes.
Q Who was present at this particular session?
A At the session present were my parents, David and Georgia, Deke, Ginny, Peter, Chris. I was present as was David Herpe.
Q And what was discussed at this particular session?
A The, Dave reported on the interest that had been expressed by my parents going back to the meeting in Ohio about developing an idea for a collective family philanthropy. And his recommendation, that that be in the form of a private family foundation. Dave was really the presenter at this. I think I talked a little bit about the history of how I had been involved in the earlier conversations. But he talked about the benefits of incorporating, having a, family members as the directors of the foundation, mechanics of how that happens, various issues around nonprofits, generally.
Q And were there any conclusions that were reached as a result of the presentations during the morning session of the Welles family meeting?
A There were a couple decisions. There was a decision to move forward to, with the pooled investment vehicle.

Q And that would be Stobie Creek?

A Yes, and there was a second decision to develop and establish a family foundation.

MR. KOLEK: Your Honor, we've been going, I think, about an hour and fifteen minutes. Do you think we might be able to take a small break?

THE COURT: Certainly, how much time?

MR. KOLEK: Ten minutes.

THE COURT: Okay. We'll be in recess until five minutes to 4:00.

MR. KOLEK: Thank you.

(Off the record.)

THE COURT: We had an off the record conversation about changing, effective tomorrow, the reporting services from Heritage, with which the Court of Federal Claims has a contract, to Merrill Legal Solutions at the request of Plaintiffs, and Defendant has kindly not lodged an objection. Plaintiffs are accommodating this transfer by assuring the Court will be delivered within the 30 day requirement after the trial is concluded consistent with an order that I'll enter, the official transcript of proceedings, hardcopy, and a courtesy hardcopy to be sent to my law clerk, Mr. Tal Kedem, for our chambers use.

In addition, the reporter, Merrill Legal

Solutions, will be responsible for receiving and shipping to the Clerk of the Court all documents that have been admitted as exhibits. It will be counsel's responsibility to make sure that Ms. Conley at the conclusion of the proceedings, has received all these exhibits.

Finally, the Court requires for its own use one CD of all the proceedings and when everything is finished, I'll make that copy available in the Clerk's office. I don't know what arrangements the government has made for a CD. The purpose will be for neither the Court's purposes nor the government's purposes will the cost of getting official and work copies in hard or digital form be increased by virtue of this change. And we all agree to that. Everyone has nodded.

So as of tomorrow, Mr. Holguin will not be required to make an appearance as reporter for Heritage. Now we may continue.

MR. KOLEK: Thank you, Your Honor.

BY MR. KOLEK:

Q I think at the time we took our break, we had just finished the morning session. Did Mr. Herpe stay with your group for the luncheon session?

A I'm not certain. I know that he left before

the afternoon's session to return to Chicago.

Q Okay, and at the lunch session, it says there was a discussion and questions, and that started at 12:15. What was discussed?

A I don't remember much about that lunch session.

Q Okay. Mr. Welles, let me show you a copy of Plaintiff's Exhibit 117. Are you familiar with this document?

A Yes, I am.

Q What is Plaintiff's Exhibit 117?

A This is a summary of the events of the Vero Beach meeting. This only includes January 24th because it was prepared by David Herpe for the sessions that he attended.

Q And there is a segment on page 1 of this report captioned, Family Office.

A Yes.

Q And I'll direct your attention to the first full paragraph.

A I see it.

Q Does what's set forth there accurately describe what took place at the meeting?

A Yes, it does.

Q Directing your attention to the second

paragraph, it says it was agreed that start-up expenses would be funded at this time with a revolving loan of $750,000 from the Welles family trust, do you see that?

A That's, yes, I do.

Q Did that take place?

A Yes, it did.

Q Was that documented with a note of any type?

A Not that I'm aware of.

Q Why is that?

A I thought, I believe it just wasn't felt that it was necessary. It was a decision made amongst the family. It was the, the purpose of this was to, for me to have sufficient funds to purchase office equipment, computers, enter into a lease agreement and I don't think it was felt that it needed to be a formal agreement.

Q Okay. Following the caption with respect to the family office, there's a caption that says, Pooled Investment Vehicle.

A Yes.

Q Directing your attention to the last paragraph of that section on page 2, it says it was agreed by the family that pooled investment vehicle LLC would be called Port Investments LLC. The LLC

will be established in sufficient time to be available to receive proceeds from the Therma-Tru sale, is that correct?

A Yes.

Q And what happened to Port Investments LLC?

A Port Investments LLC, David Herpe went back, researched, determined that Port Investments, the actual name, was already used. He reported that to me and asked if we had another name. And a name that was chosen, I believe by Ginny, was Stobie Creek Investments LLC, which is a name that means little to anybody else but a lot to our family because it's a place right near our island in Canada.

Q Okay, and the next discussion is with respect to a private foundation.

A Yes.

Q The second paragraph said that the family agreed to name the foundation the Cricket Foundation. Does that assume that there was a decision made to establish a foundation?

A Yes, there was.

Q And now it's called the Cricket Foundation. It ultimately became the Cricket Island Foundation, is that correct?

A Yes, yes.

Q The first grant request we got was from a cricket team that was trying to fund their road trip.
A Okay. Thank you, Mr. Welles. Okay, I'd like to turn to the afternoon session of that agenda. Let's go back to Plaintiff's Exhibit 113. Following lunch, it appears that there was a discussion, III, says Family Philosophy. David and Georgia were the presenters that took place at 2:00. Who was present for that session, Mr. Welles?
A Present for the session were my parents, David and Georgia, my brothers, Deke, Peter and Chris, and my sister Ginny.
Q Okay, and what was discussed at that session?
A Well, it was led, as the agenda suggests, by my parents and family ethic, some different ideas around fairness and equity, and I think it was really the earliest attempt that we made to establish a mission for the foundation. And that mission was ultimately predicated on certain family values and my parents were discussing what they viewed as the family values.
Q IV of that has a caption of Capital Gains Strategies and then it lists Dave Waterman at 4:15. Who was present for that particular session?

A For this session, my parents David and Georgia, my brothers Deke, Peter, Chris, my sister Ginny, and I do know that Deke was in and out of this meeting periodically because he had some Therma-Tru business to attend to.

Q Mr. Welles, why was David Waterman at the meeting?

A He was at the meeting on my invitation specifically to discuss capital gain strategies.

Q And what did Mr. Waterman tell the family?

A He told the family about the basis enhancing structure that he was familiar with that other clients of his firm had engaged in, and he described that strategy.

Q And what did he describe to you?

A He described that there were a number of elements that had to be satisfied in order for the strategy to work. I think he opined that he thought that he understood from several of the attorneys at his firm that the strategy worked and I think there was more to it, but I think he gave a fairly thorough analysis.

Q And how long did his presentation last, do you recall?

A I'm going to guess it was an hour and-a-half

although I don't have a good memory of that.

Q And did anybody have any questions?

A There were a number of questions.

Q And who asked what questions?

A The, well, it's like my family for everybody to ask questions. I don't remember a lot of them. There was one question about, that I do recall, about the downside of the strategy not working.

Q What did Mr. Waterman tell you?

A Then he talked about the payment of capital gains if the basis wasn't successfully stepped up, that there would be substantial capital gains and interest and talked about penalties.

Q And what was the status of the transaction involving Kenner and Therma-Tru at this time?

A It was being negotiated. It was well underway.

Q Was there any finality with respect to the transaction?

A No.

Q Were there any other questions that were raised at that meeting?

A There was a question that I remember that my sister asked and that was would you do it?

Q And who did she ask that of?

A To Dave Waterman.
Q And what did Mr. Waterman say?
A He said yes I would.
Q Did you know at the Vero Beach meeting what type of option or options might be involved in this basis enhancing strategy?
THE COURT: Stop. You haven't elicited from the witness that when Mr. Waterman presented it he discussed options.
MR. KOLEK: Oh, I'm sorry.
BY MR. KOLEK:
Q Mr. Welles, I'd ask you to turn back to Plaintiff's Exhibit 111, I think 24 pages in. Did Mr. Waterman give any discussion with respect to this Jenkins & Gilchrist executive summary?
A Yes, he talked about every aspect of it.
Q Directing your attention to item number one, what was involved in this particular step?
A What was involved here was the taxpayer entering into a series of foreign currency option trades, and David Waterman did discuss the option aspect of the strategy.
Q And what did Mr. Waterman tell you about that, if you recall?
A I recall him being fairly modest or

dismissive about his own financial expertise around this, but that it was an important element of the structure.

Q Was there any discussion of the type of particular foreign option currency trades that might be engaged in?

A No.

THE COURT: Was there a discussion with Mr. Waterman resulting in questions or otherwise, by anyone when you were there of the investment opportunities, if any, to be made with respect to this transaction involving foreign currency options?

THE WITNESS: Could you repeat the question?

THE COURT: Was there any discussion when you were there that you heard with anybody in response to a question to Mr. Waterman or otherwise about any financial aspects, including advantages, to the foreign currency trading, foreign option exchange vehicles?

THE WITNESS: There were questions some of which were directed at me. Dave Waterman knew that I was involved in foreign currency options, and I do remember and some family members, Dave saying that he was deferring somewhat to me to choose the specific foreign currency options to develop a profitable

trade.

BY MR. KOLEK:

Q And what did you understand by profitable trade?

A That there was a reasonable expectation of earning a profit on the currency transaction, on the options transaction.

Q Was there any conclusion reached at the end of this particular session that's listed at IV?

A Was there a conclusion reached?

Q Yes. Well, what was decided?

A What was decided was that there was a general level of, I guess, enthusiasm around pursuing the strategy that Dave presented and that each of us was going to make a decision around that. I, in particular, was going to begin looking at some specific currency options trades.

Q Why was there enthusiasm?

A I think in part because it got a strong endorsement from Dave. I think there was also enthusiasm, eyes lit up somewhat when Dave talked about the chance for a very significant profit. People were talking about or a comment was made, and I don't remember who made it, about wouldn't it be great if we had that much more money that we could establish

a foundation with.

Q And what did Mr. Waterman say about the possibility of that large profit?

A My recollection is he said it was a very small, if he had to handicap it, it was a small opportunity.

Q Did Mr. Waterman say anything further about the profit potential of these types of trades?

A I believe he said that there was, that he understood that there was profit potential in some of the transactions that his firm had, that other partners in his firm had engaged in.

Q Okay. What did you do following the Vero Beach meeting?

A We all returned to our respective homes, continued work on the Kenner transaction and I began to do some diligence on the options transactions.

Q What did you do?

A I made a series of phone calls to people that I knew in the business to get some ideas on some different currencies we might enter into.

Q When did you first contact David Parse?

A I contacted David Parse first, I believe it was in February, perhaps late February.

Q How did that conversation occur?

A I was referred to him by Donna Guerin.
Q When did you have that conversation with Ms. Guerin?
A At that same timeframe. She called me. I think her interest was she knew that we were discussing this at the Vero Beach meeting.
Q Where were you at the time of this call?
A I was in New York.
Q And where was she?
A At Jenkins & Gilchrist in Chicago.
Q And was anybody else on the telephone call with you?
A Not that I recall.
Q And what did Ms. Guerin say to you?
A She asked how did it go. I reported that there was general enthusiasm around the presentation. I think what she was trying to do at that point was to, you know, motivate us to move forward and she said if you want to learn more, you should talk to David Parse at Deutsche Bank.
Q And is this the same David Parse that you knew from your days at Goldman Sachs?
A Yes.
Q And did you in fact contact Mr. Parse?
A Yes, I called him.

Q When did that occur?
A This was in late February.
Q And what did you tell Mr. Parse?
A I told him that we, I said hello. We went through some pleasantries because we did know each other and told him that I had gotten his number from Donna Guerin, that she suggested I call. And he began to talk about how they had done a number of transactions with Jenkins & Gilchrist.
Q And what did Mr. Parse tell you about the investment program?
A He said that it involved some things that I knew. It involved foreign currency options, began to give me some ideas and what, around what those options might be.
Q Did you have any additional meetings with your family following the Vero Beach meeting?
A I had a series of telephone calls with family members.
Q When did those calls occur?
A Those occurred, I believe, in early March.
Q And were these separate calls with your family members?
A Yes, they were.
Q And who did you speak with?

A I spoke with my parents, I think together. I spoke with my brother Deke, my brother Peter, my brother Chris and my sister Ginny.
Q And these were separate conversations?
A Yes.
Q Was the substance of each conversation about the same?
A Yes, it was.
Q And what did you tell your parents or your family in these separate conversations?
A I told them that I had been doing some work on the foreign currency options with the idea of finding a profitable trade, and that they needed, or suggested that they needed to make a decision, that I wasn't going to move forward with this until there was some consensus amongst the entire family to move forward.
Q Okay. Did you have followup conversations with Mr. Parse?
A Yes.
Q When did that occur?
A Same timeframe. There were a couple conversations in March.
Q And were they by telephone or in person?
A By telephone.

Q And you were in New York?
A Yes.
Q And Mr. Parse was in Chicago?
A Yes, he was.
Q And what was said?
A There was more discussion of the, of some research recommendations around currencies. David Parse made some comments which, around the legal aspects of this strategy, which, and I didn't view him as a lawyer, but he made some comments around that. Other, a series of conversations and they got more specific around some different currency ideas.
Q Did you speak with anybody else?
A Yes.
Q Who did you speak with?
A I spoke with Goldman Sachs.
Q Who at Goldman Sachs?
A Neal Breslin (phonetic).
Q And who is Neal Breslin? I think you mentioned Mr. Breslin before.
A Yes, Neal Breslin was the person then assigned to us, our representative at Goldman.
Q And when did that conversation occur?
A In March of 2000.
Q And was that in person or by telephone?

A By telephone.
Q And where were you?
A I was at my desk in New York.
Q And Mr. Breslin?
A Was at Goldman Sachs in New York.
Q And was there anybody else on the telephone call?
A Yes, there was. He conferenced in a foreign currency options trader.
Q And what was discussed?
A Various currency crosses. There were a number of different ideas that were suggested. There were also a number of different volatility levels of currencies.
Q Did you take any notes of that conversation?
A Yes, I did.
Q May I show you a copy of a document that I believe was provided by you to the government in discovery?
A Sure.
MR. KOLEK: May I please have 154?
MR. JOHNSON: I'm sorry, Mr. Kolek, what number?
MR. KOLEK: Plaintiff's Exhibit 154. For the record, I've just handed Mr. Johnson the original

of these notes.

BY MR. KOLEK:

Q Mr. Welles, is this a copy of notes that you took contemporaneously with respect to your conversation with Mr. Breslin?

A Yes, it is.

Q Where did you maintain these notes?

A I kept it in my, at my desk.

Q Was this normally part of the notes that you would keep with respect to business transactions in which you engaged?

A Yes.

MR. KOLEK: Your Honor, we move to the admission of these documents --

MR. JOHNSON: Your Honor, I'm sorry, Mr. Kolek, a couple of issues. One, the exhibit that's marked PX 154 appears to have two pages attached to it which are not notes, dated March 17, '05. So I'm wondering if that's a mistake or whether they were intended to be included in the exhibit.

And then the other issue I have is that the notes, I guess I'd like some foundation or clarification as to which notes we're talking about. The originals appear to be on two different types of paper and that's clear also from the copies. So I

think we need some foundation as to which notes we're talking about and when these were purportedly taken and whether they're two separate sets of notes. And also, I think, Your Honor, we had a hearsay objection in our filed objections.

THE COURT: I've got a lot of documents to keep track of and I'm going to have to charge you with making me aware of your filed objections. They're not for purposes of trial. They haven't been registered. Please use them as your own checklists. You'll have to raise objections as each document is tendered.

I think you'll have to lay a better foundation. These documents evidently were made at a different time by the different types of paper unless you can establish otherwise with this witness. And the last two pages, I don't see those dates on them, but they don't, these are printouts. So unless you want to excise the printouts, let's start with the first, query the witness about the first two pages of handwritten notes and then the next two pages of handwritten notes.

BY MR. KOLEK:

Q Mr. Welles, let's take the first page of handwritten notes. What does that reflect?

A What this reflects is some notes that I took

while on the telephone with, GS stands for Goldman Sachs.

Q And when did this telephone call occur?

A This telephone call occurred in March of 2000.

Q And with whom did you speak with at Goldman Sachs?

A I spoke with Neal Breslin at Goldman Sachs. I also spoke with a trader at Goldman Sachs.

Q Do you know the name of the trader at Goldman Sachs?

A No, I don't.

Q And where did you maintain these particular notes, Mr. Welles?

A I kept them at my desk.

Q And were these notes maintained by you consistently from the time that you made them?

A Yes.

THE COURT: I misspoke and I hope I didn't confuse the record. It would appear that the first three pages are part of the same note-taking. If it's the witness's testimony that the next two pages are related and were taken at the same time, you'll have to substantiate with some information on there that would allow us to link it.

BY MR. KOLEK:

Q Mr. Welles, would you take a look at the second page, the second page of notes?

A Yes.

Q What does that reflect?

A The second page reflects a different telephone conversation, again, that I made from my desk in New York.

Q And with whom did you speak?

A With David Parse at Deutsche Bank.

Q And when did this call take place?

A This call took place, I don't have a specific date here, but it was also from March of 2000.

Q And where were you at the time this call took place?

A I was at my desk in New York.

Q And where was Mr. Parse?

A At Deutsche Bank in Chicago.

Q And who originated that call?

A I did.

Q And do these notes accurately reflect the substance of your conversation with him?

A Yes, they do.

THE COURT: Tell us what about them triggers

in your mind that this is a different telephone conversation with Mr. Parse than page 1, which is a telephone conversation with Mr. Breslin. I see page 1 has GS for Goldman Sachs. What does page 2 have that tells me it's --

THE WITNESS: Well, I wrote a line when I completed the conversation with Goldman Sachs and below it I wrote BT/Alex Brown. That was, actually, stood for Bankers Trust/Alex Brown, which was the entity that became Deutsche Bank. So these were the, a subsequent conversation with David Parse.

THE COURT: Beginning at the bottom of that page.

THE WITNESS: Yes, beginning at the bottom of that page, beginning at the bottom of page 1.

BY MR. KOLEK:

Q And I note on page 2 there is a jagged line that appears across the page. Does that signify anything?

A Yes, that again signaled the end of a conversation, the end of the conversation with David Parse at Deutsche Bank.

Q And what is below that? What does that signify?

A That's a new conversation.

Q With whom was that conversation?
A That conversation was with Frank Edwards.
Q And who's Mr. Frank Edwards?
A He was the person that was assigned to us from Morgan Stanley.
Q Was this a telephone conversation?
A Yes, it was.
Q And when did this telephone conversation occur?
A In March of 2000.
Q And who participated in that call?
A I was on the phone with Frank Edwards and also a trader from Morgan Stanley.
Q And where were you at the time?
A At my desk in New York.
Q And where was Mr. Edwards at the time?
A At Morgan Stanley in New York.
Q If you'll turn to page 3 of that. I think it's marked JFW 1303, is that correct?
A Yes.
Q And what does this page reflect?
A This is the, this is a carryover from the previous page, so same conversation with Frank Edwards and then the restaurant choice that day.
Q Okay.

A And then the dotted, dashed line indicates the end of that conversation and another conversation, telephone conversation.

Q This is on page 3?

A Yes, it is.

THE COURT: I'm sorry, the first conversation was, would you refresh me?

THE WITNESS: The top of the page continues a conversation with Frank Edwards at Morgan Stanley.

THE COURT: All right, thanks. And then we have lunch?

THE WITNESS: Then we have lunch.

THE COURT: And then what?

THE WITNESS: And then we have another conversation with David Parse.

BY MR. KOLEK:

Q And when did this conversation take place?

A In March of 2000.

Q And where were you at the time this call took place?

A I was at my desk in New York.

Q And where was Mr. Parse?

A He was at Deutsche Bank in Chicago.

Q And was there anybody else on the telephone call?

A No.

Q Now there's another page that follows. Can you tell us what these notes reflect?

A Yes. This is another conversation with David Parse at Deutsche Bank.

Q And when did this call take place, Mr. Welles?

A In March of 2000.

Q And this was a telephone call?

A Yes.

Q And where were you at the time?

A At my desk in New York.

Q And where was Mr. Parse at the time?

A At Deutsche Bank in Chicago.

Q And did you place the call or did Mr. Parse place the call?

A I placed the call.

Q And was there anybody else on the call?

A Not that I remember.

Q And do these notes accurately reflect the sum and substance of your, or the notes that you took at the time you had that conversation with Mr. Parse?

A Yes.

Q And where did you maintain these particular notes?

A I kept them on my desk.
Q And were these kept together with the other notes that you had taken?
A Yes, they were all in a binder.
Q Okay, let me draw your attention to the next page, which is JFW 1305. Can you tell us what those notes reflect?
A Yes. This is a conversation, I believe it's the continuation of a conversation with David Parse at Deutsche Bank.
Q So the page that's numbered JFW 1304 and the page that's numbered 1305 actually constitute a continuation of one conversation?
A I believe so, yes.
Q And let me turn your attention to the next page, which is JFW 1306.
A Let me just say that there was, at some point I'd, rather than using a dashed line I used stars to indicate that I had completed a conversation and started another one.
Q Thank you, so over here on the page that's marked JFW 1305 --
A Yes.
Q -- there are a series of stars across.
A Yes.

Q Does that reflect that there was another telephone conversation?
A Yes, it does.
Q With whom was this telephone conversation?
A David Parse also.
Q And when did this telephone conversation take place?
A In March of 2000.
Q And was this by telephone or in person?
A By telephone.
Q And who was on the line besides Mr. Parse and you?
A Nobody.
Q And where were you when this call took place?
A I was at my desk in New York.
Q And where was Mr. Parse?
A At Deutsche Bank in Chicago.
Q Okay. Directing your attention to the next page, JFW 1306, and let's take the next two pages together, JFW 1306 and JFW 1307. What are these documents, Mr. Welles?
A These are printouts. They're a printed page from a Bloomberg screen.
Q And when were these documents prepared?

A They were prepared in March of 2005.
Q And why were they prepared in March of 2005?
A I was at that time, I was looking back, if you'll look at the top of the page, I was trying to determine the range of the Euro during the year, during the period of March 1, 2000 through April 28th, 2000.
Q And why were these particular pages associated with the prior notes?
A I had them all in the same file.
Q And all of these notes were produced to the government pursuant to subpoena, is that correct?
A Yes, they were.
Q And all of these notes were maintained regularly by you at your desk, is that correct?
A Yes.
Q In the normal course of business?
A Yes.
MR. KOLEK: Your Honor, we would move for the admission of Plaintiff's Exhibit 154.
MR. JOHNSON: Your Honor, given his testimony that these were created at a different time, I don't know if it would be confusing to have them as one exhibit or if it would be less confusing to separate them into two exhibits. And by that I mean

\he separation of the printouts from the notes. These were purportedly generated five years later from the notes. But as to the notes themselves, I have no objection, Your Honor.

THE COURT: I will admit a seven page document understanding the last two pages are dated 2005. I don't think there will be any confusion on the record.

(The document referred to was marked for identification as Plaintiff's Exhibit No. 154 and received in evidence.)

BY MR. KOLEK:

Q Mr. Welles, directing your attention to the first page of Plaintiff's Exhibit 154, and in particular the first portion of that page that begins with the initials GS and going through the line that's drawn across the bottom, or towards about two-thirds of the way down.

A Yes.

Q What do these notes reflect?

A As I indicated, these notes reflect a conversation. GS stands for Goldman Sachs, and they were notes that I took in a conversation with Neal Breslin and a trader at Goldman in soliciting their

views on various foreign currency option crosses.

Q Mr. Welles, I have a difficult time reading your writing, quite frankly. Could you explain to us what is set forth there?

A I have a difficult time too, but I'll, bear with me. The first line, if you want me to go through it that way, I'd be happy to.

Q Please.

A That says go w/, and that means go with highest volatility cross.

Q And what did that mean?

A That's actually what I was asking of, that was my own comment. We were trying to determine high-volatility currency crosses.

Q Okay, and then what's set forth below that?

A Below that says euro/dollar and notation, one week, 14 percent, one month, 13 percent.

Q And what does that mean, Mr. Welles?

A This refers to the euro/dollar currency cross rate for that period in March of 2000, and that's a historical volatility level, a 15-percent historical volatility for one week and 13-3/4-percent volatility in the one-month period.

Q Could you explain to us what that means?

A Yes.

THE COURT: Is it 14 or 15 percent?

THE WITNESS: I believe what I, am I looking here at the euro/dollar?

THE COURT: Right.

THE WITNESS: One week is 14 percent, one month 13 percent.

THE COURT: Correct.

THE WITNESS: Excuse me. Yes, what I mean by this is that options are priced based on historic volatility, so the movement of a currency relative to another currency, historically over some period of time, and option pricing of volatilities are an important determinant in how an option price would be derived. So when you ask a trader and he's able to get the information on current, on volatility levels, that will give you an idea of how rich, how expensively priced an option will be or how cheaply it will be priced.

BY MR. KOLEK:

Q Is it that the higher the volatility, the more expensive or the less expensive?

A The higher volatility would be, would increase the chances if the higher volatility increases, would increase the probability that you had a trade that ends up in the money.

THE COURT: I believe he was asking how expensive they were.

THE WITNESS: Oh, how expensive? More volatility would be more expensive. It would be richer.

BY MR. KOLEK:

Q The next one that's listed, could you tell us what that is?

A Yes, that is yen/dollar and goes on to indicate a one week volatility of 15 percent and a one month volatility of 13.75 percent.

Q Why were you looking at only one week and one month periods?

A That's often the way that volatilities are expressed. That's the convention.

Q And what about the next item that's listed there?

A The next item is sterling/euro and the notation indicates 13-1/2 percent volatility for one week and 11.4 percent volatility for one month.

Q And what about the next?

A The next one is euro/yen, which is the currency cross of the euro versus the yen. That indicates a one week volatility of 20 percent and a one month volatility of 18.5 percent.

Q What does the next notation refer to?
A The next notation says NASDAQ/euro and below that is --
Q Is the NASDAQ a currency?
A No, the NASDAQ is the domestic over-the-counter market, the NASDAQ market.
Q And what does that refer to?
A Well, the note below it actually explains it. There was a feeling at the time, at least in the impression of Goldman Sachs, that as the NASDAQ weakens, the euro strengthens.
Q And what did that mean to you?
A Well, this is, again, this is not a currency, but NASDAQ, because it's a domestic stock market, it has dollar denominated stocks in it. As the NASDAQ weakens, which means that domestic stocks are for sale, there appear to be a correlation where the euro was strengthening. This was important at this time because in March, after an enormous period of run up in the NASDAQ market, the air was coming out of the bubble or the bubble was bursting, one way or another, and the domestic stock market was getting very volatile.
Q And what would that indicate?
A In this case, if this point of view was

correct, that you would see significant strengthening in the euro as the NASDAQ market continued to sell off.

Q And what would that mean with respect to putting on any type of trade with respect to the euro?

A That if you entered a bullish euro trade that you would see volatility and strength in the European currency.

Q Okay, and what is the last, can you help us with your writing there?

A Yeah, that says BOJ. It's hard to read also, but BOJ survey on Monday.

Q And what does that refer to?

A That refers to the Bank of Japan, survey was to be announced the forthcoming Monday.

Q And what did that mean?

A Well, the Bank of Japan like other central banks would report on GDP growth on the current account balance on trade balance, so this, and this could have been a manufacturing survey, I don't know. But they also report on manufacturing surveys and those were all things that affect the price of a currency.

Q And what's the last line prior to the line that's drawn all the way across?

A That says it expects yen weakness versus dollar.

Q Okay. Turning your attention now to the next segment, I think you referred to this as your notes of a conversation with BT/Alex Brown, is that correct?

A Yes.

Q Who did you speak with?

A I spoke with David Parse.

Q And again, this was approximately when?

A This was in, I believe, in late March 2000.

Q And what do these notes reflect?

A They are notes I took in my conversation with David Parse.

Q And let's go through them, take April 17th.

A That says April 17th or 18th expiration.

Q And what does that mean?

A The, we were beginning at this point to talk about specific expiration for options contracts and those were dates that were, that I wrote down.

Q So if I understand correctly, before having conversations with Mr. Parse regarding specific trades, you had spoken with someone at Goldman Sachs, with Mr. Breslin?

A Yes, I had.

Q Okay. In that BT/Alex Brown section, what does your writing next say?

A That says MKT, my notation for market, looking for euro to weaken. Only euro buyers are short-covering.

Q And what does that mean?

A Well, priced into the market was the expectation that the euro would weaken relative to other currencies, typically the dollar. But because people, because traders had been short the euro, they would need to short-cover. In other words, they would need to buy back those positions and that would be an offset. That would actually lead to strength of the euro as people bought back short-covering positions.

Q Okay, and what does the next line indicate?

THE COURT: I'm sorry, what was the last word on that line?

THE WITNESS: Short-covering.

THE COURT: Covering.

A The next line says outright win trade: sell euro or sell Swiss franc.

BY MR. KOLEK:

Q And what does that refer to?

A As we were talking about different options, types of trades, there was the notation, the

conversation was about an outright win trade. In other words, trying to make a lot of money on the trade. And below that, actually is another notation which is the opposite, which is a mitigate loss trade.

Q And what does that mean?

A I think that's referring there to some kind of hedge transaction.

Q Okay. Turning to the next page, which I think is marked JFW 1302, could you tell us what is provided there?

A Yes, my notes say valid for profit motive, and next to that, Tax Court said in Allied Signal.

Q And what does that refer to?

A These were some notes I took with the same conversation with David Parse, and he was telling me some things that he knew or thought around the tax treatment of, for some case law. And as I said earlier, I was not relying on him for legal opinions.

Q Okay, and then what does the next line say?

A Same terms, same contracts, same strike prices.

Q Okay, and then what did that mean?

A This was again talking to, about the structure of the, of options contracts whereby they would have the same terms, meaning the same expiration

date, same contract so that the contracts would be exactly the same, and the same strike prices which would be the strike price determination.

Q All right. What is, the next one, it looks to be euro spot .9, is that 9610?

A Yes, it is.

Q And what does that refer to?

A I was writing down where the spot, where the euro was trading. The spot was, at that very time that I was speaking with David Parse, was at .9610.

Q And apparently, it looks to me, it says bullish euro .9880, and then the next line bearish euro .9375. What does that refer to?

A Yeah, well, those were different levels that if you, that were you to take a bullish euro position, you would look for appreciation to that level, to .9880. If you were bearish on the euro, if you were looking for the euro to weaken, you would use a strike price of .9375.

Q And how would those strike prices be determined?

A From option pricing models.

Q And then the next line, SFR, what does that refer to? It says SFR-spot 1.657, is that correct, or is that 97?

A Yeah, that's the Swiss franc and that was the spot rate at the time that I wrote this down.

Q Okay, and then the next two lines you're going to have to help me.

A Well, this was, similarly to the bullish euro and bearish euro, this is bullish Swiss frank, 1.6135. And below that it says bearish SFR, which is bearish Swiss franc. If you were to take a negative view or a weakening the Swiss anticipating a move to .16975.

Q So is this that there were two different types of transactions? One could be a bullish euro and a bearish or a bullish Swiss franc? What was --

THE COURT: I think he can explain what they're talking about in that transaction.

BY MR. KOLEK:

Q Okay. What was meant by this?

A This was referring to a spread kind of trade whereby you were taking different and multiple options positions. And the top notation would be a spread whereby you might take a, if you're looking, as I said, for appreciation in the euro to a strike price of 9.880, and a similar type of spread on the Swiss franc is noted below that.

Q Was there any determination at this time

whether or not these were trades that you might put out?

A Not yet, no.

Q And what follows next on that segment?

A Below that says expiration 10:00 o'clock EST 4/17.

Q And what did that mean?

A And then I, you see where I actually circled the notation above and drew a line to it. What that would mean was we were now talking about some very specific expiration date of contracts, and that would be expiration at 10:00 Eastern Standard Time on April 17th.

Q And what about the next line then after that?

A Next line below that says 1.6135 or lower you win, anything higher you lose.

Q What does that refer to?

A That refers to, in the case of the options circled there, the bullish Swiss, that at 1.6135 or lower, you actually would finish in the money. Your option would expire with value and if not, if it was higher than that strike price, your option would expire worthless.

Q All right. There is another jagged line or

there's a, I guess, a line segment going across, is that correct?

A Yes, there is.

Q What is below there?

A Well, this is a new conversation --

Q When did this conversation occur?

A At, very close to the same time, within, in late of March of 2000.

Q Was this before or after your conversation with Mr. Parse?

A This was after.

Q And where were you at the time?

A I was at my desk in New York.

Q And who did you speak with at Morgan Stanley?

A With Frank Edwards and with a trader on his foreign currency options desk.

Q And do these notes reflect what you discussed?

A Yes, they do.

Q And what did you discuss?

A Discussed ideas that they might generate for profitable currency cross trades.

Q And can you describe what your notes state?

A Yeah, these aren't as complete, but this one

shows the euro/yen cross.

Q And what does that mean?

A They were recommending or suggested that there might be a profitable trade in the euro versus the Japanese yen.

Q Okay, and then can you explain what your notes refer to, though, the 4/17?

A This, the 4/17 was a termination date, expiration date that we were considering, meaning 4/17 being April 17th of 2000.

Q And what follows on that line?

A What follows there is 4.2MM, that's 4.2 million payout to digital. That's what I wrote.

Q And below that?

A .9625 strike, and that's the symbol for yen, but I think, my recollection is I was talking about the euro, not the yen, at this point.

Q And what were you intending by these notes?

A I was just trying to record, because I didn't trust my memory, I was trying to record some different ideas that, around as we got closer to number 1, some recommendations around what might be profitable currency cross trades. And as we got closer to a transaction, the actual terms.

Q What does the term "digital" refer to?

A It's a class of, what you would refer to as an exotic option.

Q And what is a digital option?

A It's usually a European style option exercisable only at maturity. Exotic options are, there's a plain vanilla option, and exotic option is often categorized as anything other than a plain vanilla option.

Q Were you also talking about digital options with Mr. Parse?

A Yes.

Q And were you also talking about digital options with Goldman Sachs?

A Yes.

Q Below where it says .9625 strike, and then you said that that was a yen symbol?

A Yes.

Q What is the next reference there?

A The next reference is talking about the euro or Swiss, sell euro or Swiss. And below that shows .956 and below that .93 strike.

Q And what does that mean?

A This was again, hard to exactly re-create, but these were some more ideas about where to sell, at what levels, strike prices, to sell either euro

currency options or Swiss franc currency options.

Q Okay. Turning to the next page, which is marked JFW 1303.

A Yes.

Q Is this still a continuation of your conversation with, I think, you said Mr. Edwards and --

A Yes.

Q -- the trader at Morgan Stanley?

A Yes.

Q And what do these notes refer to?

A That first line says a long euro versus dollar and below it it says, support at .95.

Q And what does that mean?

A Well, that's a research point of view, that if you were long the euro versus the dollar looking for appreciation, their view was at this .95 was a technical support level.

Q And what does the next line refer to?

A That's the address of Il Menestrello. I think we were getting hungry at that time.

Q And what is Il Menestrello?

A That's an excellent Italian restaurant.

Q Now below that, again, you have that dotted line going across.

A Yeah, indicating a new conversation.
Q And with whom is this telephone conversation?
A This is with David Parse?
Q And when did this telephone conversation take place?
A In late March of 2000.
Q Was this after your conversation with Mr. Edwards at Morgan Stanley?
A Yes.
Q And what do your notes here reflect?
A These indicate different levels, different option pricing levels. And the first notation shows euro calls .9912 buy and .9914 sell.
Q And what does that mean?
A Well, those were strike prices for the contemplated European call option strike prices.
Q There's two of them. One is a buy and one is a sell. What does that mean?
A That would mean selling, buying a contract at .9912 strike price and selling a contract at .9914.
Q What is the economics of something like that?
A Well, it's a spread trade. One of the benefits of doing that is that if you are purchasing

options, you need to fund that position. If you simultaneously sell options, you're receiving option, you're receiving money, so your out-of-pocket expense is lower.

Q Okay.

A The benefit, added benefit is you can control more currency with fewer out-of-pocket dollars.

Q Is that a description of a spread, I think you said?

A It's of one type, yes.

Q Okay, and what were the economics of this particular spread trade and with a euro call of .9912 and a, excuse me, a euro call where you would buy at .9912 and sell at .9914?

A Well, that's hard to know exactly because I didn't indicate where the euro was trading at that moment, but presumably it was lower. So if you were buying, if you had a bullish position on the euro, you were hoping for the appreciation to that level.

Q Does this reflect like if the euro was lower than this, that this would be a bullish trade?

A This would be a bullish trade on the euro.

Q Okay, and what's the next one? Can you explain that one?

A Yes. SFR is the symbol for Swiss franc. Now puts, which is a different type of option, 1.7027 buy and 1.7029 sell. And very similarly to what I just described, these are option positions or strike prices that were being contemplated for a separate pair of options contracts on the Swiss franc.

Q And would the economics work generally the same with respect to the Swiss franc in relationship to the spot price of the Swiss franc?

A They would be similar, yes.

Q Now, turning your attention now to what is marked at JFW 1304, can you describe what these notes refer to?

A Yes, these are notes taken in another conversation with David Parse.

Q And when did this conversation occur?

A In late March of 2000.

Q And was this by telephone?

A Yes, it was.

Q And who was on the telephone call?

A David Parse and me.

Q Was there anybody else?

A Not that I remember.

Q Okay. Would you please explain what these notes mean?

A Yeah, these notes are talking to the specifics of a transaction, the very specifics. So the first notation is 1 percent paid on Thursday.

Q What does that mean?

A What it means is that that's the option premium that I would pay is 1 percent.

Q Okay.

A And Thursday was, you know, the upcoming time where we put this trade on or where it would need to be paid for.

Q Okay. What does the next line say?

A The next line says Friday or Monday, 1 percent goes to Deutsche in London.

Q And what does the next line say?

A Next week sign paper assigning LLC, this is a little hard, transfer to partner, and that's a fragment, but I think that means partnership.

Q Okay, and what about the next line?

A Expire either worthless.

Q And what does that mean?

A Well, that's a fragment too, because there was, one outcome of the option positions was that they would expire worthless, but I knew there to be other --

Q What were the other options? What were the

other alternatives?

A That they would expire with significant value.

Q And by significant value, what do you mean by that?

A Well, this is getting now to the very specifics of the trade that I engaged in. And significant value would be, mean doubling my money or having a 200 times return on my money.

Q Okay, and what does the next line say?

A The next line says partnership gets assigned to the S corp.

Q All right, and what does the next line provide?

A The next line, again a little hard, then we liquidate what's in partnership to S corp, is what I think it says.

Q Okay, and what about the next line, www?

A WWW, I'm not certain. I think that's a symbol. I think that's a stock symbol. I just don't remember what that, significance of that.

Q All right. The next line, could you please tell us what you wrote there?

A Yes, what I wrote there is hope for two things, (1) volatility, and (2) guess right.

Q And what does that mean?

A Well, that talks to what I was hoping or expecting would happen during the term that these option trades were outstanding. And the first was that you have volatility so that the spot rate would go up to and through the option price whereby you would be in the money. And you also hoped for a guess-right, so directionally, you have to guess right on which way the underlying currencies would move.

Q Now there's a bracket around some other notations. What do --

THE COURT: If we go down to those, indulge me, right before www is dot single dit dit, would you read that again? Is it later we liquidate?

THE WITNESS: It said, no, I think what that says is then we liquidate what's in partnership --

THE COURT: What's in partnership.

THE WITNESS: -- to S corp.

THE COURT: Thank you. Go ahead. We're in the bracket.

BY MR. KOLEK:

Q In the bracket. Can you explain to us what's in the bracket there?

A More scribblings. The first one says dollar-cross, and this is referring to dollar-ross

versus another currency. The second one says high volatility, in parentheses in the next three weeks. So this is presumably around a trade of a duration of about three weeks hoping for high volatility. The next one says, I think it says a couple of currencies, hard to know. Below that is CHF which is the symbol for Swiss franc.

Q What's in the parenthetical?

A Where I actually write out Swiss franc, is that what you're referring to?

Q Okay, thank you.

A CHF is a symbol for Swiss franc.

Q And then the next line?

A The next line it says half money bearish euro or alternatively or bullish, and opposite on CHF. And the CHF is, again, the symbol for a Swiss franc. So we were, again, referring here very closely to the transaction that I engaged in.

Q And then it says one trade.

A One trade.

Q What does that mean?

A It's one, when it says one trade it's very clearly different option positions, but I think when I said one trade it's referring to settlement date being the same, the expiration date being the same.

Q And then what's below that, Mr. Welles?
A Below that reads everybody contributes, and what I believe I meant there was that all the members of the Stobie Creek partnership contribute options in the partnership. And below that it says 200M dollar, that's $200 million dollar amount. The euro is going in two directions, 100 million bullish euro versus dollar, and the other direction 100 million bearish Swiss franc versus dollar.
Q And what's below that?
A Below that, all flows into same LLC.
Q And then below that?
A Then hope for volatility in dollar in the next three weeks.
Q Okay. Were you aware that there was a high correlation in the way in which the euro and the Swiss franc traded?
A Yes.
THE COURT: Why don't you ask him what he knows about the correlation.
BY MR. KOLEK:
Q Do you know if there was a correlation between the Swiss franc and the euro?
A I knew that there was a strong correlation, yes.

Q And what was that correlation?
A That correlation, I guess, would be called a positive correlation whereby a currency has tended to move in the same direction. As one currency strengthens, the other would as well.
Q All right. I'd like to just move on now to JFW 1305. Would you tell us what your notes reflect there?
A Yes. The first line says one trade hits in next three weeks and you, and that's a fragment.
Q What did you mean by that?
A What I meant by that is if one trade hits and you win, you profit.
Q And then below that?
A Below that says euro bull or bear spread need.
Q What does that mean?
A And that's another fragment. And what I did not continue to write was you need volatility.
Q And what's below that?
A The, below that opposite position is, I'm having trouble reading that --
THE COURT: Correlated?
THE WITNESS: Yes, it's correlated. Yes, I think, thank you, Your Honor. Maybe the originals are

better. I believe that says opposite position is correlated, or in correlated I believe it says.

BY MR. KOLEK:

Q Let me show you what is the original of your notes, if that helps.

A Okay, see if that helps. Yeah, that's better. What it reads is opposite position in correlated.

Q And what does that mean?

A Taking an opposition or option trade in a correlated currency.

Q And below that what is stated?

A Below that says taking half the guess off and want number 1 volatility, and number 2 correlation, I'm not sure I can understand what I wrote there.

Q Then you've got a series of stars, is that correct?

A Yes, I do.

Q And what does that signify?

A The end of a conversation, the beginning of the next one.

Q And with whom was this conversation?

A This was another conversation with David Parse.

Q And when did this conversation take place?
A In late March of 2000.
Q And where we you at the time?
A I was at my desk in New York.
Q And where was Mr. Parse?
A At Deutsche Bank in Chicago.
Q And can you explain to the Judge what's reflected there?
A Yeah, that would be hard for you to read, Your Honor, but that means to me 2 million premium. In other words, 2 million in option premium. And below that says get 4MM, 4 million back plus or minus 30 percent.
Q And what does that mean, Mr. Welles?
A That was the probability that David Parse was assigning to the outcome whereby we would double our option premium.
Q So he was saying that there was a plus or minus 30 percent chance that you would double your money?
A Yes.
Q And what about the next line?
A The next line says 2 million premium goes to zero is 70 percent.
Q And what does that mean?

A What that means is that he was indicating what he viewed as a probability of the option premium expiring worthless, so in other words going to zero was something on the order of plus or minus 70 percent.

Q And I think that there's one final line on that page, is that correct?

A Yes, two correlated currencies split it up.

Q And what did that mean?

A That was the notion of taking opposite points of view on a correlated pair of currencies.

MR. KOLEK: The last two pages on the exhibit, JFW 1306 and JFW 1307, I really didn't have any questions at this time with respect to that. It's now about 5:25, Your Honor. You wanted to break around 5:30. Would now be a good time to break?

THE COURT: Yes. I'll read the exhibits on the record.

MR. KOLEK: Thank you. Off the record.

(Off the record.)

THE COURT: Okay, we're two hours roughly into the Plaintiffs today, we admitted Plaintiff's 143, 154, no more handwriting for Mr. Welles, 184.

MR. JOHNSON: I have 36, Your Honor. It was this morning, formation of JFW Enterprises, LLC and --

THE COURT: I'm sorry. Was this document admitted?

MR. CROWL: It was, Judge.

THE COURT: My mistake, thank you. You're getting good at this, Mr. Gibson. Watch out, you'll be a politician.

(Laughter.)

MR. JOHNSON: I'm not a politician, Your Honor.

THE COURT: Only the ones we discussed, of course, were admitted. I'll caution you. I'm not doing that individually because you didn't do it by number, and if you want us to make the record clear, I'll go over it tonight and tell you which tab. Assuming it's not a problem, we admitted 36 today as to the tabs that we discussed with Mr. Waterman.

And then for the government, did we admit Defendant's 42 with Mr. Herpe or not? We may have discussed it but not admitted it. My notes reflect it wasn't admitted.

MR. CROWL: And ours do as well, Judge.

THE COURT: That may have been the one yesterday. Then we admitted 93 for Defendant, Defendant's 112, Defendant's 305, 326, 327, Defendant's 371, Defendant's 377, Defendant's 453,

Defendant's 572, 573, 574, Defendant's 669, 684 and 715.

MR. CROWL: Yes, Judge.

THE COURT: We'll go off the record now. We'll resume tomorrow morning at 9:00 a.m. Thank you very much, Mr. Reporter, and we'll have the changing of the guard at that time. Off the record.

(Whereupon, at 5:32 p.m., the hearing in the above-entitled matter was adjourned to resume April 11, 2008, at 9:00 a.m.)

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

REPORTER'S CERTIFICATE

DOCKET NO.: 0574807-5205

CASE TITLE: Stobie Creek Investment

HEARING DATE: April 10, 2008

LOCATION: Chicago, Illinois

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: April 10, 2008

Adrian Holquin
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N. W.
Washington, D. C. 20005-4018